# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SIERRA CLUB                    )
     408 C Street, NE                 )
     Washington, DC 20002,        )
                                   )
CLEAN WATER ACTION       )          No. _____
     4455 Connecticut Ave NW, A300 )
     Washington, DC 20008-2328, )
                                     )
GULF RESTORATION NETWORK   )
     338 Baronne Street, Suite 200 )
     New Orleans, LA 70112, )
                                     )
CHRIS LOY                         )
     7513 E. Veve Lane              )
     Tampa, FL 33610,              )
                                     )
RICHARD SOMMERVILLE        )
     16205 Larson Lane             )
     Hudson, FL 34667,            )
                                     )
              Plaintiffs,          )
                                     )
              v.                  )
                                     )
LT. GEN. ROBERT L. VAN ANTWERP )
     U.S. Army Corp of Engineers )
     Chief Counsel's Office )
     441 G. Street, NW )
     Washington, D.C. 20314 )
                                     )
DIRK KEMPTHORNE,           )
     Secretary, U.S. Department )
     of the Interior, )
     1849 C Street, NW )
     Washington, D.C. 20240, )
                                     )
     and                        )

DALE HALL,                                    )
   Director,                   )
   United States Fish and      )
   Wildlife Service,           )
   1849 C Street, NW           )
   Washington, D.C.  20240,    )
                               )
     Defendants.     )
_____)

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  This case challenges the United States Army Corps of Engineers' ("ACOE's" or "Corps'") unlawful issuance of a Clean Water Act section 404 permit for the dredging and filling of wetlands and surface waters, and the United States Fish and Wildlife Service's ("FWS's" or "Service's") unlawful issuance of a concurrence letter that the permit will not adversely affect federally listed species.  More specifically, this case challenges the Corps' permit for the destruction of federally protected wetlands and surface waters in order to allow construction of a massive mall and commercial complex called Cypress Creek Town Center ("CCTC") - containing over two million square feet of retail space, half a million square feet of office space, hundreds of residences and hotel rooms and over sixteen thousand parking spaces - without statutorily required consultation on impacts to federally listed species and avoidance and minimization of impacts to wetlands.

2.  The CCTC site contains habitat for three federally listed species, the Wood Stork, the Eastern Indigo Snake, and the Florida Scrub Jay.  The site's southern portion has been designated by Pasco County, Florida, as a "critical wildlife linkage" given its location between other conservation lands in the area.  Adjacent to the site is Cypress Creek, designated an "Outstanding

Florida Water" by the State of Florida, and a major tributary for the Hillsborough River, the primary municipal water supply for Tampa. The wetlands remaining on site, and ultimately Cypress Creek itself, are to receive the storm water discharge from the development. The development itself will place massive demands on limited water supplies while paving groundwater recharge areas that currently exist on site.

3. The Corps required no reduction in the size of the mall, or the number of its parking spaces, or multi story buildings or parking garages, despite the massive size of the complex, its impact to wildlife and threatened and endangered species habitat, its impacts on wetlands and Cypress Creek, and its implications for groundwater depletion. The Corps did not require the applicant to pursue any alternatives that would avoid or minimize unnecessary impacts to these resources.

4. The Plaintiffs now file suit alleging the following claims: 1) the Corps' issuance of the permit without engaging in formal section 7 consultation with the FWS on impacts to the Wood Stork, the Florida Scrub Jay, the Eastern Indigo Snake, and the Manatee, and the FWS's issuance of its concurrence letter and it determination that the project was not likely to adversely affect such species, violated the Endangered Species Act, 16 U.S.C. § 1532 et seq. ("ESA"), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; 2) the Corps' issuance of the permit without requiring that all practicable alternatives be meaningfully analyzed and pursued; without requiring that impacts to wetlands and surface waters be avoided and minimized; without assuring that there would not be significant degradation of waters of the United States; and without meaningfully examining the secondary and cumulative impacts of the project in making its determinations, violated the Clean Water Act, 33 U.S.C. § 1344 et seq. ("CWA"), and the APA,

3

5 U.S.C. § 706; and 3) the Corps' failure to meaningfully and accurately assess the impacts of the

project, including the secondary and cumulative impacts of the project and potential alternatives,

in its Environmental Assessment ("EA"), and the Corps' refusal to prepare an Environmental

Impact Statement ("EIS"), violated the National Environmental Policy Act, 42 U.S.C. § 4321 et

seq. ("NEPA"), and the APA, 5 U.S.C. § 706.

5.   Plaintiffs seek remand of the Corps' permit and the FWS's concurrence letter so that

the Corps can consult with the Service to accurately assess the impacts to threatened and

endangered species, and identify adequate means to prevent, mitigate and/or offset such impacts.

Plaintiffs also seek remand to compel compliance with the Clean Water Act requirement that

impacts to wetlands and waters be avoided and minimized, and to ensure that the remaining

wetlands on site and Cypress Creek itself are not significantly degraded by the construction and

operation of the facility.   To accomplish these objectives, Plaintiffs seek remand so that a full and

accurate assessment of the environmental impacts of the development can be undertaken in an

EIS.

## Jurisdiction

7.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 16 U.S.C. §

1540(g), and 33 U.S.C. § 1365(a).

## Parties

8.   Plaintiff the Sierra Club is a national nonprofit organization of over 750,000 members.

The Sierra Club's members are dedicated to exploring, enjoying, and protecting the wild places of

the earth; to practicing and promoting the responsible use of the earth's ecosystems and

resources; to educating and enlisting humanity to protect and restore the quality of the natural and

4

human environment; and to using all lawful means to carry out these objectives.  The Sierra Club

has chapters throughout the United States.

9.  Sierra Club members enjoy observing, studying, photographing and appreciating

wildlife, including threatened and endangered species such as the Wood Stork, the Florida Scrub

Jay, the Eastern Indigo Snake, and the Manatee, as well as their habitat.  These species depend on

habitat that exists in and around waters of the United States, including Cypress Creek, its

watershed basin, and the lower Hillsborough River which Cypress Creek feeds, as well as habitat

on the CCTC site itself.

10.  The interests of the Sierra Club, and of its members, both now and in the future, in

observing, studying, and otherwise enjoying wildlife such as the Wood Stork, the Florida Scrub

Jay, and the Eastern Indigo Snake, in their natural habitat, including Cypress Creek and the

wetlands and uplands in its basin, are harmed by the defendants' issuance of the section 404

permit, because activities permitted as a result of the permit and the concurrence letter, including

the destruction of habitat for such species, are harming and contributing to the extirpation of the

Wood Stork, the Eastern Indigo Snake, and the Florida Scrub Jay, and reducing their opportunity

to observe other species, and absent the issuance of the permit and the concurrence letter, the

permitted activities would not occur.

11.  Sierra Club members also enjoy hiking, kayaking and canoeing in and around wild and

scenic wetlands, rivers, and streams throughout the United States, including Hillsborough River

and Cypress Creek.  Sierra Club members have canoed on Cypress Creek for well over a decade.

They do so because they enjoy the natural tranquility of such areas, because they appreciate its

scenery, and because they enjoy experiencing, observing and exploring the natural flora and fauna

in the environment around them.  The Sierra Club has sponsored "Inner City Outings" for its

members and children and residents of the inner city in which it takes them to conservation lands

near metropolitan areas like Tampa, including to Cypress Creek.  In addition, Sierra Club and its

members rely upon such resources, including Cypress Creek, both directly and indirectly such as

through use of recharged groundwater, for water for drinking and for other household uses.

12.  The interests of the Sierra Club and its members in recreating in and utilizing such

wetlands, rivers and streams, including Cypress Creek, are harmed by the defendants' issuance of

the section 404 permit because the permit will lead to the destruction and degradation of such

waters and their surrounding environment, and the degradation and depletion of drinking water

and groundwater, and absent the issuance of the permit the destruction and degradation of the

waters would not occur.

13.  Plaintiff Clean Water Action is a national organization of over one million members

dedicated to protecting and improving the quality of all of America's waters, and the aquatic

ecosystems of which those waters are a part.  Clean Water Action seeks to protect wetlands, lakes

and streams, and in so doing, to protect their ecosystems, the flora and fauna that are part of

them, and the clean and healthy drinking water they provide for Americans nationally.  Clean

Water Action seeks to help its members press for the enforcement, and advancement, of the

nation's environmental laws among national decision-makers like the Corps, and expends funds

educating the public about the value of aquatic ecosystems and the consequences of the Corps'

issuance of permits.

14.  Clean Water Action's members enjoy exploring the nation's wetlands, rivers, and

streams, including Hillsborough River and Cypress Creek, and observing the flora and fauna

therein, including threatened and endangered species such as those implicated by this project. They depend upon the water that the nation's wetlands, rivers and streams, including Hillsborough River and Cypress Creek, provide - both directly and indirectly such as through groundwater recharge - for drinking and other household uses.

15.  The interests of Clean Water Action's members in observing, studying, and otherwise enjoying the flora and fauna of ecosystems, including threatened and endangered species, are harmed by the defendants' issuance of the section 404 permit because activities permitted as a result of the permit reduce Clean Water Actions' members' opportunity to observe such flora and fauna, and absent the issuance of the permit, the permitted activities would not occur.  The interests of Clean Water Action's members in recreating in such wetland, rivers and streams, and utilizing the drinking water they provide, are also harmed by the defendants' issuance of the section 404 permit, because the permit will lead to the destruction and degradation of such water resources, and absent the issuance of the permit, the destruction and degradation of the waters would not occur.  Clean Water Action is also injured because the Corps' noncompliance with the ESA, the Clean Water Act, and NEPA, including with regard to the permit at issue in this case, causes Clean Water Action to have to expend additional funds informing the public as to the importance of wetlands, the requirements of the law, and the Corps' failure to implement the law and protect such wetlands.

16.  Plaintiff Gulf Restoration Network ("GRN") is a non profit membership corporation comprised of organizational and individual members dedicated to restoring the Gulf of Mexico and its connected watersheds and ecosystems to an ecologically and biologically sustainable condition.  GRN and its members have worked to raise the awareness of the pollution and

degradation of the Gulf of Mexico and its contributing coastal watersheds, have opposed

development that will degrade water quality and destroy wetlands, aquatic ecosystems, and

related uplands, and have worked to protect habitat for flora and fauna of the region, particularly

rare, threatened and endangered species, including for example, the Manatee.  GRN seeks to

educate and inform people nationally as to the condition of the Gulf of Mexico and its

contributing watersheds, to inform them of the impacts that their activities have on these natural

resources, and to encourage and facilitate changes in their behavior to reduce those impacts

17.  Members of GRN enjoy recreating in conservation lands and waters in the Gulf of

Mexico region, including in Florida and in the Hillsborough River watershed in particular.  For

example, Joseph Murphy, a member of GRN, has canoed regularly in the Hillsborough River

watershed since the late 1980's, logging hundreds of hours in the Hillsborough River watershed,

and plans to continue to do so.  He lives in the Tampa Region and over the last fifteen years or so

he has worked to canoe every significant tributary to the Hillsborough River.  As part of this

continuing plan, he expects to canoe the entire fifty four mile stretch from Green Swamp, down

Cypress Creek to Tampa Bay, in the future.  Members of GRN, like Joseph Murphy, also hike

through the conservation lands in the Hillsborough River and Cypress Creek watersheds

numerous times, and Joseph Murphy drives past the Cypress Creek site on a weekly basis.

18.  GRN's members recreate in such areas, including the lands and waters in the

Hillsborough River area, because they derive a sense of peace and happiness from being in the

natural environment.  They enjoy observing and/or looking for various flora and fauna in the area,

including rare species such as the Wood Stork, the Manatee, the Eastern Indigo Snake, and the

gopher tortoise.  GRN's members that live in Tampa also rely upon the Hillsborough River, and

8

Cypress Creek, for drinking water and other uses.

19.  The interests of GRN and its members in recreating in and utilizing such wetlands, rivers and streams, including Cypress Creek, are harmed by the defendants' issuance of the section 404 permit because the permit will lead to the destruction and degradation of such waters and their surrounding environment, and the degradation and depletion of drinking water and groundwater, and absent the issuance of the permit the destruction and degradation of the waters would not occur.

20.  The interests of GRN, and of its members, in observing, studying, and otherwise enjoying wildlife such as the Wood Stork, the Manatee, and the Eastern Indigo Snake, in their natural habitat, including Cypress Creek and the wetlands and uplands in its basin, are harmed by the defendants' issuance of the section 404 permit, because activities permitted as a result of the permit, including the destruction of habitat for such species, are harming and contributing to the extirpation of the Wood Stork, the Manatee, and the Eastern Indigo Snake, and reducing their opportunity to observe other species, and absent the issuance of the permit, the permitted activities would not occur.

21.  Plaintiff Chris Loy is a Sierra Club member and has been a resident of the Tampa metropolitan area for 9 years.  He currently lives on the Hillsborough River and his backyard forms part of the river's bank.  He canoes and swims in the Hillsborough River from his back yard.  The water quality in the Hillsborough River behind his house is directly affected by the quality and quantity of water that flows into it, and removed from it for municipal water supplies. For example, when water is diverted from the Hillsborough River for municipal drinking water supplies, the river behind his house changes from its clear dark color, like tea, to a murky color.

9

When the water is a murky color Mr. Loy can no longer swim in the water.

22. Mr. Loy draws his home water from a well on his property. His children drink Tampa's municipal water at school, and he uses Tampa's municipal water at his office.

23. Mr. Loy exercises in the natural environment in his community. He has canoed approximately 80% of the rivers in west central Florida. Most frequently he canoes the Hillsborough River, about 18-22 times a year, including 6-10 times a year in the upper Hillsborough River near where the Cypress Creek enters the Hillsborough River. He also canoes with his children on the Hillsborough River near his house. Approximately three or four times a year he hikes and bikes in the public conservation lands in the Hillsborough River and Cypress Creek basin, including conservation lands that are adjacent to, and within approximately a quarter mile of, the CCTC site. He frequently drives past the CCTC site.

24. Mr. Loy enjoys recreating in these lands and waterways because he enjoys the solitude and the escape from crowded urban areas. He enjoys the scenery and the plants and wildlife he observes, including among others the Wood Stork, egrets and ibis. For example, he enjoys traveling to one particular conservation land adjacent to the CCTC site. The conservation land has a wide body of water with an island in it that is approximately one half to one mile from the CCTC site. On the island he can see Wood Storks, ibis, cattle egrets, white egrets, snowy egrets, little blue herons, tricolored herons, and anhingas.

25. The interests of Mr. Loy in observing, studying, and otherwise enjoying the flora and fauna of the Hillsborough River and Cypress Creek basins, including for example Wood Storks, egrets and ibis, are harmed by the defendants' issuance of the section 404 permit, because activities permitted as a result of the permit, including the destruction of habitat for such species,

10

are harming and contributing to the extirpation of listed species such as the Wood Stork and the Eastern Indigo Snake, and reduce his opportunity to observe wild flora and fauna, and absent the issuance of the permit the permitted activities would not occur. Similarly, the interests of Mr. Loy in recreating on such lands, wetlands, rivers and streams, and utilizing the drinking water they provide, are harmed by the defendants' issuance of the section 404 permit, because the permit will lead to the destruction and degradation of such resources, and absent the issuance of the permit, the destruction and degradation of such resources would not occur. Mr. Loy is also adversely affected by the sight of the CCTC development's clearing activities in and/or among the lands he has enjoyed recreating in.

26. Plaintiff Richard Sommerville has resided in the Tampa region for approximately twenty two years, and in Pasco County for about eight years. He obtains his water from a well on his land that draws from the underground aquifers in the area.

27. Plaintiff Sommerville enjoys exploring and recreating in the natural environment in his community. He has swum, canoed, hiked and biked in watersheds and river and stream basins around Tampa since he moved to the region.

28. Mr. Sommerville has canoed Cypress Creek on a number of occasions, including past the CCTC site location. On his last canoe trip on Cypress Creek he could hear the construction from the CCTC site as he canoed the creek. He could see murky water draining off of the site, and where it entered Cypress Creek it degraded Cypress Creek, turning it from a clear dark color like tea to a light creamy murky color. Upon grounding on the opposite bank from the CCTC site he could see the construction equipment and the construction zone, and the area was cleared of vegetation.

11

29. Mr. Sommerville recreates in such natural areas because he draws peace from being in its solitude. He also enjoys seeing the natural flora and fauna, and he looks for rare and/or listed species such as the Wood Stork, the Eastern Indigo Snake, the Florida Scrub Jay, and the gopher tortoise. Indeed, he maintains his own property in a somewhat natural condition, with indigenous plants and animals including 6 active burrows with numerous adult gopher tortoises.

30. The interests of Mr. Sommerville in observing, studying, and otherwise enjoying the flora and fauna of the Hillsborough River and Cypress Creek basins, including the Wood Stork, American Alligator, the little blue heron, egrets and ibis, for example, are harmed by the defendants' issuance of the section 404 permit because activities permitted as a result of the permit, including the destruction of habitat for such species, are harming and contributing to the extirpation of the Wood Stork, the Florida Scrub Jay, and the Eastern Indigo Snake, and reducing his opportunity to observe these and other species like the gopher tortoise, and absent the issuance of the permit the permitted activities would not occur. Similarly, the interests of Mr. Sommerville in recreating in such lands, wetlands, rivers and streams, and utilizing the drinking water they provide, are harmed by the defendants' issuance of the section 404 permit, because the permit will lead to the destruction and degradation of such resources, and absent the issuance of the permit, the destruction and degradation of the waters would not occur.

31. Defendant Lt. Gen. Robert L. Van Antwerp is the Chief of Engineers for the United States Army Corps of Engineers and is responsible for ensuring that the Corps complies with the requirements of the CWA, NEPA and the APA.

32. Defendant Dirk Kempthorne is the Secretary for the Department of the Interior, the Department that is responsible, with the Department of Commerce, for the implementation of the

ESA.

33.  Defendant Dale Hall is the Director of the Fish and Wildlife Service, the agency

within the Department of the Interior that is charged with implementation of the ESA, and he is

responsible for ensuring that the Service complies with the requirements of the ESA and the APA.

### Statutory Scheme Relating to Plaintiffs' Claims

**A.      Endangered Species Act**

34.  Congress enacted the Endangered Species Act ("ESA" or "Act") with the express

purpose of providing both "a means whereby the ecosystems upon which endangered and

threatened species depend may be conserved, [and] a program for the conservation of such

endangered species and threatened species . . . ." Id. at § 1531(b).  To achieve this purpose, the

Act imposes various duties, detailed below, on the Secretary of the Interior and the Secretary of

Commerce, duties which have been delegated to the United States Fish and Wildlife Service (the

"Service" or "FWS") and the National Marine Fisheries Service ("NMFS").  50 C.F.R. §

402.01(b).

35.  The Act affords protections to species listed as "endangered" or "threatened."  16

U.S.C. § 1532(6), (16), (20).  Section 9 of the Act and implementing regulations proscribe the

"take" of endangered and threatened species, 16 U.S.C. § 1538(a)(1), see also, 50 C.F.R. §§

17.21, 17.31, which is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture,

or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The ESA's

prohibitions extend to any person's "attempt to commit, solicit another to commit, or cause to be

committed, any offense defined" in the ESA.  Id. at § 1538(g).  The term "person" includes "any

officer, employee, agent, department, or instrumentality of the Federal Government . . . ."  16

U.S.C. § 1532(13).  The ESA also requires the Service to "develop and implement . . . 'recovery plans' . . . for the conservation and survival of endangered species and threatened species . . . ." 16 U.S.C. § 1533(f)(1).

36.  Section 7 of the ESA mandates that each federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2).  The FWS has promulgated regulations implementing the consultation requirements of section 7.  50 C.F.R. Part 402.  Under the section 7 regulations, each federal agency must review its actions and determine if they "may affect" an endangered or threatened species.  50 C.F.R. § 402.14(a).  If an action "may affect" an endangered or threatened species, the agency must engage in "formal consultation" with the FWS, unless the FWS "concur[s]" in writing that the action is not likely to "adversely affect" any threatened or endangered species.  Id. at § 402.14(b).  The federal agency responsible for consulting with the FWS must prepare and provide to the Service a "biological assessment" of the effects of the proposed action on any endangered or threatened species, which includes "the best scientific and commercial data available . . . for the adequate review of the effects that an action may have upon listed species . . . ."  50 C.F.R. § 402.14(c), (d).  In fulfilling its formal consultation requirements under section 7, the FWS is required to evaluate the status of the listed species, "evaluate the effects of the action and cumulative effects on the listed species," and "formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species," after the review of all relevant information.  50 C.F.R. §§ 402.14(g)(2)-(4).

37.  The conclusion of the consultation process is the issuance of the Service's "biological opinion," "detailing how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and setting forth the Service's opinion whether the action is "likely to jeopardize" the continued existence of a listed species.  50 C.F.R. § 402.14(h)(3).  If the FWS determines that an action is unlikely to jeopardize a species, but will result in the take of a species, the FWS must issue an "Incidental Take Statement" in which it must identify the anticipated impact to the species, reasonable and prudent measures to minimize such impact, and "terms and conditions" that must be complied with to implement the reasonable and prudent measures.  16 U.S.C. § 1536(b)(4).  If the FWS determines the action is likely to jeopardize a listed species, the Service must specify "reasonable and prudent alternatives" to insure that such jeopardy is not likely to occur.  16 U.S.C. § 1536(b)(3)(A).

**B.**     **The Clean Water Act**

38.  Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA prohibits the discharge of any pollutant into the waters of the United States, including wetlands, without a permit.  33 U.S.C. § 1311(a).  The term "pollutant" includes "dredge spoil," "solid waste," "rock, sand, cellar dirt and industrial . . . waste discharged into water."  33 U.S.C. § 1362(6).

39.  Section 404 of the CWA authorizes the Army Corps of Engineers to issue permits for the discharge of "dredged or fill materials" into waters of the U.S.  Before any such permit can be issued, however, the Corps must comply with two sets of regulations – "404 Guidelines" issued by the Environmental Protection Agency, see 40 C.F.R. §§ 230.1-230.80, and the Corps' own

section 404 regulations.  See 33 C.F.R. Parts 320-330.

40.  The EPA's 404 guidelines provide that "[f]rom a national perspective, the degradation or destruction of . . . wetlands, is considered to be among the most severe environmental impacts," and "[t]he guiding principle should be that degradation or destruction of [wetlands] may represent an irreversible loss of valuable aquatic resources."  40 C.F.R. § 230.1(d).  As a result, "[d]redged or fill material should not be discharged into the aquatic ecosystem [wetlands], unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  Id. § 230.1(c).

41.  The EPA's section 404 guidelines establish several prohibitions to discharges to wetlands.  First, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem . . . ."  40 C.F.R. § 230.10(a).  The inquiry into practicability goes to both on-site and off-site - that is "internal" and "external" - alternatives.  Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85336, 85339, Dec 24, 1980 ("1980 Notice");  Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 44 Fed. Reg. 54222, 54223, September 18, 1979 ("1979 Notice").

42.  An alternative is deemed practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  The inquiry into "cost" involves whether the alternatives to be considered are "reasonable in terms of the overall scope/cost of the of the proposed project";  under such an analysis, an alternative is not practicable if it is "unreasonably expensive."  1980

Notice, 45 Fed. Reg. at 85339, 43.

43. The EPA's guidelines establish a strong presumption that there are practicable alternatives to the discharge of fill to wetlands if the activity to be permitted is not "water dependent," that is, if it "does not require access or proximity to or siting within" a wetland "to fulfill its basic purpose," such as a marina. 40 C.F.R. § 230.10(a)(3). It is the burden of the applicant to rebut the presumption by "clearly demonstrat[ing]" "that there is no other practicable alternative that would avoid or minimize the wetlands losses." Id. § 230.10(a)(3). "In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." Id. at 85348 (emphasis added).

44. A second prohibition to issuing a permit under the EPA's 404 guidelines is that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). "[E]ffects contributing to significant degradation considered individually or collectively, include:[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites." Id.; see also id. at § 230.10(c)(2), (3), (4). "Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients [or] purify water."). 40 C.F.R. § 230.10(c)(3). "Significant" in this context means anything that is more than "more than trivial." 1980 Notice, 45 Fed. Reg. at 85343.

45. A third prohibition under the 404 Guidelines is that - even if the Corps finds that there

are no practicable alternative for a proposed project - "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). "[A]ll reasonable reduction in impacts [must] be obtained." 1980 Notice, 45 Fed. Reg. at 85344. The 404 regulations further specify "[s]ome of the ways" to minimize the effect of the discharge, including, for example, "confining the discharge to minimize smothering of organisms," and "[d]esigning the discharge to avoid a disruption of periodic water inundation patterns." 40 C.F.R. § 230.70.

46.   Under the Corps' own regulations, the public notice requirements mandate that section 404 permit applicants include in the permit all activities "reasonably related" and provide a complete description of such activities "sufficient for public notice." 33 C.F.R. §§ 325.1(d)(1)-(2).  Once the application is complete, the Corps must issue a public notice soliciting comments from interested persons.  33 U.S.C. § 1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3.  The public notice is the "primary method of advising all interested parties of the proposed activity . . . and of soliciting comments and information necessary to evaluate the probable impact on the public interest." 33 C.F.R. § 325.3(a).  Thus, the notice must include "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment;" and it must include a description of the proposed activities, and all "available information which may assist interested parties in evaluating the likely impact of the proposed activity . . . ." Id.  A public hearing must be provided "whenever a public hearing is needed for making a decision," 33 C.F.R. § 327.4(a), and requests for a public hearing "shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is otherwise

no valid interest to be served by a hearing." Id. at § 327.4(b). "In case of doubt, a public hearing

shall be held." Id. at § 327.4(c).

47. The Corps' regulations provide that "[n]o permit will be granted which involves the

alteration of wetlands identified as important" unless the Corps finds, after its "public interest

review," that "the benefits of the proposed alteration outweigh the damage to the wetlands

resource," and that the proposed alteration is necessary to realize those benefits. Id. § 320.4(a),

(b). In its review the Corps must consider "[a]ll factors which may be relevant to the proposal"

including "the cumulative effects" of the project, 33 C.F.R. § 320.4(a)(1), and it must consult

with the Service "with a view to the conservation of wildlife resources by prevention of their

direct and indirect loss and damage due to the activity proposed in a permit application." 33

C.F.R. § 320.4(c).

48. The Corp's regulations provide eight criteria for determining whether any given

wetlands are "important to the public interest," including: whether their alteration "would affect

detrimentally natural drainage characteristics, [or] sedimentation patterns; whether they "serve as

valuable storage areas for storm and flood waters;" whether they "are ground water discharge

areas that maintain minimum baseflows important to aquatic resources and those which are prime

natural recharge areas;" whether they "serve significant water purification functions;" and whether

they are "unique in nature or scarce in quantity to the region or local area." 33 C.F.R. §

320.4(b)(2).

C.      The National Environmental Policy Act

49. NEPA is the "basic national charter for protection of the environment." 40 C.F.R. §

1500.1(a). NEPA has two sets of implementing regulations for actions against the Corps:

19

regulations promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. § 1500 et

seq., and regulations promulgated by the Corps itself. 33 C.F.R. § 230.1.

50.   NEPA's purpose is to "insure that environmental information is available to public

officials and citizens before decisions are made and before actions are taken," and "to help public

officials make decisions that are based on understanding of environmental consequences . . . ." 40

C.F.R. § 1500.1 (b)-(c) (emphasis added).   NEPA requires all agencies of the federal government

to prepare a "detailed statement" - an Environmental Impact Statement - regarding all "major

federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. §

4332(C).  This duty extends to any federal actions that "will or may" have a significant effect on

the environment.  40 C.F.R. § 1508.3 (emphasis added).  The agency must also include in its

review of environment affects possible alternatives, including a no action alternative, and review

the environmental affects of those alternatives.  See 42 U.S.C. § 4332.

51.   NEPA establishes several criteria for determining whether an impact is significant.

Among these are the "degree to which the proposed action affects public health or safety," the

"[u]nique characteristics of the geographic area such as proximity to historic or cultural resources,

park lands, prime farmlands [and] ecologically critical areas," "[t]he degree to which the effects

on the quality of the human environment are likely to be highly controversial," "[t]he degree to

which the action may establish a precedent for future actions with significant effects," "whether

the action is related to other actions with . . . cumulatively significant impacts," and "the degree

to which the action may adversely affect an endangered or threatened species." 40 C.F.R. §

1508.27(b).

52.   In reviewing the effect an action may have on the environment, and in considering the

effects of possible alternatives, the agency must consider the direct, indirect and cumulative impacts on the environment. 40 C.F.R. § 1508.8 ("[e]ffects and impacts . . . are synonymous . . . . [and include] direct, indirect, or cumulative" effects). "Direct effects . . . are caused by the action and occur at the same time and place." Id. "Indirect effects . . . are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." Id. The "[c]umulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

53. When an agency is uncertain whether an activity will have a significant effect on the environment, and thus, whether it has a duty to prepare an EIS, the agency may prepare an Environmental Assessment ("EA") to assist it in determining whether the action may have a significant environmental effect. 40 C.F.R. §§ 1508.9, 1501.4. The EA must include "discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). The agency must "provide sufficient evidence and analysis" of the direct, indirect and cumulative environmental impacts of the proposed action and the alternatives considered to support its "determination whether to prepare an environmental impact statement or

a finding of no significant impact." 40 C.F.R. § 1508.9(1).

54.   If, after preparing an EA, the Corps determines that there will be no significant

impact, it must prepare a "finding of no significant impact" and make the finding available to the

public. 40 C.F.R. §§ 1501.4, 1508.13.  Even if the Corps properly decides that an EIS is

unnecessary, its EA must be sufficiently detailed to adequately address potential impacts and

reasonable alternatives.  Id. § 1508.9.

55.   In addition, CEQ regulations provide that meaningful public participation and

oversight is essential to the NEPA process.  Facilitating public input is a central element of the

NEPA process.  See, e.g., 40 C.F.R. § 1500.1(b) ("[a]ccurate scientific analysis, expert agency

comments and public scrutiny are essential to implementing NEPA"); id. ("environmental

information [must be] made available to public officials and citizens before decisions are made and

before actions are taken").

### Facts Giving Rise To Plaintiffs' Claims

**I.     Cypress Creek Town Center**

**A.     The Cypress Creek Town Center Site - Location**

56.   CCTC is proposed to be built on approximately 507 acres of undeveloped land in

Pasco County, Florida, located near a highway interchange and a state and county road.

Department of the Army Environmental Assessment and Statement of Finding, SAJ-2003-2336

("EA") at 1.  Located between other public conservation lands, the CCTC site forms a

"bottleneck" for wildlife moving between the conservation lands, and Pasco County has

designated parts of it a "critical wildlife linkage" between the conservation lands.  EA at 37.  The

Cypress Creek Preserve, for example, which is owned by Hillsborough County, is downstream

and about 1.25 miles from the site. Also in the vicinity are other protected lands such as the municipal wells that provide drinking water to Tampa Bay Water, the regional supplier to St Petersburg, Tampa, Pinellas County, Pasco County, and Hillsborough County.

57. Pasco County, and the area around the CCTC site, is experiencing rapid development. See, e.g., EA at 50. For example, immediately south of the CCTC site is King Ranch, a site that is over three hundred acres that is currently predominately pasture, and is expected to be a commercial and residential development. Id. at 50. Under construction less than two miles east from the CCTC site is the Wiregrass development, a 5,118 acre project; four miles northwest of the CCTC site is The Grove, another mall under construction; and elsewhere in the county is the "Connerton" project, a 4,931 acre project with five villages.

**B.     The Cypress Creek Town Center Development**

58. CCTC is to be a "regional mall and supporting commercial enterprises, including retail businesses, financial institutions, hotels, restaurants, cinemas, offices and multifamily residential housing." EA at 2  To be built in two phases, it will have over 2,000,000 square feet of retail and commercial space, including department stores, big box stores, a quarter of a million square feet of restaurant space, banks, and a cinema. It will also have hundreds of hotel rooms, hundreds of residences, and almost a quarter million square feet of office space. In addition, over sixteen thousand parking spaces will be paved, accounting for almost half of the wetlands to be lost.

59. To accommodate the increase in traffic, the CCTC project will expand the existing roadways in the area. The developer will either build, or pay for, a new bridge across Cypress Creek, and will extend the existing road network across the site and the creek, to connect it to roads in the south. The developer will also widen existing roads in the area. The CCTC

23

development is expected to induce further growth in the area.

### C.   Cypress Creek Town Center Development Site - Wetlands and Uplands

60.  The CCTC project site itself is approximately 155 acres of wetlands, 9.65 acres of surface waters, and 342 acres of uplands. Corps EA at 1. The CCTC site - predominately pasture and wetlands until this past summer - was zoned Agricultural until the CCTC development was proposed. To allow the construction of the Cypress Creek Town Center development, the site's zoning was changed to MPUD, or Master Planned Unit Development.

61.  The wetlands and surface waters are cypress swamps, mixed wetland forests, freshwater marshes, wet prairies, ditches and small ponds. EA at 1. Together with Cypress Creek, which is immediately adjacent to the site, the wetlands form part of a natural "wetland system consist[ing] of a network of freshwater wetlands adjacent to Cypress Creek." Id. The wetlands on the site represent about one percent of the entire wetland resources of the Cypress Creek Basin. Permit, Attach. 3, p. 22 of 72.

62.  The wetlands on the site provide several important functions. EA at 34-35. First, the wetlands "provide natural biological functions such as foraging and roosting habitat for some species, especially wading birds on a seasonal basis." EA at 34. Among other species actually seen and recorded, the wetlands provide foraging habitat for the Wood Stork, a federally listed species, and several Florida Species of Special Concern: the snowy egret, the tricolored heron, the little blue heron, and the white ibis. Permit Attach 3, p. 18 of 72. The CCTC site is within the core foraging area of five breeding colonies of Wood Storks, EA at 46, and is about 1.3 miles from the nearest Wood Stork colony. Public Notice at 3. Wetlands on the site also provide habitat for the Eastern Indigo Snake, a federally listed threatened species.

24

63. Another important function of the wetlands on the site is flood control. In addition, the Corps has acknowledged that "the wetlands to be filled provide water purification functions." EA at 35.

64. The remaining 67 percent of the site is used for agricultural purposes or is forested, and the vast majority of this land are uplands. Permit, Attach. 3, p. 21 of 72. In addition to providing pasture and forest, the uplands provide important wildlife habitat. Gopher tortoises - a state listed threatened species - occupy uplands pasture. See Permit, Attach. 3, p. 18 of 72. Approximately 25 gopher tortoises and 66 gopher tortoise burrows were identified and ultimately removed by the applicant's biological consultants. July 7, 2007, BRA Relocation Report. These gopher tortoise burrows provide the primary habitat for the Eastern Indigo Snake. See USFWS, Multi-Species Recovery Plan at 4-569, 570. The uplands also provide critical buffers to Cypress Creek and provide a source of groundwater recharge to the underlying aquifer.

**D.   Cypress Creek**

66. Cypress Creek which runs immediately adjacent to the site of the CCTC, see EA at 1, 49, has been designated an "Outstanding Florida Water" by the State of Florida, Fla. Admin. Code Ann. r. 62-302.700(9)(i)(14)(c), meaning that it is "worthy of special protection because of [its] natural attributes." Fla. Stat. Ch. 403.061(27). Most of the remaining Outstanding Florida Waters exist in protected conservation lands such as parks: only a few waters exist in unprotected lands. See http://www.dep.state.fl.us/water/wqssp/ofw.htm. It is Florida's stated "policy to afford the highest protection to Outstanding Florida Waters." Fla. Admin. Code Ann. r. 62-302.700(1).

67. Cypress Creek is also a major tributary to the Hillsborough River which is "the major

source of drinking water for [the] City of Tampa." EA at 41 (emphasis added). Cypress Creek is

an important contributor to the City of Tampa's drinking water, and the Hillsborough River

provides water for approximately 600,000, including the City of Tampa.

## II.     Federally Listed Species Likely To Be Adversely Impacted By The Cypress Creek Town Center And The Cumulative Impacts Of Growth In The Area

### A.     The Threatened Eastern Indigo Snake

68. The Eastern Indigo Snake ("Indigo") - the longest snake in the United States - is a

lustrous, black, docile, non-venomous snake that now exists in only two states, Georgia and

Florida. Eastern Indigo Snake, Multi-Species Recovery Plan for South Florida, USFWS, at 4-

567, 568 ("Multi-Species Plan"). The Indigo needs a mosaic of habitat types, though it is "closely

associated with the gopher tortoise [*Gopherus polyphemus*], the burrows of which provide

shelter." Id. at 4-569.

69. The Indigo has suffered "dramatic population declines" and "any additional threats to

its survival could cause local extirpations." Id. at 4-567, 572 (emphasis added). Today, "habitat

loss and fragmentation by residential and commercial expansion have become much more

significant threats to the Eastern Indigo Snake." Multi-Species Plan at 4-569. In addition,

"human population growth will increase the risk of direct mortality of the eastern indigo snake

from property owners, domestic animals, and highway mortality." Id.

70. Central to the recovery of the Indigo is the protection and enhancement of existing

populations of the species. Id. A second element of recovery is the implementation of the

Eastern Indigo Snake "guidelines" developed by the FWS, which help prevent the direct mortality

of the snake during construction and other activities by providing for the education of

construction workers as to what an Indigo looks like, and mandating that the Indigos be allowed to leave the site.  Id.

**B.      The Threatened Florida Scrub Jay**

71.  The Florida scrub jay is a "30 centimeter (12 inch), bluish-colored, crestless jay . . . [with a] necklace of blue feathers."  FWS, Threatened Status for the Florida Scrub Jay, 52 Fed. Reg. 20715, 20716 (June 3, 1987).  The Florida Scrub Jay is a "relict species of fire-dominated oak scrub habitat that occurs on well-drained sandy soils in peninsular Florida."  Multi-Species Plan at 4-261.  Florida Scrub Jay habitat "consists of dense thickets of scrub oaks less than 3 meters in height, interspersed with bare sand for foraging and storing acorns."  52 Fed. Reg. at 20716.  The Florida Scrub Jay shares its habitat with the Eastern Indigo Snake and the state listed gopher tortoise, which are known to occur with scrub-jays, such that management for one species must consider management for the other species.  Multi-Species Plan at 4-261.

72.  The Florida Scrub Jay was listed because of the "loss, fragmentation and degradation of scrub habitats throughout Florida, due primarily to urbanization, agriculture, and fire suppression."  Id. at 261.  Central to the recovery of the Florida Scrub Jay is the protection, management and enhancement of scrub jay habitat on public and private lands.  Multi-Species Plan at 4-285.  Like the Eastern Indigo Snake, the Florida Scrub Jay's recovery plan also calls for the enforcement of "available protective measure[s]," primarily through section 7 consultations. Id.

**C.      The Endangered Wood Stork**

73.  The Wood Stork, which was listed as endangered by the FWS in 1984, "is the only species of true stork breeding in the U.S."  See FWS, U.S. Breeding Population of the Wood

Stork Determined To Be Endangered, 49 Fed. Reg. 7332 (February 28, 1984). It is "a large, long-legged, white wading bird with an unfeathered gray head and a stout dark bill" that "frequent[s] freshwater and brackish wetlands" to feed and "usually nests in cypress and mangrove swamps." Id. It co-exists with and breeds in colonies with great egrets, snowy egrets, and white ibis. Multi-Species Plan at 4-393.

74.  The "unique feeding method of the Wood Stork gives it specialized habitat requirements." Mult-Species Plan at 4-393. The Wood Stork feeds by using "tactolocation"; essentially it wades through wetlands with its beak partly immersed and open, and when it feels prey it snaps its beak closed on it, lifts its head and swallows it. Id. at 4-399. This requires relatively high prey densities, and a fairly specific, and shallow, water depth, id., and during breeding season, the habitat must close to its breeding colony. Id. at 4-400.

75.  The primary cause of the Wood Stork's decline is the "loss of suitable feeding habitat," which is "especially true for the south Florida rookeries." 49 Fed Reg. 7332. Habitat protection is a primary element to the recovery of the Wood Stork. Wood Stork Recovery Plan, U.S. FWS Southeast Region, 1997, at 16; Multi-Species Plan at 4-417, 418. This requires protection of a "mosaic" of wetlands, foraging sites and roosting sites: "wetlands must, once again, provide at the right locations and times, the food resources that are necessary." Wood Stork Recovery Plan at 16.

**D.    The Endangered West Indian Manatee**

76.  The endangered West Indian manatee currently occupies the lower stretches of the Hillsborough River, as well as Tampa Bay and its marine reserves, which receive waters from Cypress Creek. The manatee is one of the most endangered marine mammals in coastal waters of

28

the United States: according to a 1998 FWS report the "status of the manatee population is, at

best, marginally stable." Florida Manatee Recovery Accomplishments: 1998 Annual Report, at 4.

77. The "major threats to Florida manatees [include] destruction and degradation of

habitat caused by widespread development throughout much of the species' Florida range."

FWS, Southeast Region, Florida Manatee Recovery Plan (Jan 29, 1996) 4. One threat in

particular is red tides, which can be caused and exacerbated by human pollution of water ways.

The species' "survival depends [in significant part] on maintaining the integrity of ecosystems and

habitat sufficient to support a sustainable manatee population," as "[i]ntensive coastal

development is perhaps the greatest long-term threat to the Florida manatee." See id.; US FWS

Manatee Recovery Plan, 2001, at 24-25.

III.    **The Corps' Implementation of Section 404 Of the Clean Water Act**

78. The Corps has been delegated the primary responsibility for implementing the CWA

404 permitting program over the past several decades. A number of studies and reports have

documented the Corps's unsuccessful history of implementation of its section 404 responsibilities.

In 1988 the United States General Accounting Office ("GAO") reviewed the Corps'

implementation of section 404 and concluded that the Corps was not adequately considering

cumulative impacts, and was not requiring permittees to pursue other practicable alternatives.

See The Corps' of Engineers' Administration of the Section 404 Program, GAO, at 3.

79. In 2001, the National Academy of Sciences ("NAS"), in cooperation with the EPA

and with the assistance of the Corps, conducted an in depth review of the Corps' implementation

of section 404 and of the mitigation that the Corps required for wetlands lost as a result of section

404 permits. The principal conclusion of the NAS was that "[t]he goal of no net loss of wetlands

29

is not being met for wetland functions by the mitigation program . . . ." Compensating for

Wetland Losses under the Clean Water Act, National Academy of Sciences, 2001 at 2. The NAS

review also identified several overarching themes, including that: "mitigation sites are not

performing as specified in Corps permits," id. at 103; "where mitigation is performing as

specified, many of those sites do not support [equivalent] functions and values," id. at 103; and

where "the regulatory program may reassemble the landscape" it may do so "with a different

habitat mix than the wetlands being lost." Id. at 109.

80. A 2005 study performed by the GAO arrived at similar findings. It concluded that the

Corps does not adequately ensure that wetlands impacts are being mitigated; that there was only

limited oversight to determine the status of compensatory mitigation; and that few enforcement

efforts were directed at ensuring that permittees accomplished the required mitigation. Wetlands

Protection: Corps Of Engineers Does Not Have an Effective Approach to Ensure That

Compensatory Mitigation Is Occurring, What We Found, General Accounting Office, September

2005.

81. A recent analysis in the St. Petersburg Times titled "Vanishing Wetlands" found that

during the last 14 years alone, at least 84,000 acres of wetlands have been lost in Florida. The

Times analysis found that between 1999 and 2003, the Corps approved more than 12,000

applications for permits to destroy wetlands and rejected one. According to the NAS's review of

literature, in "southeast Florida [a study] of 40 wetland creation and restoration projects found

that only about half of the required 430 hectacres of wetlands had been constructed." NAS Study

at 101 (emphasis added). Another study conducted by the Florida Department of Environmental

Regulation found that of 63 permits issued, only 6% percent achieved permit compliance, and

only 27 % were achieving various tests for ecological functionality and viability.  NAS at 117

(emphasis added).

IV.    **The Corps' Issuance of the CCTC Section 404 Permit and the FWS concurrence Letter**

A.    **The Public Notice and Ensuing Comments**

82.    On October 31, 2005, the Corps issued a Public Notice regarding Sierra Properties

(the "applicant" or "developer") to fill approximately 54 acres of wetlands and 10 acres of surface

waters with 270,418 cubic yards of fill material.  10/31/2005 Corps Public Notice at 1 ("Notice").

The Notice did not identify that Cypress Creek flows into the Hillsborough River, nor that the

Hillsborough River is "the major source of drinking water for the City of Tampa."  EA at 41.  The

Notice did not identify the site's close proximity to municipal wells; the functions performed by

the wetlands being lost, such as flood control, storm water storage, water purification, nutrient

assimilation, and groundwater recharge; the functions performed by the uplands, such as

providing buffers for Cypress Creek and habitat for threatened species; that parts of the site have

been designated a "critical" wildlife habitat corridor for wildlife traveling between protected lands;

the full magnitude of the project, such as the two million plus square feet of retail space, the

hundreds of thousands of square feet of office space, the thousands of parking spaces, nor the

hundreds of planned residences.

83.    The Notice did not identify the potential environmental impacts of the project's

proposed destruction of wetlands and surface waters.  Rather than identify alternatives to the

project or the environmental impacts of those alternatives, the public was advised that it could

separately request a copy of the alternatives analysis prepared by the permit applicant for a fee.

84. Governmental entities, residents and conservation organizations responded to the Notice and objected to the permit issuance on multiple grounds: over two hundred comments were submitted including the comments sent to state agencies. People commenting stressed the lack of substantive information in the Corps' Notice, and they requested a public hearing.

85. Commenters stressed the environmental sensitivity of the site and the likelihood of significant adverse environmental impacts. Among the detailed concerns about the environmental impacts of the development were the following:

- a loss of wetlands leading to a decreased ability to absorb nutrients and urban runoff and pollutants;
- the potential release of pollutants and nutrients from parking lot runoff, fertilizers and pesticides into Cypress Creek and other water bodies;
- the introduction of petrochemicals from increased parking lot storage of cars on the impacted wetlands and associated oils and exhaust;
- the insufficient buffers proposed to protect the remaining wetlands and Cypress Creek itself;
- the increased probability of damage to the watershed of Cypress Creek, which collects diffused surface waters as a tributary of the Hillsborough River, a surface drinking water source for the City of Tampa;
- the loss of flood storage capacities and an increased probability of damage in the event of a tropical storm or hurricane due to loss of protective wetlands and impacts in the 100-year floodplain; and
- the loss of wildlife habitat.

Commenters also stated that a mall was not a "water-dependent activity" and that other practical alternatives existed both on site and off site that should be pursued. They identified other potential sites for the mall, and they identified means by which the mall could be reconfigured or re-planned to avoid and or minimize impacts.

86. Commenters also challenged the Corps' reliance on mitigation. They provided information demonstrating that the Corps' mitigation rarely if ever succeeded, that mitigation was not monitored to assure its success, and that rarely did the mitigation actually compensate for the

natural wetlands destroyed.

87. Commenters also identified other malls and developments being constructed in the area and challenged the purported public need for the CCTC development, and the ability of the market to support all of the malls. For example, commenters noted major malls within two to four miles of the proposed construction. The public also raised concerns about cumulative impacts of the proposed use given the other development occurring in the area, wetland impacts, surface water impacts, groundwater impacts, secondary urban sprawl, traffic, and resulting pollution. Commenters urged the Corps to prepare an EIS.

**B.      The Corps' EA, The Permit, And The FWS Concurrence Letter**

**1.      General Background Information**

88. On May 15, 2007, the Corps issued the environmental assessment and the requested section 404 permit challenged in this case. The approved project remained almost completely unchanged from the proposed project. The permitted project will destroy over fifty acres of wetlands and almost ten acres of surface waters for an enormous development that will include 630 residences, 700 hotel rooms, over two million square feet of commercial space and sixteen thousand parking spaces. Almost half of the wetlands to be destroyed are to be paved over for parking. EA at 11. The approved project will have an <u>average</u> buffer around remaining wetlands of 25 feet, meaning that the planned buffer will often be less than 25 feet. EA at 15. The project will have only a 50 foot buffer from Cypress Creek. EA at 15.

89. The project will destroy occupied habitat of the Wood Stork and the Eastern Indigo Snake and it will also destroy habitat that is suitable for the Florida Scrub Jay. Eastern Indigo Snake and Florida Scrub Jay habitat will be lost without a determination of the necessary

mitigation to offset that habitat loss, or the requirement that the mitigation be performed. The project will destroy much of the "critical" wildlife linkage that connects other neighboring preservation lands.

90. The Corps did not require reduction in the size of the mall. The Corps did not require any meaningful reconfiguration to minimize impacts.

### 2. The Corps' and the Service's Review of Impacts On Endangered Species And The Agencies' Violation Of The Endangered Species Act

91. The Corps acknowledged that the project might affect the Wood Stork and the Eastern Indigo Snake. EA at 4, 46-47. The Corps therefore sought informal consultation with the FWS for these species, and a concurrence that the species were not likely to be adversely affected. The Corps sought no consultation with regard to the Florida Scrub Jay and the Manatee, although the CCTC development is likely to adversely affect them, primarily through habitat loss and degradation. The agencies were also required to rely upon the best available data and to base their decisions on that data.

### a. The Wood Stork

92. The Corps based its "no adverse effect" determination on its assertion that "thirty-seven survey days over four years (2003-2005) did not yield any sightings of Wood Storks on the project area," and on the creation of foraging habitat through mitigation to offset the loss of existing habitat. Similarly, the FWS based its no adverse effect determination in part on the ground that no Wood Stork was ever seen nesting or foraging on the site, and in part on the expected creation of Wood Stork foraging habitat.

93. The Corps' and the FWS' determinations were contrary to the evidence in the record

34

and did not address issues raised by the record.  The biological consultants that undertook the

biological surveys reported that they observed Wood Storks on site, along with other wading

birds, foraging or resting.  Neither the Corps nor the FWS identified in the EA or addressed the

issue of unsuccessful or poor past mitigation efforts, the cause of past mitigation failures, what

was being done differently in this case to prevent such failure, nor what type of insurance was

being built into this mitigation plan in case this mitigation plan failed as well.  The Corps and the

FWS also failed to address the adverse effect to the Wood Stork of the loss of existing habitat

during the time period that the site was under construction and the new mitigation lands were

becoming established.  The Corps and the FWS also failed to adequately address secondary and

cumulative impacts to the Wood Stork.

### b.      The Eastern Indigo Snake

94.  The Corps' and the FWS's "no adverse effect" determination with regard to the

Eastern Indigo Snake was solely "based on the applicant's commitment to abide by the USFWS's

guidelines to protect this species."  No formal consultation was undertaken.  EA at 47,

Concurrence Letter at 5.

95.  The Corps' and the FWS's determination failed to consider whether the Eastern

Indigo Snake has habitat on the site, how much habitat it has on the site, what quality habitat it

has on the site, or whether and how much habitat will be destroyed, or what the significance to

the snake would be from the loss of the "critical wildlife linkage" connecting the other

conservation lands in the area, or the expansion of roads and traffic in the area.

96.  Evidence in the record and before the agencies make clear that there is Eastern Indigo

Snake habitat on site.  The snake is closely associated with, and lives in the burrows of, gopher

tortoises.  Multi-Species Plan at 4-569.  The applicant's own biological consultants identified the existence of gopher tortoises on site, Permit, Attachment 3, Biological Research Associates ("BRA") Mitigation Plan at p.18 of 72; and they ultimately found 25 gopher tortoises and 66 gopher tortoise burrows.  See BRA Relocation Report, July 7, 2007, at 1.  An Eastern Indigo Snake was also seen on or adjacent to the property.

97.  The guidelines relied upon by the agencies to find no adverse effect to the Eastern Indigo Snake do not address the impact of loss of snake habitat.  They only address the direct take of Indigos during construction activities and require that the snake be allowed to leave, or be removed from, a construction site, without analyzing whether the animals are being displaced to an area of equivalent or even suitable habitat.  See Standard Protection Measures For The Eastern Indigo Snake, Permit, Attachment 5.

### c.    The Florida Scrub Jay

98.  In issuing the permit, the Corps did not seek concurrence or consultation with the Service about the Florida Scrub Jay.  The Corps determined that the development would not affect the species because it concluded "there was no scrub jay habitat on the site."  EA at 48.  The FWS offered its own conclusion in a single sentence of the Concurrence Letter wherein it also stated that there was no Scrub Jay habitat on site.  Concurrence Letter at 5.

99.  The agencies' determinations are counter to the information they had before them, and they failed to address or even explain how they arrived at their determinations given the conflicting evidence.  Among other things, there was xeric oak scrub habitat on site, three meters or shorter, in sandy soils which is consistent with Florida Scrub Jay Habitat.  Other species that co-exist in the same types of habitat were noted as being on site, having habitat on site, or having

enough of a connection to the site to require consultation, including, for example, the gopher tortoise and the Eastern Indigo Snake. The agencies themselves visited the site and affirmed the presence of Florida Scrub Jay habitat on site. The agencies did not address this information in their decision nor reconcile it with their determination.

### d.   The West Indian Manatee

100. The Corps never sought consultation with regard to the Manatee, although development, and associated water pollution and red tides, have been identified as a significant threat to the Manatee. The Corps failed to seek concurrence or request consultation with the USFWS regarding whether the CCTC development site, in concert with the cumulative impacts of development in the area, may adversely impact the Manatee, by polluting waterways that flow into Hillsborough River and empty into Tampa Bay, which are important Manatee habitat.

### 3.   The Corps' Legally Insufficient Clean Water Act and NEPA Analyses

101. In the EA the Corps acknowledged that the development is not water dependent, EA at 29, but the Corps failed to mention or apply a presumption that there were other practicable alternatives that would avoid and/or minimize impacts to wetlands and surface waters, and that would have less significant environmental impacts. The Corps also failed to require the applicant to rebut such a presumption and clearly demonstrate that there were no other such practicable alternatives. The Corps' determination that there were no practicable alternatives to avoid and/or minimize environmental impacts was contrary to the evidence in the record, and thus violated the requirements of avoidance and minimization. In reaching the determination the Corps failed to inquire into relevant issues and it did not require that the applicant meet its evidentiary burden. The Corps did not base its determination on evidence in the record, but, rather, on the

37

applicant's own statements.  When the applicants statements were contradicted by evidence in the record, the Corps disregarded that evidence and did not engage in an independent inquiry into the contradictory information and statements.

102.  The Corps' determination that there would be no significant degradation of waters of the United States was contrary to the evidence in the record.  In reaching the determination the Corps failed to inquire into relevant issues as discussed in greater detail below.

103.  The Corps failed to take a hard look at a number of environmental impacts, including secondary and cumulative impacts.  The Corps failed to adequately address secondary impacts to remaining wetlands on site and impacts from the project's inducing growth in the area.  Similarly, the Corps's cumulative impact analysis was one paragraph that recited legal standards for a cumulative impacts analysis and then referred to and approved the applicant's cumulative impacts analysis.  The applicant's cumulative impacts analysis focused on water quality, flooding, wetlands and the Wood Stork.  The analysis of the four selected topics did not meaningfully address the four issues because, among other things, it did not appropriately evaluate the development that is taking place in the area and was often limited to reciting the protections in other laws and asserting that those laws would moderate or prevent environmental impacts.  The analysis also failed to adequately address important issues such as water supply issues, groundwater impacts and depletion, expanded roadway impacts, traffic increases and habitat loss, degradation and fragmentation for species like the Eastern Indigo Snake.

104.  The Corps' public interest review incorporated such flaws and was contrary to the evidence in the record and failed to identify or address relevant issues.  Among other things, the Corps noted that the public questioned the need for the project in light of the other developments

in the area. The Corps relied upon two market analyses provided by the applicant and concluded that the analyses demonstrated the need and viability in the market place for the development. The analyses indicated the opposite and concluded that the market cannot support the mall. The Corps also concluded that there was no native wildlife habitat on the project site other than in wetlands. The record establishes the existence of gopher tortoises on the site which live in uplands. The Corps also identified the existence of the "critical wildlife linkage" and concluded that the "integrity of this linkage" will be preserved by the "extensive" 50 foot buffers. The Corps did not analyze or identify how wide the corridor was before the project, what species use the corridor, how wide a corridor and buffer those species need, what type of habitat they need in the corridor, or whether the buffer proposed would be adequate in size or type of habitat to function as a critical wildlife corridor. The Corps failed to adequately and accurately review impacts to other conservation lands - such as impacts to the wildlife corridor - to water supplies, to aesthetic and recreation interests, and to flood related concerns.

105. The Corps failed to prepare an EIS. The CCTC project may significantly affect the human environment and the CCTC project triggers a number of CEQ significance criteria, including that the project, especially in concert with cumulative impacts of other developments in the area, may significantly affect drinking water supplies and flood risks, 40 C.F.R. § 1508.27(b)(2); will destroy wetlands and degrade an Outstanding Florida Water, id. at § 1508.27(b)(3); is "controversial" within the meaning of the CEQ regulations, id. at § 1508.27(b)(4); and may affect a number of federally listed species, such as the Wood Stork and the Eastern Indigo Snake, id. at § 1508.27(b)(9).

### a.      Off Site Alternatives, Avoidance

106. The Corps did not undertake a sufficient review of off site alternatives analysis: it failed to inquire into central issues, its determinations were contrary to the record, and where there were conflicts between the record and the applicant's assertions, the Corps did not resolve the conflicts. The Corps accepted the applicant's dismissal of one alternative site as "impracticable" because "access could only be provided by one arterial road." EA at 9. The EA – incorporating the applicant's alternatives analysis – expressly stated that two major or minor roads were merely "preferred by the applicant," and that more limited access was "considered less suitable," but not impracticable. Corps EA at 7. Similarly, the Corps accepted the "applicant['s] further clarifi[cation] that the project purpose cannot be met by dividing the proposed project between sites" or combining two parcels. EA at 9, 10. The EA indicated that two possible alternative sites, rejected individually as too small and unable to be configured to accommodate the project, were located directly across a road from each other. Combined, the two sites have 300 acres of developable land, alleviating the concern that individually they were too small, and like the proposed CCTC site, the two sites are in the northwest and southwest quadrants of a highway interchange. Moreover, there was a third alternative site in the immediate area that could also have been considered in combination with the other site. The Corps failed to address and resolve these issues, and the record indicates that the combined development was neither considered nor found impracticable.

107. The EA's review of the environmental impacts of each alternative did not indicate the environmental impacts of the alternatives. For example the no action alternative was one

short paragraph with no environmental information, and the remaining sites were demarcated 0-4

for a range of their impacts.

### b.      On Site Alternatives, Avoidance and Minimization

108.  The Corps's determination that there were no on-site alternatives, and that the

project's impacts could not be avoided or minimized, was contrary to the evidence.  The Corps

also failed to independently inquire into and resolve inconsistences in the information before it,

such as conflicts between the applicant's statements and evidence in the record, the Corps did not

require that the applicant "clearly demonstrate" the lack of practicable alternatives, and it did not

consider issues central to the required analysis.

109.  The Corps determined that the project could not be reduced and/or reconfigured to

reduce impacts to wetlands based upon the applicant's assertions that the project could not

achieve financing, and thus would not be financially viable, if it was not large enough to bring in

enough income to realize an 8.0% return.  See e.g. EA at 11, 14.  The Corps applied the wrong

legal standard in reaching its on-site alternatives determinations and its determinations were

contrary to the evidence.  The correct legal standard that the Corps is supposed to evaluate is

whether the additional cost to a project as the result of avoiding or minimizing impacts is

reasonable.  E.g., 1980 Notice, 45 Fed. Reg. at 85343.

110.  Assuming the correct "cost" standard was applied, the Corps's determination that

impacts could not be avoided or reduced was contrary to the evidence in the record and based

upon unsupported and contradicted statements by the applicant.  The Corps' apparent

determination that an 8.0% rate of return, as calculated by the applicant, was the minimum return

necessary to secure financing, and that the applicant had demonstrated this, was contrary to the

41

evidence in the record. The applicant was inconsistent as to what return it needed to achieve to secure financing, stating numbers that ranged from 7.8% to 8.0%. The evidence supplied by the applicant indicated that the project could be financed for less than an 8.0% rate of return, as calculated by the applicant. Also, the evidence supplied indicated that the applicant could achieve a rate of return, with a reduced or downsized project and/or with a parking garage, that would be sufficient to obtain financing, according to reported industry standard rates of return provided by the applicant. The reviewing permitting officer for the Corps requested that the Corps arrange for an economist to review the information that the applicant submitted, but the Corps denied the request.

111. In addition, the report on which the applicant relied does not establish a minimum rate of return, as it is an average of rates of return based upon a survey, not a statement of minimum rates of return. The applicant's calculations themselves were also based upon many assumptions that lacked any evidentiary support. For example, the base land value reported in almost every financial calculation of the applicant - the supposed "cost"of the land - is reported as being 60 and 70 million dollars. This figure is unsubstantiated as are other important figures like rental income.

112. The Corps' determination that impacts to wetlands could not be reduced through reducing the amount of parking is also contrary to the evidence in the record. The Corps requested that the applicant study nearby malls to see how much parking was really needed. The applicant's own study revealed that the project "proposed more parking than any existing mall in the evaluation." EA at 12 (emphasis added). The applicant also supplied statements by fellow developers that stated they believed a parking ratio of approximately 4.5 - 5 parking spaces were

needed per 1000 square feet. Similarly, the applicant asserted that the project could be built on

200-260 acres. The project exceeded these figures.

### c.  The Corps' Mitigation

113.  The Corps never identified or addressed information in the record documenting the

inefficacy of the Corps' mitigation programs, and it failed to address central issues relevant to

mitigation. Evidence before the agency indicated that permittees often fail to build or preserve

mitigation areas; that the Corps does not oversee implementation of the mitigation, that adequate

monitoring is not required, or performed as required, and that the mitigation fails to replace lost

functions correctly. The Corps did not identify these issues or explain how this project's

mitigation will be successful where other projects have failed.

114.  The Corps' determination that its mitigation plan will be successful and offset

wetlands losses as expected or required is unfounded, unexplained, contrary to the evidence in the

record and fails to consider necessary issues. Its determinations regarding the minimum required

contents of the plan, and its apparent acceptance of changes to the plan during the permitting

process, are also unfounded, unexplained, contrary to the evidence in the record, and contrary to

the law and the Corps' Regulatory Guidance Letters. The mitigation plan defines success as

meeting minimum criteria for one year; it does not establish adequate monitoring times; it allows

the applicant to be discharged from monitoring, and therefore maintenance, responsibilities at any

pont in time after a minimum standard has been meet, it has hydrological and ecological flaws,

such as its replacement of wetland functions with storm water management ponds and its siting of

off site mitigation miles away in a separate basin, and the plan does not have adequate

contingency plans in the event the mitigation plan is unsuccessful. These failures impact water

supply, water quality, flood, and habitat concerns.

> **d.    The Corps' Unlawful Determination That There Would Be No Significant Degradation Of US Waters.**

115. The Corps failed to identify and address the relevant factors bearing upon whether there would be significant degradation of wetlands and surface waters, and its determination that there would be no significant degradation is unsupported by the record and contrary to the evidence. The Corps acknowledged that upland buffers around Cypress Creek were important to maintaining water quality in the Creek, but the Corps did not identify or determine the minimum size of a buffer necessary to protect the Creek, and it did not address information in the record concerning the necessary buffer sizes. The Corps accepted a fifty foot buffer as the best that is possible given financial constraints. Similarly, the Corps did not identify and determine the minimum size of buffer necessary to protect remaining wetlands. It accepted an "average" twenty five foot buffers as the best that was possible given financial constraints. As discussed above, the Corps acknowledged in its secondary impacts analysis that there may be impacts to on-site wetlands. The Corps never identified or determined what those impacts might be, how severe they might be, or whether average twenty five foot buffers would be adequate to protect them from significant degradation.

116. The Corps did not identify or address the relevant factors regarding whether the storm water treatment system would be adequate to protect the remaining wetlands and Cypress Creek, and its determination that the system would prevent substantial degradation of waters is unfounded and contrary to the evidence in the record. The Corps did not identify or determine the likely pollutants from the site, whether the storm water system would effectively treat those

pollutants, what impacts the pollutants would have on Cypress Creek if they were not "treated,"
what the area's precipitation is like, and what will happen when weather in the region exceeds a
1.5 inch rain event as it frequently does. Id. The Corps' deferral to the approval of other state
agencies does not satisfy the Clean Water Act or NEPA.

117. The Corps' determination that there would be no significant degradation based upon
the water quality monitoring plan is also unfounded and contrary to the evidence in the record.
The water quality monitoring plan does not protect water quality, because of, among other things,
inadequate determinations of baselines, locations and timing of samples, repeated samplings when
degradation is found, and the duration of sampling, as it ends five years after completion of
construction. The plan is also inadequate because the Corps does not retain power to force
specific corrective action it believes necessary if steps must be taken if water quality is degraded,
and that the fact that the applicant can choose what remedial steps it can take from among those
that it considers feasible, when it has already indicated to the Corps that it does not view any
further steps towards minimization, beyond those already in the permit, to be feasible.

IV.    **Permit Issuance and Significant Events Post Permit Issuance**

118. On May 14, 2007, the Corps mailed notices to the public informing it of the Corps'
refusal to hold requested public hearings. On May 15, 2007, the Corps issued the CCTC permit,
although it had represented that it was not going to issue the permit any time in the near future,
and members of the public were securing an economist to review the application. The public and
conservation organizations that had been actively involved opposing the issuance of the permit
immediately protested the decision and sought to have the Corps revoke or suspend its decision.

119. In late June and early July the applicant began removal of the state listed gopher

tortoise from the site and the removal of vegetation as well. It accelerated its activities in response to conservationists' efforts to stop the project in state administrative proceedings, including by working by headlamp extremely late into the night and, on another occasion, through a tropical storm.

120. On July 17, 2007, the Sierra Club formally provided the Corps with the statutorily required sixty days notice of its intent to sue under the ESA, it requested that the Corps suspend or revoke the permit, and it encouraged the Corps to contact the Sierra Club to resolve the issue. During the intervening sixty days the Sierra Club - and other organizations - continued to reiterate their opposition to the development. They have also steadily sought to challenge the development through various administrative proceedings.

121. In the intervening time, the CCTC developers were cited by two governmental agencies for unlawfully discharging polluted water into Cypress Creek and/or its associated wetlands. To the extent that the applicant has destroyed endangered species habitat, or filled any wetlands and/or surface waters, the destruction constitutes an ongoing violation of the ESA, and the fill constitutes an unlawful discharge and continuing violation of the Clean Water Act.

122. On September 6, 2007, the Sierra Club wrote the Corps and forwarded notices of the violations. The Sierra Club again requested that the Corps suspend or revoke the CCTC permit.

123. On September 19, 2007, the Sierra Club again inquired with the Corps' and the Service's counsel as to whether the Corps had any response to the Sierra Club's concerns and whether the Corps would suspend or revoke the permit. Neither agency had any response at that time.

124.  On September 28, 2007, plaintiffs again inquired whether the Corps and the Service would respond to its letters and suspend or revoke the permit.  On September 29, 2007, the Sierra Club's statutorily required sixty day notice period expired.  To date, neither the Corps nor the Service have had a response to the Sierra Club's letters.

## CLAIM ONE
## THE CORPS AND THE FWS: VIOLATIONS OF THE ESA

125.  By issuing the section 404 CCTC permit without engaging in formal section 7 consultation with the FWS about the potential impacts, including cumulative impacts, to the Wood Stork and the Eastern Indigo Snake, and by failing to engage in either formal or informal section 7 consultation with the FWS regarding impacts to the Florida Scrub Jay and the Manatee, and by failing to utilize the best available data, the Corps violated section 7 of the ESA, and caused and contributed to others violating the ESA, 16 U.S.C. § 1536(a), and its implementing regulations, and has acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

126.  By issuing its concurrence letter that the CCTC project was not likely to adversely affect the Wood Stork, the Eastern Indigo Snake and the Florida Scrub Jay, and by failing to use the best available data, the FWS violated section 7 of the ESA, 16 U.S.C. § 1536(a), and its implementing regulations, and has acted arbitrarily and capriciously in violation of the APA.  5 U.S.C. § 706(2).

127. These violations of the ESA, the applicable regulations, and APA have caused and will continue to cause plaintiffs injuries as described in ¶¶ 8-30.

## CLAIM TWO
## THE CORPS: VIOLATIONS OF THE CLEAN WATER ACT

128.  The plaintiffs incorporate the allegations of paragraphs 1- 123 herein.  By issuing the

CCTC permit for the destruction of over fifty acres of wetlands and surfaces waters without

providing adequate public notice, without requiring the applicant to clearly demonstrate the lack

of practicable alternatives; without making determinations supported by information before the

agency about the availability of practicable alternatives; without requiring the applicant to avoid

and minimize impacts to waters of the United States; without ensuring that there would not be

significant degradation of waters of the United States; by premising the permit in reliance on

mitigation to prevent impacts without addressing the shortfalls of the mitigation when evidence

before the agency indicated that mitigation would be unsuccessful; and by failing to take a hard

look at the environmental impacts of the permit, including secondary and cumulative impacts, the

Corps has violated the Clean Water Act, and has acted arbitrarily and capriciously in violation of

the APA.  5 U.S.C. § 706(2).

129.  These violations of the Clean Water Act, its implementing regulations and the APA

have caused and will continue to cause plaintiffs injuries as described in ¶¶ 8-30.

## CLAIM THREE
## THE CORPS: VIOLATIONS OF NEPA

130.  By issuing the CCTC permit without providing adequate opportunity for public

notice and comment; without taking a hard look at the environmental impacts of the permit,

including secondary and cumulative impacts of the permit and alternatives, without providing

adequate and accurate information in the EA to inform the public of such environmental impacts,

and by failing to prepare an EIS, the Corps has violated NEPA and its implementing regulations,

48

and has acted arbitrarily and capriciously in violation of the APA.  5 U.S.C. § 706(2).

131.  These violations of NEPA, its implementing regulations and the APA have caused and will continue to cause plaintiffs injuries as described in ¶¶ 8-30.

**WHEREFORE**, plaintiffs request the Court issue an order:

(1)     declaring that the Corps' issuance of the permit, and the FWS's concurrence letter, violated the Endangered Species Act, the Clean Water Act, NEPA, and their implementing regulations, and the Administrative Procedure Act;

(2)     preliminarily and permanently setting aside the Corps' permit and the FWS's concurrence letter and requiring the Corps to ameliorate the damage caused by the permit it unlawfully issued.

(3)     awarding plaintiffs their costs and reasonable attorneys' fees, including expert fees; and

(4)     awarding plaintiffs any other relief that is just and proper.

Respectfully submitted,

_____
Joshua Stebbins
D.C. Bar No. 468542

_____
Howard M. Crystal
D.C. Bar No. 446189

_____
Eric R. Glitzenstein
D.C. Bar No. 358287

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
jstebbins@meyerglitz.com
hcrystal@meyerglitz.com

Attorneys for Plaintiffs

Date: October 1, 2007