UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

SIERRA CLUB, CLEAN WATER ACTION,
GULF RESTORATION NETWORK, CHRIS LOY,
and RICHARD SOMMERVILLE

                Plaintiffs,

v.                                                                    Civ. No. 1:07-cv-01756

LT. GEN. ROBERT L. VAN ANTWERP,
in his official capacity as Chief of Engineers,
U.S. Army Corps of Engineers,
DIRK KEMPTHORNE, in his official capacity
as Secretary, U.S. Department of the Interior, and
H. DALE HALL, in his official capacity as
Director,  U.S. Fish and Wildlife Service,

                Defendants.

_____/

## FEDERAL DEFENDANTS' MOTION TO TRANSFER VENUE

COME NOW, Federal Defendants, by and through undersigned counsel, and hereby

moves the Court to transfer the above-captioned action to the United States District Court for the

Middle District of Florida, pursuant to 28 U.S.C. § 1404(a).

In support of this motion, Federal Defendants state as follows:

1.      This action could have been brought in the Middle District of Florida, where a

substantial part of the events or omissions giving rise to Plaintiffs' claims occurred;

2.      The interests of justice favor transfer to the Middle District of Florida, because

the impacts of the agency actions referenced in Plaintiffs' Complaint are regional in nature and

specific to the Middle District of Florida;

3.      The Plaintiffs would not be inconvenienced by a transfer.  The two individually-

named Plaintiffs reside in the Middle District of Florida, and on information and belief, the

Plaintiff organizations have members residing within the State of Florida; and

4.     The instant case is substantially similar in issues to a case filed in the Middle

District of Florida by Plaintiffs' same counsel:  Citizens for Sanity.Com v. Lt. Gen Robert L.

Van Antwerp and Dale Hall, No. 8:07-cv-1106-T-23MSS, filed June 26, 2007.

Further and additional support is contained in the accompanying Memorandum in

Support of Federal Defendants' Motion to Transfer Venue.

Pursuant to LCvR 7.1, counsel for Defendants has conferred with counsel for Plaintiffs

regarding this motion.  Plaintiffs' counsel indicated that Plaintiffs will oppose this motion.

Respectfully submitted this 2nd day of October, 2007.

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division


Date:  ____October 2, 2007_____          _____/s/ Mark A. Brown_____
MARK A. BROWN (FL Bar No. 0999504)
Senior Trial Attorney
mark.brown@usdoj.gov
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0204
Facsimile: (202) 305-0275

ANDREW J. DOYLE
Florida Bar No 84948
andrew.doyle@usdoj.gov
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986

Washington, D.C. 20026-2986
Telephone: (202) 514-4427
Facsimile: (202) 514-8865
Attorneys for Defendants

Of Counsel:

Dorothy L. Boardman
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019
Tel: (904) 232-1165
Fax: (904) 232-3692
E-mail:  Dorothy.L.Boardman@saj02.usace.army.mil
Attorney for Federal Defendants

Delores Young
Department of the Interior
Office of the Regional Solicitor
Southeast Region
75 Spring St., S.W.
Suite 304
Atlanta, GA  30303
Telephone: (404) 331-3379
Facsimile: (404) 730-2682

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

SIERRA CLUB, CLEAN WATER ACTION,
GULF RESTORATION NETWORK, CHRIS LOY,
and RICHARD SOMMERVILLE

        Plaintiffs,

v.                                   Civ. No. 1:07-cv-01756

LT. GEN. ROBERT L. VAN ANTWERP,
in his official capacity as Chief of Engineers,
U.S. Army Corps of Engineers,
DIRK KEMPTHORNE, in his official capacity
as Secretary, U.S. Department of the Interior, and
H. DALE HALL, in his official capacity as
Director,  U.S. Fish and Wildlife Service,

        Defendants.

_____/

## FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER VENUE

## <u>INTRODUCTION</u>

Federal Defendants hereby move to transfer this suit to the United States District Court

for the Middle District of Florida.  This case challenges a permitting decision by the U.S. Army

Corps of Engineers ("Corps") concerning the construction of a regional shopping mall in Pasco

County, Florida.  The disputed agency actions giving rise to Plaintiffs claims occurred in the

Middle District of Florida, and the individually-named Plaintiffs also reside there.  Moreover, the

alleged environmental impacts of the challenged permit are entirely limited to the Middle

District of Florida.  As outlined below, the interests of justice will best be served by transferring

this action to the Middle District of Florida.

**BACKGROUND**

I.    **Factual Background**

Plaintiffs in this action challenge the Corps' decision to issue a permit for the discharge of dredged or fill materials into waters of the United States under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344. Plaintiffs also challenge the decision of the U.S. Fish and Wildlife Service ("FWS") to concur in the Corps' determination that the proposed actions are "not likely to adversely affect" threatened and endangered species under Section 7 of the Endangered Species Act ("ESA"),16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.13(a). The permittee is currently engaged in the construction of the Cypress Creek Town Center, a regional shopping center and mixed-use residential/commercial development. The project site is located entirely within Pasco County, Florida. On information and belief, the permittee has already commenced discharges authorized under the Corps permit and has completed several months of site preparation and construction work.

This is not the first lawsuit challenging the Cypress Creek Town Center Development. Just three months ago, Plaintiffs' counsel filed a substantially similar complaint in the Middle District of Florida. See Citizens for Sanity.Com and Danieal Rametta v. Antwerp and Hall, Case No. 8:07-cv-01106-SDM-MSS (Def. Exhibit 1). The case was assigned to the Honorable Judge Steven D. Merryday. Plaintiffs voluntarily dismissed their complaint *the day after it was filed*. See Notice of Dismissal (Def. Exhibit 2).

II.   **Standard for Granting Motion to Transfer**

This Court has authority to transfer this case pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides:

2

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

"The idea behind § 1404(a) is that where a 'civil action' to vindicate a wrong -- however brought in a court -- presents issues . . . that make one District Court more convenient than another, the trial judge can, after findings, transfer the whole action to the more convenient court."  Cont'l Grain Co. v. The FBL-585, 364 U.S. 19, 26 (1960).

The decision whether to transfer rests in the sound discretion of the district court[1] and should be exercised in light of all the circumstances of a case.  See e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257 (1981); Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 184-85 (1952); Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996) (§ 1404(a) vests "'discretion in the district court to adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness.'") (quoting Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29 (1988)).  The court weighs several factors in deciding a motion for change of venue under this provision, including the convenience of the parties and witnesses, access to proof, calendar congestion, where relevant events took place, and the interests of justice.  E.g., Car-Freshner Corp. v. Auto-Aid Mfg. Corp., 438 F. Supp. 82, 85 (N.D.N.Y. 1977); see also Hawksbill Sea Turtle v. FEMA, 939 F. Supp. 1, 3-5 (D.D.C. 1996).

---

[1]  This discretion is limited by the requirement that the transfer may be only to another "district or division where [the case] might have been brought."  28 U.S.C. § 1404(a).  As noted below, Plaintiffs could have filed this action in the Middle District of Florida pursuant to 28 U.S.C. §1391(e), so this requirement has been met.

3

## ARGUMENT

**I.**     **The District Court for the Middle District of Florida is a Forum in Which The D.C. Action Could Have Been Brought.**

The "threshold consideration" in determining the appropriateness of transfer under § 1404(a) is whether the action "could have been brought" in the transferee district.  See Van Dusen v. Barrack, 376 U.S. 612, 616 (1964) (transfer power is expressly limited by clause restricting transfer to those districts in which the action "could have been brought"), superceded by statute on other grounds, as stated in Ross. v. Colorado Outward Bound Sch., 822 F.2d 1524 (10th Cir. 1987).  Thus, the transferee district must have jurisdiction over the case.  Hoffman v. Blaski, 363 U.S. 335, 343 (1960).  Here, Plaintiffs base their claims on federal question jurisdiction and the grant of jurisdiction under the ESA and the CWA, see Complaint at ¶ 7.  The U.S. District Court for the Middle District of Florida would have subject-matter jurisdiction over such claims, so the only relevant question is whether venue is proper in the transferee district. see Martin-Trigona v. Meister, 668 F. Supp. 1, 4 (D. D.C. 1987).

Pursuant to § 1391(e), venue is proper in the "judicial district in which. . . a substantial part of the events or omissions giving rise to the claim occurred. . . ."  28 U.S.C. §1391(e)(2). However, "there may be several districts that qualify as a situs of such 'substantial' activities." David D. Siegel, Commentary on 1988 and 1990 Revisions of Section 1391, 28 U.S.C.A. § 1391 (1993) at 9; see 15 Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters §3802.1 at 4, 6-7 n.9 (2d ed. 1986 (2005 Supp.)) (the language of § 1391(e)(2) makes "it clear that there may be more than one district in which a claim may be thought to have arisen and in which venue should be proper").

4

Plaintiffs' claims in this action all relate to a specific Corps of Engineers permitting decision for a project site in Pasco County, Florida. Pasco County is entirely within the Middle District of Florida. 28 U.S.C. § 89(b). The offices of the Corps and FWS, where the disputed agency decisions were made, are located in Jacksonville, Florida, which is also in the Middle District of Florida. The individually-named plaintiffs, Messrs. Loy and Sommerville, reside in the Middle District of Florida in Tampa. Complaint at ¶ 21 ("Plaintiff Christ Loy. . . has been a resident of the Tampa metropolitan area for 9 years."); id. at ¶ 26 ("Plaintiff Richard Sommerville has resided in the Tampa region for approximately twenty two years, and in Pasco County for about eight years."). The various Plaintiff organizations have members who reside and/or recreate within the Middle District of Florida. Id. at ¶¶ 8 - 20. These facts compel the conclusion that this case could have been brought in the Middle District of Florida. Consequently, venue in the Middle District of Florida is proper under 28 U.S.C. § 1391(e)(2), and as a result, this case could have been brought there.

## II.    Both the Interests of Justice and the Convenience of the Parties and Possible Witnesses Will Be Served By Transferring This Case.

### A.    The Interests of Justice Will Be Best Served By Transferring This Case.

The strongest reason to transfer this action to the Middle District of Florida is that the interests of justice will best be advanced by such a transfer. The interests of justice are primarily defined as the prevention of unnecessary expense to the public and duplicative use of judicial resources. See Cont'l Grain, 364 U.S. at 26 & 27. In its determination of the interests of justice, the D.C. Circuit inquires as to "'whether the impact of the litigation is local to one region. . . .'" Oil, Chem. & Atomic Workers Local Union No. 6-148 v. N.L.R.B., 694 F.2d 1289, 1300 (D.C. Cir. 1982) (quoting Liquor Salesmen's Union Local 2 v. N.L.R.B., 664 F.2d 1200, 1205 (D.C.

Cir. 1981)); <u>Citizen Advocates for Responsible Expansion v. Dole</u>, 561 F. Supp. 1238, 1240

(D.D.C. 1983) (justice requires that localized controversies be decided at home). The interests of

justice are promoted when a localized controversy such as this one is resolved in the region that

it impacts. <u>See</u> <u>Oil, Chem. & Atomic Workers</u>, 694 F.2d 1289. As the Supreme Court has

noted:

> In cases which touch the affairs of many persons, there is reason for holding the
> trial in their view and reach rather than in remote parts of the country where they
> can learn of it by report only. <u>There is a local interest in having localized
> controversies decided at home</u>.

<u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 509 (1947) (emphasis added).

It is not atypical for cases in this district which are brought under the ESA or other

environmental statutes to be transferred to the local district if a party to the litigation so requests.

For example, in <u>Hawksbill Sea Turtle</u>, 939 F. Supp. 1, the Court transferred an ESA challenge

concerning a Virgin Islands housing project to the District of the Virgin Islands. The Court

reasoned that "[t]he housing project, and the habitat of the sea turtle and tree boa are in the

Virgin Islands, and the alleged violation of the environmental laws took place there." <u>Id.</u> at 3. In

<u>Nw. Forest Res. Council v. Babbitt</u>, No. 93-1579 JHG, 1994 WL 908586 (D.D.C. Apr. 13,

1994), the Court transferred a challenge to the listing of the marbled murrelet under the ESA

from the District of Columbia to the Western District of Washington where much of the bird's

habitat is found. The court noted that "marbled murrelets do not inhabit land or water in--or

anywhere near--the District of Columbia." <u>Id.</u> at *4. Likewise, in <u>Trout Unlimited</u>, 944 F. Supp.

at 20, the Court transferred an action brought by environmental groups in the District of

Columbia against the U.S. Forest Service regarding the granting of easements for the operation

of a dam to the local District of Colorado where the dam would operate. The Court deferred "to

the more compelling interest of the State of Colorado in having this localized controversy decided at home." Id. at 19.

Judge Roberts issued an order granting the United States' motion to transfer venue to the Southern District of Florida in a case challenging the Central and Southern Florida Comprehensive Plan, which regulates water resources in southern Florida, including parts of the Florida Everglades. Miccosukee Tribe of Indians v. United States, No. 99-2464 (D.D.C. filed December 28, 2000) (filed herewith as Def. Exhibit 3). The court noted that Plaintiffs failed to demonstrate any significant connection to the District of Columbia and that "the people of [southern Florida] have an interest in the dispute that far outweighs the interests of the citizens of this District." Id. at 14 - 15 (quoting Seariver Maritime Fin. Holdings v. Pena, 952 F. Supp. 9, 11 (D.D.C. 1997)).

In Kent County, Delaware v. Welsh, 02-02306 (D.D.C.) (E-filed order dated March 6, 2003) (filed herewith as Def. Exhibit 4), Judge Roberts granted a motion to transfer venue in a case challenging an Environmental Protection Agency ("EPA") decision to approve "Total Maximum Daily Loads" ("TMDLs") for the Murderkill River in Delaware. The court noted that "[t]he District of Columbia has little or no connection to the precipitating events at issue other than as the location of EPA headquarters." Id. at 5. As in the instant case, the decision at issue was made outside the District of Columbia. Id. at n. 1. The court noted that judges in Delaware might be more familiar with the river at issue and with the consent decree governing the schedule for establishing TMDLs in Delaware. Id. at 7. The court concluded that "the interest of justice in deciding local controversies at home weighs heavily in favor of transfer to Delaware. . . ", because the case challenged "a decision made outside of this district by EPA that

affects the citizens of Delaware." Id. at 8.

Most recently, in a factually similar case challenging a Corps decision to issue ten permits for the discharge of dredged or fill material into waters of the United States pursuant to the CWA, 33 U.S.C. § 1344, Judge Urbina granted the Federal Defendants' motion to transfer venue to the United States District Court for the Southern District of Florida. Sierra Club v. Flowers, 276 F. Supp. 2d 62 (D.D.C. 2003). The Corps permits challenged in that case authorize ten mining companies to conduct limerock mining on 5,409 acres of company-owned wetlands in Miami-Dade County, Florida. The court held that the case could have been brought in the Southern District of Florida and the interests of justice favored transfer to that forum. The court reasoned that "the plaintiffs' choice of forum merits little deference because the District of Columbia has 'no meaningful ties to the controversy and no particular interest in the parties or subject matter.'" Id. at 67 (quoting Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 13 (D.D.C. 2000)). Although the Federal Defendants maintained offices in the District of Columbia, there was a "lack of evidence that federal officials in this forum played 'an active or significant role' in the decision to issue the permits." Id. (quoting Airport Working Group v. U.S. Dep't of Def., 226 F. Supp. 2d 227, 230 (D.D.C. 2002); Trout Unlimited, 944 F. Supp. at 18)). "Federal officials in Florida, not the District of Columbia, signed the final record of decision authorizing the permits." Id. at 68. The court also reasoned that "the decision to issue the permits is a controversy local to Florida and is one in which Florida and its residents have a great interest." Id. at 71. Moreover, the court noted that "[t]he mining companies to whom the Corps issued the permits, and who now move to intervene in this action, are located in Florida." Id.

In the instant case, Plaintiffs note that the project site is in the vicinity of wells that

8

provide drinking water to a municipal water supplier, see Complaint at ¶ 57.  Plaintiffs also

allege that the permitted activities will result in adverse effects to wetland and upland habitats in

the project area, as well as adverse effects on threatened and endangered species.  Id. at ¶¶ 60-62.

However, the disputed actions have no impacts within the District of Columbia.  The disputed

actions have alleged impacts within Florida.  As Plaintiffs' claims are regional in nature and

specific to the Middle District of Florida, they should be transferred there.

Although Defendants bear the burden of demonstrating that transfer is appropriate under

28 U.S.C. § 1404(a), that burden is "substantially diminished" where, as here, "the connection

between plaintiffs, the controversy and the chosen forum is attenuated."  Citizen Advocates for

Responsible Expansion v. Dole, 561 F. Supp. 1238, 1239 (D.D.C. 1983) (citations omitted);

Armco Steel Co. v. CSX Corp., 790 F. Supp. 311, 323 (D.D.C. 1991) (deference to plaintiff's

choice of forum is "greatly diminished" when the events have little connection to the chosen

forum).  See also California Farm Bureau Fed'n v. Badgley, No. 02-2328 (RCL), 2005 WL

1532718, *3 (D.D.C. 2005) ("This lower level of deference is also supported by the fact that the

Delta Smelt dispute relates to actions taken by Interior officials within the Eastern District of

California and involves more closely the interests of Californians like plaintiffs than residents of

D.C."); Harris v. Republic Airlines, 699 F. Supp. 961, 963 (D.D.C. 1988) (deference overcome

where plaintiff's choice of forum "has no factual nexus to the case"); Kafack v. Primerica Life

Ins. Co., 934 F. Supp. 3, 6 (D.D.C. 1996) ("deference is mitigated where the plaintiff's choice of

forum has 'no meaningful ties to the controversy and no particular interest in the parties or

subject matter'") (citation omitted); Citizen Advocates for Responsible Expansion, 561 F. Supp.

at 1239 (burden on moving party "is substantially diminished where, as here, transfer is sought

to the forum where plaintiffs reside . . . and the connection between plaintiffs, the controversy

and the chosen forum is attenuated."); Trout Unlimited, 944 F. Supp. at 17 (deference to

plaintiff's choice of forum is reduced where the plaintiff's choice has "no meaningful ties to the

controversy and no particular interest in the parties or subject matter.") (citations omitted);

Hawksbill Sea Turtle, 939 F. Supp. at 3 (less deference owed to plaintiffs' choice of forum

where it has insubstantial nexus with facts of case); Nw. Forest Res. Council, 1994 WL at *3

("several decisions in this circuit suggest that [plaintiffs' choice of forum] is not entitled to any

great weight," particularly where "there is an insubstantial factual nexus with the plaintiffs'

choice.") (citations omitted).

    Here, the controversy surrounding the Corps' and FWS' actions in this case has no

discernable connection with the District of Columbia, except that two of the Plaintiff

environmental organizations and the Federal Defendants have offices within the District of

Columbia.  However, Plaintiffs do not allege that government officials in the District of

Columbia had any particular involvement in the challenged permitting decision.  Thus, the

controversy here is very attenuated from the forum that Plaintiffs seek.

    The presence of federally-protected wetlands or endangered species does not constitute a

"national" connection that requires this case to be heard in the District of Columbia.  The D.C.

Circuit has rejected the contention that the District of Columbia is more competent to determine

issues of federal environmental law than any other federal court.  As stated in Nat's Wildlife

Fed'n v. Harvey, 437 F. Supp. 2d 42, 49 ( D.D.C. 2006):

> [T]he fact that this case involves the interpretation of federal statutes does not
> automatically make the District of Columbia more competent to decide the case
> than Florida, as Plaintiffs allege. Where plaintiffs' claims are based on federal
> environmental law, this Court follows "the principle that the transferee federal

court is competent to decide federal issues correctly." <u>Sierra Club</u>, 276 F. Supp.2d
at 70 n. 6 (quoting <u>In re Korean Air Lines Disaster of Sept. 1, 1983</u>, 829 F.2d
1171, 1175 (D.C.Cir.1987)). Thus, both courts are competent to interpret the
federal statutes involved in this case, and there is no reason to transfer or not
transfer based on this factor.

Thus, the public interest in resolving local controversies at home strongly favors transfer to the

United States District Court for the Middle District of Florida, where Pasco County and the

project site are located.

**B.**     **The Convenience to the Parties and Witnesses Will Be Served By Transferring This Case**.

Although the burden of showing that transfer is warranted still rests with the Defendants,

it is well established that the showing of inconvenience required for transfer under § 1404(a) is

less than that required for dismissal of the action under the doctrine of forum *non conveniens*.

<u>See</u> <u>Norwood v. Kirkpatrick</u>, 349 U.S. 29, 32 (1955); <u>S.E.C. v. Savoy Indus.</u>, 587 F.2d 1149,

1154 (D.C. Cir. 1978).  Convenience in the context of a motion to transfer is heavily dependent

on the facts of each case, which in this case require transfer to the Middle District of Florida.

**1.**     **Convenience to the parties**

The convenience to the parties would be better served by the transfer of this action to the

Middle District of Florida.  The Federal Defendants have offices in the Middle District of

Florida.  Moreover, both of the individually-named Plaintiffs are Florida residents.  <u>See</u>

Complaint at ¶¶ 21, 26.  Plaintiffs specifically allege that at least one member of the Gulf

Restoration Network resides in the Tampa Region.  <u>Id.</u> at ¶ 17.  Sierra Club and Clean Water

Action are national environmental organizations and both groups, presumably, have members

within the Middle District of Florida.  On information and belief, Clean Water Action maintains

an office in the Middle District of Florida at 2002 E. 5th Avenue, Unit 101, Tampa, FL 33605.

11

Sierra Club has a Tampa Bay Group, with a mailing address of P.O. Box 1948, Tampa, FL 33601-1948.

Plaintiffs could not dispute that the Middle District of Florida is a proper forum or the obvious connections of the action to the District given that Plaintiffs' counsel previously filed a complaint challenging this same action in the Middle District of Florida yet, inexplicably, voluntarily dismissed the suit the next day.  See Def. Exhibits 1-2.  Indeed, absent some other legitimate explanation, Defendants can only speculate that the previous action was dismissed and re-filed in this forum with different named Plaintiffs in an attempt to forum shop and avoid having the assigned judge in Florida (Judge Merryday) preside over the case.  See generally Fund for Animals, Inc. v. Rice, Case No.8:94-cv-01913-SDM, Order filed October 12, 1995 (M.D. Fla. 2006) (Def. Exhibit 5) (granting summary judgment in favor of the United States in case litigated by Plaintiffs' counsel), as amended by Order filed August 26, 1996 (Def. Exhibit 6) (deleting footnote one of summary judgment opinion).

### 2.    Convenience to potential witnesses

Another consideration which must be balanced by the Court when determining whether transfer is justified is that of convenience to the witnesses.  28 U.S.C. § 1404(a) (1993).  It is possible in this case that witnesses will be utilized, if only for limited purposes, e.g., because Plaintiffs may seek injunctive relief, in which case limited extra-record evidence may be received to ascertain public interest concerns associated with possible injunctive remedies.  See Complaint at p. 49 (Plaintiffs request the Court to issue an order "preliminarily and permanently setting aside the Corps permit and the FWS's concurrence letter. . . .").  To the extent that any witness testimony is required, Defendants anticipate that such witnesses would be located in

Florida.  Moreover, the documents that will comprise the administrative record, which is currently being assembled in Florida, were created primarily in Florida.

For these reasons, the interests of both the parties and the potential witnesses favor transfer of this case to the Middle District of Florida.

### **CONCLUSION**

All of the factors relevant to consideration of transfer under 28 U.S.C. § 1404(a) argue for transfer of this action to the Middle District of Florida, where venue lies for this case.  This action could have been brought in the Middle District of Florida.  Further, both the interests of justice and the interests of the litigants favor transfer.  For the foregoing reasons, this case should be transferred to the Middle District of Florida.

Respectfully submitted this 2nd day of October, 2007.

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division


Date:  _____October 2, 2007_____          _____/s/ Mark A. Brown_____
                                            MARK A. BROWN (FL Bar No. 0999504)
                                            Senior Trial Attorney
                                            mark.brown@usdoj.gov
                                            U.S. Department of Justice
                                            Environment and Natural Resources Division
                                            Wildlife and Marine Resources Section
                                            P.O. Box 7369
                                            Washington, D.C. 20044-7369
                                            Telephone: (202) 305-0204
                                            Facsimile: (202) 305-0275

                                            ANDREW J. DOYLE
                                            Florida Bar No 84948
                                            andrew.doyle@usdoj.gov
                                            U.S. Department of Justice
                                            Environment and Natural Resources Division

Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-2986
Telephone: (202) 514-4427
Facsimile: (202) 514-8865
Attorneys for Defendants

Of Counsel:

Dorothy L. Boardman
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019
Tel: (904) 232-1165
Fax: (904) 232-3692
E-mail:  Dorothy.L.Boardman@saj02.usace.army.mil
Attorney for Federal Defendants

Delores Young
Department of the Interior
Office of the Regional Solicitor
Southeast Region
75 Spring St., S.W.
Suite 304
Atlanta, GA  30303
Telephone: (404) 331-3379
Facsimile: (404) 730-2682

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Tampa Division

| | |
|---|---|
| Citizens For Sanity.Com, Inc.<br>19840 State Road 54<br>Lutz, FL 33558,<br><br>Daniel Rametta,<br>19840 State Road 54<br>Lutz, Florida 33558,<br><br>       Plaintiffs,<br><br>  v.<br><br>Lt. Gen. Robert L. Van Antwerp<br>Chief of Engineers,<br>Army Corps of Engineers<br>20 Massachusetts Ave., N.W.<br>Washington, D.C. 20314,<br><br>Dale Hall,<br>Director,<br>U.S. Fish and Wildlife Service<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This action challenges a highly controversial decision by the United States Army

Corps of Engineers ("Corps") to authorize the filling of wetlands abutting the Cypress Creek -

a water body that has been designated an "Outstanding Florida Water" by the State of Florida

and a major tributary to the Hillsborough River, the City of Tampa's drinking water supply.

The wetlands are being destroyed and the Creek placed at grave risk so as to allow the

building of sprawling parking lots and other major structures for a massive shopping mall,

EXHIBIT 1

office, and hotel complex known as the Cypress Creek Town Center ("CCTC").  The Corps'

decision to issue the permit violates the Clean Water Act ("CWA"), 33 U.S.C. § 1344 et seq.

– which creates a strong presumption that valuable wetlands should not be destroyed for

projects like this one – and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §

4321 et seq., which mandates that projects with potentially significant environmental effects

must be preceded by preparation of an Environmental Impact Statement ("EIS").  No such

EIS was prepared by the Corps, and the environmental analysis that was prepared ignored or

downplayed a host of potentially serious environmental effects – including the potential for

threat to the public's drinking water supply in the area – as well as reasonable and far less

damaging alternative sites for the project.

    2.  This action also challenges the United States Fish and Wildlife Service's decision to

"concur" in the Corps' finding that the destruction of the wetlands, which are in the core

foraging habitat of five colonies of Wood Storks, a species listed as endangered by the federal

government, will not "adversely affect" the Wood Stork or other federally listed species.  In

making its decision to concur in the Corps' finding that no formal "consultation" under the

Endangered Species Act ("ESA"), 16 U.S.C. § 1532 et seq., was required for this project, the

Fish and Wildlife Service ("FWS" or "Service") violated the ESA, the Service's own

implementing regulations, and the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").

## Jurisdiction

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## Parties

4. Plaintiff Citizens For Sanity.com, Inc. ("Citizens") is a Florida not-for-profit membership based corporation that has at least 35 current members residing in Pasco County Florida. Citizens was formed to protect the environment, fish, wildlife, air and water quality of Pasco County by promoting, among other things, sustainable development. Citizens and its members have worked to protect water and air quality, wetlands, wildlife habitat and threatened and endangered species from unnecessary destruction during the ongoing development in the County. In particular, Citizens and its members have carefully monitored the project at issue, and they have provided public comments urging that the project is not in the public interest.

5. Citizens brings this action on its own institutional behalf, and also on behalf of its members, who have and will continue to regularly canoe, hike, fish, hunt, birdwatch, and otherwise enjoy the natural beauty and wildlife in Pasco County generally, and the area of Cypress Creek specifically. For example, Citizens member Clay Colson lives approximately six miles from Cypress Creek. He greatly enjoys canoeing and kayaking Florida waters, including Cypress Creek, and stopping along the banks of the creeks and rivers to explore Florida's flora and fauna. He has canoed and kayaked Cypress Creek many times, and has seen an Eastern Indigo snake on the proposed CCTC site. The ability of Mr. Colson and other Citizens members to continue to enjoy Cypress Creek, including its outstanding water quality

3

and flora and fauna, is injured by the Corps' failure to comply with the CWA, NEPA, and the APA, because the Corps has unlawfully authorized the destruction of wetlands near Cypress Creek, that enhance its beautiful natural environment, that provide habitat for its wildlife, and that purify and regulate the flow of its water.

6. Citizens and its members' ability to engage in educational and advocacy activities concerning Pasco County, Cypress Creek, and the proposed project more specifically, is also injured by the Corps' failure to comply with the CWA, NEPA, and the APA, because, by violating these statutes, the agency failed to provide information to the public that it was required to provide, and also failed to provide adequate opportunities for public participation and input as required by law.

7. Citizens and its members are also injured by the FWS's concurrence that the proposed development is unlikely to adversely affect the Wood stork and other federally listed species. As a consequence of that concurrence and resulting failure of the Service and the Corps to engage in formal consultation under the ESA, the ability of Citizens and its members to observe and enjoy the Wood stork and other federally listed species in the vicinity of the project will be impaired, and Citizens and its members will also be deprived of essential information that would be generated pursuant to the formal consultation process.

8. Plaintiff Dan Rametta is a long time resident of Pasco County. He currently lives on a 25 acre farm approximately five miles from the proposed site. Mr. Rametta draws his drinking water on his farm from the same aquifers that underlie the proposed mall. He is a member of Citizens for Sanity.com, Inc., sits on its board of directors, and is currently its

4

Secretary. He is also a member of the Sierra Club, which submitted extensive comments to the Corps concerning the project's adverse impacts.

9. Mr. Rametta enjoys canoeing along Cypress Creek, including along the specific stretch that borders the project site. He first canoed Cypress Creek in 1970 or 1971, and has continued to canoe Cypress Creek since then, bringing along on various occasions his son, wife and his friends. On Mr. Rametta's canoe trips, he makes numerous stops along both sides of the creek to observe and photograph wildlife including gopher tortoises, Florida alligators, otters, sandhill cranes, great blue herons, various wading birds and other wildlife including, if possible, Wood storks and Eastern indigo snakes. Mr. Rametta's last canoe trip along Cypress Creek was in May 2007. He plans to return again to canoe Cypress Creek in the near future with one or more of his fourteen grandchildren.

10. Mr. Rametta canoes along Cypress Creek, and in other areas, including other parts of Pasco County, in part because he derives great enjoyment from observing nature and taking surveys of various species. Cypress Creek itself is particularly meaningful to Mr. Rametta because of its outstanding natural beauty, its outstanding water quality, its navigability, and its proximity to his home.

11. The ability of Mr. Rametta to continue to enjoy Cypress Creek, including its outstanding water quality and flora and fauna, is injured by the Corps' failure to comply with the CWA, NEPA, and the APA, because the Corps has unlawfully authorized the destruction of wetlands that abut Cypress Creek, that enhance its beautiful natural environment, that provide habitat for its wildlife, and that purify and regulate the flow of its water, including he

5

water he draws for use at his home.  Mr. Rametta's ability to observe and enjoy the Wood

stork and other federally listed species in the vicinity of the project is also impaired by the

FWS's unlawful and arbitrary concurrence that the massive project will not adversely affect

habitat used by these species.

12.  Defendant Lt. Gen. Robert L. Van Antwerp is the Chief of Engineers for the

United States Army Corps of Engineers and is responsible for ensuring that the Corps

complies with the requirements of the CWA, NEPA and the APA.

13.  Defendant Dale Hall is the Director of the Fish and Wildlife Service, and is

responsible for ensuring that the Service complies with the requirements of the ESA and the

APA.

### Statutory Scheme Relating to Plaintiffs' Claims

**A.**     **Clean Water Act**

14.  The Clean Water Act was enacted "to restore and maintain the chemical, physical,

and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  It prohibits the

discharge of any pollutant into the waters of the United States, including wetlands, without a

permit.  33 U.S.C. § 1311(a).  The term "pollutant" includes "dredge spoil," "solid waste,"

"rock, sand, cellar dirt and industrial . . . waste discharged into water."  33 U.S.C. § 1362(6).

15.  Section 404 of the CWA authorizes the Army Corps of Engineers to issue permits

for the discharge of "dredged or fill materials" into waters of the U.S., but only if stringent

regulatory requirements are satisfied.  There are two sets of regulations implementing the

Corps' 404 permit program -- one that was promulgated by the Corps itself, see 33 C.F.R.

6

Parts 320-330, and one that was promulgated by the Environmental Protection Agency

("EPA"), called the "404 Guidelines." See 40 C.F.R. §§ 230.1-230.80. Under the Corps'

regulations, an applicant for a 404 permit must include in the same permit application all

activities which it plans to undertake which are "reasonably related" to the project under

review, and must also provide a complete description of such activities "sufficient for public

notice." 33 C.F.R. §§ 325.1(d)(1)-(2).

16. When the Corps has received a complete application, it must issue a public notice

soliciting comments from interested persons as to the advisability of granting the permit. 33

U.S.C. § 1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3. Because the public notice is the "primary

method of advising all interested parties of the proposed activity for which a permit is sought

and of soliciting comments and information necessary to evaluate the probable impact on the

public interest," the notice must include "sufficient information to give a clear understanding

of the nature and magnitude of the activity to generate meaningful comment." 33 C.F.R. §

325.3(a). The notice must also include a description of "all proposed activities," id. §

325.3(a)(6), and all "available information which may assist interested parties in evaluating the

likely impact of the proposed activity." Id. § 325.3(a)(13).

17. The Corps' regulations provide that "[a] public hearing will be held in connection

with the consideration of a [dredge and fill permit] whenever a public hearing is needed for

making a decision on" the permit application. 33 C.F.R. § 327.4(a). Requests for a public

hearing "shall be granted, unless the district engineer determines that the issues raised are

insubstantial or there is otherwise no valid interest to be served by a hearing," id. § 327.4(b),

but "[i]n case of doubt, a public hearing <u>shall be held.</u>" 33 C.F.R. § 327.4(c) (emphasis

added).

18. In performing its substantive review of a section 404 application, the Corps is

required to give wetlands -- such as those that will be destroyed by the project at issue – the

highest possible level of protection. As the regulations explain, "wetlands constitute a

productive and valuable public resource, <u>the unnecessary alteration and destruction of which</u>

<u>should be discouraged as contrary to the public interest.</u>" 33 C.F.R. § 320.4(b)(1) (emphasis

added).

19. The regulations identify eight types of functions performed by wetlands that are

"important to the public interest." <u>Id.</u> § 320.4(b) These include "[w]etlands the destruction or

alteration of which would affect detrimentally natural drainage characteristics, [or]

sedimentation patterns," "[w]etlands which serve as v<u>aluable storage areas for storm and</u>

<u>flood waters,</u>" "wetlands which are ground water discharge areas that maintain minimum

baseflows important to aquatic resources and those which are <u>prime natural recharge areas,</u>"

"wetlands which serve <u>significant water purification functions,</u>" and "wetlands which are

<u>unique in nature or scarce in quantity to the region or local area.</u>" 33 C.F.R. § 320.4(b)(2)

(emphasis added).

20. The regulations further provide that "[n]o permit will be granted which involves

the alteration of wetlands identified as important" under any of these criteria unless the Corps

finds (1) that, under what is called its "public interest review," "the benefits of the proposed

alteration outweigh the damage to the wetlands resource," and (2) that "the proposed

8

alteration <u>is necessary to realize those benefits.</u>" <u>Id.</u> § 320.4(b)(4) (emphasis added). In

making these determinations, the Corps must consider "[a]ll factors which may be relevant to

the proposal," including "the cumulative effects" of the project. <u>Id.</u>; 33 C.F.R. § 320.4(a)

(emphasis added). The Corps must consult with the Fish and Wildlife Service "with a view to

the conservation of wildlife resources by prevention of their direct and indirect loss and

damage due to the activity proposed in a permit application." 33 C.F.R. § 320.4(c).

21. The EPA's "404 guidelines," which also govern the issuance of dredge and fill

permits, 40 C.F.R. Part 230; 33 C.F.R. § 320.4(b)(4), establish a strong presumption against

permitting any damage to wetlands, especially with regard to projects that are not "water

dependent," <u>i.e.</u>, do not inherently necessitate construction in water resources. <u>Id.</u> at §

230.10(a)(3). The 404 guidelines declare that "[f]rom a national perspective, <u>the degradation</u>

<u>or destruction of . . . wetlands is considered to be among the most severe environmental</u>

<u>impacts,</u>" and that "[t]he guiding principle should be that <u>degradation or destruction of</u>

<u>[wetlands] may represent an irreversible loss of valuable aquatic resources.</u>" 40 C.F.R. §

230.1(d) (emphasis added). Hence, "[d]redged or fill material should not be discharged into

the aquatic ecosystem [wetlands], unless it can be demonstrated that such a discharge will <u>not</u>

<u>have an unacceptable adverse impact</u> either individually or in combination with known and/or

probable impacts of other activities affecting the ecosystems of concern." <u>Id.</u> § 230.1(c)

(emphasis added).

22. The 404 guidelines further provide that the Corps may not issue permits for filling

wetlands if any "practicable" alternatives are available. More specifically, "no discharge of

9

dredged or fill material shall be permitted if there is a practicable alternative to the proposed

discharge which would have less adverse impact on the aquatic ecosystem, so long as the

alternative does not have other significant adverse environmental consequences." 40 C.F.R. §

230.10(a). To be "practicable," an alternative need not accomplish the project proponent's

objectives to the same extent and in the same manner as the specific activity proposed by the

permit applicant. Rather, an alternative is deemed practicable "if it is available and capable of

being done after taking into consideration cost, existing technology, and logistics in light of

overall project purposes," and it may include the discharge of dredged or fill material into

wetlands at other locations. Id. at § 230.10(a)(1).

     23. Under the EPA's guidelines there is a very strong presumption that there are

practicable alternatives to the discharge of fill to "special aquatic sites" - i.e., wetlands - if the

project "does not require access or proximity to or siting within" a wetland "to fulfill its basic

purpose (i.e., is not 'water dependent')." Id. at 230.10(a)(3). The heavy presumption that the

project should not be permitted may only be rebutted if the applicant "clearly demonstrate[s]"

that there is no other practicable alternative that would avoid or minimize the wetlands losses.

Id. § 230.10(a)(3). "In addition, where a discharge is proposed for a special aquatic site, all

practicable alternatives to the proposed discharge which do not involve a discharge into a

special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless

clearly demonstrated otherwise." Id. (emphasis added).

     24. In addition, "no discharge of dredged or fill material shall be permitted which will

cause or contribute to significant degradation of the waters of the United States." 40 C.F.R.

§ 230.10(c).  The guidelines further specify that "effects contributing to significant

degradation considered individually or <u>collectively</u>, include:[s]ignificantly adverse effects of

the discharge of pollutants on human health or welfare, including but not limited to effects on

<u>municipal water supplies</u>, plankton, fish, shellfish, wildlife, and special aquatic sites." <u>Id</u>; <u>see</u>

<u>also</u> <u>id</u>. ("Such effects may include, but are not limited to, loss of fish and wildlife habitat or

<u>loss of the capacity of a wetland to assimilate nutrients [or] purify water</u>") (emphasis added).

    25.  The 404 guidelines further provide that, even if the Corps finds that there is no

practicable alternative for a proposed project that will destroy wetlands,  "no discharge of

dredged or fill material shall be permitted unless appropriate and practicable steps have been

taken which will minimize potential adverse impacts of the discharge on the aquatic

ecosystem." 40 C.F.R. § 230.10(d).  The regulations further specify "[s]ome of the ways" to

minimize the effect of the discharge, including, for example, "confining the discharge to

minimize smothering of organisms," and "[d]esigning the discharge to avoid a disruption of

periodic water inundation patterns."  40 C.F.R. § 230.70.

    **B.**    **National Environmental Policy Act**

    26.  NEPA is the "basic national charter for protection of the environment."  40 C.F.R.

§ 1500.1(a).  Among the purposes of the statute are to "insure that environmental information

is available to public officials and citizens before decisions are made and actions are taken,"

and to "help public officials make decisions that are based on understanding of environmental

consequences . . . ."  <u>Id.</u> at § 1500.1(b)-(c) (emphasis added).  The Corps must follow its own

11

regulations implementing NEPA, 33 C.F.R. § 230.1, as well as regulations promulgated by the

Council on Environmental Quality (CEQ), 40 C.F.R. § 1500 et seq.

27. To accomplish its purposes, NEPA requires all agencies of the federal government

to prepare a "detailed statement"- an EIS - regarding all "major federal actions significantly

affecting the quality of the human environment." 42 U.S.C. § 4332(C). The duty to prepare

an EIS extends to all major federal actions that "will or may have an effect on" the

environment. 40 C.F.R. § 1508.3 (emphasis added).

28. If an agency is uncertain whether an activity may have a significant effect on the

environment - and thus, whether it must prepare an EIS - the agency may prepare an

Environmental Assessment ("EA") to assist it in determining whether the action may have a

significant environmental effect. 40 C.F.R. §§ 1508.9, 1501.4. The EA must include

"discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of

the environmental impacts of the proposed action and alternatives, and a listing of agencies

and persons consulted." 40 C.F.R. § 1508.9(b). Section 102(2)(E) requires that federal

agencies "study, develop, and describe appropriate alternatives to recommended courses of

action in any proposal which involves unresolved conflicts concerning alternative uses of

available resources." 42 U.S.C. § 4332(E).

29. In performing its analyses of the environmental impacts of a proposed action and

its alternatives, the agency must consider the direct, indirect and cumulative impacts on the

environment. 40 C.F.R. § 1508.8 ("[e]ffects and impacts . . . are synonymous . . . . [and

include] direct, indirect, or cumulative" effects). "Direct effects . . . are caused by the action

12

and occur at the same time and place." Id. "Indirect effects . . . are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." Id. (emphasis added). The "[c]umulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

30. In evaluating the potential significance of an action, and thus in reviewing the direct, indirect and cumulative impacts of an action, the Corps must consider in an EA the "degree to which the proposed action affects public health or safety," "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands [and] ecologically critical areas," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the action may establish a precedent for future actions with significant effects," "whether the action is related to other actions with . . . cumulatively significant impacts," and "the degree to which the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b).

13

31. An EA must "provide sufficient evidence and analysis" of the direct, indirect and cumulative environmental impacts of the proposed action and the alternatives considered to support its "determination whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. If, after preparing an EA, the Corps determines that there will be no significant impact, it must prepare a "finding of no significant impact" and make the finding available to the public. 40 C.F.R. §§ 1501.4, 1508.13. Even if the Corps properly decides that an EIS is unnecessary, its EA must be sufficiently detailed to adequately address potential impacts and reasonable alternatives. Id. § 1508.9.

32. The CEQ regulations also provide that meaningful public participation and oversight is essential to the NEPA process. See, e.g., 40 C.F.R. § 1500.1(b) ("[a]ccurate scientific analysis, expert agency comments and public scrutiny are essential to implementing NEPA"); id. ("environmental information [must be] made available to public officials and citizens before decisions are made and before actions are taken").

C.    **Endangered Species Act**

33. Recognizing that all of the country's "species of fish, wildlife and plants are of esthetic, ecological, educational, historical, recreational and scientific value to the Nation and its people," 16 U.S.C. § 1531(a)(3), Congress enacted the ESA with the express purpose of providing both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ." Id. at § 1531(b). The duties the Act imposes on the

14

Secretaries of the Interior and Commerce have been delegated to the Service and the National

Marine Fisheries Service respectively.  50 C.F.R. § 402.01(b).

34.  The ESA provides protection for threatened or endangered "species."  16 U.S.C.

§ 1532(16).  A species is "endangered" if it "is in danger of extinction throughout all or a

significant portion of its range . . . ."  Id. at § 1532(6).  It is "threatened" if it "is likely to

become an endangered species within the foreseeable future throughout all or a significant

portion of its range."  Id. at § 1532(20).

35.  Listed species are entitled to significant protections under the ESA, including a

number of Congressionally mandated measures designed to protect and restore listed species.

For example, under the ESA and its implementing regulations it is illegal for anyone to "take"

an endangered or threatened animal. 16 U.S.C. § 1538(a)(1); 50 C.F.R. §§ 17.21, 17.31.  The

term "take" includes "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The Act also

requires the Service to "develop and implement . . . 'recovery plans' . . . for the conservation

and survival of endangered species and threatened species . . . ."  16 U.S.C. § 1533(f)(1).

36.  In addition, section 7 of the ESA provides that each federal agency "shall, in

consultation with and with the assistance of the Secretary, insure that any action authorized ...

by such agency ... is not likely to jeopardize the continued existence of any endangered species

or threatened species."  16 U.S.C. § 1536(a)(2).  The Secretary has delegated to the Director

of the Fish and Wildlife Service the consultation obligations imposed by section 7, and the

15

Fish and Wildlife Service has promulgated regulations implementing the requirements of

section 7. 50 C.F.R. Part 402.

37. To fulfill its obligations under section 7, each federal agency must review its

actions to determine whether they "may affect" an endangered or threatened species. 50

C.F.R. § 402.14(a). If an action "may affect" such a species, the agency must engage in

"formal consultation" with the FWS unless the Service "concurs" in writing that the action is

not likely to "adversely affect" any threatened or endangered species. Id. The federal agency

responsible for consulting with the FWS must prepare and provide to the Service a "biological

assessment" of the effects of the proposed action on any endangered or threatened species,

which includes "the best scientific and commercial data available . . . for the adequate review

of the effects that an action may have upon listed species." 50 C.F.R. § 402.14(d).

38. During the formal consultation process, the FWS must review all relevant

information, evaluate the status of the listed species, "evaluate the effects of the action and

cumulative effects on the listed species," and formulate its biological opinion as to "whether

the action, taken together with cumulative effects, is likely to jeopardize the continued

existence of listed species. . . ." 50 C.F.R. §§ 402.14(g)(1)-(4).

39. At the conclusion of the consultation process, the FWS must issue a "biological

opinion," which "detail[s] how the agency action affects the species," 16 U.S.C. §

1536(b)(3)(A), and sets forth the Service's opinion as to whether the action is "likely to

jeopardize" the continued existence of a listed species. 50 C.F.R. §§ 402.14(h)(1)-(3). If the

FWS concludes that the action is likely to jeopardize a listed species, it must suggest those

16

"reasonable and prudent alternatives" which would insure that such jeopardy is not likely to

occur. 16 U.S.C. § 1536(b)(3)(A). Even if the FWS determines that an action is unlikely to

jeopardize a species, the biological opinion must nonetheless specify "terms and conditions"

for minimizing incidental take of the species, as well as additional conservation measures that

can be adopted by the action agency. Id. at § 1536(b)(4)(C).

### Facts Giving Rise To Plaintiffs' Claims

**A.**     **The Rapid Loss of Wetlands In Florida and the Corps' Proven Inability to
Prevent And Adequately Mitigate Such Losses.**

40. Over the last several decades, development activities throughout Florida have

resulted in a significant loss and degradation of Florida's natural areas, and its wetlands in

particular. According to a recent analysis in the St. Petersburg Times called "Vanishing

Wetlands," during the last 14 years alone, at least 84,000 acres of wetlands have been lost in

Florida. The Times' analysis further found that, despite the heavy presumption established by

the CWA and implementing regulations that remaining wetlands should be preserved, the

Corps generally takes the opposite approach in reviewing applications for permits to fill

wetlands; between 1999 and 2003, the Corps approved more than 12,000 applications for

permits to destroy wetlands and rejected one. The Times' analysis further found that the

Corps approves more permits to destroy wetlands in Florida than any other state in the

country; that it generally requires completely inadequate mitigation measures to offset such

losses; and that it also fails to monitor whether developers are even implementing the

mitigation measures that are required by their permits. As a consequence, according to the

Times' analysis, which is based in part on former Corps employees who worked with the

17

agency for many years, such mitigation measures rarely, if ever, actually compensate for the destruction and degradation of wetlands permitted by the Corps in Florida.

41. A recent analysis conducted by the federal General Accounting Office ("GAO") similarly concluded that the Corps does not adequately ensure that wetlands impacts are being minimized and mitigated, and that there was only "limited oversight to determine the status of compensatory mitigation" and few enforcement efforts directed at ensuring that permittees accomplish mitigation. General Accounting Office, Wetlands Protection: Corps Of Engineers Does Not Have an Effective Approach to Ensure That Compensatory Mitigation Is Occurring, What We Found, September 2005, http://www.epa.gov/owow/ wetlands/pdf/GAO05898.pdf (last visited June 25, 2007).

42. Pasco County is presently experiencing the rapid development and conversion of wetlands that has occurred in other parts of Florida. A Pasco County Growth Management Department spreadsheet listed, as of October 1, 2005, numerous development projects in Pasco County that may contribute to the loss and degradation of wetlands in the County. For example, the Wiregrass Ranch development, just two miles from the CCTC site, is a 5,118 acre project that contemplates building 4,400,000 square feet of retail, 16,000 residential units, 3,900,000 square feet of office space, and other developments. The "Connerton" project is a 4,931 acre project with five villages, "8,540 residences, 1,701,200 Square Feet Retail; 1,143,800 Square Feet Government/Office; [and] 819,000 Square Feet Industrial." And just fives miles Northwest of the site is the Bexley Ranch Development on 6,872 acres

18

with 7,000 residential units. On information and belief, these and other major projects may require Corps permits for the destruction of wetlands resources in Pasco County.

**B.    Cypress Creek and the Project Site**

       **1.      Cypress Creek And Its Wetlands**

43.    Cypress Creek, which runs immediately adjacent to the site of the CCTC, see Department of the Army Environmental Assessment and Statement of Finding, SAJ-2003-2336 ("Corps EA") at 1 and 49, has been designated an "Outstanding Florida Water" by the State of Florida, Fl. Admin. Code Ann. r. 62-302.700(9)(i)(14)(C), meaning that it is "worthy of special protection because of [its] natural attributes. " Fl. Stat. § 403.061(27). It is Florida's stated "policy to afford the highest protection to Outstanding Florida Waters." Fla. Admin. Code Ann. r. 63-302.700(1).

44.    Cypress Creek is also a major tributary to the Hillsborough River, and the Hillsborough River is "the major source of drinking water for [the] City of Tampa." Corps EA at 41 (emphasis added). As such, Cypress Creek is an important contributor to the City of Tampa's drinking water, and the Hillsborough River provides water for approximately 600,000, including the City of Tampa. As the Corps itself stated in the EA on the CCTC project, "[g]iven that a portion of the project drains into Cypress Creek, an Outstanding Florida Water (OFW) and a tributary to the Hillsborough River (the major source of drinking water for the City of Tampa), water quality was an issue of great concern." Corps EA at 41 (emphasis added).

19

45. The proposed construction site for the CCTC is occupied habitat of the American Alligator and the Eastern indigo snake, federally listed threatened species. The site also contains foraging habitat for the Wood stork, a federally listed endangered species, and is part of the core Wood stork foraging area for five wood stork breeding colonies. Corps EA at 46. The nearest Wood stork colony is only 1.3 miles from the Site. Notice at 3. The Hillsborough River provides habitat for the endangered West Indian Manatee, and Cypress Creek provides much of the Hillsborough River's water. Accordingly, degradation of Cypress Creek has the potential to degrade the Hillsborough River, Tampa Bay, as well as the City of Tampa, which draws much of its water from the Hillsborough River.

46. Cypress Creek and its associated wetlands provide important water purification functions, assimilating nutrients and removing pollutants from the water that ultimately flows into Hillsborough River and becomes the City of Tampa's water supply. Corps EA at 16. In addition, they provide important storage capacities for storm water, and in so doing, they reduce flooding and provide flood control. Id.; see also id. at 35. Cypress Creek's wetlands also assist in recharging the underlying aquifers which serve as a public drinking water supply.

2. **The Project Site and the Project as Approved by the Corps**

47. The site of the proposed project is approximately 507 acres of presently undeveloped land and is located within Pasco County, directly adjacent to the Cypress Creek. 155 acres of the site are wetlands and 9.65 acres are surface waters. Corps EA at 1. The wetlands are described in the Corps' Notice and EA as cypress swamps, mixed wetland forests, freshwater marshes, wet prairies, ditches and small ponds. Id. Together, they form

20

part of a natural "wetland system consist[ing] of a network of freshwater wetlands adjacent to Cypress Creek." Id. The "wetlands do provide natural biological functions such as foraging and roosting habitat for some species, especially wading birds, on a seasonal basis." Id. at 34. The uplands on the site are, at present, primarily pastureland.

48. The site includes areas "identified as a <u>critical wildlife linkage</u> in the 2002 report titled 'Assessment of Measures to Protect Wildlife Habitat in Pasco County,'" a report that was commissioned by Pasco County. Corps EA at 37 (emphasis added). "The natural lands along Cypress Creek within the project area fall into the identified 'Cypress Creek to Cypress Bridge' <u>critical</u> linkage." Id. (emphasis added). "<u>This linkage is deemed important because of its location as a 'bottleneck' between large conservation lands associated with the Cabbage Swamp and Cypress Swamp and the conservation lands in Hillsborough County.</u>" Id. (emphasis added).

49. The site is in close proximity to public lands, including a wetland mitigation site that is downstream from the planned project, and adjacent to Cypress Creek. The Cypress Creek Preserve, owned by Hillsborough County, is also downstream and about 1.25 miles from the site. There are also nearby municipal wells that provide drinking water to Tampa Bay Water, regional supplier to St Petersburg, Pinellas and Hillsborough County. The wetlands slated for destruction function to recharge the Floridan aquifer which is the main source of water into which these wells are drilled. The wetlands also capture, store, and allow to be absorbed and purified the water that slowly percolates first into the surficial, then the intermediate and finally into the deeper Floridan aquifer.

50. As explained in the Corps' EA on the CCTC project, the project entails an enormous "regional mall and supporting commercial enterprises, including retail businesses, financial institutions, hotels, restaurants, cinemas, offices and multi-family residential housing." Corps EA at 2. In total, the development plan calls for 630 residences; 700 hotel rooms, more than 900,000 square feet of retail space; three department stores; 178,800 square feet of restaurants; and 420,000 square feet of office space.

51. To service these developments, tens of acres of surface parking will also be constructed. As approved, the project will destroy 23 acres of wetlands - almost half of the total wetlands to be destroyed - for parking lots alone. Corps EA at 11. Wetlands will also be destroyed so that storm water retention ponds can be created to retain some of the storm water that the wetlands currently hold and purify. This is necessary because, with the massive increase in impervious surfaces, stormwater runoff will now be rapidly shed off the site, rather than being absorbed into the wetlands.

52. The project description calls for "protecting" the wetlands on site that will not be destroyed for project construction - as well as to protect Cypress Creek itself - using buffers and a storm water treatment system. The effectiveness of these protective measures is essential to safeguarding Cypress Creek and other resources, as the Corps recognized: "[m]inimizing impacts to the upland buffer adjacent to Cypress Creek is of paramount concern given the quality of the resource (Cypress Creek is an Outstanding Florida Water) and the proximity and scale of the proposed development." EA at 15 (emphasis added). The Corps

22

also acknowledged the vital importance of adequate treatment of storm water before discharge to the remaining wetlands and Cypress Creek. Id. at 16, 35, 36, 42, 44-45.

53. The remaining wetlands will only have an "average 25-foot buffer" around them, suggesting that many wetlands may be even closer to parking lots, buildings, and other developments. Corps EA at 15, 35. Cypress Creek itself will have only a buffer of 50 feet from activities associated with the project, id. at 15, 36, although the developer of a nearby residential project ("Grand Hampton") agreed to buffers five times larger.

54. Stormwater treatment ponds that will be built on site are designed to hold only 1.5 inches of rain, Corps EA at 41, although the area in which the proposed site lies experiences weather events that deposit far more than 1.5 inches of rain. For example, the National Weather Service provides the following statistics from 2006 concerning the record rainfall in any given twenty four hour period for each of the following months: June 2006 (3.17 inches/24 hour period); July 2006 (1.98 inches/24 hour period); August 2006 (1.87 inches/24 hour period); September 2006 (3.05 inches/24 hour period); November 2006 (1.75 inches/24 hour period). See http://www.weather.gov (last visited June 17, 2007) (under climate/past weather).

55. The project also relies heavily on off-site mitigation – i.e., creating and protecting wetlands on an off-site location – of the sort that, according to the recent GAO and St. Peterbsug Times analyses of the Corps permitting program, has routinely failed adequately to offset wetlands losses from similar Corps-permitted projects.

C.    **The Corps' Public Notice**

23

56. On October 31, 2005, the Corps issued a Public Notice regarding the application of Sierra Properties to fill approximately 53.89 acres of jurisdictional wetlands and 9.65 acres of man-made jurisdictional surface waters - or 63.54 acres of "waters of the United States" - with 270,418 cubic yards of fill material. 10/31/2005 Corp Public Notice at 1 ("Notice"). The Notice – which afforded the public only thirty days to submit comments – did not identify the fact that Cypress Creek flows into the Hillsborough River, nor that Hillsborough River is "the major source of drinking water for the City of Tampa." Corps EA at 41. The Notice did not specify that the Site is in close proximity to municipal wells that provide the potable water for nearby communities. The Notice also failed to identify the specific functions performed by the wetlands being lost, such as flood control, storm water storage, water purification, nutrient assimilation, and groundwater recharge. The Notice also did not advise the public that the site has been designated a "critical" wildlife habitat corridor that allows wildlife to travel between protected lands.

57. The Notice did describe the proposed project in terms that make clear that it is not "water-dependent," i.e., the Notice did not suggest any reason why the project must, to accomplish its basic purposes, be built in Florida's rapidly dwindling wetlands. Rather, the Notice described the kinds of quintessential upland developments that need not entail the loss and degradation of wetlands, i.e., the overall purpose was identified as "develop[ing] a regional mall and supporting commercial enterprises, including retail businesses, financial institutions, hotels, restaurants, cinemas, offices and multifamily residential housing." Notice at 1. The Notice did not, however, identify the full scope of the project, such as the tens of

24

acres of parking lots to be built in wetlands, the hundreds of residential units, or the massive

scale of the mall, with its million plus square feet of retail space, and hundreds of thousands of

square feet of office space.

58. The Notice did not identify any of the potential environmental impacts of the

proposed project. Nor did it identify any of the alternatives to the project, nor the

environmental impacts of those alternatives. Id. Instead, for a review of the alternatives, the

public was advised that it could separately request a copy of the "alternatives analysis"

prepared by the permit applicant for a fee. Notice at 4.

**D.     Public Comments**

59. Despite the inadequate project description, conservation organizations and many

residents of Pasco County strenuously opposed permit issuance on multiple grounds.

Although commenters stressed the lack of substantive information in the Notice, such as the

lack of any information concerning the quality and function of the wetlands being destroyed,

the comments highlighted many ways in which the project could have significant adverse

effects on environmental values. Detailed comments submitted on behalf of individuals

residing in proximity to the site further explained that the "proposed project is uniquely

situated within, adjacent to and in between the 100 year floodplain, wetlands and waters of

Cypress Creek," which is an "environmentally sensitive location that provides important

wetland functions to the 'human environment' including water development enhancement,

water storage and flood attenuation, groundwater recharge, fish and wildlife habitat aesthetics

and recreation."

25

60. The public comments stressed additional "[e]nvironmental, cultural, and sociological impacts [that] will result" from the project and "have not been fully understood or given adequate consideration," including "potential release of pollutants and nutrients from parking lot runoff, fertilizers and pesticides" into Cypress Creek and other water bodies; the "introduction of petrochemicals from increased parking lot storage of cars on the impacted wetlands and associated oils and exhaust"; the "loss of wetlands leading to a decreased ability to absorb nutrients and urban runoff and pollutants"; the "increased probability of damage to [the] watershed of Cypress Creek, which collects diffused surface waters as a tributary of the Hillsborough River, a surface drinking water source for the City of Tampa;" the "increased probability of damage in the event of [a] tropical storm or hurricane due to loss of protective wetlands and impacts in the 100-year floodplain"; and "cumulative impacts of the proposed use and other recently approved or pending wetland fill applications near this project in Pasco and Hillsborough County within the Cypress Creek watershed," including "at least 4-5 other regional malls that have been approved in the surrounding area." Commenters further highlighted a plethora of indirect environmental effects that would flow from the massive project, and explained that "mega-malls" of equivalent size have resulted in "tremendous secondary urban sprawl" with attendant traffic, pollution, and other significant environmental impacts. In view of these and other serious environmental impacts and risks, commenters urged the Corps to prepare an EIS, or to at least fully address in an EA the need for an EIS in light of these issues and concerns.

26

61.  Public comments also specifically stressed that the proposed mall was not a "wetland dependent" activity under either the Corps' definition of such activities, or under the Pasco County Comprehensive Plan, which narrowly defines such activities as those whose use "requires access to the water for waterborne transportation, including ports, or marinas, recreation, electricity-generating facilities, or water supply." Because the shopping mall and related development activities are clearly not "water-dependent," commenters stressed that, under the CWA and its implementing regulations and guidelines, the destruction and degradation of the wetlands on the project site should be avoided, particularly because there are other potential sites in the immediate area whose development would not necessitate significant wetlands destruction.  Commenters not only identified specific alternative sites where the CCPC project could be built with far less environmental damage and risk, but they also identified other major malls already under construction in the immediate vicinity – The Shops at Wiregrass and The Groves at Wesley Chapel – and questioned the need for a third mall in the same location (in the case of The Shops at Wiregrass within a two minutes driving time, just East of the site).

62.  Public comments also highlighted ways in which the project could be reconfigured on-site so as to eliminate or drastically reduce the projected wetlands impacts, particularly because the "wetland impacts are largely for the Mall's associated surface parking and accessways."  Commenters specifically urged that the wetland impacts be "avoided or minimized, by using mall parking lot design alternatives" and that "one simple solution is to

27

require or provide a multi-level parking garage" – which are "found at many malls in Florida" – that "would avoid direct fill impacts to the wetlands located on site."

63. Although the Corps' Notice had provided few details about steps being taken by the developer to address project impacts, commenters strongly criticized as inadequate the measures that were described. With regard to the minimal "buffers" designed to protect the wetlands remaining on site and Cypress Creek itself, commenters pointed out that the buffers were far smaller than those agreed to by other developers in the vicinity and that were called for by the available scientific literature on the measures necessary to safeguard wetlands ecosystems and water bodies that are used for drinking water purposes. With regard to the "off-site mitigation," commenters described in detail the St. Petersburg Times' analysis of the Corps' systemic failure to monitor the implementation of off-site mitigation measures agreed to by permittees, and how this has contributed to the loss of many thousands of acres of wetlands in Florida alone in the last 15 years. Commenters further explained that the Corps' own employees who worked in the permitting program have explained that the Corps rarely if ever ensures that off-site mitigation is actually taking place; that few if any of the off-site mitigation efforts actually compensate for the natural wetlands being destroyed; and hence that the Corps' emphasis on such "mitigation" is, according to a retired Corps permitting official, a "big shell game." In light of the Times' analysis, commenters urged the Corps to explain what, if any, underlined additional steps it is taking to verify the representations being made by the permit applicant in this case, and to ensure that meaningful off-site mitigation will in fact take place.

28

64. On or around February, 2007, plaintiff Rametta discussed the permit application with a Corps employee, Tracy Hurst, who indicated that she was the principal permitting officer for the project, i.e., the Corps employee largely responsible for reviewing the permit application and ensuring its compliance with federal law. Ms. Hurst indicated to Mr. Rametta that, because of her training as a biologist, she did not believe that she was qualified to independently evaluate the economic analyses submitted by the developer – analyses that were essential to determining the availability of "practicable" on-site and off-site alternatives that would eliminate or drastically reduce the adverse impacts on wetlands. Accordingly, Ms. Hurst advised Mr. Rametta that she had recommended to Corps officials that they assign an economist to review the project, but that Corps officials had refused to do so. On information and belief, therefore, no Corps employee with expertise concerning economic issues has ever independently evaluated the economic analyses and data relied on by the project proponent to support the contention that alternatives entailing fewer environmental impacts and risks are not "practicable," as opposed to merely less profitable.

**E.     The Corps' Environmental Assessment, Refusal To Prepare An EIS, And Issuance of a Permit In Violation of the CWA and NEPA.**

65. On May 17, 2007, the Corps issued an EA for the project and later that month the Corps issued a final section 404 permit for the project, which was largely unchanged from the development described in the Public Notice. The EA asserts that "this permit action will not have a significant impact on the quality of the human environment," and hence that an EIS "will not be required," but the EA does not specifically explain why application of the CEQ significance criteria do not warrant preparation of an EIS.

29

66. While the EA fails to address many of the concerns raised by commenters –
including, e.g., those relating to potential petrochemical contamination of Cypress Creek and
Hillsborough river; the Corps' failure to ensure that off-site mitigation meaningfully
compensates for wetlands losses; the actual need for the project in light of other nearby malls;
the inadequacy of on-site measures to reduce impacts relative to steps taken by other
developers and what is called for by the scientific literature on wetlands protection; and
cumulative effects on wetlands and other natural resources – it nonetheless acknowledges
serious environmental concerns and potential adverse impacts. For example, the EA
acknowledges that the project area is likely used by or provides habitat for several federally
listed endangered and threatened species, particularly the Wood stork and the Eastern indigo
snake, Corps EA at 4, and lies "within the core foraging area of 5 wood stork breeding
colonies, id. at 46; that the "Hillsborough County Environmental Protection Commission
raised issues regarding water quality and water supply," id. at 4; that the project was opposed
by local conservation groups and residents of Pasco County, id. at 4-5; that the impacts to
wetlands from parking lots should be "heavily scrutinized," id. at 11; that "[m]inimizing
impacts to the upland buffer adjacent to Cypress Creek is of paramount concern given the
quality of the resource (Cypress Creek is an Outstanding Florida Water) and the proximity and
scale of the proposed development," id. at 15 (emphasis added); that the "vast majority of the
lost wildlife habitat function cannot be mitigated effectively on-site," id. at 16-17; that the
wetlands being destroyed "do provide natural biological functions such as foraging and
roosting habitat for some species, especially wading birds, on a seasonal basis," id. at 34; that

30

the "wetlands do serve as valuable storage areas for storm and flood waters," id. at 35; and

that because a "portion of the project drains into Cypress Creek," which is a "tributary to the

Hillsborough River (the major source of drinking water for the City of Tampa), water quality

was an issue of great concern." Id. at 41 (emphasis added).

67. As the EA and comments submitted to the Corps make clear, the proposed

project triggers a number of the significance criteria under the CEQ regulations implementing

NEPA, and hence an EIS should have been prepared prior to permit issuance. For example,

the project may, particularly along with other similar projects, significantly affect drinking

water supplies and flood risks, 40 C.F.R. § 1508.27(b)(2); it will destroy wetlands and

degrade an Outstanding Florida Water, id. at § 1508.27(b)(3); its adverse effects and risks are

highly "controversial" within the meaning of the CEQ regulations, id. at § 1508.27(b)(4); it

establishes a significant precedent, including by authorizing the destruction of wetlands near

an Outstanding Florida Water, and that contribute to the drinking water of over a million

people, and by approving on-site measures that are clearly inadequate to safeguard the

remaining wetlands, id. at § 1508.27(b)(6); and it may affect a number of federally listed

species, such as the Wood stork and the Eastern Indigo snake, id. at § 1508.27(b)(9).

68. The EA and the Corps' CWA permitting procedures are also legally deficient

because, while the EA concedes in a checklist that the mall, parking lots, and associated

developments are not "water-dependent" activities, see Corps EA at 29 – and hence the Corps

should have imposed an extremely heavy burden on the project applicant to justify the

destruction of any wetlands for such activities – the EA instead reflects that the Corps

31

imposed no such burden before deciding to issue a permit for a significant loss of wetlands. To the contrary, the Corps largely, if not entirely, deferred to the applicants' self-serving assessment of the economic justification for the project and the need to destroy wetlands, and hence the Corps violated its legal duties by a) failing to take a hard, independent look at various practicable alternatives and their relative environmental impacts, b) failing to offer evidentiary support for many of the Corps' findings other than the statements of the project applicant; c) offering conclusions that run counter to the record evidence, including the detailed comments that were submitted by project opponents; (d) undermining the public's ability to provide meaningful comments on the project, including by omitting important project elements from the Public Notice and by failing to afford the public an opportunity to comment on the EA, which set forth many such elements for the first time; and e) otherwise acting contrary to the Corps' CWA regulations and the 404 guidelines, as well as to NEPA's requirement that the Corps take a "hard look" at all environmental effects, including indirect and cumulative effects.

1. **The Corps' Inadequate Analysis of Alternatives for Avoiding, Minimizing, and Mitigating Wetlands and Other Adverse Impacts.**

69. For its alternatives analysis, the Corps essentially deferred to the analysis provided by the applicant. In the alternatives analysis, the applicant reviewed a "no action alternative," eleven off-site alternatives, several on-site alternatives, and avoidance, minimization and mitigation options, as discussed below.

a. **No Action Alternative**

32

70. The "no action alternative" in the EA provided no information concerning the current site, the impacts, or the functioning, of the site as it currently exists. The "no action alternative" is intended to provide a benchmark by which to judge the environmental benefits and impacts of leaving the proposed site as it is currently versus developing it. The no action alternative discussion provided by the Corps provides no such meaningful benchmark of the environmental benefits of maintaining the site, or at least those portions of it containing wetlands, in its present, largely undeveloped condition.

**b. Off-Site Alternatives**

71. The EA indicates that the permit applicant selected eleven off-site alternatives to analyze, but fails to explain how the applicant selected the sites it analyzed (beyond a description of the reasoning for selecting the general geographic region for the mall). The EA does not indicate that the Corp made any attempt to analyze for itself what other possible alternative sites should or could have been considered.

72. The EA indicates that the applicant identified criteria it used to evaluate each site, ranking each criteria from 0-4 for each site. The criteria included, among other things, a minimum of 200-250 acres that could be configured to allow development of the mall complex, and a "prefer[ence]" for sites with access to "2 major or minor arterial roads . . . while sites with access solely from collector roads were considered less suitable." EA at 7 (emphasis added). It also assigned a 0 - 4 value to the "Environmental Suitability" criterion that it used to evaluate each Site, which was supposed to encompass the following considerations: "acreage of wetland impacts, quality of wetland that would be impacted,

33

presence of wetland dependent species, suitability of soils, flood zones . . . upland listed species . . . [and the] difficulty of obtaining needed permits." Corps EA at 7.

73. Five sites were immediately eliminated because they did not provide the minimum 200-250 acres. Some of these sites were directly across a road from each other, such as "Northwest quadrant of Interstate 75 and County Road 54" (site 2), and "Southwest quadrant of Interstate 75 and County Road 54" (site 3). Corps EA at 8. However, with no explanation or evidence offered in the EA, the Corps stated that "[c]ombining parcels was considered but did not yield a viable alternative." Corps EA at 9. Similarly, with no evidentiary support other than what "the applicant further clarified," the Corps concluded that "the project purpose cannot be met by dividing the proposed project between sites." Corps EA at 10. The Corps therefore failed to demonstrate that combining two sites was in fact impracticable.

74. Four sites were eliminated from consideration because they were "Not for Sale." Corps EA at 6, 9. There is no evidence in the EA that any inquiry was ever made by the Corps or even the project applicant as to whether the owners of the four sites were approached about selling their land, and if so, what the offer was, or whether the owners would even consider offers. One of these parcels was the "Geraci" property which the Corps was specifically informed by plaintiff Rametta was a viable and available alternative prior to issuance of the permit. The EA does not reflect any inquiry into or analysis by the Corps of the "availability" of these other sites.

75. Of the remaining three sites, site one was eliminated because it was in a slower growing part of Pasco County, although the location is on I-75, just 9 miles and 7 minutes

34

north of the proposed site. The Corps did not discuss the close proximity of the two other sites, nor, for example, the fact that the market area for the proposed mall was intended to extend all the way to southern Hernando County, another 8-10 miles north on I-75. Yet the EA does not reflect any independent inquiry into or analysis of the practicability of these sites by the Corps.

75. Site four was eliminated because "access could only be provided by one arterial road" and thus the applicant asserted it "failed to be practicable since it cannot provide the required access." Corps EA at 9. However, the applicant's own alternatives analysis expressly stated that two major or minor roads were merely "preferred by the applicant," and that "sites with access solely from collector roads were considered less suitable." Corps EA at 7 (emphasis added). Under the CWA and implementing regulations, such "preferences" are not legally sufficient to justify the destruction of wetlands, especially for the construction of a project that is admittedly not water-dependent. In addition, site four is served by "one arterial road" (County Road 581), which is currently being expanded to a six lane road. Accordingly, site four is not even limited to the smaller collector roads the applicant deemed "less suitable." The Corps did not discuss these important facts, nor does it appear to have considered whether a second road could be brought to the site.

76. The EA contains no information about the environmental conditions at the proposed off-site alternatives, nor what the environmental impacts of developing at the other sites would have been. For example, there is little information or discussion concerning whether these other sites had wetlands, the quality of the wetlands, the extent of the wetlands,

35

whether the wetlands were "jurisdictional" under the CWA, whether there were surface

waters at the sites, whether there were other natural resources at the sites, such as an

Outstanding Florida Water, whether the sites provided the headwaters for drinking waters, the

recharge area for municipal wells, or whether the lands were designated a "critical" habitat

linkage as is the proposed site.  Rather, the EA merely assigns - and for only two of the off

site alternative - the number "3," Corps EA at 9, a designation that means "[f]ew impacts, less

difficult to permit."  Id. at 8.  The other nine alternative sites did not even have any ranking at

all and the EA does not reflect any inquiry into or analysis of environmental conditions at

these off site alternatives by the Corps.  The separate Alternatives Site Analysis provides some

more information, but none of the details necessary to compare the environmental conditions

of the various sites.

### c.  On Site Alternatives

77.  In the ESA the Corps also deferred to the applicant's analysis of four on-site

alternatives for reducing impacts to wetlands.  These ranged from Alternative A, which would

destroy 106 acres of wetlands, or 63% of existing wetlands, leaving 64 acres remaining, to

alternative D, the proposed alternative, which destroys 54 acres of wetlands, or 32% percent

of the existing wetlands on the site, almost half of which are to be destroyed for parking lots.

Corps EA at 11.  The EA did not analyze whether there were other specific configurations,

beyond the four listed by the applicant, that could have further reduced impacts to wetlands

beyond a discussion of a road extension.  Therefore, there is little information in the EA from

which one could determine whether there are other on-site alternatives less damaging to wetlands.

### d. Avoidance

78. The applicant's analysis of the "avoidance" of impacts to wetlands, and the Corps' discussion of it in the EA, focused largely on the 23 acres of wetlands that will be destroyed for parking. Although the EA discusses a number of possible design changes to avoid destroying wetlands, all of these avoidance measures were rejected by the applicant because they would supposedly result in a drop in the profit level to below 8.0% which, the applicant asserted, would result in a loss of financing, making all avoidance options impracticable. See Corps EA at 11-13; id. at 14 ("The applicant stated that a rate of return below 8% deems the alternative impracticable"). In addition, the applicant "stated" that its tenants demanded surface parking, and that it therefore could not reduce the amount of surface parking by using parking garages. Id. However, the EA does not provide supporting evidence the applicant's assertions. Id. Nor does the EA suggest that the Corps sought to independently inquire into, or verify, the veracity of the applicant's statements, although commenters had pointed out that other similarly sized malls had relied on, for example, parking garages to minimize the amount of surface area used for parking.

79. For example, in response to the Corps' request that the applicant consider relying more heavily on parking garages so as to avoid needless wetlands destruction, the applicant asserted that this was not practicable because the applicant had to make at least an 8.0% percent profit, and additional parking garages would drop the profit rate. Corps EA at 11

("the Rate of Return . . . deems the alternative impracticable since financing cannot be secured at this [7.4-7.5 %] profit level"). Id. The "applicant further stated that the 'Power Center' tenants . . . demand their customers parking at grade and will not accept a location served by structured parking." Corps EA at 11-12. The EA, however, does not proffer or identify any evidence to support the fact that no financing was available if profits dropped below 8.0%. Nor did the EA cite any evidence to support the asserted demand of 'Power Center' tenants, much less that identified the tenants or their demands. Nor does the EA suggest that the Corps independently inquired into, or sought to verify, the cost of a second or third garage, the availability of financing below 8.0%, or the identity of tenants and the demands the tenants made.

80. Similarly, when the Corps inquired into whether fewer parking spaces was a possibility, the applicant's own study revealed that the project "proposed more parking than any existing mall in the evaluation." Corps EA at 12 (emphasis added). According to the EA, the applicant nonetheless justified its inability to reduce its parking by "stat[ing]" that because the project at issue is a regional mall, it will have more restaurants, and the number of restaurants in the mall required a greater number of parking spaces. The EA, however, does not proffer or identify any information that supports the applicant's assertions, nor does it suggest the Corps sought independently to investigate the issue. For example, the EA does not identify any evidence to support the assertions that regional malls have, or must have, more restaurants, that restaurants require more parking than other commercial activities, or that the other malls that were reviewed in the EA were not regional malls or that they had

38

comparatively fewer restaurants. Moreover, the Corps even noted exceptions to the applicant's assertions. Thus, the Corps accepted the impracticability of fewer parking spaces without independent investigation, based on assertions of the applicant, and in face of conflicting evidence.

81. The Corps also inquired into whether any buildings could be multi-story other than the three department stores, but the Corps accepted at face value the applicant's assertions that such a revision was not possible: "The applicant stated that the Power Center tenants . . . require a one-story format, as sales dollars decrease on the second floor and operational costs are higher. . . . [and] the department stores are the only stores that have a variety of departments that allows them to merchandize the second floor." Corps' EA at 12. The EA cites no evidence to support these assertions, and it does not appear from the EA that the Corps sought to independently inquire into or verify such assertions.

### e. Minimization

82. To minimize the effects of the development, "the Corps required the applicant to evaluate the practicability of downsizing the project" and "since cost was the limiting factor, alternatives consisted of reducing the footprint," or size, of the development. Corps EA at 13. However, the Corps' analyses of minimization also rest upon, and defer to, the applicant's self-serving assertions with little or no supporting evidence, and no apparent efforts at independent verification by the Corps of the applicant's assertions.

83. For example, as the Corps explained, "just a 5.0 % downsizing in project uses would reduce the project footprint by over 28 acres," but the applicant "stated" even this was

39

not practicable, and the Corps simply deferred to this assertion. Id. at 14. The EA further states that the applicant "stated" that none of the downsizing alternatives was practicable because "the reduction in project footprint and resulting Rate of Return" fell below 8.0%, rendering the project not profitable enough to garner financing. Corps EA at 13 (The "applicant stated that a Rate of Return below 8.0% deems the alternative impracticable.") (emphasis added); id. at 14 ("the feasibility studies performed by the applicant show that deleting just one bank from the project would bring the rate of Return below 8.0%") (emphasis added). The EA indicates that the Corps engaged in no independent evaluation of these representations and cited no evidence other than the applicant's own statements in support of the critical assertion that virtually any change at all would drop the rate of return below 8.0% and undermine financing.

84. Although the Corps stated that it viewed "[m]inimizing impacts to the upland buffer adjacent to Cypress Creek [to be] of paramount concern given the quality of the resources (Cypress Creek is an Outstanding Florida Water) and the proximity and scale of the proposed development," Corps EA at 15, the EA does not seriously scrutinize whether the buffers adopted by the applicant will in fact be sufficient to protect the remaining wetlands and Cypress Creek, especially in light of scientific literature suggesting that buffers must be far greater to afford such protection. Instead, the Corps, once again, simply accepted the applicant's assertion that larger buffers would drop the project below an 8.0% of return rate, and that no financing would then be available, which the Corps never independently investigated nor verified. The Corps' conclusion in the EA that the buffers afford "the best

40

protection possible for the Creek," therefore, is predicated on the project applicant's financial interests, not on what will actually afford the "best" protection for the natural resources on the site. EA at 15.

85. The EA also never addresses whether the storm water treatment system will in fact be adequate to protect the quality of the "resources" potentially affected. The EA offers no evidence that the storm water treatment system is adequate to prevent degradation of Cypress Creek and its wetlands. For example, although this is a hurricane-prone area, the Corps neither discusses whether, nor offers evidence that, the storm water system will be effective at "treating" storm water in weather events that exceed the system's 1.5-inch capacity, even though such weather events are common in the area. Nor is there any evidence, or discussion, as to whether, during such events, the retention ponds that are part of the "treatment" system will be able to regulate the flow of water into the wetlands.

86. In addition, the EA does not address whether, or provide any evidence that, the "treatment" system will be adequate to effectively treat the pollutants in the storm water. The EA never identifies or discusses the expected pollutants from the development that will need to be treated to maintain water quality. Thus, there is no basis upon which to determine whether the proposed system, which will remove "dissolved solids as well as greases and floating debris," will in fact be adequate to protect Cypress Creek or the Hillsborough River, which is Tampa's drinking water supply. The Corps never addressed public comments that raised the concern of petrochemicals and oils washing off the many acres of parking lot, along with fertilizers and pesticides.

87. The EA never discusses or explains how, or offers evidence that, a water quality monitoring plan will be sufficient to protect water quality in Cypress Creek and its wetlands. For example, should the monitoring reveal a drop in water quality, the Corps does not identify in the EA what steps could or would be taken to rectify the situation, following construction of the mall, to improve the system, or which steps are even mandatory. Nonetheless, the EA relies heavily upon such monitoring to protect water resources.

      f.     **Mitigation**

88. The EA states that the Corps and permit applicant largely plan to off-set wetland impacts through off-site mitigation, although the EA identifies several on-site "lost wetlands functions" – such as flood water storage, water purification, and wildlife habitat for federally listed species – that cannot be replaced by off-site mitigation. Corps EA at 16-17. In addition, the EA never responds to issues raised in public comments that question the efficacy of the Corps' heavy reliance on off-site mitigation. In particular, the Corps made no effort to address the concerns raised by commenters -- based on the St. Petersburg Times and GAO analyses – that off-site mitigation frequently fails because artificially created wetlands do not survive or because the applicant fails to build or preserve them; that the Corps has no effective oversight or monitoring program to ensure that off-site mitigation actually occurs; and that the Corps' own employees have disparaged off-site mitigation as affording no meaningful protection for wetlands. Nor did the Corps make any commitment to provide for more monitoring and oversight than it has engaged in with regard to past projects that have resulted in a net loss of many thousands of acres of wetlands in Florida.

## 2.    The Corps' Inadequate Analysis of Whether the Project is in the Public Interest or Otherwise Complies With the 404 Guidelines

89.    The Corps' EA asserts that issuance of a permit for destruction of wetlands is "not contrary to the public interest" and "complies with the 404(b)(1) guidelines," but fails to support those conclusions with adequate analysis or data.  The EA does not explain how it is in the public interest – particularly in light of the declared purposes of the CWA and the Corps' own regulations stressing that the "unnecessary alteration or destruction of [wetlands] should be discouraged as contrary to the public interest," 33 C.F.R. § 320.4(b)(1) (emphasis added) – to destroy and degrade wetlands, and to also risk degradation of an "Outstanding Florida Water" resource, in order to construct a huge shopping mall that is admittedly not water dependent and is also being built in close proximity to other malls that already provide similar shopping and other commercial opportunities.  It ignores evidence provided in comments that conflicts with the evidence it relied upon, such as the alleged need for a new mall when others are being built close by.  In violation of the Corps' regulations, the Corps' public interest finding also fails adequately to address, inter alia, various wetlands "functions important to the public interest," id. at § 320.4(b)(2), including the extent to which: the wetlands "serve significant natural biological functions" for various wildlife species, id., destruction of the wetlands "would affect detrimentally natural drainage characteristics," id., the wetlands "serve as valuable storage areas for storm and flood water," id., and the wetlands "serve significant water purification functions."  Id.  The Corps' public interest review is also legally deficient because it is not based on the Corps' own independent analysis that the

"benefits of the proposed alteration outweigh the damage to the wetlands resource." Id. at §
320.4(b)(4).

### 3. The Corps' Inadequate Analysis of Indirect and Cumulative Effects

90. The Corps' EA also fails to take a hard look at the environmental effects of
indirect or secondary impacts associated with the project. For example, it discussed one
aspect of the growth inducing effect of the project on one neighboring area – King Ranch –
but it did not identify, or even discuss, any adverse environmental impacts from such growth
inducing effects, such as traffic or pollution impacts. Nor did it consider whether there might
be other growth inducing effects on other lands.

91. The EA acknowledges that the remaining on-site wetlands may suffer "changes in
wetland function and values," but does not identify what these changes are, what their
possible severity might be, or what the consequences of such "changes in wetland function"
might be. Corps' EA at 50. For example, the EA does not consider, or discuss, whether the
wetlands might die off or erode away, in part or in whole, and it does not discuss what the
consequences of this would be, such as loss of storm water retention capacities and increases
in flooding as a result, or loss of water purification capacities and increases in pollution and
sedimentation of other wetlands (or Cypress Creek's waters), and/or adverse impacts to
municipal drinking water sources.

92. The EA contains only a one paragraph assessment of the cumulative impacts of
the project, stating simply that the Corps "instructed the applicant to complete a
comprehensive cumulative impact analysis," and that the Corps "agrees with the findings of

the [applicant's] report . . . that the project will not have any significant cumulative impacts." Corps EA at 51. The EA does not identify or even discuss what any specific cumulative impacts might be, nor what other actions might be cumulative with the proposed action. Similarly, the EA does not discuss any of the concerns raised in comments concerning cumulative effects, such as the cumulative impacts of this and other ongoing and planned developments on groundwater usage and drawdown, flood water storage, generation of storm water volumes, pollutant and nutrient processing, and drinking water supplies.

### 4. The Corps' Failure to Provide For Meaningful Public Input

93. Although the Corps largely deferred to the permit applicants' own self-serving economic and other analyses, the Corps never afforded the public a meaningful opportunity to comment on, or otherwise have input into, the validity, accuracy, objectivity, and completeness of these analyses. In particular, the Corps never afforded the public an opportunity to comment on the EA, although that document set forth, for the first time, many of the economic and other critical assumptions on which the project applicant was relying in resisting on- and off-site alternatives that would better avoid and/or reduce environmental impacts. Nor did the Corps provide for a public hearing, as provided for in the CWA and implementing regulations. Accordingly, the Corps not only failed to engage in its own independent scrutiny of the economic justifications for the project as approved, but it also largely negated the concerned public's ability to engage in such scrutiny.

45

**F.      The FWS's Arbitrary Concurrence That The Project "May Affect But Is Not
Likely to Adversely Affect" Any Federally Listed Species**

94.  Although the project area is indisputably occupied by federally listed species –

including the Eastern indigo snake and American alligator – and contains suitable foraging

habitat for the endangered Wood stork, the FWS, on March 22, 2007, concurred with the

Corps' finding that the development of a massive shopping mall, parking lots, and related

developments on the site would have no adverse effects on listed species, and hence that

formal consultation and production of a Biological Opinion could be avoided.  Corps' EA at

4.  The FWS reached this conclusion although the loss and degradation of foraging habitat

was one of the principal reasons for the listing of the Wood stork as endangered and the

Service has determined that preventing such loss and degradation is essential to the recovery

of the species.  In concurring with the Corps' determination, the Service relied on an analysis

of the site conducted by Biological Research Associates, a consultant hired by the permit

applicant whose evaluation of Wood stork impacts in connection with another Corps-

permitted project was characterized by a federal district judge as a "patently absurd" basis on

which to conclude that the project would have no adverse effects on the species.  Sierra Club

v. Flowers, 423 F. Supp. 2d 1273, 1372 (S.D. Fla. 2006).

46

## COUNT ONE

## VIOLATION OF THE CWA AND THE APA

### (Army Corps of Engineers)

95.  By making a decision to issue a section 404 permit that authorizes the direct

destruction of over fifty acres of wetlands in land adjacent to an Outstanding Florida Water

and will result in the loss and degradation of additional wetlands on the project site, in order

to build a shopping mall, parking lots, and other activities that are not water-dependent and

hence may be built in areas that do not entail the loss of wetlands, the Corps has violated the

CWA, the Corps' implementing regulations, and the EPA's guidelines, abused its discretion,

and acted arbitrarily and capriciously in violation of the Administrative Procedure Act, 5

U.S.C. § 706(2).  The Corps has also violated the CWA, the Act's implementing regulations,

and APA by issuing the permit without (1) providing adequate public notice and input; (2)

adequately exploring and explaining the loss of wetlands values and functions; (3) disclosing

and adequately considering the direct, secondary, and cumulative effects of the permit; (4)

applying a strong rebuttable presumption that there were other practicable alternatives to the

project; (5) requiring the applicant to "clearly demonstrate" that there were no other

practicable alternatives; (6) developing a full range of alternatives, analyzing the practicability

of the alternatives, and independently assessing, inquiring into, and verifying, the applicant's

assertions and purported evidence that there were no practicable alternatives; (7) adequately

requiring that the project avoid, minimize, and mitigate significant effects upon wetlands,

water quality, fish and wildlife, and historic and cultural resources; and (8) actually explaining

how it is in the "public interest" to destroy Florida's ever-dwindling wetlands resources in order to build another shopping mall in close proximity to other malls and commercial centers.

96. These violations of the CWA, the regulations, the guidelines, and the APA have caused and will continue to cause plaintiffs injuries as described in ¶¶ 4-11.

## COUNT TWO

## VIOLATION OF NEPA AND THE APA

### (Army Corps of Engineers)

97. By failing to prepare a NEPA document that adequately addresses the serious environmental issues raised by the Corps' proposed project -- including by failing to (1) prepare an EIS; (2) take a hard look at the environmental impacts of the proposed action and its alternatives, including analyzing and disclosing less environmentally damaging alternatives; (3) consider the direct, indirect and cumulative impacts of the proposed action and alternatives; (4) adequately disclose critical environmental information and analysis to the public before a final decision was made, including by failing to provide adequate notice to the public about the size and scale of the project and the project's location in wetlands that provide, store, and purify, headwaters for the drinking water of over three quarters of a million people; and otherwise disregarding the requirements of NEPA and the CEQ regulations -- the Corps has violated NEPA and the CEQ's implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

48

98.  These violations of NEPA, the CEQ regulations, and the APA have caused and will continue to cause plaintiffs' injuries as described in ¶¶ 4-11.

**COUNT THREE**

**VIOLATION OF THE ESA AND THE APA**

**(Fish and Wildlife Service)**

99.  By making a decision to "concur" in the Corps' finding that no formal consultation is required under the Endangered Species Act before making a decision to authorize the destruction of over 50 acres of wetlands that are located within the core foraging range of five breeding colonies of the endangered Wood Storks, the Fish and Wildlife Service violated the ESA and the Fish and Wildlife Service's implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

These violations of the ESA, the applicable regulations, and APA have caused and will continue to cause plaintiffs injuries as described in ¶¶ 4-11.

**WHEREFORE**, plaintiffs request that the Court issue an order:

(1)    declaring that the Corps' decision to issue the permit violated the Clean Water Act, Endangered Species Act, the National Environmental Policy Act, and the Administrative Procedure Act;

(2)    declaring that the Fish and Wildlife Service's decision to "concur" in the Corps' decision to forego formal consultation under section 7(a)(2) of the Endangered Species Act

49

violates the Endangered Species Act, the Fish and Wildlife Service's implementing

regulations, and the Administrative Procedure Act.

      (3)     setting aside the Corps' decision to issue the permit;

      (4)     setting aside the Fish and Wildlife Service's decision to "concur" in the Corps'

decision to forego formal consultation under section 7(a)(2) of the Endangered Species Act;

      (5)     preliminarily and permanently enjoining the permitted activities unless and until

the Corps and FWS fully comply with the requirements of the Clean Water Act, the

Endangered Species Act, and the National Environmental Policy Act;

      (6) awarding plaintiffs their costs and reasonable attorneys' fees; and

(7) awarding plaintiffs any other relief that is just and proper.

Respectfully submitted,

_____
Joshua Stebbins
D.C. Bar No. 468542

_____
Eric R. Glitzenstein
D.C. Bar No. 358287

_____
Howard M. Crystal
D.C. Bar No. 446189

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
Jstebbins@meyerglitz.com

_____
Martha Collins
Collins & West, P.A.
500 East Kennedy Blvd., Suite 100
Tampa, FL 33602
Telephone: (813)273-9166
Facsimile: (813)273-6826
JWest@collins-west.com
FL Bar No. 0167770
Attorneys for Plaintiffs

Date: June 26, 2007

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Daniel Rametta
Dated: June 25, 2007

51

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### Tampa Division

| | | |
|---|---|---|
| Citizens for Sanity.com, Inc., et al | ) ) ) | |
| v. | ) ) | No: 8:07-cv-1106-T-23MSS |
| Lt. Gen. Robert L. Van Antwerp, et al | ) ) ) ) | |

## PLAINTIFFS CITIZENS FOR SANITY.COM, INC.'S ET AL'S
## NOTICE OF DISMISSAL

Pursuant to Fed R. Civ. P. 41(a)(1), Plaintiffs Citizens For Sanity.com, Inc., and Dan Rametta hereby give notice of their voluntary dismissal of the above captioned action.

Respectfully submitted,

Martha Collins
Fla. Bar No.: 0167770
Collins & West, P.A.
500 East Kennedy Blvd., Suite 100
Tampa, FL 33602
Telephone: (813)273-9166
Facsimile: (813)273-6826
Jwest@collins-west.com

EXHIBIT 2

Eric R. Glitzenstein
D.C. Bar No. 358287
Howard M. Crystal
D.C. Bar No. 446189
Joshua Stebbins
D.C. Bar No. 468542

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
Jstebbins@meyerglitz.com

Attorneys for Plaintiffs

Date: June 27, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| ATLANTIC SUGAR ASSOCIATION, INC., et al., | ) ) ) |
| Intervenor-Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES OF AMERICA, et al., | ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 99-2464
(RWR)

**FILED**

DEC 2 8 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION

Plaintiffs, a federally-recognized Native American Tribe and two agriculture entities all located in southern Florida, and intervenor-plaintiffs, four business entities located in southern Florida, challenge defendants' development and implementation of proposals contained in the Central and Southern Florida Comprehensive Plan ("the Florida Plan"), which regulates water resources in southern Florida, including parts of the Florida Everglades. Specifically, plaintiffs allege that defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 (1994), the Water Resources Development Act of 1996 ("WRDA"), Pub. L. No. 104-303, § 528, 110 Stat. 3658 (1996), and

EXHIBIT 3

-2-

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 <u>et seq.</u>
(1994), by failing to comply with the NEPA, WRDA and APA
regulatory procedures in developing and implementing the Florida
Plan proposals.  Defendants have moved to transfer this case to
the Southern District of Florida pursuant to 28 U.S.C. § 1404(a).
Because I find that the interest of justice favors transfer,
defendants' motion will be granted, and this case will be
transferred to the United States District Court for the Southern
District of Florida.

<u>BACKGROUND</u>

Pursuant to the WRDA, in July 1999 the Army Corps of
Engineers submitted to Congress a "proposed comprehensive plan
[the Florida Plan] for the purpose of restoring, preserving, and
protecting the South Florida ecosystem."  Pub. L. No. 104-303,
§§ 528(b)(1)(A)(i), (b)(1)(B)(ii), 110 Stat. 3658, 3768.  The
Florida Plan included new proposals that modified certain water
conservation and flood control provisions of the Central and
Southern Florida Project ("C&SF Project").  The C&SF Project,
authorized by Congress in 1948, was established to provide flood
control and water supply for municipal, industrial and
agricultural uses in southern Florida.  (Pls.'s Compl. ¶¶ 28-29.)

Plaintiff Miccosukee Tribe of Indians of Florida, depends on
the Florida Everglades for its subsistence, land, water
resources, natural resources, and its religious, cultural,

-3-

economic and historical identity needs. (Id. ¶¶ 1-7.) Plaintiff
Dade County Farm Bureau, an association of farmers and
agricultural businesses that has operated in southern Dade County
since 1942, depends on southern Florida's water resources to grow
crops. (Id. ¶¶ 10-11.) Plaintiff Brooks Tropicals, Inc., a
Florida corporation that grows tropical fruits in South Dade
County, also depends on southern Florida's water resources to
grow its crops. (Id. ¶¶ 14-15.) Intervenor-plaintiffs, Atlantic
Sugar Association, Inc., Okeelanta Corporation, Osceola Farms
Company and United States Sugar Corporation, are businesses that
depend on southern Florida's water resources for crop irrigation.
(Intervenor-Pls.' Reply Mot. to Int. at 5.) Plaintiffs assert
that the development and implementation of the Florida Plan
proposals failed to follow procedural regulations under the NEPA,
WRDA and APA, and, as a result, have harmed plaintiffs, all of
whom depend on southern Florida's water resources for their
livelihoods. (Pls.' Compl. ¶¶ 7-9, 12-13, 16-17.)

## DISCUSSION

Defendants have moved to transfer this case to the Southern
District of Florida pursuant 28 U.S.C. § 1404(a), which provides
that "[f]or the convenience of parties and witnesses, in the
interest of justice, a district court may transfer any civil
action to any other district or division where it might have been
brought." 28 U.S.C. § 1404(a). When a genuine choice of venue

-4-

exists,[1] the decision to transfer must be made "according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)). Courts have broad discretion in determining whether transfer is appropriate pursuant to section 1404(a). See id. In exercising this discretion, courts must balance a number of case-specific factors, including the parties' private interests and the public interests, such as efficiency and fairness. See id. at 29-30. In summary:

> The private interest considerations include: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses . . . ., but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof.  The public interest considerations include:  (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

Trout Unlimited v. United States Dep't of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996) (footnotes omitted).

---

[1] It is undisputed that this case could have been brought in the United States District Court for the Southern District of Florida, because "a substantial part of property that is the subject of the action is situated" in southern Florida. 28 U.S.C. § 1391(e)(2).

-5-

A.    <u>Private Interest Considerations</u>

1.    <u>Choice of Forum</u>

Plaintiffs chose to file this action in the District of Columbia.  Absent facts that would mitigate against the plaintiffs' choice of forum, plaintiffs' choice is afforded substantial deference.  <u>See</u> <u>Shapiro, Lifschitz & Schram, P.C. v. Hazard</u>, 24 F. Supp.2d 66, 71 (D.D.C. 1998) (citing <u>Int'l Bhd. of Painters & Allied Trades Union v. Best Painting & Sandblasting Co.</u>, 621 F. Supp. 906, 907 (D.D.C. 1985); <u>Gross v. Owen</u>, 221 F.2d 94, 95 (D.C. Cir. 1955)); <u>see also</u> <u>Pain v. United Technologies Corp.</u>, 637 F.2d 775, 783 (D.C. Cir. 1980) (holding that a case should not be transferred "from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff").

Deference to plaintiffs' forum choice is diminished where, as here, transfer is sought to the plaintiffs' resident forum. <u>See</u> <u>Citizen Advocates for Responsible Expansion, Inc. v. Dole</u>, 561 F. Supp. 1238, 1239 (D.D.C. 1983) (deference to plaintiffs' forum choice is diminished where "transfer is sought to the forum where plaintiffs reside . . . and the connection between plaintiffs, the controversy and the chosen forum is attenuated"); <u>see also</u> <u>Islamic Republic of Iran v. Boeing Co.</u>, 477 F. Supp. 142, 144 (D.D.C. 1979) ("[i]n weighing claims of convenience, the Court recognizes the diminished consideration accorded to a

-6-

plaintiff's choice of forum where . . . that forum has no
meaningful ties to the controversy and no particular interest in
the parties or subject matter"). All parties to this action
reside in southern Florida for purposes of venue. (Defs.' Mot.
to Transfer at 6-7.) Deference to plaintiffs' forum choice is
further diminished when that forum has an insubstantial
connection to the subject matter of the claims at issue. See
Hawksbill Sea Turtle v. FEMA, 939 F. Supp. 1, 3 (D.D.C. 1996)
(holding that plaintiff's choice of forum is entitled to less
deference when there is "an insubstantial factual nexus with the
plaintiff's choice") (internal citations omitted); Trout
Unlimited, 944 F. Supp. at 17; Armco Steel Co. v. CSX Corp., 790
F. Supp. 311, 323 (D.D.C. 1991) ("[D]eference is 'greatly
diminished when the activities have little, if any, connection
with the chosen forum'") (quoting Consolidated Metal Prods.,
Inc. v. American Petroleum Inst., 569 F. Supp. 773, 775 (D.D.C.
1983)). The degree of deference that I must afford to
plaintiffs' choice of forum therefore depends upon the nexus
between plaintiffs' chosen forum and the dispute over the new
proposals in the Florida Plan.

Defendants argue that "this case has a much more attenuated
factual nexus to the District of Columbia that it does to the
Southern District of Florida." (Defs.' Mot. to Transfer at 12.)
Specifically, defendants claim that the Southern District of

Florida is a more appropriate venue for this lawsuit, because the Florida Plan proposals at issue concern water resources only in Florida and are the product of work, environmental studies, and public input conducted in southern Florida. Defendants also assert that plaintiffs' alleged connection to the District of Columbia -- that the Chief of Engineers and the Secretary of Army submitted a report on the Florida Plan proposals to Congress -- is sufficiently attenuated such that transfer is appropriate. (Id.) Defendants argue that the "delivery of the proposed [Florida Plan] to Congress is a ministerial act linked to this district only by the fact that the seat of federal government is located here." (Defs.' Reply at 4.) The more meaningful connection, defendants contend, is in the Southern District of Florida, where defendants undertook a six year effort to study and receive public input about water resource needs, natural resource requirements and conservation interests, and to develop the Florida Plan proposals at issue. (Id. at 5.)

Plaintiffs argue that the District of Columbia is the appropriate forum, because the Florida Plan report "was communicated to Congress by Army personnel, in Washington, D.C." (Pls.' Response in Opp'n to Defs.' Mot. to Transfer ("Pls.' Response") at 6-7.) As defendants pointed out, this is merely a procedural act that does not provide meaningful support for plaintiffs' choice of forum. (See Defs.' Reply at 4.)

-8-

Plaintiffs further argue, but have not substantiated, that the proposals at issue resulted from decisions made in the District of Columbia. (See Pls.' Response at 6 ("The litigation is the result of decisions made by federal government officials which appear to have been made in the District of Columbia.") (emphasis added); Pls.' Notice of Filing Supp. Materials, Attach. at 1 (stating that a decision was made "at the Washington level" to expand the report by including information from the C&SF Project's Restudy).) Plaintiffs do not establish their case's connection to the District of Columbia with one editing decision made "at the Washington level." To embrace this broad interpretation of venue requirements would ignore the cautions articulated by this Circuit. See Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993) (holding that courts in the District of Columbia Circuit must "examine challenges to personal jurisdiction and venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia"); see also Stafford v. Briggs, 444 U.S. 527, 543-44 (1980) (finding that Congress, in enacting 28 U.S.C. § 1391(e), intended to allow plaintiffs to bring actions against government officers for injunctions in districts other than the District of Columbia).

In sum, plaintiffs have failed to demonstrate that they have any significant connection to the District of Columbia. As in

Trout Unlimited and Hawksbill, none of the plaintiffs reside in
the District of Columbia.  Plaintiffs also have not shown that
defendants made any significant decisions or took any meaningful
actions concerning the Florida Plan proposals within the District
of Columbia.  Considering all the circumstances in this case, as
between the parties' different forum preferences, I find that
defendants' forum choice is entitled to deference.

      2.   Where the Claims Arose

The Army Corps of Engineers conducted research in southern
Florida and developed the Florida Plan proposals through a six
year process involving southern Florida personnel and agencies.
(Defs.' Mot. to Transfer at 7-8.)  Moreover, the public comment
process involved Florida residents, and plaintiffs have not
argued that the comment and rulemaking procedures used in
implementing the Plan's proposals involved nationwide
participation.  Even if the Florida Plan proposals were submitted
to officials in the District of Columbia for use in drafting a
report, they were developed, reviewed publicly and finalized in
southern Florida.  On balance, therefore, I find that the
substantive claims alleged in plaintiffs' complaint arose in
southern Florida.

-10-

### 3.    Convenience to the Parties, Witnesses and Access to Sources of Proof

A forum's convenience for parties and potential witnesses and its access to administrative records are factors weighed in determining whether to transfer a case pursuant to 28 U.S.C. § 1404(a).  Here, as is mentioned above, all plaintiffs and defendants reside in southern Florida.  While litigating in the District of Columbia may not be a hardship to any party, no party claims that the Southern District of Florida is inconvenient to any party.  Accordingly, this factor weighs in favor of transfer.

In addition, this dispute involves an administrative record review and likely will be resolved without the need for witnesses.  Accordingly, arguments as to each forum's convenience for witnesses carry little import in this analysis.  See Vencor Nursing Ctrs. v. Shalala, 63 F. Supp.2d 1, 7 (D.D.C. 1999) (holding that convenience of witnesses was of little relevance because no evidentiary hearing or trial was foreseeable).

### B.    Public Interest Considerations

In determining whether the interest of justice favors transfer, courts also must focus on several public interest considerations, including: (1) the transferee court's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. See Trout Unlimited, 944 F. Supp. at 16.

### 1.  Transferee Court's Familiarity With Governing Law

A court's knowledge and familiarity with the issues presented can weigh for or against transfer in the interest of justice.  Both the United States District Court for the Southern District of Florida and the United States District Court for the District of Columbia have adjudicated many cases that involved NEPA and APA claims.  This case, however, also presents a challenge under the WRDA, which was enacted "for the purpose of restoring, preserving, and protecting the South Florida ecosystem."  Pub. L. No. 104-303, § 528(b)(1)(A)(i).  Defendants have pointed out that Florida federal courts commonly preside over environmental and administrative-based claims involving local Florida water and natural resources, including the Everglades.  (See Defs.' Mot. to Transfer at 15-16 (citing United States v. South Florida Water Management Dist., 28 F.3d 1563 (11th Cir. 1994), cert. denied, 514 U.S. 1107 (1995); Miccosukee Tribe of Indians of Florida v. United States, 6 F. Supp.2d 1346 (S.D. Fla. 1998); Miccosukee Tribe of Indians of Florida v. United States, 980 F. Supp. 448 (S.D. Fla. 1997), aff'd, 163 F.3d 1359 (11th Cir. 1998), cert. denied, 120 S. Ct. 41 (1999); South Dade Land Corp. v. Sullivan, 853 F. Supp. 404 (S.D. Fla. 1993)).)  Federal courts in the Southern District of Florida are likely to be more familiar with the WRDA, a statute of central importance in this case, although all federal courts are equally capable of

-12-

applying the federal laws at issue.[2]  Accordingly, this factor
may not tip the scales in either direction.  If it does, though,
it weighs slightly in favor of transfer.

>    2.   Relative Congestion of the Courts

Neither party argues that congestion in either court will
cause undue delay.  Because the parties presented no evidence
that plaintiffs will receive a speedier resolution of their claim
in either court, this factor is neutral.

>    3.   Local Interest in Deciding Local Controversies

The Supreme Court has held that "[t]here is a local interest
in having localized controversies decided at home."  Gulf Oil
Corp. v. Gilbert, 330 U.S. 501, 509 (1947).  Parties disagree as
to whether the Florida Plan proposals at issue constitute a local
controversy.  Defendants argue that this dispute is a localized
controversy because the Florida Plan proposals were developed
through "extensive and intensive involvement with persons and
agencies principally located in the Southern District of
Florida," "scores of public meetings and outreach sessions" held
in southern Florida, and written comments from southern Florida
residents and organizations.  (Defs.' Mot. to Transfer at 7-8.)
Importantly, defendants assert that the "people and resources

---

[2]Plaintiffs assert that the United States District Court for
the District of Columbia "is thoroughly expert in the application
of federal law to government."  (Pls.' Response at 9.)  If
plaintiffs are implying that this Court has more expertise in
applying federal laws, I decline to accept that argument.

-13-

that will be affected most are those located in South Florida,"
and, therefore, South Florida residents should have the
opportunity to attend any court hearings or other proceedings.
(Id. at 8-11; Defs.' Reply at 5-6.)

Plaintiffs contend that this case "is a matter of National,
not just local, concern," (Pls.' Response at 9), involving
property that affects national interests. However, they offer no
support for this conclusory allegation. While there may be some
national interests involved, plaintiffs have not shown that any
individuals or organizations outside of Florida have participated
in the public comment and input. Plaintiffs also have not shown
that a national interest in the Florida Everglades supersedes the
many local interests at stake as well as the public's ability to
participate in future court proceedings.[3]

_____

[3]Plaintiffs and intervenor-plaintiffs rely on Concerned
Rosebud Area Citizens v. Babbitt, 34 F. Supp.2d 775 (D.D.C.
1999), in arguing that the existence of a localized controversy
regarding southern Florida's water resources does not support
defendants' motion to transfer. (See Pls.' Response at 10-11;
Intervenor-Pls.' Opp'n to Defs.' Mot. to Transfer at 1-4, 9, 12.)
The court's decision in Concerned Rosebud Area Citizens, however,
focused on convenience to potential witnesses and does not aid
plaintiffs' or intervenor-plaintiffs' arguments. In Concerned
Rosebud Area Citizens, plaintiffs challenged the government's
decision to approve a lease between a Native American Tribe and a
Nebraska general partnership to construct a pork production
facility on the Tribe's property in South Dakota. 34 F. Supp.2d
at 775-76. The court denied the government's motion to transfer
to the District of South Dakota, stating that the "[g]overnment's
entire argument in favor of transfer is contingent upon a
decision [to have witnesses testify at a preliminary injunction
hearing] that has not been made." Id. at 776. In addition,
Concerned Rosebud Area Citizens did not involve a challenge to a

-14-

This case presents a controversy over proposals that will have a direct and substantial impact on the water resources, property and residents of southern Florida. In addition, this case concerns proposals issued pursuant to the WRDA, a statute specifically regulating the southern Florida ecosystem. The Florida Plan proposals and the court's application of the WRDA will have the greatest impact, if not sole impact, on southern Florida residents. See Trout Unlimited, 944 F. Supp. at 19-20 (holding that "matters that are of great importance in [the transferee state] should be resolved in the forum where the people 'whose rights and interests are in fact most vitally affected by the suit'" (citations omitted)). Those residents deserve, it would seem, the most reasonable opportunity to have access to any future court proceedings in this case. See Seariver Maritime Fin. Holdings, Inc. v. Pena, 952 F. Supp. 9, 11 (D.D.C. 1997) (holding that transfer to Alaska was appropriate to allow "the citizens of Alaska to participate in the proceedings arising out of this case"). As the Court in Seariver held, "[w]hile the interpretation of a federal statute can have broad implications, it is clear in this case that the people of [southern Florida] have an interest in the dispute that far

_____

statute that specifically regulated the South Dakota property at issue. Here, by contrast, plaintiffs brought a challenge under the WRDA, which specifically regulates the southern Florida property and resources at issue.

-15-

outweighs the interests of the citizens of this District."  Id.
This factor weighs heavily in favor of transfer.

### CONCLUSION

Defendants' request to transfer plaintiffs' cause of action
is "in the interest of justice" under 28 U.S.C. § 1404(a).
Parties are all residents of southern Florida where the
substantive claims arose.  Plaintiffs have challenged the Florida
Plan proposals under the WRDA, which specifically regulates
southern Florida's ecosystem.  The outcome will most directly
affect south Florida residents.  Accordingly, the balance of
factors I have considered weighs in favor of transferring this
case to the Southern District of Florida.

For these reasons, defendant's motion to transfer to the
United States District Court for the Southern District of Florida
pursuant to 28 U.S.C. § 1404(a) will be granted.  An appropriate
order accompanies this memorandum opinion.

SIGNED this _28th_ day of _December_, 2000.

_____
RICHARD W. ROBERTS
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                  )
KENT COUNTY, DELAWARE             )
LEVY COURT,                       )
                                  )
          Plaintiff,              )
                                  )
     v.                           )     Civil Action No. 02-2306 (RWR)
                                  )
DONALD WELSH, Regional            )
Administrator, *et al.*,          )
                                  )
          Defendants.             )
_____ )

MEMORANDUM OPINION

     Plaintiff Kent County, Delaware, Levy Court ("Kent County")

filed this lawsuit challenging the Environmental Protection

Agency's ("EPA's") approval of Total Maximum Daily Loads

("TMDLs") for the Murderkill River in Delaware.  Defendants EPA

Regional Administrator Donald Welsh, EPA Administrator Christine

Todd Whitman, and the EPA have moved to transfer this case to the

United States District Court for the District of Delaware.

Although the convenience of the parties is virtually equal

whether the case is decided in Delaware or in the District of

Columbia, the interests of justice heavily favor transfer.  As a

result, defendants' motion to transfer will be granted.

BACKGROUND

     The Clean Water Act requires states to establish TMDLs for

certain bodies of water.  33 U.S.C. § 1313(d)(1)(A) (2000).  The

EXHIBIT 4

- 2 -

TMDLs must be established at levels necessary to implement
applicable water quality standards with seasonal variations and a
certain margin of safety.  33 U.S.C. § 1313(d)(1)(C).  After the
state develops a TMDL, it must be submitted to the EPA for
approval.  33 U.S.C. § 1313(d)(2).

The Delaware Department of Natural Resources developed TMDLs
for the Murderkill River in Delaware and submitted those TMDLs to
the EPA for approval.  The regional EPA Administrator in
Philadelphia, Pennsylvania approved the proposed TMDLs.

Pursuant to the Administrative Procedure Act ("APA"), 5
U.S.C. § 702, plaintiff challenges the EPA's approval of the
TMDLs as arbitrary and capricious.  Plaintiff alleges that it
will be forced to construct and operate new wastewater facilities
and that its citizens will suffer increased sewer rates.

<u>DISCUSSION</u>

Defendants moved to transfer this case pursuant to 28 U.S.C.
§ 1404(a), which provides that "[f]or the convenience of parties
and witnesses, in the interest of justice, a district court may
transfer any civil action to any other district or division where
it might have been brought."  The movants have the burden of
showing that convenience and the interest of justice favor
transfer.  <u>Reiffin v. Microsoft Corp.</u>, 104 F. Supp. 2d 48, 50
(D.D.C. 2000).

- 3 -

Section 1404(a) grants district courts broad discretion to transfer cases, but that discretion "is not untrammeled." Fine v. McGuire, 433 F.2d 499, 501 (D.C. Cir. 1970); see also In re Chatman-Bey, 718 F.2d 484, 486 (D.C. Cir. 1983). Courts must "adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)).

The Court must first determine whether "venue [is] proper in the transferee district with respect to every defendant and each claim for relief, and [must also determine whether] all defendants [were] amenable to process emanating from the transferee district at the time the action was initially filed." Lamont v. Haig, 590 F.2d 1124, 1131 n.45 (D.C. Cir. 1978); see also Relf v. Gasch, 511 F.2d 804, 806 (D.C. Cir. 1975) (holding that the district court may transfer a case only to a judicial district where the case might have been brought); Boers v. United States, 133 F. Supp. 2d 64, 65 (D.D.C. 2001) (stating that "venue must be proper in the transferee district"); Kafack v. Primerica Life Insurance Co., 934 F. Supp. 3, 5 (D.D.C. 1996). It is undisputed that venue and personal jurisdiction over these federal defendants would be proper in the District of Delaware.

- 4 -

The court must then "balance a number of case-specific factors which include the private interests of the parties as well as public interests such as efficiency and fairness." Wilderness Society v. Babbitt, 104 F. Supp. 2d 10, 12 (D.D.C. 2000). On the private side of the balance, these factors include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; and (5) the convenience of the witnesses. Id. The factors on the public side of the balance include: (1) the transferee's familiarity with the governing law; (2) the relative congestion of both the transferor and transferee courts; and (3) the local interest in deciding local controversies at home. Id.; see also Kafack, 934 F. Supp. at 6; Shapiro, Lifschitz and Schram, P.C. v. Hazard, 24 F. Supp. 2d 66, 71 (D.D.C. 1998); Hawksbill Sea Turtle v. Federal Emergency Management Agency, 939 F. Supp. 1, 3 (D.D.C. 1996).

I.   Private Factors

    A.   Plaintiff's choice of forum

    Typically, the plaintiff's choice of forum is given considerable weight. See Shapiro, 24 F. Supp. 2d at 71. The Court, however, gives "substantially less deference when the forum preferred by the plaintiff is not his home forum." Boers, 133 F. Supp. 2d at 65 (citing Piper Aircraft v. Reyno, 454 U.S.

- 5 -

235, 255-56 (1981)).  Additionally, the weight accorded
plaintiff's preference sharply diminishes "where the plaintiff's
choice of forum has 'no meaningful ties to the controversy and no
particular interest in the parties or subject matter.'"  <u>Kafack</u>,
934 F. Supp. at 6.  The degree of deference this Court must show,
then, depends on the strength of the connection between the
events in question and the District of Columbia.  <u>See Wilderness
Society</u>, 104 F. Supp. 2d at 13.

In this case, plaintiff's choice of forum does not weigh
heavily in its favor.  Plaintiff is a county in Delaware, and
there is no evidence that the events which give rise to
plaintiff's claims occurred in this district.[1]  <u>Cf. Wilderness
Society</u>, 104 F. Supp. 2d at 14 (noting that Secretary Babbitt had
been personally involved in the case, visiting the relevant area
and meeting with local Eskimo residents, government and industry
officials, and scientists).  The District of Columbia has little
or no connection to the precipitating events at issue other than
as the location of EPA headquarters.  This connection is an
inadequate basis for giving deference to plaintiff's choice of a

─────────────────────

[1] Plaintiff argues that EPA policies are established in the
District of Columbia.  Plaintiff has not, however, presented
evidence of any decision-making that took place in this case in
the District of Columbia.  Rather, defendants assert that all
relevant decisions were made in the EPA regional office in
Philadelphia.

- 6 -

foreign forum.  See Citizen Advocates for Responsible Expansion,

Inc. v. Dole, 561 F. Supp. 1238, 1240 (D.D.C. 1983) (transferring

to Texas a case in which Texas plaintiffs sought to enjoin

construction of two segments of highway in Texas alleging that

the construction violated federal statutes).

    B.   Defendants' choice of forum

Defendants prefer to defend this case in the District of

Delaware.  This preference is reasonable.  The challenged TMDLs

were originally established by the Delaware Department of Natural

Resources and approved by the EPA in its regional office in

Philadelphia.  The TMDLs apply to a river in Delaware and

plaintiff alleges threatened economic injury in Delaware.

    C.   Whether the claim arose elsewhere

Plaintiff challenges a decision that was made in the EPA

regional office in Philadelphia.  Plaintiff has presented no

evidence that any decision in this case was made in this district

or that a resident of this district was personally involved in

the decision to approve the challenged TMDLs.  Cf. Wilderness

Society, 104 F. Supp. 2d at 15 (Secretary of Interior signed the

Record of Decision in the District of Columbia and some review

occurred at the Department of Interior's Washington

headquarters).  Because the decision to approve the TMDLs for a

river in Delaware was made outside the District of Columbia, any

- 7 -

alleged violation of federal law would have occurred outside the District. See, e.g., Hawksbill, 939 F. Supp. at 3. Therefore, this factor weighs in favor of transfer.

D.   Convenience of the parties and witnesses

Plaintiff is a county in Delaware, and the defendants are a federal agency and its Administrator in the District of Columbia, and the EPA's Regional Administrator in Philadelphia. The case will be decided based on the administrative record, which is located in the EPA office in Philadelphia, so there will be no witnesses. The convenience of the parties appears evenly balanced.

II.  Public Factors

A.   Transferee's familiarity with the governing law

Plaintiff alleges that the EPA's approval of the TMDLs submitted by the Delaware Department of Natural Resources was arbitrary and capricious. Federal courts in all districts share the ability to apply the Administrative Procedure Act. However, the judges in the District of Delaware may have greater familiarity with the river at issue and with a consent decree that established a schedule for the Delaware Department of Natural Resources to submit proposed TMDLs to the EPA and for the EPA to decide whether to approve or reject the proposed TMDLs.

- 8 -

B.   <u>Relative congestion of the transferor and transferee
     courts</u>

There is no evidence in the record regarding the relative
congestion of the transferor and transferee courts.

C.   <u>Local interest in deciding controversies at home</u>

Plaintiff challenges the EPA's decision to approve TMDLs
that apply to a river in Delaware.  As a result, the federal
court in Delaware has a strong interest in deciding this
controversy at home.  "[C]ontroversies should be resolved in the
locale where they arise . . . ."  <u>Kafack</u>, 934 F. Supp. at 9.  This
factor weighs heavily in favor of transfer to Delaware.

<u>CONCLUSION</u>

The public and private factors in this case weigh in favor
of transfer.  Plaintiff is a county in Delaware and challenges a
decision made outside of this district by the EPA that affects
the citizens of Delaware.  The federal courts in Delaware have
the ability to decide, and the greater interest in deciding, this
local Delaware dispute.  Although the convenience of the parties
may be relatively equal between the District of Delaware and this
federal district, the interest of justice in deciding local
controversies at home weighs heavily in favor of transfer to
Delaware.  For these reasons, the motion to transfer will be
granted.  A Transfer Order accompanies this Memorandum Opinion.

- 9 -

SIGNED this 6th day of March, 2003.

_____
RICHARD W. ROBERTS
United States District Judge

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE FUND FOR ANIMALS, INC., et al.,

    Plaintiffs,

v.                      CASE NO. 94-1913-CIV-T-23E

COLONEL TERRY L. RICE, et al.,

    Defendants.

_____/

**ORDER**

This action, which involves a portion of Florida that is both scenic and environmentally sensitive, presents itself to the court on cross-motions for summary judgment. I have reviewed carefully the entire record.[1] The parties have argued orally and submitted memoranda with accompanying exhibits.

---

[1]    Cases that implicate a subject so dear to many, such as the continued existence of Florida's magnificent panther, tend to excite undue excess. In this case, counsel for the plaintiff has assumed an unusually aggressive stance. First, she suggests that United States Senator Bob Graham has intervened feloniously in an unseemly attempt to thwart her effort to salvage the Florida panther. This suggestion is illogical and regrettable. To say the absolute least, Senator Graham is not widely known as a committed enemy of Florida's environment in general or Florida's panthers in particular. Senator Graham is a public official of long and distinguished service. Whether one agrees or disagrees with him on some particular matter, one cannot reasonably doubt his integrity, especially if the doubt arises from a letter reporting secondhandedly that he merely inquired with the Attorney General of the United States respecting the status of a matter affecting his constituents. This court will not countenance any inquiry, as suggested by counsel for the plaintiffs, into the *bona fides* of Senator Graham's official activity. Nothing in ATX, Inc. v. U.S. Dep't of Transportation, 41 F.3d 1522 (D.C. Cir. 1994), counsels to the contrary. Any defamation of Senator Graham in this court will land counsel, net worth duly lessened, into the custody of the United States Marshal.

Counsel for the plaintiffs also upbraided this court and attacked Mr. Sims, counsel for Sarasota County. I caution counsel to consider her statements carefully. After all, she was permitted without interruption to argue well beyond her allotted time and for a time that exceeded the defendants' time; she was permitted to file a paper in excess of the usual limitations; and she was invited by the court to introduce matters into evidence after she had overlooked to do so. Further, counsel's suggestion that Mr. Sims is a gleeful and wanton panther killer constitutes the sort of assault (although received with dignity by Mr. Sims) that is nothing but a distraction from the merits of the plaintiffs' case. This is not a contest between panther lovers and panther killers; this is a dispute arising from the governmental difficulties attendant to managing the daily needs of human beings. As soon as plaintiffs' counsel understands that, she will advocate more effectively.

REC'D OCT 18 1995 EXHIBIT 5

## BACKGROUND

A skeletal chronology of pertinent events reveals that on November 22, 1989, the U.S. Army Corps of Engineers (the Corps) received an application from Sarasota County (the County) for a Section 404 Clean Water Act permit, the object of which is to "fill" wetlands on a piece of property typically described as the "Walton Tract."

Notice of the County's application was dispersed to government agencies, private organizations, and other interested persons during June, 1990. The notice invited public comment.

During August, 1990, the U.S. Fish and Wildlife Service (the Service) rendered a biological opinion consenting to the project. However, the Environmental Protection Agency (EPA) recommended denial of the permit under Section 404(b)(1) of the guidelines promulgated pursuant to the Clean Water Act.

On August 5, 1991, the County submitted an alternative analysis, which included modifications of the project calculated to reduce the prospective effect on wetlands. Four sites (D, E, F, and G) suitable for the landfill, including the Walton Tract (site F), were proposed as the project site. During September, 1993, the County submitted a revised plan reducing the wetlands' effect of the project from 120 acres to approximately 74 acres. On February 24, 1994, EPA notified the Corps that it no longer objected to the issuance of the permit.

At the end of May, 1994, the Corps (1) completed an Environmental Assessment and Statement of Findings, determining that no environmental impact statement was required, and (2) announced that

- 2 -

a public hearing would not benefit the decision-making process. The requested permit, after nearly five years of administrative review, was approved on June 3, 1994.[2] On June 17, 1994, the Fund for Animals, Inc., submitted a sixty-day notice of intent to sue, which alleges violation of the Endangered Species Act and the Clean Water Act. On August 16, 1994, the Service requested resumption of Section 7 consultation under the Endangered Species Act to allow consideration of any potential effect on the Florida panther (<u>Felis concolor</u> <u>corvi</u>) and the eastern indigo snake (<u>Drymarchon corais couperi</u>).[3]

In October, 1994, the Service issued to the Corps a second biological opinion. This second opinion addressed any concerns regarding the panther and the snake and included a so-called "incidental take" statement for the snake, conservation recommenda-tions for the panther, and recommendations regarding both wetland preservation measures and a monitoring program. The Service concluded that the project was unlikely to jeopardize further the existence of either the panther or the snake.

---

[2]    On August 10, 1994, the Corps verified the applicability of Nationwide Permit No. 26 (as authorized by 33 C.F.R. Part 330, Appendix A) to the County's proposal to fill 0.47 acre of wetlands as part of the Knight's Trail Road extension project, which will provide access to the Walton Tract.

[3]    The Florida panther was classified as endangered in 1967. Historically existing throughout the southern United States, the panther range is now reportedly limited to southern Florida. (The plaintiffs suggest a more expansive area of residence.)  The Florida Panther Habitat Preservation Plan (HPP) was developed and approved in November, 1993, to implement the Florida Panther Recovery Plan.  HPP concludes, some anecdotal evidence notwithstanding, that no occupied panther habitat exists in Sarasota County or, in fact, north of the Caloosahatchee River, which proceeds inland from Fort Myers and then generally northeast. Accordingly, the land included in HPP's recommendation for critical habitat designation area is <u>not</u> in Sarasota County.

The eastern indigo snake was listed as threatened in 1978, although the Service has yet to designate any critical habitat for the snake.

- 3 -

The Corps, incorporating the Service's recommendations, modified the permit on November 14, 1994. In response, on November 30, 1994, the plaintiffs commenced this action against the Corps, the Service, EPA, and the County Administrator for Sarasota County.[4] On December 21, 1994, the Service again requested that the Corps resume consultation on the permit. The Corps suspended the County's permit on December 22, 1994.

On February 7, 1995, the Corps suspended its verification of coverage by Nationwide Permit No. 26 for discharge of fill associated with the County's Knight's Trail Road extension project. Subsequently, during April, 1995, the Service issued to the Corps a third biological opinion, which addressed the impact of the landfill project and the Knight's Trail extension, concluded again that the proposed project is unlikely to jeopardize the continued existence of the Florida panther and eastern indigo snake, and included both an "incidental take" statement for indigo snakes and conservation recommendations for the panther.

On April 12, 1995, the plaintiffs submitted comments to the Corps on the third biological opinion. On April 13, 1995, the Corps determined, based on the Service's biological opinion and the Corps' independent environmental assessment, that reinstatement of the permit to dredge and fill 74 acres of wetlands with additional modifications was in the public interest. The modified permit was reinstated on April 13, 1995.

---

[4]     EPA was omitted from the second amended complaint.

- 4 -

### DISCUSSION

The second amended complaint raises claims pursuant to the Clean Water Act (CWA), 33 U.S.C. §§ 1251-1387; the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544; and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370d. Because this case involves a challenge governed by the Administrative Procedure Act (APA), 5 U.S.C. § 706, the federal agencies' actions must be sustained unless the agencies acted arbitrarily, capriciously, or contrary to law. <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 376-78, (1989); <u>North Buckhead Civic Ass'n v. Skinner</u>, 903 F.2d 1533, 1538 (11th Cir. 1990). The standard of review applicable to agency action is narrow and distinctly deferential to the agencies' substantive expertise. <u>Baltimore Gas & Elec. v. Natural Resources Defense Counsel, Inc.</u>, 462 U.S. 87, 103 (1983); <u>Environmental Coalition of Broward County, Inc. v. Myers</u>, 831 F.2d 984, 986 (11th Cir. 1987). Judicial review is generally limited to the agencies' administrative evidentiary record. <u>Florida Power and Light Co. v. Lorion</u>, 470 U.S. 729, 743-44 (1985); <u>Camp v. Pitts</u>, 411 U.S. 138, 143 (1973).

The plaintiffs challenge the Corps' actions under the CWA. However, the Corps' administrative record establishes that the Corps' decision to modify and reinstate the Section 404 permit complied with both the APA and the CWA.

The Corps concluded, among other things, that the Walton Tract offered opportunities preferable to the other sites for both buffer zone capacity and mitigation because of its large size and the presence of wetlands damaged by earlier activity. According to the

Corps' findings, the mitigation plan requires creation of approximately 70 acres of wetlands, restoration of 126.6 acres of wetlands, and enhancement of an additional 136.3 acres of wetlands.

The Corps' administrative record demonstrates that the Corps considered all available information concerning both the Florida panther and the indigo snake. In fact, the Corps determined that preservation of the designated 2,971 acres "will preserve the option to provide further panther habitat should populations be moved north of the Caloosahatchee River in a recovery effort."[5]

The Corps' process of determination, which is neither reducible to a mathematical formula nor capable of inflexible precision, requires careful consideration of a variety of factors, both developmental and environmental. Viewed in that context, this court cannot confidently conclude that the Corps' decision to allow intrusion into the Walton Tract was either arbitrary and capricious or inconsistent with the 404(b)(1) guidelines.

The administrative record also demonstrates that the Corps' decision not to issue an additional public notice or hold a public hearing concerning the Knight's Trail Road extension project was not arbitrary and capricious. Two conflicting considerations collide at this point: the ordinary benefit associated with a public airing of issues and the need, after all is said and done, to bring public issues to a conclusion. The Corps' regulations invest the district engineer with discretionary authority to issue a supplemental public notice "if in his view there is a change in

---

[5]    The Corps lawfully considered elements of the "Public Interest Review" in compliance with 33 C.F.R. § 320.4(a)(1).

- 6 -

the application data that would affect the public's review of the proposal." 33 C.F.R. § 325.2(a)(2).  In this case, the district engineer issued no supplemental public notice in response to the plaintiffs' latter objections because the district engineer determined that the incremental wetlands' impact of the road access extension was "minor" (i.e., a "fill" of about 0.47 acre).  The district engineer had before him all information legally pertinent to the impact of the road extension.  Accordingly, although no supplemental public notice concerning the access road occurred, the Corps acted within its discretion.

The plaintiffs challenge both the Service's and the Corps' actions pursuant to the ESA.  However, the administrative record establishes that the Service's biological opinion, which concludes that the proposed project for the Walton Tract was not likely to jeopardize the continued existence of the Florida panther, complied with the requirements of the APA, Section 4(f) of the ESA, 16 U.S.C. § 1533(f), and Section 7(a) of the ESA, 16 U.S.C. § 1536(a).  The Corps' reliance on the Service's biological opinion complies with the requirements of both the APA and Section 7(a) of the ESA.

The Florida Panther Recovery Plan, which is specifically contingent on "appropriations, priorities, and budgetary and other constraints affecting the parties involved," presents merely guidelines and not requirements vested with the force of law.  <u>See</u> <u>Oregon Natural Resource Council v. Turner</u>, 863 F. Supp. 1277, 1284 (D. Or. 1994); <u>see</u> <u>also</u> <u>National Wildlife Fed'n v. National Park</u> <u>Serv.</u>, 669 F. Supp. 384, 388-89 (D. Wyo. 1987).  The Service has

- 7 -

AO 72A
(Rev. 8/82)

implemented, or is in the process of implementing, numerous provisions of the recovery plan. For example, the Service, among other things, has included in the permit a management plan for over 5,000 acres of the Walton Tract.

The plaintiffs contend that the Service's biological opinion conflicts with the Florida Panther Habitat Preservation Plan (the HPP) and violates the ESA. However, neither the ESA nor its implementing regulations mandate conclusions arising from the Section 7 consultation in connection with a Section 4 recovery plan. 16 U.S.C. § 1536(a); 50 C.F.R. Part 402.

The HPP specifically recognizes that "no jeopardy" opinions from the Service may further the recommended conservation benefits contained in the HPP. In this case, the permit results in the preservation of approximately 3,000 acres of the Walton Tract--a recommendation of the HPP.

Although they lodge other ESA arguments, the burden remains on the plaintiffs to demonstrate arbitrary and capricious agency action. The plaintiffs present no evidence establishing agency action that meets this standard.

Finally, the plaintiffs present a NEPA challenge in connection with the Corps' decision not to prepare an environmental impact statement (EIS). In deciding whether to prepare an EIS for a proposed action, a federal agency must initially determine if the proposed action is of the type that (1) normally requires the preparation of an EIS or (2) normally does not require either an EIS or an environmental assessment (EA). 40 C.F.R. § 1501.4(a). If the action falls into neither category, the agency must prepare

- 8 -

an EA.   40 C.F.R. § 1501.4(b).   The EA is a brief and concise document containing sufficient evidence and analysis for the agency to determine whether to prepare an EIS or a finding of no significant impact (FONSI).    40 C.F.R.  §§ 1501.4(b), 1508.9(a)(1), 1508.13.  See, e.g., River Road Alliance, Inc. v. Corps of Eng'rs of U.S. Army, 764 F.2d 445, 449 (7th Cir. 1985), cert. denied, 475 U.S. 1055 (1986).

The Corps has the initial responsibility and the broad discretion to determine the extent of a project's impact and significance.  C.A.R.E. Now, Inc. v. F.A.A., 844 F.2d 1569, 1572 (11th Cir.), reh'g denied, 854 F.2d 1326 (1988).  In this case, because the Corps concluded that the project did not fall into either category under 40 C.F.R. § 1501.4(a), it prepared an EA pursuant to § 1501.4(b).  Again, the plaintiffs have not met their burden of proving that the Corps' decision was arbitrary and capricious.  See, e.g., Lower Alloways Creek Township v. Public Serv. Elec. & Gas Co., 687 F.2d 732 (3d Cir. 1982).

I conclude that the Corps considered all available and reliable information in arriving at its conclusions.  Although others may disagree with the result, the statutorily authorized agency must ultimately arrive at a decision.  The role of the court is quite limited.  The court must determine what was considered, how it was considered, and whether the agency action was arbitrary and capricious.  The Court does not determine whether the result reached by the agency is agreeable to the plaintiffs or to anyone else.

- 9 -

The Corps did what it is charged to do.  The Corps evaluated "the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."  40 C.F.R. § 1508.27(b)(9).[6]  The Corps reviewed and analyzed the impacts of the project on the two species in terms of the Service's findings and conclusions in its "no jeopardy" biological opinions.  The Corps reviewed the cumulative impacts of the proposed action and other future projects.  The Corps reviewed other information submitted by interested federal and state agencies such as EPA and the Florida Game and Freshwater Fish Commission.  The Corps reviewed information submitted by members of the interested public, including the plaintiffs.  In fact, the Corps modified the permit by adopting the Service's conservation recommendations for the panther and the incidental take statement for the snake.  The Corps considered the "[u]nique characteristics of the geographic area such as proximity to . . . wetlands, wild and scenic rivers, or ecologically critical areas" by reviewing in the EA the impacts of the proposed action on the wetlands in the project area.  40 C.F.R. § 1508.27(b)(3).  The Corps considered "whether the action is related to other actions with individually insignificant but cumulatively significant impacts" by evaluating (1) the cumulative wetlands' impact over the life-span of the landfill facility (approximately thirty-nine years) and the development potential of

---

[6]    Here, the Florida panther and the eastern indigo snake do not have designated critical habitats in the project area.  None of the alleged panther sightings was susceptible to verification.  Obviously, the opportunity for mistaken, anecdotal information is frequent and tempting to the casual observer.

- 10 -

the area zoned for government use and (2) the cumulative impact of the proposed action and other future actions on the Florida panther and the eastern indigo snake.    40 C.F.R. § 1508.27(b)(7).    The Corps considered "the degree to which the effects on the quality of the human environment are likely to be highly controversial."    40 C.F.R. § 1508.27(b)(4).    The Corps has documented, analyzed, and weighed in the EA all environmental issues and concerns relevant to the proposed action, including those of the plaintiffs' experts. The Corps analyzed the effects of the County's revised mitigation measures, which call for the creation of 69.7 acres of wetlands, as well as the enhancement and restoration of 126.6 acres and 136.3 acres of historic wetlands.    No local, state, or federal agencies have opposed the Corps' decision or the project.

The Corps' record demonstrates that the Corps fully and adequately considered all environmental factors relevant to its decision regarding the permit and that its actions are neither arbitrary nor capricious.    Accordingly, in the absence of any genuine issue of material fact, the court adjudges that the defendants' Motions for Summary Judgment are **GRANTED** and the plaintiffs' Motion for Summary Judgment is **DENIED**.    All other pending motions are **DENIED**.

ORDERED in Tampa, Florida, on October __12th__, 1995.


_____
Steven D. Merryday
UNITED STATES DISTRICT JUDGE


- 11 -



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


THE FUND FOR ANIMALS, INC., et al.,

       Plaintiffs,

   vs.                          Case No. 94-1913-CIV-T-23E

COLONEL TERRY L. RICE, et al.,

       Defendants.

_____/


## O R D E R

Before the Court is the plaintiffs' motion to delete a footnote from the summary judgment order (Docs. 70 and 73). Upon consideration, the motion is **GRANTED**.

ORDERED in Tampa, Florida, on August 22ND _____, 1996.


                               _____
                                 Steven D. Merryday
                   United States District Judge


EXHIBIT 6