UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB, CLEAN WATER ACTION, GULF RESTORATION NETWORK, CHRIS LOY, and RICHARD SOMMERVILLE, | ) ) ) ) | Civil Action No.  1:07-cv-01756 (RCL) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers, DIRK KEMPTHORNE, in his official capacity as Secretary, U.S. Department of the Interior, and H. DALE HALL, in his official capacity as Director, U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) / | |

**MOTION TO INTERVENE OF SIERRA PROPERTIES I, LLC, PASCO 54, LTD., PASCO RANCH, INC., AND JG CYPRESS CREEK LLC**

Pursuant to Rule 24, Federal Rules of Civil Procedure, Sierra Properties I, LLC (doing business as Sierra Properties), Pasco 54, Ltd., Pasco Ranch, Inc., and JG Cypress Creek LLC (hereinafter collectively referred to as "Movant-Intervenors"), hereby move to intervene as Defendants in this case.  Movant-Intervenors are developing Cypress Creek Town Center, a multi-use development that will include a regional shopping center, retail stores, financial institutions, hotels, restaurants, cinemas, offices, and multi-family residential housing, in accordance with a U.S. Army Corps of Engineers' Clean Water Act Section 404 permit that Plaintiffs seek to invalidate in their Complaint, a copy of which is attached hereto as Exhibit A. Movant-Intervenors are authorized to intervene as a matter of right pursuant to Rule 24(a)(2) because they have an interest in the property and transactions which are the subject of this action

and they are so situated that the disposition of this action may impair their ability to protect their interests. In the alternative, this Court should exercise its discretion to allow Movant-Intervenors to intervene pursuant to Rule 24(b)(2) because their claims and defenses have questions of law and fact in common with the issues in this action. This Motion to Intervene is supported by the accompanying Memorandum of Points and Authorities. Movant-Intervenors' Answer to Plaintiffs' Complaint is attached hereto as Exhibit B.

Counsel for the Movant-Intervenors has contacted counsel for both Plaintiffs and Federal Defendants regarding this motion. Federal Defendants take no position with regard to the motion. Plaintiffs take no position with regard to the proposed intervention until they see the motion.

Dated: October 16, 2007

Respectfully Submitted,

WHITE & CASE LLP

Eric Grannon (D.C. Bar No. 473778)
Erin M. Everitt (D.C. Bar No. 497407)
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600 (telephone)
(202) 639-9355 (facsimile)

Of Counsel:

Douglas M. Halsey
T. Neal McAliley
Angela D. Daker
White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131-2352
(305) 371-2700 (telephone)
(305) 358-5744 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th of October, I caused Movant-Intervenors' Motion to Intervene, Answer to Plaintiffs' Complaint for Declaratory and Injunctive Relief, and Memorandum of Points and Authorities in Support of Motion to Intervene to be served upon the following parties by e-mail and U.S. mail:

Eric Robert Glitzenstein
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue, NW
Washington, DC  20009
(202) 588-5206
Fax:(202) 588-5049
Email: eric@meyerglitz.com

*Counsel for Plaintiffs' Sierra Club, Clean Water
Action, Gulf Restoration Network, Chris Loy and
Richard Sommerville*

Mark Arthur Brown
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7369
Ben Franklin Station
Washington, DC  20044-7369
(202) 305-0204
Fax: (202) 514-0097
Email: mark.brown@usdoj.gov

*Counsel for Defendants' Robert van Antwerp, Dirk
Kempthorne and Dale Hall*

Erin M. Everitt

# Motion to Intervene
# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB<br>    408 C Street, NE<br>    Washington, DC 20002, | ) <br>) <br>) <br>) |
| CLEAN WATER ACTION<br>    4455 Connecticut Ave NW, A300<br>    Washington, DC 20008-2328, | )    No. _____<br>) <br>) <br>) |
| GULF RESTORATION NETWORK<br>    338 Baronne Street, Suite 200<br>    New Orleans, LA 70112, | ) <br>) <br>) <br>) |
| CHRIS LOY<br>    7513 E. Veve Lane<br>    Tampa, FL 33610, | ) <br>) <br>) <br>) |
| RICHARD SOMMERVILLE<br>    16205 Larson Lane<br>    Hudson, FL 34667, | ) <br>) <br>) <br>) |
|         Plaintiffs, | ) <br>) |
| v. | ) <br>) |
| LT. GEN. ROBERT L. VAN ANTWERP<br>    U.S. Army Corp of Engineers<br>    Chief Counsel's Office<br>    441 G. Street, NW<br>    Washington, D.C. 20314 | ) <br>) <br>) <br>) <br>) |
| DIRK KEMPTHORNE,<br>    Secretary, U.S. Department<br>    of the Interior,<br>    1849 C Street, NW<br>    Washington, D.C.  20240, | ) <br>) <br>) <br>) <br>) |
|     and | ) <br>) |

DALE HALL,                                    )
    Director,                                 )
    United States Fish and                    )
    Wildlife Service,                         )
    1849 C Street, NW                         )
    Washington, D.C.  20240,                  )
                                              )
            Defendants.              )
                                              )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This case challenges the United States Army Corps of Engineers' ("ACOE's" or "Corps'") unlawful issuance of a Clean Water Act section 404 permit for the dredging and filling of wetlands and surface waters, and the United States Fish and Wildlife Service's ("FWS's" or "Service's") unlawful issuance of a concurrence letter that the permit will not adversely affect federally listed species. More specifically, this case challenges the Corps' permit for the destruction of federally protected wetlands and surface waters in order to allow construction of a massive mall and commercial complex called Cypress Creek Town Center ("CCTC") - containing over two million square feet of retail space, half a million square feet of office space, hundreds of residences and hotel rooms and over sixteen thousand parking spaces - without statutorily required consultation on impacts to federally listed species and avoidance and minimization of impacts to wetlands.

2. The CCTC site contains habitat for three federally listed species, the Wood Stork, the Eastern Indigo Snake, and the Florida Scrub Jay. The site's southern portion has been designated by Pasco County, Florida, as a "critical wildlife linkage" given its location between other conservation lands in the area. Adjacent to the site is Cypress Creek, designated an "Outstanding

Florida Water" by the State of Florida, and a major tributary for the Hillsborough River, the primary municipal water supply for Tampa. The wetlands remaining on site, and ultimately Cypress Creek itself, are to receive the storm water discharge from the development. The development itself will place massive demands on limited water supplies while paving groundwater recharge areas that currently exist on site.

3. The Corps required no reduction in the size of the mall, or the number of its parking spaces, or multi story buildings or parking garages, despite the massive size of the complex, its impact to wildlife and threatened and endangered species habitat, its impacts on wetlands and Cypress Creek, and its implications for groundwater depletion. The Corps did not require the applicant to pursue any alternatives that would avoid or minimize unnecessary impacts to these resources.

4. The Plaintiffs now file suit alleging the following claims: 1) the Corps' issuance of the permit without engaging in formal section 7 consultation with the FWS on impacts to the Wood Stork, the Florida Scrub Jay, the Eastern Indigo Snake, and the Manatee, and the FWS's issuance of its concurrence letter and it determination that the project was not likely to adversely affect such species, violated the Endangered Species Act, 16 U.S.C. § 1532 et seq. ("ESA"), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; 2) the Corps' issuance of the permit without requiring that all practicable alternatives be meaningfully analyzed and pursued; without requiring that impacts to wetlands and surface waters be avoided and minimized; without assuring that there would not be significant degradation of waters of the United States; and without meaningfully examining the secondary and cumulative impacts of the project in making its determinations, violated the Clean Water Act, 33 U.S.C. § 1344 et seq. ("CWA"), and the APA,

3

5 U.S.C. § 706; and 3) the Corps' failure to meaningfully and accurately assess the impacts of the

project, including the secondary and cumulative impacts of the project and potential alternatives,

in its Environmental Assessment ("EA"), and the Corps' refusal to prepare an Environmental

Impact Statement ("EIS"), violated the National Environmental Policy Act, 42 U.S.C. § 4321 et

seq. ("NEPA"), and the APA, 5 U.S.C. § 706.

5.  Plaintiffs seek remand of the Corps' permit and the FWS's concurrence letter so that

the Corps can consult with the Service to accurately assess the impacts to threatened and

endangered species, and identify adequate means to prevent, mitigate and/or offset such impacts.

Plaintiffs also seek remand to compel compliance with the Clean Water Act requirement that

impacts to wetlands and waters be avoided and minimized, and to ensure that the remaining

wetlands on site and Cypress Creek itself are not significantly degraded by the construction and

operation of the facility.  To accomplish these objectives, Plaintiffs seek remand so that a full and

accurate assessment of the environmental impacts of the development can be undertaken in an

EIS.

## Jurisdiction

7.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 16 U.S.C. §

1540(g), and 33 U.S.C. § 1365(a).

## Parties

8.  Plaintiff the Sierra Club is a national nonprofit organization of over 750,000 members.

The Sierra Club's members are dedicated to exploring, enjoying, and protecting the wild places of

the earth; to practicing and promoting the responsible use of the earth's ecosystems and

resources; to educating and enlisting humanity to protect and restore the quality of the natural and

human environment; and to using all lawful means to carry out these objectives. The Sierra Club has chapters throughout the United States.

9. Sierra Club members enjoy observing, studying, photographing and appreciating wildlife, including threatened and endangered species such as the Wood Stork, the Florida Scrub Jay, the Eastern Indigo Snake, and the Manatee, as well as their habitat. These species depend on habitat that exists in and around waters of the United States, including Cypress Creek, its watershed basin, and the lower Hillsborough River which Cypress Creek feeds, as well as habitat on the CCTC site itself.

10. The interests of the Sierra Club, and of its members, both now and in the future, in observing, studying, and otherwise enjoying wildlife such as the Wood Stork, the Florida Scrub Jay, and the Eastern Indigo Snake, in their natural habitat, including Cypress Creek and the wetlands and uplands in its basin, are harmed by the defendants' issuance of the section 404 permit, because activities permitted as a result of the permit and the concurrence letter, including the destruction of habitat for such species, are harming and contributing to the extirpation of the Wood Stork, the Eastern Indigo Snake, and the Florida Scrub Jay, and reducing their opportunity to observe other species, and absent the issuance of the permit and the concurrence letter, the permitted activities would not occur.

11. Sierra Club members also enjoy hiking, kayaking and canoeing in and around wild and scenic wetlands, rivers, and streams throughout the United States, including Hillsborough River and Cypress Creek. Sierra Club members have canoed on Cypress Creek for well over a decade. They do so because they enjoy the natural tranquility of such areas, because they appreciate its scenery, and because they enjoy experiencing, observing and exploring the natural flora and fauna

in the environment around them. The Sierra Club has sponsored "Inner City Outings" for its

members and children and residents of the inner city in which it takes them to conservation lands

near metropolitan areas like Tampa, including to Cypress Creek. In addition, Sierra Club and its

members rely upon such resources, including Cypress Creek, both directly and indirectly such as

through use of recharged groundwater, for water for drinking and for other household uses.

12. The interests of the Sierra Club and its members in recreating in and utilizing such

wetlands, rivers and streams, including Cypress Creek, are harmed by the defendants' issuance of

the section 404 permit because the permit will lead to the destruction and degradation of such

waters and their surrounding environment, and the degradation and depletion of drinking water

and groundwater, and absent the issuance of the permit the destruction and degradation of the

waters would not occur.

13. Plaintiff Clean Water Action is a national organization of over one million members

dedicated to protecting and improving the quality of all of America's waters, and the aquatic

ecosystems of which those waters are a part. Clean Water Action seeks to protect wetlands, lakes

and streams, and in so doing, to protect their ecosystems, the flora and fauna that are part of

them, and the clean and healthy drinking water they provide for Americans nationally. Clean

Water Action seeks to help its members press for the enforcement, and advancement, of the

nation's environmental laws among national decision-makers like the Corps, and expends funds

educating the public about the value of aquatic ecosystems and the consequences of the Corps'

issuance of permits.

14. Clean Water Action's members enjoy exploring the nation's wetlands, rivers, and

streams, including Hillsborough River and Cypress Creek, and observing the flora and fauna

therein, including threatened and endangered species such as those implicated by this project.
They depend upon the water that the nation's wetlands, rivers and streams, including
Hillsborough River and Cypress Creek, provide - both directly and indirectly such as through
groundwater recharge - for drinking and other household uses.

15. The interests of Clean Water Action's members in observing, studying, and otherwise
enjoying the flora and fauna of ecosystems, including threatened and endangered species, are
harmed by the defendants' issuance of the section 404 permit because activities permitted as a
result of the permit reduce Clean Water Actions' members' opportunity to observe such flora and
fauna, and absent the issuance of the permit, the permitted activities would not occur. The
interests of Clean Water Action's members in recreating in such wetland, rivers and streams, and
utilizing the drinking water they provide, are also harmed by the defendants' issuance of the
section 404 permit, because the permit will lead to the destruction and degradation of such water
resources, and absent the issuance of the permit, the destruction and degradation of the waters
would not occur. Clean Water Action is also injured because the Corps' noncompliance with the
ESA, the Clean Water Act, and NEPA, including with regard to the permit at issue in this case,
causes Clean Water Action to have to expend additional funds informing the public as to the
importance of wetlands, the requirements of the law, and the Corps' failure to implement the law
and protect such wetlands.

16. Plaintiff Gulf Restoration Network ("GRN") is a non profit membership corporation
comprised of organizational and individual members dedicated to restoring the Gulf of Mexico
and its connected watersheds and ecosystems to an ecologically and biologically sustainable
condition. GRN and its members have worked to raise the awareness of the pollution and

degradation of the Gulf of Mexico and its contributing coastal watersheds, have opposed

development that will degrade water quality and destroy wetlands, aquatic ecosystems, and

related uplands, and have worked to protect habitat for flora and fauna of the region, particularly

rare, threatened and endangered species, including for example, the Manatee.  GRN seeks to

educate and inform people nationally as to the condition of the Gulf of Mexico and its

contributing watersheds, to inform them of the impacts that their activities have on these natural

resources, and to encourage and facilitate changes in their behavior to reduce those impacts

17.  Members of GRN enjoy recreating in conservation lands and waters in the Gulf of

Mexico region, including in Florida and in the Hillsborough River watershed in particular.  For

example, Joseph Murphy, a member of GRN, has canoed regularly in the Hillsborough River

watershed since the late 1980's, logging hundreds of hours in the Hillsborough River watershed,

and plans to continue to do so.  He lives in the Tampa Region and over the last fifteen years or so

he has worked to canoe every significant tributary to the Hillsborough River.  As part of this

continuing plan, he expects to canoe the entire fifty four mile stretch from Green Swamp, down

Cypress Creek to Tampa Bay, in the future.  Members of GRN, like Joseph Murphy, also hike

through the conservation lands in the Hillsborough River and Cypress Creek watersheds

numerous times, and Joseph Murphy drives past the Cypress Creek site on a weekly basis.

18.  GRN's members recreate in such areas, including the lands and waters in the

Hillsborough River area, because they derive a sense of peace and happiness from being in the

natural environment.  They enjoy observing and/or looking for various flora and fauna in the area,

including rare species such as the Wood Stork, the Manatee, the Eastern Indigo Snake, and the

gopher tortoise.  GRN's members that live in Tampa also rely upon the Hillsborough River, and

8

Cypress Creek, for drinking water and other uses.

19. The interests of GRN and its members in recreating in and utilizing such wetlands, rivers and streams, including Cypress Creek, are harmed by the defendants' issuance of the section 404 permit because the permit will lead to the destruction and degradation of such waters and their surrounding environment, and the degradation and depletion of drinking water and groundwater, and absent the issuance of the permit the destruction and degradation of the waters would not occur.

20. The interests of GRN, and of its members, in observing, studying, and otherwise enjoying wildlife such as the Wood Stork, the Manatee, and the Eastern Indigo Snake, in their natural habitat, including Cypress Creek and the wetlands and uplands in its basin, are harmed by the defendants' issuance of the section 404 permit, because activities permitted as a result of the permit, including the destruction of habitat for such species, are harming and contributing to the extirpation of the Wood Stork, the Manatee, and the Eastern Indigo Snake, and reducing their opportunity to observe other species, and absent the issuance of the permit, the permitted activities would not occur.

21. Plaintiff Chris Loy is a Sierra Club member and has been a resident of the Tampa metropolitan area for 9 years. He currently lives on the Hillsborough River and his backyard forms part of the river's bank. He canoes and swims in the Hillsborough River from his back yard. The water quality in the Hillsborough River behind his house is directly affected by the quality and quantity of water that flows into it, and removed from it for municipal water supplies. For example, when water is diverted from the Hillsborough River for municipal drinking water supplies, the river behind his house changes from its clear dark color, like tea, to a murky color.

When the water is a murky color Mr. Loy can no longer swim in the water.

    22. Mr. Loy draws his home water from a well on his property. His children drink Tampa's municipal water at school, and he uses Tampa's municipal water at his office.

    23. Mr. Loy exercises in the natural environment in his community. He has canoed approximately 80% of the rivers in west central Florida. Most frequently he canoes the Hillsborough River, about 18-22 times a year, including 6-10 times a year in the upper Hillsborough River near where the Cypress Creek enters the Hillsborough River. He also canoes with his children on the Hillsborough River near his house. Approximately three or four times a year he hikes and bikes in the public conservation lands in the Hillsborough River and Cypress Creek basin, including conservation lands that are adjacent to, and within approximately a quarter mile of, the CCTC site. He frequently drives past the CCTC site.

    24. Mr. Loy enjoys recreating in these lands and waterways because he enjoys the solitude and the escape from crowded urban areas. He enjoys the scenery and the plants and wildlife he observes, including among others the Wood Stork, egrets and ibis. For example, he enjoys traveling to one particular conservation land adjacent to the CCTC site. The conservation land has a wide body of water with an island in it that is approximately one half to one mile from the CCTC site. On the island he can see Wood Storks, ibis, cattle egrets, white egrets, snowy egrets, little blue herons, tricolored herons, and anhingas.

    25. The interests of Mr. Loy in observing, studying, and otherwise enjoying the flora and fauna of the Hillsborough River and Cypress Creek basins, including for example Wood Storks, egrets and ibis, are harmed by the defendants' issuance of the section 404 permit, because activities permitted as a result of the permit, including the destruction of habitat for such species,

are harming and contributing to the extirpation of listed species such as the Wood Stork and the Eastern Indigo Snake, and reduce his opportunity to observe wild flora and fauna, and absent the issuance of the permit the permitted activities would not occur. Similarly, the interests of Mr. Loy in recreating on such lands, wetlands, rivers and streams, and utilizing the drinking water they provide, are harmed by the defendants' issuance of the section 404 permit, because the permit will lead to the destruction and degradation of such resources, and absent the issuance of the permit, the destruction and degradation of such resources would not occur. Mr. Loy is also adversely affected by the sight of the CCTC development's clearing activities in and/or among the lands he has enjoyed recreating in.

26. Plaintiff Richard Sommerville has resided in the Tampa region for approximately twenty two years, and in Pasco County for about eight years. He obtains his water from a well on his land that draws from the underground aquifers in the area.

27. Plaintiff Sommerville enjoys exploring and recreating in the natural environment in his community. He has swum, canoed, hiked and biked in watersheds and river and stream basins around Tampa since he moved to the region.

28. Mr. Sommerville has canoed Cypress Creek on a number of occasions, including past the CCTC site location. On his last canoe trip on Cypress Creek he could hear the construction from the CCTC site as he canoed the creek. He could see murky water draining off of the site, and where it entered Cypress Creek it degraded Cypress Creek, turning it from a clear dark color like tea to a light creamy murky color. Upon grounding on the opposite bank from the CCTC site he could see the construction equipment and the construction zone, and the area was cleared of vegetation.

11

29. Mr. Sommerville recreates in such natural areas because he draws peace from being in its solitude. He also enjoys seeing the natural flora and fauna, and he looks for rare and/or listed species such as the Wood Stork, the Eastern Indigo Snake, the Florida Scrub Jay, and the gopher tortoise. Indeed, he maintains his own property in a somewhat natural condition, with indigenous plants and animals including 6 active burrows with numerous adult gopher tortoises.

30. The interests of Mr. Sommerville in observing, studying, and otherwise enjoying the flora and fauna of the Hillsborough River and Cypress Creek basins, including the Wood Stork, American Alligator, the little blue heron, egrets and ibis, for example, are harmed by the defendants' issuance of the section 404 permit because activities permitted as a result of the permit, including the destruction of habitat for such species, are harming and contributing to the extirpation of the Wood Stork, the Florida Scrub Jay, and the Eastern Indigo Snake, and reducing his opportunity to observe these and other species like the gopher tortoise, and absent the issuance of the permit the permitted activities would not occur. Similarly, the interests of Mr. Sommerville in recreating in such lands, wetlands, rivers and streams, and utilizing the drinking water they provide, are harmed by the defendants' issuance of the section 404 permit, because the permit will lead to the destruction and degradation of such resources, and absent the issuance of the permit, the destruction and degradation of the waters would not occur.

31. Defendant Lt. Gen. Robert L. Van Antwerp is the Chief of Engineers for the United States Army Corps of Engineers and is responsible for ensuring that the Corps complies with the requirements of the CWA, NEPA and the APA.

32. Defendant Dirk Kempthorne is the Secretary for the Department of the Interior, the Department that is responsible, with the Department of Commerce, for the implementation of the

ESA.

33. Defendant Dale Hall is the Director of the Fish and Wildlife Service, the agency within the Department of the Interior that is charged with implementation of the ESA, and he is responsible for ensuring that the Service complies with the requirements of the ESA and the APA.

### Statutory Scheme Relating to Plaintiffs' Claims

**A.    Endangered Species Act**

34. Congress enacted the Endangered Species Act ("ESA" or "Act") with the express purpose of providing both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ." Id. at § 1531(b). To achieve this purpose, the Act imposes various duties, detailed below, on the Secretary of the Interior and the Secretary of Commerce, duties which have been delegated to the United States Fish and Wildlife Service (the "Service" or "FWS") and the National Marine Fisheries Service ("NMFS"). 50 C.F.R. § 402.01(b).

35. The Act affords protections to species listed as "endangered" or "threatened." 16 U.S.C. § 1532(6), (16), (20). Section 9 of the Act and implementing regulations proscribe the "take" of endangered and threatened species, 16 U.S.C. § 1538(a)(1), see also, 50 C.F.R. §§ 17.21, 17.31, which is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The ESA's prohibitions extend to any person's "attempt to commit, solicit another to commit, or cause to be committed, any offense defined" in the ESA. Id. at § 1538(g). The term "person" includes "any officer, employee, agent, department, or instrumentality of the Federal Government . . . ." 16

U.S.C. § 1532(13). The ESA also requires the Service to "develop and implement . . . 'recovery

plans' . . . for the conservation and survival of endangered species and threatened species . . . ."

16 U.S.C. § 1533(f)(1).

     36. Section 7 of the ESA mandates that each federal agency "shall, in consultation with

and with the assistance of the Secretary, insure that any action authorized . . . by such agency

. . . is not likely to jeopardize the continued existence of any endangered species or threatened

species." 16 U.S.C. § 1536(a)(2). The FWS has promulgated regulations implementing the

consultation requirements of section 7. 50 C.F.R. Part 402. Under the section 7 regulations, each

federal agency must review its actions and determine if they "may affect" an endangered or

threatened species. 50 C.F.R. § 402.14(a). If an action "may affect" an endangered or threatened

species, the agency must engage in "formal consultation" with the FWS, unless the FWS

"concur[s]" in writing that the action is not likely to "adversely affect" any threatened or

endangered species. Id. at § 402.14(b). The federal agency responsible for consulting with the

FWS must prepare and provide to the Service a "biological assessment" of the effects of the

proposed action on any endangered or threatened species, which includes "the best scientific and

commercial data available . . . for the adequate review of the effects that an action may have upon

listed species . . . ." 50 C.F.R. § 402.14(c), (d). In fulfilling its formal consultation requirements

under section 7, the FWS is required to evaluate the status of the listed species, "evaluate the

effects of the action and cumulative effects on the listed species," and "formulate its biological

opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the

continued existence of listed species," after the review of all relevant information. 50 C.F.R. §§

402.14(g)(2)-(4).

37. The conclusion of the consultation process is the issuance of the Service's "biological opinion," "detailing how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and setting forth the Service's opinion whether the action is "likely to jeopardize" the continued existence of a listed species. 50 C.F.R. § 402.14(h)(3). If the FWS determines that an action is unlikely to jeopardize a species, but will result in the take of a species, the FWS must issue an "Incidental Take Statement" in which it must identify the anticipated impact to the species, reasonable and prudent measures to minimize such impact, and "terms and conditions" that must be complied with to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4). If the FWS determines the action is likely to jeopardize a listed species, the Service must specify "reasonable and prudent alternatives" to insure that such jeopardy is not likely to occur. 16 U.S.C. § 1536(b)(3)(A).

**B.    The Clean Water Act**

38. Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any pollutant into the waters of the United States, including wetlands, without a permit. 33 U.S.C. § 1311(a). The term "pollutant" includes "dredge spoil," "solid waste," "rock, sand, cellar dirt and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

39. Section 404 of the CWA authorizes the Army Corps of Engineers to issue permits for the discharge of "dredged or fill materials" into waters of the U.S. Before any such permit can be issued, however, the Corps must comply with two sets of regulations – "404 Guidelines" issued by the Environmental Protection Agency, see 40 C.F.R. §§ 230.1-230.80, and the Corps' own

15

section 404 regulations. See 33 C.F.R. Parts 320-330.

40. The EPA's 404 guidelines provide that "[f]rom a national perspective, the degradation or destruction of . . . wetlands, is considered to be among the most severe environmental impacts," and "[t]he guiding principle should be that degradation or destruction of [wetlands] may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d). As a result, "[d]redged or fill material should not be discharged into the aquatic ecosystem [wetlands], unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." Id. § 230.1(c).

41. The EPA's section 404 guidelines establish several prohibitions to discharges to wetlands. First, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem . . . ." 40 C.F.R. § 230.10(a). The inquiry into practicability goes to both on-site and off-site - that is "internal" and "external" - alternatives. Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85336, 85339, Dec 24, 1980 ("1980 Notice"); Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 44 Fed. Reg. 54222, 54223, September 18, 1979 ("1979 Notice").

42. An alternative is deemed practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). The inquiry into "cost" involves whether the alternatives to be considered are "reasonable in terms of the overall scope/cost of the of the proposed project"; under such an analysis, an alternative is not practicable if it is "unreasonably expensive." 1980

16

Notice, 45 Fed. Reg. at 85339, 43.

43. The EPA's guidelines establish a strong presumption that there are practicable alternatives to the discharge of fill to wetlands if the activity to be permitted is not "water dependent," that is, if it "does not require access or proximity to or siting within" a wetland "to fulfill its basic purpose," such as a marina. 40 C.F.R. § 230.10(a)(3). It is the burden of the applicant to rebut the presumption by "clearly demonstrat[ing]" "that there is no other practicable alternative that would avoid or minimize the wetlands losses." Id. § 230.10(a)(3). "In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." Id. at 85348 (emphasis added).

44. A second prohibition to issuing a permit under the EPA's 404 guidelines is that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). "[E]ffects contributing to significant degradation considered individually or collectively, include:[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites." Id.; see also id. at § 230.10(c)(2), (3), (4). "Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients [or] purify water."). 40 C.F.R. § 230.10(c)(3). "Significant" in this context means anything that is more than "more than trivial." 1980 Notice, 45 Fed. Reg. at 85343.

45. A third prohibition under the 404 Guidelines is that - even if the Corps finds that there

17

are no practicable alternative for a proposed project - "no discharge of dredged or fill material
shall be permitted unless appropriate and practicable steps have been taken which will minimize
potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d).
"[A]ll reasonable reduction in impacts [must] be obtained." 1980 Notice, 45 Fed. Reg. at 85344.
The 404 regulations further specify "[s]ome of the ways" to minimize the effect of the discharge,
including, for example, "confining the discharge to minimize smothering of organisms," and
"[d]esigning the discharge to avoid a disruption of periodic water inundation patterns." 40 C.F.R.
§ 230.70.

    46.  Under the Corps' own regulations, the public notice requirements mandate that
section 404 permit applicants include in the permit all activities "reasonably related" and provide a
complete description of such activities "sufficient for public notice." 33 C.F.R. §§
325.1(d)(1)-(2). Once the application is complete, the Corps must issue a public notice soliciting
comments from interested persons. 33 U.S.C. § 1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3. The
public notice is the "primary method of advising all interested parties of the proposed activity . . .
and of soliciting comments and information necessary to evaluate the probable impact on the
public interest." 33 C.F.R. § 325.3(a). Thus, the notice must include "sufficient information to
give a clear understanding of the nature and magnitude of the activity to generate meaningful
comment;" and it must include a description of the proposed activities, and all "available
information which may assist interested parties in evaluating the likely impact of the proposed
activity . . . ." Id. A public hearing must be provided "whenever a public hearing is needed for
making a decision," 33 C.F.R. § 327.4(a), and requests for a public hearing "shall be granted,
unless the district engineer determines that the issues raised are insubstantial or there is otherwise

no valid interest to be served by a hearing." Id. at § 327.4(b). "In case of doubt, a public hearing shall be held." Id. at § 327.4(c).

47. The Corps' regulations provide that "[n]o permit will be granted which involves the alteration of wetlands identified as important" unless the Corps finds, after its "public interest review," that "the benefits of the proposed alteration outweigh the damage to the wetlands resource," and that the proposed alteration is necessary to realize those benefits. Id. § 320.4(a), (b). In its review the Corps must consider "[a]ll factors which may be relevant to the proposal" including "the cumulative effects" of the project, 33 C.F.R. § 320.4(a)(1), and it must consult with the Service "with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application." 33 C.F.R. § 320.4(c).

48. The Corp's regulations provide eight criteria for determining whether any given wetlands are "important to the public interest," including: whether their alteration "would affect detrimentally natural drainage characteristics, [or] sedimentation patterns; whether they "serve as valuable storage areas for storm and flood waters;" whether they "are ground water discharge areas that maintain minimum baseflows important to aquatic resources and those which are prime natural recharge areas;" whether they "serve significant water purification functions;" and whether they are "unique in nature or scarce in quantity to the region or local area." 33 C.F.R. § 320.4(b)(2).

C.      The National Environmental Policy Act

49. NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two sets of implementing regulations for actions against the Corps:

19

regulations promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. § 1500 et

seq., and regulations promulgated by the Corps itself. 33 C.F.R. § 230.1.

50.    NEPA's purpose is to "insure that environmental information is available to public

officials and citizens before decisions are made and before actions are taken," and "to help public

officials make decisions that are based on understanding of environmental consequences . . . ." 40

C.F.R. § 1500.1 (b)-(c) (emphasis added). NEPA requires all agencies of the federal government

to prepare a "detailed statement" - an Environmental Impact Statement - regarding all "major

federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. §

4332(C). This duty extends to any federal actions that "will or may" have a significant effect on

the environment. 40 C.F.R. § 1508.3 (emphasis added). The agency must also include in its

review of environment affects possible alternatives, including a no action alternative, and review

the environmental affects of those alternatives. See 42 U.S.C. § 4332.

51.    NEPA establishes several criteria for determining whether an impact is significant.

Among these are the "degree to which the proposed action affects public health or safety," the

"[u]nique characteristics of the geographic area such as proximity to historic or cultural resources,

park lands, prime farmlands [and] ecologically critical areas," "[t]he degree to which the effects

on the quality of the human environment are likely to be highly controversial," "[t]he degree to

which the action may establish a precedent for future actions with significant effects," "whether

the action is related to other actions with . . . cumulatively significant impacts," and "the degree

to which the action may adversely affect an endangered or threatened species." 40 C.F.R. §

1508.27(b).

52.    In reviewing the effect an action may have on the environment, and in considering the

effects of possible alternatives, the agency must consider the direct, indirect and cumulative

impacts on the environment. 40 C.F.R. § 1508.8 ("[e]ffects and impacts . . . are synonymous . . .

. [and include] direct, indirect, or cumulative" effects). "Direct effects . . . are caused by the

action and occur at the same time and place." Id. "Indirect effects . . . are caused by the action

and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect

effects may include growth inducing effects and other effects related to induced changes in the

pattern of land use, population density or growth rate, and related effects on air and water and

other natural systems, including ecosystems." Id. The "[c]umulative impact is the impact on the

environment which results from the incremental impact of the action when added to other past,

present, and reasonably foreseeable future actions regardless of what agency (Federal or

non-Federal) or person undertakes such other actions. Cumulative impacts can result from

individually minor but collectively significant actions taking place over a period of time." 40

C.F.R. § 1508.7.

    53. When an agency is uncertain whether an activity will have a significant effect on the

environment, and thus, whether it has a duty to prepare an EIS, the agency may prepare an

Environmental Assessment ("EA") to assist it in determining whether the action may have a

significant environmental effect. 40 C.F.R. §§ 1508.9, 1501.4. The EA must include "discussions

of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental

impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."

40 C.F.R. § 1508.9(b). The agency must "provide sufficient evidence and analysis" of the direct,

indirect and cumulative environmental impacts of the proposed action and the alternatives

considered to support its "determination whether to prepare an environmental impact statement or

a finding of no significant impact." 40 C.F.R. § 1508.9(1).

54. If, after preparing an EA, the Corps determines that there will be no significant

impact, it must prepare a "finding of no significant impact" and make the finding available to the

public. 40 C.F.R. §§ 1501.4, 1508.13. Even if the Corps properly decides that an EIS is

unnecessary, its EA must be sufficiently detailed to adequately address potential impacts and

reasonable alternatives. Id. § 1508.9.

55. In addition, CEQ regulations provide that meaningful public participation and

oversight is essential to the NEPA process. Facilitating public input is a central element of the

NEPA process. See, e.g., 40 C.F.R. § 1500.1(b) ("[a]ccurate scientific analysis, expert agency

comments and public scrutiny are essential to implementing NEPA"); id. ("environmental

information [must be] made available to public officials and citizens before decisions are made and

before actions are taken").

<u>**Facts Giving Rise To Plaintiffs' Claims**</u>

**I.     Cypress Creek Town Center**

     **A.     The Cypress Creek Town Center Site – Location**

56. CCTC is proposed to be built on approximately 507 acres of undeveloped land in

Pasco County, Florida, located near a highway interchange and a state and county road.

Department of the Army Environmental Assessment and Statement of Finding, SAJ-2003-2336

("EA") at 1. Located between other public conservation lands, the CCTC site forms a

"bottleneck" for wildlife moving between the conservation lands, and Pasco County has

designated parts of it a "critical wildlife linkage" between the conservation lands. EA at 37. The

Cypress Creek Preserve, for example, which is owned by Hillsborough County, is downstream

and about 1.25 miles from the site. Also in the vicinity are other protected lands such as the municipal wells that provide drinking water to Tampa Bay Water, the regional supplier to St Petersburg, Tampa, Pinellas County, Pasco County, and Hillsborough County.

57. Pasco County, and the area around the CCTC site, is experiencing rapid development. See, e.g., EA at 50. For example, immediately south of the CCTC site is King Ranch, a site that is over three hundred acres that is currently predominately pasture, and is expected to be a commercial and residential development. Id. at 50. Under construction less than two miles east from the CCTC site is the Wiregrass development, a 5,118 acre project; four miles northwest of the CCTC site is The Grove, another mall under construction; and elsewhere in the county is the "Connerton" project, a 4,931 acre project with five villages.

**B.    The Cypress Creek Town Center Development**

58. CCTC is to be a "regional mall and supporting commercial enterprises, including retail businesses, financial institutions, hotels, restaurants, cinemas, offices and multifamily residential housing." EA at 2  To be built in two phases, it will have over 2,000,000 square feet of retail and commercial space, including department stores, big box stores, a quarter of a million square feet of restaurant space, banks, and a cinema. It will also have hundreds of hotel rooms, hundreds of residences, and almost a quarter million square feet of office space. In addition, over sixteen thousand parking spaces will be paved, accounting for almost half of the wetlands to be lost.

59. To accommodate the increase in traffic, the CCTC project will expand the existing roadways in the area. The developer will either build, or pay for, a new bridge across Cypress Creek, and will extend the existing road network across the site and the creek, to connect it to roads in the south. The developer will also widen existing roads in the area. The CCTC

23

development is expected to induce further growth in the area.

### C.    Cypress Creek Town Center Development Site - Wetlands and Uplands

60.   The CCTC project site itself is approximately 155 acres of wetlands, 9.65 acres of surface waters, and 342 acres of uplands. Corps EA at 1. The CCTC site - predominately pasture and wetlands until this past summer - was zoned Agricultural until the CCTC development was proposed. To allow the construction of the Cypress Creek Town Center development, the site's zoning was changed to MPUD, or Master Planned Unit Development.

61.   The wetlands and surface waters are cypress swamps, mixed wetland forests, freshwater marshes, wet prairies, ditches and small ponds. EA at 1. Together with Cypress Creek, which is immediately adjacent to the site, the wetlands form part of a natural "wetland system consist[ing] of a network of freshwater wetlands adjacent to Cypress Creek." Id. The wetlands on the site represent about one percent of the entire wetland resources of the Cypress Creek Basin. Permit, Attach. 3, p. 22 of 72.

62.   The wetlands on the site provide several important functions. EA at 34-35. First, the wetlands "provide natural biological functions such as foraging and roosting habitat for some species, especially wading birds on a seasonal basis." EA at 34. Among other species actually seen and recorded, the wetlands provide foraging habitat for the Wood Stork, a federally listed species, and several Florida Species of Special Concern: the snowy egret, the tricolored heron, the little blue heron, and the white ibis. Permit Attach 3, p. 18 of 72. The CCTC site is within the core foraging area of five breeding colonies of Wood Storks, EA at 46, and is about 1.3 miles from the nearest Wood Stork colony. Public Notice at 3. Wetlands on the site also provide habitat for the Eastern Indigo Snake, a federally listed threatened species.

63. Another important function of the wetlands on the site is flood control. In addition, the Corps has acknowledged that "the wetlands to be filled provide water purification functions." EA at 35.

64. The remaining 67 percent of the site is used for agricultural purposes or is forested, and the vast majority of this land are uplands. Permit, Attach. 3, p. 21 of 72. In addition to providing pasture and forest, the uplands provide important wildlife habitat. Gopher tortoises - a state listed threatened species - occupy uplands pasture. See Permit, Attach. 3, p. 18 of 72. Approximately 25 gopher tortoises and 66 gopher tortoise burrows were identified and ultimately removed by the applicant's biological consultants. July 7, 2007, BRA Relocation Report. These gopher tortoise burrows provide the primary habitat for the Eastern Indigo Snake. See USFWS, Multi-Species Recovery Plan at 4-569, 570. The uplands also provide critical buffers to Cypress Creek and provide a source of groundwater recharge to the underlying aquifer.

**D.    Cypress Creek**

66. Cypress Creek which runs immediately adjacent to the site of the CCTC, see EA at 1, 49, has been designated an "Outstanding Florida Water" by the State of Florida, Fla. Admin. Code Ann. r. 62-302.700(9)(i)(14)(c), meaning that it is "worthy of special protection because of [its] natural attributes." Fla. Stat. Ch. 403.061(27). Most of the remaining Outstanding Florida Waters exist in protected conservation lands such as parks: only a few waters exist in unprotected lands. See http://www.dep.state.fl.us/water/wqssp/ofw.htm. It is Florida's stated "policy to afford the highest protection to Outstanding Florida Waters." Fla. Admin. Code Ann. r. 62-302.700(1).

67. Cypress Creek is also a major tributary to the Hillsborough River which is "the major

source of drinking water for [the] City of Tampa." EA at 41 (emphasis added). Cypress Creek is an important contributor to the City of Tampa's drinking water, and the Hillsborough River provides water for approximately 600,000, including the City of Tampa.

## II.     Federally Listed Species Likely To Be Adversely Impacted By The Cypress Creek Town Center And The Cumulative Impacts Of Growth In The Area

### A.     The Threatened Eastern Indigo Snake

68.     The Eastern Indigo Snake ("Indigo") - the longest snake in the United States - is a lustrous, black, docile, non-venomous snake that now exists in only two states, Georgia and Florida. Eastern Indigo Snake, Multi-Species Recovery Plan for South Florida, USFWS, at 4-567, 568 ("Multi-Species Plan"). The Indigo needs a mosaic of habitat types, though it is "closely associated with the gopher tortoise [*Gopherus polyphemus*], the burrows of which provide shelter." Id. at 4-569.

69.     The Indigo has suffered "dramatic population declines" and "any additional threats to its survival could cause local extirpations." Id. at 4-567, 572 (emphasis added). Today, "habitat loss and fragmentation by residential and commercial expansion have become much more significant threats to the Eastern Indigo Snake." Multi-Species Plan at 4-569. In addition, "human population growth will increase the risk of direct mortality of the eastern indigo snake from property owners, domestic animals, and highway mortality." Id.

70.     Central to the recovery of the Indigo is the protection and enhancement of existing populations of the species. Id. A second element of recovery is the implementation of the Eastern Indigo Snake "guidelines" developed by the FWS, which help prevent the direct mortality of the snake during construction and other activities by providing for the education of

26

construction workers as to what an Indigo looks like, and mandating that the Indigos be allowed to leave the site.  Id.

**B.    The Threatened Florida Scrub Jay**

71.  The Florida scrub jay is a "30 centimeter (12 inch), bluish-colored, crestless jay . . . [with a] necklace of blue feathers."  FWS, Threatened Status for the Florida Scrub Jay, 52 Fed. Reg. 20715, 20716 (June 3, 1987).  The Florida Scrub Jay is a "relict species of fire-dominated oak scrub habitat that occurs on well-drained sandy soils in peninsular Florida."  Multi-Species Plan at 4-261.  Florida Scrub Jay habitat "consists of dense thickets of scrub oaks less than 3 meters in height, interspersed with bare sand for foraging and storing acorns."  52 Fed. Reg. at 20716.  The Florida Scrub Jay shares its habitat with the Eastern Indigo Snake and the state listed gopher tortoise, which are known to occur with scrub-jays, such that management for one species must consider management for the other species.  Multi-Species Plan at 4-261.

72.  The Florida Scrub Jay was listed because of the "loss, fragmentation and degradation of scrub habitats throughout Florida, due primarily to urbanization, agriculture, and fire suppression."  Id. at 261.  Central to the recovery of the Florida Scrub Jay is the protection, management and enhancement of scrub jay habitat on public and private lands.  Multi-Species Plan at 4-285.  Like the Eastern Indigo Snake, the Florida Scrub Jay's recovery plan also calls for the enforcement of "available protective measure[s]," primarily through section 7 consultations. Id.

**C.    The Endangered Wood Stork**

73.  The Wood Stork, which was listed as endangered by the FWS in 1984, "is the only species of true stork breeding in the U.S."  See FWS, U.S. Breeding Population of the Wood

27

Stork Determined To Be Endangered, 49 Fed. Reg. 7332 (February 28, 1984). It is "a large, long-legged, white wading bird with an unfeathered gray head and a stout dark bill" that "frequent[s] freshwater and brackish wetlands" to feed and "usually nests in cypress and mangrove swamps." Id. It co-exists with and breeds in colonies with great egrets, snowy egrets, and white ibis. Multi-Species Plan at 4-393.

74. The "unique feeding method of the Wood Stork gives it specialized habitat requirements." Mult-Species Plan at 4-393. The Wood Stork feeds by using "tactolocation"; essentially it wades through wetlands with its beak partly immersed and open, and when it feels prey it snaps its beak closed on it, lifts its head and swallows it. Id. at 4-399. This requires relatively high prey densities, and a fairly specific, and shallow, water depth, id., and during breeding season, the habitat must close to its breeding colony. Id. at 4-400.

75. The primary cause of the Wood Stork's decline is the "loss of suitable feeding habitat," which is "especially true for the south Florida rookeries." 49 Fed Reg. 7332. Habitat protection is a primary element to the recovery of the Wood Stork. Wood Stork Recovery Plan, U.S. FWS Southeast Region, 1997, at 16; Multi-Species Plan at 4-417, 418. This requires protection of a "mosaic" of wetlands, foraging sites and roosting sites: "wetlands must, once again, provide at the right locations and times, the food resources that are necessary." Wood Stork Recovery Plan at 16.

**D.    The Endangered West Indian Manatee**

76. The endangered West Indian manatee currently occupies the lower stretches of the Hillsborough River, as well as Tampa Bay and its marine reserves, which receive waters from Cypress Creek. The manatee is one of the most endangered marine mammals in coastal waters of

the United States: according to a 1998 FWS report the "status of the manatee population is, at

best, marginally stable." Florida Manatee Recovery Accomplishments: 1998 Annual Report, at 4.

77.  The "major threats to Florida manatees [include] destruction and degradation of

habitat caused by widespread development throughout much of the species' Florida range."

FWS, Southeast Region, Florida Manatee Recovery Plan (Jan 29, 1996) 4.  One threat in

particular is red tides, which can be caused and exacerbated by human pollution of water ways.

The species' "survival depends [in significant part] on maintaining the integrity of ecosystems and

habitat sufficient to support a sustainable manatee population," as "[i]ntensive coastal

development is perhaps the greatest long-term threat to the Florida manatee." See id.; US FWS

Manatee Recovery Plan, 2001, at 24-25.

**III.    The Corps' Implementation of Section 404 Of the Clean Water Act**

78.  The Corps has been delegated the primary responsibility for implementing the CWA

404 permitting program over the past several decades.  A number of studies and reports have

documented the Corps's unsuccessful history of implementation of its section 404 responsibilities.

In 1988 the United States General Accounting Office ("GAO") reviewed the Corps'

implementation of section 404 and concluded that the Corps was not adequately considering

cumulative impacts, and was not requiring permittees to pursue other practicable alternatives.

See The Corps' of Engineers' Administration of the Section 404 Program, GAO, at 3.

79. In 2001, the National Academy of Sciences ("NAS"), in cooperation with the EPA

and with the assistance of the Corps, conducted an in depth review of the Corps' implementation

of section 404 and of the mitigation that the Corps required for wetlands lost as a result of section

404 permits.  The principal conclusion of the NAS was that "[t]he goal of no net loss of wetlands

is not being met for wetland functions by the mitigation program . . . ." Compensating for

Wetland Losses under the Clean Water Act, National Academy of Sciences, 2001 at 2. The NAS

review also identified several overarching themes, including that: "mitigation sites are not

performing as specified in Corps permits," id. at 103; "where mitigation is performing as

specified, many of those sites do not support [equivalent] functions and values," id. at 103; and

where "the regulatory program may reassemble the landscape" it may do so "with a different

habitat mix than the wetlands being lost." Id. at 109.

  80. A 2005 study performed by the GAO arrived at similar findings. It concluded that the

Corps does not adequately ensure that wetlands impacts are being mitigated; that there was only

limited oversight to determine the status of compensatory mitigation; and that few enforcement

efforts were directed at ensuring that permittees accomplished the required mitigation. Wetlands

Protection: Corps Of Engineers Does Not Have an Effective Approach to Ensure That

Compensatory Mitigation Is Occurring, What We Found, General Accounting Office, September

2005.

  81. A recent analysis in the St. Petersburg Times titled "Vanishing Wetlands" found that

during the last 14 years alone, at least 84,000 acres of wetlands have been lost in Florida. The

Times analysis found that between 1999 and 2003, the Corps approved more than 12,000

applications for permits to destroy wetlands and rejected one. According to the NAS's review of

literature, in "southeast Florida [a study] of 40 wetland creation and restoration projects found

that only about half of the required 430 hectacres of wetlands had been constructed." NAS Study

at 101 (emphasis added). Another study conducted by the Florida Department of Environmental

Regulation found that of 63 permits issued, only 6% percent achieved permit compliance, and

only 27 % were achieving various tests for ecological functionality and viability. NAS at 117 (emphasis added).

**IV.    The Corps' Issuance of the CCTC Section 404 Permit and the FWS concurrence Letter**

    **A.    The Public Notice and Ensuing Comments**

    82.    On October 31, 2005, the Corps issued a Public Notice regarding Sierra Properties (the "applicant" or "developer") to fill approximately 54 acres of wetlands and 10 acres of surface waters with 270,418 cubic yards of fill material. 10/31/2005 Corps Public Notice at 1 ("Notice"). The Notice did not identify that Cypress Creek flows into the Hillsborough River, nor that the Hillsborough River is "the major source of drinking water for the City of Tampa." EA at 41. The Notice did not identify the site's close proximity to municipal wells; the functions performed by the wetlands being lost, such as flood control, storm water storage, water purification, nutrient assimilation, and groundwater recharge; the functions performed by the uplands, such as providing buffers for Cypress Creek and habitat for threatened species; that parts of the site have been designated a "critical" wildlife habitat corridor for wildlife traveling between protected lands; the full magnitude of the project, such as the two million plus square feet of retail space, the hundreds of thousands of square feet of office space, the thousands of parking spaces, nor the hundreds of planned residences.

    83.    The Notice did not identify the potential environmental impacts of the project's proposed destruction of wetlands and surface waters. Rather than identify alternatives to the project or the environmental impacts of those alternatives, the public was advised that it could separately request a copy of the alternatives analysis prepared by the permit applicant for a fee.

84. Governmental entities, residents and conservation organizations responded to the Notice and objected to the permit issuance on multiple grounds: over two hundred comments were submitted including the comments sent to state agencies. People commenting stressed the lack of substantive information in the Corps' Notice, and they requested a public hearing.

85. Commenters stressed the environmental sensitivity of the site and the likelihood of significant adverse environmental impacts. Among the detailed concerns about the environmental impacts of the development were the following:

- a loss of wetlands leading to a decreased ability to absorb nutrients and urban runoff and pollutants;
- the potential release of pollutants and nutrients from parking lot runoff, fertilizers and pesticides into Cypress Creek and other water bodies;
- the introduction of petrochemicals from increased parking lot storage of cars on the impacted wetlands and associated oils and exhaust;
- the insufficient buffers proposed to protect the remaining wetlands and Cypress Creek itself;
- the increased probability of damage to the watershed of Cypress Creek, which collects diffused surface waters as a tributary of the Hillsborough River, a surface drinking water source for the City of Tampa;
- the loss of flood storage capacities and an increased probability of damage in the event of a tropical storm or hurricane due to loss of protective wetlands and impacts in the 100-year floodplain; and
- the loss of wildlife habitat.

Commenters also stated that a mall was not a "water-dependent activity" and that other practical alternatives existed both on site and off site that should be pursued. They identified other potential sites for the mall, and they identified means by which the mall could be reconfigured or re-planned to avoid and or minimize impacts.

86. Commenters also challenged the Corps' reliance on mitigation. They provided information demonstrating that the Corps' mitigation rarely if ever succeeded, that mitigation was not monitored to assure its success, and that rarely did the mitigation actually compensate for the

natural wetlands destroyed.

87. Commenters also identified other malls and developments being constructed in the area and challenged the purported public need for the CCTC development, and the ability of the market to support all of the malls. For example, commenters noted major malls within two to four miles of the proposed construction. The public also raised concerns about cumulative impacts of the proposed use given the other development occurring in the area, wetland impacts, surface water impacts, groundwater impacts, secondary urban sprawl, traffic, and resulting pollution. Commenters urged the Corps to prepare an EIS.

**B.     The Corps' EA, The Permit, And The FWS Concurrence Letter**

**1.     General Background Information**

88. On May 15, 2007, the Corps issued the environmental assessment and the requested section 404 permit challenged in this case. The approved project remained almost completely unchanged from the proposed project. The permitted project will destroy over fifty acres of wetlands and almost ten acres of surface waters for an enormous development that will include 630 residences, 700 hotel rooms, over two million square feet of commercial space and sixteen thousand parking spaces. Almost half of the wetlands to be destroyed are to be paved over for parking. EA at 11. The approved project will have an average buffer around remaining wetlands of 25 feet, meaning that the planned buffer will often be less than 25 feet. EA at 15. The project will have only a 50 foot buffer from Cypress Creek. EA at 15.

89. The project will destroy occupied habitat of the Wood Stork and the Eastern Indigo Snake and it will also destroy habitat that is suitable for the Florida Scrub Jay. Eastern Indigo Snake and Florida Scrub Jay habitat will be lost without a determination of the necessary

mitigation to offset that habitat loss, or the requirement that the mitigation be performed. The
project will destroy much of the "critical" wildlife linkage that connects other neighboring
preservation lands.

90. The Corps did not require reduction in the size of the mall. The Corps did not require
any meaningful reconfiguration to minimize impacts.

### 2. The Corps' and the Service's Review of Impacts On Endangered Species And The Agencies' Violation Of The Endangered Species Act

91. The Corps acknowledged that the project might affect the Wood Stork and the
Eastern Indigo Snake. EA at 4, 46-47. The Corps therefore sought informal consultation with
the FWS for these species, and a concurrence that the species were not likely to be adversely
affected. The Corps sought no consultation with regard to the Florida Scrub Jay and the
Manatee, although the CCTC development is likely to adversely affect them, primarily through
habitat loss and degradation. The agencies were also required to rely upon the best available data
and to base their decisions on that data.

#### a. The Wood Stork

92. The Corps based its "no adverse effect" determination on its assertion that "thirty-
seven survey days over four years (2003-2005) did not yield any sightings of Wood Storks on the
project area," and on the creation of foraging habitat through mitigation to offset the loss of
existing habitat. Similarly, the FWS based its no adverse effect determination in part on the
ground that no Wood Stork was ever seen nesting or foraging on the site, and in part on the
expected creation of Wood Stork foraging habitat.

93. The Corps' and the FWS' determinations were contrary to the evidence in the record

and did not address issues raised by the record. The biological consultants that undertook the biological surveys reported that they observed Wood Storks on site, along with other wading birds, foraging or resting. Neither the Corps nor the FWS identified in the EA or addressed the issue of unsuccessful or poor past mitigation efforts, the cause of past mitigation failures, what was being done differently in this case to prevent such failure, nor what type of insurance was being built into this mitigation plan in case this mitigation plan failed as well. The Corps and the FWS also failed to address the adverse effect to the Wood Stork of the loss of existing habitat during the time period that the site was under construction and the new mitigation lands were becoming established. The Corps and the FWS also failed to adequately address secondary and cumulative impacts to the Wood Stork.

### b.     The Eastern Indigo Snake

94. The Corps' and the FWS's "no adverse effect" determination with regard to the Eastern Indigo Snake was solely "based on the applicant's commitment to abide by the USFWS's guidelines to protect this species." No formal consultation was undertaken. EA at 47, Concurrence Letter at 5.

95. The Corps' and the FWS's determination failed to consider whether the Eastern Indigo Snake has habitat on the site, how much habitat it has on the site, what quality habitat it has on the site, or whether and how much habitat will be destroyed, or what the significance to the snake would be from the loss of the "critical wildlife linkage" connecting the other conservation lands in the area, or the expansion of roads and traffic in the area.

96. Evidence in the record and before the agencies make clear that there is Eastern Indigo Snake habitat on site. The snake is closely associated with, and lives in the burrows of, gopher

tortoises. Multi-Species Plan at 4-569. The applicant's own biological consultants identified the

existence of gopher tortoises on site, Permit, Attachment 3, Biological Research Associates

("BRA") Mitigation Plan at p.18 of 72; and they ultimately found 25 gopher tortoises and 66

gopher tortoise burrows. See BRA Relocation Report, July 7, 2007, at 1. An Eastern Indigo

Snake was also seen on or adjacent to the property.

  97. The guidelines relied upon by the agencies to find no adverse effect to the Eastern

Indigo Snake do not address the impact of loss of snake habitat. They only address the direct

take of Indigos during construction activities and require that the snake be allowed to leave, or be

removed from, a construction site, without analyzing whether the animals are being displaced to

an area of equivalent or even suitable habitat. See Standard Protection Measures For The Eastern

Indigo Snake, Permit, Attachment 5.

**c. The Florida Scrub Jay**

  98. In issuing the permit, the Corps did not seek concurrence or consultation with the

Service about the Florida Scrub Jay. The Corps determined that the development would not

affect the species because it concluded "there was no scrub jay habitat on the site." EA at 48.

The FWS offered its own conclusion in a single sentence of the Concurrence Letter wherein it

also stated that there was no Scrub Jay habitat on site. Concurrence Letter at 5.

  99. The agencies' determinations are counter to the information they had before them,

and they failed to address or even explain how they arrived at their determinations given the

conflicting evidence. Among other things, there was xeric oak scrub habitat on site, three meters

or shorter, in sandy soils which is consistent with Florida Scrub Jay Habitat. Other species that

co-exist in the same types of habitat were noted as being on site, having habitat on site, or having

36

enough of a connection to the site to require consultation, including, for example, the gopher

tortoise and the Eastern Indigo Snake. The agencies themselves visited the site and affirmed the

presence of Florida Scrub Jay habitat on site. The agencies did not address this information in

their decision nor reconcile it with their determination.

### d.    The West Indian Manatee

100. The Corps never sought consultation with regard to the Manatee, although

development, and associated water pollution and red tides, have been identified as a significant

threat to the Manatee. The Corps failed to seek concurrence or request consultation with the

USFWS regarding whether the CCTC development site, in concert with the cumulative impacts of

development in the area, may adversely impact the Manatee, by polluting waterways that flow

into Hillsborough River and empty into Tampa Bay, which are important Manatee habitat.

### 3.    The Corps' Legally Insufficient Clean Water Act and NEPA Analyses

101. In the EA the Corps acknowledged that the development is not water dependent,

EA at 29, but the Corps failed to mention or apply a presumption that there were other

practicable alternatives that would avoid and/or minimize impacts to wetlands and surface waters,

and that would have less significant environmental impacts. The Corps also failed to require the

applicant to rebut such a presumption and clearly demonstrate that there were no other such

practicable alternatives. The Corps' determination that there were no practicable alternatives to

avoid and/or minimize environmental impacts was contrary to the evidence in the record, and thus

violated the requirements of avoidance and minimization. In reaching the determination the Corps

failed to inquire into relevant issues and it did not require that the applicant meet its evidentiary

burden. The Corps did not base its determination on evidence in the record, but, rather, on the

applicant's own statements.  When the applicants statements were contradicted by evidence in the record, the Corps disregarded that evidence and did not engage in an independent inquiry into the contradictory information and statements.

102.  The Corps' determination that there would be no significant degradation of waters of the United States was contrary to the evidence in the record.  In reaching the determination the Corps failed to inquire into relevant issues as discussed in greater detail below.

103.  The Corps failed to take a hard look at a number of environmental impacts, including secondary and cumulative impacts.  The Corps failed to adequately address secondary impacts to remaining wetlands on site and impacts from the project's inducing growth in the area.  Similarly, the Corps's cumulative impact analysis was one paragraph that recited legal standards for a cumulative impacts analysis and then referred to and approved the applicant's cumulative impacts analysis.  The applicant's cumulative impacts analysis focused on water quality, flooding, wetlands and the Wood Stork.  The analysis of the four selected topics did not meaningfully address the four issues because, among other things, it did not appropriately evaluate the development that is taking place in the area and was often limited to reciting the protections in other laws and asserting that those laws would moderate or prevent environmental impacts.  The analysis also failed to adequately address important issues such as water supply issues, groundwater impacts and depletion, expanded roadway impacts, traffic increases and habitat loss, degradation and fragmentation for species like the Eastern Indigo Snake.

104.  The Corps' public interest review incorporated such flaws and was contrary to the evidence in the record and failed to identify or address relevant issues.  Among other things, the Corps noted that the public questioned the need for the project in light of the other developments

in the area. The Corps relied upon two market analyses provided by the applicant and concluded that the analyses demonstrated the need and viability in the market place for the development. The analyses indicated the opposite and concluded that the market cannot support the mall. The Corps also concluded that there was no native wildlife habitat on the project site other than in wetlands. The record establishes the existence of gopher tortoises on the site which live in uplands. The Corps also identified the existence of the "critical wildlife linkage" and concluded that the "integrity of this linkage" will be preserved by the "extensive" 50 foot buffers. The Corps did not analyze or identify how wide the corridor was before the project, what species use the corridor, how wide a corridor and buffer those species need, what type of habitat they need in the corridor, or whether the buffer proposed would be adequate in size or type of habitat to function as a critical wildlife corridor. The Corps failed to adequately and accurately review impacts to other conservation lands - such as impacts to the wildlife corridor - to water supplies, to aesthetic and recreation interests, and to flood related concerns.

105. The Corps failed to prepare an EIS. The CCTC project may significantly affect the human environment and the CCTC project triggers a number of CEQ significance criteria, including that the project, especially in concert with cumulative impacts of other developments in the area, may significantly affect drinking water supplies and flood risks, 40 C.F.R. § 1508.27(b)(2); will destroy wetlands and degrade an Outstanding Florida Water, id. at § 1508.27(b)(3); is "controversial" within the meaning of the CEQ regulations, id. at § 1508.27(b)(4); and may affect a number of federally listed species, such as the Wood Stork and the Eastern Indigo Snake, id. at § 1508.27(b)(9).

a.     **Off Site Alternatives, Avoidance**

106.  The Corps did not undertake a sufficient review of off site alternatives analysis: it

failed to inquire into central issues, its determinations were contrary to the record, and where

there were conflicts between the record and the applicant's assertions, the Corps did not resolve

the conflicts.  The Corps accepted the applicant's dismissal of one alternative site as

"impracticable" because "access could only be provided by one arterial road." EA at 9.  The EA

– incorporating the applicant's alternatives analysis – expressly stated that two major or minor

roads were merely "preferred by the applicant," and that more limited access was "considered less

suitable," but not impracticable.  Corps EA at 7.  Similarly, the Corps accepted the "applicant['s]

further clarifi[cation] that the project purpose cannot be met by dividing the proposed project

between sites" or combining two parcels.  EA at 9, 10.  The EA indicated that two possible

alternative sites, rejected individually as too small and unable to be configured to accommodate

the project, were located directly across a road from each other.  Combined, the two sites have

300 acres of developable land, alleviating the concern that individually they were too small, and

like the proposed CCTC site, the two sites are in the northwest and southwest quadrants of a

highway interchange.  Moreover, there was a third alternative site in the immediate area that

could also have been considered in combination with the other site.  The Corps failed to address

and resolve these issues, and the record indicates that the combined development was neither

considered nor found impracticable.

107.  The EA's review of the environmental impacts of each alternative did not indicate

the environmental impacts of the alternatives.  For example the no action alternative was one

short paragraph with no environmental information, and the remaining sites were demarcated 0-4 for a range of their impacts.

      **b.**    **On Site Alternatives, Avoidance and Minimization**

108. The Corps's determination that there were no on-site alternatives, and that the project's impacts could not be avoided or minimized, was contrary to the evidence. The Corps also failed to independently inquire into and resolve inconsistences in the information before it, such as conflicts between the applicant's statements and evidence in the record, the Corps did not require that the applicant "clearly demonstrate" the lack of practicable alternatives, and it did not consider issues central to the required analysis.

109. The Corps determined that the project could not be reduced and/or reconfigured to reduce impacts to wetlands based upon the applicant's assertions that the project could not achieve financing, and thus would not be financially viable, if it was not large enough to bring in enough income to realize an 8.0% return. <u>See e.g.</u> EA at 11, 14. The Corps applied the wrong legal standard in reaching its on-site alternatives determinations and its determinations were contrary to the evidence. The correct legal standard that the Corps is supposed to evaluate is whether the additional <u>cost</u> to a project as the result of avoiding or minimizing impacts is reasonable. <u>E.g.</u>, 1980 Notice, 45 Fed. Reg. at 85343.

110. Assuming the correct "cost" standard was applied, the Corps's determination that impacts could not be avoided or reduced was contrary to the evidence in the record and based upon unsupported and contradicted statements by the applicant. The Corps' apparent determination that an 8.0% rate of return, as calculated by the applicant, was the minimum return necessary to secure financing, and that the applicant had demonstrated this, was contrary to the

evidence in the record. The applicant was inconsistent as to what return it needed to achieve to secure financing, stating numbers that ranged from 7.8% to 8.0%. The evidence supplied by the applicant indicated that the project could be financed for less than an 8.0% rate of return, as calculated by the applicant. Also, the evidence supplied indicated that the applicant could achieve a rate of return, with a reduced or downsized project and/or with a parking garage, that would be sufficient to obtain financing, according to reported industry standard rates of return provided by the applicant. The reviewing permitting officer for the Corps requested that the Corps arrange for an economist to review the information that the applicant submitted, but the Corps denied the request.

111. In addition, the report on which the applicant relied does not establish a minimum rate of return, as it is an average of rates of return based upon a survey, not a statement of minimum rates of return. The applicant's calculations themselves were also based upon many assumptions that lacked any evidentiary support. For example, the base land value reported in almost every financial calculation of the applicant - the supposed "cost"of the land - is reported as being 60 and 70 million dollars. This figure is unsubstantiated as are other important figures like rental income.

112. The Corps' determination that impacts to wetlands could not be reduced through reducing the amount of parking is also contrary to the evidence in the record. The Corps requested that the applicant study nearby malls to see how much parking was really needed. The applicant's own study revealed that the project "proposed more parking than any existing mall in the evaluation." EA at 12 (emphasis added). The applicant also supplied statements by fellow developers that stated they believed a parking ratio of approximately 4.5 - 5 parking spaces were

needed per 1000 square feet. Similarly, the applicant asserted that the project could be built on

200-260 acres. The project exceeded these figures.

### c.     The Corps' Mitigation

113. The Corps never identified or addressed information in the record documenting the

inefficacy of the Corps' mitigation programs, and it failed to address central issues relevant to

mitigation. Evidence before the agency indicated that permittees often fail to build or preserve

mitigation areas; that the Corps does not oversee implementation of the mitigation, that adequate

monitoring is not required, or performed as required, and that the mitigation fails to replace lost

functions correctly. The Corps did not identify these issues or explain how this project's

mitigation will be successful where other projects have failed.

114. The Corps' determination that its mitigation plan will be successful and offset

wetlands losses as expected or required is unfounded, unexplained, contrary to the evidence in the

record and fails to consider necessary issues. Its determinations regarding the minimum required

contents of the plan, and its apparent acceptance of changes to the plan during the permitting

process, are also unfounded, unexplained, contrary to the evidence in the record, and contrary to

the law and the Corps' Regulatory Guidance Letters. The mitigation plan defines success as

meeting minimum criteria for one year; it does not establish adequate monitoring times; it allows

the applicant to be discharged from monitoring, and therefore maintenance, responsibilities at any

pont in time after a minimum standard has been meet, it has hydrological and ecological flaws,

such as its replacement of wetland functions with storm water management ponds and its siting of

off site mitigation miles away in a separate basin, and the plan does not have adequate

contingency plans in the event the mitigation plan is unsuccessful. These failures impact water

supply, water quality, flood, and habitat concerns.

>       **d.    The Corps' Unlawful Determination That There Would Be No
>              Significant Degradation Of US Waters.**

115.  The Corps failed to identify and address the relevant factors bearing upon whether there would be significant degradation of wetlands and surface waters, and its determination that there would be no significant degradation is unsupported by the record and contrary to the evidence. The Corps acknowledged that upland buffers around Cypress Creek were important to maintaining water quality in the Creek, but the Corps did not identify or determine the minimum size of a buffer necessary to protect the Creek, and it did not address information in the record concerning the necessary buffer sizes. The Corps accepted a fifty foot buffer as the best that is possible given financial constraints. Similarly, the Corps did not identify and determine the minimum size of buffer necessary to protect remaining wetlands. It accepted an "average" twenty five foot buffers as the best that was possible given financial constraints. As discussed above, the Corps acknowledged in its secondary impacts analysis that there may be impacts to on-site wetlands. The Corps never identified or determined what those impacts might be, how severe they might be, or whether average twenty five foot buffers would be adequate to protect them from significant degradation.

116.  The Corps did not identify or address the relevant factors regarding whether the storm water treatment system would be adequate to protect the remaining wetlands and Cypress Creek, and its determination that the system would prevent substantial degradation of waters is unfounded and contrary to the evidence in the record. The Corps did not identify or determine the likely pollutants from the site, whether the storm water system would effectively treat those

pollutants, what impacts the pollutants would have on Cypress Creek if they were not "treated," what the area's precipitation is like, and what will happen when weather in the region exceeds a 1.5 inch rain event as it frequently does. Id. The Corps' deferral to the approval of other state agencies does not satisfy the Clean Water Act or NEPA.

117. The Corps' determination that there would be no significant degradation based upon the water quality monitoring plan is also unfounded and contrary to the evidence in the record. The water quality monitoring plan does not protect water quality, because of, among other things, inadequate determinations of baselines, locations and timing of samples, repeated samplings when degradation is found, and the duration of sampling, as it ends five years after completion of construction. The plan is also inadequate because the Corps does not retain power to force specific corrective action it believes necessary if steps must be taken if water quality is degraded, and that the fact that the applicant can choose what remedial steps it can take from among those that it considers feasible, when it has already indicated to the Corps that it does not view any further steps towards minimization, beyond those already in the permit, to be feasible.

**IV.     Permit Issuance and Significant Events Post Permit Issuance**

118. On May 14, 2007, the Corps mailed notices to the public informing it of the Corps' refusal to hold requested public hearings. On May 15, 2007, the Corps issued the CCTC permit, although it had represented that it was not going to issue the permit any time in the near future, and members of the public were securing an economist to review the application. The public and conservation organizations that had been actively involved opposing the issuance of the permit immediately protested the decision and sought to have the Corps revoke or suspend its decision.

119. In late June and early July the applicant began removal of the state listed gopher

tortoise from the site and the removal of vegetation as well. It accelerated its activities in response to conservationists' efforts to stop the project in state administrative proceedings, including by working by headlamp extremely late into the night and, on another occasion, through a tropical storm.

120. On July 17, 2007, the Sierra Club formally provided the Corps with the statutorily required sixty days notice of its intent to sue under the ESA, it requested that the Corps suspend or revoke the permit, and it encouraged the Corps to contact the Sierra Club to resolve the issue. During the intervening sixty days the Sierra Club - and other organizations - continued to reiterate their opposition to the development. They have also steadily sought to challenge the development through various administrative proceedings.

121. In the intervening time, the CCTC developers were cited by two governmental agencies for unlawfully discharging polluted water into Cypress Creek and/or its associated wetlands. To the extent that the applicant has destroyed endangered species habitat, or filled any wetlands and/or surface waters, the destruction constitutes an ongoing violation of the ESA, and the fill constitutes an unlawful discharge and continuing violation of the Clean Water Act.

122. On September 6, 2007, the Sierra Club wrote the Corps and forwarded notices of the violations. The Sierra Club again requested that the Corps suspend or revoke the CCTC permit.

123. On September 19, 2007, the Sierra Club again inquired with the Corps' and the Service's counsel as to whether the Corps had any response to the Sierra Club's concerns and whether the Corps would suspend or revoke the permit. Neither agency had any response at that time.

124.  On September 28, 2007, plaintiffs again inquired whether the Corps and the Service would respond to its letters and suspend or revoke the permit.  On September 29, 2007, the Sierra Club's statutorily required sixty day notice period expired.  To date, neither the Corps nor the Service have had a response to the Sierra Club's letters.

## CLAIM ONE
## THE CORPS AND THE FWS: VIOLATIONS OF THE ESA

125.  By issuing the section 404 CCTC permit without engaging in formal section 7 consultation with the FWS about the potential impacts, including cumulative impacts, to the Wood Stork and the Eastern Indigo Snake, and by failing to engage in either formal or informal section 7 consultation with the FWS regarding impacts to the Florida Scrub Jay and the Manatee, and by failing to utilize the best available data, the Corps violated section 7 of the ESA, and caused and contributed to others violating the ESA, 16 U.S.C. § 1536(a), and its implementing regulations, and has acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

126.  By issuing its concurrence letter that the CCTC project was not likely to adversely affect the Wood Stork, the Eastern Indigo Snake and the Florida Scrub Jay, and by failing to use the best available data, the FWS violated section 7 of the ESA, 16 U.S.C. § 1536(a), and its implementing regulations, and has acted arbitrarily and capriciously in violation of the APA.  5 U.S.C. § 706(2).

127. These violations of the ESA, the applicable regulations, and APA have caused and will continue to cause plaintiffs injuries as described in ¶¶ 8-30.

**CLAIM TWO**
**THE CORPS: VIOLATIONS OF THE CLEAN WATER ACT**

128.  The plaintiffs incorporate the allegations of paragraphs 1- 123 herein.  By issuing the

CCTC permit for the destruction of over fifty acres of wetlands and surfaces waters without

providing adequate public notice, without requiring the applicant to clearly demonstrate the lack

of practicable alternatives; without making determinations supported by information before the

agency about the availability of practicable alternatives; without requiring the applicant to avoid

and minimize impacts to waters of the United States; without ensuring that there would not be

significant degradation of waters of the United States; by premising the permit in reliance on

mitigation to prevent impacts without addressing the shortfalls of the mitigation when evidence

before the agency indicated that mitigation would be unsuccessful; and by failing to take a hard

look at the environmental impacts of the permit, including secondary and cumulative impacts, the

Corps has violated the Clean Water Act, and has acted arbitrarily and capriciously in violation of

the APA.  5 U.S.C. § 706(2).

129.  These violations of the Clean Water Act, its implementing regulations and the APA

have caused and will continue to cause plaintiffs injuries as described in ¶¶ 8-30.

**CLAIM THREE**
**THE CORPS: VIOLATIONS OF NEPA**

130.  By issuing the CCTC permit without providing adequate opportunity for public

notice and comment; without taking a hard look at the environmental impacts of the permit,

including secondary and cumulative impacts of the permit and alternatives, without providing

adequate and accurate information in the EA to inform the public of such environmental impacts,

and by failing to prepare an EIS, the Corps has violated NEPA and its implementing regulations,

and has acted arbitrarily and capriciously in violation of the APA. 5 U.S.C. § 706(2).

131. These violations of NEPA, its implementing regulations and the APA have caused and will continue to cause plaintiffs injuries as described in ¶¶ 8-30.

**WHEREFORE**, plaintiffs request the Court issue an order:

(1)    declaring that the Corps' issuance of the permit, and the FWS's concurrence letter, violated the Endangered Species Act, the Clean Water Act, NEPA, and their implementing regulations, and the Administrative Procedure Act;

(2)    preliminarily and permanently setting aside the Corps' permit and the FWS's concurrence letter and requiring the Corps to ameliorate the damage caused by the permit it unlawfully issued.

(3)    awarding plaintiffs their costs and reasonable attorneys' fees, including expert fees; and

(4)    awarding plaintiffs any other relief that is just and proper.

Respectfully submitted,

Joshua Stebbins
D.C. Bar No. 468542

Howard M. Crystal
D.C. Bar No. 446189

Eric R. Glitzenstein
D.C. Bar No. 358287

49

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
jstebbins@meyerglitz.com
hcrystal@meyerglitz.com

Attorneys for Plaintiffs

Date: October 1, 2007

# Motion to Intervene
# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB, CLEAN WATER ACTION, GULF RESTORATION NETWORK, CHRIS LOY, and RICHARD SOMMERVILLE, | ) ) ) ) | Civil Action No.  1:07-cv-01756 (RCL) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers, DIRK KEMPTHORNE, in his official capacity as Secretary, U.S. Department of the Interior, and H. DALE HALL, in his official capacity as Director, U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ANSWER OF SIERRA PROPERTIES I, LLC, PASCO 54, LTD.,
PASCO RANCH, INC., AND JG CYPRESS CREEK LLC TO PLAINTIFFS'
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Intervening Defendants Sierra Properties I, LLC, Pasco 54, Ltd., Pasco Ranch, Inc., and

JG Cypress Creek LLC (collectively referred to hereinafter as "Intervening Defendants"), by and

through undersigned counsel, hereby assert defenses and answer the Complaint for Declaratory

and Injunctive Relief that has been filed by Plaintiffs Sierra Club, Clean Water Action, Gulf

Restoration Network, Chris Loy, and Richard Sommerville.

**Answer to the Allegations of the Complaint**

Intervening Defendants hereby answer the allegations made in each numbered paragraph

of Plaintiffs' Complaint as follows:

1.      The first sentence of this paragraph contains Plaintiffs' characterization of their lawsuit, to which no response is required.  To the extent that the first sentence is deemed to contain factual allegations, Intervening Defendants deny those facts.  The second sentence contains conclusions of law to which no response is required; however, to the extent the second sentence contains factual allegations, those allegations are denied.

2.      Due to the vagueness and ambiguity in the first sentence of this paragraph, Intervening Defendants lack sufficient knowledge or information to form a belief as to the truth of its allegations and therefore deny such allegations.  Intervening Defendants admit the allegations in the second sentence of this paragraph that the site's southern portion has been designated by Pasco County, Florida, as "critical wildlife linkage."  Intervening Defendants also admit the allegations in the third sentence in this paragraph that portions of Cypress Creek have been designated an "Outstanding Florida Water" by the State of Florida, that it flows into the Hillsborough River, and that Tampa obtains some water from the Hillsborough River.  Due to vagueness and ambiguity in the fourth sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.  Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations made in the fifth sentence, and therefore deny same.

3.      This paragraph contains Plaintiffs' characterizations and argument concerning the permit issued by the Corps on May 15, 2007, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to the permit for a true statement of its contents.

4.      This paragraph contains Plaintiffs' characterization of the relief they seek in this lawsuit, to which no response is required.  To the extent that this paragraph is deemed to contain factual allegations, Intervening Defendants deny those facts.

5.      This paragraph contains Plaintiffs' characterization of their lawsuit, to which no response is required.  To the extent that this paragraph is deemed to contain factual allegations, Intervening Defendants deny those facts.

6.      There is no paragraph 6 in the Complaint.

**Jurisdiction**

7.      This paragraph contains conclusions of law to which no response is required.

**Parties**

8.      Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

9.      Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph, and therefore deny same. Due to vagueness and ambiguity in the second sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations, and therefore deny same.

10.     This paragraph contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in this paragraph, Intervening Defendants deny those facts.

11.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

12.     This paragraph contains conclusions of law to which no response is required.   To the extent Plaintiffs are deemed to have pleaded factual allegations in this paragraph, Intervening Defendants deny those facts.

13.      Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

14.      Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

15.     The first sentence of this paragraph contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in this sentence, Intervening Defendants deny those facts.  The second sentence contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in the second sentence, Intervening Defendants deny those facts. The third sentence contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in the third sentence, Intervening Defendants deny those facts.

16.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

17.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

18.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

19.     This paragraph contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in this paragraph, Intervening Defendants deny those facts.

20.     This paragraph contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in this paragraph, Intervening Defendants deny those facts.

21.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

22.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

23.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

24.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

25.     The first sentence of this paragraph contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in this sentence, Intervening Defendants deny those facts.  The second sentence contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in the second sentence of this paragraph, Intervening Defendants deny those facts.   The third sentence contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in the third sentence of this paragraph, Intervening Defendants deny those facts.

26.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

27.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

28.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

29.     Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny same.

30.     The first sentence of this paragraph contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in this sentence, Intervening Defendants deny those facts.  The second sentence contains conclusions of law to which no response is required.  To the extent Plaintiffs are deemed to have pleaded factual allegations in the second sentence of this paragraph, Intervening Defendants deny those facts.

31.     Intervening Defendants admit that Lt. Gen. Robert L. Antwerp is currently the chief of Engineers for the United States Army Corps of Engineers ("Corps").  The remainder of this paragraph contains conclusions of law to which no response is required.

32.     Intervening Defendants admit that Dirk Kempthorne is currently the Secretary of the Interior.  The remainder of this paragraph contains conclusions of law to which no response is required.

33.     Intervening Defendants admit that Dale Hall is currently the Director of the United States Fish and Wildlife Service ("FWS").  The remainder of this paragraph contains conclusions of law to which no response is required.

## Statutory Scheme Relating to Plaintiffs' Claims

34.    This paragraph contains conclusions of law to which no response is required.

35.    This paragraph contains conclusions of law to which no response is required.

36.    This paragraph contains conclusions of law to which no response is required.

37.    This paragraph contains conclusions of law to which no response is required.

38.    This paragraph contains conclusions of law to which no response is required.

39.    This paragraph contains conclusions of law to which no response is required.

40.    This paragraph contains conclusions of law to which no response is required.

41.    This paragraph contains conclusions of law to which no response is required.

42.    This paragraph contains conclusions of law to which no response is required.

43.    This paragraph contains conclusions of law to which no response is required.

44.    This paragraph contains conclusions of law to which no response is required.

45.    This paragraph contains conclusions of law to which no response is required.

46.    This paragraph contains conclusions of law to which no response is required.

47.    This paragraph contains conclusions of law to which no response is required.

48.    This paragraph contains conclusions of law to which no response is required.

49.    This paragraph contains conclusions of law to which no response is required.

50.    This paragraph contains conclusions of law to which no response is required.

51.    This paragraph contains conclusions of law to which no response is required.

52.    This paragraph contains conclusions of law to which no response is required.

53.    This paragraph contains conclusions of law to which no response is required.

54.    This paragraph contains conclusions of law to which no response is required.

55.    This paragraph contains conclusions of law to which no response is required.

## <u>Facts Giving Rise to Plaintiffs' Claims</u>

56.    Intervening Defendants admit the allegations in the first sentence of this paragraph.  Intervening Defendants deny the allegation in the second sentence of this paragraph that Cypress Creek Town Center "forms a 'bottleneck' for wildlife moving between the conservation lands."  Intervening Defendants admit that Pasco County has designated parts of the Cypress Creek Town Center site a "critical wildlife linkage" and deny the remaining allegations in the second sentence of this paragraph.  Intervening Defendants admit that the Cypress Creek Preserve is located more than a mile from the Cypress Creek Town Center site and deny the remaining allegations in the third sentence of this paragraph.  Due to vagueness and ambiguity in the fourth sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.

57.    Intervening Defendants admit that the Corps prepared an Environmental Assessment for this project.  This paragraph contains Plaintiffs' characterizations of, argument regarding, and citations to selective portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

58.    Intervening Defendants admit that the Corps prepared an Environmental Assessment for this project.  This paragraph contains Plaintiffs' characterizations of, argument regarding, and citations to selective portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

59.    Intervening Defendants admit the allegations in the first, second, and third sentences of this paragraph.  Due to vagueness and ambiguity in the fourth sentence of this

paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.

60.      Intervening Defendants admit that the Corps prepared an Environmental Assessment for this project.  This paragraph contains Plaintiffs' characterizations of, argument regarding, and citations to selective portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

61.      Intervening Defendants admit that the Corps prepared an Environmental Assessment for this project.  This paragraph contains Plaintiffs' characterizations of, argument regarding, and citations to selective portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

62.      The first sentence of this paragraph contains a conclusion of law to which no response is required.  The second sentence of this paragraph selectively cites to portions of Permit Attachment 3, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to the document for a true statement of its contents.   The third sentence of this paragraph cites to portions of the Environmental Assessment and Public Notice, documents which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents.  Due to vagueness and ambiguity in the fourth sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.

63.    Intervening Defendants deny the allegations in the first sentence of this paragraph. The second sentence of this paragraph selectively quotes from the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

64.    Intervening Defendants admit that the Corps prepared an Environmental Assessment for this project.  The first and second sentences of this paragraph selectively cite to portions of Permit Attachment 3, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  The third sentence of this paragraph selectively cites to portions of Permit Attachment 3, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  The fourth sentence in this paragraph selectively cites to portions of a July 7, 2007 Biological Research Associates Relocation Report, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  The fifth sentence in this paragraph selectively cites to portions of the FWS's Multi-Species Recovery Plan, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  Due to vagueness and ambiguity in the last sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.

65.    There is no paragraph 65 in the Complaint.

66.    Intervening Defendants admit the allegation in the first sentence of this paragraph that part of Cypress Creek runs near Cypress Creek Town Center.  Intervening Defendants also

admit the allegation in the first sentence that parts of Cypress Creek has been designated an "Outstanding Florida Water" by the State of Florida. The rest of the first sentence contains conclusions of law to which no response is required. The second sentence of this paragraph contains Plaintiffs' characterizations of information contained on the website www.dep.state.fl.use/water/wqssp/ofw.htm. Intervening Defendants believe this website is the best evidence of its contents and respectfully refer the Court to the website for a true statement of its contents. The third sentence is a conclusion of law to which no response is required.

67. The first sentence of this paragraph selectively quotes from the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents. Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph and therefore deny same.

68. This paragraph selectively cites to and quotes portions of the FWS's Multi-Species Recovery Plan, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

69. This paragraph selectively cites to portions of the FWS's Multi-Species Recovery Plan, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

70. This paragraph selectively cites to portions of the FWS's Multi-Species Recovery Plan, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

71.    The first sentence of this paragraph selectively quotes from a FWS report entitled "Threatened Status for the Florida Scrub Jay," a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  The second sentence of this paragraph quotes from portions of the FWS's Multi-Species Recovery Plan, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  The third sentence of this paragraph selectively quotes from a FWS report entitled "Threatened Status for the Florida Scrub Jay," a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  The fourth sentence of this paragraph selectively cites to portions of the FWS's Multi-Species Recovery Plan, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

72.    This paragraph selectively cites to and quotes portions of the FWS's Multi-Species Recovery Plan, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

73.    The first and second sentences of this paragraph selectively cite to and quote from a FWS report entitled "U.S. Breeding Population of the Wood Stork," a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  The third sentence of this paragraph selectively cites to and quotes portions of the FWS's Multi-Species Recovery Plan, a document

which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

74.    This paragraph selectively cites to and quotes portions of the FWS's Multi-Species Recovery Plan, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

75.    The first and second sentences of this paragraph selectively cite to and quote from a FWS report entitled "U.S. Breeding Population of the Wood Stork," a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents. The second sentence of this paragraph selectively cites to portions of the FWS's 1997 Wood Stork Recovery Plan and Multi-Species Recovery Plan, documents which speak for themselves and are the best evidence of their contents. Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents. The third sentence selectively cites to and quotes from the FWS 1997 Wood Stork Recovery Plan, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to the document for a true statement of its contents.

76.    Due to vagueness and ambiguity in the first sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same. The second sentence of this paragraph selectively cites to and quotes from a 1998 Annual Report on Florida Manatee Recovery Accomplishments, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

77.     The first sentence of this paragraph selectively cites to and quotes from portions of the FWS's January 29, 1996 Florida Manatee Recovery Plan, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to the document for a true statement of its contents.  Due to vagueness and ambiguity in the second sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.  The third sentence selectively cites to and quotes from portions of the FWS's January 29, 1996 Florida Manatee Recovery Plan and the FWS's 2001 Manatee Recovery Plan, documents which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents.

78.     The first sentence of this paragraph contains a conclusion of law to which no response is required.  Due to vagueness and ambiguity in the second sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.  The third sentence contains Plaintiffs' selective citation to and characterization of portions of a 1988 report by the General Accounting Office entitled "The Corps Of Engineers' Administration of the Section 404 Program," a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to the document for a true statement of its contents.  Intervening Defendants affirmatively aver that this document is completely irrelevant to this case.

79.     Due to vagueness and ambiguity in the first sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.  The second and third sentences of this paragraph contain Plaintiffs' selective quotation from and characterization of a report entitled

"Compensation for Wetland Losses under the Clean Water Act" by the National Academy of Sciences, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to the document for a true statement of its contents. Intervening Defendants affirmatively aver that this document is completely irrelevant to this case.

80.     Due to vagueness and ambiguity in the first sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same. The second sentence of this paragraph contains Plaintiffs' selective citation to and characterization of a September 2005 General Accounting Office report entitled "Wetlands Protection: Corps Of Engineers Does Not Have an Effective Approach to Ensure That Compensatory Mitigation Is Occurring, What We Found," a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to the document for a true statement of its contents. Intervening Defendants affirmatively aver that this document is completely irrelevant to this case.

81.     The first and second sentences of this paragraph contain Plaintiffs' selective citation to and characterizations of portions of an article in the St. Petersburg Times entitled "Vanishing Wetlands," a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to the document for a true statement of its contents. The third and fourth sentences of this paragraph selectively quotes from and characterizes portions of a report entitled "Compensation for Wetland Losses under the Clean Water Act" by the National Academy of Sciences, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to the

document for a true statement of its contents.  Intervening Defendants affirmatively aver that this document is completely irrelevant to this case.

82.     Intervening Defendants admit that the Corps issued a Public Notice regarding Cypress Creek Town Center on October 31, 2005.  The remainder of this paragraph contains Plaintiffs' characterizations and selected purported quotations from the Public Notice and the Environmental Assessment, documents which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to those documents for a true statement of their contents.

83.     This paragraph contains Plaintiffs' characterizations of the Public Notice, which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to the document for a true statement of its contents.

84.     This paragraph contains Plaintiffs' characterizations of unidentified comments received by the Corps to the Public Notice, comments which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to the comments on the Public Notice for a true statement of their contents.

85.     This paragraph contains Plaintiffs' characterizations of unidentified comments received by the Corps to the Public Notice, comments which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to the comments on the Public Notice for a true statement of their contents.

86.     This paragraph contains Plaintiffs' characterizations of unidentified comments received by the Corps to the Public Notice, comments which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to the comments on the Public Notice for a true statement of their contents.

87.    This paragraph contains Plaintiffs' characterizations of unidentified comments received by the Corps to the Public Notice, comments which speak for themselves and are the best evidence of their contents. Intervening Defendants respectfully refer the Court to the comments on the Public Notice for a true statement of their contents.

88.    Intervening Defendants admit that the Corps issued an Environmental Assessment, and issued a Section 404 permit to Sierra Properties on May 15, 2007. The remainder of this paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, and characterizations of the permit, documents which speak for themselves and are the best evidence of their contents. Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents.

89.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, and characterizations of the permit, documents which speak for themselves and are the best evidence of their contents. Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents. To the extent this paragraph is deemed to contain any factual allegations, Intervening Defendants deny such allegations.

90.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, and characterizations of the permit, documents which speak for themselves and are the best evidence of their contents. Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents.

91.    The first, second, and third sentences of this paragraph contain Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants

respectfully refer the Court to this document for a true statement of its contents.  The fourth

sentence of this paragraph contains conclusion of law that require no response.  To the extent this

paragraph is deemed to contain any factual allegations, Intervening Defendants deny such

allegations.

92.    This paragraph contains Plaintiffs' characterizations of and selective citations to

portions of the Environmental Assessment, a document which speaks for itself.  Intervening

Defendants respectfully refer the Court to this document for a true statement of its contents.

93.    The first sentence of this paragraph contains conclusions of law that require no

response.  Due to vagueness and ambiguity in the second sentence of this paragraph, Intervening

Defendants lack knowledge or information sufficient to form a belief as to the truth of its

allegations and therefore deny same.  The third, fourth, and fifth sentences contain Plaintiffs'

characterizations of the Environmental Assessment, a document which speaks for itself and is the

best evidence of its contents.  Intervening Defendants respectfully refer the Court to this

document for a true statement of its contents.  To the extent this paragraph is deemed to contain

any factual allegations, Intervening Defendants deny such allegations.

94.    This paragraph contains Plaintiffs' characterizations and selective quotations from

the Environmental Assessment, a document which speaks for itself and is the best evidence of its

contents.  Intervening Defendants respectfully refer the Court to the document for a true

statement of its contents.  To the extent this paragraph is deemed to contain any factual

allegations, Intervening Defendants deny such allegations.

95.    This paragraph contains Plaintiffs' characterizations of and selective citations to

portions of the Environmental Assessment, a document which speaks for itself and is the best

evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

96.     Due to vagueness and ambiguity in the first sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.  The remainder of the paragraph quotes from and cites to selected portions of the FWS's Multi-Species Recovery Plan, Attachment 3 to the Permit, and the Biological Research Associates Mitigation Plan, documents which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents.  To the extent this paragraph is deemed to contain any factual allegations, Intervening Defendants deny such allegations.

97.     This paragraph contains conclusions of law to which no response in required.  To the extent this paragraph is deemed to contain any factual allegations, Intervening Defendants deny such allegations.

98.     This paragraph contains Plaintiffs' characterizations of and selective quotations from the Environmental Assessment and the FWS Concurrence Letter, documents which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents.

99.     This paragraph contains Plaintiffs' characterizations of and selective quotations from the Environmental Assessment and the FWS Concurrence Letter, documents which speak for themselves and are the best evidence of their contents.  Intervening Defendants respectfully refer the Court to these documents for a true statement of their contents.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

100.     Intervening Defendants admit that the Corps never engaged in formal consultation with, or sought concurrence from, the FWS regarding the Manatee.  Intervening Defendants deny the remaining allegations in this paragraph.

101.     This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

102.     This paragraph contains conclusions of law to which no response is required.

103.     This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no response is required.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

104.     This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no response is required.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

105.     The Complaint does not contain a paragraph 105.

106.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no response is required.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

107.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

108.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no response is required.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

109.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no response is required.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

110.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no response is required.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

111.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no response is required.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

112.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no response is required.  To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

113.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  This paragraph also contains conclusions of law to which no

response is required. To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

114.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents. This paragraph also contains conclusions of law to which no response is required. To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

115.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents. This paragraph also contains conclusions of law to which no response is required. To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

116.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents. This paragraph also contains conclusions of law to which no response is required. To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

117.    This paragraph contains Plaintiffs' characterizations of and selective citations to portions of the Environmental Assessment, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document

for a true statement of its contents. This paragraph also contains conclusions of law to which no response is required. To the extent this paragraph is deemed to contain factual allegations, Intervening Defendants deny such allegations.

118.    The first sentence of this paragraph contains Plaintiffs' characterization of a May 14, 2007 Notice from the Corps, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to the document for a true statement of its contents. With regard to the second sentence in this paragraph, Intervening Defendants admit that the Corps issued the Cypress Creek Town Center permit on May 15, 2007. Intervening Defendants deny the remainder of the allegations in the second sentence. Due to vagueness and ambiguity in the third sentence of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of its allegations and therefore deny same.

119.    Intervening Defendants deny the allegations in this paragraph.

120.    The first sentence of this paragraph contains Plaintiffs' characterizations of a July 2007 letter from the Sierra Club, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents. Due to vagueness and ambiguity in the second and third sentences of this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of their allegations and therefore deny same.

121.    Due to vagueness and ambiguity in this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of their allegations and therefore deny same.

122.    This paragraph contains Plaintiffs' characterizations of a September 6, 2007 letter from the Sierra Club, a document which speaks for itself and is the best evidence of its contents. Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.

123.    The first sentence of this paragraph contains Plaintiffs' characterizations of a September 19, 2007 letter from the Sierra Club, a document which speaks for itself and is the best evidence of its contents.  Intervening Defendants respectfully refer the Court to this document for a true statement of its contents.  Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph and therefore deny same.

124.    Due to vagueness and ambiguity of the allegations in this paragraph, Intervening Defendants lack knowledge or information sufficient to form a belief as to the truth of their allegations and therefore deny same.

### Plaintiffs' Purported Claims for Relief

125.    Intervening Defendants deny the allegations of this paragraph.

126.    Intervening Defendants deny the allegations of this paragraph.

127.    Intervening Defendants deny the allegations of this paragraph.

128.    Intervening Defendants deny the allegations of this paragraph.

129.    Intervening Defendants deny the allegations of this paragraph.

130.    Intervening Defendants deny the allegations of this paragraph.

131.    Intervening Defendants deny the allegations of this paragraph.

### Relief Requested

The Court should deny the relief requested by Plaintiffs.

### All Claims

To the extent any allegation in Plaintiffs' Complaint for Declaratory and Injunctive Relief remains unanswered, the Intervening Defendants deny such allegation.

### First Defense

The Court lacks subject-matter jurisdiction over Plaintiffs' claims on various grounds, including, but not limited to, that Plaintiffs lack standing and the claims in the Complaint are moot.

### Second Defense

Plaintiffs are estopped from challenging the Cypress Creek Town Center permit.

### Third Defense

Plaintiffs are barred from seeking equitable relief because of the doctrine of unclean hands.

### Fourth Defense

Plaintiffs have waived objections to the Cypress Creek Town Center permit that they did not raise during the permit process.

**Fifth Defense**

Plaintiffs' claims are barred by laches.

Dated:  October 16, 2007

Respectfully Submitted,

WHITE & CASE LLP

Eric Grannon (D.C. Bar No. 473778)
Erin M. Everitt (D.C. Bar No. 497407)
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600 (telephone)
(202) 639-9355 (facsimile)

Of Counsel:

Douglas M. Halsey
T. Neal McAliley
Angela D. Daker
White & Case LLP
Wachovia Financial Center
Suite 4900
200 South Biscayne Blvd.
Miami, Florida  33131-2352
(305) 371-2700 (telephone)
(305) 358-5744 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB, CLEAN WATER ACTION, GULF RESTORATION NETWORK, CHRIS LOY, and RICHARD SOMMERVILLE, | ) ) ) ) ) | Civil Action No.  1:07-cv-01756 (RCL) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers, DIRK KEMPTHORNE, in his official capacity as Secretary, U.S. Department of the Interior, and H. DALE HALL, in his official capacity as Director, U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) / | |

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THE MOTION TO INTERVENE OF SIERRA PROPERTIES I, LLC,
PASCO 54, LTD., PASCO RANCH, INC., AND JG CYPRESS CREEK LLC

I.    INTRODUCTION

Sierra Properties I, LLC ("Sierra Properties"), Pasco 54, Ltd. ("Pasco 54"), and Pasco Ranch, Inc. ("Pasco Ranch") (collectively, "Sierra Group"), and JG Cypress Creek LLC ("JG Cypress") (collectively referred to hereinafter as "Movant-Intervenors"), pursuant to Federal Rule of Civil Procedure 24, by and through undersigned counsel, hereby submit this Memorandum of Points and Authorities in support of their Motion to Intervene as defendants in this case.  Movant-Intervenors are jointly developing Cypress Creek Town Center in Pasco County, Florida, the subject of this litigation.

In May 2007, the U.S. Army Corps of Engineers ("Corps") issued a permit under Section 404 of the Clean Water Act to Sierra Properties permitting the dredge and fill of wetlands and surface waters as part of the development of Cypress Creek Town Center. Site preparation and construction of Cypress Creek Town Center have already commenced. In the Complaint, Plaintiffs request that the Court preliminarily and permanently set aside the Cypress Creek Town Center permit.

Movant-Intervenors are the true parties of interest in this action and their interests will be severely impaired if Plaintiffs obtain the relief they seek. Movant-Intervenor Sierra Properties holds the permit that Plaintiffs seek to set aside, and affiliated-entities, Movant-Intervenors Pasco 54 and Pasco Ranch, own all but approximately 100 acres of the Cypress Creek Town Center property. Movant-Intervenor JG Cypress owns the remaining approximately 100 acres of the Cypress Creek Town Center property upon which a regional shopping mall is being constructed. If Plaintiffs' suit is successful, Movant-Intervenors will lose millions of dollars, and could be forced to default on the numerous financial and legal commitments they have made for successful completion of Cypress Creek Town Center. Given the significance of their interests in this suit, and the severity of the potential consequences if Plaintiffs are successful, Movant-Intervenors should be allowed to intervene as of right or, alternatively, should be allowed to permissively intervene.

## II.    BACKGROUND

This case involves a challenge to the Corps' issuance of a Clean Water Act Section 404 permit to Sierra Properties. The permit authorizes the dredging and filling of wetlands and surface waters as part of the development of Cypress Creek Town Center, a multi-use development that will include a regional mall, a variety of retail stores, financial institutions, hotels, restaurants, cinemas, offices, and multi-family residential housing. Compl. ¶ 1;

Environmental Assessment ("EA") at 2, attached hereto as Exhibit ("Ex.") A.  The Complaint claims that the Corps violated the Clean Water Act and the National Environmental Protection Act, and that the Corps and the U.S. Fish and Wildlife Service ("FWS") violated the Endangered Species Act.  Compl. ¶¶ 125-31.

Following years of pre-application discussions, in May 2005, Sierra Properties applied for a Section 404 Clean Water Act permit (and numerous Florida state and local government permits) to fill approximately fifty-four acres of wetlands and ten acres of surface waters in order to develop Cypress Creek Town Center.  Ex. A at 3.  Pasco 54 and Pasco Ranch own all but approximately 100 acres of the project site.  Declaration of John R. Sierra, Jr. at ¶ 7, attached hereto as Ex. B.  JG Cypress owns approximately 100 acres of the project site.  Declaration of Judson E. Smith at ¶ 4, attached hereto as Ex. C.  Sierra Group and JG Cypress are jointly developing Cypress Creek Town Center.  Ex. B ¶ 5; Ex. C ¶ 6.

The Corps consulted with the FWS as part of the permitting process.  Ex. A at 4.  Both agencies concluded that the project would not adversely impact any federally listed species.  On October 31, 2005, the Corps issued a Public Notice regarding Cypress Creek Town Center.  Compl. ¶ 82.

During a lengthy public comment period, Plaintiffs and others commented extensively on the Public Notice.  Having resolved substantially all of the concerns raised in the comments, on May 15, 2007, the Corps issued an EA and a Section 404 permit to Sierra Properties to allow development of Cypress Creek Town Center to proceed.  Ex. A.  The Corps' analysis in the EA showed that development of Cypress Creek Town Center would not cause unacceptable environmental impacts, and further showed that Cypress Creek Town Center was not likely to adversely impact any endangered species.  Ex. A.

Sierra Group and JG Cypress have invested a substantial amount of money and resources in the Cypress Creek Town Center project, including a significant investment in development of off-site mitigation for the project. Ex. B ¶ 9; Ex. C ¶ 8. Movant-Intervenors have made numerous financial and legal commitments that can only be met if the Section 404 permit for Cypress Creek Town Center remains in effect. Ex. B ¶¶ 9, 10; Ex. C ¶¶ 8, 9.

On October 1, 2007, Plaintiffs' counsel filed the instant lawsuit, seeking to preliminarily and permanently set aside the Cypress Creek Town Center permit. Compl. at 49.[1]

## III. DISCUSSION

### A. SIERRA GROUP AND JG CYPRESS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT

Pursuant to Rule 24(a)(2), a party seeking to intervene as of right must establish the following four elements: "(1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003). All requirements for intervention as of right are met here.

#### 1. The Application for Intervention is Timely

Movant-Intervenors filed the instant application for intervention on October 16, 2007, fifteen days after the Complaint was filed, before any responsive pleadings to the Complaint are due, and before the parties have filed or the Court has ruled on any dispositive motions. Thus, there can be no doubt that the application is timely. *See, e.g.*, *Mova Pharms. Corp. v. Shalala*,

---

[1] Three months before Plaintiffs' counsel filed the instant lawsuit, Plaintiffs' counsel, apparently representing a related group of Plaintiffs, filed a previous lawsuit making these same claims in the Middle District of Florida on June 26, 2007. Plaintiffs' counsel voluntarily dismissed the lawsuit the day after it was filed.

140 F.3d 1060, 1076 (D.C. Cir. 1998) ("Upjohn sought to intervene a few weeks after Mova

initiated its action, and before the district court ruled on the preliminary injunction; this cannot

be regarded as untimely.").

      2.      **Sierra Group and JG Cypress Have a Legally Protected Interest in the Action**

Sierra Group and JG Cypress have clear interests relating to the property and transactions

which are the subject of this action. To satisfy the "interest" requirement of Rule 24(a)(2), an

applicant for intervention must identify a legally protected interest. *Mova Pharms.*, 140 F.3d at

1074 (quoting *S. Christian Leadership Conference v. Kelley*, 747 F.2d 777, 779 (D.C. Cir.

1984)). This requirement is satisfied by establishing that the applicant has Article III standing to

participate in the action. *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 29 (D.C. Cir.

2000); *Mova Pharms.*, 140 F.3d at 1074. For Article III standing, a party must have suffered an

injury in fact that is fairly traceable to the challenged action, and that would be redressed by a

favorable decision. *Bennett v. Spear*, 520 U.S. 154, 162, 167 (1997).

Here, where entities are moving to intervene as defendants, the focus of the standing

inquiry is on the potential of the lawsuit to injure the prospective intervenors. *See, e.g.*, *Glamis

Imperial Corp. v. U.S. Dep't of Interior*, No. 01-530, 2001 WL 1704305, at *3 (D.D.C. Nov. 13,

2001) (holding that "the Quechan Tribe has standing because it has identified a specific injury it

would suffer if the plaintiff's suit was successful and the mining project was allowed to

proceed"); *Am. Horse Prot. Ass'n v. Veneman*, 200 F.R.D. 153, 156 (D.D.C. 2001). The D.C.

Circuit has held that the interest in intervention is clear where the disposition of a claim in favor

of the plaintiffs would directly impact the applicant's interests. *See Dimond v. District of

Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986).

The potential injury to Sierra Group and JG Cypress if Plaintiffs' challenge is successful is undeniable. Sierra Properties holds the permit that is the subject of Plaintiffs' claims and is a manager of the permitted project. Pasco 54 and Pasco Ranch own a majority of the permitted property. JG Cypress owns approximately 100 acres at the site, including the property upon which a regional shopping mall, a key component of Cypress Creek Town Center, is to be built. Both Sierra Group and JG Cypress have invested vast resources, money, and time in the development of Cypress Creek Town Center, and have made legal and financial commitments that will be adversely impacted if Plaintiffs' challenge to the permit is successful.

It is axiomatic that owners of the subject property have sufficient interest in the suit to intervene. *See Foster v. Guery*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("[a]n intervenor's interest is obvious when he asserts a claim to property that is the subject matter of the suit . . . ."). It is also well-established that permitees (or those who hold contracts from the government) have legally protected interests in the context of third-party challenges to the government's issuance of those permits or contracts. *See, e.g.*, *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001) (citing *Sierra Club v. Envtl. Prot. Agency*, 995 F.2d 1478, 1483 (9th Cir. 1993)) (finding that "lawsuit would affect the use of real property owned by the intervenor by requiring the defendant to change the terms of permits it issues to the would-be intervenor, which permits regulate the use of that real property. These interests are squarely in the class of interests traditionally protected by law"); *Sierra Club v. Glickman*, 82 F.3d 106, 109 (5th Cir. 1996) (American Farm Bureau, as representative of farmers who have the right to pump water in relation to government programs being challenged, has legally protected interest); *Sierra Club v. Envtl. Prot. Agency*, 995 F.2d 1478, 1482 (9th Cir. 1993) (owner of facility that received Clean Water Act permit had legally protected interest in litigation by third party that would invalidate

permit); *Natural Res. Def. Council v. Envtl. Prot. Agency*, 99 F.R.D. 607, 609 (D.D.C. 1983) (pesticide manufacturers and pesticide industry representatives subject to regulations under challenge have legally protected interest).

### 3. This Action Threatens to Impair Sierra Group's and JG Cypress' Legally Protected Interests

Movant-Intervenors' interests will be adversely affected by the relief requested by Plaintiffs, *i.e.* the setting aside of the Cypress Creek Town Center permit. Intervention aims to protect interests that "are of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment." *United States v. AT&T*, 642 F.2d 1285, 1292 (D.C. Cir. 1980) (quoting *Smith v. Gale*, 144 U.S. 509, 518 (1892)). In determining whether an action threatens to impair an intervenor-applicants' interests, a reviewing court is to look at the "'practical consequences' of denying intervention . . . ." *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977) (quoting *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967)).

The practical consequences of denying intervention in this case are staggering. Plaintiffs seek to block development of the property. If successful, Plaintiffs' lawsuit would prevent Sierra Group and JG Cypress from developing their property in accordance with all other state and local government development permits that have been issued with respect to Cypress Creek Town Center. Such a result would be catastrophic to Movant-Intervenors. Not only would Movant-Intervenors lose their significant investments in a project that has been approved by all governmental agencies after several years of permitting, but they may also be subject to legal claims by third parties if they fail to timely complete Cypress Creek Town Center.

Such a loss of investments and future revenues alone demonstrates that this action threatens Movant-Intervenors' interests. *See Fund for Animals,* 322 F.3d at 735 (intervenor-

applicants' potential loss of revenues if plaintiffs' action was successful sufficient to establish

that action may impair applicant's interests); *Mova Pharms.*, 140 F.3d at 1076 (danger of loss of

market share due to denial of a preliminary injunction sufficient to establish that action

threatened applicants' interests); *Friends of Animals v. Kempthorne*, 452 F. Supp. 2d 64, 70

(D.D.C. 2006) ("costs, delays and uncertainties associated with the denial of intervention" were

sufficient to establish that action threatened to impair applicant's interests).

> **4.    No Party to this Action Can Adequately Represent Sierra Group's and JG Cypress' Interests**

Federal Defendants will not adequately represent the interests of Movant-Intervenors.

This requirement is "satisfied if the applicant shows that representation of his interest 'may be'

inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v.*

*United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972) (quoting Moore's Federal

Practice); *see also Dimond v. District of Columbia*, 792 F.2d at 192.  This "minimal burden" is

more than met here.

Federal Defendants are in a different position than Movant-Intervenors.  As the D.C.

Circuit has held, a federal agency's obligation "is to represent the interests of the American

people," while Movant-Intervenors' obligation is to represent their own business interests and

protect themselves.  *Fund for Animals*, 322 F.3d at 736; *see also Dimond*, 792 F.2d at 192-93

("A government entity such as the District of Columbia is charged by law with representing the

public interest of its citizens.  State Farm, on the other hand, is seeking to protect a more narrow

'parochial' financial interest not shared by the citizens of the District of Columbia.").  Given the

fact that the resolution of this litigation, one way or the other, will have a significant impact on

Movant-Intervenors' business operations, and future economic viability, their interest is much

narrower and more focused on this litigation than the Federal Defendants.

While Movant-Intervenors and the Federal Defendants may agree on some issues, such as the validity of the permit Plaintiffs seek to set aside, they may disagree on other key legal and factual issues that arise during the action. *See Costle*, 561 F.2d at 912 (holding that EPA may not adequately represent interests of chemical and rubber companies after finding that "a shared general agreement [by EPA] with appellants that the regulations should be lawful does not necessarily ensure agreement in all particular respects about what the law requires … appellants may well have honest disagreements with EPA on legal and factual matters."); *Nuesse v. Camp*, 385 F.2d 694, 703 (D.C. Cir. 1967) ("[t]he tactical similarity of the present legal contentions of the [parties] does not assure the adequacy of representation or necessarily preclude the [intervenors] from the opportunity to appear on [their] own behalf"); *see also County of San Miguel, Colorado v. MacDonald*, No. 06-1946, 2007 WL 2367759, at *10 (D.D.C. Aug. 21, 2007) (allowing trade associations to intervene in action challenging decision of FWS not to list the Gunnison sage-grouse as "endangered" or "threatened" because FWS would not represent the interests of trade associations' members). For example, Federal Defendants may agree to place conditions on the permit that will negatively impact Movant-Intervenors' interests or Movant-Intervenors may wish to advance a timetable for these proceedings considering the investments and obligations they have made in reliance upon the permit.

In similar circumstances, the D.C. Circuit has consistently held that "governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals*, 322 F.3d at 736 (holding that FWS and District of Columbia could not adequately represent the interests of the Mongolian ministry in action challenging listing of central Asian argali sheep as threatened because FWS represents "interests of the American people, as expressed by the ESA, while the [Mongolian ministry's] concern is for Mongolia's people and natural resources" and

the District of Columbia "is charged by law with representing the public interests of its

citizens"); *see also Costle*, 561 F.2d at 912-13 (rubber and chemical companies allowed to

intervene in action against EPA where settlement agreement required EPA to establish

regulations for various pollutants because applicant-intervenors' interests were "more narrow

and focused than EPA's"); *Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969) (school board

did not adequately represent interests of intervening parents because the "board represents all

parents," while the intervening parents were concerned with their own individual children); *see

also Friends of Animals*, 452 F. Supp. 2d at 70 (finding that Department of Interior would not

adequately represent interests of intervening hunting organizations in action challenging decision

to exclude certain species of antelope from prohibition of killing and selling endangered species).

### B.    ALTERNATIVELY, THE COURT SHOULD ALLOW PERMISSIVE INTERVENTION

Alternatively, Movant-Intervenors should be allowed to intervene pursuant to the broad

discretion afforded the Court under Rule 24(b).  Permissive intervention is based upon

consideration of the following factors:  (1) the existence of an independent ground for the

Court's subject matter jurisdiction; (2) whether the motion is timely; and (3) whether the putative

intervenor has a claim or defense that has a question of law or fact in common with the main

action.  *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045-46 (D.C. Cir. 1998).   The goal

of Rule 24(b)(2) is to dispose of related controversies together, and, thus, courts flexibly apply

the rule to meet that goal.  *Id.* at 1045-46.

### 1.    There are Independent Jurisdictional Grounds for Sierra Group and JG Cypress to Participate

The first factor for permissive intervention is met in this case because the Court has

jurisdiction to consider and rule on the issues Movant-Intervenors seek to raise in the lawsuit.

As discussed above, Movant-Intervenors have standing to appear in this case.  Plaintiffs seek to

block development of Cypress Creek Town Center.  If Plaintiffs' requested relief is granted,

Movant-Intervenors will not be able to complete development of Cypress Creek Town Center, a

development in which Movant-Intervenors have made substantial investments and have made

commitments to tenants, lenders, and other third parties.  This would be a substantial injury-in-

fact caused by Plaintiffs' suit, and it would be redressed by a ruling against Plaintiffs.

Independently, Movant-Intervenors clearly would have had standing to challenge a decision by

the Corps not to issue the permit at issue in this case.  Thus, there are independent jurisdictional

grounds for Movant-Intervenors to participate in this action.

> **2.     The Motion is Timely, and Sierra Group and JG Cypress Will Not Delay or Prejudice Either Plaintiffs or Federal Defendants**

As set forth above, this Motion was filed within fifteen days after the filing of the

Complaint, before any responsive pleadings have been filed, and before the Court has ruled on

any dispositive motions.  Thus, there is no doubt that the Motion is timely.

Movant-Intervenors participation in this case will not prejudice the adjudication of

Plaintiffs' claims.  Plaintiffs will still be allowed to advance the same factual and legal

arguments they would advance if Movant-Intervenors were not in the case.  In fact, Movant-

Intervenors' participation will complement the existing litigation because they are the real parties

in interest.  *See, e.g.*, *Sierra Club v. Glickman*, 82 F.3d 106, 109 (5th Cir. 1996).

Movant-Intervenors will not cause any undue delay.  The deadline for responding to the

Complaint has not yet passed, and Movant-Intervenors attached their Answer to the Complaint to

their Motion to Intervene as Exhibit A.  They will abide by all scheduling deadlines and will

coordinate to the extent possible with the other parties so as not to cause any undue delay.

### 3. Sierra Group and JG Cypress Have Defenses That Have Questions of Law and Facts in Common With Plaintiffs' Claims

Movant-Intervenors have defenses that have common questions of law and fact with Plaintiffs' claims. The central focus of this litigation is the permit issued by the Corps for development of Cypress Creek Town Center, a project that Movant-Intervenors are jointly developing. Plaintiffs challenge both the Corps' decision to issue the permit and the FWS's decision regarding consultation on the permit. Movant-Intervenors seek to raise defenses against Plaintiffs' claims so that the permit at issue is not revoked or changed to the detriment of Movant-Intervenors. Movant-Intervenors therefore not only have common issues of law and fact with Plaintiffs' claims, but indeed seek to litigate the same legal and factual issues. Such a showing has been found sufficient for permissive intervention. *See, e.g.*, *Humane Soc'y of U.S. v. Clark,* 109 F.R.D. 518, 521 (D.D.C. 1985) (granting permissive intervention to groups concerned with issues raised in third party environmental lawsuit against government agencies); *Huron Evntl. Activist League v. Envtl. Prot. Agency*, 917 F. Supp. 31, 43 (D.D.C. 1996) (industry representatives allowed permissive intervention as defendants where they sought to raise defenses to precise claims brought by plaintiffs).

## CONCLUSION

For the foregoing reasons, Sierra Properties, Pasco 54, Pasco Ranch, and JG Cypress respectfully request that this Court grant their Motion to Intervene.

Dated:  October 16, 2007

Respectfully Submitted,

WHITE & CASE LLP

Eric Grannon (D.C. Bar. No. 473778)
Erin M. Everitt (D.C. Bar No. 497407)
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600 (telephone)
(202) 639-9355 (facsimile)

Of Counsel:

Douglas M. Halsey
T. Neal McAliley
Angela D. Daker
White & Case LLP
Wachovia Financial Center
Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131-2352
(305) 371-2700 (telephone)
(305) 358-5744 (facsimile)

CESAJ-RD-SW-T
SAJ-2003-2336 (IP-TEH)

MEMORANDUM FOR RECORD

SUBJECT: Department of the Army Environmental Assessment and
Statement of Finding for Above-Numbered Permit Application

1.  Applicant:    Sierra Properties
                  C/O Mr. John Sierra, Jr.
                  509 Guisando de Avila, Suite 200
                  Tampa, FL 33613

2.  Location, Existing Site Conditions, Project Description,
Changes to Project:

    a.    Location:  The project is located in the Cypress Creek
watershed, bounded on the west by State Road 54, on the south by
Cypress Creek, and on the east by Interstate 75, Sections 22 and
27, Township 26 South, and Range 19 East, Pasco County, Florida.

    b.  Latitude/Longitude:  28.19294 North; 82.39138 West

    c.  Existing Site Conditions:  The project site consists of
approximately 507.7 acres including 155.46 acres jurisdictional
wetlands, 9.65 acres jurisdictional surface waters, a non-
jurisdictional 1.73-acre DOT stormwater pond, 3.57 acres of non-
jurisdictional wetlands and surface waters and 337.29 acres of
uplands.  Jurisdictional wetlands consist of cypress swamps
(FLUCFCS[1] 621), mixed wetland forests (FLUCFCS 630), freshwater
marshes (FLUCFCS 641), wet prairies (FLUCFCS 643), ditches
(FLUCFCS 510) and small ponds (FLUCFCS 500).

The wetland system consists of a network of freshwater wetlands
adjacent to Cypress Creek, a designated Outstanding Florida Water
by the State of Florida pursuant to 62-302.700 F.A.C.  The
uplands on the site are predominantly pasture.  The existing area
surrounding the project site consists of commercial development
to the east, pastureland to the north and south, low-density
residential development to the east and high-density residential
development to the northwest and southeast.  The site is
immediately west of Interstate 75 and bisected by State Road 56,
an east-west, 4-lane road.

---

[1] Florida Land Use, Cover, and Forms Classification System


EXHIBIT

A

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:   Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

    d.  Project Description: The applicant proposes to construct
a regional mall known as Cypress Creek Town Center (CCTC)
requiring the discharge of approximately 270,418 cubic yards of
fill material into approximately 53.89 acres of jurisdictional
wetlands, 9.65 acres of man-made jurisdictional surface waters,
and 3.57 acres of non-jurisdictional, isolated wetlands and
surface waters.  In addition, temporary impacts are proposed for
0.012 acres of jurisdictional wetlands.

    e.  Changes to Project since public notice: Mitigation Area
M-3 was originally proposed to serve only as a floodplain
mitigation area.  Plans were revised to revegetate and monitor
this area to serve as additional on-site mitigation.  On the off-
site Alston mitigation tract, 19.4 acres of (savannah) wetland
creation was added.  The public notice featured 8.7 acres of wet
prairie restoration.  An additional 6.1 acres of wet prairie
restoration was added for a total of 14.8 acres.  Due to a lack
of baseline information, the Corps will not accept nor require
the 28.6 acres of hydrologic wetland enhancement proposed in
Wetland Areas 8 and 9.  These areas were instead granted
preservation credit.  The project was revised to include planting
of the 13.20 acres of proposed littoral shelves with native
vegetation.  The project was also revised to include planting of
2.81 acres of shallow, non-littoral shelf area within 300 feet of
Cypress Creek with native vegetation.

3.  Project Purpose:

    a.  Basic:  The basic project purpose is to develop a
regional mall and supporting commercial enterprises, including
retail businesses, financial institutions, hotels, restaurants,
cinemas, offices and multi-family residential housing.

    b.  Overall:  The overall project purpose is to develop a
regional mall and supporting commercial enterprises to serve a
market bounded by U.S. 301 on the east, the Suncoast Parkway on
the west, extreme southern Hernando County to the north, and
northern Tampa to the south.

4.  Scope of Analysis: The scope of analysis includes the
507.7-acre parcel owned by the applicant.

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

5.  Statutory Authority: Section 404 of the Clean Water Act of
1972, as amended.

6.  Other Federal, State, and Local Authorizations Obtained or
Required and Pending:

    a.  State water quality certification (WQC):  The Southwest
Florida Water Management District (SWFWMD) issued Environmental
Resource Permit No. 43026931.001 on January 30, 2007.

    b.  Coastal Zone Management (CZM) consistency/permit: There
is no evidence or indication from the State of Florida that the
project is inconsistent with the Florida CZM.  Issuance of a
SWFWMD permit certifies that the project is consistent with the
CZM plan.

    c.  Other authorizations:  Not applicable.

7.  Date of Public Notice and Summary of Comments:

    a.  Pre-application meeting(s): On 18 Jan 05, the Corps met
with the applicant during a pre-application meeting.

    b.  Important dates: On 16 Dec 04, a jurisdictional
determination was requested by the applicant.  The application
was received on 10 May 05.  On 22 Sep 05, the Corps requested
additional information necessary to publish the public notice.
The jurisdictional delineation was verified by the Corps on
20 Oct 05.  The application was considered complete on 13 Oct 05
and a public notice was published on 31 Oct 05.  A Request for
Additional Information (RAI) was made on 28 Feb 06 and this
information was received on 2 May 06.  A second RAI was made on
21 Jun 06 and this information was received on 12 Sep 06.  A
third RAI was made on 12 Oct 06 and this information was received
on 14 Nov 06.  The Environmental Resource Permit was received on
1 Feb 07.  An updated mitigation plan was provided on 21 Feb 07.
A fourth RAI was made on 21 Mar 07 and this information was
received on 27 Mar 07.  U.S. Fish and Wildlife Service
concurrence was received on 27 Mar 07.

-3-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

_____

c.  Public notice comments: The Corps has reviewed all of the
comments submitted in response to the circulation of the public
notice.  The Corps has summarized these comments below:

(1)  U.S. Environmental Protection Agency (USEPA):  By
letter dated 10 Nov 05, USEPA requested an extension to the
30-day comment period.  The Corps granted this extension and
USEPA was given until 31 Dec 05 to provide comments; however, no
comments were submitted.

(2)  U.S. Fish and Wildlife Service (USFWS): By letter
dated 22 Mar 07, USFWS concurred with the Corps' determination
that the project may affect, but is not likely to adversely
affect, the wood stork and eastern indigo snake.  Additional
detail is provided in Item 11 of this document.

(3)  National Marine Fisheries Service (NMFS):  By email
dated 9 Nov 05, NMFS notified the Corps that they were not
responsible for the affected resources (freshwater wetlands) and
had no comment.

(4)  State Historic Preservation Officer (SHPO):  By
letter dated 20 Jun 05, SHPO stated that their review of the
Florida Master Site File indicated no significant archaeological
or historical resources in the project area.  They also stated
that because of the location and/or nature of the project, it is
unlikely that any such sites will be affected.

(5)  State and local agencies: The Hillsborough County
Environmental Protection Commission raised issues regarding water
quality and water supply, addressed in Item 10(b)(14) below.
Mr. Peter Hanzel, representing the Wesley Chapel Chamber of
Commerce, expressed support for the project based on the economic
returns expected and the need for a mall in the area.

(6)  Organizations: Comments were received from Mr. Dan
Rametta, representing Citizens for Sanity.Com (CFS), Mr. Richard
Sommerville, representing Citizens for Sanity of Pasco County,
Inc. and the Naturecoast Group of the Sierra Club, Ms. Leslie
Blackner, representing Floridians for Environmental
Accountability & Reform (FEAR), Ms. Denise Layne, representing
Sierra Club Tampa Bay Group, and Ms. Jennifer Seney, representing

-4-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

Preserve Pasco.  Ms. Seney expressed support for the project; all
others expressed concerns analyzed in Items 8 and 10-13 of this
document.

(7)  Individuals: Mr. Ralph Brookes submitted comments
as the attorney representing the following adjacent property
owners: Mr. Bob Jones, Ms. Shirley Jones, and Ms. Leigh Jefts.
Fifteen (15) identical form letters were submitted from various
individuals.  The issues raised by Mr. Brookes and the senders of
the form letters are addressed in detail in Items 8, 10-13 of
this document.

(8)  Others Including Internal Coordination: No
comments were provided.

(9)  Elected officials:  By letter dated 9 Dec 05, U.S.
Congressman Michael Bilirakis forwarded the concerns of his
constituent, Richard Sommerville.  By letter dated 27 Dec 05 to
Congressman Bilirakis, the Corps acknowledged receipt of the
concerns and stated that such concerns would be given due
consideration in the Corps' decision-making process.  By letter
dated 7 Dec 05, U.S. Senator Bill Nelson forwarded the concerns
of his constituent, Richard Sommerville.  By letter dated
27 Dec 05 to Senator Nelson, the Corps acknowledged receipt of
the concerns and stated that such concerns would be given due
consideration in the Corps' decision-making process.  Richard
Sommerville's comments on the public notice, dated 30 Nov 05,
were attached to these two letters to elected officials.  No new
issues were raised.

8.  Alternatives

a. No-action alternative

The no-action alternative would result in the continued use of
the parcel for agriculture.  The site is leased for $6,000 per
year.  The 2005 Pasco County taxes for the undeveloped property
were $27,085.  Therefore, the current net revenue from the parcel
is a loss of $21,085 and not practicable.

b. Site selection criteria

-5-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

The applicant conducted a regional market evaluation to determine
the geographic extent of a viable market for a regional mall in
northeast Tampa.  The boundaries of the market were determined by
accessibility, physical barriers, location of competing
facilities, and limitations of driving time and distance.  The
eastern boundary ends roughly at U.S. Highway 301, beyond which
the low population density and modest income level restrict the
ability to draw shoppers effectively.  The southern boundary is
restricted to the outskirts of north Tampa by existing, saturated
markets for Citrus Park Mall, University Mall, and Brandon Town
Center.  The northern boundary extends to southern Hernando
County, beyond which driving time is too great to effectively
draw shoppers in the examined market.  The western boundary is
similarly restricted by drive time and is roughly limited by the
Suncoast Parkway.

Within the target market defined above, the applicant examined 12
sites.  The site selection criteria used in the analysis included
the following:

    (1) Size and configuration:  200-250 acres required in
a configuration to allow development of the mall and associated
uses.

Ratings:  0 =  Less than 200 acres and/or cannot be configured to
permit development; 2 = Acreage marginally adequate and can be
configured to permit development; 4 = Acreage adequate and can be
configured to permit development.

    (2) Availability:

Ratings:  0 = Not for sale; 2 = For sale with potential
complications (e.g., trust dispute, estate not settled);
4 = For sale.

    (3) Market Potential:  Market research conducted by the
applicant showed that a minimum primary trade zone population of
250,000 is required to support the proposed regional mall.
Average annual income needed to support the proposed project is
between $60,000 and $75,000.

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

Ratings:  0 = Market potential severely restricted; 1 = Market
potential limited; 2 = Market potential not ideal;
3 = Market potential acceptable; 4 = Market potential excellent.

(4) Access:  Must be located on a primary thoroughfare
in close proximity to a freeway interchange serving the entire
area.  Sites with direct access to 2 major or minor arterial
roads are preferred by the applicant, while sites with access
solely from collector roads were considered less suitable.

Ratings:  0 = Access unacceptable; 1 = Access marginally
acceptable only with major improvements; 2 = Access acceptable
only with improvements; 3 = Access good but not ideal;
4 = Access ideal.

(5) Roadway network:  The ability of the adjacent
roadway to accommodate traffic generated by the proposed project
was considered.  Where the network would require improvements,
costs of the improvements were considered.

Ratings:  0 = Inadequate; 1 = Requires major improvements;
2 = Requires minor improvements; 3 = Acceptable; 4 = Excellent.

(6) Consistency with County Comprehensive Plan and
Zoning:

Ratings:  0 = Not consistent with Comprehensive Plan and/or
Zoning, approval of amendments highly unlikely; 1 = Not
consistent with Comprehensive Plan and/or Zoning, approval of
amendments difficult to obtain; 2 = Not consistent with
Comprehensive Plan and/or Zoning, approval of amendments somewhat
difficult to obtain; 3 = Not consistent with Comprehensive Plan
and/or Zoning, approval of amendments not difficult; 4 =
Consistent with Comprehensive Plan and Zoning.

(7) Environmental Suitability:  The following
environmental impacts were considered:  acreage of wetland
impacts, quality of wetlands that would be impacted, presence of
wetland-dependent listed species, suitability of soils, flood
zones, and upland listed species.  The evaluation considered the
difficultly of obtaining needed permits.

-7-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

Ratings:  0 = Impacts substantial, not permittable; 1 = Impacts
substantial, very difficult to permit; 2 = Fewer impacts,
somewhat difficult to permit; 3 = Few impacts, less difficult to
permit; 4 = No impacts.
    c. Off-site alternatives:  The following 12 sites, within
the target market defined above, were evaluated:

        (1) Southeast quadrant of Interstate 75 and State Road
52.

        (2) Northwest quadrant of Interstate 75 and County Road
54.

        (3) Southwest quadrant of Interstate 75 and County Road
54.

        (4) Southeast quadrant of Interstate 75 and County Road
54.

        (5) Southeast quadrant of County Road 54 and County
Road 581 (Bruce B. Downs Boulevard).

        (6) "Geraci" family property located South of County
Road 54, between the Suncoast Parkway and U.S. Highway 41.

        (7) Northeast and southeast quadrant of Interstate 75
and State Road 56.

        (8) Portion of southern extent of Wiregrass Ranch.

        (9) South of Morris Bridge Road, approximately ¾ mile
east of Interstate 75.

        (10) Directly east of Interstate 75, between Morris
Bridge Road and Fowler Avenue.

        (11) North of Fowler Avenue, approximately 1 mile east
of Interstate 75.

        (12) Northwest and southwest quadrants of Interstate 75
and State Road 56 (proposed site).

| Criteria |
|---|

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

|      |    | 1 | 2  | 3  | 4  | 5  | 6  | 7  |
|------|----|---|----|----|----|----|----|----|
|      | 1  | 4 | 4  | 0  | 2  | 1  | 0  | 3  |
|      | 2  | 0 | -- | -- | -- | -- | -- | -- |
|      | 3  | 0 | -- | -- | -- | -- | -- | -- |
|      | 4  | 4 | 4  | 2  | 0  | 0  | 1  | 3  |
| Site | 5  | 1 | 0  | -- | -- | -- | -- | -- |
|      | 6  | 3 | 0  | -- | -- | -- | -- | -- |
|      | 7  | 2 | 0  | -- | -- | -- | -- | -- |
|      | 8  | 1 | 0  | -- | -- | -- | -- | -- |
|      | 9  | 0 | -- | -- | -- | -- | -- | -- |
|      | 10 | 0 | -- | -- | -- | -- | -- | -- |
|      | 11 | 0 | -- | -- | -- | -- | -- | -- |
|      | 12 | 4 | 4  | 4  | 4  | 1  | 2  | 2  |

Nine out of twelve sites were not practicable because they were
too small and/or were not available for sale.  Site 1, although
available and of sufficient size, failed to be a viable
alternative because there is a lack of population density and
extremely limited populated growth in this northern portion of
Pasco County. The site has recently been designated as an
Employment Center by Pasco County, which means this site will no
longer be developable as a regional retail center.  Due to the
narrow configuration of the northern portion of Site 4, access
could only be provided by one arterial road.  Thus, Site 4 failed
to be practicable since it cannot provide the required access.
Therefore, of the 12 sites examined above, Site 12 is the only
practicable site.

One commenter stated that the alternative of revamping the
existing University Mall should be considered.  It was not
considered by the applicant because it falls outside of the
target market area defined above.  Had this alternative been
considered, it would have failed to be practicable since it was
not for sale.

The applicant's research revealed no brownfields/redevelopment
opportunities of sufficient size within the target market area.
Combining parcels was considered but did not yield a viable
alternative.

The applicant further clarified that the project purpose cannot

-9-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

be met by dividing the proposed project between sites.  The
regional mall, power center, and outparcels create a synergy when
located adjacent to one another that is required to achieve
financial viability.

    d. On-site alternatives:

On the selected project site, the applicant initially evaluated 4
site plans as follows:

        (1) Alternative A: Featured a multi-family residential
component on southern portion, requiring destruction of a large
majority (30 acres) of Wetland P for stormwater facilities.

        (2) Alternative B: Removed the multi-family residential
component from the southern portion and relocated stormwater
facility in uplands.

        (3) Alternative C:  This plan further reduced impacts
by 10 acres by reconfiguring the footprint in the southwest
portion of the site.

        (4) Alternative D (proposed plan):  Further refinement
of stormwater and flood control facilities allowed a further
reduction of impacts by 10+ acres.

| Alternative | Acreage of wetland impact |
|-------------|---------------------------|
| A           | 106                       |
| B           | 75.6                      |
| C           | 65                        |
| D           | 53.89                     |

Further analysis was performed for alternative routes for County
Road 54 through the property.  The applicant is required by Pasco
County to extend the road through the project area to County Line
Road.  The proposed project is not dependent on the extension of
the road south of the property, as its access is gained from
Interstate 75 and State Road 56.  Therefore, the Corps analyzed
the route of County Road 54 within the project area as direct

-10-

CESAJ-RD-SW-T SAJ-2003-2336 (IP-TEH)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

impacts and those south of the project area as secondary impacts.
The northern starting point of the road is dictated by the
existing State Road 56 and County Road 54 intersection. Impacts
to Wetlands J and K were unavoidable given this constraint.
However, retaining walls will be installed along the west side of
the road to minimize impacts on remaining portions of Wetland J.
Impacts to Wetland R will be completed avoided by use of a
retaining wall on the east side of the road. The road was
aligned to cross Cypress Creek at a location where no wetlands
would be impacted, between wetlands
R and S. South of Cypress Creek lays King Ranch. In 2006, Wade
Trim completed a route study for Pasco County that examined
3 different routes from Cypress Creek to County Line Road. An
alternative was selected that had no impacts to aquatic
resources. Therefore, secondary impacts south of the project
area due to the extension of County Road 54 are not expected.

    e. Avoidance:

As impacts due to parking for this project account for 43.34% of
wetland impacts (or 23.03 acres out of a total of 53.89 acres),
the type (surface versus garage) and quantity of parking were
heavily scrutinized.

The Corps required the applicant to evaluate the practicability
of employing additional parking garages (in lieu of surface
parking) in the project design to minimize the footprint of
surface parking. The project, as originally proposed, featured a
2,098-space parking structure in Phase 2 of the project. It will
displace a portion of Phase I surface parking to accommodate
parking demand generated by the addition of 215,000 ft$^2$ of retail
in Phase 2 on the south side of State Road 56. The applicant
completed a financial feasibility study to analyze the economic
practicability of adding a 2,000-space parking garage to the
plan, for a total of 4,098 spaces within parking garages.
Although these additional spaces within a parking garage would
reduce the project footprint by 16 acres, the resulting Rate of
Return (7.4% in Phase 1 and 7.5% in Phase 2) deems the
alternative impracticable since financing cannot be secured at
this profit level. The applicant further stated that the "Power

Center" tenants, north of State Road 56, demand their customer

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

parking at grade and will not accept a location served by
structured parking.

The Corps questioned why the proposed number of parking spaces
exceeded that required by Pasco County.  The applicant stated
that Pasco County's requirements were the minimum, but not
sufficient to meet shopping center industry standards.  The
applicant supplied parking data verifying the requirements of
stores like Kohls, Costco, and Target to have at least 1 parking
space per 200 square feet (as is proposed in this project).
Pasco County requires only 1 parking space per 300 square feet
for retail.

The Corps also required the applicant to compare the proposed
parking with that of nearby malls.  The results revealed that the
project proposed more parking than any existing mall in the
evaluation.  The applicant stated that regional malls, such as
that proposed, have a much higher component of restaurant uses
than older malls.  Restaurant uses require 2-3 times the amount
of parking than retail.  Hypothetically, if one-half of the
projects' restaurant use were converted to retail, the project
would then have less parking than all malls in the analysis
except Westshore Plaza.  Westshore Plaza is deemed an exception
due its location in a mature urban market where parking is
restricted by economics and tenant demand is high.

The only buildings within the development that will be multi-
story are the 3 proposed department stores.  The Corps inquired
if other uses could be converted to multi-story to reduce the
project footprint.  The applicant stated that the Power Center
tenants north of State Road 56 require a one-story format, as
sales dollars decrease on the second floor and operational costs
are higher.  Within the open-air mall south of State Road 56,
the department stores are the only stores that have a variety of
departments that allows them to merchandize the second floor.

The applicant's use of retaining walls as opposed to gradual side
slopes resulted in the avoidance of 1.23 acres of wetland
impacts.  Retaining walls are proposed behind the power center,

the northern boundary of Pond D, two locations along County Road

-12-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

54, and behind the hotel and department store on the south side
of State Road 56.

The Corps inquired as to what efforts would be taken to ensure
the construction of storm water ponds does not dewater adjacent
wetlands.  During construction of the ponds, recharge ditches
will be placed between the wetlands and excavated to maintain a
base flow to the wetlands.  After construction, the ponds will
provide flows to the wetlands after treatment and attenuation of
the runoff.  A detailed geotechnical engineering study was
performed by Ardaman Associates to address this potential
concern.  The Ardaman report concludes that construction of the
stormwater ponds will not adversely dewater adjacent wetlands.

A commenter asked if efforts were taken to avoid impacts to
forested wetlands in particular.  The project site contains
primarily forested wetlands.  The only herbaceous system of good
quality is adjacent to Cypress Creek and will be preserved.  It
would not be ecologically sound to impact this sensitive area
adjacent to Cypress Creek to minimize forested wetland impacts.

    f. Minimization:

To examine potential downsizing of the project to reduce wetland
impacts, the Corps required the applicant to evaluate the
practicability of downsizing the project uses in terms of
existing technology, cost, and logistics.  Since cost was the
limiting factor, alternatives consisted of reducing the footprint
by 5% (Alternative 2), 10% (Alternative 3),
15% (Alternative 4), and 20% (Alternative 5), as compared to that
proposed (Alternative 1).  For these alternatives, the reduction
in project footprint and resulting Rate of Return was reported as
follows:

|  | Alternatives |
|---|---|

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Retail (ft$^2$) | 921,647 | 875,565 | 829,482 | 783,400 | 737,318 |
| Restaurants(ft$^2$) | 178,800 | 169,765 | 160,830 | 151,895 | 142,960 |
| Office (ft$^2$) | 420,000 | 399,000 | 378,000 | 357,000 | 336,000 |
| Residential Units | 630 | 599 | 567 | 536 | 504 |
| Dept Stores | 3 | 2 | 1 | 1 | 1 |
| Hotel Rooms | 700 | 525 | 350 | 175 | 175 |
| Banks | 4 | 3 | 2 | 1 | 1 |
| | | | | | |
| Reduction in Site Area (ac) | NA | 28.71 | 57.49 | 69.36 | 77.64 |
| Phase 1 Rate of Return (%) | 8.0 | 7.73 | 7.46 | 7.33 | 7.20 |
| Phase 2 Rate of Return (%) | 8.0 | 7.80 | 7.64 | 7.57 | 7.54 |

Although just a 5% downsizing in project uses would reduce the
project footprint by over 28 acres, the applicant stated that a
Rate of Return below 8.0% deems the alternative impracticable.
The applicant states that a Rate of Return of at least 8.0% is
required to secure financing for the project.  In fact, the
financial feasibility studies performed by the applicant show
that deleting just one bank from the project would bring the Rate
of Return below 8%.

One commenter suggested building the project over State Road 56
to minimize wetland impacts.  The construction of retail
structures over major roadways, particularly interstate highways,
is rarely done outside of major metropolitan areas, such as New
York or Atlanta.  Aside from the obvious issue of cost, there are
technical and legal issues that must be considered.  The Florida
Department of Transporation (FDOT) owns the air rights over the
State Road 56 right-of-way.  Construction of buildings over State
Road 56 would reduce FDOT's future options for the interchange of
State Road 56 and Interstate 75.  Such structures would require a
high elevation to achieve proper design clearances.  Spans would
have to be long and columns would obstruct views making for a
dangerous approach to the Interstate 75 interchange.  Ingress and
egress would be complex, difficult to design and could
potentially pose safety issues.  To the best of applicant's

-14-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

knowledge, FDOT has never approved of such a proposal.

Minimizing impacts to the upland buffer adjacent to Cypress Creek
is of paramount concern given the quality of the resource
(Cypress Creek is an Outstanding Florida Water) and the proximity
and scale of the proposed development.  Buffers enhance or
provide a number of important aquatic resource functions
including: sediment removal and erosion control, excess nutrient
and metal removal, moderation of storm water runoff, moderation
of water temperature, maintenance of habitat diversity, wildlife
species distribution and diversity, and reduction of human
impact.  The proposed construction of Ponds "D" and "E" will
reduce the width of this natural buffer in places.  However, a
minimum buffer distance between Cypress Creek and any type of
activity is 50 feet.  Also, the minimum distance between the
Creek and any paved surface is approximately 600 feet.  The
applicant will provide further protection to the creek by 1)
planting all littoral shelves on the site with native vegetation,
and 2) planting the shallow, non-littoral shelf area within 300
feet of Cypress Creek with native vegetation.  The ponds, as
proposed, will serve as buffers or "soft uses" between the
development and Cypress Creek and provide all of the referenced
functions including:  sediment removal, erosion control, nutrient
and metal removal, moderation of stormwater runoff, moderation of
water temperature, maintenance of habitat diversity and reduction
of human impact.  Given that the project footprint could not be
further reduced (discussed above), the Corps finds that
maintenance of the
50-foot buffer, strategic location of the ponds between the
development and Cypress Creek, and the plantings of native
vegetation within the ponds provide the best protection possible
for the Creek.

Impacts to remaining on-site wetlands will be minimized by
maintaining an average 25-foot buffer and protecting them in
perpetuity through a conservation easement.


  g. Compensatory Mitigation:

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

The applicant proposes both on-site and off-site mitigation.
On site, the applicant will create mitigation areas M-1 (2.95
ac), M-2 (2.39 ac), and M-3 (8.27 ac).  Both M-1 and M-2 will be
forested wetlands and M-3 will be an herbaceous wetland.

The applicant also proposes off-site mitigation on the 250-acre
Alston tract in southeastern Pasco County in the headwaters of
the Hillsborough River.  The land is owned and will continue to
be owned by Mr. Brad Alston.  The approved off-site mitigation
plan includes:

- 62.2 acres of forested wetland preservation
  (Wetland Preservation 1/Mixed Forest Wetlands & Wetland
  Preservation 8/Dewatered Cypress Wetland & Wetland
  Preservation 9/Dewatered Cypress Wetlands within
  Flatwoods)
- 4.9 acres of herbaceous wetland preservation
  (Wetland Preservation 2/Marshes Within Flatwoods)
- 19.4 acres of herbaceous wetland creation
  (Wetland Creation 1/Savannah)
- 14.8 acres of herbaceous wetland restoration
  (Wetland Restoration 1/Wet Prairie)
- 8.0 acres of forested wetland enhancement
  (Wetland Enhancement 1/Historic Slough System & Wetland
  Enhancement 5/Cypress in Pasture)
- 9.3 acres of herbaceous wetland enhancement (Enhancement
  3/Marshes in Pasture & Enhancement 4/Marshes in Pasture
  on boundary)

The Corps determined that lost wetland functions on the project
site were 1) flood water storage, 2) water purification, and 3)
wildlife habitat.  Flood storage will be mitigated on-site
through storm water ponds.  These ponds will also provide
filtration functions.  The water quality monitoring plan will
ensure there are no adverse effects to water quality.  Wildlife
habitat can be partially mitigated on-site through the
construction of littoral shelves within the stormwater ponds.
These shelves are frequently used by wading birds.  However, the
vast majority of the lost wildlife habitat function cannot be
mitigated effectively on-site.  The Corps determined that it was
appropriate in this case to mitigate the lost wildlife habitat

CESAJ-RD-SW-T SAJ-2003-2336 (IP-TEH)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

off-site. The only value that could potentially be affected is
use of Cypress Creek for recreational enjoyment. This use will
be unaffected by the project, as large buffers will visually and
spatially separate the development from the mall. Construction
of the mall will not directly impact the creek nor affect any
public access.

A quantitative functional assessment was completed by the Corps
using the Unified Mitigation Assessment Methodology as follows:

| | Wetland Type | Wetland ID | Acres | UMAM delta | Functional Loss |
|---|---|---|---|---|---|
| **IMPACTS** | Forested | A / A1* | 25.43 | 0.0667 | -1.70 |
| | Forested | A | 23.20 | 0.5667 | -13.15 |
| | Forested | A-2 | 0.84 | 0.4000 | -0.34 |
| | Forested | H | 3.73 | 0.5667 | -2.11 |
| | Forested | J | 9.33 | 0.6667 | -6.22 |
| | Forested | L | 2.51 | 0.6333 | -1.60 |
| | *Subtotal* | | *65.04* | | *-25.12* |
| | | | | | |
| | Herbaceous | K | 3.83 | 0.4667 | -1.79 |
| | Herbaceous | N | 4.43 | 0.5667 | -2.51 |
| | Herbaceous | T | 0.18 | 0.4333 | -0.08 |
| | Herbaceous | U | 1.09 | 0.6000 | -0.65 |
| | Herbaceous | F | 0.30 | 0.2000 | -0.06 |
| | Herbaceous | L | 11.45 | 0.6333 | -7.25 |
| | Herbaceous | L1 | 1.46 | 0.4333 | -0.63 |
| | Herbaceous | O | 0.82 | 0.6333 | -0.52 |
| | Herbaceous | A1 | 0.18 | 0.3667 | -0.07 |
| | Herbaceous | A3 | 0.07 | 0.3667 | -0.03 |
| | *Subtotal* | | *23.81* | | *-13.59* |
| | | | | | |
| | **TOTAL** | | **88.85** | | **-38.71** |

*Secondary impact due to use of the wetland for stormwater
treatment.

Note: Jurisdictional ditch D1 (0.12 ac) was determined to have
negligible aquatic function and impacts did not require

-17-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

mitigation.

Note:  The following temporary impacts for outfall construction
were considered minimal and did not require mitigation:
K (0.005 ac) and L (0.007 ac).

Note:  The following wetlands were determined to be non-
jurisdictional and impacts did not require mitigation:  G (2.54
ac), I (0.59 ac), and S (0.44 ac).

| | Wetland Type | Wetland ID | Acres | UMAM delta | Relative Functional Gain | Functional Gain |
|---|---|---|---|---|---|---|
| **MITIGATION (ON-SITE CREATION)** | Forested | M1 | 2.95 | 0.80 | 0.4233 | 1.25 |
| | Forested | M2 | 2.39 | 0.80 | 0.4233 | 1.01 |
| | *Subtotal* | | 5.34 | | | 2.26 |
| | | | | | | |
| | Herbaceous | M-3 | 8.27 | 0.67 | 0.4298 | 3.55 |
| | | | | | | |
| | **TOTAL** | | **13.61** | | | **5.81** |

| | Wetland Type | Wetland ID | Acres | UMAM delta | Relative Functional Gain | Functional Gain |
|---|---|---|---|---|---|---|
| **MITIGATION (OFF-SITE CREATION)** | Herbaceous | 1 | 19.40 | 0.80 | 0.2992 | 5.80 |

CESAJ-RD-SW-T   SAJ-2003-2336 (IP-TEH)
SUBJECT:   Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

| | Wetland Type | Wetland ID | Acres | UMAM delta | Relative Functional Gain | Functional Gain |
|---|---|---|---|---|---|---|
| **MITIGATION (OFF-SITE ENHANCEMENT)** | Forested | 1 | 4.20 | 0.53 | 0.1411 | 0.59 |
| | Forested | 5 | 3.80 | 0.23 | 0.1504 | 0.57 |
| | *Subtotal* | | 8 | | | 1.16 |
| | | | | | | |
| | Herbaceous | 3 | 7.90 | 0.43 | 0.2794 | 2.21 |
| | Herbaceous | 4 | 1.40 | 0.40 | 0.2493 | 0.35 |
| | *Subtotal* | | 9.3 | | | 2.56 |
| | | | | | | |
| | **TOTAL** | | **17.3** | | | **3.72** |

| | Wetland Type | Wetland ID | Acres | UMAM delta | Relative Functional Gain | Functional Gain |
|---|---|---|---|---|---|---|
| **MITIGATION (OFF-SITE RESTORATION)** | Herbaceous | 1 | 14.80 | 0.83 | 0.5194 | 7.69 |

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

| | Wetland Type | Wetland ID | Acres | Preservation Adjustment Factor | Adjusted UMAM Delta | Functional Gain |
|---|---|---|---|---|---|---|
| **MITIGATION (OFF-SITE** | Forested | 1 | 33.8 | 0.90 | 0.27 | 9.13 |
| | Forested | 8 | 2.9 | 0.90 | 0.27 | 0.78 |
| | Forested | 9 | 25.5 | 0.90 | 0.27 | 6.89 |
| | *Subtotal* | | *62.2* | | | *16.8* |
| | | | | | | |
| | Herbaceous | 2 | 4.9 | 0.90 | 0.27 | 1.02 |
| | | | | | | |
| | **TOTAL** | | **67.1** | | | **17.82** |

| | | Forested FG/FL (ac) | Herbaceous FG/FL (ac) |
|---|---|---|---|
| **SUMMARY** | Impacts | -25.12 (65.04) | -13.59 (23.81) |
| | | | |
| | Creation | +2.26 (5.34) | +9.35 (27.67) |
| | Enhancement | +1.16 (8.0) | +2.56 (9.3) |
| | Restoration | 0 | +7.69 (14.8) |
| | Preservation | +16.8 (62.2) | +1.02 (4.9) |
| | **Total** | **+20.22 (47.14)** | **+20.62 (56.67)** |

Total Functional Loss = -38.71

Total Functional Gain = +40.84

The applicant requested enhancement credit for Wetland Areas
8 and 9.  However, with the lack of baseline data, it is the
determination of the Corps that measurable success criteria to
demonstrate hydrologic enhancement cannot be created.  Therefore,
preservation credit was given to these areas.
To ensure compliance with the proposed mitigation plan, it will

-20-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

be attached to the federal permit (Attachment 3) and the
following special conditions will be included:

*On-site wetland mitigation:  Within 12 months from the date of
this permit, the Permittee must complete final grading and
initial planting of on-site wetland creation areas and record
conservation easements for all mitigation areas to accomplish the
following objectives in accordance with the approved compensatory
wetland mitigation plan (Attachment 3):*

> *(1)  5.34 acres forested wetland creation*
> *(2)  8.27 acres herbaceous wetland creation*
> *(3)  13.2 acres of littoral shelf vegetation within surface
>       water management ponds*
> *(4)  2.81 acres of shallow water (non-littoral shelf)
>       vegetation within surface water quality ponds to
>       include all such areas within 300 feet of the top of
>       bank of Cypress Creek.*

*Off-site wetland mitigation:  Within 12 months from the date of
this permit, the Permittee must complete final grading (including
sod removal) and initial mulching and seeding of wetland
mitigation areas, erect all required fencing, construct all
berms, and record conservation easements for all mitigation
areas.  Initial planting of shrubs and trees within wetland
mitigation areas shall be completed within 24 months.  These
measures will serve to accomplish the following objectives in
accordance with the approved compensatory wetland mitigation plan
(Attachment 3):*

> *(1)  33.8 acres forested wetland preservation*
> *(2)  4.9 acres herbaceous wetland preservation*
> *(3)  19.4 acres herbaceous wetland creation*
> *(4)  14.8 acres herbaceous wetland restoration*
> *(5)  8.0 acres forested wetland enhancement*
> *(6)  9.3 acres herbaceous wetland enhancement*

*In addition to the specific performance standards of the approved
compensatory mitigation plan (Attachment 3), the Permittee must
meet the following performance standards:*

> *a.  At least 80 percent cover by appropriate wetland species*

-21-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

(i.e., FAC or wetter).

b.  Less than 5 percent cover of Category I and II invasive exotic plant species, pursuant to the most current list established by the Florida Exotic Pest Plant Council at http://www.fleppc.org, and shall include the nuisance species primrose willow (Ludwigia peruviana), dogfennel (Eupatorium capillifolium), Bermudagrass (Cynodon spp.), Bahiagrass (Paspalum notatum), and cattail (Typha spp.).

c.  Less than 20 percent mortality of planted wetland species.

For herbaceous mitigation areas, the Permittee must achieve the above performance standards by the end of the 5-year monitoring period, with no maintenance during the 5th year of monitoring. For forested mitigation areas, the Permittee must achieve the above performance standards by the end of the 10-year monitoring period, with no maintenance during the 10th year of monitoring. In the event that the above performance standards have not been achieved the Permittee must undertake a remediation program approved by the Corps in accordance with Special Condition 6 of this permit.

To show compliance with the performance standards the Permittee must complete the following:

a.  Perform a time-zero monitoring event of the wetland mitigation area(s) within 60 days of completion of mitigation objectives.

b.  Submit the time-zero report to the Corps within 60 days of completion of the monitoring event.  The report will include a paragraph depicting baseline conditions of the mitigation site(s) prior to initiation of the mitigation objectives and a detailed plan view drawing of all created, enhanced and/or restored mitigation areas.

c.  Perform semi-annual monitoring of the wetland mitigation areas for a period of no less than 3 years subsequent to completion of the mitigation objectives and annually thereafter.

d.  Submit annual monitoring reports to the Corps within 60

-22-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

days of completion of the monitoring event.

   e.  Monitor the mitigation area(s) and submit annual
monitoring reports to the Corps until released in accordance with
Special Condition 7 of this permit.

Annual monitoring reports must follow a 10-page maximum report
format for assessing mitigation sites.  The Permittee must submit
all documentation to the Corps on 8½-inch by 11-inch paper, and
include the following:

   a.  Project Overview (1 Page):

     (1)  Corps Permit Number.

     (2)  Name and contact information of Permittee and
consultant.

     (3)  Name of party responsible for conducting the
monitoring and the date(s) the inspection was conducted.

     (4)  A summary paragraph defining the purpose for the
approved project, acreage and type of aquatic resources impacted,
and mitigation acreage and type of aquatic resources authorized
to compensate for the aquatic impacts.

     (5)  Written description on the location and any
identifiable information to locate the site perimeter(s).

     (6)  Directions to the mitigation site (from a major
highway).

     (7)  Dates compensatory mitigation commenced and/or was
completed.

     (8)  Short statement on whether the performance standards
are being met.

     (9)  Dates of any recent corrective or maintenance
activities conducted since the previous report submission.

     (10)  Specific recommendations for any additional

-23-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

*corrective or remedial actions.*

*b.  Requirements (1 page):  List the monitoring requirements
and performance standards, as specified in the approved
mitigation plan and special conditions of this permit, and
evaluate whether the compensatory mitigation project site is
successfully achieving the approved performance standards or
trending towards success.*

*c.  Summary Data (maximum of 4 pages):  Data must be provided
to substantiate the success and/or potential challenges
associated with the compensatory mitigation project.  Any photo
documentation must be dated and clearly labeled with the
direction from which the photo was taken, and be identified on
the appropriate maps.*

*d.  Maps (maximum of 3 pages):  Maps must be provided to show
the location of the compensatory mitigation site relative to
other landscape features, habitat types, locations of
photographic reference points, transects, sampling data points,
and/or other features pertinent to the mitigation plan.*

*e.  Conclusions (1 page):  A general statement must be
included describing the conditions of the compensatory mitigation
project.  If performance standards are not being met, a brief
explanation of the difficulties and potential remedial actions
proposed by the Permittee, including a timetable, must be
provided.*

*If the compensatory mitigation fails to meet the performance
standards at the end of 5 years after the initiation of
herbaceous mitigation activities has occurred, the compensatory
mitigation will be deemed unsuccessful.  If the compensatory
mitigation fails to meet the performance standards at the end of
10 years after the initiation of forested mitigation activities
has occurred, the compensatory mitigation will be deemed
unsuccessful. Within 60 days of notification by the Corps that
the mitigation is unsuccessful, the Permittee must submit to the
Corps an alternate compensatory mitigation proposal to fully
offset the functional loss that occurred as a result of the
project.  The alternate mitigation proposal may be required to
include additional mitigation to compensate for the temporal loss*

-24-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

of wetland function associated with the unsuccessful compensatory
mitigation activities.  The Corps reserves the right to fully
evaluate, amend, and approve or reject the alternate compensatory
mitigation proposal.  Within 120 days of Corps approval, the
Permittee will complete the alternate compensatory mitigation
proposal.

Your responsibility to complete the required compensatory
mitigation, as set forth in Special Condition 1 of this permit
will not be considered fulfilled until you have demonstrated
mitigation success and have received written verification from
the Corps. A mitigation area which has been released will require
no further monitoring or reporting by the Permittee; however the
Permittee, Successors and subsequent Transferees remain
perpetually responsible to ensure that the mitigation area(s)
remain in a condition appropriate to offset the authorized
impacts in accordance with General Condition 2 of this permit.

The Permittee must provide to the Corps as-built drawings of the
authorized work and an As-Built Certification Form
(Attachment 6).  The drawings and Certification Form must be
submitted to the Corps within 60 days of completion of the
authorized work, or at the expiration of the construction window
of this permit, whichever occurs first.  The drawings must be
signed and sealed by a registered professional engineer and
include the following:

    a.  A plan view drawing of the location of the authorized
work footprint (as shown on the permit drawings) with an overlay
of the work as constructed in the same scale as the attached
permit drawings (8½-inch by 11-inch).  The drawing should show
all "earth disturbance," including wetland impacts, water
management structures, and any on-site mitigation areas.

    b.  List any deviations between the work authorized by this
permit and the work as constructed.  In the event that the
completed work deviates, in any manner, from the authorized work,
the Permittee shall describe, on the As-Built Certification Form,
the deviations between the work authorized by this permit and the
work as constructed.  Clearly indicate on the as-built drawings
any deviations that have been listed. Please note that the
depiction and/or description of any deviations on the drawings

-25-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

and/or As-Built Certification Form does not constitute approval
of any deviations by the U.S. Army Corps of Engineers.

   c.  The Department of the Army Permit number.

   d.  Include pre- and post-construction aerial photographs of
   the project site, if available.

The Permittee must have a legally sufficient conservation
easement prepared to ensure that the areas referenced in Special
Condition 1 will remain in their natural state in perpetuity.
The on-site conservation easement will encompass approximately
99.070 acre(s) of wetlands and 17.607 acre(s) of uplands. The
off-site conservation easement will encompass approximately 130.5
acre(s) of wetlands and 118.6 acre(s) of uplands.    These natural
preserve areas will not be disturbed by any dredging, filling,
land clearing, agricultural activities, planting, or other
construction work whatsoever.   The Permittee agrees that the only
future utilization of the preserved areas in question will be as
a purely natural area. To show compliance with this condition the
Permittee must complete the following:

   a.  Within 12 months from the date of this permit, submit to
   the Corps the draft conservation easement document with a legal
   description, survey, and scale drawings, of the area in question.

   b.  Within 30 days of Corps' approval of the draft
   conservation easement, record the easement in the public records
   of Pasco County, Florida.  A certified copy of the recorded
   document, plat, and verification of acceptance from the grantee
   must be forwarded to the Corps within 60 days of Corps' approval
   of the draft conservation easement.

   c.  Within 12 months from the date of this permit submit to
   the Corps a title insurance commitment with the draft
   conservation easement document, **IN FAVOR OF THE GRANTEE,** for the
   property which is being offered for preservation to show that the
   Permittee has clear title to the real property and can legally
   place it under a conservation easement.  Any existing liens or
   encumbrances on the property must be subordinated to the
   conservation easement.  At the time of recordation of the
   conservation easement, a title insurance policy must be provided

-26-

CESAJ–RD–SW–T  SAJ–2003–2336 (IP–TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above–Numbered Permit Application

to the Corps in an amount equal to the current market value of
the property.

   d.  In the event this permit is transferred, proof of
delivery of a copy of the recorded conservation easement to the
subsequent Permittee or Permittees must be submitted to the Corps
together with the notification of permit transfer.

The Grantee shall not assign its rights or obligations under this
conservation easement except to another organization qualified to
hold such interests under the applicable state and federal laws,
including §704.06 Florida Statutes, and committed to holding this
conservation easement exclusively for conservation purposes.  The
Corps shall be notified in writing of any intention to reassign
the conservation easement to a new grantee and must approve the
selection of the grantee.  The new grantee must accept the
assignment in writing and a copy of this acceptance delivered to
the Corps.  The conservation easement must then be re-recorded and
indexed in the same manner as any other instrument affecting title
to real property and a copy of the recorded conservation easement
furnished to the Corps.

All reports, documentation and correspondence required by the
conditions of this permit must be submitted to the following
address: U.S. Army Corps of Engineers, Regulatory Division,
Enforcement Section, P.O. Box 4970, Jacksonville, FL 32232.

One commenter expressed concern about the potential impacts
of the nearby phosphate processing facility on the off-site
mitigation tract.  This facility is located approximately 1 mile
to the southwest.  Given the distance of this facility and the
fact that it is not connected to the drainage of the mitigation
site, the Corps finds that there will be no adverse effects.

The Corps did express concern about the narrow strip of land
lying between the proposed mitigation parcel and SWFWMD public
lands to the east in Polk County.  The applicant clarified that
the strip is part of an unrelated project's
(SAJ–2005–5292 (IP–TEH)) mitigation proposal currently under
review by the State and the Corps.  The Corps believes that this
strip is rendered undevelopable and unusable for agriculture with
the preservation of the tract proposed for this project.

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:   Department of the Army Environmental Assessment and Statement of Findings for the Above-Numbered Permit Application

Therefore, this adjacent strip of land is not likely to adversely affect the proposed mitigation site regardless of whether it is preserved as part of another Corps permit or not.

Since the SWFWMD Environmental Resource Permit and the Corps permit will not have identical requirements, the following special conditions will be added to prevent non-compliance with the Corps permit:

> *The Environmental Resource Permit (ERP) No. 43026931.001 and special conditions are made a part of this DA permit.  For the purposes of compliance with this DA permit, where the conditions of the ERP and DA permits conflict, the DA permit shall apply.*

> *A modification of ERP No. 43026931.001 does not automatically constitute a modification of this DA permit. If the permittee proposes to change any part of the authorized activity, including the mitigation, it is the permittee's responsibility to request a modification of this DA permit from this office.*

   g. Conclusions of Alternatives Analysis:

The Corps concludes that the applicant has selected the least environmentally damaging practicable alternative.  The resulting impact and associated lost functions will be fully mitigated through a combination of on- and off-site mitigation.

9.   Evaluation of the 404(b)(1) Guidelines:  The Corps reviewed the proposed project in accordance with the 404(b)(1) Guidelines. The review demonstrates that the Corps analyzed all of the alternatives and that the proposed alternative is the least environmentally damaging and practicable alternative considering expense, existing technology, and logistics.  The project would not cause or contribute to violations of State Water quality standards, jeopardize the existence of any endangered species or affect a marine sanctuary.  The Corps does

not expect significant degradation and the applicant has taken all available practicable steps to minimize impacts.

| a.   Restrictions on Discharges (230.10 (a)- | |
|---|---|

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

| (d)) | |
|---|---|
| A review of the permit application indicates that: | |
| 1) The activity is located in a special aquatic site (wetlands, riffle and pool complexes, sanctuaries and refuges, mudflats, vegetated shallows, or coral reefs) | yes(X) no( ) |
| 2) The activity needs to be located in a special aquatic site to fulfill its basic purpose. | yes( ) no(X) |
| 3) It has been demonstrated in Item 8 above that there are no less damaging practicable alternatives that would satisfy the project's overall purpose. | yes(X) no( ) |
| 4) The least damaging practicable alterative has no other significant adverse environmental consequences. | yes(X) no( ) |
| 5) The activity causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard. | yes( ) no(X) |
| 6) The activity violates applicable toxic effluent standards or prohibitions under Section 304 of the Act. | yes( ) no(X) |
| 7) The activity jeopardizes the continued existence of federally listed threatened or endangered species or will likely cause the destruction or adverse modification of critical habitat. | yes( ) no(X) |
| 8) The activity violates the requirements of a federally designated marine sanctuary. | yes( ) no(X) |
| 9) The activity will cause or contribute to significant degradation of waters of the U.S. by causing significant adverse impacts on human health or welfare. | yes( ) no(X) |
| 10) The activity will cause or contribute to significant degradation of waters of the U.S. by causing significant adverse impacts on life stages of aquatic life and other wildlife | yes( ) no(X) |

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

| | |
|---|---|
| dependent on aquatic ecosystems. | |
| 11) The activity will cause or contribute to significant degradation of waters of the U.S. by causing significant adverse impacts on aquatic ecosystem diversity, productivity, and stability. | yes(  )  no(X) |
| 12) The activity will cause or contribute to significant degradation of waters of the U.S. by causing significant adverse impacts on recreational, aesthetic, and economic values. | yes(  )  no(X) |
| 13) Appropriate and practicable steps have been taken to minimize potential adverse impacts to the discharge on the aquatic ecosystem. | yes(X)  no(  ) |
| | |
| b. Finding of Compliance or Non-Compliance with Restrictions on Discharge (230.12 (a) and (b)) | |
| 1) The proposed disposal site complies with the requirements of these Guidelines. | yes(X)  no(  ) |
| 2) The proposed disposal site complies with the requirements of these Guidelines with the inclusion of appropriate and practicable discharge conditions to minimize pollution or adverse effects tot the affected aquatic ecosystem. | yes(X)  no(  ) |
| 3) The proposed disposal site fails to comply with the requirements of these Guidelines because there is a less damaging practicable alternative that does not have other significant adverse environmental consequences. | yes(  )  no(X) |
| 4) The proposed disposal site fails to comply with the requirements of these Guidelines because the proposed discharge will result in significant degradation of the aquatic ecosystem. | yes(  )  no(X) |
| 5) The proposed disposal site fails to comply with the requirements of these | yes(  )  no(X) |

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

| | |
|---|---|
| Guidelines because the proposed discharge does not include all appropriate and practicable measures to minimize harm to the aquatic ecosystem. | |
| 6) The proposed disposal site fails to comply with the requirements of these Guidelines because there does not exist sufficient information to make a reasonable judgment. | yes ( ) no(X) |

10.  Public interest review:

     a. General public interest findings:

          (1) Relative extent of the public and private need:
Commenters expressed concern regarding the need for more retail
in a growing retail market in Pasco County.  The applicant was
required to address the current need for the project given
commercial enterprises that have been developed in Pasco County
since 2000 and those likely to be constructed by the planned
opening of proposed mall.

The applicant provided a market analysis conducted by an
independent firm in 2002 and updated in 2005 and a fiscal impact
analysis completed in 2004.  These analyses demonstrated project
need and viability in the marketplace and benefits to the local
community. The total annual revenues from the project to the
County are projected at $7.7 million at build-out.  These
revenues include over $3 million in sales tax returning to the
County.  Expenditures include general government services,
police, fire, transportation, mass transit amenities, etc. and
are projected to be $1.8 million annually at build-out.  County
revenues will far exceed the expenditures.  The annual net fiscal
benefit for Pasco County from the development will reach $5.9
million at build-out.

Regarding private need, the landowner expects to make a
reasonable return off the land investment.

          (2) Practicability of using reasonable alternative
locations and methods to accomplish the objective of the purposed
work where there are unresolved conflicts as to resource use:

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

See Item 8 of this document.

(3) Extent and permanence of the beneficial and/or
detrimental effects, which the proposed work is likely to have on
the public, and private uses to which the area is suited:
Detrimental impacts are expected to be minimal although they
would be permanent in the construction area.  The beneficial
effects associated with utilization of the property would be
permanent.

| PUBLIC INTEREST FACTORS | ADVERSE MAJOR / MINOR | | BENEFICIAL MAJOR / MINOR | | NEGLIGIBLE | NO EFFECT |
|---|---|---|---|---|---|---|
| Conservation | | | | | | T/P |
| Economics | | | P | | | |
| Aesthetics | | | | | T/P | |
| General environmental concerns | | T/P | | | | |
| Wetlands | | T/P | | | | |
| Historic properties | | | | | | P |
| Fish and wildlife values | | T/P | | | | |
| Flood hazards | | | | | | P |
| Flood plain values | | | | | | P |
| Land use | | | | | | P |
| Navigation | | | | | | P |
| Shore erosion and accretion | | | | | | P |
| Recreation | | | | | | P |
| Water supply and conservation | | | | | | P |
| Water quality | | | | | | P |
| Energy needs | | | | | | P |
| Safety | | | | | | P |
| Food and fiber | | | | | | P |

-32-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

| | | | | | | |
|---|---|---|---|---|---|---|
| production | | | | | | |
| Mineral needs | | | | | | P |
| Consideration s of property ownership | | | | | | P |
| Needs and welfare of the people | | | | T/P | | |
| Traffic | | T | | | | P |

Note:  T = Temporary and P = Permanent

    b.  Items of public interest: The Corps reviewed all of the public interest factors including, but not limited to, those listed below.  The Corps evaluated the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest.  The benefits which reasonably may be expected to accrue from the proposal were balanced against its reasonably foreseeable detriments. The decision also reflects the national concern for both protection and utilization of important resources. The Corps has determined that the proposed project is not contrary to the public interest.

    (1) Conservation:  The Corps has determined that the project represents the least environmentally damaging practicable alternative and that all unavoidable wetland impacts have been appropriately mitigated.  Pasco County changed the zoning of the project area from residential to residential/office/retail and conservation lands.  Although the Corps does not challenge local zoning decisions, the use of the project area for a regional mall appears to be a reasonable use of the parcel given its location adjacent to Interstate 75 and a major intersection.

    (2) Economics:  Economic changes will occur as a result of this project.  Pasco County has long been a bedroom community for Tampa and a major local growth management issue has been the lack of jobs and commercial centers in Pasco County.  The project is expected to create 4,000 jobs and a significant amount of revenue for Pasco County.  A fiscal impact analysis was completed by Fishkind and Associates in October 2004.  This analysis demonstrated that total annual revenues from the project to the County are projected at $7.7 million at build-out.  These

-33-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

revenues include over $3 million in sales tax returning to the
County.  Expenditures include general government services,
police, fire, transportation, mass transit amenities, etc. and
are projected to be $1.8 million annually at build-out.  Revenues
will far exceed the expenditures.  The annual net fiscal benefit
for Pasco County from the development will reach $5.9 million at
build-out.

    (3) Aesthetics:  No specific objections were raised in
regard to aesthetics.  The project site is largely bordered by an
interstate and two state roads as well as Cypress Creek.  A
vegetated tree-line will be left intact along the creek.
Therefore, no significant changes in the local aesthetics are
expected to occur other than the transition from an agricultural
use to a commercial, office, and residential use.

    (4) General environmental concerns:  These concerns are
captured in Items (5) and (7) below.

    (5) Wetlands:  The wetlands are of moderate quality as
they were logged and some of them were ditched.  The wetlands do
provide natural biological functions such as foraging and
roosting habitat for some species, especially wading birds, on a
seasonal basis.  The wetlands are predominantly forested
(cypress) and not unique or rare in the landscape.  Wetlands will
have an average 25-foot buffer around them.  The site does not
contain wetlands set aside for study of the aquatic environment
or as sanctuaries or refuges.  The project is not expected to
affect detrimentally natural drainage characteristics,
sedimentation patterns, salinity distribution, flushing
characteristics, current patterns, or other environmental
characteristics.  The site is approximately
20 miles from the coastline and therefore does not contain
wetlands that are significant in shielding other areas from wave
action, erosion, or storm damage.  The wetlands do serve as
valuable storage areas for storm and flood waters; however,
floodplain compensation ponds and stormwater facilities have been
designed to ensure no increased risk of flooding.  Although the
wetlands to be filled provide water purification functions,
project alterations are not expected to adversely affect the
local water quality in Cypress Creek.  Stormwater ponds have been
designed to maintain water quality and a stringent water quality

-34-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

monitoring plan will be implemented as a condition of this
permit.  The project is not expected to adversely impact ground
water discharge as described in Item 10(b)(14) below.

Commenters expressed concern that permit issuance would set a
precedent for wetland fill in high quality wetlands without
regard to 404(b)(1) Guidelines and the practice of allowing
floodplain compensation.  The Corps has determined that this
project meets the 404(b)(1) Guidelines as specified in Item 9 of
this document.  Floodplain compensation is considered a necessary
and appropriate method to mitigate floodplain storage by the
SWFWMD.  Issuance of the Environmental Resource Permit by SWFWMD
ensures that losses in floodplain storage have adequately been
offset.

        (6) Historic properties:  By letter dated 20 Jun 05,
the State Historic Preservation Officer stated that their review
of the Florida Master Site File indicated no significant
archaeological or historical resources in the project area.  They
also stated that because of the location and/or nature of the
project, it is unlikely that any such sites will be affected.
The Corps determined the project would have no effect on historic
properties.

        (7) Fish and wildlife values:  The potential impact of
the project on state-listed fish and wildlife species was
assessed in detail during the Development of Regional Impact
review process.  Intensive surveys were completed following the
survey methodology approved by the Florida Fish and Wildlife
Conservation Commission (FFWCC).  A small population of gopher
tortoise was found on the site.  A condition of the Development
Order requires that the applicant relocate all tortoises.  The
American Alligator was observed using Cypress Creek, but this
habitat will not be impacted.  The following wading birds were
observed, but no nests were found:  little blue heron, white
ibis, tricolored heron, and snowy egret.  The gain in wood stork
habitat discussed in Item 11 of this document also demonstrates a
gain in potential habitat for these wading birds.  No suitable
habitat was found on-site for the gopher frog, Florida pine
snake, or Florida mouse.  The applicant is required by state law
to coordinate with the FFWCC to obtain any necessary approvals
and follow all regulations of the FFWCC in regard to listed

-35-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

_____

species.

Other than the wetlands that exist on the project site, there is
essentially no native wildlife habitat on the property.  Almost
all of the uplands on the property have previously been converted
to bahia grass (*Paspalum notatum*) dominated pasture.  The
wetlands were logged and some of them were ditched.  The wildlife
surveys revealed that the site provides relatively little habitat
for wildlife.  The most valuable habitat that exists on the
project site is Cypress Creek.  Secondarily, the wetlands provide
foraging and roosting habitat for some species, especially wading
birds, on a seasonal basis.

Multiple actions will be taken to minimize potential impacts to
wildlife habitat.  Wetlands will have an average 25-foot buffer
around them and Cypress Creek will have a minimum 50-foot buffer
to any use and a 600-foot buffer from impervious surface.  The
remaining wetlands will be placed under a conservation easement.
The applicant is required by Development Order to implement a
county-approved wildlife management plan.  Low Impact Development
features such as treatment swales will remove pollutants and
reduce potential risks of wildlife consuming toxins from
stormwater ponds.  Thirty-percent of the stormwater treatment
pond acreage will consist of littoral shelves, shallow areas
providing further wildlife habitat, especially for wading birds.
Also, given the stringent water quality treatment outlined in
Item 10(b)(15) of this document, wildlife using Cypress Creek
should not experience increased exposure to toxins as a result of
the project.

This project is not expected to impact fishery resources, as
there will be no direct impacts to Cypress Creek and the water
quality monitoring plan will ensure no adverse impacts to water
quality.

The project site includes areas identified as a critical wildlife
linkage in the 2002 report titled "Assessment of Measures to
Protect Wildlife Habitat in Pasco County" and prepared by
Glatting-Jackson for Pasco County.  The natural lands along
Cypress Creek within the project area fall into the identified
"Cypress Creek to Cypress Bridge" critical linkage.  This linkage
is deemed important because of its location as a "bottleneck"

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

between large conservation lands associated with Cabbage Swamp
and Cypress Swamp and the conservation lands in Hillsborough
County.  The entirety of Wetlands J, P, R, and S are included in
this linkage.  As discussed in Item 8(d) above, it is necessary
to fill a portion of Wetland J to extend County Road 54
southward.  The rest of the wetlands are not proposed for impact
and will be placed under conservation easement.  The Corps finds
that the impacts to the northern tip of Wetland P will not impede
wildlife movements along the creek.  The extensive buffers along
the creek (50 feet from any use,
600 feet from impervious surface) and planting of native
vegetation within the stormwater pond area within 300 feet of
Cypress Creek will preserve the integrity of this linkage.
Further, the applicant will incorporate wildlife corridors into
the design of the bridge (not part of this project, but rather a
secondary impact).

Note: Potential impacts of the project on federally endangered
species are addressed in Item 11 of this document.

        (8) Flood hazards:  No changes in local flood levels
are expected as a result of this project.  The project design
incorporates substantial stormwater storage and attenuation
facilities to avoid any impacts to the flood levels as a result
of the proposed project. The project design will comply with all
applicable County and Water Management District regulations.  No
structures will be located below the 100-year floodplain
elevation.

A detailed hydrodynamic hydraulic regional study was developed
for this portion of Cypress Creek to determine the existing (pre-
development) 100-year flood levels.  The model incorporated the
proposed development conditions (post-development) and
demonstrated that there will be no adverse impacts to the
existing 100-year flood levels as a result of the project.

This study also concludes that peak discharge rates for post-
development conditions will not exceed the allowable discharge
rates based upon existing pre-development conditions.
Accordingly, the construction of the project and its associated
stormwater management system will not result in any increased
flood elevations or peak flows within the creek. Therefore, there

-37-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

will be no adverse impacts to adjacent properties or residents.

Issuance of the SWFWMD permit is indicative of their acceptance
of this study.  Furthermore, the Corps must assume issuance of
the SWFWMD Environmental Resource Permit constitutes compliance
with all requisite state regulations.

    (9) Floodplain values:  The project will have no adverse
impacts to the 100-year floodplain. Measures taken to avoid and
minimize floodplain impacts include use of substantial setbacks
from the main conveyance area of Cypress Creek, concentration of
development activities in the highest areas of the site,
strategically locating the stormwater management areas in the
floodplain area to maximize their benefits to the floodplain, use
of retaining walls to reduce fill area, and use of floodplain
mitigation areas to replace floodplain volume lost due to
unavoidable fill.

Assertions that the project violates Pasco County's Comprehensive
Plan contradict the County's findings.  The Pasco County Board of
County Commissioners, in Resolution 05-40 approved on 23 Nov 04,
approved the Development Order for this project.  Item 2(d) of
this Development Order states that the project is consistent with
the County's comprehensive plan.  Subsequently, the Pasco County
Board of County Commissioners approved the Amended and Restated
Development Order by Resolution 05-188 on 26 Apr 05.  Item 2(c)
of the Amended and Restated Development Order states that the
revisions to the Cypress Creek Town Center DRI are consistent
with the Pasco County Comprehensive Plan as amended.  The Corps
defers to the County on local zoning issues such as this.

    (10)  Land use:  On 23 Nov 04, Pasco County changed the
land use designation of the project area from residential to
residential/office/retail and conservation lands.  This was not
an issue of public interest during review of the Corps
application.

    (11)  Navigation:  Not a relevant issue of public
interest.

    (12)  Shore erosion and accretion: Not a relevant issue
of public interest.

                              -38-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

(13)    Recreation:  While the proposed site, currently
vacant and being used as pasture for cattle, could be considered
"green space", this land is located in two quadrants of an
interstate interchange and is appropriate for the proposed
development.  The project will generate substantial demand for
recreational uses.  The multi-family residential use will consist
of 630 units and will provide their own recreational
opportunities.  The mall itself will serve as a gathering place
for local residents and provide entertainment opportunities in
the form of theaters and restaurants.  Cypress Creek itself
offers recreational opportunities in the form of canoeing,
kayaking, wildlife viewing, and fishing.  The subject parcel has
been in private ownership and does not provide access for these
activities.  Other access points exist upstream and downstream.
Therefore, recreational opportunities are expected to remain
unchanged as a result of this project.

(14)    Water supply and conservation:  Potable water for
the project will be provided by the Pasco County Utilities
Department.  The County has stated that it has excess capacity of
4 mgd based on the difference in permitted facility capacity and
present average annual usage.  The project will have minimal, if
any, impact on the area's water supply.

Concerns were raised regarding the expected impacts on
groundwater recharge given the close proximity of wells and the
integrity of the aquifer.  Condition 5(c)(4) of the Pasco County
Development Order requires the applicant to implement a
groundwater monitoring program that has been reviewed and
approved by the County, the Florida Department of Environmental
Protection, SWFWMD, and Tampa Bay Water.  The monitoring program
is required to begin prior to construction and continue for
5 years beyond project build-out.  Biennial reporting is required
and therefore the entities above will review the results of the
monitoring to ensure no adverse impacts to groundwater resources.
The Development Order also states that there shall be no
excavation into the Floridian aquifer's confining layers or
underlying limestone.  The Development Order also requires
compliance with the Wellfield Protection Ordinance (Section 612
of Pasco County Land Development Code, as amended).  Given the
oversight of the County through the provisions of the Development

-39-

CESAJ-RD-SW-T SAJ-2003-2336 (IP-TEH)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

Order, the Corps has reasonable assurance that no adverse impacts
will occur to groundwater resources.

Hillsborough County specifically questioned whether the potential
for water level recovery from reductions in well field pumping
had been taken into account in project development.
The applicant verified that it had been taken into account.
Seasonal high water levels were set in the field by an
environmental professional and reviewed by SWFWMD. These
seasonal high levels were compared to indicators of historic high
pool levels and they were determined to be equivalent. Since the
project is located only on the fringes of the modeled wellfield
drawdown areas of the surficial aquifer and current and historic
field indicators are at essentially the same elevations, it is
not likely that the wellfields are currently lowering water
levels in wetlands on this site. In addition, Tampa Bay Water
has already reduced water production in its central system
wellfields, including the Cypress Creek Wellfield and the Cypress
Bridge Wellfield, down to a level of water production that has
been predicted by both Tampa Bay Water and the SWFWMD to result
in recovery. As required by SWFWMD, no credit was considered in
either flows or elevations due to pumping. The Master Stormwater
Management Plan was based on the assumption that water levels are
at historic elevations.

(15)   Water quality:  Given that a portion of the
project drains into Cypress Creek, an Outstanding Florida Water
(OFW) and a tributary to the Hillsborough River (the major source
of drinking water for the City of Tampa), water quality was an
issue of great concern.

Due to the location of the project adjacent to an OFW, the
applicant voluntarily designed the stormwater treatment system
south of S.R. 56 (the portion draining to Cypress Creek) to
exceed the requirements of the State. The treatment ponds on
the south side of S.R. 56 have been designed to treat the first
1.5 inches of runoff as opposed to treating only the first inch
of runoff, which will benefit water quality. Low Impact Design
techniques (primarily infiltration swales within the impervious
area) will also be implemented to further enhance water quality.

-40-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

The applicant created a surface water quality monitoring plan to
ensure no adverse impacts to this important resource.  The plan
underwent many iterations in response to the Corps' concerns and
those of other agencies.  The final plan was ultimately approved
by Pasco County, Southwest Florida Water Management District,
Florida Department of Environmental Protection, Tampa Bay Water,
Tampa Bay Regional Planning Council, and the Environmental
Protection Commission of Hillsborough County.  The plan requires
surface water monitoring of numerous parameters at upstream and
downstream locations.  Baseline data is currently being collected
and data will continue to be collected for 5 years after
construction begins. To ensure compliance with this plan, the
following special condition will be added to the Corps permit:

> The Permittee will comply with the terms and conditions of the
> document titled "Cypress Creek Town Center Surface Water
> Quality Monitoring Plan" and dated February 26, 2007
> (Attachment 4).  All reports generated in support of this plan
> shall be submitted to the Corps.

In a memo dated 24 May 04, the Administrator of Public Works and
Utilities Services for the City of Tampa stated that he does not
anticipate any significant impact to the Hillsborough River water
supply provided that the mitigation is completed in the same
basin and the land is deeded to SWFWMD (as proposed).

The Clean Water Act assigns responsibility for control of non-
point sources of pollution to the states. Pursuant to
33 CFR 320.4(d), certification of compliance with applicable
effluent limitations and water quality standards required under
provisions of section 401 of the Clean Water Act will be
considered conclusive with respect to water quality
considerations unless the Regional Administrator, U.S.
Environmental Protection Agency (USEPA), advises of other water
quality aspects to be taken into consideration.  The Southwest
Florida Water Management District issued Environmental Resource
Permit No. 43026931.001 which constitutes Water Quality
Certification.  Further, USEPA had no comment on the project.
Based on these facts, combined with the water quality monitoring
plan required by the Corps permit, the Corps does not expect any
adverse impacts to water quality or downstream ecosystems as a

-41-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

result of the proposed project.

The project does entail stormwater treatment within wetlands
A/A1.  The alternative analysis demonstrated that there was no
other less damaging practicable alternative.  The Corps performed
a functional assessment of the lost functions and compensatory
mitigation was required and is accounted for in the approved
mitigation plan described in Item 8(g).  In addition, Florida law
governing issuance of the Environmental Resource Permit requires
that appropriate measures be taken to avoid adversely impacting
wetlands used for stormwater treatment.  Per this requirement,
biological indicators have been used to design a fluctuation
regime for the wetland that will maintain wetland hydroperiod.
The applicant will also pre-treat water before it enters the
wetland.  The water will first pass through a sump and grease
baffle system.  This will result in the removal of most dissolved
solids as well as greases and floating debris.  The sumps are to
be cleaned out on a regular basis.

In addition to the standard stormwater treatment system, the
applicant has incorporated Low Impact Design (LID) features.  LID
is a relatively new group of technology-based practices that have
been developed by the Maryland Department of Natural Resources
for addressing suburban stormwater management.  These practices
were designed to ensure that a site's post-development hydrologic
functions mimic those of the pre-development condition.  These
functions include groundwater recharge, infiltration, and
frequency and volume of discharge.  Some examples of LID features
include infiltration systems (infiltration swales, infiltration
drainfields, dry wells and level spreaders), filtering systems
(filter strips, exfiltration trenches/dry swales) and vegetated
conveyance systems.  The LID features will be installed in
parking lots and based on studies
of LID efficiencies, will provide an additional level of water
treatment prior to the water reaching the treatment wetland.

          (16)   Energy needs:  Not a relevant issue of public
interest.

          (17)   Safety: Not a relevant issue of public interest.

          (18)   Food and fiber production: Not a relevant issue of
                                    -42-

CESAJ-RD-SW-T   SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

public interest.

(19)   Mineral needs: Not a relevant issue of public interest.

(20)   Property ownership: Not a relevant issue of public interest.

(21)   Needs and welfare of the people:  Potential impacts on adjacent property owners, surrounding communities (including, but not limited to, Lutz, an unincorporated area of Hillsborough County), and nearby public lands and restoration projects were analyzed.

The only residential properties that are directly adjacent to the project are south of State Road 56 and west of the site. Impacts to these residents have been minimized to the greatest extent possible.  Representatives of The Jacobs Group met with several property owners on four separate occasions.  These meetings resulted in a realignment of the proposed County 54 extension away from the western edge of the project site and in zoning conditions that include landscaped buffers to block the view of the property owner most impacted by the road, restrictions on lighting, and limits on the types of uses that can be developed along County Road 54.  The owner of the undeveloped property (King Ranch) south of the project site has the ability to develop their property with access from County Line Road, and, they are processing plans with Pasco County to develop the King Ranch as retail, office and residential.  There is no reason to expect additional wetland impacts within the King Ranch.

Four "communities" are within the area surrounding the project site.  These include unincorporated areas of Wesley Chapel and Land O'Lakes in Pasco County, New Tampa, which is in the City of Tampa, and Lutz, an unincorporated area in Hillsborough County. The residents of these communities will benefit from convenient access to regional shopping, restaurants, movie theaters and entertainment and will no longer have to drive 10 to 15 miles to the Brandon Town Center, Citrus Park Mall or University Square Mall for regional shopping opportunities.  The proposed project will create an estimated 4,000 job opportunities for residents, many of whom currently drive long distances to work.  In Pasco

-43-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

County, residents will benefit from revenues generated by the
project.  These revenues will fund road construction, police and
fire protection, schools, and the acquisition of environmentally
sensitive lands.  The Wesley Chapel Chamber of Commerce has
publicly expressed strong support for development of the project.

Three public lands are close to the project site.  A Florida
Department of Transportation wetland mitigation site lies
adjacent to the creek east of Interstate 75.  It is downstream of
the project site adjacent to Cypress Creek.  There is no access
to the mitigation site from the project site.  Given the
developer commitment to protect water quality in Cypress Creek,
it is improbable that development of the proposed project could
impact this mitigation site.

The Southwest Florida Water Management District property called
"Cypress Creek" is located northwest of the project site.  The
closest part of the SWFWMD site is approximately 0.5 miles from
the project site.  It lies on the opposite side of State Road 54
and County Road 54 along the creek.  It is upstream of the
project site.  There is no access to this property from State
Road 54 or County Road 54.  Since it lies upstream and has no
access, it is improbable that development of the project site
could affect this SWFWMD property.  Development of the proposed
project should not affect future management of the SWFWMD
property.  The most probable management needs, controlled burns,
will not be affected by development of the site as a mall.  Since
residential housing, which is more sensitive to smoke,
already lies between the project site and the SWFWMD property,
that housing, not the mall, would control the conditions under
which controlled burns could occur.

The second public land is the Cypress Creek Preserve.  It lies in
Hillsborough County.  Most of the site lies within the triangle
created by the juncture of Interstate 75 and
Interstate 275, although there is an outlying parcel west of
Interstate 275.  This property belongs to Hillsborough County.
The northernmost extent of the Cypress Creek Preserve is
approximately 1.25 miles south of the project site.  Between the
project site and the Hillsborough County site, the creek flows
through extensive floodplain swamp and past multiple residential
developments.  Given the developer commitment to protect water

-44-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

_____

quality in Cypress Creek, adverse impacts to Cypress Creek
Preserve are not expected.  As with the SWFWMD property, the
primary management need of the Cypress Creek Preserve is a
controlled burn.  Close proximity of two interstate highways, not
the proposed project, will limit burn management of the Cypress
Creek Preserve.

Commenters were also concerned about the potential for the
project to cause urban sprawl.  Urban sprawl is a land
development pattern that is defined by the State as having large
expanses of single use, low-density development and/or including
development that does not maximize the use of existing or
proposed infrastructure thereby creating a financial burden on
the community.  By meeting a need of the large amount of existing
residential development in south Pasco County and northeastern
Hillsborough County, travel patterns will be changed in a
positive way.  Instead of traveling south to existing regional
malls, these trips will be shortened.  The new pattern will
shorten travel times and trip lengths and reduce traffic
congestion.  Shortened trip lengths and times will reduce the
consumption of gasoline and reduce air pollution.  The proposed
project site will maximize the use of existing infrastructure as
it is adjacent to the regional road network and to public sewer
and water facilities.  Therefore, the project is not expected to
cause urban sprawl.  The Corps also recognizes that zoning and
land use issues are largely a local issue and defers to local
city, county, and state governments on these issues.

    (22)  Traffic:  Due to the change in land use from
agriculture to residential and  commercial, there will be an
increase in the amount of local traffic.  Additionally, the mall
is a destination and, hence, it will change traffic patterns.
Currently, most traffic with a mall destination passes the
project site on either Interstate 75 or State Road 56 and heads
south to existing malls in Hillsborough County.  The increase in
traffic and change in traffic patterns will be mitigated through
the applicant's widening of State Road 54/56 and the extension of
County Road 54.

11. Threatened or endangered species:

    a. Wood stork

-45-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

The USFWS concurred with the Corps' determination that the
project may affect, but is not likely to adversely affect, the
wood stork.  The project area lies within the core foraging area
of 5 wood stork breeding colonies, but is not within the primary
or secondary zones of any.  Thirty-seven survey days over 4 years
(2002-2005) did not yield any sightings of wood storks on the
project area.  Corps personnel did not observe any wood storks
during the course of 3 visits to the site.  USFWS determined that
there are currently 16.22 acres of potential wood stork habitat
on the site.  Post-construction, USFWS estimates the project will
result in 21.35 acres of potential wood stork habitat including
Mitigation Area M-3 and littoral shelves within stormwater ponds.
USFWS recommended that a hedge of trees or tall shrubs be planted
between stormwater ponds "A" and "D" and the proposed
construction activities to minimize wood stork road kill.  The
Corps finds this recommendation reasonable and enforceable.  The
following special condition will be added to the Corps permit:

*Within 60 days of final grading of stormwater ponds "A" and
"D", the Permittee shall plant a continuous hedge of native
trees and/or tall shrubs between each pond and the adjacent
development and/or roads.*

USFWS also recommended that grounds maintenance operators be
trained to avoid use of fertilizers, herbicides, or disposal of
other contaminants around wetlands and stormwater ponds to
preclude impacts to wood stork food sources.  The Corps finds
this provision unenforceable and will not add a special condition
to the Corps permit to require this measure.  The Corps believes
the surface water quality monitoring plan (Attachment 4) will
adequately ensure that water quality is not adversely impacted.

One commenter noted the applicant's alternatives analysis
recognized potential wood stork habitat on Site #1, but not on
the proposed site (#12).  The Corps and the applicant did, in
fact, recognize the existence of potential wood stork habitat on
the project site as describe above. It did not appear to the
Corps that there were notable differences in potential endangered

-46-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

species habitat among alternative sites.  Regarding the wood
stork, no rookeries were noted on any site, and all sites fall
within the 18-mile foraging area of some wood stork rookery,
making them very similar in comparison.

   b. Eastern indigo snake

The USFWS concurred with the Corps' determination that the
project may affect, but is not likely to adversely affect, the
eastern indigo snake.  This determination was based on the
applicant's commitment to abide by USFWS' guidelines to protect
this species.  To ensure compliance with this commitment, the
following special condition will be added to the Corps permit:

   *That the permittee will comply with the terms and conditions
   of the 2004 Standard Protection Measures for the Eastern
   Indigo Snake, attached.*

   c. Scrub jay

The Corps determined that there was no scrub jay habitat on the
site; therefore, there would be no effect on this species.  USFWS
reached the same finding.

   d. Bald eagle

The Corps determined that the project would have no effect on the
bald eagle.  USFWS reported that the closest bald eagle nest is
at 6.5 miles and also reached this finding.

   e. Gulf sturgeon

The Corps determined that the project would have no effect on the
gulf sturgeon.  One commenter claimed that he saw a large fish in
Cypress Creek that may have been an endangered gulf sturgeon.
The Corps discovered that hatchery-raised gulf sturgeon were
released by the Florida Fish and Wildlife Conservation Committee
(FFWCC) in 2000 in the Hillsborough River into the freshwater
upstream of the dam and reservoir.  Mr. Danny Roberts of FFWCC

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

conducted the study and stated that he lost track of the released
sturgeon while their transmitters were still functional.  He
believes they were flushed downstream and out of the river during
a tropical storm, during which all gates in the Hillsborough
River and Bypass Canal were opened.  Furthermore, since adult
sturgeon primarily feed in marine or brackish water, the expected
lifetime of a fish released in freshwater above a dam is
extremely limited.

    f. West Indian manatee

The Corps determined that the project would have no effect on the
West Indian manatee.  A commenter expressed concern that the
project may impact this species.  The Corps concludes that
negative impacts to the West Indian manatee are highly
improbable.  Manatees cannot access the upper reaches of the
river system due to the presence of the City of Tampa dam,
located over 25 miles downstream from the project area.
Implementation of the surface water quality monitoring plan
(Attachment 4) will also ensure downstream habitats are not
adversely affected.
12. Secondary Impacts:

The Corps evaluated potential secondary impacts of the project
that are reasonably foreseeable, but are later in time or farther
removed in distance.  The Corps identified the following
secondary impacts:

    a.  State Road 54 extension

As explained above in Item 8(d), the Corps analyzed the route of
County Road 54 within the project area as a direct impact and the
portion south of the project area as a secondary impact.  The
northern starting point of the road is dictated by the existing
State Road 56 and County Road 54 intersection.  Impacts to
Wetlands J and K were unavoidable given this constraint.
However, retaining walls will be installed along the west side of
the road to minimize impacts on remaining portions of Wetland J.
Impacts to Wetland R will be completely avoided by use of a
retaining wall on the east side of the road.  The road was
aligned to cross Cypress Creek at a location where no wetlands
would be impacted, between wetlands R and S.  South of Cypress

CESAJ-RD-SW-T . SAJ-2003-2336 (IP-TEH)
SUBJECT: Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

Creek lays King Ranch. Pasco County (Wade Trim 2006) completed a
route study that examined 3 different alignments from Cypress
Creek to County Line Road. An alternative was selected that had
no impacts to aquatic resources. Therefore, secondary impacts
south of the project area due to the extension of County Road 54
are not expected.

The extension of State Road 54 requires a bridge over Cypress
Creek. To avoid and minimize secondary impacts that may occur in
connection with the bridge, the applicant will 1) use a bridge
rather than culvert to avoid impacts to flow, 2) route stormwater
from the bridge into a stormwater pond (not the creek), 3) fence
the bridge so that trash and debris do not blow into the creek,
and 4) provide for wildlife access beneath the bridge.

   b.  Changes in land uses on adjacent lands

A mixed-use project is proposed for King Ranch, which is located
immediately south of the project. King Ranch is currently
accessible from County Line Road in an area that is developing
rapidly. While King Ranch itself is not a secondary impact of
the project, the nature of the King Ranch development will likely
be different. Without the proposed project, there would be no
access from the north and the King Ranch development would likely
not provide the equivalent economic benefit to Pasco County.
With access from the north, King Ranch is likely to provide more
commercial development. Without access from the north, King
Ranch would most likely yield residential development. Since
these uses are similar in the impacts on the aquatic environment,
the Corps does not anticipant any significant secondary impacts.

   c.  Changes in functions and values of remaining on-site
wetlands

Potential secondary impacts to on-site wetlands may include
changes in wetland functions and values due to proximity of the
development and changes in hydrology due to construction of
surface water management ponds or potable water production.
Measures to avoid and minimize these impacts are as follows:

       (1)  Buffers between the wetlands and the development
will be maintained with a minimum average width of 25 feet.

-49-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

        (2)  To avoid the dewatering of adjacent wetlands,
surface water management ponds have been carefully placed and
designed to treat surface water runoff and manage water levels
such that adjacent wetlands are protected.  The appropriate
hydrological modeling has been conducted by Ardaman and
Associates.

    d.  Effects of stormwater treatment with wetlands

The project does entail stormwater treatment within wetlands
A/A1.  The alternative analysis demonstrated that there was no
other less damaging practicable alternative.  The Corps performed
a functional assessment of the lost functions and compensatory
mitigation was required and is accounted for in the approved
mitigation plan described in Item 8(g).  In addition, Florida law
governing issuance of the ERP permit requires that appropriate
measures be taken to avoid adversely impacting wetlands used for
stormwater treatment.  Per this requirement, biological
indicators have been used to design a fluctuation regime for the
wetland that will maintain wetland hydroperiod.  The applicant
will also pre-treat water before it enters the wetland.  The
water will first pass through a sump and grease baffle system.
This will result in the removal of most dissolved solids as well
as greases and floating debris.  The sumps are to be cleaned out
on a regular basis.

The Corps finds that the project will not result in any
significant secondary impacts.  Those potential impacts that
have been identified above have been avoided and minimized to the
maximum extent practicable.

13. Cumulative impacts: The Corps instructed the applicant to
complete a comprehensive cumulative impact analysis pursuant to
40 CFR § 1508.7, with a focus on wetlands, water quality, and
flooding.  The analysis considered the incremental impact of the
proposed project when added to other past, present, and
reasonably foreseeable future actions regardless of what agency
(Federal or non-Federal) or person undertakes such other actions.
Cumulative impacts can result from individually minor but
collectively significant actions taking place over a period of
time.  The Corps agrees with the findings of the report titled

CESAJ-RD-SW-T  SAJ-2003-2336.(IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

"Cypress Creek Town Center Cumulative Analysis", dated August
2006, and prepared by Biological Research Associates, that the
project will not have any significant cumulative impacts.

14.  Essential Fisheries Habitat (EFH): The public notice
included an initial determination that the project would not have
an adverse impact on EFH or Federally managed fisheries.  The NMFS
did not provide any EFH conservation recommendations in response
to the public notice.  Therefore, the Corps is satisfied that the
consultation procedures outlined in 50 CFR Section 600.920 of the
regulation to implement the EFH provisions of the Magnuson-
Stevens Act have been met.

15.  Public Hearing Evaluation:  Requests for a public hearing
were received from: Mr. Ralph Brookes representing Mr. Bob Jones,
Ms. Shirley Jones, and Ms. Leigh Jefts, Ms. Leslie Blackner,
representing Floridians for Environmental Accountability & Reform
(FEAR), Ms. Denise Layne, representing Sierra Club Tampa Bay
Group, and 15 individuals.  On 14 May 07, the Corps denied these
requests.  A public hearing is not held unless additional
information is necessary to make a decision on the application.
The Corps reviewed the information provided by these commenters
and concluded that substantive additional information would not
be received and that a public hearing would not benefit the
decision-making process on this permit application.

16.  Determinations:

     a.  Finding of No Significant Impact (FONSI): Having reviewed
the information provided by the applicant and all interested
parties and an assessment of the environmental impacts, I find
that this permit action will not have a significant impact on the
quality of the human environment.  Therefore, an Environmental
Impact Statement will not be required.

     b.  Compliance with 404(b)(1) Guidelines: Having completed
the evaluation in paragraph 8 above, I have determined that the
proposed discharge complies with the 404(b)(1) guidelines.

     c.  Section 176(c) of the Clean Air Act General Conformity
Rule Review: The proposed permit action has been analyzed for
conformity applicability pursuant to regulations implementing
-51-

CESAJ-RD-SW-T  SAJ-2003-2336 (IP-TEH)
SUBJECT:  Department of the Army Environmental Assessment and Statement
of Findings for the Above-Numbered Permit Application

---

Section 176(c) of the Clean Air Act.  It has been determined that
the activities proposed under this permit will not exceed de
minimis levels of direct or indirect emissions of a criteria
pollutant or its precursors and are exempted by 40 CFR Part
93.153.  Any later indirect emissions are generally not within
the Corps' continuing program responsibility and generally cannot
be practically controlled by the Corps.  For these reasons a
conformity determination is not required for this permit action.

    d.  Public Interest Determination: I find that issuance of a
Department of the Army permit is not contrary to the public
interest.


PREPARED BY:                          15 May 07


Tracy Hurst
Project Manager
West Permits Section


REVIEWED BY:


Charles A. Schnepel
Chief, West Permits Section


APPROVED BY:


Paul L. Grosskruger
Colonel, U.S. Army
District Commander


-52-

## DECLARATION OF JOHN R. SIERRA, JR.

I, John R. Sierra, Jr., state the following:

1.    I am President of Sierra Properties I, LLC.  Sierra Properties I, LLC does business under the name Sierra Properties.  I am also President of Pasco Ranch, Inc. and President of Pasco 54, Inc., which is the General Partner of Pasco 54, Ltd., each affiliates of Sierra Properties. I have been employed by Sierra Properties or its affiliates for 28 years.

2.    Sierra Properties is a Florida limited liability company with offices located in Tampa, Florida and is in the business of land development.

3.    Sierra Properties is currently developing Cypress Creek Town Center, a development that will include a regional mall, a variety of retail stores, financial institutions, hotels, restaurants, cinemas, offices, and multi-family residential housing.  This project has received all necessary environmental and land use approvals from state and local governments, including wetland permits issued under Florida law.

4.    On May 15, 2007, the U.S. Army Corps of Engineers ("Corps") issued Clean Water Act Section 404 Permit No. SAJ-2003-2336 (IP-TEH) to Sierra Properties permitting the discharge of dredge and fill material in approximately fifty-four acres of wetlands and ten acres of surface waters, as part of the development of Cypress Creek Town Center.

5.    Sierra Properties and JG Cypress Creek LLC are jointly developing Cypress Creek Town Center.

6.    Sierra Properties is the holder of the permit and a manager of the permitted project.

7.    Affiliates of Sierra Properties, Pasco 54, Ltd. and Pasco Ranch, Inc., together own all of the permitted acreage for Cypress Creek Town Center except for the approximately 100 acres owned by JG Cypress Creek LLC.

MIAMI 747680 (2K)



EXHIBIT

B

8.    Site preparation and construction of Cypress Creek Town Center commenced following the receipt of federal, state, and local environmental and land use permits.

9.    Sierra Properties and its affiliates have made a substantial investment in the development of Cypress Creek Town Center including the property, infrastructure, engineering and design work, improvements, and off-site mitigation. They have also made numerous legal and financial commitments in order to develop Cypress Creek Town Center.

10.    Sierra Properties and its affiliates rely on the Section 404 permit issued by the Corps to conduct their business. If the existing Section 404 permit for Cypress Creek Town Center were rescinded or revoked, Sierra Properties and its affiliates would suffer significant financial injury and potential liability. They would lose their multi-year investment in this project, and be prevented from meeting the numerous financial and legal obligations they have entered into in reliance upon the Corps' Section 404 permit.

11.    Sierra Properties and its affiliates seek to defend the issuance of the Corps' Section 404 permit in order to protect their property and investments in this project.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on the _____ 16th _____ day of October, 2007.

_____

**JOHN R. SIERRA, JR.**
President of Sierra Properties I, LLC;
President of Pasco 54, Inc., the General Partner of Pasco 54, Ltd.; and
President of Pasco Ranch, Inc.

## DECLARATION OF JUDSON E. SMITH

I, Judson E. Smith, state the following:

1.    I am the Executive Vice President and Chief Financial Officer of JG Cypress Creek LLC ("JG Cypress"). I have been employed by JG Cypress or its affiliates for 20 years.

2.    JG Cypress is an Ohio limited liability company doing business in Florida.

3.    JG Cypress owns property in Pasco County, Florida, where it is jointly developing Cypress Creek Town Center, a mixed-use development that will include a regional mall, a variety of retail stores, financial institutions, hotels, restaurants, cinemas, offices and multi-family residential housing, with Sierra Properties I, LLC ("Sierra Properties"). This project has received all necessary environmental and land use approvals from state and local governments, including wetland permits issued under Florida law.

4.    JG Cypress owns approximately 100 acres of the Cypress Creek Town Center site.

5.    On May 15, 2007, the U.S. Army Corps of Engineers ("Corps") issued Clean Water Act Section 404 Permit No. SAJ-003-2336 (IP-TEH) to Sierra Properties permitting the discharge of dredge and fill material in approximately fifty-four acres of wetlands and ten acres of surface waters, as part of the development of Cypress Creek Town Center.

6.    JG Cypress and Sierra Properties are jointly developing Cypress Creek Town Center.

7.    Site preparation and construction of Cypress Creek Town Center commenced following receipt of all federal, state, and local environmental and land use permits.

8.    JG Cypress has made a significant financial investment in its property, facilities, equipment, and personnel in the development of Cypress Creek Town Center. It has also made numerous legal and financial commitments in connection with development of Cypress Creek



Town Center, including obtaining loan commitments in order to finance the project, negotiating and entering into leases with future tenants, off-site mitigation, and negotiating and entering into architectural, engineering, site work, and construction-related contracts for Cypress Creek Town Center.

9.    JG Cypress relies on the Section 404 permit issued by the Corps to conduct its business. If the existing Section 404 permit for Cypress Creek Town Center were rescinded or revoked, JG Cypress would suffer significant financial injury and potential liability. It would potentially lose the millions of dollars it has invested in the project over many years, be unable to meet the numerous financial and legal obligations it has entered into in reliance upon the Corps' Section 404 permit, and its ability to develop the project would be significantly impaired.

10.    JG Cypress seeks to defend the issuance of the Corps' Section 404 permit in order to protect its property and investments in the Cypress Creek Town Center project.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on the ___15th___ day of October, 2007.

JUDSON E. SMITH