## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, et al., Plaintiffs ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. 1:07-cv-01756 (RCL) |
| ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| and ) | |
| ) | |
| SIERRA PROPERTIES, et al., ) | |
| ) | |
| Intervening Defendants ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs hereby move for summary judgment. For the reasons set forth in the accompanying memorandum, there are no genuine issues of material fact in dispute and Plaintiffs are entitled to judgment as a matter of law. In support of this motion, plaintiffs submit the accompanying memorandum of law, a statement of material facts as to which there is no genuine issue, Exhibits 1-11, and a proposed Order.

Respectfully submitted,

_____/s/_____
Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

January 16, 2008                    Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, et al., Plaintiffs ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. 1:07-cv-01756 (RCL) |
| ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| and ) | |
| ) | |
| SIERRA PROPERTIES, et al., ) | |
| ) | |
| Intervening Defendants ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Respectfully submitted,

_____/s/_____
Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C. 20009
(202) 588-5206

January 16, 2008                    Attorneys for Plaintiffs

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    Statutory And Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Clean Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   Facts Giving Rise To Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Cypress Creek Town Center Site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    The Cypress Creek Town Center Development . . . . . . . . . . . . . . . . . . . . . 10

    C.    Pasco County And The Cypress Creek Town Center Location . . . . . . . . . . . . . 11

    D.    Federally Listed Species Likely To Be Adversely Impacted By
           The Cypress Creek Town Center And The Cumulative Impacts
           Of Growth In The Area. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    E.    Events Giving Rise To Plaintiffs' Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.    Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.   The Corps' And The FWS Violated The Endangered Species Act By Failing
    To Engage In Formal Consultation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.    CCTC Will Adversely Affect Utilized Wood Stork Foraging Habitat. . . . . . . . 19

    B.    The Corps And The Service Failed To Evaluate The Impacts To The
           Indigo Of Habitat Loss, Fragmentation, And Road Mortality. . . . . . . . . . . . . 21

III.   The Corps Violated The Clean Water Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      A.   The Corps Failed To Require That Practicable Alternatives To Avoid
         Or Minimize The Destruction Of Wetlands Be Undertaken. . . . . . . . . . . . . . . . 24

           1.   The Record Demonstrates Reducing The Size Of CCTC Was A
               Practicable Alternative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

           2.   The Corps Violated The Clean Water Act By Failing To
               Enforce The Practicable Alternative Of Reducing The Number
               Of Parking Spaces. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      B.   The Corps's Determination That The Project Would Not Cause Or
         Contribute To The Substantial Degradation Of Waters Of The United
         States Is Arbitrary and Capricious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      C.   The Corps' "Mitigation" Program On Which The Corps Is Relying Has
         A Proven Track Record Of Failing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IV.   The Corps Violated NEPA By Failing To Take A Hard Look At The
      Environmental Impacts Of Constructing And Operating CCTC And By
      Failing To Prepare An EIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      A.   An EIS Should Have Been Prepared . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      B.   The Corps Prepared A Legally Insufficient EA. . . . . . . . . . . . . . . . . . . . . . . . 41

RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                    **PAGE**

Alliance For Legal Action v. U.S. Army Corps of Engineers,
    314 F. Supp. 2d 534 (M.D.N.C. 2004) ........................................................... 29

Amoco Prod. Co. v. Village of Gambell,
    480 U.S. 531 (1987) ...................................................................... 44

Anderson v. Evans,
    371 F.3d 475 (9th Cir. 2004) ......................................................... 40

Cabinet Mountains Wilderness v. Peterson,
    685 F.2d 678 (D.C. Cir. 1982) ....................................................... 18

Citizens for Better Forestry v. U.S. Department of Agriculture,
    481 F. Supp. 2d 1059 (N.D. Cal. 2007) ......................................... 19

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971) ...................................................................... 18

Environmental Defense v. Army Corps of Eng.,
    515 F. Supp. 2d 69 (D.D.C. 2007) ................................... 24, 36, 45

Environmental Prot. Information Center v. Blackwell,
    389 F. Supp. 2d 1174 (N.D. Cal. 2004) ........................................ 40

Fla. Key Deer v. Stickney,
    864 F. Supp. 1222 (S.D. Fla.1994) ........................................ 18, 43

Fund for Animals v. Williams,
    391 F. Supp. 2d 191 (D.D.C. 2005) .............................................. 36

*Grand Canyon Trust v. FAA,
    290 F.3d 339 (D.C. Cir. 2002) ................................................ 39, 41

Humane Society of the U.S. v. Department of Commerce,
    432 F. Supp. 2d 4 (D.D.C. 2006) .................................................. 40

_____

\* Authorities upon which plaintiffs chiefly rely are marked with asterisks

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance
    Co.,
    463 U.S. 29 (1983) ........................................................................... 18, 35

National Parks & Conservation Association v. Babbitt,
    241 F.3d 723 (9th Cir. 2001) ................................................. 38, 40

Natural Resources Defense Counsel v. Hodel,
    865 F.2d 288 (D.C. Cir. 1988) ................................................ 42

Northwest Bypass Group v. U.S. Army Corps of Engineers,
    490 F. Supp. 2d 184 (D.N.H. 2007) ....................................... 24, 29

Public Serv. Co. v. Andrus,
    825 F. Supp. 1483 (D. Idaho 1993) ........................................ 38

Realty Income Trust v. Eckerd,
    564 F.2d 447 (D.C. Cir. 1977) ................................................ 44

Se. Ala. Conservation Council v. U.S. Army Corps of Eng'rs,
    472 F.3d 1097 (9th Cir. 2006) ................................................ 44

Sierra Club v. Flowers,
    423 F. Supp. 2d 1273 (S.D. Fla. 2006) ........................... 20, 21, 23

*Sierra Club v. Marsh,
    816 F.2d 1376 (9th Cir.1987) ................................................ 43, 45

Sierra Club v. Marsh,
    872F. 2d 497 (1st Cir. 1989) ................................................ 44

Sierra Club v. Strock,
    495 F. Supp. 2d 1188 (S.D. Fla. 2007) .................................. 21

Sierra Club v. Watkins,
    808 F.Supp 852, 859 (D.D.C. 1991) ..................................... 41, 44

*Tenn. Valley Authority v. Hill,
    437 U.S. 153 (1978) ............................................................... 43

---

* Authorities upon which plaintiffs chiefly rely are marked with asterisks

Thomas v. Peterson,
    753 F.2d 754 (9th Cir. 1985) ...................................... 44

*Town of Cave Creek v. FAA,
    325 F.3d 320 (D.C. Cir. 2003) ................................... 41

United States v. Metropolitan District Commission,
    930 F.2d 132 (1st Cir. 1991) ..................................... 44

*Utahns for Better Transport v. U.S. Department of Transport,
    305 F.3d 1152 (10th Cir. 2002), modified in part 319 F.3d
    1207 (10th Cir. 2003) ........................................ 24, 25, 27, 29,31, 32

Weinberger v. Romero-Barcelo,
    465 U.S. 305 (1982) .............................................. 43

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 702 ........................................................ 45

5 U.S.C. § 706 ................................................. 17, 18, 43, 45

16 U.S.C. § 1531(b) ................................................. 5, 6

16 U.S.C. §§ 1532 ..................................................... 5

16 U.S.C. § 1540(g) ............................................... 17, 45

42 U.S.C. § 4332 ....................................................... 6

33 C.F.R. § 230.1-230.26 ............................................... 6

33 C.F.R. § 320.4 ...................................................... 4

33 C.F.R. § 325.7 ................................................. 17, 45

40 C.F.R. § 6.207 ...................................................... 6

40 C.F.R. §1500.1 ...................................................... 6

40 C.F.R. § 1508 ........................................ 6, 7, 8, 38, 39, 40, 41

_____

* Authorities upon which plaintiffs chiefly rely are marked with asterisks

40 C.F.R. § 230.1 ......................................................................................... 2, 3, 4

40 C.F.R. § 230.10 ........................................................ 4, 23, 24, 25, 27,29, 31, 32, 33

40 C.F.R. § 230.80 .............................................................................................. 2

50 C.F.R. § 10.13 ............................................................................................. 8, 9

50 C.F.R. § 17.3 .................................................................................................. 5

50 C.F.R. § 17.21 ................................................................................................ 5

50 C.F.R. § 17.31 ................................................................................................ 5

50 C.F.R. § 402.01 .............................................................................................. 5

50 C.F.R. § 402.14 .......................................................................................... 5, 18

**STATE STATUTES**

Fla. Admin. Code Ann. r. 62-302.700(1) ........................................................ 9, 10, 39

Fla. Stat. § 403.061(27) ................................................................................... 9, 39

**MISCELLANEOUS**

Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg.
          85,336, 85,339, 85,343, 85,344 (Dec. 24, 1980) ................................... 4, 26, 32

Wood Stork Listing Rule, 49 Fed. Reg. 7332, 7332 .......................................... 12, 16

Wetlands Protection: Corps of Engineers Does Not Have an Effective
          Oversight Approach to Ensure That  Compensatory Mitigation Is
          Occurring, U.S. General Accounting Office (2005) ................................... 36, 37

NAS, Compensating for Wetland Losses Under the Clean Water Act (2001) .......................... 36

## INTRODUCTION

This case challenges the United States Army Corps of Engineers' ("ACOE's" or "Corps'") unlawful issuance of a Clean Water Act ("CWA") permit for the filling of over fifty acres of federally protected wetlands for the construction of a massive commercial complex called Cypress Creek Town Center ("CCTC"). It also challenges the United States Fish and Wildlife Service's ("FWS's" or "Service's") concurrence therewith.

The CCTC site contains habitat for federally listed endangered and threatened species – including the Wood Stork and the Eastern Indigo Snake – much of which the development will destroy. The site's southern portion has been designated by Pasco County, Florida, as a "critical wildlife linkage" because it is located between and provides a connecting corridor to other conservation lands. The development will, in effect, reduce this corridor to fifty feet by placing, among other things, storm water ponds in the corridor. Cypress Creek, which is adjacent to the site and has been designated an "Outstanding Florida Water" by the State of Florida, is a major tributary for the Hillsborough River, a primary municipal water supply for Tampa. Much of the runoff from the site will ultimately drain into Cypress Creek. Natural buffers that had protected wetlands remaining on site will be greatly reduced.

Much of this environmental harm could have been avoided or mitigated if, for example, CCTC had simply been reduced in size. Yet the Corps required no reduction in the development or the number of parking spaces despite the vast size of the complex, its impact on wildlife, including federally listed species, wetlands, and Cypress Creek. Instead, the Corps is relying primarily on off-site mitigation when national studies have repeatedly demonstrated such mitigation to be woefully inadequate to save the nations' dwindling wetlands.

Plaintiffs therefore bring the following claims: 1) the Corps and the Service violated the Endangered Species Act, 16 U.S.C. §§ 1532-1544 ("ESA"), by failing to engage in formal section 7 consultation on impacts to listed species; 2) the Corps violated the CWA, 33 U.S.C. §§ 1251-1387, by failing to require that practicable alternatives to filling wetlands and surface waters be meaningfully analyzed, pursued, and offset; and arbitrarily and capriciously concluding there would be no significant degradation of remaining wetlands and Cypress Creek; and 3) the Corps violated the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ("NEPA"), by failing to take a hard look at the myriad impacts of the project, including secondary and cumulative impacts and potential alternatives, in its Environmental Assessment ("EA"), and by failing to prepare an Environmental Impact Statement ("EIS").  As discussed below, therefore, Plaintiffs seek a remand of the Corps' permit and injunctive relief.

## BACKGROUND

### I.    Statutory And Regulatory Background

#### A.    The Clean Water Act

The CWA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  It prohibits discharging any pollutant – including "dredge spoil," rock, and sand – into waters of the United States, including wetlands, without a permit.  Id. §§ 1311(a), 1362(6).  Section 404 grants the Corps authority to issue permits for the discharge of "dredged or fill material," id. § 1344, but the Corps must comply with two sets of implementing regulations: the Environmental Protection Agency's ("EPA's") "404 Guidelines," see 40 C.F.R. §§ 230.1-230.80, and the Corps' own regulations.  See 33 C.F.R. Parts 320-330.

2

The 404 Guidelines explain that "[f]rom a national perspective, the degradation or destruction of . . . wetlands, is considered to be among the most severe environmental impacts" within the purview of the CWA; "[t]he guiding principle should be that degradation or destruction of [wetlands] may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d). As a result, there should be no discharge into wetlands "unless it can be demonstrated [the] discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities . . . ." Id. § 230.1(c).

The 404 Guidelines establish prohibitions to discharges to wetlands. See id. §§ 230.10, .12. First, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem . . . ." Id. § 230.10(a). "An alternative is practicable" if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Id. § 230.10(a)(1); accord id. § 230.3(q). If an activity is not "water dependent" – if it does not require access to a wetland for its basic purpose, such as a marina – there is a strong presumption there are practicable, less damaging alternatives, and the permit must be denied "unless clearly demonstrated otherwise" by the applicant. Id. § 230.10(a)(3).

Second, the 404 Guidelines prohibit discharges "which will cause or contribute to significant degradation of the waters of the United States." Id. § 230.10(c). In this regard, the Corps' analyses must consider, for example, the collective effects of discharges on "human health or welfare . . . municipal water supplies . . . fish . . . wildlife," wetlands, and the "loss of fish and wildlife habitat or loss of the capacity . . . to assimilate nutrients [or] purify water." Id.

The Corps must make a written determination regarding such effects, including cumulative and secondary effects. E.g. id. § 230.10.12; Subparts B-G.

Third, even if there are no practicable alternatives for a proposed project, the 404 Guidelines still prohibit the discharges "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." Id. § 230.10(d). "[A]ll reasonable reduction in impacts [must] be obtained." Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336, 85,344 (Dec. 24, 1980) ("1980 Notice"). Fourth, discharges are prohibited if they would jeopardize the continued existence of a threatened or endangered species. 40 C.F.R. § 230.10(b)(3).

The Corps must specify whether each of these prohibitions is satisfied. Id. § 230.12. If there is insufficient information to make a reasonable judgment, the Corps must specify that as well. Id. § 230.12(a)(3)(iv).

The second set of governing regulations – the Corps' regulations – provide that "[n]o permit will be granted which involves the alteration of wetlands identified as important" unless the Corps finds, after its "public interest review," that "the benefits . . . outweigh the damage," and the "alteration" is necessary to realize those benefits. 33 C.F.R. § 320.4(a), (b). The Corps must consider all relevant factors and cumulative effects. Id. at § 320.4(a)(1). The regulations provide eight criteria to evaluate the public interest, including the impacts on: "drainage characteristics, [or] sedimentation patterns"; storm and flood water storage; groundwater, "prime natural recharge areas," and "minimum baseflows important to aquatic resources"; and "water purification functions." Id. § 320.4(b)(2).

4

B.    **The Endangered Species Act**

Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). To achieve this purpose, the ESA imposes duties on the Secretary of the Interior, which have been delegated to the Service. 50 C.F.R. § 402.01(b).

The ESA affords protections to species listed as "endangered" or "threatened"("listed species"). 16 U.S.C. §§ 1532(6), (16), (20). For example, section 9 and implementing regulations proscribe the "take" of listed species, id. § 1538(a)(1); see also, 50 C.F.R. §§ 17.21, 17.31, which is defined to include "harass[ing]" and "harm[ing]" a species. 16 U.S.C. § 1532(19). In turn, "harm" may encompass "significant habitat modification." 50 C.F.R. § 17.3.

Section 7 of the ESA mandates that each federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." Id. § 1536(a)(2). Under section 7's implementing regulations, each federal agency must review its actions and determine if they "may affect" a listed species. 50 C.F.R. § 402.14(a). If an action "may affect" a listed species, the agency must engage in "formal consultation" with the FWS, unless the FWS "concur[s]" in writing that the "action is not likely to adversely affect any listed species." Id. at § 402.14(b).

Formal consultation requires a full evaluation of impacts to listed species, including the status of the listed species and "the effects of the action and cumulative effects" on the species. Id. § 402.14(g)(2)-(4). It concludes with the Service's "biological opinion," "detailing how the

agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and whether the Service believes

the action is "likely to jeopardize the continued existence of a listed species," 50 C.F.R. §

402.14(h)(3).  If an action is unlikely to jeopardize a species, but will result in any take of a

species, the Service must issue an "Incidental Take Statement" ("ITS") identifying the

anticipated impact to the species, "reasonable and prudent measures" to minimize such impact,

and mandatory "terms and conditions" to implement such measures.  16 U.S.C. § 1536(b)(4).  If

the action is likely to jeopardize a listed species, the Service must specify "reasonable and

prudent alternatives" to insure jeopardy is not likely to occur.  Id. § 1536(b)(3)(A).

### C.    The National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment."  40 C.F.R. §

1500.1(a).  Its purpose is to "insure that environmental information is available to public officials

and citizens before decisions are made and before actions are taken," and "to help public officials

make decisions that are based on understanding of environmental consequences . . . ."  Id. §

1500.1(b),(c).  As such, meaningful public participation and oversight is "essential" to the NEPA

process, as is facilitating public input.  See, e.g., id. § 1500.1(b).

NEPA has two sets of implementing regulations that govern Corps activities: regulations

promulgated by the Council on Environmental Quality ("CEQ"), id. §§ 1500.1-1518.4, and the

Corps' own regulations, 33 C.F.R. §§ 230.1-230.26.  NEPA and its implementing regulations

require federal agencies to prepare a "detailed statement" – an EIS – regarding all major federal

actions that may significantly affect the environment, 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.3,

in which the agency must analyze possible alternatives to the proposed action, including a no

action alternative, and review the environmental effects of those alternatives, see 42 U.S.C. §

4332; 40 C.F.R. § 6.207(d)(2). In so doing, an agency must consider the direct, indirect, and cumulative environmental impacts of its action and of the alternatives to it. 40 C.F.R. § 1508.8.[1]

NEPA establishes several criteria for determining whether an impact is significant, including impacts on: "public health or safety;" listed species; and areas with unique characteristics, such as park lands, wetlands, wild and scenic rivers, and ecologically critical areas. Id. § 1508.27(b). An action may also be significant if its effects are "likely to be highly controversial," if it "may establish a precedent for future actions," or if it is "related to other actions with . . . cumulatively significant impacts." Id.

An agency uncertain whether to prepare an EIS may prepare an EA to assist in evaluating whether an action may have a significant environmental effect. Id. § 1508.9. The EA must include "discussions of the need for the proposal, of alternatives," and of the direct, indirect, and cumulative environmental impacts with "sufficient evidence and analysis" to support a determination to prepare an EIS or a "finding of no significant impact" ("FONSI"). Id.

## II.    Facts Giving Rise To Plaintiffs' Claims

### A.    Cypress Creek Town Center Site

The CCTC site is approximately 507 acres of undeveloped land in Pasco County, Florida, that is approximately one third, or 155 acres, wetlands, and two thirds, or 337 acres, uplands. EA at 1, AR6636; AR6497 (map). Cypress Creek forms the southern border of the site. AR6495

---

[1] "Direct effects" "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). "Indirect effects" "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Id. § 1508.8(b). The "[c]umulative impact" is the impact "which results from the incremental impact . . . added to other past, present, and reasonably foreseeable future actions" regardless of who undertakes the actions, and "can result from individually minor but collectively significant actions" over time. Id. § 1508.7.

(map); 500-509 (electronic pdf presents clear photos).[2]  The southern portion of the site,

including uplands and wetlands in and around Cypress Creek, is designated a "critical wildlife

linkage," as the site is located between conservation lands and forms a "bottleneck" for wildlife

moving between the lands.  EA at 37, AR6672; 24 (map).

    Wetlands on site form part of a natural "wetland system" "consist[ing] of a network of

freshwater wetlands adjacent to Cypress Creek."  AR6636.  Though previously logged, they

consist primarily of cypress swamps, mixed wetland forests, freshwater marshes, and wet

prairies, with some small ponds.  Id.  The wetlands provide important foraging and roosting

habitat for a number of species.  EA at 34, AR6669.  Wood Storks – listed as endangered under

the ESA – and hundreds of other birds including tricolored herons, little blue herons, and white

ibises – all Florida Species of Special Concern and all protected by the Migratory Bird Treaty

Act, see 50 C.F.R. § 10.13 – have been observed foraging in CCTC wetlands.  FWS191-192,

196.  CCTC wetlands are within the core foraging area of five breeding colonies of Wood Storks,

AR6681, and the nearest colony is only 1.3 miles from the site, Corps Public Notice ("Notice"),

AR3093.  In addition, wetlands, along with uplands, support the critical wildlife linkage running

along Cypress Creek.  AR6672.  As part of an interconnected riparian wetlands system, the

wetlands provide "valuable storage areas for storm and flood waters," and "water purification

functions" among other functions.  AR6636, AR6670.

    CCTC uplands consist of pastureland, wooded lands and expanses of scrubby areas.  See

FWS511-512 (descriptions and photos).  The uplands also provide important wildlife habitat,

---

    [2] Citations to the Corps record begin with the prefix AR, while the FWS record has the
prefix FWS.

particularly along the southern part of the site where the soils are sandy and well drained ("xeric" or dry), and the vegetation scrubby and wooded in places. E.g. FWS511-12. In this area, Gopher Tortoises (state listed as threatened) were abundant until excavated by the developer. E.g. FWS191-92, 195, 201 (map noting 20-25 Gopher Tortoise burrows). Eastern Indigo Snakes ("Indigos"), listed as threatened under the ESA, also use such habitat, especially the Gopher Tortoise burrows, which provide shelter. FWS2586, AR3093. The applicant's agents concluded Indigos "occur on site or have a reasonably high probability of occurring." FWS191. Florida Scrub Jays, federally listed as threatened, also use this habitat type. E.g. FWS2633; 2639.

CCTC uplands, together with wetlands, also provide at least a 300-500 foot wide "high quality buffer" that protects Cypress Creek. E.g. AR3975, AR4602. As such, they provide "sediment removal and erosion control, excess nutrient and metal removal, moderation of storm water runoff, moderation of water temperature, maintenance of habitat diversity, wildlife species distribution and diversity, and reduction of human impact." AR6650. Indeed, the Corps considered the protection of these uplands "of paramount concern" given that they protect Cypress Creek and given the "proximity and scale" of CCTC. Id.

Cypress Creek itself is a natural and scenic waterbody. See FWS500-510 (clear photographs). It is a principal tributary to the Hillsborough River, which is "the major source of drinking water for the City of Tampa." EA at 41, AR6676. The Creek has been designated an "Outstanding Florida Water" ("OFW") by the State of Florida, Fla. Admin. Code Ann. r. 62-302.700(9)(i)(14)(c), meaning it is "worthy of special protection because of [its] natural attributes." Fla. Stat. § 403.061(27). Indeed, most remaining OFWs exist only in protected

9

conservation lands, see http://www.dep.state.fl.us/water/wqssp/ofw.htm, and Florida's policy is

to provide them "the highest protection."  Fla. Admin. Code Ann. r. 62-302.700(1).

    **B.**    **The Cypress Creek Town Center Development**

Described as a "regional mall and supporting commercial enterprises, including retail

businesses, financial institutions, hotels, restaurants, cinemas, offices and multi-family residential

housing," EA at 2, AR6637, CCTC will have over 2,000,000 square feet ("SF") of retail and

commercial space, including department stores, big box stores, and a cinema, 700 hotel rooms,

over 600 residences, almost half a million SF of office space, and over 14,000 parking spaces.

AR3964-65, 3968-69, 3972-73.  Nearly all single story construction, EA at 12, AR6647; AR

3974, CCTC maximizes the wetlands and wildlife habitat that must be destroyed or impaired.

The massive size of CCTC ensures extensive impacts to the sensitive environmental

features on and around the site.  Over fifty acres of wetlands – and almost ten acres of surface

waters – will be destroyed outright, nearly half to provide the 14,000 + parking spaces.  EA at 11,

AR6646.  Runoff from CCTC will be sent to storm water ponds on the banks of Cypress Creek.

AR3976.  The upland buffers protecting Cypress Creek will be reduced to a mere fifty feet, while

the buffers protecting the remaining wetlands will average only 25 feet, and be zero in some

places.  AR6650; AR3975, AR4667 (retaining walls abutting wetlands).  The "critical wildlife

linkage" will be reduced from approximately 300 feet to the residual 50 feet of buffers remaining

around Cypress Creek, with the Corps relying on the storm water ponds to substitute for habitat

destroyed.  EA at 37, AR6672; AR6450.  Existing habitat for listed species in uplands and

wetlands will be destroyed.  E.g. EA at 46, AR6681 (wood storks); 191,195 (Indigos, which

share habitat with Gopher Tortoise; Gopher Tortoise habitat will be developed).  And, with so

little room for treatment of runoff, CCTC will utilize the remaining natural wetlands to receive storm water pond discharge.  EA at 50, AR6685.

### C.    Pasco County And The Cypress Creek Town Center Location

Pasco County and the surrounding area is experiencing "unprecedented" growth and "dramatic increases."  See, e.g., AR3964.  Commercial development in particular is extensive. Developments near CCTC include: 1) "Wiregrass," a 5,000 acre commercial and residential development with 750,000 SF of retail space, just two miles from CCTC, AR6423, AR6433, AR4389-91; 2) "The Grove," a 120 acre mall with 800,000 SF of retail space just four miles from CCTC, AR4398, AR6422, AR6427; 3) "Cypress Creek Development," a 400 acre commercial development under a mile from CCTC, AR6425, AR5542; and 4) "King Ranch," a 300+ acre commercial and residential development immediately across Cypress Creek from CCTC, EA at 50, AR6685.  See, e.g. AR4378-79.

Pasco County roadways are expanding equally rapidly, in and around CCTC.  E.g., AR3405, AR5711, AR5943.  SR 56 will be widened to four and six lanes, with up to three turning lanes in either direction just two miles from CCTC.  AR5920 ($1 billion in improvements); AR5745.  State Road 54 (County Road 54) forms the northwestern border of the site and will be extended across the southern half of the site, a bridge that will span Cypress Creek, and connect to roads to the south, AR6684, and widened.  See AR4396.  It is the "last link" creating a new north-south roadway to provide a "parallel facility" to I-75.  AR02333.

Pasco County's growth will cause a rapid increase in demand for water in "a region where demand is expected to exceed" traditional sources within the next twenty years.  Development Order, AR2328.  Tampa, which again relies heavily upon the Hillsborough River (which is fed

11

by Cypress Creek) for its drinking water, AR6676, is already "caught between the demands of water customers and the need to keep enough fresh water flowing to support wildlife," <u>Is Tampa's Proposal A Risky One For River?</u>, St. Petersburg Times, AR3496.  Overpumping has already lowered Cypress Creek's flows and dried its wetlands.  AR6223-26.

### D.    Federally Listed Species Likely To Be Adversely Impacted By The Cypress Creek Town Center And The Cumulative Impacts Of Growth In The Area.

The Wood Stork is a "large, long-legged, white wading bird with an unfeathered gray head and a stout dark bill" that "frequent[s] freshwater and brackish wetlands" to feed and "usually nests in cypress and mangrove swamps."  Wood Stork Listing Rule, 49 Fed. Reg. 7332, 7332.  The Wood Stork's primary cause of decline is the "loss of suitable feeding habitat."  <u>Id.</u> at 7333 (citation omitted); FWS2541.  For the Wood Stork to recover, "[a]t a minimum, . . . currently occupied . . . foraging habitat must be protected from further loss or degradation."  Recovery Plan, FWS2549.

The Indigo – the longest snake in the United States – is a lustrous black, docile, non-venomous snake that now exists in only in Georgia and Florida.  FWS 2584.  The Indigo ranges over large areas and needs a mosaic of habitat types, though it is "closely associated with the gopher tortoise . . . the burrows of which provide shelter."  FWS2585-86, FWS2588-89.

According to the FWS, the Indigo has suffered "dramatic population declines" and "<u>any additional threats to its survival could cause local extirpations.</u>"  FWS2584, FWS2589 (emphasis added).  Today, "habitat loss and fragmentation by residential and commercial expansion have become much more significant threats to the eastern indigo snake" than any other threat.  FWS2584.  In addition, "human population growth will increase the risk of direct mortality . . . from property owners, domestic animals, and highway mortality."  FWS2589.

12

The Florida Scrub Jays ("Jay") uses the same "xeric" (dry) habitat types as Indigos and Gopher Tortoises, such that management efforts for one must consider impacts to others. FWS2633, FWS2639. The principal threat to the Jay is "loss, fragmentation, and degradation of scrub habitats . . . due primarily to urbanization, agriculture, and fire suppression." FWS2630.

As discussed below, although the record reflects that the construction and operation of the massive development may have adverse impacts on all of these species, the Corps and the CCTC did not pursue formal consultation under the ESA. As to the Jay, the Corps did not even request or initiate consultation prior to issuance of the permit.

### E.    Events Giving Rise To Plaintiffs' Claims.

On October 31, 2005, the Corps issued a Public Notice regarding the application of "Sierra Properties, C/O Mr. John Sierra, Jr." ("applicant") to fill approximately 54 acres of wetlands and 10 acres of surface waters. Notice, AR3091-3092. Governmental entities, residents, and conservation organizations commented and raised grave concerns, E.g. AR3329, AR3136-41; AR4295-96; AR3504.

Sierra Club explained that the project would have serious environmental effects, and that the Corps should at least require alternatives to avoid or minimize wetlands impacts, such as a reduction in the size of CCTC, particularly given that CCTC is not a water dependent project; Sierra Club requested a minimum 250 foot buffer to protect Cypress Creek; it warned of reductions in water recharge and increased water demands; it contested the need for CCTC, given other nearby commercial development; it raised grave concerns regarding wildlife impacts; and, like many other commenters, it requested that an EIS be prepared. AR3345-3370.

Sierra Club explained that the Corps's past mitigation for wetlands losses authorized under section 404 rarely, if ever, succeeded and that the Corps failed even to monitor mitigation to assure success. AR3359-3362. Sierra Club pointed to an investigative report by the St. Petersburg Times that found Florida alone had lost over 84,000 acres of wetlands from the late 1980s through 2003. AR3360. The Corps' own former permitting officers with decades of experience were quoted stating the Corps' mitigation was "a huge scam," a "fraud," and "a make-believe program." AR3360, 61. The public noted a report by the National Academy of Sciences ("NAS"), for example, that is discussed below, and that confirms that mitigation is often delayed or never finished, that there is no routine tracking of compliance, and in many instances compliance has been poor at best. AR3375.

During its review of the application, the Corps initially focused on alternatives that would avoid and/or minimize impacts to wetlands, and leave larger protective buffers around the remaining wetlands and Cypress Creek (and preserve the critical wildlife linkage). E.g., AR6648-50. These included reducing CCTC's size and reducing the footprint of parking lots by building a second multi-story garage. E.g., AR6646. Ultimately, however, the Corps deferred to the applicant's assertion that reducing CCTC's size was impracticable, because either option would supposedly reduce the profit margin – the rate of return – of CCTC to below 8.0%, which the applicant contended was the minimum required to secure long term financing. EA at 14, AR6649. As the Corps explained:

> Although just a 5% downsizing . . . would reduce the project footprint by 28 acres, the applicant stated that a Rate of Return [ROR] below 8.0% deems the alternative impracticable. The applicant states a Rate of Return of at least 8.0% is required to secure financing.

EA at 11, AR6649 (emphasis added).

14

Yet the record demonstrates that even the Corps was not convinced it was impracticable to reduce CCTC's size.  For example, in the Corps' last formal written request for information on the topic in October 2006, the Corps stated that it "will not accept an 8.0% minimum ROR to argue against practicability . . . and considers all alternatives viable from a cost perspective that result in a ROR equal to or exceeding 7.8%."  AR5385-86 (emphasis added); see also 4467-68.[3]

In fact, just one week before issuing the permit, the Corps met with the applicant and again urged that CCTC be downsized for environmental reasons, dismissing the applicant's assertions it needed an 8.0% rate of return.  See Corps Meeting Minutes, AR4023-25.  Noting that "Sierra Club [was] likely to sue," the Corps was "nervous about creation in [federal wetlands]"; it requested the applicant "back[] up everything 300' from creek + preserve - in agreement w/ Pasco Co's wildlife corridor plan"; and it inquired "where [the applicant] can min[imize]" impacts to wetlands as a "vast expanse of upland[s] [are] avail[able]."  AR6450, 6451.  When the applicant asserted that it needed an 8.0% rate of return, the Corps responded that a "7.7 [rate of return] is not too bad," and warned that a citizen who opposed CCTC "ha[d] hired [an] economist" to independently review the application.  AR6452 (emphasis added).

---

[3]  As the Corps concluded, the applicant's stated need for an 8.0% rate of return was "conflicting" because, for example, it had also stated that the office, residential, and hotel components of CCTC were "not critical for financial viability" even though eliminating them would reduce the rate of return to 7.7 or 7.8 %.  AR4467-68, AR4501, AR3966.  Moreover, when the Corps met with the applicant and pressed the issue, the applicant confirmed these statements and that "financing could be secured with a ROR of 7.8 %."  AR5385; AR4501. And, when the applicant "summarized" rates of return from other projects to justify an 8.0% required rate of return, it arbitrarily "adjusted" – increased – the rates by one half of a percent.  AR4599-60.  It was at this point that the Corps determined that it would not accept an 8.0% return as a minimum rate of return.  AR5385-86; see also AR5398 (applicant states that it cannot get bank to state an 8.0% rate of return was necessary for financing).

However, the Corps did not await that economic analysis, or retain its own economist. Instead, it issued the permit even though, as the permitting officer admitted repeatedly during the review process, it did not understand the applicant's financial analyses and needed the assistance of an economist: "[T]here are a couple issues, inherent to our analysis, that hinge on economic analyses that are beyond my training as a biologist," and thus "I am requesting assistance from . . . an economist . . . ." AR3787 (emphasis added). Yet Corps superiors refused the request and, as shown below, the applicant exploited the confusion. Id.; see also e.g., AR4327-28 (requesting applicant's help, explaining "I'm still struggling with interpreting the financial feasibility studies . . . [t]o address my confusion about this in general.").

The Corps also initially sought to avoid impacts to wetlands and buffers by reducing the number of parking spaces. E.g., EA at 11, AR6646. Yet, here again, the Corps ultimately capitulated to the applicant's assertions that reducing parking was impracticable. For example, despite the fact that the Corps required the applicant "to compare the proposed parking with that of nearby malls," and the "results revealed that the project proposed more parking than any existing mall," the Corps never required that parking be reduced. EA at 12, AR6647.

Because the Corps permitted massive wetlands destruction, it also purported to require mitigation – principally conservation and restoration in an off site location – that would offset that loss. E.g., AR6651-63. The Service and Corps also based their ESA analyses on the mitigation proposed. E.g., EA at 46, AR6681. However, the Corps did not respond to comments on the failure of its past mitigation efforts, let alone detail what steps it was taking (such as better monitoring) to ensure that past problems were not duplicated here.

16

On May 15, 2007, the Corps granted the CCTC permit with virtually no modifications beyond minor changes to the mitigation plan. EA at 2, AR6637. On July 17, 2007, the Sierra Club formally provided the Corps with sixty days notice of its intent to sue, as it was statutorily required to do to press claims against the agency under the ESA. See Exhibit 1. The notice raised many of the same issues Sierra Club raised in its earlier comments, and it encouraged the Corps to revoke or suspend the permit, as the Corps is authorized to do under its regulations, see 33 C.F.R. § 325.7, or at least to contact the Sierra Club to resolve the issue. The Corps did not even respond. On September 29, 2007, the Sierra Club's sixty day notice period expired, and immediately thereafter, on October 1, 2007, Plaintiffs filed suit.[4]

---

[4] Plaintiffs in this case include three non-profit environmental membership organizations, Sierra Club, Clean Water Action and the Gulf Restoration Network, and two individual plaintiffs, Chris Loy and Richard Sommerville. As detailed in their declarations in support of standing, the missions of both Sierra Club and Clean Water Action are to protect and improve environmental resources. Sierra Club ("SC") Decl. ¶ 3 (Exhibit 7); Clean Water Action ("CW") Decl. at ¶ 3 (Exhibit 8). Sierra Club has over three thousand members in the greater Tampa metropolitan area, with 560 members in Pasco County alone. SC Decl. at ¶ 2; Clean Water Action has approximately 2,500 members that reside in and around Cypress Creek, and over 22,000 members in the Tampa Bay area generally. CW Decl. ¶ 2. Sierra Club's and Clean Water Action's members enjoy recreating in the Cypress Creek basin, including canoeing on Cypress Creek past the CCTC site and biking and walking through the conservation lands in the Cypress Creek basin nearby the CCTC site, and they drive past CCTC. E.g. SC Decl. ¶ 7; CW Decl. ¶ 4; Colson Decl. ¶ 5 (Exhibit 9); Loy Decl. ¶¶ 8-10 (Exhibit 10); Armentano Decl. ¶¶ 4-8 (Exhibit 11). They do so because they enjoy the beauty of the area, the peaceful surroundings, and observing and looking for the flora and fauna in the natural environment in which they live, including the Wood Stork, the Indigo, and the Jay. E.g. Colson Decl. ¶ 7 Loy Decl. ¶ 10; Armentano Decl. ¶¶ 7-8. These and other interests will be injured because of the environmental harm that CCTC will cause, including the destruction of Wood Stork and Indigo habitat, the degradation of Cypress Creek and its wetlands, and aesthetic harm to the beauty of the area. Colson Decl. ¶ 17, 21-24; Loy Decl. ¶¶ 11-13; Armentano Decl. ¶ 9.

17

<u>**ARGUMENT**</u>

**I.    <u>Standard Of Review</u>**

This action is brought under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and

the Administrative Procedure Act ("APA").  5 U.S.C. § 706.  Like APA challenges to the

implementation of the CWA and NEPA, courts in this circuit review the implementation of the

ESA in accordance with APA standards of review.  See <u>Cabinet Mountains Wilderness v.</u>

<u>Peterson</u>, 685 F.2d 678, 685 (D.C. Cir. 1982) (citation omitted).  Under those standards, the

Court must "set aside agency action, findings, and conclusions found to be" "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(A); <u>see also id.</u> § 706(2)(D).  The Court must immerse itself in the administrative record

and conduct a "thorough, probing, in-depth review" of the facts, <u>Citizens to Preserve Overton</u>

<u>Park v. Volpe</u>, 401 U.S. 402, 415 (1971), and determine if the agency considered the "'relevant

factors'," "examine[d] the relevant data and articulate[d] a satisfactory explanation . . . including

a 'rational connection between the facts found and the choice made.'"  <u>Motor Vehicle Mfrs.</u>

<u>Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (citations omitted).

**II.    <u>The Corps And The FWS Violated The Endangered Species Act By Failing To</u>**
**<u>Engage In Formal Consultation.</u>**

Under section 7 of the ESA, the Corps must engage in formal consultation with the

Service if its action "may affect a listed species."  50 C.F.R. § 402.14(a).  Section 7 is the "heart

of the [ESA]" as its procedural and substantive requirements are central to the ESA's protections

of listed species.  <u>See Fla. Key Deer v. Stickney</u>, 864 F. Supp. 1222, 1241 (S.D. Fla.1994).  Only

if an agency's action "is not likely to adversely affect" a listed species may formal consultation –

and the FWS's preparation of a Biological Opinion – be avoided.  <u>Id.</u> § 402.14(b).

In this case, the Corps' determination that CCTC "may affect" but was "not likely to adversely affect" the Wood Stork and the Indigo, and the FWS's concurrence, were arbitrary, capricious, and contrary to the evidence in the record.  Moreover, the Corps and the Service failed even to consider the relevant factors with regard to the Indigo.  To the contrary, the record indicates these species will be adversely affected and formal consultation was required.  See 50 C.F.R. § 402.14(a).  In such circumstances - where listed species will be adversely impacted and the agency failed to formally consult - courts have repeatedly enjoined the agency action pending compliance with the ESA.  See, e.g., Citizens for Better Forestry v. U.S. Dept. Agriculture, 481 F.Supp. 2d 1059 (N.D. Cal. 2007); Fla. Key Deer v. Stickney, 864 F. Supp. 1222, 1241 (S.D. Fla.1994).

### A.       CCTC Will Adversely Affect Utilized Wood Stork Foraging Habitat.

The Corps expressly based its conclusion that CCTC is not likely to adversely affect the Wood Stork on two principal factors: 1) Wood Storks were supposedly never observed on site; and 2) the proposed mitigation would offset the loss of habitat to the site.  See EA at 46, AR6681 ("[t]hirty-seven days of surveys over 4 years (2002-2005) did not yield any sightings of wood storks on the project area," and construction of storm water ponds would offset habitat loss).  Similarly, the FWS's analyses reviewed whether impacted wetlands "are likely to be used by foraging wood storks," and whether proposed mitigation "adequate[ly] compensate[s]" for the lost wetlands.  Concurrence, AR6364.  In this regard, the FWS repeatedly inquired into whether wood storks had been observed foraging on site and, if so, in what wetlands, e.g., AR487, and it specifically noted in its determination that "[w]ood storks have not been observed nesting or foraging on site" over "a total of 37 days," though it cautioned that the observation of Wood

19

Storks is not controlling as the birds could be "easily missed."  Concurrence, AR6364.

Ultimately the FWS determined that the "majority of wetland habitat onsite appears to be of

marginal foraging value because of existing land-use patterns" – i.e., past logging and grazing –

and therefore the proposed mitigation would offset wetlands loss.  AR6365.

 However, the record shows Wood Storks <u>have</u> been observed foraging on site, and the

site contains quality habitat for wading birds.  The mitigation plan attached to the permit notes

Wood Storks were observed "foraging or loafing" on site.  AR6560.  And a wildlife survey by

the applicant's consultants (Biological Research Associates) ("BRA")) records Wood Storks

foraging on site with hundreds of other wading birds.  FWS191-92, 196.  Indeed, the Florida

Department of Environmental Protection noted that although the "observations were made in the

dry season [when] . . . the wetland areas were depleted and dry, <u>numerous birds were counted,</u>

<u>[i]ncluding wood storks</u> . . . ."  FWS204-05 (emphasis added).

 The agencies' inaccurate assessments resulted in large part from the fact that the

applicant's consultant specifically told the FWS that no Wood Storks were ever observed  on

site.  For example, in "response to [the FWS's] 9 November 2006 email request for

clarification," AR5561, BRA baldly – and erroneously – stated that "<u>[n]o wood storks have ever</u>

<u>been observed on the project site</u>," AR5562 (emphasis added); <u>see also</u> AR3989.  Later, when

FWS was concerned that litoral shelves in storm water ponds may be inadequate to mitigate for

lost wood stork foraging habitat, BRA incorrectly stated:

> We have done at least 4 formal wildlife surveys on the property over 7 years.  We have
> also been on site many many times for other purposes . . . .   <u>Wood storks have never been</u>
> <u>observed foraging on the property</u>. . . .   <u>I hope this puts this issue to rest and we can look</u>
> <u>forward to your letter of concurrence</u>.

E-mail from J. Bailey, BRA, to L. Smith, FWS (Feb. 28, 2007), AR5917 (emphases added). Two weeks later, relying on the erroneous information from the applicant's consultants, FWS concurred there would be no adverse impact to Wood Storks, expressly (and wrongly) observing no Wood Storks had ever been observed foraging on site.  Concurrence, AR6364.[5]

In addition, the FWS failed to explain how it calculated the required amount of mitigation needed to offset lost wood stork habitat – which the FWS relied upon in determining there would be no adverse impacts to the Wood Stork – especially given the high rate of failure of Corps mitigation projects for past 404 permits.  See supra at 37.

**B.    The Corps And The Service Failed To Evaluate The Impacts To The Indigo Of Habitat Loss, Fragmentation, And Road Mortality.**

With respect to the Indigo, the agencies' no adverse effect determination was likewise arbitrary and capricious because they failed to consider adverse impacts to Indigos from the loss and fragmentation of Indigo habitat.  In fact, in contrast to the Wood Stork, the agencies never even sought to evaluate the amount or quality of Indigo habitat that would be lost, much less CCTC's (cumulatively with other development) fragmentation of remaining Indigo habitat, or the increased risk of road mortality once CCTC was operating.

To the contrary, as the EA and the Concurrence reflect, the agencies limited their consideration solely to the direct injury or death of an Indigo during the actual construction of the

---

[5]  In Sierra Club v. Flowers the court was similarly tasked with reviewing a 404 permit which relied on BRA's biological assessment.  423 F.Supp. 2d 1273, 1371 (S.D. Fla. 2006), supplemented by Sierra Club v. Strock, 495 F.Supp.2d 1188 (S.D. Fla. 2007).  In concluding formal consultation was required, the court severely criticized BRA's work, describing BRA's assessment of wood stork impacts "patently absurd."  Id. at 1372.  In this case, BRA's submissions were misleading regarding observations of wood storks on site.  E.g. AR491-96; AR3997; AR4326; FWS485-87.  BRA's description of usage by other wading birds was similarly inconsistent.  Compare AR3996 ("low numbers"), with 196 (hundreds observed).

CCTC development.  Specifically, the agencies concluded there would be no adverse impact

because "applicant has agreed to follow the Eastern Indigo Snake Protection Measures <u>during</u>

<u>project construction</u>, which [FWS] believe[s] should adequately address adverse effects to the

snake": The agencies did not even require that a survey be performed for the Indigo.

Concurrence, AR6367 (emphasis added); <u>see</u> also AR6682.

But the construction guidelines do not address the impact to Indigos from the loss and

fragmentation of Indigo habitat, AR6629, which, again, is the leading cause of the species'

decline.  FWS2584.  Yet if CCTC is destroying Indigo <u>habitat</u> it adversely affects the species,

even if steps are taken to reduce the risks of killing an Indigo during construction.  And, to be

sure, there is Indigo habitat on the CCTC site, as the Corps itself explained that Gopher Tortoises

were present on site and "<u>Gopher tortoise burrows are considered suitable habitat and are often</u>

<u>used . . . [by the] eastern indigo snake.</u>"  AR3093 (emphasis added).  Indigos in fact depend upon

Gopher Tortoise burrows for shelter.  FWS2586.  BRA identified between 20 and 25 Gopher

Tortoise burrows, <u>see</u> FWS201; equating the Indigo's "Preferred Habitat" to "Gopher Tortoise

habitat," BRA concluded the Indigo was "considered to either occur on site or have a reasonably

high probability of occurring," FWS191-92 (identifying such species in Table 12-2).  BRA's

"Qualitative Description[s]" of the CCTC site also conclude the Indigo is "reasonably expected

to be found" on site.  AR6103; <u>see also</u> <u>e.g.</u> AR6105 ("rare . . . snake species").  And a state plan

for acquiring conservation lands reports records of Indigos in Cypress Creek basin.  FWS2454.

However, neither agency even considered the impact of habitat loss on the Indigo's

survival and recovery, <u>see</u> EA at 47, AR6682; Concurrence, FWS6367, despite the FWS's own

conclusion that "habitat loss and fragmentation by residential and commercial expansion" are the

22

Indigo's primary threat, FWS2584, and the public's comments that the measures adopted do nothing to protect Indigo habitat, e.g., AR3377.  The same agencies made the same mistake in Sierra Club v. Flowers, 423 F.Supp. 2d 1273, 1374-75 (S.D. Fla. 2006), in which the agencies avoided formal consultation over loss of Wood Stork habitat based on the assumption that the birds would simply go somewhere else.  Id.  The court, however, concluded that destroying a species' habitat alone is a sufficient basis to find adverse effects that trigger formal consultation. Id.  (rejecting FWS conclusion that "the Wood Storks simply can relocate to other areas").

Another significant threat is "human population growth [that] will increase the risk of direct mortality of the eastern indigo snake from property owners, domestic animals, and highway mortality."  FWS2589.  But again, neither agency even addressed the impacts that CCTC and other development would have on the Indigo as they introduce thousands of cars, expand roads, and increase traffic.  See infra at 11.[6]

## III.   The Corps Violated The Clean Water Act.

The Corps violated the CWA by issuing the permit when there were "practicable alternative[s] to the proposed discharge which would have less adverse impact on the aquatic ecosystem."  40 C.F.R. § 230.10(a).  At the very least, the Corps failed to require the applicant to rebut the heavy presumption that there are such alternatives in a situation involving a non-water dependent project by "clearly demonstrat[ing]" that no such alternative exists to avoid or minimize wetlands loss.  Id. § 230.10(a)(3); AR6664.  "[T]he burden is on the Applicant . . . ,

---

[6]  The agencies did no better with regard to the Florida Scrub Jay.  Neither agency explained its conclusion that there is no Jay habitat on site, although Jays share habitat with the Gopher Tortoise and Indigo: indeed, they overlap to the extent it is "critical" that management decisions for one species consider the other species as well.  E.g., FWS2639.

with <u>independent verification</u> by the COE, <u>to provide detailed, clear and convincing information</u>

<u>proving impracticability</u>."  <u>Utahns for Better Transp. v. U.S. Dep't of Transp.</u>, 305 F.3d 1152,

1186 (10th Cir. 2002), <u>modified in part</u> 319 F.3d 1207 (10th Cir. 2003) (emphasis added).  <u>See</u>

<u>also</u> <u>Northwest Bypass Group v. U.S. Army Corps of Engineers</u>, 490 F.Supp.2d 184, 191

(D.N.H. 2007) (applicant must overcome "very strong presumption" with "detailed, clear, and

convincing information proving impracticality, which the Corps independently verifies").

     The Corps also violated the CWA by issuing a permit without assuring that the permit

would not "cause or contribute to significant degradation" of wetlands and Cypress Creek.  40

C.F.R. § 230.10(c).  Yet a "§ 404(b) permit cannot be issued if the proposed discharge will result

in significant degradation of the aquatic ecosystem or if there is insufficient information to make

a reasonable judgment as to whether the discharge will result in significant degradation."  <u>Utahns</u>

<u>for Better Tranp.</u>, 305 F.3d at 1191-92 (citation omitted); <u>see</u> <u>also</u> 40 C.F.R. §§ 230.10(c),

230.12(a)(3)(ii), (iv).  Moreover, the Corps's determination that issuance of the permit complied

with these requirements was based on a deeply flawed mitigation plan, was arbitrary and

capricious, and lacked a reasoned explanation.  <u>E.g.</u>, <u>Envtl. Def. v. Army Corps of Eng.</u>, 515 F.

Supp. 2d 69, 79-85 (D.D.C. 2007) (remanding Corps decision where Corps "manipulated" data

to make inadequate mitigation appear sufficient).

### A.    The Corps Failed To Require That Practicable Alternatives To Avoid Or Minimize The Destruction Of Wetlands Be Undertaken.

     The most obvious alternative for avoiding or minimizing impacts to wetlands (other than

simply denying the permit) is reducing the size of the CCTC development.  As the Corps itself

explained, a mere 5% reduction would reduce CCTC by nearly 30 acres – almost half of the

acreage of wetlands to be filled.  EA at 14, AR6649.  A second alternative is reducing surface

parking acreage by building an additional parking garage to stack parking vertically, and a third is reducing the 14,000 + parking spaces.  EA at 11, AR6646.  Nonetheless, despite the heavy presumption that practicable alternatives exist, the Corps did not require the first two alternatives because the applicant insisted reducing CCTC would reduce its rate of return below 8.0%, and it could not get financing without an 8.0% return.  Id.  The Corps's action is unlawful in this regard because: 1) the Corps never required that the applicant "clearly demonstrate" and "prov[e] impracticability" by "provid[ing] detailed, clear and convincing information," Utahns for Better Transp., 305 F.3d at 1163, 1186; and 2) the record shows alternatives that would lessen wetlands impacts are practicable.  The Corps's rejection of the third alternative – just reducing the number of parking spaces – was unlawful because, again, the Corps did not require clear proof of impracticability, and the record shows it was practicable.

### 1.    The Record Demonstrates Reducing The Size Of CCTC Was A Practicable Alternative.

As a preliminary issue, the Corps applied the wrong legal standing for judging practicability.  Under the 404 Guidelines, "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2); see also id. § 230.3(q) (defining "practicable").  In this case, the Corps determined "cost was the limiting factor." EA at 13, AR6648.  The plain meaning of the term "cost" requires the Corps to examine whether the cost – the expense – of reducing the size of CCTC was practicable.  See id. §§ 230.10(a)(2), 230.3(q); see also American Heritage College Dictionary, 232, 4th ed. (defining "cost" as the "amount paid or required in payment;" the "expenditure of something").

25

The preamble to the 404 Guidelines confirms that the inquiry into "cost" turns on whether the alternative is "reasonable in terms of the overall scope/cost of the proposed project": an alternative is not practicable if it is "unreasonably expensive." 1980 Notice, 45 Fed. Reg. at 85,339, 43 (emphasis added). The 1980 Notice specifically explained that it substituted the term "cost" for "economic," which was initially proposed, precisely because "[t]he term economic might be construed to include consideration of the applicant's financial standing, or investment, or market share." Id. at 85,339.[7]

Despite this direction, the Corps failed to obtain and judge the reasonableness of the additional cost of reducing the size of CCTC, or of building a second garage, as the law required. Instead, at the applicant's urging, the Corps engaged in speculation about whether the applicant, if it reduced the size of the town center, for example, would be able to generate enough profit, or "rate of return," such that the applicant would be able to attract unidentified investors to provide financing in the future. E.g., EA at 13-15, AR6648-50; see also AR4598-601; AR5408-5411. Had the Corps actually engaged in the required analysis, it would have been compelled to find at least one practicable alternative exists because reducing the size of the project would not have led to additional costs, but rather a savings as costs were reduced. Compare AR4045 ($330,232,820 in costs, approved "Base Plan"), with AR5477-78 ($320,063,420 in costs, 5 % reduction).

---

[7] In fact, the relevant Corps' Regulatory Guidance Letter ("RGL") confirms the plain meaning of the rule and explains that "[t]he determination of what constitutes an unreasonable expense should generally consider whether the projected cost is substantially greater than the costs normally associated with the particular type of project." RGL 93-02, Guidance on Flexibility of the 404(b)(1) Guidelines and Mitigation Banking at 6, Exhibit 2 (emphasis added). And in this very case, the permitting officers' superior specifically directed the line officers to apply this very cost analysis and obtain "an estimate [of cost], then . . . review that estimate based on the total cost of the project and make a judgment on that being a 'reasonable' cost.'" AR3787.

Because the Corps applied the wrong legal standard, the Corps' alternatives analysis inappropriately delved into the supposed financial viability of various CCTC alternatives. Two principal factors drove its assessment: 1) the supposed minimum required profit – "rate of return" – necessary to attract future investors; and 2) whether various alternatives could achieve that rate of return. E.g., EA at 13-15, AR6648-50. Even if the Corps had applied the correct legal standard, which it did not, the permit still should not have been issued because the record shows that reducing CCTC's size, for example, is in fact a practicable alternative – at the very least, insufficient information was submitted to "clearly demonstrate [] otherwise." 40 C.F.R. §§ 230.10(a), 230.12(a)(3)(iv); see also Utahns for Better Transp., 305 F.3d at 1186. Indeed, as discussed above, even the Corps was skeptical the town center could not be reduced, infra at 14-15, and hence should at least have conducted further analysis.

First, the applicant never clearly demonstrated that a minimum rate of 8.0 % was required, and hence that the complex could not have been scaled back to preserve wetlands. After the Corps concluded in October 2006 that it would "not accept an 8.0% minimum ROR" and that it "considers all alternatives viable from a cost perspective that result in a ROR equal to or exceeding 7.8%," AR5385-85, the applicant submitted a report published by the Real Estate Research Corporation ("RERC") ("RERC Report") to establish its need for a minimum 8.0% rate of return. RERC Report, AR5417-5475. The applicant (and ultimately the Corps) relied on the RERC Report to demonstrate that the "minimum ROR required for the Cypress Creek Town Center project is 8.0%." AR5409.

However, the RERC Report – which lists various rates of return for different types of real estate projects, e.g., AR5469 – does not list minimum rates of return. To the contrary, the RERC

27

Report lists, among other information, <u>average</u> rates of return for such projects.  This fact is expressly stated in RERC's "Report Methodology" section, in which RERC explains that it generates the report by surveying investors throughout the country, and "results are collected, <u>averaged</u>, and then displaced in [RERC's] quarterly report."  RERC Report, AR5473 (emphasis added).  Thus, the rates of return reported by RERC are not the minimums necessary for a project to be financially viable, but rather <u>midpoints</u> among numerous rates of return.  It follows that lower viable rates exist than the reported averages.  Hence, the applicant's own document proved it did <u>not</u> need an 8.0% rate of return.

Second, in submitting the RERC Report, the applicant misled the Corps by directing the Corps to comparing the RERC reported "pre-tax yield" RORs to the applicant's calculated rates of return for the various CCTC alternatives.  <u>See</u> AR5409 (repeatedly directing the Corps to review RERC reported pre-tax yield RORs).  This is because – as the applicant itself acknowledged in an earlier submission – the applicant's financial calculations of its RORs for various alternatives were calculations of what is known as the initial "capitalization rate," also known as the "going-in capitalization rate."  <u>See</u> AR4599 ("[t]he Rate of Return ['ROR'] is the Capitalization Rate ('Cap Rate') for Commercial Retail Properties").  By calculating one type of rate of return in its analyses – the going in cap rate – and then urging the Corps to review an entirely different type of rate of return in the RERC report – the pre tax yield rate – the applicant skewed the Corps' analyses.[8]

---

[8]  Pre-tax yield rates calculate the rate of return of a real estate venture over a given holding period, and thus they will include appreciation in the value of the property and increases in rent over time.  As the RERC report explains, the "pre-tax yield" rate is "in effect a time-weighted average return on equity and, as used here, is synonymous with the term 'yield.'"  AR5473.  In contrast, cap rates are essentially financial snap shots in time that analyze, in a given

If one compares the applicant's calculated going in cap rates for various CCTC alternatives to the RERC Report's going in cap rates, the RERC Report demonstrates that numerous CCTC alternatives are practicable according to the applicant's own calculations. The RERC Report indicates the going in cap rate for Tampa is 7.7% for a Regional Mall and 7.6% for a Power Center. RERC Report, AR 5469. And, as the Corps found in the EA, CCTC could be reduced by 5% – saving 28 acres or half the acreage of wetlands lost – and still generate a going in cap rate of 7.73% for Phase I of CCTC, and 7.8% for Phase II of CCTC, which exceeds the RERC Report's going in cap rates. Compare EA at 14, 6649, with RERC Report, AR5469; see also AR5477-78; AR2625-26 ("Reduction of Office Plan" with 7.9% and 7.8% rates of return); AR2631-32. Thus, at the very least, CCTC could be reduced 5%, thus reducing impacts to wetlands, and still generate the rate of return reported by the RERC Report.

In addition, the Corps also erred because the applicant's financial analyses simply do not provide the "detailed, clear and convincing information," Utahns for Better Transp., 305 F.3d at 1186, necessary to overcome the strong presumption of practicability. See also 40 C.F.R. §§ 230.10(a), 230.12(a)(3)(iv). The calculations are dependent upon the values – the various costs and incomes – input by the applicant, and yet supporting information for critical "costs" and "incomes" used in the calculations is lacking. Nor did the Corps seek to verify such information, as required under the CWA and NEPA. See Northwest Bypass Group, 490 F.Supp.2d at 191; Alliance For Legal Action v. U.S. Army Corps of Engineers, 314 F.Supp.2d 534, 543 (M.D.N.C.

---

moment, the expenditures of a project versus the income. As the RERC report explains in defining the "Going-In (Overall) Capitalization Rate," it is "the first year NOI [net operating income] . . . divided by present value (or purchase price)." Id. Calculations of "going in cap rates" therefore reflect different sources of income than calculations of "pre tax yield" rates, and the two are not comparable.

2004).  Without information to substantiate the values inserted – which include, for example, the

costs of land – the calculations do not "clearly demonstrate" CCTC could not be reduced and still

achieve an 8.0% rate of return.[9]

### 2. The Corps Violated The Clean Water Act By Failing To Enforce The Practicable Alternative Of Reducing The Number Of Parking Spaces.

As discussed above, a third practicable alternative that would avoid or minimize wetlands

loss is simply reducing the number of parking spaces.  According to the Corps, it "heavily

scrutinized" this alternative because nearly <u>half</u> of the wetlands loss was for parking.  EA at 11,

AR6646.  Nonetheless, the Corps violated the CWA by failing to require the applicant to "clearly

demonstrate" parking could not be reduced.  Moreover, because parking could in fact be reduced,

the Corps acted unlawfully by failing to require the reduction.

CCTC will have 14,212 spaces for 2,631,000 square feet ("SF"), if one excludes hotels

and residences for ease of comparison to other malls.  AR3973 (based on figures in first row of

table).  This comes to a ratio of 5.4 spaces per 1000 SF.  <u>Cf.</u> <u>id.</u> (calculating the ratio for CCTC

components individually).

Correspondence from "Regional Mall Developers" submitted in support of the permit

includes a letter from one such developer stating that "[t]he entire center should park 4.5 spaces

per 1,000 square feet."  AR4044, 4046.  Meanwhile, a second provided the "latest thinking in

---

[9]  Indeed, the greatest single "cost" in the applicant's calculations - the value of the CCTC land itself, which is listed as $72,837,500 overall - isn't really a cost at all, as the applicant, through its agents, purchased the property in 1988 for less than five million dollars.  <u>See</u> AR2996; http://images.pascogov.com/deed.aspx?bp=16890314 Special Warranty Deed (posted on Pasco County government website), Exhibit 3.  The Court may take notice of matters of public record.  <u>E.g.</u> <u>Humane Soc. of U.S. v. Johanns</u>, – F.Supp.2d –, 2007 WL 1201610, *4 (D.D.C. 2007).

large scale retail development" and explained that "[p]arking [is] typically a ratio of 4.5 to 5 spaces per 1,000 sq ft." AR4044, AR4051, 50. Thus, with 5.4 spaces/1000 SF, CCTC has nearly <u>twenty percent</u> more parking than the applicant's professional colleagues stated was necessary. <u>Compare</u> AR3973, <u>with</u> AR4047, AR4050. CCTC's parking also exceeds the 5.0/1000 SF ratio requested by potential tenants. <u>See</u> AR6647.

    As discussed above, the Corps also asked the applicant to "compare the proposed parking" of CCTC to other malls. <u>Id.</u> In response, the applicant surveyed five other malls, <u>see</u> AR3973, and as the Corps itself explained, "the results [of the survey] revealed that the project proposed <u>more parking than any existing mall in the evaluation</u>," EA 12, AR6647 (emphasis added). CCTC also had the second highest parking ratio. AR3973. Yet the Corps dismissed these findings because the "applicant state[d] that regional malls, such as that proposed, have a much higher component of restaurant uses than older malls," <u>id.</u>, although this statement, even if true, does not "clearly demonstrate" that reduced parking is impracticable. AR6647.

*    *    *

    In sum, the Corps failed to apply the required legal presumption that this non-water dependant project could not avoid significant wetlands loss. Rather, it applied the wrong legal standard for cost; it failed to inquire into and verify matters central to its financial analyses; it failed to require the applicant to "clearly demonstrate" with "detailed, clear and convincing information" that reducing CCTC, or reducing parking, were truly impracticable; and, it issued the permit despite evidence demonstrating that practicable alternatives for avoiding and minimizing wetlands impacts existed. 40 C.F.R. § 230.10(a), (c); 230.12; <u>Utahns for Better Transp.</u>, 305 F.3d at 1186-87 (Corps violated CWA by failing to verify cost estimates). If the

31

strong presumption in favor of preserving the nation's wetlands is given more than lip service, this decision cannot be deemed compatible with the CWA or the Record.

**B.    The Corps's Determination That The Project Would Not Cause Or Contribute To The Substantial Degradation Of Waters Of The United States Is Arbitrary and Capricious.**

CWA regulations prohibit the issuance of a permit if it will "cause or contribute to significant degradation" of waters and wetlands, 40 C.F.R § 230.10(c), and they require the Corps to examine individual, cumulative, and secondary impacts to fish, wildlife, wetlands, nutrient and pollutant assimilation, drinking water supplies, and aesthetics; see also id. § 230.11; Subparts B-G.  "Significant" in this context means anything that is "more than 'trivial.'"  1980 Notice, 45 Fed. Reg. at 85,343.  Moreover, a permit cannot be issued "if there is insufficient information to make a reasonable judgment as to . . . significant degradation." Utahns For Better Transp., 305 F.3d at 1191 (citing 40 C.F.R. § 230.12(a)(3)(ii), (iv)).

In this case the Corps failed to meaningfully analyze, among other things, the impacts to Cypress Creek – and its wetlands – of eliminating their protective buffers.  The Corps itself stated that the "upland buffer adjacent to Cypress Creek is of paramount concern given the quality of the resource . . . and the proximity and scale" of CCTC.  EA at 15, AR6650 (emphasis added).  The Corps was concerned about "the elimination of high quality buffer to Cypress Creek" – a "native, mature buffer adjacent to Cypress Creek [that] provides a high [protective] function" – "due to the construction of storm ponds that would reduce the existing buffer by 300 - 500 feet."  AR3975, AR4602 (emphasis added).  Indeed, on the eve of issuing the CCTC

32

permit, the Corps repeated that the "buffer zone [was] most imp[ortant] even though [it] includes uplands." AR6452.[10]

The Sierra Club and others included information in their comments from scientific reports indicating that "'a buffer width of 300 feet was determined to be the distance necessary to protect viably functioning wetland ecosystem.'" AR3351 (citations omitted). Indeed, buffers of more than 6000 feet may be needed depending on the wildlife at issue. Id. And, with respect to water quality, "buffer widths should never be less that 75 feet . . . as this is the smallest width necessary to prevent erosion and sedimentation." Id. Pasco County Growth Management Department requested 75-100 foot buffers around Class I wetlands. AR2092.

Yet despite these concerns, and without responding to the information provided, the Corps permitted the CCTC development with a minimum 50 foot buffer around Cypress Creek, and an average 25 foot buffer around the remaining wetlands on site. EA at 15, AR6650. As the Corps concluded, "[g]iven that the project footprint could not be further reduced, . . . the Corps finds that maintenance of the 50-foot buffer [with planted storm water ponds] provide[s] the best protection possible for the creek." Id. However, the required analysis is not just whether impacts have been reduced but rather whether the destruction of the protective buffers will in fact cause or contribute to the significant degradation of Cypress Creek, the remaining wetlands, and the habitat therein. 40 C.F.R. §§ 230.10(c), .11, .12. And there is simply insufficient information

_____

[10] As the Corps explained, natural buffers provide "important aquatic resource functions including: sediment removal and erosion control, excess nutrient and metal removal, moderation of storm water runoff, moderation of water temperature, maintenance of habitat diversity, wildlife species distribution and diversity, and reduction of human impact." AR6650; see also, e.g., AR3975. They also support Gopher Tortoise and Indigo habitat, FWS201 (map), and the "critical wildlife linkage," AR6672.

and analysis in the Record to support a determination that reducing existing buffers from 500 feet to 50 feet for Cypress Creek, and 25 feet for wetlands, would not contribute to the significant degradation of those waters.

Indeed, the Corps never analyzed, for example, the size of buffers on other sites, the efficacy of buffers of varying widths, the species that rely on the CCTC buffers and their habitat needs, or the levels of various functions the 50 foot and 25 foot buffers would provide. Instead, the Corps simply asserted that the storm water ponds – which will <u>introduce</u> polluted runoff into the area and fundamentally change the nature of the habitat in the area – will provide the same functions as the buffers they are destroying. AR6650. Moreover, the Corps never even addresses the issue in its discussion of water quality, AR6676-77, and, without analyzing the species that use the buffer, including the wildlife corridor, and their habitat requirements, beyond a mention of wading birds, the Corps concludes the buffers, as impacted, will "preserve the integrity" of the linkage. AR6672. In effect, the Corps allowed the applicant to establish buffers that serve its economic needs, without regard to potential degradation.

There were also other flaws in the Corps' significant degradation analyses. For example, the Corps acknowledged that runoff poses a "great concern" "[g]iven that . . . the project drains into Cypress Creek . . . a tributary to the Hillsborough River (the major source of drinking water for [Tampa])." EA at 41, AR6676. And remaining wetlands will be used to "treat" runoff from storm water ponds because allegedly CCTC cannot be reduced and still make an 8.0% profit. AR6685. Yet the Corps never clearly determined the type and volume of contaminants CCTC was likely to generate, nor did it meaningfully analyze the efficacy of the specific treatment measures proposed by the applicant at removing such contaminants and what the impact of the

34

remaining contaminants would be on receiving waters.  Precisely because of the possibility of

degradation, the applicant is required to test for various contaminants in Cypress Creek.[11]

    In short, the Corps' determination that CCTC's construction and operation would not

cause or contribute to significant degradation of Cypress Creek is unsubstantiated in the Record.

Indeed, it runs counter to the Record and the Corps' own initial judgment that larger buffers are

necessary to provide highly important protective functions.  See State Farm, 463 U.S. at 43.

C.    **The Corps' "Mitigation" Program On Which The Corps Is Relying Has A Proven Track Record Of Failing.**

    Mitigation to offset environmental impacts figured prominently in the Corps' and the

FWS's determinations that the permit would not adversely impact endangered species, other

wildlife, wetlands functions, or otherwise cause or contribute to the significant degradation of

waters of the United States.  E.g., FWS Concurrence, AR6364 (analyzing whether "mitigation

adequately compensates for [the] impacts."); EA at 35-37, 46-48, AR6670-72, 6681-83; AR6676

(City of Tampa concludes no significant impact to water supply if mitigation performed).  Yet

the proposed mitigation plan simply repeats mistakes the Corps has made in its other permits –

mistakes pinpointed in public comments and in public GAO and NAS reports – and which the

Corps itself acknowledged two years earlier.  The Corps' and Service's conclusions that

proposed mitigation would offset impacts is therefore arbitrary and capricious, and its reliance on

---

[11] The applicant is proposing to build a system of storm water detention ponds to receive the first 1.5 inches of runoff, which the applicant asserts exceeds state requirements, with a system to treat floating debris, grease, and dissolved solids, after which runoff is sent to the remaining wetlands which, on the southern part of the site, drain into Cypress Creek. AR6677, 6685-86.  In addition, the applicant proposes to implement Low Impact Development ("LID") features – primarily surface water infiltration trenches (or "swales") in parking lot islands, and porous paving, AR01611 – that allow stormwater to infiltrate directly into the underground water table without passing through the stormwater management system.  AR01611; AR01608.

that mitigation to comply with the CWA mandates requires remand.  E.g., Envtl. Def., 515 F. Supp. 2d at 88.

To begin with, the Corps failed to explain in the EA how this project would be different from past mitigation efforts that were unsuccessful.  Yet it was incumbent upon the Corps to do so given the public's concern stressed in comments – and the objective independent criticism leveled by GAO and NAS – concerning the Corps' poor track record with mitigation.

The National Academy of Sciences reported in 2001 that "[t]he goal of no net loss of wetlands is not being met for wetland functions by the mitigation program." NAS, Compensating for Wetland Losses Under the Clean Water Act at 2 (2001); see also id. at 103, 109.  Exhibit 4. According to the NAS's report, for example, in "southeast Florida [a] study of 40 wetland creation and restoration projects found that only about half of the required 430 hectacres of wetlands had been constructed."  Id. at 101 (emphasis added).  Meanwhile, another study conducted by the Florida Department of Environmental Regulation found that of 63 permits issued, only 6% percent achieved permit compliance, and only 27% were achieving various tests for ecological functionality and viability.  Id. at 117.[12]

Following the NAS report, the GAO concluded in 2005 that "[] the Corps' priority has been and continues to be processing permit applications" and it "has consistently neglected to ensure that the mitigation it has required . . . has been completed." GAO, GAO-05-898, Wetlands Protection: Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure That

---

[12]  The NAS and GAO reports are public documents submitted to the Corps for comment, or which the Corps otherwise participated in generating, and hence were clearly "before" the agency when it made the permit decision at issue.  See Fund for Animals v. Williams, 391 F. Supp. 2d 191, 198-99 (D.D.C. 2005) (requiring record supplementation with GAO report).  In fact, the Corps published RGL 06-3, Exhibit 6, supra at 37, in response to these reports.

Compensatory Mitigation Is Occurring, at 26 (2005) (emphasis added); id. at 26-27 (as GAO

previously reported in 1988 and 1993, the Corps "place[s] little emphasis on its compliance

efforts, including compensatory mitigation," and has "limited oversight of . . . mitigation").

Exhibit 5.  Indeed, in addition to statements by Corps veterans that its mitigation is a "scam" and

a "fraud," AR3360, 3361, the Corps itself cast doubt on the efficacy of its mitigation in its final

meeting with the applicant.  AR6452 (asking "how [do you] think creat[ed] wetlands will

funct[ion] like nat[ural] wetlands.").

        The Corps attempted to respond to the GAO and NAS reports by publishing an RGL in

2006 specifying that "special conditions . . . must specify the length of monitoring required," and

that the "monitoring period must be sufficient to demonstrate that the compensatory mitigation

project has met performance standards, but not less than five years" RGL, U.S. Army Corps of

Engrs. RGL (Aug 3, 2006) No. 06-03 at 3, 2 (emphasis added) Exhibit 6.  But not only did the

Corps fail to adopt the new minimum monitoring guidelines in the RGL in this case, it also failed

to explain why they were unnecessary.  To be sure, the Corps initially demanded "that the

herbaceous mitigation areas will be monitored for five (5) years" and "the forested mitigation

area . . . for ten (10) years."  AR5969 (requiring amendments to section 5(b) of the mitigation

plan) (emphasis added).  Yet neither the permit ultimately issued, nor the mitigation plan,

mandate that mitigation "will be monitored" for five, much less ten, years.  Id.[13]

_____

        [13]  To the contrary, section 7, titled "Monitoring Plan," provides that the "Permittee shall
monitor the mitigation area until the criteria set forth in the Mitigation Success Criteria are met"
and provides the "area may be released from monitoring . . . and reporting requirements . . . at
any time during the monitoring period."  AR6593.  And section 5(b), which provides the
"Minimum Success Criteria," and which the Corps had demanded set five and ten year
monitoring periods, now states "[w]etlands . . . will be released from monitoring . . . when the
following criteria are met continuously for a period of at least one year," and that the "area may

In short, despite public comments noting great concerns about the Corps' past failed mitigation requirements, and NAS and GAO reports verifying these concerns, the Corps once again relied heavily upon mitigation to offset environmental impacts without even acknowledging these concerns or demonstrating why its mitigation here would work where previous efforts had failed. The Corps even failed to follow its own procedures designed to address its past failures (which it had initially insisted on) with no explanation. This is the essence of arbitrary and capricious action.

**IV.    The Corps Violated NEPA By Failing To Take A Hard Look At The Environmental Impacts Of Constructing And Operating CCTC And By Failing To Prepare An EIS.**

**A.    An EIS Should Have Been Prepared**

Despite the massive size of the CCTC project, the destruction of dwindling wetlands, the loss of protective buffers on the banks of an Outstanding Florida Water that feeds Tampa's drinking water supply, the impacts to a "critical wildlife linkage" running across the site, and the destruction of habitat for listed species, the Corps refused to prepare an EIS before granting the permit. Instead, the Corps proceeded solely on a cursory EA; in so doing it violated NEPA.

CCTC triggers several NEPA significance factors, any one of which warrants preparation of an EIS. See Nat'l Parks & Conservation Ass'n v. Babbitt, ("NPCA"), 241 F.3d 723, 731 (9th Cir. 2001); Pub. Serv. Co. v. Andrus, 825 F. Supp. 1483, 1495 (D. Idaho 1993); 40 C.F.R. §

---

be released from monitoring . . . at any time . . . ." AR6586 (emphases added); accord AR6590. The only potentially relevant provision is section 4 (c), (e) of the permit which provides for semiannual monitoring of "no less than three years" and annually thereafter until released, AR4055, which again can be within a year of whenever success criteria were reported to have been met. AR6586, AR6593.

1508.27. And the Corps is required to perform an EIS "[i]f any significant environmental impact might result" from the action. Grand Canyon Trust v. FAA, 290 F.3d 339, 340 (D.C. Cir. 2002).

As the Record makes evident, CCTC has "[u]nique characteristics" such as "wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). Again, the site abuts and drains into Cypress Creek, a scenic waterbody, FWS500-510 (photos), which Florida designated an "Outstanding Florida Water" and afforded "[s]pecial [p]rotection," precisely because of "[its] natural attributes." See EA 15, AR6650; Fla. Admin. Code Ann. n. 62-302.700(9)(i)(14)(c); Fla. Stat. § 403.061(27). Approximately one third of the site is wetlands. EA at 1, AR6636. And across the southern portion of the site, along Cypress Creek, runs a government-designated "critical wildlife linkage" that forms a "bottleneck" connecting large conservation lands in the area. EA 37, AR6672. Together, these lands provide habitat for listed species. E.g., EA at 46, AR6681; AR3093.

Yet one third of these wetlands will be destroyed and protective buffers around remaining wetlands reduced to an average of 25 feet, and around Cypress Creek to fifty feet, with storm water ponds. EA1, 15, 36, AR6636, AR6650, AR6672. In so doing, CCTC will reduce the "critical wildlife linkage" from approximately 300 feet to fifty feet of buffers with the storm water ponds. AR6672; AR6450. Moreover, runoff from the site will "drain[] into Cypress Creek" – which the Corps expressed "great concern[s]" about – as well as into remaining wetlands. EA41, AR 6676. And CCTC's Low Impact Development ("LID") features will shunt untreated runoff directly into the groundwater table that supports Cypress Creek and the wetlands. EA42-43, AR6677-78; AR4112. As discussed further below, CCTC and other development will create significant new water demands, yet current levels of pumping are

39

already lowering Cypress Creek's water levels and drying its wetlands.  AR6223-26.  Such myriad impacts warrant preparation of an EIS.  E.g., Envtl. Prot. Info. Center v. Blackwell, 389 F. Supp. 2d 1174, 1196-97 (N.D. Cal. 2004) (NEPA review inadequate when site could "play an important role" in habitat connectivity).

Second, as explained above, CCTC "may adversely affect an endangered or threatened species," 40 C.F.R. § 1508.27(b)(9), by destroying Wood Stork and Indigo habitat: the primary threat to each species' survival.  See FWS2541, FWS2584, FWS2630.  In addition, CCTC may adversely affect the Indigo by increasing fragmentation of remaining Indigo habitat through road construction and increased traffic, and the increased likelihood of potential road mortality.

Largely because the Corps failed to take a hard look at such potential impacts, "possible effects . . . are highly uncertain."  40 C.F.R. 1508.27(b)(5).  There is little or no information on the species, or the impacts to such species, that rely on the wildlife corridor, nor on the large conservation lands the corridor connects, if the corridor is functionally severed.  Similarly, as discussed further below, the EA does not resolve concerns about impacts to water.  E.g., AR6675-76.  Uncertainty in such situations requires that an EIS be performed.  NPCA, 241 F.3d at 732.  Finally, the effects on the quality of the human environment are likely to be highly controversial, because evidence in the Record points to serious, unresolved impacts.  40 C.F.R. § 1508.27(b)(4); see also Anderson v. Evans, 371 F.3d 475, 489 (9th Cir. 2004); NPCA, 241 F.3d at 736 (action controversial where "'substantial questions'" exist about "'significant degradation'" of environment and "'size, nature, or effect'" of action (citations omitted));  Humane Soc'y of the U.S. v. Dep't of Commerce, 432 F. Supp .2d 4, 19-21 (D.D.C. 2006).  In addition, as discussed

40

infra, the issuance of the CCTC permit violates the ESA and the CWA, which in itself warrants preparation of an EIS. See 40 C.F.R. § 1508.27(b)(10).

**B.    The Corps Prepared A Legally Insufficient EA.**

Even if the Corps were not required to prepare an EIS, the EA is inadequate because the Corps failed to meaningfully analyze the environmental impacts of CCTC and its alternatives, and to provide information and reasoning sufficient to support a finding of no significant impact ("FONSI"). See 40 C.F.R. §1508.9. As this Court explained in Sierra Club v. Watkins, an EA serves several important purposes, including "explain[ing] how the agency reached [its] conclusion," aiding decision making, and, perhaps most importantly, "disclosure of information to the decision maker and the public." 808 F.Supp 852, 859, 870 (D.D.C. 1991). In reviewing an EA and FONSI, a court must determine whether the agency (a) "'accurately identified the relevant environmental concern'"; (b) has "'taken a "hard look" at the problem'"; (c) has made "'a convincing case for its finding'"; and (d) has "'sufficiently reduce[d] the impact'" if the impact would warrant an EIS. Town of Cave Creek v. FAA, 325 F.3d 320, 327 (D.C. Cir. 2003).

First, the Corps never provided a meaningful analysis of the environmental impacts of the alternatives. The no action alternative – intended to serve as a benchmark to compare environmental impacts of actions – addressed only economic issues. See Grand Canyon Trust., 290 F.3d at 347; AR6640. Similarly, analysis of the environmental impacts of alternatives is lacking. There is no "hard look" of the environmental benefits of the reduction scenarios, such as how much uplands buffer – or wetlands, or wood stork or indigo habitat – could be saved, or whether the applicant could avoid using the natural wetlands on site to "treat" runoff, with various reductions or alternatives. See EA at 10-15, AR6645-6650.

41

Just as important, the Corps failed to take a hard look at the impacts of the project it approved. Again, there was no meaningful discussion of impacts to the "critical wildlife linkage," such as the species using it and the types and amount of habitat they require. AR6672. Neither agency discussed impacts to the Indigo from loss of habitat, fragmentation, or road mortality, nor did they look hard enough to realize Wood Storks were on site. Nor was there meaningful analyses of the level of function and protection that 50 and 25 foot buffers would provide, and what would flow from this level of protection. AR6650. Although the Corps acknowledged a great concern about degradation of Cypress Creek, it never fully analyzed the proposed treatment systems' ability to remove the pollutants from runoff, nor what impacts would result if they were discharged into Cypress Creek. AR6676-77.

Similarly, the applicant's cumulative impact analysis was severely limited. AR6686, AR6207. For example, there was no analysis of the cumulative impacts of development and road expansion on Indigos. Natural Resources Defense Counsel v. Hodel, 865 F.2d 288, 297 (D.C. Cir. 1988) (agency failed to consider cumulative effects on species of other development). There was also no meaningful analysis of the cumulative impact of development on increased water demand and water withdrawal. To be sure, the report identified that overpumping of the aquifer had dried out Cypress Creek's wetlands, slowed the flow of Cypress Creek, and caused subsidence and "treefall" and that agencies were working to resolve the issue, AR06223-26, see also AR3802-04, AR3496-98, but there was no meaningful consideration of the new developments' water demand, the water resources available, and the consequences if it could not be met. In short, the EA is patently inadequate and the permit must be remanded for a review of environmental impacts of the proposed project and its alternatives.

42

## V.    RELIEF

Plaintiffs seek remand of the Corps' permit and the FWS's concurrence letter for consultation on impacts to listed species from the construction and operation of CCTC, including means to prevent, mitigate, and/or offset such impacts.  5 U.S.C. § 706.  Plaintiffs seek remand to ensure impacts to wetlands and waters are avoided, minimized, and adequately mitigated; to ensure remaining wetlands and Cypress Creek are not significantly degraded by the construction and operation of CCTC; and, to complete a meaningful assessment of the environmental impacts of CCTC in an EIS that complies with the ESA, CWA, and NEPA.  Id.

Plaintiffs also seek injunctive relief a) precluding any further activity on site until the Corps and the Service comply with the requirements of the ESA, CWA, and NEPA; and b) compelling the agencies to comply with such laws.  With regard to the ESA, the Supreme Court has explained that "Congress had foreclosed the exercise of the usual discretion possessed by a court of equity," Weinberger v. Romero-Barcelo, 465 U.S. 305, 313 (1982), and that in "the 'balancing of equities and hardships' involving endangered species, "the order of priorities" that Congress established favors endangered species.  Tenn. Valley Auth. v. Hill, 437 U.S. 153, 193, 194 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities") (citations omitted).  Indeed, in TVA v. Hill, the Supreme Court "emphatically" stated that, under the ESA, they lacked "the power to engage in such a weighing process" between "the loss of a sum certain-even $100 million [the Tellico Dam project]-against a congressionally declared 'incalculable' value [the snail darter]."  Id. at 187-188.  See also Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir.1987); Fla. Key Deer, 864 F. Supp. at 1241 ("Absent 'unusual

circumstances,' an injunction is an appropriate remedy for violation of the ESA.") (citing Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985)).

Similarly, injunctive relief is also warranted with regard to the CWA and NEPA claims. As the Supreme Court has explained, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987). Thus, in cases such as this one, "when an action is being undertaken in violation of NEPA, there is a presumption" of irreparable harm justifying a court order precluding "continuation of the action until the agency brings itself into compliance." Realty Income Trust v. Eckerd, 564 F.2d 447, 456 (D.C. Cir. 1977); see also Se. Ala. Conservation Council v. U.S. Army Corps of Eng'rs, 472 F.3d 1097, 1100 (9th Cir. 2006) (denying stay of injunction pending appeal of CWA claims because "[o]ngoing harm to the environment constitutes irreparable harm warranting an injunction"); United States v. Metro. Dist. Comm'n, 930 F.2d 132 (1st Cir. 1991) (Breyer, C.J.) (affirming conditional injunction barring new sewer hookups in Boston under CWA); Sierra Club v. Marsh, 872F. 2d 497, 504 (1st Cir. 1989) (Breyer, J.); Sierra Club v. Watkins, 808 F.Supp. at 852 (enjoining shipment of nuclear fuel rods for NEPA violation).

Injunctive relief is especially appropriate in this case because the applicant began land clearing activities after receipt of the challenged permit and has continued such activities, including the removal and filling of wetlands, after Plaintiffs sent their statutorily required sixty days notice of intent to challenge the permit as a violation of the ESA. Sierra Club Decl. ¶ 19, Ex. 7; Colson Decl. ¶¶ 13-18, Ex. 9. Intervenors have continued their work on site unabated since Plaintiffs filed their complaint, and have refused to refrain from doing so in order to afford the Court and opportunity to resolve the parties' motion of summary judgment.

44

As discussed above, CCTC's construction and operation are, and will, adversely impact federally listed species by destroying and fragmenting their habitat and creating the increased risk of road mortality. The project will adversely affect wildlife through impacts to the critical wildlife corridor that such species rely upon. And it will cause avoidable wetlands destruction and significant degradation of remaining wetlands and Cypress Creek itself. These impacts were not adequately identified, discussed, and/or mitigated for, and this failure is in significant part the result of the applicant's own efforts to obscure the issues during the permitting process.

Many of the environmental impacts are irreparable upon completion of construction and operation of the mall, such as the construction and filling of storm water ponds in Indigo habitat that also supports the wildlife linkage and provides protective buffers for Cypress Creek. Such impacts therefore also cause irreparable harm to the Plaintiffs' interests in enjoying and recreating in and along Cypress Creek, its wetlands and conservation lands, and their interests in observing listed species. The Corps should be required to reevaluate its decision to issue the permit, as the Corps has reserved the right to do in the permit, AR6487-89, and in its regulations. 33 C.F.R. § 325.7. During this time the Corps should be ordered to suspend the permit and all work pursuant to it on the CCTC site, and the Intervening Defendants should be enjoined from continuing work on the site, and should be required to stabilize the site to prevent any further environmental harm, while the Corps performs the analyses required by the ESA, CWA and NEPA, consistent with the Court's order. 5 U.S.C. §§ 702, 706; 16 U.S.C. § 1540(g). E.g. Envtl. Def., 515F. Supp. 2d.69, 88 (D.D.C. 2007); see also Sierra Club v. Marsh, 816 F.2d at 1384.

Respectfully submitted,


/s/ Joshua Stebbins
Joshua Stebbins
D.C. Bar No. 468542


/s/ Howard Crystal
Howard M. Crystal
D.C. Bar No. 446189


/s/ Eric Glitzenstein
Eric R. Glitzenstein
D.C. Bar No. 358287

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
jstebbins@meyerglitz.com
hcrystal@meyerglitz.com

Attorneys for Plaintiffs


Date: January 16, 2008

46

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

SIERRA CLUB, et al., Plaintiffs      )
                                    )
      Plaintiffs,           )
                                    )
      v.                   )      Civ. No. 1:07-cv-01756 (RCL)
                                    )
LT. GEN. ROBERT L. VAN ANTWERP, et al.,  )
                                    )
      Defendants.          )
                                    )
      and               )
                                    )
SIERRA PROPERTIES, et al.,     )
                                    )
      Intervening Defendants    )

_____)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7.1(h), plaintiffs submit the following statement of material facts as to which there is no genuine issue.

1. The Cypress Creek Town Center ("CCTC") site is approximately 507 acres of undeveloped land in Pasco County, Florida, that is approximately one third, or 155 acres, wetlands, and two thirds, or 337 acres, uplands. EA at 1, AR6636; AR6497 (map).

2. Cypress Creek forms the southern border of the site. AR6495 (map); FW500-509 (electronic pdf presents clear photos).

3. The southern portion of the site, including uplands and wetlands in and around Cypress Creek, is designated a "critical wildlife linkage," as the site is located between conservation lands and forms a "bottleneck" for wildlife moving between the lands. AR6672; FWS24 (map).

4.    Wetlands on Cypress Creek site form part of a natural "wetland system" "consist[ing] of a network of freshwater wetlands adjacent to Cypress Creek."  EA at 1, AR6636.

5.    Though previously logged, the wetlands consist primarily of cypress swamps, mixed wetland forests, freshwater marshes, and wet prairies, with some small ponds.  Id.

6.    The wetlands provide important foraging and roosting habitat for a number of species. AR6669.

7.    Wood Storks and hundreds of other birds including tricolored herons, little blue herons, and white ibises, which are all Florida Species of Special Concern and all protected by the Migratory Bird Treaty Act, have been observed foraging in CCTC wetlands. FWS191-192, FWS196.

8.    CCTC wetlands are within the core foraging area of five breeding colonies of Wood Storks, EA at 46, AR6681, and the nearest colony is only 1.3 miles from the site, Corps Public Notice ("Notice"), AR3093.

9.    Wetlands, along with uplands, support the critical wildlife linkage running along Cypress Creek.  EA at 37, AR6672.

10.    As part of an interconnected riparian wetlands system, the wetlands provide "valuable storage areas for storm and flood waters," and "water purification functions" among other functions.  EA at 1, 35, AR6636, 6670.

11.    CCTC uplands consist of pastureland, wooded lands and expanses of scrubby areas.  See FWS511-512 (descriptions and photos).

12.    The uplands also provide important wildlife habitat, particularly along the southern part of the site where the soils are sandy and well drained ("xeric" or dry), and the vegetation

2

scrubby and wooded in places.  FWS511-12.

13.    In this area, Gopher Tortoises (state listed as threatened) were abundant until excavated

by the developer.  FWS191-92, 195, 201 (map noting 20-25 Gopher Tortoise burrows).

14.    Eastern Indigo Snakes ("Indigos") also use such habitat, especially the Gopher Tortoise

burrows, which provide shelter.  FWS2586, AR3093.

15.    The applicant's agents concluded Indigos "occur on site or have a reasonably high

probability of occurring."  FWS191.

16.    Florida Scrub Jays, federally listed as threatened, also use this habitat type.  FWS2633;

FWS2639.

17.    CCTC uplands, together with wetlands, also provide at least a 300-500 foot wide "high

quality buffer" that protects Cypress Creek, as the Corps itself concluded.  AR3975,

AR4602.

18.    CCTC uplands, together with wetlands provide "sediment removal and erosion control,

excess nutrient and metal removal, moderation of storm water runoff, moderation of

water temperature, maintenance of habitat diversity, wildlife species distribution and

diversity, and reduction of human impact."  AR6650.

19.    The Corps considered the protection of the uplands "of paramount concern" given that

they protect Cypress Creek and given "proximity and scale" of CCTC.  Id.

20.    Cypress Creek itself is a natural and scenic waterbody.  See FWS500-510.

21.    Cypress Creek is a principal tributary to the Hillsborough River, which is "the major

source of drinking water for the City of Tampa."  AR6676.

22.    The Creek has been designated an "Outstanding Florida Water" ("OFW") by the State of

3

Florida, Fla. Admin. Code Ann. r. 62-302.700(9)(i)(14)(c), meaning it is "worthy of special protection because of [its] natural attributes." Fla. Stat. § 403.061(27).

23.    Most remaining OFWs exist only in protected conservation lands, see http://www.dep.state.fl.us/water/wqssp/ofw.htm, and Florida's policy is to provide them "the highest protection." Fla. Admin. Code Ann. r. 62-302.700(1).

24.    CCTC is described as a "regional mall and supporting commercial enterprises, including retail businesses, financial institutions, hotels, restaurants, cinemas, offices and multi-family residential housing," AR6637, and will have over 2,000,000 square feet ("SF") of retail and commercial space, including department stores, big box stores, and a cinema, 700 hotel rooms, over 600 residences, almost a half million SF of office space, and over 14,000 parking spaces. AR3964-65, 3968-69, 3972-73.

25.    CCTC is nearly all single story construction, AR6647; AR 3974, and it therefore maximizes the wetlands and wildlife habitat that must be destroyed or impaired.

26.    The massive size of CCTC ensures extensive impacts to the sensitive environmental features on and around the site.

27.    Over fifty acres of wetlands - and almost ten acres of surface waters - will be destroyed outright, nearly half to provide more than 14,000 parking spaces. AR6646.

28.    Runoff from CCTC will be sent to storm water ponds are that are right on Cypress Creek's banks. AR3976.

29.    The upland buffers protecting Cypress Creek will be reduced to a mere fifty feet, while the buffers protecting the remaining wetlands will average only 25 feet, and be zero in some places. EA at 15, AR6650; AR3975, AR4667.

4

30.  The "critical wildlife linkage" will be reduced from approximately 300 feet to the residual 50 feet of buffers remaining around Cypress Creek, with the Corps relying on the storm water ponds to substitute for habitat destroyed.  AR6672; AR6450.

31.  Existing habitat for listed species in uplands and wetlands will be destroyed.  EA at 46, AR6681 (wood storks).

32.  Gopher Tortoise habitat and burrows will be destroyed and Indigo habitat will be destroyed when Gopher Tortoise habitat and burrows are destroyed.  FWS191,195.

32.  CCTC will utilize remaining natural wetlands to receive storm water pond discharge.  EA at 50, AR6685.

33.  Pasco County and the surrounding area is experiencing "unprecedented" growth and "dramatic increases."  AR3964.

34.  Developments near CCTC include: 1) "Wiregrass," a 5,000 acre commercial and residential development with 750,000 SF of retail space, two miles from CCTC, AR6423, AR6433, AR4389-91; 2) "The Grove," a 120 acre mall with 800,000 SF of retail space four miles from CCTC, AR4398, AR6422, AR6427; 3) "Cypress Creek Development," a 400 acre commercial development under a mile from CCTC, AR6425, AR5542; and 4) "King Ranch," a more than 300 acre commercial and residential development immediately across Cypress Creek from CCTC, EA at 50, AR6685.  AR4378-79.

35.  Pasco County roadways are expanding rapidly in and around CCTC.  AR3405, AR5711, AR5943.

36.  SR 56 will be widened to four and six lanes, with up to three turning lanes in either direction just two miles from CCTC.  AR5920; AR 5745.

5

37.   State Road 54 (County Road 54) forms the northwestern border of the site and will be extended across the southern half of the site, a bridge that will span Cypress Creek, and connect to roads to the south, AR6684, and widened.  AR4396.

38.   Pasco County's growth will cause an increase in demand for water in an area that already has stretched its drinking water supply.  AR3496, AR06223-26.

39.   Tampa is having difficulty meeting demands for water without causing adverse environmental impacts.  AR3496, AR06223-26.

40.   Overpumping for water has already lowered Cypress Creek's flows and dried its wetlands.  AR6223-26.

41.   The Wood Stork is a "large, long-legged, white wading bird with an unfeathered gray head and a stout dark bill" that "frequent[s] freshwater and brackish wetlands" to feed and "usually nests in cypress and mangrove swamps."  Wood Stork Listing Rule, 49 Fed. Reg. 7332, 7332.

42.   The Wood Stork's primary cause of decline is the "loss of suitable feeding habitat."  Id. at 7333 (citation omitted); FWS2541.

43.   For the Wood Stork to recover, "[a]t a minimum, . . . currently occupied . . . foraging habitat must be protected from further loss or degradation."  Recovery Plan, FWS2549.

44.   The Indigo is the longest snake in the United States and is a lustrous black, docile, non-venomous snake that now exists in only two states, Georgia and Florida.  FWS2584.

45.   The Indigo ranges over large areas and needs a mosaic of habitat types, though it is "closely associated with the gopher tortoise . . . the burrows of which provide shelter." FWS2585-86, 2588, 2589.

6

46.    According to the FWS, the Indigo has suffered "dramatic population declines" and "any additional threats to its survival could cause local extirpations."  FWS2584, 2589.

47.    Today "habitat loss and fragmentation by residential and commercial expansion have become much more significant threats to the eastern indigo snake" than any other threat.  FWS2584.

48.    In addition, "human population growth will increase the risk of direct mortality of the eastern indigo snake from property owners, domestic animals, and highway mortality."  FWS2589.

49.    The Florida Scrub Jays ("Jay") use the same "xeric" (dry) habitat types as Indigos and Gopher Tortoises, such that management efforts for one species must consider impacts to other species.  FWS2633, 2639.

50.    The principal threat to the Jay is the "loss, fragmentation, and degradation of scrub habitats . . . due primarily to urbanization, agriculture, and fire suppression."  FWS2630.

51.    The Corps and the CCTC did not pursue formal consultation under the ESA.  AR6639.

52.    The Corps did not request consultation prior to issuance of the permit with regard to the Jay.  AR6639.

53.    On October 31, 2005, the Corps issued a Public Notice regarding the application of "Sierra Properties, C/O Mr. John Sierra, Jr." ("applicant") to fill approximately 54 acres of wetlands and 10 acres of surface waters.  Notice, AR3091-3092.

54.    Governmental entities, residents, and conservation organizations commented and raised concerns.  AR3329, AR3136-41; AR4295-96.

55.    Sierra Club explained that the project would have serious environmental effects, and that

7

the Corps should at least require alternatives to avoid or minimize wetlands impacts, such as a reduction in the size of CCTC, particularly given that CCTC is not a water dependent project; it requested a minimum 250 foot buffer to protect Cypress Creek, provided supporting scientific information; it warned of reductions in water recharge and increased water demands; it contested the need for CCTC, given other nearby commercial development; it raised grave concerns regarding wildlife impacts; and it requested an EIS be prepared. AR3345-3370.

56.    Sierra Club also provided information that the Corps' past mitigation for wetlands losses it authorized under section 404, rarely, if ever, succeeded and that the Corps failed even to monitor mitigation to assure success. AR3359-3362.

57.    Sierra Club pointed the Corps to an investigative report by the St. Petersburg Times that found Florida alone had lost over 84,000 acres of wetlands from the late 1980s through 2003. AR3360.

58.    Corps permitting officers with decades of experience were quoted in the St Petersburg Times article stating the Corps's mitigation was "a huge scam," a "fraud," and "a make-believe program." AR3360, 61.

59.    During the permit review the public noted reports by the United States General Accounting Office ("GAO") and the National Academy of Sciences ("NAS") confirming that mitigation was often delayed or never finished and that there is no routine tracking of compliance, and in many instances compliance has been poor at best. AR3375.

60.    During its review of the application, the Corps initially focused on alternatives that would avoid and/or minimize impacts to wetlands, and leave larger protective buffers around the

remaining wetlands and Cypress Creek (and preserve the critical wildlife linkage). EA at 13-15, AR6648-50.

61.     The Corps considered reducing CCTC's size and reducing the footprint of parking lots by building a second multistory parking garage. AR6646.

62.     The Corps deferred to the applicant's assertion that reducing CCTC's size, or building a second garage, was impracticable, because either option would supposedly reduce the profit margin - the rate of return - of CCTC to below 8.0%, which the applicant contended was the minimum required to secure long term financing. AR6649.

63.     As the Corps explained, "although just a 5% downsizing . . . would reduce the project footprint by 28 acres, the applicant stated that a Rate of Return [ROR] below 8.0% deems the alternative impracticable. The applicant states a Rate of Return of at least 8.0% is required to secure financing." EA at 11, AR6649.

64.     In the Corps' last formal written request for information on the topic in October 2006, the Corps stated that "the Corps will not accept an 8.0% minimum ROR to argue against practicability . . . and considers all alternatives viable from a cost perspective that result in a ROR equal to or exceeding 7.8%." AR5385-86; see also 4467-68.

65.     The Corps concluded the applicant's stated need for an 8.0% rate of return was "conflicting" because, for example, it had also stated that the office, residential, and hotel components of CCTC were "not critical for financial viability" even though eliminating them would reduce the rate of return to 7.7 or 7.8 %. AR4467-68, AR4501, AR3966.

66.     When the Corps met with the applicant and pressed the issue, the applicant confirmed these statements and that "financing could be secured with a ROR of 7.8 %." AR5385;

AR4501.

67.    When the applicant "summarized" rates of return from other projects to justify an 8.0%

required rate of return, it arbitrarily "adjusted" - increased - the rates by one half of a

percent.  AR4599-60.

68.    Just one week before issuing the permit the Corps met with the applicant and again urged

that CCTC be downsized for environmental reasons.  Corps Meeting Minutes,

AR4023-25.

69.    During the meeting it dismissed the applicant's assertions it needed an 8.0% rate of return.

Id.

70.    The Corps stated that "Sierra Club [was] likely to sue," and that it was "nervous about

creation in [federal wetlands]"; it requested the applicant "back[] up everything 300' from

creek + preserve - in agreement w/ Pasco Co's wildlife corridor plan"; and it inquired

"where [the applicant] can min[imize]" impacts to wetlands as a "vast expanse of

upland[s] [are] avail[able]."  AR6450, 6451.

71.    When the applicant asserted that it needed an 8.0% rate of return, the Corps responded

that a "7.7 [rate of return] is not too bad," and it warned that a citizen who opposed

CCTC "ha[d] hired [an] economist" to independently review the application.  AR6452.

72.    The Corps did not await that economic analysis, or retain its own economist, and it issued

the permit without such assistance.

73.    The permitting officer admitted she did not understand the applicant's financial analyses

and needed the assistance of an economist: "[T]here are a couple issues, inherent to our

analysis, that hinge on economic analyses that are beyond my training as a biologist," and

10

thus "I am requesting assistance from . . . an economist . . . ."  AR3787.

74.  The Corps also initially sought to avoid impacts to wetlands and buffers by reducing the number of parking spaces.  AR6646.

75.  The Corps ultimately capitulated to the applicant's assertions that reducing parking was impracticable.

76.  Despite the fact that the Corps required the applicant "to compare the proposed parking with that of nearby malls," and the "results revealed that the project proposed more parking than any existing mall," the Corps never required that parking be reduced. AR6647.

77.  The Corps required some mitigation as conservation and restoration in an off-site location.  AR6651-63.

78.  The Service and Corps also based their ESA analyses on the proposed mitigation. AR6681.

79.  The Corps did not respond to comments on the failure of its past mitigation efforts, let alone detail what steps it was taking (such as better monitoring) to ensure that past problems were not duplicated here.

80.  On May 15, 2007, the Corps granted the CCTC permit with virtually no modifications beyond minor changes to the mitigation plan.  EA at 2, AR6637.

81.  On July 17, 2007, the Sierra Club formally provided the Corps with sixty days notice of its intent to sue, as it was statutorily required to do to press claims against the agency under the ESA.

82.  The notice raised many of the same issues Sierra Club raised in its earlier comments, and

it encouraged the Corps to revoke or suspend the permit, as the Corps is authorized to do under the Corps' regulations, see 33 C.F.R. § 325.7, or at least to contact the Sierra Club to resolve the issue.

83.    The Corps did not respond.

84.    On September 29, 2007, the Sierra Club's sixty day notice period expired, and immediately thereafter, on October 1, 2007, Plaintiffs filed suit.

85.    Plaintiffs in this case include three non-profit environmental membership organizations, Sierra Club, Clean Water Action and the Gulf Restoration Network, and two individual plaintiffs, Chris Loy and Richard Sommerville.

86.    The missions of both Sierra Club and Clean Water Action are to protect and improve environmental resources.  Sierra Club ("SC") Decl. ¶ 3; Clean Water Action ("CW") Decl. at ¶ 3.

87.    Sierra Club has over three thousand members in the greater Tampa metropolitan area, with 560 members in Pasco County alone.  SC Decl. at ¶ 2; Clean Water Action has approximately 2,500 members that reside in and around Cypress Creek, and over 22,000 members in the Tampa Bay area generally.  CW Decl. ¶ 2.

88.    Sierra Club's and Clean Water Action's members and individual Plaintiff Chris Loy enjoy recreating in the Cypress Creek basin, including canoeing on Cypress Creek past the CCTC site and biking and walking through the conservation lands in the Cypress Creek basin nearby the CCTC site, and they drive past CCTC.  SC Decl. ¶ 7; CW Decl. ¶ 4; Colson Decl. ¶ 5; Loy Decl. ¶ 8-10; Armentano Decl. ¶ 4-8.

89.    Such members do so because they enjoy the beauty of the area, the peaceful surroundings,

and observing and looking for the flora and fauna in the natural environment in which they live, including if they are fortunate the Wood Stork, the Indigo, and the Jay.  Colson Decl. ¶ 7; Loy Decl. ¶ 10; Armentano Decl. ¶ 7-8.

90.    These and other interests will be injured because of the environmental harm that CCTC will cause, including the destruction of Wood Stork and Indigo habitat, the degradation of Cypress Creek and its wetlands, and aesthetic harm to the beauty of the area.  Colson Decl. ¶ 17, 21-24; Loy Decl. ¶ 11-13; Armentano Decl. ¶ 9.

Respectfully submitted,

_____/s/_____
Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

January 16, 2006                              Attorneys for Plaintiffs

13

## Meyer Glitzenstein & Crystal

1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Joshua R. Stebbins
Tanya M. Sanerib
Erin M. Tobin

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

July 17, 2007

**VIA CERTIFIED MAIL AND**
**ELECTRONIC TRANSMISSION (EMAIL AND/OR FACSIMILE)**

Lt. Gen. Robert L. Van Antwerp
Chief of Engineers,
Army Corps of Engineers
20 Massachusetts Ave., N.W.
Washington, D.C. 20314
202-761-1683 (fax)

Lt. Gen. Robert L. Van Antwerp
Mr. Lance Wood, Esq.
U.S. Army Corp of Engineers
Chief Counsel's Office
441 G. Street, NW
Washington, D.C 20314
lance.d.wood@usace.army.mil

Dirk Kempthorne
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
exsec@ios.doi.gov (executive secretary)
(202) 219-2100 (fax)

## Exhibit 1



recycled paper

Dale Hall,
Director,
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240
dale_hall@fws.gov

RE:    **Notice of Intent Regarding the Cypress Creek Town Center in Pasco County, Florida**

We are writing on behalf of the Sierra Club to provide you with written notice of violations of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1531 et seq., the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., in connection with the U.S. Army Corps of Engineers ("Corps") section 404 permit for the destruction of wetlands in Pasco County, Florida. See generally Department of Army Permit, Permit No. SAJ-2003-2336 (IP-THE) (May 15, 2007). The permit allows wetlands destruction to build a sprawling "regional mall and supporting commercial enterprises, including retail businesses, financial institutions, hotels, restaurants, cinemas, offices and multi-family residential housing" to be known as "Cypress Creek Town Center" ("CCTC"). Corps Environmental Assessment and Statement of Finding Of No Significant Environmental Impact, May 15, 2007, ("EA") at 2. We understand that the developer is currently on site and destroying wetlands pursuant to the permit.

As discussed in greater detail below, the project calls for over fifty acres of wetlands to be destroyed, nearly half for parking lots. EA at 11. It will destroy acres of wood stork habitat, Eastern indigo snake habitat, EA at 46-47, and Florida scrub jay habitat. It will imperil the water quality, and quantity, of Cypress Creek, and therefore both the City of Tampa's drinking water and West Indian manatee habitat. It requires paving over a recharge area for groundwater aquifers while drawing heavily upon that groundwater. And it threatens a critical wildlife linkage across the site that connects nearby conservation lands.

The Corps' permit is unlawful for a number of reasons. Among other deficiencies, the Corps failed to: 1) consult with the United States Fish and Wildlife Service ("FWS") concerning, for example, impacts on the Florida scrub jay and the West Indian manatee; 2) engage in formal consultation with FWS concerning adverse impacts on the wood stork and the Eastern indigo snake; 3) comply with CWA requirements prohibiting the destruction of wetlands where there are practicable alternatives, especially since the Corps acknowledged the project was not water dependent; 4) require the applicant to clearly demonstrate that there were no practicable alternatives; 5) comply with CWA requirements prohibiting the destruction of wetlands without avoidance and minimization of those impacts; 6) comply with CWA requirements prohibiting activities that might substantially degrade waters of the United States; 7) prepare an Environmental Impact Statement ("EIS").

In light of these clear violations of the ESA, the CWA and NEPA, the Sierra Club urges the Corps to revoke and/or suspend the permit to address these concerns. Otherwise, the Sierra Club intends to bring suit to challenge the unlawfully issued permit. Please feel free to contact us to discuss these matters.

## BACKGROUND

On May 15, 2007, the Corps issued an environmental assessment and a permit authorizing the filling of over fifty acres of wetlands for an enormous development that will include 630 residences, 700 hotel rooms, more than 900,000 square feet of retail space (enough for 8 giant box stores like Walmart, Lowes, and Home Depot, along with smaller stores), 178,800 square feet of restaurants, and 420,000 square feet of office space. EA at 14. The Corps has acknowledged that the project is expected to induce growth, in an area that is already "rapidly growing." Corps Public Notice, 1, October 31, 2005. See also EA at 34, 49-50. Although commenters raised numerous concerns about the project based on the little information provided in the Corps' public notice, including among other things, the existence of alternative sites where less wetlands would be destroyed, the unnecessary destruction of wetlands on the site due partly to parking lots and other one-story structures, and the threats to the water quality and quantity of groundwater and surface waters like Cypress Creek, the Corps issued its EA and permit without addressing many of these concerns.

The 500 acre development site is in lands that provide habitat for federally listed species - the wood stork, the Eastern indigo snake, and the Florida scrub jay - and that also provide headwaters for the City of Tampa's drinking water. The Corps itself acknowledged the significance of the permitted action when, for example, it concluded that "[g]iven that a portion of the project drains into Cypress Creek, an Outstanding Florida Water (OFW) and a tributary to the Hillsborough River (the major source of drinking water for the City of Tampa), **water quality was an issue of great concern.**" EA at 41 (emphasis added). Moreover, the site includes areas "identified as a critical wildlife linkage" in a report commissioned by Pasco County. Corps EA at 37 (emphasis added). This is because the site includes lands "along Cypress Creek within the project area [that] fall into the identified 'Cypress Creek to Cypress Bridge' critical linkage" connecting other conservation areas. Id. (emphasis added). Alligators, little blue herons, white ibis, tricolored herons, snowy egrets, gopher tortoises, and Eastern indigo snakes are among the species observed on the site. EA at 36.

With regard to federally listed species, the Corps acknowledged that the development may affect the wood stork and the Eastern indigo snake, though it determined that the project was not likely to adversely affect the species, and it received a concurrence from the FWS on March 14, 2007 in this regard. The Corps determined that there would be no impact on two federally listed species, the Florida scrub jay and the West Indian manatee.

However, the site includes several acres of xeric oak scrub, which provide habitat for the imperilled Florida scrub jay, a threatened species under the ESA. The Florida scrub jay is a "30

3

centimeter (12 inch), bluish-colored, crestless jay . . . [with a] necklace of blue feathers." FWS, Threatened Status for the Florida Scrub Jay, 52 FR 20715, 20716 (June 3, 1987). The Florida scrub jay lives only in the Florida scrub habitat, which "consists of dense thickets of scrub oaks less than 3 meters in height, interspersed with bare sand for foraging and storing acorns." Id. The jay has been completely eliminated from much of its habitat, and elsewhere its populations have "decreased drastically" in other areas. Id. The "major cause of the jay's population decline and its disappearance from specific sites is habitat destruction." Id. (emphasis added). "In virtually every county where the species occurs, it is known to have declined in numbers:" the total number of surviving Florida scrub jays on private property, like the site here, is estimated at only 2,000, while greater numbers can be found on public lands. Id. The Florida scrub jay is number seven on the National Audubon Society's 2006 report America's Top Ten Most Endangered Birds.

The site is also within the core foraging area for five breeding colonies of wood storks, EA at 46, and is 1.3 miles from the nearest wood stork colony. Public Notice at 3. The wood stork, which was listed as endangered by the FWS in 1984, "is the only species of true stork breeding in the U.S." See FWS, U.S. Breeding Population of the Wood Stork Determined To Be Endangered, 49 FR 7332 (February 28, 1984). It is "a large, long-legged, white wading bird with an unfeathered gray head and a stout dark bill" that "frequent[s] freshwater and brackish wetlands" to feed and "usually nests in cypress and mangrove swamps." Id. The primary cause of the wood storks decline is the "loss of suitable feeding habitat," which is "especially true for the south Florida rookeries" as "[f]eeding areas in south Florida have decreased by about 35 percent since 1900 due to man's alteration of wetlands." Id. (emphasis added).

The site also provides habitat for the Eastern indigo snake, a threatened species that lives in burrows under ground. Public Notice at 3. See also FWS, Listing of the Eastern Indigo Snake As A Threatened Species, 43 FR 4026 (January 31, 1978). The snake has been seen on the site as recently as this past May. A primary cause of the snake's decline is "rapid development resulting in considerable loss of available habitat." Id. at 4028 (emphasis added). Because its habitat is "ideal for human settlement," there are "serious decline[s] in populations of the Eastern indigo snakes in many areas." Id.

The endangered West Indian manatee currently occupies the lower stretches of the Hillsborough River, as well as Tampa Bay and its marine reserves, which receive waters from Cypress Creek. The manatee is one of the most endangered marine mammals in coastal waters of the United States, and according to a 1998 FWS report the "status of the manatee population is, at best, marginally stable." Florida Manatee Recovery Accomplishments: 1998 Annual Report, at 4. The "major threats to Florida manatees are collisions with watercraft, which account for 25 percent of known manatee deaths in Florida annually, and destruction and degradation of habitat caused by widespread development throughout much of the species' Florida range." FWS, Southeast Region, Florida Manatee Recovery Plan (Jan 29, 1996) 4. The Recovery Plan further states that "[i]ncreases in direct human-caused mortality and habitat destruction are two of the consequences of the rapid growth in Florida's human population," and that "[a]s long as this trend continues, the long term survival of manatees in the U.S. is in serious jeopardy." Id. "Intensive

4

coastal development is perhaps the greatest long-term threat to the Florida manatee," and the species' "survival depends [in significant part] on maintaining the integrity of ecosystems and habitat sufficient to support a sustainable manatee population." Id. (emphasis added). One impact of development is a decrease in water quality that can kill off submergent, emergent, and floating sea grasses and other vegetation, which provides much of the manatees diet, and that can also lead to red tides.

## DISCUSSION

### I.    The Endangered Species Act

Section 7 of the ESA requires that each federal agency ensure that its actions, and any actions it authorizes, are not likely to "jeopardize the continued existence" of a listed species.  16 U.S.C. § 1536(a)(2).  In fulfilling this mandate, each federal agency "shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a).  If an action may affect a listed species, "formal consultation" with the FWS is required unless, "as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the [FWS], that the proposed action is not likely to adversely affect any listed species or critical habitat." Id. at 402.14(b).

In the context of a biological assessment, the agency must "evaluate the potential effects of the action on listed and proposed species . . . and determine whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12.  Among the criteria for consideration in a biological assessment are "an on-site inspection of the area affected by the action to determine if listed or proposed species are present or occur seasonally," "the views of recognized experts on the species at issue," "literature and other information," an "analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies," and "an analysis of alternate actions considered by the Federal agency for the proposed action." Id. (emphasis added).  In the context of informal consultation, the "Federal agency, with the written concurrence of the Service," must review the action to determine whether, in fact, "the action is not likely to adversely affect listed species or critical habitat." 50 C.F.R. § 402.13.

In this case, the Corps' determination that the development would have no effect on the Florida scrub jay because there was "no scrub jay habitat on the site," and its resulting failure to engage in consultation regarding the Florida scrub jay, was arbitrary and capricious and contrary to law.  See EA at 48.  Among other things, the Corps permitting officer, Tracy Hurst, and Linda Smith of the FWS, visited the site in February 2006 during which time they walked through and photographed xeric oak scrub habitat which the FWS officer acknowledged was Florida scrub jay habitat.  The loss of such habitat has been identified as a primary cause of the decline of the Florida scrub jay.

The Corps' determination that there would be no effect on the West Indian manatee, and its failure to engage in consultation regarding the manatee, was similarly arbitrary and capricious and contrary to law. EA at 48. The Corps' determination was predicated upon the location of manatees downstream from the site, and a water quality monitoring plan to protect the quality of the water that flows downstream. Id. However, the Corps failed to adequately address impacts to downstream water quality, including cumulative impacts of development in the area. For example, it never addresses the types of pollution likely to be generated by the CCTC development, such as oils and other petrochemicals washed from the acres of parking lots; the efficacy of the storm water treatment system (consisting of ponds and baffles designed to remove grease) at handling such pollution; the ability of a storm water treatment system, designed to handle a 1.5" rain event, to handle the volumes of storm water generated by storm events in the area that frequently exceed 1.5"; the adequacy of protective buffers around the creek and remaining wetlands; and the ability of a plan that monitors water quality to actually protect water quality and quantity, particularly downstream. These issues were raised by comments that were largely ignored by the Corps. Yet the rapid and poorly planned development of Florida, resulting in the increasing pollution, sedimentation and turbidity of its waters, increasing red tides, and declining sea grasses and water quality, has contributed to the decline of the manatees. Florida Manatee Recovery Plan, Third Rev., 2001 FWS SE Region (Oct. 30, 2001) 30.

Similarly, the Corps' determination that the project was not likely to adversely affect the Eastern indigo snake, and thus its failure to engage in formal consultation under the ESA on that species, was arbitrary and capricious and contrary to law. The Corps' determination, and the FWS's unlawful "concurrence" was based upon, in short, allowing the snake sufficient time to flee the site if a worker spots a snake during clearing activities. EA at 47 (referring to FWS's guidelines). Yet the Corps' apparent determination that such means are adequate to protect the snake is patently arbitrary and capricious. The site is over 500 acres. EA at 1. It is being cleared by as many as sixty pieces of large earth moving equipment moving so quickly that half the site was cleared of vegetation in under one week. Again, Eastern indigo snakes live in burrows underground, Public Notice at 3, and they have been seen on the site as recently as this past May 2007. The expectation that there will be no adverse affect on the snake because workers will see the snake in time to prevent harm to the snake, or that the snake will flee a 500 acre construction site on its own, is specious. Moreover, the snake is being driven to extinction in significant part by "rapid development resulting in considerable loss of available habitat." Listing of the Eastern Indigo Snake As A Threatened Species, 43 FR 4026 at 4028. It is unclear how allowing the snake to flee the site addresses the loss of habitat that is driving it to extinction, particularly given the rapid growth in the area in general. Public Notice at 1. The Corps' determination that the project is not likely to adversely impact the snake on the grounds that the snake can simply move to another location, and the FWS's concurrence with it, is arbitrary and capricious.

The Corps was therefore required to formally consult with the FWS on Florida scrub jay, Eastern indigo snake and West Indian manatee impacts. The FWS's conclusory statements in its March 14, 2007, concurrence letter is plainly inadequate to fulfill the consultation requirement. Indeed, for species for which the Corps did not even request such concurrence, any FWS

6

statements in the concurrence letter were dicta and without legal affect.

The Corps' determination that the project is not likely to adversely affect the wood stork, and thus its failure to engage in formal consultation under the ESA, was also arbitrary and capricious and contrary to law. The Corps' determination, and the FWS's unlawful concurrence, was based upon the construction of mitigation areas and storm water treatment ponds to offset the loss of existing wood stork habitat, as well as a row of shrubs to minimize "wood stork roadkill." EA at 46. Yet, among other things, the Corps failed to even discuss the long history of failure of its mitigation program, e.g., General Accounting Office, Wetlands Protection: Corps Of Engineers Does Not Have an Effective Approach to Ensure That Compensatory Mitigation Is Occurring, September 2005, http://www.epa.gov/owow/wetlands/pdf/GAO05898.pdf, (executive summary, pp. 1-6 attached), much less the ability of storm water retention ponds - designed and intended to process storm water with "dissolved solids as well as greases and floating debris," EA at 42, rushing off of parking lots - to offset the loss of existing wetlands. Yet, as noted above, the loss of wood stork foraging habitat is a driving cause of the species' imperilled status.[1]

Section 9 of the ESA prohibits any person from "tak[ing] any [endangered] species within the United States or the territorial seas of the United States." 16 U.S.C. § 1538(a)(1)(B). "'[T]ake' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture" a listed species or attempt to do so, either directly or indirectly by degrading its habitat sufficiently to impair essential behavior patterns. See e.g. 16 U.S.C. § 1532(19).

The ESA's prohibitions extend to any person's "to attempt to commit, solicit another to commit, or cause to be committed, any offense defined" in the ESA. § 1538(g). The term "person" includes "any officer, employee, agent, department, or instrumentality . . . of any State, municipality, or political subdivision of a State ... [or] any State, municipality, or political subdivision of a State . . . ." 16 U.S.C. § 1532(13). The Secretary of the Interior has defined "harm" as "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3 (2005). Courts have held that government officials and agencies can be liable under the ESA for takings by third parties, when the action of the third party was done pursuant to a license or permit it issued.

---

[1] In strikingly similar circumstances, the United States District Court for the Southern District of Florida just rejected the Corps's determination (and the Service's concurrence with it) that the issuance of a permit for the destruction of wetlands "may affect, [but is] not likely to adversely affect" the wood stork. See Sierra Club v. Strock, Civ. No. 03-23427-civ-Hoeveler, slip op. at 122-127, 128 (S.D.Fl. July 13, 2007) ("For the Defendants to base the [permits] on their assertions that no protected species were likely to be affected, and then - after being forced to comply with their own regulations by this Court - to determine that three endangered species and one threatened species may be affected by the very same mining that was previously studied, leads to little confidence in these agencies.") (emphasis in original). Much as in this case, the wetlands to be destroyed in Sierra Club v. Strock contained foraging habitat for woodstorks that was important in part because it was located near brooding colonies, and they provided habitat for the eastern indigo snake. See id. at 128-131.

7

Strahan v. Coxe, 127 F.3d 155 (1st Cir. 1997); Defenders of Wildlife v. Administrator EPA, 882 F.2d 1294 (8th Cir. 1989); Loggerhead Turtle v. County Council of Volusia County, Florida, 896 F.Supp. 1170, 1181-82 (M.D.Fl. 1995).

The Corps and its commanding officers have violated section 9 of the ESA. More specifically, in issuing the challenged permit the Corps has caused the take of federally listed species identified above. The permitted development at the site will destroy habitat of threatened and endangered species, including, for example, habitat that is occupied by the eastern indigo snake, and thus it will degrade its habitat sufficiently to impair essential behavior patterns. Moreover, the actions permitted by the permit threatens to, and will, result in direct harm and harassment of listed species.

## II.    The Clean Water Act

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It prohibits the discharge of any pollutant into the waters of the United States, including wetlands, without a permit. 33 U.S.C. § 1311(a). The term "pollutant" includes "dredge spoil," "solid waste," "rock, sand, cellar dirt and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

Section 404 of the CWA authorizes the Army Corps of Engineers to issue permits for the discharge of "dredged or fill materials" into waters of the U.S., but only if stringent regulatory requirements are satisfied. Implementing regulations prohibit the Corps from issuing permits for filling wetlands if any "practicable" alternatives are available. 40 C.F.R. § 230.10(a). The regulations provide a very strong presumption that there are practicable alternatives to filling wetlands for activities that are not "water dependent," id. at 230.10(a)(3), which can be overcome only if the applicant "clearly demonstrate[s]" that there is no other practicable alternative. Id. (emphasis added). In addition, a permit cannot be issued: 1) "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem," 40 C.F.R. § 230.10(d); 2) if it "will cause or contribute to significant degradation of the waters of the United States," 40 C.F.R. § 320.10(c); or 3) if it is against the public interest, 33 C.F.R. § 320.4(b)(2), among other things.

In this case, the Corps itself acknowledges that the development is not water dependent. EA at 29. Yet in the EA the Corps failed to even mention, much less apply, the presumption that there were other practicable alternatives, and it likewise failed to require that the applicant "clearly demonstrat[e]" that there were not other practicable alternatives available. See EA at 6-11; 40 C.F.R. § 230.10(a)(3). Instead, the Corps' EA relied upon the applicant's self-serving statements – which often were contradicted by other evidence in the EA itself – without the Corps making an attempt at independent inquiry or verification at critical junctures. Thus, for example, the Corps accepted the applicant's dismissal as "impracticable" one alternative site because "access could only be provided by one arterial road," EA at 9, when the EA itself – incorporating the applicant's own alternatives analysis – expressly stated that two major or minor roads were

8

merely "<u>preferred</u> by the applicant," and that more limited access was "considered less suitable," but <u>not</u> impracticable.  Corps EA at 7 (emphasis added).

Similarly, the Corps failed to require avoidance and minimization of impacts to wetlands, such as by reducing the number of parking spaces and installing parking garages: again, almost half of the wetlands are to be paved for parking lots. EA at 11, 12. For example, although the Corps requested the applicant study nearby malls to see how much parking was really needed – and the applicant's own study revealed that the project "<u>proposed more parking than any existing mall in the evaluation</u>," EA at 12 (emphasis added) – the Corps simply accepted the applicant's "stat[ments]" that, despite the study, the applicant could not reduce the number of parking spaces. <u>Id.</u>

Likewise, the Corps simply accepted the applicant's assertions that it could not build additional parking garages, or reduce the footprint of the giant complex, because the applicant had to make at least an 8.0% percent profit to secure financing, which it could not do if it built a garage or eliminated even just one bank. Corps EA at 11, 14 (applicant "<u>reported</u>" that none of the downsizing alternatives was practicable because "the reduction in project footprint and resulting Rate of Return" fell below 8.0%, rendering the project not profitable enough to garner financing); <u>see also id.</u> (the "<u>applicant stated</u> that a Rate of Return below 8.0% deems the alternative impracticable.") (emphasis added).

For the same reason, the Corps did not require greater buffers around Cypress Creek, or the remaining Category I wetlands (which have an "average" buffer of 25 feet) because of the inability to obtain financing without an 8.0% return.  EA at 13 ("cost was the limiting factor"); <u>id.</u> at 15 ("Given that the footprint could not be further reduced . . . the Corps finds the [buffer] . . . the best possible protection for the creek.").  But the EA does not cite, much less provide, evidence that establishes the impracticability of avoiding, or minimizing, adverse impacts, such as by having larger buffers, much less evidence regarding the adequacy, or protectiveness, of such small buffers.

In short, in critical junctures of its analysis the Corps simply relied on the applicant's assertions that opportunities for alternatives, avoidance and minimization were not practicable, without any requirement that the applicant "clearly demonstrat[e]" that it was not feasible to avoid or minimize impacts.  Moreover with respect to cost issues, the Corps applied the wrong decision criteria in letting the applicant's ability to obtain financing determine practicability. <u>E.g.</u>, (focus on cost should be on whether alternatives "are reasonable in terms of the overall scope/cost of the proposed project" and "consideration of the applicant's financial standing" is "not necessarily material"); EPA, Corps Regulatory Guidance Letter 93-02 (August 23, 1993) ("the determination of what constitutes an unreasonable expense should generally consider whether the project is substantially greater than the costs normally associated with the particular type of project").

Furthermore, the Corps failed to determine, let alone make any real inquiry, into whether the proposed action might adversely affect waters of the United States. For example, without any analysis of the system's efficacy, it simply accepted a storm water treatment system that was designed: a) to treat a maximum rain event of 1.5" in an area that the government itself reports regularly has weather events that exceed 1.5", see http://www.weather.gov (last visited June 17, 2007) (under climate/past weather); and b) to process "dissolved solids as well as greases and floating debris," EA at 42, not the oils and petrochemicals that flow off a massive Town Center and parking area like the one proposed. Similarly, the Corps never analyzed the efficacy of the "average" 25 foot buffers at protecting the remaining Category I wetlands on the site, or Cypress Creek, but rather it just accepted the fact that given cost constraints it is the best option available, and it deferred to others concerning degradation of the water quality. EA at 15, 41-42.

The Corps's public interest analysis is similarly arbitrary and capricious for a number of reasons, including its failure to consider critical information before it, like other development in the area. For example, it evaluated the areas' need for the development, and the ability of the area to handle the project's groundwater consumption, without discussing the other major developments in the area. Moreover, it incorporates the same flaws identified above with regard to practicable alternatives for avoidance and minimization.

## III.    NEPA

NEPA requires all agencies of the federal government to prepare a "detailed statement" - an EIS - regarding all major federal actions that may significantly affecting the environment. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.3. NEPA identifies a number of criteria for evaluating the potential significance of an action, and thus whether to prepare an EIS. 40 C.F.R. § 1508.27(b). An agency may prepare an EA to assist it in determining whether the action may have a significant environmental effect. 40 C.F.R. §§ 1508.9, 1501.4.

If it does prepare an EA, the Corps must take a hard look at the proposed action and possible alternatives and include "discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9 (emphasis added). Section 102(2)(E) requires that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332 (2)(E). Critically, an EA must "provide sufficient evidence and analysis" of the direct, indirect and cumulative environmental impacts of the proposed action and the alternatives to base a "determin[ation] whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9 (emphasis added); 40 C.F.R. § 1508.8.

In this case, several "significance" criteria were triggered and an EIS must be prepared. As the Corps itself concluded, the project raises issues of "great concern" regarding drinking water and protection of an "Outstanding Florida Water." EA at 41 ("[g]iven that a portion of the

10

project drains into Cypress Creek, an Outstanding Florida Water (OFW) and a tributary to the Hillsborough River (the major source of drinking water for the City of Tampa), water quality was an issue of great concern") (emphasis added); See 40 C.F.R. § 1508.27(b)(2) ("degree to which the proposed action affects public health or safety"). Second, not only does the site abut an "Outstanding Florida Water," but it includes areas "identified as a critical wildlife linkage'" by a government commissioned report and a "'bottleneck' between large conservation lands." EA at 37 (emphasis added); 40 C.F.R. § 1508.27(b)(3) ("[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands [and] ecologically critical areas"). See also id. at 15 ("[m]inimizing impacts to the upland buffer adjacent to Cypress Creek is of paramount concern given the quality of the resource (Cypress Creek is an outstanding Florida Water) and the proximity and scale of the proposed development.") (emphasis added).

Moreover, the Corps did not respond to numerous significant issues raised in comments about practicable alternatives, minimization, buffer size, and endangered species impacts, and thus, the environmental impacts continue to be hotly disputed and controversial. 40 C.F.R. § 1508.27(b)(4) ("[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"). And the project establishes the precedent that, among other things, reliance on assertions of the applicant that go to practicability is acceptable, and that destroying acres of wetlands that abut and feed an Outstanding Florida Water, and that contribute to the drinking water of hundreds of thousands of people, does not represent a significant impact on the environment. 40 C.F.R. § 1508.27(b)(6) ("[t]he degree to which the action may establish a precedent for future actions with significant effects"). The development takes place in a rapidly developing area, Public Notice at 1, where numerous other large developments are being constructed, and are likely to involve wetlands impacts. 40 C.F.R. § 1508.27(b) (7) ("the degree to which the action is related to other actions with . . . cumulatively significant impacts"). And it may adversely affect a number of federally listed species, such as the scrub jay and wood stork. 40 C.F.R. § 1508.27(b) (9), (10) ("the degree to which the action may adversely affect an endangered species," and whether "the action threatens a violation of Federal . . . law or requirements imposed for the protection of the environment.").

In addition, the Corps' EA, the Corps failed to take a hard look at the environmental impacts of the proposed action and its alternatives, and to "provide sufficient evidence and analysis" to support its "determination" that there will be no significant impact. 40 C.F.R. § 1508.9 (emphasis added). For example, the Corps provided absolutely no environmental information concerning the current site, or the impacts, or functioning, of the site as it currently exists in the no action alternative, EA at 5, though the "no action alternative" is supposed to provide a "benchmark" by which to judge the environmental benefits and impacts of leaving the proposed site as it currently is versus developing it. See e.g. Custer County Action Ass'n v. Garvey, 256 F.3d 1024 (10th Cir. 2001) ("In requiring consideration of a no-action alternative, the Council on Environmental Quality intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo.").

The EA itself discloses no information about the environmental conditions at the proposed

off-site alternatives, nor what the environmental impacts of developing at the other sites would have been. For example, there is no information or discussion concerning whether these other sites had wetlands, the quality of the wetlands, the extent of the wetlands, whether the wetlands were "jurisdictional" under the CWA, whether there were surface waters at the sites, whether there were other natural resources at the sites, such as an Outstanding Florida Water, whether the sites provided the headwaters for drinking water or the recharge area for municipal wells, or whether the lands were designated a "critical" habitat linkage as is the proposed site. Rather, the EA merely assigns - and for only two of the off site alternatives - the number "3," Corps EA at 9, a designation that means "[f]ew impacts, less difficult to permit." Id. at 8.

And the Corps' EA fails to take a hard look at the indirect and cumulative impacts associated with the project. Corps EA at 91-92. For example, in the Corps' discussion of indirect effects the Corps acknowledges that the remaining on-site wetlands may suffer "changes in wetland function and values," Corps' EA at 50, but it does not identify what these changes are, what their possible severity might be, or what the consequences of such "changes in wetland function" might be. And the Corps acknowledges the growth inducing effects of the action, e.g. EA at 34 ("[e]conomic changes will occur as a result of this project . . . ."), it admits that the project is expected to induce a shift away from the region's status as a "bedroom community," id., and it notes the first example of this growth inducing affect on the neighboring property, King Ranch, EA at 50 ("the nature of King Ranch will change . . . [and will] likely provide more commercial development [as opposed to] residential development."). But yet the Corps did not identify or even discuss important environmental impacts from such growth inducing effects, such as traffic or pollution impacts, nor the scale of the impacts.

Such a discussion of the impacts of regional growth is even more lacking in the Corps' cumulative impacts analysis, which essentially consists of a single paragraph identifying the factors the Corps must consider and concurring with the "[applicant's] report . . . that the project will not have any significant cumulative impacts." Corps EA at 51. The EA does not even identify or discuss what any specific cumulative impacts might be, nor what other actions might be cumulative with the proposed action. Yet the Corps acknowledges, for example, that the area is "rapidly growing," Public Notice at 1, and that the area will now transition away from a "bedroom community" in part because of this very project. EA at 34. Indeed, commenters provided lists of other massive developments underway in the area. However, these issues were not addressed by the Corps before issuing the permit and allowing the developer to begin destroying wetlands.

*        *        *        *

The Sierra Club is gravely concerned that the Corps has failed to comply with the ESA, the CWA, and NEPA in granting the permit at issue. They request that the Corps revoke or at least suspend the permit while it undertakes the additional analyses mandated by federal law. Absent such actions, the Sierra Club intends to file suit to bring the Corps into compliance with these vital laws designed to protect Florida's wetlands and the environment from unnecessary and unlawful degradation. Again, please feel free to contact us to discuss these matters.

Sincerely,

Joshua R. Stebbins
Howard M. Crystal
Eric R. Glitzenstein

cc:

Governor Charles Crist
Office of the Governor
The Capitol
400 South Monroe Street
Tallahassee, FL 32399
Charlie.Crist@myflorida.com

United States Government Accountability Office

# GAO

Report to the Ranking Democratic Member, Committee on Transportation and Infrastructure, House of Representatives

September 2005

# WETLANDS PROTECTION

## Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure That Compensatory Mitigation Is Occurring



**GAO**

Accountability ★ Integrity ★ Reliability

GAO-05-898

September 2005

# WETLANDS PROTECTION



## GAO
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-05-898, a report to the Ranking Democratic Member, Committee on Transportation and Infrastructure, House of Representatives

# Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure That Compensatory Mitigation Is Occurring

## Why GAO Did This Study

Because wetlands provide valuable functions, the administration set a national goal of no net loss of wetlands in 1989. Section 404 of the Clean Water Act generally prohibits the discharge of dredged or fill material into waters of the United States, which include certain wetlands, without a permit from the U.S. Army Corps of Engineers (Corps). To help achieve the goal of no net loss, the Corps can require compensatory mitigation, such as restoring a former wetland, as a condition of a permit when the loss of wetlands is unavoidable. Permittees can perform the mitigation or pay a third party—a mitigation bank or an in-lieu-fee arrangement—to perform the mitigation. GAO was asked to review the (1) guidance the Corps has issued for overseeing compensatory mitigation, (2) extent to which the Corps oversees compensatory mitigation, and (3) enforcement actions the Corps can take if required mitigation is not performed and the extent to which it takes these actions.

## What GAO Recommends

GAO recommends that the Secretary of the Army direct the Corps to establish an effective oversight approach that will ensure that permittees and third parties are performing required compensatory mitigation. In commenting on our report, the Department of Defense generally agreed with GAO's recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-898.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Anu K. Mittal at (202) 512-3841 or mittala@gao.gov.

## What GAO Found

The Corps has developed guidance that establishes two primary oversight activities for compensatory mitigation: requiring the parties performing mitigation to periodically submit monitoring reports to the Corps and conducting compliance inspections of the mitigation. However, parts of the guidance are vague or internally inconsistent. For example, the guidance suggests that the Corps place a high priority on requiring and reviewing monitoring reports when "substantial mitigation" is required, but it does not define substantial mitigation. Furthermore, one section of the guidance directs district officials to conduct compliance inspections of a relatively high percentage of compensatory mitigation sites, while another section designates these inspections as a low priority, leading to confusion by Corps officials.

Overall, the seven Corps districts GAO visited performed limited oversight to determine the status of compensatory mitigation. The Corps required monitoring reports for 89 of the 152 permit files reviewed where the permittee was required to perform compensatory mitigation. However, only 21 of these files contained evidence that the Corps received these reports. Moreover, only 15 percent of the 152 permit files contained evidence that the Corps had conducted a compliance inspection. The Corps districts provided somewhat more oversight for mitigation performed by the 85 mitigation banks and 12 in-lieu-fee arrangements that GAO reviewed. For the 60 mitigation banks that were required to submit monitoring reports, 70 percent of the files contained evidence that the Corps had received at least one monitoring report. However, only 36 percent of the mitigation bank files that GAO reviewed contained evidence that the Corps conducted an inspection. For the 6 in-lieu-fee arrangements that were required to submit monitoring reports to the Corps, 5 had submitted at least one report. In addition, the Corps had conducted inspections of 5 of the 12 arrangements.

The Corps can take a variety of enforcement actions if required compensatory mitigation is not performed. These actions include issuing compliance orders, assessing administrative penalties of up to $27,500, requiring the permittee to forfeit a bond, suspending or revoking a permit, implementing the enforcement provisions of agreements with third parties, and recommending legal actions. District officials rarely use these actions and rely primarily on negotiation to resolve any violations. In some cases, GAO found district officials may not be able to use enforcement actions after detecting instances of noncompliance because they have limited their enforcement capabilities. For example, because they did not always specify the requirements of compensatory mitigation in the permits, they had no legal recourse for noncompliance.

# Contents

Letter                                                                          1

    Results in Brief                                         4
    Background                                               7
    Corps Guidance for Oversight of Compensatory Mitigation Is
       Sometimes Vague or Internally Inconsistent   12
    Corps Districts Perform Limited Oversight of Compensatory
       Mitigation                                17
    Corps Districts Can Take a Variety of Enforcement Actions to
       Resolve Violations but Rely Primarily on Negotiation   21
    Conclusions                                              26
    Recommendations for Executive Action                     27
    Agency Comments and Our Evaluation                       28

Appendixes

    Appendix I:    Scope and Methodology                       29
    Appendix II:   Corps of Engineers Federal Guidance for Oversight of
              Compensatory Mitigation                    33
    Appendix III:  File Review Results by Corps District      36
    Appendix IV:   Comments from the Department of Defense    39
    Appendix V:    GAO Contact and Staff Acknowledgments      42

Tables

    Table 1:   Permit Files Reviewed at the Seven Districts, Fiscal Year
          2000                                           30
    Table 2:   Mitigation Banks Reviewed at the Seven Districts,
          November 28, 1995, through December 2004        31
    Table 3:   In-Lieu-Fee Arrangements Reviewed at the Seven
          Districts                                       32
    Table 4:   Results of Review of Corps Oversight of Individual Permits
          Issued in Fiscal Year 2000 Where Permittees Are
          Responsible for Compensatory Mitigation         36
    Table 5:   Results of Review of Corps Oversight of Mitigation Banks
          Approved from November 1995 through December 2003   37
    Table 6:   Results of Review of Corps Oversight of In-Lieu-Fee
          Arrangements Currently in Operation at the Time of Our
          Site Visit                                      37

Figures

    Figure 1:   Marsh in Michigan                             7
    Figure 2:   Bayou in Louisiana                            8

Contents

Figure 3:  Wetlands Restoration Project in Washington, D.C. (Before
and After)                                                                    11

## Abbreviations

Corps      U.S. Army Corps of Engineers
EPA        Environmental Protection Agency

This is a work of the U.S. government and is not subject to copyright protection in the
United States. It may be reproduced and distributed in its entirety without further
permission from GAO. However, because this work may contain copyrighted images or
other material, permission from the copyright holder may be necessary if you wish to
reproduce this material separately.



**United States Government Accountability Office**
Washington, D.C. 20548

September 8, 2005

The Honorable James L. Oberstar
Ranking Democratic Member
Committee on Transportation and Infrastructure
House of Representatives

Dear Mr. Oberstar:

Wetlands such as bogs, swamps, and marshes support a number of valuable functions—controlling floods, improving water quality, and providing wildlife habitat, among other things. Given the value of these functions, the administration set a national goal in 1989 of balancing the losses and gains of wetlands to achieve no net loss of wetlands. Each subsequent President has reaffirmed and expanded this goal to achieve net gains of wetlands in the long term. The U.S. Army Corps of Engineers (Corps) is responsible for processing permit applications from individuals and businesses seeking to build driveways, houses, golf courses, or commercial buildings or perform other activities that could degrade or destroy wetlands on their property, and each year the Corps approves thousands of these permit applications. The Corps' decisions are to reflect the national concern for both the protection and utilization of important resources.

Under section 404 of the Clean Water Act, the Corps and the Environmental Protection Agency (EPA) regulate activities affecting wetlands. Under related regulations and guidance issued by these agencies, a permittee is expected to avoid deliberate discharge of fill materials into wetlands or other federally regulated waters and then to minimize discharges that cannot be avoided. If such discharges are unavoidable, the Corps can require mitigation to compensate for the loss and/or degradation of wetlands from permitted activities as a condition of issuing the permit. Such compensatory mitigation could involve (1) creating a new wetland, (2) restoring a former wetland, (3) enhancing a degraded wetland, or (4) preserving an existing wetland. Since 1993, the Corps has required such mitigation on more than 40,000 acres of land per year. Permittees may perform their own compensatory mitigation, often on or near the project site, or they may pay another entity to perform mitigation, usually at a location away from the project site, but generally within the same watershed. This kind of mitigation, known as third-party mitigation, is typically performed by mitigation banks or sponsors of in-lieu-fee arrangements. Mitigation banks are often private for-profit entities with land in areas where they believe that they can successfully establish

wetlands.[1] These areas include those that have the potential to become wetlands, previously filled wetlands, wetlands that have been degraded by invasive plant species,[2] or wetlands that are threatened by development. After the mitigation banks improve these areas as wetlands, permittees required to perform compensatory mitigation pay fees to the mitigation bank to fulfill their mitigation requirements. In contrast to mitigation banks, in-lieu-fee arrangements are often sponsored by public or nonprofit entities. Under agreements with the Corps, in-lieu-fee sponsors receive payments from multiple permittees required to perform compensatory mitigation. Then, at a later date, the sponsors use these funds to establish wetlands.

The Corps is responsible for ensuring that permittees, mitigation banks, and in-lieu-fee sponsors perform required compensatory mitigation. However, the Corps historically has not emphasized oversight of such mitigation activities. In 1988, we reported that the Corps placed a high priority on issuing permits and did not routinely inspect project sites to ensure that permittees were in compliance with their permit conditions, which include any compensatory mitigation that the permittee was required to perform.[3] More recently, the National Research Council, environmental groups, and others have raised concerns that the Corps may not spend sufficient time on oversight to ensure that permittees or third parties are performing the required compensatory mitigation.

In this context, you asked us to review the (1) guidance the Corps has established for overseeing compensatory mitigation, (2) extent to which the Corps oversees compensatory mitigation, and (3) enforcement actions the Corps can take if it determines that compensatory mitigation requirements are not being met and the extent to which it takes such actions.

---

[1] According to the Environmental Law Institute, in the early 1990s, most banks were sponsored by public entities, such as state highway agencies, but now most mitigation banks are sponsored by private entities.

[2] Invasive species are nonnative plants, animals, and microorganisms that are found throughout the United States and that have a devastating effect on natural areas, where they can take over wetland habitats and strangle native flora.

[3] GAO, *Wetlands: The Corps of Engineers' Administration of the Section 404 Program,* GAO/RCED-88-110 (Washington, D.C.: July 28, 1988).

In conducting our work, we selected 7 of the 38 Corps districts that implement the section 404 program—Charleston, South Carolina; Galveston, Texas; Jacksonville, Florida; New Orleans, Louisiana; St. Paul, Minnesota; Seattle, Washington; and Wilmington, North Carolina. We selected these districts because they represent different geographic areas of the United States and collectively accounted for over two-thirds of the compensatory mitigation required by individual permits issued in fiscal year 2003.[4] To identify the guidance the Corps has established for overseeing compensatory mitigation, we examined Corps documents and interviewed officials from Corps headquarters, as well as from Corps' district offices.

To determine the extent to which the Corps oversees compensatory mitigation, we reviewed a total of 249 files. We reviewed 152 permit files issued in fiscal year 2000 where the permittee was responsible for the mitigation. We selected this time frame because most of the permits we reviewed were valid for 5 years or less, and sufficient time would have passed for the permittee to begin work on the permitted project and for the Corps to have received a monitoring report or conducted a compliance inspection. We also reviewed files for 85 mitigation banks and 12 in-lieu-fee arrangements.[5] The mitigation bank and in-lieu-fee arrangement files we reviewed usually provided data on the mitigation activities for multiple permittees, and the mitigation conducted can encompass thousands of acres. While our results cannot be generalized to all 38 Corps districts, according to a Corps official responsible for managing the program nationally, our findings would most likely represent program

---

[4]Individual permits are typically issued for projects that may have substantial environmental impacts. For smaller impacts, Corps officials generally issue either letters of permission, which are used when the proposed work is minor and is not expected to receive appreciable opposition, or general permits, which cover activities that have been identified as being substantially similar in nature, such as stabilizing stream banks. The Charleston, Galveston, Jacksonville, New Orleans, St. Paul, and Wilmington districts were the top six districts nationwide in terms of mitigation required by individual permits. Seattle was among the top districts in the western part of the United States.

[5]In those districts where it was not feasible to review all files, we selected a random sample of files from the district's database for review. We reviewed a random sample of permit files in the Jacksonville district and a random sample of mitigation bank files in the Jacksonville, New Orleans, and St. Paul districts. Because the New Orleans district was not able to identify permits requiring the permittee to perform mitigation from their database, we asked district officials to select these permits, and we reviewed all of them.

implementation by other Corps districts. We also interviewed district officials to obtain additional information on how they oversee compensatory mitigation.

To identify enforcement actions the Corps can take if it determines that compensatory mitigation requirements are not being met and the extent to which it takes these actions, we examined agency regulations and documents that outline available enforcement actions, reviewed agency data on noncompliance cases, and discussed levels of noncompliance and actions taken with district officials. In addition, we interviewed several sponsors of mitigation banks and a sponsor of an in-lieu-fee arrangement to obtain their perspectives on the Corps' mitigation program. A more detailed description of the scope and methodology of our review is presented in appendix I. We performed our work between June 2004 and September 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

The Corps has developed guidance that establishes two primary oversight activities for compensatory mitigation. First, the Corps guidance directs district officials to require the parties performing mitigation to periodically submit monitoring reports to the Corps on the status of compensatory mitigation. Second, the guidance calls for district officials to conduct compliance inspections of the mitigation. However, we found that parts of the guidance are vague or internally inconsistent, thus limiting their usefulness. For example, the guidance suggests that requiring and reviewing monitoring reports is a high-priority activity for the Corps when "substantial mitigation" is required, but it does not define substantial mitigation. Furthermore, the guidance does not indicate what actions Corps officials should take if permittees or third parties do not submit required monitoring reports. The guidance is also internally inconsistent because, in one section of the guidance, district officials are directed to conduct compliance inspections on a relatively high percentage of compensatory mitigation sites to ensure that permit conditions have been met, while another section designates these inspections as a low-priority activity, to be conducted only if the goals for other higher priority work, such as issuing permits, have been achieved. As a result, district officials told us that they are unsure of how many resources to allocate to compliance inspections. The Corps is currently developing new guidance, which it expects to issue by fall of 2005.

Overall, the Corps districts we visited have performed limited oversight to determine the status of required compensatory mitigation. For the 152 permit files that we reviewed where the individual permittee was required to perform compensatory mitigation, we found little evidence that required monitoring reports were submitted or that the Corps conducted compliance inspections. The Corps required monitoring reports for 89 of the files that we reviewed, but only 24 percent, or 21 permit files, contained evidence that the Corps had actually received the report. Only 15 percent of the files contained evidence that the Corps had conducted a compliance inspection. Although Corps districts provided somewhat more oversight for mitigation conducted by the 85 mitigation banks and 12 in-lieu-fee arrangements that we reviewed, even in these cases oversight was still limited. For the 60 mitigation banks that were required to submit monitoring reports, 70 percent of the files showed that the Corps had received at least one monitoring report. The percentage of the mitigation bank files with evidence that the Corps conducted an inspection ranged from a low of 13 percent to a high of 78 percent in the seven districts. For the 6 in-lieu-fee arrangements that were required to submit monitoring reports to the Corps, 5 had submitted at least one report. In addition, the Corps had conducted a compliance inspection for 5 of the 12 arrangements. District officials told us that the Corps' conflicting guidance, which notes that compliance inspections are crucial yet makes them a low priority, as well as limited resources contribute to their low level of oversight of compensatory mitigation. However, because many projects that we reviewed did not receive oversight, the districts cannot definitively assess whether compensatory mitigation has been performed on thousands of acres. Without this information, it is unclear how the Corps is assessing the effectiveness of its mitigation program or assessing whether this program is contributing to the national goal of no net loss of wetlands.

The Corps can take a variety of enforcement actions if required compensatory mitigation is not performed. These actions include issuing compliance orders, assessing administrative penalties up to $27,500, suspending or revoking a permit, implementing the enforcement provisions of agreements with third parties, and recommending legal actions.[5] According to fiscal year 2003 data provided by the Corps, the seven districts did not take any enforcement actions to obtain compliance with

---

[5]Under Corps' regulations, the Corps may refer appropriate cases to the local U.S. attorney to file a criminal or civil action. Appropriate cases include, but are not limited to, violations that are willful, repeated, or of substantial impact. 33 C.F.R § 326.5.

issued permits. Instead, district officials rely primarily on negotiation with permittees and third parties, a first step in the enforcement process, rather than enforcement actions to resolve any violations. According to district officials, when they find that required compensatory mitigation has not been performed, they usually first contact the responsible parties to discuss options and time frames for bringing the permittee or third-party sponsor into compliance. District officials told us that typically no further action is necessary because the desired action is subsequently taken. If district officials are not able to resolve the noncompliance through negotiation, they told us that they then notify the responsible party in writing of the noncompliance and lay out potential enforcement actions and time frames. District officials told us that they generally resort to enforcement actions only after negotiation fails because taking enforcement actions is usually more time-consuming and does not necessarily result in the required mitigation being completed. For instance, according to Corps district officials, while monetary penalties are an effective tool that draws attention to compliance and enforcement, the funds collected from assessing these penalties are required by law to go into the general fund of the federal Treasury. We found that, sometimes, district officials wanting to pursue enforcement actions after detecting instances of noncompliance may be unable to do so because they have limited their enforcement capabilities by not specifying the requirements for compensatory mitigation in permits and by not establishing agreements with third parties. For example, the Corps does not always specify what mitigation activity should be performed or the time frame for completing the mitigation in individual permits. Similarly, some districts have not established agreements called for in federal guidance with mitigation bank or in-lieu-fee sponsors. Without such agreements, the Corps and the third-party sponsors have not formally agreed to the penalties that may be imposed and/or corrective actions that may be required if the mitigation efforts are not performed. Therefore, the Corps does not have sufficient legal recourse if third parties do not perform required compensatory mitigation.

To address the concerns we have identified, we are recommending that the Secretary of the Army direct the Corps of Engineers to establish an effective oversight approach that will ensure that permittees and third parties are performing required compensatory mitigation. In commenting on our report, the Department of Defense generally agreed with our recommendations.

# Regulatory Guidance Letter 93-02

## SUBJECT: Guidance on Flexibility of the 404(b)(1) Guidelines and Mitigation Banking

### DATE: August 23, 1993     EXPIRES: December 31, 1998

1. Enclosed are two guidance documents signed by the Office of the Assistant Secretary of the Army (Civil Works) and the Environmental Protection Agency. The first document provides guidance on the flexibility that the U.S. Army Corps of Engineers should be utilizing when making determinations of compliance with the Section 404(b)(1) Guidelines, particularly with regard to the alternatives analysis. The second document provides guidance on the use of mitigation banks as a means of providing compensatory mitigation for Corps regulatory decisions.

2. Both enclosed guidance documents should be implemented immediately. These guidance documents constitute an important aspect of the President's plan for protecting the Nation's wetlands, "Protecting America's Wetlands: A Fair, Flexible and Effective Approach" (published on 24 August 1993).

3. This guidance expires 31 December 1998 unless sooner revised or rescinded.

FOR THE DIRECTOR OF CIVIL WORKS:

JOHN P. ELMORE, P.E.
Chief, Operations, Construction and Readiness Division
Directorate of Civil Works

United States Environmental Protection Agency
Office of Wetlands, Oceans and Watersheds
Washington, D.C. 20460

United States Department of the Army
U.S. Army Corps of Engineers
Washington, D.C. 20314

MEMORANDUM TO THE FIELD

SUBJECT: APPROPRIATE LEVEL OF ANALYSIS REQUIRED FOR EVALUATING COMPLIANCE WITH THE SECTION 404(b)(1) GUIDELINES ALTERNATIVES REQUIREMENTS

Exhibit 2

1. **PURPOSE:** The purpose of this memorandum is to clarify the appropriate level of analysis required for evaluating compliance with the Clean Water Act Section 404(b)(1) Guidelines requirements for consideration of alternatives. 40 CFR 230.10(a). Specifically, this memorandum describes the flexibility afforded by the Guidelines to make regulatory decisions based on the relative severity of the environmental impact of proposed discharges of dredged or fill material into waters of the United States.

2. **BACKGROUND:** The Guidelines are the substantive environmental standards by which all Section 404 permit applications are evaluated. The Guidelines, which are binding regulations, were published by the Environmental Protection Agency at 40 CFR Part 230 on December 24, 1980. The fundamental precept of the Guidelines is that discharges of dredged or fill material into waters of the United States, including wetlands, should not occur unless it can be demonstrated that such discharges, either individually or cumulatively, will not result in unacceptable adverse effects on the aquatic ecosystem. The Guidelines specifically require that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 CFR 230.10(a). Based on this provision, the applicant is required in every case (irrespective of whether the discharge site is a special aquatic site or whether the activity associated with the discharge is water dependent) to evaluate opportunities for use of non-aquatic areas and other aquatic sites that would result in less adverse impact on the aquatic ecosystem. A permit cannot be issued, therefore, in circumstances where a less environmentally damaging practicable alternative for the proposed discharge exists (except as provided for under Section 404(b)(2)).

3. **DISCUSSION:** The Guidelines are, as noted above, binding regulations. It is important to recognize, however, that this regulatory status does not limit the inherent flexibility provided in the Guidelines for implementing these provisions. The preamble to the Guidelines is very clear in this regard:

*Of course, as the regulation itself makes clear, a certain amount of flexibility is still intended. For example, while the ultimate conditions of compliance are "regulatory", the Guidelines allow some room for judgment in determining what must be done to arrive at a conclusion that those conditions have or have not been met.*

Guidelines Preamble, "Regulations versus Guidelines", 45 Federal Register 85336 (December 24, 1980)

Notwithstanding this flexibility, the record must contain sufficient information to demonstrate that the proposed discharge compiles with the requirements of Section 230.10(a) of the Guidelines. The amount of information needed to make such a determination and the level of scrutiny required by the Guidelines is commensurate with the severity of the environmental impact (as determined by the functions of the aquatic resource and the nature of the proposed activity) and the scope/cost of the project.

   a.  **Analysis Associated with Minor Impacts:**

The Guidelines do not contemplate that the same intensity of analysis will be required for all types of projects but instead envision a correlation between the scope of the evaluation and the potential extent of adverse impacts on the aquatic environment. The introduction to Section 230.10(a) recognizes that the level of analysis required may vary with the nature and complexity of each individual case:

*Although all requirements in Section 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.*

40 CFR 230.10

Similarly, Section 230.6 ("Adaptability") makes clear that the Guidelines:

*allow evaluation and documentation for a variety of activities, ranging from those with large, complex impacts on the aquatic environment to those for which the impact is likely to be innocuous. It is unlikely that the Guidelines will apply in their entirely to any one activity, no matter how complex. It is anticipated that substantial numbers of permit applications will be for minor, routine activities that have little, if any, potential for significant degradation of the aquatic environment. **It generally is not intended or expected that extensive testing, evaluation or analysis will be needed to make findings of compliance in such routine cases.***

40 CFR 230.6 (9) (emphasis added)

Section 230.6 also emphasizes that when, making determinations of compliance with the Guidelines, users:

*must recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. **The level of documentation should reflect the significance and complexity of the discharge activity.***

40 CFR 230.6 (b) (emphasis added)

Consequently, the Guidelines clearly afforded flexibility to adjust the stringency of the alternatives review for projects that would have only minor impacts. Minor impacts are associated with activities that generally would have little potential to degrade the aquatic environment and include one, and frequently more, of the following characteristics: are located in aquatic resources of limited natural function; are small in size and cause little direct impact; have little potential for secondary or cumulative impacts; or cause only temporary impacts. It is important to recognize, however, that in some circumstances even small or temporary fills result in substantial impacts, and that in such cases a more detailed evaluation is

necessary. The Corps Districts and EPA Regions will, through the standard permit evaluation process, coordinate with the U.S. Fish and Wildlife Service, National Marine Fisheries Service and other appropriate state and Federal agencies in evaluating the likelihood that adverse impacts would result from a particular proposal. It is not appropriate to consider compensatory mitigation in determining whether a proposed discharge will cause only minor impacts for purposes of the alternatives analysis required by Section 230.10(a).

In reviewing projects that have the potential only for minor impacts on the aquatic environment, Corps and EPA field offices are directed to consider, in coordination with state and Federal resource agencies, the following factors:

i.   Such projects by their nature should not cause or contribute to significant degradation individually or cumulatively. Therefore, it generally should not be necessary to conduct or require detailed analyses to determine compliance with Section 230.10(c).

ii.  Although sufficient information must be developed to determine whether the proposed activity is in the fact the least damaging practicable alternative, the Guidelines do not require an elaborate search for practicable alternatives if it is reasonably anticipated that there are only minor differences between the environmental impacts of the proposed activity and potentially practicable alternatives. This decision will be made after consideration of resource agency comments on the proposed project. It often makes sense to examine first whether potential alternatives would result in no identifiable or discernible difference in impact on the aquatic ecosystem. Those alternatives that do not may be eliminated from the analysis since Section 230.10(a) of the Guidelines only prohibits discharges when a practicable alternative exists when would have *less adverse impact on the aquatic ecosystem.* Because evaluating practicability is generally the more difficult aspect of the alternatives analysis, this approach should save time and effort for both the applicant and the regulatory agencies.\* By initially focusing the alternatives analysis on the question of impacts on the aquatic ecosystem, it may be impossible to limit (or in some instances eliminate altogether) the number of alternatives that have to be evaluated for practicability.

     \* In certain instances, however, it may be easier to examine practicability first. Some projects may be so site-specific (e.g. erosion control, bridge replacement) that no offsite alternative could be practicable. In such cases the alternatives analysis may appropriately be limited to onsite options only.

iii. When it is determined that there is no identifiable or discernible difference in adverse impact on the environment between the applicant's proposed alternative and all other practicable alternatives, then the applicant's

alternative is considered as satisfying the requirements of Section 230.10(a).

iv.  Even where a practicable alternative exists that would have less adverse impact on the aquatic ecosystem, the Guidelines allow it to be rejected if it would have "other significant adverse environment consequences." 40 CFR 230.10(A). As explained in the preamble, this allows for consideration of "evidence of damages to other ecosystems in deciding whether there is a 'better' alternative." Hence, in applying the alternatives analysis required by the Guidelines, it is not appropriate to select an alternative where minor impacts on the aquatic environment are avoided at the cost of substantial impacts to other natural environmental values.

v.   In cases of negligible or trivial impacts (e.g., small discharges to construct individual driveways), it may be possible to conclude that no alternative location could result in less adverse impact on the aquatic environment within the meaning of the Guidelines. In such cases, it may not be necessary to conduct an offsite alternatives analysis but instead require only any practicable onsite minimization.

This guidance concerns application of the Section 404(b)(1) Guidelines to projects with minor impacts. Projects which may cause more than minor impacts on the aquatic environment, either individually or cumulatively, should be subjected to a proportionately more detailed level of analysis to determine compliance or noncompliance with the Guidelines. Projects which cause substantial impacts, in particular, must be thoroughly evaluated through the standard permit evaluation process to determine compliance with all provisions of the Guidelines.

b.  **Relationship between the Scope of Analysis and the Scope/Cost of the Proposed Project:**

The Guidelines provide the Corps and EPA with discretion for determining the necessary level of analysis to support a conclusion as to whether or not an alternative is practicable. Practicable alternatives are those alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 CFR 230.10(a)(2). The preamble to the Guidelines provides clarification on how cost is to be considered in the determination of practicability:

*Our intent is to consider those alternatives which are **reasonable in terms of the overall scope/cost of the proposed project.** The term economic [for which the term "cost" was substituted in the final rule] might be construed to include consideration of the applicant's financial standing, or investment, or market share, a cumbersome inquiry which is not necessarily material to the objectives of the Guidelines.*

Guidelines Preamble, "Alternatives", Federal Register 85339 (December 24, 1980) (emphasis added).

Therefore, the level of analysis required for determining which alternatives are practicable will vary depending on the type of project proposed. The determination of what constitutes an unreasonable expense should generally consider whether the projected cost is substantially greater that the costs normally associated with the particular type of project. Generally, as the scope/cost of the project increases, the level of analysis should also increase. To the extent the Corps obtains information on the costs associated with the project, such information may be considered when making a determination of what constitutes an unreasonable expense.

The preamble to the Guidelines also states that "[i]f an alleged alternative is unreasonably expensive to the applicant, the alternative is not, 'practicable.'" Guidelines Preamble, "Economic Factors", 45 Federal Register 85343 (December 24, 1980). Therefore, to the extent that the individual homeowners and small businesses may typically be relevant consideration in determining what constitutes a practicable alternative. It is important to emphasize, however, that it is not a particular applicant's financial standing that is the primary consideration for determining practicability, but rather characteristics of the project and what constitutes a reasonable expense for these projects that are most relevant to practicability determinations.

4. The burden of proof to demonstrate compliance with the Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued. 40 CFR 230.12(a)(3)(iv).

5. A reasonable, common sense approach in applying the requirements of the Guidelines' alternatives analysis is fully consistent with sound environmental protection. The Guidelines clearly contemplate that reasonable direction should be applied based on the nature of the aquatic resource and potential impacts of a proposed activity in determining compliance with the alternatives test. Such an approach encourages effective decision making and fosters a better understanding and enhanced confidence in the Section 404 program.

6. This guidance is consistent with the February 6, 1990 "Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning The Determination of Mitigation under the Clean Water Act Section 404(b)(1) Guidelines."

ROBERT H. WAYLAND, III
Director, Office of Wetlands, Oceans, and Watersheds
U.S. Environmental Protection Agency

MICHAEL L. DAVIS
Office of the Assistant Secretary of the Army (Civil Works)
Department of the Army

United States Environmental Protection Agency
Office of Wetlands, Oceans, and Watersheds
Washington, D.C. 20460

United States Department of the Army
U.S. Army Corps of Engineers
Washington, D.C. 20314

MEMORANDUM TO THE FIELD

SUBJECT: ESTABLISHMENT AND USE OF WETLAND MITIGATION BANKS IN
THE CLEAN WATER ACT SECTION 404 REGULATORY PROGRAM

1. This memorandum provides guidelines for the establishment and use of wetland
mitigation banks in the Clean Water Act Section 404 regulatory program. This
memorandum serves as interim guidance pending completion of Phase I by the Corps of
Engineers' Institute for Water Resources study on wetland mitigation banking,* at which
time this guidance will be reviewed and any appropriate revisions will be incorporated
into final guidelines.

* The Corps of Engineers Institute for Water Resources, under the authority of Section
307(d) of the Water Resources Development Act of 1990, is undertaking a
comprehensive two-year review and evaluation of wetland mitigation banking to assist in
the development of a national policy on this issue. The interim summary report
documenting the results of the first phase of the study is scheduled for completion in the
fall of 1993.

2. For purposes of this guidance, wetland mitigation banking refers to the restoration,
creation, enhancement, and, in exceptional circumstances, preservation of wetlands or
other aquatic habitats expressly for the purpose of providing compensatory mitigation in
advance of discharges into wetlands permitted under the Section 404 regulatory program.
Wetland mitigation banks can have several advantages over individual mitigation
projects, some of which are listed below:

   a. Compensatory mitigation can be implemented and functioning in advance of
      project impacts, thereby reducing temporal losses of wetland functions and
      uncertainty over whether the mitigation will be successful in offsetting wetland
      losses.
   b. It may be more ecologically advantageous for maintaining the integrity of the
      aquatic ecosystem to consolidate compensatory mitigation for impacts to many
      smaller, isolated or fragmented habitats into a single large parcel or contiguous
      parcels.
   c. Development of a wetland mitigation bank can bring together financial resources
      and planning and scientific expertise not practicable to many individual mitigation

proposals. This consolidation of resources can increase the potential for the establishment and long-term management of successful mitigation.

d. Wetland mitigation banking proposals may reduce regulatory uncertainty and provide more cost-effective compensatory mitigation opportunities.

3. The Section 404(b)(1) Guidelines (Guidelines), as clarified by the "Memorandum of Agreement Concerning the Determination of Mitigation under the Section 404(b)(1) Guidelines" (Mitigation MOA) signed February 6, 1990, by the Environmental Protection Agency and the Department of the Army, establish a mitigation sequence that is used in the evaluation of individual permit applications. Under this sequence, all appropriate and practicable steps must be undertaken by the applicant to first avoid and then minimize adverse impacts to the aquatic ecosystem. Remaining unavoidable impacts must then be offset through compensatory mitigation to the extent appropriate and practicable. Requirements for compensatory mitigation may be satisfied through the use of wetland mitigation banks, so long as their use is consistent with standard practices for evaluating compensatory mitigation proposals outlined in the Mitigation MOA. It is important to emphasize that, given the mitigation sequence requirements described above, permit applicants should not anticipate that the establishment of, or participation in, a wetland mitigation bank will ultimately lead to a determination of compliance with the Section 404(b)(1) Guidelines without adequate demonstration that impacts associated with the proposed discharge have been avoided and minimized to the extent practicable.

4. The agencies' preference for on-site, in-kind compensatory mitigation does not preclude the use of wetland mitigation banks where it has been determined by the Corps, or other appropriate permitting agency, in coordination with the Federal resource agencies through the standard permit evaluation process, that the use of a particular mitigation bank as compensation for proposed wetland impacts would be appropriate for offsetting impacts to the aquatic ecosystem. In making such a determination, careful consideration must be given to wetland functions, landscape position, and affected species populations at both the impact and mitigation bank sites. In addition, compensation for wetland impacts should occur, where appropriate and practicable, within the same watershed as the impact site. Where a mitigation bank is being developed in conjunction with a wetland resource planning initiative (e.g., Special Area Management Plan, State Wetland Conservation Plan) to satisfy particular wetland restoration objectives, the permitting agency will determine, in coordination with the Federal resource agencies, whether use of the bank should be considered an appropriate form of compensatory mitigation for impacts occurring within the same watershed.

5. Wetland mitigation banks should generally be in place and functional before credits may be used to offset permitted wetland losses. However, it may be appropriate to allow incremental distribution of credits corresponding to the appropriate stage of successful establishment of wetland functions. Moreover, variable mitigation ratios (credit acreage to impacted wetland acreage) may be used in such circumstances to reflect the wetland functions attained at a bank site at a particular point in time. For example, higher ratios would be required when a bank is not yet fully functional at the time credits are to be withdrawn.

6. Establishment of each mitigation bank should be accompanied by the development of a formal written agreement (e.g., memorandum of agreement) among the Corps, EPA, other relevant resource agencies, and those parties who will own, develop, operate or otherwise participate in the bank. The purpose of the agreement is to establish clear guidelines for establishment and use of the mitigation bank. A wetlands mitigation bank may also be established through issuance of a Section 404 permit where establishing the proposed bank involves a discharge of dredged or fill material into waters of the United States. The banking agreement or, where applicable, special conditions of the permit establishing the bank should address the following considerations, where appropriate:

   **a.** location of the mitigation bank;
   **b.** goals and objectives for the mitigation project;
   **c.** identification of bank sponsors and participants;
   **d.** development and maintenance plan;
   **e.** evaluation methodology acceptable to all signatories to establish bank credits and assess bank success in meeting the project goals and objectives;
   **f.** specific accounting procedures for tracking crediting and debiting;
   **g.** geographic area of applicability;
   **h.** monitoring requirements and responsibilities;
   **i.** remedial action responsibilities including funding; and
   j.  provisions for protecting the mitigation bank in perpetuity.

Agency participation in a wetlands mitigation banking agreement may not, in any way, restrict or limit the authorities and responsibilities of the agencies.

7. An appropriate methodology, acceptable to all signatories, should be identified and used to evaluate the success of wetland restoration and creation efforts within the mitigation bank and to identify the appropriate stage of development for issuing mitigation credits. A full range of wetland functions should be assessed. Functional evaluations of the mitigation bank should generally be conducted by a multi-disciplinary team representing involved resource and regulatory agencies and other appropriate parties. The same methodology should be used to determine the functions and values of both credits and debits. As an alternative, credits and debits can be based on acres of various types of wetlands (e.g., National Wetland Inventory classes). Final determinations regarding debits and credits will be made by the Corps, or other appropriate permitting agency, in consultation with Federal resource agencies.

8. Permit applications may draw upon the available credits of a third party mitigation bank (i.e., a bank developed and operated by an entity other than the permit applicant). The Section 404 permit, however, must state explicitly that the permittee remains responsible for ensuring that the mitigation requirements are satisfied.

9. To ensure legal enforceability of the mitigation conditions, use of mitigation bank credits must be conditioned in the Section 404 permit by referencing the banking agreement or Section 404 permit establishing the bank; however, such a provision should

not limit the responsibility of the Section 404 permittee for satisfying all legal requirements of the permit.

ROBERT H. WAYLAND, III
Office of Wetlands, Oceans, and Watersheds
U.S. Environmental Protection Agency

MICHAEL L. DAVIS
Office of the Assistant Secretary of the Army (Civil Works)
Department of the Army

**WARRANTY DEED, Book: 1689 Page: 0314**

34-26-19

At First Page                          Page 1 of 5                          Page 2

☆ 4, 317, 488. ☆

This instrument was prepared by:

EDWARD J. KOHRS

of Macfarlane Ferguson Allison & Kelly

P. O. Box 1531, Tampa, FL 33601

**R**

## SPECIAL WARRANTY DEED

THIS DEED, made the 15th day of March, 1988 by

ZOE F. MARVIL and HENRY LOGAN KING, of Hillsborough County,

Florida, hereinafter called Grantors, to J. ROBERT SIERRA (an

undivided 9/10 interest) and JOHN ROBERT SIERRA, JR. (an

undivided 1/10 interest), whose post office address is P. O. Box

270603, Tampa, Florida 33688, hereinafter called Grantees:

WITNESSES: That Grantors, for and in consideration of the

sum of $10.00 and other valuable consideration, receipt whereof

is hereby acknowledged, hereby grant, bargain, sell, convey and

transfer unto Grantees, all that certain land situate in Pasco

County, Florida, as more particularly described in Exhibit "A"

attached hereto and made a part hereof.

Together with all the tenements, hereditaments and appurt-

enances thereto belonging or in any wise appertaining.

To have and to hold the same in fee simple forever.

And said Grantors do hereby warrant the title to said land

with respect to acts by and claims against the Grantors, but not

otherwise, and will defend the title against the same except for

those matters described in Exhibit "B" attached hereto and made a

part hereof.

SUBJECT PROPERTY IS NOT THE HOMESTEAD OF EITHER OF THE GRANTORS

IN WITNESS WHEREOF, the said Grantors have executed this

Warranty Deed as of the day and year first above written.

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

15th day The foregoing instrument was acknowledged before me this
_March_____, 1988 by ZOE F. MARVIL.

_Grace M. Friedley_
Notary Public State at Large

My Commission Expires:
_July 23, 1989_

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

15th day of _March_____, 1988 by HENRY LOGAN KING. The foregoing instrument was acknowledged before me this

_Grace M. Friedley_
Notary Public State at Large

My Commission Expires:
_July 23, 1989_

Pasco County Official Records - Book: 1689 Page: 0314      Page 1 of 1

<< OR 1689/0308   Case 1:07-cv-01756-RCL   Document 32-4   Filed 01/16/2008   Page 3 of 5   OR 1689/0319 >>
Pasco County Official Records [ PDF | JPG | GIF ]

**WARRANTY DEED**, Book: **1689** Page: **0314**

34-26-19

EXHIBIT "A"

To Deed from Zoe F. Marvil and Henry Logan King to J. Robert Sierra
and John R. Sierra, Jr.

LEGAL DESCRIPTION

That part of the East 3/4 of the North 1/4 of Section 34, Township 26 South, Range
19 East, in Pasco County, Florida, lying North of the Northerly line of Cypress Creek
and West of the Westerly line of the Right of Way of Interstate Highway No. 175, in
Pasco County, Florida. ALSO, that part of Lots 1 through 11, inclusive; in Block 1 lying
East of the Easterly line of the Right of Way of State Road 54; Tracts 1 thorugh 26,
inclusive; Tract 28 through 34, inclusive; Tracts 36 through 40, inclusive; and Tracts
47 through 88, inclusive, in WORTHINGTON GARDENS, according to the plat thereof
as recorded in Plat Book 2, Page 57; Public Records of Pasco County, Florida; LESS
AND EXCEPT therefrom the Right of Way of Interstate Highway I-75, and also LESS
that part thereof lying Easterly of the said Right of Way, all being in Pasco County,
Florida, together with vacated rights-of-way owned by Sellers.

ALL BEING MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND
BOUNDS DESCRIPTION:

A parcel of land lying in Sections 27 and 34, Township 26 South, Range 19 East, Pasco,
County, Florida, said parcel also being a portion of "Worthington Gardens", as recorded
in Plat Book 2, Page 57, Public Records of Pasco County, Florida, all being more
particularly described as follows:

BEGIN at the Northeast corner of Tract 1 of said "Worthington Gardens", as shown
on the map or plat thereof; run thence S00°39'53"W, along a line 25.00 feet West of
and parallel to the East boundary of said Section 27 for 2130.29 feet, to a point on a
line 25.00 feet South of and parallel to the Westerly projection of the South boundary
of Borrow Pit No. 4 as shown on State of Florida, State Road Department Right-of-Way
Map, Section 14140-2401; thence S89°20'20"E, along said parallel line, for 25.00 feet,
to the East boundary of said Section 27; thence S00°39'53"W, along said East boundary
for 1629.57 feet to the Northerly right-of-way line of State Road 93 (Interstate 75)
as shown on said State of Florida, State Road Department Right-of-Way Map, Section
14140-2401; thence S20°49'13"W, along said Northerly right-of-way line for 1642.74,
feet to the intersection of the South boundary of said Section 27; thence continue
S20°49'13"W, along said Northerly right-of-way line for 1198.50 feet, to the Northerly
line of Cypress Creek, lying in the aforesaid Section 34, Township 26 South, Range 19
East; thence Westerly, along said Northerly line of Cypress Creek as approximated
by the following forty one (41) courses: 1) N89°59'03"W for 28.54 feet; 2) N89°59'03"W
for 315.23 feet; 3) N82°54'43"W for 155.80 feet; 4) N52°51'11"W for 52.19 feet; 5)
N44°45'09"W for 322.68 feet; 6) N70°08'29"W for 89.40 feet; 7) S07°32'10"W for 59.07
feet; 8) N75°39'53"W for 118.25 feet; 9) S28°40'02"W for 201.86 feet; 10) N71°55'17"E
for 78.72 feet; 11) S07°28'14"W for 98.14 feet; 12) S64°18'48"W for 199.03 feet; 13)
S11°20'23"W for 155.44 feet; 14) N75°19'30"W for 114.61 feet; 15) N82°11'08"W for
186.67 feet; 16) S75°12'55"W for 318.21 feet; 17) N86°01'02"W for 218.94 feet; 18)
N71°10'02"W for 108.14 feet; 19) N00°42'23"W for 165.90 feet; 20) N37°20'40"W for
87.65 feet; 21) N58°04'11"W for 72.19 feet; 22) N13°54'31"W for 96.13 feet; 23)
N34°39'50"W for 136.86 feet; 24) N06°54'43"W for 191.11 feet; 25) N44°49'24"W for
150.09 feet; 26) N27°16'08"W for 64.72 feet; 27) N73°08'56"W for 41.33 feet; 28)
N30°34'34"W for 34.82 feet; 29 ) N05°16'42"W for 40.53 feet; 30) N35°21'28"W for 38.88

LESS:

Tract 27 of "Worthington Gardens" according to the plat thereof as recorded in Plat Book 2, Page 57 of the Public Records of Pasco County, Florida being more particularly described as follows, to wit:

A portion of Seciton 27, Township 26 South, Range 19 East; commence at the Northeast corner of the Northwest 1/4 of said Section 27; thence S89°51'18"W along the Northerly boundary of said Section 27 a distance of 638.69 feet; thence S00°40'00"W, 25.00 feet to the Northeast corner of Tract 27 and the POINT OF BEGINNING; thence continue S00°40'00"W, 637.15 feet to the Southeast corner of said Tract 27; thence S89°52'51"W, 305.97 feet to the Southwest corner of said Tract 27; thecne N00°40'00"E, 637.00 feet to the Northwest corner of said Tract 27; thecne N89°51'18"E, 306.00 feet to the POINT OF BEGINNING.

AND ALSO LESS    ALL OF THE FOLLOWING:

Tract 35 of "Worthington Gardens" according to the Plat thereof as recorded in Plat Book 2, Page 57, of the Public Records of Pasco County, Florida, being more particularly described as follows, to wit:

A portion of Section 27, Township 26 South, Range 19 East: commence at the Northeast corner of the Northwest 1/4 of said Section 27; thence S89°51'18"W along the Northerly boundary of said Section 27, a distance of 638.69 feet; thence S00°40'00"W 1343.32 feet to the Northeast corner of said Tract 35 and the POINT OF BEGINNING; thence continue S00°40'00"W, 638.25 feet to the Southeast corner of said Tract 35; thence S89°55'56"W, 305.91 feet to the Southwest corner of said Tract 35; thence N00°40'00"E 638.12 feet to the Northwest corner of said Tract 35; thence N89°54'E 305.94 feet to the POINT OF BEGINNING.

Road right-of-way of "Worthington Gardens" according to the plat thereof as recorded in Plat Book 2, Page 57, of the Public Records of Pasco County, Florida, not previously vacated, said road right-of-way being more particularly described as follows, to wit:

BEGIN at the aforesaid Southwest corner of Tract 35 of "Worthington Gardens", run thence S89°55'56"W, along the Westerly projection, of the South boundary thereof, for 50.00 feet to the East boundary of Tract 36 of said "Worthington Gardens"; thence N00°40'00"E, along said East boundary for 926.98 feet to the Northeast corner thereof; thence S89°51'18"W, along the North boundary of said Tract 36 for 414.63 feet to the Easterly right-of-way line of State Road 54 as shown on the State of Florida, State Road Department Right-of-Way Map, Section 14090-2151; thence N05°21'08"E, along said Easterly right-of-way line for 50.23 feet; thence N89°51'18"E along the South boundary of Lot 11, Block 1 and the South boundary of Tract 29 of said "Worthington

EXHIBIT "B"

To Deed  From Zoe F. Marvil and Henry Logan King to J. Robert
Sierra and John Robert Sierra, Jr.

PERMITTED EXCEPTIONS

1.   Taxes for 1988 and subsequent years.

2.   Easement to Florida Power Corporation recorded in O.R. Book
     120, page 496, public records of Pasco County, Florida.

3.   Survey matters shown on survey prepared by Post, Buckley,
     Schuh & Jernigan, Inc. dated June 17, 1986 and revised
     February 29, 1988.

4.   Zoning and other governmental regulations.

5.   Rights of access for ingress, egress, utilities and drainage
     for the two outparcels shown on the abovementioned survey.

# COMPENSATING FOR WETLAND LOSSES UNDER THE CLEAN WATER ACT

Committee on Mitigating Wetland Losses

Board on Environmental Studies and Toxicology

Water Science and Technology Board

Division on Earth and Life Studies

National Research Council

NATIONAL ACADEMY PRESS
Washington, D.C.

Exhibit 4

NATIONAL ACADEMY PRESS 2101 Constitution Avenue, N.W. Washington, D.C. 20418

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This project was supported by Cooperative Agreement No. C X 827828-01-0 between the National Academy of Sciences and the U.S. Environmental Protection Agency. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the view of the organizations or agencies that provided support for this project.

Library of Congress Cataloging-in-Publication Data

Compensating for wetland losses under the Clean Water Act / Committee on Mitigating Wetland Losses, Board on Environmental Studies and Toxicology, Water Science and Technology Board, Division on Earth and Life Studies, National Research Council.
    p. cm.
Includes bibliographical references (p.    ).
  ISBN 0-309-07432-0 (hardcover)
  1. Wetlands—Law and legislation—United States. 2. Wetland conservation—Government policy—United States. 3. Wetland mitigation banking—United States. I. National Research Council (U.S.). Committee on Mitigating Wetland Losses.
  KF5624 .C66 2001
  346.7304'6918--dc21

2001004921

*Compensating for Wetland Losses Under the Clean Water Act* is available from the National Academy Press, 2101 Constitution Avenue, N.W., Box 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet: http://www.nap.edu

Copyright 2001 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

# Acknowledgments

Many individuals assisted the committee and National Research Council (NRC) staff in their task to create this report. We are especially grateful for the outstanding assistance provided by Lisa Morales, U.S. Environmental Protection Agency. We are also appreciative of the generous support provided by John Goodin, U.S. Environmental Protection Agency; John Studt, U.S. Army Corps of Engineers; Robert Brumbaugh, U.S. Army Corps of Engineers; Benjamin Tuggle, U.S. Fish and Wildlife Service; Thomas Bigford, National Marine Fisheries Service; Kathryn Conant, National Marine Fisheries Service; and Susan Marie Stedman, National Marine Fisheries Service.

Field trips held in conjunction with committee meetings helped the committee better understand the complexities of mitigating wetland losses. We would like to express our appreciation to the following people, who assisted the committee and NRC staff during these field trips:

*Washington, DC*
Michael Bean, Environmental Defense Fund
George Beston, Maryland Department of the Environment
Denise Clearwater, Maryland Department of the Environment
Timothy Searchinger, Environmental Defense Fund
Julie Sibbing, National Audubon Society

*Orlando, Florida*
William Ainslie, U.S. Environmental Protection Agency
William Barnard, Greater Orlando Aviation Authority
Constance Bersok, Florida Department of Environmental Protection

*ACKNOWLEDGMENTS*

Stephen Brooker, U.S. Army Corps of Engineers
Edwin Edmundson, South Florida Water Management District
Mark Evans, U.S. Army Corps of Engineers
Monica Folk, The Nature Conservancy
Paul Gray, Audubon of Florida
Kathleen S. Hale, Environmental Management and Design
Michael Norland, National Park Service
Robert Robbins, South Florida Water Management District
William Streever, U.S. Army Corps of Engineers
Edward Swakon, EAS Engineering, Inc.
Jora Young, The Nature Conservancy

*Northbrook, Illinois*
Sue Elston, U.S. Environmental Protection Agency
Jeanette Gallihugh, U.S. Fish and Wildlife Service
Donald Hey, Wetlands Research, Inc.
Kerry Leigh, Christopher B. Burke Engineering, Ltd.
Michael Miller, Illinois State Geologic Survey
James Minor, Illinois State Geologic Survey
Charles Paine, Max McGraw Wildlife Foundation
James Robb, Indiana Department of Environmental Management
Joseph Roth, Corlands
John Ryan, Land and Water Resources, Inc.
David Siebert, Wisconsin Department of Natural Resources

*Irvine, California*
Rich Ambrose, University of California, Los Angeles
Gerhard Bombe, Orange County Parks and Recreation Department
Anthony Bomkamp, Glenn Lukos & Associates
Peter Bowler, University of California, Irvine
William Bretz, University of California Natural Reserve System, San
    Joaquin Marsh Reserve
Richard Broming, Rancho Mission Viejo
Mary Kentula, U.S. Environmental Protection Agency and National
    Health and Environmental Effects Research Laboratory
Victor Leipzig, Huntington Beach Wetlands Conservancy
Molly Martindale, U.S. Army Corps of Engineers
Thomas Mulroy, Science Applications International Corporation
Eric Stein, PCR Environmental, Inc.
Mark Sudol, U.S. Army Corps of Engineers, Los Angeles District
Sat Tamaribuchi, The Irvine Company
Sherry Teresa, Center for Natural Lands Management
Kenneth Thompson, Irvine Ranch Water District
William Tippets, California Department of Fish and Game, South
    Coast Region

# Preface

The U.S. Army Corps of Engineers (Corps) and the U.S. Environmental Protection Agency (EPA) share responsibility for regulating the mitigation (lessening of impacts) of damages to wetlands. In response to a request from EPA, the National Research Council (NRC) formed the Committee on Mitigating Wetland Losses to evaluate mitigation practice as a way to restore and maintain the quality of the nation's waters, particularly as regulated under Section 404 of the Clean Water Act.

The committee reviewed the available literature on replacement of wetland functions, considered both restoration and creation efforts, visited several mitigation sites around the United States, and then evaluated both the ecological performance of mitigation projects and the institutions under which mitigation projects are conducted (permittee-responsible mitigation banks and in-lieu fee programs). At a series of five meetings, the committee worked in a truly interdisciplinary and collaborative manner to develop the conclusions and recommendations presented in this report.

The committee is grateful for the briefings and the assistance provided by the staff of EPA, the Corps, the U.S. Fish and Wildlife Service, and the National Marine Fisheries Service.

The committee is also grateful for the excellent and untiring support provided by the NRC staff, who organized the meetings and field trips and kept us on track in addressing the major tasks, as well as the fine details in report preparation. Dr. Suzanne van Drunick, our outstanding project director, kept the process on track and made sure that the report

was coherent. We all benefited greatly from the help of Jennifer Saunders, who followed Leah Probst as project assistant. Ruth Crossgrove, Mirsada Karalic-Loncarevic, and Barbara O'Hare helped with the many details that made the report ready for publication. Dr. David Policansky initiated the project, and we thank him for providing stimulating discussions. Dr. James Reisa's suggestions improved the Executive Summary.

The committee members were exemplary in their dedication to this complicated task; without their expertise, hard work, and timely responses, completion of the project would not have been possible.

Joy B. Zedler
*Chair*, Committee on Mitigating Wetland Losses

# Executive Summary

Wetlands are complex ecosystems that, depending on their type and on circumstances within a watershed, can improve water quality, provide natural flood control, diminish droughts, recharge groundwater aquifers, and stabilize shorelines. They often support a wide variety of plants and animals, including rare and endangered species, migratory birds, and the young of commercially valuable fishes. Their beauty and diversity contribute recreational value.

The current high regard for wetlands, however, contrasts with earlier practices of draining and filling prior to the mid-1970s. Some past federal policies encouraged wetland conversion to promote agricultural, commercial, and residential development; mosquito control; and other activities that benefited society. By the 1980s the wetland area in the contiguous United States had decreased to approximately 53% of what it had been in the 1780s.

In recent years, concern about the loss of wetlands in the United States has led to federal efforts to protect wetlands on both public and private lands. Provisions in the Clean Water Act especially, the Food Security Act, several court rulings, and government policies, regulations, and directives regulate discharge of pollutants to wetlands and the filling of wetlands.

A principal objective of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." The U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency define the "waters of the United States" to include

*1*

most wetlands. This interpretation recognizes that some wetlands improve water quality through nutrient cycling and sediment trapping and retention; it is based on the judgment that some goals of the Clean Water Act cannot be achieved if wetlands are not protected. Indeed, in 1989, President Bush stated that "no net loss" of wetlands was a goal of his administration, and that was reflected in interagency agreements soon afterward.

The Clean Water Act prohibits the discharge of materials, such as soil or sand, into waters of the United States, unless authorized by a permit issued under Section 404 of that act. The Corps of Engineers, or a state program approved by the Environmental Protection Agency, has authority to issue such permits and to decide whether to attach conditions to them. To achieve no net loss of wetlands within the Section 404 program, a permittee is first expected to avoid deliberate discharge of materials into wetlands and then to minimize discharge that cannot be avoided. When damages are unavoidable, the Corps of Engineers can require the permittee to provide "compensatory mitigation" as a condition of issuing a permit.

Compensatory mitigation specifically refers to restoration, creation, enhancement, and in exceptional cases, preservation of other wetlands as compensation for impacts to natural wetlands. The permit recipient, either on a permit-by-permit basis or within a single-user mitigation bank, carries out "permittee-responsible" mitigation. In third-party mitigation (i.e., commercial mitigation bank, in-lieu fee program, cash donation, or revolving fund program), another party accepts a payment from the permittee and assumes the permittee's mitigation obligation. Most compensatory mitigation has been done by permit recipients, rather than by third parties.

The Committee on Mitigating Wetland Losses, which prepared this report, was established by the National Research Council to evaluate how well and under what conditions compensatory mitigation required under Section 404 is contributing toward satisfying the overall objective of restoring and maintaining the quality of the nation's waters. The committee reviewed examples of wetland restoration and creation projects in Florida, Illinois, and southern California that were required as a condition of Section 404 permits; received briefings from outside experts; and conducted an extensive review of the scientific literature on wetlands, government data and reports, and information provided by a wide variety of experts and organizations.

## THE COMMITTEE'S PRINCIPAL FINDINGS

*Conclusion 1: The goal of no net loss of wetlands is not being met for wetland functions by the mitigation program, despite progress in the last 20 years.*

A recent study by the U.S. Fish and Wildlife Service suggests that the rate of loss of wetland area has slowed over the past decade. From 1986 to 1997, the estimated annual rate of wetland loss (58,545 acres per year) was about 23% that of the previous decade. Wetland losses due to agriculture declined precipitously, and there were significant reductions in losses due to urban and rural development. The decrease in wetland loss due to development may be attributable to the 404 permit process; however, the available data are not sufficient for drawing a firm conclusion.

The Corps of Engineers keeps data on the areas of permitted fill and areas of compensatory mitigation required as a condition for permits. From 1993 to 2000, approximately 24,000 acres of wetlands were permitted to be filled, and 42,000 acres were required as compensatory mitigation on an annual basis. Thus, 1.8 acres were supposed to be mitigated (i.e., gained) for every 1 acre permitted (i.e., lost). If the mitigation conditions specified in permits were actually being met, this ratio suggests that the 404 permit program could be described as resulting in a net gain in jurisdictional wetland area and function in the United States. The committee, however, found that the data available from the Corps were not adequate for determining the status of the required compensation wetlands. In addition, the data do not report the wetland functions that were lost due to the permitted fill. Further, the literature on compensatory mitigation suggests that required mitigation projects often are not undertaken or fail to meet permit conditions. Therefore, the committee is not convinced that the goal of no net loss for permitted wetlands is being met for wetland functions. The magnitude of the shortfall is not precisely known and cannot be determined from current data.

*Recommendations*

- The wetland area and functions lost and regained over time should be tracked in a national database. This database could include the Corps of Engineers' Regulatory Analysis and Management System database.
- The Corps of Engineers should expand and improve quality assurance measures for data entry in the Regulatory Analysis and Management System database.
- The Corps of Engineers, in cooperation with states, should encourage the establishment of watershed organizations responsible for tracking, monitoring, and managing wetlands in public ownership or under easement.

*Conclusion 2: A watershed approach would improve permit decision making.*

Wetland functions must be understood within a watershed framework in order to secure the purposes of the Clean Water Act. The federal

guidelines for permit decision making express a strong preference for compensation as near the permitted impact site as possible and for the same wetland type and functions. The committee concluded that such a preference for on-site and in-kind mitigation should not be automatic, but should follow from an analytically based assessment of the wetland needs in the watershed and the potential for the compensatory wetland to persist over time.

On-site compensation is typically constrained by hydrological conditions that are likely to have been or are being modified by the developments requiring mitigation. Hydrological conditions, including variability in water levels and water flow rates, are the primary driving force influencing wetland development, structure, functioning, and persistence. Proper placement within the landscape of compensatory wetlands to establish hydrological equivalence is necessary for wetland sustainability. The ability to achieve desired outcomes within a specific location is also a function of the degree of degradation of the hydrological conditions, soils, vegetation, and fauna at the site. The more degraded the local site and the more degraded the watershed, the less likely it will support a high-quality project. Thus, opportunities for in-kind compensation need to be sought within a larger landscape context.

Even with a suitable position in the landscape, the ability to establish desired wetland functions will depend on the particular function, the restoration or creation approach used, and the degree of degradation at the compensation site. Landscape position, hydrological variability, species richness, biological dynamics, and hydrological regime all are important factors that affect wetland restoration and mitigation of loss. Some wetland types—in particular, fens and bogs—cannot be effectively restored with present knowledge. Mitigation efforts that do not include a proper assessment of such factors are unlikely to contribute to the goals of the Clean Water Act.

### Recommendations

• Avoidance is strongly recommended for wetlands that are difficult or impossible to restore, such as fens or bogs.
• Site selection for wetland conservation and mitigation should be conducted on a watershed scale in order to maintain wetland diversity, connectivity, and appropriate proportions of upland and wetland systems needed to enhance the long-term stability of the wetland and riparian systems. Regional watershed evaluation would greatly enhance the protection of wetlands and/or the creation of wetland corridors that mimic natural distributions of wetlands in the landscape.
• All mitigation wetlands should become self-sustaining. Proper

placement in the landscape to establish hydrogeological equivalence is inherent to wetland sustainability.

- The biological dynamics should be evaluated in terms of the populations present in reference models for the region and the ecological requirements of those species.

- The science and technology of wetland restoration and creation need to be based on a broader range of studies involving sites that differ in degree of degradation, restoration efforts, and regional variations. Predictability and effectiveness of outcomes should then improve.

- Hydrological variability should be incorporated into wetland mitigation design and evaluation. Except for some open-water wetlands, static water levels are not normal. Because of climatic variability, it should be recognized that many wetland types do not satisfy jurisdictional criteria every year. Hydrological functionality should be based on comparisons to reference sites during the same time period.

- Riparian wetlands should receive special attention and protection, because their value for stream water quality and overall stream health cannot be duplicated in any other landscape position.

A mitigation site needs to have the ability to become self-sustaining. This means that the hydrological processes that define a wetland in the ecosystem need to be present and expected to persist in perpetuity. To aid regulators and mitigators in designing projects that will become ecologically self-sustaining, the committee offers 10 operational guidelines.

### Operational Guidelines for Creating or Restoring Self-Sustaining Wetlands

1. Consider the hydrogeomorphic and ecological landscape and climate.
2. Adopt a dynamic landscape perspective.
3. Restore or develop naturally variable hydrological conditions.
4. Whenever possible, choose wetland restoration over creation.
5. Avoid over-engineered structures in the wetland's design.
6. Pay particular attention to appropriate planting elevation, depth, soil type, and seasonal timing.
7. Provide appropriately heterogeneous topography.
8. Pay attention to subsurface conditions, including soil and sediment geochemistry and physics, groundwater quantity and quality, and infaunal communities.
9. Consider complications associated with wetland creation or restoration in seriously degraded or disturbed sites.
10. Conduct early monitoring as part of adaptive management.

*Conclusion 3: Performance expectations in Section 404 permits have often been unclear, and compliance has often not been assured nor attained.*

The attainment of no net loss of wetlands through both permittee and third-party mitigation requires that performance requirements for individual compensation sites be clearly stated and that the stated requirements will be met by the parties responsible for the mitigation. Some mitigation sites studied by the committee have met the criteria for permit compliance and are, or show promise of, developing into functional wetlands. However, in many cases, even though permit conditions may have been satisfied, required compensation actions were poorly designed or carelessly implemented. In other cases, the location of the mitigation site within the watershed could not provide the necessary hydrological conditions and hence the desired plant and animal communities, including buffers and uplands, necessary to achieve the desired wetland functions.

At some sites, compliance criteria were being met, but the hydrological variability that is a defining feature of a wetland had not been established. Concern that sites might not meet hydrological criteria used to define wetlands in the permitting process often encouraged construction of permanently flooded open-water wetlands. In some situations, seasonally and intermittently flooded or saturated wetlands would have better served the needs of the watershed. Compliance criteria sometimes specified plant species that the site conditions could not support or required plantings that were unnecessary or inappropriate. Monitoring is seldom required for more than 5 years, and the description of ecosystem functions in many monitoring reports is superficial. Legal and financial mechanisms for assuring long-term protection of sites are often absent, especially for permittee-responsible mitigation.

Long-term management is especially important, because wetland restoration and creation sites seldom achieve functional equivalency with reference sites or comply with permit requirements within 5 years. Up to 20 years may be needed for some wetland restoration or creation sites to achieve functional goals. The amount of time needed to become fully functional depends on the type of wetland, its degree of degradation, conditions in the surrounding watershed, and uncertainties in the application of scientific understanding. Once wetlands become fully functional, long-term stewardship, including monitoring or periodic assessment, is critical to achieving the goals of the Clean Water Act. "Long-term stewardship" implies a time frame typically accorded to other publicly valued natural assets, such as parks. This time frame emphasizes the importance of developing mitigation wetlands that are self-sustaining, so that the long-term costs are not unmanageable. The committee recommends three general goals to ensure compliance of sites that contribute to the water-

shed. The committee made nine specific recommendations to achieve these goals.

### General Goals

- Individual compensatory mitigation sites should be designed and constructed to maximize the likelihood that they will make an ongoing ecological contribution to the watershed; this contribution should be specified in advance.
- Compensatory mitigation should be in place concurrent with, and preferably before, permitted activity.
- To ensure the replacement of lost wetland functions, there should be effective legal and financial assurances for long-term site sustainability and monitoring of all compensatory wetland projects.

### Specific Recommendations

- Impact sites should be evaluated using the same functional assessment tools as used for the mitigation site.
- Mitigation projects should be planned with and measured by a broader set of wetland functions than are currently employed.
- Mitigation goals must be clear, and those goals carefully specified in terms of measurable performance standards, in order to improve mitigation effectiveness. Performance standards in permits should reflect mitigation goals and be written in such a way that ecological viability can be measured and the impacted functions replaced.
- Because a particular floristic assemblage might not provide all the functions lost, both restoration of community structure (e.g., plant cover and composition) and restoration of wetland functions should be considered in setting goals and assessing outcomes. Relationships between structure and function should be better known.
- The Corps of Engineers and other responsible regulatory authorities should use a functional assessment protocol that recognizes the watershed perspective to establish permittee compensation requirements.
- Dependence on subjective, best professional judgment in assessing wetland function should be replaced by science-based, rapid assessment procedures that incorporate at least the following characteristics: effectively assess goals of wetland mitigation projects; assess all recognized functions; incorporate effects of position in landscape; reliably indicate important wetland processes, or at least scientifically established structural surrogates of those processes; scale assessment results to results from reference sites; are sensitive to changes in performance over a dynamic range; are integrative over space and time; and generate parametric and dimensioned units, rather than nonparametric rank.

- The Corps of Engineers and other responsible regulatory authorities should take actions to improve the effectiveness of compliance monitoring before and after project construction.
- Compensatory mitigation sites should receive long-term stewardship, i.e., a time frame expected for other publicly valued assets, such as parks.
- The Corps of Engineers and other responsible regulatory authorities should establish and enforce clear compliance requirements for permittee-responsible compensation to assure that (1) projects are initiated no later than concurrent with permitted activity, (2) projects are implemented and constructed according to established design criteria and use an adaptive management approached specified in the permit, (3) the performance standards are specified in the permit and attained before permit compliance is achieved, and (4) the permittee provides a stewardship organization with an easement on, or title to, the compensatory wetland site and a cash contribution appropriate for the long-term monitoring, management and maintenance of the site.

*Conclusion 4: Support for regulatory decision making is inadequate.*

In addition to using a watershed framework, the federal regulatory authorities can work to improve functional wetland assessment, permit compliance monitoring, staff training, research, and collaboration with state agencies. The committee recommends that the Corps of Engineers, Environmental Protection Agency, and other responsible regulatory authorities take several specific actions.

### Recommendations

- To assist permit writers and others in making compensatory mitigation decisions, a reference manual should be developed to help design projects that will be most likely to achieve permit requirements. The manual should be organized around the themes developed in this report. The Corps of Engineers should develop such a manual for each region, based in part on the careful enumeration of wetland functions in the 404(b)(1) guidelines and in part on local and national expertise regarding the difficulty of restoring different wetland types, hydrological conditions, and functions in alternative restoration or creation contexts.
- The Corps of Engineers and other responsible authorities should commit funds to allow staff participation in professional activities and in technical training programs that include the opportunity to share experiences across districts.

• The Corps of Engineers and other responsible regulatory authorities should establish a research program to study mitigation sites to determine what practices achieve long-term performance for creation, enhancement, and restoration of wetlands.

• States, with the participation of appropriate federal agencies, are encouraged to prepare technical plans or initiate interagency consensus processes for setting wetland protection, acquisition, restoration, enhancement, and creation project priorities on an ecoregional (watershed) basis.

*Conclusion 5: Third-party compensation approaches (mitigation banks, in-lieu fee programs) offer some advantages over permittee-responsible mitigation.*

The committee evaluated several compensatory mitigation mechanisms and developed a taxonomy to evaluate their potential strengths and weaknesses. Mechanisms were characterized by the following five attributes: (1) on-site or off-site compensatory mitigation action; (2) responsible party; (3) timing of the mitigation actions; (4) whether the Mitigation Banking Review Team process is used; and (5) stewardship requirements. The committee does not favor any particular mechanism but has offered recommendations that will, if adopted, assure that permittee-responsible as well as third-party mitigation will secure no net loss of wetlands. In addition, the committee believes that no net loss of wetlands will require a strengthened partnership with the states.

### Recommendations

• The taxonomy developed by the committee is recommended as a reference point for discussions about compensatory mitigation. In practice, however, a compensatory mitigation mechanism may not fit neatly into one of the listed categories (e.g., mitigation bank versus in-lieu fee versus cash donation). Accordingly, the committee recommends that when an agency reviews mitigation options, it is most important to focus on their characteristics or attributes (e.g., who is legally responsible, the timing of the mitigation actions, whether the Mitigation Banking Review Team process is used, and whether stewardship requirements are in place).

• Institutional systems should be modified to provide third-party compensatory mitigation with all of the following attributes: timely and assured compensation for all permitted activities; watershed integration; and assurances of long-term sustainability and stewardship for restored, created, enhanced, or preserved wetlands.

• The Corps of Engineers and the Environmental Protection Agency should work with the states to expand their permitting and watershed planning programs to fill gaps in the federal wetland program.

## CONCLUSION

The Clean Water Act Section 404 program should be improved to achieve the goal of no net loss of wetlands for both area and functions. The above recommendations will help to achieve this goal. It is of paramount importance that the regulatory agencies consider each permitting decision over broader geographic areas and longer time periods, i.e., by modifying the boundaries of permit decision making in time and space.

The EPA issued its Section 404(b)(1) guidelines in 1975 (Fed. Regist. 40(Sept. 5):41292-41298)). In their first iteration the guidelines stressed the need to avoid wetland impacts. If no less environmentally damaging practicable alternative existed and if a project would not cause unacceptable adverse impacts on aquatic resources, the Corps could issue a permit. The guidelines also called for the impacts of a permitted project to be minimized. No mention was made of restoration, enhancement, or creation of wetlands, although the 1975 guidelines stated that "[c]onsideration shall be given to preservation of submersed and emergent vegetation."

The current Section 404(b)(1) guidelines, promulgated in 1980, reaffirmed the avoidance and minimization requirements in greater detail (Fed. Regist. 45(Dec. 24):85336-85357). Subpart H (230.70-77) describes a number of actions that the Corps should consider as permit conditions to minimize adverse effects—for example, actions concerning the location of discharge, composition of discharge material, control of material after discharge, method of dispersal, and use of appropriate equipment and technology. Included in the minimization discussion is a reference to compensatory mitigation: "Habitat development and restoration techniques can be used to minimize adverse impacts and to compensate for destroyed habitat." Thus, in the Section 404(b)(1) guidelines, compensatory mitigation, such as the restoration of wetlands, is a subset of minimization.

Additional support for compensatory mitigation can also be found elsewhere in the Section 404(b)(1) guidelines. The guidelines require that a permitted activity not cause or contribute to significant degradation of the waters of the United States, either individually or cumulatively. When determining whether a proposed activity will result in significant degradation, the Corps will consider to what extent compensatory mitigation will offset the activity's adverse effects.

The Section 404(b)(1) guidelines were developed in accordance with the Administrative Procedure Act's public notice and comment procedures and are binding regulations that appear in the Code of Federal Regulations. Frequently, agencies turn to less formal documents, such as MOAs or regulatory guidance letters (which are typically not subjected to public notice and comment) to interpret the requirements of the CWA and the Section 404(b)(1) guidelines (Gardner 1991). These documents are issued to provide guidance to agency personnel and the public to explain how the agencies intend to apply the statute and regulations in the field. Much of the detail of the mitigation policies for the Section 404 program is found in these guidance documents.

A 1990 MOA between EPA and the Department of the Army explains how mitigation determinations should be made (Fed. Regist. 55(Mar. 12):9210). The MOA notes that the mitigation requirements of CEQ's regu-

*COMPENSATING FOR WETLAND LOSSES UNDER THE CLEAN WATER ACT*

lation and the CWA Section 404(b)(1) guidelines are compatible and, as a practical matter, may be condensed to three general types of mitigation: avoidance, minimization, and compensatory mitigation (see Figure 4-1). The MOA emphasizes that this mitigation must be applied in a sequential fashion: an applicant must first avoid wetlands to the extent practicable; then minimize unavoidable impacts; and, finally, compensate for any remaining impacts through restoration, enhancement, creation, or, in exceptional cases, preservation. With respect to compensatory mitigation, the MOA expresses a preference for on-site, in-kind mitigation, with restoration as the first option considered.

The Corps and EPA mitigation MOA's sequencing requirement is limited in several important respects. First, the MOA applies only to individual permits, not general permits such as nationwide permits. Significantly, the Corps has reported that up to 85% of authorized projects in waters of the United States proceed under a general permit (Davis 1997).



FIGURE 4-1   Mitigation sequencing.

types described in other documents; or presence of certain wildlife species, particularly species with special status designations, such as species listed pursuant to the federal Endangered Species Act. Few permits specify animal populations or communities; however, habitat for selected species (e.g., waterfowl and endangered species) is sometimes specified.

## PROJECT IMPLEMENTATION

### Mitigation Permit with Special Conditions

Once a Section 404 mitigation plan is completed, it is provided to the Corps for review and approval. When the Section 404 permit is issued, the items prescribed in the mitigation plan are included as a special condition of the permit. These special conditions form the legal requirements of the permit. Because the permit requirements are legally binding, it is important that the permit conditions be clear, complete, and comprehensive so that the desired mitigation outcome is achieved. If the special conditions are not included in the permit or if they do not clearly describe mitigation milestones to be achieved, it is possible for regulatory certification to be obtained by the permittee even though the mitigation does not produce a mitigation site that replaces the impact area's functions and values (see Coyote Creek case study, Appendix B).

### Mitigation Specified But Not Carried Out

The committee learned that in some cases specified mitigation was not initiated as required in the Corps permit. Eight studies provided information as to whether required mitigation was initiated for a mixture of programs (Table 6-3). In addition, numerous studies on mitigation required by permits revealed that as much as 34% of the mitigation was never installed (FDER 1991b; Allen and Feddema 1996; Sudol 1996; Robb 2000). In southeast Florida, Erwin's (1991) study of 40 mitigation wetland creation and restoration projects found that only about half of the required 430 hectares of wetlands had been constructed.

The committee found that compliance inspections are rarely conducted by the Corps and that this is policy. In a Memorandum for Commanders, Major Subordinate Commands, and District Commands dated April 8, 1999, Major General Russell Furman provided the Standard Operating Procedures (SOPs; Appendixes F and G) and described how the regulatory program would be executed across the United States. In addition to describing policy and program administration, the SOPs prioritized regulatory activities by the percentage of staff time devoted to them. Activities to be emphasized are described as "above the line," and de-

TABLE 6-3    Mitigation Initiated for Permits Requiring Mitigation

| Location | Source | No. of Permits Considered | Initiated, % |
|---|---|---|---|
| Orange County | Sudol (1996) | 57 | 96 |
| Southern California | Allen and Feddema (1996) | 75 | 92 |
| Florida | Erwin (1991) | 97 | 66 |
| Indiana | Robb (2000) | 345 | 62 (completed)[a] |
| | | | 14 (not attempted) |
| | | | 20 (incomplete) |
| Massachusetts | Brown and Veneman (1998) | 114 | 74 |
| New Jersey | Torok et al. (1996) | 80 | 28 |
| Ohio | Fennessy and Roehrs (1997) | 14 | 100 |
| Washington | Johnson et al. (2000) | 45 | 93 |

[a]For 1988-1993 permits as of 1995; additional ones may be under construction in later years.

emphasized activities are described as "below the line." The SOPs specifically note that "below-the-line" activities should be accomplished only after the "above-the-line" activities are fully executed. The SOP lists 10 activities under Permit Evaluation, plus another eight under Mitigation. Under Permit Evaluation, activity number 1, resource permit evaluation for timely decisions, is above the line. Extensive negotiation with other agencies to reach consensus (number 7) and multiple site visits and meetings of extensive preapplication (number 10) are below the line. Under Mitigation, compliance inspections for all mitigation (number 6) and multiple visits to a mitigation site (number 8) are below the line. Of the five activities under Enforcement (number 2) implement self-reporting and certification for compliance is above the line. The committee found that the cumulative effect of these policy decisions indicates that evaluating and issuing permits takes priority over careful evaluation of mitigation projects.

In addition to the SOPs, testimony provided to the committee by Corps staff from Chicago, Los Angeles, and San Francisco indicated that the workload for Corps regulatory staff is exceedingly high. Regulators from all the Corps Districts providing testimony to the committee indicated that there are consistently more Section 404 permit applications than there is time for Corps staff to perform adequate reviews. That problem, coupled with guidance provided in the SOPs, indicates that priority is given to issuing permits (which often require mitigation), yet mitigation development and follow-up inspections to determine if mitigation

commitments are being met is not a priority, and the activity is not encouraged. Indeed, the SOPs suggest that since compliance inspections and site visits fall "below the line," these activities are not adequately performed because there is insufficient time for staff to perform the activities "above the line." The committee believes that compliance inspections should be an "above-the-line" activity to ensure that the programmatic goal of no net loss of wetland functions and values is met.

If the Corps recognized mitigation compliance and increased compliance as a priority activity, mitigation would more likely be carried out as specified in Section 404 permits. The committee recognizes that increasing compliance efforts would result in increased staff workloads requiring additional regulatory staff.

## COMPLIANCE WITH PERMIT CONDITIONS

The literature shows that many mitigation sites are not performing as specified in Corps permits (Allen and Feddema 1996; Sudol 1996; FDER 1991b; Race 1985). These same studies also show that where mitigation is performing as specified, many of those sites do not support functions and values equivalent to similar reference sites. In some cases, the standard to be met by an individual compensatory mitigation project may stop with a requirement to secure some wetlands structure or to design the project in a particular way. In this case, the premise is that restoring hydrology will facilitate the development of other wetland functions. However, permits do not always call for hydrological measurement.

If mitigation is not carried out to the level specified in the permit, then the Corps can take enforcement action and require a permittee to perform the agreed-upon mitigation. However, if the permit does not specify mitigation, or if the permit is not clear as to the level of mitigation that must be performed or what parameters must be met for the mitigation to be considered complete, it becomes difficult for the Corps to determine if the project is in compliance. Mason and Slocum (1987), for example, found that compliance rates were twice as high when the permits contained specific conditions compared with those that had no specific conditions. For this reason, it is important that Section 404 permits specifying mitigation contain specific language about the expected mitigation outcome (mitigation goal).

The mitigation goal statement should be followed by specific objectives that consist of specific statements about the intended mitigation outcome (Streever 1999b). Performance standards are then developed from the mitigation goal statement and objectives. When these performance standards are included in the Section 404 permit as special conditions, they become legally binding upon the permittee.

## Design Standards and Detailed Performance Standards

With detailed assessment of the impacted sites and/or reference systems selected as targets, the committee could set detailed performance standards. But neither data set is typically available. Thus, projects are designed without adequate knowledge, and performance criteria are general and few in number (Streever 1999b). Ecologists, hydrologists, and other scientists who study mitigation sites find many shortcomings in comparing mitigation sites with reference systems (see Chapter 2). Thus, it seems that regulators need to agree that either (1) design standards constitute reasonable performance criteria, or (2) detailed assessment of functions lost must be matched by detailed assessment of mitigation site performance and penalties developed for failure to achieve performance standards.

A consistent set of procedures to identify wetlands is required in order to permit wetland filling under the guidelines of the CWA. The Corps created preliminary guides to regional wetlands and developed techniques for identifying wetlands (USACE 1978a,b,c,d; Reppert 1979; USACE 1987; NRC 1995). The resulting schemes were based on a triad of wetland characteristics: hydrological conditions, soil characteristics, and plant communities. Lists of wetland plant species and hydric soils were created for all parts of the country (USDA 1982, 1985, 1987, 1991). Hydrological requirements were codified (such as number of days of flooding and depth to groundwater) and, to some extent, adapted to various regions. Hydrological data were not available for many wetland sites; therefore, procedures were developed for estimating hydrological conditions from soils and other features (NRC 1995). More detail on the history of the federal wetland manuals and current and past practices in wetland delineation is presented in NRC (1995).

Basic to all wetland restoration and creation projects is the need to set goals for each site's hydrological conditions. Hydrology is most often cited as the primary driving force influencing wetland development, structure, function, and persistence (Gosselink and Turner 1978; Carter 1986; LaBaugh 1986; Day et al. 1988; Novitzki 1989; Wilcox 1988; Gosselink et al. 1990; Sharitz et al. 1990; FDER 1991a; Reaves and Croteau-Hartman 1994; Bedford 1996, 1999; Morgan and Roberts 1999). Consequently, establishment of the appropriate hydrology is fundamental to wetland mitigation whether through restoration or creation (NRC 1992, 1995; Brinson 1993; Bedford 1996; Mitsch and Wilson 1996; Shaffer et al. 1999; Cole and Brooks 2000b). In a survey of 175 federal, state, private, and environmental professionals working in wetland restoration, hydrology was considered one of the most difficult structural features of a wetland to establish and the most important component of a project (Holman and Childres 1995).

One measure of mitigation compliance is the restoration of jurisdictional hydrology. An explicit hydrological standard is the percentage of the growing season that soils need to be saturated. Clark and Benforado (1981) suggested that areas saturated less than 5% of the growing season clearly exhibited upland hydrological characteristics and that areas saturated more than 12.5% clearly exhibited wetland hydrological characteristics. The 1987 Corps wetland delineation established the 5% criterion as the jurisdictional threshold, a quantitative value that was reaffirmed by the NRC (1995). However, there are major differences in depth to water table between a wetland that satisfies the 5% standard and one that meets the 12.5% standard (see Figure 6-1). These differences in wetness lead to very different ecological communities (Scherrer et al. 2001).

Because the permittees responsible for the mitigation need some time frame that clearly defines the length of their mitigation responsibility, hydrological performance standards may be based on 5 years or less of water-table monitoring. However, the hydrological regime in nonriverine, intermittently saturated freshwater wetlands varies not only seasonally but also year to year (see Figure 6-2). During a short monitoring period,



FIGURE 6-1   Water-table position and duration of root zone saturation for wetland site that satisfies the jurisdictional hydrology criteria (5% of growing season) as compared with wetland site that satisfies the criteria (12% of the growing season). Simulation modeling (DRAINMOD) was used to determine values. SOURCE: Skaggs (1978). Reprinted with permission; copyright 1978, Water Resources Research Institute of the University of North Carolina, Raleigh.



FIGURE 6-2   Year-to-year variations in water-table depth and duration of root zone saturation for a wetland site that satisfies jurisdictional hydrology criteria at least 5% of the growing season. Year-to-year extremes are typical for intermittently saturated wetlands. Values determined from simulation modeling using DRAINMOD. SOURCE: Skaggs (1978). Reprinted with permission; copyright 1978, Water Resources Research Institute of the University of North Carolina, Raleigh.

water levels might not meet hydrological standards for several consecutive years, even though the wetland could satisfy criteria over the long term. Depending on the date when the 5-year monitoring period began and ended, there could be six 5-year periods where the wetland did not satisfy hydrological criteria (see Figure 6-3). If this were a mitigation site and the 5-year monitoring period occurred during one of these six periods, the mitigation project would not comply with performance standards. Recognizing this potential shortcoming, practitioners tend to err toward the wet end of the range, creating wetlands that are much wetter than normal for the given landscape position (Cole and Brooks 2000b).

In many cases this approach has resulted in the creation of open-water areas as compensation for loss of intermittently inundated or saturated wetlands (Kentula et al. 1992a). The stable-water pond has come to typify mitigation efforts in many parts of the country (Cole and Brooks 2000b). Mitigation projects that stress the wet end of the range will not replace the functions provided by much drier impact sites. For example, use of a mitigation site as a stormwater storage, attenuation, or treatment wetland may compromise biodiversity goals.



FIGURE 6-3    Year-to-year variation of the longest period that wetland hydrological criteria satisfied. Results obtained from long-term simulation modeling using DRAINMOD. NOTE: There are several 5-year periods where criteria are not satisfied 3 out of 5 years. SOURCE: Skaggs (1978). Reprinted with permission; copyright 1978, Water Resources Research Institute of the University of North Carolina, Raleigh.

Breaux and Serefiddin (1999) examined 110 compensatory wetland mitigation projects in California (permitted from 1988 to 1995) and determined that the most commonly measured parameter was vegetation (type or cover) (Table 6-4). Two of the most commonly assumed wetland val-

TABLE 6-4    Parameters Measured in 110 Compensatory Wetland Mitigation Projects in California from 1988 to 1995

| Parameter | % of Sites Measured |
|---|---|
| Vegetation | 72 |
| Hydrology | 22 |
| Wildlife | 38 |
| Water quality | 7 |
| Soils | 3 |
| Invertebrates | 3 |
| Flood storage | Not mentioned |

SOURCE: Adapted from Breaux and Serefiddin (1999).

ues, flood storage and water-quality improvements, were supposed to be examined in less than 10% of the permits.

The committee concludes that current permitting procedures do not always result in permit conditions that are clear and enforceable and lead to the development of viable mitigation that compensates for the functions and values of the permitted impact. Instead, permits typically contain performance standards that measure only one or several easily measured parameters of a mitigation site, and in many cases, these parameters do not reflect the overall viability of the mitigation site. Recommendations relevant to this conclusion are provided in Chapter 8.

## MITIGATION RATIOS

Mitigation ratios are the proportional requirements for replacing wetlands that are permitted for fill. A point that is frequently raised in assessments of mitigation is that the ratios (the number of required mitigation acres to the permitted acres) are too low (Morgan and Roberts 1999; Allen and Feddema 1996). Ratios vary across permits, often because the logic behind the ratios differs. Higher ratios might be required for sites and wetland types that are difficult to restore. Higher ratios might be also used if there is a long time expected between the permitted activity and the achievement of the desired endpoint for the compensation site. Ratios have been used to reflect the functional values of the impact site, that is, the ratio would be higher for a pristine wetland than for a severely degraded wetland. An example of ratio guidelines used by the California Department of Fish and Game incorporates this principle in its guidelines for mitigating impacts to streams and associated habitat (see Appendix D). Mitigation ratios are 1:1 for low-value habitat (e.g., unvegetated streams), whereas ratios can be as high as 5:1 for impacts to endangered species habitat (e.g., mature willow riparian inhabited by least Bell's vireo).

The Corps and the Environmental Protection Agency (EPA) mitigation Memorandum of Agreement (MOA) states that "mitigation should provide, at a minimum, one-for-one functional replacement (i.e., no net loss of values), with an adequate margin of safety to reflect the expected degree of success associated with the mitigation plan . . . [T]his ratio may be greater where the functional values of the area being impacted are demonstrably high and the replacement wetlands are of lower functional value or the likelihood of success of the mitigation project is low. Conversely, the ratio may be less than 1 to 1 for areas where the functional values associated with the area being impacted are demonstrably low and the likelihood of success associated with the mitigation proposal is high."

Whether required ratios were met was examined in nine studies for four nonfederal (not Section 404) programs (see Table 6-5). The mitigation ratio requirements were never fully met, but the ratio for the mitigation implemented was higher than 1:1 in three of the nine studies. These results present another way of examining the compliance rate of mitigation when viewed on a programmatic scale. The average percentage was 69%, implying that for these nine mitigation efforts, a 1.5:1 ratio of mitigation:loss acreage would be needed to equal the area lost (if all other permit conditions are met, including functional equivalency). The committee concludes that some mitigation will not be fully implemented. The reasons that mitigation projects do not meet expectations are partially dependent on performance and design criteria, program oversight, and execution. These are discussed in the next sections.

In all programs surveyed by Allen and Feddema (1996) in Southern California, the area mitigated was about equal to the area lost due to permitting. That was accomplished by varying the amount of mitigation required by habitat type so that different replacement risks were built into the permit requirement (see Table 6-6). The committee heard testimony to the effect that pressure to mitigate for one rare wetland type with a high mitigation ratio resulted in a more common wetland type with a lower ratio. In effect, the regulatory program may reassemble the landscape with a different habitat mix than the wetlands being lost.

TABLE 6-5   Mitigation Ratios Required and the Actual Ratios Met, Based on Post-Construction Evaluation (assumes complete compliance in meeting permit conditions)

| Location | Ratios Required | Ratios On Site | % Compliant | Source |
|---|---|---|---|---|
| California | | | | Fenner (1991) |
| San Diego County | 1.51:1 | 1:0.93 | 62 | Allen and Feddema (1996) |
| Southern | 1.40:1 | 1:0.96 | 69 | DeWeese (1994) |
| Sacramento | | | | |
| San Francisco | 1.44:1 | 1:0.29 | 90 | DeWeese (1994) |
| Orange County | 1.03:1 | 1:0.18 | 17 | Sudol (1996) |
| Indiana | 2.48:1 | 1:1.1 | 44 | J. T. Robb (personal communication 2000) |
| Ohio | 1.5:1 | 1:1.26 | 84 | Fennessy and Roehrs (1997) |
| Ohio | 1.72:1 | 1:0.66 | 38 | Wilson and Mitsch (1996) |
| Ohio | 1.5:1 | 1:0.93 | 62 | Sibbing (1997) (includes enhancement) |
| Tennessee | 1:1 | 1:0.87 | 87 | Morgan and Roberts (1999) |

NOTE: Data not directly comparable among locations because of different types of surveys.

TABLE 6-6   Mitigation Ratios (Area Basis) and Achievement Rates (%) for Different Wetland Types in Southern California

| Wetland Type | Required Ratio | Actual Ratio | Rate |
|---|---|---|---|
| Riparian habitat | 1.39:1 | 0.97:1 | 70 |
| Freshwater | 0.9:1 | 0.61:1 | 67 |
| Saltwater | 2.1:1 | 2.1:1 | 100 |
| Unidentified riparian | 1.59:1 | 0.40:1 | 67 |
| Riparian woodland | 2.40:1 | 1.6:1 | 67 |
| Total | 1.39:1 | 1.096:1 | 69 |

SOURCE: Adapted from Allen and Feddema (1996).

Mitigation ratios are considered further in Chapter 8 under the topic of Permit Conditions. The adjustment of ratios is one of the principal tools for addressing risk and temporal loss with the ultimate goal of achieving permit compliance.

## MONITORING OF MITIGATION PROJECTS

Once a Section 404 permit is issued by the Corps and the agreed-upon mitigation and corresponding performance standards are outlined in the permit special conditions, it is the responsibility of the permittee to conduct ongoing monitoring of the site to ensure that the performance standards are being achieved. The Corps should review the monitoring reports submitted by the permittee and conduct periodic inspections of the site to ensure compliance with the permit.

Table 6-7 lists results of seven reports on the monitoring frequency for six states. The highest monitoring rate was for a California study in which 324 sites had at least one monitoring site visit; two-thirds of these 324 sites had no second site visit required. One study (Louisiana) reported that monitoring occurred on only 10% of the sites. Six of seven studies reported a monitoring rate of about 50% or less. This result has important implications for the success of a mitigation program. Several studies have shown that permit compliance rate may be quite low when monitoring is sparse or does not occur. Mason and Slocum (1987) evaluated 32 wetlands in Virginia and, at the time of their analysis, documented that permits with specific conditions for creating wetlands were 86% compliant, whereas when there were no specific permit conditions, then permit compliance was 44%. When time limits for completion were specified, 100% of the mitigation efforts were compliant, compared with

TABLE 6-7    Frequency of Monitoring for Permits That Required Mitigation

| State | Source | No. of Permits | No Monitoring at: |
|-------|--------|----------------|-------------------|
| Alabama | Sifneos et al. (1992a) | 18 | 61% were not monitored |
| California | Holland and Kentula (1992) | 324 | 40% had incomplete acreage; 2% had no completion date; two-thirds did not require follow-up |
| Louisiana | Sifneos et al. (1992a) | 93 | 90% were not monitored |
| Mississippi | Sifneos et al. (1992a) | 5 | 80% were not monitored |
| Oregon | Storm and Stellini (1994) | 58 | 53% had no site visit recorded |
| Washington | Storm and Stellini (1994) | 17 | 67%; monitoring was done at three of the nine sites requiring monitoring |
| Washington | Kentula (1986) | 35 | 49% had no site visit |

50% without deadlines or time limits. Morgan and Roberts (1999) concluded that "some applicants apparently believe that they will not be held accountable for their projects." Morgan and Roberts (1999) implied that this self-interest in reporting data to agencies might have an influence on the accuracy of the evaluation and made a plea that "we strongly recommend that consultants responsible for site development not be allowed to submit the monitoring reports for their own projects." Zentner (1988) found that the "lack of monitoring was a common element of unsuccessful projects."

In addition, the permit may sparsely quantify the necessary requirements. Lowe et al. (1989) estimated that 86% of the 29 permits he surveyed "did not contain enough details or were not clear enough to ensure success of the created wetland, nor were they drawn tightly enough to enable the District to enforce the terms to correct problems. Two of the most often noted deficiencies in the permit conditions were the absence of success and maintenance criteria and the lack of provisions for corrective action should the created wetland fail." DeWeese (1994) noted that the omission of monitoring reports meant that the need for remedial action went unnoticed and therefore was not done or was not done as well. These sentiments were shared by Race and Fonseca (1996):

> [O]ur survey of past mitigation projects nationwide indicates that the success rate of permit-linked mitigation projects remains low overall. In addition, there is continuing difficulty in translating mitigation concepts into legal principles, regulatory standards, and permit conditions that

are scientifically defensible and sound. Based on the record of past poor performance, we assert that continued piecemeal revision efforts focused on technical or scientific details are not likely to make compensatory mitigation more effective. There is need to acknowledge the extent to which non-scientific, real-world complications plague current policies and practices. To prevent continued loss of wetlands under compensatory mitigation, decisive action must be taken by placing emphasis on improving compliance, generating desired acreage, and maintaining a true baseline.

Based on design requirements, Morgan and Roberts (1999) found that 72% of the mitigation sites inspected were smaller than required. Morgan and Roberts (1999) also found that many sites were not constructed to topographic specifications, resulting in sites that could not attain appropriate hydrological requirements to create the intended results.

Accordingly, the Corps/EPA Mitigation MOA (USACE/EPA 1990) recognizes that "[m]onitoring is an important aspect of mitigation, especially in areas of scientific uncertainty. Monitoring should be directed toward determining whether permit conditions are complied with and whether the purpose intended to be served by the conditions are actually achieved." Thus, a mitigation site must be physically monitored to determine compliance with design standards as well as compliance with performance standards (whether the site exhibits a trend toward achieving the target wetland functions).

## MONITORING DURATION

The literature and testimony provided to the committee indicate that monitoring periods commonly last between 3 and 5 years following mitigation site construction. However, for many created and restored systems, particularly those such as woody riparian systems that require long periods of time for plant establishment, a short-duration monitoring (3-5 years) might not be long enough to determine whether mitigation goals will be acheived (see Coyote Creek case study, Appendix B). The mitigation guidelines from the St. Paul District (Eggers 1992) recommend monitoring beyond 5 years if necessary. For forested wetlands, Morgan and Roberts (1999) recommend revising the monitoring period to a time frame that better reflects the time needed to achieve the desired outcomes.

A 5-year monitoring window is a common permit requirement. For example, Tennessee, like most states, requires that most mitigation projects be monitored annually for 5 years (Morgan and Roberts 1999). This requirement is especially true of tree-dominated mitigation sites that may take 50 years or more to mature (Morgan and Roberts 1999).

Obviously, the specific needs and performance requirements of a particular mitigation site will influence monitoring frequency and duration.

## THE COMPLIANCE RECORD

In the mid-1980s, some scientists involved in wetland restoration and creation believed that mitigation was effective (Harvey and Josselyn 1986). Others emphasized a need for more research, enforcement, and monitoring (Kusler and Groman 1986; Race 1986). Since then, follow-up studies of compensatory restoration and creation projects have identified significant shortcomings with respect to the functioning of mitigation sites (see Chapter 2). Shortcomings are evident in every region of the country. The discussion focuses on plant communities, because that is what is most commonly monitored. The committee notes, however, that while vegetation may be easily measured, it is a poor indicator of function (Reinartz and Warne 1993).

One of the most comprehensive investigations involved a review of 61 permits for 128 projects in six counties around Chicago, Illinois (Gallihugh and Rogner 1998). That study found that 17% of the wetland vegetation proposed was established, and an additional 22% had established wetlands but with vegetation other than that proposed. Fifty-two percent of the wetlands had excessive or unplanned open water, and 9% had insufficient hydrology. The wetland area lost was 117 hectares (ha) and the approved wetland mitigation amounted to 144 ha. So, in theory, there was a mitigation ratio of 1.2:1, resulting in a net gain of 27 ha. In actuality, the study found that 29 ha were not established and at least 99 ha were found to have unsatisfactory hydrology (too wet or too dry).

In a smaller sampling, Wilson and Mitsch (1996) evaluated five wetland projects in detail to estimate their ecological and legal outcomes (legal compliance was determined by the authors in consultation with the regulators). Only two of the five mitigation cases showed the mitigation projects were in full legal compliance, but four of the five were on a trajectory toward legal compliance with permit requirements (Table 6-8). Overall, 24.4 ha of wetlands were lost, and about 16 ha were actually created or restored. Because of the failure of one large site, only 38% of the desired wetland area was established at the time of their study. For the four wetlands that were compliant, there was an overall mitigation ratio of 1.4:1.

Evaluations of ecological equivalency between mitigation sites and reference sites are rarely conducted as part of a programmatic review. Kentula et al. (1992b) found that 65% of the permits that they surveyed in Oregon and Washington required a functional assessment, but these assessments lacked detail. A salt marsh creation project in southern Califor-

*138    COMPENSATING FOR WETLAND LOSSES UNDER THE CLEAN WATER ACT*

TABLE 6-8    Permit Requirements and Compliance for Five Replacement Wetlands Investigated in Ohio

| Location, County Replaced | Wetland Type Lost | Required | Implemented | Wetland Area, hectares | | | |
|---|---|---|---|---|---|---|---|
| | | | | Lost | Required | Area Implemented | % of Required |
| Portage | Emergent | Emergent/ woody | Emergent/ woody | 0.4 | 0.6 | 0.6 | 100 |
| Delaware | Emergent/ woody | Emergent/ woody | Emergent/ woody | 3.7 | 5.4 | ~4.0 | 74 |
| Franklin | Emergent | Emergent/ submergent | Emergent/ submergent | 15 | 28 | 32 | 11 |
| Jackson | Emergent | Emergent/ scrub-shrub | Emergent/ scrub-shrub | 4.8 | 7.2 | 7.5 | 105 |
| Gallia | Emergent | Emergent/ woody | Emergent | 0.5 | 0.8 | 0.7 | 88 |
| Total | | | | 24.4 | 42 | ~16.0 | 38 |

SOURCE: Data from Wilson and Mitsch (1996).

nia was evaluated using several indicators of function, and the results show the importance of measuring more than vegetation to characterize ecological performance (Table 6-9). Four constructed salt marshes were studied for 5 years or longer, and 11 attributes were compared with nearby natural sites. Three attributes of plant health (biomass, height, and nitrogen content) varied from 42% to 84% equivalency, two benthic invertebrate parameters varied from 36% to 78% equivalency, and four soil parameters (organic content, sediment nitrogen, pore water nitrogen, and nitrogen fixation) varied from 17% to 110% of that in the reference marsh. A high score for one parameter does not guarantee a high score for another. A recent compilation of the 10-year data set indicated that this project did not comply with permit conditions, which included tall vegetation suitable for nesting by an endangered bird (Zedler and Callaway 1999).

A systematic approach to measuring ecological equivalency involves the application of Brinson's (1993) Hydrogeomorphic Method (HGM), which is broadly applicable to most wetlands. Sudol (1996) used the HGM method to assess 40 mitigation projects covering 97 hectares of impacts for 104 hectares of proposed mitigation in Orange County, California.

TABLE 6-9   Index of Functional Equivalency for Four Constructed Salt Marshes in Relationship to Natural Sites in Paradise Creek, Southern California

| Parameter | % Equivalency to Reference Wetland |
| --- | --- |
| Organic matter content | 51 |
| Sediment nitrogen as inorganic nitrogen | 45 |
| Sediment nitrogen (total Kjeldahl) | 52 |
| Pore-water nitrogen as inorganic nitrogen | 17 |
| Nitrogen fixation in top 1 cm | 51 |
| Nitrogen fixation in rhizosphere | 110 |
| Biomass of vascular plants | 42 |
| Foliar nitrogen concentration | 84 |
| Height of vascular plants | 65 |
| Epibenthic invertebrate numbers | 36 |
| Epibenthic invertebrate species list | 78 |
| Average of all comparisons | 57 |

NOTE: Only the most vigorous stands of vegetation in the mitigation site were sampled for comparison with the reference site.

SOURCE: Zedler and Langis (1991). Reprinted with permission from *Ecological Restoration*; copyright 1991, University of Wisconsin Press, Madison.

Fifteen habitat functions were compared in 7 reference sites. Forty-two percent of the compensatory mitigation wetland area met the terms of the permit requirements. However, not one mitigation effort was completely successful in terms of the HGM analyses. Fourteen mitigation efforts were partially successful. The overarching reason given to explain the lack of success was that there was insufficient restoration and creation of the necessary hydrological conditions.

Brown and Veneman (1998) examined 70 mitigation permits in Massachusetts and made field visits to 68 permittee-responsible sites that underwent restoration and also to a subset of sites that apparently were mitigation banks. Various environmental parameters were measured in both mitigation wetland and an appropriate reference site, although full information on how the comparison was made is not available (discussed in Chapter 2). Some of their results are in Table 6-10. The compensatory wetland had fewer species among all sites, but the mitigation bank sites had more species than the reference sites. Although plant cover and other indices of plant community health were similar in reference and mitigation wetland, the species were not the same. The differences in plant species may explain why the use by amphibians, mammals, and birds (but not reptiles) was higher in the reference sites.

TABLE 6-10   Ecological Parameters in Paired Replacement and Reference Wetlands in Massachusetts

| Parameter | All Reference Wetlands | All Replacement Wetland | Reference Wetlands | Mitigation Bank Wetlands |
|---|---|---|---|---|
| **Plant** | | | | |
| Number of species | 11.4 ± 2.7 | 7.8 ± 3.8 | 15.5 ± 3.4 | 17.3 ± 2.4 |
| Number of facultative or wetter species | 10.2 ± 2.7 | 7.8 ± 3.8 | Same in both | Same in both |
| Cover all species | More in reference sites | More in reference sites | Same in both | Same in both |
| Cover wetland species | More in reference sites | More in reference sites | Lower in reference sites | Lower in reference sites |
| Wetland index value | 2.3 ± 0.33 | 2.3 ± 0.68 | 2.1 ± 0.7 | 2.0 ± 0.4 |
| Similarity of species | Dissimilar | Dissimilar | Dissimilar | Dissimilar |
| Water-quality function value | N.A. | N.A. | 0.86 ± 0.8 | 0.95 ± 0.32 |
| Sediment stabilization | N.A. | N.A. | 0.86 ± 0.075 | 0.86 ± 0.05 |
| Wildlife utilization (Jaccard Similarity Index) | N.A. | N.A. | | |
| Amphibians | N.A. | N.A. | More in reference sites | More in reference sites |
| Mammals | N.A. | N.A. | More in reference sites | More in reference sites |
| Reptiles | N.A. | N.A. | Similar | Similar |
| Birds | N.A. | N.A. | More in reference sites | More in reference sites |

NOTES: The mean and ± 1 standard deviation are shown, when given in the source document. A. For 68 sites of all sizes; B. for 12 sites that were for "variances," which appear to be mitigation banks. These variance sites have much better site planning and oversight than the nonvariance (mitigation bank) wetlands. N.A., Not available.

SOURCE: Adapted from Brown and Veneman (1998).

Estimates of functional equivalency and compliance rates from various studies are summarized in Table 6-11. The percentage of permits meeting permit compliance ranges from 3% to 100%, and the percentage of permits resulting in various measures of ecological functionality (equivalency) ranges from 0 to 67%. For studies with estimates of both permit compliance and ecological equivalency, the averages are 55% and 23%, respectively. The average for all eight estimates for ecological equivalency is 14%. Some of these sites may improve with time (see discussion of trajectories in Chapter 2).

Eighteen studies used the number of restoration or creation sites that met permit conditions as an indicator of permit compliance (see Table 6-12). Ten of the 18 studies had compliance rates of greater than 50%. Sudol (1996) surveyed 70 (required as part of 80 permits) mitigation sites in Orange County, California, to determine permit compliance for permits issued between 1985 and 1993. There were 128 ha of impact, of which 19 ha met all conditions of mitigation. Of the 80 permits, 30 projects were considered compliant with permit conditions. Of the remaining projects,

TABLE 6-11   Comparison of the Percentage of Permits Meeting Their Requirements and Percentage of Those Permits Meeting Various Tests of Ecological Functionality or Viability

| Location | No. of Permits | % Permit Compliance | % Meeting Viability/ Function[a] | Source or Notes |
|---|---|---|---|---|
| California | 57 | 18 | 0 | Sudol (1996) |
| Florida | 29 | 79 | 45 | Lowe et al. (1989) |
| Florida | 63 | 6 | 27 | FDER (1991a) |
|    Freshwater | 34 | 3 | 12 | |
|    Saltwater | 29 | 10 | 45 | |
| Florida | N.A. | N.A. | 4 | Erwin (1991) |
| Florida, St. Johns | N.A. (1992) | 43 | 27 | OPPAGA (2000) |
|    Water Management District (WMD) | N.A. (1999) | 78 | 67 | OPPAGA (2000) |
| Ohio | 10 | 100 | 0 | Fennessy and Roehrs (1997) |
| Oregon | 17 | 47 | 18 | Storm and Stellini (1994) |
| Unknown | 29 | 21 | 3 | Mockler et al. (1998) |

[a]Criteria used: Sudol (1996) classified sites as a complete success and not irrigated; Lowe et al. (1989) classified site viability as good or poor; DeWeese (1994) rated sites as successful if they scored 7 or higher on a scale of 0 to 10; FDER (1991a) rated sites based on hydrology, soils, vegetation, and fauna.
NOTES: N.A., Not available.

TABLE 6-12   Compliance (Based on Permit Number) for Fully Implemented Mitigation Plans

| Location | No. of Permits | % in Compliance[a] | Source |
|---|---|---|---|
| California | | | |
|   Orange County | 57 | 13 | Sudol (1996) |
|   Southern Sacramento | 75 | 42 | Allen and Feddema (1996) |
|   San Francisco | 30 | 50 | DeWeese (1994) |
| Florida | 29 | 79 | Lowe et al. (1989) |
| Florida | 42 | 10 | Erwin (1991) |
| Florida (Northeastern) | 201 | 86 | Miracle et al. (1998)[b] |
| Florida | | | |
|   Southwestern WMD | 33 | 33 | OPPAGA (2000), for 1988 to 1989 |
|   Southwestern WMD | 254 | 82 | OPPAGA (2000), for permits since 1995[c] |
|   St. Johns WMD | N.A. | 78 | OPPAGA (2000), for 1999 |
|   Suwannee River WMD | N.A. | 100 | OPPAGA (2000) |
| Florida Department of Environmental Protection | | | |
|   Southeastern District | N.A. | 67 | OPPAGA (2000), no date |
|   Northeastern District | N.A. | 87 | OPPAGA (2000), no date |
| Illinois | N.A. | 4 | Gallihugh and Rogner (1998) |
| Massachusetts Department of Environmental Protection | 84 | 49 | Brown and Veneman (1998) |
| Ohio | 14 | 100 | Fennessy and Roehrs (1997) |
| Ohio | 5 | 80 | Wilson and Mitsch (1996) |
| Virginia | 32 | N.A. | Mason and Slocum (1987) |
|   1.a | N.A. | 86 | When with specific permit conditions |
|   b | N.A. | 44 | When without specific permit conditions |
|   2.a | N.A. | 100 | Permits with time limits |
|   b | N.A. | 50 | Permits without time limits |
| Washington | 17 | 53 | Storm and Stellini (1994) |
| Washington | 43 | 35 | Johnson et al. (2000) |
| Unknown | 29 | 21 | Mockler et al. (1998) |

[a]Compliance based on 100% compliance for Allen and Feddema (1996); scale of 8 out of 10 (75% in compliance) for DeWeese (1994).
[b]After 5 years; some mitigation was still in the monitoring stage (and compliant).
[c]Includes mitigation efforts that achieved success and that were "trending toward" success, as defined by the evaluators.
NOTES: Based on field inspection or monitoring reports and when all permit conditions were met. Unverified mitigation attempts were considered noncompliant. N.A., Not available.

6 were not compliant, 2 were never attempted, and 13 permits were never completed. The remaining projects were only partially successful in meeting the permit requirements. Eight studies of five state permitting programs examined whether attempts at mitigation met permit conditions (see Table 6-13). Compliance with the permit was measured by the area of created or restored wetlands. The results indicate that the compensatory wetland mitigation area was often less than the permitted area.

Mitigation sites have also been evaluated using more subjective measures. DeWeese (1994) evaluated 30 projects in California to determine mitigation compliance using a 10-point scale based on professional judgment. About half of the sites were at least 5 years old. DeWeese ranked only 1 of the 30 sites high, 13 were average or above average, and 6 were below average (Table 6-14). Two sites had low value, and two others were judged to have no value. The average value was 4.7 for 30 mitigation projects. There was no net loss in area as a result of permitting, but there was a net loss in ecological functionality.

Allen and Feddema (1996) examined 75 sites in California using three simple criteria evaluated subjectively: weed invasion, plant cover, and vegetation status. They found a 69% "success rate" and estimated that 77 ha replaced 81 ha lost, for a net loss of 5%. Storm and Stellini (1994) found a mixed result in their review of 17 compensatory mitigation projects in Washington (Table 6-15). Fifty-three percent could not be verified as being in compliance with the permit, 29% were verified as being out of compliance, and two-thirds were not ecologically equivalent to the wetlands lost through the permitting program. Monitoring was done for only

TABLE 6-13    Compliance (Area Basis) for Mitigation That Was Attempted Based on Field Inspection or Monitoring Reports

| Location | No. of Permits | Impacted Hectares | % Area Gain (loss) | Source |
|---|---|---|---|---|
| California | | | | |
|    Orange County | 68 | 128 | (92) | Sudol (1996) |
|    San Diego County | N.A. | 102 | (8) | Fenner (1991) |
|    Southern | 75 | 80 | (8) | Allen and Feddema (1996) |
|      Sacramento | | | | |
|    San Francisco | 30 | 168 | 44 | DeWeese (1994) |
| Florida | 29 | 269 | (32) | Lowe et al. (1989) |
| Indiana | 31 | 14 | 10 | J. T. Robb (personal commun. 2000) |
| Ohio | 5 | 24 | (33) | Wilson and Mitsch (1996) |
| Tennessee | 50 | 38 | (13) | Morgan and Roberts (1999) |

TABLE 6-14    Ranking of Compliance for 30 Sites in San Francisco Bay That Were Issued Section 404 Permits

| Permits (No.) | Compliance (%) |
|---|---|
| 3 | 100 |
| 6 | 85 to 95 |
| 6 | 75 to 85 |
| 12 | 45 to 75 |
| 1 | 1 to 14 |
| 2 | 0 |

NOTE: DeWeese (1994) ranked sites (scale 1 to 10) to determine their ecological success rate.

one-third of that required. These subjective measures of equivalency suggest that compliance is much lower than expected.

The historical and national perspective of mitigation in the United States that has been presented comes from a wide range of studies, and we do not think that our review is a parochial or geographically restricted one. A summary of key data reviews is in Table 6-16. Between 70% and 76% of the mitigation required in the permits is implemented, and about 50% to 53% of the implemented mitigation projects did not meet the permit requirements. In addition, the estimate of functional equivalency of mitigation wetland was about 20% of that intended. These estimates (based on the mean or median value in the tables) suggest that there is a substantial net loss in wetland area from wetlands permitting program. In terms of the ecological equivalency of these wetlands, there is a low value of the wetlands actually built.

TABLE 6-15    Results from an Analysis of Compliance for 17 Mitigation Projects with Field Investigation in Western Washington

| Condition | Number | Percent |
|---|---|---|
| Not verified as being in compliance | 9 | 53 |
| Out of compliance | 5 | 29 |
| Not functioning ecologically | 11 | 65 |
| In compliance with regulatory requirements | 3 | 18 |
| Monitoring done/required | 9/17 | 53 |
| Monitoring done when required | 3 | 33 |

SOURCE: Storm and Stellini (1994).

TABLE 6-16    Summary of Data from Previous Tables on Wetland Permit Implementation, Compliance, Ecological Success, and Monitoring Frequency

| Parameter | No. of Studies | No. of States | Range | Mean | Median |
|---|---|---|---|---|---|
| 1. % Mitigation attempted for required mitigation permits (778+ permits; Table 6-3) | 8 | 7 | 28 to 100 | 76 | 70 |
| 2. % Compliance for mitigation required, based on field inspections | | | | | |
| a. % area gain (loss) (Table 6-13) | 8 | 5 | (92) to 44 | (17) | (32.5) |
| b. % permits issued (Table 6-12) | 19 | 6 | 0 to 100 | 58 | 53 |
| 3. % Ratio required and ratios met (post-construction; Table 6-5) | 9 | 4 | 17 to 90 | 61 | 62 |
| 4. % Functional equivalency of completed mitigation (Table 6-11) | 9 | 4 | 0 to 67 | 21 | 18 |
| 5. % Sites insufficiently monitored for permitted mitigation (Table 6-7) | 7 | 6 | 40 to 90 | 63 | 61 |

NOTE: The average of a tie for the median value is given.

## Record Keeping

The committee found that in many cases, mitigation was required to offset impacts; however, some project files did not contain a mitigation plan or other explicit agreements on the size and type of mitigation to be provided. Because mitigation projects extend over many years, mitigation plans need to be on record, with mitigation requirements clarified, so that all subsequent parties involved in the evaluation of the mitigation site know exactly what was required.

Many of the problems of tracking wetland loss and gain resulting from mitigation implementation could be addressed by improved record-keeping on the part of the Corps. Through improved compliance inspections described in Chapter 8, information should be included in a national database, such as the Corps Regulatory Analysis and Management System (RAMS) database. If each Corps project manager followed data-entry quality-assurance measures, then wetland losses and gains could be tracked more accurately on a national scale.

## CONCLUSIONS

1. It appears that the performance standards sought in compensatory mitigation have not often been well defined.

2. Wetland restoration and creation trajectories do not suggest equivalency with reference sites within the commonly used 5-year monitoring period.

3. The literature and testimony provided to the committee indicate that the national goal of "no net loss" for permitted wetland conversions is not being met.

4. The gap between what is required and what is realized is not precisely known; however, the evidence strongly suggests that the required compensatory mitigation called for by wetland permits to date will not be realized.

5. Permit follow-up is sparse or too infrequent, and a higher post-monitoring rate will increase permit compliance rates. Compliance monitoring is commonly known to be nonexistent after 5 years. Better documentation and monitoring will increase compliance rates.

6. The sparse compliance monitoring is a direct consequence of its designation as a "below-the-line" policy standard. Raising compliance monitoring to "above the line" will greatly enhance mitigation success. Chapter 8 further discusses mitigation compliance issues; specifically, recommendations 4 and 6 in that chapter addresses concerns outlined here.

## RECOMMENDATIONS

The committee makes the following recommendations relative to future mitigation compliance to ensure that the nation has an accurate reporting of wetland losses and gains:

1. The wetland area *and* functions lost and regained over time should be tracked in a national database. This database may or may not be the Corps Regulatory Analysis and Management System (RAMS) database.

2. The Corps should expand and improve the quality-assurance measures for data entry in the RAMS database.

3. Mitigation goals must be clear and those goals carefully specified in terms of measurable performance standards in order to improve mitigation effectiveness. Performance standards in permits should reflect mitigation goals and be written in such a way that ecological viability can be measured and the impacted functions replaced.

United States Government Accountability Office

# GAO

Report to the Ranking Democratic Member, Committee on Transportation and Infrastructure, House of Representatives

September 2005

# WETLANDS PROTECTION

## Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure That Compensatory Mitigation Is Occurring



G A O

Accountability ★ Integrity ★ Reliability

GAO-05-898

Exhibit 5

September 2005

# GAO
**Accountability · Integrity · Reliability**

# Highlights

Highlights of GAO-05-898, a report to the Ranking Democratic Member, Committee on Transportation and Infrastructure, House of Representatives

# WETLANDS PROTECTION

## Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure That Compensatory Mitigation Is Occurring

## Why GAO Did This Study

Because wetlands provide valuable functions, the administration set a national goal of no net loss of wetlands in 1989. Section 404 of the Clean Water Act generally prohibits the discharge of dredged or fill material into waters of the United States, which include certain wetlands, without a permit from the U.S. Army Corps of Engineers (Corps). To help achieve the goal of no net loss, the Corps can require compensatory mitigation, such as restoring a former wetland, as a condition of a permit when the loss of wetlands is unavoidable. Permittees can perform the mitigation or pay a third party—a mitigation bank or an in-lieu-fee arrangement—to perform the mitigation. GAO was asked to review the (1) guidance the Corps has issued for overseeing compensatory mitigation, (2) extent to which the Corps oversees compensatory mitigation, and (3) enforcement actions the Corps can take if required mitigation is not performed and the extent to which it takes these actions.

## What GAO Recommends

GAO recommends that the Secretary of the Army direct the Corps to establish an effective oversight approach that will ensure that permittees and third parties are performing required compensatory mitigation. In commenting on our report, the Department of Defense generally agreed with GAO's recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-898.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Anu K. Mittal at (202) 512-3841 or mittala@gao.gov.

## What GAO Found

The Corps has developed guidance that establishes two primary oversight activities for compensatory mitigation: requiring the parties performing mitigation to periodically submit monitoring reports to the Corps and conducting compliance inspections of the mitigation. However, parts of the guidance are vague or internally inconsistent. For example, the guidance suggests that the Corps place a high priority on requiring and reviewing monitoring reports when "substantial mitigation" is required, but it does not define substantial mitigation. Furthermore, one section of the guidance directs district officials to conduct compliance inspections of a relatively high percentage of compensatory mitigation sites, while another section designates these inspections as a low priority, leading to confusion by Corps officials.

Overall, the seven Corps districts GAO visited performed limited oversight to determine the status of compensatory mitigation. The Corps required monitoring reports for 89 of the 152 permit files reviewed where the permittee was required to perform compensatory mitigation. However, only 21 of these files contained evidence that the Corps received these reports. Moreover, only 15 percent of the 152 permit files contained evidence that the Corps had conducted a compliance inspection. The Corps districts provided somewhat more oversight for mitigation performed by the 85 mitigation banks and 12 in-lieu-fee arrangements that GAO reviewed. For the 60 mitigation banks that were required to submit monitoring reports, 70 percent of the files contained evidence that the Corps had received at least one monitoring report. However, only 36 percent of the mitigation bank files that GAO reviewed contained evidence that the Corps conducted an inspection. For the 6 in-lieu-fee arrangements that were required to submit monitoring reports to the Corps, 5 had submitted at least one report. In addition, the Corps had conducted inspections of 5 of the 12 arrangements.

The Corps can take a variety of enforcement actions if required compensatory mitigation is not performed. These actions include issuing compliance orders, assessing administrative penalties of up to $27,500, requiring the permittee to forfeit a bond, suspending or revoking a permit, implementing the enforcement provisions of agreements with third parties, and recommending legal actions. District officials rarely use these actions and rely primarily on negotiation to resolve any violations. In some cases, GAO found district officials may not be able to use enforcement actions after detecting instances of noncompliance because they have limited their enforcement capabilities. For example, because they did not always specify the requirements of compensatory mitigation in the permits, they had no legal recourse for noncompliance.

# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 4 |
| | Background | 7 |
| | Corps Guidance for Oversight of Compensatory Mitigation Is Sometimes Vague or Internally Inconsistent | 12 |
| | Corps Districts Perform Limited Oversight of Compensatory Mitigation | 17 |
| | Corps Districts Can Take a Variety of Enforcement Actions to Resolve Violations but Rely Primarily on Negotiation | 21 |
| | Conclusions | 26 |
| | Recommendations for Executive Action | 27 |
| | Agency Comments and Our Evaluation | 28 |

| Appendixes | | |
|---|---|---|
| Appendix I: | Scope and Methodology | 29 |
| Appendix II: | Corps of Engineers Federal Guidance for Oversight of Compensatory Mitigation | 33 |
| Appendix III: | File Review Results by Corps District | 36 |
| Appendix IV: | Comments from the Department of Defense | 39 |
| Appendix V: | GAO Contact and Staff Acknowledgments | 42 |

| Tables | | |
|---|---|---|
| Table 1: | Permit Files Reviewed at the Seven Districts, Fiscal Year 2000 | 30 |
| Table 2: | Mitigation Banks Reviewed at the Seven Districts, November 28, 1995, through December 2004 | 31 |
| Table 3: | In-Lieu-Fee Arrangements Reviewed at the Seven Districts | 32 |
| Table 4: | Results of Review of Corps Oversight of Individual Permits Issued in Fiscal Year 2000 Where Permittees Are Responsible for Compensatory Mitigation | 36 |
| Table 5: | Results of Review of Corps Oversight of Mitigation Banks Approved from November 1995 through December 2003 | 37 |
| Table 6: | Results of Review of Corps Oversight of In-Lieu-Fee Arrangements Currently in Operation at the Time of Our Site Visit | 37 |

| Figures | | |
|---|---|---|
| Figure 1: | Marsh in Michigan | 7 |
| Figure 2: | Bayou in Louisiana | 8 |

Contents

Figure 3:   Wetlands Restoration Project in Washington, D.C. (Before
            and After)                                                    11

## Abbreviations

| | |
|---|---|
| Corps | U.S. Army Corps of Engineers |
| EPA | Environmental Protection Agency |

This is a work of the U.S. government and is not subject to copyright protection in the
United States. It may be reproduced and distributed in its entirety without further
permission from GAO. However, because this work may contain copyrighted images or
other material, permission from the copyright holder may be necessary if you wish to
reproduce this material separately.



**United States Government Accountability Office**
**Washington, D.C. 20548**

September 8, 2005

The Honorable James L. Oberstar
Ranking Democratic Member
Committee on Transportation and Infrastructure
House of Representatives

Dear Mr. Oberstar:

Wetlands such as bogs, swamps, and marshes support a number of valuable functions—controlling floods, improving water quality, and providing wildlife habitat, among other things. Given the value of these functions, the administration set a national goal in 1989 of balancing the losses and gains of wetlands to achieve no net loss of wetlands. Each subsequent President has reaffirmed and expanded this goal to achieve net gains of wetlands in the long term. The U.S. Army Corps of Engineers (Corps) is responsible for processing permit applications from individuals and businesses seeking to build driveways, houses, golf courses, or commercial buildings or perform other activities that could degrade or destroy wetlands on their property, and each year the Corps approves thousands of these permit applications. The Corps' decisions are to reflect the national concern for both the protection and utilization of important resources.

Under section 404 of the Clean Water Act, the Corps and the Environmental Protection Agency (EPA) regulate activities affecting wetlands. Under related regulations and guidance issued by these agencies, a permittee is expected to avoid deliberate discharge of fill materials into wetlands or other federally regulated waters and then to minimize discharges that cannot be avoided. If such discharges are unavoidable, the Corps can require mitigation to compensate for the loss and/or degradation of wetlands from permitted activities as a condition of issuing the permit. Such compensatory mitigation could involve (1) creating a new wetland, (2) restoring a former wetland, (3) enhancing a degraded wetland, or (4) preserving an existing wetland. Since 1993, the Corps has required such mitigation on more than 40,000 acres of land per year. Permittees may perform their own compensatory mitigation, often on or near the project site, or they may pay another entity to perform mitigation, usually at a location away from the project site, but generally within the same watershed. This kind of mitigation, known as third-party mitigation, is typically performed by mitigation banks or sponsors of in-lieu-fee arrangements. Mitigation banks are often private for-profit entities with land in areas where they believe that they can successfully establish

wetlands.[1] These areas include those that have the potential to become wetlands, previously filled wetlands, wetlands that have been degraded by invasive plant species,[2] or wetlands that are threatened by development. After the mitigation banks improve these areas as wetlands, permittees required to perform compensatory mitigation pay fees to the mitigation bank to fulfill their mitigation requirements. In contrast to mitigation banks, in-lieu-fee arrangements are often sponsored by public or nonprofit entities. Under agreements with the Corps, in-lieu-fee sponsors receive payments from multiple permittees required to perform compensatory mitigation. Then, at a later date, the sponsors use these funds to establish wetlands.

The Corps is responsible for ensuring that permittees, mitigation banks, and in-lieu-fee sponsors perform required compensatory mitigation. However, the Corps historically has not emphasized oversight of such mitigation activities. In 1988, we reported that the Corps placed a high priority on issuing permits and did not routinely inspect project sites to ensure that permittees were in compliance with their permit conditions, which include any compensatory mitigation that the permittee was required to perform.[3] More recently, the National Research Council, environmental groups, and others have raised concerns that the Corps may not spend sufficient time on oversight to ensure that permittees or third parties are performing the required compensatory mitigation.

In this context, you asked us to review the (1) guidance the Corps has established for overseeing compensatory mitigation, (2) extent to which the Corps oversees compensatory mitigation, and (3) enforcement actions the Corps can take if it determines that compensatory mitigation requirements are not being met and the extent to which it takes such actions.

---

[1] According to the Environmental Law Institute, in the early 1990s, most banks were sponsored by public entities, such as state highway agencies, but now most mitigation banks are sponsored by private entities.

[2] Invasive species are nonnative plants, animals, and microorganisms that are found throughout the United States and that have a devastating effect on natural areas, where they can take over wetland habitats and strangle native flora.

[3] GAO, *Wetlands: The Corps of Engineers' Administration of the Section 404 Program*, GAO/RCED-88-110 (Washington, D.C.: July 28, 1988).

In conducting our work, we selected 7 of the 38 Corps districts that implement the section 404 program—Charleston, South Carolina; Galveston, Texas; Jacksonville, Florida; New Orleans, Louisiana; St. Paul, Minnesota; Seattle, Washington; and Wilmington, North Carolina. We selected these districts because they represent different geographic areas of the United States and collectively accounted for over two-thirds of the compensatory mitigation required by individual permits issued in fiscal year 2003.[4] To identify the guidance the Corps has established for overseeing compensatory mitigation, we examined Corps documents and interviewed officials from Corps headquarters, as well as from Corps' district offices.

To determine the extent to which the Corps oversees compensatory mitigation, we reviewed a total of 249 files. We reviewed 152 permit files issued in fiscal year 2000 where the permittee was responsible for the mitigation. We selected this time frame because most of the permits we reviewed were valid for 5 years or less, and sufficient time would have passed for the permittee to begin work on the permitted project and for the Corps to have received a monitoring report or conducted a compliance inspection. We also reviewed files for 85 mitigation banks and 12 in-lieu-fee arrangements.[5] The mitigation bank and in-lieu-fee arrangement files we reviewed usually provided data on the mitigation activities for multiple permittees, and the mitigation conducted can encompass thousands of acres. While our results cannot be generalized to all 38 Corps districts, according to a Corps official responsible for managing the program nationally, our findings would most likely represent program

---

[4]Individual permits are typically issued for projects that may have substantial environmental impacts. For smaller impacts, Corps officials generally issue either letters of permission, which are used when the proposed work is minor and is not expected to receive appreciable opposition, or general permits, which cover activities that have been identified as being substantially similar in nature, such as stabilizing stream banks. The Charleston, Galveston, Jacksonville, New Orleans, St. Paul, and Wilmington districts were the top six districts nationwide in terms of mitigation required by individual permits. Seattle was among the top districts in the western part of the United States.

[5]In those districts where it was not feasible to review all files, we selected a random sample of files from the district's database for review. We reviewed a random sample of permit files in the Jacksonville district and a random sample of mitigation bank files in the Jacksonville, New Orleans, and St. Paul districts. Because the New Orleans district was not able to identify permits requiring the permittee to perform mitigation from their database, we asked district officials to select these permits, and we reviewed all of them.

implementation by other Corps districts. We also interviewed district officials to obtain additional information on how they oversee compensatory mitigation.

To identify enforcement actions the Corps can take if it determines that compensatory mitigation requirements are not being met and the extent to which it takes these actions, we examined agency regulations and documents that outline available enforcement actions, reviewed agency data on noncompliance cases, and discussed levels of noncompliance and actions taken with district officials. In addition, we interviewed several sponsors of mitigation banks and a sponsor of an in-lieu-fee arrangement to obtain their perspectives on the Corps' mitigation program. A more detailed description of the scope and methodology of our review is presented in appendix I. We performed our work between June 2004 and September 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

The Corps has developed guidance that establishes two primary oversight activities for compensatory mitigation. First, the Corps guidance directs district officials to require the parties performing mitigation to periodically submit monitoring reports to the Corps on the status of compensatory mitigation. Second, the guidance calls for district officials to conduct compliance inspections of the mitigation. However, we found that parts of the guidance are vague or internally inconsistent, thus limiting their usefulness. For example, the guidance suggests that requiring and reviewing monitoring reports is a high-priority activity for the Corps when "substantial mitigation" is required, but it does not define substantial mitigation. Furthermore, the guidance does not indicate what actions Corps officials should take if permittees or third parties do not submit required monitoring reports. The guidance is also internally inconsistent because, in one section of the guidance, district officials are directed to conduct compliance inspections on a relatively high percentage of compensatory mitigation sites to ensure that permit conditions have been met, while another section designates these inspections as a low-priority activity, to be conducted only if the goals for other higher priority work, such as issuing permits, have been achieved. As a result, district officials told us that they are unsure of how many resources to allocate to compliance inspections. The Corps is currently developing new guidance, which it expects to issue by fall of 2005.

Overall, the Corps districts we visited have performed limited oversight to determine the status of required compensatory mitigation. For the 152 permit files that we reviewed where the individual permittee was required to perform compensatory mitigation, we found little evidence that required monitoring reports were submitted or that the Corps conducted compliance inspections. The Corps required monitoring reports for 89 of the files that we reviewed, but only 24 percent, or 21 permit files, contained evidence that the Corps had actually received the report. Only 15 percent of the files contained evidence that the Corps had conducted a compliance inspection. Although Corps districts provided somewhat more oversight for mitigation conducted by the 85 mitigation banks and 12 in-lieu-fee arrangements that we reviewed, even in these cases oversight was still limited. For the 60 mitigation banks that were required to submit monitoring reports, 70 percent of the files showed that the Corps had received at least one monitoring report. The percentage of the mitigation bank files with evidence that the Corps conducted an inspection ranged from a low of 13 percent to a high of 78 percent in the seven districts. For the 6 in-lieu-fee arrangements that were required to submit monitoring reports to the Corps, 5 had submitted at least one report. In addition, the Corps had conducted a compliance inspection for 5 of the 12 arrangements. District officials told us that the Corps' conflicting guidance, which notes that compliance inspections are crucial yet makes them a low priority, as well as limited resources contribute to their low level of oversight of compensatory mitigation. However, because many projects that we reviewed did not receive oversight, the districts cannot definitively assess whether compensatory mitigation has been performed on thousands of acres. Without this information, it is unclear how the Corps is assessing the effectiveness of its mitigation program or assessing whether this program is contributing to the national goal of no net loss of wetlands.

The Corps can take a variety of enforcement actions if required compensatory mitigation is not performed. These actions include issuing compliance orders, assessing administrative penalties up to $27,500, suspending or revoking a permit, implementing the enforcement provisions of agreements with third parties, and recommending legal actions.[6] According to fiscal year 2003 data provided by the Corps, the seven districts did not take any enforcement actions to obtain compliance with

---

[6]Under Corps' regulations, the Corps may refer appropriate cases to the local U.S. attorney to file a criminal or civil action. Appropriate cases include, but are not limited to, violations that are willful, repeated, or of substantial impact. 33 C.F.R § 326.5.

issued permits. Instead, district officials rely primarily on negotiation with permittees and third parties, a first step in the enforcement process, rather than enforcement actions to resolve any violations. According to district officials, when they find that required compensatory mitigation has not been performed, they usually first contact the responsible parties to discuss options and time frames for bringing the permittee or third-party sponsor into compliance. District officials told us that typically no further action is necessary because the desired action is subsequently taken. If district officials are not able to resolve the noncompliance through negotiation, they told us that they then notify the responsible party in writing of the noncompliance and lay out potential enforcement actions and time frames. District officials told us that they generally resort to enforcement actions only after negotiation fails because taking enforcement actions is usually more time-consuming and does not necessarily result in the required mitigation being completed. For instance, according to Corps district officials, while monetary penalties are an effective tool that draws attention to compliance and enforcement, the funds collected from assessing these penalties are required by law to go into the general fund of the federal Treasury. We found that, sometimes, district officials wanting to pursue enforcement actions after detecting instances of noncompliance may be unable to do so because they have limited their enforcement capabilities by not specifying the requirements for compensatory mitigation in permits and by not establishing agreements with third parties. For example, the Corps does not always specify what mitigation activity should be performed or the time frame for completing the mitigation in individual permits. Similarly, some districts have not established agreements called for in federal guidance with mitigation bank or in-lieu-fee sponsors. Without such agreements, the Corps and the third-party sponsors have not formally agreed to the penalties that may be imposed and/or corrective actions that may be required if the mitigation efforts are not performed. Therefore, the Corps does not have sufficient legal recourse if third parties do not perform required compensatory mitigation.

To address the concerns we have identified, we are recommending that the Secretary of the Army direct the Corps of Engineers to establish an effective oversight approach that will ensure that permittees and third parties are performing required compensatory mitigation. In commenting on our report, the Department of Defense generally agreed with our recommendations.

## Background

Wetlands include swamps, marshes, bogs, and similar areas. They are characterized by three factors: (1) frequent or prolonged presence of water at or near the soil surface, (2) hydric soils that form under flooded or saturated conditions, and (3) plants that are adapted to live in these types of soils. Wetlands are found throughout the United States. They may differ greatly in their physical characteristics; for example, water may not be present on the wetland for part of the year or it may be present year-round. Figures 1 and 2 show two different types of wetlands—a marsh and a bayou.

**Figure 1: Marsh in Michigan**



Source: U.S. Fish and Wildlife Service.

**Figure 2: Bayou in Louisiana**



Source: U.S. Fish and Wildlife Service.

Wetlands provide many important functions for the environment and for society. For example, wetlands

- improve water quality by removing excess nutrients from sources such as fertilizer applied to agricultural land and municipal sewage and by trapping other pollutants in soil particles;

- reduce the harmful effects of weather events by storing flood waters and buffering roads and houses from the storm surges caused by hurricanes; and

- provide important habitat for plants and wildlife—more than one-third of threatened and endangered species, such as the whooping crane and Florida panther, live in wetlands.

Over half of the estimated 220 million acres of wetlands in the contiguous United States during colonial times have disappeared, and many of the remaining wetlands have been degraded. This loss in wetlands was primarily caused by agricultural activities and development; significant wetland loss continued through the mid-1970s. While the economic pressure to develop wetlands continues today, according to the U.S. Fish and Wildlife Service, the rate of wetland loss has decreased significantly over the past 30 years.[7]

The decrease in the rate of wetlands loss stems from executive actions and legislation, prompted by an increased recognition of the benefits of wetlands. In 1977, the first executive order for the protection of wetlands directed federal agencies to take action to minimize the destruction of wetlands and to preserve and enhance wetlands' benefits when carrying out responsibilities such as managing federal lands and facilities or providing federally financed construction.[8] Subsequently, in 1989, the administration set a national goal of no net loss of wetlands to ensure that these valuable resources are protected.

The Clean Water Act provides the primary legislative authority for federal efforts to regulate wetlands and other waters of the United States.[9] The act's objective is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. The section 404 program under the Clean Water Act is the principal federal program that provides regulatory protection for wetlands. Section 404 generally prohibits the discharge of dredged or fill material in waters of the United States, which

---

[7]The Emergency Wetlands Resources Act of 1986, as amended, requires the Fish and Wildlife Service to, among other things, assess the status of wetlands in the United States and trends in wetland gains or losses and to report the results to Congress each decade. 16 U.S.C. § 3931.

[8]Exec. Order No. 11990 (May 24, 1977).

[9]Other federal laws and programs regulating activities in wetlands include the Swampbuster Provision of the Food Security Act of 1985, as amended, which denies benefits to farmers who drain wetlands on their property; the Wetlands Reserve Program, which offers payments to farmers to restore and protect wetlands on their property; and the Coastal Wetlands Planning, Protection and Restoration Act, which authorized spending for coastal wetlands conservation and restoration projects and created a task force to develop a comprehensive approach for protecting and restoring coastal wetlands in Louisiana.

include certain wetlands, without a permit from the Corps.[10] Responsibility for issuing these permits is delegated to 38 Corps district offices. The Corps requires the permittee to first avoid discharges of dredged or fill materials into wetlands and then to minimize discharges that cannot be avoided. To replace lost wetland functions, the Corps can require compensatory mitigation as a condition of issuing a permit when damage or degradation of wetlands is unavoidable.

Compensatory mitigation can consist of creating a new wetland, restoring a former wetland, enhancing a degraded wetland, or preserving an existing wetland. According to Corps guidance, compensatory mitigation should generally provide, at a minimum, one-to-one functional replacement for a lost wetland.[11] When determining the type, size, and nature of compensatory mitigation to be performed, district officials may consider factors such as the wetland's location, the rarity of the ecosystem, water levels, vegetation, wildlife usage, and the presence of endangered species. In some cases, the loss of the functions of a certain wetland area may be offset by either a larger or a smaller wetland area. For example, on an acreage basis, the ratio should be greater than one-to-one when the lost wetland functions are high and the replacement wetlands provide lower functions.

In the absence of information about the functions of a certain site, acreage may be used instead to determine the amount of compensatory mitigation to help achieve the national goal of no net loss. Figure 3 shows land before and after a wetland restoration project.

---

[10]These discharges result from activities such as construction or mining and may include soil, rock, sand, or other materials. Section 404(g) of the Clean Water Act authorizes EPA-approved states to assume responsibility for issuing section 404 permits in certain waters under their jurisdiction (other than waters used to transport interstate or foreign commerce); only Michigan and New Jersey have assumed this responsibility.

[11]Even an acre for acre replacement of lost wetlands may not translate into maintaining equal functionality. Questions remain about whether created wetlands function as effectively as natural wetlands.

**Figure 3: Wetlands Restoration Project in Washington, D.C. (Before and After)**





Source: U.S. Geological Survey.

Before



Source: U.S. Geological Survey.

After

Compensatory mitigation may be performed by permittees or third parties. Third-party mitigation is typically performed by mitigation banks, which are generally private for-profit entities that establish wetlands under agreements with the Corps, or under in-lieu-fee arrangements, which are often sponsored by public or nonprofit entities. Under mitigation banking guidance issued in 1995 and in-lieu-fee guidance issued in 2000, mitigation bank and in-lieu-fee sponsors should have formal, written agreements with the Corps, developed in consultation with EPA and other resource agencies such as the U.S. Fish and Wildlife Service, to provide frameworks for how the mitigation bank or in-lieu-fee arrangement will operate. According to Corps guidance, these written agreements should include information on

- *the mitigation site*, including the types of wetlands to be developed, the conditions of any existing wetlands, and the geographic area; and

- *site management*, such as

  - monitoring plans and reporting protocols on the progress of the mitigation,

  - remedial actions and the parties responsible for performing them if the mitigation is not successful,

  - accounting procedures for tracking payments received from permittees,

- performance standards for determining ecological success of the site, and

- provisions for long-term management and maintenance.

The Corps and EPA, which have joint enforcement authorities for the section 404 program, established a memorandum of agreement allocating enforcement responsibilities between the two agencies. According to this agreement, the Corps is the lead enforcement agency for all violations of Corps-issued permits, while EPA is the lead enforcement agency when unpermitted activities occur in wetlands.[12] Historically, the Corps has not emphasized enforcement activities. In 1988, we reported that many Corps permits were not monitored for compliance with permit conditions, the Corps districts we visited at that time did not place a high priority on detecting unauthorized impacts to wetlands, and the frequent lack of monitoring could result in the loss of valuable wetland resources. Subsequently, in 1993, we reported that the Corps continued to emphasize permit processing over compliance and enforcement and that funding and staffing shortfalls had inhibited the Corps' and EPA's compliance and enforcement activities.[13] More recently, the National Research Council, environmental groups, and others have noted the same lack of emphasis on monitoring and enforcement.

## Corps Guidance for Oversight of Compensatory Mitigation Is Sometimes Vague or Internally Inconsistent

The Corps has developed guidance that establishes two primary activities for oversight of compensatory mitigation performed by permittees or third parties. The guidance directs Corps districts to require that permittees performing compensatory mitigation periodically submit monitoring reports that provide information on the status of their mitigation efforts. For mitigation banks and in-lieu-fee arrangements, the guidance directs Corps districts to require sponsors to submit annual monitoring reports. The guidance also suggests that district staff conduct annual on-site inspections of mitigation bank activities but does not specify a frequency for inspections of mitigation activities performed by permittees and in-lieu-

---

[12]The Corps refers to its actions in response to activities not in compliance with issued permits, as "compliance actions," as distinct from EPA's "enforcement actions" in response to unauthorized activities performed without required permits.

[13]GAO, *Wetlands Protection: The Scope of the Section 404 Program Remains Uncertain*, GAO/RCED-93-26 (Washington, D.C.: Apr. 6, 1993).

fee sponsors. However, we found that parts of the guidance are vague or internally inconsistent, thus limiting their usefulness.

## Corps Guidance Establishes Two Primary Oversight Activities for Compensatory Mitigation

The Corps has three primary guidance documents that establish requirements for overseeing compensatory mitigation performed by permittees, mitigation banks, or in-lieu-fee arrangements: (1) *The 1999 Army Corps of Engineers Standard Operating Procedures for the Regulatory Program*; (2) *The Federal Guidance for the Establishment, Use and Operation of Mitigation Banks*; and (3) *The Federal Guidance on the Use of In-Lieu-Fee Arrangements for Compensatory Mitigation Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act*. The two primary oversight activities these guidance documents establish are (1) Corps review of monitoring reports submitted by permittees or third parties and (2) the conduct of compliance inspections (field visits) that provide firsthand knowledge of the status of the mitigation.[14] The guidance documents lay out the following requirements:

- *1999 Standard Operating Procedures for the Regulatory Program.* This document, which highlights current Corps policies and procedures and provides guidance to the districts for setting priorities for their regulatory program activities, calls for Corps districts to require permittees to submit periodic monitoring reports and states that the districts should review all monitoring reports. It also states that compliance inspections are essential to ensure that compensatory mitigation is performed and directs Corps districts to inspect a relatively high percentage of compensatory mitigation performed by permittees to ensure compliance with permit conditions. Districts are to inspect all mitigation banks to ensure compliance with the banking agreement.

- *Federal Guidance for the Establishment, Use and Operation of Mitigation Banks.* Developed to provide guidance for establishing, using, and operating mitigation banks, this federal guidance directs the Corps to require that mitigation bank sponsors submit annual monitoring reports to the Corps and other authorizing agencies, which can include the EPA and the U.S. Fish and Wildlife Service, among others. Typically, mitigation banks are to be monitored for 5 years;

---

[14]See appendix II for a summary of these guidance documents.

however, according to the guidance, it may be necessary to extend this period for mitigation banks that require more time to reach a stable condition or that have undertaken remedial activities. In addition, the guidance encourages members of the mitigation banking review team, which the Corps chairs, to conduct regular (e.g., annual) on-site inspections, as appropriate, to monitor bank performance.[15]

- *Federal Guidance on the Use of In-Lieu-Fee Arrangements for Compensatory Mitigation Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.* This federal guidance was developed to ensure that in-lieu-fee arrangements can serve as an effective and useful mitigation approach. The guidance specifies that there should be appropriate schedules established for regular (e.g., annual) monitoring reports to document funds received, impacts permitted, funds disbursed, types of projects funded, and the success of projects conducted. Furthermore, the guidance calls for the Corps in conjunction with other federal and state agencies to evaluate these reports and conduct regular reviews to ensure that the arrangement is operating effectively and is consistent with agency policy and the specific agreement.

## Corps Guidance Is Sometimes Vague or Internally Inconsistent

Although Corps guidance documents establish monitoring reports and compliance inspections as the two primary oversight activities for compensatory mitigation, these guidance documents are sometimes vague or internally inconsistent. Specifically, the guidance is vague on the following key points:

- *The circumstances under which monitoring reports should be required.* Although the Corps' standard operating procedures call for district officials to require and review monitoring reports for mitigation banks and "other substantial mitigation," it does not define substantial mitigation. We found that Corps districts differed in how they defined "substantial mitigation." For example, two districts require mitigation reports when the mitigation involves restoring, enhancing, or creating a wetland but not when the mitigation involves preserving a wetland.

---

[15]A mitigation banking review team is an interagency group of federal, state, tribal, and/or local regulatory and resource agency representatives which are signatories to the mitigation banking agreement and oversee the establishment, use, and operation of the mitigation bank.

Another district interpreted "substantial" mitigation to include mitigation projects that generally involved more than one-half acre.

- *The actions district officials should take if reports are not submitted as required.* Corps guidance does not address the issue of noncompliance if monitoring reports are not submitted for review. For the files that we reviewed, we found that monitoring reports were provided for 44 percent, or 68 of the 155 cases in which these reports were required. District officials told us that, because of budget constraints, little time is spent on compliance activities, including following up on the submission of monitoring reports. While three districts that we visited have established a process for tracking due dates for monitoring reports from either permittees or third parties, none of the districts had a system for tracking reports from both.[16] Without such tracking systems, a district official told us that Corps officials may not realize when monitoring reports are due or that the reports were not submitted as required.

- *The information that should be included in a monitoring report.* The guidance does not specify what information should be included in monitoring reports submitted by permittees and mitigation banks, despite the importance of these reports as a primary means of overseeing compliance with mitigation requirements. We found that some monitoring reports were only a few pages in length and provided limited information about the site, while other reports were over 50 pages in length, were more comprehensive, and included data on the water levels at the mitigation site, the plants growing at the site, methods for monitoring both the water levels and plant growth, documentation of animals present at the site, and photographs of the site. The Chief of the Regulatory Branch acknowledged that the information submitted in monitoring reports varies significantly and may not always provide the details needed to assess the status of the compensatory mitigation.

---

[16]The Jacksonville district office has a tracking system for permits and is modifying the system to include mitigation banks. The New Orleans district only has a system for tracking reports for mitigation banks. The Seattle district has a system for tracking reports from permittees, and officials stated that it does not currently need such a system for mitigation banks because it has not had a problem with receiving the reports since there are only two banks currently approved by the district.

Furthermore, the guidance is internally inconsistent about the emphasis districts should place on compliance inspections. The Corps' standard operating procedures state that compliance inspections are essential, and districts should inspect a relatively high percentage of compensatory mitigation sites to ensure compliance with permit conditions, although they do not define what high means. The mitigation banking guidance states that districts should inspect all mitigation performed by banks annually to ensure compliance with the banking agreement.[17] The in-lieu-fee guidance does not specify how often compliance inspections should be conducted. However, the standard operating procedures also designate all compliance inspections as a low-priority activity, to be performed only if the goals for other higher-priority work, such as issuing permits, have been achieved. Furthermore, the guidance states that the degree to which districts perform lower priority work would affect whether districts received additional resources. District officials told us that in the past they were instructed that if they spent too many resources on low-priority activities, their budget would be reduced. Consequently, a number of district officials told us that they are unsure of how much time to spend on compliance inspections. According to officials in one district we visited, for instance, the number of sites they were inspecting was based on a target set in the 1991 guidance because the current guidance is not as specific.[18] Other districts do not have a specific goal for the number of inspections that district officials will conduct for mitigation activities. The Corps is revising its standard operating procedures to include specific performance goals for compliance inspections. Corps officials told us they expect to finalize the revised standard operating procedures by fall of 2005.

---

[17]This agreement is referred to as the mitigation banking instrument in the federal mitigation banking guidance.

[18]In 1991, the Corps' numerical inspection goal was equivalent to 25 percent of the individual permits issued in the prior year. Permits with required mitigation, including general permits if applicable, were a high priority to inspect.

## Corps Districts Perform Limited Oversight of Compensatory Mitigation

Overall, the Corps districts we visited have performed only limited oversight of compensatory mitigation undertaken by permittees and third parties. For the 152 individual permit files that we reviewed, we frequently found little evidence that the required monitoring reports were submitted or that the Corps conducted compliance inspections. Although Corps districts provided somewhat more oversight for mitigation performed by the 85 mitigation banks and 12 in-lieu-fee arrangements that we reviewed, we found that oversight was still limited even in these cases. Detailed results of our file review by district are presented in appendix III.

## Corps Districts Provide Little Oversight of Mitigation Performed by Permittees

According to our review of 152 permit files where the permittee was responsible for performing the compensatory mitigation, the Corps districts generally provided little oversight either through a monitoring report or a compliance inspection.[19] The Corps required permittees to submit monitoring reports for 89 of the 152 permit files that we reviewed. This ranged from a low of zero in Charleston to a high of 100 percent in Seattle. However, we found only 21 files contained evidence that the Corps actually received these required reports, ranging from a low of zero in two districts to a high of 69 percent in Jacksonville.[20] Furthermore, only 15 percent, or 23 of the 152 permit files, showed that the Corps had conducted a compliance inspection. The actual proportion of permits receiving oversight may be less because several districts could not locate some of the permit files that we requested for review.

The following cases illustrate situations in which the Corps required compensatory mitigation as a condition of permit issuance, but the files contained no evidence that the Corps had conducted oversight:

- In November 1999, the Corps issued a permit authorizing a permittee to install two boat slips and dredge approximately 5,270 feet of a canal in Louisiana, which would affect marsh and other wetland areas. As a

---

[19]The permit files in the Wilmington district contained evidence that district officials had more consistently conducted oversight of mitigation performed by permittees. There was evidence that district officials had either received a monitoring report or conducted a compliance inspection for 14 of 21 permit files, or 67 percent, that we reviewed. See appendix III.

[20]Four permit files contained evidence that the Corps received monitoring reports although the Corps did not require submission of these reports.

GAO-05-898 Wetlands Protection

condition of issuing this permit, the Corps required the permittee to use the dredge material and establish wetland plants to create a 710-acre intertidal marsh. The Corps also required the permittee to submit annual monitoring reports for 5 years. The file contained no evidence that the Corps had received any monitoring reports or conducted compliance inspections to determine the status of the required mitigation.

- In May 2000, the Corps issued a permit authorizing a developer to fill over 430 acres of wetlands to build a residential golf community in Florida. As a condition of issuing this permit, the Corps required the permittee to enhance over 1,000 acres of wetlands and to create 13 acres of wetlands. The Corps also required the permittee to submit annual monitoring reports for 5 years. The file contained no evidence that the Corps had conducted any compliance inspections or received any monitoring reports to determine the status of the required mitigation.

- In May 2000, the Corps issued a permit authorizing a permittee to fill 77 acres for a landfill in Texas. As a condition of issuing this permit, the Corps required the permittee to create 122 acres of prairie wetlands and to preserve 58 acres of wetlands on-site. The preservation area also included lakes and uplands that were to be managed for wildlife habitat. The Corps required the permittee to submit monitoring reports after 6 months and annually for 5 years. The file contained no evidence that the Corps had conducted any compliance inspections or received any monitoring reports to determine the status of the required mitigation.

Moreover, even when Corps officials conducted oversight, they did not always perform suggested follow-up. For example, in one permit file we reviewed, the Corps issued a permit in December 1999 that authorized the excavation of an approximately 15-acre sand and gravel mining project in a wetland area. The Corps required the permittee to restore the mining area to a wetland plant community as the excavation occurred and to submit annual monitoring reports on the progress of this restoration effort. The permittee submitted one report to the Corps in March 2000, which stated that the work authorized by the permit had begun but that compensatory mitigation activities could not be completed until excavation was completed. No other monitoring reports were in the file, and the file did not contain any evidence that Corps officials had followed up to determine if the compensatory mitigation was performed. Another file indicated that, in December 2000, a Corps official had inspected a project site to assess the status of the required compensatory mitigation for a permit issued in August 2000. This permit authorized filling about 6 acres of wetlands to

build a retail facility. The official's inspection indicated that construction was almost finished, but the mitigation to enhance 4 acres of wetlands was still under way. The official recommended that the site be revisited at a later date. However, the file contained no evidence that the Corps conducted a follow-up compliance inspection or contacted the permittee to determine the status of the mitigation.

## Corps Districts Perform Somewhat Greater Oversight of Mitigation Performed by Mitigation Banks and In-Lieu-Fee Sponsors

Corps districts provided somewhat more oversight for mitigation conducted by third parties, although even in these cases oversight was limited. Of the 85 mitigation banks that we reviewed, the Corps required that 71 percent, or 60 of the 85 mitigation bank sponsors, submit monitoring reports and 70 percent, or 42 mitigation bank files, contained evidence that at least one monitoring report had been received.[21] However, only 31 of the 85 mitigation bank files contained evidence that the Corps conducted a compliance inspection.[22] This ranged from a low of 13 percent in the St. Paul district to a high of 78 percent in the Wilmington district. The following cases illustrate situations where files contained no evidence that the Corps had conducted oversight of the mitigation bank:

- In February 1999, the Corps approved a mitigation bank in Texas that preserved and protected about 540 acres of swamp. The agreement between the Corps and the mitigation bank sponsor included a requirement that the sponsor submit an annual report on the mitigation bank's status of operation and maintenance. The file contained no evidence of any monitoring reports submitted by the sponsor or compliance inspections conducted by the Corps.

- In August 1999, the Corps approved an approximately 360-acre mitigation bank in Louisiana to reestablish a productive, coastal, forested wetland ecosystem on previously converted agricultural lands. The agreement between the Corps and the mitigation bank sponsor included a requirement that the sponsor provide the Corps with annual

---

[21]Only one district did not conduct oversight for a majority of the mitigation banks that we reviewed. We reviewed an additional 10 mitigation bank files for banks approved during calendar year 2004. We did not include these banks in our overall totals because monitoring reports are typically required on a yearly basis and not enough time had elapsed during our review to determine if the banks submitted monitoring reports.

[22]One mitigation bank file contained evidence that the Corps received a monitoring report even though the Corps did not require the sponsor to submit monitoring reports.

monitoring reports for at least 5 years and then reports once every 5 years. The file contained no evidence of any monitoring reports submitted by the sponsor or compliance inspections conducted by the Corps.

- In December 2001, the Corps approved a 2,100-acre mitigation bank in Florida to restore native tree species and enhance the site's hydrology. The agreement between the Corps and the mitigation bank sponsor required the sponsor to submit annual monitoring reports to the Corps for 4 years. The file contained no evidence of any monitoring reports submitted by the sponsor or compliance inspections conducted by the Corps.

For in-lieu-fee arrangements, the Corps required the sponsors of 6 of the 12 in-lieu-fee arrangements that we reviewed to submit monitoring reports. We found that five of the six files contained evidence that the sponsor had submitted at least one report. We also found that the Corps had received monitoring reports from one in-lieu-fee sponsor who was not required to submit a report. In addition, the files contained evidence that the Corps had conducted at least one compliance inspection for 5 of the 12 arrangements.

## Conflicting Guidance and Limited Resources Contribute to the Corps' Low Level of Oversight of Compensatory Mitigation

District officials told us that the Corps' conflicting guidance, which notes that compliance inspections are crucial but makes them a low priority, as well as limited resources contribute to their low level of oversight of compensatory mitigation activities. According to the Chief of the Regulatory Branch, historically, districts were to issue permits within specified time frames. If those time frames were not met, work in other areas, including compliance, was not to be performed. In addition, funds were allocated primarily for permit processing, with little remaining for other activities. However, Corps headquarters and district officials recognize the importance of oversight. They stated that without a comprehensive oversight program the Corps cannot ensure that compensatory mitigation will occur. In the absence of additional national guidance and resources, some of the districts we visited have decided to take their own steps to improve oversight. For example, Jacksonville district officials increased their compliance inspections of compensatory mitigation performed by permittees; the number of inspections more than tripled from 2003 to 2004 after several years of decline. In addition, New Orleans district officials told us that, in 2003, they began tracking monitoring reports and compliance inspections for mitigation banks, more aggressively followed up to ensure that the mitigation banks submit

required monitoring reports, and increased the number of compliance inspections of the mitigation banks.

## Corps Districts Can Take a Variety of Enforcement Actions to Resolve Violations but Rely Primarily on Negotiation

The Corps can take a variety of enforcement actions if required compensatory mitigation is not performed.[23] Possible enforcement actions include issuing compliance orders and assessing administrative penalties, requiring the permittee to forfeit a bond, suspending or revoking a permit, and implementing the enforcement provisions of agreements with third parties to perform mitigation on permittees' behalf. In addition, the Corps may refer a case to the Department of Justice to bring legal action in federal district court. However, district officials rarely use these enforcement actions, relying primarily on negotiation with permittees or third parties as a first step in the enforcement process to resolve any noncompliance cases they detect. In some cases, district officials want to pursue enforcement actions after detecting instances of noncompliance, but they may not be able to do so because they have limited their enforcement capabilities by not including specific requirements in the permits or third-party agreements.

### A Variety of Enforcement Actions Are Available to Corps Districts

When the Corps determines that required compensatory mitigation has not been performed, the type of enforcement action taken would depend on, among other things, whether mitigation is to be carried out by the permittee or by a third party.

In cases where the permittee was to perform the mitigation, the Corps may issue a compliance order, assess administrative penalties, require the permittee to forfeit a bond, suspend or revoke a permit, and/or refer the case to the Department of Justice for legal action. Under section 404 of the Clean Water Act and Corps regulations, the Corps may take the following actions:

- *Issue compliance orders to permittees who violate any condition of their permits.* Each order must specify the nature of the violation,

---

[23]The Corps refers to its actions in response to noncompliance as "compliance actions," as distinct from EPA's "enforcement actions" in response to unauthorized activities performed without required permits.

which could include failure to implement mitigation requirements, and specify a time by which the permittee must come into compliance.[24]

- *Assess administrative penalties, in an amount of up to $27,500.*[25]

- *Require the permittee to forfeit a bond, if such a bond was a condition of the permit.* The Corps has the authority to require permittees to post a financial bond to assure that they will fulfill all obligations required by the permit, which could include compensatory mitigation.[26]

- *Suspend a permit for, among other things, a permittee's failure to comply with the terms and conditions of the permit.*[27] A suspension requires the permittee to stop the activities previously authorized by the suspended permit. Following the suspension, the Corps may take action to reinstate, modify, or revoke the permit.[28]

- *Refer the case to the Department of Justice to bring an action in federal district court seeking an injunction and civil penalties.*[29] Cases that are appropriate for judicial actions include violations that are willful, repeated, flagrant, or of substantial impact.[30] Civil penalties may be awarded by the court in an amount of up to $25,000 per day for each violation.[31]

---

[24]33 U.S.C. § 1344(s); 33 C.F.R. § 326.4(d).

[25]The Corps has authority to assess Class I administrative penalties in an amount of up to $11,000 per violation, not to exceed $27,500. 33 U.S.C. § 1319(g) and 33 C.F.R. § 326.6(a)(1). The current penalty amounts were effective July 26, 2004. 69 *Fed. Reg.* 35518 (June 25, 2004). However, under the Corps' policy, once the Corps decides to proceed with an administrative penalty, it cannot subsequently refer the case to the Department of Justice for legal action. 33 C.F.R. § 326.6(a)(2).

[26]33 C.F.R. § 325.4(d).

[27]33 C.F.R. § 325.7(c).

[28]33 C.F.R. § 325.7(d).

[29]33 U.S.C. § 1344(s); 33 C.F.R. § 326.5.

[30]33 C.F.R. § 326.5(a).

[31]33 U.S.C. § 1344(s)(4).

The enforcement actions available to the Corps for a mitigation bank or in-lieu-fee sponsor's failure to carry out mitigation would depend on the provisions that are incorporated into each permit (if applicable) and mitigation bank agreement or in-lieu-fee agreement and would be governed by the terms of the agreement with the Corps. For example, once the Corps has agreed that a permittee's mitigation requirements will be satisfied by a mitigation bank or in-lieu-fee arrangement, the permittee satisfies these mitigation requirements by submitting the required payment to the third-party sponsor. Federal guidance for mitigation banks states, "it is extremely important that an enforceable mechanism be adopted establishing the responsibility of the bank sponsor to develop and operate the bank properly."[32] The guidance states that the bank sponsor is responsible for securing sufficient funds or other financial assurances in the form of, among other things, performance bonds, irrevocable trusts, escrow accounts, and letters of credit. In addition, "the banking agreement should stipulate the general procedures for identifying and implementing remedial measures at a bank." Similarly, federal guidance states that an in-lieu-fee agreement should contain, among other things, "financial, technical and legal provisions for remedial actions and responsibilities (*e.g.*, contingency fund)"; "financial, technical and legal provisions for long-term management and maintenance (*e.g.*, trust)"; and a "provision that clearly states that the legal responsibility for ensuring mitigation terms are fully satisfied rests with the organization accepting the fee."[33]

## Corps Districts Rely Primarily on Negotiation

While the Corps may take a variety of enforcement actions, the seven districts did not take any enforcement actions in fiscal year 2003, the latest year for which data is available.[34] Instead, district officials primarily rely on negotiation, a first step in the Corps' enforcement process, to resolve noncompliance issues. In keeping with Corps regulations, district officials told us that, when they find that required compensatory mitigation has not been performed, they first notify the responsible party and gather relevant information to better understand the noncompliance case. They then

---

[32]*60 Fed. Reg.* 58605 (Nov. 28, 1995).

[33]*65 Fed. Reg.* 66914 (Nov. 7, 2000).

[34]The fiscal year 2003 data provided by the Corps includes information about litigation and penalties but does not provide information on permit suspensions or revocations. According to a headquarters senior project manager, the Corps rarely uses these actions to obtain compliance.

attempt to negotiate by discussing with the permittees or third parties available corrective actions and time frames for voluntarily bringing the work into compliance. For example, at one district, officials told us that corrective actions by responsible parties could include working with an environmental organization such as The Nature Conservancy to improve wetlands or developing a traveling exhibit for local schools to educate children about the value of protecting wetlands. According to Corps officials, no additional action is needed generally because responsible parties are willing to work with the Corps to get back into compliance.

If district officials do not succeed in voluntarily bringing the responsible party into compliance, they notify the responsible party in writing, laying out potential enforcement actions available to the Corps and time frames for the party to respond to the letter—the next step toward achieving compliance. District officials told us they generally resort to such actions to achieve compliance only after negotiation has failed because such actions usually take more time to implement. For example, one district official estimated that when the Corps refers a noncompliance case to the Department of Justice, district officials may be occupied for several months. Similarly, according to Corps officials, developers prefer to negotiate with the Corps because it is less time-consuming than pursuing legal solutions. In addition, use of enforcement actions does not always ensure that the required compensatory mitigation will be completed. For instance, Corps district officials told us, while monetary penalties are an effective tool that draws attention to compliance and enforcement, the funds collected from assessing these penalties are required by law to go into the general fund of the federal Treasury.[35]

## Corps Sometimes Limits Its Own Enforcement Ability

On occasion, district officials wanting to pursue enforcement actions after detecting instances of noncompliance may not be able to do so because they have limited their enforcement capabilities; that is, they have not specified the requirements for compensatory mitigation in permits and failed to establish agreements with third parties. In our file review, we identified several permits that lacked this crucial information about

---

[35]31 U.S.C. § 3302(b), known as the miscellaneous receipts statute, requires that, unless otherwise provided, a government agency must deposit any funds received from sources other than appropriations into the general fund of the Treasury.

required mitigation.[36] Both the Chief of the Regulatory Branch and district officials stress the importance of including specific mitigation information in permits so that the Corps can take actions necessary to ensure required compensatory mitigation occurs. However, some of the districts we visited acknowledged that the lack of enforceable conditions included within a permit has been a problem and they have efforts under way, such as permit reviews and standardized permit conditions, to ensure that future permits are issued with the conditions needed to ensure enforceability. Although a review process for permit conditions may be a good idea, we found that, even when a review process was in place in some of the districts we visited, they still had issued permits with unenforceable conditions.

In addition, we found that three districts had not established formal agreements with third parties to document the objectives and implementation of mitigation banks or in-lieu-fee arrangements, as called for in federal guidance. Of the 85 mitigation bank files we reviewed, 21 did not have agreements with the Corps. These mitigation banks were all located in Minnesota, one of two states with mitigation banks that fall under the jurisdiction of the St. Paul District Office. According to district officials, Minnesota had developed state mitigation banking guidelines before the federal guidelines. Many of the banks in Minnesota were approved by the state program and partially developed before requesting Corps approval. Corps officials told us they had decided not to take additional steps to develop agreements with these mitigation banks. Currently, district officials issue a letter approving all or a portion of the state bank for use in the Corps compensatory mitigation program but do not develop a banking agreement with the bank sponsor. At the time of our review, district officials realized that the lack of mitigation banking agreements limited their enforcement ability and, therefore, were developing banking guidelines to provide more structure for the establishment of mitigation banks in Minnesota. However, they had not yet begun to consistently develop such agreements.

For the in-lieu-fee arrangements we reviewed, the Galveston and New Orleans districts have not established formal agreements with in-lieu-fee sponsors. Without such agreements, district officials may not know how

---

[36]A National Research Council report also has noted that it is important for permit requirements to contain clear and comprehensive information about compensatory mitigation and that without such information Corps officials may not be able to ensure that mitigation replaces the functions and values of lost wetlands.

many permittees are using these arrangements to fulfill their compensatory mitigation requirements. For example, for the arrangements that he was responsible for monitoring, a Galveston district official could not provide us with information about the number of permittees using the arrangement to perform compensatory mitigation, the total amount of payments the in-lieu-fee sponsor had received, or any oversight activities conducted by the Corps to ensure that the sponsor was performing the required compensatory mitigation. Before our visit, Galveston district officials were unaware that their four in-lieu-fee arrangements were not in compliance with federal guidance and are now attempting to restructure these arrangements. In addition, a Galveston district official told us the district will develop such agreements with the sponsors of future arrangements. With regard to the in-lieu-fee arrangement in New Orleans that did not have an agreement, officials told us that resource constraints and other priorities had prevented them from establishing a formal agreement with the in-lieu-fee sponsor. This arrangement has collected approximately $1 million since its inception in 1994, but district officials could provide no other information regarding oversight of the arrangement.[37]

Until the districts establish formal agreements with third-party sponsors, the Corps does not have sufficient legal recourse if third parties do not perform required compensatory mitigation because the sponsors have not reached agreement with the Corps on what penalties and/or corrective actions will be required to address any problems if the mitigation efforts are not performed. The Corps' Chief of the Regulatory Branch noted that he would encourage the districts to cease using these in-lieu-fee arrangements to provide compensatory mitigation until such agreements are established.

## Conclusions

The Corps' section 404 program is crucial to the nation's efforts to protect wetlands and achieve the national goal of no net loss. Although Corps officials acknowledge that compensatory mitigation is a key component of this program, the Corps has consistently neglected to ensure that the mitigation it has required as a condition of obtaining a permit has been completed. The Corps' priority has been and continues to be processing permit applications. In 1988 and 1993, we reported that the Corps was placing little emphasis on its compliance efforts, including compensatory

---

[37]According to a New Orleans official, although the majority of the total is the result of compensatory mitigation requirements, some of the monies were collected as a result of penalty assessments from the state's coastal program.

mitigation, and little has changed. The Corps continues to provide limited oversight of compensatory mitigation, largely relying on the good faith of permittees to comply with compensatory mitigation requirements. The Corps' oversight efforts have been further hampered by vague and inconsistent guidance that does not (1) define key terms, (2) specify the actions Corps staff should take if required monitoring reports are not received, or (3) set clear expectations for oversight of compensatory mitigation. Furthermore, district officials have failed to establish agreements with third-party sponsors that would ensure the agency has legal recourse if compensatory mitigation is not performed. Until the Corps takes its oversight responsibilities more seriously, it will not know if thousands of acres of compensatory mitigation have been performed and will be unable to ensure that the section 404 program is contributing to the national goal of no net loss of wetlands.

## Recommendations for Executive Action

Given the importance of compensatory mitigation to the section 404 program and its contribution to achieving the national goal of no net loss of wetlands, we recommend that the Secretary of the Army direct the Corps of Engineers to establish an oversight approach that ensures required mitigation is being performed throughout the nation. As part of this oversight approach, the Corps should

- develop more specific guidance for overseeing compensatory mitigation performed by permittees, mitigation banks, and in-lieu-fee sponsors; in particular, the guidance should define key terms such as "substantial mitigation" and specify the actions Corps officials should take if required monitoring reports are not received;

- clarify expectations for oversight of mitigation, including establishing goals for the number of monitoring reports that should be reviewed and the number of compliance inspections that should be conducted; and

- review existing mitigation banks and in-lieu-fee arrangements to ensure that the sponsor has an approved agreement with the Corps, as called for in federal guidance; if such agreements are not in place, they should be developed and the Corps should ensure that future mitigation banks and in-lieu-fee arrangements have these approved agreements.

## Agency Comments and Our Evaluation

We provided a draft of this report to the Secretary of the Department of Defense for review and comment. The Department of Defense concurred with the report's findings and recommendations. In its written comments, the Department of Defense stated that the Corps is currently revising its standard operating procedures. According to the department, the revised guidance will provide details on mitigation requirements as well as compliance and enforcement procedures. The department also indicated that the Corps will issue a Regulatory Guidance Letter that will clarify monitoring requirements for compensatory mitigation and include an outline for standardized monitoring reports. In addition, the Department of Defense provided technical comments and clarifications that we incorporated, as appropriate. The Department of Defense's written comments are presented in appendix IV.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to interested congressional committees and Members of Congress; the Secretary of Defense; the Secretary of the U.S. Army; and the Chief of Engineers and Commander, U.S. Army Corps of Engineers. We also will make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you have any questions about this report, please contact me at (202) 512-3841 or mittala@gao.gov. Contact points for our Offices of Congressional Relations and of Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix V.

Sincerely yours,

Anu K. Mittal
Director, Natural Resources
    and Environment

Appendix I

# Scope and Methodology

Our review focused on the compensatory mitigation activities at 7 of the U.S. Army Corps of Engineers' (Corps) 38 districts that implement the section 404 program: Charleston, South Carolina; Galveston, Texas; Jacksonville, Florida; New Orleans, Louisiana; St. Paul, Minnesota; Seattle, Washington; and Wilmington, North Carolina. We selected these districts because they represent different geographic areas of the United States, and they comprised over two-thirds of the compensatory mitigation required by individual permits issued in fiscal year 2003.[1] The Charleston, Galveston, Jacksonville, New Orleans, St. Paul, and Wilmington districts were the top districts nationwide in terms of mitigation required by individual permits. While the Seattle district is not one of the top 7 districts nationwide, it is one of the top districts in the western region in terms of required individual permit mitigation, and we included it to provide geographic coverage. To determine how much compensatory mitigation was required by permits issued by each of the 38 districts, we used the Quarterly Permit Data System data, which we examined and determined to be suitably reliable for selecting the districts to be included in our review.

To identify the guidance the Corps has established for overseeing compensatory mitigation, we examined legislation, federal guidance on mitigation banks and in-lieu-fee arrangements, Corps regulations, Corps guidance, and supplemental guidance developed by the districts. We also met with responsible Corps headquarters and district officials to discuss the Corps' guidance on oversight of compensatory mitigation.

To determine the extent to which the Corps oversees compensatory mitigation, we reviewed a total of 249 files. We reviewed 152 permit files issued in fiscal year 2000 where the permittee was responsible for the mitigation. We selected this time frame because sufficient time would have passed for the permittee to begin work on the permitted project, as most of the permits we reviewed were valid for 5 years or less, and for the Corps to have received a monitoring report or conducted a compliance inspection. We also reviewed files for 95 mitigation banks (including 10 mitigation banks approved in 2004), and 12 in-lieu-fee arrangements. The mitigation banks we reviewed had been approved since the mitigation banking guidance was established on November 28, 1995. For in-lieu-fee

---

[1] Individual permits are typically issued for projects that may have substantial environmental impacts. For smaller impacts, Corps officials generally issue either letters of permission, which are used when the proposed work is minor and is not expected to receive appreciable opposition, or general permits, which cover activities that have been identified as being substantially similar in nature, such as stabilizing stream banks.

arrangements, we reviewed the arrangements currently operating at the seven districts at the time of our site visit. These mitigation bank and in-lieu-fee arrangement files usually provided data on the mitigation activities for multiple permittees, and the mitigation conducted can encompass thousands of acres. Owing to the large number of permits and mitigation banks at some of the districts, we selected a random sample of permit files at Jacksonville and of mitigation banks at the Jacksonville, New Orleans, and St. Paul districts. These samples were drawn so that the estimates from the samples would have a precision margin of about plus or minus 15 percentage points at the 95 percent confidence level. However, we decided not to project our estimates to the population of permits in the seven districts because some districts were unable to find information for our sampled units, and another district was unable to provide a list of permits within the scope of our sample. Since we had no information on the missing permits, we are only presenting estimates for the permits and banks that we reviewed.

While our results are not representative of the activities of the 38 district offices nationwide, the Corps' Chief of the Regulatory Branch told us that our findings would likely indicate program implementation at the other districts not included in the scope of our review. Tables 1 through 3 detail the permit files, mitigation banks, and in-lieu-fee arrangements reviewed at each of the districts.

**Table 1: Permit Files Reviewed at the Seven Districts, Fiscal Year 2000**

| District | Number of permits reviewed |
|---|---|
| Charleston | 25 |
| Galveston | 18 |
| Jacksonville | 24 |
| New Orleans | 26 |
| St. Paul | 31 |
| Seattle | 7 |
| Wilmington | 21 |
| Total | 152 |

Source: GAO analysis of Corps data.

As listed in table 1, we reviewed all permits that met our criteria (individual permits where the permittee was responsible for performing mitigation issued in fiscal year 2000) with the following exceptions:

- *Charleston.* The district could not locate three permit files.

- *Jacksonville.* We selected a random sample of 55 the 167 individual permits identified by Jacksonville officials. The district could not locate complete permit files for 13 of the permits we requested. In addition, 18 of the permits we requested did not meet our criteria; for example, some permits were modified in fiscal year 2000 but were not issued in that year.

- *New Orleans.* District officials could not identify the permits that met our criteria from the district database. Therefore, we asked district officials to select the permits issued in fiscal year 2000 where the permittee was responsible for performing compensatory mitigation and reviewed all of the permits they identified.

- *St. Paul.* The district could not locate one permit file.

**Table 2: Mitigation Banks Reviewed at the Seven Districts, November 28, 1995, through December 2004**

| District | Number of banks reviewed |
|---|---|
| Charleston | 10 |
| Galveston | 4 |
| Jacksonville[a] | 19 |
| New Orleans[a, b] | 23 |
| St. Paul[a] | 28 |
| Seattle | 2 |
| Wilmington | 9 |
| Total | 95[c] |

Source: GAO analysis of Corps data.

[a]We randomly selected mitigation bank files for review at this district.

[b]New Orleans could not locate files for two of the mitigation banks that we requested for review.

[c]This total includes the 10 mitigation bank agreements that were approved during 2004: Jacksonville - 4, New Orleans - 1, and St. Paul - 5.

Appendix I
Scope and Methodology

**Table 3: In-Lieu-Fee Arrangements Reviewed at the Seven Districts**

| District | Number of arrangements |
|---|---:|
| Charleston | 2 |
| Galveston | 4 |
| Jacksonville | 4 |
| New Orleans | 1 |
| St. Paul | 0 |
| Seattle | 0 |
| Wilmington | 1 |
| **Total** | **12** |

Source: GAO analysis of Corps data.

Note: At the Galveston and New Orleans districts, we asked for documentation of the in-lieu-fee arrangements. Because neither of these districts has formal agreements for its arrangements, as called for by federal guidance, the districts did not provide any documentation for us to review. Therefore, any information about these districts' in-lieu-fee arrangements was obtained through interviews with district officials.

In addition to the file reviews, we spoke with district officials and reviewed relevant documentation to gain a better understanding of the districts' oversight programs and to gather any information that may not have been available during our file reviews.

To identify the enforcement actions the Corps can take if it determines that compensatory mitigation requirements are not being met and the extent to which it takes these actions, we analyzed Corps data on how the district offices resolved instances of noncompliance during fiscal year 2003. In addition, we reviewed relevant regulations and documentation obtained either from Corps officials or identified during our file reviews. We also discussed with headquarters and district officials the enforcement actions available to the Corps and the frequency with which the districts used these actions.

In addition, we met with several sponsors of mitigation banks and in-lieu-fee arrangements, as well as subject area experts, such as members of the National Research Council, to gain their views on the Corps' mitigation program. We conducted our review from June 2004 through September 2005 in accordance with generally accepted government auditing standards.

# Corps of Engineers Federal Guidance for Oversight of Compensatory Mitigation

As noted earlier, the Corps has three primary guidance documents for overseeing compensatory mitigation performed by permittees, mitigation banks, and in-lieu-fee arrangements: (1) *The 1999 Army Corps of Engineers Standard Operating Procedures for the Regulatory Program* (Parts I and II); (2) *The Federal Guidance for the Establishment, Use and Operation of Mitigation Banks*; and (3) *The Federal Guidance on the Use of In-Lieu-Fee Arrangements for Compensatory Mitigation Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.* These documents provide guidance for overseeing compensatory mitigation as described in this appendix.

## Standard Operating Procedures for the Regulatory Program (Parts I and II)

The Corps' 1999 Standard Operating Procedures for the Regulatory Program (Part I) highlights critical policies and procedures that are major factors in administering a consistent program nationwide. It specifies the following:

- *For all compensatory mitigation,*

  - Compliance inspections are essential.

- *For individual permitees,*

  - Districts will inspect a relatively high percentage of compensatory mitigation to ensure compliance with permit conditions. This is important because many of the Corps permit decisions require compensatory mitigation to offset project impacts.

  - To minimize field visits and the associated expenditures of resources, permits with compensatory mitigation requirements should require applicants to provide periodic monitoring reports and certify that the mitigation is in accordance with permit conditions. Districts should review all monitoring reports.

  - Districts will require all permittees to submit a self-certification statement of compliance. Districts should not be expending funds on surveillance as a discrete activity. Surveillance should be performed in conjunction with other activities such as permit or enforcement actions.

- *For mitigation banks,*

- Districts will inspect all mitigation banks to ensure compliance with the banking agreement.

- *For in-lieu-fee arrangements,*

  - These are not mentioned in Part I of the standard operating procedures.

The Corps' Standard Operating Procedures for the Regulatory Program (Part II) lists the work that should be prioritized. Part II states that it is not intended to dissuade districts from doing lower priority work; however, all districts should perform the high priority work before expending resources on the lower priority work. Part II specifies the following for mitigation:

- *High priority work consists of:*

  - requiring and reviewing monitoring reports on mitigation banks and other substantial mitigation, including in-lieu-fee approaches to assure success; and

- *Low priority work consists of:*

  - compliance inspections for all mitigation and multiple site visits to a mitigation site.

## Federal Guidance for the Establishment, Use and Operation of Mitigation Banks

*The Federal Guidance for the Establishment, Use and Operation of Mitigation Banks,* issued in November 1995, provides policy guidance for the establishment, use, and operation of mitigation banks for the purpose of providing compensatory mitigation. Oversight guidance in this document is as follows:

- Members of the mitigation banking review team, which the Corps chairs, are encouraged to conduct regular (e.g., annual) on-site inspections, as appropriate, to monitor bank performance.

- Annual monitoring reports should be submitted to the authorizing agencies, which include the Corps. The period for monitoring will typically be 5 years; however, it may be necessary to extend this period for projects requiring more time to reach a stable condition or where remedial activities were undertaken.

Federal Guidance on the Use of In-Lieu-Fee Arrangements for Compensatory Mitigation Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act

*The Federal Guidance on the Use of In-Lieu-Fee Arrangements for Compensatory Mitigation Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act*, issued in November 2000, clarifies the manner in which in-lieu-fee mitigation may serve as an effective and useful approach to satisfy compensatory mitigation requirements and meet the administration goal of no net loss of wetlands. Related to oversight, it specifies the following:

- There should be appropriate schedules for regular (e.g., annual) monitoring reports to document funds received, impacts permitted, how funds were disbursed, types of projects funded, and the success of projects conducted, among other aspects of the arrangement.

- The Corps should evaluate the reports and conduct regular reviews to ensure that the arrangement is operating effectively and is consistent with agency policy and the specific agreement.

Appendix III

# File Review Results by Corps District

This appendix presents the results of our file review at seven Corps districts—Charleston, South Carolina; Galveston, Texas; Jacksonville, Florida; New Orleans, Louisiana; St. Paul, Minnesota; Seattle, Washington; and Wilmington, North Carolina. Results of our review for individual permits issued in fiscal year 2000 where permittees were responsible for the mitigation are presented in table 4. Results for mitigation banks approved between the date of the mitigation bank federal guidance (November 28, 1995) and December 31, 2003, are in table 5 and in-lieu-fee arrangements currently operating at the districts at the time of our site visits are in table 6.

**Table 4: Results of Review of Corps Oversight of Individual Permits Issued in Fiscal Year 2000 Where Permittees Are Responsible for Compensatory Mitigation**

|  | Charleston | Galveston | Jacksonville | New Orleans | St. Paul | Seattle | Wilmington |
|---|---|---|---|---|---|---|---|
| Number of permit files reviewed | 25 | 18 | 24 | 26 | 31 | 7 | 21 |
| Permits requiring monitoring reports | 0 | 11 | 16 | 19 | 19 | 7 | 17 |
| Permit files with evidence of at least one monitoring report | 1[a] | 1[a] | 11 | 0 | 2 | 2 | 8[b] |
| Permit files with evidence of at least one compliance inspection | 3 | 3 | 4 | 0 | 1 | 2 | 10 |
| Permit files with evidence of either monitoring reports or compliance inspections | 4 | 3 | 13 | 0 | 3 | 2 | 14 |

Source: GAO analysis of Corps data.

[a]Monitoring report was received, but the Corps did not require the permittee to submit it.

[b]Of the eight permit files with evidence of at least one monitoring report in Wilmington, two of the permits did not require these reports.

**Table 5: Results of Review of Corps Oversight of Mitigation Banks Approved from November 1995 through December 2003**

| | Charleston | Galveston | Jacksonville[a] | New Orleans[a] | St. Paul[a] | Seattle | Wilmington |
|---|---|---|---|---|---|---|---|
| Number of mitigation bank files reviewed | 10 | 4 | 15[b] | 22[c] | 23[d] | 2 | 9 |
| Mitigation banking agreements requiring monitoring reports | 5 | 4 | 14 | 22 | 4 | 2 | 9 |
| Mitigation bank files with evidence of at least one monitoring report | 4 | 3 | 7[e] | 16 | 2 | 2 | 9 |
| Mitigation bank files with evidence of at least one compliance inspection | 5 | 1 | 5 | 9 | 3 | 1 | 7 |
| Mitigation bank files with evidence of either monitoring reports or compliance inspections | 7 | 3 | 8 | 18 | 5 | 2 | 9 |

Source: GAO analysis of Corps data.

[a]GAO reviewed a random sample of mitigation bank files at this district.

[b]Four additional banks were approved in 2004. All of the banking agreements require the sponsor to provide monitoring reports to the Corps.

[c]One additional bank was approved in 2004. The banking agreement requires the sponsor to provide monitoring reports to the Corps.

[d]Five additional banks were approved in 2004. Of these, one of the banking agreements required the sponsor to provide monitoring reports to the Corps.

[e]For one bank, a monitoring report was received, but the Corps did not require the bank to submit it.

**Table 6: Results of Review of Corps Oversight of In-Lieu-Fee Arrangements Currently in Operation at the Time of Our Site Visit**

| | Charleston | Galveston[a] | Jacksonville | New Orleans [a] | St. Paul | Seattle | Wilmington |
|---|---|---|---|---|---|---|---|
| Number of in-lieu-fee arrangements reviewed | 2 | 4 | 4 | 1 | 0 | 0 | 1 |
| Arrangements with agreements requiring monitoring reports | 2 | 0 | 3 | 0 | N/A | N/A | 1 |
| Arrangements with evidence of at least one monitoring report | 1 | 0 | 4[b] | 0 | N/A | N/A | 1 |
| Arrangements with evidence of at least one compliance inspection | 0 | 0 | 4 | 0 | N/A | N/A | 1 |
| Arrangements with evidence of either monitoring reports or compliance inspections | 1 | 0 | 4 | 0 | N/A | N/A | 1 |

Source: GAO analysis of Corps data.

[a]The Galveston and New Orleans districts do not have any formal agreements or documentation regarding oversight for their in-lieu-fee arrangements. As a result, district officials did not have any monitoring requirements or provide files for us to review.

Appendix III
File Review Results by Corps District

[b]For one arrangement, a monitoring report was received, but the Corps did not require the arrangement to submit it.

Appendix IV

# Comments from the Department of Defense



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
108 ARMY PENTAGON
WASHINGTON DC 20310-0108

2 6 AUG 2005

Ms. Anu Mittal
Director
Natural Resource and Environment
U.S. General Accounting Office
441 G Street, N.W.
Washington, D.C. 20548-1000

Dear Ms. Mittal:

This is the Department of Defense (DoD) response to the GAO draft report, 'WETLANDS PROTECTION: Corps of Engineers Is Not Providing the Oversight Needed to Ensure That Compensatory Mitigation Is Occurring,' dated August 12, 2005, (GAO Code 360490/GAO-05-898).

The GAO report was prepared to examine the: (1) guidance the Corps has issued for overseeing compensatory mitigation; (2) extent to which the Corps oversees compensatory mitigation; and (3) enforcement actions the Corps can take if required mitigation is not performed and the extent to which it takes these actions. The report acknowledges that the Corps has existing guidance that establishes two primary oversight activities for compensatory mitigation: requiring monitoring reports be submitted by permittees and conducting compliance inspections of the mitigation sites. In general, the report concludes that better oversight of compensatory mitigation is completed for third-party mitigation than for permittee-responsible mitigation. In addition, the report indicates that the Corps prefers to negotiate with permittees over using enforcement actions to bring them into compliance with permit conditions, and for those infrequent circumstances where permittees believe that enforcement actions have been overly severe they may request review by the appropriate Division Commander. As a consequence of this investigation, the GAO recommends that the Secretary of the Army direct the Corps to establish an effective oversight approach to ensure that permittees and third parties are accomplishing all required compensatory mitigation as specified in their authorizations. On behalf of the Department of Defense, I have enclosed specific comments on the recommendations of the GAO.

Very truly yours,

*John Paul Woodley, J.*

John Paul Woodley, Jr.
Assistant Secretary of the Army
(Civil Works)

Enclosure

Printed on 🔁 Recycled Paper

GAO DRAFT REPORT - DATED AUGUST 12, 2005
GAO CODE 360490/GAO-05-898

"WETLANDS PROTECTION: Corps of Engineers is Not Providing the Oversight
Needed to Ensure That Compensatory Mitigation Is Occurring"

DEPARTMENT OF DEFENSE COMMENTS
TO THE RECOMMENDATIONS

**RECOMMENDATION 1:** The GAO recommends that the Secretary of the Army direct the Corps of Engineers to develop more specific guidance for overseeing compensatory mitigation performed by permittees, mitigation banks, and in-lieu-fee sponsors. In particular, the guidance should define key terms, such as "substantial mitigation"; and specify the actions Corps officials should take if required monitoring reports are not received. (p. 28/GAO Draft Report)

**DOD RESPONSE:** We concur with this recommendation. The Standard Operation Procedures (SOP) procedures issued in 1999 do not adequately address mitigation nor compliance and enforcement. The Corps recognized this shortcoming prior to the GAO initiating this investigation and has been working on a revised SOP to clarify existing discrepancies and lack of specific guidance. The revised SOP will provide details on mitigation requirements as well as compliance and enforcement procedures in relation to all permit conditions, including compensatory mitigation requirements. A revised draft SOP will be circulated in October 2005 for review and comment by the Corps Divisions and Districts.

**RECOMMENDATION 2:** The GAO recommends that the Secretary of the Army direct the Corps of Engineers to clarify expectations for oversight of mitigation, including establishing goals for the number of monitoring reports that should be reviewed and the number of compliance inspections that should be conducted. (p. 28/GAO Draft Report)

**DOD RESPONSE:** We concur. The Corps will issue a Regulatory Guidance Letter (RGL) clarifying monitoring requirements for compensatory mitigation projects. The RGL will state what is required to be monitored and provide an outline for standardized monitoring reports. This outline will ensure Corps resources are used to provide oversight of the projects themselves rather than reports. In addition to the RGL, the Corps has established performance measures (issued in 2003 and will be tracked in 2006) that provide clear guidance to Corps districts on the level of oversight that is expected for compensatory mitigation projects. These performance measures were coordinated with the Office of Management and Budget through the Program Assessment and Rating Tool process (PART). Through a combination of the RGL and tracking of the performance measures, the Corps will insure better oversight of existing and future compensatory mitigation so that the Administration's goal of no overall net loss of wetlands is achieved within our Regulatory program. Additionally, the RGL will

-2-

communicate to the public, mitigation bankers, ILF providers, and the Federal and State agencies what is expected of permittees who are required to perform compensatory mitigation.

**RECOMMENDATION 3:**  The GAO recommends that the Secretary of the Army direct the Corps of Engineers to review existing mitigation banks and in-lieu-fee arrangements to ensure that they have approved agreements with the Corps, as called for in federal guidance.  If such agreements are not in place, they should be developed.  Additionally, the Corps should ensure that future mitigation banks and in-lieu-fee arrangements have these approved agreements. (p. 29/GAO Draft Report)

**DOD RESPONSE:**  We concur.  In response to independent critiques of the effectiveness of wetland compensatory mitigation projects, the Army Corps of Engineers, the Environmental Protection Agency, and the Departments of Agriculture, Commerce, Interior, and Transportation released the National Wetlands Mitigation Action Plan (MAP) on December 26, 2002.  The MAP includes tasks that will lead to improved ecological performance and results of compensatory mitigation.  On May 7, 2004, the Corps issued guidance entitled "Mitigation for Impacts to Aquatic Resources from Surface Coal Mining" to supplement existing guidance so as to facilitate uniform implementation of compensatory mitigation requirements and the implementation of successful compensatory mitigation projects.  In addition, Section 314 of the National Defense Authorization Act for Fiscal Year 2004 directed the Corps to issue regulations "establishing performance standards and criteria for the use, consistent with section 404 of the Federal Water Pollution Control Act (33 U.S.C. 1344), of on-site, off-site, and in-lieu-fee mitigation and mitigation banking as compensation for lost wetlands functions in permits issued by the Secretary of the Army under such section."  The Corps has prepared a draft mitigation rule that establishes standards and requirements for all forms of compensatory mitigation projects, including wetland and stream projects.  The Corps will implement this new comprehensive mitigation rule in accordance with the interagency vetting, coordination, and comment procedures stipulated by the Administrative Procedures Act.  The Corps will ensure district offices follow these new requirements and procedures in concert with additional follow-on supplemental guidance developed through the MAP process.

Appendix V

# GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Anu K. Mittal (202) 512-3841 (mittala@gao.gov) |
| **Staff Acknowledgments** | In addition to the individual named above, Sherry McDonald, Assistant Director; Diane Caves; Jonathan Dent; Doreen Feldman; Janet Frisch; Natalie Herzog; Cynthia Norris; Karen O'Conor; Anne Rhodes-Kline; Jerry Sandau; Carol Herrnstadt Shulman; Lisa Vojta; and Daniel Wade Zeno made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER



**US Army Corps
of Engineers®**

# REGULATORY GUIDANCE LETTER

No. 06-03                                                    Date: August 3, 2006

---

SUBJECT: Minimum Monitoring Requirements for Compensatory Mitigation Projects Involving the Creation, Restoration, and/or Enhancement of Aquatic Resources.

## 1. Purpose and Applicability

    **a. Purpose.** To provide the Districts and regulated public guidance on minimum monitoring requirements for compensatory mitigation projects including the required content for monitoring reports.

    **b. Applicability.** The District Engineer (DE) must require the submission of monitoring reports to assess the development and condition of compensatory mitigation projects, unless the DE determines that monitoring is not practicable for that compensatory mitigation project. This guidance applies to all Department of the Army (DA) permit authorizations under Section 404 of the Clean Water Act and Sections 9 and 10 of the Rivers and Harbors Act, including Nationwide Permit (NWP) verifications, which require monitoring of compensatory mitigation involving the creation, restoration, and/or enhancement of aquatic resources as a special condition.

## 2. Background

    Recent studies by the Government Accountability Office (GAO) and National Research Council (NRC) indicated that the U.S. Army Corps of Engineers (Corps) was not providing adequate oversight to ensure that compensatory mitigation projects were successfully replacing the aquatic resource functions and services lost as a result of permitted activities. For example, the GAO study determined that many project files requiring mitigation lacked monitoring reports despite the fact that such reports were required as a condition of the permit. Similarly, the NRC study documented that a lack of clearly stated objectives and performance standards in approved compensatory mitigation proposals made it difficult to ascertain whether the goal of no net loss of wetland resources was achieved.

    On March 28, 2006, the Corps and Environmental Protection Agency published a proposed rule (Mitigation Rule) to revise regulations governing compensatory mitigation for activities authorized by permits issued by the Department of the Army (33 CFR Parts 325 and 332). This Regulatory Guidance Letter (RGL) was formulated to compliment and be consistent with the proposed Mitigation Rule. Subsequently, this RGL may be revised if the guidance stated herein is not consistent with the final Mitigation Rule.

Exhibit 6

**3. Discussion**

Inconsistent approaches to monitoring compensatory mitigation projects are one of many factors that have affected the ability of project managers (PM) to adequately enforce the required performance standards of Corps approved mitigation plans. Standardizing monitoring requirements will aid PMs when evaluating compensatory mitigation sites, thereby allowing DEs to effectively assess the status and success of compensatory mitigation projects.

This RGL addresses the reports and requirements associated with monitoring mitigation projects and for determining the information necessary to conduct compensatory mitigation site assessments. Monitoring requirements are typically based on the performance standards for a particular project and may vary from one compensatory mitigation project to another.

Monitoring reports are documents intended to provide the DE with information to determine if a compensatory mitigation project site is successfully meeting its performance standards. Remedial actions for correcting deficiencies in mitigation outcomes must be based on information provided in the monitoring reports and subsequent site inspections.

**4. Guidance**

    **a. Monitoring guidelines for compensatory mitigation.**

        **i. Performance Standards.** Performance standards, as defined in 33 CFR 332.2, must be consistent with the objectives of the compensatory mitigation project. The goal of these standards is to ensure that the project can be objectively evaluated to determine if it is developing into the desired resource type and providing the expected functions. Mitigation projects compensating for wetland impacts must include special conditions that clearly state that all wetlands within the mitigation site which are counted towards compensation must meet performance standards for and be monitored for the three parameters defined in the 1987 Corps of Engineers Wetland Delineation Manual and any associated guidance (i.e., hydrophytic vegetation, hydric soils, and the appropriate hydrology). Additional performance standards based on functional assessment methods and/or criteria may be incorporated into the special conditions as a basis for determining if the site is achieving the desired functional capacity. Compensatory mitigation projects also are conducted to offset impacts to other aquatic resources, such as riverine and estuarine habitats. Special conditions of the DA permits must clearly state performance standards specific to the type and function of the ecosystem in relation to the objectives of the compensatory mitigation project. Alternatively, the special conditions can refer to the performance standards documented in the Corps approved mitigation plan.

        **ii. Monitoring Timeframe.** The monitoring period must be sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. Special conditions of the permit must support the five-year monitoring requirement and include deadlines for submittal of reports. Increased monitoring timeframes are usually needed for mitigation sites that take longer to develop and reach a level of stability. For example, a site at which a forested wetland is being restored may take longer than five years to develop into a fully functioning wetland. Certain compensatory mitigation projects may require

monitoring more often than annually during the early stages of development. This additional monitoring will allow project managers to quickly address problems and/or concerns associated with the mitigation site. Annual monitoring can resume once the site has stabilized and begun to develop in accordance with the approved performance standards. Monitoring may be conducted on a less frequent timeframe (such as every other year) in cases where monitoring is required for longer than five years. Yearly monitoring must occur for the first few years, however, to ensure the area is becoming established as a successful mitigation site. Off-year monitoring must include some form of assessment such as driving by the mitigation site, telephone conversations regarding condition of the mitigation site, etc. The special conditions of the DA permit (or the mitigation plan as referenced in the special conditions) must specify the length of monitoring required. Onsite conditions, the complexity of the approved mitigation plan, and unforeseen circumstances will ultimately determine whether the length and amount of mitigation monitoring required should be extended beyond the five-year time frame for a particular project. Complex and/or ecologically significant compensatory mitigation projects should have higher priority for site visits.

The DE may waive any remaining monitoring requirements upon a determination that the compensatory mitigation project has achieved its performance standards. For example, restoring open water habitat that was temporarily drained may not require a five-year monitoring period. Conversely, the DE may extend the original monitoring period upon a determination that performance standards have not been met or the compensatory mitigation project is not on track to meet them (e.g., high mortality rate of vegetation). The DE may also revise monitoring requirements when remediation is required.

    **iii. Monitoring Reports**. Monitoring reports are required for all compensatory mitigation projects unless the DE determines that monitoring is not practicable for that compensatory mitigation project. The content of the monitoring reports must be specified in the special conditions of the DA permit so that the requirements are clearly identified for the permittee. In addition, the monitoring reports must comply with the timeframes specified in the special conditions of the DA permit. Monitoring reports should not be used as a substitute for onsite compliance inspections. Rather, monitoring reports must provide the PM with sufficient information to assess progress towards meeting the specified performance standards and to prioritize site inspections based on the findings documented in the report. The standard monitoring report format presented here is designed to provide the PM with sufficient information on the permitted work, the mitigation site, and whether a compliance visit is warranted. This new format will allow the permittee to electronically submit the reports and photos for review. Electronic submittals should be strongly encouraged by the Corps districts. Site visits to mitigation sites should be documented in the administrative record and will count toward district performance goals. DEs should consider taking enforcement action if the responsible party fails to submit complete and timely monitoring reports.

    **b. Contents of Monitoring Reports**. Monitoring reports provide the PM with a convenient mechanism for assessing the status of required compensatory mitigation projects. They also allow the PM to prioritize inspections of compensatory mitigation projects so that the Corps can ensure effective use of limited resources and maximize replacement of the most valuable impacted aquatic resources within an ecosystem. The PM should schedule a site visit

and determine potential remedial actions if problems with the compensatory mitigation project are identified in a monitoring report.

DEs should discourage the submittal of large bulky reports that provide general information. While often helpful as background, reiteration of the mitigation and monitoring plan content, lengthy discussions of site progress, and extensive paraphrasing of quantified data are unnecessary. Monitoring reports must be concise and effectively provide the information necessary to assess the status of the compensatory mitigation project. Reports must provide information necessary to describe the site conditions and whether the compensatory mitigation project is meeting the performance standards.

Annual monitoring reports must follow a 10-page maximum report format for assessing mitigation sites, as follows:

### i. Project Overview (1 page)

(1) Corps Permit Number
(2) Name and contact information of permittee and consultant
(3) Name of party responsible for conducting the monitoring and the date(s) the inspection was conducted.
(4) A summary paragraph defining the purpose of the approved project, acreage and type of aquatic resources impacted, and mitigation acreage and type of aquatic resources authorized to compensate for the aquatic impacts.
(5) Written description on the location and any identifiable landmarks of the compensatory mitigation project including information to locate the site perimeter(s).
(6) Directions to the mitigation site
(7) Dates compensatory mitigation commenced and/or was completed.
(8) Short statement on whether the performance standards are being met
(9) Dates of any recent corrective or maintenance activities conducted since the previous report submission.
(10) Specific recommendations for any additional corrective or remedial actions.

### ii. Requirements (1 page)

List the monitoring requirements and performance standards, as specified in the approved mitigation plan and special conditions of the permit, and evaluate whether the compensatory mitigation project site is successfully achieving the approved performance standards or trending towards success. A table is one option for comparing the performance standards to the conditions and status of the developing mitigation site.

### iii. Summary Data (maximum of 4 pages)

Summary data must be provided to substantiate the success and/or potential challenges associated with the compensatory mitigation project. Photo documentation may be provided to support the findings and recommendations referenced in the monitoring report and to assist the PM in assessing whether the compensatory mitigation project is successful for the monitoring period. Submitted photos must fit on a standard 8 ½ X 11" piece of paper, dated, and clearly labeled with the direction from which the photo was taken. The photo sites must also be identified on the appropriate maps.

### iv. Maps (maximum of 3 pages)

Maps must be provided to show the location of the compensatory mitigation site relative to other landscape features, habitat types, locations of photographic reference points, transects, sampling data points, and/or other features pertinent to the mitigation plan. In addition, the submitted maps must clearly delineate the mitigation site perimeter(s), which will assist PMs in locating the mitigation area(s) during subsequent site inspections. Each map or diagram must fit on a standard 8 ½ X 11" piece of paper and include a legend and the location of any photos submitted for review.

### v. Conclusions (1 page)

A general statement must be included describing the conditions of the compensatory mitigation project. If performance standards are not being met, a brief explanation of the difficulties and potential remedial actions proposed by the permittee, including a timetable, must be provided. The DE will ultimately determine if the mitigation site is successful for a given monitoring period.

**c. Completion of Compensatory Mitigation Requirements.** Compensatory mitigation requirements will not be considered fulfilled until the permittee has received written concurrence from the DE that the compensatory mitigation project has met its objectives and no additional monitoring reports are required. PMs will review the final monitoring reports to make this determination. A final field visit should be conducted to verify that onsite conditions are consistent with information documented in the mitigation reports.

**d. Special Condition.** The following condition must be added to all DA permits that require compensatory mitigation:

> *Your responsibility to complete the required compensatory mitigation as set forth in Special Condition X will not be considered fulfilled until you have demonstrated mitigation success and have received written verification from the U.S. Army Corps of Engineers.*

5

## 5. Duration

This guidance remains in effect unless revised or rescinded.

DON T. RILEY
Major General, US Army
Director of Civil Works

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, et al.,      ) | |
|      ) | |
| Plaintiffs,      ) | |
|      ) | |
| v.      ) | Civ. No. 1:07-cv-01756 (RCL) |
|      ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, et al.,      ) | DECLARATION IN SUPPORT OF |
|      ) | STANDING OF SIERRA CLUB |
| Defendants,      ) | |
|      ) | |
| and      ) | |
|      ) | |
| SIERRA PROPERTIES, et al.,      ) | |
|      ) | |
| Intervening Defendants      ) | |

## DECLARATION OF SIERRA CLUB

I, Athan Manuel, do hereby declare s follows:

    1)      I am the Director of Lands Protection for Sierra Club, and my office is located at

408 C St. NE, Washington, DC 20002.

    2)      The Sierra Club is a national nonprofit organization of over 750,000 members. It

is organized into chapters, which to some extent correlate to individual states or

regions, and within those chapters there may be groups. The Sierra Club, Florida

Chapter, has a Tampa Bay Group, which has 1,931 members, and a Nature Coast

Group, which has 1,122 members. Within Pasco County, there are 560 members;

Hillsborough County has 1,958 members, and Pinellas has 2,576. These numbers

are approximate because membership changes over time, though they were

accurate as of January 8, 2008.

Exhibit 7

3)     The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places

of the earth; to practicing and promoting the responsible use of the earth's

ecosystems and resources; to educating and enlisting humanity to protect and

restore the quality of the natural and human environment; and to using all lawful

means to carry out these objectives.

4)     To achieve these ends Sierra Club, including for example the Tampa Bay Group,

organizes outings including hikes, canoe trips and bike trips for its members.

These trips are organized because Sierra Club members enjoy exploring and

observing their natural environment, including in particular the natural

environment in which Sierra Club's members live and work, the flora and fauna

in the area, especially rare and threatened or endangered species, and the scenic

beauty of the area.  The trips are intended to be educational in so far as people

learn about the ecosystems around them.  And they are intended to increase

awareness of the environment and potential impacts to it.

5)     Sierra Club also works to achieve these ends through informing its membership

through newsletters as to current pressing issues and the work Sierra Club is

undertaking.  It comments on proposed laws, rules, permits, and other government

actions, and it files lawsuits to oppose laws, rules, permits and other such agency

actions.  And it engages the media to raise public awareness generally about

environmental issues.

6)     The Sierra Club has had a longstanding involvement with Cypress Creek - and

with Hillsborough River, which of Cypress Creek is a major tributary – including

2

Cypress Creek's basin and watershed. This has included organizing trips to
Cypress Creek basin, and working to protect and educate people about Cypress
Creek.

7)     Sierra Club has organized trips, including hiking and walking and picnicking in
the Cypress Creek area. The most recent outing was August of 2007 for hiking at
the Cypress Creek wellfield area, which is approximately 5 miles from the
Cypress Creek Town Center ("CCTC") site. Such events date back years. In
addition, individual Sierra Club members recreate in the Cypress Creek, and on
Cypress Creek itself, including canoeing on Cypress Creek in the location of the
CCTC development, and they have done so for years, independent of Sierra
Club's involvement. Sierra Club's members intend to continue using Cypress
Creek, and the lands in the area, for recreation.

8)     Sierra Club, and the Sierra Club Tampa Bay Group has personally dedicated years
toward public education and protection of the Cypress Creek, Hillsborough River,
its basin and watershed through involvement in various land use processes at the
local, state and federal levels; public school speaking engagements on the value of
our eco-system in this area; and, involvement in state-wide/nation-wide
campaigns to save Cypress Creek.

9)     For example, Sierra Club started a "National Save Cypress Creek Campaign" in
2000-01, in response to a plan by the Florida Department of Transportation to
place an East/West Expressway through environmentally sensitive land in
Hillsborough County, impacting the Hillsborough River watershed including

through the Cypress Creek watershed.  Unbridled growth in Pasco County and

New Tampa in Hillsborough County prompted attention from the local group of

Sierra Club to the Florida Chapter level and then to the National level and a

campaign against destruction of the Cypress Creek area was initiated.  Canvassing

and petitions were part of this campaign, and were sent to elected officials at the

local, state and federal levels.

10)     Similarly, in 2000, Sierra Club participated as a representative on the

Hillsborough County Land Acquisition Protection Program to establish the

Cypress Creek Preserve.  In this capacity, Sierra Club successfully persuaded

Hillsborough County to buy over 2,000 acres of environmentally sensitive land

through which Cypress Creek runs.  These lands are approximately 5 miles from

the CCTC site.  These lands are part of the interconnected conservation lands in

Pasco County and Hillsborough County.

11)     Sierra Club filed a state law suit against the City of Tampa in 2000-02 concerning

the rezoning for the Grand Hampton development contending that the City of

Tampa was not protecting Cypress Creek and Trout Creek by allowing the

construction of a golf course community in sensitive lands adjacent to Cypress

Creek wetlands.  Sierra Club settled the lawsuit in exchange for, among other

things, protective buffers along parts of the creeks, removal of the golf course,

and protection of wetlands and habitat.

12)     Sierra Club also worked with the developers of Live Oak Preserve in 2002, which

presented environmental impacts to conservation lands within the Cypress Creek

4

watershed, to minimize the impacts by removing a proposed golf course, creating

pedestrian trails and keeping conservation lands and wildlife habitat intact.

13) Sierra Club volunteers have also presented programs at various elementary and

middle schools in the Tampa Bay metropolitan area on the importance of

wetlands, the significance of Cypress Creek Preserve, and the need to protect

water resources.

14) Sierra Club became involved with the CCTC development as early as January

2004, when it attended meetings in Pasco County on the proposed CCTC

development. Sierra Club met with the Mayor of Tampa, in May 2004,

concerning potential impacts to Cypress Creek, and Hillsborough River, from the

CCTC development. Sierra Club Florida Nature Coast group sent a letter to the

Board of County Commissioners objecting to CCTC in September 2005.

15) Sierra Club Tampa Bay Group sent its first alert to its members concerning the

CCTC development, pertaining to local and state issues concerning rezoning for

the development and the issuance of a development of regional impact ("DRI")

permit, for a hearing on November 23, 2004. A representative for Sierra Club

testified at the November 23 hearing before the Pasco County Commission.

16) Sierra Club worked to oppose the DRI for CCTC, including by coordinating with

the Hillsborough River Greenways Task Force, sending alerts to members to write

to the Department of Community Affairs ("DCA"), the Governor, and the DCA

Secretary and Staff, objecting to the DRI. Sierra Club met with DCA staff and

attorneys, the Florida Department of Environmental Protection, the Hillsborough

County Commission; and City of Tampa regarding CCTC and the DRI it had requested.

17)    Sierra Club and its members also sent a number of comments opposing issuance of the United States Army Corps of Engineers ("Corps") permit challenged in this case, seeking the protection of Cypress Creek, wetlands, and wildlife.  AR03136-03141; AR03345-3370; AR04303-4304.

18)    Sierra Club believes that the CCTC permit as issued will have significant environmental impacts on Cypress Creek, on the wetlands in the area, on water supplies, and on the flora and fauna in the area, including threatened and endangered species such as the Wood Stork, the Eastern Indigo Snake and the Florida Scrub Jay.  These impacts will result from, among other things, the destruction of wetlands and the nutrient assimilation capacities of the environment in the area, introduction of new sources of pollution and contamination, increased demands for water, and the destruction and fragmentation of wildlife habitat, including the critical wildlife linkage running along Cypress Creek.  It will also result in aesthetic harms to a beautiful creek and area.

19)    Sierra Club was surprised by the issuance of the Corps's CCTC permit because it believed that the permit would be under review for a longer time given the environmental impacts that needed review.  Since the issuance of the CCTC permit, Sierra Club has continued to press the Corps to rescind or suspend the permit to comply with federal environmental laws, and to protect the sensitive Cypress Creek environment.  Sierra Club sent the Corps and the United States

Fish and Wildlife Service a notice of intent to bring suit in July, 2007, which the

CCTC was aware of.  Sierra Club and other plaintiffs, through their attorneys,

have corresponded with the Corps on several occasions providing information as

to violations of the environmental laws at issue in this case.  E.g. Attachment A.

As recently as this past December, we have sought to meet with the Corps to

explain why we believe the Corps and the Service violated the law, but the

agencies have declined to meet with us.

   I declare under penalty of perjury that the foregoing is true and correct, to the best of my

knowledge.

Executed on January ___/4___, 2008.

Athan Manuel for
SIERRA CLUB

# Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Joshua R. Stebbins
Tanya M. Sanerib
Erin M. Tobin

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

September 6, 2007

Lt. Gen. Robert L. Van Antwerp
Chief of Engineers,
Army Corps of Engineers
20 Massachusetts Ave., N.W.
Washington, D.C. 20314
202-761-1683 (fax)

Lt. Gen. Robert L. Van Antwerp
Mr. Lance Wood, Esq.
U.S. Army Corp of Engineers
Chief Counsel's Office
441 G. Street, NW
Washington, D.C 20314
lance.d.wood@usace.army.mil

Dirk Kempthorne
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
exsec@ios.doi.gov (executive secretary)
(202) 208-6956 (fax)

Dale Hall,
Director,
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240
dale_hall@fws.gov
703 358 2594 (fax)

**RE:   Cypress Creek Town Center in Pasco County, Florida**

We are writing on behalf of the Sierra Club concerning the Department of Army Permit


recycled paper

Attachment A

No. SAJ-2003-2336 (IP-THE) (May 15, 2007) ("Permit"), authorizing the destruction of wetlands for construction of the Cypress Creek Town Center ("CCTC") under section 404 of the Clean Water Act. As you know, Sierra Club gave notice of its intent to sue to challenge the Permit in its correspondence of July 17, 2007, unless the Corps suspends or revokes the Permit.

Among other legal violations identified by the Sierra Club in its July 17, 2007, Notice, the Sierra Club explained that the CCTC development will cause significant degradation of Cypress Creek, an Outstanding Florida Water, and ultimately the Hillsborough River, to which Cypress Creek flows. Moreover, in issuing the Permit the Corps failed to take a hard look at such degradation, both during the construction and during the operation of the CCTC development; it did not require that practicable alternatives to reduce or avoid impacts be pursued; and it did not require minimization of such impacts.

Land clearing of the CCTC development site has begun. Not surprisingly, the project has unlawfully discharged large amounts of turbid storm water into wetlands and Cypress Creek, significantly degrading the wetlands and the Creek. The developer of the site has now been cited twice for discharges, see attached, by two separate agencies. As the Sierra Club explained earlier, the CCTC project will inescapably cause significant degradation of Cypress Creek, and ultimately Hillsborough River, which is unlawful under the Clean Water Act.

The Sierra Club continues to be gravely concerned that the Corps has failed to comply with the ESA, the CWA, and NEPA in granting the Permit at issue. The Sierra Club again requests that the Corps suspend or revoke the Permit authorizing the CCTC project while the Corps undertakes the additional analyses mandated by federal law. Absent such actions, the Sierra Club intends to file suit to bring the Corps into compliance with the law. In the meantime, the Sierra Club also requests that the Corps station officers at the CCTC site to monitor activities and prevent any further discharges. Please feel free to contact us to discuss these matters.

Sincerely,

Joshua R. Stebbins

cc:

Governor Charles Crist
Office of the Governor
The Capitol
400 South Monroe Street
Tallahassee, FL 32399



## Southwest Florida
### Water Management District

2379 Broad Street, Brooksville, Florida 34604-6899
(352) 796-7211 or 1-800-423-1476 (FL only)
SUNCOM 628-4150  TDD only 1-800-231-6103 (FL only)
On the Internet at: WaterMatters.org

An Equal
Opportunity
Employer

**Bartow Service Office**
170 Century Boulevard
Bartow, Florida 33830-7700
(863) 534-1448 or
1-800-492-7862 (FL only)
SUNCOM 572-6200

**Lecanto Service Office**
Suite 226
3600 West Sovereign Path
Lecanto, Florida 34461-8070
(352) 527-8131

**Sarasota Service Office**
6750 Fruitville Road
Sarasota, Florida 34240-9711
(941) 377-3722 or
1-800-320-3503 (FL only)
SUNCOM 531-6900

**Tampa Service Office**
7601 Highway 301 North
Tampa, Florida 33637-6759
(813) 985-7481 or
1-800-836-0797 (FL only)
SUNCOM 578-2070

Judith C. Whitehead
Chair, Hernando

Neil Combee
Vice Chair, Polk

Todd Pressman
Secretary, Pinellas

Jennifer E. Closshey
Treasurer, Hillsborough

Thomas G. Dabney
Sarasota

Patricia M. Glass
Manatee

Heidi B. McCree
Hillsborough

Ronald E. Oakley
Pasco

Sallie Parks
Pinellas

Maritza Rovira-Forino
Hillsborough

Patsy C. Symons
DeSoto

David L. Moore
Executive Director

William S. Bilenky
General Counsel

August 20, 2007

Hank King
15330 Cypress Creek Run
Lutz, FL 33559-08606

Subject:        Letter Dated August 14, 2007
                Construction Inspection Deviation for Cypress Creek Town Center

Dear Mr. King:

Enclosed you will find a copy of a letter dated on August 14, 2007, by Compliance
Engineer, Clay Black concerning the Cypress Creek Town Center – Phase 1, Permit No.
43026931.001. This letter is being sent to you, as requested by H. Robert Lue, Director,
Brooksville Regulation Department.

If I can be of any further assistance, please don't hesitate in contacting me at
1-800-423-1476 extension. 4349.

Sincerely,

Sandy Semegen
Field Service Supervisor
Brooksville Regulation Department

SS:jen
Enclosure
cc:        Files of Record 43026931.001/CT 181111 and CT 191098
           H. Robert Lue, P.E., Director, Brooksville Regulation Department
           Wojciech M. Mroz, P.E., Surface Water Regulation Manager
           Leonard Bartos, P.W.S., Environmental Regulation Manager
           C. Clay Black, P.E., Senior Professional Engineer
           Frank Gargano, Senior Field Technician
           Cliff Jackson, Senior Field Technician



An Equal
Opportunity
Employer



# Southwest Florida
## Water Management District

2379 Broad Street, Brooksville, Florida 34604-6899

(352) 796-7211 or 1-800-423-1476 (FL only)

SUNCOM 628-4150  TDD only 1-800-231-6103 (FL only)

On the Internet at: WaterMatters.org

| | | | |
|---|---|---|---|
| **Bartow Service Office** | **Lecanto Service Office** | **Sarasota Service Office** | **Tampa Service Office** |
| 170 Century Boulevard | Suite 226 | 6750 Fruitville Road | 7601 Highway 301 North |
| Bartow, Florida 33830-7700 | 3600 West Sovereign Path | Sarasota, Florida 34240-9711 | Tampa, Florida 33637-6759 |
| (863) 534-1448 or | Lecanto, Florida 34461-8070 | (941) 377-3722 or | (813) 985-7481 or |
| 1-800-492-7862 (FL only) | (352) 527-8131 | 1-800-320-3503 (FL only) | 1-800-836-0797 (FL only) |
| SUNCOM 572-6200 | | SUNCOM 531-6900 | SUNCOM 578-2070 |

**Judith C. Whitehead**
Chair, Hernando

**Neil Combee**
Vice Chair, Polk

**Todd Pressman**
Secretary, Pinellas

**Jennifer E. Closshey**
Treasurer, Hillsborough

**Thomas G. Dabney**
Sarasota

**Patricia M. Glass**
Manatee

**Heidi B. McCree**
Hillsborough

**Ronald E. Oakley**
Pasco

**Sallie Parks**
Pinellas

**Maritza Rovira-Forino**
Hillsborough

**Patsy C. Symons**
DeSoto

**David L. Moore**
Executive Director

**William S. Bilenky**
General Counsel

August 14, 2007

Pasco 54 Ltd., Pasco 54 Inc., Pasco Ranch Inc., and Pasco Properties
509 Guisando De Avila, Suite 200
Tampa, FL 33613

Subject:  **CONSTRUCTION INSPECTION DEVIATION**
Project Name:  Cypress Creek Town Center – Phase 1
Permit No.:  43026931.001
CT No.:  181111
Sec/Twp/Rng:  27/26S/19E
County:  Pasco

Dear Permittees:

The District has received a complaint alleging that turbid water is discharging from your site located at SR 56 in Pasco County. District staff investigated and found the following deviations:

- Water levels in Wetland R are very high and it appears that unauthorized discharges have occurred.
- Turbidity levels in Wetland R and Wetland L are very high.
- Erosion control and sedimentation barriers have not been repaired around Wetland L.

These problems must be corrected immediately in order to assure continued compliance with your permit. I suggest you employ a Florida Professional Engineer to investigate, devise solutions, and oversee remedial construction.

Please respond to this letter within 14 days of receipt with the results of your investigation, a repair plan, and a construction schedule. Your plan should address dewatering activities, turbidity reduction, and erosion control measure construction and maintenance.

You may contact me at the Brooksville Service Office, extension 4325 if you wish to discuss this matter further.

Sincerely,

C. Clay Black, P.E.
Brooksville Regulation Department

CCB:jen
cc:     Files of Record 43026931.001/CT 181111 and CT 191098
        WilsonMiller Inc.
        Don Campbell, Kearney Construction Co., LLC
        Brent Guy, Quality Control Inspection, Inc.
        H. Robert Lue, P.E., Director, Brooksville Regulation Department
        Wojciech M. Mroz, P.E., Surface Water Regulation Manager
        Leonard Bartos, P.W.S., Environmental Regulation Manager
        Sandy Semegen, Field Technician Manager
        Frank Gargano, Senior Field Technician
        Cliff Jackson, Senior Field Technician



**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
Tampa Regulatory Office
10117 Princess Palm Ave, STE 120
Tampa, FL 33610

REPLY TO
ATTENTION OF

Regulatory Division
Enforcement Section
Tampa Regulatory Office
SAJ-2003-2336 (IP-TEH)

Sierra Properties
509 Guisando De Avila, STE 200
Tampa, FL 33613

<u>NOTICE OF NONCOMPLIANCE</u>

Dear Gentlemen:

A recent inspection of your property by U.S. Army Corps of Engineers staff indicates that you have not complied with the terms and conditions of your Department of the Army permit. Department of the Army permit No. 2003-2336 (IP-TEH) authorized you to perform work in jurisdictional wetlands associated with the Cypress Creek Town Center project. The project is located at the junction of State Road 54 and I-75, Pasco County, Florida. (Lat. 28.19294° N; Long. 82.39138° W)

On July 31, 2007, district staff documented that 0.785 acres of jurisdictional wetlands had been mechanically cleared and compacted during construction activities. Although the wetland disturbance had been self-reported by you via your environmental consultant, the work was unauthorized and was in violation of your permit.

In addition, Army Corps staff documented unauthorized offsite discharges in Cypress Creek as follows: (1) During our July 31, 2007 inspection, staff documented the accumulation of eroded sediments in the creek. The sedimentation was associated with a failed sedimentation barriers along the eastern boundary of the creek. (2) On August 3, 2007, staff documented that turbid water had been discharged to the creek because water and sediments had breached your sedimentation screens. Your state water quality certification did not authorize offsite discharges. Failure to comply with your water quality certification and failure to maintain your site activities in good condition are violations of the general conditions of your Federal permit.

-2-

It is my responsibility, as District Engineer, to issue this Notice of Noncompliance. My staff is conducting an investigation to determine the most appropriate enforcement action to address the alleged violation.

Among the enforcement options available are actions in Federal District Court for fines and injunctions requiring work cessation and/or restoration. The Court may also require that the restoration be performed by a third-party contract and be funded through a money judgment against the Permittee.

On an administrative level, the permit may be suspended, revoked, or modified and administrative penalties assessed. The administrative penalty proceeding requires notice to the Department of Environmental Protection and to all interested persons, all of who can submit comments. If you do not request an administrative hearing, anyone who comments may request one. The Corps may levy a Class I Administrative penalty in an amount not exceeding $27,500 in a case such as this.

You are advised to acknowledge receipt of this letter within 15 days. You should provide any information concerning why the terms and conditions of your Department of the Army permit have not been complied with.

The Corps does acknowledge your good-faith efforts to address the referenced problems on site. As of this date, you have submitted a restoration plan to restore the damaged wetland and, to our knowledge, are working with Southwest Water Management District staff to improve your site stabilization measures to prevent further offsite discharges or degradation of water quality.

-3-

If you have any questions regarding this letter, please contact Thomas Farrell at the letterhead address or at telephone 813.769.7072.

Sincerely,

for:

Paul L. Grosskruger
Colonel, U.S. Army
District Commander

cc: Frank Gargano
Senior Field Technician
Brooksville Regulation Department
Southwest Florida Water Management District
2379 Broad ST
Brooksville, Florida 34604-6899

Biological Research Associates
c/o John Bailey and Eva Bailey
3905 Crescent Park DR
Riverview FL 33569

PRIVILEGED AND CONFIDENTIAL

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SIERRA CLUB, et al., | ) |
| Plaintiffs, | ) |
| v. | )  Civ. No. 1:07-cv-01756 (RCL) |
| LT. GEN. ROBERT L. VAN ANTWERP, et al., | )  DECLARATION IN SUPPORT OF STANDING OF CLEAN WATER ACTION |
| Defendants, | ) |
| and | ) |
| SIERRA PROPERTIES, et al., | ) |
| Intervening Defendants | ) |

**DECLARATION OF CLEAN WATER ACTION**

I, Kathleen E. Aterno, do hereby declare as follows:

1) I am the Managing and Florida Director, of Clean Water Action ("CWA") and Clean Water Fund (CWF). CWA's headquarters is located in Washington D.C.

2) CWA is a national non-profit environmental organization of over one million members dedicated to protecting and improving the quality of all of America's waters, and the aquatic ecosystems of which those waters are a part. CWA has approximately 2,500 members that reside in and around Cypress Creek, and over 22,000 members in the Tampa Bay area generally.

3) CWA seeks to protect wetlands, lakes and streams, and in so doing, to protect their ecosystems, the flora and fauna that are part of them, and the clean and

Exhibit 8

healthy drinking water they provide for Americans nationally.  CWA seeks to help its members press for the enforcement, and advancement, of the nation's environmental laws among national decision-makers like the Corps, and expends funds educating the public about the value of aquatic ecosystems and the consequences of the Corps' issuance of permits.

4)     CWA's members enjoy exploring the nation's wetlands, rivers, and streams and the wetlands and ecosystems of which they are part, including Hillsborough River and Cypress Creek.  They enjoy looking for and/or observing the flora therein, such as the ecology of the bottom lands with their cypress stands, red maples, water oaks, and laurel oaks, as well as the uplands, and the fauna that inhabit such habitat, including for example threatened and endangered species such as Wood Storks and Eastern Indigo Snakes and Florida Scrub Jays.  They depend upon the water that the nation's wetlands, rivers and streams, including Hillsborough River and Cypress Creek, provide - both directly and indirectly such as through groundwater recharge - for drinking and other household uses.

5)     CWA believes that Cypress Creek Town Center ("CCTC") will have significant negative environmental impact on Cypress Creek, the ecosystems of its basin and of the Hillsborough basin, on water supplies, and on the flora and fauna in the area, including threatened and endangered species such as the Wood Stork, the Eastern Indigo Snake and the Florida Scrub Jay.  Clean Water Action believes these impacts will result from, among other things, the destruction of wetlands, the loss of water purification capacities , the introduction of pollution, increased

demand for water, and loss and fragmentation of wildlife habitat.  It will also result in aesthetic harms to a beautiful creek and area.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

Executed on January _11, 2008.

Kathleen E. Aterno for
Clean Water Action

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, et al., ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> LT. GEN. ROBERT L. VAN ANTWERP, et al., ) <br><br> Defendants, ) <br><br> and ) <br><br> SIERRA PROPERTIES, et al., ) <br><br> Intervening Defendants ) | Civ. No. 1:07-cv-01756 (RCL) <br><br> DECLARATION IN SUPPORT OF STANDING |

## DECLARATION OF CLAY COLSON

I, Clay Colson, do hereby declare the following:

1)     I am a resident of Pasco County, Florida, and have been a resident of Pasco County since 1988. Prior to that, I was a resident of Hillsborough County, where I had resided my entire life before moving to Pasco County. I currently live approximately six miles from Cypress Creek. I drive past the Cypress Creek Town Center site on a regular basis, including, for example, when I shop, such as at Sam's Club on State Road 56.

2)     I am and have been an active member of Sierra Club since 2000, and I have held leadership positions at the Sierra Club. I was a founding member of a new group of the Florida Chapter of the Sierra Club, the Naturecoast group, that is particularly focused on Pasco County issues. For approximately two and a half

Exhibit 9

years I was the Nature Coast Issue Chair of the Florida Chapter of the Sierra Club.

3) I use water from a well on my property to run my household and water my numerous animals, and the well draws from the surficial aquifer. When I first moved to Pasco County, I used this well as my drinking water, but, due to degradation of the aquifer, I no longer feel safe drinking this water myself, and therefore I no longer drink this water. Instead, I bottle and bring Pasco County municipal water to my home for my drinking water.

4) I am an outdoor enthusiast and greatly enjoy canoeing Florida's waters, particularly following its rivers and creeks from their headwaters to their mouths. On such trips I enjoy stopping along the banks of the creeks and rivers to explore Florida's flora and fauna. For example, I have canoed Cypress Creek and Hillsborough River numerous times.

5) I first canoed Cypress Creek in 1986, and I have returned approximately every year since, totaling about 27 trips. On almost every trip that I have canoed Cypress Creek, I have canoed past the Cypress Creek Town Center ("CCTC") site, as it is near the location where I put the canoe in. I have swum in Cypress Creek on almost every trip, until approximately three or four years ago, when I initially stopped swimming in the water because of low water levels, which were the result of a drought and overpumping of wellfields in the region. Although water levels on Cypress Creek fluctuate, and at times are now high enough to swim in again, now I do not swim because of concerns of pollution from CCTC.

6) I frequently stop on the banks of Cypress Creek, including to eat, walk around,

2

and observe the scenery, the plants, and the natural environment. I have stopped on the banks of the proposed site for the Cypress Creek Town Center ("CCTC") site. The first time I stopped on the banks of Cypress Creek, at the location of CCTC, was on my first trip in 1986, on my way back to the location where I put my canoe in. We stopped at banks at the CCTC site to rest, eat some food, and enjoy the beautiful scenery, including the ancient oaks on site. These oaks no longer exist on the property.

7)    I return to the Cypress Creek area again and again, and I intend to return to Cypress Creek within several months, because I love its pristine beauty. It is a designated Outstanding Florida Water because of its beauty and its pristine state. I also enjoy looking for and observing its flora and fauna, including as discussed below Wood Storks and Eastern Indigo Snakes. I also value the solitude of areas few other people have been to. Until recently, Cypress Creek was one of those places, although now the reach of Cypress Creek that flows past the CCTC development has become degraded, and construction equipment can be seen and heard from the Creek. As discussed further below, polluted water flows off the CCTC site and into Cypress Creek.

8)    I have seen Wood Storks perched in the trees on the banks of Cypress Creek, and along Cypress Creek's banks in shallow water areas at least a dozen times since the first time I canoed Cypress Creek. The most common area where I have seen Wood Storks on Cypress Creek is immediately east of I-75, in grass flats on the north bank of the Creek. I see them here frequently enough that I have developed

3

an expectation of seeing them in this area. These grass flats are probably 500-1000 feet to the east of the CCTC site, just on the other side of I-75.

9)    I have also seen Wood Storks on and around the CCTC site, along the north bank of Cypress Creek, in locations that stretch nearly the entire length of the site as it borders Cypress Creek: they typically are preening themselves in the trees. I have seen Wood Storks here almost every time I have seen Wood Storks in the grass flats to the east of the CCTC site. The first time I saw them on this part of the CCTC site was in 1986, and the last time was in February of 2006. I have not seen Wood Storks on the site since land clearing and construction began on the CCTC site.

10)   On one such trip on Cypress Creek, on or around May 27, 2007, I found an Eastern Indigo Snake at the CCTC site. It was along the north/east bank of Cypress Creek, and it climbed up the bank and onto the CCTC site. I was able to identify the snake as an Eastern Indigo due to its distinctive lustrous coloring and movement, and I have knowledge regarding snakes as I used to sell snakes. On this same trip I observed over 48 Gopher Tortoise burrows in and around the southern portion of the CCTC site. Eastern Indigo Snakes utilize Gopher Tortoise burrows for shelter, and the two species share habitats.

11)   I have routinely looked for Florida Scrub Jays by identifying their habitat in the Cypress Creek area. Florida Scrub Jay habitat is consistent with and overlaps with Gopher Tortoise habitat and Eastern Indigo Snake habitat. Florida Scrub Jays require scrub oaks that are between one and three meters tall and in sandy

4

soils, among other characteristics. On the trip on Cypress Creek that I saw Gopher Tortoise burrows on the CCTC site I also observed Florida Scrub Jay habitat on the CCTC site.

12)    In mid to late 2005 I began reading articles about the proposed construction of CCTC on the Cypress Creek site. Within a couple of weeks of reading the articles I visited Cypress Creek to see if anything had changed. A number of organizations submitted comments opposing the CCTC permit unless the permit was modified.

13)    In May of 2007, the Corps granted the applicant a permit to begin dredging and filling wetlands on the CCTC site.

14)    Before the applicant began grading the CCTC site, it had to remove rare, state listed Gopher Tortoises from where they were located in the southern portion of the site. The applicant initially obtained a permit to remove ten Gopher Tortoises. This initial permit proved to be insufficient because there were many more Gopher Tortoises, so it sought to amend its permit to remove an additional forty Gopher Tortoises, which an environmental organization challenged. Before the challenge could be heard, the applicant went on site at night and excavated the remaining burrows and Gopher Tortoises that it found, resulting in a total of 66 excavated active and inactive burrows, and 25 Gopher Tortoises.

15)    The excavation of the 66 Gopher Tortoise burrows, and the relocation of 25 Gopher Tortoises, was particularly sad for me not only as I care a great deal about Gopher Tortoises, but also because this is prime Eastern Indigo Snake habitat that

5

was being removed. In fact, the overlap between Gopher Tortoises and Eastern Indigo Snakes are so common that the FFWCC permits issued provided for the incidental removal of Eastern Indigo Snakes as well, with qualifications.

16) After the removal of the Gopher Tortoises, the applicant began clearing the site of vegetation, and began land grading activities as well. At the time that the Sierra Club issued its notice of intent to sue, the applicant accelerated its land clearing activities by increasing the number of workers on site, and by working seven days a week.

17) Between June 2007 September 2007, I visited Cypress Creek over seven times, either in a canoe or by walking the opposite bank from the CCTC site. During these trips I almost always observed polluted water filled with sediment running off the CCTC site, from the land clearing activities, into Cypress Creek. The volumes of runoff varied from trip to trip, but at times a rushing torrent would flow off the CCTC site into Cypress Creek. The CCTC runoff created a massive plume in Cypress Creek and turned Cypress Creek, which is typically a clear, dark color, see Fish And Wildlife Service Administrative Record 00500-00510, into a creamy tan color like coffee with cream. The runoff covered the Creek, its banks and surrounding wetlands in silt, and aquatic organisms, such as frogs, died as a result of it.

18) Because I was greatly concerned that CCTC runoff was degrading Cypress Creek, I called a number of governmental organizations and reported the discharges. Two governmental organizations, Southwest Florida Water Management District

6

("SWFMD"), and the Corps, both issued notices of violation, both for unauthorized discharges, and one for unauthorized destruction of wetlands. These notices are attached. <u>See</u> Attachment A. Even after these notices were issued, I witnessed continuing discharges from CCTC to Cypress Creek, though to my knowledge, no governmental agencies responded, nor did they issue any other notices of violations.

19)    Once the Sierra Club served its notice of intent to sue, I saw the applicant transfer a significant portion of its crew to the northern portion of the CCTC site, across State Road 56, to hasten wetlands dredging and filling. Prior to the Sierra Club's service of the notice of intent, the applicant had done only limited work on the northern portion of the site, including vegetation removal.

20)    These activities, which would not have been undertaken if not for the Army Corps of Engineers' permit, have had an affect on the quality of the area, and have impacted my enjoyment of it. As discussed above, before construction on the CCTC began, the waters of the creek were a clear brown. It was possible for me to see down to the bottom of the Creek. Today, the waters are murky and filled with particulate matter and turbidity. At times, I cannot see more than two inches beneath the water surface. Because of the change in the water, I will not swim in the Creek, which I had planned on resuming because water levels in Cypress Creek had increased. I no longer feel safe eating the fish I catch in the Creek, so I catch and release. I have also rerouted my drives, and changed the stores I patronage, so that I do not have to witness the destruction of the site.

21)    The development adversely affects my ability to look for and potentially observe threatened and endangered species such as the Wood Stork, the Eastern Indigo Snake and the Florida Scrub Jay. It will cause the destruction and degradation of the habitat that these species use in and near Cypress Creek.

22)    I believe that CCTC, with the other development in the area, will also adversely affect the water quality in Cypress Creek, and Hillsborough River, because of the increase in demand and extraction of water for municipal use. This lowers water tables, water levels in wetlands, and flows in surface waters such as Cypress Creek and Hillsborough River, and has been an issue in this area. Indeed, in the Cypress Creek basin, including in the vicinity of CCTC, I have seen damage from over extraction of water, including wetlands and cypress swamps that were dried out and subsided, and trees that had fallen over.

23)    The development undertaken pursuant to the permit adversely affects my aesthetic interests in the site, because it is no longer the serene, peaceful place I came to enjoy. I will therefore reduce, and may even discontinue, my visits to Cypress Creek, particularly in the location of CCTC, if the CCTC development is built as planned.

I declare, under penalty of perjury, that the foregoing is true and correct, to the best of my knowledge.

Executed on _FRIDAY, JANUARY 11_, 2008

_Clay J. Colson_

Clay Colson

8

# Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Joshua R. Stebbins
Tanya M. Sanerib
Erin M. Tobin

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

September 6, 2007

Lt. Gen. Robert L. Van Antwerp
Chief of Engineers,
Army Corps of Engineers
20 Massachusetts Ave., N.W.
Washington, D.C. 20314
202-761-1683 (fax)

Lt. Gen. Robert L. Van Antwerp
Mr. Lance Wood, Esq.
U.S. Army Corp of Engineers
Chief Counsel's Office
441 G. Street, NW
Washington, D.C 20314
lance.d.wood@usace.army.mil

Dirk Kempthorne
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
exsec@ios.doi.gov (executive secretary)
(202) 208-6956 (fax)

Dale Hall,
Director,
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240
dale_hall@fws.gov
703 358 2594 (fax)

RE:    **Cypress Creek Town Center in Pasco County, Florida**

We are writing on behalf of the Sierra Club concerning the Department of Army Permit



recycled paper

No. SAJ-2003-2336 (IP-THE) (May 15, 2007) ("Permit"), authorizing the destruction of wetlands for construction of the Cypress Creek Town Center ("CCTC") under section 404 of the Clean Water Act. As you know, Sierra Club gave notice of its intent to sue to challenge the Permit in its correspondence of July 17, 2007, unless the Corps suspends or revokes the Permit.

Among other legal violations identified by the Sierra Club in its July 17, 2007, Notice, the Sierra Club explained that the CCTC development will cause significant degradation of Cypress Creek, an Outstanding Florida Water, and ultimately the Hillsborough River, to which Cypress Creek flows. Moreover, in issuing the Permit the Corps failed to take a hard look at such degradation, both during the construction and during the operation of the CCTC development; it did not require that practicable alternatives to reduce or avoid impacts be pursued; and it did not require minimization of such impacts.

Land clearing of the CCTC development site has begun. Not surprisingly, the project has unlawfully discharged large amounts of turbid storm water into wetlands and Cypress Creek, significantly degrading the wetlands and the Creek. The developer of the site has now been cited twice for discharges, see attached, by two separate agencies. As the Sierra Club explained earlier, the CCTC project will inescapably cause significant degradation of Cypress Creek, and ultimately Hillsborough River, which is unlawful under the Clean Water Act.

The Sierra Club continues to be gravely concerned that the Corps has failed to comply with the ESA, the CWA, and NEPA in granting the Permit at issue. The Sierra Club again requests that the Corps suspend or revoke the Permit authorizing the CCTC project while the Corps undertakes the additional analyses mandated by federal law. Absent such actions, the Sierra Club intends to file suit to bring the Corps into compliance with the law. In the meantime, the Sierra Club also requests that the Corps station officers at the CCTC site to monitor activities and prevent any further discharges. Please feel free to contact us to discuss these matters.

Sincerely,

Joshua R. Stebbins

cc:

Governor Charles Crist
Office of the Governor
The Capitol
400 South Monroe Street
Tallahassee, FL 32399



# Southwest Florida
## Water Management District

2379 Broad Street, Brooksville, Florida 34604-6899

(352) 796-7211 or 1-800-423-1476 (FL only)

SUNCOM 628-4150  TDD only 1-800-231-6103 (FL only)

On the Internet at: WaterMatters.org

An Equal
Opportunity
Employer

**Bartow Service Office**
170 Century Boulevard
Bartow, Florida 33830-7700
(863) 534-1448 or
1-800-492-7862 (FL only)
SUNCOM 572-6200

**Lecanto Service Office**
Suite 226
3600 West Sovereign Path
Lecanto, Florida 34461-8070
(352) 527-8131

**Sarasota Service Office**
6750 Fruitville Road
Sarasota, Florida 34240-9711
(941) 377-3722 or
1-800-320-3503 (FL only)
SUNCOM 531-6900

**Tampa Service Office**
7601 Highway 301 North
Tampa, Florida 33637-6759
(813) 985-7481 or
1-800-836-0797 (FL only)
SUNCOM 578-2070

Judith C. Whitehead
Chair, Hernando

Neil Combee
Vice Chair, Polk

Todd Pressman
Secretary, Pinellas

Jennifer E. Closshey
Treasurer, Hillsborough

Thomas G. Dabney
Sarasota

Patricia M. Glass
Manatee

Heidi B. McCree
Hillsborough

Ronald E. Oakley
Pasco

Sallie Parks
Pinellas

Maritza Rovira-Forino
Hillsborough

Patsy C. Symons
DeSoto

David L. Moore
Executive Director

William S. Bilenky
General Counsel

August 20, 2007

Hank King
15330 Cypress Creek Run
Lutz, FL 33559-08606

Subject:     Letter Dated August 14, 2007
             Construction Inspection Deviation for Cypress Creek Town Center

Dear Mr. King:

Enclosed you will find a copy of a letter dated on August 14, 2007, by Compliance Engineer, Clay Black concerning the Cypress Creek Town Center – Phase 1, Permit No. 43026931.001. This letter is being sent to you, as requested by H. Robert Lue, Director, Brooksville Regulation Department.

If I can be of any further assistance, please don't hesitate in contacting me at 1-800-423-1476, extension. 4349.

Sincerely,

Sandy Semegen
Field Service Supervisor
Brooksville Regulation Department

SS:jen
Enclosure
cc:     Files of Record 43026931.001/CT 181111 and CT 191098
        H. Robert Lue, P.E., Director, Brooksville Regulation Department
        Wojciech M. Mroz, P.E., Surface Water Regulation Manager
        Leonard Bartos, P.W.S., Environmental Regulation Manager
        C. Clay Black, P.E., Senior Professional Engineer
        Frank Gargano, Senior Field Technician
        Cliff Jackson, Senior Field Technician





**Southwest Florida**
*Water Management District*

2379 Broad Street, Brooksville, Florida 34604-6899
(352) 796-7211 or 1-800-423-1476 (FL only)
SUNCOM 628-4150  TDD only 1-800-231-6103 (FL only)

*On the Internet at: WaterMatters.org*

An Equal
Opportunity
Employer

Bartow Service Office
170 Century Boulevard
Bartow, Florida 33830-7700
(863) 534-1448 or
1-800-492-7862 (FL only)
SUNCOM 572-6200

Lecanto Service Office
Suite 226
3600 West Sovereign Path
Lecanto, Florida 34461-8070
(352) 527-8131

Sarasota Service Office
6750 Fruitville Road
Sarasota, Florida 34240-9711
(941) 377-3722 or
1-800-320-3503 (FL only)
SUNCOM 531-6900

Tampa Service Office
7601 Highway 301 North
Tampa, Florida 33637-6759
(813) 985-7481, or
1-800-836-0797 (FL only)
SUNCOM 578-2070

Judith C. Whitehead
Chair, Hernando

Neil Combee
Vice Chair, Polk

Todd Pressman
Secretary, Pinellas

Jennifer E. Closshey
Treasurer, Hillsborough

Thomas G. Dabney
Sarasota

Patricia M. Glass
Manatee

Heidi B. McCree
Hillsborough

Ronald E. Oakley
Pasco

Sallie Parks
Pinellas

Maritza Rovira-Forino
Hillsborough

Patsy C. Symons
DeSoto

David L. Moore
Executive Director

William S. Bilenky
General Counsel

August 14, 2007

Pasco 54 Ltd., Pasco 54 Inc., Pasco Ranch Inc., and Pasco Properties
509 Guisando De Avila, Suite 200
Tampa, FL 33613

Subject:     **CONSTRUCTION INSPECTION DEVIATION**
Project Name:  Cypress Creek Town Center – Phase 1
Permit No.:    43026931.001
CT No.:       181111
Sec/Twp/Rng:  27/26S/19E
County:       Pasco

Dear Permittees:

The District has received a complaint alleging that turbid water is discharging from your site located at SR 56 in Pasco County. District staff investigated and found the following deviations:

* Water levels in Wetland R are very high and it appears that unauthorized discharges have occurred.
* Turbidity levels in Wetland R and Wetland L are very high.
* Erosion control and sedimentation barriers have not been repaired around Wetland L.

These problems must be corrected immediately in order to assure continued compliance with your permit. I suggest you employ a Florida Professional Engineer to investigate, devise solutions, and oversee remedial construction.

Please respond to this letter within 14 days of receipt with the results of your investigation, a repair plan, and a construction schedule. Your plan should address dewatering activities, turbidity reduction, and erosion control measure construction and maintenance.

You may contact me at the Brooksville Service Office, extension 4325 if you wish to discuss this matter further.

Sincerely,

C. Clay Black, P.E.
Brooksville Regulation Department

CCB:jen
cc:     Files of Record 43026931.001/CT 181111 and CT 191098
        WilsonMiller Inc.
        Don Campbell, Kearney Construction Co., LLC
        Brent Guy, Quality Control Inspection, Inc.
        H. Robert Lue, P.E., Director, Brooksville Regulation Department
        Wojciech M. Mroz, P.E., Surface Water Regulation Manager
        Leonard Bartos, P.W.S., Environmental Regulation Manager
        Sandy Semegen, Field Technician Manager
        Frank Gargano, Senior Field Technician
        Cliff Jackson, Senior Field Technician



CERTIFIED MAIL    RETURN RECEIPT REQUESTED

**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
Tampa Regulatory Office
10117 Princess Palm Ave, STE 120
Tampa, FL 33610

REPLY TO
ATTENTION OF

Regulatory Division
Enforcement Section
Tampa Regulatory Office
SAJ-2003-2336 (IP-TEH)

Sierra Properties
509 Guisando De Avila, STE 200
Tampa, FL 33613

<u>NOTICE OF NONCOMPLIANCE</u>

Dear Gentlemen:

A recent inspection of your property by U.S. Army Corps of Engineers staff indicates that you have not complied with the terms and conditions of your Department of the Army permit. Department of the Army permit No. 2003-2336 (IP-TEH) authorized you to perform work in jurisdictional wetlands associated with the Cypress Creek Town Center project. The project is located at the junction of State Road 54 and I-75, Pasco County, Florida. (Lat. 28.19294° N; Long. 82.39138° W)

On July 31, 2007, district staff documented that 0.785 acres of jurisdictional wetlands had been mechanically cleared and compacted during construction activities. Although the wetland disturbance had been self-reported by you via your environmental consultant, the work was unauthorized and was in violation of your permit.

In addition, Army Corps staff documented unauthorized offsite discharges in Cypress Creek as follows: (1) During our July 31, 2007 inspection, staff documented the accumulation of eroded sediments in the creek. The sedimentation was associated with a failed sedimentation barriers along the eastern boundary of the creek. (2) On August 3, 2007, staff documented that turbid water had been discharged to the creek because water and sediments had breached your sedimentation screens. Your state water quality certification did not authorize offsite discharges. Failure to comply with your water quality certification and failure to maintain your site activities in good condition are violations of the general conditions of your Federal permit.

-2-

It is my responsibility, as District Engineer, to issue this Notice of Noncompliance. My staff is conducting an investigation to determine the most appropriate enforcement action to address the alleged violation.

Among the enforcement options available are actions in Federal District Court for fines and injunctions requiring work cessation and/or restoration. The Court may also require that the restoration be performed by a third-party contract and be funded through a money judgment against the Permittee.

On an administrative level, the permit may be suspended, revoked, or modified and administrative penalties assessed. The administrative penalty proceeding requires notice to the Department of Environmental Protection and to all interested persons, all of who can submit comments. If you do not request an administrative hearing, anyone who comments may request one. The Corps may levy a Class I Administrative penalty in an amount not exceeding $27,500 in a case such as this.

You are advised to acknowledge receipt of this letter within 15 days. You should provide any information concerning why the terms and conditions of your Department of the Army permit have not been complied with.

The Corps does acknowledge your good-faith efforts to address the referenced problems on site. As of this date, you have submitted a restoration plan to restore the damaged wetland and, to our knowledge, are working with Southwest Water Management District staff to improve your site stabilization measures to prevent further offsite discharges or degradation of water quality.

-3-

    If you have any questions regarding this letter, please
contact Thomas Farrell at the letterhead address or at telephone
813.769.7072.

                              Sincerely,

                              for:
                              Paul L. Grosskruger
                              Colonel, U.S. Army
                              District Commander


cc: Frank Gargano
Senior Field Technician
Brooksville Regulation Department
Southwest Florida Water Management District
2379 Broad ST
Brooksville, Florida 34604-6899

Biological Research Associates
c/o John Bailey and Eva Bailey
3905 Crescent Park DR
Riverview FL 33569

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Civ. No. 1:07-cv-01756 (RCL) |
| LT. GEN. ROBERT L. VAN ANTWERP, et al., | ) DECLARATION IN SUPPORT OF STANDING |
| Defendants, | ) |
| and | ) |
| SIERRA PROPERTIES I LLC, et al., | ) |
| Intervening Defendants. | ) |

### DECLARATION OF CHRIS LOY

I, Chris Loy, do hereby declare the following:

1)  I am and have been a resident of the Tampa metropolitan area for 9 years. I currently live on the Hillsborough River and my backyard forms part of the river's bank. Cypress Creek is a major tributary to the Hillsborough River.

2)  I am a member of Sierra Club and have been since at least 2002.

3)  I canoe and swim in the Hillsborough River from my back yard. Upstream from my home, on the Hillsborough River, is a dam that is used to divert water flowing down Hillsborough River out of the natural course of the river and into the Tampa municipal water system. This system is managed by Tampa Bay Water.

4)  The water quality in the Hillsborough River behind my house is directly affected

Exhibit 10

by the quality and quantity of water that flows into it, and that is removed from it for municipal water supplies. For example, when water is diverted from the Hillsborough River for municipal drinking water supplies, the river behind my house slows its flow and changes from its clear dark color, to a murky color. When the water is a murky color I no longer swim in the water because I am concerned for my health and it is aesthetically unpleasant.

5)    I draw my home water from a well on my property. My children drink Tampa's municipal water at school, and I use Tampa's municipal water at my office.

6)    I enjoy exercising in the natural environment in my community. I have canoed approximately 80% of the rivers in west central Florida. Most frequently I canoe the Hillsborough River, about 10-12 times a year, including 2-3 times a year in the upper Hillsborough River near - within a mile or so – where Cypress Creek enters the Hillsborough River. I also canoe with my children on the Hillsborough River near my house.

7)    I drive past the Cypress Creek Town Center ("CCTC") site on a regular basis, several times a month.

8)    Approximately three or four times a year I hike and bike in the public conservation lands in the Hillsborough River and Cypress Creek basin, including a conservation area (Cypress Creek Preserve ELAPP site) that is between approximately a quarter mile to three quarters of a mile from the CCTC site.

9)    I enjoy recreating in these lands and waterways because I enjoy the solitude and the escape from crowded urban areas. I come to these areas in part to enjoy the

scenery and the plants and wildlife I observe, including among others the Wood

Stork, egrets and ibis.

10)     For example, I enjoy traveling to the conservation land mentioned above that is

nearby the CCTC site.  I go to this site because it is convenient to my home and

work, because it is part of my natural community in which I live, and because it

has natural flora and fauna that I enjoy observing, including Wood Storks.  I have

been to this conservation land approximately 10 times, the most recent being

within the 12 months.  The conservation land has a wide body of water with an

island in it that is approximately one half to one mile from the CCTC site.  On the

island I see Wood Storks, ibis, cattle egrets, white egrets, snowy egrets, little blue

herons, tricolored herons, and anhingas.  These birds can be incredibly loud and

active: their sqwuaking and interactions are quite interesting to observe.  I have

shared my enjoyment of this site by leading hikes with co-workers and friends as

well as family visiting Florida.  Cypress Creek flows through this conservation

land, and there is a small foot bridge that crosses Cypress Creek.  I enjoy crossing

the bridge and standing on the bridge and absorbing the beautiful and scenic

qualities of Cypress Creek and its environs.

11)     I believe that the CCTC's impacts on wood stork habitat and other wading bird

habitat will adversely affect the wood storks and wading birds that utilize the

Cypress Creek basin, and that I travel to Cypress Creek in part to see.  Destruction

of wildlife habitat necessarily adversely affects the species.  It will also, therefore,

adversely affect my ability to enjoy seeing these species.  I also believe that the

CCTC will adversely affect the water quality and quantity in Cypress Creek as a result of discharges to the creek: indeed it already has, as reflected by the attached citations issued to the developers of CCTC for unlawful discharges to Cypress Creek. Degradation of Cypress Creek will ultimately adversely affect my enjoyment of lands, and the flora and fauna in the area.

12) I believe that CCTC, with the other development rapidly taking place in the Cypress Creek and Hillsborough River basins, will also adversely affect the quality of water in Cypress Creek and Hillsborough River because of the increased demand on water supplies in the area. It is common knowledge that demand for drinking and household water in the Tampa area generally has caused an overexploitation of water resources in the area, and that this has lead to decreased water quality in water bodies in the area, including Hillsborough River. This is reflected, for example, in news articles, such as the one in the Administrative Record at AR03496-98, that document that water extraction adversely affects the water quantity, and therefore quality, in the Hillsborough River. As a result, Hillsborough River, as it flows behind my home, will become less aesthetically pleasing and more stagnant, and a murky color, more often. This will negatively affect my enjoyment of my home and back yard, as one reason I purchased my home was to enjoy the view of Hillsborough River, and to recreate in it. As a result, I will also decrease my swimming and canoeing in Hillsborough River. I am also concerned about the effects that overexploitation will have on the aquifer that I rely upon for my home water use.

13)     Seeing the CCTC development and the impacts to the site as I drive past the site

causes me great disappointment, frustration, and sadness, though I am

increasingly resigned to agencies' failure to enforce environmental laws.

I declare, under penalty of perjury, that the foregoing is true and correct, to the best of my

knowledge.

Executed on _____January 11_____, 2008

_____

Chris Loy

## Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Joshua R. Stebbins
Tanya M. Sanerib
Erin M. Tobin

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

September 6, 2007

Lt. Gen. Robert L. Van Antwerp
Chief of Engineers,
Army Corps of Engineers
20 Massachusetts Ave., N.W.
Washington, D.C. 20314
202-761-1683 (fax)

Lt. Gen. Robert L. Van Antwerp
Mr. Lance Wood, Esq.
U.S. Army Corp of Engineers
Chief Counsel's Office
441 G. Street, NW
Washington, D.C 20314
lance.d.wood@usace.army.mil

Dirk Kempthorne
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
exsec@ios.doi.gov (executive secretary)
(202) 208-6956 (fax)

Dale Hall,
Director,
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240
dale_hall@fws.gov
703 358 2594 (fax)

RE:    Cypress Creek Town Center in Pasco County, Florida

We are writing on behalf of the Sierra Club concerning the Department of Army Permit


recycled paper

No. SAJ-2003-2336 (IP-THE) (May 15, 2007) ("Permit"), authorizing the destruction of wetlands for construction of the Cypress Creek Town Center ("CCTC") under section 404 of the Clean Water Act. As you know, Sierra Club gave notice of its intent to sue to challenge the Permit in its correspondence of July 17, 2007, unless the Corps suspends or revokes the Permit.

Among other legal violations identified by the Sierra Club in its July 17, 2007, Notice, the Sierra Club explained that the CCTC development will cause significant degradation of Cypress Creek, an Outstanding Florida Water, and ultimately the Hillsborough River, to which Cypress Creek flows. Moreover, in issuing the Permit the Corps failed to take a hard look at such degradation, both during the construction and during the operation of the CCTC development; it did not require that practicable alternatives to reduce or avoid impacts be pursued; and it did not require minimization of such impacts.

Land clearing of the CCTC development site has begun. Not surprisingly, the project has unlawfully discharged large amounts of turbid storm water into wetlands and Cypress Creek, significantly degrading the wetlands and the Creek. The developer of the site has now been cited twice for discharges, see attached, by two separate agencies. As the Sierra Club explained earlier, the CCTC project will inescapably cause significant degradation of Cypress Creek, and ultimately Hillsborough River, which is unlawful under the Clean Water Act.

The Sierra Club continues to be gravely concerned that the Corps has failed to comply with the ESA, the CWA, and NEPA in granting the Permit at issue. The Sierra Club again requests that the Corps suspend or revoke the Permit authorizing the CCTC project while the Corps undertakes the additional analyses mandated by federal law. Absent such actions, the Sierra Club intends to file suit to bring the Corps into compliance with the law. In the meantime, the Sierra Club also requests that the Corps station officers at the CCTC site to monitor activities and prevent any further discharges. Please feel free to contact us to discuss these matters.

Sincerely,

Joshua R. Stebbins

cc:

Governor Charles Crist
Office of the Governor
The Capitol
400 South Monroe Street
Tallahassee, FL 32399



# Southwest Florida
## Water Management District

2379 Broad Street, Brooksville, Florida 34604-6899

(352) 796-7211 or 1-800-423-1476 (FL only)

SUNCOM 628-4150  TDD only 1-800-231-6103 (FL only)

On the Internet at: WaterMatters.org

An Equal
Opportunity
Employer

**Bartow Service Office**
170 Century Boulevard
Bartow, Florida 33830-7700
(863) 534-1448 or
1-800-492-7862 (FL only)
SUNCOM 572-6200

**Lecanto Service Office**
Suite 226
3600 West Sovereign Path
Lecanto, Florida 34461-8070
(352) 527-8131

**Sarasota Service Office**
6750 Fruitville Road
Sarasota, Florida 34240-9711
(941) 377-3722 or
1-800-320-3503 (FL only)
SUNCOM 531-6900

**Tampa Service Office**
7601 Highway 301 North
Tampa, Florida 33637-6759
(813) 985-7481 or
1-800-836-0797 (FL only)
SUNCOM 578-2070

Judith C. Whitehead
Chair, Hernando

Neil Combee
Vice Chair, Polk

Todd Pressman
Secretary, Pinellas

Jennifer E. Closshey
Treasurer, Hillsborough

Thomas G. Dabney
Sarasota

Patricia M. Glass
Manatee

Heidi B. McCree
Hillsborough

Ronald E. Oakley
Pasco

Sallie Parks
Pinellas

Maritza Rovira-Forino
Hillsborough

Patsy C. Symons
DeSoto

David L. Moore
Executive Director

William S. Bilenky
General Counsel

August 20, 2007

Hank King
15330 Cypress Creek Run
Lutz, FL 33559-08806

Subject:    Letter Dated August 14, 2007
            Construction Inspection Deviation for Cypress Creek Town Center

Dear Mr. King:

Enclosed you will find a copy of a letter dated on August 14, 2007, by Compliance Engineer, Clay Black concerning the Cypress Creek Town Center – Phase 1, Permit No. 43026931.001. This letter is being sent to you, as requested by H. Robert Lue, Director, Brooksville Regulation Department.

If I can be of any further assistance, please don't hesitate in contacting me at 1-800-423-1476, extension. 4349.

Sincerely,

Sandy Samegen
Field Service Supervisor
Brooksville Regulation Department

SS:jen
Enclosure
cc:     Files of Record 43026931.001/CT 181111 and CT 191098
        H. Robert Lue, P.E., Director, Brooksville Regulation Department
        Wojciech M. Mroz, P.E., Surface Water Regulation Manager
        Leonard Bartos, P.W.S., Environmental Regulation Manager
        C. Clay Black, P.E., Senior Professional Engineer
        Frank Gargano, Senior Field Technician
        Cliff Jackson, Senior Field Technician





## Southwest Florida
### Water Management District

2379 Broad Street, Brooksville, Florida 34604-6899
(352) 796-7211 or 1-800-423-1476 (FL only)
SUNCOM 628-4150   TDD only 1-800-231-6103 (FL only)

*On the Internet at: WaterMatters.org*

An Equal
Opportunity
Employer

| | | | |
|---|---|---|---|
| **Bartow Service Office**<br>170 Century Boulevard<br>Bartow, Florida 33830-7700<br>(863) 534-1448 or<br>1-800-492-7862 (FL only)<br>SUNCOM 572-6200 | **Lecanto Service Office**<br>Suite 226<br>3600 West Sovereign Path<br>Lecanto, Florida 34461-8070<br>(352) 527-8131 | **Sarasota Service Office**<br>6750 Fruitville Road<br>Sarasota, Florida 34240-9711<br>(941) 377-3722 or<br>1-800-320-3503 (FL only)<br>SUNCOM 531-6900 | **Tampa Service Office**<br>7601 Highway 301 North<br>Tampa, Florida 33637-6759<br>(813) 985-7481, or<br>1-800-836-0797 (FL only)<br>SUNCOM 578-2070 |

Judith C. Whitehead
Chair, Hernando

Neil Combee
Vice Chair, Polk

Todd Pressman
Secretary, Pinellas

Jennifer E. Closshey
Treasurer, Hillsborough

Thomas G. Dabney
Sarasota

Patricia M. Glass
Manatee

Heidi B. McCree
Hillsborough

Ronald E. Oakley
Pasco

Sallie Parks
Pinellas

Maritza Rovira-Forino
Hillsborough

Patsy C. Symons
DeSoto

David L. Moore
Executive Director

William S. Bilenky
General Counsel

August 14, 2007

Pasco 54 Ltd., Pasco 54 Inc., Pasco Ranch Inc., and Pasco Properties
509 Guisando De Avila, Suite 200
Tampa, FL 33613

Subject:    CONSTRUCTION INSPECTION DEVIATION
            Project Name:   Cypress Creek Town Center – Phase 1
            Permit No.:     43026931.001
            CT No.:         181111
            Sec/Twp/Rng:    27/26S/19E
            County:         Pasco

Dear Permittees:

The District has received a complaint alleging that turbid water is discharging from your site located at SR 56 in Pasco County. District staff investigated and found the following deviations:

* Water levels in Wetland R are very high and it appears that unauthorized discharges have occurred.
* Turbidity levels in Wetland R and Wetland L are very high.
* Erosion control and sedimentation barriers have not been repaired around Wetland L.

These problems must be corrected immediately in order to assure continued compliance with your permit. I suggest you employ a Florida Professional Engineer to investigate, devise solutions, and oversee remedial construction.

Please respond to this letter within 14 days of receipt with the results of your investigation, a repair plan, and a construction schedule. Your plan should address dewatering activities, turbidity reduction, and erosion control measure construction and maintenance.

You may contact me at the Brooksville Service Office, extension 4325 if you wish to discuss this matter further.

Sincerely,

C. Clay Black, P.E.
Brooksville Regulation Department

CCB:jen
cc:    Files of Record 43026931.001/CT 181111 and CT 191098
       WilsonMiller Inc.
       Don Campbell, Kearney Construction Co., LLC
       Brent Guy, Quality Control Inspection, Inc.
       H. Robert Lue, P.E., Director, Brooksville Regulation Department
       Wojciech M. Mroz, P.E., Surface Water Regulation Manager
       Leonard Bartos, P.W.S., Environmental Regulation Manager
       Sandy Semegen, Field Technician Manager
       Frank Gargano, Senior Field Technician
       Cliff Jackson, Senior Field Technician



DEPARTMENT OF THE ARMY
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
Tampa Regulatory Office
10117 Princess Palm Ave, STE 120
Tampa, FL 33610

REPLY TO
ATTENTION OF

Regulatory Division
Enforcement Section
Tampa Regulatory Office
SAJ-2003-2336 (IP-TEH)


Sierra Properties
509 Guisando De Avila, STE 200
Tampa, FL 33613

NOTICE OF NONCOMPLIANCE

Dear Gentlemen:

A recent inspection of your property by U.S. Army Corps of
Engineers staff indicates that you have not complied with the
terms and conditions of your Department of the Army permit.
Department of the Army permit No. 2003-2336 (IP-TEH) authorized
you to perform work in jurisdictional wetlands associated with
the Cypress Creek Town Center project. The project is located at
the junction of State Road 54 and I-75, Pasco County, Florida.
(Lat. 28.19294° N; Long. 82.39138° W)

On July 31, 2007, district staff documented that 0.785
acres of jurisdictional wetlands had been mechanically cleared
and compacted during construction activities. Although the
wetland disturbance had been self-reported by you via your
environmental consultant, the work was unauthorized and was in
violation of your permit.

In addition, Army Corps staff documented unauthorized
offsite discharges in Cypress Creek as follows: (1) During our
July 31, 2007 inspection, staff documented the accumulation of
eroded sediments in the creek. The sedimentation was associated
with a failed sedimentation barriers along the eastern boundary
of the creek. (2) On August 3, 2007, staff documented that
turbid water had been discharged to the creek because water and
sediments had breached your sedimentation screens. Your state
water quality certification did not authorize offsite
discharges. Failure to comply with your water quality
certification and failure to maintain your site activities in
good condition are violations of the general conditions of your
Federal permit.

-2-

It is my responsibility, as District Engineer, to issue this Notice of Noncompliance. My staff is conducting an investigation to determine the most appropriate enforcement action to address the alleged violation.

Among the enforcement options available are actions in Federal District Court for fines and injunctions requiring work cessation and/or restoration. The Court may also require that the restoration be performed by a third-party contract and be funded through a money judgment against the Permittee.

On an administrative level, the permit may be suspended, revoked, or modified and administrative penalties assessed. The administrative penalty proceeding requires notice to the Department of Environmental Protection and to all interested persons, all of who can submit comments. If you do not request an administrative hearing, anyone who comments may request one. The Corps may levy a Class I Administrative penalty in an amount not exceeding $27,500 in a case such as this.

You are advised to acknowledge receipt of this letter within 15 days. You should provide any information concerning why the terms and conditions of your Department of the Army permit have not been complied with.

The Corps does acknowledge your good-faith efforts to address the referenced problems on site. As of this date, you have submitted a restoration plan to restore the damaged wetland and, to our knowledge, are working with Southwest Water Management District staff to improve your site stabilization measures to prevent further offsite discharges or degradation of water quality.

-3-

    If you have any questions regarding this letter, please
contact Thomas Farrell at the letterhead address or at telephone
813.769.7072.

                                Sincerely,

                                                  for:
                                Paul L. Grosskruger
                                Colonel, U.S. Army
                                District Commander

cc: Frank Gargano
Senior Field Technician
Brooksville Regulation Department
Southwest Florida Water Management District
2379 Broad ST
Brooksville, Florida 34604-6899

Biological Research Associates
c/o John Bailey and Eva Bailey
3905 Crescent Park DR
Riverview FL 33569

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SIERRA CLUB, et al., | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) | Civ. No. 1:07-cv-01756 (RCL) |
| LT. GEN. ROBERT L. VAN ANTWERP, et al., | ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| SIERRA PROPERTIES, et al., | ) ) | |
| Intervening Defendants | ) ) | |

**DECLARATION OF THOMAS ARMENTANO**

I, Thomas Armentano, do hereby declare as follows:

1)     I am a resident of Pasco County, Florida, and live approximately five miles from the Cypress Creek Town Center ("CCTC") site. I drive past the CCTC site when I drive around Pasco County for errands, and I will do so again.

2)     I am a member of Clean Water Action ("CWA") and have been since May 2005. I have a PhD in ecology and have spent over 30 years working as an ecologist.

3)     I greatly enjoy exploring and observing natural ecosystems and environments and the flora and fauna therein. I travel to the conservation lands around my home to do so, including conservation lands in the Cypress Creek watershed. It is my intent to continue exploring and expanding my trips to and in these lands.

Exhibit 11

4)    I have visited three areas, in particular, to explore and observe Cypress Creek's ecology; and I intend to continue to do so, including in the next year. From my house I have biked many times along State Road 54 sometimes following it to where it crosses Cypress Creek, near the intersection of State Road 54 and 56, right near the CCTC site on Old Cypress Creek Road. In so doing I have stopped on the bridge over Cypress Creek to observe and appreciate the Creek, including the creek bottom and its surface waters (particularly for submerged and floating aquatic plants) and the bottomlands in the area, including a significant cypress stand and associated bottomland hardwood forest. I also look for fauna that might inhabit the area as I do in all my forays.

5)    I have also biked up to a half-dozen times in a South West Florida Water Management District site which is part of the Cypress Creek basin. When I do so, I follow along trails through the area, sometimes leaving them to explore and to observe the area's wetlands, bottomlands, and uplands, and the waters of the Cypress Creek system.

6)    I also have gone to lands around a municipal well field in the area two or three times. In so doing, I cross over a tiny bridge under which Cypress Creek flows; and I enjoy seeing the beauty of the Creek and the ecology as I do so.

7)    I go to such areas because I enjoy examining the vegetation and the ecosystems of such lands. I enjoy observing the cypress, the cabbage palms, and the bottomland hardwood trees such as red maple, swamp laurel oak, water oak, tupelo, and other native bottomland tree species as well as the bromeliads, ferns, and other

herbaceous species. I enjoy looking for birds, including arboreal and wading birds, and seeing a wood stork would be a great attraction for me. I also enjoy exploring the uplands and looking for the flora and fauna that use such habitat. I look for gopher tortoise burrows and gopher tortoises, and it would be of special interest to see eastern indigo snakes, - which utilize gopher tortoise burrows for shelter, - given their rarity. Similarly, I would like to see a Florida Scrub Jay – particularly because I have not yet seen one – and I keep an eye out for them as they use the same general type of upland habitat as eastern indigo snakes.

8)   As an ecologist, I also enjoy examining the creek and its environs as a functioning riparian ecosystem. In this respect, the creek is seen in cross-section as a lowland flow channel with adjacent higher elevation terraces and vegetated zones on slopes that tie together the bottomland and upland zones. These vegetated zones serve several functions, including both vital wildlife habitat and providing buffers which protect the downslope wetlands and stream, and it concerns and saddens me that larger protective buffers are not being maintained around Cypress Creek and its wetlands and that these areas will be impacted.

9)   It is my intent to continue to explore the natural lands near my home, including the conservation lands in and along Cypress Creek. When I drive past the CCTC development and witness its destruction of the natural environment in such a vast and sensitive site, I find it appalling and am saddened. I believe that the development will adversely affect the Cypress Creek ecosystem, water supply and water quality, and the flora and fauna in the area, including threatened and

endangered species such as the Wood Stork, the Eastern Indigo Snake, and the

Florida Scrub Jay. I believe these impacts will result from, among other things,

the destruction of wetlands, the introduction of pollution, increased demand for

water, and loss and fragmentation of wildlife habitat. It will also result in

aesthetic harm to a beautiful creek and a beautiful area. It diminishes my interest

and enjoyment in exploring this area and this part of the Cypress Creek basin and

its ecology.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my

knowledge.

Executed on January  11 , 2008.

Thomas Armentano

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| SIERRA CLUB, et al., Plaintiffs | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|     v. | )    Civ. No. 1:07-cv-01756 (RCL) |
| | ) |
| LT. GEN. ROBERT L. VAN ANTWERP, et al., | ) |
| | ) |
|     Defendants. | ) |
| | ) |
|     and | ) |
| | ) |
| SIERRA PROPERTIES, et al., | ) |
| | ) |
|     Intervening Defendants | ) |

---

## [PROPOSED] ORDER GRANTING SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment.

Upon consideration of the motions, as well as the entire record in this case, it is, by the Court,

this __ day of ____, 2008, hereby

ORDERED that plaintiffs' motion for summary judgment is granted; and it is further

ORDERED that the Federal Defendants' and Intervening Defendants' motions for

summary judgment are denied; and it is further

ORDERED that the Army Corps' of Engineers' Permit at issue be enjoined and

remanded; and it is further

ORDERED that on remand, the Corps and the Fish and Wildlife Service shall fully

address the deficiencies set forth in the Court's accompanying memorandum opinion, and, after

opportunity for public comment, shall report back to the Court within 180 days as to results of its

analyses, including any further steps necessary to ameliorate or mitigate for any unlawful

environmental impacts to date: the Court will then determine whether further relief should be ordered, and it is further

ORDERED that all activity on the site shall cease until further Order of the Court; and it is further

ORDERED that the Court shall retain jurisdiction over this action for the purpose of enforcing this Order and to entertain any appropriate motion by Plaintiffs for attorneys fees and costs.

_____
U.S. District Court Judge
Royce C. Lamberth

Dated _____

2