IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

SIERRA CLUB, *et al.*,

        Plaintiffs,

v.                                                                          Civ. No. 1:07-cv-01756 (RCL)

LT. GEN. ROBERT L. VAN ANTWERP,
in his official capacity as Chief of Engineers,
U.S. Army Corps of Engineers, *et al.*,

        Defendants,

   and

SIERRA PROPERTIES I, LLC, *et al.*,

        Intervening Defendants.

_____/

**<u>NOTICE OF FILING OF DECLARATION</u>**

Federal Defendants hereby give notice to the Court and Plaintiffs of the declaration of

Tracy E. Hurst (attached hereto as Ex. 1).  Federal Defendants are filing this notice to keep the

Court and parties informed of activities at, and in the immediate vicinity of the Cypress Creek

Town Center (CCTC) project site.

The above-captioned action challenges a U.S. Army Corps of Engineers (Corps) permit

to fill wetlands under § 404 of the Clean Water Act, 33 U.S.C. § 1344, for construction of the

CCTC, outside of Tampa, Florida.  Plaintiffs allege the permit was issued in violation of the

Clean Water Act, the National Environmental Policy Act, and the Endangered Species.  *See*

Compl. (Dkt. No. 1).  On February 1, 2008, the Corps suspended the permit at issue, SAJ-2003-

2336, for unauthorized discharges of turbid water from the site. *See* Notice of Permit Suspension (Dkt. No. 40). As a result of the suspension, Federal Defendants sought to remand the permit to the Corps and stay the briefing schedule. *See* Motion to Remand and Stay Litigation (Dkt. No. 41); Motion to Stay or Extend Briefing Schedule (Dkt. No. 42). The parties are awaiting the Court's decision on both motions.

As part of their Motion to Remand, Federal Defendants stated that all the wetlands authorized to be filled under the CCTC permit had already been filled. *See* Reply in Support of Motion to Remand and Stay Litigation at 8 (Dkt. No. 49). The Corps, however, was recently made aware that a small area of wetlands (0.508 acre) had not yet been disturbed when the Corps suspended the CCTC permit. *See* Hurst Decl. ¶ 6.

Additionally, the Corps issued an April 28, 2008, authorization under Nationwide Permit 14 for road construction immediately adjacent to the CCTC site. The Corps action (permit SAJ-2008-1150) authorizes the Florida Department of Transportation (FDOT) to fill 0.248 acre of wetlands as part of FDOT's expansion of State Road 56. *See* Letter to John Kubler (Ex. 2). The permitted action is necessary to complete the expansion and implement improvements to alleviate the risk of flooding on State Road 56 that may occur in the approaching rainy season. *See* Statement of Findings (Ex. 3). The FDOT expansion is independent of the CCTC construction. *See* Hurst Decl. ¶ 5.

Permit SAJ-2008-1150 includes 0.224 acre of wetlands previously authorized under the CCTC permit. Hurst Decl. ¶ 2. FDOT purchased these previously-permitted acres from the CCTC property owners (Intervening Defendants, here) on October 23, 2007, after issuance of the

CCTC permit in May 2007, to expand the FDOT right-of-way for the road. *See* Hurst Decl. ¶ 3. The Corps then required FDOT to seek its own authorization for the wetlands to be impacted by the expansion. Hurst Decl. ¶ 3.

The CCTC permit itself remains suspended and the Corps continues to investigate the discharges from the site. Upon completion of that investigation, the Corps will issue a decision to either reaffirm, modify, or revoke the CCTC permit. Permit SAJ-2008-1150 will be taken into consideration as part of that evaluation. Hurst Decl. ¶ 4. At a minimum, any reaffirmation or modification of the CCTC permit will include adjustments in wetland impact acreage and mitigation requirements to reflect the 0.224 acre of wetlands now owned by FDOT and covered under permit SAJ-2008-1150. Hurst Decl. ¶ 4.

Respectfully submitted,

                                      RONALD J. TENPAS
                                      Assistant Attorney General
                                      Environment & Natural Resources Division

Date:   April 28, 2008        By:   */s/ Kristofor R. Swanson*

                                      JESSICA O'DONNELL
                                      D.C. Bar No. 473166
                                      Trial Attorney
                                      U.S. Department of Justice
                                      Environment and Natural Resources Division
                                      Environmental Defense Section
                                      P.O. Box 23986
                                      Washington, D.C. 20026-3986
                                      Telephone:  (202) 305-085
                                      Facsimile:  (202) 514-8865
                                      jessica.odonnell@usdoj.gov

MARK A. BROWN
D.C. Bar No. 470050
Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0204
Facsimile: (202) 305-0275
mark.brown@usdoj.gov

KRISTOFOR R. SWANSON
Colo. Bar No. 39378
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone:  (202) 305-0248
Facsimile:  (202) 305-0274
kristofor.swanson@usdoj.gov

Of Counsel:

Dorothy L. Boardman
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019
Tel: (904) 232-1165
Fax: (904) 232-3692
E-mail:  Dorothy.L.Boardman@saj02.usace.army.mil

Delores Young
Department of the Interior
Office of the Regional Solicitor
Southeast Region
75 Spring St., S.W., Suite 304
Atlanta, GA  30303
Telephone: (404) 331-3379
Facsimile: (404) 730-2682

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SIERRA CLUB, et al.,                      )
                                          )
         Plaintiffs,                      )
                                          )
                 v.                       )      Civ. No. 1:07-cv-
                                          )      01756 (RCL)
LT. GEN. ROBERT L. VAN ANTWERP, et al.,   )
                                          )
         Defendants,                      )
                                          )
         and                              )
                                          )
SIERRA PROPERTIES, et al.,                )
                                          )
         Intervening Defendants.          )
_____  )

DECLARATION OF TRACY E. HURST

         I, Tracy E. Hurst, declare as follows:

         1.    I am a biologist in the South Permits Branch of the
Regulatory Division for the Jacksonville District of the U.S.
Army Corps of Engineers ("Corps").  My field office is located
at 10117 Princess Palm Avenue, Suite 120, Tampa, Florida, and
among my duties I am responsible for reviewing and evaluating
applications for Department of the Army permits under Section
404 of the Clean Water Act.  I have been in this position since
20 March 2005.  From 23 May 2004 to 19 March 2005, I held an
identical position in the Palm Beach Gardens field office of the
Regulatory Division of the Jacksonville District.  From 14
January 2001 to 22 May 2004, I was a biologist for the Permits
Branch of the Regulatory Division for the Charleston District of
the Corps.  From 28 August 2000 to 13 January 2001, I served as
a biologist in the Planning Division of the Louisville District
of the Corps.  Prior to my employment with the Corps I was
employed by the Commonwealth of Kentucky for 3 years as a
biologist in the Division of Water, Department for Surface
Mining, and the Department of Fish and Wildlife Resources.  I am
experienced in the evaluation of Department of the Army permit
applications for work in waters of the United States for
compliance with the National Environmental Policy Act,
Endangered Species Act, Magnuson Stevens Fishery Conservation

Act, and National Historic Preservation Act.  I hold a Bachelor of Science degree in Environmental Studies from Vanderbilt University and a Masters of Science degree in Forestry with a wildlife management specialization from the University of Kentucky.

2.     The U.S. Army Corps of Engineers ("Corps") recently granted a Nationwide Permit No. 14 authorization for the Florida Department of Transportation (FDOT) to fill 0.248 acre of waters of the United States to construct improvements to State Road 56 (Corps permit SAJ-2008-1150).  Of the 0.248 acre that was authorized, 0.224 acre was previously authorized by the Corps in a permit granted to Sierra Properties for the construction of Cypress Creek Town Center (CCTC) (Corps permit SAJ-2003-2336, currently suspended).  The primary purpose of this declaration is to clarify the circumstances and order of events that resulted in the Corps granting authorization to FDOT to perform work in areas that were previously authorized for use by Sierra Properties under the CCTC permit.

3.     The Corps issued Sierra Properties permit SAJ-2003-2336 for CCTC on 15 May 2007.  On 23 October 2007, FDOT purchased a portion of the CCTC property for expansion of the State Road 56 right-of-way.  Since FDOT now owns this additional right-of-way, the Corps required FDOT to apply for a Corps permit for the entire 0.248 acre of impact, even though a portion of the area was previously permitted under the CCTC project.

4.     The Corps will address this change in the CCTC project boundary as part of its decision to reaffirm, modify, or revoke the suspended CCTC permit.  In the event the Corps reaffirms or modifies the CCTC permit, the project boundary will be adjusted to exclude the 0.224 acre of wetlands and the associated upland acreage now owned by FDOT.  The mitigation requirement will also be adjusted to reflect the decrease in wetland impact by CCTC.

5.     The Corps has determined that the work to be performed by FDOT on State Road 56 under SAJ-2008-1150 has independent utility from Cypress Creek Town Center as follows.

a.     Wetland 7 / Wetland 8 Impacts:  In 1998, the Corps authorized FDOT to construct State Road 56 for a 6-lane build-out in the vicinity of this project (SAJ-1995-0079).  Four lanes were initially constructed.  The permit expired in 2003 and all authorized impacts were completed prior to permit expiration.  In February 2006, FDOT informed Sierra Properties

of additional State Road 56 right-of-way needs for an elevated
ultimate future section from Interstate 75 to Cypress Creek
Bridge.  The contemplated elevated section will benefit multiple
users along State Road 56 and nearby roadways.  To allow for the
future elevated section, it is necessary to widen State Road 56
to the outside of the existing 4 lanes, rather than to the
inside, as originally planned.  This allowance requires impacts
to Wetland 7 and Wetland 8, as authorized.  The elevated portion
that is ultimately planned is not required for full
functionality of the existing interchange of State Road 56 and
I-75, nor is it required for full functionality of ingress and
egress into Cypress Creek Town Center.  It is planned to
accommodate future traffic concerns, of which Cypress Creek Town
Center is but one of many contributors.  A primary benefit will
be to motorists along State Road 56 and State Road 54 that do
not wish to turn onto County Road 54.  They will travel on the
elevated section and will no longer have to wait for the traffic
light at County Road 54, thereby easing congestion.

     b.   Wetland 4 Impacts:  The impact at Wetland 4 is
required to provide piping to convey water from the FDOT right-
of-way.  Since the original design of State Road 56 in 1998,
FDOT recognized the need for additional drainage improvements
necessary to install the final 2 lanes. In other words, the
existing storm water treatment system in place today does not
have the capacity to properly treat the storm water that will be
produced as a result of installing the final 2 lanes of State
Road 56.  The drainage improvements authorized under permit SAJ-
2008-1150 are necessary to complete the 6-laning of State Road
56.  The drainage improvements at Wetland 4 will convey only
drainage from the roadway and will not convey any drainage from
the CCTC site. CCTC is solely responsible for drainage within
its site.

     6.   At this time the Corps would also like to inform the
Court of an error in our 6 March 2008 reply in support of our
motion for voluntary remand and stay of the litigation.  In this
document, the Corps asserted that all wetlands on the CCTC
property had been filled.  This statement was based on
information received from the Permittee and represented our best
knowledge at the time.  In our review of the FDOT proposal
described above, we became aware that a small area of wetlands
totaling 0.508 acres had not yet been disturbed.  This area lies
adjacent to State Road 56.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 28, 2008

Signed by:

Tracy E. Hurst
Biologist
U.S. Army Corps of Engineers

# EXHIBIT 2



**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
10117 PRINCESS PALM AVENUE, SUITE 120
TAMPA, FLORIDA 33610

REPLY TO
ATTENTION OF

April 28, 2008

Tampa Permits Section
SAJ-2008-1150(NW-TEH)


Mr. John Kubler
Florida Dept. of Transporation
District 7
11201 N. McKinley Dr.
Tampa, FL  33612-0000

Dear Mr. Kubler:

     Your application for a Department of the Army permit received
on April 2, 2008, has been assigned number SAJ-2008-1150(NW-TEH).
A review of the information and drawings provided shows the
proposed work includes improvements to State Road 56 requiring
0.248 acre of impact to waters of the United States.  The project
is located immediately adjacent to the existing State Road 56,
between its intersection with County Road 54 and the southbound
on/off ramps at Interstate 75.  The project lies within Section
27 of Township 26 South and Range 19 East, Pasco County, Florida.

     Your project, as depicted on the enclosed drawings, is
authorized by Nationwide Permit (NWP) Number 14.  In addition,
project specific conditions have been enclosed.  This
verification is valid until April 28, 2010.  Please access the
U.S. Army Corps of Engineers' Jacksonville District's Regulatory
web address at
http://www.saj.usace.army.mil/regulatory/permitting/nwp/nwp.htm
to access web links to view the Final Nationwide Permits, Federal
Register Vol. 72, dated March 12, 2007, the Corrections to the
Final Nationwide Permits, Federal Register 72,
May 8, 2007, and the List of Regional Conditions.  These files
contain the description of the Nationwide Permit authorization,
the Nationwide Permit general conditions, and the regional
conditions, which apply specifically to this verification for
NWP 14.  A copy of a portion of the Final Nationwide Permits,
Federal Register Vol. 72, dated March 12, 2007, has been
enclosed, specifically pages 11180 through 11198.  Additionally,
enclosed is a list of the six General Conditions, which apply to
all Department of the Army authorizations.  You must comply with
all of the special and general conditions and any project
specific condition of this authorization or you may be subject to

-2-

enforcement action.  In the event you have not completed
construction of your project within the specified time limit, a
separate application or re-verification may be required.

The following special conditions are included with this
verification:

1.  Within 60 days of completion of the work authorized, the
attached "Self-Certification Statement of Compliance" must be
completed and submitted to the U.S. Army Corps of Engineers.
Mail the completed form to the Regulatory Division, Enforcement
Section, Post Office Box 4970, Jacksonville, Florida 32232-0019.

2.  That the permittee will comply with the terms and
conditions of the 2004 Standard Protection Measures for the
Eastern Indigo Snake, attached.

3.  No structure or work shall adversely affect or disturb
properties listed in the National Register of Historic Places or
those eligible for inclusion in the National Register.  Prior to
the start of work, the Permittee or its agent, shall conduct a
search in the National Register Information System (NRIS).
Information can be found at
http://www.cr.nps.gov/nr/research/nris.htm.  Information on
properties eligible for inclusion in the National Register can be
identified by contacting the Florida Master File Office by email
at fmsfile@dos.state.fl.us or by telephone at
850-245-6440.

If unexpected cultural resources are encountered at any time
within the project area that was not the subject of a previous
cultural resource assessment survey, work should cease in the
immediate vicinity of such discoveries.  The permittee, or other
party, should notify the SHPO immediately, as well as the
appropriate Army Corps of Engineers office.  After such
notifications, project activities should not resume without
verbal and/or written authorization from the SHPO.

If unmarked human remains are encountered, all work shall
stop immediately, and the proper authorities notified in
accordance with Section 872.05, Florida Statutes, unless on
Federal lands.  After such notifications, project activities on
non-Federal lands shall not resume without verbal and/or written
authorization from the Florida State Archaeologist for finds
under his or her jurisdiction.

-3-

This letter of authorization does not obviate the necessity to obtain any other Federal, State, or local permits, which may be required. In Florida, projects qualifying for this NWP must be authorized under Part IV of Chapter 373 by the Department of Environmental Protection, a water management district under § 373.069, F.S., or a local government with delegated authority under § 373.441, F.S., and receive Water Quality Certification (WQC) and Coastal Zone Consistency Concurrence (CZCC) (or a waiver), as well as any authorizations required by the State for the use of sovereignty submerged lands. You should check State-permitting requirements with the Florida Department of Environmental Protection or the appropriate water management district.

This letter does not give absolute Federal authority to perform the work as specified on your application. The proposed work may be subject to local building restrictions mandated by the National Flood Insurance Program. You should contact your local office that issues building permits to determine if your site is located in a flood-prone area, and if you must comply with the local building requirements mandated by the National Flood Insurance Program.

If you are unable to access the internet or require a hardcopy of any of the conditions, limitations, or expiration date for the above referenced NWP, please contact Tracy Hurst by telephone at 813-769-7063.

Thank you for your cooperation with our permit program. The Corps Jacksonville District Regulatory Division is committed to improving service to our customers. We strive to perform our duty in a friendly and timely manner while working to preserve our environment. We invite you to take a few minutes to visit the following link and complete our automated Customer Service Survey: http://regulatory.usacesurvey.com/. Your input is appreciated - favorable or otherwise.

Sincerely,

Charles A. Schnepel
Chief, Tampa Permits Section

-4-

Enclosures:

Project Drawings
Standard Protection Measures for the Eastern Indigo Snake
Final Nationwide Permits pp. 11180-11198
Self-Certification Form

cc:

Ms. Linda Smith, USFWS
Mr. Chris Roberts, Wilson-Miller
Mr. John Bailey, BRA
CESAJ-RD-PE

GENERAL CONDITIONS
33 CFR PART 320-330
PUBLISHED FEDERAL REGISTER DATED 13 NOVEMBER 1986

1.  The time limit for completing the work authorized ends on **date identified in the letter**.  If you find that you need more time to complete the authorized activity, submit your request for a time extension to this office for consideration at least one month before the above date is reached.

2.  You must maintain the activity authorized by this permit in good condition and in conformance with the terms and conditions of this permit.  You are not relieved of this requirement if you abandon the permitted activity, although you may make a good faith transfer to a third party in compliance with General Condition 4 below.  Should you wish to cease to maintain the authorized activity or should you desire to abandon it without a good faith transfer, you must obtain a modification of this permit from this office, which may require restoration of the area.

3.  If you discover any previously unknown historic or archeological remains while accomplishing the activity authorized by this permit, you must immediately notify this office of what you have found.  We will initiate the Federal and state coordination required to determine if the remains warrant a recovery effort of if the site is eligible for listing in the National Register of Historic Places.

4.  If you sell the property associated with this permit you must obtain the signature of the new owner in the space provided and forward a copy of the permit to this office to validate the transfer of this authorization.

5.  If a conditioned water quality certification has been issued for your project, you must comply with the conditions specified in the certification as special conditions to this permit.  For your convenience, a copy of the certification is attached if it contains such conditions.

6.  You must allow a representative from this office to inspect the authorized activity at any time deemed necessary to ensure that it is being or has been accomplished in accordance with the terms and conditions of your permit.



LOCATION MAP

IMPACT LOCATIONS
WETLAND W7 & W8
28°11'39.50" N
82°23'30.00" W

IMPACT LOCATIONS
WETLAND W4
28°11'30.00" N
82°23'45.00" W

APPLICANT: FLORIDA DEPARTMENT OF TRANSPORTATION
WATER BODY: CABBAGE SWAMP, CYPRESS CK. & TROUT CK.
COUNTY: PASCO
DATUM: NGVD, 1929
PURPOSE: NEW CONSTRUCTION OF ROADWAY
DATE: APRIL 21ST, 2008

FILE: SAJ-2008-1150 (NW-TEH)
DATE: 28 APRIL 2008

SHEET ___1___ OF 9



APPLICANT: FLORIDA DEPARTMENT OF TRANSPORTATION
WATER BODY: CABBAGE SWAMP, CYPRESS CK. & TROUT CK.
COUNTY: PASCO
DATUM: NGVD, 1929
PURPOSE: NEW CONSTRUCTION OF ROADWAY
DATE: MARCH 28TH, 2008

PROJECT
BOUNDARY
MAP

FILE: SAJ-2008-1150 (NW-TEH)
DATE: 28 APRIL 2008
SHEET  2  OF 9



WETLAND W4
PLAN VIEW





WETLAND W4
CROSS SECTIONS

SECTION B-B
STA. 68+90.00

SECTION A-A
STA. 67+99.59
SKEW < 45°00'000"

SCALE = 40H 10V

APPLICANT: FLORIDA DEPARTMENT OF TRANSPORTATION
WATER BODY: CABBAGE SWAMP, CYPRESS CK. & TROUT CK.
COUNTY: PASCO
DATUM: NGVD, 829
PURPOSE: NEW CONSTRUCTION OF ROADWAY
DATE: MARCH 28TH, 2008

WETLAND W4 FILL IMPACTS
(TOTAL 1207 CUBIC YARDS)

FILE: SAJ-2008-1150 (NW-TEH)
DATE: 28 APRIL 2008
SHEET 5 OF 9



WETLAND W4
CROSS SECTIONS

SECTION C-C
STA. 70+00.00

SCALE = 40H 10V

APPLICANT: FLORIDA DEPARTMENT OF TRANSPORTATION
WATER BODY: CABBAGE SWAMP, CYPRESS CK. & TROUT CK.
COUNTY: PASCO
DATUM: NGVD, B29
PURPOSE: NEW CONSTRUCTION OF ROADWAY
DATE: MARCH 28TH, 2008

FILE: SAJ-2008-1150 (NW-TEH)
DATE: 28 APRIL 2008

SHEET ___ 6 ___ OF 9



WETLAND W7
CROSS SECTIONS

SECTION E–E
STA. 85+00.00

SCALE = 40H 10V

APPLICANT: FLORIDA DEPARTMENT OF TRANSPORTATION
WATER BODY: CABBAGE SWAMP, CYPRESS CK. & TROUT CK.
COUNTY: PASCO
DATUM: NGVD, 1929
PURPOSE: NEW CONSTRUCTION OF ROADWAY
DATE: MARCH 28TH, 2008

FILE: SAJ-2008-1150 (NW-TEH)
DATE: 28 APRIL 2008
SHEET 7 OF 9

WETLAND W7 FULL IMPACTS
(TOTAL 640.8 CUBIC YARDS)

WETLAND W7 FULL IMPACTS
(CLEAN SOIL)

WETLAND W7
IMPACTED LIMITS

ₑ CONST. / ₑ SURVEY



WETLAND W8
CROSS SECTIONS

SECTION F-F
STA. 86+00.00

SECTION D-D
STA. 81+50.00

SCALE = 40H 10V

APPLICANT: FLORIDA DEPARTMENT OF TRANSPORTATION
WATER BODY: CABBAGE SWAMP, CYPRESS CK. & TROUT CK.
COUNTY: PASCO
DATUM: NGVD, 1929
PURPOSE: NEW CONSTRUCTION OF ROADWAY
DATE: MARCH 28TH, 2008

WETLAND W8 FILL IMPACTS
(TOTAL 3257.2 CUBIC YARDS)

FILE: SAJ-2008-1150 (NW-TEH)
DATE: 28 APRIL 2008

SHEET ___6___ OF 9

MAJOR RETAIL C

M-3
SHW = 46.14
(2.95 Ac.)

45.0

5' wide hand-excavated
swale match to 45.64
elevation in wetland

Wetland P Jurisdictional Line

Erosion Control

46.14
45.80
45.0

45.0

5' wide hand-excavated
swale match to 45.64
elevation in wetland

Wetland P Jurisdictional Line

SECTION A-A

WETLAND BOUNDARY "P"

SHW = 46.14

EL. 46.14     EL. 46.14
EL. 45.0      EL. 45.0

0.26 Ac Area required as mitigation for the
FDOT SR 56 expansion. Monitoring and
maintenance are the responsibility of the
Cypress Creek Town Center permittee.

COE # SAJ20032336

120     0     60     120

1 inch = 120 ft.

Figure 24b



| Preparation Date: 02/01/07 | Revision Date: 05/01/2007 |
| Project Manager: JJB | CAD QA/QC: BJV- 020107 |
| Project #: 7724-001-B08 | CAD Operator: BJV |

*Figure 24b*
*Cypress Creek Town Center*
*Mitigation Area M-3 Planting Plan*

FILE:  SAJ-2008-1150 (NW-TEH)
DATE:  28 APRIL 2008

SHEET  9  OF 9

$(getvar,"dwgprefix")$(getvar,"dwgname")

## STANDARD PROTECTION MEASURES FOR THE EASTERN INDIGO SNAKE

1.   An eastern indigo snake protection/education plan shall be developed by the applicant or requestor for all construction personnel to follow.  The plan shall be provided to the Service for review and approval at least 30 days prior to any clearing activities.  The educational materials for the plan may consist of a combination of posters, videos, pamphlets, and lectures (*e.g.*, an observer trained to identify eastern indigo snakes could use the protection/education plan to instruct construction personnel before any clearing activities occur).  Informational signs should be posted throughout the construction site and along any proposed access road to contain the following information:

   a.   a description of the eastern indigo snake, its habits, and protection under Federal Law;
   b.   instructions not to injure, harm, harass or kill this species;
   c.   directions to cease clearing activities and allow the eastern indigo snake sufficient time to move away from the site on its own before resuming clearing; and,
   d.   telephone numbers of pertinent agencies to be contacted if a dead eastern indigo snake is encountered.  The dead specimen should be thoroughly soaked in water and then frozen.

2.   If not currently authorized through an Incidental Take Statement in association with a Biological Opinion, only individuals who have been either authorized by a section 10(a)(1)(A) permit issued by the Service, or by the State of Florida through the Florida Fish Wildlife Conservation Commission (FWC) for such activities, are permitted to come in contact with an eastern indigo snake.

3.   An eastern indigo snake monitoring report must be submitted to the appropriate Florida Field Office within 60 days of the conclusion of clearing phases.  The report should be submitted whether or not eastern indigo snakes are observed.  The report should contain the following information:

   a.   any sightings of eastern indigo snakes and
   b.   other obligations required by the Florida Fish and Wildlife Conservation Commission, as stipulated in the permit.

Revised February 12, 2004

**11180**    Federal Register / Vol. 72, No. 47 / Monday, March 12, 2007 / Notices

significant'' as defined under Executive Order 12866, and (2) concerns an environmental health or safety risk that we have reason to believe may have a disproportionate effect on children. If the regulatory action meets both criteria, we must evaluate the environmental health or safety effects of the proposed rule on children, and explain why the regulation is preferable to other potentially effective and reasonably feasible alternatives.

The NWPs issued today are not subject to this Executive Order because they are not economically significant as defined in Executive Order 12866. In addition, these NWPs do not concern an environmental or safety risk that we have reason to believe may have a disproportionate effect on children.

*Executive Order 13175*

Executive Order 13175, entitled ''Consultation and Coordination with Indian Tribal Governments'' (65 FR 67249, November 6, 2000), requires agencies to develop an accountable process to ensure ''meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications.'' The phrase ''policies that have tribal implications'' is defined in the Executive Order to include regulations that have ''substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes.''

The NWPs issued today do not have tribal implications. They are generally consistent with current agency practice and will not have substantial direct effects on tribal governments, on the relationship between the Federal government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes. Therefore, Executive Order 13175 does not apply to this proposal. Corps districts are conducting government-to-government consultation with Indian tribes to develop regional conditions that help protect tribal rights and trust resources, and to facilitate compliance with general condition 16, Tribal Rights.

*Environmental Documentation*

A decision document, which includes an environmental assessment and Finding of No Significant Impact (FONSI), has been prepared for each NWP. These decision documents are available at: *http://www.regulations.gov* (docket ID number COE–2006–0005). They are also available by contacting

Headquarters, U.S. Army Corps of Engineers, Operations and Regulatory Community of Practice, 441 G Street, NW., Washington, DC 20314–1000.

*Congressional Review Act*

The Congressional Review Act, 5 U.S.C. 801 et seq., as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. We will submit a report containing the final NWPs and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. The proposed NWPs are not a ''major rule'' as defined by 5 U.S.C. 804(2).

*Executive Order 12898*

Executive Order 12898 requires that, to the greatest extent practicable and permitted by law, each Federal agency must make achieving environmental justice part of its mission. Executive Order 12898 provides that each federal agency conduct its programs, policies, and activities that substantially affect human health or the environment in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under such programs, policies, and activities because of their race, color, or national origin.

The NWPs issued today are not expected to negatively impact any community, and therefore are not expected to cause any disproportionately high and adverse impacts to minority or low-income communities.

*Executive Order 13211*

The proposed NWPs are not a ''significant energy action'' as defined in Executive Order 13211, ''Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use'' (66 FR 28355, May 22, 2001) because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

*Authority*

We are issuing new NWPs, modifying existing NWPs, and reissuing NWPs without change under the authority of Section 404(e) of the Clean Water Act (33 U.S.C. 1344) and Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 401 et seq.).

Dated: March 1, 2007.

**Don T. Riley,**
*Major General, U.S. Army, Director of Civil Works.*

**Nationwide Permits, Conditions, Further Information, and Definitions**

*A. Index of Nationwide Permits, Conditions, Further Information, and Definitions*

Nationwide Permits

1. Aids to Navigation.
2. Structures in Artificial Canals.
3. Maintenance.
4. Fish and Wildlife Harvesting, Enhancement, and Attraction Devices and Activities.
5. Scientific Measurement Devices.
6. Survey Activities.
7. Outfall Structures and Associated Intake Structures.
8. Oil and Gas Structures on the Outer Continental Shelf.
9. Structures in Fleeting and Anchorage Areas.
10. Mooring Buoys.
11. Temporary Recreational Structures.
12. Utility Line Activities.
13. Bank Stabilization.
14. Linear Transportation Projects.
15. U.S. Coast Guard Approved Bridges.
16. Return Water From Upland Contained Disposal Areas.
17. Hydropower Projects.
18. Minor Discharges.
19. Minor Dredging.
20. Oil Spill Cleanup.
21. Surface Coal Mining Operations.
22. Removal of Vessels.
23. Approved Categorical Exclusions.
24. Indian Tribe or State Administered Section 404 Programs.
25. Structural Discharges.
26. [Reserved].
27. Aquatic Habitat Restoration, Establishment, and Enhancement Activities.
28. Modifications of Existing Marinas.
29. Residential Developments.
30. Moist Soil Management for Wildlife.
31. Maintenance of Existing Flood Control Facilities.
32. Completed Enforcement Actions.
33. Temporary Construction, Access, and Dewatering.
34. Cranberry Production Activities.
35. Maintenance Dredging of Existing Basins.
36. Boat Ramps.
37. Emergency Watershed Protection and Rehabilitation.
38. Cleanup of Hazardous and Toxic Waste.
39. Commercial and Institutional Developments.
40. Agricultural Activities.

Federal Register / Vol. 72, No. 47 / Monday, March 12, 2007 / Notices **11181**

41. Reshaping Existing Drainage Ditches.
42. Recreational Facilities.
43. Stormwater Management Facilities.
44. Mining Activities.
45. Repair of Uplands Damaged by Discrete Events.
46. Discharges in Ditches.
47. Pipeline Safety Program Designated Time Sensitive Inspections and Repairs.
48. Existing Commercial Shellfish Aquaculture Activities.
49. Coal Remining Activities.
50. Underground Coal Mining Activities.

Nationwide Permit General Conditions

1. Navigation.
2. Aquatic Life Movements.
3. Spawning Areas.
4. Migratory Bird Breeding Areas.
5. Shellfish Beds.
6. Suitable Material.
7. Water Supply Intakes.
8. Adverse Effects from Impoundments.
9. Management of Water Flows.
10. Fills Within 100-Year Floodplains.
11. Equipment.
12. Soil Erosion and Sediment Controls.
13. Removal of Temporary Fills.
14. Proper Maintenance.
15. Wild and Scenic Rivers.
16. Tribal Rights.
17. Endangered Species.
18. Historic Properties.
19. Designated Critical Resource Waters.
20. Mitigation.
21. Water Quality.
22. Coastal Zone Management.
23. Regional and Case-by-Case Conditions.
24. Use of Multiple Nationwide Permits.
25. Transfer of Nationwide Permit Verifications.
26. Compliance Certification.
27. Pre-Construction Notification.
28. Single and Complete Project.

Further Information

Definitions.
Best management practices (BMPs).
Compensatory mitigation.
Currently serviceable.
Discharge.
Enhancement.
Ephemeral stream.
Establishment (creation).
Historic property.
Independent utility.
Intermittent stream.
Loss of waters of the United States.
Non-tidal wetland.
Open water.
Ordinary high water mark.
Perennial stream.
Practicable.
Pre-construction notification.
Preservation.
Re-establishment.
Rehabilitation.
Restoration.
Riffle and pool complex.
Riparian areas.
Shellfish seeding.
Single and complete project.
Stormwater management.
Stormwater management facilities.
Stream bed.
Stream channelization.
Structure.

Tidal wetland.
Vegetated shallows.
Waterbody.

B. Nationwide Permits

1. *Aids to Navigation.* The placement of aids to navigation and regulatory markers which are approved by and installed in accordance with the requirements of the U.S. Coast Guard (see 33 CFR, chapter I, subchapter C, part 66). [Section 10]

2. *Structures in Artificial Canals.* Structures constructed in artificial canals within principally residential developments where the connection of the canal to a navigable water of the United States has been previously authorized (see 33 CFR 322.5(g)). [Section 10]

3. *Maintenance.* (a) The repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure, or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification. Minor deviations in the structure's configuration or filled area, including those due to changes in materials, construction techniques, or current construction codes or safety standards that are necessary to make the repair, rehabilitation, or replacement are authorized. This NWP also authorizes the repair, rehabilitation, or replacement of those structures or fills destroyed or damaged by storms, floods, fire or other discrete events, provided the repair, rehabilitation, or replacement is commenced, or is under contract to commence, within two years of the date of their destruction or damage. In cases of catastrophic events, such as hurricanes or tornadoes, this two-year limit may be waived by the district engineer, provided the permittee can demonstrate funding, contract, or other similar delays.

(b) This NWP also authorizes the removal of accumulated sediments and debris in the vicinity of and within existing structures (e.g., bridges, culverted road crossings, water intake structures, etc.) and the placement of new or additional riprap to protect the structure. The removal of sediment is limited to the minimum necessary to restore the waterway in the immediate vicinity of the structure to the approximate dimensions that existed when the structure was built, but cannot extend further than 200 feet in any direction from the structure. This 200 foot limit does not apply to maintenance

dredging to remove accumulated sediments blocking or restricting outfall and intake structures or to maintenance dredging to remove accumulated sediments from canals associated with outfall and intake structures. All dredged or excavated materials must be deposited and retained in an upland area unless otherwise specifically approved by the district engineer under separate authorization. The placement of riprap must be the minimum necessary to protect the structure or to ensure the safety of the structure. Any bank stabilization measures not directly associated with the structure will require a separate authorization from the district engineer.

(c) This NWP also authorizes temporary structures, fills, and work necessary to conduct the maintenance activity. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and discharges, including cofferdams, are necessary for construction activities, access fills, or dewatering of construction sites. Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. Temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations. The areas affected by temporary fills must be revegetated, as appropriate.

(d) This NWP does not authorize maintenance dredging for the primary purpose of navigation or beach restoration. This NWP does not authorize new stream channelization or stream relocation projects.

*Notification:* For activities authorized by paragraph (b) of this NWP, the permittee must submit a pre-construction notification to the district engineer prior to commencing the activity (see general condition 27). Where maintenance dredging is proposed, the pre-construction notification must include information regarding the original design capacities and configurations of the outfalls, intakes, small impoundments, and canals. (Sections 10 and 404)

**Note:** This NWP authorizes the repair, rehabilitation, or replacement of any previously authorized structure or fill that does not qualify for the Clean Water Act Section 404(f) exemption for maintenance.

4. *Fish and Wildlife Harvesting, Enhancement, and Attraction Devices and Activities.* Fish and wildlife harvesting devices and activities such as pound nets, crab traps, crab dredging, eel pots, lobster traps, duck blinds, and

clam and oyster digging, and small fish attraction devices such as open water fish concentrators (sea kites, etc.). This NWP does not authorize artificial reefs or impoundments and semi-impoundments of waters of the United States for the culture or holding of motile species such as lobster, or the use of covered oyster trays or clam racks. (Sections 10 and 404)

5. *Scientific Measurement Devices.* Devices, whose purpose is to measure and record scientific data, such as staff gages, tide gages, water recording devices, water quality testing and improvement devices, and similar structures. Small weirs and flumes constructed primarily to record water quantity and velocity are also authorized provided the discharge is limited to 25 cubic yards. (Sections 10 and 404)

6. *Survey Activities.* Survey activities, such as core sampling, seismic exploratory operations, plugging of seismic shot holes and other exploratory-type bore holes, exploratory trenching, soil surveys, sampling, and historic resources surveys. For the purposes of this NWP, the term "exploratory trenching" means mechanical land clearing of the upper soil profile to expose bedrock or substrate, for the purpose of mapping or sampling the exposed material. The area in which the exploratory trench is dug must be restored to its pre-construction elevation upon completion of the work. In wetlands, the top 6 to 12 inches of the trench should normally be backfilled with topsoil from the trench. This NWP authorizes the construction of temporary pads, provided the discharge does not exceed 25 cubic yards. Discharges and structures associated with the recovery of historic resources are not authorized by this NWP. Drilling and the discharge of excavated material from test wells for oil and gas exploration are not authorized by this NWP; the plugging of such wells is authorized. Fill placed for roads and other similar activities is not authorized by this NWP. The NWP does not authorize any permanent structures. The discharge of drilling mud and cuttings may require a permit under Section 402 of the Clean Water Act. (Sections 10 and 404)

7. *Outfall Structures and Associated Intake Structures.* Activities related to the construction or modification of outfall structures and associated intake structures, where the effluent from the outfall is authorized, conditionally authorized, or specifically exempted by, or that are otherwise in compliance with regulations issued under the National Pollutant Discharge Elimination System

Program (Section 402 of the Clean Water Act). The construction of intake structures is not authorized by this NWP, unless they are directly associated with an authorized outfall structure.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Sections 10 and 404)

8. *Oil and Gas Structures on the Outer Continental Shelf.* Structures for the exploration, production, and transportation of oil, gas, and minerals on the outer continental shelf within areas leased for such purposes by the Department of the Interior, Minerals Management Service. Such structures shall not be placed within the limits of any designated shipping safety fairway or traffic separation scheme, except temporary anchors that comply with the fairway regulations in 33 CFR 322.5(l). The district engineer will review such proposals to ensure compliance with the provisions of the fairway regulations in 33 CFR 322.5(l). Any Corps review under this NWP will be limited to the effects on navigation and national security in accordance with 33 CFR 322.5(f). Such structures will not be placed in established danger zones or restricted areas as designated in 33 CFR part 334, nor will such structures be permitted in EPA or Corps designated dredged material disposal areas.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Section 10)

9. *Structures in Fleeting and Anchorage Areas.* Structures, buoys, floats and other devices placed within anchorage or fleeting areas to facilitate moorage of vessels where the U.S. Coast Guard has established such areas for that purpose. (Section 10)

10. *Mooring Buoys.* Non-commercial, single-boat, mooring buoys. (Section 10)

11. *Temporary Recreational Structures.* Temporary buoys, markers, small floating docks, and similar structures placed for recreational use during specific events such as water skiing competitions and boat races or seasonal use, provided that such structures are removed within 30 days after use has been discontinued. At Corps of Engineers reservoirs, the reservoir manager must approve each buoy or marker individually. (Section 10)

12. *Utility Line Activities.* Activities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss

of greater than ½ acre of waters of the United States.

*Utility lines:* This NWP authorizes the construction, maintenance, or repair of utility lines, including outfall and intake structures, and the associated excavation, backfill, or bedding for the utility lines, in all waters of the United States, provided there is no change in pre-construction contours. A "utility line" is defined as any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and radio and television communication. The term "utility line" does not include activities that drain a water of the United States, such as drainage tile or french drains, but it does apply to pipes conveying drainage from another area.

Material resulting from trench excavation may be temporarily sidecast into waters of the United States for no more than three months, provided the material is not placed in such a manner that it is dispersed by currents or other forces. The district engineer may extend the period of temporary side casting for no more than a total of 180 days, where appropriate. In wetlands, the top 6 to 12 inches of the trench should normally be backfilled with topsoil from the trench. The trench cannot be constructed or backfilled in such a manner as to drain waters of the United States (e.g., backfilling with extensive gravel layers, creating a french drain effect). Any exposed slopes and stream banks must be stabilized immediately upon completion of the utility line crossing of each waterbody.

*Utility line substations:* This NWP authorizes the construction, maintenance, or expansion of substation facilities associated with a power line or utility line in non-tidal waters of the United States, provided the activity, in combination with all other activities included in one single and complete project, does not result in the loss of greater than ½ acre of waters of the United States. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters of the United States to construct, maintain, or expand substation facilities.

*Foundations for overhead utility line towers, poles, and anchors:* This NWP authorizes the construction or maintenance of foundations for overhead utility line towers, poles, and anchors in all waters of the United States, provided the foundations are the minimum size necessary and separate footings for each tower leg (rather than

a larger single pad) are used where feasible.

*Access roads:* This NWP authorizes the construction of access roads for the construction and maintenance of utility lines, including overhead power lines and utility line substations, in non-tidal waters of the United States, provided the total discharge from a single and complete project does not cause the loss of greater than ½-acre of non-tidal waters of the United States. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters for access roads. Access roads must be the minimum width necessary (see Note 2, below). Access roads must be constructed so that the length of the road minimizes any adverse effects on waters of the United States and must be as near as possible to pre-construction contours and elevations (e.g., at grade corduroy roads or geotextile/gravel roads). Access roads constructed above pre-construction contours and elevations in waters of the United States must be properly bridged or culverted to maintain surface flows.

This NWP may authorize utility lines in or affecting navigable waters of the United States even if there is no associated discharge of dredged or fill material (See 33 CFR part 322). Overhead utility lines constructed over section 10 waters and utility lines that are routed in or under section 10 waters without a discharge of dredged or fill material require a section 10 permit.

This NWP also authorizes temporary structures, fills, and work necessary to conduct the utility line activity. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and discharges, including cofferdams, are necessary for construction activities, access fills, or dewatering of construction sites. Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. Temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations. The areas affected by temporary fills must be revegetated, as appropriate.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity if any of the following criteria are met: (1) The activity involves mechanized land clearing in a forested wetland for the utility line right-of-way; (2) a section 10 permit is required; (3) the utility line in waters of the United States, excluding overhead lines, exceeds 500 feet; (4) the utility line is placed within a

jurisdictional area (i.e., water of the United States), and it runs parallel to a stream bed that is within that jurisdictional area; (5) discharges that result in the loss of greater than ¹⁄₁₀-acre of waters of the United States; (6) permanent access roads are constructed above grade in waters of the United States for a distance of more than 500 feet; or (7) permanent access roads are constructed in waters of the United States with impervious materials. (See general condition 27.) (Sections 10 and 404)

**Note 1:** Where the proposed utility line is constructed or installed in navigable waters of the United States (i.e., section 10 waters), copies of the pre-construction notification and NWP verification will be sent by the Corps to the National Oceanic and Atmospheric Administration (NOAA), National Ocean Service (NOS), for charting the utility line to protect navigation.

**Note 2:** Access roads used for both construction and maintenance may be authorized, provided they meet the terms and conditions of this NWP. Access roads used solely for construction of the utility line must be removed upon completion of the work, accordance with the requirements for temporary fills.

**Note 3:** Pipes or pipelines used to transport gaseous, liquid, liquescent, or slurry substances over navigable waters of the United States are considered to be bridges, not utility lines, and may require a permit from the U.S. Coast Guard pursuant to Section 9 of the Rivers and Harbors Act of 1899. However, any discharge of dredged or fill material into waters of the United States associated with such pipelines will require a section 404 permit (see NWP 15).

13. *Bank Stabilization.* Bank stabilization activities necessary for erosion prevention, provided the activity meets all of the following criteria:

(a) No material is placed in excess of the minimum needed for erosion protection;

(b) The activity is no more than 500 feet in length along the bank, unless this criterion is waived in writing by the district engineer;

(c) The activity will not exceed an average of one cubic yard per running foot placed along the bank below the plane of the ordinary high water mark or the high tide line, unless this criterion is waived in writing by the district engineer;

(d) The activity does not involve discharges of dredged or fill material into special aquatic sites, unless this criterion is waived in writing by the district engineer;

(e) No material is of the type, or is placed in any location, or in any manner, to impair surface water flow

into or out of any water of the United States;

(f) No material is placed in a manner that will be eroded by normal or expected high flows (properly anchored trees and treetops may be used in low energy areas); and, (g) The activity is not a stream channelization activity.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity if the bank stabilization activity: (1) Involves discharges into special aquatic sites; (2) is in excess of 500 feet in length; or (3) will involve the discharge of greater than an average of one cubic yard per running foot along the bank below the plane of the ordinary high water mark or the high tide line. (See general condition 27.) (Sections 10 and 404)

14. *Linear Transportation Projects.* Activities required for the construction, expansion, modification, or improvement of linear transportation projects (e.g., roads, highways, railways, trails, airport runways, and taxiways) in waters of the United States. For linear transportation projects in non-tidal waters, the discharge cannot cause the loss of greater than ½-acre of waters of the United States. For linear transportation projects in tidal waters, the discharge cannot cause the loss of greater than ¹⁄₃-acre of waters of the United States. Any stream channel modification, including bank stabilization, is limited to the minimum necessary to construct or protect the linear transportation project; such modifications must be in the immediate vicinity of the project.

This NWP also authorizes temporary structures, fills, and work necessary to construct the linear transportation project. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and discharges, including cofferdams, are necessary for construction activities, access fills, or dewatering of construction sites. Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. Temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations. The areas affected by temporary fills must be revegetated, as appropriate.

This NWP cannot be used to authorize non-linear features commonly associated with transportation projects, such as vehicle maintenance or storage buildings, parking lots, train stations, or aircraft hangars.

# EXHIBIT 2 (Part 2)

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity if: (1) The loss of waters of the United States exceeds $\frac{1}{10}$ acre; or (2) there is a discharge in a special aquatic site, including wetlands. (See general condition 27.) (Sections 10 and 404)

**Note:** Some discharges for the construction of farm roads or forest roads, or temporary roads for moving mining equipment, may qualify for an exemption under section 404(f) of the Clean Water Act (see 33 CFR 323.4).

15. *U.S. Coast Guard Approved Bridges.* Discharges of dredged or fill material incidental to the construction of bridges across navigable waters of the United States, including cofferdams, abutments, foundation seals, piers, and temporary construction and access fills, provided such discharges have been authorized by the U.S. Coast Guard as part of the bridge permit. Causeways and approach fills are not included in this NWP and will require a separate section 404 permit. (Section 404)

16. *Return Water From Upland Contained Disposal Areas.* Return water from an upland contained dredged material disposal area. The return water from a contained disposal area is administratively defined as a discharge of dredged material by 33 CFR 323.2(d), even though the disposal itself occurs on the upland and does not require a section 404 permit. This NWP satisfies the technical requirement for a section 404 permit for the return water where the quality of the return water is controlled by the state through the section 401 certification procedures. The dredging activity may require a section 404 permit (33 CFR 323.2(d)), and will require a section 10 permit if located in navigable waters of the United States. (Section 404)

17. *Hydropower Projects.* Discharges of dredged or fill material associated with hydropower projects having: (a) Less than 5000 kW of total generating capacity at existing reservoirs, where the project, including the fill, is licensed by the Federal Energy Regulatory Commission (FERC) under the Federal Power Act of 1920, as amended; or (b) a licensing exemption granted by the FERC pursuant to Section 408 of the Energy Security Act of 1980 (16 U.S.C. 2705 and 2708) and Section 30 of the Federal Power Act, as amended.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Section 404)

18. *Minor Discharges.* Minor discharges of dredged or fill material into all waters of the United States, provided the activity meets all of the following criteria:

(a) The quantity of discharged material and the volume of area excavated do not exceed 25 cubic yards below the plane of the ordinary high water mark or the high tide line;

(b) The discharge will not cause the loss of more than 1/10 acre of waters of the United States; and

(c) The discharge is not placed for the purpose of a stream diversion.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity if: (1) The discharge or the volume of area excavated exceeds 10 cubic yards below the plane of the ordinary high water mark or the high tide line, or (2) the discharge is in a special aquatic site, including wetlands. (See general condition 27.) (Sections 10 and 404)

19. *Minor Dredging.* Dredging of no more than 25 cubic yards below the plane of the ordinary high water mark or the mean high water mark from navigable waters of the United States (i.e., section 10 waters). This NWP does not authorize the dredging or degradation through siltation of coral reefs, sites that support submerged aquatic vegetation (including sites where submerged aquatic vegetation is documented to exist but may not be present in a given year), anadromous fish spawning areas, or wetlands, or the connection of canals or other artificial waterways to navigable waters of the United States (see 33 CFR 322.5(g)). (Sections 10 and 404)

20. *Oil Spill Cleanup.* Activities required for the containment and cleanup of oil and hazardous substances that are subject to the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR part 300) provided that the work is done in accordance with the Spill Control and Countermeasure Plan required by 40 CFR 112.3 and any existing state contingency plan and provided that the Regional Response Team (if one exists in the area) concurs with the proposed containment and cleanup action. This NWP also authorizes activities required for the cleanup of oil releases in waters of the United States from electrical equipment that are governed by EPA's polychlorinated biphenyl spill response regulations at 40 CFR part 761. (Sections 10 and 404)

21. *Surface Coal Mining Operations.* Discharges of dredged or fill material into waters of the United States associated with surface coal mining and reclamation operations provided the activities are already authorized, or are currently being processed as part of an integrated permit processing procedure, by the Department of Interior (DOI), Office of Surface Mining (OSM), or by states with approved programs under Title V of the Surface Mining Control and Reclamation Act of 1977.

*Notification:* The permittee must submit a pre-construction notification to the district engineer and receive written authorization prior to commencing the activity. (See general condition 27.) (Sections 10 and 404)

22. *Removal of Vessels.* Temporary structures or minor discharges of dredged or fill material required for the removal of wrecked, abandoned, or disabled vessels, or the removal of man-made obstructions to navigation. This NWP does not authorize maintenance dredging, shoal removal, or riverbank snagging.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity if: (1) The vessel is listed or eligible for listing in the National Register of Historic Places; or (2) the activity is conducted in a special aquatic site, including coral reefs and wetlands. (See general condition 27.) If condition 1 above is triggered, the permittee cannot commence the activity until informed by the district engineer that compliance with the "Historic Properties" general condition is completed. (Sections 10 and 404)

**Note 1:** If a removed vessel is disposed of in waters of the United States, a permit from the U.S. EPA may be required (see 40 CFR 229.3). If a Department of the Army permit is required for vessel disposal in waters of the United States, separate authorization will be required.

**Note 2:** Compliance with general condition 17, Endangered Species, and general condition 18, Historic Properties, is required for all NWPs. The concern with historic properties is emphasized in the notification requirements for this NWP because of the likelihood that submerged vessels may be historic properties.

23. *Approved Categorical Exclusions.* Activities undertaken, assisted, authorized, regulated, funded, or financed, in whole or in part, by another Federal agency or department where:

(a) That agency or department has determined, pursuant to the Council on Environmental Quality's implementing regulations for the National Environmental Policy Act (40 CFR part 1500 et seq.), that the activity is categorically excluded from environmental documentation, because it is included within a category of actions which neither individually nor

cumulatively have a significant effect on the human environment; and

(b) The Office of the Chief of Engineers (Attn: CECW–CO) has concurred with that agency's or department's determination that the activity is categorically excluded and approved the activity for authorization under NWP 23.

The Office of the Chief of Engineers may require additional conditions, including pre-construction notification, for authorization of an agency's categorical exclusions under this NWP.

*Notification:* Certain categorical exclusions approved for authorization under this NWP require the permittee to submit a pre-construction notification to the district engineer prior to commencing the activity (see general condition 27). The activities that require pre-construction notification are listed in the appropriate Regulatory Guidance Letters. (Sections 10 and 404)

**Note:** The agency or department may submit an application for an activity believed to be categorically excluded to the Office of the Chief of Engineers (Attn: CECW–CO). Prior to approval for authorization under this NWP of any agency's activity, the Office of the Chief of Engineers will solicit public comment. As of the date of issuance of this NWP, agencies with approved categorical exclusions are the: Bureau of Reclamation, Federal Highway Administration, and U.S. Coast Guard. Activities approved for authorization under this NWP as of the date of this notice are found in Corps Regulatory Guidance Letter 05–07, which is available at: *http://www.usace.army.mil/inet/functions/cw/cecwo/reg/rglsindx.htm.* Any future approved categorical exclusions will be announced in Regulatory Guidance Letters and posted on this same Web site.

24. *Indian Tribe or State Administered Section 404 Programs.* Any activity permitted by a state or Indian Tribe administering its own section 404 permit program pursuant to 33 U.S.C. 1344(g)–(l) is permitted pursuant to Section 10 of the Rivers and Harbors Act of 1899. (Section 10)

**Note 1:** As of the date of the promulgation of this NWP, only New Jersey and Michigan administer their own section 404 permit programs.

**Note 2:** Those activities that do not involve an Indian Tribe or State section 404 permit are not included in this NWP, but certain structures will be exempted by Section 154 of Pub. L. 94–587, 90 Stat. 2917 (33 U.S.C. 591) (see 33 CFR 322.3(a)(2)).

25. *Structural Discharges.* Discharges of material such as concrete, sand, rock, etc., into tightly sealed forms or cells where the material will be used as a structural member for standard pile supported structures, such as bridges, transmission line footings, and

walkways, or for general navigation, such as mooring cells, including the excavation of bottom material from within the form prior to the discharge of concrete, sand, rock, etc. This NWP does not authorize filled structural members that would support buildings, building pads, homes, house pads, parking areas, storage areas and other such structures. The structure itself may require a section 10 permit if located in navigable waters of the United States. (Section 404)

26. [Reserved]

27. *Aquatic Habitat Restoration, Establishment, and Enhancement Activities.* Activities in waters of the United States associated with the restoration, enhancement, and establishment of tidal and non-tidal wetlands and riparian areas and the restoration and enhancement of non-tidal streams and other non-tidal open waters, provided those activities result in net increases in aquatic resource functions and services.

To the extent that a Corps permit is required, activities authorized by this NWP include, but are not limited to: the removal of accumulated sediments; the installation, removal, and maintenance of small water control structures, dikes, and berms; the installation of current deflectors; the enhancement, restoration, or establishment of riffle and pool stream structure; the placement of in-stream habitat structures; modifications of the stream bed and/or banks to restore or establish stream meanders; the backfilling of artificial channels and drainage ditches; the removal of existing drainage structures; the construction of small nesting islands; the construction of open water areas; the construction of oyster habitat over unvegetated bottom in tidal waters; shellfish seeding; activities needed to reestablish vegetation, including plowing or discing for seed bed preparation and the planting of appropriate wetland species; mechanized land clearing to remove non-native invasive, exotic, or nuisance vegetation; and other related activities. Only native plant species should be planted at the site.

This NWP authorizes the relocation of non-tidal waters, including non-tidal wetlands and streams, on the project site provided there are net increases in aquatic resource functions and services.

Except for the relocation of non-tidal waters on the project site, this NWP does not authorize the conversion of a stream or natural wetlands to another aquatic habitat type (e.g., stream to wetland or vice versa) or uplands. This NWP does not authorize stream channelization. This NWP does not

authorize the relocation of tidal waters or the conversion of tidal waters, including tidal wetlands, to other aquatic uses, such as the conversion of tidal wetlands into open water impoundments.

*Reversion.* For enhancement, restoration, and establishment activities conducted: (1) In accordance with the terms and conditions of a binding wetland enhancement, restoration, or establishment agreement between the landowner and the U.S. Fish and Wildlife Service (FWS), the Natural Resources Conservation Service (NRCS), the Farm Service Agency (FSA), the National Marine Fisheries Service (NMFS), the National Ocean Service (NOS), or their designated state cooperating agencies; (2) as voluntary wetland restoration, enhancement, and establishment actions documented by the NRCS or USDA Technical Service Provider pursuant to NRCS Field Office Technical Guide standards; or (3) on reclaimed surface coal mine lands, in accordance with a Surface Mining Control and Reclamation Act permit issued by the OSM or the applicable state agency, this NWP also authorizes any future discharge of dredged or fill material associated with the reversion of the area to its documented prior condition and use (i.e., prior to the restoration, enhancement, or establishment activities). The reversion must occur within five years after expiration of a limited term wetland restoration or establishment agreement or permit, and is authorized in these circumstances even if the discharge occurs after this NWP expires. The five-year reversion limit does not apply to agreements without time limits reached between the landowner and the FWS, NRCS, FSA, NMFS, NOS, or an appropriate state cooperating agency. This NWP also authorizes discharges of dredged or fill material in waters of the United States for the reversion of wetlands that were restored, enhanced, or established on prior-converted cropland that has not been abandoned or on uplands, in accordance with a binding agreement between the landowner and NRCS, FSA, FWS, or their designated state cooperating agencies (even though the restoration, enhancement, or establishment activity did not require a section 404 permit). The prior condition will be documented in the original agreement or permit, and the determination of return to prior conditions will be made by the Federal agency or appropriate state agency executing the agreement or permit. Before conducting any reversion activity the permittee or the appropriate Federal

or state agency must notify the district engineer and include the documentation of the prior condition. Once an area has reverted to its prior physical condition, it will be subject to whatever the Corps Regulatory requirements are applicable to that type of activity at the time. The requirement that the activity result in a net increase in aquatic resource functions and services does not apply to reversion activities meeting the above conditions. Except for the activities described above, this NWP does not authorize any future discharge of dredged or fill material associated with the reversion of the area to its prior condition. In such cases a separate permit would be required for any reversion.

*Reporting:* For those activities that do not require pre-construction notification, the permittee must submit to the district engineer a copy of: (1) The binding wetland enhancement, restoration, or establishment agreement, or a project description, including project plans and location map; (2) the NRCS or USDA Technical Service Provider documentation for the voluntary wetland restoration, enhancement, or establishment action; or (3) the SMCRA permit issued by OSM or the applicable state agency. These documents must be submitted to the district engineer at least 30 days prior to commencing activities in waters of the United States authorized by this NWP.

*Notification.* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity (see general condition 27), except for the following activities:

(1) Activities conducted on non-Federal public lands and private lands, in accordance with the terms and conditions of a binding wetland enhancement, restoration, or establishment agreement between the landowner and the U.S. FWS, NRCS, FSA, NMFS, NOS, or their designated state cooperating agencies;

(2) Voluntary wetland restoration, enhancement, and establishment actions documented by the NRCS or USDA Technical Service Provider pursuant to NRCS Field Office Technical Guide standards; or

(3) The reclamation of surface coal mine lands, in accordance with an SMCRA permit issued by the OSM or the applicable state agency.

However, the permittee must submit a copy of the appropriate documentation. (Sections 10 and 404)

Note: This NWP can be used to authorize compensatory mitigation projects, including mitigation banks and in-lieu fee programs.

However, this NWP does not authorize the reversion of an area used for a compensatory mitigation project to its prior condition, since compensatory mitigation is generally intended to be permanent.

28. *Modifications of Existing Marinas.* Reconfiguration of existing docking facilities within an authorized marina area. No dredging, additional slips, dock spaces, or expansion of any kind within waters of the United States is authorized by this NWP. (Section 10)

29. *Residential Developments.* Discharges of dredged or fill material into non-tidal waters of the United States for the construction or expansion of a single residence, a multiple unit residential development, or a residential subdivision. This NWP authorizes the construction of building foundations and building pads and attendant features that are necessary for the use of the residence or residential development. Attendant features may include but are not limited to roads, parking lots, garages, yards, utility lines, storm water management facilities, septic fields, and recreation facilities such as playgrounds, playing fields, and golf courses (provided the golf course is an integral part of the residential development).

The discharge must not cause the loss of greater than ½-acre of non-tidal waters of the United States, including the loss of no more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds this 300 linear foot limit is waived in writing by the district engineer. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters.

*Subdivisions:* For residential subdivisions, the aggregate total loss of waters of United States authorized by this NWP cannot exceed 1/2 acre. This includes any loss of waters of the United States associated with development of individual subdivision lots.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Sections 10 and 404)

30. *Moist Soil Management for Wildlife.* Discharges of dredged or fill material into non-tidal waters of the United States and maintenance activities that are associated with moist soil management for wildlife for the purpose of continuing ongoing, site-specific, wildlife management activities where soil manipulation is used to manage habitat and feeding areas for wildlife. Such activities include, but are not limited to, plowing or discing to impede succession, preparing seed beds, or establishing fire breaks. Sufficient

riparian areas must be maintained adjacent to all open water bodies, including streams to preclude water quality degradation due to erosion and sedimentation. This NWP does not authorize the construction of new dikes, roads, water control structures, or similar features associated with the management areas. The activity must not result in a net loss of aquatic resource functions and services. This NWP does not authorize the conversion of wetlands to uplands, impoundments, or other open water bodies. (Section 404)

Note: The repair, maintenance, or replacement of existing water control structures or the repair or maintenance of dikes may be authorized by NWP 3. Some such activities may qualify for an exemption under Section 404(f) of the Clean Water Act (see 33 CFR 323.4).

31. *Maintenance of Existing Flood Control Facilities.* Discharges of dredged or fill material resulting from activities associated with the maintenance of existing flood control facilities, including debris basins, retention/detention basins, levees, and channels that: (i) were previously authorized by the Corps by individual permit, general permit, by 33 CFR 330.3, or did not require a permit at the time they were constructed, or (ii) were constructed by the Corps and transferred to a non-Federal sponsor for operation and maintenance. Activities authorized by this NWP are limited to those resulting from maintenance activities that are conducted within the "maintenance baseline," as described in the definition below. Discharges of dredged or fill materials associated with maintenance activities in flood control facilities in any watercourse that have previously been determined to be within the maintenance baseline are authorized under this NWP. This NWP does not authorize the removal of sediment and associated vegetation from natural water courses except when these activities have been included in the maintenance baseline. All dredged material must be placed in an upland site or an authorized disposal site in waters of the United States, and proper siltation controls must be used.

*Maintenance Baseline:* The maintenance baseline is a description of the physical characteristics (e.g., depth, width, length, location, configuration, or design flood capacity, etc.) of a flood control project within which maintenance activities are normally authorized by NWP 31, subject to any case-specific conditions required by the district engineer. The district engineer will approve the maintenance baseline

based on the approved or constructed capacity of the flood control facility, whichever is smaller, including any areas where there are no constructed channels, but which are part of the facility. The prospective permittee will provide documentation of the physical characteristics of the flood control facility (which will normally consist of as-built or approved drawings) and documentation of the approved and constructed design capacities of the flood control facility. If no evidence of the constructed capacity exists, the approved capacity will be used. The documentation will also include best management practices to ensure that the impacts to the aquatic environment are minimal, especially in maintenance areas where there are no constructed channels. (The Corps may request maintenance records in areas where there has not been recent maintenance.) Revocation or modification of the final determination of the maintenance baseline can only be done in accordance with 33 CFR 330.5. Except in emergencies as described below, this NWP cannot be used until the district engineer approves the maintenance baseline and determines the need for mitigation and any regional or activity-specific conditions. Once determined, the maintenance baseline will remain valid for any subsequent reissuance of this NWP. This NWP does not authorize maintenance of a flood control facility that has been abandoned. A flood control facility will be considered abandoned if it has operated at a significantly reduced capacity without needed maintenance being accomplished in a timely manner.

*Mitigation:* The district engineer will determine any required mitigation one-time only for impacts associated with maintenance work at the same time that the maintenance baseline is approved. Such one-time mitigation will be required when necessary to ensure that adverse environmental impacts are no more than minimal, both individually and cumulatively. Such mitigation will only be required once for any specific reach of a flood control project. However, if one-time mitigation is required for impacts associated with maintenance activities, the district engineer will not delay needed maintenance, provided the district engineer and the permittee establish a schedule for identification, approval, development, construction and completion of any such required mitigation. Once the one-time mitigation described above has been completed, or a determination made that mitigation is not required, no

further mitigation will be required for maintenance activities within the maintenance baseline. In determining appropriate mitigation, the district engineer will give special consideration to natural water courses that have been included in the maintenance baseline and require compensatory mitigation and/or best management practices as appropriate.

*Emergency Situations:* In emergency situations, this NWP may be used to authorize maintenance activities in flood control facilities for which no maintenance baseline has been approved. Emergency situations are those which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if action is not taken before a maintenance baseline can be approved. In such situations, the determination of mitigation requirements, if any, may be deferred until the emergency has been resolved. Once the emergency has ended, a maintenance baseline must be established expeditiously, and mitigation, including mitigation for maintenance conducted during the emergency, must be required as appropriate.

*Notification:* The permittee must submit a pre-construction notification to the district engineer before any maintenance work is conducted (see general condition 27). The pre-construction notification may be for activity-specific maintenance or for maintenance of the entire flood control facility by submitting a five-year (or less) maintenance plan. The pre-construction notification must include a description of the maintenance baseline and the dredged material disposal site. (Sections 10 and 404)

32. *Completed Enforcement Actions.* Any structure, work, or discharge of dredged or fill material remaining in place or undertaken for mitigation, restoration, or environmental benefit in compliance with either:

(i) The terms of a final written Corps non-judicial settlement agreement resolving a violation of Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act of 1899; or the terms of an EPA 309(a) order on consent resolving a violation of Section 404 of the Clean Water Act, provided that:

(a) The unauthorized activity affected no more than 5 acres of non-tidal waters or 1 acre of tidal waters;

(b) The settlement agreement provides for environmental benefits, to an equal or greater degree, than the environmental detriments caused by the

unauthorized activity that is authorized by this NWP; and

(c) The district engineer issues a verification letter authorizing the activity subject to the terms and conditions of this NWP and the settlement agreement, including a specified completion date; or

(ii) The terms of a final Federal court decision, consent decree, or settlement agreement resulting from an enforcement action brought by the United States under Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act of 1899; or

(iii) The terms of a final court decision, consent decree, settlement agreement, or non-judicial settlement agreement resulting from a natural resource damage claim brought by a trustee or trustees for natural resources (as defined by the National Contingency Plan at 40 CFR subpart G) under Section 311 of the Clean Water Act, Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act, Section 312 of the National Marine Sanctuaries Act, Section 1002 of the Oil Pollution Act of 1990, or the Park System Resource Protection Act at 16 U.S.C. 19jj, to the extent that a Corps permit is required.

Compliance is a condition of the NWP itself. Any authorization under this NWP is automatically revoked if the permittee does not comply with the terms of this NWP or the terms of the court decision, consent decree, or judicial/non-judicial settlement agreement. This NWP does not apply to any activities occurring after the date of the decision, decree, or agreement that are not for the purpose of mitigation, restoration, or environmental benefit. Before reaching any settlement agreement, the Corps will ensure compliance with the provisions of 33 CFR part 326 and 33 CFR 330.6(d)(2) and (e). (Sections 10 and 404)

33. *Temporary Construction, Access, and Dewatering.* Temporary structures, work, and discharges, including cofferdams, necessary for construction activities or access fills or dewatering of construction sites, provided that the associated primary activity is authorized by the Corps of Engineers or the U.S. Coast Guard. This NWP also authorizes temporary structures, work, and discharges, including cofferdams, necessary for construction activities not otherwise subject to the Corps or U.S. Coast Guard permit requirements. Appropriate measures must be taken to maintain near normal downstream flows and to minimize flooding. Fill must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. The use of dredged

material may be allowed if the district engineer determines that it will not cause more than minimal adverse effects on aquatic resources. Following completion of construction, temporary fill must be entirely removed to upland areas, dredged material must be returned to its original location, and the affected areas must be restored to pre-construction elevations. The affected areas must also be revegetated, as appropriate. This permit does not authorize the use of cofferdams to dewater wetlands or other aquatic areas to change their use. Structures left in place after construction is completed require a section 10 permit if located in navigable waters of the United States. (See 33 CFR part 322.)

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity (see general condition 27). The pre-construction notification must include a restoration plan showing how all temporary fills and structures will be removed and the area restored to pre-project conditions. (Sections 10 and 404)

34. *Cranberry Production Activities.* Discharges of dredged or fill material for dikes, berms, pumps, water control structures or leveling of cranberry beds associated with expansion, enhancement, or modification activities at existing cranberry production operations. The cumulative total acreage of disturbance per cranberry production operation, including but not limited to, filling, flooding, ditching, or clearing, must not exceed 10 acres of waters of the United States, including wetlands. The activity must not result in a net loss of wetland acreage. This NWP does not authorize any discharge of dredged or fill material related to other cranberry production activities such as warehouses, processing facilities, or parking areas. For the purposes of this NWP, the cumulative total of 10 acres will be measured over the period that this NWP is valid.

*Notification:* The permittee must submit a pre-construction notification to the district engineer once during the period that this NWP is valid, and the NWP will then authorize discharges of dredge or fill material at an existing operation for the permit term, provided the 10-acre limit is not exceeded. (See general condition 27.) (Section 404)

35. *Maintenance Dredging of Existing Basins.* Excavation and removal of accumulated sediment for maintenance of existing marina basins, access channels to marinas or boat slips, and boat slips to previously authorized depths or controlling depths for ingress/egress, whichever is less, provided the

dredged material is deposited at an upland site and proper siltation controls are used. (Section 10)

36. *Boat Ramps.* Activities required for the construction of boat ramps, provided the activity meets all of the following criteria:

(a) The discharge into waters of the United States does not exceed 50 cubic yards of concrete, rock, crushed stone or gravel into forms, or in the form of pre-cast concrete planks or slabs, unless the 50 cubic yard limit is waived in writing by the district engineer;

(b) The boat ramp does not exceed 20 feet in width, unless this criterion is waived in writing by the district engineer;

(c) The base material is crushed stone, gravel or other suitable material;

(d) The excavation is limited to the area necessary for site preparation and all excavated material is removed to the upland; and,

(e) No material is placed in special aquatic sites, including wetlands.

The use of unsuitable material that is structurally unstable is not authorized. If dredging in navigable waters of the United States is necessary to provide access to the boat ramp, the dredging may be authorized by another NWP, a regional general permit, or an individual permit.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity if: (1) The discharge into waters of the United States exceeds 50 cubic yards, or (2) the boat ramp exceeds 20 feet in width. (See general condition 27.) (Sections 10 and 404)

37. *Emergency Watershed Protection and Rehabilitation.* Work done by or funded by:

(a) The Natural Resources Conservation Service for a situation requiring immediate action under its emergency Watershed Protection Program (7 CFR part 624);

(b) The U.S. Forest Service under its Burned-Area Emergency Rehabilitation Handbook (FSH 509.13);

(c) The Department of the Interior for wildland fire management burned area emergency stabilization and rehabilitation (DOI Manual part 620, Ch. 3);

(d) The Office of Surface Mining, or states with approved programs, for abandoned mine land reclamation activities under Title IV of the Surface Mining Control and Reclamation Act (30 CFR subchapter R), where the activity does not involve coal extraction; or

(e) The Farm Service Agency under its Emergency Conservation Program (7 CFR part 701).

In general, the prospective permittee should wait until the district engineer issues an NWP verification before proceeding with the watershed protection and rehabilitation activity. However, in cases where there is an unacceptable hazard to life or a significant loss of property or economic hardship will occur, the emergency watershed protection and rehabilitation activity may proceed immediately and the district engineer will consider the information in the pre-construction notification any comments received as a result of agency coordination to decide whether the NWP 37 authorization should be modified, suspended, or revoked in accordance with the procedures at 33 CFR 330.5.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity (see general condition 27). (Sections 10 and 404)

38. *Cleanup of Hazardous and Toxic Waste.* Specific activities required to effect the containment, stabilization, or removal of hazardous or toxic waste materials that are performed, ordered, or sponsored by a government agency with established legal or regulatory authority. Court ordered remedial action plans or related settlements are also authorized by this NWP. This NWP does not authorize the establishment of new disposal sites or the expansion of existing sites used for the disposal of hazardous or toxic waste.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Sections 10 and 404)

**Note:** Activities undertaken entirely on a Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) site by authority of CERCLA as approved or required by EPA, are not required to obtain permits under Section 404 of the Clean Water Act or Section 10 of the Rivers and Harbors Act.

39. *Commercial and Institutional Developments.* Discharges of dredged or fill material into non-tidal waters of the United States for the construction or expansion of commercial and institutional building foundations and building pads and attendant features that are necessary for the use and maintenance of the structures. Attendant features may include, but are not limited to, roads, parking lots, garages, yards, utility lines, storm water management facilities, and recreation facilities such as playgrounds and playing fields. Examples of commercial developments include retail stores, industrial facilities, restaurants,

business parks, and shopping centers. Examples of institutional developments include schools, fire stations, government office buildings, judicial buildings, public works buildings, libraries, hospitals, and places of worship. The construction of new golf courses, new ski areas, or oil and gas wells is not authorized by this NWP.

The discharge must not cause the loss of greater than ½-acre of non-tidal waters of the United States, including the loss of no more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds this 300 linear foot limit is waived in writing by the district engineer. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Sections 10 and 404)

40. *Agricultural Activities.* Discharges of dredged or fill material into non-tidal waters of the United States for agricultural activities, including the construction of building pads for farm buildings. Authorized activities include the installation, placement, or construction of drainage tiles, ditches, or levees; mechanized land clearing; land leveling; the relocation of existing serviceable drainage ditches constructed in waters of the United States; and similar activities.

This NWP also authorizes the construction of farm ponds in non-tidal waters of the United States, excluding perennial streams, provided the farm pond is used solely for agricultural purposes. This NWP does not authorize the construction of aquaculture ponds.

This NWP also authorizes discharges of dredged or fill material into non-tidal waters of the United States to relocate existing serviceable drainage ditches constructed in non-tidal streams.

The discharge must not cause the loss of greater than ½-acre of non-tidal waters of the United States. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters. This NWP does not authorize the relocation of greater than 300 linear feet of existing serviceable drainage ditches constructed in non-tidal streams, unless for drainage ditches constructed in intermittent and ephemeral streams, this 300 linear foot limit is waived in writing by the district engineer.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Section 404)

**Note:** Some discharges for agricultural activities may qualify for an exemption under Section 404(f) of the Clean Water Act (see 33 CFR 323.4). This NWP authorizes the construction of farm ponds that do not qualify for the Clean Water Act Section 404(f)(1)(C) exemption because of the recapture provision at Section 404(f)(2).

41. *Reshaping Existing Drainage Ditches.* Discharges of dredged or fill material into non-tidal waters of the United States, excluding non-tidal wetlands adjacent to tidal waters, to modify the cross-sectional configuration of currently serviceable drainage ditches constructed in waters of the United States, for the purpose of improving water quality by regrading the drainage ditch with gentler slopes, which can reduce erosion, increase growth of vegetation, and increase uptake of nutrients and other substances by vegetation. The reshaping of the ditch cannot increase drainage capacity beyond the original as-built capacity nor can it expand the area drained by the ditch as originally constructed (i.e., the capacity of the ditch must be the same as originally constructed and it cannot drain additional wetlands or other waters of the United States). Compensatory mitigation is not required because the work is designed to improve water quality.

This NWP does not authorize the relocation of drainage ditches constructed in waters of the United States; the location of the centerline of the reshaped drainage ditch must be approximately the same as the location of the centerline of the original drainage ditch. This NWP does not authorize stream channelization or stream relocation projects.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity, if more than 500 linear feet of drainage ditch will be reshaped. (See general condition 27.) (Section 404)

42. *Recreational Facilities.* Discharges of dredged or fill material into non-tidal waters of the United States for the construction or expansion of recreational facilities. Examples of recreational facilities that may be authorized by this NWP include playing fields (e.g., football fields, baseball fields), basketball courts, tennis courts, hiking trails, bike paths, golf courses, ski areas, horse paths, nature centers, and campgrounds (excluding recreational vehicle parks). This NWP also authorizes the construction or expansion of small support facilities, such as maintenance and storage buildings and stables that are directly related to the recreational activity, but it

does not authorize the construction of hotels, restaurants, racetracks, stadiums, arenas, or similar facilities.

The discharge must not cause the loss of greater than ½-acre of non-tidal waters of the United States, including the loss of no more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds this 300 linear foot limit is waived in writing by the district engineer. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Section 404)

43. *Stormwater Management Facilities.* Discharges of dredged or fill material into non-tidal waters of the United States for the construction and maintenance of stormwater management facilities, including the excavation of stormwater ponds/facilities, detention basins, and retention basins; the installation and maintenance of water control structures, outfall structures and emergency spillways; and the maintenance dredging of existing stormwater management ponds/ facilities and detention and retention basins.

The discharge must not cause the loss of greater than ½-acre of non-tidal waters of the United States, including the loss of no more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds this 300 linear foot limit is waived in writing by the district engineer. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters. This NWP does not authorize discharges of dredged or fill material for the construction of new stormwater management facilities in perennial streams.

*Notification:* For the construction of new stormwater management facilities, or the expansion of existing stormwater management facilities, the permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) Maintenance activities do not require pre-construction notification if they are limited to restoring the original design capacities of the stormwater management facility. (Section 404)

44. *Mining Activities.* Discharges of dredged or fill material into non-tidal waters of the United States for mining activities, except for coal mining activities. The discharge must not cause the loss of greater than ½-acre of non-tidal waters of the United States. This NWP does not authorize discharges into

**11190**    Federal Register / Vol. 72, No. 47 / Monday, March 12, 2007 / Notices

non-tidal wetlands adjacent to tidal waters.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) If reclamation is required by other statutes, then a copy of the reclamation plan must be submitted with the pre-construction notification. (Sections 10 and 404)

45. *Repair of Uplands Damaged by Discrete Events.* This NWP authorizes discharges of dredged or fill material, including dredging or excavation, into all waters of the United States for activities associated with the restoration of upland areas damaged by storms, floods, or other discrete events. This NWP authorizes bank stabilization to protect the restored uplands. The restoration of the damaged areas, including any bank stabilization, must not exceed the contours, or ordinary high water mark, that existed before the damage occurred. The district engineer retains the right to determine the extent of the pre-existing conditions and the extent of any restoration work authorized by this NWP. The work must commence, or be under contract to commence, within two years of the date of damage, unless this condition is waived in writing by the district engineer. This NWP cannot be used to reclaim lands lost to normal erosion processes over an extended period.

Minor dredging is limited to the amount necessary to restore the damaged upland area and should not significantly alter the pre-existing bottom contours of the waterbody.

*Notification:* The permittee must submit a pre-construction notification to the district engineer (see general condition 27) within 12-months of the date of the damage. The pre-construction notification should include documentation, such as a recent topographic survey or photographs, to justify the extent of the proposed restoration. (Sections 10 and 404)

Note: Uplands lost as a result of a storm, flood, or other discrete event can be replaced without a section 404 permit, if the uplands are restored to the ordinary high water mark (in non-tidal waters) or high tide line (in tidal waters). (See also 33 CFR 328.5.)

46. *Discharges in Ditches.* Discharges of dredged or fill material into non-tidal ditches that are: (1) Constructed in uplands, (2) receive water from an area determined to be a water of the United States prior to the construction of the ditch, (3) divert water to an area determined to be a water of the United States prior to the construction of the ditch, and (4) are determined to be

waters of the United States. The discharge must not cause the loss of greater than one acre of waters of the United States.

This NWP does not authorize discharges of dredged or fill material into ditches constructed in streams or other waters of the United States, or in streams that have been relocated in uplands. This NWP does not authorize discharges of dredged or fill material that increase the capacity of the ditch and drain those areas determined to be waters of the United States prior to construction of the ditch.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Section 404)

47. *Pipeline Safety Program Designated Time Sensitive Inspections and Repairs.* Activities required for the inspection, repair, rehabilitation, or replacement of any currently serviceable structure or fill for pipelines that have been identified by the Pipeline and Hazardous Materials Safety Administration's Pipeline Safety Program (PHP) within the U.S. Department of Transportation as time-sensitive (see 49 CFR parts 192 and 195) and additional maintenance activities done in conjunction with the time-sensitive inspection and repair activities. All activities must meet the following criteria:

(a) Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable when temporary structures, work and discharges, including cofferdams, are necessary for construction activities or access fills or dewatering of construction sites;

(b) Material resulting from trench excavation may be temporarily sidecast into waters of the United States for no more than three months, provided that the material is not placed in such a manner that it is dispersed by currents or other forces. The district engineer may extend the period of temporary side casting for no more than a total of 180 days, where appropriate. The trench cannot be constructed or backfilled in such a manner as to drain waters of the United States (e.g., backfilling with extensive gravel layers, creating a french drain effect);

(c) Temporary fill must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. Temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations. The affected areas must be revegetated, as appropriate;

(d) In wetlands, the top 6 to 12 inches of the trench should normally be backfilled with topsoil from the trench so that there is no change in preconstruction contours;

(e) To the maximum extent practicable, the restoration of open waters must be to the pre-construction course, condition, capacity, and location of the waterbody;

(f) Any exposed slopes and stream banks must be stabilized immediately upon completion of the project;

(g) Additional maintenance activities done in conjunction with the time-sensitive inspection or repair must not result in additional losses of waters of the United States; and,

(h) The permittee is a participant in the Pipeline Repair and Environmental Guidance System (PREGS).

*Reporting:* The permittee must submit a post construction report to the PHP within seven days after completing the work. The report must be submitted electronically to PHP via PREGS. The report must contain the following information: Project sites located in waters of the United States, temporary access routes, stream dewatering sites, temporary fills and temporary structures identified on a map of the pipeline corridor; photographs of the pre- and post-construction work areas located in waters of the United States; and a list of best management practices employed for each pipeline segment shown on the map. (Section 10 and 404)

Note: Division engineers may modify this NWP by adding regional conditions to protect the aquatic environment, as long as those regional conditions do not require pre-construction notification or other actions that would delay time sensitive inspections and repairs. Examples of appropriate regional conditions include best management practices.

48. *Existing Commercial Shellfish Aquaculture Activities.* This NWP authorizes the installation of buoys, floats, racks, trays, nets, lines, tubes, containers, and other structures necessary for the continued operation of the existing commercial aquaculture activity. This NWP also authorizes discharges of dredged or fill material necessary for shellfish seeding, rearing, cultivating, transplanting, and harvesting activities. Rafts and other floating structures must be securely anchored and clearly marked.

This NWP does not authorize new operations or the expansion of the project area for an existing commercial shellfish aquaculture activity. This NWP does not authorize the cultivation of new species (i.e., species not previously cultivated in the waterbody). This NWP

does not authorize attendant features such as docks, piers, boat ramps, stockpiles, staging areas, or the deposition of shell material back into waters of the United States as waste.

*Reporting:* For those activities that do not require pre-construction notification, the permittee must submit a report to the district engineer that includes the following information: (1) The size of the project area for the commercial shellfish aquaculture activity (in acres); (2) the location of the activity; (3) a brief description of the culture method and harvesting method(s); (4) the name(s) of the cultivated species; and (5) whether canopy predator nets are being used. This is a subset of the information that would be required for pre-construction notification. This report may be provided by letter or using an optional reporting form provided by the Corps. Only one report needs to be submitted during the period this NWP is valid, as long as there are no changes to the operation that require pre-construction notification. The report must be submitted to the district engineer within 90 days of the effective date of this NWP.

*Notification:* The permittee must submit a pre-construction notification to the district engineer if: (1) The project area is greater than 100 acres; or (2) there is any reconfiguration of the aquaculture activity, such as relocating existing operations into portions of the project area not previously used for aquaculture activities; or (3) there is a change in species being cultivated; or (4) there is a change in culture methods (e.g., from bottom culture to off-bottom culture); or (5) dredge harvesting, tilling, or harrowing is conducted in areas inhabited by submerged aquatic vegetation. (See general condition 27.) (Sections 10 and 404)

**Note:** The permittee should notify the applicable U.S. Coast Guard office regarding the project.

49. *Coal Remining Activities.* Discharges of dredged or fill material into non-tidal waters of the United States associated with the remining and reclamation of lands that were previously mined for coal, provided the activities are already authorized, or are currently being processed as part of an integrated permit processing procedure, by the Department of Interior (DOI) Office of Surface Mining (OSM), or by states with approved programs under Title IV or Title V of the Surface Mining Control and Reclamation Act of 1977. Areas previously mined include reclaimed mine sites, abandoned mine land areas, or lands under bond

forfeiture contracts. The permittee must clearly demonstrate to the district engineer that the reclamation plan will result in a net increase in aquatic resource functions. As part of the project, the permittee may conduct coal mining activities in an adjacent area, provided the newly mined area is less than 40 percent of the area being remined plus any unmined area necessary for the reclamation of the remined area.

*Notification:* The permittee must submit a pre-construction notification to the district engineer and receive written authorization prior to commencing the activity. (See general condition 27.) (Sections 10 and 404)

50. *Underground Coal Mining Activities.* Discharges of dredged or fill material into non-tidal waters of the United States associated with underground coal mining and reclamation operations provided the activities are authorized, or are currently being processed as part of an integrated permit processing procedure, by the Department of Interior (DOI), Office of Surface Mining (OSM), or by states with approved programs under Title V of the Surface Mining Control and Reclamation Act of 1977.

This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters. This NWP does not authorize coal preparation and processing activities outside of the mine site.

*Notification:* The permittee must submit a pre-construction notification to the district engineer and receive written authorization prior to commencing the activity. (See general condition 27.) If reclamation is required by other statutes, then a copy of the reclamation plan must be submitted with the pre-construction notification. (Sections 10 and 404)

**Note:** Coal preparation and processing activities outside of the mine site may be authorized by NWP 21.

## C. Nationwide Permit General Conditions

**Note:** To qualify for NWP authorization, the prospective permittee must comply with the following general conditions, as appropriate, in addition to any regional or case-specific conditions imposed by the division engineer or district engineer. Prospective permittees should contact the appropriate Corps district office to determine if regional conditions have been imposed on an NWP. Prospective permittees should also contact the appropriate Corps district office to determine the status of Clean Water Act Section 401 water quality certification and/or Coastal Zone Management Act consistency for an NWP.

1. *Navigation.* (a) No activity may cause more than a minimal adverse effect on navigation.

(b) Any safety lights and signals prescribed by the U.S. Coast Guard, through regulations or otherwise, must be installed and maintained at the permittee's expense on authorized facilities in navigable waters of the United States.

(c) The permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim shall be made against the United States on account of any such removal or alteration.

2. *Aquatic Life Movements.* No activity may substantially disrupt the necessary life cycle movements of those species of aquatic life indigenous to the waterbody, including those species that normally migrate through the area, unless the activity's primary purpose is to impound water. Culverts placed in streams must be installed to maintain low flow conditions.

3. *Spawning Areas.* Activities in spawning areas during spawning seasons must be avoided to the maximum extent practicable. Activities that result in the physical destruction (e.g., through excavation, fill, or downstream smothering by substantial turbidity) of an important spawning area are not authorized.

4. *Migratory Bird Breeding Areas.* Activities in waters of the United States that serve as breeding areas for migratory birds must be avoided to the maximum extent practicable.

5. *Shellfish Beds.* No activity may occur in areas of concentrated shellfish populations, unless the activity is directly related to a shellfish harvesting activity authorized by NWPs 4 and 48.

6. *Suitable Material.* No activity may use unsuitable material (e.g., trash, debris, car bodies, asphalt, etc.). Material used for construction or discharged must be free from toxic pollutants in toxic amounts (see Section 307 of the Clean Water Act).

7. *Water Supply Intakes.* No activity may occur in the proximity of a public water supply intake, except where the activity is for the repair or improvement

**11192**     Federal Register / Vol. 72, No. 47 / Monday, March 12, 2007 / Notices

of public water supply intake structures or adjacent bank stabilization.

8. *Adverse Effects From Impoundments.* If the activity creates an impoundment of water, adverse effects to the aquatic system due to accelerating the passage of water, and/or restricting its flow must be minimized to the maximum extent practicable.

9. *Management of Water Flows.* To the maximum extent practicable, the pre-construction course, condition, capacity, and location of open waters must be maintained for each activity, including stream channelization and storm water management activities, except as provided below. The activity must be constructed to withstand expected high flows. The activity must not restrict or impede the passage of normal or high flows, unless the primary purpose of the activity is to impound water or manage high flows. The activity may alter the pre-construction course, condition, capacity, and location of open waters if it benefits the aquatic environment (e.g., stream restoration or relocation activities).

10. *Fills Within 100-Year Floodplains.* The activity must comply with applicable FEMA-approved state or local floodplain management requirements.

11. *Equipment.* Heavy equipment working in wetlands or mudflats must be placed on mats, or other measures must be taken to minimize soil disturbance.

12. *Soil Erosion and Sediment Controls.* Appropriate soil erosion and sediment controls must be used and maintained in effective operating condition during construction, and all exposed soil and other fills, as well as any work below the ordinary high water mark or high tide line, must be permanently stabilized at the earliest practicable date. Permittees are encouraged to perform work within waters of the United States during periods of low-flow or no-flow.

13. *Removal of Temporary Fills.* Temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations. The affected areas must be revegetated, as appropriate.

14. *Proper Maintenance.* Any authorized structure or fill shall be properly maintained, including maintenance to ensure public safety.

15. *Wild and Scenic Rivers.* No activity may occur in a component of the National Wild and Scenic River System, or in a river officially designated by Congress as a "study river" for possible inclusion in the system while the river is in an official study status, unless the appropriate Federal agency with direct management responsibility for such river, has determined in writing that the proposed activity will not adversely affect the Wild and Scenic River designation or study status. Information on Wild and Scenic Rivers may be obtained from the appropriate Federal land management agency in the area (e.g., National Park Service, U.S. Forest Service, Bureau of Land Management, U.S. Fish and Wildlife Service).

16. *Tribal Rights.* No activity or its operation may impair reserved tribal rights, including, but not limited to, reserved water rights and treaty fishing and hunting rights.

17. *Endangered Species.* (a) No activity is authorized under any NWP which is likely to jeopardize the continued existence of a threatened or endangered species or a species proposed for such designation, as identified under the Federal Endangered Species Act (ESA), or which will destroy or adversely modify the critical habitat of such species. No activity is authorized under any NWP which "may affect" a listed species or critical habitat, unless Section 7 consultation addressing the effects of the proposed activity has been completed.

(b) Federal agencies should follow their own procedures for complying with the requirements of the ESA. Federal permittees must provide the district engineer with the appropriate documentation to demonstrate compliance with those requirements.

(c) Non-federal permittees shall notify the district engineer if any listed species or designated critical habitat might be affected or is in the vicinity of the project, or if the project is located in designated critical habitat, and shall not begin work on the activity until notified by the district engineer that the requirements of the ESA have been satisfied and that the activity is authorized. For activities that might affect Federally-listed endangered or threatened species or designated critical habitat, the pre-construction notification must include the name(s) of the endangered or threatened species that may be affected by the proposed work or that utilize the designated critical habitat that may be affected by the proposed work. The district engineer will determine whether the proposed activity "may affect" or will have "no effect" to listed species and designated critical habitat and will notify the non-Federal applicant of the Corps' determination within 45 days of receipt of a complete pre-construction notification. In cases where the non-Federal applicant has identified listed species or critical habitat that might be affected or is in the vicinity of the project, and has so notified the Corps, the applicant shall not begin work until the Corps has provided notification the proposed activities will have "no effect" on listed species or critical habitat, or until Section 7 consultation has been completed.

(d) As a result of formal or informal consultation with the FWS or NMFS the district engineer may add species-specific regional endangered species conditions to the NWPs.

(e) Authorization of an activity by a NWP does not authorize the "take" of a threatened or endangered species as defined under the ESA. In the absence of separate authorization (e.g., an ESA Section 10 Permit, a Biological Opinion with "incidental take" provisions, etc.) from the U.S. FWS or the NMFS, both lethal and non-lethal "takes" of protected species are in violation of the ESA. Information on the location of threatened and endangered species and their critical habitat can be obtained directly from the offices of the U.S. FWS and NMFS or their world wide Web pages at *http://www.fws.gov/* and *http://www.noaa.gov/fisheries.html* respectively.

18. *Historic Properties.* (a) In cases where the district engineer determines that the activity may affect properties listed, or eligible for listing, in the National Register of Historic Places, the activity is not authorized, until the requirements of Section 106 of the National Historic Preservation Act (NHPA) have been satisfied.

(b) Federal permittees should follow their own procedures for complying with the requirements of Section 106 of the National Historic Preservation Act. Federal permittees must provide the district engineer with the appropriate documentation to demonstrate compliance with those requirements.

(c) Non-federal permittees must submit a pre-construction notification to the district engineer if the authorized activity may have the potential to cause effects to any historic properties listed, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places, including previously unidentified properties. For such activities, the pre-construction notification must state which historic properties may be affected by the proposed work or include a vicinity map indicating the location of the historic properties or the potential for the presence of historic properties. Assistance regarding information on the location of or potential for the presence of historic resources can be sought from the State

Federal Register / Vol. 72, No. 47 / Monday, March 12, 2007 / Notices          **11193**

Historic Preservation Officer or Tribal Historic Preservation Officer, as appropriate, and the National Register of Historic Places (see 33 CFR 330.4(g)). The district engineer shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey. Based on the information submitted and these efforts, the district engineer shall determine whether the proposed activity has the potential to cause an effect on the historic properties. Where the non-Federal applicant has identified historic properties which the activity may have the potential to cause effects and so notified the Corps, the non-Federal applicant shall not begin the activity until notified by the district engineer either that the activity has no potential to cause effects or that consultation under Section 106 of the NHPA has been completed.

(d) The district engineer will notify the prospective permittee within 45 days of receipt of a complete pre-construction notification whether NHPA Section 106 consultation is required. Section 106 consultation is not required when the Corps determines that the activity does not have the potential to cause effects on historic properties (see 36 CFR 800.3(a)). If NHPA section 106 consultation is required and will occur, the district engineer will notify the non-Federal applicant that he or she cannot begin work until Section 106 consultation is completed.

(e) Prospective permittees should be aware that section 110k of the NHPA (16 U.S.C. 470h–2(k)) prevents the Corps from granting a permit or other assistance to an applicant who, with intent to avoid the requirements of Section 106 of the NHPA, has intentionally significantly adversely affected a historic property to which the permit would relate, or having legal power to prevent it, allowed such significant adverse effect to occur, unless the Corps, after consultation with the Advisory Council on Historic Preservation (ACHP), determines that circumstances justify granting such assistance despite the adverse effect created or permitted by the applicant. If circumstances justify granting the assistance, the Corps is required to notify the ACHP and provide documentation specifying the circumstances, explaining the degree of damage to the integrity of any historic properties affected, and proposed mitigation. This documentation must include any views obtained from the applicant, SHPO/THPO, appropriate

Indian tribes if the undertaking occurs on or affects historic properties on tribal lands or affects properties of interest to those tribes, and other parties known to have a legitimate interest in the impacts to the permitted activity on historic properties.

19. *Designated Critical Resource Waters.* Critical resource waters include, NOAA-designated marine sanctuaries, National Estuarine Research Reserves, state natural heritage sites, and outstanding national resource waters or other waters officially designated by a state as having particular environmental or ecological significance and identified by the district engineer after notice and opportunity for public comment. The district engineer may also designate additional critical resource waters after notice and opportunity for comment.

(a) Discharges of dredged or fill material into waters of the United States are not authorized by NWPs 7, 12, 14, 16, 17, 21, 29, 31, 35, 39, 40, 42, 43, 44, 49, and 50 for any activity within, or directly affecting, critical resource waters, including wetlands adjacent to such waters.

(b) For NWPs 3, 8, 10, 13, 15, 18, 19, 22, 23, 25, 27, 28, 30, 33, 34, 36, 37, and 38, notification is required in accordance with general condition 27, for any activity proposed in the designated critical resource waters including wetlands adjacent to those waters. The district engineer may authorize activities under these NWPs only after it is determined that the impacts to the critical resource waters will be no more than minimal.

20. *Mitigation.* The district engineer will consider the following factors when determining appropriate and practicable mitigation necessary to ensure that adverse effects on the aquatic environment are minimal:

(a) The activity must be designed and constructed to avoid and minimize adverse effects, both temporary and permanent, to waters of the United States to the maximum extent practicable at the project site (i.e., on site).

(b) Mitigation in all its forms (avoiding, minimizing, rectifying, reducing, or compensating) will be required to the extent necessary to ensure that the adverse effects to the aquatic environment are minimal.

(c) Compensatory mitigation at a minimum one-for-one ratio will be required for all wetland losses that exceed $^1/_{10}$ acre and require pre-construction notification, unless the district engineer determines in writing that some other form of mitigation would be more environmentally appropriate and provides a project-

specific waiver of this requirement. For wetland losses of $^1/_{10}$ acre or less that require pre-construction notification, the district engineer may determine on a case-by-case basis that compensatory mitigation is required to ensure that the activity results in minimal adverse effects on the aquatic environment. Since the likelihood of success is greater and the impacts to potentially valuable uplands are reduced, wetland restoration should be the first compensatory mitigation option considered.

(d) For losses of streams or other open waters that require pre-construction notification, the district engineer may require compensatory mitigation, such as stream restoration, to ensure that the activity results in minimal adverse effects on the aquatic environment.

(e) Compensatory mitigation will not be used to increase the acreage losses allowed by the acreage limits of the NWPs. For example, if an NWP has an acreage limit of $^1/_2$ acre, it cannot be used to authorize any project resulting in the loss of greater than $^1/_2$ acre of waters of the United States, even if compensatory mitigation is provided that replaces or restores some of the lost waters. However, compensatory mitigation can and should be used, as necessary, to ensure that a project already meeting the established acreage limits also satisfies the minimal impact requirement associated with the NWPs.

(f) Compensatory mitigation plans for projects in or near streams or other open waters will normally include a requirement for the establishment, maintenance, and legal protection (e.g., conservation easements) of riparian areas next to open waters. In some cases, riparian areas may be the only compensatory mitigation required. Riparian areas should consist of native species. The width of the required riparian area will address documented water quality or aquatic habitat loss concerns. Normally, the riparian area will be 25 to 50 feet wide on each side of the stream, but the district engineer may require slightly wider riparian areas to address documented water quality or habitat loss concerns. Where both wetlands and open waters exist on the project site, the district engineer will determine the appropriate compensatory mitigation (e.g., riparian areas and/or wetlands compensation) based on what is best for the aquatic environment on a watershed basis. In cases where riparian areas are determined to be the most appropriate form of compensatory mitigation, the district engineer may waive or reduce the requirement to provide wetland

compensatory mitigation for wetland losses.

(g) Permittees may propose the use of mitigation banks, in-lieu fee arrangements or separate activity-specific compensatory mitigation. In all cases, the mitigation provisions will specify the party responsible for accomplishing and/or complying with the mitigation plan.

(h) Where certain functions and services of waters of the United States are permanently adversely affected, such as the conversion of a forested or scrub-shrub wetland to a herbaceous wetland in a permanently maintained utility line right-of-way, mitigation may be required to reduce the adverse effects of the project to the minimal level.

21. *Water Quality.* Where States and authorized Tribes, or EPA where applicable, have not previously certified compliance of an NWP with CWA Section 401, individual 401 Water Quality Certification must be obtained or waived (see 33 CFR 330.4(c)). The district engineer or State or Tribe may require additional water quality management measures to ensure that the authorized activity does not result in more than minimal degradation of water quality.

22. *Coastal Zone Management.* In coastal states where an NWP has not previously received a state coastal zone management consistency concurrence, an individual state coastal zone management consistency concurrence must be obtained, or a presumption of concurrence must occur (see 33 CFR 330.4(d)). The district engineer or a State may require additional measures to ensure that the authorized activity is consistent with state coastal zone management requirements.

23. *Regional and Case-By-Case Conditions.* The activity must comply with any regional conditions that may have been added by the Division Engineer (see 33 CFR 330.4(e)) and with any case specific conditions added by the Corps or by the state, Indian Tribe, or U.S. EPA in its section 401 Water Quality Certification, or by the state in its Coastal Zone Management Act consistency determination.

24. *Use of Multiple Nationwide Permits.* The use of more than one NWP for a single and complete project is prohibited, except when the acreage loss of waters of the United States authorized by the NWPs does not exceed the acreage limit of the NWP with the highest specified acreage limit. For example, if a road crossing over tidal waters is constructed under NWP 14, with associated bank stabilization authorized by NWP 13, the maximum acreage loss of waters of the United

States for the total project cannot exceed ⅓-acre.

25. *Transfer of Nationwide Permit Verifications.* If the permittee sells the property associated with a nationwide permit verification, the permittee may transfer the nationwide permit verification to the new owner by submitting a letter to the appropriate Corps district office to validate the transfer. A copy of the nationwide permit verification must be attached to the letter, and the letter must contain the following statement and signature:

"When the structures or work authorized by this nationwide permit are still in existence at the time the property is transferred, the terms and conditions of this nationwide permit, including any special conditions, will continue to be binding on the new owner(s) of the property. To validate the transfer of this nationwide permit and the associated liabilities associated with compliance with its terms and conditions, have the transferee sign and date below."

_____
(Transferee)

_____
(Date)

26. *Compliance Certification.* Each permittee who received an NWP verification from the Corps must submit a signed certification regarding the completed work and any required mitigation. The certification form must be forwarded by the Corps with the NWP verification letter and will include:

(a) A statement that the authorized work was done in accordance with the NWP authorization, including any general or specific conditions;

(b) A statement that any required mitigation was completed in accordance with the permit conditions; and

(c) The signature of the permittee certifying the completion of the work and mitigation.

27. *Pre-Construction Notification.* (a) *Timing.* Where required by the terms of the NWP, the prospective permittee must notify the district engineer by submitting a pre-construction notification (PCN) as early as possible. The district engineer must determine if the PCN is complete within 30 calendar days of the date of receipt and, as a general rule, will request additional information necessary to make the PCN complete only once. However, if the prospective permittee does not provide all of the requested information, then the district engineer will notify the prospective permittee that the PCN is still incomplete and the PCN review

process will not commence until all of the requested information has been received by the district engineer. The prospective permittee shall not begin the activity:

(1) Until notified in writing by the district engineer that the activity may proceed under the NWP with any special conditions imposed by the district or division engineer; or

(2) If 45 calendar days have passed from the district engineer's receipt of the complete PCN and the prospective permittee has not received written notice from the district or division engineer. However, if the permittee was required to notify the Corps pursuant to general condition 17 that listed species or critical habitat might be affected or in the vicinity of the project, or to notify the Corps pursuant to general condition 18 that the activity may have the potential to cause effects to historic properties, the permittee cannot begin the activity until receiving written notification from the Corps that is "no effect" on listed species or "no potential to cause effects" on historic properties, or that any consultation required under Section 7 of the Endangered Species Act (see 33 CFR 330.4(f)) and/or Section 106 of the National Historic Preservation (see 33 CFR 330.4(g)) is completed. Also, work cannot begin under NWPs 21, 49, or 50 until the permittee has received written approval from the Corps. If the proposed activity requires a written waiver to exceed specified limits of an NWP, the permittee cannot begin the activity until the district engineer issues the waiver. If the district or division engineer notifies the permittee in writing that an individual permit is required within 45 calendar days of receipt of a complete PCN, the permittee cannot begin the activity until an individual permit has been obtained. Subsequently, the permittee's right to proceed under the NWP may be modified, suspended, or revoked only in accordance with the procedure set forth in 33 CFR 330.5(d)(2).

(b) *Contents of Pre-Construction Notification:* The PCN must be in writing and include the following information:

(1) Name, address and telephone numbers of the prospective permittee;

(2) Location of the proposed project;

(3) A description of the proposed project; the project's purpose; direct and indirect adverse environmental effects the project would cause; any other NWP(s), regional general permit(s), or individual permit(s) used or intended to be used to authorize any part of the proposed project or any related activity. The description should be sufficiently detailed to allow the district engineer to

determine that the adverse effects of the project will be minimal and to determine the need for compensatory mitigation. Sketches should be provided when necessary to show that the activity complies with the terms of the NWP. (Sketches usually clarify the project and when provided result in a quicker decision.);

(4) The PCN must include a delineation of special aquatic sites and other waters of the United States on the project site. Wetland delineations must be prepared in accordance with the current method required by the Corps. The permittee may ask the Corps to delineate the special aquatic sites and other waters of the United States, but there may be a delay if the Corps does the delineation, especially if the project site is large or contains many waters of the United States. Furthermore, the 45 day period will not start until the delineation has been submitted to or completed by the Corps, where appropriate;

(5) If the proposed activity will result in the loss of greater than $\frac{1}{10}$ acre of wetlands and a PCN is required, the prospective permittee must submit a statement describing how the mitigation requirement will be satisfied. As an alternative, the prospective permittee may submit a conceptual or detailed mitigation plan.

(6) If any listed species or designated critical habitat might be affected or is in the vicinity of the project, or if the project is located in designated critical habitat, for non-Federal applicants the PCN must include the name(s) of those endangered or threatened species that might be affected by the proposed work or utilize the designated critical habitat that may be affected by the proposed work. Federal applicants must provide documentation demonstrating compliance with the Endangered Species Act; and

(7) For an activity that may affect a historic property listed on, determined to be eligible for listing on, or potentially eligible for listing on, the National Register of Historic Places, for non-Federal applicants the PCN must state which historic property may be affected by the proposed work or include a vicinity map indicating the location of the historic property. Federal applicants must provide documentation demonstrating compliance with Section 106 of the National Historic Preservation Act.

(c) *Form of Pre-Construction Notification:* The standard individual permit application form (Form ENG 4345) may be used, but the completed application form must clearly indicate that it is a PCN and must include all of the information required in paragraphs (b)(1) through (7) of this general condition. A letter containing the required information may also be used.

(d) *Agency Coordination:* (1) The district engineer will consider any comments from Federal and state agencies concerning the proposed activity's compliance with the terms and conditions of the NWPs and the need for mitigation to reduce the project's adverse environmental effects to a minimal level.

(2) For all NWP 48 activities requiring pre-construction notification and for other NWP activities requiring pre-construction notification to the district engineer that result in the loss of greater than ½-acre of waters of the United States, the district engineer will immediately provide (e.g., via facsimile transmission, overnight mail, or other expeditious manner) a copy of the PCN to the appropriate Federal or state offices (U.S. FWS, state natural resource or water quality agency, EPA, State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Office (THPO), and, if appropriate, the NMFS). With the exception of NWP 37, these agencies will then have 10 calendar days from the date the material is transmitted to telephone or fax the district engineer notice that they intend to provide substantive, site-specific comments. If so contacted by an agency, the district engineer will wait an additional 15 calendar days before making a decision on the pre-construction notification. The district engineer will fully consider agency comments received within the specified time frame, but will provide no response to the resource agency, except as provided below. The district engineer will indicate in the administrative record associated with each pre-construction notification that the resource agencies' concerns were considered. For NWP 37, the emergency watershed protection and rehabilitation activity may proceed immediately in cases where there is an unacceptable hazard to life or a significant loss of property or economic hardship will occur. The district engineer will consider any comments received to decide whether the NWP 37 authorization should be modified, suspended, or revoked in accordance with the procedures at 33 CFR 330.5.

(3) In cases of where the prospective permittee is not a Federal agency, the district engineer will provide a response to NMFS within 30 calendar days of receipt of any Essential Fish Habitat conservation recommendations, as required by Section 305(b)(4)(B) of the Magnuson-Stevens Fishery Conservation and Management Act.

(4) Applicants are encouraged to provide the Corps multiple copies of pre-construction notifications to expedite agency coordination.

(5) For NWP 48 activities that require reporting, the district engineer will provide a copy of each report within 10 calendar days of receipt to the appropriate regional office of the NMFS.

(e) *District Engineer's Decision:* In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest. If the proposed activity requires a PCN and will result in a loss of greater than $\frac{1}{10}$ acre of wetlands, the prospective permittee should submit a mitigation proposal with the PCN. Applicants may also propose compensatory mitigation for projects with smaller impacts. The district engineer will consider any proposed compensatory mitigation the applicant has included in the proposal in determining whether the net adverse environmental effects to the aquatic environment of the proposed work are minimal. The compensatory mitigation proposal may be either conceptual or detailed. If the district engineer determines that the activity complies with the terms and conditions of the NWP and that the adverse effects on the aquatic environment are minimal, after considering mitigation, the district engineer will notify the permittee and include any conditions the district engineer deems necessary. The district engineer must approve any compensatory mitigation proposal before the permittee commences work. If the prospective permittee elects to submit a compensatory mitigation plan with the PCN, the district engineer will expeditiously review the proposed compensatory mitigation plan. The district engineer must review the plan within 45 calendar days of receiving a complete PCN and determine whether the proposed mitigation would ensure no more than minimal adverse effects on the aquatic environment. If the net adverse effects of the project on the aquatic environment (after consideration of the compensatory mitigation proposal) are determined by the district engineer to be minimal, the district engineer will provide a timely written response to the applicant. The response will state that the project can proceed under the terms and conditions of the NWP.

If the district engineer determines that the adverse effects of the proposed work are more than minimal, then the district engineer will notify the applicant either: (1) That the project does not qualify for authorization under the NWP and instruct the applicant on the procedures to seek authorization under an individual permit; (2) that the project is authorized under the NWP subject to the applicant's submission of a mitigation plan that would reduce the adverse effects on the aquatic environment to the minimal level; or (3) that the project is authorized under the NWP with specific modifications or conditions. Where the district engineer determines that mitigation is required to ensure no more than minimal adverse effects occur to the aquatic environment, the activity will be authorized within the 45-day PCN period. The authorization will include the necessary conceptual or specific mitigation or a requirement that the applicant submit a mitigation plan that would reduce the adverse effects on the aquatic environment to the minimal level. When mitigation is required, no work in waters of the United States may occur until the district engineer has approved a specific mitigation plan.

28. *Single and Complete Project.* The activity must be a single and complete project. The same NWP cannot be used more than once for the same single and complete project.

*D. Further Information*

1. District Engineers have authority to determine if an activity complies with the terms and conditions of an NWP.

2. NWPs do not obviate the need to obtain other federal, state, or local permits, approvals, or authorizations required by law.

3. NWPs do not grant any property rights or exclusive privileges.

4. NWPs do not authorize any injury to the property or rights of others.

5. NWPs do not authorize interference with any existing or proposed Federal project.

*E. Definitions*

*Best management practices (BMPs):* Policies, practices, procedures, or structures implemented to mitigate the adverse environmental effects on surface water quality resulting from development. BMPs are categorized as structural or non-structural.

*Compensatory mitigation:* The restoration, establishment (creation), enhancement, or preservation of aquatic resources for the purpose of compensating for unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved.

*Currently serviceable:* Useable as is or with some maintenance, but not so degraded as to essentially require reconstruction.

*Discharge:* The term "discharge" means any discharge of dredged or fill material and any activity that causes or results in such a discharge.

*Enhancement:* The manipulation of the physical, chemical, or biological characteristics of an aquatic resource to heighten, intensify, or improve a specific aquatic resource function(s). Enhancement results in the gain of selected aquatic resource function(s), but may also lead to a decline in other aquatic resource function(s). Enhancement does not result in a gain in aquatic resource area.

*Ephemeral stream:* An ephemeral stream has flowing water only during, and for a short duration after, precipitation events in a typical year. Ephemeral stream beds are located above the water table year-round. Groundwater is not a source of water for the stream. Runoff from rainfall is the primary source of water for stream flow.

*Establishment (creation):* The manipulation of the physical, chemical, or biological characteristics present to develop an aquatic resource that did not previously exist at an upland site. Establishment results in a gain in aquatic resource area.

*Historic Property:* Any prehistoric or historic district, site (including archaeological site), building, structure, or other object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior. This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria (36 CFR part 60).

*Independent utility:* A test to determine what constitutes a single and complete project in the Corps regulatory program. A project is considered to have independent utility if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility.

*Intermittent stream:* An intermittent stream has flowing water during certain times of the year, when groundwater provides water for stream flow. During dry periods, intermittent streams may not have flowing water. Runoff from rainfall is a supplemental source of water for stream flow.

*Loss of waters of the United States:* Waters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity. Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody. The acreage of loss of waters of the United States is a threshold measurement of the impact to jurisdictional waters for determining whether a project may qualify for an NWP; it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services. The loss of stream bed includes the linear feet of stream bed that is filled or excavated. Waters of the United States temporarily filled, flooded, excavated, or drained, but restored to pre-construction contours and elevations after construction, are not included in the measurement of loss of waters of the United States. Impacts resulting from activities eligible for exemptions under Section 404(f) of the Clean Water Act are not considered when calculating the loss of waters of the United States.

*Non-tidal wetland:* A non-tidal wetland is a wetland that is not subject to the ebb and flow of tidal waters. The definition of a wetland can be found at 33 CFR 328.3(b). Non-tidal wetlands contiguous to tidal waters are located landward of the high tide line (i.e., spring high tide line).

*Open water:* For purposes of the NWPs, an open water is any area that in a year with normal patterns of precipitation has water flowing or standing above ground to the extent that an ordinary high water mark can be determined. Aquatic vegetation within the area of standing or flowing water is either non-emergent, sparse, or absent. Vegetated shallows are considered to be open waters. Examples of "open waters" include rivers, streams, lakes, and ponds.

*Ordinary High Water Mark:* An ordinary high water mark is a line on the shore established by the fluctuations of water and indicated by physical characteristics, or by other appropriate means that consider the characteristics of the surrounding areas (see 33 CFR 328.3(e)).

*Perennial stream:* A perennial stream has flowing water year-round during a typical year. The water table is located above the stream bed for most of the year. Groundwater is the primary source of water for stream flow. Runoff from rainfall is a supplemental source of water for stream flow.

*Practicable:* Available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

*Pre-construction notification:* A request submitted by the project proponent to the Corps for confirmation that a particular activity is authorized by nationwide permit. The request may be a permit application, letter, or similar document that includes information about the proposed work and its anticipated environmental effects. Pre-construction notification may be required by the terms and conditions of a nationwide permit, or by regional conditions. A pre-construction notification may be voluntarily submitted in cases where pre-construction notification is not required and the project proponent wants confirmation that the activity is authorized by nationwide permit.

*Preservation:* The removal of a threat to, or preventing the decline of, aquatic resources by an action in or near those aquatic resources. This term includes activities commonly associated with the protection and maintenance of aquatic resources through the implementation of appropriate legal and physical mechanisms. Preservation does not result in a gain of aquatic resource area or functions.

*Re-establishment:* The manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former aquatic resource. Re-establishment results in rebuilding a former aquatic resource and results in a gain in aquatic resource area.

*Rehabilitation:* The manipulation of the physical, chemical, or biological characteristics of a site with the goal of repairing natural/historic functions to a degraded aquatic resource. Rehabilitation results in a gain in aquatic resource function, but does not result in a gain in aquatic resource area.

*Restoration:* The manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former or degraded aquatic resource. For the purpose of tracking net gains in aquatic resource area, restoration is divided into two categories: Re-establishment and rehabilitation.

*Riffle and pool complex:* Riffle and pool complexes are special aquatic sites under the 404(b)(1) Guidelines. Riffle and pool complexes sometimes characterize steep gradient sections of streams. Such stream sections are recognizable by their hydraulic characteristics. The rapid movement of water over a course substrate in riffles results in a rough flow, a turbulent surface, and high dissolved oxygen levels in the water. Pools are deeper areas associated with riffles. A slower stream velocity, a streaming flow, a smooth surface, and a finer substrate characterize pools.

*Riparian areas:* Riparian areas are lands adjacent to streams, lakes, and estuarine-marine shorelines. Riparian areas are transitional between terrestrial and aquatic ecosystems, through which surface and subsurface hydrology connects waterbodies with their adjacent uplands. Riparian areas provide a variety of ecological functions and services and help improve or maintain local water quality. (See general condition 20.)

*Shellfish seeding:* The placement of shellfish seed and/or suitable substrate to increase shellfish production. Shellfish seed consists of immature individual shellfish or individual shellfish attached to shells or shell fragments (i.e., spat on shell). Suitable substrate may consist of shellfish shells, shell fragments, or other appropriate materials placed into waters for shellfish habitat.

*Single and complete project:* The term "single and complete project" is defined at 33 CFR 330.2(i) as the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers. A single and complete project must have independent utility (see definition). For linear projects, a "single and complete project" is all crossings of a single water of the United States (i.e., a single waterbody) at a specific location. For linear projects crossing a single waterbody several times at separate and distant locations, each crossing is considered a single and complete project. However, individual channels in a braided stream or river, or individual arms of a large, irregularly shaped wetland or lake, etc., are not separate waterbodies, and crossings of such features cannot be considered separately.

*Stormwater management:* Stormwater management is the mechanism for controlling stormwater runoff for the purposes of reducing downstream erosion, water quality degradation, and flooding and mitigating the adverse effects of changes in land use on the aquatic environment.

*Stormwater management facilities:* Stormwater management facilities are those facilities, including but not limited to, stormwater retention and detention ponds and best management practices, which retain water for a period of time to control runoff and/or improve the quality (i.e., by reducing the concentration of nutrients, sediments, hazardous substances and other pollutants) of stormwater runoff.

*Stream bed:* The substrate of the stream channel between the ordinary high water marks. The substrate may be bedrock or inorganic particles that range in size from clay to boulders. Wetlands contiguous to the stream bed, but outside of the ordinary high water marks, are not considered part of the stream bed.

*Stream channelization:* The manipulation of a stream's course, condition, capacity, or location that causes more than minimal interruption of normal stream processes. A channelized stream remains a water of the United States.

*Structure:* An object that is arranged in a definite pattern of organization. Examples of structures include, without limitation, any pier, boat dock, boat ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, permanent mooring structure, power transmission line, permanently moored floating vessel, piling, aid to navigation, or any other manmade obstacle or obstruction.

*Tidal wetland:* A tidal wetland is a wetland (i.e., water of the United States) that is inundated by tidal waters. The definitions of a wetland and tidal waters can be found at 33 CFR 328.3(b) and 33 CFR 328.3(f), respectively. Tidal waters rise and fall in a predictable and measurable rhythm or cycle due to the gravitational pulls of the moon and sun. Tidal waters end where the rise and fall of the water surface can no longer be practically measured in a predictable rhythm due to masking by other waters, wind, or other effects. Tidal wetlands are located channelward of the high tide line, which is defined at 33 CFR 328.3(d).

*Vegetated shallows:* Vegetated shallows are special aquatic sites under the 404(b)(1) Guidelines. They are areas that are permanently inundated and under normal circumstances have rooted aquatic vegetation, such as seagrasses in marine and estuarine systems and a variety of vascular rooted plants in freshwater systems.

*Waterbody:* For purposes of the NWPs, a waterbody is a jurisdictional

**11198**     **Federal Register** / Vol. 72, No. 47 / Monday, March 12, 2007 / Notices

water of the United States that, during a year with normal patterns of precipitation, has water flowing or standing above ground to the extent that an ordinary high water mark (OHWM) or other indicators of jurisdiction can be determined, as well as any wetland area (see 33 CFR 328.3(b)). If a jurisdictional wetland is adjacent—meaning bordering, contiguous, or neighboring— to a jurisdictional waterbody displaying an OHWM or other indicators of jurisdiction, that waterbody and its adjacent wetlands are considered together as a single aquatic unit (see 33 CFR 328.4(c)(2)). Examples of "waterbodies" include streams, rivers, lakes, ponds, and wetlands.

[FR Doc. E7–3960 Filed 3–9–07; 8:45 am]

BILLING CODE 3710–92–P

## SELF-CERTIFICATION STATEMENT OF COMPLIANCE

### Permit Number: SAJ-2008-1150 (NW-TEH)

Permittee's Name & Address (please print or type): _____

_____

_____

Telephone Number: _____

Location of the Work: _____

_____

Date Work Started: _____ Date Work Completed: _____

Description of the Work (e.g., bank stabilization, residential or commercial filling, docks, dredging, etc.): _____

_____

_____

Acreage or Square Feet of Impacts to Waters of the United States:
_____

Describe Mitigation completed (if applicable): _____

_____

_____

Describe any Deviations from Permit (attach drawing(s) depicting the deviations): _____

_____

_____

                    * * * * * * * * * * * * * * * * * * * *
I certify that all work, and mitigation (if applicable) was done in accordance with the limitations and conditions as described in the permit. Any deviations as described above are depicted on the attached drawing(s).


                            _____
                            Signature of Permittee


                            _____
                            Date

# EXHIBIT 3

CESAJ-RD-SW-T  (1145B)                          28 April 2008
SAJ-2008-1150 (NW-TEH)

MEMORANDUM FOR RECORD

SUBJECT:  Statement of Findings/Environmental Assessment/Finding
of No Significant Impact/Public Interest Determination

1.  For each of the reissued and new Nationwide Permits (NWP),
HQUSACE issued a decision document that contains an Environmental
Assessment (EA), Statement of Findings, public interest review,
and as appropriate, a Section 404(b)(1) Guidelines analysis.  The
Office of the Chief of Engineers has determined that division and
district engineers will impose, as necessary, additional
conditions on the NWP authorization or exercise discretionary
authority to address locally important factors relating to the
public interest, including any potential adverse effects on the
human environment, and to ensure that the authorized activity
results in no more than minimal individual and cumulative adverse
effects on the environment.  Supplemental documentation was
prepared for the Division Engineer to address the individual and
cumulative effects of the NWP(s) on local resources.  On
12 July 2007, the supplemental documentation was issued by the
Division Engineer and the Jacksonville District's proposed
regional conditions were approved.  Where required by the terms
of the permit, general conditions, and/or regional conditions,
the Jacksonville District will continue to perform case-specific
review to ensure that the NWP will authorize only activities with
no more than minimal individual and cumulative adverse effects on
the environment and those activities will not be contrary to the
public interest.

2.  Name and address of applicant:

FDOT District 7
11201 N. McKinley Dr.
Tampa, FL  33612-0000

3.  Project Background:  In 1998, the Corps authorized FDOT to
discharge fill in wetlands in the vicinity of the Cypress Creek
Town Center (CCTC) project in connection with the construction of
State Road 56 to 6 lanes (SAJ-1995-0079).  The road was built and
the FDOT permit expired in 2003.  On 15 May 07, the Corps
authorized fill in wetlands for construction of the adjacent CCTC
project (SAJ-2003-2336).  After issuance of the CCTC permit, FDOT
purchased a portion of the CCTC property for expansion of the SR
56 right-of-way.  Therefore, of the 0.248 acre of wetland impact
proposed by FDOT with this application, 0.224 acre was previously
authorized under the CCTC permit.  Since FDOT now owns this

CESAJ-RD-SW-T   (1145b)
SUBJECT:  Statement of Findings/Environmental Assessment/Finding
of No Significant Impact/Public Interest Determination

additional right-of-way, FDOT is required to secure a Corps
permit for the entire 0.248 acre of impact, even though a portion
of the area was previously permitted under the CCTC project.

4.  Project description:  The proposed work includes impacts to
three wetlands.  At Wetland W4, the proposed work requires
impacts to 0.031 acre of waters of the United States.  On the
south side of SR 56, the impact is required to provide piping to
convey water that formerly traveled through Wetland J (which has
now been filled at its northern tip as part of the CCTC project).
On the north side of SR 56, the impact at W4 is required to
install concrete pipes, headwall, and riprap at the outlet of the
"smart box."  The "smart box" is the drainage structure that
conveys the first inch of storm water runoff to the FDOT Pond 20
and routes the excess water under SR 56 and into piping that
exits into Wetland J adjacent to Pond 20.

Impacts at Wetlands W7 and W8 include grading for roadside
ditches and side slope tie-in fill, requiring impacts to 0.217
acre of waters of the United States.

This activity meets the terms and conditions for authorization
under Nationwide Permit 14, as published in the 12 March 2007,
issue of the Federal Register (72 FR 11092).

|  | Proposed (Previously authorized by Corps permit SAJ-2003-2336)  (ac) | Proposed (No previous Corps permits)  (ac) | Total |
|---|---|---|---|
| W4 | 0.013 | 0.018 | 0.031 |
| W7 | 0.048 | 0.000 | 0.048 |
| W8 | 0.163 | 0.006 | 0.169 |
| TOTAL | 0.224 | 0.024 | 0.248 |

5.  Project location:  The project is located immediately
adjacent to the existing State Road 56, between its intersection
with County Road 54 and the southbound on/off ramps at
Interstate 75.  The project lies within Section 27 of Township 26
South and Range 19 East, Pasco County, Florida.

6.  Existing site conditions:  The project area consists of
herbaceous wetlands immediately adjacent to the existing State
Road 56.  At the W4 and W7 impact sites, the proposed impact
areas consist of undisturbed wetlands that have not been filled.
At the W8 impact site, the proposed wetland impacts previously

2

CESAJ-RD-SW-T   (1145b)
SUBJECT:   Statement of Findings/Environmental Assessment/Finding
of No Significant Impact/Public Interest Determination

authorized by the CCTC permit were partially disturbed by grading
activities prior to the CCTC permit suspension in February 2008.
The wetlands at the W8 impact site that were not included in the
CCTC permit remain undisturbed.

7.   Scope of Analysis:   The two areas of proposed wetland impact:
W4 and W7/W8.

8.   Alternatives:

Given the plans to elevate SR 56, at W7/W8, widening can no
longer occur to the interior of the existing 4 lanes.   This
interior area will now be used to allow for support piling for
the elevated structure.   This widening must now be accomplished
to the outside of the existing lanes.   Since wetlands lie on both
sides of the existing 4 lanes, wetland impacts were unavoidable.

FDOT recognized the need for additional drainage improvements
necessary to install the final 2 lanes along SR 56.   The drainage
improvements proposed by this application at W4 will provide
treatment for 23.29 acres of impervious pavement, whereas the
existing storm water system treats only 5.57 acres of impervious
pavement.   Therefore, the proposed work at W4 will result in an
improvement in water quality as compared to conditions that exist
today.   The no-action alternative would result in water of lower
water quality discharging into Wetland J.   Also, without the
proposed improvements, addition of the final 2 lanes would cause
potential flooding of a public roadway.

The "smart box" that will be placed at the northeast quadrant of
SR 56 and CR 54 will increase the level of storm water treatment.
It will route the first inch of storm water runoff to FDOT Pond
20 for treatment and send the remainder of flow under SR 56
through the culverts at W4 and into Wetland J.   Without the
proposed impacts at W4, there would be no piping in place to
transfer excess flows to Wetland J, rendering installation of the
"smart box" infeasible.   Therefore, the impacts at W4 are
necessary to provide the increased treatment offered at FDOT Pond
20 and will result in improved water quality.

This project is necessary to prevent flooding of State Road 56
and the urgency is evident given the expected rainfall events
associated with the approaching spring/summer wet season.   A
rainfall event exceeding 7 inches (or a 10-year event) over an
8-hour period could currently flood the roadway and endanger
public safety.

3

CESAJ-RD-SW-T   (1145b)
SUBJECT:  Statement of Findings/Environmental Assessment/Finding
of No Significant Impact/Public Interest Determination


The Corps examined the alternative of removing the fill within
Wetland J on the CCTC project site to restore previous flows and
alleviate the threat of flooding.  If this were done, it would
negate the need for the impact at W4 that lies on the south side
of SR 56.  However, this alternative would take several months to
accomplish.  Local and state permits would be required and the
earthwork would then take additional time to construct and
stabilize.  Given the realities of the existing conditions at
CCTC and the onset of the rainy season, removal of fill within
Wetland J is not practicable.

Also, see Decision Document for Nationwide Permit 14, which was
approved by the Director of Civil Works on 1 March 2007 and
Supplemental Environmental Assessment for Nationwide Permit 14,
which was approved by the South Atlantic Division Commander on
12 July 2007.

9.  Evaluation of the potential adverse environmental effects
(direct, indirect, and cumulative) of the proposed activity:  See
Decision Document for Nationwide Permit 14, which was approved by
the Director of Civil Works on 1 March 2007, and Supplemental
Environmental Assessment for Nationwide Permit 14, which was
approved by the South Atlantic Division Commander on
12 July 2007.

10.  Mitigation required to ensure that the activity being
verified by the U.S. Army Corps of Engineers (Corps) will have no
more than minimal adverse effect on environment:  Use of the
Unified Mitigation Assessment Methodology yields a functional
loss of 0.11 unit for the proposed 0.248 acres of impact.  To
compensate for this loss, Sierra Properties/CCTC has agreed to
allow FDOT to use 0.11 unit of functional gain previously
approved by the Corps under the CCTC permit.  Specifically,
0.26 acre of wetland creation area M-3 has been designated as
mitigation for this FDOT project.  By agreement, the entirety of
M-3 (8.27 acres total) will continue to be managed and maintained
by Sierra Properties.  Sierra Properties has committed to the
continued management and maintenance of mitigation area M-3 in
the event the CCTC permit is revoked or modified (the CCTC permit
is currently suspended).  Mitigation area M-3 has already been
constructed and planted.

11.  Other Federal, State, and Local Authorizations Obtained or
Required and Pending:

    a.  Clean Water Act Section 401 Water Quality Certification
(WQC): The 0.248-acre project area has been granted Water Quality
Certification under 3 Southwest Florida Water Management District

4

CESAJ-RD-SW-T   (1145b)
SUBJECT:   Statement of Findings/Environmental Assessment/Finding
of No Significant Impact/Public Interest Determination


(SWFWMD) Environmental Resource Permits:  44012944.012 issued on
10 April 2008, 44012944.010 issued on 7 September 2007, and
43026931.001 issued on 30 January 2007.

    b.   Coastal Zone Management (CZM) consistency certification:
There is no evidence or indication from the State of Florida that
the project is inconsistent with the Florida Coastal Zone
Management Plan.   Issuance of a SWFWMD permit certifies that the
project is consistent with the CZM plan.

    c.   Endangered Species Act compliance:  On 31 March 2008, the
Corps initiated informal consultation with U.S. Fish and Wildlife
Service (USFWS).   The majority of the area subject to this permit
(i.e., 0.224 acre out of a total of 0.248 acre) falls within the
area that was surveyed for wildlife from 2002-2005 as part of the
CCTC property.   The remaining 0.024 acres is immediately adjacent
acreage of similar habitat.   The Corps concluded that the project
would have no effect on the scrub jay or West Indian manatee
since the project area does not contain suitable habitat.   Based
on the replacement of wood stork foraging habitat within the
creation mitigation area, the Corps concluded that the project
may affect, but is not likely to adversely affect, the wood
stork.   No eastern indigo snakes were encountered during the
2002-2005 wildlife surveys.   In addition, Corps staff have
visited the site multiple times from 2005-2008 and have not
encountered eastern indigo snakes.   Moreover, the 0.024-acre area
subject to this permit does not contain any gopher tortoise
burrows, such as those that may serve as refugia for Eastern
Indigo Snakes in more northern areas of its range.   To further
ensure against adverse effects in the unlikely event that any
Eastern Indigo Snakes is encountered, the applicant has agreed to
abide by the USFWS 2004 Standard Protection Measures for the
Eastern Indigo Snake.   Therefore, the Corps concluded--and FWS
has concurred--that the project may affect, but is not likely to
adversely affect, the eastern indigo snake. By electronic mail
transmitted on 8 April 2008, USFWS concurred with the above
determinations.


    d.   National Historic Preservation Act (NHPA) compliance:
NHPA concerns will be addressed by the placement of a special
condition in the verification letter advising Pemittees to
contact the State Historic Preservation Office prior to
initiating work and how to proceed should unexpected cultural
resources be encountered.

Version 1.1
Date:  27 Sep 07

CESAJ-RD-SW-T  (1145b)
SUBJECT:  Statement of Findings/Environmental Assessment/Finding
of No Significant Impact/Public Interest Determination

12.  Special Conditions:

   a. Within 60 days of completion of the work authorized, the
attached "Self-Certification Statement of Compliance" must be
completed and submitted to the U.S. Army Corps of Engineers.
Mail the completed form to the Regulatory Division, Enforcement
Section, Post Office Box 4970, Jacksonville, Florida 32232-0019.

   b. That the permittee will comply with the terms and conditions
of the 2004 Standard Protection Measures for the Eastern Indigo
Snake, attached.

   c. No structure or work shall adversely affect or disturb
properties listed in the National Register of Historic Places or
those eligible for inclusion in the National Register.  Prior to
the start of work, the Permittee or its agent, shall conduct a
search in the National Register Information System (NRIS).
Information can be found at
http://www.cr.nps.gov/nr/research/nris.htm.  Information on
properties eligible for inclusion in the National Register can be
identified by contacting the Florida Master File Office by email
at fmsfile@dos.state.fl.us or by telephone at
850-245-6440.

   If unexpected cultural resources are encountered at any time
within the project area that was not the subject of a previous
cultural resource assessment survey, work should cease in the
immediate vicinity of such discoveries.  The permittee, or other
party, should notify the SHPO immediately, as well as the
appropriate Army Corps of Engineers office.  After such
notifications, project activities should not resume without
verbal and/or written authorization from the SHPO.

   If unmarked human remains are encountered, all work shall
stop immediately, and the proper authorities notified in
accordance with Section 872.05, Florida Statutes, unless on
Federal lands.  After such notifications, project activities on
non-Federal lands shall not resume without verbal and/or written
authorization from the Florida State Archaeologist for finds
under his or her jurisdiction.

13.  Public interest review:  See Decision Document for
Nationwide Permit 14, which was approved by the Director of Civil
Works on 1 March 2007, and Supplemental Environmental Assessment
for Nationwide Permit 14, which was approved by the South
Atlantic Division Commander on 12 July 2007.

Version 1.1
Date:  27 Sep 07

CESAJ-RD-SW-T  (1145b)
SUBJECT:  Statement of Findings/Environmental Assessment/Finding
of No Significant Impact/Public Interest Determination

14.  Finding of No Significant Impact:  See Decision Document for
Nationwide Permit 14, which was approved by the Director of Civil
Works on 1 March 2007.

15.  Public Interest Determination:  This activity, if conducted
in accordance with the terms and conditions of the NWP and the
special conditions stated in the NWP verification letter, will
not be contrary to the public interest.

PREPARED BY:                          REVIEWED BY:

Tracy Hurst                           Charles A. Schnepel
PROJECT MANAGER                       CHIEF, TAMPA PERMITS SECTION

7