IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

SIERRA CLUB, *et al.*,

    Plaintiffs,

v.                Civ. No. 1:07-cv-01756 (RCL)

LT. GEN. ROBERT L. VAN ANTWERP,
in his official capacity as Chief of Engineers,
U.S. Army Corps of Engineers, *et al.*,

    Defendants,

  and

SIERRA PROPERTIES I, LLC, *et al.*,

    Intervening Defendants.

_____/

## NOTICE OF ADDITIONAL CORRECTIVE MEASURES

   Federal Defendants hereby give notice to the Court and Plaintiffs that, by letter dated May

16, 2008, the United States Army Corps of Engineers ("Corps") authorized additional corrective

measures, some of which will take place within previously filled jurisdictional wetlands, on the

Cypress Creek Town Center ("CCTC") project site.  See May 16, 2008 Declaration of T. Hurst

(attached as Ex. A).  The Corps has concluded that the corrective measures are necessary to

protect Cypress Creek and associated wetlands from potential discharges of turbid water that

could otherwise occur during the impending rainy season.  Id. ¶ 2.

   The above-captioned action challenges a Corps permit to fill wetlands under section 404

of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, for construction of the CCTC project,

outside of Tampa, Florida.  Plaintiffs allege the permit was issued in violation of the CWA, the

National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA").  See

Compl. (Dkt. No. 1).  On February 1, 2008, the Corps suspended the permit at issue, SAJ-2003-

2336, for unauthorized discharges of turbid water from the site.  See Notice of Permit Suspension

(Dkt. No. 40).  As a result of the suspension, Federal Defendants moved for a remand of the

permit to the Corps and to stay the briefing schedule.  See Motion for Remand and to Stay

Litigation ("Motion for Remand") (Dkt. No. 41); Motion to Stay or Extend Briefing Schedule

(Dkt. No. 42).  The parties are awaiting the Court's decision on both motions.

    As part of the suspension, the Corps  ordered a stop to construction activities in all areas

within the Corps' CWA section 404 jurisdiction, and ordered the permittee to undertake

"corrective actions for immediate assurance that additional offsite discharges will not occur."

Notice of Permit Suspension (Dkt. No. 40), at 3.  At the time of the suspension, all but 0.508 acre

of the 53.5 acres of wetlands authorized to be filled under the permit had been filled.  See April

29, 2008 Declaration of T. Hurst ¶ 6 (Dkt. No. 50-2).  The initial corrective measures that

involved work in jurisdictional areas were described in the Declaration of Thomas A. Farrell,

dated February 13, 2008, submitted in support of the Corps' Motion for Remand.  Feb. 13, 2008

Declaration of T. Farrell ¶ 4 (Dkt. No. 41-2).

    On April 29, 2008, the permittee requested authorization to undertake additional

corrective measures necessary to prevent discharges of turbid storm water from the site.  See May

16, 2008 Letter from Corps to J. Sierra (hereinafter "May 16, 2008 Approval Letter") (attached

as Ex. B).  Those measures would involve completion of the infrastructure for the storm water

management system and grading within the previously filled jurisdictional areas.  Id. at 2.  The

permittee's April 29, 2008 request analyzed alternative corrective measures, but concluded that

"[g]iven the existing site conditions, . . . the proposed action is the best option to stabilize the site." See May 16, 2008 Corps Memo re: Need for Additional Stabilization Measures at Cypress Creek Town Center Project Site (hereinafter "May 16, 2008 Memo"), at 3 (attached as Exhibit C).

The Corps evaluated the permittee's April 29, 2008 request and concurred that the proposed additional corrective measures are necessary to prevent additional turbid discharges to Cypress Creek and associated wetlands. Id. at 6. The Corps further concluded that "it is important for this work [on the corrective measures] to begin as soon as possible. The matter is urgent as the rainy season begins at the end of May." Id. at 4. Because the Corps' "primary objective is to provide the best protection possible to Cypress Creek and its associated wetlands," the Corps authorized the additional corrective measures outlined in the permittee's April 29, 2008 request, subject to several conditions. Id. at 4; see also May 16, 2008 Approval Letter.

The Corps' approval of the additional corrective measures is an interim action necessary to protect Cypress Creek and its associated wetlands and should not effect the Court's consideration of the Corps' Motion for Remand. The Corps intends to complete its investigation, undertake any necessary environmental reviews, issue a decision to modify, revoke, or reinstate the permit and take any appropriate enforcement action. See May 16, 2008 Approval Letter, at 2. As explained in the Corps' Motion for Remand, the Corps has a substantial and legitimate interest in investigating the circumstances leading to the permit suspension and considering whether they have any effect on the Corps' initial permitting decision. See Motion for Remand, at 9-10 (Dkt. No. 41). Further, if the Corps modifies or revokes the permit, some of Plaintiffs' claims may be rendered moot. Id. at 9. At a minimum, even if the Corps reinstates the permit,

the Court's evaluation of the issues raised in the litigation would benefit from the additional information and analyses the Corps is developing.

Plaintiffs are not prejudiced by the requested remand and stay or the Corps' instant action. The wetlands where some of the emergency corrective measures are to be undertaken were already filled prior to the suspension and thus the corrective measures will not cause any additional environmental harm. See May 16, 2008 Memo, at 2. In fact, the corrective measures are necessary to prevent the environmental harm that could occur if steps are not taken to prevent additional turbid discharges into Cypress Creek and associated wetlands. Id. at 6. Further, the Corps' approval limits the work authorized to only that which is necessary to implement the corrective measures. Id. at 6. Specifically, "[s]ite grading is limited to the minimum elevation required for the purpose of preventing unauthorized offsite discharges and may not include any impervious surface nor advancement of construction of the retail structures or facilities or infrastructure which support the retail structures." May 16, 2008 Approval Letter, at 1. Thus, the Corps has taken steps to insure that the additional corrective measures will not advance construction within the wetlands areas on site. May 16, 2008 Memo, at 6.

Finally, the Corps' approval of the corrective measures does not predetermine the outcome of its final action on the suspension. As the Corps explained in its May 16, 2008 approval letter, the approval

> does not limit our options to modify, revoke, or reaffirm the permit as part of our analysis under the permit suspension. Depending on the outcome of the Corps' investigation of the previous discharges, further project modifications, including but not limited to additional storm water treatment measures and modification of the storm water management system, may be required in the event that the Corps elects to reinstate the permit. Alternatively, you may be required to restore the site if the Corps elects to revoke the permit after further review.

May 16, 2008 Approval Letter, at 2.

Although the Corps previously indicated that it would complete its review of the permit within three to six months, the Corps' ability to keep to that schedule has been hampered by a two-and-a- half month delay in receiving necessary technical reports from the permittee.  See id. at 2.  However, barring any additional delays, the Corps intends to complete its review within an additional three months (which is within the outer limits of its initial estimate provided to the Court in its Motion for Remand), and will advise the Court of any additional delays.  See May 16, 2008 Declaration of T. Hurst ¶ 3.

                    Respectfully submitted,


                    RONALD J. TENPAS
                    Assistant Attorney General
                    Environment & Natural Resources Division


Date:  _May 16, 2008 _____          By:____ /s/ Jessica O'Donnell_____

                    JESSICA O'DONNELL
                    D.C. Bar No. 473166
                    Trial Attorney
                    U.S. Department of Justice
                    Environment and Natural Resources Division
                    Environmental Defense Section
                    P.O. Box 23986
                    Washington, D.C. 20026-3986
                    Telephone:  (202) 305-085
                    Facsimile:  (202) 514-8865
                    jessica.odonnell@usdoj.gov

                    MARK A. BROWN
                    D.C. Bar No. 470050
                    Senior Trial Attorney
                    U.S. Department of Justice

                              -5-

Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0204
Facsimile: (202) 305-0275
mark.brown@usdoj.gov

KRISTOFOR R. SWANSON
Colo. Bar No. 39378
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone:  (202) 305-0248
Facsimile:  (202) 305-0274
kristofor.swanson@usdoj.gov

Of Counsel:

Dorothy L. Boardman
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019
Tel: (904) 232-1165
Fax: (904) 232-3692
E-mail:  Dorothy.L.Boardman@saj02.usace.army.mil

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SIERRA CLUB, et al.,                    )
                                        )
        Plaintiffs,                     )
                                        )
                v.                      )    Civ. No. 1:07-cv-
                                        )    01756 (RCL)
LT. GEN. ROBERT L. VAN ANTWERP, et al., )
                                        )
        Defendants,                     )
                                        )
        and                             )
                                        )
SIERRA PROPERTIES, et al.,              )
                                        )
        Intervening Defendants.         )
_____)

DECLARATION OF TRACY E. HURST

        I, Tracy E. Hurst, declare as follows:

        1.    I am a biologist in the South Permits Branch of the
Regulatory Division for the Jacksonville District of the U.S.
Army Corps of Engineers ("Corps"). My field office is located
at 10117 Princess Palm Avenue, Suite 120, Tampa, Florida, and
among my duties I am responsible for reviewing and evaluating
applications for Department of the Army permits under Section
404 of the Clean Water Act. I have been in this position since
20 March 2005. From 23 May 2004 to 19 March 2005, I held an
identical position in the Palm Beach Gardens field office of the
Regulatory Division of the Jacksonville District. From 14
January 2001 to 22 May 2004, I was a biologist for the Permits
Branch of the Regulatory Division for the Charleston District of
the Corps. From 28 August 2000 to 13 January 2001, I served as
a biologist in the Planning Division of the Louisville District
of the Corps. Prior to my employment with the Corps I was
employed by the Commonwealth of Kentucky for 3 years as a
biologist in the Division of Water, Department for Surface
Mining, and the Department of Fish and Wildlife Resources. I am
experienced in the evaluation of Department of the Army permit
applications for work in waters of the United States for
compliance with the National Environmental Policy Act,
Endangered Species Act, Magnuson Stevens Fishery Conservation

Act, and National Historic Preservation Act.  I hold a Bachelor of Science degree in Environmental Studies from Vanderbilt University and a Masters of Science degree in Forestry with a wildlife management specialization from the University of Kentucky.

2.     As part of the suspension of the Corps permit for Cypress Creek Town Center, the Corps required the Permittee to implement initial corrective measures to prevent future discharges of turbid water into Cypress Creek.  In declarations on 13 February 2008, the Corps informed the Court of the measures that were approved.  The purpose of this declaration is to inform the Court that the Corps has authorized additional corrective measures that include work within wetlands filled prior to permit suspension.  These measures include additional grading to establish positive drainage to facilitate vegetation of the site, installation of an outfall structure, additional berms, and a bermed containment area for additional storm water storage.  The Corps has concluded that approval of these measures prior to the onset of the rainy season is necessary to stabilize the site and prevent further turbid discharge into Cypress Creek and its associated wetlands.

3.     The Corps anticipates it will take 3 months to complete our review and issue a decision modifying, revoking, or reinstating the permit, unless additional delays in the receipt of necessary information from the Permittee or other unforeseen circumstances beyond the Corps' control arise.  This estimate conforms with the 3-6 month estimate provided to the Court on 13 February 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   16 May 2008

Signed by:

Tracy E. Hurst
Biologist
U.S. Army Corps of Engineers

# Exhibit B

CERTIFIED-RETURN RECEIPT REQUESTED



**DEPARTMENT OF THE ARMY**

JACKSONVILLE DISTRICT CORPS OF ENGINEERS

P. O. BOX 4970

JACKSONVILLE, FLORIDA 32232-0019

May 16, 2008

Regulatory Division
Special Projects/Enforcement Branch
Enforcement Section
SAJ-2003-2336 (IP-TEH)

Mr. John Sierra, Jr.
Sierra Properties
509 Guisando de Avila, Suite 200
Tampa, FL 33613

Dear Mr. Sierra:

The U.S. Army Corps of Engineers (Corps) has completed its review of your April 29, 2008, request to modify the previously approved stabilization measures at the Cypress Creek Town Center (CCTC) construction site.

You may proceed with the revised measures, some of which will involve work within the limits of jurisdictional wetlands filled prior to permit suspension, provided that:

1. Site grading is limited to the minimum elevation required for the purpose of preventing unauthorized offsite discharges and may not include any impervious surface nor advancement of construction of the retail structures or facilities or infrastructure which support the retail structures.

2. All dry areas of the site are stabilized with temporary cover (e.g. mulch, hay, soil tackifiers, etc.) within 7 days of this letter. All newly exposed dry areas shall be stabilized with temporary cover within 7 days of dry conditions. Temporary cover shall be maintained in any given area until grading activities are conducted in that area.

3. Grading and seeding is conducted in a phased approach within site drainage basins. Each graded area shall be seeded sufficiently to promote site stabilization within 7 days following stabilization grade.

-2-

4. You provide the Corps with the interim grading plan and
   weekly written progress reports.

Approval of your revised plan is based on our understanding and
your assertions that the revised measures, if fully implemented,
will prevent further unauthorized discharges into Cypress Creek.
Prevention of unauthorized discharges into Cypress Creek is the
sole responsibility of the Permittee. Should the revised plan
fail to prevent unauthorized discharges, you will be held
responsible and the Corps may require additional stabilization
measures. You should understand that the Corps' approval of the
revised plan, which entails completion of the infrastructure for
the storm water management system, does not limit our options to
modify, revoke, or reaffirm the permit as part of our analysis
under the permit suspension. Depending on the outcome of the
Corps' investigation of the previous discharges, further project
modifications, including but not limited to additional storm
water treatment measures and modification of the storm water
management system, may be required in the event that the Corps
elects to reinstate the permit. Alternatively, you may be
required to restore the site if the Corps elects to revoke the
permit after further review.

Consideration of reinstatement, modification, or revocation of
the suspended permit continues. Any decision to reinstate or
modify the permit will include a supplement to the Environmental
Assessment. Our decision has been delayed substantially given
that we received your final corrective measures and environmental
damage assessment on April 14, 2008, approximately 2 ½ months
after these materials were requested in concert with the permit
suspension. To further complicate our analysis, the final
corrective measures listed in the April 14, 2008 submittal are
modified by the revised stabilization measures presented in your
April 29, 2008 submittal. Also, as we have previously conveyed
to you, our action is contingent upon resolution of the ongoing
enforcement case and demonstration and reasonable assurance to
the Corps that the site stabilization measures will successfully
prevent additional unauthorized discharges.

We have also coordinated your revised stabilization measures
with the U.S. Fish and Wildlife Service. To ensure compliance
with their previous determinations pursuant to the Endangered
Species Act, you must continue to abide by the attached Standard
Protection Measures for the Eastern Indigo Snake.

-3-

If you have questions regarding this notice, please contact Thomas Farrell at the letterhead address or by telephone at 813.769.7072.

Sincerely,

Eric P. Summa
Chief, Enforcement Section

Enclosure

cc:

Steve Godley
Biological Resource Associates
3905 Crescent Park Drive
Riverview, FL 33578

Thomas P. Schmitz
The Richard E. Jacobs Group, Inc.
25425 Center Ridge Road
Cleveland, OH 44145-4122

Leonard F. Bartos P.W.S.
Environmental Regulation Manager
Brooksville Regulation Department
Southwest Florida Water Management District
2379 Broad Street (US Highway 41S)
Brooksville, Florida 34604 - 6899

Jessica Kleinfelter
Compliance & Enforcement Manager
FL Department of Environmental Protection NPDES Stormwater
Section
2600 Blair Stone Road, MS-2500 Tallahassee, Florida 32399-2400

Dorothy Boardman
Office of Counsel, USACE, Jacksonville

## STANDARD PROTECTION MEASURES FOR THE EASTERN INDIGO SNAKE

1.  An eastern indigo snake protection/education plan shall be developed by the applicant or requestor for all construction personnel to follow. The plan shall be provided to the Service for review and approval at least 30 days prior to any clearing activities. The educational materials for the plan may consist of a combination of posters, videos, pamphlets, and lectures (*e.g.*, an observer trained to identify eastern indigo snakes could use the protection/education plan to instruct construction personnel before any clearing activities occur). Informational signs should be posted throughout the construction site and along any proposed access road to contain the following information:

    a.  a description of the eastern indigo snake, its habits, and protection under Federal Law;
    b.  instructions not to injure, harm, harass or kill this species;
    c.  directions to cease clearing activities and allow the eastern indigo snake sufficient time to move away from the site on its own before resuming clearing; and,
    d.  telephone numbers of pertinent agencies to be contacted if a dead eastern indigo snake is encountered. The dead specimen should be thoroughly soaked in water and then frozen.

2.  If not currently authorized through an Incidental Take Statement in association with a Biological Opinion, only individuals who have been either authorized by a section 10(a)(1)(A) permit issued by the Service, or by the State of Florida through the Florida Fish Wildlife Conservation Commission (FWC) for such activities, are permitted to come in contact with an eastern indigo snake.

3.  An eastern indigo snake monitoring report must be submitted to the appropriate Florida Field Office within 60 days of the conclusion of clearing phases. The report should be submitted whether or not eastern indigo snakes are observed. The report should contain the following information:

    a.  any sightings of eastern indigo snakes and
    b.  other obligations required by the Florida Fish and Wildlife Conservation Commission, as stipulated in the permit.

Revised February 12, 2004

# Exhibit C

MEMORANDUM

TO:       FILE SAJ-2003-2336 (IP-TEH)

FROM:     TRACY HURST, CESAJ-RD-SW-T

DATE:     MAY 16, 2008

SUBJECT:  NEED FOR ADDITIONAL STABILIZATION MEASURES AT THE
          CYPRESS CREEK TOWN CENTER PROJECT SITE

---

The purpose of this memorandum is to explain the rationale
behind the Corps' approval of the additional initial
corrective measures proposed by the Cypress Creek Town
Center Permittee in correspondence dated April 29, 2008
(see attached "South Side Permit Exhibit" and "North Side
Permit Exhibit").

The Corps suspended the permit for Cypress Creek Town
Center on February 1, 2008, based on repeated turbid
discharges into Cypress Creek.  The suspension prohibited
any work within areas that had been delineated as waters of
the United States.  As part of the permit suspension, the
Permittee was required to implement initial corrective
actions to provide assurances that additional off-site
discharges would not occur.  On February 6, 2008, the
Permittee submitted an initial corrective measures plan.
This plan included, and the Corps approved, the following
measures:

    1. Raising the outfall weir elevations on the storm
       water ponds on the south side of the site so that
       additional storage volume was available.

    2. Construction of a berm around both the southern and
       northern portions of the site, allowing additional
       site storage of storm water within uplands.

    3. "Plugging" the pipe inlets into the storm water
       ponds on the southern portion of the site to allow
       for storage of flood waters in the uplands on the
       site.

    4. Sodding of unprotected berms.

   5. Alum treatment in storm water ponds to reduce
      turbidity to meet state water quality standards
      prior to controlled release of water.

On April 9, 2008, the Corps witnessed turbid water being
released from Pond E into Wetland P.  Although this water
travelled off-site through a culvert under Interstate 75
and into the wetland on the east side of the interstate,
the Corps could not locate any point where the turbid water
entered Cypress Creek.  Based on this release of turbid
water, the Corps questioned the efficacy of the previously
approved corrective measures and instructed the Permittee
to explore alternatives to preclude further turbid
discharges.

On April 14, 2008, the Corps learned that discharge noted
on April 9, 2008, was due solely to the failure to
effectively plug the pipe inlets to the storm water ponds
(#3 above).  The Permittee had planned to block the pipe
inlets with concrete masonry bulkheads, but was unable to
do so prior to the April 9, 2008 discharge as a result of
safety concerns.  Instead, earthen coffer dams were
constructed, which ultimately failed with heavy rain and
resulted in the April 9, 2008 discharge.  As of April 24,
2008, these masonry bulkheads had been installed and the
cofferdams removed.

With the masonry bulkheads in place, as well as all of the
other approved corrective measures, the Corps was of the
understanding that the site had been sufficiently
stabilized to prevent future discharges.  However, at a
meeting on April 24, 2008, the Permittee requested that the
Corps authorize additional stabilization measures,
involving work within waters of the United States that were
filled prior to permit suspension.  This request was
codified in the plan submitted by the Permittee on April
29, 2008.  It is the Corps' understanding that these
additional measures are needed to provide the storm water
storage and treatment necessary to accommodate the
impending rainy season which usually begins in Florida in
the latter half of May.  The Corps can only conclude that
the measures initially proposed on February 6, 2008, did
not consider the onset of the rainy season.

The Permittee demonstrated that the berm that was
previously approved by the Corps (and is in place today)
can contain 22.5 inches of rainfall, but not the 29 inches

of rainfall expected in an average rainy season.
Therefore, once rainfall accumulation within the bermed
area reaches 22.5 inches, the water would have to be pumped
into the storm water ponds.  However, the capacity of these
ponds is not sufficient to accept this water due to the
prolonged length of time it is taking to settle solids out
of the water to meet state water quality standards so that
it can be released.  The high turbidity in the ponds (and
all ponded water on site) is a function of exposed,
unvegetated clayey soils on the site that are prone to long
periods of suspension.  The only way to reduce this
turbidity, shorten settlement/treatment times, increase
releases, and improve storage capacity in the ponds is to
vegetate the site and prevent movement and suspension of
clayey soils in the first place.  The measures in the
Permittee's February 6, 2008, plan did not provide for
positive site drainage and progression of water into storm
water ponds, therefore much of the site contains ponded
water.  These ponded areas cannot be stabilized with
vegetation and are the primary source of suspended
sediments during rainfall events.

In the April 29, 2008, plan, the Permittee analyzed
alternatives to stabilize the site that would avoid or
minimize work within wetlands filled prior to the permit
suspension.  These alternatives included mobile filtration
systems and closed-loop recirculation systems combined with
a polymer application.  The Permittee found that the mobile
filtration systems could not treat the anticipated volume
of water during the rainy season.  The Permittee also found
that the recirculation system and polymer application may
not treat water sufficiently to meet state water quality
standards.  Neither alternative would resolve the source of
the turbidity, the exposed clayey soils.  Given existing
site conditions, it was determined that the measures
proposed in the April 29, 2008, plan are the best option to
stabilize the site.

The April 29, 2008, plan addresses the source of the
turbidity by allowing for positive site drainage through
additional grading on the site and placement of the
underground piping leading to the storm water ponds.  This
will allow ponded areas to dry, vegetation to become
established, and will minimize suspension of clayey
materials.  The result will be less turbid water entering
the ponds, allowing for regular releases of non-turbid
water.  Valves have been installed on the masonry bulkheads

to allow water to reach the storm water ponds.  There is also the added protection of being able to temporarily close the valves should the storm water ponds reach capacity.  As the pipe installation, grading, and stabilization activities are predicted to take over one month to complete, it is important that this work begin as soon as possible.  The matter is urgent given that the rainy season in Florida begins at the end of May.  The Corps' primary objective is to provide the best protection possible to Cypress Creek and its associated wetlands.

The April 29, 2008, plan also includes the installation of an outlet structure to release storm water from Wetland A on the northern portion of the site.  This impact was authorized in the Corps permit, but not constructed prior to permit suspension.  On the northern portion of the site, Pond A was designed to provide a portion of the treatment and Wetland A (and its associated sumps) provide a portion.  Water within Pond A, once treated, outfalls into Wetland A.  Therefore, the proposed outlet structure at Wetland A is the only route for water to leave the site.  Since this outlet structure is not in place, water is accumulating on the northern side of the site, contained by berms.  Anticipated rainfall could cause a breach of the constructed berms and release water into adjacent wetlands.  Therefore, the Corps finds it prudent to authorize construction of this outlet structure to prevent unauthorized discharges.

The April 29, 2008, plan also includes construction of an additional temporary berm to provide further protection to Mitigation Area 3 and a 31-acre bermed containment area for additional temporary storage capacity, both to be placed on the south side of the project as interim stabilization measures.

The Corps met with the South Florida Water Management District (SWFWMD) and the Florida Department of Environmental Protection on May 8, 2008, to discuss the Permittee's April 29, 2008 stabilization measures.  Both of these agencies have expressed their support of the outlined measures and acknowledged the need to further stabilize the site.

Corps staff have reviewed the revised stabilization plan in detail and have visited the site multiple times with representatives of the Permittee to assess whether the

proposed stabilization measures will be effective.  Civil
engineers retained by the Permittee have concluded that the
proposed stabilization measures "will allow the
stabilization of the former Corps jurisdictional areas and
dramatically reduce the potential for any further turbid
discharges to Cypress Creek".  Corps staff agree, but have
cautioned the Permittee that the Permittee remains
responsible in the event that unpermitted discharges occur
after completion of the proposed stabilization work.  In
addition, Corps staff have advised the Permitee that,
depending on the outcome of the Corps' investigation of the
previous discharges, further project modifications,
including but not limited to further storm water treatment
measures, may be required in the event that the Corps
elects to reinstate the permit.  Alternatively, the
Permittee may be required to restore the site if the Corps
elects to revoke the permit after further review.

Although our investigation of the unauthorized discharges
is still ongoing, we have made a preliminary determination
that discharges to date occurred as a result of human error
and construction sequencing.  There is no evidence to
suggest that the discharges were a result of a fault in the
design of storm water management system.  In the
May 8, 2008, meeting with SWFWMD, their staff stated that
the Environmental Resource Permit they issued for the site
remains valid, does not require modification, and that the
storm water management system design remains adequate.

The first discharges observed by the Corps on
July 31, 2007, and August 3, 2007, were a result of failed
sediment fences.  The Corps also notes that although site
construction began in early June 2007, construction of the
storm water facilities was not started until
August 24, 2007.  Commencement of site clearing and
construction activities prior to construction of storm
water facilities likely contributed to the July and
August 2007 discharges, as did inadequate best management
practices.

The discharge that occurred on January 24, 2008, also
appears to be a result of human error, compounded by a
5+ inch rain event at an unexpected time of year.  The
SWFWMD had instructed the Permittee to raise the height of
outlet structure at Pond D due to high water levels, but
the Permittee failed to do so.  Therefore, the additional
rainfall surpassed the capacity of Pond D.  The elevation

of this structure was raised shortly thereafter.  The
SWFWMD also noted that site water was being pumped into
Pond D on the date of discharge, further aggravating the
problem and contributing to the release of turbid water.

And finally, as explained above, the discharge noted on
April 9, 2008, was due to solely to the failure to
effectively plug the pipe inlets to the storm water ponds.

The Corps consulted with the U.S. Fish and Wildlife Service
(USFWS) regarding the additional stabilization measures
proposed.  The USFWS concluded that all previous
determinations pursuant to the Endangered Species Act
remain applicable, provided that the Permittee abide by
USFWS's Standard Protection Measures for the Eastern Indigo
Snake (see attached).

In summary, the Corps has approved the additional initial
corrective measures proposed by the Cypress Creek Town
Center Permittee in correspondence dated April 29, 2008,
based on our findings that these measures are necessary to
stabilize the site given the impending onset of the rainy
season.  The Corps has taken steps to ensure the corrective
measures do not advance construction within the wetland
portions of the site that were filled prior to permit
suspension.  The Permittee has acknowledged that areas
stabilized with temporary cover, as proposed, will need to
be stripped of grass to allow for paving and vertical
construction should the permit be reinstated.  Our approval
limits the work authorized to only that which is necessary
to implement the corrective measures.  Site grading is
limited to the minimum elevation required for the purpose
of preventing unauthorized offsite discharges and may not
include any impervious surface nor advancement of
construction of the retail structures or facilities or
infrastructure which support the retail structures.



WESLEY CHAPEL BLVD. (CR 54)
STATE ROAD 56
WETLAND H
NO WORK REQUIRED WITHIN WETLAND 'H'
EXISTING INTERIM OUTFALL SWALE FOR POND A
POND A
CS-A2
CS-A3
CS-A1
WETLAND A
POND B
CS-AB
WETLAND A-1
CONSTRUCT CS-AB
BERM H
CONSTRUCT REMAINDER OF OUTFALL SWALE FOR POND A
CONSTRUCT ORIGINAL DESIGN SWALE (TYP.)
WETLAND A
BERM A
FLOW PATH (TYP.)
AREA TO BE BROUGHT TO ORIGINAL DESIGN MASS-GRADE ELEVATION IN ORDER TO BE STABILIZED & PROVIDE POSITIVE DRAINAGE TO STORMWATER MANAGEMENT SYSTEM
ORIGINAL DESIGN MASS-GRADE ELEVATION (TYP.)
CONTAINMENT AREA
NO WORK REQUIRED WITHIN WETLAND 'F'
BERM E
WETLAND E
LEGEND
ACOE JURISDICTIONAL WETLAND & SURFACE WATER IMPACT AREAS COVERED UNDER SECTION 404 PERMIT
ACOE JURISDICTIONAL WETLAND & SURFACE WATER AREAS TO REMAIN
STORMWATER INFRASTRUCTURE REMAINING TO BE INSTALLED
EXISTING STORMSEWER INFRASTRUCTURE
EXISTING CONTAINMENT BERMS
WilsonMiller
CLIENT: PASCO 54, LTD.
PROJECT: CYPRESS CREEK TOWN CENTER
TITLE: NORTH SIDE PERMIT EXHIBIT
1 REVISED PER ACOE COMMENTS 05/15/08
DESIGNED BY: JLB/2231 04/08
CHECKED BY: JLB/2231 04/08
03560-100-000
03560-100

**STANDARD PROTECTION MEASURES FOR THE EASTERN INDIGO SNAKE**

1.      An eastern indigo snake protection/education plan shall be developed by the applicant or requestor for all construction personnel to follow.  The plan shall be provided to the Service for review and approval at least 30 days prior to any clearing activities.  The educational materials for the plan may consist of a combination of posters, videos, pamphlets, and lectures (*e.g.*, an observer trained to identify eastern indigo snakes could use the protection/education plan to instruct construction personnel before any clearing activities occur).  Informational signs should be posted throughout the construction site and along any proposed access road to contain the following information:

   a.      a description of the eastern indigo snake, its habits, and protection under Federal Law;
   b.      instructions not to injure, harm, harass or kill this species;
   c.      directions to cease clearing activities and allow the eastern indigo snake sufficient time to move away from the site on its own before resuming clearing; and,
   d.      telephone numbers of pertinent agencies to be contacted if a dead eastern indigo snake is encountered.  The dead specimen should be thoroughly soaked in water and then frozen.

2.      If not currently authorized through an Incidental Take Statement in association with a Biological Opinion, only individuals who have been either authorized by a section 10(a)(1)(A) permit issued by the Service, or by the State of Florida through the Florida Fish Wildlife Conservation Commission (FWC) for such activities, are permitted to come in contact with an eastern indigo snake.

3.      An eastern indigo snake monitoring report must be submitted to the appropriate Florida Field Office within 60 days of the conclusion of clearing phases.  The report should be submitted whether or not eastern indigo snakes are observed.  The report should contain the following information:

   a.      any sightings of eastern indigo snakes and
   b.      other obligations required by the Florida Fish and Wildlife Conservation Commission, as stipulated in the permit.

Revised February 12, 2004