WHITE & CASE

White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131-2352

Tel + 1 305 371 2700
Fax + 1 305 358 5744/5766
www.whitecase.com

Direct Dial + (305) 995-5268 dhalsey@whitecase.com

August 22, 2008

VIA ELECTRONIC MAIL AND EXPRESS MAIL (WITH ENCLOSURES)

Ms. Tracy Hurst
Project Manager
U.S. Army Corps of Engineers
10117 Princess Palm Avenue, Suite 120
Tampa, FL 33610

Re: Cypress Creek Town Center Permit (Case No. 07-cv-01756, D.D.C. Oct. 1, 2007)

Dear Ms. Hurst:

This letter and the attached declarations and documents are submitted on behalf of Sierra Properties I, LLC, Pasco 54, Ltd., Pasco Ranch, Inc., and JG Cypress Creek LLC (collectively, "Permittees") in response to the July 23, 2008 and August 11, 2008 correspondence to the U.S. Army Corps of Engineers ("Corps") submitted by counsel for the Sierra Club, Gulf Restoration Network, Clean Water Action, Richard Sommerville, and Chris Loy (collectively "Plaintiffs") regarding the Cypress Creek Town Center ("CCTC") project.[1] This letter is generally organized following the sequence of the issues addressed in Plaintiffs' letter.

Plaintiffs' correspondence consists primarily of a restatement of positions and arguments they either presented to the Corps during the original permitting process or were contained in their motion for summary judgment filed with the district court on January 16, 2008. While Plaintiffs attempt to recast several of their arguments, and cite some new materials, there is nothing about their restated arguments or the new materials they present that warrants a different result from the one the Corps reached during the original permitting process. As set forth below, the documents that are already part of the Administrative Record, coupled with the additional materials submitted with this letter, demonstrate that, when completed, CCTC will have minimal

[1] Citations to Plaintiffs' July 23, 2008 submission will be in the form of "Pl. Sub. at ___." Citations to Plaintiffs' August 11, 2008 submission will be in the form of "Pl. 2nd Sub. at ___."

ALMATY ANKARA BANGKOK BEIJING BERLIN BRATISLAVA BRUSSELS BUDAPEST DRESDEN DÜSSELDORF FRANKFURT HAMBURG HELSINKI HONG KONG ISTANBUL JOHANNESBURG LONDON LOS ANGELES MEXICO CITY MIAMI MILAN MOSCOW MUNICH NEW YORK PALO ALTO PARIS PRAGUE RIYADH SÃO PAULO SHANGHAI SINGAPORE STOCKHOLM TOKYO WARSAW WASHINGTON, DC

MIAMI 790069 (2K)

EXHIBIT B

environmental impacts, and that the mitigation the Permittees have already provided is more than sufficient to compensate for the loss of the former on-site wetlands.[2]

## I. Background

CCTC is a partially constructed regional mixed-use development located at the intersection of I-75 and State Road 56 in Pasco County. AR[3] 6636-37; D.E. 52. The overall project site is approximately 507.7 acres. AR 6636. Plans for the site provide for a regional business center, including retail stores, hotels, restaurants, theaters, offices, banks, and multi-family housing. AR 6637; AR 6649.

Approximately 155.46 acres of wetlands on the property were identified as being within Corps regulatory jurisdiction. AR 6636. The project, however, called for filling only 53.89 acres of such wetlands and 9.65 acres of man-made surface waters. AR 6637. The southern portion of the project site is located near Cypress Creek. AR 6636.

The project is designed to have a large on-site stormwater management system. AR 6672. When completed, the system will include a network of stormwater pipes, infiltration swales and other Low Impact Design ("LID") features. AR 6648; AR 6676; AR 6677-78. The project calls for five large detention ponds around the perimeter of the site. AR 6523. The project requires a minimum distance between Cypress Creek and any paved surface of 600 feet, a minimum buffer distance between Cypress Creek and any project activity of 50 feet, and 25-foot buffers around on-site preserved wetlands. AR 6650. The project also includes an extensive water quality monitoring plan to ensure no adverse effects on water quality. AR 6651; AR 6676.

CCTC was reviewed and approved by all local governments having jurisdiction over the project. Pasco County issued the Development Order ("DO") approving the project on November 23, 2004. AR 2340. After extensive review and analysis, AR 6522, the Southwest Florida Water Management District ("SWFWMD") approved an Environmental Resource Permit ("ERP") for the project on January 30, 2007. AR 6638. The ERP provides numerous conditions to avoid and minimize environmental impacts. AR 6522-41. This permit functions as the State Water Quality Certification under the Clean Water Act ("CWA"). 33 U.S.C. § 1341; Fla. Stat. § 373.036.

In May 2005, Sierra Properties submitted a permit application to the Corps for the CCTC project. AR 2397-2511. The Corps issued a Public Notice for the project on October 31, 2005,

---

[2] Plaintiffs' July 23rd correspondence includes a lengthy section setting forth Plaintiffs' characterization of the applicable law and regulations. The Corps is thoroughly familiar with the applicable legal authorities. Accordingly, we have elected to omit from this response a summary of the relevant federal statutes and rules.

[3] Citations to the Corps' Administrative Record, filed with the Court on January 2, 2008, D.E. 27, are in the form of "AR ___." Citations to the United States Fish and Wildlife Service's ("FWS") Administrative Record, also filed with the Court on January 2, 2008, D.E. 27, are in the form of "FWS ____." "D.E. ___" citations refer to docket entries of documents filed with the clerk in the above-referenced action. Citations to other documents or evidence are expressly noted.

AR 3091-3135, identifying the areas to be permitted, the acreage of the project, and the impacts by acreage, AR 3092. On December 5, 2005, after concluding that the project "is not likely to adversely affect" the Wood Stork and the Eastern Indigo Snake, the Corps initiated informal consultation with the FWS regarding these species. AR 3410. After this consultation, on March 22, 2007, the FWS concurred with the Corps' "not likely to adversely affect" determination regarding the two species. AR 6681-82; AR 5962-67.

During the permitting process, the Corps made several requests for additional information on a variety of topics. *See, e.g.*, AR 3877; AR 4467; AR 5384; AR 5956. After extensive consideration of the permit application, on May 15, 2007, the Corps issued the Statement of Findings regarding the CCTC Permit. AR 6636-88. The Statement of Findings was also written to function as an Environmental Assessment for the project. AR 6636. In it, the Corps considered and addressed the same arguments Plaintiffs advance in their July 23rd and August 11th submissions. *Id.*

The Corps' Permit required both on-site and off-site compensatory mitigation for the 53.89 acres of wetland losses. AR 6651-62. The mitigation consists of: 1) creation of 13.61 acres of on-site wetlands (in addition to the approximately 100 acres of existing on-site wetlands that the Permit required be preserved), 2) restoration and preservation of 118.6 acres of wetlands on a 250-acre tract off-site in southeastern Pasco County (the "Alston tract"), 3) creation of stormwater ponds to mitigate for loss of flood storage, and 4) construction of planted littoral shelves and planted pond bottoms within 300 feet of Cypress Creek to mitigate for the loss of wildlife habitat. AR 6651-52. Based on a quantitative functional assessment using the Unified Mitigation Assessment Methodology, the Corps determined that the total wetland function loss due to the project was -38.71, and that the total functional gain from the mitigation was +40.84, resulting in a net positive balance. AR 6654-55.

In June 2007, the Permittees began site development and construction work on the CCTC site. *See* Final Environmental Assessment of Discharges Report prepared by Biological Research Associates ("BRA") at 9. The target opening date for the main commercial center was originally scheduled for October 2008. As part of initial site preparation and grading, all but 0.508 acres of on-site wetlands were filled in accordance with the Permit. D.E. 52 at 2. The required mitigation for the project has also been substantially completed. *See* Final Assessment of Discharges at 9-10. Earthwork associated with the off-site mitigation was completed in August 2007, and initial seeding of the mitigation site was conducted in December 2007. *Id.* On-site mitigation area M-3 was planted on August 26-31, 2007, on-site mitigation area M-1 was planted on November 6-24, 2007, and on-site mitigation area M-2 was planted on July 9-18, 2008. *Id.* at 9.

During early stages of site preparation and prior to construction of the stormwater management system, unusual rain events overwhelmed permit-approved erosion control measures and triggered the release of turbid stormwater from the construction-site to the nearby wetlands and ultimately Cypress Creek. D.E. 52 at 2. In response, additional erosion control measures were designed and implemented by Permittees, including an extensive perimeter berm system that greatly increased water storage capacity on site. *See* Final Assessment of Discharges at Appendix F. (A detailed explanation of the chronology of the accidental discharges, and the

corrective actions taken by the Permittees after the first two discharges, is contained in the April 2008 Final Environmental Assessment of Discharges Report prepared by BRA.).

In January 2008, a highly unusual rain event occurred that dropped more than 10% of total average annual rainfall for the CCTC area in a single day. *See* Final Assessment of Discharges at 14-15. This event caused turbid water to be released from Pond D. *See* Final Assessment of Discharges at 13, 14-16. Although this was quickly stopped, water from the intense storm and drainage from off the CCTC site continued to pick up and carry the turbid water to the Creek. *Id.*

In response to the January 22-23, 2008 rainfall event, Permittees implemented additional corrective measures, including:

- Building reinforced concrete-block walls on the top of the discharge weirs on all of the detention ponds located on the project site. The Permittees constructed these walls before receiving the Notice of Suspension. The raising of the control elevation of the weirs has created an additional 28.8 acre-feet of stormwater capacity in the detention ponds.

- Installing additional turbidity control screens across the small stream that drains Wetland J into Cypress Creek. The Permittees installed several of these screens before receiving the Corps' Notice of Suspension.

- Placing sod on the side of the stormwater berm located between Pond D and the Florida Department of Transportation ("FDOT") Pond 20 to avoid potential turbid runoff downslope into Wetland J. The Permittees did this before receiving the Corps' Notice of Suspension.

- Pumping turbid water from Wetland J to Pond D so that this turbid water cannot be flushed into Cypress Creek as the result of future rainfall events. This pumping began on February 7, 2008 after authorization was received from the SWFWMD.

- Constructing two large on-site containment areas to supplement the on-site ponds built during the construction phase.

- Constructing and sodding additional perimeter berms to contain construction water within the site.

- Constructing masonry bulkheads in twin storm lines to control drainage leading to ponds "D" and "E."

- Planting grass seed on all exposed soils by direct seeding or application of hydroseed.

D.E. 41-2; D.E. 52-2; D.E. 52-4. Initial environmental assessments by the responsible state and local government agencies found no permanent environmental damage to Cypress Creek from the turbid discharges from CCTC.

On February 1, 2008, the Corps suspended the CCTC Permit. D.E. 40. Prior to the permit suspension, CCTC was in the middle of construction. The suspension barred all site work, including completion of the stormwater management system. D.E. 52 at 2. Several months later, the Corps approved corrective measures to stabilize the site. *Id.* at 2-3. The infrastructure for the stormwater management system is partially completed and will be completed within 60 days of reinstatement of the Permit.

## II. The CCTC Permit Should Be Reinstated

### A. The Clean Water Act Does Not Require Modification of the Permit

#### 1. There Are No Practicable Alternatives

The record supports the Corps' finding that there are no practicable alternatives for CCTC. The Section 404 Guidelines define a "practicable alternative" as an alternative that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project objectives." 40 CFR § 230.10(a)(2).

Of the four on-site alternatives analyzed in the Environmental Assessment, the approved plan, CCTC, had the least acreage of wetland impacts. AR 6645. Eleven off-site alternatives, in addition to the approved plan, were evaluated in the Environmental Assessment and the alternatives analysis. AR 6643-45; AR 2792-2803. Four of the off-site alternatives – Alternatives 5, 6, 7, and 8 – were impracticable because they were not available for sale. AR 6644; AR 2798-2800. Off-site alternatives 2, 3, 9, 10, and 11 were too small for the development of a regional retail center. AR 2795; AR 2800-01. Site 1 was not practicable because of the lack of population density and the limited projected populated growth in the northern section of Pasco County. AR 6644; AR 2792-93. Site 4 was impracticable because it was accessible only by a single arterial road. AR 6644; AR 2796-97. Thus, the approved plan was and is the only practicable alternative. AR 6644; AR 2803.

##### a. Downsizing the Mall Is Not Practicable

Plaintiffs argue that the Corps should have required a smaller project. Downsizing the mall, however, was and is not a practicable alternative from a cost perspective. AR 6649. An alternative is not practicable if it makes the project cost-prohibitive for the applicant. *See Bering Strait Citizens for Responsible Resource Dev. v. U.S. Army Corps of Eng'rs*, 2008 WL 43711, *5 (9th Cir. 2008) ("After extensive consultation with [the applicant], the Corps determined that all alternatives were impracticable . . . because alternatives were cost prohibitive or undesirable for other reasons. This rationale is acceptable under the CWA."); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1266-67 (10th Cir. 2004) (affirming determination that a smaller project than the approved plan would not be economically viable); *James City County, Va., v. EPA*, 955 F.2d 254, 259-260 (4th Cir. 1992) (finding alternative to dam project would result in water costing 50% more, thereby rendering alternative impracticable due to cost).

Plaintiffs do not contest that a smaller mall would have resulted in a rate of return of less than 8%, and the record evidence established this to be the case. AR 4597-4601 (indicating that each of the eight alternatives produces less than an 8% rate of return); AR 4615-28 (demonstrating the specific costs and incomes associated with alternative projects and indicating the resulting rates of return would be less than 8%); AR 5408-11 (demonstrating the rates of return associated with smaller projects and concluding that any smaller project results in a rate of return less than 8.0%).

Plaintiffs instead continue to contest whether an 8% rate of return was necessary to secure permanent financing for the project and to make the project financially feasible. Pl. Sub. at 7-11. As explained in the August 21, 2008 declaration of Steven Klett, of Ernst & Young LLP ("EY"), attached hereto as Ex. A, however, it would have been virtually impossible to obtain permanent financing for the CCTC project in 2006 with less than an 8% rate of return.

EY's analysis, based on an assessment of information from different sources, including the Real Estate Research Corporation ("RERC") Summer 2006 Report submitted by Permittees during the permitting process, concluded that the appropriate going-in capitalization rate for a power center, such as CCTC, in the second quarter of 2006 was 7.60%. *See* Ex. A at 6-7.[4]

As Mr. Klett explains, determining the going-in capitalization rates is not the end of the analysis for proposed projects such as CCTC. *See* Ex. A at 7. For new development projects, as opposed to fully completed and leased projects, the market demands a premium for the risks associated with taking on new development activities and to account for unforeseen circumstances. *Id.* A new project is subject to many risks that are not present with an existing project, such as: 1) construction cost escalations beyond inflation, 2) construction cost overruns/change orders, 3) permanent financing rate risk, 4) increases in capitalization rates, 5) increases in investor equity return requirements, and 6) lease-up risk. *Id.*

In order to account for such risks, new developments must provide a higher rate of return than fully completed and leased projects. *See* Ex. A at 7-8. In order to determine the appropriate rate of return for a proposed project, such as CCTC, an upward adjustment of going-in capitalization rates is required. *Id.* Thus, Mr. Magdziarz's contention that such an adjustment would be "arbitrary and unsubstantiated," *see* Pl. Sub. at Attach. A at 14, is itself unsubstantiated.[5]

With regard to the appropriate amount of the adjustment from going-in capitalization rates for the CCTC project, EY's analysis concluded that a 150 to 300 basis point spread (1.5 to

---

[4] Dr. Magdziarz's contention that it is not appropriate to estimate minimum rates of return based on reported average rates of return is also unsupported. As made clear by Mr. Klett, it is completely appropriate and common in the industry to consider averages when estimating rates of return. *See* Ex. A at 7. This is largely because there are many unknown or uncertain factors at the time a development project is proposed, so averages are one of the only available sources for estimating minimum rates of return. *Id.*

[5] Another example of Mr. Magdziarz's willingness to ignore the facts in order to support Plaintiffs' position is his inaccurate assertion in paragraph 26 of his first declaration that the "Initial Capitalization Rates" reported in the RERC Report were already adjusted to account for risks associated with new development. As Mr. Klett makes clear, the "Initial Capitalization Rates" Mr. Magdziarz refers to are simply going-in capitalization rates and are not rates for new development. *See* Ex. A at 5. In fact, RERC does not even survey or report rates of return for new development. *Id.*

3 percentage points) above the applicable going-in capitalization rates for completed projects would have been appropriate in the second quarter of 2006. *See* Ex. A at 9. Based on this, EY concluded that a range of rates of return between 9.10% and 10.60% was indicated for a proposed development such as CCTC in the second quarter of 2006. *Id.* Thus, the 8% rate of return figure utilized by Permittees during the permitting process, which was based on an adjustment of only 50 basis points above the going-in capitalization rate, was actually a very conservative figure in that it was substantially less than the rate of return EY's analysis indicates should have been the benchmark for the CCTC project. To the extent the 8% figure was off, it disfavored Permittees.

EY's analysis also establishes that the applicable rates of return would be even higher today due to market deterioration, including increases in mortgage rates, higher loan to value ratios, and higher equity investor returns. Ex. A at 10. In other words, if we were to conduct an analysis of appropriate rates of return today, they would be much higher than the 8% rate of return that was utilized for purposes of the financial feasibility studies in the second quarter of 2006.

In the second quarter of 2006, it would have been virtually impossible to obtain financing below an 8% rate of return in the second quarter of 2006. As Mr. Klett explains, a below-market rate of return would not have been viewed favorably by lenders. *See* Ex. A at 10-11. As established above, the 8% benchmark utilized by Permittees during the permitting process was actually already below the applicable market rate, which was between 9.10% and 10.60% according to EY's analysis, so the notion that permanent financing could have been obtained at a rate of return less than the already deflated 8% figure utilized by Permittees is completely unsupported.

Plaintiffs also assert that the land values underlying the financial feasibility analysis were flawed, but this is not the case. The financial feasibility study in the administrative record established that the "Base Value" for the CCTC land was $72,837,500 for the 291.35 acres of developable CCTC property. AR 4343; 4315-17. This estimate included a small portion of land that was sold to the FDOT and other small portions of the site that ultimately were not developable.

The total developable land on the site (minus the portion of land sold to the FDOT) is 287.07 acres. *See* July 31, 2008 Summary Appraisal Report prepared by Oxtal Real Estate Advisers, Inc., attached hereto as Ex. B. A recent appraisal of the land, on July 31, 2008, values the 287.07 acres of CCTC developable land at $83,850,000. *See* Ex. B. This is significantly more that the $72,837,500 estimated in the financial feasibility studies that are part of the administrative record in this case.

Based on this recent appraisal, land values underlying the rate of return analysis conducted during the permitting process were modest. If anything, the Permittees understated, not overstated, the value of the land. A higher land value would have only necessitated higher returns for the alternatives.

Mr. Magdziarz provides no support for his assertion that the land value underlying the financial feasibility analysis should have been determined based on the price that Sierra

Properties paid for the land 20 years ago instead of the estimated value of the land in 2006. Using 20 year old land values would, as Mr. Magdziarz states, "significantly alter the results of the applicant's calculations and render many alternatives financially feasible." But there is no authority, and he cites none, that supports using an unadjusted historic purchase price to determine current market value and current rates of return.

**b. Reducing the Number of Surface Parking Spaces Is Not Practicable**

Plaintiffs also argue that reducing the number of surface parking spaces, either by constructing a second parking garage or by simply reducing the number of parking spaces altogether, was a practicable alternative. Once again, Plaintiffs confuse issues regarding practicable alternative locations for a regional mall – reducing parking spaces itself is not such an alternative – with the minimization of wetland impacts. Plaintiffs also completely ignore that the project already features one parking garage, with 2,098 parking spaces, AR 6646, so the project plan does, in fact, inherently include a reduction in the amount of surface parking.

Plaintiffs' complaint is apparently that two, not one, parking garages should be utilized, but the record evidence established that replacing some of the remaining surface parking with a second parking garage is not practicable. Materials in the administrative record support the Environmental Assessment's conclusion that, "Although . . . a parking garage would reduce the project footprint . . . the resulting Rate of Return . . . deems the alternative impracticable since financing cannot be secured at this profit level." AR 6646. The record evidence also established, as the Environmental Assessment concluded, that another parking garage is impracticable because proposed tenants for Cypress Creek Town Center will not accept structured parking. AR 6646-47; AR 3972; AR 2155.

The record evidence further established that simply reducing the total number of surface parking spaces is not practicable. Cypress Creek Town Center has an average of one parking space per 200 square feet. AR 6647. This is consistent with shopping center industry standards. *See* AR 5412; AR 5532; AR 5533; AR 5530. Regional malls, such as Cypress Creek Town Center, have a much higher utilization rate than older malls due to high restaurant utilization. AR 4604-06; AR 4660-65. As the Environmental Assessment concluded, restaurant uses require 2-3 times the amount of parking than retail alone. AR 6647; *see also* AR 4604-06; AR 5530.

Plaintiffs' argument that the Corps simply accepted the applicant's representations is contrary to the record. The Corps verified the applicant's information, and even requested that the applicant evaluate the practicability of employing additional parking garages in order to minimize the footprint, AR 6646; AR 3969-72, and compare the proposed parking at Cypress Creek Town Center to parking at other malls in the area, AR 6647; AR 3972-73. The Corps also inquired as to why the number of parking spaces in the project exceeded the minimum for Pasco County, which is one parking space per 300 square feet, and the applicant supplied uncontested record evidence that the Pasco County requirement was a minimum, not a maximum, and was not based on industry standards. AR 6647; AR 5412.

**2. The CCTC Project Will Not Cause or Contribute to the Significant Degradation of Waters of the United States**

The Corps was correct that the CCTC project will not cause or contribute to significant degradation of the waters of the United States. During the original permitting process, the Corps considered all of the relevant factors under 40 CFR § 230.10. AR 6664-65. To ensure no such degradation, the Corps required a stormwater management system to ensure that the completed project will have no adverse impacts to Cypress Creek and its surrounding wetlands, AR 6672, a minimum buffer distance of 50 feet between Cypress Creek and any type of activity, AR 6650, a minimum buffer distance of 25 feet between the remaining on-site wetlands and any activity, AR 6650, a comprehensive water quality monitoring system approved by all responsible state and local agencies, AR 6676; AR 6616-27, and extensive wetlands mitigation measures, AR 6651-52; AR 6654-55.

Plaintiffs, however, contend that the project, as permitted, will result in significant degradation of the waters of the United States because: 1) the stormwater management system is insufficient, 2) the buffers are insufficient, and 3) the monitoring program is insufficient. Each of these contentions is without merit.

**a. The stormwater management system is sufficient**

Plaintiffs' criticisms of the permanent stormwater management system designed for CCTC ignore that the Corps extensively analyzed the system and concluded that it was sufficient to protect the water quality of Cypress Creek. AR 6676-77. The Environmental Assessment discussed in great detail the system that the applicant designed, which exceeds State requirements, and concluded that the treatment system will actually enhance water quality. AR 6676-77. A detailed analysis of the stormwater system was conducted by the SWFWMD before it issued the Water Quality Certification/ERP, which is incorporated and attached to the Corps Permit. AR 6520-41. The stormwater system for that part of the site south of SR 54 was designed to provide at least 50% more than the treatment standard required by the State of Florida. AR 6676.

Plaintiffs' criticisms of the permanent stormwater management system hinge primarily on assertions by Dr. Mark Rains. Plaintiffs attached Dr. Rains' first declaration to their July 23rd submission and relies heavily upon it in support of their arguments regarding the alleged deficiencies of the stormwater system. Apparently believing that Dr. Rains' first declaration was insufficient, Plaintiffs submitted a second declaration from Dr. Rains to the Corps on August 11, 2008. *See* Pl. 2nd Sub. at Attach. A at 2. Dr. Rains' second declaration, however, casts serious doubts on the reliability of Dr. Rains' conclusions with regard to this case. As of September 5, 2007, the date when Dr. Rains alleges he took the photograph depicting turbid water coming from Cypress Creek Town Center site to Cypress Creek, the pond depicted in the photograph was not directly connected to Cypress Creek or its wetlands, completely undercutting Dr. Rains' suggestion that the photograph somehow showed runoff from the site going into the Creek.

Plaintiffs' first attack on the stormwater system is that it is "too small." Pl. Sub. at 12. This contention is based solely on the assertion in Dr. Mark Rains' first declaration that "the

stormwater management system . . . will handle the first 1.5 inches **of rain**." *See* Pl. Sub. at Ex. T, ¶ 11 (emphasis added). This statement, however, evinces a fundamental misunderstanding of the stormwater system. The permanent stormwater system approved by the Corps treats the first 1.5 inches of **runoff**, not rain. *See* Declaration of Bruce McArthur, attached hereto as Ex. C, ¶ 7; AR 6676 (stating that the stormwater system will treat "1.5 inches of runoff"). In order to produce 1.5 inches of runoff, rainfall will need to exceed 2.9 inches. *Id.*[6] 2.9 inches is actually a conservative estimate of the amount of rain that will be needed to produce 1.5 inches of runoff because that figure does not take into account that 10% of the parking for CCTC will be constructed of porous pavement that will absorb rain. *Id.* It also fails to take into account the evapotranspiration that will occur during rainfall events. *Id.*

Moreover, the volume of runoff that the system is designed to treat is based on the fact that approximately 90% of all storm events in Florida will produce one inch of rainfall or less. *See* Ex. C, ¶ 8. Studies by the U.S. Geological Survey ("USGS") have shown that the first inch of runoff carries 90% of the pollution load from a storm event. *Id.* Therefore, the treatment of the first 1.5 inches of runoff will treat well over 90% of all storms and pollution loads. *Id.*[7]

Setting aside the fact that Plaintiffs' argument that the capacity of the stormwater system hinges on the faulty premise that the system is designed to treat only 1.5 inches of rainfall, as opposed to runoff, Plaintiffs are also incorrect in their assertion that the area "regularly receives rains in excess of 1.5 inches." Pl. Sub. at 12. Plaintiffs identify only ten rain events over a three year period in which the Tampa area actually received over 1.5 inches in rainfall. *Id.* Ten days in 3 years is not "regularly" under any standard. In fact, it is quite rare.[8] Moreover, all but one of the rain events Plaintiffs cite to were rain events of less than the 2.9 inch minimum of rainfall that the approved CCTC stormwater system can handle. *Id.*

In addition to their inaccurate contentions regarding the capacity of the permanent stormwater management system, Plaintiffs assert that the system has a limited ability to effectively treat the specific types of contaminants likely to be present in the CCTC stormwater. Pl. Sub. at 13. Plaintiffs again rely solely on assertions in Dr. Rains' declaration in support of

---

[6] Thus, Plaintiffs' contention that the stormwater system is only treating the "minimum amount of stormwater" required under state regulations and the DRI by treating 1.5 inches of runoff is also unsupported. The system is designed to treat 1.5 inches of runoff, which amounts to more than 2.9 inches of rain, well over the 1.5 inches of rain treatment required under the DRI and the state regulations Plaintiffs reference.

[7] Dr. Rains' contention that the CCTC site will decrease infiltration and, thereby, increase the magnitude of stormwater off the site and decrease the quality of water flowing off the site is simply unsupported. Dr. Rains cites no authority in support of this proposition. *See* Pl. Sub. at Attach. 7, ¶ 10. Moreover, Dr. Rains ignores the fact that, as part of the design and permitting for the CCTC project, a detailed hydrodynamic computer model was developed for the entire watershed between Interstate 75 and SR 54, which includes the CCTC site. *See* Ex. C, ¶ 6. The model evaluated the 1-inch, 2-inch, 2.33, 10, 25, 50 and 100-year/24-hour storm events, and showed that the completed CCTC stormwater management system will ensure that CCTC will not cause any increase or decrease in flows or durations. *Id.* The model also shows that the surrounding wetland hydroperiods for the entire study area would not be adversely affected by the CCTC project for both peak stages and durations. *Id.*

[8] Historical data shows that, on average, only approximately 2 days of each year have rainfall that exceeds 2.5 inches. *See* Declaration of Dr. John Garlanger, attached hereto as Ex. D, ¶ 10.

this contention. *Id.* Dr. Rains, however, cites no evidence in support of his contention. His contentions are contradicted by the evidence of record.

Plaintiffs are correct in stating that runoff from urban development is likely to have nutrients and pollutants. But the CCTC stormwater system has more than sufficient capacity to treat the types of contaminants that likely will be present at CCTC.[9]

Dr. Rains' contention in paragraph 12 of his first declaration that stormwater detention ponds have limited treatment capacities, *see* Pl. Sub. at 14, Attach. T at ¶ 12, ignores that the detention ponds are part of the stormwater system and meet the design criteria for detention ponds established by the State of Florida. *See* Declaration of Dr. Douglas Durbin, attached hereto as Ex. E, ¶ 4. In fact, the CCTC system exceeds the requirements established by the SWFWMD, which have been proven to be effective at ensuring compliance with state water quality standards.[10] *See* Ex. C, ¶ ¶ 10, 11; Ex. E, ¶ 9. The Florida Department of Environmental Protection ("FDEP") has reported and concluded that wet detention systems, such as the system utilized by CCTC, provide significant treatment of stormwater. *See* Ex. D, ¶ 11.

Studies by USGS and others that have shown that water quality changes in groundwater near stormwater ponds are localized around the ponds. *See* Ex. E, ¶ 5. Moreover, CCTC soils have high clay content which dramatically impede percolation, infiltration, and groundwater transport of contaminants. *Id.* Any infiltration or percolation that occurs allows for adsorption of nutrients, metals, and organics into pond sediments and immediately adjacent soils, thereby preventing such constituents from reaching Cypress Creek. *Id.* The presence of clay in the soils at CCTC augment this adsorption capacity. *Id.* Dr. Rains' first declaration also states that "upland and wetland soils and sediments adjacent to streams are areas in which a large proportion of the biogeochemical processing of dissolved constituents occurs," *see* Pl. Sub. at Attach. T, ¶ 12, but the CCTC project retains buffers along the stream to maintain such function, and provides a well-designed stormwater system to prevent losses of such function from the areas being developed. *See* Ex. C, ¶¶ 10, 11; Ex. D, ¶ 11; Ex. E, ¶¶ 4, 5.

Dr. Rains' contention in paragraph 15 of his first declaration that the close proximity of the detention ponds to Cypress Creek will result in contaminated groundwater discharge to Cypress Creek is also meritless. Once completed, the bottom of the pond littoral zones will be

---

[9] In addition to having the capacity to sufficiently treat contaminants, the stormwater system is expressly designed to monitor the following contaminants identified by Dr. Rains: nitrogen, phosphorous, oil, grease, and heavy metals. AR 4713.

[10] The SWFWMD conducted a study of 22 treatment systems in Tampa Bay. Ex. C, ¶ 11. Water quality sampling included Cadmium, Copper, Iron, Lead, Manganese, Nickel, Zinc, Ammonia, Unionized Ammonia, Chromium, NO2 + NO3, Total Phosphorus, Ortho Phosphorus, Total Suspended Solids, Turbidity, Total Organic Carbon, Alkalinity, pH, Temperature, Dissolved Oxygen and Conductivity. The SWFWMD concluded that, "Both the constructed and natural systems are extremely effective in State water quality standard compliance, especially for Alkalinity, Unionized Ammonia, Iron, Nickel and more notorious stormwater pollutants, such as Turbidity, Cadmium, Zinc and Lead. These findings reinforce the effectiveness of the current regulatory rules and design criteria." *Id.*

covered with vegetative matter and peaty materials, which possess natural ion exchange abilities. *See* Ex. C, ¶ 15. Metals, such as metallic sulphides and other minerals, will be immobilized indefinitely in the anerobic peaty bottom materials. *Id.* Nitrogen and phosphorus will be taken up by plants with as much as 72% of the phosphorus migrating downward into the soils, where they will remain insoluble at the aerobic mud-water interface in shallow water. *Id.* Nitrogen and phosphorus do not move laterally through the soils to the aquifer. These nutrients are retained in the sediments underlying the ponds. *Id.*

With regard to Plaintiffs' contention that Cypress Creek is especially susceptible to nutrient loading because it has a low dissolved oxygen content, *see* Pl. Sub. at 14, Attach. T at ¶ 15, nutrient loading to the Creek will actually be lower once the permanent stormwater system is completed compared to site conditions prior to issuance of the Permit. *See* Ex. E, ¶ 7. Moreover, it is well-established that runoff from urban land uses, such as the CCTC project, have much lower nutrient concentrations than agricultural uses, including pasture land. *Id.* Additionally, Cypress Creek is a shaded, tannic system, which diminishes the potential for algae blooms. *Id.* And the permanent stormwater system will reduce turbidity prior to release into the Creek (and associated wetlands) compared to overland runoff from pasture lands. *Id.* at ¶ 6. This has been borne out in recent monitoring events, which show very low turbidity in Cypress Creek. *Id.* at ¶ 7.

Dr. Rains' contention in paragraph 13 of his first declaration that the CCTC permanent stormwater management system provides for water to be routed overland into wetlands, and that this will change the natural hydrologic regimes of these wetlands and Cypress Creek and result in introduction of additional contaminated waters into Cypress Creek is, like several of his other contentions, contrary to fact. First, there is no direct overland discharge from CCTC to Cypress Creek or its adjacent wetlands. *See* Ex. C, ¶ 12. Second, all stormwater receives treatment prior to discharge. *Id.* Third, the hydrodynamic backwater model shows that there will be no adverse effects to both peak stage and duration to Cypress Creek and the surrounding wetlands from storm events. *Id.* Indeed, the stormwater system was designed to provide attenuation and treatment of stormwater runoff. *Id.*

Plaintiffs also argue that the LID measures that are part of the CCTC project are inconsistent with the concept of LID, and cite to the use of bioswales, one LID feature of the CCTC plan, as being insufficient to effectively treat the types of contaminants likely to be present in CCTC stormwater. Pl. Sub. at 13, 17 n.7. Plaintiffs misunderstand the role and the function of LID features of CCTC. While the CCTC Permit includes LID features, it was never intended or considered to be an LID Development and the permitted stormwater management system does not even take credit for the LID features included in the approved project. *See* Ex. C, ¶ 16. As such, the development's LID features, including the bioswales, are in addition to the water quality treatment being provided as part of the overall stormwater management system.

Moreover, the LID measures included in the project are not trivial. The CCTC project includes the following LID features to improve water quality:

- Implementation of bioswales and rain gardens, which collect the stormwater runoff from the parking areas through shallow swales prior to discharge into the stormwater

management system. The project has not claimed any credit for this additional water quality treatment or attenuation. FWS 0750; AR 2348.

- Utilization of porous pavement parking areas in strategic locations, comprising at least 10% of the total parking provided. Although the implementation of porous pavement results in less runoff than impervious pavement, credit was not claimed for the reduction in runoff because of the use of porous pavement. FWS 0750.

- Where possible, roof runoff will be directed into dry wells to capture the first runoff prior to discharging to the stormwater system. No credit was claimed for this. FWS 0750; AR 2348.

- For tire, battery, and gas pump areas, separate catchments will be provided that drain into the sanitary sewer system, instead of the stormwater management system. No credit was claimed for this measure. FWS 0751.

- Use of fertilizers and pesticides will be minimized. No credit was claimed for this technique. FWS 0751; *See* CCTC Integrated Pest Management Plan, attached hereto as Ex. F.

- Streets and parking areas will be vacuumed monthly instead of swept to reduce pollutant in runoff. No credit was taken for this measure. FWS 0751.[11]

Dr. Rains' second declaration primarily focuses on issues related to turbidity, but the opinions in the second declaration are as flawed as the opinions in the first. In paragraph 7 of his second declaration, Dr. Rains argues that turbidity can cause significant environmental problems. Pl. 2nd Sub. at Attach A at 3-4. In support, Dr. Rains cites to Figure 1, which is from a generic uncalibrated impact assessment model that has not been correlated to the specific conditions of Cypress Creek. Ex. C, ¶ 17. As a result, it is unhelpful in determining the impact of turbidity on the Creek.

Dr. Rains claims in paragraph 9 of his second declaration that data he claims to have collected on September 5, 2007 shows turbidity measurements of 100 NTU downstream of discharges from the Cypress Creek Town Center site. This is inconsistent with data from both SWFWMD and BRA. SWFWMD data from September 4, 2007 shows much lower turbidity levels. *See* Ex. G. Data collected from BRA on September 10, 2007 shows background turbidity levels. *See* Ex. H.

---

[11] In including these LID features, the Permittees complied with conditions of the Pasco County DO relating to LID techniques for CCTC, which were provided to the Corps during their review of the initial permit. AR 2317-55. Condition 5.c.(8)(a) of the DO states that: "Low impact design elements should be incorporated throughout the site to the maximum extent possible to include shallow vegetated swales in all parking areas; small, recessed garden areas throughout parking and building landscape areas; porous pavement and other pervious pavement technologies; stabilized grass areas for overflow parking; and retention of the maximum amount of the existing, native vegetation."

In paragraph 9 of his second declaration, Dr. Rains also attempts to compare turbidity levels in stormwater runoff to EPA drinking water standards. It is, however, not appropriate to compare stormwater runoff values to EPA drinking water standards. *See* Ex. C, ¶ 18. Water from the Creek is not even used for human consumption without filtration and treatment. *Id.* Thus, the existing water in the Creek does not even meet EPA drinking water standards. *Id.* Dr. Rains' suggestion that stormwater runoff from the Cypress Creek Town Center site should meet the same standards as water that goes to the public for consumption is beyond the pale.

Dr. Rains' conclusion in paragraph 11 of his declaration that inadvertent discharges from the Cypress Creek Town Center site have caused significant environmental impact to Cypress Creek is completely without merit because it is primarily based on the same generic uncalibrated assessment model discussed above. Dr. Rains presents no evidence or data to support this claim. Moreover, water quality monitoring data on September 10, 2007 shows no lasting impacts from the accidental discharges from the site. *See* Ex. H. Finally, benthic macroinvertebrate data from February 2008 reflects healthy scores at all stations upstream of, adjacent to, and downstream of the Cypress Creek Town Center site. *See* Ex. E, ¶ 15.

Plaintiffs point generally to recent discharge events in support of their contention that the permanent stormwater management system is deficient. The recent discharges, however, come from a construction site where the stormwater management system has not been completed. The discharges resulted from extreme rainfall events (5.2-6.0 inches in a 10-hour period, more than 10% of average annual rainfall in less than a day) and issues with ***erosion control measures*** intended to address ***construction activities***. *See* Final Assessment of Discharges 13-16. The ***permanent*** stormwater management system designed for the project had not been completed at the time of the discharges. D.E. 52 at 2. The Corps should reject Plaintiffs' suggestion that the project's likely impact on Cypress Creek should be measured by the performance of erosion control measures during construction rather than the permanent stormwater management system. The Corps should also reject Plaintiffs' and Dr. Rains' contention that further turbid discharges will occur once the permanent stormwater system is completed. As established herein, that is simply not the case. Dr. Rains does not identify a single project of any kind to support his contention that such discharges will also occur at CCTC after the permanent system is completed.

**b. The project is set back an appropriate distance from Cypress Creek and Corps jurisdictional wetlands**

During the initial permitting process, the Corps concluded that the 50 and 25 foot buffers required by the project would sufficiently protect Cypress Creek, the "critical wildlife linkage,"[12] and on-site wetlands. AR 6650; AR 6672. The 50 and 25 foot buffers that are part of the

[12] The "critical wildlife linkage" has no legal basis in the Clean Water Act, but instead is a local land use concept of Pasco County, Florida. Pasco County Comprehensive Plan-2025, 3-7 (Revised 2006) ("Pasco County has identified Critical Linkages . . . which shall serve as connecting corridors for lands that are currently in public ownership to protect and conserve native vegetative communities, endangered and threatened species, and natural functions of wildlife habitats, including wetlands."); AR 3924-25, 5958. Pasco County determined that the project would not cause unacceptable impacts to this "linkage" when it issued its DO. AR 2319.

approved project serve several functions, including sediment removal and erosion control, excess nutrient and metal removal, moderation of stormwater runoff, moderation of water temperature, maintenance of habitat diversity, wildlife species distribution and diversity, and reduction of human impact. AR 6650.

Plaintiffs' first attack on the buffers is their contention that Pasco County requested 75-100 foot buffers around all class one wetlands, and 50 foot buffers between Cypress Creek and any activity. First, it should be noted that the Corps does not require buffers, which is apparently why Plaintiffs cite to alleged wishes of Pasco County in support of this argument. Second, Plaintiffs cite only to a Response to Comments submitted by the Permittee during the DRI process for the project in support of their Pasco County argument. Pl. Sub. at 14 (citing AR 2092). The Response cited by Plaintiffs, however, states that 50 foot buffers will be placed between Cypress Creek and any activity, and the project will include "setbacks from other jurisdictional wetlands as required by appropriate State regulatory agencies." AR 2092. Moreover, Pasco County ultimately approved the project with 25 foot buffers around wetlands, so any concerns that the County may have had were resolved during the permitting process. AR 2317. Thus, Plaintiffs' contention that the buffers contravene the wishes of Pasco County is baseless.

Plaintiffs contend that 100 foot buffers are necessary, and rely on Dr. Rains and three reports and studies that he cites in support of this contention. Pl. Sub. at 15, Attach. F, Attach. G, Attach. H, and Attach. T at ¶ 14. But the buffer recommendations that Plaintiffs and Dr. Rains rely upon are from a published report for the State of Washington and other areas outside of Florida. *Id.* These areas of the country do not require the same stormwater management, attenuation, and treatment as required by the State of Florida. *See* Ex. C, ¶ 14. Development runoff in the areas covered by the reports Plaintiffs rely upon is routinely routed overland, with no velocity controls or pollution abatement. *Id.* For these types of development, buffers would be essential to the protection of wetlands and would provide velocity control, limited attenuation, and nutrient removal. *Id.* Florida, however, leads the nation in stormwater management, in both quantity and quality. *Id.* For example, all development runoff, including runoff from the CCTC site, must be conveyed to attenuation/treatment ponds prior to discharge to wetlands. *Id.* Thus, 100 foot buffers are not necessary for Florida development projects, including CCTC, because the buffers will not be subject to development runoff, high velocities, or nutrient loadings as is the case in the parts of the country analyzed in the reports relied upon by Plaintiffs and Dr. Rains. *Id.*

Plaintiffs' contention that "the location of the ponds adjacent to Cypress Creek and its wetlands is one of the greatest threats to Cypress Creek" has no basis in fact. Pl. Sub. at 15. Plaintiffs apparently base this contention on their argument that, because the ponds are close to the Creek, there is little distance for polluted water in the ponds to be biologically processed before it reaches Cypress Creek. *Id.*; Attach. T at ¶ 5. There is absolutely no support for Dr. Rains' contention that stormwater detention ponds, such as those approved for the CCTC project, have limited treatment capacities, and that stormwater detention ponds release water through infiltration into the sediments and groundwater. *See* Pl. Sub. at 14, Attach T at ¶ 12.

While Dr. Rains concludes that the buffers are insufficient to prevent significant off-site degradation, he ignores that pre-existing conditions at the CCTC site had cattle grazing to the very top of the stream bank and with direct access to the stream by cattle, allowing for direct nutrient and bacterial inputs into these wetlands and Cypress Creek. *See* Ex. E, ¶ 6. After the CCTC project is completed, there will be treatment for nutrients, and there will no longer be a source for bacteria inputs from cattle. This is simply another way in which the project will improve, as opposed to degrade, water quality.

**c. The Permittees have agreed to a comprehensive water quality monitoring plan**

The Corps analyzed and carefully considered the comprehensive monitoring plan to ensure no adverse impacts to Cypress Creek. AR 6676. In criticizing the plan, Plaintiffs ignore the fact that the surface water quality monitoring plan was approved by all responsible state and local agencies, including Pasco County, the SWFWMD, the FDEP, Tampa Bay Water, the Tampa Bay Regional Planning Council, and the Environmental Protection Commission of Hillsborough County. AR 6676; AR 6616-27.

The approved plan for CCTC includes more frequent sampling, more sampling locations, more parameters, and more follow-up provisions than other similar developments in the region. *See* Ex. E , ¶ 10. The plan includes provisions for follow-up sampling, as well as source tracking to identify the origin of potential problems, to address any water quality issues that may arise. *Id.*

The monitoring plan is designed to sample water quality at the times when water quality problems would be most likely to occur – immediately after rain events when the stormwater system is discharging. But it also provides for sampling when there is no discharge from the CCTC site in order to continue to generate "background" data as a means of maintaining a regular sampling record even when the CCTC site is not discharging. *See* Ex. E, ¶ 10. Thus, Dr. Rains' contentions that "sampling will only occur if there is sufficient rain to cause a discharge from the stormwater system," and that the plan does not call for sampling that will establish an appropriate baseline, reflect Plaintiffs' misunderstanding of the extent of the monitoring called for by the plan.

Contrary to Dr. Rains' assertions, the monitoring plan calls for a variety of sampling stations upstream of, adjacent to, and downstream of the CCTC site. *See* Ex. E, ¶ 14. Sampling from stations in these locations is designed to provide a comprehensive picture of water quality in Cypress Creek. *See* Ex. E, ¶ 10. Thus, no new sampling locations are needed. Sampling at these locations has resulted in healthy scores at all stations. *See* Ex. E, ¶ 14. These results demonstrate that no degradation has occurred since development of CCTC commenced. *Id.* This includes a lack of any degradation due to the accidental releases into Cypress Creek that Plaintiffs reference. *Id.*

### 3. The Mitigation Is Sufficient

The extensive on-site and off-site mitigation required by the Permit is more than sufficient to offset the loss of function and value attributable to the former on-site wetlands. AR 6651-56. This mitigation consists of: 1) creation of 13.61 acres of on-site wetlands (in addition to the on-site wetlands that the CCTC plan will preserve), 2) restoration and preservation of 118.6 acres of wetlands on a 250-acre tract in southeastern Pasco County (the Alston tract), 3) creation of stormwater ponds to mitigate for loss of flood storage, and 4) construction of planted littoral shelves and planted pond bottoms within 300 feet of Cypress Creek to mitigate for the loss of wildlife habitat. AR 6651-52. Based on a quantitative functional assessment using the Unified Mitigation Assessment Methodology, the Corps determined that the total wetland function loss due to the project was -38.71, and that the total functional gain from the mitigation was + 40.84. AR 6654-55; *see also* AR 6542-6615 (72-page Mitigation Plan attached to the Permit).

Apparently recognizing the sufficiency of the mitigation plan, Plaintiffs do not focus most of their argument on the actual mitigation plan for ***this*** project. Pl. Sub. at 16-17. Instead, Plaintiffs primarily attack the Corps for its alleged ***past*** mitigation failures on other unrelated projects. *Id.* In so doing, Plaintiffs cite two government reports regarding the Corps' national wetland mitigation program. *Id.* Neither of these reports, however, addresses the mitigation ***for this project***. They are irrelevant. Moreover, as Plaintiffs concede, *see* Pl. Sub. at 16, these reports focus on the Corps' alleged failures in ***monitoring*** wetland mitigation, not on whether the mitigation itself has been successful. But just because the Corps may not have appropriately monitored other projects for compliance does not mean such mitigation did not occur, that the Corps will not adequately monitor the wetland mitigation required in this case, or that the mitigation here will be unsuccessful.

Plaintiffs misstate the monitoring period required under the Permit, stating that the Permit calls for less than five years of monitoring. *See* Pl. Sub. at 17 ("But the Corps failed to require a minimum of five years of monitoring in its mitigation plan for the CCTC site."). This is not true. Special Condition 4(c) of the Permit requires semi-annual monitoring for the first three years after completion of the mitigation objectives and annual monitoring **every year after that**, mandating that the Permittees:

> Perform semi-annual monitoring of the wetland mitigation areas for a period of no less than 3 years subsequent to completion of the mitigation objectives and **annually after that**.

AR 6482 (emphasis added). Not only is the monitoring that is part of the Permit in compliance with the Regulatory Guidance Letter ("RGL") Plaintiffs cite to, it actually requires more monitoring than suggested in the RGL. Indeed, the monitoring in the Permit requires annual monitoring after the first three years whereas the RGL allows for less frequent monitoring when the monitoring is longer than five years. RGL, U.S. Army Corps of Engr's. (Aug. 3, 2006) No. 06-03 at 3 ("Monitoring may be conducted on a less frequent timeframe (such as every other year) in cases where monitoring is required for longer than five years.").

Plaintiffs' only direct attack on the substantive aspects of the CCTC mitigation plan is their contention that the off-site mitigation plan fails to provide on-site groundwater recharge. Pl. Sub. at 16. This argument, however, ignores the fact that the approved plan was designed to minimize water loss and to replicate the storage available in the surficial aquifer system so that groundwater is not decreased as a result of CCTC. AR 4611; *see also* Ex. D, ¶ 5. In fact, the project includes multiple features designed to reduce water loss, including recycling stormwater, the use of low volume irrigation and native plants adapted to soils conditions and ambient rainfall in the landscape design, use of drip-irrigation, use of landscaped bioswales, use of porous pavement, landscaping designed to be compatible with porous pavement, use of xeriscape techniques, and roof runoff into dry wells. AR 4611. The plan also calls for on-site recharge for wetlands. AR 6648; *see also* AR 4611.

While Dr. Rains is correct in paragraph 5 of his first declaration that "streamflow is comprised of baseflow and direct surface runoff during rainfall events," as established in Dr. Garlanger's declaration, this does not require on-site groundwater recharge mitigation because the total streamflow contribution of the CCTC site after development will be significantly greater than the pre-development contribution, and the baseflow contribution will also be higher than the pre-development baseflow. *See* Ex. D, ¶ 7. Thus, Plaintiffs' suggestion that on-site groundwater recharge mitigation is necessary is completely erroneous because the features of the approved plan already significantly minimize the potential for water loss and, consequently, negate the need for any on-site groundwater recharge mitigation.

### B. Consultation Under the Endangered Species Act Was Sufficient

#### 1. Consultation Regarding the Wood Stork Was Sufficient

The CCTC project is not likely to adversely affect the Wood Stork. Because the FWS concurred with the Corps' determination that the project is not likely to adversely affect the Wood Stork, the Corps was not required to engage in "formal" consultation with the FWS regarding the Wood Stork. 50 CFR § 402.14(b). Plaintiffs appear, however, to suggest that no or minimal consultation occurred regarding impacts to the Wood Stork. This could not be further from the truth. While the consultation that occurred between the Corps and the FWS was technically an "informal" consultation, it was extensive. During the consultation process, the Corps and the FWS received and reviewed voluminous materials, including, but not limited to, the following:

- Wildlife Surveys (FWS 0491-98; FWS 1451-57; AR 1859-74; AR 2008)
- 7/20/06 BRA Email to FWS Regarding Wood Stork, Foraging Habitat, Mitigation (FWS 0653)
- 9/12/06 BRA RAI Response Part 1, 6-8 of 8 (Cumulative impacts analysis) (AR 4595)
- 12/12/06 BRA Letter to FWS Transmitting Response to Questions re: Wood Stork (FWS 0939)

- 1/16/07 BRA Letter to FWS Transmitting Revised Functional Assessment Part 1-2 of 2 (FWS 0944)
- 1/31/07 BRA Email to FWS Summarizing Impacted and Created Habitat (FWS 1035)
- 2/27/07 BRA Email to FWS Regarding Littoral Shelves (FWS 1087)
- 2/28/07 BRA Email to FWS Regarding Littoral Shelves (FWS 1091)

In light of the extensive and lengthy consultation that has already occurred with regard to the Wood Stork, Plaintiffs' suggestion that further consultation is required is solely to further delay the project.

The Corps' original determination that the CCTC project is not likely to adversely affect the Wood Stork, and the FWS's concurrence with that decision, remain supported by the record. While the project area is within "core foraging area of 5 wood stork breeding colonies," the site is not within the primary or secondary zones of any of these colonies. AR 6681. Moreover, while the site contained 16.22 acres of potential Wood Stork habitat, AR 6681, no Wood Stork colonies were actually located on the project site. AR 6559; AR 6681-82. Impacts to very small amounts of potential Wood Stork habitat do not require formal consultation, especially when the birds in question forage within an 18-mile radius. AR 6682.

The FWS found that the "majority of wetland habitat onsite appears to be of marginal foraging value because of existing land-use patterns." AR 6365. This finding is confirmed by the rare observation of Wood Storks on the site, which reflects minimal usage of the site by Wood Storks. AR 3813 (dense brushy wetlands on-site "may account for the low observed usage by Wood Storks"); AR 5746-48 (summary of impacted and created habitat reflecting minimal usage by Wood Storks).[13]

After independently evaluating the minimum extent of functional Wood Stork habitat on site, the FWS nonetheless required mitigation for the potential Wood Stork habitat that would be

[13] Plaintiffs cite to the declaration of Clay Colson in support of their contention that Wood Storks were on the site prior to the commencement of construction. Pl. Sub. at 17. Mr. Colson states that "the most common area where [he has seen] Wood Storks on Cypress Creek is immediately east of I-75, in grass flats on the north bank of the Creek." Pl. Sub. at Attach. M, ¶ 8. As the photograph attached hereto as Exhibit I shows, there are no grass flats at this location. The closest grass flats to the location Mr. Colson identifies are approximately two miles downstream. *See* Exhibit J (aerial photograph of grass flats constructed by the FDOT as mitigation for SR 56). Moreover, Mr. Colson states that he has seen Wood Storks "on and around the CCTC" site along the north bank of Cypress Creek, but has not seen any in those locations since February 2006. Pl. Sub. at Attach. M, ¶ 9. The suggestion is that construction on the site is the reason why Mr. Colson has not seen Wood Storks since February 2006. But this conclusion is not supported by the facts. First, the CCTC Permit was not issued until almost one and a half years after February 2006, on May 15, 2007. Moreover, Wood Storks have, in fact, been observed on the site since construction began. Photographs of Wood Storks in the newly created foraging areas on the CCTC site that were taken in March 2008 are attached hereto as Exhibit K. Therefore, construction could not be the reason why Mr. Colson has not observed Wood Storks in those locations. AR 6637. Second, the Wood Storks that Mr. Colson claims to have observed likely came from the rookery located in the apex of the I-75, I-275 junction, which was largely abandoned during the 2006 breeding season. A map reflecting the colony location and its usage, by year, is included in the cumulative impact analysis. AR 2497-523.

lost due to the project. AR 6365-66. This mitigation will result in 21.35 acres of potential Wood Stork habitat and, thus, will create approximately 5.13 more potential foraging habitat for the Wood Stork than the 16.22 acres of potential habitat that existed on the site prior to the project. *Id.*

Plaintiffs incorrectly argue that the Corps' and the FWS's original determinations were based on the belief that no Wood Storks had ever been observed on the site. First, neither the Corps nor the FWS stated that their Wood Stork analysis was based on a belief that no Wood Storks had ever utilized the site. AR 6681-82; AR 6364-67. In fact, both agencies expressly assumed the opposite. The FWS assumed that the site was utilized by the Wood Stork when it conducted its Wood Stork analysis. AR 6364 (FWS concurrence, stating, "we do not generally base our analysis on presence or absence of foraging wood storks from surveys because foraging behavior could occur on the site for only part of the year and only on certain years and thus [is] easily missed"). The lengthy analysis and discussion of impacts on Wood Storks and their habitat in the Environmental Assessment makes clear that the Corps also assumed that Wood Storks utilized the site and that the site contained potential Wood Stork habitat. AR 6681-82 ("The Corps and the applicant did, in fact, recognize the existence of potential wood stork habitation on the project site."). Second, the Corps and the FWS were well aware that Wood Storks had been observed on the site because there were repeated references to such observations in the record. FWS 191-92; FWS 0196 (wildlife survey by BRA recording Wood Storks foraging on site); FWS 204 (Wood Storks observed by FDEP); AR 6560 (Mitigation Plan attached to Permit stating that Wood Storks, along with other birds, were observed on site). More recently, BRA submitted the Final Environmental Assessment of Discharges, which clearly states, at page 103, n.1, that Wood Storks had been observed on the site before construction commenced.

Plaintiffs' suggest that BRA purposely misled the Corps and the FWS regarding the existence of Wood Storks on the CCTC site. Pl. Sub. at 18 n.8. This is a cynical attempt to exploit a simple mistake that has already been corrected. BRA submitted materials to the Corps and the FWS documenting that Wood Storks had been observed on the site. *See, e.g.,* FWS 0191-92; FWS 0196; FWS 0204-05. In a separate document, another BRA employee inadvertently stated that Wood Storks had not been observed on the site. BRA has acknowledged this mistake, and specifically corrected the record on this issue in the recently submitted Final Environmental Assessment of Discharges, which explicitly acknowledges that Wood Storks had been observed on the CCTC site prior to commencement of construction. That this was a mistake is clear from the fact that BRA repeatedly submitted materials indicating that Wood Storks had been observed on the site. *See, e.g.,* FWS 0191-92; FWS 0196. This inadvertent misstatement was clearly not relied upon by either agency, and was corrected in the record. The Corps and the FWS clearly have knowledge that Wood Storks had been observed on the site prior to construction, just as they have knowledge that Wood Storks have recently been observed in the newly created on-site mitigation areas.

**2. Consultation Regarding the Eastern Indigo Snake Was Sufficient**

The Corps' original determination that the CCTC project is "not likely to adversely impact" the Eastern Indigo Snake, and the FWS's concurrence in that decision, are supported by

the record.  As with the Wood Stork, because the FWS concurred with the Corps' determination that the project is not likely to adversely affect the Eastern Indigo Snake, the Corps was not required to engage in "formal" consultation with the FWS regarding the Eastern Indigo Snake. 50 CFR § 402.14(b).  The consultation that occurred between the FWS and the Corps regarding the Eastern Indigo Snake was extensive and thorough and satisfied the requirements of the Endangered Species Act ("ESA").

There is no record evidence that Indigo Snakes have been observed on or near the site. AR 6367.  In support of their contention that Eastern Indigo Snakes were on the CCTC site prior to construction, Plaintiffs cite to Mr. Colson's statement that on May 27, 2007 he saw a single Eastern Indigo Snake climb from the banks of Cypress Creek onto the CCTC site.  Pl. Sub. at Attach. M at 4.  Plaintiffs' request for further consultation, beyond the extensive consultation that has already occurred, is based largely on Mr. Colson, a lay person, who thinks he saw one snake on the site over a year ago, prior to construction.

The record evidence establishes that qualified biologists from BRA looked for snakes, including Indigo Snakes, as part of multiple listed species surveys that they conducted.  They did not observe any Indigo Snakes on the site during any of those surveys.  AR 3819-20.  While the fact that BRA did not see any Indigo Snakes does not prove that Indigo Snakes never occurred on the site, it does demonstrate that the specific habitats found on the site prior to construction were not preferred by Indigo Snakes and were not heavily used by them, if they were even used at all.

Dr. C. Kenneth Dodd's[14] criticism of the results of BRA's wildlife studies reflects a fundamental misunderstanding of the manner in which the results were reported.  Dr. Dodd states that BRA based its determination that the occurrence of the Eastern Indigo Snake on the site was unlikely on a finding that there were only four Gopher Tortoise burrows on-site in 2005.  Pl. Sub. at Attach. O, ¶ 33.  Dr. Dodd also questions how the finding of four burrows in 2005 can be reconciled with 20-24 on-site burrows recorded in 2002 and 66 burrows being excavated in 2007.  *Id.*  But the 2005 "four" burrows figure that Dr. Dodd incorrectly focuses on came from a transect sample of the site, not 100% of all burrows on the site.  In 2002, BRA's wildlife survey observed 26 active and inactive burrows based on an 85% survey.  AR 1923.  This survey effort would yield an estimated 31 burrows on the site.  In 2005, BRA updated its wildlife survey and found four burrows in a 15% sampling of the site.  FWS 0497.  The 2005 survey effort extrapolated for the entire site would be 27 burrows.  Thus, the 2002 (31 burrows) and 2005 (estimated 27 burrows) survey efforts yielded a similar number of burrows for the site.  In 2007, BRA excavated 66 burrows (33 gopher tortoise burrows and 33 armadillo burrows) during the gopher tortoise relocation and captured 25 gopher tortoises.  *See* Ex. L.[15]  While the survey methods recommended by Dr. Dodd in his declaration are certainly alternative methods for surveying, they are not the methods for surveying recommended in the Florida Fish and Wildlife Conservation Commission ("FFWCC") methodology guidelines, which are the methodologies

---

[14] Plaintiffs rely upon Dr. Dodd's declaration in support of their Eastern Indigo Snake contentions.

[15] While the actual tortoise population was 25 tortoises, six of these tortoises were 2007 hatchlings and would not have been detected in previous surveys because they would not have had burrows.

that BRA employed during all of their wildlife surveys for this project. *See* FFWCC Methodology Guidelines, attached hereto as Ex. M.

BRA's relocation team has relocated thousands of gopher tortoises, and has also relocated tortoise commensals, including Eastern Indigo Snake. They found no Indigo Snakes during the relocation at the CCTC site. The relocation of the gopher tortoises in 2007 was conducted consistent with recommendations in "The Natural History and Management of the Gopher Tortoise *Gopherus polyphemus,*" (Daudin) 2008, Ray Ashton and Patricia Ashton. Moreover, the FFWCC was on-site throughout the entire gopher tortoise relocation and confirmed the accuracy of BRA's relocation efforts. *See* Ex. L.

Plaintiffs ***assume*** that many Indigo Snakes were present on the CCTC site because gopher tortoise burrows, sometimes used by Indigo Snakes as habitat, were present on the site. But the existence of potentially suitable habitat on the site does not mean that Indigo Snakes were actually utilizing those specific burrows as habitat or that the habitat was quality habitat.

The FWS recognized that "it is difficult to confirm absence or presence of the snake on site at all times," and, as a result, assumed that there was suitable habitat on the site and required the applicant to comply with the terms and conditions of the *2004 Standard Protection Measures for the Eastern Indigo Snake* just in case any Indigo Snakes were on the site. AR 6367. The FWS concluded that following these measures was sufficient to address any potential adverse impacts on the Indigo Snake. *Id.* Requiring that the applicant follow standard protection measures to protect the species from adverse impacts, after informal consultation, is sufficient to satisfy the ESA's consultation requirements. Moreover, the existence of unoccupied potential habitat on the site does not require or merit formal consultation.

The entire construction site has undergone grading activities and the gopher tortoises have been relocated. Any additional formal consultation about the Indigo Snake at this time would be pointless.

**3. No Formal Consultation Regarding the Florida Scrub-Jay Was Required**

Plaintiffs have provided no information that indicates that the informal consultation between the Corps and the FWS caused these agencies to erroneously conclude that the CCTC project will cause no impact to the Florida Scrub-Jay.[16] No Florida Scrub-Jays were observed on the site prior to construction despite the intensive wildlife surveys and follow-up studies that were conducted. AR 3819; FWS 1454.

Plaintiffs are simply incorrect in asserting that Florida Scrub-Jay habitat was located on the site prior to construction. There was no suitable habitat for this species on the site and the species was not observed during the wildlife surveys. AR 6683; FWS 1428. The Corps and the

[16] Even though consultation regarding the Florida Scrub-Jay was not officially requested, the FWS nonetheless considered the impacts of the project on the Scrub-Jay and concluded that there would be no impact.

FWS conducted an on site inspection in 2006, and never noted observing any Florida Scrub-Jays or Scrub-Jay habitat. *Id.*

Mr. Colson's statement in his declaration that Florida Scrub-Jay habitat is consistent with and overlaps with gopher tortoise habitat and Eastern Indigo Snake habitat is misleading. While it is true that tortoises and Indigo Snakes do almost always occur in habitat inhabited by Florida Scrub-Jays, the opposite is not true. *See* Glen E. Woolfenden & John W. Fitzpatrick, *Florida Scrub Jay*, THE BIRDS OF N. AM. (1996), attached hereto as Ex. N. Florida Scrub-Jays have very specific habitat needs, which include specific plant species, structure, and area, and cannot persist in habitat that does not meet those needs. *Id.* They are permanently territorial and a single family of Florida Scrub-Jays needs on average 22 acres of good quality habitat to survive. *Id.* Although a few individuals of scrub oak species did occur on the CCTC site prior to construction, they were overgrown and the area was too limited in size to support even a single Florida Scrub-Jay family. *Id.* Moreover, these few scrub oak individuals do not even exist on the site anymore. Thus, the habitat that Plaintiffs incorrectly claim was Florida Scrub-Jay habitat is gone.

While it appears that Dr. Bradley Stith, who Plaintiffs rely upon in support of their Florida Scrub-Jay arguments, has extensive knowledge of the biology and demographics of the Florida Scrub-Jay, he has never been on the site. Pl. Sub. at Attach. P, ¶ 10. His specific opinion about the existence of Florida Scrub-Jay habitat on the CCTC site is based solely on his review of aerial photographs, soils maps, and a grainy photograph that was provided to the FWS by Daniel Rametta, a plaintiff in an almost identical action that was filed in the Middle District of Florida. On the other hand, experienced biologists from BRA, the FWS, and the FFWCC actually visited the site prior to development. AR 3813; AR 6670-71; AR 6689. BRA and the FWS concluded that no Florida Scrub-Jay habitat existed on site, *see* AR 6683; AR 6689; FWS 1428, and the FFWCC never raised any concerns indicating that it thought there was Scrub-Jay habitat on the site. Again, BRA conducted extensive wildlife surveys in 2002 and again in 2005 covering the entire site, including the area that Dr. Stith asserts was Florida Scrub-Jay habitat prior to construction, and found no such habitat. AR 1859-74; AR 2008; FWS 1451-57.

Dr. Stith refers to studies of metapopulations of Florida Scrub-Jays. Pl. Sub. at Attach. P, ¶ 3. BRA has completed Florida Scrub-Jay surveys on properties within this metapopulation and these surveys reflect more current conditions. *See* Exs. O-S. The closest metapopulation in the map Dr. Stith relies upon is approximately 12 miles to the northwest and is largely restricted to four large properties: Cross Bar Ranch, Al Bar Ranch, Barthle Ranch, and 4G Ranch. *Id.* The documents that Dr. Stith relies upon include families on the Conner Ranch which disappeared more than 5 years ago. *Id.* Thus, there is nothing in Dr. Stith's declaration that should alter the Corps' and the FWS' determinations that the project will cause no impact to the Florida Scrub-Jay.

### C. The Environmental Assessment Was Sufficient and No Environmental Impact Statement Was or Is Required

The Environmental Assessment satisfied the requirements of NEPA, and took a hard look at the project, the impacts of the alternatives, and the cumulative impacts. The Corps prepared

the Environmental Assessment. In so doing, the Corps reviewed, examined, and analyzed the materials submitted by third parties, including the applicant and its consultants and Plaintiffs, in addition to its own records and the records of the many state and local agencies that considered the environmental impacts of the project. The Corps also made various requests for additional information regarding potential impacts. AR 3881-82; AR 3893-912; AR 4471-72; AR 4480; AR 4500. This demonstrates that the Corps took the requisite hard look at the impacts required under National Environmental Policy Act ("NEPA") in the Environmental Assessment, and no Environmental Impact Statement was or is required.

**1. The Corps Took a Hard Look at the Impacts of the Project**

Plaintiffs raise three specific aspects of the CCTC project that they claim were not sufficiently analyzed by the Corps: 1) the stormwater management system, 2) whether the buffers called for by the plan are sufficient to protect the Pasco County "critical wildlife linkage," and 3) potential impacts to the Wood Stork and the Eastern Indigo Snake. Pl. Sub. at 21-22.

Plaintiffs are wrong that the Corps did not sufficiently identify and consider the proposed stormwater management system. This issue is really about the water quality of Cypress Creek, which is within the province of the state and local agencies, including the SWFWMD, which issued a Water Quality Certification for the project. In addition to all of the state and local authorities approving the stormwater system, the Corps also took a hard look at the system, repeatedly reiterating its concern about the impacts of the project on Cypress Creek. AR 3880; AR 4469; AR 4472; AR 5385; AR 5404; AR 5557; AR 5958; AR 6650; AR 6670-73; AR 6676; AR 6679-80. As discussed above with regard to Plaintiffs' CWA arguments, the Corps analyzed the stormwater system in great detail, and correctly concluded that the system will actually enhance water quality. AR 6676-77.

Plaintiffs are also wrong when they state that the Corps did not take a hard look at the buffers, and whether the buffers are sufficient to protect the Pasco County "critical wildlife linkage." As discussed above, the Environmental Assessment explicitly identifies and discusses this very issue, and concludes that the 50 and 25 foot buffers are sufficient to protect the "critical wildlife linkage," AR 6672, in addition to Cypress Creek, AR 6650, and onsite wetlands, AR 6650.

As set forth above, the Corps consulted extensively with the FWS regarding the impacts of the project on the Wood Stork and the Eastern Indigo Snake. Both agencies concluded that the project was not likely to adversely affect either species. Thus, Plaintiffs' argument that the Corps failed to take the requisite hard look at the impacts of the project on these species is unsupported.

**2. The Corps Took a Hard Look at the Impacts of the Alternatives**

Plaintiffs' primary criticism with regard to the scope of analysis of the environmental impacts is the analysis of the no action alternative. Plaintiffs claim that only the economic impacts of the no action alternative were analyzed during the permitting process. Pl. Sub. at 22.

This is not true. The environmental impacts of the no action alternative were analyzed and included in the administrative record. AR 4597-98. Because circumstances have changed since the original permitting process, Permittees are attaching an additional analysis of environmental impacts of project alternatives for the Corps to consider on remand. This assessment analyzes three alternatives and ultimately confirms that the environmental impacts of the no action and other alternatives outweigh the minimal impacts of the completed CCTC project. *See* Ex. T.

Plaintiffs also argue that the Corps failed to analyze the impacts of several reduction scenarios. NEPA does not impose an obligation on an agency to consider every possible impact of every conceivable alternative. Moreover, the "reduction scenarios" identified by Plaintiffs are simply a recharacterization of issues that the Corps did look at and consider, such as whether there was a way to lessen impacts on Wood Stork and Eastern Indigo Snake habitat, which was unnecessary in light of the Corps' and the FWS's findings that the project was not likely to adversely affect either of those species. Furthermore, the CCTC Permit includes extensive mitigation for loss of Wood Stork habitat. Another "reduction scenario" raised by Plaintiffs is their contention that the Corps should have considered whether CCTC could avoid using on-site wetlands to treat runoff, but the Corps (and all of the responsible state and local agencies) carefully analyzed, and ultimately approved, every aspect of the stormwater management system, and required mitigation for all wetland impacts of the project, making this another non-issue.

### 3.      The Corps Took a Hard Look at the Cumulative Impacts

Plaintiffs again misstate the record by claiming that the cumulative impacts analysis was only one paragraph. The cumulative impacts analysis, however, is 24 pages long, contains an additional 51 pages of appendices, and analyzed the impacts of CCTC on water quality, Wood Storks, flooding, and wetlands. AR 4710-33. Given the relatively minimal direct impacts of the project, it was entirely reasonable for the Corps to conclude that there would not be significant cumulative impacts.

Plaintiffs' criticisms of the cumulative impacts analysis are largely based on Plaintiffs' dissatisfaction with the amount of analysis in the Environmental Assessment regarding various cumulative impacts. But Plaintiffs' desire that the Corps prepare a lengthier analysis does not somehow render the cumulative impacts analysis deficient.

Plaintiffs first argue that the cumulative impacts analysis should have addressed the cumulative impacts of road expansion on, specifically, the Eastern Indigo Snake. While Plaintiffs are correct, the impacts of road expansion on key parameters were analyzed in the cumulative impacts analysis. AR 4718 (water quantity); 4723 (Wood Storks); AR 4729 (wetlands). Just because the one parameter out of hundreds that Plaintiffs cherry picked was not analyzed does not make the analysis of the impacts of road expansion deficient.

Plaintiffs also incorrectly claim that the impacts of other development were not adequately analyzed. The cumulative impacts analysis expressly analyzes the impacts of potential future development. AR 4718; 4723, 4729. Moreover, the Environmental Assessment specifically discusses the impacts of development/"urban sprawl." AR 6680. In any event, CCTC is a result of urban sprawl, not a cause of it.

Plaintiffs also argue that the cumulative impacts of the project on water demand and withdrawal were not analyzed. This is not true. The consumptive use of water falls within the province of the state, regional and local regulators, not the Corps, Fla. Stat. § 373.036; Fla. Stat. § 373.042; Fla. Stat. § 373.0421, and the state, regional, and local agencies considered these issues and concluded that they did not have an objection to CCTC on these grounds. The Corps considered and agreed with these conclusions by the responsible state and local agencies in reaching its decision regarding the CCTC Permit. AR 6638; 6675-76.

First, the SWFWMD issued an ERP/Water Quality Certification for CCTC after extensively analyzing the impacts to water demand and withdrawal, and finding that the project would not cause adverse cumulative impacts to water resources. AR 6638; AR 6521-41; Fla. Stat. § 373.036; 33 U.S.C. § 1341. Second, with regard to impacts on the groundwater recharge and the integrity of the aquifer, the Pasco County DO required "the applicant to implement a groundwater monitoring program that has been reviewed and approved by the County, the FDOT, SWFWMD, and Tampa Bay Water," "no excavation into the Floridian aquifer's confining layers or underlying limestone," and compliance with the Pasco County Wellfield Protection Ordinance. AR 6675. Third, with regard to whether the potential for water level recovery from reductions in wellfield pumping had been taken into account in project development, SWFWMD compared seasonal high water levels to indicators of historic high pool levels. *Id.* Based on this comparison, SWFWMD determined that the levels were equivalent. *Id.* In other words, it is not likely that the wellfields are currently lowering water levels in wetlands on the CCTC site because the project is located only on the fringes of the modeled wellfield drawdown areas of the surficial aquifer and current and historical indicators are at essentially the same elevations. AR 6675. Fourth, "Tampa Bay Water has already reduced water production in its central system wellfields, including the Cypress Creek Wellfield and the Cypress Bridge Wellfield, down to a level of water production that has been predicted by both Tampa Bay Water and the SWFWMD to result in recovery." AR 6675. Fifth, the surface water quality monitoring plan designed to ensure no adverse impacts to Cypress Creek was approved by Pasco County, the SWFWMD, the FDEP, Tampa Bay Water, the Tampa Bay Regional Planning Council, and the Environmental Protection Commission of Hillsborough County. AR 6676.

Finally, no Environmental Impact Statement was or is required. None of the factors that Plaintiffs identify require preparation of an Environmental Impact Statement. Plaintiffs largely focus on the fact that wetlands will be impacted in support of their contention that an Environmental Impact Statement is required, but an Environmental Impact Statement is not required for every project that impacts wetlands. This is particularly true for a project such as the CCTC project, which will impact only 53.89 acres of wetlands. Plaintiffs also argue that potential impacts to Cypress Creek require preparation of an Environmental Impact Statement, but there is no such requirement. The potential impacts to Cypress Creek were extensively and thoroughly analyzed by the Corps and discussed in the Environmental Assessment. Plaintiffs next argue that potential impacts of the project on the Pasco County "critical wildlife linkage" require preparation of an Environmental Impact Statement, but impacts to the linkage were thoroughly analyzed by the Corps. Plaintiffs also suggest that potential endangered species impacts – specifically, impacts to Wood Stork and Eastern Indigo Snake habitat – require preparation of an Environmental Impact Statement. There is, however, no requirement that an

Environmental Impact Statement be prepared for every case involving potential impacts to endangered species or their habitat. Moreover, as set forth above, the potential impacts of the project on these species and their habitats were thoroughly analyzed by both the Corps and the FWS and discussed in the Environmental Assessment.

We thank you in advance for considering these comments. Please do not hesitate to contact me if you believe additional information should be considered in your evaluation of the Plaintiffs' letters and declarations.

Sincerely,

Douglas M. Halsey

cc: (via mail)

Mark A. Brown
Senior Trial Attorney
Wildlife & Marine Resources Section
U.S. Dept. of Justice
P.O. Box 7369
Washington DC 20044-7369

John F. Kasbar
Assistant District Counsel
U.S. Army Corps of Engineers
701 San Marco Blvd.
Jacksonville, FL 32207

Paul L. Grosskruger
Colonel, U.S. Army
District Commander
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa, FL 33610

Charles Schnepel
Chief, West Permit Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa, FL 33610

Eric Summa
Section Chief, Enforcement Section
Jacksonville, District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

Thomas Farrell
Regulatory Division
Special Projects/Enforcement Branch
Enforcement Section
Jacksonville, District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

David Hankla
U.S. Department of the Interior
Fish and Wildlife Service
6620 Southpoint Drive, South
Suite 310
Jacksonville, FL 32216