**WHITE & CASE**

White & Case LLP                           Tel   + 1 305 371 2700
Wachovia Financial Center, Suite 4900       Fax  + 1 305 358 5744/5766
200 South Biscayne Boulevard                www.whitecase.com
Miami, Florida 33131-2352

Direct Dial + (305) 995-5268       dhalsey@whitecase.com

November 5, 2008

<u>VIA ELECTRONIC MAIL AND EXPRESS MAIL</u>

Ms. Tracy Hurst
Project Manager
U.S. Army Corps of Engineers
10117 Princess Palm Avenue, Suite 120
Tampa, FL  33610

Re:   Cypress Creek Town Center Permit (Case No. 07-cv-01756, D.D.C. Oct. 1, 2007)

Dear Ms. Hurst:

      This letter is written on behalf of Sierra Properties I, LLC, Pasco 54, Ltd., Pasco Ranch, Inc., and JG Cypress Creek LLC (collectively, "Permittees") in response to the October 2, 2008 correspondence submitted to the U.S. Army Corps of Engineers ("Corps") by counsel for the Sierra Club, Gulf Restoration Network, Clean Water Action, Richard Sommerville, and Chris Loy (collectively, "Plaintiffs") regarding the Cypress Creek Town Center ("CCTC") project.

      Plaintiffs' October 2, 2008 submission largely restates the same positions and arguments raised in their July 23, 2008 and August 11, 2008 submissions to the Corps.  Because we have already addressed those arguments in our August 22, 2008 correspondence, we only address those issues warranting clarification or correction in light of Plaintiffs' most recent submission.  Specifically, we address herein Plaintiffs' arguments that:  (1) if an unadjusted historic purchase price for the CCTC property were used instead of the property's fair market value, a smaller regional mall would be economically viable and therefore a practicable alternative within the meaning of the Corps' regulations under Section 404 of the Clean Water Act ("CWA"); and (2) CCTC will significantly degrade Cypress Creek and its adjacent wetlands.  We do not address Plaintiffs' Endangered Species Act ("ESA") and National Environmental Policy Act ("NEPA") arguments because they simply restate their previous arguments, which we comprehensively addressed in our August 22nd Submission.

ALMATY   ANKARA   BANGKOK   BEIJING   BERLIN   BRATISLAVA   BRUSSELS   BUDAPEST   DRESDEN   DÜSSELDORF   FRANKFURT   HAMBURG
HELSINKI   HONG KONG   ISTANBUL   JOHANNESBURG   LONDON   LOS ANGELES   MEXICO CITY   MIAMI   MILAN   MOSCOW   MUNICH
NEW YORK   PALO ALTO   PARIS   PRAGUE   RIYADH   SÃO PAULO   SHANGHAI   SINGAPORE   STOCKHOLM   TOKYO   WARSAW   WASHINGTON, DC

EXHIBIT C

WHITE & CASE

Ms. Tracy Hurst
November 5, 2008
Page 2

I.      **Plaintiffs' proposed "practicable alternatives" analysis is legally and logically flawed.**

As with their earlier submissions, Plaintiffs argue that a smaller CCTC is a practicable alternative. Their argument is based almost exclusively on their claim that the unadjusted historic purchase price of the CCTC land 20 years ago should be utilized in determining the comparative rate of return for the proposed CCTC and an alternative, smaller CCTC. Pl. 3rd Sub. at 3. Plaintiffs, however, either misunderstand or have deliberately mischaracterized what "cost" means under the Corps' regulations that call for analyzing the practicability of an alternative from a cost perspective.

Under the Section 404 Rules, "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project objectives." 40 CFR § 230.10(a)(2). An alternative that is cost prohibitive or not economically viable is not practicable. *See Bering Strait Citizens for Responsible Resource Dev. v. U.S. Army Corps of Eng'rs*, 2008 WL 43711, *5 (9th Cir. 2008) ("After extensive consultation with [the applicant], the Corps determined that all alternatives were impracticable . . . because alternatives were cost prohibitive or undesirable for other reasons. This rationale is acceptable under the CWA."); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1266-67 (10th Cir. 2004) (affirming determination that a smaller project than the approved plan would not be economically viable); *James City County, Va., v. EPA*, 955 F.2d 254, 259-260 (4th Cir. 1992) (finding alternative to dam project would result in water costing 50% more, thereby rendering alternative impracticable due to cost). The preamble to the Section 404 Guidelines confirms that the inquiry into "cost" turns on whether the alternative is "reasonable in terms of the overall scope/cost of the proposed project," and that an alternative is not practicable if it is "unreasonably expensive." *See* 1980 Notice, 45 Fed. Reg. at 85,339, 43.

In its classic formulation, the cost or current purchase price of another site must, among other things, be considered in determining whether that site is a practicable alternative to the proposed project site. If the cost of an alternative upland site with few or no wetland impacts is prohibitive, then it is not practicable under the Corps' regulations. It is the current market price of the alternative site that must be considered under the regulations – not a historic purchase price – in determining if the alternative is practicable.

Whether reducing a project's size and its associated wetland impacts is practicable is an appropriate consideration under the Section 404 guidelines. In doing so, the Corps and the applicant must consider the economic viability of the proposed project compared to a smaller version of the project. Unlike the alternative site exercise, where the purchase price or cost of the alternative site is determinative, the reduced project alternative entails the weighing of the future economic viability of two different projects on the same site.

WHITE & CASE

Ms. Tracy Hurst
November 5, 2008
Page 3

As explained in the Ernst & Young analysis, the rate of return is also the going-in capitalization rate (or the overall capitalization rate),[1] which is defined by RERC as "the first year Net Operating Income ("NOI") (before capital items of [such as] tenant improvement and leasing commissions and debt service but after real estate taxes) divided by **present value (or purchase price)**." *See* Ernst & Young Report at 6; Summer 2006 RERC Report at 52 (AR 05473) (emphasis added). As Ernst & Young notes, RealtyRates "concurs with RERC's definition with their statement that the OAR [overall capitalization rate] is the, 'ratio of net operating income to **property value or sales**.'" *See* Ernst & Young Report at 6 (emphasis added). *See also* Commercial Lending & Investment Property Loan Glossary of Terms, at 10, attached hereto as Exhibit A (defining "going-in capitalization rate" as "[t]he capitalization rate computed by dividing the projected first year's net operating income by the value of the property."); All About Cap Rate And Its Use In Real Estate Investing, J. Kobzeff, at 1, attached hereto as Exhibit B ("cap rate merely expresses the relationship between a property's value and its net operating income"); Estimating Value With The Capitalization Rate, M. Santarelli, at 1, attached hereto as Exhibit C ("The Cap Rate is calculated by taking the property's net operating income (NOI) and dividing it by the property's fair market value (FMV)."); How To Estimate Resale Value Using "Cap" Rates, F. Gallinelli at 1, attached hereto as Exhibit D ("Mathematically, a property's simple capitalization rate is the ratio between its net operating income (NOI) and its present value:  Cap. Rate = NOI/Present Value").

In other words, when determining the economic viability of CCTC and the smaller alternative project, it is the current value of the two projects and their projected rates of return based on those values that must be considered in determining economic viability and financability. According to Plaintiffs, however, if the applicant inherited the project property instead of purchasing the property for fair market value before seeking a permit, than the project could be reduced substantially more based solely on the amount the applicant paid for the property. Whether the applicant inherited the property, bought it at a tax sale, or purchased it within 12 months of submitting the permit application is of no relevance in determining whether a smaller alternative project is economically viable. Not only is Plaintiffs' theory unsupported by any of the applicable statutes, regulations, rules, case law, or widely-accepted real estate industry valuation protocols, it defies common sense.

As set forth in detail in Permittees' August 22nd Submission at 5-9, the appraised value of the land (approximately $72,837,500 at the time the permit application was under consideration), combined with other relevant factors discussed extensively in Permittees' August 22 Submission and the Ernst & Young Report, confirms the Corps' original conclusion that reducing the size of the project was impracticable because it would make the project cost prohibitive. Plaintiffs' argument that Permittees have submitted "no supporting information or explanation why it is impracticable" to have a less than 8% rate of return for CCTC ignores all of the information submitted during the permitting process and the detailed Ernst & Young analysis submitted on August 22nd which concluded that "an 8% ROR is a reasonable minimum

---

[1] As established in the Ernst & Young Analysis at 6, the terms "rate of return," "going-in capitalization rate," and "overall capitalization rate" are used interchangeably throughout the real estate industry.

WHITE & CASE

Ms. Tracy Hurst
November 5, 2008
Page 4

development return for a retail development project such as Cypress Creek Town Center."
8/22/08 Sub. at Ex. A at p. 11.

Plaintiffs state that that Permittees have "abandon[ed] and undermin[ed] the RERC reported rate of return . . . ." Pl. 3rd Sub. at 4. Plaintiffs are mistaken. Both during the original permitting process and in their August 22nd Submission, Permittees have relied upon the Summer 2006 RERC Report as a reliable source that supports the conclusion that reducing the size of CCTC would make the project impracticable. 8/22/08 Sub. at 6.

Permittees inadvertently cited to the wrong table in the Summer 2006 RERC Report during the permitting process, and corrected this error by relying on the appropriate tables in their August 22nd Submission. Plaintiffs nonetheless recklessly argue that Permittees' mis-citation was a deliberate attempt to mislead the Corps. This assertion is false and Plaintiffs know it. The earlier reference to the wrong table, since corrected, does nothing to change the fact that, as explained in great detail in our August 22nd Submission, and the Ernst & Young analysis attached thereto, other tables in the Summer 2006 RERC Report and other sources demonstrate that 8% was an extraordinarily low minimum rate of return for the project and that the required rate of return should have actually been higher. 8/22/08 Sub. at 5-9.

Plaintiffs' argument that a smaller project would have been economically viable and was therefore a practicable alternative is based entirely on their novel theory that a historic purchase price should be used in calculating relative rates of return for alternative future development scenarios. Plaintiffs cite no authority to support the Corps' use of their proposed economic "analysis" because there is none.

## II.     CCTC will not cause significant degradation of Cypress Creek and its wetlands.

Plaintiffs apparently now concede that isolated discharges during the construction phase of the project are not indicators of how the permanent stormwater management system will perform when completed. But Plaintiffs still insist on mischaracterizing the ephemeral character of those discharges. Permittees acknowledge that there were temporary exceedances of turbidity standards. But, as set forth in our August 22nd Submission, Plaintiffs are simply incorrect that the isolated discharges into Cypress Creek resulted in degradation of the creek or its wetlands. 8/22/08 Sub. at 5. Environmental assessments by the responsible state and local government agencies found no permanent damage to Cypress Creek or its wetlands from the discharges from CCTC. Thus, there is simply no support for Plaintiffs' argument that the discharges justify revoking the CCTC permit.

WHITE & CASE

Ms. Tracy Hurst
November 5, 2008
Page 5

As established in our August 22nd submission at 9-14, and during the permitting process, the permanent stormwater system has sufficient capacity and will adequately treat the types of contaminants likely to be present in CCTC stormwater.[2]

Plaintiffs attempt to downplay the fact that their expert's entire analysis of the capacity of the permanent stormwater system hinges on a crucial inaccuracy – that the system will only handle the first 1.5 inches of rainfall, as opposed to 1.5 inches of runoff. But, as explained in our August 22nd submission, this is a critical distinction because in order to achieve 1.5 inches of runoff, rainfall will need to exceed 2.9 inches, which is extremely rare. 8/22/08 Sub. at 10.

Plaintiffs do not dispute that the permanent stormwater management system complies with all applicable state requirements, and exceeds many of those requirements. Plaintiffs' argument that CCTC will cause or contribute to the degradation of Cypress Creek hinges on their apparent belief that the applicable state requirements are inadequate or irrelevant. That is simply a disagreement with a policy decision by the state, not a reason to believe that this project will cause or contribute to the degradation of Cypress Creek or its wetlands.

Instead of simply conceding that the system is more than adequate, Plaintiffs essentially argue that CCTC should be held to a higher standard than every other permitted project in the state of Florida, and should be required to have a stormwater system that can handle an infinite amount of water. To this end, Plaintiffs argue that Permittees have not addressed "what will happen when rainfall exceeds the systems' capacity." Pl. 3rd Sub. at 5. This question, of course, could be asked of any stormwater system because no system has infinite capacity. Plaintiffs cite to no evidence supporting the conclusion that the stormwater system does not have sufficient capacity, or that rainfall will ever exceed the system's capacity. In fact, the record evidence supports the exact opposite conclusion. 8/22/08 Sub. at 9-14. That some highly unusual, hypothetical event may occur that causes rainfall that exceeds a system that is in compliance with all, and exceeds many, of the applicable regulatory requirements does not support Plaintiffs' assertion that the project "will cause and contribute to the significant degradation of Cypress Creek and its wetlands." Pl. 3rd Sub. at 5.

We thank you in advance for considering these comments. Please do not hesitate to contact us if you believe additional information should be considered in your evaluation of the Plaintiffs' letters and declarations.

Sincerely,

Douglas M. Halsey

cc: (via mail)

---

[2] Plaintiffs apparently concede that the permanent stormwater system will effectively treat the specific types of contaminants likely to be present at CCTC because they no longer contest that point in their most recent submission.

WHITE & CASE

Ms. Tracy Hurst
November 5, 2008
Page 6

Mark A. Brown
Senior Trial Attorney
Wildlife & Marine Resources Section
U.S. Dept. of Justice
P.O. Box 7369
Washington DC  20044-7369

John F. Kasbar
Assistant District Counsel
U.S. Army Corps of Engineers
701 San Marco Blvd.
Jacksonville, FL  32207

Paul L. Grosskruger
Colonel, U.S. Army
District Commander
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa, FL  33610

Charles Schnepel
Chief, West Permit Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa, FL  33610

Eric Summa
Section Chief, Enforcement Section
Jacksonville, District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

Thomas Farrell
Regulatory Division, Special Projects/Enforcement Branch
Enforcement Section
Jacksonville, District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

WHITE & CASE

Ms. Tracy Hurst
November 5, 2008
Page 7


David Hankla
U.S. Department of the Interior
Fish and Wildlife Service
6620 Southpoint Drive, South
Suite 310
Jacksonville, FL  32216

Joshua Stebbins
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056