# Meyer Glitzenstein & Crystal

1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C.  20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Joshua R. Stebbins
Tanya M. Sanerib
Erin M. Tobin

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

July 17, 2007

**VIA CERTIFIED MAIL AND**
**ELECTRONIC TRANSMISSION (EMAIL AND/OR FACSIMILE)**

Lt. Gen. Robert L. Van Antwerp
Chief of Engineers,
Army Corps of Engineers
20 Massachusetts Ave., N.W.
Washington, D.C. 20314
202-761-1683 (fax)

Lt. Gen. Robert L. Van Antwerp
Mr. Lance Wood, Esq.
U.S. Army Corp of Engineers
Chief Counsel's Office
441 G. Street, NW
Washington, D.C 20314
lance.d.wood@usace.army.mil

Dirk Kempthorne
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
exsec@ios.doi.gov (executive secretary)
(202) 219-2100 (fax)



recycled paper

AR021732

Dale Hall,
Director,
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240
dale_hall@fws.gov

RE:   **Notice of Intent Regarding the Cypress Creek Town Center in Pasco County,**
      **Florida**

We are writing on behalf of the Sierra Club to provide you with written notice of
violations of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1531 et seq., the Clean
Water Act ("CWA"), 33 U.S.C. § 1251 et seq., and the National Environmental Policy Act
("NEPA"), 42 U.S.C. § 4321 et seq., in connection with the U.S. Army Corps of Engineers
("Corps") section 404 permit for the destruction of wetlands in Pasco County, Florida. See
generally Department of Army Permit, Permit No. SAJ-2003-2336 (IP-THE) (May 15, 2007).
The permit allows wetlands destruction to build a sprawling "regional mall and supporting
commercial enterprises, including retail businesses, financial institutions, hotels, restaurants,
cinemas, offices and multi-family residential housing" to be known as "Cypress Creek Town
Center" ("CCTC"). Corps Environmental Assessment and Statement of Finding Of No
Significant Environmental Impact, May 15, 2007, ("EA") at 2. We understand that the developer
is currently on site and destroying wetlands pursuant to the permit.

As discussed in greater detail below, the project calls for over fifty acres of wetlands to be
destroyed, nearly half for parking lots. EA at 11. It will destroy acres of wood stork habitat,
Eastern indigo snake habitat, EA at 46-47, and Florida scrub jay habitat. It will imperil the water
quality, and quantity, of Cypress Creek, and therefore both the City of Tampa's drinking water
and West Indian manatee habitat. It requires paving over a recharge area for groundwater
aquifers while drawing heavily upon that groundwater. And it threatens a critical wildlife linkage
across the site that connects nearby conservation lands.

The Corps' permit is unlawful for a number of reasons. Among other deficiencies, the
Corps failed to: 1) consult with the United States Fish and Wildlife Service ("FWS") concerning,
for example, impacts on the Florida scrub jay and the West Indian manatee; 2) engage in formal
consultation with FWS concerning adverse impacts on the wood stork and the Eastern indigo
snake; 3) comply with CWA requirements prohibiting the destruction of wetlands where there are
practicable alternatives, especially since the Corps acknowledged the project was not water
dependent; 4) require the applicant to clearly demonstrate that there were no practicable
alternatives; 5) comply with CWA requirements prohibiting the destruction of wetlands without
avoidance and minimization of those impacts; 6) comply with CWA requirements prohibiting
activities that might substantially degrade waters of the United States; 7) prepare an
Environmental Impact Statement ("EIS").

AR021733

In light of these clear violations of the ESA, the CWA and NEPA, the Sierra Club urges the Corps to revoke and/or suspend the permit to address these concerns. Otherwise, the Sierra Club intends to bring suit to challenge the unlawfully issued permit. Please feel free to contact us to discuss these matters.

## BACKGROUND

On May 15, 2007, the Corps issued an environmental assessment and a permit authorizing the filling of over fifty acres of wetlands for an enormous development that will include 630 residences, 700 hotel rooms, more than 900,000 square feet of retail space (enough for 8 giant box stores like Walmart, Lowes, and Home Depot, along with smaller stores), 178,800 square feet of restaurants, and 420,000 square feet of office space. EA at 14. The Corps has acknowledged that the project is expected to induce growth, in an area that is already "rapidly growing." Corps Public Notice, 1, October 31, 2005. See also EA at 34, 49-50. Although commenters raised numerous concerns about the project based on the little information provided in the Corps' public notice, including among other things, the existence of alternative sites where less wetlands would be destroyed, the unnecessary destruction of wetlands on the site due partly to parking lots and other one-story structures, and the threats to the water quality and quantity of groundwater and surface waters like Cypress Creek, the Corps issued its EA and permit without addressing many of these concerns.

The 500 acre development site is in lands that provide habitat for federally listed species - the wood stork, the Eastern indigo snake, and the Florida scrub jay - and that also provide headwaters for the City of Tampa's drinking water. The Corps itself acknowledged the significance of the permitted action when, for example, it concluded that "[g]iven that a portion of the project drains into Cypress Creek, an Outstanding Florida Water (OFW) and a tributary to the Hillsborough River (the major source of drinking water for the City of Tampa), **water quality was an issue of great concern.**" EA at 41 (emphasis added). Moreover, the site includes areas "identified as a critical wildlife linkage" in a report commissioned by Pasco County. Corps EA at 37 (emphasis added). This is because the site includes lands "along Cypress Creek within the project area [that] fall into the identified 'Cypress Creek to Cypress Bridge' critical linkage" connecting other conservation areas. Id. (emphasis added). Alligators, little blue herons, white ibis, tricolored herons, snowy egrets, gopher tortoises, and Eastern indigo snakes are among the species observed on the site. EA at 36.

With regard to federally listed species, the Corps acknowledged that the development may affect the wood stork and the Eastern indigo snake, though it determined that the project was not likely to adversely affect the species, and it received a concurrence from the FWS on March 14, 2007 in this regard. The Corps determined that there would be no impact on two federally listed species, the Florida scrub jay and the West Indian manatee.

However, the site includes several acres of xeric oak scrub, which provide habitat for the imperilled Florida scrub jay, a threatened species under the ESA. The Florida scrub jay is a "30

3

centimeter (12 inch), bluish-colored, crestless jay . . . [with a] necklace of blue feathers." FWS, Threatened Status for the Florida Scrub Jay, 52 FR 20715, 20716 (June 3, 1987). The Florida scrub jay lives only in the Florida scrub habitat, which "consists of dense thickets of scrub oaks less than 3 meters in height, interspersed with bare sand for foraging and storing acorns." Id. The jay has been completely eliminated from much of its habitat, and elsewhere its populations have "decreased drastically" in other areas. Id. The "major cause of the jay's population decline and its disappearance from specific sites is habitat destruction." Id. (emphasis added). "In virtually every county where the species occurs, it is known to have declined in numbers:" the total number of surviving Florida scrub jays on private property, like the site here, is estimated at only 2,000, while greater numbers can be found on public lands. Id. The Florida scrub jay is number seven on the National Audubon Society's 2006 report America's Top Ten Most Endangered Birds.

The site is also within the core foraging area for five breeding colonies of wood storks, EA at 46, and is 1.3 miles from the nearest wood stork colony. Public Notice at 3. The wood stork, which was listed as endangered by the FWS in 1984, "is the only species of true stork breeding in the U.S." See FWS, U.S. Breeding Population of the Wood Stork Determined To Be Endangered, 49 FR 7332 (February 28, 1984). It is "a large, long-legged, white wading bird with an unfeathered gray head and a stout dark bill" that "frequent[s] freshwater and brackish wetlands" to feed and "usually nests in cypress and mangrove swamps." Id. The primary cause of the wood storks decline is the "loss of suitable feeding habitat," which is "especially true for the south Florida rookeries" as "[f]eeding areas in south Florida have decreased by about 35 percent since 1900 due to man's alteration of wetlands." Id. (emphasis added).

The site also provides habitat for the Eastern indigo snake, a threatened species that lives in burrows under ground. Public Notice at 3. See also FWS, Listing of the Eastern Indigo Snake As A Threatened Species, 43 FR 4026 (January 31, 1978). The snake has been seen on the site as recently as this past May. A primary cause of the snake's decline is "rapid development resulting in considerable loss of available habitat." Id. at 4028 (emphasis added). Because its habitat is "ideal for human settlement," there are "serious decline[s] in populations of the Eastern indigo snakes in many areas." Id.

The endangered West Indian manatee currently occupies the lower stretches of the Hillsborough River, as well as Tampa Bay and its marine reserves, which receive waters from Cypress Creek. The manatee is one of the most endangered marine mammals in coastal waters of the United States, and according to a 1998 FWS report the "status of the manatee population is, at best, marginally stable." Florida Manatee Recovery Accomplishments: 1998 Annual Report, at 4. The "major threats to Florida manatees are collisions with watercraft, which account for 25 percent of known manatee deaths in Florida annually, and destruction and degradation of habitat caused by widespread development throughout much of the species' Florida range." FWS, Southeast Region, Florida Manatee Recovery Plan (Jan 29, 1996) 4. The Recovery Plan further states that "[i]ncreases in direct human-caused mortality and habitat destruction are two of the consequences of the rapid growth in Florida's human population," and that "[a]s long as this trend continues, the long term survival of manatees in the U.S. is in serious jeopardy." Id. "Intensive

4

AR021735

coastal development is perhaps the greatest long-term threat to the Florida manatee," and the species' "survival depends [in significant part] on maintaining the integrity of ecosystems and habitat sufficient to support a sustainable manatee population." Id. (emphasis added).  One impact of development is a decrease in water quality that can kill off submergent, emergent, and floating sea grasses and other vegetation, which provides much of the manatees diet, and that can also lead to red tides.

## DISCUSSION

### I.        The Endangered Species Act

Section 7 of the ESA requires that each federal agency ensure that its actions, and any actions it authorizes, are not likely to "jeopardize the continued existence" of a listed species.  16 U.S.C. § 1536(a)(2).  In fulfilling this mandate, each federal agency "shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a).  If an action may affect a listed species, "formal consultation" with the FWS is required unless, "as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the [FWS], that the proposed action is not likely to adversely affect any listed species or critical habitat." Id. at 402.14(b).

In the context of a biological assessment, the agency must "evaluate the potential effects of the action on listed and proposed species . . . and determine whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12.  Among the criteria for consideration in a biological assessment are "an on-site inspection of the area affected by the action to determine if listed or proposed species are present or occur seasonally," "the views of recognized experts on the species at issue," "literature and other information," an "analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies," and "an analysis of alternate actions considered by the Federal agency for the proposed action." Id. (emphasis added).  In the context of informal consultation, the "Federal agency, with the written concurrence of the Service," must review the action to determine whether, in fact, "the action is not likely to adversely affect listed species or critical habitat." 50 C.F.R. § 402.13.

In this case, the Corps' determination that the development would have no effect on the Florida scrub jay because there was "no scrub jay habitat on the site," and its resulting failure to engage in consultation regarding the Florida scrub jay, was arbitrary and capricious and contrary to law. See EA at 48.  Among other things, the Corps permitting officer, Tracy Hurst, and Linda Smith of the FWS, visited the site in February 2006 during which time they walked through and photographed xeric oak scrub habitat which the FWS officer acknowledged was Florida scrub jay habitat.  The loss of such habitat has been identified as a primary cause of the decline of the Florida scrub jay.

5

The Corps' determination that there would be <u>no</u> effect on the West Indian manatee, and its failure to engage in consultation regarding the manatee, was similarly arbitrary and capricious and contrary to law.  EA at 48.  The Corps' determination was predicated upon the location of manatees downstream from the site, and a water quality monitoring plan to protect the quality of the water that flows downstream.  <u>Id.</u>  However, the Corps failed to adequately address impacts to downstream water quality, including cumulative impacts of development in the area.  For example, it never addresses the types of pollution likely to be generated by the CCTC development, such as oils and other petrochemicals washed from the acres of parking lots; the efficacy of the storm water treatment system (consisting of ponds and baffles designed to remove grease) at handling such pollution; the ability of a storm water treatment system, designed to handle a 1.5" rain event, to handle the volumes of storm water generated by storm events in the area that frequently exceed 1.5"; the adequacy of protective buffers around the creek and remaining wetlands; and the ability of a plan that <u>monitors</u> water quality to actually <u>protect</u> water quality and quantity, particularly downstream.  These issues were raised by comments that were largely ignored by the Corps.  Yet the rapid and poorly planned development of Florida, resulting in the increasing pollution, sedimentation and turbidity of its waters, increasing red tides, and declining sea grasses and water quality, has contributed to the decline of the manatees.  Florida Manatee Recovery Plan, Third Rev., 2001 FWS SE Region (Oct. 30, 2001) 30.

Similarly, the Corps' determination that the project was not likely to adversely affect the Eastern indigo snake, and thus its failure to engage in formal consultation under the ESA on that species, was arbitrary and capricious and contrary to law.  The Corps' determination, and the FWS's unlawful "concurrence" was based upon, in short, allowing the snake sufficient time to flee the site if a worker spots a snake during clearing activities.  EA at 47 (referring to FWS's guidelines).  Yet the Corps' apparent determination that such means are adequate to protect the snake is patently arbitrary and capricious.  The site is over 500 acres.  EA at 1.  It is being cleared by as many as sixty pieces of large earth moving equipment moving so quickly that half the site was cleared of vegetation in under one week.  Again, Eastern indigo snakes live in burrows underground, Public Notice at 3, and they have been seen on the site as recently as this past May 2007.  The expectation that there will be no adverse affect on the snake because workers will see the snake in time to prevent harm to the snake, or that the snake will flee a 500 acre construction site on its own, is specious.  Moreover, the snake is being driven to extinction in significant part by "rapid development resulting in considerable loss of available habitat."  Listing of the Eastern Indigo Snake As A Threatened Species, 43 FR 4026 at 4028.  It is unclear how allowing the snake to flee the site addresses the loss of habitat that is driving it to extinction, particularly given the rapid growth in the area in general.  Public Notice at 1.  The Corps' determination that the project is not likely to adversely impact the snake on the grounds that the snake can simply move to another location, and the FWS's concurrence with it, is arbitrary and capricious.

The Corps was therefore required to formally consult with the FWS on Florida scrub jay, Eastern indigo snake and West Indian manatee impacts.  The FWS's conclusory statements in its March 14, 2007, concurrence letter is plainly inadequate to fulfill the consultation requirement.  Indeed, for species for which the Corps did not even request such concurrence, any FWS

6

AR021737

statements in the concurrence letter were dicta and without legal affect.

The Corps' determination that the project is not likely to adversely affect the wood stork, and thus its failure to engage in formal consultation under the ESA, was also arbitrary and capricious and contrary to law.  The Corps' determination, and the FWS's unlawful concurrence, was based upon the construction of mitigation areas and storm water treatment ponds to offset the loss of existing wood stork habitat, as well as a row of shrubs to minimize "wood stork roadkill." EA at 46.  Yet, among other things, the Corps failed to even discuss the long history of failure of its mitigation program, e.g., General Accounting Office, Wetlands Protection: Corps Of Engineers Does Not Have an Effective Approach to Ensure That Compensatory Mitigation Is Occurring, September 2005, http://www.epa.gov/owow/wetlands/pdf/GAO05898.pdf, (executive summary, pp. 1-6 attached), much less the ability of storm water retention ponds - designed and intended to process storm water with "dissolved solids as well as greases and floating debris," EA at 42, rushing off of parking lots - to offset the loss of existing wetlands.  Yet, as noted above, the loss of wood stork foraging habitat is a driving cause of the species' imperilled status.[1]

Section 9 of the ESA prohibits any person from "tak[ing] any [endangered] species within the United States or the territorial seas of the United States." 16 U.S.C. § 1538(a)(1)(B). "'[T]ake' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture" a listed species or attempt to do so, either directly or indirectly by degrading its habitat sufficiently to impair essential behavior patterns.  See e.g. 16 U.S.C. § 1532(19).

The ESA's prohibitions extend to any person's "to attempt to commit, solicit another to commit, or cause to be committed, any offense defined" in the ESA.  § 1538(g).  The term "person" includes "any officer, employee, agent, department, or instrumentality . . . of any State, municipality, or political subdivision of a State ... [or] any State, municipality, or political subdivision of a State . . . ." 16 U.S.C. § 1532(13).  The Secretary of the Interior has defined "harm" as "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3 (2005).  Courts have held that government officials and agencies can be liable under the ESA for takings by third parties, when the action of the third party was done pursuant to a license or permit it issued.

---

[1] In strikingly similar circumstances, the United States District Court for the Southern District of Florida just rejected the Corps's determination (and the Service's concurrence with it) that the issuance of a permit for the destruction of wetlands "may affect, [but is] not likely to adversely affect" the wood stork.  See Sierra Club v. Strock, Civ. No. 03-23427-civ-Hoeveler, slip op. at 122-127, 128 (S.D.Fl. July 13, 2007) ("For the Defendants to base the [permits] on their assertions that no protected species were likely to be affected, and then - after being forced to comply with their own regulations by this Court - to determine that three endangered species and one threatened species may be affected by the very same mining that was previously studied, leads to little confidence in these agencies.") (emphasis in original).  Much as in this case, the wetlands to be destroyed in Sierra Club v. Strock contained foraging habitat for woodstorks that was important in part because it was located near brooding colonies, and they provided habitat for the eastern indigo snake.  See id. at 128-131.

AR021738

Strahan v. Coxe, 127 F.3d 155 (1st Cir. 1997); Defenders of Wildlife v. Administrator EPA, 882 F.2d 1294 (8th Cir. 1989); Loggerhead Turtle v. County Council of Volusia County, Florida, 896 F.Supp. 1170, 1181-82 (M.D.Fl. 1995).

The Corps and its commanding officers have violated section 9 of the ESA. More specifically, in issuing the challenged permit the Corps has caused the take of federally listed species identified above. The permitted development at the site will destroy habitat of threatened and endangered species, including, for example, habitat that is occupied by the eastern indigo snake, and thus it will degrade its habitat sufficiently to impair essential behavior patterns. Moreover, the actions permitted by the permit threatens to, and will, result in direct harm and harassment of listed species.

## II.     The Clean Water Act

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It prohibits the discharge of any pollutant into the waters of the United States, including wetlands, without a permit. 33 U.S.C. § 1311(a). The term "pollutant" includes "dredge spoil," "solid waste," "rock, sand, cellar dirt and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

Section 404 of the CWA authorizes the Army Corps of Engineers to issue permits for the discharge of "dredged or fill materials" into waters of the U.S., but only if stringent regulatory requirements are satisfied. Implementing regulations prohibit the Corps from issuing permits for filling wetlands if any "practicable" alternatives are available. 40 C.F.R. § 230.10(a). The regulations provide a very strong presumption that there are practicable alternatives to filling wetlands for activities that are not "water dependent," id. at 230.10(a)(3), which can be overcome only if the applicant "clearly demonstrate[s]" that there is no other practicable alternative. Id. (emphasis added). In addition, a permit cannot be issued: 1) "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem," 40 C.F.R. § 230.10(d); 2) if it "will cause or contribute to significant degradation of the waters of the United States," 40 C.F.R. § 320.10(c); or 3) if it is against the public interest, 33 C.F.R. § 320.4(b)(2), among other things.

In this case, the Corps itself acknowledges that the development is not water dependent. EA at 29. Yet in the EA the Corps failed to even mention, much less apply, the presumption that there were other practicable alternatives, and it likewise failed to require that the applicant "clearly demonstrat[e]" that there were not other practicable alternatives available. See EA at 6-11; 40 C.F.R. § 230.10(a)(3). Instead, the Corps' EA relied upon the applicant's self-serving statements – which often were contradicted by other evidence in the EA itself – without the Corps making an attempt at independent inquiry or verification at critical junctures. Thus, for example, the Corps accepted the applicant's dismissal as "impracticable" one alternative site because "access could only be provided by one arterial road," EA at 9, when the EA itself – incorporating the applicant's own alternatives analysis – expressly stated that two major or minor roads were

8

AR021739

merely "<u>preferred</u> by the applicant," and that more limited access was "considered less suitable," but <u>not</u> impracticable.  Corps EA at 7 (emphasis added).

Similarly, the Corps failed to require avoidance and minimization of impacts to wetlands, such as by reducing the number of parking spaces and installing parking garages: again, almost half of the wetlands are to be paved for parking lots.  EA at 11, 12.  For example, although the Corps requested the applicant study nearby malls to see how much parking was really needed – and the applicant's own study revealed that the project "<u>proposed more parking than any existing mall in the evaluation</u>," EA at 12 (emphasis added) – the Corps simply accepted the applicant's "stat[ments]" that, despite the study, the applicant could not reduce the number of parking spaces. <u>Id.</u>

Likewise, the Corps simply accepted the applicant's assertions that it could not build additional parking garages, or reduce the footprint of the giant complex, because the applicant had to make at least an 8.0% percent profit to secure financing, which it could not do if it built a garage or eliminated even just one bank.  Corps EA at 11, 14 (applicant "<u>reported</u>" that none of the downsizing alternatives was practicable because "the reduction in project footprint and resulting Rate of Return" fell below 8.0%, rendering the project not profitable enough to garner financing); <u>see also id.</u> (the "<u>applicant stated</u> that a Rate of Return below 8.0% deems the alternative impracticable.") (emphasis added).

For the same reason, the Corps did not require greater buffers around Cypress Creek, or the remaining Category I wetlands (which have an "average" buffer of 25 feet) because of the inability to obtain financing without an 8.0% return.  EA at 13 ("cost was the limiting factor"); <u>id.</u> at 15 ("Given that the footprint could not be further reduced . . . the Corps finds the [buffer] . . . the best possible protection for the creek.").  But the EA does not cite, much less provide, evidence that establishes the impracticability of avoiding, or minimizing, adverse impacts, such as by having larger buffers, much less evidence regarding the adequacy, or protectiveness, of such small buffers.

In short, in critical junctures of its analysis the Corps simply relied on the applicant's assertions that opportunities for alternatives, avoidance and minimization were not practicable, without any requirement that the applicant "clearly demonstrat[e]" that it was not feasible to avoid or minimize impacts.  Moreover with respect to cost issues, the Corps applied the wrong decision criteria in letting the applicant's ability to obtain financing determine practicability.  <u>E.g.</u>, (focus on cost should be on whether alternatives "are reasonable in terms of the overall scope/cost of the proposed project" and "consideration of the applicant's financial standing" is "not necessarily material"); EPA, Corps Regulatory Guidance Letter 93-02 (August 23, 1993) ("the determination of what constitutes an unreasonable expense should generally consider whether the project is substantially greater than the costs normally associated with the particular type of project").

AR021740

Furthermore, the Corps failed to determine, let alone make any real inquiry, into whether the proposed action might adversely affect waters of the United States.  For example, without any analysis of the system's efficacy, it simply accepted a storm water treatment system that was designed: a) to treat a maximum rain event of 1.5" in an area that the government itself reports regularly has weather events that exceed 1.5", see http://www.weather.gov (last visited June 17, 2007) (under climate/past weather); and b) to process "dissolved solids as well as greases and floating debris," EA at 42, not the oils and petrochemicals that flow off a massive Town Center and parking area like the one proposed.  Similarly, the Corps never analyzed the efficacy of the "average" 25 foot buffers at protecting the remaining Category I wetlands on the site, or Cypress Creek, but rather it just accepted the fact that given cost constraints it is the best option available, and it deferred to others concerning degradation of the water quality.  EA at 15, 41-42.

The Corps's public interest analysis is similarly arbitrary and capricious for a number of reasons, including its failure to consider critical information before it, like other development in the area.  For example, it evaluated the areas' need for the development, and the ability of the area to handle the project's groundwater consumption, without discussing the other major developments in the area.  Moreover, it incorporates the same flaws identified above with regard to practicable alternatives for avoidance and minimization.

## III.    NEPA

NEPA requires all agencies of the federal government to prepare a "detailed statement" - an EIS - regarding all major federal actions that may significantly affecting the environment.  42 U.S.C. § 4332(C); 40 C.F.R. § 1508.3.  NEPA identifies a number of criteria for evaluating the potential significance of an action, and thus whether to prepare an EIS.  40 C.F.R. § 1508.27(b).  An agency may prepare an EA to assist it in determining whether the action may have a significant environmental effect.  40 C.F.R. §§ 1508.9, 1501.4.

If it does prepare an EA, the Corps must take a hard look at the proposed action and possible alternatives and include "discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9 (emphasis added).  Section 102(2)(E) requires that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332 (2)(E).  Critically, an EA must "provide sufficient evidence and analysis" of the direct, indirect and cumulative environmental impacts of the proposed action and the alternatives to base a "determin[ation] whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9 (emphasis added); 40 C.F.R. § 1508.8.

In this case, several "significance" criteria were triggered and an EIS must be prepared.  As the Corps itself concluded, the project raises issues of "great concern" regarding drinking water and protection of an "Outstanding Florida Water."  EA at 41 ("[g]iven that a portion of the

AR021741

project drains into Cypress Creek, an Outstanding Florida Water (OFW) and a tributary to the Hillsborough River (the major source of drinking water for the City of Tampa), **water quality was an issue of great concern**") (emphasis added); See 40 C.F.R. § 1508.27(b)(2) ("degree to which the proposed action affects public health or safety"). Second, not only does the site abut an "Outstanding Florida Water," but it includes areas "identified as a critical wildlife linkage'" by a government commissioned report and a "'bottleneck' between large conservation lands." EA at 37 (emphasis added); 40 C.F.R. § 1508.27(b)(3) ("[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands [and] ecologically critical areas"). See also id. at 15 ("[m]inimizing impacts to the upland buffer adjacent to Cypress Creek is of paramount concern given the quality of the resource (Cypress Creek is an outstanding Florida Water) and the proximity and scale of the proposed development.") (emphasis added).

Moreover, the Corps did not respond to numerous significant issues raised in comments about practicable alternatives, minimization, buffer size, and endangered species impacts, and thus, the environmental impacts continue to be hotly disputed and controversial. 40 C.F.R. § 1508.27(b)(4) ("[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"). And the project establishes the precedent that, among other things, reliance on assertions of the applicant that go to practicability is acceptable, and that destroying acres of wetlands that abut and feed an Outstanding Florida Water, and that contribute to the drinking water of hundreds of thousands of people, does not represent a significant impact on the environment. 40 C.F.R. § 1508.27(b)(6) ("[t]he degree to which the action may establish a precedent for future actions with significant effects"). The development takes place in a rapidly developing area, Public Notice at 1, where numerous other large developments are being constructed, and are likely to involve wetlands impacts. 40 C.F.R. § 1508.27(b) (7) ("the degree to which the action is related to other actions with . . . cumulatively significant impacts"). And it may adversely affect a number of federally listed species, such as the scrub jay and wood stork. 40 C.F.R. § 1508.27(b) (9), (10) ("the degree to which the action may adversely affect an endangered species," and whether "the action threatens a violation of Federal . . . law or requirements imposed for the protection of the environment.").

In addition, the Corps' EA, the Corps failed to take a hard look at the environmental impacts of the proposed action and its alternatives, and to "provide sufficient evidence and analysis" to support its "determination" that there will be no significant impact. 40 C.F.R. § 1508.9 (emphasis added). For example, the Corps provided absolutely no environmental information concerning the current site, or the impacts, or functioning, of the site as it currently exists in the no action alternative, EA at 5, though the "no action alternative" is supposed to provide a "benchmark" by which to judge the environmental benefits and impacts of leaving the proposed site as it currently is versus developing it. See e.g. Custer County Action Ass'n v. Garvey, 256 F.3d 1024 (10th Cir. 2001) ("In requiring consideration of a no-action alternative, the Council on Environmental Quality intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo.").

The EA itself discloses no information about the environmental conditions at the proposed

11

off-site alternatives, nor what the environmental impacts of developing at the other sites would have been. For example, there is no information or discussion concerning whether these other sites had wetlands, the quality of the wetlands, the extent of the wetlands, whether the wetlands were "jurisdictional" under the CWA, whether there were surface waters at the sites, whether there were other natural resources at the sites, such as an Outstanding Florida Water, whether the sites provided the headwaters for drinking water or the recharge area for municipal wells, or whether the lands were designated a "critical" habitat linkage as is the proposed site. Rather, the EA merely assigns - and for only two of the off site alternatives - the number "3," Corps EA at 9, a designation that means "[f]ew impacts, less difficult to permit." Id. at 8.

And the Corps' EA fails to take a hard look at the indirect and cumulative impacts associated with the project. Corps EA at 91-92. For example, in the Corps' discussion of indirect effects the Corps acknowledges that the remaining on-site wetlands may suffer "changes in wetland function and values," Corps' EA at 50, but it does not identify what these changes are, what their possible severity might be, or what the consequences of such "changes in wetland function" might be. And the Corps acknowledges the growth inducing effects of the action, e.g. EA at 34 ("[e]conomic changes will occur as a result of this project . . . ."), it admits that the project is expected to induce a shift away from the region's status as a "bedroom community," id., and it notes the first example of this growth inducing affect on the neighboring property, King Ranch, EA at 50 ("the nature of King Ranch will change . . . [and will] likely provide more commercial development [as opposed to] residential development."). But yet the Corps did not identify or even discuss important environmental impacts from such growth inducing effects, such as traffic or pollution impacts, nor the scale of the impacts.

Such a discussion of the impacts of regional growth is even more lacking in the Corps' cumulative impacts analysis, which essentially consists of a single paragraph identifying the factors the Corps must consider and concurring with the "[applicant's] report . . . that the project will not have any significant cumulative impacts." Corps EA at 51. The EA does not even identify or discuss what any specific cumulative impacts might be, nor what other actions might be cumulative with the proposed action. Yet the Corps acknowledges, for example, that the area is "rapidly growing," Public Notice at 1, and that the area will now transition away from a "bedroom community" in part because of this very project. EA at 34. Indeed, commenters provided lists of other massive developments underway in the area. However, these issues were not addressed by the Corps before issuing the permit and allowing the developer to begin destroying wetlands.

*       *       *       *

The Sierra Club is gravely concerned that the Corps has failed to comply with the ESA, the CWA, and NEPA in granting the permit at issue. They request that the Corps revoke or at least suspend the permit while it undertakes the additional analyses mandated by federal law. Absent such actions, the Sierra Club intends to file suit to bring the Corps into compliance with these vital laws designed to protect Florida's wetlands and the environment from unnecessary and unlawful degradation. Again, please feel free to contact us to discuss these matters.

12

Sincerely,

Joshua R. Stebbins
Howard M. Crystal
Eric R. Glitzenstein

cc:

      Governor Charles Crist
      Office of the Governor
      The Capitol
      400 South Monroe Street
      Tallahassee, FL 32399
      Charlie.Crist@myflorida.com

AR021744

United States Government Accountability Office

# GAO

Report to the Ranking Democratic Member, Committee on Transportation and Infrastructure, House of Representatives

September 2005

# WETLANDS PROTECTION

## Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure That Compensatory Mitigation Is Occurring



**GAO**

Accountability ★ Integrity ★ Reliability

AR021745

September 2005

# GAO
**Accountability·Integrity·Reliability**

# Highlights

Highlights of GAO-05-898, a report to the Ranking Democratic Member, Committee on Transportation and Infrastructure, House of Representatives

# WETLANDS PROTECTION

# Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure That Compensatory Mitigation Is Occurring

## Why GAO Did This Study

Because wetlands provide valuable functions, the administration set a national goal of no net loss of wetlands in 1989. Section 404 of the Clean Water Act generally prohibits the discharge of dredged or fill material into waters of the United States, which include certain wetlands, without a permit from the U.S. Army Corps of Engineers (Corps). To help achieve the goal of no net loss, the Corps can require compensatory mitigation, such as restoring a former wetland, as a condition of a permit when the loss of wetlands is unavoidable. Permittees can perform the mitigation or pay a third party—a mitigation bank or an in-lieu-fee arrangement—to perform the mitigation. GAO was asked to review the (1) guidance the Corps has issued for overseeing compensatory mitigation, (2) extent to which the Corps oversees compensatory mitigation, and (3) enforcement actions the Corps can take if required mitigation is not performed and the extent to which it takes these actions.

## What GAO Recommends

GAO recommends that the Secretary of the Army direct the Corps to establish an effective oversight approach that will ensure that permittees and third parties are performing required compensatory mitigation. In commenting on our report, the Department of Defense generally agreed with GAO's recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-898.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Anu K. Mittal at (202) 512-3841 or mittala@gao.gov.

## What GAO Found

The Corps has developed guidance that establishes two primary oversight activities for compensatory mitigation: requiring the parties performing mitigation to periodically submit monitoring reports to the Corps and conducting compliance inspections of the mitigation. However, parts of the guidance are vague or internally inconsistent. For example, the guidance suggests that the Corps place a high priority on requiring and reviewing monitoring reports when "substantial mitigation" is required, but it does not define substantial mitigation. Furthermore, one section of the guidance directs district officials to conduct compliance inspections of a relatively high percentage of compensatory mitigation sites, while another section designates these inspections as a low priority, leading to confusion by Corps officials.

Overall, the seven Corps districts GAO visited performed limited oversight to determine the status of compensatory mitigation. The Corps required monitoring reports for 89 of the 152 permit files reviewed where the permittee was required to perform compensatory mitigation. However, only 21 of these files contained evidence that the Corps received these reports. Moreover, only 15 percent of the 152 permit files contained evidence that the Corps had conducted a compliance inspection. The Corps districts provided somewhat more oversight for mitigation performed by the 85 mitigation banks and 12 in-lieu-fee arrangements that GAO reviewed. For the 60 mitigation banks that were required to submit monitoring reports, 70 percent of the files contained evidence that the Corps had received at least one monitoring report. However, only 36 percent of the mitigation bank files that GAO reviewed contained evidence that the Corps conducted an inspection. For the 6 in-lieu-fee arrangements that were required to submit monitoring reports to the Corps, 5 had submitted at least one report. In addition, the Corps had conducted inspections of 5 of the 12 arrangements.

The Corps can take a variety of enforcement actions if required compensatory mitigation is not performed. These actions include issuing compliance orders, assessing administrative penalties of up to $27,500, requiring the permittee to forfeit a bond, suspending or revoking a permit, implementing the enforcement provisions of agreements with third parties, and recommending legal actions. District officials rarely use these actions and rely primarily on negotiation to resolve any violations. In some cases, GAO found district officials may not be able to use enforcement actions after detecting instances of noncompliance because they have limited their enforcement capabilities. For example, because they did not always specify the requirements of compensatory mitigation in the permits, they had no legal recourse for noncompliance.

AR021746

# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 4 |
| | Background | 7 |
| | Corps Guidance for Oversight of Compensatory Mitigation Is Sometimes Vague or Internally Inconsistent | 12 |
| | Corps Districts Perform Limited Oversight of Compensatory Mitigation | 17 |
| | Corps Districts Can Take a Variety of Enforcement Actions to Resolve Violations but Rely Primarily on Negotiation | 21 |
| | Conclusions | 26 |
| | Recommendations for Executive Action | 27 |
| | Agency Comments and Our Evaluation | 28 |

| Appendixes | | |
|---|---|---|
| Appendix I: | Scope and Methodology | 29 |
| Appendix II: | Corps of Engineers Federal Guidance for Oversight of Compensatory Mitigation | 33 |
| Appendix III: | File Review Results by Corps District | 36 |
| Appendix IV: | Comments from the Department of Defense | 39 |
| Appendix V: | GAO Contact and Staff Acknowledgments | 42 |

| Tables | | |
|---|---|---|
| Table 1: | Permit Files Reviewed at the Seven Districts, Fiscal Year 2000 | 30 |
| Table 2: | Mitigation Banks Reviewed at the Seven Districts, November 28, 1995, through December 2004 | 31 |
| Table 3: | In-Lieu-Fee Arrangements Reviewed at the Seven Districts | 32 |
| Table 4: | Results of Review of Corps Oversight of Individual Permits Issued in Fiscal Year 2000 Where Permittees Are Responsible for Compensatory Mitigation | 36 |
| Table 5: | Results of Review of Corps Oversight of Mitigation Banks Approved from November 1995 through December 2003 | 37 |
| Table 6: | Results of Review of Corps Oversight of In-Lieu-Fee Arrangements Currently in Operation at the Time of Our Site Visit | 37 |

| Figures | | |
|---|---|---|
| Figure 1: | Marsh in Michigan | 7 |
| Figure 2: | Bayou in Louisiana | 8 |

GAO-05-898 Wetlands Protection

AR021747

Contents

Figure 3:   Wetlands Restoration Project in Washington, D.C. (Before
and After)                                                                              11

**Abbreviations**

Corps      U.S. Army Corps of Engineers
EPA        Environmental Protection Agency

This is a work of the U.S. government and is not subject to copyright protection in the
United States. It may be reproduced and distributed in its entirety without further
permission from GAO. However, because this work may contain copyrighted images or
other material, permission from the copyright holder may be necessary if you wish to
reproduce this material separately.

AR021748



**G A O**
Accountability ∗ Integrity ∗ Reliability

**United States Government Accountability Office**
**Washington, D.C. 20548**

September 8, 2005

The Honorable James L. Oberstar
Ranking Democratic Member
Committee on Transportation and Infrastructure
House of Representatives

Dear Mr. Oberstar:

Wetlands such as bogs, swamps, and marshes support a number of valuable
functions—controlling floods, improving water quality, and providing
wildlife habitat, among other things. Given the value of these functions, the
administration set a national goal in 1989 of balancing the losses and gains
of wetlands to achieve no net loss of wetlands. Each subsequent President
has reaffirmed and expanded this goal to achieve net gains of wetlands in
the long term. The U.S. Army Corps of Engineers (Corps) is responsible for
processing permit applications from individuals and businesses seeking to
build driveways, houses, golf courses, or commercial buildings or perform
other activities that could degrade or destroy wetlands on their property,
and each year the Corps approves thousands of these permit applications.
The Corps' decisions are to reflect the national concern for both the
protection and utilization of important resources.

Under section 404 of the Clean Water Act, the Corps and the Environmental
Protection Agency (EPA) regulate activities affecting wetlands. Under
related regulations and guidance issued by these agencies, a permittee is
expected to avoid deliberate discharge of fill materials into wetlands or
other federally regulated waters and then to minimize discharges that
cannot be avoided. If such discharges are unavoidable, the Corps can
require mitigation to compensate for the loss and/or degradation of
wetlands from permitted activities as a condition of issuing the permit.
Such compensatory mitigation could involve (1) creating a new wetland,
(2) restoring a former wetland, (3) enhancing a degraded wetland, or (4)
preserving an existing wetland. Since 1993, the Corps has required such
mitigation on more than 40,000 acres of land per year. Permittees may
perform their own compensatory mitigation, often on or near the project
site, or they may pay another entity to perform mitigation, usually at a
location away from the project site, but generally within the same
watershed. This kind of mitigation, known as third-party mitigation, is
typically performed by mitigation banks or sponsors of in-lieu-fee
arrangements. Mitigation banks are often private for-profit entities with
land in areas where they believe that they can successfully establish

GAO-05-898 Wetlands Protection

AR021749

wetlands.[1] These areas include those that have the potential to become wetlands, previously filled wetlands, wetlands that have been degraded by invasive plant species,[2] or wetlands that are threatened by development. After the mitigation banks improve these areas as wetlands, permittees required to perform compensatory mitigation pay fees to the mitigation bank to fulfill their mitigation requirements. In contrast to mitigation banks, in-lieu-fee arrangements are often sponsored by public or nonprofit entities. Under agreements with the Corps, in-lieu-fee sponsors receive payments from multiple permittees required to perform compensatory mitigation. Then, at a later date, the sponsors use these funds to establish wetlands.

The Corps is responsible for ensuring that permittees, mitigation banks, and in-lieu-fee sponsors perform required compensatory mitigation. However, the Corps historically has not emphasized oversight of such mitigation activities. In 1988, we reported that the Corps placed a high priority on issuing permits and did not routinely inspect project sites to ensure that permittees were in compliance with their permit conditions, which include any compensatory mitigation that the permittee was required to perform.[3] More recently, the National Research Council, environmental groups, and others have raised concerns that the Corps may not spend sufficient time on oversight to ensure that permittees or third parties are performing the required compensatory mitigation.

In this context, you asked us to review the (1) guidance the Corps has established for overseeing compensatory mitigation, (2) extent to which the Corps oversees compensatory mitigation, and (3) enforcement actions the Corps can take if it determines that compensatory mitigation requirements are not being met and the extent to which it takes such actions.

---

[1]According to the Environmental Law Institute, in the early 1990s, most banks were sponsored by public entities, such as state highway agencies, but now most mitigation banks are sponsored by private entities.

[2]Invasive species are nonnative plants, animals, and microorganisms that are found throughout the United States and that have a devastating effect on natural areas, where they can take over wetland habitats and strangle native flora.

[3]GAO, *Wetlands: The Corps of Engineers' Administration of the Section 404 Program,* GAO/RCED-88-110 (Washington, D.C.: July 28, 1988).

AR021750

In conducting our work, we selected 7 of the 38 Corps districts that implement the section 404 program—Charleston, South Carolina; Galveston, Texas; Jacksonville, Florida; New Orleans, Louisiana; St. Paul, Minnesota; Seattle, Washington; and Wilmington, North Carolina. We selected these districts because they represent different geographic areas of the United States and collectively accounted for over two-thirds of the compensatory mitigation required by individual permits issued in fiscal year 2003.[4] To identify the guidance the Corps has established for overseeing compensatory mitigation, we examined Corps documents and interviewed officials from Corps headquarters, as well as from Corps' district offices.

To determine the extent to which the Corps oversees compensatory mitigation, we reviewed a total of 249 files. We reviewed 152 permit files issued in fiscal year 2000 where the permittee was responsible for the mitigation. We selected this time frame because most of the permits we reviewed were valid for 5 years or less, and sufficient time would have passed for the permittee to begin work on the permitted project and for the Corps to have received a monitoring report or conducted a compliance inspection. We also reviewed files for 85 mitigation banks and 12 in-lieu-fee arrangements.[5] The mitigation bank and in-lieu-fee arrangement files we reviewed usually provided data on the mitigation activities for multiple permittees, and the mitigation conducted can encompass thousands of acres. While our results cannot be generalized to all 38 Corps districts, according to a Corps official responsible for managing the program nationally, our findings would most likely represent program

---

[4]Individual permits are typically issued for projects that may have substantial environmental impacts. For smaller impacts, Corps officials generally issue either letters of permission, which are used when the proposed work is minor and is not expected to receive appreciable opposition, or general permits, which cover activities that have been identified as being substantially similar in nature, such as stabilizing stream banks. The Charleston, Galveston, Jacksonville, New Orleans, St. Paul, and Wilmington districts were the top six districts nationwide in terms of mitigation required by individual permits. Seattle was among the top districts in the western part of the United States.

[5]In those districts where it was not feasible to review all files, we selected a random sample of files from the district's database for review. We reviewed a random sample of permit files in the Jacksonville district and a random sample of mitigation bank files in the Jacksonville, New Orleans, and St. Paul districts. Because the New Orleans district was not able to identify permits requiring the permittee to perform mitigation from their database, we asked district officials to select these permits, and we reviewed all of them.

AR021751

implementation by other Corps districts. We also interviewed district officials to obtain additional information on how they oversee compensatory mitigation.

To identify enforcement actions the Corps can take if it determines that compensatory mitigation requirements are not being met and the extent to which it takes these actions, we examined agency regulations and documents that outline available enforcement actions, reviewed agency data on noncompliance cases, and discussed levels of noncompliance and actions taken with district officials. In addition, we interviewed several sponsors of mitigation banks and a sponsor of an in-lieu-fee arrangement to obtain their perspectives on the Corps' mitigation program. A more detailed description of the scope and methodology of our review is presented in appendix I. We performed our work between June 2004 and September 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

The Corps has developed guidance that establishes two primary oversight activities for compensatory mitigation. First, the Corps guidance directs district officials to require the parties performing mitigation to periodically submit monitoring reports to the Corps on the status of compensatory mitigation. Second, the guidance calls for district officials to conduct compliance inspections of the mitigation. However, we found that parts of the guidance are vague or internally inconsistent, thus limiting their usefulness. For example, the guidance suggests that requiring and reviewing monitoring reports is a high-priority activity for the Corps when "substantial mitigation" is required, but it does not define substantial mitigation. Furthermore, the guidance does not indicate what actions Corps officials should take if permittees or third parties do not submit required monitoring reports. The guidance is also internally inconsistent because, in one section of the guidance, district officials are directed to conduct compliance inspections on a relatively high percentage of compensatory mitigation sites to ensure that permit conditions have been met, while another section designates these inspections as a low-priority activity, to be conducted only if the goals for other higher priority work, such as issuing permits, have been achieved. As a result, district officials told us that they are unsure of how many resources to allocate to compliance inspections. The Corps is currently developing new guidance, which it expects to issue by fall of 2005.

AR021752

Overall, the Corps districts we visited have performed limited oversight to determine the status of required compensatory mitigation. For the 152 permit files that we reviewed where the individual permittee was required to perform compensatory mitigation, we found little evidence that required monitoring reports were submitted or that the Corps conducted compliance inspections. The Corps required monitoring reports for 89 of the files that we reviewed, but only 24 percent, or 21 permit files, contained evidence that the Corps had actually received the report. Only 15 percent of the files contained evidence that the Corps had conducted a compliance inspection. Although Corps districts provided somewhat more oversight for mitigation conducted by the 85 mitigation banks and 12 in-lieu-fee arrangements that we reviewed, even in these cases oversight was still limited. For the 60 mitigation banks that were required to submit monitoring reports, 70 percent of the files showed that the Corps had received at least one monitoring report. The percentage of the mitigation bank files with evidence that the Corps conducted an inspection ranged from a low of 13 percent to a high of 78 percent in the seven districts. For the 6 in-lieu-fee arrangements that were required to submit monitoring reports to the Corps, 5 had submitted at least one report. In addition, the Corps had conducted a compliance inspection for 5 of the 12 arrangements. District officials told us that the Corps' conflicting guidance, which notes that compliance inspections are crucial yet makes them a low priority, as well as limited resources contribute to their low level of oversight of compensatory mitigation. However, because many projects that we reviewed did not receive oversight, the districts cannot definitively assess whether compensatory mitigation has been performed on thousands of acres. Without this information, it is unclear how the Corps is assessing the effectiveness of its mitigation program or assessing whether this program is contributing to the national goal of no net loss of wetlands.

The Corps can take a variety of enforcement actions if required compensatory mitigation is not performed. These actions include issuing compliance orders, assessing administrative penalties up to $27,500, suspending or revoking a permit, implementing the enforcement provisions of agreements with third parties, and recommending legal actions.[6] According to fiscal year 2003 data provided by the Corps, the seven districts did not take any enforcement actions to obtain compliance with

---

[6]Under Corps' regulations, the Corps may refer appropriate cases to the local U.S. attorney to file a criminal or civil action. Appropriate cases include, but are not limited to, violations that are willful, repeated, or of substantial impact. 33 C.F.R § 326.5.

AR021753

issued permits. Instead, district officials rely primarily on negotiation with permittees and third parties, a first step in the enforcement process, rather than enforcement actions to resolve any violations. According to district officials, when they find that required compensatory mitigation has not been performed, they usually first contact the responsible parties to discuss options and time frames for bringing the permittee or third-party sponsor into compliance. District officials told us that typically no further action is necessary because the desired action is subsequently taken. If district officials are not able to resolve the noncompliance through negotiation, they told us that they then notify the responsible party in writing of the noncompliance and lay out potential enforcement actions and time frames. District officials told us that they generally resort to enforcement actions only after negotiation fails because taking enforcement actions is usually more time-consuming and does not necessarily result in the required mitigation being completed. For instance, according to Corps district officials, while monetary penalties are an effective tool that draws attention to compliance and enforcement, the funds collected from assessing these penalties are required by law to go into the general fund of the federal Treasury. We found that, sometimes, district officials wanting to pursue enforcement actions after detecting instances of noncompliance may be unable to do so because they have limited their enforcement capabilities by not specifying the requirements for compensatory mitigation in permits and by not establishing agreements with third parties. For example, the Corps does not always specify what mitigation activity should be performed or the time frame for completing the mitigation in individual permits. Similarly, some districts have not established agreements called for in federal guidance with mitigation bank or in-lieu-fee sponsors. Without such agreements, the Corps and the third-party sponsors have not formally agreed to the penalties that may be imposed and/or corrective actions that may be required if the mitigation efforts are not performed. Therefore, the Corps does not have sufficient legal recourse if third parties do not perform required compensatory mitigation.

To address the concerns we have identified, we are recommending that the Secretary of the Army direct the Corps of Engineers to establish an effective oversight approach that will ensure that permittees and third parties are performing required compensatory mitigation. In commenting on our report, the Department of Defense generally agreed with our recommendations.

AR021754