## Storz, Christina D SAJ

| | |
|---|---|
| **From:** | Daker, Angela [adaker@miami.whitecase.com] |
| **Sent:** | Tuesday, November 10, 2009 5:10 PM |
| **To:** | Storz, Christina D SAJ |
| **Cc:** | Halsey, Douglas |
| **Subject:** | FW: CCTC - PN Comments - Email 2 of 4 |

**Attachments:**     document2009-01-26-091611.pdf



document2009-01-
26-091611.pdf ...

"Hurst, Tracy E SAJ" <Tracy.E.Hurst@usace.army.mil>

01/26/2009 09:51 AM

To
<Hsierra@sierra-properties.com>, <tschmitz@rejacobsgroup.com> cc Subject
CCTC - PN Comments - Email 2 of 4




><((((°>'·.¸¸.·´¯'·.¸¸.·´¯'·....><((((°>

Tracy Hurst
U.S. Army Corps of Engineers
10117 Princess Palm Ave., Ste. 120
Tampa, FL  33610
813/769-7063
813/769-7061 FAX


><((((°>'·.¸¸.·´¯'·.¸¸.·´¯'·....><((((°>

Please assist us in better serving you!  Please complete the customer survey by clicking
on the following link:  http://regulatory.usacesurvey.com/

AR021821

**Hurst, Tracy E SAJ**

| | |
|---|---|
| **From:** | Josh Stebbins [JStebbins@meyerglitz.com] |
| **Sent:** | Thursday, January 15, 2009 5:21 PM |
| **To:** | Hurst, Tracy E SAJ |
| **Subject:** | Comments Regarding The Cypress Creek Town Center Permit Reevaluation |

     

1.15.09 Comments  7.23.08 FINAL  8.11.08 Corps  10.2 Letter To  MG & C 1.15.09  MG & C 1.15.09
To Corps.pdf ...  ORPS CORRESPOND  Letter.pdf (223 ...  Corps on Remand...  Comments Kearne...  Comments Kearne...

District Engineer

C/O  Tracy Hurst

Project Manager

West Permits Section

U.S. Army Corps of Engineers

Tampa Regulatory Office

10117 Princess Palm Ave., Suite 120

Tampa FL 33610


Re:       Public Notice Re Permit Application No.   SAJ-2003-2336 (IP-THE).


Dear Ms. Hurst:


Attached, please find comments and associated materials submitted on behalf of Sierra
Club, Gulf Restoration Network, Clean Water Action, Richard Sommerville, and Chris Loy.  A
copy was also sent by U.S. mail.  Please let me know if there is anything else you require
to consider these materials on review of the Cypress Creek Town Center permit.


Sincerely,


Joshua Stebbins

Meyer Glitzenstein & Crystal

1601 Connecticut Ave., NW

Suite 700

Washington, DC

20009

202 588 5206

1

AR021822

## Meyer Glitzenstein & Crystal

1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Tanya M. Sanerib
Joshua R. Stebbins
Delcianna J. Winders

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

January 15, 2009

**VIA EMAIL AND U.S. MAIL**

District Engineer
C/O Tracy Hurst
Project Manager
West Permits Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Palm Ave., Suite 120
Tampa FL 33610

Re:    **Public Notice Re Permit Application No.  SAJ-2003-2336 (IP-THE).**

We are writing on behalf of the Sierra Club, Gulf Restoration Network, Clean Water Action, Richard Sommerville, and Chris Loy, plaintiffs in <u>Sierra Club et al v. Van Antwerp</u>, et al (07-cv-01756) (D.D.C. Oct. 1, 2007), in response to the Army Corps of Engineers's ("Corps's") Public Notice of your evaluation of whether to reinstate, modify or revoke the Cypress Creek Town Center ("CCTC") permit.  In addition to the brief comments herein, we request that the Corps include in its evaluation the comments and attached materials relating to the CCTC permit that this office previously submitted to the Corps on July 23, 2008, August 11, 2008, and October 2, 2008.  Given that you have this information in your office already, and the attachments are voluminous, we re-submit at this time only the comments themselves, and not the attachments.  However, if you require that the attachments be resubmitted please let us know and we will submit them again.  We request that the Corps address the issues raised therein.

In addition to the comments and materials submitted thus far, Plaintiffs also submit herewith a complaint filed in state court against the permit applicant and/or its agent, the developer of the CCTC project, by their construction contractor.  In this complaint and attached documents, the contractor states that the developers deliberately rushed onto the CCTC site to destroy as much of the natural environment as they could prior to Plaintiffs' ability to challenge the CCTC permit.  Moreover, the complaint indicates that the developers refused to employ best management practices and documents unlawful and damaging discharges from the CCTC site to



recycled paper

AR021823

Cypress Creek and its wetlands.

As articulated more fully in Plaintiffs' earlier comments, the CCTC permit issued by the Corps violates the Endangered Species Act, the Clean Water Act and NEPA and should not be reissued. It is unfortunate that the Public Notice issued by your office on December 16, 2008, indicates that the Corps has not addressed any of the flaws in the initial permit. Apparently the Corps does not intend to engage in formal consultation with the Fish and Wildlife Service regarding adverse impacts to the federally listed Wood Stork, Eastern Indigo Snake and Florida Scrub Jay. Nor is the Corps giving required consideration to the significant environmental impacts of CCTC in an Environmental Impact Statement, such as impacts to the critical wildlife linkage crossing the site, to the threatened and endangered species on site and with habitat on site, to wetlands and protective buffers associated with Cypress Creek, nor to the Cypress Creek watershed and its wetlands, collectively an Outstanding Florida Water ("OFW"), among other concerns.

Throughout the Corps's review of the CCTC permit, Plaintiffs have sought to engage and meet with the Corps to discuss these concerns, but the Corps has steadfastly refused to respond to Plaintiffs, although it is evident that the Corps has been coordinating with the developers of the CCTC site. Plaintiffs have sought to keep informed of the Corps's review of the CCTC permit, such as through Freedom of Information Act ("FOIA") requests, in part in an effort to ensure that their comments to the Corps are fully informed, but the Corps has likewise failed to respond to Plaintiffs' FOIA requests. In this regard, Plaintiffs sought an extension of the Corps's public comment period specifically because the Corps informed Plaintiffs that they would not provide their response to Plaintiffs' FOIA request until shortly after the Corps's public comment period closed. Unfortunately the Corps has not responded to Plaintiffs' requests for extension. In short, it appears that the Corps is determined to ignore Plaintiffs and their concerns.

Moreover, from the Public Notice issued by the Corps it appears that the Corps also seeks to exclude the public at large from any meaningful participation in the review of the CCTC permit. Plaintiffs note that the Notice fails to identify any of the significant environmental concerns raised by the CCTC permit. The Notice never mentions the existence of endangered and threatened species on site, the existence of a critical wildlife linkage running across the site, nor the presence of an Outstanding Florida Water bounding the site – Cypress Creek and its wetlands, which are also considered Outstanding Florida Waters - to which the CCTC project will ultimately discharge its stormwater runoff. Indeed, in its initial Environmental Assessment, the Corps itself admitted grave concerns about impacts to these environmental values, but they are mentioned nowhere in the Public Notice. The Notice is thus legally deficient and cannot be expected to solicit meaningful public input.

Plaintiffs therefore request a public hearing with regard to the Corps's potential re-issuance of the permit. Not only does this appear to be the only avenue by which the Plaintiffs can engage the Corps, outside of litigation, but given the insufficiency of the Public Notice, it may be the only means by which the general public will be aware of the myriad environmental impacts

AR021824

of the CCTC permit.

Sincerely,

Joshua Stebbins

cc via mail (w/o attachments):

Mark A. Brown
Senior Trial Attorney
Wildlife & Marine Resources Section
U.S. Dept. of Justice
P.O. Box. 7369
Washington DC 20044-7369

Paul L. Grosskruger
Colonel, U.S. Army
District Commaner
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

Charles Schnepel
Chief, West Permit Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

Eric Summa
Section Chief, Enforcement Section
Jacksonville District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

Thomas Farrell
Regulatory Division

3

AR021825

Special Projects/Enforcement Branch
Enforcement Section
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019

Douglas M. Halsey
White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, FL 33131-2352

4

AR021826

## Meyer Glitzenstein & Crystal

1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C.  20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Tanya M. Sanerib
Joshua R. Stebbins
Delcianna J. Winders

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

July 23, 2008

Tracy Hurst
Project Manager
West Permits Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

David Hankla
U.S. Department Of the Interior
Fish and Wildlife Service
6620 Southpoint Drive, South
Suite 310
Jacksonville, FL 32216

Re:   **Army Corps of Engineers's Voluntary Remand In Sierra Club et al v. Van
Antwerp, et al (07-cv-01756) (D.D.C. Oct. 1, 2007)**

We are writing on behalf of the Sierra Club, Gulf Restoration Network, Clean Water
Action, Richard Sommerville, and Chris Loy, plaintiffs in the above referenced action.  As you are
aware, the Court has recently granted Federal Defendants' motion for a voluntary remand on the
grounds that Federal Defendants intend to review additional information bearing on the legality of
the Cypress Creek Town Center ("CCTC") permit challenged in this case, and after its review,
decide whether to reinstate, modify or revoke the agency decisions challenged by Plaintiffs.  June
11, 2008 Order at 6-10.  In its order, the Court concluded that, in addition to the Corps's review
of Clean Water Act issues, "[b]ased on the Corps' investigation, it may conduct additional
environmental review under the Endangered Species Act or NEPA."  Id. at 6.  It is on this
expanded record that the Court will review any further decision to reinstate, modify or reinstate
the permit.  See id. at 6-7.

Accordingly, to ensure that the Corps has on remand a more complete record for
consideration of these issues, Plaintiffs are submitting the following comments and documents,
indexed below, that should be considered before the agencies decide whether to reinstate, modify,



recycled paper

AR021827

or revoke the CCTC permit.  Plaintiffs believe that in certain critical respects the permit applicant misled Federal Defendants during the initial permitting process, and moreover, that Federal Defendants failed to comply with applicable federal laws in issuing the CCTC permit.

The Corps should prepare and circulate for public review a supplemental NEPA document and provide for a new public comment and hearing opportunity.  Plaintiffs request and would appreciate the opportunity to meet with the Corps to discuss the issues identified below and resolve any questions that the Corps may have with respect to the issues raised by plaintiffs during the Corps's review on remand.

I.      **Statutory And Regulatory Background**

   A.      **The Clean Water Act**

The CWA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  It prohibits discharging any pollutant – including "dredge spoil," rock, and sand – into waters of the United States, including wetlands, without a permit.  Id. §§ 1311(a), 1362(6).  Section 404 grants the Corps authority to issue permits for the discharge of "dredged or fill material," id. § 1344, but the Corps must comply with two sets of implementing regulations: the Environmental Protection Agency's ("EPA's") "404 Guidelines," see 40 C.F.R. §§ 230.1-230.80, and the Corps's own regulations.  See 33 C.F.R. Parts 320-330.

The 404 Guidelines establish prohibitions to discharges to wetlands.  See 40 C.F.R. §§ 230.10, .12.  First, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem . . . ."  Id. § 230.10(a).  "An alternative is practicable" if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  Id. § 230.10(a)(1); accord id. § 230.3(q).  If an activity is not "water dependent" – if it does not require access to a wetland for its basic purpose, such as a marina – there is a strong presumption there are practicable, less damaging alternatives, and the permit must be denied "unless clearly demonstrated otherwise" by the applicant.  Id. § 230.10(a)(3).

Second, the 404 Guidelines prohibit discharges "which will cause or contribute to significant degradation of the waters of the United States."  Id. § 230.10(c).  In this regard, the Corps's analyses must consider, for example, the collective effects of discharges on "human health or welfare . . . municipal water supplies . . . fish . . . wildlife," wetlands, and the "loss of fish and wildlife habitat or loss of the capacity . . . to assimilate nutrients [or] purify water."  Id.  The Corps must make a written determination regarding such effects, including cumulative and secondary effects.  E.g. id. § 230.12; Subparts B-G.

Even if there are no practicable alternatives for a proposed project, the 404 Guidelines still

AR021828

prohibit the discharges "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." Id. § 230.10(d). "[A]ll reasonable reduction in impacts [must] be obtained." Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336, 85,344 (Dec. 24, 1980) ("1980 Notice"). Discharges are prohibited if they would jeopardize the continued existence of a threatened or endangered species. 40 C.F.R. § 230.10(b)(3).

### B.     The Endangered Species Act

Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). To achieve this purpose, the ESA imposes duties on the Secretary of the Interior, which have been delegated to the Fish and Wildlife Service ("FWS" or "Service"). 50 C.F.R. § 402.01(b).

The ESA affords protections to species listed as "endangered" or "threatened" ("listed species"). 16 U.S.C. §§ 1532(6), (16), (20). For example, section 9 and implementing regulations proscribe the "take" of listed species, id. § 1538(a)(1); see also, 50 C.F.R. §§ 17.21, 17.31, which is defined to include "harass[ing]" and "harm[ing]" a species. 16 U.S.C. § 1532(19). In turn, "harm" may encompass "significant habitat modification." 50 C.F.R. § 17.3.

Section 7 of the ESA mandates that each federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." Id. § 1536(a)(2). Under section 7's implementing regulations, each federal agency must review its actions and determine if they "may affect" a listed species. 50 C.F.R. § 402.14(a). If an action "may affect" a listed species, the agency must engage in "formal consultation" with the FWS, unless the FWS "concur[s]" in writing that the "action is not likely to adversely affect any listed species." Id. at § 402.14(b).

Formal consultation requires a full evaluation of impacts to listed species, including the status of the listed species and "the effects of the action and cumulative effects" on the species. Id. § 402.14(g)(2)-(4). It concludes with the Service's "biological opinion," "detailing how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and whether the Service believes the action is "likely to jeopardize the continued existence of a listed species," 50 C.F.R. § 402.14(h)(3). If an action is unlikely to jeopardize a species, but will result in any take of a species, the Service must issue an "Incidental Take Statement" ("ITS") identifying the anticipated impact to the species, "reasonable and prudent measures" to minimize such impact, and mandatory "terms and conditions" to implement such measures. 16 U.S.C. § 1536(b)(4). If the action is likely to jeopardize a listed species, the Service must specify "reasonable and prudent alternatives" to insure jeopardy is not likely to occur. Id. § 1536(b)(3)(A).

AR021829

### C.    The National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purpose is to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and "to help public officials make decisions that are based on understanding of environmental consequences . . . ." Id. § 1500.1(b),(c). As such, meaningful public participation and oversight is "essential" to the NEPA process, as is facilitating public input. See, e.g., id. § 1500.1(b).

NEPA has two sets of implementing regulations that govern Corps activities: regulations promulgated by the Council on Environmental Quality ("CEQ"), id. §§ 1500.1-1518.4, and the Corps' own regulations, 33 C.F.R. §§ 230.1-230.26. NEPA and its implementing regulations require federal agencies to prepare a "detailed statement" – an EIS – regarding all major federal actions that may significantly affect the environment, 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.3, in which the agency must analyze possible alternatives to the proposed action, including a no action alternative, and review the environmental effects of those alternatives, see 42 U.S.C. § 4332; 40 C.F.R. § 6.207(d)(2). In so doing, an agency must consider the direct, indirect, and cumulative environmental impacts of its action and of the alternatives to it. 40 C.F.R. § 1508.8.

NEPA establishes several criteria for determining whether an impact is significant, including impacts on: "public health or safety;" listed species; and areas with unique characteristics, such as park lands, wetlands, wild and scenic rivers, and ecologically critical areas. Id. § 1508.27(b). An action may also be significant if its effects are "likely to be highly controversial," if it "may establish a precedent for future actions," or if it is "related to other actions with . . . cumulatively significant impacts." Id.

An agency that is uncertain whether to prepare an EIS may prepare an Environmental Assessment ("EA") to assist in evaluating whether an action may have a significant environmental effect. Id. § 1508.9. The EA must include "discussions of the need for the proposal, of alternatives," and of the direct, indirect, and cumulative environmental impacts of each with "sufficient evidence and analysis" to support a determination to prepare an EIS or a "finding of no significant impact" ("FONSI"). Id.

## II.    Factual Background

### A.    The CCTC Site

The CCTC site is approximately 507 acres of undeveloped land in Pasco County, Florida, that is approximately one third, or 155 acres, wetlands, and two thirds, or 337 acres, uplands. EA at 1, AR6636; AR6497 (map). Cypress Creek forms the southern border of the site. AR6495; 500-509. The southern portion of the site, including uplands and wetlands in and around Cypress Creek, is designated a "critical wildlife linkage," as the site is located between conservation lands

4

and forms a "bottleneck" for wildlife moving between the lands.  EA at 37, AR6672; 24 (map).[1]

Wetlands on site form part of a natural "wetland system" "consist[ing] of a network of freshwater wetlands adjacent to Cypress Creek." AR6636.  They consist primarily of cypress swamps, mixed wetland forests, freshwater marshes, and wet prairies, with some small ponds.  Id.  As part of an interconnected riparian wetlands system, the wetlands provide "valuable storage areas for storm and flood waters," and "water purification functions" among other functions.  AR6636, AR6670.  As the Florida Department of Environmental Protection noted, the wetlands have been "indiscriminate[ly]" logged by the applicant in an effort to "jusitif[y] . . . a decreased value to the habitats and wetlands" and facilitate the permitting process .  AR2039-40.  During the permitting process, the value of the wetlands, particularly in the southern portion of the site where they are associated with Cypress Creek has been "underrepresented" and "the net value of the system is has not changed" despite the applicant's efforts to reduce their values.  AR2040.

These wetlands provide important foraging and roosting habitat for a number of species.  EA at 34, AR6669.  Wood Storks – listed as endangered under the ESA – and hundreds of other birds including tricolored herons, little blue herons, and white ibises – all Florida Species of Special Concern and all protected by the Migratory Bird Treaty Act, see 50 C.F.R. § 10.13 – have been observed foraging in CCTC wetlands.  FWS191-192, 196.  CCTC wetlands are within the core foraging area of five breeding colonies of Wood storks, AR6681, and the nearest colony is only 1.3 miles from the site, Corps Public Notice ("Notice"), AR3093.  In addition, wetlands, along with uplands, support a "critical wildlife linkage" running along Cypress Creek.  AR6672.

CCTC uplands consist of pastureland, wooded lands and expanses of scrubby areas.  See FWS511-512 (descriptions and photos).  The uplands also provide important wildlife habitat, particularly along the southern part of the site where the soils are sandy and well drained ("xeric" or dry), and the vegetation scrubby and wooded in places.  E.g. FWS511-12.  In this area, Gopher tortoises (state listed as threatened) were abundant until excavated by the developer.  E.g. FWS191-92, 195, 201 (map noting 20-25 Gopher Tortoise burrows).  Eastern Indigo Snakes ("Indigos"), listed as threatened under the ESA, also use such habitat, especially the Gopher Tortoise burrows, which provide shelter.  FWS2586, AR3093.  The applicant's agents concluded Indigos "occur on site or have a reasonably high probability of occurring." FWS191.  Florida Scrub Jays, federally listed as threatened, also use this habitat type.  E.g. FWS2633; 2639.

CCTC uplands, together with wetlands, also provide at least a 300-500 foot wide "high quality buffer" that protects Cypress Creek.  E.g. AR3975, AR4602.  As such, they provide "sediment removal and erosion control, excess nutrient and metal removal, moderation of storm water runoff, moderation of water temperature, maintenance of habitat diversity, wildlife species distribution and diversity, and reduction of human impact." AR6650.  The Corps itself acknowledged that protection of these uplands is "of paramount concern" given that they protect

---

[1] Citations to "AR" and "FWS" are to the two administrative records produced by the federal government in the above referenced litigation.

AR021831

Cypress Creek and given the "proximity and scale" of CCTC.  Id.

Cypress Creek itself is a natural and scenic waterbody.  See FWS500-510 (clear photographs).  It is a principal tributary to the Hillsborough River, which is "the major source of drinking water for the City of Tampa."  EA at 41, AR6676.  The Creek has been designated an "Outstanding Florida Water" ("OFW") by the State of Florida, Fla. Admin. Code Ann. r. 62-302.700(9)(i)(14)(c), meaning it is "worthy of special protection because of [its] natural attributes."  Fla. Stat. § 403.061(27).  Indeed, most remaining OFWs exist only in protected conservation lands, see http://www.dep.state.fl.us/water/wqssp/ofw.htm, and Florida's policy is to provide them "the highest protection."  Fla. Admin. Code Ann. r. 62-302.700(1).

## B.   Threatened and Endangered Species Likely To Be Affected

The wood stork is a "large, long-legged, white wading bird with an unfeathered gray head and a stout dark bill" that "frequent[s] freshwater and brackish wetlands" to feed and "usually nests in cypress and mangrove swamps."  Wood Stork Listing Rule, 49 Fed. Reg. 7332, 7332.  The Wood stork's primary cause of decline is the "loss of suitable feeding habitat."  Id. at 7333 (citation omitted); FWS2541.  For the Wood stork to recover, "[a]t a minimum, . . . currently occupied . . . foraging habitat must be protected from further loss or degradation."  Recovery Plan, FWS2549.

The Indigo – the longest snake in the United States – is a lustrous black, docile, non-venomous snake that now exists in only in Georgia and Florida.  FWS 2584.  The Indigo ranges over large areas and needs a mosaic of habitat types, though it is "closely associated with the gopher tortoise . . . the burrows of which provide shelter."  FWS2585-86, FWS2588-89.  According to the FWS, the Indigo has suffered "dramatic population declines" and "any additional threats to its survival could cause local extirpations."  FWS2584, FWS2589 (emphasis added).  Today, "habitat loss and fragmentation by residential and commercial expansion have become much more significant threats to the eastern indigo snake" than any other threat.  FWS2584.  In addition, "human population growth will increase the risk of direct mortality . . . from property owners, domestic animals, and highway mortality."  FWS2589.

The Florida Scrub Jays ("Jay") uses the same "xeric" (dry) habitat types as Indigos and Gopher tortoises, such that management efforts for one must consider impacts to others.  FWS2633, FWS2639.  The principal threat to the Jay is "loss, fragmentation, and degradation of scrub habitats . . . due primarily to urbanization, agriculture, and fire suppression."  FWS2630.

## C.   Recent Events

On October 31, 2005, the Corps issued a Public Notice regarding the application of "Sierra Properties, C/O Mr. John Sierra, Jr." ("applicant") to fill approximately 54 acres of wetlands and 10 acres of surface waters.  Notice, AR3091-3092.  During its review of the application, the Corps initiallysought to avoid and/or minimize impacts to wetlands, and leave

AR021832

larger protective buffers around the remaining wetlands and Cypress Creek (and preserve the critical wildlife linkage), by reducing CCTC's size and reducing the footprint of parking lots by building a second multi-story garage. E.g., AR6646-50.

On May 15, 2007, the Corps granted the CCTC permit with virtually no modifications beyond minor changes to the mitigation plan. EA at 2, AR6637. On July 17, 2007, the Sierra Club formally provided the Corps with sixty days notice of its intent to sue, as it was statutorily required to do to press claims against the agency under the ESA. The Sierra Club has repeatedly sought to meet with the Corps and FWS to discuss the permit. On October 1, 2007, Sierra Club filed suit challenging the permit.

Almost immediately after major construction activities began on the CCTC site, the site began illegally discharging large volumes of polluted storm water to Cypress Creek and its remaining wetlands. As a result, on February 1, 2008, the Corps suspended the CCTC permit so that it could review the legality of the permit and the Corps's assumptions upon which the permit were based. As the Corps itself acknowledged, in issuing the CCTC permit the Corps "relied heavily" on "assurances" of environmental protection from the applicant, and that these "assurances" "have not been met." Corps Notice of Permit Suspension. Thus it became "clear to the Corps that [the permittees'] assurances" "that the project would meet [Clean Water Act] 404(B)(1) guidelines, would be in the public interest, and would not impose significant, unacceptable impacts to wetlands and water quality" have proven hollow. Suspension at 2-3 (emphasis added). The Corps also moved from a stay of litigation and a voluntary remand.

On June 11, 2008, the Court granted the Corps's motion for voluntary remand to allow the Corps to review the appropriateness of the CCTC permit. In connection therewith, Plaintiffs provide the following comments and information.

III.     **The CCTC Permit Cannot Be Reinstated As Initially Issued And Must Be Significantly Modified Or Revoked: Impacts To Wetlands And Buffers Must Be Reduced; The Corps And FWS Must Engage In Formal Consultation Under Section Seven Of The ESA; And The Corps Must Prepare An Environmental Impact Statement Addressing The Cumulative Impacts Of The CCTC Project.**

    A.     **The Clean Water Act Requires That The Corps Modify The CCTC Permit To Avoid And Minimize Impacts To CCTC Wetland And Cypress Creek.**

        1.     **The Size Of CCTC Must Be Reduced To Minimize Impacts To Wetlands And To Protect Cypress Creek.**

As discussed above, the Clean Water Act requires that impacts to Cypress Creek and wetlands be avoided and minimized, and that wetlands cannot be filled unless there are no practicable alternatives to doing so. 40 C.F.R. § 230.10. Where, as in this case, the development is a non water dependent project, "the burden is on the Applicant . . . , with independent

AR021833

verification by the COE, to provide detailed, clear and convincing information proving impracticability." Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1186 (10th Cir. 2002), modified in part 319 F.3d 1207 (10th Cir. 2003) (emphasis added). See also Northwest Bypass Group v. U.S. Army Corps of Engineers, 490 F.Supp.2d 184, 191 (D.N.H. 2007) (applicant must overcome "very strong presumption" with "detailed, clear, and convincing information proving impracticality, which the Corps independently verifies").

In this case, the Corps's avoidance and minimization analyses - and its initial issuance of the CCTC permit - turned on the applicant's assertion that it cannot reduce the size of the CCTC development and still generate a 8.0% rate of return, which the applicant has asserted is the minimum rate of return needed to build the CCTC development. See EA at 14, AR6649. As the Corps explained:

> Although just a 5% downsizing . . . would reduce the project footprint by 28 acres, the applicant stated that a Rate of Return [ROR] below 8.0% deems the alternative impracticable. The applicant states a Rate of Return of at least 8.0% is required to secure financing.

EA at 11, AR6649. Similarly, because the Corps accepted the applicant's assertions that reducing CCTC was not a practicable alternative, the Corps issued the initial permit a) without requiring greater protective buffers around Cypress Creek and its wetlands; b) without requiring improved storm water management plans that do not use remaining wetlands on site to "treat" storm water runoff; and c) without requiring adequate on site mitigation. E.g., EA at 11 (AR6646), 14 (AR6649), 15 (AR6650); 16 (AR6651), 42 (AR6677).[2]

However, as explained by the declaration of Mr. Joseph Magdziarz, Attachment A, the materials submitted by the applicant in support of its permit do not demonstrate that CCTC cannot be reduced: to the contrary, they demonstrate that CCTC can be reduced and still be financially feasible, according to the applicant's own assertions, and thus CCTC's impacts on wetlands, buffers and Cypress Creek can in fact be reduced as well. Mr. Magdziarz is a professional real estate appraiser who routinely analyzes commercial properties to evaluate them for financing and investment purposes.

More specifically, as Mr. Magdziarz explains, the RERC report that the applicant relies upon to establish a minimum 8.0% return does not provide minimum levels of return, but to the contrary, average rates of return for various types of projects, and thus higher and lower rates of return are reflected in the rates reported in the RERC Report. See Magdziarz Decl. at ¶18. This is explained in the RERC Methodology section, in which RERC explains that it generates the

---

[2] Likewise, the Corps accepted the applicant's assertions that it could not build additional parking garages, or reduce the footprint of the giant complex, because the applicant had to make at least a 8.0% percent profit to secure financing, which it allegedly could not do if it built a garage or eliminated even just one bank. Corps EA at 11, 14

AR021834

report by surveying investors throughout the country, and "results are collected, averaged, and then displaced in [RERC's] quarterly report." RERC Report, AR5473. See also Magdziarz Decl. at ¶ 18.

Second, if one compares the applicant's calculated rates of return - which are a type of calculation known as a "going in capitalization rate" calculation - to the "going in capitalization rates" listed in the RERC report, numerous CCTC alternatives (alternatives that are smaller in size and that can reduce impacts to wetlands) are practicable according to the applicant's own calculations. See Magdziarz Decl. at ¶¶ 20-23. For example, the RERC Report indicates the "going in capitalization rate" or "going in cap rate" for Tampa is 7.7% for a Regional Mall and 7.6% for a Power Center. RERC Report, AR 5469. And, as the Corps found in the EA, CCTC could be reduced by 5% – saving 28 acres or half the acreage of wetlands lost – and still generate a going in cap rate of 7.73% for Phase I of CCTC, and 7.8% for Phase II of CCTC, which, again, exceeds the RERC Report's going in cap rates. Compare EA at 14, 6649, with RERC Report, AR5469; see also AR5477-78; AR2625-26 ("Reduction of Office Plan" with 7.9% and 7.8% rates of return); AR2631-32. Thus, at the very least, CCTC could be reduced 5%, reducing impacts to wetlands, and yet still generate the rate of return reported by the RERC Report, which the applicant asserts establishes the minimum rate of return. See also Magdziarz Decl. at ¶¶ 20-23.[3]

Third, Mr. Magdziarz explains that information that is critical to substantiating the applicant's financial analyses is missing, such as the values – the various costs and incomes – used by the applicant in its financial calculations. Such costs include, for example, the actual cost of

---

[3] In performing financial analyses on rates of return for a real estate investment, there are a number of ways to calculate the rates of return, and the applicant mislead the Corps in its permit application by calculating a "capitalization rate" of return for various CCTC alternatives and then directing the Corps to review what are known as "pre tax yield" rates of return listed in the RERC Report. A capitalization rate or "cap rate" is essentially a financial snapshot in time, and if calculated at the beginning of an investment it is often referred to as the "initial capitalization rate," or the "going in capitalization rate" or "overall capitalization rate," to use the RERC Report's terminology, see RERC Summer 2006 Report, AR 5473, and if calculated at the end of an investment, it is referred to as the "terminal capitalization rate" or "residual capitalization rate." Id.; see also Magdziarz Decl. at ¶¶ 8-10. A different means of calculating rates of return is the "pre-tax yield rate," also known as the "internal rate of return," "IRR," or the "discount" rate, which, in contrast to capitalization rates, determines the rate of return over a given holding period and thus includes additional and different sources of return that are time dependent, such as the appreciation in the value of a piece of property and the increase in rental rates over time. Id. In its calculations of the rates of return for various CCTC alternatives, the applicant calculated "capitalization rates" of return, as it acknowledged at least once in its submissions, see AR4599, yet the applicant then directed the Corps to compare those "capitalization rates" for the CCTC alternatives to the higher pre tax yield rates provided by the RERC Report. E.g. AR 5409. See also Magdziarz Decl. at ¶¶ 20-23.

AR021835

the land, which is the primary driver of the applicant's financial calculations, as well as costs of rent and construction. Magdziarz Decl at ¶ 31.

If the Corps had actually demanded such information, it would have found that the information undermines the applicant's calculations. For example, the Special Warranty Deed for the sale of the CCTC land to the permit applicant, attached hereto, lists the purchase/sale price of the CCTC land as $4,317,488.00 in the tax stamp at the top of the deed. See Attach. B. This deed is available on Pasco County's website. See http://images.pascogov.com/deed.aspx?bp=16890314. The Special Warranty Deed therefore establishes the actual cost to the applicant of acquiring the CCTC land.[4]

However, rather than incorporate the actual cost of the CCTC land in its calculations - approximately $4.3 million - the applicant instead included in its financial calculations what it contended was the "Base Value" for the land - $72,837,500, e.g. AR4345, AR5478 - and the applicant then used this figure - the single highest cost listed by the applicant in its financial calculations - to drive up the costs of the CCTC development, and thus to argue that CCTC could not be reduced in size and still generate an 8.0 % rate of return. In contrast, if the Corps used the actual cost of the land to the applicant in the applicant's financial calculations, numerous CCTC alternatives proposed by the developer would generate a rate of return above 8.0% and therefore, according to the applicant's analyses, would be financially feasible, allowing a reduction in the size of CCTC and a reduction in the extent of wetlands impacts. See Magdziarz Decl. at ¶ 35.

Empirical evidence before the Corps also indicates that CCTC could be reduced in size and still be financially feasible. For example, the Corps could simply review the myriad other smaller projects being constructed in the area around the CCTC site. Such developments include, among many others noted in the record: 1) "The Grove," a 120 acre mall with 800,000 SF of retail space just four miles from CCTC, AR4398, AR6422, AR6427; and 2) "King Ranch," a 300 acre commercial and residential development immediately across Cypress Creek from CCTC, EA at 50, AR6685. See, e.g., AR4378-79. Such developments indicate that smaller projects can in fact be constructed while being financially feasible.

The size of CCTC could also be reduced simply by reducing the number of parking spaces. CCTC will have 14,212 spaces for 2,631,000 square feet ("SF"), if one excludes hotels and residences for ease of comparison to other malls. AR3973 (based on figures in first row of table). This comes to a ratio of 5.4 spaces per 1000 SF. Cf. id. (calculating the ratio for CCTC components individually). Correspondence from "Regional Mall Developers" submitted in support of the permit includes a letter from one such developer stating that "[t]he entire center should park 4.5 spaces per 1,000 square feet." AR4044, 4046. Meanwhile, a second regional developer provided the "latest thinking in large scale retail development" and explained that

---

[4] The significance of the $4,317,488.00 dollar amount noted on the deed, and the actual purchase price of the CCTC land by the applicant and/or its agents, can be verified through the purchaser/CCTC permit holder, or perhaps through the other parties to that sales transaction.

AR021836

"[p]arking [is] typically a ratio of 4.5 to 5 spaces per 1,000 sq ft." AR4044, AR4051, 50. Thus, with 5.4 spaces/1000 SF, CCTC has nearly twenty percent more parking than the applicant's professional colleagues stated was necessary. Compare AR3973, with AR4047, AR4050. CCTC's parking also exceeds the 5.0/1000 SF ratio requested by potential tenants. See AR6647.

The Corps also asked the applicant to "compare the proposed parking" of CCTC to other malls. Id. In response, the applicant surveyed five other malls, see AR3973, and as the Corps itself explained, "the results [of the survey] revealed that the project proposed more parking than any existing mall in the evaluation," EA 12, AR6647 (emphasis added). CCTC also had the second highest parking ratio. AR3973. The Corps cannot dismiss these findings based upon the "applicant['s] state[ments] that regional malls, such as that proposed, have a much higher component of restaurant uses than older malls," id., because even if this unsupported statement were true, it does not "clearly demonstrate" that reduced parking is impracticable. AR6647.[5]

> 2. **The Corps Must Ensure That The CCTC Development Does Not Significantly Degrade Cypress Creek And Its Remaining Wetlands By Ensuring That The Storm Water Treatment System, Buffers And Monitoring Plans Will In Fact Be Effective.**

Before reinstating, revoking or modifying the permit, the Corps should require that the applicant more specifically quantify storm water volumes and pollutant levels, after which the Corps should ensure that the proposed storm water system can handle the storm water the site will generate. The Corps's proposed monitoring program cannot substitute for a reasoned determination - grounded in record evidence - that the likely quantity and quality of storm water discharged will not in fact cause significant degradation of Cypress Creek and the remaining wetlands on site. Cf. 40 C.F.R. §§ 230.10, .12. The Corps must also determine, based on adequate evidence before it, the minimum buffers necessary to protect Cypress Creek and the remaining wetlands on site.

The volume and quality of storm water runoff that CCTC will generate poses a significant threat to Cypress Creek and the remaining wetlands on site. As the Corps itself acknowledged, the CCTC development's runoff - particularly given the tremendous amount of impervious surface, including expanded roads and parking for 14,000+ vehicles - poses a "great concern"

---

[5] Indeed, throughout the record, the applicant itself referred to the other malls in the studies as regional malls, and some of these malls were built within the last 5-10 years. Nor should the applicant's assertion that this is a "lifestyle" mall change the analyses or differentiate this mall from the other malls in the studies - the project's purpose as stated in the permit was for a regional mall, not a "lifestyle" mall. AR6637. Moreover, CCTC, given its enormous size and numerous features such as hotels, residences, offices, and big box stores, does not qualify as a lifestyle mall, which is typically much smaller and of a different nature, as indicated by the applicant's submissions. E.g. AR4660, 4663 (noting that lifestyle centers typically range between 150,000 and 500,000 SF and have an average of 350,000 SF, and describing their features).

11

"[g]iven that . . . the project drains into Cypress Creek . . . a tributary to the Hillsborough River (the major source of drinking water for [Tampa])." EA at 41, AR6676. Similarly, the Corps viewed conserving upland buffers that protect Cypress Creek and its wetlands "of paramount concern given the quality of the resource" and the "proximity and scale" of CCTC. EA at 15, AR06650. Yet the Corps allowed the applicant to use remaining on site wetlands to receive and hold runoff from storm water ponds because CCTC allegedly could not be reduced and still make an 8.0% profit. AR6685. And, despite its concern about protective buffers, the Corps authorized the permit applicant to reduce protective buffers around the creek to 50 feet, and around wetlands to an average of 25 feet because "the project footprint could not be further reduced." AR6650.

The appropriate analysis, however, is not just whether the project's impacts can be further reduced, but whether the project will cause or contribute to significant degradation of waters of the United States. 40 C.F.R. § 230.10(c). The record reveals a number of issues the Corps must reexamine before it reissues the CCTC permit. First, the capacity of the storm water system - 1.5 inches - is too small to effectively protect Cypress Creek and its wetlands given the rainfalls in the area that regularly exceed this amount. See Attach. T, Dr. Mark Rains Decl. at ¶ 11. This is particularly true given that the CCTC system will not revert to an empty state between rains - unlike many hydrological models - but, in reality, the system will frequently have water remaining in it from previous rains, thus reducing the available capacity of the storm water system to receive new rains to below the system's stated 1.5 inches.[6]

The erosion and scouring effect of high volumes and high velocities of water is well established. See Attach. C, Environmental Protection Agency, Protecting Water Quality From Urban Runoff; Attach. S, Florida Erosion And Sediment Control Inspector's Manual, at 1-4. Yet while the storm water system has a capacity to treat 1.5 inches of rain, the area regularly receives rains far in excess of 1.5 inches. For example, as the attached records show, the National Weather Service provides the following statistics from 2006, 2007 and 2008 for the Tampa area, listing the maximum rainfall on a single calendar day for each of the following months: June 2006 (3.13 inches/24 hour period); July 2006 (1.98 inches/24 hour period); August 2006 (1.56 inches/24 hour period); September 2006 (2.82 inches/24 hour period); November 2006 (1.75 inches/24 hour period); June 2007 (2.87 inches/24 hour period); July 2007 (3.31 inches/24 hour period); August 2007 (2.95 inches/24 hour period); September 2006 (1.98 inches/24 hour period); June 2008 (3.08 inches/24 hour period). See Attach. D (NOAA National Weather

---

[6] Although the applicant asserts that it is exceeding the state required treatment standard of 1.0 inches, the applicant was required to treat 1.5 inches by its Development of Regional Impact permit. AR02323. Moreover, state regulations also require that storm water systems discharging to Outstanding Florida Waters ("OFWs") handle 1.5 inches of water, and both Cypress Creek's wetlands, which will be receiving the storm water, see EA at 42, AR 6677, and Cypress Creek itself, are OFWs. See F.A.C. 62-302.700(9)(i) (listing Cypress Creek and its waters as an OFW); F.A.C. 62-102.200 (referring to section 403.031(13), for definition of water as including wetlands that feed and abut a waterway). Thus, the applicant is in reality treating the minimum amount of storm water that it is allowed to treat.

12

AR021838

Service Weather Reports); see also http://www.weather.gov (last visited July 1, 2008). Moreover, as these same weather reports indicate, significant rainfall often falls on consecutive days, such as in June 2008, this past month, when 3.08 inches of rain on June 21 was followed by 1.7 inches of rain on June 22, compounding the extent to which the CCTC system is under capacity. The Corps has never evaluated or determined what the impacts of the excess of rainfall - rainfall over the 1.5 inch capacity of the CCTC storm water system - will be.

The failure of the proposed CCTC storm water system to handle the quantity of storm water generated by a typical rain event will most likely cause significant damage to the remaining wetlands on site and Cypress Creek, as evidenced by events to date. The discharge of heavy flows of storm water from the CCTC site has already caused erosion, channeling, and transported pollutants to Cypress Creek and its wetlands. This is evident in the attached photographs and linked video showing voluminous discharges flowing from the CCTC site into Cypress Creek and its remaining wetlands, creating channels and choking the area in silted water. See Attach. E (photographs); see also youtube links at http://www.youtube.com/watch?v=RD7DOWLdYVw&feature=related. These same issues will most likely arise when the storm water system is fully functional and rains exceed the 1.5 inch volume of the storm water system causing similar scouring, erosion and pollution.

The CCTC permit also poses a significant threat to Cypress Creek and its wetlands because of the storm water system's limited ability to effectively treat the specific types of contaminants likely to be present in the CCTC storm water. See Attach. T, Rains Decl. at ¶¶ 13-15. According to the EA,, the system is designed to function as follows: water will pass through a "sump and grease baffle system" to remove dissolved solids, greases and floating debris, and into holding or "detention" ponds which will discharge to the remaining wetlands that, on the southern part of the site, drain into Cypress Creek. AR6677, 6685-86. The ponds can remove some nutrients from the storm water, such as phosphorous and nitrogen, but their capacity to do so is "limited," as explained by the United States Department of Housing and Urban Development, Low Impact Development Manual ("US HUD LID Manual") included in the record. See AR4111. Bioswales - essentially vegetative strips surrounding storm water drains in the parking lots - will also be relied upon to remove some contaminants before the water is actually sent to the ponds, but there is no information in the record as to the number and size of the bioswales and what level of pollutants they will be able to remove: the Corps was not given this information. E.g., AR4310-11.

In contrast, the US HUD LID Manual indicates that runoff from an urban development is likely to have "nutrients and pollutants such as nitrogen, phosphorous, oil, grease, heavy metals and trash." AR4109. Florida Department of Environmental Protection identified pesticides and heavy metals as "common[]" in runoff. AR2111; see also Attach. T, Rains Decl. at 12. Similarly, the Corps requested that the applicant test for potential contaminants that other regulatory agencies identified as potentially present in runoff, including nutrients, petroleum products, polyaromatic hydrocarbons ("PAHS"), and heavy metals. See e.g., AR6623, AR05382-83.

13

AR021839

There is therefore a disconnect between the pollutants that CCTC is designed to treat - greases and dissolved solids and a "limited" amount of nutrients - and the types of pollutants that will be generated by the CCTC development - pesticides, petroleum compounds, oils, heavy metals, PAHS and nutrients. The discharge of polluted stormwater into Cypress Creek waters and wetlands will likely lead to substantial degradation of these waters. See M. Rains Decl. at ¶¶ 12-15. There is simply inadequate information to support the Corps's earlier determination that the issuance of the CCTC permit would not significantly degrade waters of the United States. Among other things, the Corps never determined the levels of contaminants that CCTC will generate, that CCTC's storm water system will remove, and therefore that Cypress Creek and its wetlands will ultimately receive, much less what environmental degradation this level of contaminants would cause.

Moreover, Cypress Creek has a low dissolved oxygen content, which means that it is especially susceptible to elevated levels of nutrients. See Attach. T, Rains Decl. at ¶ 15. It is critical that the Corps meaningfully evaluate the efficacy of the storm water treatment system at treating the types and quantities of the relevant contaminants that CCTC is likely to generate, and then determine the effect on the environment that will result from the discharge of the untreated storm water on the environment. Only by taking these steps can the Corps rationally determine that the CCTC storm water system will not result in significant degradation of Cypress Creek and the remaining wetlands. See Id. 40 C.F.R. § 230.10(c).[7]

To compound the threat to Cypress Creek and its wetlands, the CCTC permit as initially authorized permitted the applicant to reduce protective buffers around Cypress Creek to 50 feet, and around wetlands to an average of 25 feet, EA at 42, AR6677, despite the Corps's own characterization of the buffers as a "paramount concern." AR6650. The proximity of the development to Cypress Creek and the lack of any real buffers is reflected in the last photo in Attachment E. Pasco County Growth Management Department requested 75-100 foot buffers around all class one wetlands, and 50 foot buffers around the Outstanding Florida Waters, AR 2092, which include Cypress Creek and its wetlands. As reflected in the attached reports and cited studies, recommended buffer sizes exceed those that the Corps approved, and research indicates that to be protective, buffers should be at least 100 or more, depending upon such things as the size and nature of the development and the environmental conditions at the site. E.g. Attach. F, Washington State Department of Ecology, Wetland Buffers: Use and Effectiveness,

---

[7] The applicants' reliance on implementing a few Low Impact Development ("LID") measures at CCTC is at best ironic. LID is a design philosophy that seeks to holistically build in relation to the environment that exists at a location, "conserving and protecting natural resource systems" and leaving sensitive environmental features in tact, including wetlands. E.g. HUD Manual, AR4088,AR4094; Attach. I, EPA, Reducing Stormwater Costs Through Low Impact Development (LID) Strategies, December 2007; Attach. R, EPA Website on LID measures, http://www.epa.gov/nps/lid/; Attach. T, Rains Decl. at ¶ 16. In stark contrast, CCTC as proposed calls for destroying one third of wetlands on site, replacing them with impervious parking lots and buildings, and using the remaining wetlands to receive runoff.

14

AR021840

February 1992 ("Buffer widths effective in preventing significant water quality impacts to wetlands are generally 100 feet or greater); Attach. G, Stormwater Manager's Resource Center, Aquatic Buffers Fact Sheet: Buffer Zones http://www.stormwatercenter.net/Assorted%20Fact%20Sheets/Tool3_Buffers/BufferZones.htm; Attach. H, Environmental Law Institute, Planner's Guide to Wetland Buffers for Local Governments, March 2008; Attach T, Rains Decl. at ¶ 14. In short, buffers should be at least 100 feet, and the buffers that the Corps approved are inadequate to protect Cypress Creek or its wetlands, and will likely lead to substantial degradation of Cypress Creek and its wetlands.

The Corps must base any re-authorization of the CCTC permit on evidence indicating that the buffers that it approves will be adequate to prevent the degradation of Cypress Creek and its wetlands. This is particularly true given that the CCTC permit as initially authorized would allow for introducing large pools of polluted storm water on the banks of Cypress Creek and its wetlands: there is little distance for the polluted water to be biologically processed as it leaches out from below the pools before it enters Cypress Creek. See Attach. T, Rains Decl. at ¶ 15. Indeed, the location of the storm water ponds adjacent to Cypress Creek and its wetlands is one of the greatest threats to these resources. Id. (the location of the stormwater ponds "poses a substantial risk of significant degradation of these resources"). The Corps's determination that 50 and 25 foot buffers are the "best possible" option given that the project's size cannot be reduced does not satisfy the Clean Water Act's requirement that the Corps determine that a project will not lead to the significant degradation of U.S. waters. See 40 C.F.R. § 230.10(c).

In addition, the Corps's monitoring program will not accurately measure levels of pollutants discharged into the environment. See Attach. T, Rains Decl. at 17-21. First, the applicant has not established an adequate baseline, and relying on sampling stations near bridges where pollutant levels are highest misrepresents the true quality of the water in Cypress Creek. Id. at ¶ 21. Indeed, the photos of Cypress Creek included in the record reveal the different water qualities at the bridges - where, for example, at the I-75 bridge the creek is choked with aquatic plant growth - while everywhere else the creek is a transparent dark color free from such algae and plant matter. See FWS 500-510.

Second, sampling should not just be performed after major rain events, but also on a regular, periodic basis, to measure levels of pollutants that the environment will experience on a daily, chronic level. Attach. T, Rains Decl. at ¶¶ 16-18. Manual measuring after major rain events will result in inaccurate measurement of contaminant levels because - after a brief spike of pollutants with the initial rainfall - as the rains continue they will flush the area out, and thus where pollutants were once previously concentrated, they will either be diluted or washed downstream. See id. In contrast, measuring on a regular periodic basis, including during relatively dry spells, will provide a more accurate representation of regular, daily pollutant levels. Id. In this regard, given that Cypress Creek has naturally low dissolved oxygen levels, and that nutrients common in storm water will further depress these levels, it is critical that dissolved oxygen also be regularly sampled for and that mandatory steps be taken to rectify lowered oxygen levels. See id. at ¶¶ 15, 21. As discussed further below, dissolved oxygen levels should be

AR021841

compared to baseline data, and not to concurrent sampling in other places on the creek that may also be affected by development.  See id. at ¶ 21.  But see AR6624 (monitoring plan excuses follow up sampling if low dissolved oxygen levels are found, and provides for comparing those levels to "synoptic data" from other sampling stations, not to baselines).

Third, sampling locations should be increased and modified.  See Attach. T, Rains Decl. at ¶¶ 19-21.  Sampling should be done along the creek adjacent to the CCTC site, in the water table immediately down gradient from any storm water ponds, immediately below the ponds; in the ponds; and in the wetlands that are receiving such water.  Besides overflow, ponds primarily discharge through seepage, and their contaminants will flow through the superficial watertable to the creek.  Id.  The location of the ponds - which again are located a mere 50 feet from the creek - therefore result in the introduction of contaminated water immediately on the creek's banks, which will then seep through the groundwater table and into the creek.  Id. at ¶ 15.  Moreover, sampling results should be compared to baseline samples discussed above, not to samples taken above and below the site at the same time.  Id. at ¶ 21.

### 3.    Off Site Mitigation

It is also critical that the Corps reevaluate its off site mitigation plan for the CCTC project. First, the off site mitigation fails to provide the on-site groundwater recharge that is critical to maintaining Cypress Creek, its wetlands and the water table.  Indeed, the mitigation site is far from the CCTC site, and is not even in the Cypress Creek watershed basin.  AR6543 (explaining the mitigation site is in the Hillsborough River basin).

Second, as the accompanying General Accounting Office ("GAO") reports, and National Academy of Science ("NAS") report reflect, the Corps's mitigation efforts have a terrible record of failing.  See Attachs. J, K, L.  Often the Corps's mitigation is unsuccessful at simply restoring or creating new wetlands when measured by any number of wetlands functions: they seldom if ever succeed in replacing or mitigating wetlands lost.  Attach. J, NAS, Compensating for Wetland Losses Under the Clean Water Act at 2 (2001); see also id. at 103, 109 ("[t]he goal of no net loss of wetlands is not being met for wetland functions by the mitigation program.").  The GAO concluded in 2005 that "[] the Corps' priority has been and continues to be processing permit applications" and it "has consistently neglected to ensure that the mitigation it has required . . . has been completed."  Attach. K, GAO, GAO-05-898, Wetlands Protection: Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure That Compensatory Mitigation Is Occurring, at 26 (2005) (emphasis added); id. at 26-27 (as GAO previously reported in 1988 and 1993, the Corps "place[s] little emphasis on its compliance efforts, including compensatory mitigation," and has "limited oversight of . . . mitigation").

In issuing the CCTC permit, the Corps failed to follow some of the minimum steps that the Corps itself identified as necessary to improve the success rate of its mitigation.  For example, the Corps required in a Regulatory Guidance Letter that "special conditions . . . must specify the length of monitoring required," and that the "monitoring period must be sufficient to demonstrate

AR021842

that the compensatory mitigation project has met performance standards, <u>but not less than five years.</u>" RGL, U.S. Army Corps of Engrs. RGL (Aug 3, 2006) No. 06-03 at 3, 2 (emphasis added). But the Corps failed to require a minimum of five years of monitoring in its mitigation plan for the CCTC site.

If the Corps is going to rely upon mitigation in issuing the CCTC permit, it must have a rational basis for doing so when its mitigation so frequently fails. In short, it is incumbent upon the Corps to explain and provide evidence supporting its determination to allow off site mitigation in this case given the Corps's past failed mitigation requirements, and NAS and GAO reports verifying these concerns. At the very least, the Corps should explain why the Corps once again relied heavily upon mitigation to offset environmental impacts; why its results will be better in this case, and why it did not need to follow its own procedures designed to address its past failures.

**B.      The Endangered Species Act Requires That The Corps And The Fish And Wildlife Service Formally Consult Under Section 7 Regarding Impacts To The Wood Stork, The Eastern Indigo Snake, And The Florida Scrub Jay.**

Before reinstating, modifying or revoking the CCTC permit, the Corps must engage in formal section 7 consultation under the ESA because the CCTC development will adversely affect the wood stork, the Eastern Indigo Snake and the Florida Scrub Jay. All of these species have habitat on site, and both the wood stork and the Eastern Indigo Snake have been observed on the CCTC site. The destruction of their habitat - and the introduction of expanded roads and numerous vehicles in their former habitat is an adverse impact to the species that requires section 7 consultation.

**1.      Wood Stork**

As discussed above, the wood stork's primary cause of decline is the "loss of suitable feeding habitat." Wood Stork Listing Rule, 49 Fed. Reg. at 7333; FWS2541. For the wood stork to recover, "[a]t a minimum, . . . currently occupied . . . foraging habitat must be protected from further loss or degradation." Recovery Plan, FWS2549.

The declaration of Clay Colson, attached, attests to repeated and frequent observations of wood storks on the CCTC site. <u>See</u> Attach. M. Indeed, the record makes clear that wood storks have been observed foraging in CCTC wetlands. FWS191-192, 196. The mitigation plan attached to the permit notes wood storks were observed "foraging or loafing" on site. AR6560. And a wildlife survey by the applicant's consultants (Biological Research Associates) ("BRA") records wood storks foraging on site with hundreds of other wading birds. FWS191-92, 196. The Florida Department of Environmental Protection noted that although the "observations were made in the dry season [when] . . . the wetland areas were depleted and dry, numerous birds were counted, [i]ncluding wood storks . . . ." FWS204-05 (emphasis added). The destruction of occupied Wood stork habitat is an adverse affect on the species that necessitates formal consultation.

17

AR021843

Nonetheless the Corps and FWS both determined that, despite destruction of wood stork foraging habitat on site, there would be no adverse impact to the species and formal consultation was not required, based on the mistaken belief refuted by the record that no wood storks used the site and the proposed compensatory measures required by the FWS. The Corps for example expressly based its conclusion on its mistaken belief that: 1) Wood storks were supposedly never observed on site; and 2) the proposed mitigation would offset the loss of habitat on the site. See EA at 46, AR6681 ("[t]hirty-seven days of surveys over 4 years (2002-2005) did not yield any sightings of wood storks on the project area," and construction of storm water ponds would offset habitat loss).[8]

Similarly, FWS's analysis specifically and inaccurately noted the lack of any observation of wood storks on site, and it relied upon the proposed mitigation to compensate for the lost wood stork habitat. Concurrence Letter, AR6364-65. Critically, the compensation that FWS required in its concurrence letter to offset lost wood stork habitat did not even address significant loss of wetlands in the connected wetland system in which the applicant's biologists had identified wood storks foraging. Compare AR6365 (Concurrence letter listing wetlands FWS considered foraging habitat) with AR1923 (recording, for example, wood storks foraging in Wetland W-A1, also known as wetland 5); AR1964 (showing wetlands 1, 4, 5); AR2019 (explaining that wetlands 1, 4, 5, also known Wetland W-A/Wetland W-A1/Wetland W-A3, are lobes of an interconnected wetland system); AR6497 (showing the authorized filling of 23.2 acres, or approximately one third of the three lobed wetlands system Wetland W-A/Wetland W-A1/Wetland W-A3).

In short, the Corps and FWS must formally consult concerning the adverse impact to the wood stork resulting from the destruction of its foraging habitat. This is all the more true because the three lobed wetland system, one third of which the Corps authorized to be filled, in which wood storks were observed foraging, was not even addressed by the FWS concurrence letter and the wood stork compensation that FWS had required for the initial issuance of the CCTC permit.

---

[8] The agencies' inaccurate assessments resulted in large part from the fact that the applicant's consultant specifically told the FWS that no wood storks were ever observed on site. For example, in "response to [the FWS's] 9 November 2006 email request for clarification," AR5561, BRA baldly – and erroneously – stated that "[n]o wood storks have ever been observed on the project site," AR5562 (emphasis added); see also AR3989. Later, when FWS was concerned that litoral shelves in storm water ponds may be inadequate to mitigate for lost wood stork foraging habitat, BRA incorrectly stated: "We have done at least 4 formal wildlife surveys on the property over 7 years. We have also been on site many many times for other purposes . . . . Wood storks have never been observed foraging on the property. . . . I hope this puts this issue to rest and we can look forward to your letter of concurrence." E-mail from J. Bailey, BRA, to L. Smith, FWS (Feb. 28, 2007), AR5917 (emphases added). Two weeks later FWS concurred that there would be no adverse impact to the wood stork and that consultation was not necessary.

AR021844

2.    **Eastern Indigo Snake**

As discussed above, the greatest threat to the Indigo is "habitat loss and fragmentation by residential and commercial expansion." FWS2584. In addition, "human population growth will increase the risk of direct mortality . . . from property owners, domestic animals, and highway mortality." FWS2589.

It is clear that the CCTC site provided excellent and occupied habitat for the Indigo at the time the CCTC permit was issued. Clay Colson in his declaration, attached, reported observing an Eastern Indigo Snake on site. See Attach. M. The applicant's own biologists concluded that Indigos "occur on site or have a reasonably high probability of occurring." FWS191. Indigos are "closely associated with the gopher tortoise . . . the burrows of which provide shelter." FWS2585-86, FWS2588-89. Contrary to the Corps's statement in the EA that a "small population of gopher tortoises" exist on site, the record before the agency when it initially issued the CCTC permit indicated that gopher tortoises were abundant. E.g. FWS191-92, 195, 201 (map noting 20-25 Gopher Tortoise burrows).

Indeed, when the applicant's biologists, BRA, filed the attached gopher tortoise removal report with the Florida Fish And Wildlife Conservation Commission, see Attach. N, the report identified a significant gopher tortoise population. More specifically, the report establishes that even the initial estimates of 20-25 gopher tortoise burrows were a gross underestimate, as the removal report documents the excavation of 25 gopher tortoises from 66 active and inactive gopher tortoise burrows. See Attach. N.

There is no question that the CCTC permit authorized the destruction of Indigo habitat. Yet the Corps and FWS concluded there would be no adverse impact to the Indigo because the "applicant has agreed to follow the Eastern Indigo Snake Protection Measures during project construction, which [FWS] believe[s] should adequately address adverse effects to the snake." Concurrence letter, AR6367; see also EA at 47, AR6682. In short, the agencies limited their consideration of adverse effects to Indigos solely to the direct injury or death of an Indigo during the actual construction of the CCTC development.

As the attached declaration of C. Kenneth Dodd - the former FWS biologist responsible for handling the listing of the Eastern Indigo Snake under the ESA in the first instance - explains, the destruction of Indigo habitat on the CCTC site will adversely affect the snake. See Attach. O, Dodd Decl. at ¶¶ 25-29. Indeed, this is only logical given that species need habitat in which to survive, and that the FWS itself has concluded that the greatest threat to Indigos is the loss of their habitat. FWS2584. The fact that the CCTC site alone may not be adequate to support a population of Indigos, which the applicant's biologists relied upon for dismissing the impact to the Indigo, is irrelevant - as Dr. Dodd explains, the species is harmed when pieces of its habitat are whittled away piecemeal, Dodd Decl. at ¶ 36, and the CCTC site, particularly given its role as a critical wildlife linkage between conservation lands in the area, could be very important to the Indigo. See Dodd Decl. at ¶¶ 25-29, 36.

19

AR021845

As Dr. Dodd explains in his declaration, the Eastern Indigo Snake Protection Measures do nothing to address the impact to Indigos from the loss and fragmentation of Indigo habitat, AR6629, which, again, is the leading cause of the species' decline. FWS2584. Dodd Decl. at ¶¶ 37-39. The measures "ignore a basic concept of ecology by assuming that individuals are separate from their habitat." Id. at ¶ 38. Because the CCTC project is destroying Indigo habitat it adversely affects the species, even if steps are taken to reduce the risks of killing an Indigo during construction. Moreover, as Dr. Dodd explains, the introduction of numerous vehicles into Indigo habitat, and the expansion of the road network in the area, will also adversely affect the Indigo as a result of increased potential for road mortality, among other things. See e.g. Dodd Decl. at ¶ 41.

The Corps and FWS must therefore formally consult on impacts to the Eastern Indigo Snake resulting from the destruction of its occupied habitat on site. In so doing, they must also address threats to the snake arising from increased risks of road mortality and human presence.

### 3.   Florida Scrub Jay

As discussed above, the Florida Scrub Jays ("Jay") uses the same "xeric" (dry) habitat types as Indigos and gopher tortoises, such that management efforts for one must consider impacts to others. FWS2633, FWS2639. The principal threat to the Jay is "loss, fragmentation, and degradation of scrub habitats . . . due primarily to urbanization, agriculture, and fire suppression." FWS2630. The agencies determined that there would be no impact to the Florida Scrub Jay as there supposedly was no Jay habitat on site. E.g. EA at 47, AR6882.

As the attached declaration of Dr. Bradley Stith, a Florida Scrub Jay expert, establishes, there was in fact Florida Scrub Jay habitat on the CCTC site. See Attach. P ¶¶ 9-10. Indeed, the importance of the habitat is potentially heightened given its location in or near a wildlife corridor. Id. at ¶ 11. Even if the Jay is not present on the site currently, the destruction of its habitat harms the Florida Scrub Jay as, for example, it deprives the species of the opportunity to expand to and use the site, and, with the limited buffers and wildlife corridor remaining under the CCTC permit, the development will destroy the value of the corridor to the Jay. Id. at ¶¶ 12, 15-16.

As with the wood stork and the Indigo, the Corps and FWS must formally consult with respect to the adverse impacts to the Florida Scrub Jay that are likely to occur as a result of the CCTC permit. Failure to do so will violate section 7 of the ESA.

### C.   NEPA: The Corps Should Prepare an Environmental Impact Statement And Conduct A Full Cumulative Impact Analyses; At Minimum the Corps Must Support Its Prior NEPA Analyses.

The Corps is required to perform an EIS in this case because "significant environmental impact might result" from the action. Grand Canyon Trust v. FAA, 290 F.3d 339, 340 (D.C. Cir. 2002). In this case, CCTC triggers several NEPA significance factors, any one of which warrants

AR021846

preparation of an EIS.  See Nat'l Parks & Conservation Ass'n v. Babbitt, ("NPCA"), 241 F.3d 723, 731 (9th Cir. 2001); Pub. Serv. Co. v. Andrus, 825 F. Supp. 1483, 1495 (D. Idaho 1993); 40 C.F.R. § 1508.27.

As the record makes evident, CCTC has "[u]nique characteristics" such as "wetlands, wild and scenic rivers, or ecologically critical areas."  40 C.F.R. § 1508.27(b)(3).  Again, the site abuts and drains into Cypress Creek, a scenic waterbody, FWS500-510 (photos), which Florida designated an "Outstanding Florida Water" and afforded "[s]pecial [p]rotection," precisely because of "[its] natural attributes."  See EA 15, AR6650; Fla. Admin. Code Ann. n. 62-302.700(9)(i)(14)(c); Fla. Stat. § 403.061(27).  Cypress Creek is also a major tributary to Tampa's water supply.  Approximately one third of the site is wetlands. EA at 1, AR6636.  And across the southern portion of the site, along Cypress Creek, runs a government-designated "critical wildlife linkage" that forms a "bottleneck" connecting large conservation lands in the area.  EA 37, AR6672.  Together, these lands provide habitat for federally listed species. E.g., EA at 46, AR6681; AR3093.

As discussed above, the Corps itself acknowledged its "great concern" that runoff from the site will "drain[] into Cypress Creek," EA41, AR 6676, yet the storm water system can only handle 1.5 inches of rain in an area that regularly receives greater rainfall, and the system is not even designed to process some of the pollutants to be generated by CCTC.  Similarly, the Corps expressed the "paramount importance" of maintaining the protective buffers around the creek, and yet protective buffers around remaining wetlands will be reduced to an average of 25 feet, and around Cypress Creek to fifty feet, with storm water ponds. EA1, 15, 36, AR6636, AR6650, AR6672.  But there is nothing to support a determination that the remaining buffers will in fact be adequate to protect Cypress Creek or its wetlands.  Meanwhile, as studies have indicated, such small buffers are in fact insufficient to protect these important resources.  In short, there is little to support a determination that the CCTC permit will not cause the significant degradation of Cypress Creek, and mush to indicate that the site will likely have significant environmental impacts.[9]

Moreover, the CCTC permit as initially authorized will effectively sever the "critical wildlife linkage" traversing the site.  CCTC as initially authorized will reduce the critical wildlife linkage to fifty feet of buffers plus storm water ponds. AR6672; AR6450.  The attached report from Pasco County concerning the wildlife corridor explains that there are at least two factors that are relevant to the necessary width of a corridors to ensure its efficacy.  See Attach. Q at 1-4.  First, the species that will use the corridor, and second, the distance that the corridor travels between the conservation lands that it connects. Id.  The report indicates that the corridors should be at a minimum between 550 and 2200 feet wide, with additional protective buffers of at least 50 feet. Id. at 19.

---

[9]  This also implicates public health concerns given that Cypress Creek is an important source of Tampa's water supply.  40 C.F.R. § 1508.27(b)(2).

AR021847

As Dr. Dodd explained in his declaration, CCTC as initially proposed will not in fact preserve the integrity of the corridor for any species but those that are extremely tolerant of human disturbance, such as raccoons. Attach. O, Dodd. Decl. at ¶ 29.  It will be of no use for the Indigo.  Id.  Likewise, Dr. Stith opined that

> fifty foot 'buffers' along side the Creek, with storm water management or flood mitigation ponds placed in the designated critical wildlife linkage, is insufficient to maintain the integrity of the corridor as a wildlife linkage, certainly with respect to the Florida Scrub Jay.

Attach. P, Stith Decl. at ¶12.

In contrast, there is nothing to support the Corps's determination that the CCTC permit will "preserve the integrity" of the corridor. EA at 37, AR6672. The Corps did not even discuss the species that will use the linkage, nor the length the linkage must traverse, much less the Pasco County specification that the linkage must be a minimum be 550-2200 feet wide, with buffers. The Corps relies upon storm water ponds to provide part of the corridor, without even examining whether such ponds even constitute habitat for the species that use the corridor.  Id.

Similarly, as explained above, CCTC "may adversely affect an endangered or threatened species," 40 C.F.R. § 1508.27(b)(9) - a significance criteria under NEPA triggering an EIS - by destroying wood stork and Indigo habitat, the primary threat to each species' survival.  See FWS2541, FWS2584, FWS2630. In addition, CCTC may adversely affect the Indigo by increasing fragmentation of remaining Indigo habitat through road construction and increased traffic, and the increased likelihood of potential road mortality.

Nor was the EA that initially accompanied the CCTC permit adequate to analyze these issues. First, the Corps never provided a meaningful analyses of potential alternatives and the environmental impacts of them. For example, the no action alternative - intended to serve as a benchmark to compare environmental impacts of actions - addressed only economic issues. Grand Canyon Trust v. F.A.A., 290 F.3d 339, 347 (D.C.Cir. 2002); AR6640. Nor is there a "hard look" at the environmental benefits of the reduction scenarios, such as how much uplands buffer - or wetlands, or wood stork or indigo habitat - could be saved, or whether the applicant could avoid using the natural wetlands on site to "treat" runoff, with various reductions or alternatives.  See EA at 11-15, AR6645-6650.[10]

The applicant's one paragraph cumulative impact analysis was equally inadequate.  See AR6686. For example, there was no analysis of the cumulative impacts of rapid and substantial road expansion, including for example on Indigos. Indeed, there was no discussion of the transition of County Road 54 into an alternative I-75 corridor that will cross the southern portion

_____

[10]  The Corps also dismissed summarily the possibility of combining off site alternatives to the CCTC site, such as combining site locations at the interchange of County Road 54 and I-75.

AR021848

of the CCTC site and a new bridge spanning Cypress Creek – the "final link" to establish a "parallel facility to Interstate 75" to carry I-75 traffic and reduce congestion on I-75. AR2333. Nor was there any mention of the elevated highway interchange being built at and on the CCTC site, which the Corps just permitted. There was also, therefore, no discussion of related pollution impacts.

The Corps also failed to adequately address other development in the area. There was also no meaningful analysis of the cumulative impact of development on increased water demand and water withdrawal, for example. To be sure, the report identified that overpumping of the aquifer had dried out Cypress Creek's wetlands, slowed the flow of Cypress Creek, and caused subsidence and "treefall" and that agencies were working to resolve the issue, AR06223-26, see also AR3802-04, AR3496-98, but there was no consideration of the CCTC's water demand in the overall context of the water resources available, demand from other new development, and the consequences of trying to meet that demand. Current levels of pumping are already lowering Cypress Creek's water levels and drying its wetlands, AR6223-26, and models even demonstrated the likely draw down of the aquifer on site. AR1967. Although the Corps inquired into the specific water demand of the CCTC project, it did not inquire into the overall water demand for all of the major projects under construction in the area, nor seek to ascertain whether the water supply could support these projects. Indeed, the area is already a water use caution area because of water shortages. AR2071. Nor did the Corps evaluate what the cumulative effect of all the development, with its impervious surfaces and storm water treatments systems, will be on Cypress Creek and its wetlands as it receives water from such systems.

Even if the initial EA was adequate, which it was not, the Corps would clearly be obligated to provide a supplemental NEPA document given the new circumstances and information now before it. This information would include not only the degradation of Cypress Creel that the permit applicant promised to avoid, but has since caused, but also the information contained herein.

*** 

In conclusion, plaintiffs are gravely concerned by the potential environmental impacts of th CCTC project. They encourage the Corps to undertake a full review of these impacts, and to formally consult with the FWS regarding impacts to listed species. Plaintiffs request the opportunity for public comment, and would be happy to discuss these concerns with the Corps and the FWS.

Sincerely,

Joshua Stebbins

23

AR021849

cc (w/o attachments):

Mark A. Brown
Senior Trial Attorney
Wildlife & Marine Resources Section
U.S. Dept. of Justice
P.O. Box. 7369
Washington DC 20044-7369

Paul L. Grosskruger
Colonel, U.S. Army
District Commaner
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

Charles Schnepel
Chief, West Permit Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

Eric Summa
Section Chief, Enforcement Section
Jacksonville District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

Thomas Farrell
Regulatory Division
Special Projects/Enforcement Branch
Enforcement Section
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019

Douglas M. Halsey
White & Case LLP
Wachovia Financial Center, Suite 4900

24

AR021850

200 South Biscayne Boulevard
Miami, FL 33131-2352

AR021851

Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Tanya M. Sanerib
Joshua R. Stebbins
Delcianna J. Winders

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

August 11, 2008

Tracy Hurst
Project Manager
West Permits Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

**Re:    Army Corps of Engineers's Voluntary Remand In Sierra Club et al v. Van
           Antwerp, et al (07-cv-01756) (D.D.C. Oct. 1, 2007).**

We are writing on behalf of the Sierra Club, Gulf Restoration Network, Clean Water
Action, Richard Sommerville, and Chris Loy, Plaintiffs in the above referenced action, to reiterate
our earlier requests that the Army Corps of Engineers ("Corps") and the Fish and Wildlife Service
("FWS") conduct a supplemental NEPA analysis with regards to the Cypress Creek Town Center
project ("CCTC"), and reopen the Corps's Clean Water Act ("CWA") analyses of the CCTC
permit. More specifically, Plaintiffs request a supplemental NEPA review including a public
notice and comment period and the preparation of an Environmental Impact Statement ("EIS").
As part of the public notice and comment period, the public should be provided with the full
administrative record concerning the CCTC site, including information reviewed by the Corps on
remand relating to CCTC's discharges and Plaintiffs' supplemental submissions. As discussed
more fully in Plaintiffs' July 28, 2008, correspondence, Plaintiffs request that the Corps reevaluate
under the CWA whether the CCTC project can be reduced in size, and thus reduce impacts to
wetlands, and whether, among other things, the CCTC permit will result in the significant
degradation of Cypress Creek. In addition, the Corps should engage in formal consultation with
FWS concerning impacts to threatened and endangered species.

A full supplemental NEPA analysis including an EIS, and further analysis under the Clean
Water Act, are required given CCTC's significant environmental impacts to date and the new
circumstances and new information now before the agency. See e.g. Plaintiffs' correspondence of
July 23, 2008; see also 40 C.F.R. § 1502.3, 1502.9. As reflected in the attached declaration of
Dr. Mark Rains, the CCTC project has already had a significant impact on the environment as a
result of CCTC's discharges to Cypress Creek, which have caused the significant degradation of


recycled paper

AR021852

the creek. See Attach. A; see also 40 C.F.R. § 1502.3. The level of controversy alone warrants preparation of an EIS given the uncertainty of environmental impacts from the CCTC project, as reflected in the numerous governmental agencies that have already issued notices of violations to CCTC's developers. See Attach. B; 40 C.F.R. § 1508.27(4). Moreover, full and meaningful opportunity for public participation is critical in light of the tremendous public interest and involvement in the CCTC project, as reflected in the attached news articles and editorials. See Attach. C.

     To date, the Corps has not responded to Plaintiffs' correspondence, including their request for full and meaningful NEPA and CWA analyses, nor their request for formal consultation with FWS under the Endangered Species Act. The Corps has not indicated to Plaintiffs whether it intends to provide for any public notice concerning the new information before the Corps, such as information relating to the discharges to the creek and Plaintiffs' supplemental submissions. Nor has the Corps indicated whether it will provide for a public comment period. Plaintiffs therefore submit the attached information in support of their request for a supplemental NEPA and CWA review, including preparation of an EIS and a public notice and comment period. Please ensure that the attached documents are included in the agency's record of its review on remand. Plaintiffs further request that the Corps indicate by August 29, 2008, whether, and in what manner, it will respond to Plaintiffs' requests,.

Thank you,

Joshua Stebbins

cc:

Mark A. Brown
Senior Trial Attorney
Wildlife & Marine Resources Section
U.S. Dept. of Justice
P.O. Box. 7369
Washington DC 20044-7369

Douglas M. Halsey
White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, FL 33131-2352

2

cc: w/o attachments

Paul L. Grosskruger
Colonel, U.S. Army
District Commaner
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

Charles Schnepel
Chief, West Permit Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

Eric Summa
Section Chief, Enforcement Section
Jacksonville District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

Thomas Farrell
Regulatory Division
Special Projects/Enforcement Branch
Enforcement Section
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019

AR021854

Meyer Glitzenstein & Crystal

1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Tanya M. Sanerib
Joshua R. Stebbins
Delcianna J. Winders

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

October 2, 2008

Tracy Hurst
Project Manager
West Permits Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

David Hankla
U.S. Department Of the Interior
Fish and Wildlife Service
6620 Southpoint Drive, South
Suite 310
Jacksonville, FL 32216

**Re:   Army Corps of Engineers's Voluntary Remand In Sierra Club et al v. Van
Antwerp, et al (07-cv-01756) (D.D.C. Oct. 1, 2007).**

We are writing on behalf of the Sierra Club, Gulf Restoration Network, Clean Water
Action, Richard Sommerville, and Chris Loy, Plaintiffs in the above referenced action, in response
to White and Case's letter on behalf of Sierra Properties' (the "Applicant's") et al.'s, letter of
August 22, 2008 ("Correspondence"). Plaintiffs do not respond to each of the Applicant's
assertions in their correspondence, though the correspondence fails to resolve any of the issues
raised by Plaintiffs. Instead, Plaintiffs highlight the following points.[1]

---

[1] Many of the Applicant's assertions in its correspondence neither reflect nor respond to
the actual statements of Plaintiffs' and their experts. For example, Dr. Rains never stated that a
specific pond, shown in a site status photograph, was the source of CCTC's discharges. See
Correspondence at 9. Contrary to the Applicant's assertion, only the Applicant made the
suggestion. Id. Indeed, the Applicant's statements in its correspondence often do not even
reflect the information the Applicant submitted in support of its correspondence. Plaintiffs urge
the Corps and FWS to carefully review the underlying information that Plaintiffs and the
Applicant have submitted.



recycled paper

I.      Clean Water Act

        A.      The Size Of Cypress Creek Town Center ("CCTC") Can And Must Be Reduced

        The Applicant's latest submission fatally undermines its section 404 permit application.
Rather than "clearly demonstrate" that it is not practicable to reduce the size of CCTC's wetlands
impacts, 40 C.F.R. § 230.10(a)(3), which the Applicant must do with "detailed, clear and
convincing information proving impracticability," information that the Corps must
"independent[ly] verif[y]," Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152,
1186 (10th Cir. 2002), modified in part 319 F.3d 1207 (10th Cir. 2003) (emphasis added), the
Applicant's latest submission demonstrates exactly the opposite: it is, in fact, entirely practicable
to reduce the size of CCTC and reduce impacts to wetlands.

        First, with respect to the accuracy of its financial calculations, the Applicant does not
contest that the actual cost of acquiring the CCTC land was approximately $4.3 million, and that
it failed to use the actual cost of its land in the financial calculations it proffered to show the
supposed impracticability of smaller CCTC alternatives.  In fact, without specifically citing the
$4.3 million figure, the Applicant implicitly acknowledges that $4.3 million was "the price that
Sierra Properties paid for the land" and "an unadjusted historic purchase price."  Correspondence
at 8.  Because it cannot dispute its $4.3 million acquisition price, the Applicant instead asserts that
"there is no authority" requiring the Applicant to use the actual cost of its land in its financial
analyses.  Id.

        Contrary to the Applicant's assertions, however, the EPA's Section 404 Guidelines do
require that the Applicant use its actual costs in analyzing practicability.  More specifically, the
regulations prohibit issuance of the CCTC permit if "there is a practicable alternative to the
proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. §
230.10(a).  And an alternative is practicable if it "is available and capable of being done after
taking into consideration cost, existing technology, and logistics in light of overall project
purposes."  Id. § 230.10(a)(1) (emphasis added); accord id. § 230.3(q).  Moreover, use of actual
costs is necessary to an objective determination of what is practicable.

        As the Corps is aware, in this case the Applicant asserts that it is not practicable to reduce
CCTC in size because, in short, its calculations show that reducing the size of CCTC reduces the
revenue CCTC will generate, and the Applicant's costs are too high to reduce CCTC's size and
thus revenue without reducing the rate of return to below a supposedly required 8.0% rate of
return.  Assuming for present purposes the appropriateness of this analyses – which Plaintiffs
contest, see Plaintiffs' Motion For Summary Judgment at 25-28, and which the Applicant's own
expert asserts is inappropriate, see Correspondence at 5 – simply using the actual $4.3 million
cost of land in the Applicants' calculations, rather that the $72 million figure used by the
Applicant, shows that the project can in fact be made smaller and still generate an 8.0% rate of

2

AR021856

return according to the Applicant's own analyses.[2]

However, in the initial permitting process the Applicant avoided this outcome by manipulating its calculations. Instead of using its actual $4.3 million land cost under "Net Land Costs" in its calculations, it inflated its "Net Land Costs" total by using $72,837,500, calling it the land's "base value." E.g., AR4344, 45. In its correspondence, the Applicant even acknowledges that rather than an actual cost, $72,837,500 is simply what the Applicant asserts is in essence the fair market value of the land. Correspondence at 7. But the supposed fair market value of CCTC land has nothing to do with the legal standard for judging the practicability of reducing CCTC because it is not in fact a cost to the Applicant. In addition, there is nothing impracticable about the Applicant choosing to "accept less" than the supposed $72 million fair market value of its land, and using a lower value - like its true costs - in its calculations.

The Applicant's own correspondence demonstrates that using a fair market value of its land, in lieu of its actual costs, results in calculations that have no real bearing on the project's practicability, i.e., whether the applicant can pursue the project while destroying fewer wetlands. The Applicant now asserts that the value of its CCTC land was $83,850,000, as opposed to $72 million. Id. If one uses $83 million (instead of $72 million as initially used) in the financial calculation of the CCTC alternative initially approved, the rate of return for the approved alternative falls below 8.0%. Cf. id. (the Applicant itself asserts that a "higher land value would have only necessitated higher [revenues] of the [CCTC] alternatives"). But despite the fact that the Applicant's highest "cost" has increased by approximately $11 million, and the CCTC project would supposedly no longer reap the allegedly required 8.0% return, the Applicant is not arguing that CCTC has now become impracticable. To the contrary, the Applicant is merely seeking reinstatement of the permit. Id. at 5. Again, as this anomaly illustrates, using the supposed fair market value is not appropriate, and it is not really a "cost" at all: it is entirely practicable for the Applicant to reduce the size of CCTC and still generate an 8.0% rate of return simply by using its actual cost of acquiring the CCTC land rather than the supposed value of the land. Moreover, the fair market value may wildly fluctuate based on market conditions, the economy, the appraiser and other factors, see Correspondence, Ex. B at 10 ("[e]ven after the passage of a relatively short period of time, property values may change substantially and require review of the appraisal"), yet this does not change the actual cost to the Applicant of the CCTC land. Tellingly, the Applicant's appraiser appraised the portion of the CCTC property on which the mall is to be built at $37 million, while the Applicant sold the land to the mall developer JG Cypress Creek, LLC (i.e., Jacobs Group), for only $25 million. See Correspondence at 2, 39.

---

[2] Contrary to the Applicant's correspondence, Plaintiffs do assert that CCTC could be made smaller and still generate an 8.0% return. E.g. Plaintiffs' July 23, Correspondence at 8. For example, "CCTC Alternative USCOE 5% Reduction," AR5477, 78, which reduces the size of CCTC by 5%, makes far more than an 8.0% rate of return if one uses the applicant's actual cost of the land in the calculations. Similarly, CCTC alternative A-5 - which reduces 16 acres of surface parking and replaces it with a parking deck, AR 4061-62 - results in a rate of return far greater than 8.0%.

3

AR021857

Second, with respect to what the Applicant's calculations actually demonstrate, and the supposed requirement of an 8.0% rate of return, the Applicant never addresses the fact that it misled the Corps when it calculated the "going in capitalization rate" in their financial calculations, but then directed the Corps to review, in the RERC Report, what are known as pre tax yield rates of return. Yet, if one compares apples to apples – that is, if one compares the going in cap rates calculated by the Applicant to the going in cap rates reported by RERC – the rate of return according to RERC for the Tampa area was 7.7% for a Regional Mall and 7.6% for a Power Center, RERC Report, AR5469, whereas the Applicant's own analysis concluded that CCTC could reduced by 5%, saving 28 acres, and generate a going in cap rate of return of 7.73% and 7.8% for Phases I and II, thus meeting the RERC reported rates of return. Compare EA at 14, 6648-49.

The Applicant instead seeks to sidestep its earlier misleading statements, abandoning and undermining the RERC reported rates of return in the process. Again, the Applicant previously told the Corps that RERC "is the Nation's leading authority on financial data for commercial development" and "an authoritative overview on . . . market recaps and historical comparisons of required rates of return for commercial development." AR 5409. The Applicant then listed various RERC rates of return and concluded that, based upon RERC's stated rates of return, 8.0% was the "minimum required for the Cypress Creek Town Center." Id. (emphasis in original).

Now, however, it appears that the RERC Report is not actually the authoritative source of rates of returns because the RERC Report supposedly does not even address new development. Instead, for a project like CCTC, the Applicant asserts there must be an even "higher rate of return" given various additional risks. E.g. Correspondence at 6. The Applicant explains that rates for developed properties would need to be adjusted up "1.5 to 3.0 percentage points" for a new development like CCTC, according to its supposed expert. Correspondence at 6-7. A rate of return of between "9.10 % and 10.60 % was indicated for a proposed development such as CCTC in the second quarter of 2006." Id. Furthermore, the Applicant asserts that "if we were to conduct an analysis of appropriate rates of return today [as opposed to in 2006] they would be much higher than the 8.0% rate of return that was utilized [in 2006]." Id. at 7.

Ultimately, however, in yet another bait and switch, the Applicant abandons even this latest information as well, begging the question what rate of return is really the minimum that is practicable. More specifically, despite citing a 9.1% - 10.6% required rate of return, id., the Applicant nonetheless asserts that it can build CCTC for an 8.0% rate of return. Meanwhile, with no supporting information or explanation why it is impracticable, the Applicant continues to assert that it cannot build the project for less than 8.0% – such as, for example, a 7.73% return, which would allow for a 5% reduction in CCTC and significant savings of wetlands on site. AR5477. These arbitrary and unsubstantiated assertions - that the Applicant can accept one certain rate of return, 8.0%, but not another, such as 7.73%, without any explanation as to why, for example, a 0.27% difference in rates of return renders CCTC impracticable - undermine the Applicant's latest

4

AR021858

submissions.[3]

    B.      CCTC Will Cause And Contribute To The Significant Degradation Of Cypress Creek And Its Wetlands.

As explained in Plaintiffs' August 11, 2008, correspondence, CCTC's discharges have already caused significant degradation to Cypress Creek in violation of EPA's section 404 Guidelines that prohibit the issuance of a permit "which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). More specifically, the Applicant's discharges resulted in extremely high turbidity levels in the Creek. The CCTC permit should be rescinded on this ground alone.

To avoid this outcome, the Applicant attacks the credibility of Plaintiffs' expert and questions the expert's turbidity photographs and measurements. Yet the Applicant's efforts are ironic at best given that CCTC's discharges and resulting turbidity have been documented in numerous ways by many people, including for example by Clay Colson in his declaration; in the expert's photographs, measurements and declaration; in other photographs and videos submitted to the Corps by Plaintiffs; and in violations issued by government agencies, including the Corps's own suspension of the CCTC permit.

Nor do the Applicant's submissions do anything further to support the conclusion that the CCTC's stormwater treatment system will be protective of Cypress Creek and its wetlands. Again, at its core the issue can more or less be reduced to one of water quantity and water quality. With respect to water quantity, the Applicant leaves unaddressed what will happen when rainfall exceeds the systems' capacity as a result of either a single rain event in twenty four hours or repeated rainfalls on consecutive or near consecutive days (regardless of whether the system handles 1.5 inches of rainfall or 1.5 inches of runoff as the Applicant has variously described it

---

[3] Again, there are significant discrepancies between the Applicant's correspondence and the information in its submissions. For example, contrary to the Applicant's characterizations, the Applicant's "expert" never stated that it would be "virtually impossible to obtain permanent financing" with a rate of return below 8.0%. Correspondence at 6. Instead, the declarant stated that "8.0% is a reasonable minimum development return" (emphasis added); that a premium of 150 to 300 basis points was suggested; that its own research suggested a rate of return of 9% to 10% was "indicated;" that a below market rate of return "would not be viewed favorably;" and that a "lender may not make the loan without additional investor concessions" such as "larger equity contribution[s]," which might be necessary "if the project had a return on cost below the minimum investor threshold." Id., Ex. A at 10, 11 (emphasis added). In a series of telling omissions, the expert never stated that CCTC could not be built for a rate of return below 8 %, nor that CCTC could not be reduced and still secure a rate of return of 8.0%. Indeed, the declarant never stated that it was impracticable for the Applicant to obtain financing at any particular rate of return, and it most certainly did not state, much less explain why, an 8.0% rate of return would be acceptable while a 7.7% rate of return, for example, would not be.

AR021859

during the permitting process). The Applicant's submissions are no more helpful with respect to the critical issue of water quality impacts resulting from day to day chronic releases of water. And the very fact that the Applicant's monitoring system recorded "healthy scores at all stations," Correspondence at 16, when massive discharges of turbid water were repeatedly documented underscores the inefficacy of the proposed monitoring plan.

II.    Endangered Species

As discussed in Plaintiffs' initial correspondence, the Corps was required to undertake formal consultation with FWS concerning adverse impacts to several threatened and endangered species, see 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a), and the Applicant's submission cannot remedy the Corps's failure to do so. With respect to the Wood Stork, there is no question that construction of CCTC would result in the destruction of Wood Stork habitat. Yet there still is no accurate assessment of lost Wood Stork habitat and required mitigation. In its correspondence the Applicant never even addresses the fact that Wood Storks were seen foraging in a wetlands complex authorized to be filled, and yet FWS never even identified the wetlands complex as Wood Stork habitat, much less did it require compensation for it.[4]

Similarly, the Applicant still fails to address the adverse impact to the Eastern Indigo Snake resulting from the loss of its habitat and the fact that the *Standard Protection Measures* fail to address adverse impacts resulting from the loss of habitat. Precisely because the Applicant has no meaningful response to this issue, it is relegated to arguing that "additional formal consultation about the Indigo Snake at this time would be pointless" because the Applicant has already supposedly destroyed the Indigo's habitat. Correspondence at 22. This assertion is as cynical as it is legally baseless. If a federal permittee has indeed destroyed endangered species habitat in violation of the ESA, then the answer is not to say "never mind" but, rather, to pursue the legally required process, the result of which could be a determination that habitat should be restored on site, or that additional off site mitigation should be undertaken.[5]

III.    NEPA

The Applicant's correspondence further highlights the inadequacies of the NEPA review

---

[4] Again, this is a direct result of what can only be the Applicant's deliberately false and repeated misrepresentations that Wood Storks were never seen foraging on site. Compare AR5562; AR3989; AR5917; AR3997; AR4326; FWS485-87 with Correspondence at 20 (asserting misrepresentations were "a simple mistake" in "a [] document") (emphasis added).

[5] The Applicant also falsely states that the "habitat on site" was "not preferred by Indigo Snakes," Correspondence at 21, although its own experts conclude that the Indigos "occur on site or have a reasonably high probability of occurring." FWS191. Indeed, in this light, the Applicant's efforts to discredit whether a Indigo was seen on site misses the critical point that CCTC contains, or contained, Indigo habitat.

AR021860

performed by the Corps and the need to perform an Environmental Impact Statement ("EIS"). Indeed, the Applicant's assertion that - because "circumstances have changed since the original permitting process" - the Applicant has submitted an additional environmental analysis of alternatives, Correspondence at 25, only bolsters the importance of engaging in a full NEPA analysis at this time.

The Applicant's correspondence cannot change the fact that the CCTC site holds unique characteristics that justify preparation of an EIS. 40 C.F.R. § 1508.27(b)(3). Nor do the Applicant's submissions resolve the significant impacts of CCTC to this unique environment. For example, with respect to the critical wildlife linkage crossing the site, the Applicant has not provided any further information about what the species are that utilize the linkage nor what habitat requirements are necessary if the linkage is to be effective. Thus, the Corps is left without support for its initial determination that construction of CCTC would preserve the integrity of the linkage. See AR 6672. To the contrary, as Plaintiffs' expert biologists explain, with respect to all but the most human tolerant species, and particularly with respect to the Indigo and the Florida Scrub Jay, the remnant of a linkage permitted by the Corps is "far too narrow" to be effective. E.g. Dodd. Decl. at ¶ 29; accord Stith Decl. at ¶ 12 ("insufficient").

Similarly, the Applicant's continued dismissal of the cumulative impacts resulting from the tremendous growth in the area - "CCTC is a result of urban sprawl, not a cause of it," Correspondence at 25 - leaves critical cumulative impacts unexamined. For example, the Applicant still fails to even identify the construction of a parallel I-75 facility across the CCTC site, much less the elevated highway exchange being constructed. And the Corps still lacks the most fundamental - and critical - information bearing on water demand and withdrawal: what will be the overall cumulative increase of water demand in the area, and what is the available supply to meet that demand?

Preparation of an EIS in this context is clearly required. First, there are potentially significant impacts on a unique environment, as well as on federally listed species. Indeed, it is inescapable that construction of CCTC has already had significant environmental impacts as a result of discharges to Cypress Creek, not to mention the uncompensated impact to threatened and endangered species. The very fact that there is such disagreement between scientists as to the impacts of CCTC – on threatened and endangered species, on the critical wildlife linkage, and on Cypress Creek and its wetlands, among other things – calls for a full EIS to be performed. 40 C.F.R. § 1508.27(b)(4) (indicating an EIS should be prepared where an action's effects are "likely to be highly controversial"). To continue to refuse to prepare an EIS in such circumstances is entirely inconsistent with NEPA. 42 U.S.C. § 4332(C)

\*       \*       \*

In short, the Applicant's correspondence does nothing to remedy the Corps's and FWS's CWA, ESA and NEPA violations. Moreover, as events and information before the Corps since its initial issuance of the permit demonstrate, the Applicant misled and/or misdirected the Corps

AR021861

during the permitting process. The environmental impacts of CCTC, including the discharges to an Outstanding Florida Water and the impacts to threatened and endangered species, have not only been larger than the Applicant led the Corps to believe, but many were also avoidable. The Corps should revoke the CCTC permit on the basis of the Applicant's misleading statements alone. Indeed, the Corps's regulations provide that the Corps may "modify, suspend, or revoke a permit as may be made necessary by considerations of the public interest," 33 C.F.R. § 325.7(a), and in this case the Cops specifically reserved its right to revoke the permit should new information surface, and should the information the Applicant provided during permitting be "false, incomplete, or inaccurate." AR06489.

At the very least, Plaintiffs again request that a full supplemental NEPA analysis, including an EIS, and further analysis under the CWA and section 7 of the ESA be undertaken given CCTC's significant environmental impacts to date and the new circumstances and new information now before the agency. See e.g. Plaintiffs' correspondence of August 11, 2008, and July 23, 2008; see also 40 C.F.R. § 1502.3, 1502.9. Again, full and meaningful opportunity for public participation is critical in light of the tremendous public interest and involvement in the CCTC project.

Thank you,

Joshua Stebbins

cc:

Mark A. Brown
Senior Trial Attorney
Wildlife & Marine Resources Section
U.S. Dept. of Justice
P.O. Box. 7369
Washington DC 20044-7369

Douglas M. Halsey
White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, FL 33131-2352

Paul L. Grosskruger
Colonel, U.S. Army
District Commaner

8

AR021862

U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

Charles Schnepel
Chief, West Permit Section
U.S. Army Corps of Engineers
Tampa Regulatory Office
10117 Princess Pal Ave., Suite 120
Tampa FL 33610

Eric Summa
Section Chief, Enforcement Section
Jacksonville District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

Thomas Farrell
Regulatory Division
Special Projects/Enforcement Branch
Enforcement Section
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019

AR021863