**Storz, Christina D SAJ**

| | |
|---|---|
| **From:** | Daker, Angela [adaker@miami.whitecase.com] |
| **Sent:** | Tuesday, November 10, 2009 5:10 PM |
| **To:** | Storz, Christina D SAJ |
| **Cc:** | Halsey, Douglas |
| **Subject:** | FW: CCTC - PN comments - Email 3 of 4 |

**Attachments:** document2009-01-26-092202.pdf


document2009-01-
26-092202.pdf

"Hurst, Tracy E SAJ" <Tracy.E.Hurst@usace.army.mil>

01/26/2009 09:55 AM

To
<Hsierra@sierra-properties.com>, <tschmitz@rejacobsgroup.com> cc Subject
CCTC - PN comments - Email 3 of 4

><((((°>'·.·.,,.·´¯'·.·.,,.·´¯'·....·><((((°>

Tracy Hurst
U.S. Army Corps of Engineers
10117 Princess Palm Ave., Ste. 120
Tampa, FL  33610
813/769-7063
813/769-7061 FAX

><((((°>'·.·.,,.·´¯'·.·.,,.·´¯'·....·><((((°>

Please assist us in better serving you!  Please complete the customer survey by clicking
on the following link:  http://regulatory.usacesurvey.com/

AR021864

and the interrelationship of all of those features to adjacent waters of the State of Florida, including Cypress Creek.

40.     SWFWMD issued an Environmental Resource Permit to the Owner for the Project as a whole, encompassing the Work required under both Contracts, on January 30, 2007.  As set forth in Item 36 of SWFWMD Permit, Section 36, the permit was issued based upon the design prepared by the Owner's consultants and included SWFWMD's required professional certification that the engineering features described in the Owner's Application to Construct and Operate the Surface Water Management System for the Project complied with all applicable laws.  The SWFWMD permit included a general description of the best management practices for erosion and pollution control to prevent violation of state water quality standards.

41.     Prior to any involvement in the Project by Kearney, the Owner designed the SWPPP and BMP for the Project to comply with the requirements of the January 30, 2007 SWFWMD permit.

42.     As part of the environmental permitting process for the Project, comprehensive permit applications were prepared and submitted by the Project Engineer. Over one year of engineering work by the Project Engineer was required to investigate, evaluate, analyze and prepare the detailed planning, design and engineering necessary to prepare and submit the Project permit applications.  Therefore, the Project Engineer (a) was the party most knowledgeable about the requirements of the environmental permits issued for the Project, and (b) owed a duty to the Contractor to expressly set forth on the Contract Plans all work of any kind or nature which was required to implement the BMP and SWPPP as prepared by the Project Engineer and/or other Owner consultants.

11

Greenberg Traurig, P.A.

AR021865

**The Project Events - Excessive Rainfall Caused Turbid
Water Discharges Which Were Not Kearney's Responsibility**

43.     On June 25, 2007, Kearney and the Owner entered into the contract for the Zone A-South Project. A complete, accurate, and authentic copy of the executed nine page Zone A-South Contract, as well as the incorporated Exhibits A - F is attached as Exhibit "1".

44.     The Owner urgently desired the Work on the Zone A-South Contract to commence as quickly as possible to minimize or avoid further challenges to the environmental impacts resulting from the Project. Consequently, a preconstruction meeting was conducted on May 30, 2007 (a copy of the preconstruction meeting minutes is Exhibit F to the Zone A-South Contract). The preconstruction minutes stated:

> (a) Item 2 states that "Kearney to sign NPDES permit", which indicated that the National Pollution Discharge Elimination System (NPDES) permit had been prepared previously by the Project Engineer.
>
> (b) Item 5 of the preconstruction meeting minutes stated that the "construction issue plans" would be available on June 13, 2007.
>
> (c) Item 8 stated "Gopher tortoise relocation will take place on Saturday, June 2, 2007."

45.     Thus, the Owner required that the Work be commenced prior to the execution of the Contract. Indeed, the first draft of the June 25, 2007 Zone A-South Contract was provided to Kearney by the Owner's Agent on June 18, 2007, after the Work had commenced.

46.     On August 4, 2007, as a result of abnormally severe rain events, it was reported that turbid water discharges occurred from Jurisdictional Wetland R and from Wetland Area J, respectively.

12

Greenberg Traurig, P.A.

AR021866

47.     On August 23, 2007, the Army Corps of Engineers issued a Notice of Noncompliance addressed to Sierra Properties, an affiliate of the Owner.

48.     By letter dated August 31, 2007, the Owner (on Sierra Properties I, LLC letterhead) transmitted to the Army Corps of Engineers a letter dated September 4, 2007 from Wilson Miller, the Project Engineer, which was signed by David A. Kemper, PE, its Senior Vice President and Managing Principal.

49.     The Owner's letter to the Army Corps of Engineers  District Commander stated that "we understand the seriousness of the matters contained in the [Corps] letter and we have enclosed a letter responding to the issues raised, written by the Project Engineer, Wilson Miller."

50.     In its September 4, 2007 letter, which was addressed to the District Commander of the Corps - Jacksonville District, the Project Engineer, on behalf of itself and the Owner, made the following representations of fact and engineering evaluations:

> a.      "With respect to unauthorized off-site discharges of turbid water, again, **this was not intentional and also was not a result of negligence on the site contractor's, or the Owner's part**. This Project proposes up to one million square feet of vertical construction with just the first phase. **This requires the clearing and grubbing of large areas of the site, which exposes masses of soil surfaces to rainfall. This area of Pasco County has experienced uncharacteristic rain events this summer**. During the time period leading up to the events summarized in your letter, the Project experienced rainfall amounts as shown on Attachment A."

AR021867

b.    "Rainfall events of this magnitude can and did cause an undesirable discharge to the creek.  **All erosion and control best management practices have been installed and were functional prior to the events described.**"

c.    "An ACOE representative had been on-site the days of the abnormally high rainfall events and was satisfied that appropriate measures had been taken to prevent sediment discharge into wetlands."

d.    "**The Project Owner and construction team have demonstrated a strong desire to make every effort to do things right on this Project.**"

e.    "**Therefore, we are implementing a very aggressive, costly, and well-thought out plan to prevent any future discharges regardless of rainfall intensity.**"

f.    "SWFWMD representatives visit the site two times a week and are very satisfied with the efforts undertaken.  ACOE representatives have visited the site three times, since the date of your letter, and are also satisfied that we are being proactive and responsive to these matters."

(Emphasis Added.)

51.    With its September 4, 2007 letter to the Corps, Wilson Miller attached a Wetland and Surface Water Impact Plan showing proposed pond berm construction and additional diversion containment berms of approximately 5900 feet in length, of which was not part of the original design for the Project.

14

AR021868

52.    The September 4, 2007 Wilson Miller letter also encompassed turbid water discharges that occurred on September 1, 2007.

53.    On or about November 7, 2007, Kearney and the Owner entered into the Mall Site Improvements Contract.  A complete, accurate, and authentic copy of the executed eight page Mall Site Improvements Contract, as well as the incorporated Exhibits A - F is attached as Exhibit "2". This Work area was a 100 acre portion of the approximately 307 acres which were improved under the Mall Site Improvements Contract.

54.    During the evening of January 22, and during the day of January 23, 2008, five inches of rain fell on the Project site and adjacent areas.  This was an abnormally severe rainfall event.  Consequently, storm water from off-site flooded onto the Project and then, as water levels dropped, some of the off-site water flowed back off the Project site into wetland areas adjacent to the Project site.  The excessive rainfall was a force majeure event.  Accordingly, the flooding could not have been prevented unless the Owner had changed the design of the Project, resulting in a change of scope to Kearney's Contract. On information and belief this would have required the Owner to seek permit modifications with respect to the Project.

55.    As a standard practice throughout the course of performance of the Contracts, the Owner directed and dictated the timing and extent of the Best Management Practices to be performed by Kearney.  These directions and dictates by the Owner included, but were not limited to, the extent, location, and timing of installation of earthen berms, cofferdams, placement of hay bales, placement of flow diverters, addition and deletion of temporary diversion swales and sediment sumps, seeding, sodding,

15

AR021869

mulching, placement of silt fences, placement of turbidity barriers, the horizontal and vertical locations of control structures, the elevation and installation of weirs, treatment with alum, discharge from retention areas, timing of destruction of wetlands, and, in general, Kearney's performance of each and every erosion control Best Management Practice - regardless of whether the item or activity was a separate pay item or was a change in scope requiring authorization through the change order process.

56.    The Owner repeatedly changed the directions and dictates previously given to Kearney regarding the performance of Best Management Practices.

57.    On numerous occasions, the Owner advised Kearney that a change in a prior Owner direction or dictate would be forthcoming, but the Owner provided no interim direction or dictate upon which Kearney could reasonably rely to address the unanticipated or differing conditions encountered.  In addition, there were numerous instances of contradictory direction from the Owner's onsite management consultant (QCI) and the Owner's Agent, creating a lack of clear and timely direction, thus disrupting and interfering with Kearney's performance of the Work.

58.    On numerous occasions, the Owner unreasonably delayed the issuance of directives or dictates as to how Kearney should implement Best Management Practices for erosion control in the face of unanticipated and differing conditions.

59.    Kearney learned that the Project Engineer and other Owner consultants had prepared revisions to Best Management Practices and the SWPPP, but the Owner had failed and/or refused to provide the revised plans, or proposed revisions, to Kearney for implementation or comment.

16

AR021870

60.    On numerous occasions, the Owner refused to allow Kearney to implement Best Management Practices that Kearney suggested might be appropriate. This included the Owners' refusal to permit sodding of the berm at Pond J, which suffered erosion from runoff down the unsodded slope as well as from the rising and receding wetland water level on outer side of berm.

61.    The Owner was obligated to disclose its superior knowledge to Kearney regardless of whether the knowledge was obtained by the Owner prior to or during construction. This same obligation to disclose superior knowledge applied with equal force and effect to the Project Engineer and all of the Owner's consultants. Therefore, regardless of whether the Owner or one or more of its engineers or consultants withheld superior knowledge, the failure to disclose this superior knowledge was a failure to cooperate, which constituted an act of bad faith for which the Owner is responsible to Kearney.

62.    The Contracts include Exhibits A - F. The Plans issued for each Contract are too voluminous to attach hereto, but are known to be in the possession of the Defendants.

63.    Kearney submitted Payment Application No. 14 for the Zone A-South Contract to the Owner's Agent on July 21, 2008, requesting payment of $86,493.56, for Work performed through July 25, 2008. The amount requested is earned, due and payable to Kearney.

64.    Kearney submitted Payment Application No. 7 RV for the Mall Site Contract to the Owner's Agent on July 25, 2008, requesting payment of $729,102.97, for

17

AR021871

Work performed through July 25, 2008.   The amount requested is earned, due and payable to Kearney.

65.   On September 4, 2008, Kearney submitted Application for Payment No. 15, Invoice No. 21133, for the Zone A-South Contract earned retainage totaling $429,788.00.

66.   On September 4, 2008, Kearney submitted Application for Payment No. 8, Invoice No. 21134, for the Mall Site Improvements Contract earned retainage totaling $370,643.84.

67.   On September 9, 2008, Kearney submitted Invoice No. 53657, resubmitting its prior requests for the payment of change orders which the Owners wrongfully refused to process and pay ("Disputed PCOs") on the Zone A-South Contract totaling $426,239.19.

68.   On September 9, 2008, Kearney submitted Invoice No. 53658, resubmitting its prior requests for the payment of change orders which the Owners wrongfully refused to process and pay ("Disputed PCOs") on the Mall Site Improvements Contract totaling $142,172.26.

69.   The Owners' wrongful termination, constituting a repudiation of the Owners' contractual obligations, accelerated the due date for the payment of retainage and requires payment for the Disputed PCOs under both Contracts.

70.   The Owners wrongfully terminated the Contracts on August 15, 2008. The Owners' wrongful termination entitles Kearney to be paid all amounts earned, plus profit on the unperformed portions of the Work, as well as other damages resulting from the Owners' breaches.

18

Greenberg Traurig, P.A.

71.     The Zone A-South Contract constitutes a single direct contract to improve 3 separate parcels of land, each of which is owned by a single, but separate and distinct, owner of record.  Thus, under Florida Statute Section 713.09, Kearney filed a separate claim of lien to secure payment from the single owner of record of each parcel.  Each of the parcel owners is jointly and severally liable for the full amount of the claim of lien recorded against each parcel and, therefore, each claim of lien seeks to enforce the right to payment of the full lienable amount against each parcel.

72.     The Mall Site Improvements Contract constitutes a single direct contract to improve 3 separate parcels of land, each of which is owned by a single, but separate and distinct, owner of record.  Thus, Florida Statute Section 713.09, requires the filing of a separate claim of lien to secure payment from the single owner of record of each parcel.  Each of the parcel owners is jointly and severally liable for the full amount of the claim of lien recorded against each parcel and, therefore, each claim of lien seeks to enforce the full lienable amount against each parcel.

## COUNT I
### FORECLOSURE OF CONSTRUCTION LIEN UNDER THE ZONE A-SOUTH CONTRACT AGAINST PARCEL OWNED BY J.G. CYPRESS

73.     Kearney realleges paragraphs 1 through 62, 63, 65, 67, and 69-71 above.

74.     This is a Count to foreclose a construction lien for the principal amount of $516,281.60, exclusive of attorneys' fees and costs.

75.     The Defendant, J.G. Cypress, is the single owner of a parcel of land which constitutes a portion of the Property identified in the Notice of Commencement for the Zone A-South Contract.

19

Greenberg Traurig, P.A.

AR021873

76.    Kearney satisfactorily performed under the Zone A-South Contract up to the point that the Owner wrongfully terminated Kearney's performance. The Owner is contractually obligated to pay Kearney for the Work performed and stored materials.

77.    All labor, services, and materials furnished by Kearney pursuant to the Zone A-South Contract have been incorporated into the improvements to the Property.

78.    Kearney's last or final furnishing of labor material or services occurred on or after August 18, 2008.

79.    Kearney filed a Claim of Lien for $516,281.60 in the Public Records of Pasco County on September 24, 2008, a true and correct copy of which is attached hereto as Exhibit "3", against the parcel of land described in the legal description attached to the Claim of Lien, and was served upon the Owner within fifteen days of recording. (The "Zone A-South/J.G. Cypress Claim of Lien.")

80.    Kearney executed its Contractor's Final Affidavit on September 24, 2008.

81.    On September 24, 2008, Kearney served its Contractor's Final Affidavit on the Owner.

82.    Kearney timely filed this action within one year of recording its Claim of Lien, and complied with all other conditions precedent required by the Zone A-South Contract and Chapter 713, Florida Statutes.

83.    The amount stated in the Claim of Lien, $516,281.60, is now due and owing to Kearney for the improvements, together with interest thereon.

84.    The amount stated in and secured by the Claim of Lien does not include all damages which Kearney is entitled to recover from the Owners. Kearney's damages

20

AR021874

in excess of the amounts secured by the Zone A-South/J.G. Cypress Claim of Lien are sought in the Breach of Contract Count for the Zone A-South Contract.

85.     Despite Kearney's demand for payment of the amounts due and secured by Claim of Lien, the Owner has failed and refused to pay the amounts demanded.

86.     Kearney is entitled to an award of attorneys' fees pursuant to Section 713.29, Florida Statutes.

87.     Kearney is entitled to recover pre-judgment interest at the rate specified in Florida Statute Section 55.03.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC prays that this honorable Court will:

a.      enter a final judgment and adjudicate that Kearney has a construction lien against the property described in the Claim of Lien in the amount of $516,281.60 plus interest, costs, and reasonable attorneys' fees;

b.      that failing payment of that amount to Kearney, that the Property be sold at judicial sale in accordance with the law;

c.      issue a deficiency judgment against Defendant J.G. Cypress if a deficiency exists after application of the proceeds of the sale; and

d.      grant any other relief necessary to protect Kearney's rights and interests.

## COUNT II
## FORECLOSURE OF CONSTRUCTION LIEN UNDER THE ZONE A-SOUTH CONTRACT AGAINST PARCEL OWNED BY PASCO RANCH

88.     Kearney realleges paragraphs 1 through 62, 63, 65, 67, and 69-71 above.

89.     This is a Count to foreclose a construction lien for the principal amount of $516,281.60, exclusive of attorneys' fees and costs.

21

Greenberg Traurig, P.A.

AR021875

90.   The Defendant, Pasco Ranch, is the single owner of a parcel of land which constitutes a portion of the Property identified in the Notice of Commencement for the Zone A-South Contract.

91.   Kearney satisfactorily performed under the Zone A-South Contract up to the point that the Owner wrongfully terminated Kearney's performance. The Owner is contractually obligated to pay Kearney for the Work performed and stored materials.

92.   All labor, services, and materials furnished by Kearney pursuant to the Zone A-South Contract have been incorporated into the improvements to the Property.

93.   Kearney's last or final furnishing of labor material or services occurred on or after August 18, 2008.

94.   Kearney filed a Claim of Lien for $516,281.60 in the Public Records of Pasco County on September 24, 2008, a true and correct copy of which is attached hereto as Exhibit "4", against the parcel of land described in the legal description attached to the Claim of Lien, and was served upon the Owner within fifteen days of recording. (The "Zone A-South/Pasco Ranch Claim of Lien.")

95.   Kearney executed its Contractor's Final Affidavit on September 24, 2008.

96.   On September 24, 2008, Kearney served its Contractor's Final Affidavit on the Owner.

97.   Kearney timely filed this action within one year of recording its Claim of Lien, and complied with all other conditions precedent required by the Zone A-South Contract and Chapter 713, Florida Statutes.

98.   The amount stated in the Claim of Lien, $516,281.60, is now due and owing to Kearney for the improvements, together with interest thereon.

<div align="center">22</div>

AR021876

99.     The amount stated in and secured by the Claim of Lien does not include all damages which Kearney is entitled to recover from the Owners. Kearney's damages in excess of the amounts secured by the Zone A-South/Pasco Ranch Claim of Lien are sought in the Breach of Contract Count for the Zone A-South Contract.

100.    Despite Kearney's demand for payment of the amounts due and secured by Claim of Lien, the Owner has failed and refused to pay the amounts demanded.

101.    Kearney is entitled to an award of attorneys' fees pursuant to Section 713.29, Florida Statutes.

102.    Kearney is entitled to recover pre-judgment interest at the rate specified in Florida Statute Section 55.03.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC prays that this honorable Court will:

   a.      enter a final judgment and adjudicate that Kearney has a construction lien against the property described in the Zone A-South/Pasco Ranch Claim of Lien in the amount of $516,281.60 plus interest, costs, and reasonable attorneys' fees;

   b.      that failing payment of that amount to Kearney, that the Property be sold at judicial sale in accordance with the law;

   c.      issue a deficiency judgment against Defendant Owner if a deficiency exists after application of the proceeds of the sale; and

   d.      grant any other relief necessary to protect Kearney's rights and interests.

23

AR021877

## COUNT III
## FORECLOSURE OF CONSTRUCTION LIEN UNDER THE
## ZONE A-SOUTH CONTRACT AGAINST
## PARCEL OWNED BY PASCO 54

103.    Kearney realleges paragraphs 1 through 62, 63, 65, 67, and 69-71 above.

104.    This is a Count to foreclose a construction lien for the principal amount of $516,281.60, exclusive of attorneys' fees and costs.

105.    The Defendant, Pasco 54, is the single owner of a parcel of land which constitutes a portion of the Property identified in the Notice of Commencement for the Zone A-South Contract.

106.    Kearney satisfactorily performed under the Zone A-South Contract up to the point that the Owner wrongfully terminated Kearney's performance. The Owner is contractually obligated to pay Kearney for the Work performed and stored materials.

107.    All labor, services, and materials furnished by Kearney pursuant to the Zone A-South Contract have been incorporated into the improvements to the Property.

108.    Kearney's last or final furnishing of labor material or services occurred on or after August 18, 2008.

109.    Kearney filed a Claim of Lien for $516,281.60 in the Public Records of Pasco County on September 24, 2008, a true and correct copy of which is attached hereto as Exhibit "5", against the parcel of land described in the legal description attached to the Claim of Lien, and was served upon the Owner within fifteen days of recording. (The "Zone A-South/Pasco 54 Claim of Lien.")

110.    Kearney executed its Contractor's Final Affidavit on September 24, 2008.

111.    On September 24, 2008, Kearney served its Contractor's Final Affidavit on the Owner.

24

AR021878

112.   Kearney timely filed this action within one year of recording its Claim of Lien, and complied with all other conditions precedent required by the Zone A-South Contract and Chapter 713, Florida Statutes.

113.   The amount stated in the Claim of Lien, $516,281.60, is now due and owing to Kearney for the improvements, together with interest thereon.

114.   The amount stated in and secured by the Claim of Lien does not include all damages which Kearney is entitled to recover from the Owners. Kearney's damages in excess of the amounts secured by the Zone A-South/Pasco 54 Claim of Lien are sought in the Breach of Contract Count for the Zone A-South Contract.

115.   Despite Kearney's demand for payment of the amounts due and secured by Claim of Lien, the Owner has failed and refused to pay the amounts demanded.

116.   Kearney is entitled to an award of attorneys' fees pursuant to Section 713.29, Florida Statutes.

117.   Kearney is entitled to recover pre-judgment interest at the rate specified in Florida Statute Section 55.03.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC prays that this honorable Court will:

a.   enter a final judgment and adjudicate that Kearney has a construction lien against the property described in the Zone A-South/Pasco 54 Claim of Lien in the amount of $516,281.60 plus interest, costs, and reasonable attorneys' fees;

b.   that failing payment of that amount to Kearney, that the Property be sold at judicial sale in accordance with the law;

25

AR021879

c.    issue a deficiency judgment against Defendant Owner if a deficiency exists after application of the proceeds of the sale; and

d.    grant any other relief necessary to protect Kearney's rights and interests.

## COUNT IV
## FORECLOSURE OF CONSTRUCTION LIEN UNDER THE ZONE A-SOUTH CONTRACT AGAINST PARCEL OWNED BY TARGET

118.    Kearney realleges paragraphs 1 through 62, 63, 65, 67, and 69-71 above.

119.    This is a Count to foreclose a construction lien for the principal amount of $516,281.60, exclusive of attorneys' fees and costs.

120.    Defendant Target Corporation ("Target") is a foreign corporation authorized to conduct business in the State of Florida.

121.    Defendant Target is the single owner of a parcel of land which constitutes a portion of the Property improved under the Zone A-South Contract. Defendant Target purchased the parcel subject to Kearney's lien rights.

122.    Kearney satisfactorily performed under the Zone A-South Contract up to the point that the Owner wrongfully terminated Kearney's performance. The Owner is contractually obligated to pay Kearney for the Work performed and stored materials.

123.    All labor, services, and materials furnished by Kearney pursuant to the Zone A-South Contract have been incorporated into the improvements to the Property. The parcel purchased by Target has been improved by Kearney's labor , services, and materials as part of the undivided performance of Work under the Zone A-South Contract.

124.    Kearney's last or final furnishing of labor material or services occurred on or after August 18, 2008.

26

AR021880

125.    Kearney filed a Claim of Lien for $516,281.60 in the Public Records of Pasco County on September 24, 2008, a true and correct copy of which is attached hereto as Exhibit "6", against the parcel of land described in the legal description attached to the Claim of Lien, and was served upon Target within fifteen days of recording. (The "Zone A-South/Target Claim of Lien.")

126.    Kearney executed its Contractor's Final Affidavit on September 24, 2008.

127.    On September 24, 2008, Kearney served its Contractor's Final Affidavit on the Owner.

128.    Kearney timely filed this action within one year of recording its Claim of Lien, and complied with all other conditions precedent required by the Zone A-South Contract and Chapter 713, Florida Statutes.

129.    The amount stated in the Claim of Lien, $516,281.60, is now due and owing to Kearney for the improvements, together with interest thereon.

130.    The amount stated in and secured by the Claim of Lien does not include all damages which Kearney is entitled to recover from the Owner. Kearney's damages in excess of the amounts secured by the Zone A-South/Target Claim of Lien are sought in the Breach of Contract Count for the Zone A-South Contract.

131.    Despite Kearney's demand for payment of the amounts due and secured by Claim of Lien, the Owner has failed and refused to pay the amounts demanded.

132.    Kearney is entitled to an award of attorneys' fees pursuant to Section 713.29, Florida Statutes.

133.    Kearney is entitled to recover pre-judgment interest at the rate specified in Florida Statute Section 55.03.

Greenberg Traurig, P.A.

AR021881

WHEREFORE, Plaintiff, Kearney Construction Co., LLC prays that this honorable Court will:

      a.    enter a final judgment and adjudicate that Kearney has a construction lien against the property described in the Zone A-South/Target Claim of Lien in the amount of $516,281.60 plus interest, costs, and reasonable attorneys' fees;

      b.    that failing payment of that amount to Kearney, that the Property be sold at judicial sale in accordance with the law;

      c.    issue a deficiency judgment against Defendant Owner if a deficiency exists after application of the proceeds of the sale; and

      d.    grant any other relief necessary to protect Kearney's rights and interests.

## COUNT V
### FORECLOSURE OF CONSTRUCTION LIEN UNDER THE ZONE A-SOUTH CONTRACT AGAINST PARCEL OWNED BY KOHL'S

134.    Kearney realleges paragraphs 1 through 62, 63, 65, 67, and 69-71 above.

135.    This is a Count to foreclose a construction lien for the principal amount of $516,281.60, exclusive of attorneys' fees and costs.

136.    Kohl's Department Stores, Inc. (Kohl's") is a foreign corporation authorized to do business in the State of Florida.

137.    The Defendant, Kohl's, is the single owner of a parcel of land which constitutes a portion of the Property improved under the Zone A-South Contract. Defendant Kohl's purchased the parcel subject to Kearney's lien rights.

28

AR021882

138.   Kearney satisfactorily performed under the Zone A-South Contract up to the point that the Owner wrongfully terminated Kearney's performance. The Owner is contractually obligated to pay Kearney for the Work performed and stored materials.

139.   All labor, services, and materials furnished by Kearney pursuant to the Zone A-South Contract have been incorporated into the improvements to the Property. The parcel purchased by Kohl's has been improved by Kearney's labor , services, and materials as part of the undivided performance of Work under the Zone A-South Contract.

140.   Kearney's last or final furnishing of labor material or services occurred on or after August 18, 2008.

141.   Kearney filed a Claim of Lien for $516,281.60 in the Public Records of Pasco County on September 24, 2008, a true and correct copy of which is attached hereto as Exhibit "7", against the parcel of land described in the legal description attached to the Claim of Lien, and was served upon Kohl's within fifteen days of recording. (The "Zone A-South/Kohl's Claim of Lien.")

142.   Kearney executed its Contractor's Final Affidavit on September 24, 2008.

143.   On September 24, 2008, Kearney served its Contractor's Final Affidavit on the Owner.

144.   Kearney timely filed this action within one year of recording its Claim of Lien, and complied with all other conditions precedent required by the Zone A-South Contract and Chapter 713, Florida Statutes.

145.   The amount stated in the Claim of Lien, $516,281.60, is now due and owing to Kearney for the improvements, together with interest thereon.

Greenberg Traurig, P.A.

AR021883

146.   The amount stated in and secured by the Claim of Lien does not include all damages which Kearney is entitled to recover from the Owner. Kearney's damages in excess of the amounts secured by the Zone A-South/Kohl's Claim of Lien are sought in the Breach of Contract Count for the Zone A-South Contract.

147.   Despite Kearney's demand for payment of the amounts due and secured by the Zone A-South/Kohl's Claim of Lien, the Owner has failed and refused to pay the amounts demanded.

148.   Kearney is entitled to an award of attorneys' fees pursuant to Section 713.29, Florida Statutes.

149.   Kearney is entitled to recover pre-judgment interest at the rate specified in Florida Statute Section 55.03.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC prays that this honorable Court will:

a.   enter a final judgment and adjudicate that Kearney has a construction lien against the property described in the Zone A-South/Kohl's Claim of Lien in the amount of $516,281.60 plus interest, costs, and reasonable attorneys' fees;

b.   that failing payment of that amount to Kearney, that the Property be sold at judicial sale in accordance with the law;

c.   issue a deficiency judgment against Defendant Owner if a deficiency exists after application of the proceeds of the sale; and

d.   grant any other relief necessary to protect Kearney's rights and interests.

Greenberg Traurig, P.A.

AR021884

## COUNT VI
## FORECLOSURE OF CONSTRUCTION LIEN UNDER
## THE MALL SITE IMPROVEMENTS CONTRACT
## AGAINST PARCEL OWNED BY J.G. CYPRESS

150.    Kearney realleges paragraphs 1 through 62, 64, 66, 68-70, and 72, above.

151.    This is a Count to foreclose a construction lien for the principal amount of $1,099,746.82, exclusive of attorneys' fees and costs.

152.    The Defendant, J.G. Cypress, is the single owner of a parcel of land which constitutes a portion of the Property identified in the Notice of Commencement for the Mall Site Improvements Contract.

153.    Kearney satisfactorily performed under the Mall Site Improvements Contract up to the point that J.G. Cypress wrongfully terminated Kearney's performance. J.G. Cypress is contractually obligated to pay Kearney for the Work performed and stored materials.

154.    All labor, services, and materials furnished by Kearney pursuant to the Mall Site Improvements Contract have been incorporated into the improvements to the Property.

155.    Kearney's last or final furnishing of labor material or services occurred on or after August 18, 2008.

156.    Kearney filed a Claim of Lien for $1,099,746.82 in the Public Records of Pasco County on September 24, 2008, a true and correct copy of which is attached hereto as Exhibit "8", against the parcel of land described in the legal description attached to the referenced Claim of Lien, and was served upon the Owner within fifteen days of recording. (The "Mall Site/J.G. Cypress Claim of Lien.")

157.    Kearney executed its Contractor's Final Affidavit on September 24, 2008.

31

AR021885

Improvements/J.G. Cypress Claim of Lien in the amount of $1,099,746.82

plus interest, costs, and reasonable attorneys' fees;

        b.     that failing payment of that amount to Kearney, that the

Property be sold at judicial sale in accordance with the law;

        c.     issue a deficiency judgment against Defendant J.G. Cypress

if a deficiency exists after application of the proceeds of the sale; and

        d.     grant any other relief necessary to protect Kearney's rights

and interests.

<div align="center">

**COUNT VII**
**FORECLOSURE OF CONSTRUCTION LIEN UNDER**
**THE MALL SITE IMPROVEMENTS CONTRACT AGAINST**
**PARCEL OWNED BY TARGET**

</div>

165.    Kearney realleges paragraphs 1 through 62, 64, 66, 68-70, and 72, above.

166.    This is a Count to foreclose a construction lien for the principal amount of

$1,099,746.82, exclusive of attorneys' fees and costs.

167.    Defendant, Target Corporation ("Target") is a foreign corporation

authorized to conduct business in the State of Florida.

168.    Defendant, Target is the single owner of a parcel of land which constitutes

a portion of the Property improved under the Mall Site Improvements Contract.

Defendant Target purchased the parcel subject to Kearney's lien rights.

169.    Kearney satisfactorily performed under the Mall Site Improvements

Contract up to the point that the Owner wrongfully terminated Kearney's performance.

The Owner is contractually obligated to pay Kearney for the Work performed and stored

materials.

<div align="center">

33

</div>

AR021886

170.   All labor, services, and materials furnished by Kearney pursuant to the Mall Site Improvements Contract have been incorporated into the improvements to the Property.   The parcel purchased by Target has been improved by Kearney's labor, material and services as part of the undivided performance of Work under the Mall Site Improvements Contract.

171.   Kearney's last or final furnishing of labor material or services occurred on or after August 18, 2008.

172.   Kearney filed a Claim of Lien for $1,099,746.82 in the Public Records of Pasco County on September 24, 2008, a true and correct copy of which is attached hereto as Exhibit "9", against the parcel of land described in the legal description attached to the referenced Claim of Lien, and was served upon Target within fifteen days of recording. ("The Mall Site/Target Claim of Lien.")

173.   Kearney executed its Contractor's Final Affidavit on September 24, 2008.

174.   On September 24, 2008, Kearney served its Contractor's Final Affidavit on J.G. Cypress.

175.   Kearney timely filed this action within one year of recording its Claim of Lien, and complied with all other conditions precedent required by the Mall Site Improvements Contract and Chapter 713, Florida Statutes.

176.   The amount stated in the Claim of Lien, $1,099,746.82, is now due and owing to Kearney for the improvements, together with interest thereon.

177.   The amount stated in and secured by the Claim of Lien does not include all damages which Kearney is entitled to recover from J.G. Cypress. Kearney's damages

Greenberg Traurig, P.A.

AR021887

in excess of the amounts secured by the Mall Site/Target Claim of Lien are sought in the Breach of Contract Count for the Mall Site Improvements Contract.

178.    Despite Kearney's demand for payment of the amounts due and secured by Claim of Lien, J.G. Cypress has failed and refused to pay the amounts demanded.

179.    Kearney is entitled to an award of attorneys' fees pursuant to Section 713.29, Florida Statutes.

180.    Kearney is entitled to recover pre-judgment interest at the rate specified in Florida Statute Section 55.03.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC prays that this honorable Court will:

a.    enter a final judgment and adjudicate that Kearney has a construction lien against the property described in the Mall Site Improvements/Target Claim of Lien in the amount of $1,099,746.82 plus interest, costs, and reasonable attorneys' fees;

b.    that failing payment of that amount to Kearney, that the Property be sold at judicial sale in accordance with the law;

c.    issue a deficiency judgment against J.G. Cypress if a deficiency exists after application of the proceeds of the sale; and

d.    grant any other relief necessary to protect Kearney's rights and interests.

### COUNT VIII
### FORECLOSURE OF CONSTRUCTION LIEN UNDER THE MALL SITE IMPROVEMENTS CONTRACT AGAINST PARCEL OWNED BY KOHL'S

181.    Kearney realleges paragraphs 1 through 62, 64, 66, 68-70, and 72, above.

35

AR021888

182.    This is a Count to foreclose a construction lien for the principal amount of $1,099,746.82, exclusive of attorneys' fees and costs.

183.    Defendant, Kohl's Department Stores, Inc. is a foreign corporation authorized to do business in the State of Florida.

184.    Defendant, Kohl's is the single owner of a parcel of land which constitutes a portion of the Property improved under the Mall Site Improvements Contract.

185.    Kearney satisfactorily performed under the Mall Site Improvements Contract up to the point that J.G. Cypress wrongfully terminated Kearney's performance. The Owner is contractually obligated to pay Kearney for the Work performed and stored materials.

186.    All labor, services, and materials furnished by Kearney pursuant to the Mall Site Improvements Contract have been incorporated into the improvements to the Property.   The parcel purchased by Kohl's has been improved by Kearney's labor, material and services as part of the undivided performance of Work under the Mall Site Improvements Contract.

187.    Kearney's last or final furnishing of labor material or services occurred on or after August 18, 2008.

188.    Kearney filed a Claim of Lien for $1,099,746.82 in the Public Records of Pasco County on September 24, 2008, a true and correct copy of which is attached hereto as Exhibit "10", against the parcel of land described in the legal description attached to the referenced Claim of Lien, and was served upon Kohl's within fifteen days of recording. (The "Mall Site/Kohl's Claim of Lien.")

189.    Kearney executed its Contractor's Final Affidavit on September 24, 2008.

Greenberg Traurig, P.A.

AR021889

190.   On September 24, 2008, Kearney served its Contractor's Final Affidavit on J.G. Cypress.

191.   Kearney timely filed this action within one year of recording its Claim of Lien, and complied with all other conditions precedent required by the Mall Site Improvements Contract and Chapter 713, Florida Statutes.

192.   The amount stated in the Claim of Lien, $1,099,746.82, is now due and owing to Kearney for the improvements, together with interest thereon.

193.   The amount stated in and secured by the Claim of Lien does not include all damages which Kearney is entitled to recover from J.G. Cypress. Kearney's damages in excess of the amounts secured by the Mall Site/J.G. Cypress Claim of Lien are sought in the Breach of Contract Count for the Mall Site Improvements Contract.

194.   Despite Kearney's demand for payment of the amounts due and secured by Claim of Lien, J.G. Cypress has failed and refused to pay the amounts demanded.

195.   Kearney is entitled to an award of attorneys' fees pursuant to Section 713.29, Florida Statutes.

196.   Kearney is entitled to recover pre-judgment interest at the rate specified in Florida Statute Section 55.03.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC prays that this honorable Court will:

   a.   enter a final judgment and adjudicate that Kearney has a construction lien against the property described in the Mall Site Improvements/Kohl's Claim of Lien in the amount of $1,099,746.82 plus interest, costs, and reasonable attorneys' fees;

Greenberg Traurig, P.A.

AR021890

158.   On September 24, 2008, Kearney served its Contractor's Final Affidavit on the Owner.

159.   Kearney timely filed this action within one year of recording its Claim of Lien, and complied with all other conditions precedent required by the Mall Site Improvements Contract and Chapter 713, Florida Statutes.

160.   The amount stated in the Claim of Lien, $1,099,746.82, is now due and owing to Kearney for the improvements, together with interest thereon.

161.   The amount stated in and secured by the Claim of Lien does not include all damages which Kearney is entitled to recover from the Owner, J.G. Cypress. Kearney's damages in excess of the amounts secured by the Mall Site/J.G. Cypress Claim of Lien are sought in the Breach of Contract Count for the Mall Site Improvements Contract.

162.   Despite Kearney's demand for payment of the amounts due and secured by Claim of Lien, the Owner, J.G. Cypress has failed and refused to pay the amounts demanded.

163.   Kearney is entitled to an award of attorneys' fees pursuant to Section 713.29, Florida Statutes.

164.   Kearney is entitled to recover pre-judgment interest at the rate specified in Florida Statute Section 55.03.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC prays that this honorable Court will:

a.   enter a final judgment and adjudicate that Kearney has a construction lien against the property described in the Mall Site

32

AR021891

b.     that failing payment of that amount to Kearney, that the Property be sold at judicial sale in accordance with the law;

c.     issue a deficiency judgment against J.G. Cypress if a deficiency exists after application of the proceeds of the sale; and

d.     grant any other relief necessary to protect Kearney's rights and interests.

## COUNT IX
## BREACH OF CONTRACT - ZONE A-SOUTH CONTRACT

197.   Kearney realleges paragraphs 1-62, 63, 65, 67, and 69-70 above.

198.   This is an action for breach of contract for an amount exceeding $15,000 exclusive of attorneys' fees and costs.

199.   The obligations imposed upon the Owner pursuant to the Zone A-South Contract and Florida law included the following express and implied covenants or promises:

a.     The duty to furnish Plans and Specifications that were warranted by the Owner to be complete, fully coordinated and buildable in all respects, including scope of work, design elements and details that were fully constructable so that the Work could be completed efficiently and without disruption or hindrance and within the timeframes established for the Project;

b.     The duty to furnish efficient business administration and development management as the developer which was fully responsible for all management, coordination, and control of (i) the Owner's design professionals and consultants, (ii) the Owner's other contractors, (iii)

38

AR021892

contractors employed by tenants, (iv) the requirements of all governmental authorities with jurisdiction over the Project and (v) other professional designers, consultants, and contractors employed by FDOT for roadwork adjacent to the Project;

c.      The duty to ensure that any further design work performed by the Owner's design professionals after execution of the Zone A-South Contract was performed in a timely manner, and was complete, fully coordinated and buildable in all respects, including scope of work, design elements, and details, so that the Work, including any changed or additional Work caused by further design work, could be constructed and completed efficiently and without disruption or hindrance, and within the timeframes established for the Zone A-South Contract, or as adjusted in accordance with Kearney's reasonable requests;

d.      The Owner was also obligated to promptly make payment for all additional quantities of Work items for which Unit Prices had been established, issue Change Orders (as defined in the Zone A-South Contract) or amendments for all changes in scope, or extensions of completion milestones required due to the Owner's legal responsibilities and/or conditions or events beyond the reasonable control of Kearney;

e.      The Owner was obligated to prevent any disruption or hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by ensuring that the Owner issued Change Orders or amendments promptly and without delay

39

AR021893

for all requests submitted by Kearney or for items initiated by acts or omissions of the Owner or Project Engineer;

f.     The Owner was obligated to prevent any disruption or hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by ensuring that the Owner properly approved payment for all amounts earned, and that the Owner representatives did not arbitrarily and capriciously reduce or cut the amounts requested for payment by Kearney.

g.     The Owner was obligated to prevent any disruption or hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by ensuring that the Owner's management, coordination, and control of work by others did not result in impacts that delayed or disrupted the Work.

h.     The duty to ensure that the Owner representatives were sufficiently experienced in all aspects of development management of a mega-retail project of similar complexity to the Project, and that the individuals hired or assigned by the Owner performed diligently, cooperatively, and in good faith and either had the necessary authority and experience to execute all decision making to prevent disruptions and impacts to the Project, or were provided with access to obtain immediate decisions from the Owner;

i.     The duty to ensure that the Owner representatives did not disrupt, hinder, or impede the Work, or otherwise fail to cooperate in the

Greenberg Traurig, P.A.

AR021894

manner that was contemplated at the time the Zone A-South Contract was executed;

j.      The duty to pay the entire balance of all amounts earned, including retainage, at the time the Owner wrongfully terminated the Contract;

k.      The duty to ensure that the Project Engineer did not issue, or attempt to issue, design changes via supplemental instructions, bulletins, reviews of shop drawings, or any procedure other than a properly authorized Change Order;

l.      The duty to perform the Owner's duties in good faith;

m.     The duty not to hinder or obstruct performance of Kearney;

n.      The duty not to cause delay or disruption to the performance of Kearney;

o.      The duty not to furnish information which might mislead Kearney;

p.      The duty to promptly furnish to Kearney all existing information which was within the possession or control of the Owner or the Project Engineer, or the Owner's consultant's or other contractors, including information discovered or developed during the Project, which might affect the efficient performance of the Work;

q.      The duty to provide complete and timely information related to requests for information;

r.      The duty to provide complete and timely information

41

AR021895

related to design changes;

    s.    The duty to ensure that any changes that affected the sequence of construction of the Work would not cause or contribute to an increase in the risk of turbid water discharges;

    t.    The duty to make timely payments;

    u.    The duty to timely issue shop drawing approvals or issue design changes that were required to be issued so that the shop drawing approval process could proceed in an uninterrupted and undisrupted manner;

    v.    The duty to prevent other contractors employed by the Owner and store owners from interfering, damaging and disrupting the Work of Kearney;

    w.    The duty to perform the Owner's obligations to review and approve required adjustments to the Zone A-South Contract in good faith;

    x.    The duty to give timely direction on potential changed or additional Work thereby avoiding any disruption of the performance of the Kearney; and

    y.    The duty to furnish information in the Plans and Specifications, directives, answers to requests for information, and other contract documents which would not mislead Kearney.

    z.    The duty to ensure that the Owner representatives did not act arbitrarily, capriciously, unfairly or deceptively in connection with any of the following Owner responsibilities:

Greenberg Traurig, P.A.

AR021896

(i)    review and approval of monthly applications for payment;

(ii)    issuance of periodic payments;

(iii)    review and approval of change order requests or requests for amendments;

(iv)    the Owner's timely and complete furnishing of information required to be provided to Kearney as part of the Owner's duties to manage, coordinate and control the development process;

(v)    review and approval of time extension requests and/or time extensions required as a result of acts and omissions of the Owner or other events beyond the control of Kearney; and

(vi)    promptly granting compensation or time extensions when an act or omission of the Owner was a substantial factor causing impact to Kearney.

### Breach and Damages

200.    The Owner breached the express and implied covenants of the Zone A-South Contract in each of the following ways:

a.    Failing to furnish Plans and Specifications that met the warranted standard required under the Spearin Doctrine, which is also known as the Doctrine of Constructability. The Owner furnished Plans and Specifications that were neither complete, fully coordinated nor buildable in all respects, and consequently, the complete scope of work, design elements and details, were not constructable and as a result caused substantial disruption and hindrance and prevented the efficient completion of the Work within the timeframes established for the Project;

b.    Failing to furnish efficient business administration and development management. As the developer, the Owner failed to fulfill

43

AR021897

its responsibility for all management, coordination, and control of (i) the Owner's design professionals and consultants, (ii) the Owner's other contractors, (iii) contractors employed by tenants, (iv) the requirements of all governmental authorities with jurisdiction over the Project, and (v) other professional designers, consultants, and contractors employed by FDOT for roadwork adjacent to the Project;

   c.    Failing to ensure that any further design work performed by the Owner's design professionals after execution of the Zone A-South Contract was performed in a timely manner, and was complete, fully coordinated and buildable in all respects, including scope of work, design elements and details.  Consequently, the Work, including the extensive changed and additional Work caused by the further design work, could not be constructed and completed efficiently and without disruption or hindrance, and within the timeframes established for the Project, and the Owner failed to issue contract adjustments in accordance with Kearney's reasonable requests;

   d.    Failing to promptly make payment for all additional quantities of Work items for which Unit Prices had been established, issue Change Orders (as defined in the Zone A-South Contract) or amendments for all changes in scope or extensions of Completion milestones;

   e.    Failing to prevent any disruption or hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by failing to issue Change Orders or

44

AR021898

amendments promptly and without delay for all requests submitted by Kearney or for items initiated by acts or omissions of the Owner or Project Engineer;

f.      Arbitrarily and capriciously reducing and cutting amounts requested for payment by Kearney. This included but was not limited to allowing Owner employees to personally benefit from withholding amounts earned by Kearney, improperly assessing retainage on amounts not subject to retainage, and failing to either enter into mutually acceptable amendments or issuing construction change directives which do not constitute a waiver of any rights by Kearney. The Owner's actions were patently lacking in good faith, and were unconscionable, unfair and deceptive.

g.      The Owner caused substantial disruption and hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by failing to ensure that the Owner's management, coordination, and control of work by others did not cause impacts that delayed or disrupted the Work.

h.      Failing to ensure (i) that the Owner representatives were sufficiently experienced in all aspects of development management of a mega-retail project of similar complexity to the Project, (ii) that the Owner representatives devoted sufficient time to this Project, and (iii) that the individuals hired or assigned by the Owner performed diligently, cooperatively, and in good faith and either had the necessary authority to

Greenberg Traurig, P.A.

AR021899

execute all decision making to prevent disruptions and impacts, or were provided with access to obtain immediate decisions from the Owner;

    i.    Failing to ensure that the Owner representatives did not disrupt, hinder, or impede the Work, or otherwise fail to cooperate in the manner that was contemplated at the time the Zone A-South Contract was executed;

    j.    Failing to pay the entire balance of all amounts earned, including retainage, at the time the Owner wrongfully terminated the Contract;

    k.    Failing to ensure that the Project Engineer did not issue, or attempt to issue, design changes via supplemental instructions, reviews of shop drawings, or any procedure other than a properly authorized and timely issued Change Order;

    l.    Failing to perform the Owner's duties in good faith;

    m.    Hindering and obstructing performance of Kearney;

    n.    Disrupting the performance of Kearney;

    o.    Furnishing information which misled Kearney;

    p.    Failing to promptly furnish to Kearney all existing information which was within the possession or control of the Owner or the Project Engineer, or the Owner's consultant's or other contractors, including information discovered or developed during the Project, which might affect the efficient performance of the Work.

46

AR021900

q.    Failing to provide complete and timely information related to requests for information;

r.    Failing to provide complete and timely information related to design changes;

s.    Improperly making changes that affected the sequence of construction of the Work and which caused or contributed to increased risks of turbid water discharges;

t.    Failing to make timely payments;

u.    Failing to timely issue shop drawing approvals or issue design changes that were required to be issued so that the shop drawing approval process could proceed in an uninterrupted and undisrupted manner;

v.    Failing to prevent other contractors employed by the Owner and store owners from interfering, damaging and disrupting the Work of Kearney;

w.    Failing to perform the Owner's obligations to review and approve required adjustments to the Zone A-South Contract in good faith;

x.    Failing to give timely direction on potential changed or additional Work thereby knowingly disrupting the performance of the Kearney; and

y.    Furnishing information in the Plans and Specifications, directives, answers to requests for information, and other contract documents which misled Kearney.

47

AR021901

z.    The Owner representatives acted in an arbitrary, capricious,

unfair, and deceptive manner in connection with the following:

    (i)    review and approval of monthly applications for payment;

    (ii)   issuance of periodic payments;

    (iii)  review and approval of change order requests or requests for amendments;

    (iv)   the Owner's timely and complete furnishing of information required to be provided to Kearney by the Owner as part of its duties to manage, coordinate and control the activities of persons and entities for which the Owner is legally responsible;

    (v)    review and approval of time extension requests and/or time extensions required as a result of acts and omissions of the Owner; and

    (vi)   promptly granting compensation or time extensions when an act or omission of the Owner was a substantial factor causing impact to Kearney.

201.    Additional examples of the Owner's breaches which caused disruptions and impacts to Kearney's performance are as follows:

a.    During the course of performance of the Project the Owner improperly made numerous and frequent changes to the scope of work and the design elements and details which were required to be constructed and completed by Kearney.

b.    The Owner completely ignored and disregarded that the design deficiencies and the Owner's lack of coordination were substantial factors in causing the repeated disruptions, interruptions, delays, and changes of sequence that were the responsibility of the Owner.

c.    The Owner abandoned the contractual procedures which are

48

Greenberg Traurig, P.A.

AR021902

required to be followed in order to fairly and properly administer the Zone A-South Contract. Instead, the Owner selectively read and interpreted the Contract requirements in an unfair and deceptive manner and ignored and disregarded the Owner's duties to make timely payments, etc.

202.    The Owner improperly and intentionally alleged false and unsubstantiated grounds for withholding payments which were earned by Kearney and which were due and payable to Kearney. By operation of law, as a consequence of the Owner's abandonment of the Contract, its unfair and deceptive actions, and the numerous other breaches by the Owner set forth herein, Kearney is discharged, released and forever relieved from any responsibility under the Zone A-South Contract.

203.    Pursuant to Florida law, the Owner is liable to Kearney for all additional costs arising from the impact of improper acts and omissions by the Owner and design professionals, consultants, and the Owner's other contractors. The improper acts and omissions for which the Owner is responsible were a substantial factor in causing Kearney to suffer damages.

204.    As a direct and approximate cause of the breaches identified above, Kearney has been damaged in the following ways and amounts and is entitled to the relief sought:

      a.    The amount of $942,520.75, which includes Contract balance, retainage, executed Change Orders, plus additional amounts earned and sought by Kearney but wrongfully denied by the Owner;

      b.    Other damages yet to be ascertained, including but not limited to attorneys' fees;

Greenberg Traurig, P.A.

AR021903

c.      Kearney is also entitled to a judgment declaring its obligations arising out of or relating to the Zone A-South Contract to be discharged and released.

WHEREFORE, Plaintiff, Kearney demands judgment against Defendants J.G. Cypress, Pasco Ranch, Pasco 54 and Pasco Properties for breach of contract and award of all damages, costs, discharge of all potential liability of Kearney, prejudgment interest and other relief this Court deems just and proper.

## COUNT X
## BREACH OF CONTRACT - MALL SITE IMPROVEMENTS CONTRACT

205.    Kearney realleges paragraphs 1-62, 64, 66, 68, 69-70, and 79, above.

206.    This is an action for breach of contract for an amount exceeding $15,000 exclusive of attorneys' fees and costs.

207.    The obligations imposed upon J.G. Cypress (for the purposes of this Count J.G. Cypress shall be referred to as the Owner) pursuant to the Mall Site Improvements Contract and Florida law included the following express and implied covenants or promises:

a.      The duty to furnish Plans and Specifications that were warranted by the Owner to be complete, fully coordinated and buildable in all respects, including scope of work, design elements and details that were fully constructable so that the Work could be completed efficiently and without disruption or hindrance and within the timeframes established for the Project;

b.      The duty to furnish efficient business administration and development management as the developer which was fully responsible

50

AR021904

for all management, coordination, and control of (i) the Owner's design professionals and consultants, (ii) the Owner's other contractors, (iii) contractors employed by tenants, (iv) the requirements of all governmental authorities with jurisdiction over the Project and (v) other professional designers, consultants, and contractors employed by FDOT for roadwork adjacent to the Project;

c.     The duty to ensure that any further design work performed by the Owner's design professionals after execution of the Mall Site Improvements Contract was performed in a timely manner, and was complete, fully coordinated and buildable in all respects, including scope of work, design elements, and details, so that the Work, including any changed or additional Work caused by further design work, could be constructed and completed efficiently and without disruption or hindrance, and within the timeframes established for the Mall Site Improvements Contract, or as adjusted in accordance with Kearney's reasonable requests;

d.     The Owner was also obligated to promptly make payment for all additional quantities of Work items for which Unit Prices had been established, issue Change Orders (as defined in the Contract) or amendments for all changes in scope, or extensions of completion milestones required due to the Owner's legal responsibilities and/or conditions or events beyond the reasonable control of Kearney;

e.     The Owner was obligated to prevent any disruption or hindrance of Kearney's business administration and management and

51

AR021905

supervision activities and other aspects of the Work, by ensuring that the Owner issued Change Orders or amendments promptly and without delay for all requests submitted by Kearney or for items initiated by acts or omissions of the Owner or Project Engineer;

       f.     The Owner was obligated to prevent any disruption or hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by ensuring that the Owner properly approved payment for all amounts earned, and that the Owner representatives did not arbitrarily and capriciously reduce or cut the amounts requested for payment by Kearney.

       g.     The Owner was obligated to prevent any disruption or hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by ensuring that the Owner's management, coordination, and control of work by others did not result in impacts that delayed or disrupted the Work.

       h.     The duty to ensure that the Owner representatives were sufficiently experienced in all aspects of development management of a mega-retail project of similar complexity to the Project, and that the individuals hired or assigned by the Owner performed diligently, cooperatively, and in good faith and either had the necessary authority and experience to execute all decision making to prevent disruptions and impacts to the Project, or were provided with access to obtain immediate decisions from the Owner;

Greenberg Traurig, P.A.

AR021906

i.    The duty to ensure that the Owner representatives did not disrupt, hinder, or impede the Work, or otherwise fail to cooperate in the manner that was contemplated at the time the Mall Site Improvements Contract was executed;

j.    The duty to pay the entire balance of all amounts earned, including retainage, at the time the Owner wrongfully terminated the Contract;

k.    The duty to ensure that the Project Engineer did not issue, or attempt to issue, design changes via supplemental instructions, bulletins, reviews of shop drawings, or any procedure other than a properly authorized Change Order;

l.    The duty to perform the Owner's duties in good faith;

m.   The duty not to hinder or obstruct performance of Kearney;

n.    The duty not to cause delay or disruption to the performance of Kearney;

o.    The duty not to furnish information which might mislead Kearney;

p.    The duty to promptly furnish to Kearney all existing information which was within the possession or control of the Owner or the Project Engineer, or the Owner's consultant's or other contractors, including information discovered or developed during the Project, which might affect the efficient performance of the Work;

q.    The duty to provide complete and timely information

53

AR021907

related to Requests for Information;

r.      The duty to provide complete and timely information related to design changes;

s.      The duty to ensure that any changes that affected the sequence of construction of the Work would not cause or contribute to an increase in the risk of turbid water discharges;

t.      The duty to make timely payments;

u.      The duty to timely issue shop drawing approvals or issue design changes that were required to be issued so that the shop drawing approval process could proceed in an uninterrupted and undisrupted manner;

v.      The duty to prevent other contractors employed by the Owner and store owners from interfering, damaging and disrupting the Work of Kearney;

w.      The duty to perform the Owner's obligations to review and approve required adjustments to the Mall Site Improvements Contract in good faith;

x.      The duty to give timely direction on potential changed or additional Work thereby avoiding any disruption of the performance of the Kearney; and

y.      The duty to furnish information in the Plans and Specifications, directives, answers to requests for information, and other contract documents which would not mislead Kearney.

AR021908

z.     The duty to ensure that the Owner representatives did not act arbitrarily, capriciously, unfairly or deceptively in connection with any of the following Owner responsibilities:

    (i)     review and approval of monthly applications for payment;

    (ii)    issuance of periodic payments;

    (iii)   review and approval of change order requests or requests for amendments;

    (iv)   the Owner's timely and complete furnishing of information required to be provided to Kearney as part of the Owner's duties to manage, coordinate and control the development process;

    (v)    review and approval of time extension requests and/or time extensions required as a result of acts and omissions of the Owner or other events beyond the control of Kearney; and

    (vi)   promptly granting compensation or time extensions when an act or omission of the Owner was a substantial factor causing impact to Kearney.

**Breach and Damages**

208.   The Owner breached the express and implied covenants of the Mall Site Improvements Contract in each of the following ways:

a.     Failing to furnish Plans and Specifications that met the warranted standard required under the Spearin Doctrine, which is also known as the Doctrine of Constructability. The Owner furnished Plans and Specifications that were neither complete, fully coordinated nor buildable in all respects, and consequently, the complete scope of work, design elements and details, were not constructable and as a result caused substantial disruption and hindrance and prevented the efficient

55

AR021909

completion of the Work within the timeframes established for the Project;

b.    Failing to furnish efficient business administration and development management. As the developer, the Owner failed to fulfill its responsibility for all management, coordination, and control of (i) the Owner's design professionals and consultants, (ii) the Owner's other contractors, (iii) contractors employed by tenants, (iv) the requirements of all governmental authorities with jurisdiction over the Project, and (v) other professional designers, consultants, and contractors employed by FDOT for roadwork adjacent to the Project;

c.    Failing to ensure that any further design work performed by the Owner's design professionals after execution of the Mall Site Improvements Contract was performed in a timely manner, and was complete, fully coordinated and buildable in all respects, including scope of work, design elements and details. Consequently, the Work, including the extensive changed and additional Work caused by the further design work, could not be constructed and completed efficiently and without disruption or hindrance, and within the timeframes established for the Project, and the Owner failed to issue contract adjustments in accordance with Kearney's reasonable requests;

d.    Failing to promptly make payment for all additional quantities of Work items for which Unit Prices had been established, issue Change Orders (as defined in the Mall Site Improvements Contract) or amendments for all changes in scope or extensions of Completion

56

AR021910

milestones;

    e.     Failing to prevent any disruption or hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by failing to issue Change Orders or amendments promptly and without delay for all requests submitted by Kearney or for items initiated by acts or omissions of the Owner or Project Engineer;

    f.     Arbitrarily and capriciously reducing and cutting amounts requested for payment by Kearney. This included but was not limited to allowing Owner employees to personally benefit from withholding amounts earned by Kearney, improperly assessing retainage on amounts not subject to retainage, and failing to either enter into mutually acceptable amendments or issuing construction change directives which do not constitute a waiver of any rights by Kearney. The Owner's actions were patently lacking in good faith, and were unconscionable, unfair and deceptive.

    g.     The Owner caused substantial disruption and hindrance of Kearney's business administration and management and supervision activities and other aspects of the Work, by failing to ensure that the Owner's management, coordination, and control of work by other did not cause impacts that delayed or disrupted the Work.

    h.     Failing to ensure (i) that the Owner representatives were sufficiently experienced in all aspects of development management of a

<div align="center">57</div>

AR021911

mega-retail project of similar complexity to the Project, (ii) that the Owner representatives devoted sufficient time to this Project, and (iii) that the individuals hired or assigned by the Owner performed diligently, cooperatively, and in good faith and either had the necessary authority to execute all decision making to prevent disruptions and impacts, or were provided with access to obtain immediate decisions from the Owner;

      i.      Failing to ensure that the Owner representatives did not disrupt, hinder, or impede the Work, or otherwise fail to cooperate in the manner that was contemplated at the time the Mall Site Improvements Contract was executed;

      j.      Failing to pay the entire balance of all amounts earned, including retainage, at the time the Owner wrongfully terminated the Contract;

      k.      Failing to ensure that the Project Engineer did not issue, or attempt to issue, design changes via supplemental instructions, reviews of shop drawings, or any procedure other than a properly authorized and timely issued Change Order;

      l.      Failing to perform the Owner's duties in good faith;

      m.      Hindering and obstructing performance of Kearney;

      n.      Disrupting the performance of Kearney;

      o.      Furnishing information which misled Kearney;

      p.      Failing to promptly furnish to Kearney all existing information which was within the possession or control of the Owner or

Greenberg Traurig, P.A.

AR021912

the Project Engineer, or the Owner's consultant's or other contractors, including information discovered or developed during the Project, which might affect the efficient performance of the Work.

      q.    Failing to provide complete and timely information related to requests for information;

      r.    Failing to provide complete and timely information related to design changes;

      s.    `Improperly making changes that affected the sequence of construction of the Work and which caused or contributed to increased risks of turbid water discharges;

      t.    Failing to make timely payments;

      u.    Failing to timely issue shop drawing approvals or issue design changes that were required to be issued so that the shop drawing approval process could proceed in an uninterrupted and undisrupted manner;

      v.    Failing to prevent other contractors employed by the Owner and store owners from interfering, damaging and disrupting the Work of Kearney;

      w.    Failing to perform the Owner's obligations to review and approve required adjustments to the Mall Site Improvements Contract in good faith;

      x.    Failing to give timely direction on potential changed or additional Work thereby knowingly disrupting the performance of the

Greenberg Traurig, P.A.

AR021913

Kearney; and

  y. Furnishing information in the Plans and Specifications, directives, answers to requests for information, and other contract documents which misled Kearney.

  z. The Owner representatives acted in an arbitrary, capricious, unfair, and deceptive manner in connection with the following:

   (i) review and approval of monthly applications for payment;

   (ii) issuance of periodic payments;

   (iii) review and approval of change order requests or requests for amendments;

   (iv) the Owner's timely and complete furnishing of information required to be provided to Kearney by the Owner as part of its duties to manage, coordinate and control the activities of persons and entities for which the Owner is legally responsible;

   (v) review and approval of time extension requests and/or time extensions required as a result of acts and omissions of the Owner; and

   (vi) promptly granting compensation or time extensions when an act or omission of the Owner was a substantial factor causing impact to Kearney.

209. Additional examples of the Owner's breaches which caused disruptions and impacts to Kearney's performance are as follows:

  a. During the course of performance of the Project the Owner improperly made numerous and frequent changes to the scope of work and the design elements and details which were required to be constructed and completed by Kearney.

  b. The Owner completely ignored and disregarded that the

60

AR021914

design deficiencies and the Owner's lack of coordination were substantial factors in causing the repeated disruptions, interruptions, delays, and changes of sequence that were the responsibility of the Owner.

     c.    The Owner abandoned the contractual procedures which are required to be followed in order to fairly and properly administer the Mall Site Improvements Contract. Instead, the Owner selectively read and interpreted the Contract requirements in an unfair and deceptive manner and ignored and disregarded the Owner's duties to make timely payments, etc.

210.    The Owner improperly and intentionally alleged false and unsubstantiated grounds for withholding payments which were earned by Kearney and which were due and payable to Kearney. By operation of law, as a consequence of the Owner's abandonment of the Contract, its unfair and deceptive actions, and the numerous other breaches by the Owner set forth herein, Kearney is discharged, released and forever relieved from any responsibility under the Mall Site Improvements Contract.

211.    Pursuant to Florida law, the Owner is liable to Kearney for all additional costs arising from the impact of improper acts and omissions by the Owner and design professionals, consultants, and the Owner's other contractors. The improper acts and omissions for which the Owner is responsible were a substantial factor in causing Kearney to suffer damages.

212.    As a direct and approximate cause of the breaches identified above, Kearney has been damaged in the following ways and amounts and is entitled to the relief sought:

Greenberg Traurig, P.A.

AR021915

a.    The amount of $1,271,919, which includes Contract balance, retainage, executed Change Orders, plus additional amounts earned and sought by Kearney but wrongfully denied by the Owner;

b.    Other damages yet to be ascertained, including but not limited to attorneys' fees;

c.    Kearney is also entitled to a judgment declaring its obligations arising out of or relating to the Mall Site Improvements Contract to be discharged and released.

WHEREFORE, Plaintiff, Kearney demands judgment against Defendant J.G. Cypress for breach of contract and award of all damages, costs, discharge of all potential liability of Kearney, prejudgment interest and other relief this Court deems just and proper.

## COUNT XI
## QUANTUM MERUIT ON THE ZONE A-SOUTH PROJECT

213.   Kearney realleges paragraphs 1 through 6 and 63, 65, 67, and 69-71 above.

214.   This is an action for quantum meruit, pled in the alternative to Count IX, for an amount exceeding $15,000 exclusive of attorneys' fees and costs.

215.   The Owner requested that Kearney perform improvements to the Owner's Property.

216.   The Owner was aware that Kearney had commenced improving the Property and the Owner received the benefit of the work as furnished by Kearney.

217.   By requesting Kearney to perform the work, the Owner made an implied promise to Kearney to pay for the value of the improvements and all work performed.

62

AR021916

218.    Kearney has made demand upon the Owner to pay the value of the improvements to the Property as a result of the work performed and the Owner has refused to pay Kearney the value of the improvements.

219.    Kearney has been damaged by the Owner's refusal to pay the value of the improvements and the work performed.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC demands judgment against Owner in quantum meruit for the value of the improvements and the work performed, costs, prejudgment interest and other relief this Court deems just.

## COUNT XII
## QUANTUM MERUIT ON MALL SITE PROJECT

220.    Kearney realleges paragraphs 1 through 6 and 64, 66, 68, 69-70 and 72 above.

221.    This is an action for quantum meruit, pled in the alternative to Count X, for an amount exceeding $15,000 exclusive of attorneys' fees and costs.

222.    The J.G. Cypress requested that Kearney perform improvements to J.G. Cypress' Property.

223.    J.G. Cypress was aware that Kearney had commenced improving the Property and J.G. Cypress received the benefit of the work as furnished by Kearney.

224.    By requesting Kearney to perform the work, J.G. Cypress made an implied promise to Kearney to pay for the value of the improvements and all work performed.

225.    Kearney has made demand upon J.G. Cypress to pay the value of the improvements to the Property as a result of the work performed and J.G. Cypress has refused to pay Kearney the value of the improvements.

63

AR021917

226.   Kearney has been damaged by J.G. Cypress' refusal to pay the value of the improvements and the work performed.

WHEREFORE, Plaintiff, Kearney Construction Co., LLC demands judgment against J.G. Cypress in quantum meruit for the value of the improvements and the work performed, costs, prejudgment interest and other relief this Court deems just.

## COUNT XIII
## DECLARATORY AND INJUNCTIVE RELIEF

227.   Kearney realleges the allegations of paragraphs 1 through 72, and paragraphs 197 through 226, above.

228.   Defendant Jacobs Group's conduct alleged herein constitutes unconscionable, unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of Florida Statutes §501.201 *et seq.*

229.   The Owner and J.G. Cypress are liable for all acts of its Agent, Jacobs Group. Jacobs Group acted wantonly, willfully, intentionally and with total disregard for Kearney's rights and interests.

230.   As a direct and proximate result of the Jacobs Group's wrongful conduct, Kearney has suffered, and will continue to suffer severe and substantial damages to its goodwill and reputation if the Jacobs Group's conduct is not enjoined and remedied through declaratory relief.

231.   Kearney has no adequate remedy at law as monetary damages will not provide full and adequate relief for all of its injuries from the Jacobs Group's unconscionable, unfair and deceptive acts and practices.

64

Greenberg Traurig, P.A.

AR021918

232.   Kearney is entitled to declaratory relief establishing that Kearney shall be discharged and released from any liability arising out of or related to the Contract and/or governmental permits and regulations pertaining thereto.

WHEREFORE, Kearney demands judgment against Defendant the Jacobs Group, Owner, and J.G. Cypress for declaratory injunctive relief under Fla. Stat. §501.201 *et seq.* and for other relief thereunder, including reasonable attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

Kearney Construction, Co. LLC hereby demands a trial by jury of all issues so triable.

Dated: September 24, 2008.

David B. Weinstein
Florida Bar No. 0604410
Michael A. Hornreich, Esquire
Florida Bar No. 0379972
**GREENBERG TRAURIG, P.A.**
Courthouse Plaza
625 East Twiggs Street, Suite 100
Tampa, Florida 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900
*Attorneys for Plaintiff*

Greenberg Traurig, P.A.

AR021919

Kearney Construction Co., LLC

NOAA Climatological Data
Station:    Hillsborough River State Park (83986)
City:       Tampa
County:     Florida

| Month | | Normal Rainfall per 2006 Data * | | Construction Days Lost Due to Rainfall |
|---|---|---|---|---|
| January | | 3.35 | | 2 |
| February | | 3.12 | | 2 |
| March | | 3.41 | | 2 |
| April | | 2.23 | | 1 |
| May | | 3.21 | | 2 |
| June | | 7.87 | | 6 |
| July | | 7.27 | | 6 |
| August | | 8.16 | | 7 |
| September | | 7.23 | | 6 |
| October | | 2.71 | | 1 |
| November | | 2.72 | | 1 |
| December | | 3.28 | | 2 |
| Annual | | 54.56 | | 38 |

* The normal rainfall amount was calculated using the actual rainfall and departure from normal quantiles reported in the NOAA Annual Climatological Summary for the year 2006.

EXHIBIT C

AR021920



"Hi Sierra"
&lt;HSierra@Sierra-Properties.c
om&gt;

06/19/2007 10:08 AM

To  &lt;dsalomone@rejacobsgroup.com&gt;,
    &lt;seeger@kearneyconstruction.com&gt;

cc

bcc

Subject  RE: CCTC Mass Grading Contract South Side

Dominic,

Looks good to me. I'm thinking you might want to add at the end of
section 2 to clarify any extensions to the completion dates:

The preceding schedule assumes the contractor will loose work days for
normal rains as shown on Exhibit C. Contractor shall keep a rain gauge
on site, record the amount of rain each day and report same to Owner on
a monthly basis. In the event that the rains exceed the amounts show on
Exhibit C, contractor shall in each such event send a completion date
extension request to Owner requesting the number of additional days
requested by Contractor and outlining the circumstances. Owner shall
approve all reasonable extension requests made by Contractor in
accordance with this section.

In the event any change in the scope of the work shall result in a
Change Order, and if such change shall result in the contractor
requiring additional time in which complete the project, then any such
Change Order request shall include the Number of additional days
requested by contractor.

Or something along these lines

Hi

-----Original Message-----
From: dsalomone@rejacobsgroup.com [mailto:dsalomone@rejacobsgroup.com]
Sent: Monday, June 18, 2007 4:20 PM
To: seeger@kearneyconstruction.com; Hi Sierra
Subject: CCTC Mass Grading Contract South Side

Here is a draft of the grading contract for the south side.
Brian, please have exhibit B revised per my markup.

----- Forwarded by Dominic J. Salomone/JacobsGroup on 06/18/2007 04:17
PM
-----

        Bonnie

        Sulda/JacobsGroup

To

        06/18/2007 02:51        Dominic J.

        PM                      Salomone/JacobsGroup@JacobsGroup

cc

AR021921



## LUMP SUM MASS GRADING AND STORM WATER MANAGEMENT CONTRACT
## FOR LAND SOUTH OF S.R. 56

THE CONTRACT, made as of the **25** day of June, 2007, by and between J.G. Cypress Creek LLC, having an office at 25425 Center Ridge Road, Cleveland, Ohio 44145 acting by and through its agent,   The Richard E. Jacobs Group, Inc., a corporation, having an office at 25425 Center Ridge Road, Cleveland, Ohio  44145 (hereinafter referred to as "Agent"), and  Pasco Ranch Inc., Pasco 54 Ltd., Pasco Properties of Tampa Bay, Inc. having it's corporate office at 509 Guisando de Avila Ste. 200, Tampa, FL  33616, (Collectively hereinafter referred to as "Owner") and  Kearny Construction Co., LLC   having an office at   5115 Joanne Kearney Blvd., Tampa, FL   33619 (hereinafter referred to as "Contractor").

WITNESSETH, that for and in consideration of the mutual covenants and agreements contained, Owner and Contractor hereby covenant and agree as follows:

### SECTION 1

Contractor agrees to furnish all material, labor, equipment and supervision, and to perform all work necessary (hereinafter collectively referred to as "Work") for Owner at  Cypress Creek Town Center the Grading Drainage and Infrastructure Improvements in Pasco County, FL in accordance with the Drawings listed in Exhibit "A" and the Project Specifications. Such Drawings have been prepared by: Wilson Miller, Inc., 2205 North 20th Street, Tampa, FL 33605.

AR021922

## SECTION 2

The Contractor agrees to perform its Work hereunder so as not to delay or interfere with Owner in any way and to complete the same in accordance with the following time schedule:

| | |
|---|---|
| **Power Center Grading. Haul Roads & Staging Areas** | 11/15/07 |
| **Lifestyle Center Grading.  Haul Roads & Staging Areas** | 12/15/07 |
| **Complete all Work South of S.R. 56** | 12/31/07 |

The preceding schedule assumes the contractor will lose work days for normal rains as shown on Exhibit C. Contractor shall keep a rain gauge on site, record the amount of rain each day and report same to Owner on a monthly basis. In the event that the rains exceed the amounts shown on Exhibit C, contractor shall in each such event send a completion date extension request to Owner requesting the number of additional days requested by Contractor and outlining the circumstances. Owner shall approve all reasonable extension requests made by Contractor in accordance with this section. In the event any change in the scope of the work shall result in a Change Order, and if such change shall result in the contractor requiring additional time in which to complete the project, then any such Change Order request shall include the Number of additional days requested by contractor.

It is agreed that time is of the essence of this Contract.

## SECTION 3

For the performance of all Work, the Owner agrees to pay the Contractor  a lump sum amount of  **Three Million Four Hundred Sixty Thousand Three Hundred Eighty Six Dollars and Ninety Cents ($3,460,386.90**                (which amount includes all sales, use, excise and similar taxes, if any) subject to additions and deductions for changes as hereinafter provided and subject, however, to the following terms and conditions:

(a) On or before the 25th day of each month, the Contractor shall submit (i) an invoice in duplicate to Agent for all labor and for all material which has been incorporated in the Work by the Contractor during the preceding calendar month (together with any supporting invoices and other substantiating information which may be requested by Agent), (ii) a payment request form

6/07                                                - 2 -

AR021923

completed by Contractor, and (iii) a waiver of mechanic's and/or materialmen's lien in a form satisfactory to the Agent covering all Work done and material supplied during the period covered by the invoice. On or about the 25th day of the following month, the Owner shall pay to the Contractor an amount equal to 90% of the amount of such invoice.

(b) Owner reserves the right to make payments by issuing checks payable jointly to the order of the Contractor and the Contractor's subcontractors and/or material suppliers.

(c) No payment made hereon shall be construed as evidence of the performance or completion of the Work, either wholly or in part, or as an acceptance of defective work or improper materials.

(d) Owner shall make final payment less retainage to Contractor within 45 days after Contractor shall have completed the Work to the full satisfaction of the Agent and shall have submitted the following documents:

    (i)   Contractor's Affidavit.
    (ii)  Final waiver of lien.
    (iii) Letter of guarantee for workmanship and materials.
    (iv) Final invoice, so marked, listing the total amount of the contract, the total amount paid and the total amount due.

(e) The unit prices listed in Exhibit "B" will be used in the event of scope changes.

(f) The hourly equipment rental rates shown on Exhibit "D will be used on Force Account Work.

## SECTION 4

The Contractor further agrees as follows:

(a) Perform all Work in this Contract in compliance with all laws, ordinances and regulations of public authorities and to pay all royalties and license fees.

(b) That, should the Contractor fail to furnish the material, labor or any portion thereof called for under this Contract within the time provided, Agent shall notify the Contractor of such failure and, if the Contractor does not furnish said material and/or labor to the satisfaction of Agent within five (5) days thereof, the Owner shall have the right to (i) purchase the necessary material and employ the necessary labor and charge the cost of same against the monies then due to become due to the Contractor on account of this Contract, (ii) withhold monies then due to become due to the Contractor on account of this Contract or (iii) terminate this Contract by written notice to the Contractor and to hold the Contractor liable for damages arising by reason of the Contractor's default in the performance of the Contractor's obligations under this

6/07

- 3 -

AR021924

Contract. Any delay to the Contractor occasioned by the Owner or any other contractor by causes beyond the control of Owner or such other contractor shall not place any liability for additional compensation or otherwise on the Owner or such other contractor except that Owner may consider an extension of time equal to the length of the delay to the Contractor provided the Contractor gives Agent written notice within ten (10) days of such delay.

(c) To permit Owner to withhold payments otherwise due Contractor if any person, firm or corporation which is a materialman, laborer or subcontractor of Contractor asserts a claim against Contractor, Owner or Agent for work performed or materials furnished in pursuance of this Contract whether or not such claim has been asserted as a mechanic's or materialmen's lien. Any payment made by Owner to Contractor while such claim exists shall not be considered a waiver of Owner's right to withhold future payments under this provision.

(d) To pay and cause to be discharged of record any mechanic's or materialmen's liens arising out of the Work to be performed by the Contractor under this Contract within fifteen (15) days after the filing thereof; provided, however, that Contractor shall have the right to contest the validity, amount and/or applicability of any such liens by appropriate legal proceedings if it shall, within such period, furnish a bond to the Owner in a form and amount and with a bonding company satisfactory to the Owner.

(e) To carry Workers' Compensation insurance complying with State laws pertaining to the Work, Comprehensive Public Liability and Property Damage insurance and Comprehensive Automobile Liability and Property Damage insurance covering Contractor's operations during this Contract. Said policies are to be for minimum limits of **Two Million Dollars ($2,000,000.)** for personal injury and **Five Million Dollars ($5,000,000.)** for property damage and shall name the Owner and Agent as additional insureds thereunder. Certificates of Insurance for such policies shall be delivered to Agent prior to the commencement of the Work and shall be so noted that such insurance shall not be canceled or materially changed except upon ten (10) days prior written notification to Agent.

(f) To indemnify and save the Owner and Agent, and their respective agents and employees, harmless from and against any and all costs, loss and expense, liability, damages, settlements or claims for damages (including attorney's fees and costs) suffered, incurred or arising from:

(i) Mechanic's and materialmen's liens and any other liens of any kind whatsoever asserted against the building or property or any part thereof arising out of the Work performed hereunder.

(ii) Injury to persons (including but not limited to death) or damage to or destruction of property including property of the Owner or Agent arising or resulting from the Work provided for an performed under this Contract, or from any actual or alleged act, omission or negligence of the Contractor, its agents or employees.

6/07

- 4 -

AR021925

The foregoing provisions shall in no way be deemed released, waived or modified in any respect by reason of any insurance or surety provided by the contractor under this Contract.

(g) To not assign this Contract or any portion thereof without the prior written consent of the Agent.

(h)

## SECTION 5

The Contractor warrants to the Owners, Agent and the Project Engineer that all materials and equipment incorporated in the Work will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards may be considered defective.

## SECTION 6

The Owner reserves the right to award other contracts in connection with other portions of the Project or other work on the site under these or other Conditions of the Contract.

## SECTION 7

The Contractor shall afford other contractors reasonable opportunity for the introduction and storage of their materials and equipment and the execution of their work, and shall properly connect and coordinate its Work with theirs.

## SECTION 8

The Contractor shall correct any Work that fails to conform to the requirements of the Contract Documents and shall remedy any defects due to faulty materials, equipment or workmanship which appear within a period of one (1) year from the Date of Final Payment or within such longer period of time as may be prescribed by law or by the terms of any applicable special guarantee required by the Contract Documents. The provisions of this Section 8 apply to Work done by Subcontractors as well as to Work done by direct employees of the Contractor.

## SECTION 9

(a) The Owner reserves the right to make, at any time during the progress of the Work, such alterations in the Drawings or in the details of the Work as may be found necessary or desirable, except that, under no circumstances shall alterations involve work beyond the terminus of the proposed Work except as may be necessary to satisfactorily complete the Work. Such alterations

AR021926

shall not invalidate the Contract and the Contractor agrees to perform the Work as altered at its contract price the same as if it had been a part of the original Contract except as otherwise provided herein.

(b) Should Contractor and Owner agree that an alteration has materially increased or decreased the cost of performing the Work and that there should be an adjustment in the contract price due to such alteration, Owner shall make such adjustment in the contract price as may have been mutually agreed upon between Contractor and Owner. This agreement and adjustment will be documented by supplemental agreement through a Change Order issued prior to the performance of the Work.

## SECTION 10

This Contract shall not be valid and binding until a fully executed original is returned to the office of the Agent, but thereafter, it shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns, as the case may be.

## SECTION 11

The Contractor agrees to refrain from using the name of the Owners, Agent or The Richard E. Jacobs Group or any principal or employee of same as a reference in any promotional materials or for any purpose other than the completion of the Work under this Contract without the prior written consent of an authorized representative of said company or individual and to require all of Contractor's subcontractors and material suppliers to so refrain from the use of said names.

## SECTION 12

The following exhibits are hereby made a part of this Contract:
Exhibit "A" – Drawing List
Exhibit "B" – Unit Price Schedule
Exhibit "C" – Average Monthly Allowable Rain Day Schedule
Exhibit "D" – Hourly Rate Schedule
Exhibit "E" – Certificate of Insurance
Exhibit "F" – Preconstruction Meeting Minutes

## SECTION 13

This Contract is being executed on behalf of JG Cypress Creek, LLC by the Richard E. Jacobs Group, Inc. not personally, but as agent for the Owners in the exercise of the power and authority conferred on it by the Owner. It is expressly understood and agreed that nothing contained in this Contract shall be construed as creating any liability whatsoever against Agent, its shareholders, officers or directors and, in particular, without limiting generality of the foregoing, there shall be no

6/07

- 6 -

AR021927

personal liability to pay any indebtedness accruing hereunder or to perform any covenant, either express or implied, herein contained to the end that the Owner, as principal, shall be solely responsible therefore.

## SECTION 14

Any notice to be given hereunder to the Owner or Contractor shall be given in writing and transmitted by hand delivery or certified mail, return receipt requested, addressed as follows:

If to Owner:

J. G. Cypress Creek LLC

c/o The Richard E. Jacobs Group

25425 Center Ridge Road

Cleveland, Ohio  44145

Attn: Dominic J. Salomone

If to Owner:

Pasco Ranch Inc,

Pasco 54 Ltd.

Pasco Properties of Tampa Bay, Inc.

509 Guisando de Avila – Ste. 200

Tampa, FL  33613

Attn: Hi Sierra

6/07

- 7 -

AR021928

If to Contractor:

Kearney Construction Co., LLC

5115 Joanne Kearney Blvd.

Tampa, FL  33619

Attn: Brian Seeger

Owner or Contractor may change the name to which notices served upon it are to be delivered or mailed, by giving ten (10) days prior written notice informing the other party of the change in address.

IN WITNESS WHEREOF, Owner and Contractor have caused this Contract to be executed as of the date first above written.

IN THE PRESENCE OF:

Kearney Construction Co., LLC
Contractor's Name

By  BRIAN W. SEELER
(Typed)

Title  PRESIDENT
(Typed)

_____
(Signature)

Witness

OWNER:  JG CYPRESS CREEK, LLC

By: The Richard E. Jacobs Group, Agent

By:  Dominic  SALOMONE

Title  V. P.  ENGINEERING

_____
(SIGNATURE)

Witness

OWNER:

6/07

- 8 -

AR021929

Pasco Ranch Inc.

Pasco 54 Ltd.

Pasco Properties of Tampa Bay, Inc.

By   John R. Sierra Jr.
(Typed)

Title   PRESIDENT
(Typed)

(SIGNATURE)

Witness

- 9 -

6/07

AR021930



## SITE IMPROVEMENTS CONTRACT

THE CONTRACT, made as of the 7 day of November, 2007, by and between J. G. Cypress Creek LLC, having an office at 25425 Center Ridge Road, Cleveland, Ohio 44145 acting by and through its agent,    The Richard E. Jacobs Group, Inc., a corporation, having an office at 25425 Center Ridge Road, Cleveland, Ohio  44145 (hereinafter referred to as "Agent"), and  Kearney Construction, Co., LLC , 5115 Joanne Kearney Blvd., Tampa, FL  33619 (hereinafter referred to as "Contractor").

WITNESSETH, that for and in consideration of the mutual covenants and agreements contained herein, the Owner and Contractor hereby covenant and agree as follows:

### SECTION 1

Contractor agrees to furnish all material, labor, equipment and supervision, to perform all work necessary (hereinafter collectively referred to as "Work") for Owner at Cypress Creek Town Center Site in Pasco County, FL in accordance with the Drawings listed in Exhibit "A" and the Project Specifications.

Such Drawings have been prepared by: Wilson Miller, Inc., 2205 North 20th Street, Tampa, FL 33605

AR021931

## SECTION 2

The Contractor agrees to perform its Work hereunder so as not to delay or interfere with Owner in any way and to complete the same in accordance with the following time schedule:

| | |
|---|---|
| Primary Storm, Sanitary and Water Mains | February 1, 2008 |
| Building Laterals | April 1, 2008 |
| Site Improvements | August 1, 2008 |

The preceding schedule assumes the contractor will loose work days for normal rains as shown on Exhibit C. Contractor shall keep a rain gauge on site, record the amount of rain each day and report same to Owner on a monthly basis. In the event that the rains exceed the amounts show on Exhibit C, contractor shall in each such event send a completion date extension request to Owner requesting the number of additional days requested by Contractor and outlining the circumstances. Owner shall approve all reasonable extension requests made by Contractor in accordance with this section.

In the event any change in the scope of the work shall result in a Change Order, and if such change shall result in the contractor requiring additional time in which complete the project, then any such Change Order request shall include the Number of additional days requested by contractor.

It is agreed that time is of the essence of this Contract.

## SECTION 3

For the performance of all Work, the Owner agrees to pay the Contractor the unit price amounts as shown on Exhibit "B" which amount includes all sales, use, excise and similar taxes, if any, subject to additions and deductions for changes as hereinafter provided and subject, however, to the following terms and conditions:

10/07

- 2 -

(a) On or before the 25th day of each month, the Contractor shall submit (i) an invoice in duplicate to Agent for all labor and for all material which has been incorporated in the Work by the Contractor during the preceding calendar month (together with any supporting invoices and other substantiating information which may be requested by Agent), (ii) a payment request form completed by Contractor, and (iii) a waiver of mechanic's and/or materialmen's lien in a form satisfactory to the Agent covering all Work done and material supplied during the period covered by the invoice. On or about the 25th day of the following month, the Owner shall pay to the Contractor an amount equal to 90% of the amount of such invoice.

(b) Owner reserves the right to make payments by issuing checks payable jointly to the order of the Contractor and the Contractor's subcontractors and/or material suppliers.

(c) No payment made hereon shall be construed as evidence of the performance or completion of the Work, either wholly or in part, or as an acceptance of defective work or improper materials.

(d) Owner shall make final payment less retainage to Contractor within 45 days after Contractor shall have completed the Work to the full satisfaction of the Agent and shall have submitted the following documents:

    (i)    Contractor's Affidavit.
    (ii)   Final waiver of lien.
    (iii)  Letter of guarantee for workmanship and materials.
    (iv)  Final invoice, so marked, listing the total amount of the contract, the total amount paid and the total amount due.

(e) The unit prices listed in Exhibit "B" will be used in the event of scope changes.

(f) The hourly equipment rental rates shown on Exhibit "D will be used on Force Account Work.

## SECTION 4

The Contractor further agrees as follows:

(a) To obtain all necessary permits and perform all Work in this Contract in compliance with all laws, ordinances and regulations of public authorities and to pay all royalties and license fees.

AR021933

(b) That, should the Contractor fail to furnish the material, labor or any portion thereof called for under this Contract within the time provided, Agent shall notify the Contractor of such failure and, if the Contractor does not furnish said material and/or labor to the satisfaction of Agent within five (5) days thereof, the Owner shall have the right to (i) purchase the necessary material and employ the necessary labor and charge the cost of same against the monies then due to become due to the Contractor on account of this Contract, (ii) withhold monies then due to become due to the Contractor on account of this Contract or (iii) terminate this Contract by written notice to the Contractor and to hold the Contractor liable for damages arising by reason of the Contractor's default in the performance of the Contractor's obligations under this Contract. Any delay to the Contractor occasioned by the Owner or any other contractor by causes beyond the control of Owner or such other contractor shall not place any liability for additional compensation or otherwise on the Owner or such other contractor except that Owner may consider an extension of time equal to the length of the delay to the Contractor provided the Contractor gives Agent written notice within ten (10) days of such delay.

(c) To permit Owner to withhold payments otherwise due Contractor if any person, firm or corporation which is a materialman, laborer or subcontractor of Contractor asserts a claim against Contractor, Owner or Agent for work performed or materials furnished in pursuance of this Contract whether or not such claim has been asserted as a mechanic's or materialmen's lien. Any payment made by Owner to Contractor while such claim exists shall not be considered a waiver of Owner's right to withhold future payments under this provision.

(d) To pay and cause to be discharged of record any mechanic's or materialmen's liens arising out of the Work to be performed by the Contractor under this Contract within fifteen (15) days after the filing thereof; provided, however, that Contractor shall have the right to contest the validity, amount and/or applicability of any such liens by appropriate legal proceedings if it shall, within such period, furnish a bond to the Owner in a form and amount and with a bonding company satisfactory to the Owner.

(e) To carry Workers' Compensation insurance complying with State laws pertaining to the Work, Comprehensive Public Liability and Property Damage insurance and Comprehensive Automobile Liability and Property Damage insurance covering Contractor's operations during this Contract. Said policies are to be for minimum limits of **Two Million Dollars ($2,000,000.)** for personal injury and **Five Million Dollars ($5,000,000.)** for property damage and shall name the Owner and Agent as additional insureds thereunder. Certificates of Insurance for such policies shall be delivered to Agent prior to the commencement of the Work and shall be so noted that such insurance shall not be canceled or materially changed except upon ten (10) days prior written notification to Agent.

(f) To indemnify and save the Owner and Agent, and their respective agents and employees, harmless from and against any and all costs, loss and expense, liability, damages, settlements or claims for damages (including attorney's fees and costs) suffered, incurred or arising from:

AR021934

(i)    Mechanic's and materialmen's liens and any other liens of any kind whatsoever asserted against the building or property or any part thereof arising out of the Work performed hereunder.

(ii)   Injury to persons (including but not limited to death) or damage to or destruction of property including property of the Owner or Agent arising or resulting from the Work provided for an performed under this Contract, or from any actual or alleged act, omission or negligence of the Contractor, its agents or employees.

The foregoing provisions shall in no way be deemed released, waived or modified in any respect by reason of any insurance or surety provided by the contractor under this Contract.

(g) To not assign this Contract or any portion thereof without the prior written consent of the Agent.

## SECTION 5

The Contractor warrants to the Owners, Agent and the Project Engineer that all materials and equipment incorporated in the Work will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards may be considered defective.

## SECTION 6

The Owner reserves the right to award other contracts in connection with other portions of the Project or other work on the site under these or other Conditions of the Contract.

## SECTION 7

The Contractor shall afford other contractors reasonable opportunity for the introduction and storage of their materials and equipment and the execution of their work, and shall properly connect and coordinate its Work with theirs.

## SECTION 8

The Contractor shall correct any Work that fails to conform to the requirements of the Contract Documents and shall remedy any defects due to faulty materials, equipment or workmanship which appear within a period of one (1) year from the Date of Final Payment or within such longer period of time as may be prescribed by law or by the terms of any applicable special guarantee required by the Contract Documents. The provisions of this Section 8 apply to Work done by Subcontractors as well as to Work done by direct employees of the Contractor.

10/07

AR021935

## SECTION 9

(a) The Owner reserves the right to make, at any time during the progress of the Work, such alterations in the Drawings or in the details of the Work as may be found necessary or desirable, except that, under no circumstances shall alterations involve work beyond the terminus of the proposed Work except as may be necessary to satisfactorily complete the Work. Such alterations shall not invalidate the Contract nor release the Surety and the Contractor agrees to perform the Work as altered at its contract price the same as if it had been a part of the original Contract except as otherwise provided herein.

(b) Should Contractor and Owner agree that an alteration has materially increased or decreased the cost of performing the Work and that there should be an adjustment in the contract price due to such alteration, Owner shall make such adjustment in the contract price as may have been mutually agreed upon between Contractor and Owner. This agreement and adjustment will be documented by supplemental agreement through a Change Order issued prior to the performance of the Work.

## SECTION 10

This Contract shall not be valid and binding until a fully executed original is returned to the office of the Agent, but thereafter, it shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns, as the case may be.

## SECTION 11

The Contractor agrees to refrain from using the name of the Owners, Agent or The Richard E. Jacobs Group or any principal or employee of same as a reference in any promotional materials or for any purpose other than the completion of the Work under this Contract without the prior written consent of an authorized representative of said company or individual and to require all of Contractor's subcontractors and material suppliers to so refrain from the use of said names.

## SECTION 12

The following exhibits are hereby made a part of this Contract:
Exhibit "A" – Drawing List
Exhibit "B" – Unit Price Proposal
Exhibit "C" – Average Monthly Rain Delay Schedule
Exhibit "D" – Hourly Rate Schedule
Exhibit "E" – Certificate of Insurance
Exhibit "F" – Pre-Award Meeting Minutes

10/07

AR021936

## SECTION 13

This Contract is being executed on behalf of JG Cypress Creek, LLC by the Richard E. Jacobs Group, Inc. not personally, but as agent for the Owners in the exercise of the power and authority conferred on it by the Owner. It is expressly understood and agreed that nothing contained in this Contract shall be construed as creating any liability whatsoever against Agent, its shareholders, officers or directors and, in particular, without limiting generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenant, either express or implied, herein contained to the end that the Owner, as principal, shall be solely responsible therefore.

## SECTION 14

Any notice to be given hereunder to the Owner or Contractor shall be given in writing and transmitted by hand delivery or certified mail, return receipt requested, addressed as follows:

If to Owner:

    J. G. Cypress Creek LLC

    c/o The Richard E. Jacobs Group

    25425 Center Ridge Road

    Cleveland, Ohio  44145

    Attn: Dominic J. Salomone

If to Contractor:

    Kearney Construction Co., LLC

    5115 Joanne Kearney Blvd.

    Tampa, FL  33619

    Attn: Brian Seeger

Owner or Contractor may change the name to which notices served upon it are to be delivered or mailed, by giving ten (10) days prior written notice informing the other party of the change in address.

10/07

AR021937

IN WITNESS WHEREOF, Owner and Contractor have caused this Contract to be executed as of the date first above written.

IN THE PRESENCE OF:

Kearney Construction Co., LLC
Contractor's Name

By BRIAN W SEEGOR
(Typed)

Title PRESIDENT
(Typed)

R W
(Signature)

Bernadette Levra
Witness

OWNER: JG CYPRESS CREEK, LLC

By: The Richard E. Jacobs Group, Agent

By: DOMINIC SALOMONE

Title VICE PRESIDENT

Salomone
(SIGNATURE)

Witness

10/07                                    · 8 ·

AR021938