# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| LT. GEN. ROBERT L. VAN ANTWERP, <u>et al.</u>, | ) |
| | ) |
| Defendants, | ) |
| | )    No. 1:07-cv-1756 (RCL) |
| v. | ) |
| | ) |
| SIERRA PROPERTIES, LLC., <u>et al.</u>, | ) |
| | ) |
| Intervening Defendants. | ) |
| _____ | ) |

## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs hereby move for summary judgment. For the reasons set forth in the accompanying memorandum, there are no genuine issues of material fact in dispute and Plaintiffs are entitled to judgment as a matter of law. In support of this motion, Plaintiffs submit the accompanying memorandum of law and a Proposed Order.

Respectfully submitted,


_____/s_____
Joshua Stebbins
D.C. Bar No. 468542
Eric R. Glitzenstein
D.C. Bar No. 358287

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
jstebbins@meyerglitz.com
eric@meyerglitz.com

Attorneys for Plaintiffs

Date: January 4, 2010

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SIERRA CLUB, et al.,             )
                        )
          Plaintiffs,      )
                        )
           v.            )
                        )
LT. GEN. ROBERT L. VAN ANTWERP, et al., )
                        )
          Defendants,      )
                        )     No. 1:07-cv-1756 (RCL)
           v.            )
                        )
SIERRA PROPERTIES, LLC., et al.,      )
                        )
          Intervening Defendants. )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

_____/s_____
Joshua Stebbins
D.C. Bar No. 468542
Eric R. Glitzenstein
D.C. Bar No. 358287

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
jstebbins@meyerglitz.com
eric@meyerglitz.com

Attorneys for Plaintiffs

Date: January 4, 2010

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      Statutory And Regulatory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      The Clean Water Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.     Facts Giving Rise To Plaintiffs' Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      The CCTC Site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      The CCTC Permit And CCTC's Environmental Impacts . . . . . . . . . . . . 10

        C.      The Building Boom Around The CCTC Site And Pasco
                County Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        D.      The Corps's Review Of CCTC's Environmental Impacts . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.      Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II.     The Corps Violated NEPA By Failing To Prepare An EIS And By
        Otherwise Failing To Take A Hard Look At The Impacts Of Constructing
        And Operating CCTC  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.      An EIS Should Have Been Prepared  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.      The Corps Prepared A Legally Insufficient EA And Failed
                To Meaningfully Analyze Cumulative Impacts . . . . . . . . . . . . . . . . . . . . 26

III.    The Corps Violated The Clean Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A.  The Corps Failed To Require That Practicable Alternatives That Avoid And Lessen The Destruction Of Wetlands Be Undertaken . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1.  The Applicant's Own Calculations Of Financial Feasibility Demonstrate That CCTC Can Be Reduced In Size . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.  The Applicant Never Proved With Clear And Convincing Evidence That An 8.0% Rate Of Return Was Necessary . . . . . . 33

3.  The Corps Violated The Clean Water Act By Failing To Enforce The Practicable Alternative Of Reducing The Number Of Parking Spaces . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.  The Corps's Determination That The Project Would Not Cause Or Contribute To The Substantial Degradation Of Waters Of The United States Or Violate State Water Quality Standards Is Arbitrary and Capricious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.  The Corps And FWS Violated The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . 40

A.  The Corps And FWS Failed To Evaluate The Impacts To The Indigo Of Habitat Loss, Fragmentation, And Road Mortality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

B.  CCTC Will Adversely Affect The Wood Stork . . . . . . . . . . . . . . . . . . . . 42

V.  RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

**PAGE**

Amoco Prod. Co. v. Vill. of Gambell,
    480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Anderson v. Evans,
    371 F.3d 475 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Bypass Group v. U.S. Army Corps of Eng's,
    490 F.Supp.2d 184 (D.N.H. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 36

Cabinet Mountains Wilderness v. Peterson,
    685 F.2d 678 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Citizens for Better Forestry v. U.S. Dep't Agric.,
    481 F.Supp.2d 1059 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Defenders of Wildlife v. Adm'r EPA,
    882 F.2d 1294 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Dep't of Transp. v. Pub. Citizen,
    541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Envtl. Prot. Info. Ctr. v. Blackwell,
    389 F. Supp. 2d 1174 (N.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Envtl Def. v. Army Corps of Eng's,
    515 F.Supp.2d 69 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 44

Fla. Key Deer v. Stickney,
    864 F.Supp. 1222 (S.D. Fla.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

Fund For Animals v. Norton,
    281 F. Supp. 2d 209 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Grand Canyon Trust v. FAA,*
    290 F.3d 339 (D.C. Cir. 2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Loggerhead Turtle v. Volusia County,
    896 F.Supp. 1170 (M.D. Fl. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24, 27

Nat'l Parks & Conservation Ass'n v. Babbitt,
    241 F.3d 723 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

Nat'l Wildlife Fed. v. Souza,
    2009 U.S. Dist. Lexis 99674 *38, Civ. No. 08-141115 (S.D. Fla. 2009) . . . . . . . . . . . 44

Natural Res. Def. Council v. Dept of Energy,
    No. C-04, 0448 SC, 2007 WL 1302498 (N.D. Cal. May 2, 2007) . . . . . . . . . . . . . . . . 24

Natural Resources Defense Councl v. Hodel,
    865 F.2d 288 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Realty Income Trust v. Eckerd,
    564 F.2d 447 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Sierra Club v. Flowers,
    423 F.Supp.2d 1273 (S.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 44

Sierra Club v. Watkins,
    808 F.Supp 852 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Tenn. Valley Auth. v. Hill,
    437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Town of Cave Creek v. FAA,
    325 F.3d 320 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26

Utahns for Better Transp. v. U.S. Dep't of Transp.,*
    305 F.3d 1152 (10th Cir. 2002), . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 33, 35, 36, 38, 40

Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**STATUTES**

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 44

16 U.S.C. § 1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1536 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16 U.S.C. § 1538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

16 U.S.C. § 1540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

33 U.S.C. § 1251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

33 U.S.C. § 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fla. Stat. § 403.061(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## REGULATIONS

33 C.F.R. § 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

33 C.F.R. § 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 6.207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 C.F.R. § 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 7, 28, 29, 32, 36, 38, 40

40 C.F.R. § 1008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 1500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 C.F.R. § 1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 C.F.R. § 1507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 18 19, 23, 24, 26

50 C.F.R. § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

50 C.F.R. § 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 42

50 C.F.R. § 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 40

Fla. Admin. Code Ann. R. 62-302.700 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## INTRODUCTION

This case challenges the Army Corps of Engineers' ("Corps's") unlawful issuance of a

Clean Water Act ("CWA") permit in 2007, and a subsequent modified CWA permit in 2009

("CCTC permits"), for the filling of over fifty acres of federally protected wetlands to construct a

massive development, Cypress Creek Town Center ("CCTC"), in Pasco County, Florida.  Unlike

most Administrative Procedure Act ("APA") challenges to an agency's action and its failure to

prepare an Environmental Impact Statement ("EIS"), in this case the Court is not limited to

reviewing assertions of future environmental impacts, devoid of evidence of such impacts.

Rather, CCTC has <u>already had significant environmental impacts.</u>  According to the Corps's own

descriptions, within two months of the CCTC permit's issuance in 2007, CCTC was "<u>sen[ding]</u>

<u>clouds of turbid, silt-laden water</u>" – polluted runoff from the site – "<u>billowing far downstream in</u>

<u>the protected [Cypress] creek</u>" with "<u>significant</u>" and "<u>unacceptable</u>" impacts.  AR21295

(emphasis added); Notice Of Suspension, AR10886-87 ("Suspension") (emphasis added).[1]

Cypress Creek and its wetlands are an "Outstanding Florida Water" ("OFW") afforded

Florida's "<u>highest protection</u>" and subject to a zero degradation policy.  <u>See</u> Fla. Admin. Code

Ann. r. 62-302.700(9)(i)(14)(c), § 62-302.700(1) (emphasis added); AR8751, AR8535.  They are

a significant tributary to Hillsborough River, Tampa's municipal water supply, <u>see</u> AR6676, and

a home to many bird species including ibis, herons, egrets, cranes, and storks.  <u>See</u> FWS191-192.

The Corps had full notice that CCTC would degrade Cypress Creek.  The CCTC permit

authorized the destruction of one third of the wetlands on the CCTC site, <u>see</u> AR6636-37 (155.46

acres of wetlands, 53.89 acres destroyed), although the Corps itself recognized that the wetlands

---

[1]  The Corps's record is cited as ARX; the Fish and Wildlife Service's record as FWSX.

played a "valuable" role in regulating water flows.  See AR6670.  Likewise, CCTC destroyed a

"high quality buffer" around Cypress Creek, although the Corps found that impacts to the buffer

were a "paramount concern" because it protected Cypress Creek through "sediment removal and

erosion control [and] moderation of storm water runoff."  AR4602, AR6650.

Moreover, CCTC's environmental impacts are not limited to Cypress Creek and adjacent

wetlands.  A government-designated "<u>critical wildlife linkage</u>" connecting other conservation

lands in the area runs along the southern portion of the site.  See AR6672 (emphasis added).

Biologists have opined that CCTC severs the linkage.  See AR10545, AR10561.

CCTC destroys occupied habitat for federally listed species such as the Eastern Indigo

Snake ("Indigo") and the Wood Stork.  E.g., AR10551, AR6681, infra at 43 n.10.  But neither the

Corps nor Fish and Wildlife Service ("FWS") considered impacts on the Indigo from habitat

loss, and though they reviewed impacts to Wood Stork habitat they failed to determine the full

scope of impacts as the applicant falsely denied observing Wood Storks on site.  E.g., AR5562.

The public vigorously opposed the permit's impacts, urging that an EIS be prepared to

carefully study them as required by the National Environmental Policy Act ("NEPA") for actions

that may have a significant environmental impact.  However, the Corps refused to prepare an

EIS.  Nor did the Corps require the applicant to reduce wetland impacts, or ensure that Cypress

Creek would not be degraded, or that water quality standards would not be violated, as required

by the Clean Water Act ("CWA").  And the Corps also refused to formally consult with FWS to

limit impacts to federally listed species, as required by the Endangered Species Act ("ESA").

Plaintiffs therefore brought this challenge to the CCTC permit when it was issued in

2007.  However, once Plaintiffs moved for summary judgment <u>the Corps suspended the permit</u>

and obtained a voluntary remand and stay of litigation, citing CCTC's massive pollution of Cypress Creek and asserting that its review on remand may moot the case.  See D.E. 41.  During the remand, Plaintiffs submitted voluminous evidence documenting CCTC's significant impacts and repeatedly asked to discuss the permit with the Corps, but the Corps refused to even speak with Plaintiffs.  Then, in August 2009, the Corps issued substantially the same permit, see AR15384, with a Supplemental Environmental Assessment ("EA") implausibly concluding that CCTC did not, and would not, have any significant impacts.  Likewise, the Corps again failed to require that CCTC be reduced in size to avoid wetlands impacts and prevent the degradation of Cypress Creek, and it refused to formally consult with FWS to limit CCTC's impacts to federally listed species.  In short, the Corps did not moot any, let alone all, of the issues in the case.

Plaintiffs therefore continue to press their legal challenge: 1) the Corps violated NEPA, 42 U.S.C. §§ 4321-4370h, by failing to prepare an EIS, and by failing to otherwise take a hard look at the project's adverse impacts and potential alternatives; 2) the Corps violated the CWA, 33 U.S.C. §§ 1251-1387, by failing to require that practicable alternatives to filling wetlands be implemented, and by arbitrarily and capriciously concluding there would be no significant degradation of Cypress Creek and its remaining wetlands, and no violations of state water quality standards; and 3) the Corps and FWS violated the ESA, 16 U.S.C. §§ 1531-1544, by failing to engage in formal section 7 consultation on impacts to listed species and, with respect to the Corps, by causing the unauthorized take of federally listed species.  Accordingly, as discussed below, Plaintiffs seek vacatur and remand of the permits and an injunction requiring restoration

of the site until relevant environmental laws are complied with.[2]

## BACKGROUND

I.   **Statutory And Regulatory Framework**

   A.   **The National Environmental Policy Act**

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. §

1500.1(a). Its purpose is to "insure that environmental information is available to public officials

and citizens before decisions are made and before actions are taken" "to help public officials

make decisions that are based on an understanding of environmental consequences . . . ." Id. §

1500.1(b),(c). As such, meaningful public participation and oversight is "essential" to the NEPA

process, as is facilitating public input. See e.g., id. § 1500.1(b).

There are two sets of NEPA regulations that govern Corps activities: regulations

promulgated by the Council on Environmental Quality ("CEQ"), id. §§ 1500.1-1518.4, and the

Corps's own regulations, 33 C.F.R. §§ 230.1-230.26. NEPA and its implementing regulations

require federal agencies to prepare a "detailed statement" – an EIS – regarding all major federal

actions that "may" significantly affect the environment. 42 U.S.C. § 4332(C); 40 C.F.R. §

1508.3. An EIS must carefully analyze the environmental effects of the action and of possible

alternatives, including a baseline no action alternative. See 42 U.S.C. § 4332; 40 C.F.R. §

6.207(d)(2). In so doing, the agency must consider the direct, indirect, and cumulative

---

[2] Plaintiffs include three non-profit environmental membership organizations, Sierra Club, Clean Water Action and the Gulf Restoration Network, and two individual plaintiffs, Chris Loy and Richard Sommerville. Plaintiffs submitted standing declarations from organizational Plaintiffs and their members when Plaintiffs initially moved for summary judgment. See D.E. 32-8 through 32-12. In the interest of efficiency and judicial economy Plaintiffs refer the Court to the declarations previously submitted rather than refiling the declarations.

4

environmental impacts of its action and of the alternatives to it.  40 C.F.R. §§ 1502, 1508.8.[3]

NEPA establishes ten criteria for determining whether an impact is significant, including impacts on listed species and on areas in proximity to wetlands and other ecologically critical areas.  Id. § 1508.27(b).  An action is also significant if it violates environmental laws, if its effects are "likely to be highly controversial," if it "may establish a precedent for future actions," or if it leads to or is "related to other actions with  . . . cumulatively significant impacts."  Id.

An agency uncertain whether to prepare an EIS may prepare an EA to assist in evaluating whether an action may have a significant environmental effect.  Id. § 1508.9.  The EA must include "discussions of the need for the proposal, of alternatives," and of their direct, indirect, and cumulative environmental impacts with "sufficient evidence and analysis" to support a determination to prepare an EIS or a "finding of no significant impact" ("FONSI").  Id.

### B.    The Clean Water Act

The CWA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  It prohibits discharging any pollutant – including "dredged spoil," rock, and sand – into waters of the United States, including wetlands, without a permit.  Id. §§ 1311(a), 1362(6).  Section 404 grants the Corps authority to issue permits for the discharge of "dredged or fill material," id. § 1344, but the Corps must comply with two sets of implementing regulations: the Environmental Protection Agency's ("EPA's")

---

[3]  "Direct effects" "are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  "Indirect effects" "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  Id. § 1508.8(b).  The "[c]umulative impact" is the impact "which results from the incremental impact . . . added to other past, present, and reasonably foreseeable future actions" regardless of who undertakes the actions, and "can result from individually minor but collectively significant actions" over time.  Id. § 1508.7.

"404 Guidelines," see 40 C.F.R. §§ 230.1-230.98, and the Corps' own regulations.  See 33 C.F.R. §§ 320.1-330.6.  There should be no discharge into wetlands "unless it can be demonstrated [the] discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities."  40 C.F.R. § 230.1(c).

To this end, the 404 Guidelines establish strict prohibitions to filling wetlands.  See id. §§ 230.10, 230.12.  First, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem."  Id. § 230.10(a).  An "alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  Id. § 230.10(a)(2); accord id. § 230.3(q).  If an activity is not "water dependent" – if it does not require access to a wetland for its basic purpose, such as a marina – there is a strong presumption there are practicable, less damaging alternatives, and the permit must be denied "unless clearly demonstrated otherwise" by the applicant.  Id. § 230.10(a)(3).

Second, the 404 Guidelines prohibit discharges "which will cause or contribute to significant degradation of the waters of the United States."  Id. § 230.10(c).  In this regard, the Corps's analysis must consider, for example, the collective effects of discharges on "human health or welfare . . . municipal water supplies . . . fish . . . wildlife," wetlands, and the "loss of fish and wildlife habitat or loss of the capacity . . . to assimilate nutrients [or] purify water."  Id.

Even if there are no practicable alternatives for a proposed project, the 404 Guidelines still prohibit the discharges "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  Id. § 230.10(d).  "[A]ll reasonable reduction in impacts [must] be obtained."  Guidelines for Specification of

6

Disposal Sites, 45 Fed. Reg. 85,336, 85,344 (Dec. 24, 1980) ("1980 Notice").

The second set of governing regulations – the Corps's regulations – provide that "[n]o permit will be granted which involves the alteration of [important] wetlands" unless the Corps finds in its "public interest review" that "the benefits . . . outweigh the damage" and the "alteration" is necessary to realize the benefits.  33 C.F.R. § 320.4(a), (b).  The Corps must consider all relevant factors and cumulative effects.  Id. § 320.4(a)(1).  The regulations provide eight criteria to evaluate the public interest, including impacts on: "drainage characteristics, [or] sedimentation patterns;" storm water storage; "prime natural recharge areas;" "minimum baseflows important to aquatic resources;" and "water purification functions."  Id. § 320.4(b)(2).

## C.   The Endangered Species Act

Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ."  16 U.S.C. § 1531(b).  To achieve this purpose, the ESA imposes duties on the Secretary of the Interior, which have been delegated to FWS.  50 C.F.R. § 402.01(b).

The ESA affords protections to species listed as "endangered" or "threatened" ("listed species").  16 U.S.C. §§ 1532(6), (16), (20).  For example, section 9 and implementing regulations proscribe the "take" of listed species, id. § 1538(a)(1); see also, 50 C.F.R. §§ 17.21, 17.31, which is defined to include "harass[ing]" and "harm[ing]" a species.  16 U.S.C. § 1532(19).  In turn, "harm" may encompass "significant habitat modification."  50 C.F.R. § 17.3.

Section 7 of the ESA mandates that each federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized  . . . by such agency  . . . is

7

not likely to jeopardize the continued existence of any endangered species or threatened species." Id. § 1536(a)(2).  Under section 7's implementing regulations, each federal agency must review its actions and determine if they "may affect" a listed species.  50 C.F.R. § 402.14(a).  If an action "may affect" a listed species, the agency must engage in "formal consultation" with the FWS, unless the FWS "concur[s]" in writing that the "action is not likely to adversely affect any listed species."  Id. at § 402.14(b).

Formal consultation requires a full evaluation of impacts to listed species, including the status of the listed species and "the effects of the action and cumulative effects" on the species. Id. § 402.14(g)(2)-(4).  It concludes with the Service's biological opinion "detailing how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and whether the Service believes the action is "likely to jeopardize the continued existence of a listed species."  50 C.F.R. § 402.14(h)(3).  If an action is unlikely to jeopardize a species, but will result in any take of a species, the Service must issue an Incidental Take Statement ("ITS") identifying the anticipated impact to the species, "reasonable and prudent measures" to minimize such impact, and mandatory "terms and conditions" to implement such measures.  16 U.S.C. § 1536(b)(4).  If the action is likely to jeopardize a listed species, the Service must specify "reasonable and prudent alternatives" to insure jeopardy is not likely to occur.  Id. § 1536(b)(3)(A).

## II.   Facts Giving Rise To Plaintiffs' Claims

### A.   The CCTC Site

CCTC will be constructed in an area that government agencies have officially recognized as environmentally "outstanding" and "critical" to wildlife.  AR6650, 6672.  It will be built on the banks of beautiful Cypress Creek, which forms the southern border of the site and has clear

black water that gives rise to majestic Cypress trees.  See FWS500-510 (photographs).  Cypress Creek is a major tributary to the Hillsborough River, which is "the major source of drinking water for the City of Tampa."  EA, AR6676.  As noted, Florida has designated the creek and its wetlands an "Outstanding Florida Water" to recognize its high value and protect it.  Fla. Admin. Code Ann. r. 62-302.700(9)(i)(14)(c); see also AR6650, AR6676.

Approximately one third of the pre-CCTC site, or 155 acres, are wetlands which form part of a natural "wetland system" including "a network of freshwater wetlands adjacent to Cypress Creek" comprised of cypress swamp, mixed wetland forests, freshwater marshes, wet prairies and small ponds  AR6636, AR6497 (map).  As part of an interconnected riparian wetlands system, the wetlands provide "valuable storage areas for storm and flood waters" and "water purification functions," among others.  AR6636, AR6670.

CCTC's uplands, which consist of pastureland, wooded lands and expanses of scrubby areas, see FWS 511-12 (photos), also play an important part in Cypress Creek's hydrological regime.  AR10664.  For example, CCTC uplands, together with wetlands, provide a "high quality buffer" hundreds of feet wide that protects Cypress Creek.  E.g., AR3975, AR4602, AR6650.  As such, they provide "sediment removal and erosion control, excess nutrient and metal removal [and] moderation of storm water runoff" among other functions.  AR6650.  The uplands also allow rainfall to infiltrate the soil, reducing and slowing surface runoff from the site: rainfall that infiltrates uplands is filtered and mixed with the groundwater flow at the site and can eventually discharge to Cypress Creek to become the Creek's baseflow.  AR10664-67.

Cypress Creek's wetlands and uplands also provide important wildlife habitat for a number of species.  EA, AR6669.  For example, Wood Storks, listed as endangered under the

ESA, and many other species of birds including tricolored herons, little blue herons, and white

ibis have been observed foraging in the wetlands.  FWS191-192, 196.  CCTC's wetlands are also

within the core foraging area of five breeding colonies of Wood Storks.  AR6681, AR3093.

Meanwhile, CCTC's uplands along the southern part of the site, where the soils are sandy

and well drained (known as "xeric" or dry soils), and the vegetation scrubby and wooded in

places, supported over twenty Gopher Tortoises and sixty-six of their burrows.  See AR10529,

FWS511-12 (photos), FWS191-92, 195, 201 (map).  Gopher tortoise burrows provide highly

important shelter for the federally threatened Indigo, and are a prime indicator of Indigo habitat.

FWS2586, AR3093.  The applicant's own biologists concluded Indigos "occur on site or have a

reasonably high probability of occurring," FWS191, and on remand Plaintiffs submitted a sworn

declaration documenting that an Indigo was observed on site in May 2007.  See AR10522.

Moreover, the federally threatened Florida Scrub Jay shares habitat with the Indigo and also has

habitat on site.  See e.g., FWS2633, FWS2639, AR10559-60.

In addition, CCTC's uplands and wetlands support a government designated "critical

wildlife linkage" hundreds of feet wide that traverses the southern portion of the site. AR6672;

see also AR10586, AR15944.  The "critical" corridor provides the connecting passageway for

wildlife moving between important conservation lands in the area.  AR6672.  Even as

pastureland the site was considered a "bottleneck" for wildlife moving between the lands.  Id.

**B.**     **The CCTC Permit And CCTC's Environmental Impacts**

The Corps first issued the CCTC permit in May 2007.  See AR6478-90.  The permit

authorized the construction of a new town center, complete with a main street "regional mall"

and a power center with "supporting commercial enterprises, including retail businesses,

10

financial institutions, hotels, restaurants, cinemas, offices and . . . residential housing."  AR6637.
As one official described it, CCTC would be a "truly large" project, AR10889, with over
2,000,000 square feet ("SF") of retail and commercial space, including department stores, big
box stores, banks, gas stations, and a cinema.  AR3964-65.  It will have 700 hotel rooms; there
will be over 600 residences; and it will include almost half a million SF of office buildings.
AR3968-69.  To give some perspective to these numbers, CCTC will provide parking for over
14,000 cars at a time.  AR3972-73.  Aerial photos demonstrate its sheer enormity.  AR10224-28.

      The massive size of CCTC ensures extensive impacts to the sensitive environmental
features on and around the site.  One out of three acres of wetlands on site – over fifty acres – and
almost ten acres of surface waters will be destroyed outright, nearly half to provide for the 14,000
+ parking spaces.  AR6636-37 (53.89 of the 155.46 acres of wetlands on site will be filled),
AR6646.  CCTC therefore destroys not only the natural ability of those wetlands to regulate and
purify runoff, but also to support wildlife habitat, including the Wood Stork.  See AR6681.

      CCTC's impacts on the uplands are no less severe.  Parking for 14,000 cars creates
massive expanses of impervious surfaces that reduce the infiltration of rainfall into the ground,
increasing polluted runoff generated by the site.  See AR10667.  The "high quality buffer"
protecting Cypress Creek will be reduced 300-500 feet to a mere fifty feet, while the buffers
protecting the remaining wetlands will average only 25 feet, and be zero in some places.
AR4602, AR6650, AR3975, AR4667 (retaining walls abutting wetlands).  The Corps itself
considered impacts to the upland buffer a "paramount concern."  AR6650.  The "critical wildlife
linkage" will be reduced from the hundreds of feet of upland buffer along the creek to the
residual 50 foot buffer, with the Corps relying on artificial storm water ponds to substitute for

habitat destroyed.  See AR6672.  And CCTC will destroy Indigo and Scrub Jay habitat when

habitat loss is the species' principal threat.  See e.g., AR10541, 42-46, 51, 55-62.

Detention ponds full of polluted runoff will be placed immediately on Cypress Creek's

banks, where the protective buffer existed, AR6650, and where the ponds will seep pollution into

the Creek.  See AR10667-69.  Meanwhile, CCTC will, and already has, used the Creek and its

wetlands as a "drain[]" for CCTC's runoff.  See AR6676-77, AR6685, AR10668.

### C.    The Building Boom Around The CCTC Site And Pasco County Generally

Compounding these impacts is that CCTC is not an isolated development.  To the

contrary, CCTC is one part of what has been a massive building boom in the area.  For years

Pasco County has been a "bedroom" community with commuters traveling south to Tampa.  See

AR6669.  Until CCTC, the CCTC site itself was part pasture.  AR 6674, 81.  In recent years,

however, the Pasco County area began experiencing "unprecedented" and "dramatic increases" in

growth.  See AR3964.  Commercial development has been rapid, particularly around the CCTC

site.  See e.g., AR4378-79.  Matching expansions of roadways have followed, in and around the

CCTC site, to service such development, including CCTC.  E.g., AR3408-09, AR5711,

AR5943.[4]

---

[4]   Development in and around CCTC includes, for example: 1) "Wiregrass," a 5,000 acre
commercial and residential development with 750,000 SF of retail space, just two miles from
CCTC, AR6433, AR4389-91; 2) "The Grove," a 120 acre mall with 800,000 SF of retail space
just four miles from CCTC, AR4398, AR6422, AR6427; 3) "Cypress Creek Development," a
400 acre commercial development under a mile from CCTC, AR6425, AR5542; and 4) "King
Ranch," a 300+ acre development immediately across Cypress Creek from CCTC, AR6685.  See
also e.g., AR5738-41, 5756-57, 5924-25.  Roadways that have expanded to service CCTC and
the other new and proposed development in the area include State Road 56, which was
constructed across the CCTC site and which now connects the site to I-75.  See e.g., AR3408-09,
AR6636, AR10042-43.  Initially I-75, the major north/south artery running to Tampa, had formed
the site's eastern border and passed the CCTC site by with no exit.  State Road 56 is now being

There is a similar expansion in demand for water in "a region where demand is expected to exceed" traditional sources within twenty years.  AR2328.  Tampa is already "caught between the demands of water customers and the need to keep enough fresh water flowing to support wildlife."  Is Tampa's Proposal A Risky One For River?, *St. Petersburg Times*, AR3496. Overpumping has already lowered Cypress Creek's flows and dried its wetlands.  AR6223-26.

### D.  The Corps's Review Of CCTC's Environmental Impacts

When the Corps issued the CCTC permit in 2007 the Corps had full advance notice of CCTC's potential impacts.  Government agencies and the public alike warned that CCTC would significantly degrade Cypress Creek.  See e.g., AR3329, AR3136-41, AR4295-96, AR3504.  The Corps said it had not "seen this level of public interest" concerning a project in years.  AR10889. The concerns raised by Plaintiff Sierra Club's comments were typical.  The Sierra Club objected to CCTC's impacts on Cypress Creek's wetlands and buffer; it was concerned the impacts would degrade Cypress Creek and drinking water supplies and harm wildlife; and it argued that the impacts were unnecessary and avoidable if CCTC's size were reduced.  AR3345-3370.

Nonetheless, the Corps assured the public that CCTC would not have significant environmental effects nor degrade Cypress Creek and it issued the CCTC permit.  See AR6687, AR6685.  By its own later admission, the Corps had "relied heavily" upon the applicant's assurances that CCTC would have no significant impacts, Suspension, AR10886, and thus the Corps never prepared an EIS to carefully analyze CCTC's impacts.  Likewise, the Corps did not require that CCTC's size be reduced because the applicant asserted that reducing CCTC's size

---

widened, see AR6681, AR5920, and an elevated highway interchange is being constructed in the center of the CCTC site.  See AR10043.  State Road/County Road 54, another arterial roadway, will be extended south across the site, bisecting it and creating the "last link" of a new north-south roadway to provide a "parallel facility" to I-75.  AR2333, AR6681.

would reduce its profit and preclude financing.  EA, AR6648-50.

Within two months of permit issuance, however, CCTC was having precisely the types of environmental impacts that the Corps said would <u>not</u> occur, sending huge amounts of "turbid, silt-laden water" into Cypress Creek.  <u>See</u> AR21295.  The Corps repeatedly demanded that the discharges stop, <u>see</u> <u>e.g.</u>, AR8783, and the applicant repeatedly assured the Corps and other governmental agencies the issue was under control and there would be no further discharges.  <u>See</u> <u>e.g.</u>, AR6773 (September 2007); AR7013 (February 2008), AR8266 (March 2008).  Yet the applicant could not prevent the discharges and CCTC polluted Cypress Creek and its wetlands off and on from at least June 2007 until mid-April 2008.  <u>See</u> Colson Decl. AR10524 (June-Sept. 2007); Pasco County, South Florida Water Management District ("SWFWMD"), and Corps violation notices, AR10867-10888, AR15841-58 (July - Oct., 2007, Jan., Feb., April 2008).

In the meantime, Plaintiffs asserted this challenge to the CCTC permit, explaining that the CCTC permit would inevitably degrade Cypress Creek and its remaining wetlands.  <u>See</u> <u>e.g.</u>, Complaint, D.E. 1.  Moreover, Plaintiffs asserted that wetlands destruction was unnecessary and unlawful; that the Corps and FWS were required to formally consult on impacts to federally listed species, and that at bare minimum an EIS had to be prepared.  <u>See</u> <u>id.</u>

Although Plaintiffs moved for summary judgment, D.E. 32, the Corps never opposed it. Instead, eight months after the discharges began – and only after Plaintiffs filed their extensive summary judgment papers – the Corps suspended the permit.  According to the agency, it was finally "<u>clear to the Corps</u>" that the applicant had provided false assurances that CCTC would "<u>meet [Clean Water Act] 404(b)(1) guidelines</u>" and would not "<u>impose significant, unacceptable impacts to wetlands and water quality.</u>"  Suspension, AR10886-87 (emphasis added).

14

Nonetheless, discharges continued for several more months, see e.g., AR8783, until the site was seeded with grass and work largely stopped.  See e.g., AR10252, AR10255-56.

The Corps sought a voluntary remand and a stay of all litigation, advising the Court that it might initiate "additional review under [NEPA] . . .  or further consultation under the ESA," D.E. 49 at 5, and that "some or all of Plaintiffs' claims in this lawsuit may be rendered moot."  D.E. 41 at 3.  The Court granted the remand and stay, noting that the Corps "may conduct additional environmental review pursuant to the [ESA] or NEPA" as well as the CWA.  D.E. 59 at 6.

During the remand Plaintiffs repeatedly submitted information to the agencies concerning CCTC's myriad impacts and means to reduce them.  See e.g., AR10282-10684 (July 2008), AR10855-AR10910 (August 2008), AR17794-AR17801 (October 2008), AR17831-AR17938 (January 2009), AR12213-12284 (May 2009), AR21282- 21313 (August 2009).  Plaintiffs identified numerous misstatements by the permit applicant, including for example repeated false assurances that Wood Storks were never observed on site.  See e.g., AR10299.

Plaintiffs also submitted detailed declarations from Dr. Mark Rains – a hydrological expert the Corps, the EPA and the Department of Justice have retained, see e.g., AR10684 – who opined that CCTC already has and will continue to have significant adverse impacts on Cypress Creek and its wetlands.  See AR10664, AR10863-64.  Plaintiffs submitted water sampling results from the creek that showed extremely high turbidity levels, see AR10862-63, and Dr. Rains explained what specific types of significant impacts such levels would have.  See AR10860-64.

In addition, Plaintiffs provided the declaration of Dr. Bradley Stith – a Florida Scrub Jay expert that FWS relied upon heavily in developing its official Florida Scrub Jay recovery plan, see AR 2640 – who opined CCTC will adversely affect the Jay and effectively sever the critical

wildlife linkage onsite.  See AR10555-62.  Likewise, Plaintiffs provided the declaration of Dr. C.

Kenneth Dodd – a retired FWS and United States Geological Service ("USGS") biologist that

authored the rule listing the Indigo while at FWS, AR10535 – who opined CCTC will adversely

impact the Indigo by destroying its habitat and severing the wildlife linkage.  See AR10546-51.

Plaintiffs also submitted a detailed declaration from Joseph Magdziarz, who has worked

in and taught real estate financing for the commercial real estate industry for over thirty years,

AR10685, who demonstrated why the applicant's assertions that CCTC could not be reduced in

size were specious.  AR10692-93.  In this regard, Plaintiffs also provided the deed for the CCTC

land that showed the applicant bought the CCTC land for only $4 million, as shown in the hand

written tax stamp on the deed, see AR10707, not $72 million as the applicant implied.  And, as

Mr. Magdziarz explained, if one uses the actual cost of the land, the applicant's own feasibility

calculations show that CCTC's size and wetlands impacts can be greatly reduced.  AR10702-03.

Despite Plaintiffs' repeated requests to discuss this information and the CCTC permit

with the Corps, the Corps flatly refused and showed no interest in conferring with Plaintiffs'

experts.  See e.g., AR17832, AR12218, AR21284.  Plaintiffs were relegated to filing a FOIA

request just to learn what information could be useful to the Corps.  See AR12218

In stark contrast the Corps met repeatedly with Intervening Defendants and even shared

the names and addresses of Plaintiffs' members so Intervening Defendants could send

intimidating letters "correct[ing]" alleged "misstatements."  AR18332-34.  Moreover, despite

Intervening Defendants' demonstrably false assurances throughout the permitting process, the

Corps again relied upon them heavily in determining CCTC had no, and would have no,

significant impacts, and that its impacts could not be reduced.  See, AR15341, 45-50, 61-62.

16

On August 31, 2009, the Corps issued a new, modified CCTC permit with a Supplemental EA.  See AR15382, AR15340.  The Corps still failed to require a reduction in CCTC's size and its impacts on wetlands and buffers.  It did not meaningfully address CCTC's impacts on wildlife habitat.  And, perhaps most stunningly, the Corps still purported to conclude there was no way CCTC did or would have a significant impact, and thus it refused to prepare an EIS.  See AR15368.  Instead, the Corps issued essentially the same permit as before.[5]

**ARGUMENT**

**I.      Standard Of Review**

This action is brought under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA.  5 U.S.C. § 706.  Like APA challenges to the implementation of the CWA and NEPA, courts in this circuit review the implementation of the ESA in accordance with APA standards of review.  See Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678 (D.C. Cir. 1982).  Thus, the Court must "set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

The Court must conduct a "thorough, probing, in-depth review" of the administrative record.  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971).  Ultimately, the Court must determine if the agency considered the "'relevant factors'," "examine[d] the relevant data and articulate[d] a satisfactory explanation . . . including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citations omitted).

---

[5]  At the present time the record indicates that the applicant has done considerable land clearing and grading of the site and has constructed the storm water management system, although with the exception of one foundation it appears no buildings have been constructed.

17

II.     **The Corps Violated NEPA By Failing To Prepare An EIS And By Otherwise Failing To Take A Hard Look At The Impacts Of Constructing And Operating CCTC**

Under NEPA, if "*any* significant environmental impact <u>might</u> result" from an agency's actions, the agency is required by NEPA and its implementing regulations to prepare an EIS to examine the impacts.  <u>Grand Canyon Trust</u>, 290 F.3d at 340 (italics in original, underline added).  The requirement that an agency prepare an EIS is fundamental to NEPA's primary objectives of ensuring that the government and the public are aware of the environmental consequences of an agency's proposed action.  <u>Dep't of Transp. v. Pub. Citizen</u>, 541 U.S. 752, 756, 768-69 (2004).

In the alternative, NEPA authorizes an agency to prepare an EA to determine whether impacts are significant enough to warrant an EIS.  <u>See</u> 40 C.F.R. § 1508.9.  A court must set aside an EA if the agency failed to (a) "'accurately identif[y] the relevant environmental concern;'" (b) take a "hard look" at the concern; (c) make "'a convincing case for its finding'" there is no significant impact; and (d) "'sufficiently reduce the impact'" if it would be significant.  <u>Town of Cave Creek v. FAA</u>, 325 F.3d 320, 327 (D.C. Cir. 2003) (internal citation omitted).

A.      **An EIS Should Have Been Prepared**

This case graphically illustrates why Congress required agencies to analyze potentially significant environmental impacts in an EIS before they act.  It is now abundantly clear that the CCTC permit has already had, and will have, significant environmental impacts, and that an EIS should have been prepared.  <u>The Corps itself suspended the CCTC permit for over a year and a half and imposed a substantial penalty on the applicant precisely because of the adverse environmental impacts that CCTC has already had.</u>  It is difficult to fathom, therefore, how the Corps could now defend the position that an EIS is not even required.

Indeed, the criteria enumerated in NEPA's regulations for evaluating the significance of

18

environmental impacts confirm that the Corps must prepare an EIS.  See 40 C.F.R. § 1508.27(b).

CCTC satisfies at least six of the criteria when meeting just one warrants preparation of an EIS.

See Nat'l Parks & Conservation Ass'n v. Babbitt, ("NPCA"), 241 F.3d 723, 731 (9th Cir. 2001);

Fund For Animals v. Norton, 281 F. Supp. 2d 209, 235 (D.D.C. 2003) ("one or more significance

factors can justify setting aside a FONSI"); 40 C.F.R. § 1508.27.

    First, an EIS should have been prepared because CCTC will be built in "close proximity

to" – in fact, within – an area with "[u]nique characteristics" such as "park lands, prime

farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."  40 C.F.R. §

1508.27(b)(3).  CCTC already has and will degrade these unique characteristics.

    Again, the project's very namesake – Cypress Creek – and its wetlands are a government-

designated "Outstanding Florida Water" precisely because their unique "natural attributes" make

them "worthy of special protection."  Fla. Admin. Code Ann. r. 62-302.700(9)(i)(14)(c); Fla.

Stat. § 403.061(27).  Most remaining OFWs exist only in protected conservation lands, see

http://www.dep.state.fl.us/water/wqssp/ofw.htm and they are subject to a zero degradation

policy.  See Fla. Admin. Code Ann. r. 62-302.700(1), AR8751, AR8535.  The wetlands are used

by migratory birds of many species, including the Wood Stork, Snowy Egrets, Tricolored

Herons, Little Blue Herons, and White Ibis.  FWS191-192, 196.  All are Florida Species of

Special Concern and are also protected by the Migratory Bird Treaty Act.  See 50 C.F.R. § 10.13.

    The fact that the CCTC permit authorizes such extensive bulldozing of wetlands, see

AR6636-7, raises great risks to Cypress Creek.  Not only are Cypress Creek's wetlands OFWs

and important in their own right, but the Corps itself found that such wetlands provide "valuable

storage areas for storm and flood waters" and "water purification" services – functions that protect Cypress Creek.  AR6670 (emphasis added); AR10664-67.

Similarly, the "high quality buffer to Cypress Creek" will be "eliminat[ed]" to allow the construction of storm ponds that will "reduce the existing buffer by 300 - 500 feet resulting in a buffer width of only 50 feet in most areas." AR3975, AR4602 (emphasis added).  Again, the Corps determined that the buffer "provides a high [protective] function" for the Creek through "sediment removal and erosion control . . . [and] moderation of storm water runoff." AR3975 (emphasis added).  The Corps viewed impacts to the buffer as a "paramount concern" given the "proximity and scale" of CCTC, but it acquiesced to the 50 foot sliver of buffer to allow room for artificial ponds of polluted runoff.  AR6650.  Compounding the threat, the Corps authorized the use of remaining wetlands, and Cypress Creek itself, as a "drain[]" for CCTC, AR6676-67, although the Corps expressed "great concern" about water quality impacts on such OFWs.  Id.

The consequences of removing the environment's natural "valuable storage areas for storm and flood waters," AR6670; its natural ability to "moderat[e] . . . storm water runoff," AR6650; and its natural ability to "remov[e]" "sediment," "control" "erosion," and "purif[y]" "water," AR6650, 70, is an increase in surges of runoff with high levels of eroded sediment – i.e., massive discharges of highly turbid runoff, which is exactly what occurred at CCTC following permit issuance.  As Dr. Rains, an expert hydrologist has explained in a declaration, wetlands, upland buffers and Cypress Creek "are parts of an integrated hydrological and ecological system:" "[n]either can function properly if one of the others is impaired." AR10664.  Under natural conditions, rainfall infiltrates the ground to mix with and form part of the groundwater: its speed is slowed and it is filtered before reaching Cypress Creek.  See AR10664-65.

20

However, as Dr. Rains explained, CCTC undermines the site's ability to perform these functions, leading to an "increase [in] the magnitude of stormflows off the CCTC site and [a] decrease [in] the quality of water flowing off the CCTC site." AR10667.  The result: "<u>clouds of turbid, silt-laden water billowing far downstream in the protected creek</u>" that the Corps itself described and found sufficiently serious to suspend the permit.  AR21295.  Photographs and videos document CCTC pollution.  <u>See</u> AR10865-66, AR21755-61, http://www.youtube.com/watch?v=RD7DOWLdYVw&feature=related[6]

To be sure, CCTC's discharges had a significant negative impact on Cypress Creek's water quality.  Water samples from Cypress Creek showed turbidity levels of 100 "NTUs" and higher, <u>fifty times the ambient level of the creek</u>, which at the time was 1.9 and 2.0 NTUs.  AR10863; <u>see also</u> AR10524.[7]  CCTC's discharges, and the resulting high turbidity, existed over prolonged periods of time: Plaintiffs provided a declaration from a Sierra Club member that visited the site over seven times between June and September 2007 and witnessed discharges on almost every visit.  AR15624.  Lead and copper levels that exceed water quality standards were also found in the stormwater ponds and wetlands tested.  AR15361, AR18846, AR18695.

Further, CCTC's discharges have already had very real and significant biological and ecological effects.  As Dr. Rains explained, given the level and duration of turbidity, the discharges would "smother stream-bed and bank habitats," "burying and suffocating eggs and newly hatched organisms," and it would "damage gill structures, thereby decreasing resistance to

---

[6]  Videos, stored on the youtube site, were cited in the record, and the parties agreed not to object to citing the videos on youtube.

[7]  NTU is the standard measurement unit of turbidity and is an abbreviation of "Nephelometric Turbidity Units."  AR10860.

disease, preventing proper egg and larval development, and interfering with particle feeding activities." AR10860. An eyewitness documented silt "cover[ing] the Creek, its banks and surrounding wetlands," and dead aquatic life, including frogs, in highly turbid areas. AR10524. Silt that blanketed wetlands had to be manually removed – shoveled out. See e.g., AR10853. In short, CCTC has and will continue to cause "significant environmental impact[s]" and interfere with the "feeding, reproduction and growth" of aquatic organisms. AR10863-64. Dr. Rain's opinion is corroborated even by basic text-book level diagrams of the relationship between turbidity and aquatic impacts, see AR10861, which the Corps never meaningfully addressed.

CCTC's discharges violated federal, state and local environmental laws, see AR10258-66, AR9961-69, which is a second CEQ significance criteria indicating that an EIS must be prepared. See 40 C.F.R. § 1508.27(b)(10) ("the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment"). Again, Florida law prohibits any degradation of OFWs. See AR8751, AR8535. Pasco County stated it issued over 23 notices of violations. See AR8764; see also AR10872-81. SWFWMD likewise issued numerous notices of violations and a $41,000 fine, see e.g., AR15841-58, as did the Florida Department of Environmental Protection. See AR15577-78. The Corps itself concluded that CCTC violated state water quality standards, see AR15340, and that it was "clear" the applicant had breached its assurances not to cause "significant" and "unacceptable" "impacts to wetlands and water quality." AR10886-87. The Corps even levied a fine of almost $300,000, AR21295 – which Intervening Defendants' attorney described as "one of the largest" ever assessed under the CWA in Florida's history. AR21310. Clearly all of the agencies considered CCTC's violations

significant and there can be no doubt that the project actually "violat[ed]" several "law[s] or requirements for the protection of the environment." 40 C.F.R. § 1008.27(b)(10).

But again, however, CCTC's impacts are not limited to impacts to water resources.  Even independent of its OFW status, the CCTC site would still be an "ecologically <u>critical</u> area[]," 40 C.F.R. § 1507.28(b)(3) (emphasis added), given the "critical wildlife linkage" that traverses the site and connects other conservation lands in the area.  <u>See</u> AR6672.  According to several leading experts on the affected species, the project will effectively destroy the corridor.  Dr. Bradley Stith has opined that the remaining wildlife corridor "<u>is insufficient to maintain the integrity of the wildlife corridor</u>, certainly with respect to the Florida Scrub-Jay."  AR10561 (emphasis added).  Similarly, Dr. C. Kenneth Dodd opined that the CCTC project "present[s] an almost impossible barrier to wildlife movement, including an Eastern Indigo Snake."  AR 10545.  According to Dr. Dodd, the remaining buffer along Cypress Creek "<u>is far too narrow to allow a corridor for all but the most tolerant wildlife species</u> (for example . . . coyotes, raccoons, opossums, armadillos)."  <u>Id.</u> (emphasis added).  At the very least these impacts should be addressed in an EIS.

<u>CCTC's impacts to federally listed species such as the Indigo is yet a third significance criteria warranting preparation of an EIS.</u>  40 C.F.R. § 1508.27(b)(9) ("degree to which the action may adversely affect an endangered or threatened species").  In destroying a flourishing gopher tortoise colony, severing the critical wildlife linkage, and introducing thousands of cars to the site, CCTC will fragment and destroy occupied Indigo habitat and increase the risk of road mortality – the principal threats to the species' survival.  <u>See</u> Dodd. Decl., AR10551, AR10545-

46.  CCTC will also destroy Florida Scrub Jay habitat, harming the Jay, Stith Decl., AR10559-62, as well as occupied Wood Stork habitat.  See AR6681, infra at 43 & n.10.

The fourth significance criteria implicated by the CCTC project is the "degree to which the action may establish a precedent."  See 40 C.F.R. 1508.27(b)(6).  Although finding that the developer was responsible for sending "clouds" of polluted water "billowing far downstream" for months on end, AR21295, the Corps has now rewarded the applicant by reissuing the CCTC permit with no significant revisions – despite the fact that Florida law affords the Cypress Creek OFW system the "highest protection" of all of Florida's waters.  In addition to that terrible precedent, according to Pasco County's biologist, Robert Tietz, AR 9961, other developers are now seeking "to shrink the rest of [the critical wildlife linkage]" given that "the Corps . . . effectively reduced the corridor width to less than 400 feet [when it] [w]as supposed to be 550'.  I hate things that look like precedents!"  AR15944 (emphasis added).   It is precisely where a project may serve as a model for future projects that an EIS is warranted under NEPA.  See Anderson v. Evans, 371 F.3d 475, 479 (9th Cir. 2004); Natural Res. Def. Council v. Dept of Energy, No. C-04-0448 SC, 2007 WL 1302498, *22 (N.D. Cal. May 2, 2007).

Finally, the project satisfies two other CEQ significance criteria because it is "highly controversial" within the meaning of NEPA, and the full scope and degree of its impacts are "highly uncertain."  40 C.F.R. § 1508.27(4), (5) (EIS warranted if action is "highly controversial" and impacts "highly uncertain").  As discussed above, well qualified experts have submitted detailed declarations documenting the types and degree of the significant environmental impacts that CCTC will have on federally listed species, on the wildlife linkage, and on the Cypress Creek OFW system.  Yet the Corps essentially ignored their statements and provided little or no

24

reasoning to support the Corps's and FWS's own conclusions to the contrary.  And where

scientists disagree upon the impacts of a project, the project is controversial and its effects

uncertain within the meaning of NEPA, warranting preparation of an EIS.  See e.g., Anderson v.

Evans, 371 F.3d 475, 489-93 (9th Cir. 2002).

Moreover, in this case, there is substantial public opposition to CCTC's environmental

impacts.  Courts have found that such an "outpouring of public protest" against a project is

relevant to the need to prepare an EIS.  See NPCA v. Babbitt, 241 F.3d at 736 & n.16.  Even

before the discharges the *Tampa Tribune* editorialized that "the Corps' failure to recognize the

vital link between wetlands and drinking water supplies is appalling," and that the Corps was

"gambl[ing] with Cypress Creek, an [OFW] that feeds the Hillsborough River, a primary source

of Tampa's drinking water."  AR10894.  Numerous articles covered CCTC's pollution of

Cypress Creek, AR10895-910, and editorials condemned the Corps's failure to protect Cypress

Creek, see e.g., AR10905, AR10910.  Public entities such as the City of Tampa complained that

the "precious water supply [is] . . . being degraded by illegal pollution" and protested the "time

lapse" between the discharges and the Corps's "visitation and oversight."  AR6770.  The Corps's

repeated reliance on "assurances by developers" to protect the environment was lambasted in the

press as a "fox-guarding-the- henhouse approach [that is] making a mockery of a process that is

supposed to guard against polluting Cypress Creek."  AR10910 (emphasis added).  Public

sentiment was summarized by a *Tampa Tribune* editorial in August 2009: the "Corps should

require the developers to reduce the project's footprint:" "if the builders won't cooperate, then

the Corps should yank the permit that should never have been given this venture."  AR21495.

In this case, the Corps's duty to prepare an EIS could hardly have been clearer.  CCTC not only meets numerous CEQ significance criteria, but it has already harmed the environment in the manner that warrants scrutiny in an EIS.

**B.     The Corps Prepared A Legally Insufficient EA That Failed To Analyze Cumulative Impacts**

Even if the Corps were not required to prepare an EIS, the EA is inadequate because the Corps failed to meaningfully analyze CCTC's environmental impacts and provide information and reasoning sufficient to support a FONSI.  See 40 C.F.R. §1508.9.  As this Court explained in Sierra Club v. Watkins, an EA serves several important purposes, including "explain[ing] how the agency reached [its] conclusion," aiding decision making, and "disclos[ing] . . . information, both to the governmental decision maker and to the public."  808 F.Supp 852, 859, 870 (D.D.C. 1991) (Lambert, J.).  The Corps must take a "hard look" at the CCTC permit and make "a convincing case" there is no significant impact.  Town of Cave Creek, 325 F.3d at 327.

In this case, the Corps never gave CCTC's impacts a hard look, nor did it make a convincing case that the impacts were not significant.  For example, although, as discussed above, two experts have now opined that CCTC will sever the critical wildlife linkage, see AR10561, AR10545-46, the Corps never made a convincing case that the "integrity" of the critical linkage would be preserved: it never even identified the species that use the corridor nor the habitat they need in a corridor.  See AR6672.  Yet an agency must carefully examine impacts to a wildlife corridor in an EA or its FONSI must be rejected.  See Envtl. Prot. Info. Ctr. v. Blackwell, 389 F. Supp. 2d 1174, 1195-97 (N.D. Cal. 2004).  Similarly, neither the Corps nor FWS even discussed CCTC's impacts on the Indigo from habitat loss and road mortality.  See AR6682-83, AR15364-65, FWS6367, FWS 21040.  Nor as discussed further below did they

26

explain their conclusion that there was no Scrub Jay habitat on site, and thus that CCTC would

not impact the species, see id., when the record shows that Jays and Indigos share habitat, that

there was Indigo habitat on site, and that Dr. Stith found Jay habitat on site.  See infra at 42 n.9.

The applicant's cumulative impact analysis fares no better.  AR6686, AR6204-30.  For

example, there was no analysis of the cumulative impacts of development and road expansion on

Indigos.  Yet as the D.C. Circuit explained in Natural Res. Def. Counsel v. Hodel, 865 F.2d 288

(D.C. Cir. 1988), where a species' range exposes it to repeated impacts in different locations, it is

critical to look at the cumulative impact of all of the development together.

Likewise, with respect to water demand, the record indicates that overpumping of the

aquifer has in the past dried out Cypress Creek's wetlands, slowed the flow of Cypress Creek,

and caused subsidence and "treefall." AR6223-26, see also AR3802-04, AR3496-98.  The

applicant assured the Corps that this would not be a problem as the government agencies had

reached an agreement to resolve the issue, id., but the fact is that the aquifer is still being over-

pumped just to meet existing water demand.  See AR12282-83.  Yet the Corps never

meaningfully addressed how the project will affect the aquifer given these cumulative effects.

In short, the record reveals that the Corps was put on notice of the real risks that the

CCTC permit poses to the environment.  But the Corps never reviewed nor provided the Court

with an EA that makes a convincing case that CCTC's impacts will be minor, or that the Corps

has taken a hard look at its impacts.

## III.    The Corps Violated The Clean Water Act

Clean Water Act regulations provide that "the degradation or destruction of . . . wetlands,

is considered to be among the most severe environmental impacts" within the purview of the

CWA.  40 C.F.R. § 230.1(d).  Thus, the "guiding principle should be that degradation or destruction of [wetlands] may represent an irreversible loss of valuable aquatic resources."  Id.

The CWA therefore establishes strict prohibitions against destroying wetlands where there are other "practicable alternatives [that] would have less adverse impact on the aquatic ecosystem."  40 C.F.R. § 230.10(a).  For non-water dependent projects like CCTC, before the Corps can authorize the destruction of wetlands, the applicant must "clearly demonstrate" that wetland impacts cannot be avoided or lessened.  Id. at § 230.10(a)(3); AR6664.  Regulations place "the burden . . . on the Applicant . . .  with independent verification by the COE, to provide detailed, clear and convincing information proving impracticability."  Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1186 (10th Cir. 2002), modified in part 319 F.3d 1207 (10th Cir. 2003) (emphasis added).  Morever, for non-water dependent projects like CCTC there is a "very strong presumption" that wetlands impacts can, in fact, be avoided and/or minimized.  Nw. Bypass Group v. U.S. Army Corps of Eng's, 490 F.Supp.2d 184, 191 (D.N.H. 2007).

In this case the Corps violated the CWA by issuing the CCTC permit when the applicant did not remotely rebut the very strong presumption of practicable alternatives that would have avoided and/or minimized wetlands impacts.  To the contrary, the record shows the applicant could have simply reduced the size of CCTC, or at least reduced the amount of surface parking lots by reducing the number of spaces and/or by building additional parking garages.

The Corps also violated the CWA because it failed to assure the permit would not "cause or contribute to significant degradation" of wetlands and Cypress Creek.  40 C.F.R. § 230.10(c).  Yet a "§ 404(b) permit cannot be issued if [it] will result in significant degradation of the aquatic ecosystem or if there is insufficient information to make a reasonable judgment as to whether the

28

discharge will result in significant degradation."  <u>Utahns for Better Tranp.</u>, 305 F.3d at 1191-92

(emphasis added) (citation omitted); <u>see also</u> 40 C.F.R. §§ 230.10(c), 230.12(a)(3)(ii), (iv).

Similarly, the Corps cannot issue a permit if it will "cause[] or contribute[] . . . to violations of

any applicable State water quality standard," 40 C.F.R. §§ 230.10(b)(1), as CCTC has and will.

> **A.**     **The Corps Failed To Require That Practicable Alternatives That Avoid Or**
> **Minimize The Destruction Of Wetlands Be Undertaken**

Under the 404 Guidelines, "[a]n alternative is practicable if it is available and capable of

being done after taking into consideration <u>cost</u>, existing technology, and logistics in light of

overall project purposes."  40 C.F.R. § 230.10(a)(2) (emphasis added); <u>see also id.</u> § 230.3(q)

(defining "practicable").  In this case, the most obvious alternative for avoiding impacts to

wetlands is simply reducing the size of CCTC: the Corps concluded a mere 5% reduction would

reduce CCTC by nearly 30 acres, AR6649 – almost half the 50 plus acres of wetlands destroyed.

Nonetheless, the Corps determined that reducing the size of CCTC was infeasible

because of "cost," EA, AR6648, as bizarre as it is to conclude that it would cost too much to

build a smaller project.  To this end, the applicant provided the Corps with simple financial

calculations listing the "TOTAL COSTS" of CCTC on one hand, the total "NET RENTAL

INCOME" from the operation of CCTC on the other hand, and the resulting "RETURN ON

COSTS" of CCTC, expressed as a percentage.  <u>E.g.</u>, AR4345.  According to the applicant, unless

CCTC achieved a minimum 8.0% rate of return, it would not be able to attract investors,

rendering it financially unworkable.  <u>See</u> <u>e.g.</u>, AR6649.  For the reasons identified below, it is

practicable to reduce CCTC's size and wetlands impacts, and the applicant has failed to

demonstrate the impracticability of smaller, less damaging versions of CCTC.

### 1. The Applicant's Own Calculations Of Financial Feasibility Demonstrate That CCTC Can Be Reduced In Size

Even if one assumes such a feasibility analysis is legally appropriate, and that an 8.0% rate of return is in fact required – both of which Plaintiffs dispute – the record demonstrates that, according to the applicant's own calculations, CCTC can be reduced in size and still achieve an 8.0% return. First, the single greatest cost in the applicant's calculations is the cost of the CCTC land, which the applicant asserted was $72,837,500. See AR4345. However, that is not the cost of the CCTC land. To the contrary, Plaintiffs obtained the deed for the CCTC land: the applicant paid only $4,317,488 for the land, see AR10707, as reflected in the hand written tax stamp on the deed. This critical fact – which establishes what it actually cost interveners to purchase the CCTC land – is not disputed: interveners refer to it as "the price [the applicant] paid for the land." AR11052; see also Supp. EA, AR15348-49 ("actual purchase price").

The applicant therefore inflated the cost of the CCTC land, and the "TOTAL COSTS" of CCTC in its calculations, by $68,520,012. If one uses the applicant's actual $4,317,488 cost of acquiring the CCTC land, and thus reduces the "NET LAND COSTS" and the "TOTAL COSTS" of building CCTC by over $68 million, numerous alternatives for reducing CCTC's size and avoiding wetland impacts become practicable according to the applicant's own analysis.

For example, the applicant's calculations for CCTC as actually permitted by the Corps show $330,232,820 as the "TOTAL COSTS;" $26,514,005 as the "NET RENTAL INCOME;" and 8.0% as the "RETURN ON COSTS" (which is simply $26,514,005 divided by $330,232,820). AR4345. For the alternative that would reduce CCTC's size by 10%, the applicant's calculations showed $315,150,060 as the "TOTAL COSTS;" $24,076,530 as the "NET RENTAL INCOME;" and 7.64% as the "RETURN ON COSTS" ($24,076,530 divided by

30

$315,150,060).  AR5482.  Because 7.64% is below 8.0%, which according to the applicant is the minimum amount needed to attract investors, this is not financially viable.  See EA, AR6649.

However, if one simply uses the applicant's actual $4,317,488 cost of acquiring the land, the 10% reduction alternative would instead show approximately $246,630,050 as CCTC's "TOTAL COSTS;" $24,076,530 as the "NET RENTAL INCOME;" and 9.76 % as the "RETURN ON COSTS."  Thus, reducing CCTC by 10% – which would significantly reduce the wetlands and other environmental impacts – is now financially feasible.

Although this is evident using elementary math, Plaintiffs also submitted to the Corps the declaration of expert Joseph Magdziarz who explained that, for example, "[u]sing the applicant's calculations and keeping all other values the same but reducing . . . the net land costs by 15%, would render the CCTC Alternative with a 5% reduction in project size financially viable," AR10702, which the Corps found would reduce CCTC by almost 28 acres.  EA, AR6649. Indeed, using the applicant's actual cost of acquiring the CCTC land would "render many alternatives financially feasible."  Magdziarz Decl. at ¶ 35, AR10702-03.[8]

On remand, Plaintiffs informed the Corps that the applicant bought the land for only $4,317,488, rather than the nearly $73 million the applicant and hence the Corps used in the impracticability analyses.  See AR10291.  Nonetheless, the Corps still accepted the $72 million figure because it supposedly represented the "market value" – "the price the Permittee could have sold the project site for" – in 2006.  Supp. EA, AR15349.  But even if that is the case, the market

---

[8]  Mr. Magdziarz has over thirty years experience conducting "financial analyses of prospective commercial development to assist [] clients in underwriting mortgage financing and in determining financial feasibility" with special emphasis on "commercial and industrial properties."  AR10686.  He holds numerous esteemed positions in the field, and teaches such financial analyses at the pre-eminent institute in the field, the Appraisal Institute.  AR10686-87.

value of the applicant's land is entirely immaterial to the applicant's calculations of CCTC's

costs, its resulting rate of return, and hence the ability to reduce CCTC's size and environmental

impact.  In other words, even if it were true that the applicant <u>could</u> have sold the land for $72

million, that does <u>not</u> mean that a less environmentally destructive project is not "practicable"

within the meaning of the CWA implementing regulations.  40 C.F.R. § 230.10(a).  Indeed,

although the applicant's actual "costs" are delineated in the regulation, the purported market

value of assets is no where mentioned in the regulations, and for good reason: it has nothing to

do with whether an applicant could avoid destroying wetlands and still construct a project.

Second, even if one were to accept the Corps's use of the supposed market value of the

CCTC land as opposed to its actual cost, the Corps was required to at least consider its market

value <u>as of 2009.</u>  That was when the Corps made its decision to issue the modified permit, and it

was also the time when the Corps explicitly determined that no less damaging alternatives to

CCTC existed, and issued a finding of no significant impact.  See <u>e.g.</u>, AR15382, 15345-49, 68.

In this regard, Plaintiffs submitted to the Corps copious evidence from sources as diverse

as economic reports to the general press demonstrating that commercial real estate prices and

values had plummeted by 2009.  See <u>e.g.</u>, AR12213-12266.  For example, Deutsche Bank

reported that the property values of commercial real estate – including malls – had "<u>plummeted,</u>

<u>with sale prices down as much as 45% from the peak in 2007</u>" and "vacancies are up – expected

by year's end to reach 13.5% for retail and 17% for office buildings."  *Time Magazine*, The

Looming Crisis In Commercial Real Estate, AR12222 (emphasis added).  Roubini Global

Economics reported a "<u>decline in prices of the underlying properties [being] in many cases as</u>

<u>much as 35-50%.</u>"  The One Trillion Dollar Commercial Real Estate Time Bomb, AR 12225

(emphasis added).  See also AR12231, The Coming Depression In Commercial Real Estate

("[p]rices may drop 35-45% in 2009" alone) (emphasis added).

> Moreover, the Corps's own economist agreed with the decline in real estate prices:
>
> Current economic conditions have changed significantly . . .  a 'building boom' in Florida
> has for the most part gone bust. . . . [T]here remains a glut of oversupply . . . . **This will
> likely result in a significant decrease in real estate prices and a significant decrease
> in demand for newly constructed developments.**

AR12289 (emphasis added).  Yet the Corps refused to use the 2009 market value in determining

practicability, nor did it even address the issue in the Supplemental EA.  Instead, the Corps

continued to use the supposed 2006 market value knowing full well that there was a "likely . . .

significant decrease in real estate prices."  AR12289.  This not only violates the CWA

regulations and the Act's overarching purpose to avoid and lessen wetlands losses whenever

possible, but it is the essence of arbitrary and capricious decisionmaking.

> ## 2.     The Applicant Never Proved With Clear And Convincing Evidence That An 8.0% Rate Of Return Was Necessary

The Corps's determination that there are no practicable, less damaging, alternatives also

fails because the applicant never proved that it in fact needed an 8.0% rate of return with the

"detailed, clear and convincing information" that the CWA requires.  Utahns for Better Transp.,

305 F.3d at 1186.  As the Corps itself concluded in 2006, the applicant's evidence that it needed

an 8.0% rate of return was "conflicting" because, for example, the applicant had also stated that

the office, residential, and hotel components of CCTC were "not critical for financial viability"

even though eliminating them would reduce the rate of return to 7.7 or 7.8 %.  AR4467-68,

AR4501, AR3966.  When the Corps raised the issue, the applicant in fact confirmed that

"financing could be secured with a ROR [Rate of Return] of 7.8 %."  AR5385; AR4501.  In a

subsequent about-face, the applicant reasserted it required an 8.0% rate of return, and supposedly "summarize[d]" rates of return from other projects to justify an 8.0% required rate of return – but it "adjusted" and increased the rates by one half of a percent.  AR4599-60.

At that point even the Corps determined that it would not accept an 8.0% return as a minimum rate of return and that it "consider[ed] all alternatives viable from a cost perspective that result in a ROR equal to or exceeding 7.8%."  AR5385-86.  In response, the applicant submitted a report published by the Real Estate Research Corporation ("RERC") ("RERC Report") to establish its supposed need for a minimum 8.0% rate of return.  RERC Report, AR5417-5475.  The applicant (and the Corps) relied on the RERC Report to demonstrate that the "minimum ROR [Rate of Return] required for the [CCTC] project is 8.0%."  AR5409.

However, the RERC Report – which lists various rates of return for different types of real estate projects, e.g., AR5469 – does not list "minimum" rates of return.  Rather, as Plaintiffs explained to the Corps on remand, the RERC Report lists, among other information, average rates of return for such projects.  Magdziarz Decl. at ¶ 18, AR10694.  This is expressly stated in RERC's "Report Methodology" section, in which RERC explains that results from surveys "are collected, averaged, and then displaced in [RERC's] quarterly report."  AR5473 (emphasis added).  Thus, there are necessarily higher and lower rates of return that projects earn.  AR10694.

Moreover, in submitting the RERC Report, the applicant misled the Corps by directing the Corps to compare RERC's reported "pre-tax yield" rates of return, AR5409, to the applicant's calculations, when the applicant's calculations were in fact calculating a different type of rate of return known as the "capitalization rate" or "going in cap rate" of return.  See AR4599, Magdziarz Decl. at ¶ 20, AR10695, Supp. EA, AR15345-46.  The "going in cap rate"

typically shows a lower reported rate of return because it does not include, for example, increases in rental rates over time, which the pre-yield calculations do.  See Supp. EA at 7 n.5, AR15346. The applicant thus prepared one type of calculation that would show a lower rate of return, and then pointed the Corps to the results of a different type of calculation that would show a higher rate of return.  See Magdziarz Decl. at ¶ 22-23, AR10696-97; see also Supp. EA, AR15345-47.

However, the RERC report in fact listed both types of rate of return, and if one compares the RERC "going in capitalization rate" to the applicant's calculations, the RERC report indicates that alternatives with a smaller footprint are feasible.  Id.  For example, RERC reported a "going in cap rate" for a Regional Mall in Tampa as 7.7%, and 7.6% for a Power Center.  AR 5469.  Meanwhile the applicant's calculations – which the Corps relied on – show that a 5% smaller CCTC could generate a going in cap rate of 7.73% for Phase I of CCTC, and 7.8% for Phase II of CCTC.  Compare EA, AR6649 with RERC Report, AR5469.  Again, a 5% reduction would reduce CCTC by 28 acres, AR6649 – almost half the acreage of wetlands lost.  See also AR5477-78, AR2625-26 (other feasible alternatives).

To be sure, Plaintiffs informed the Corps of all this on remand.  In response, the applicant reverted to its earlier assertions that the RERC reported rates of return had to be adjusted upward, using for example a survey of supposed professionals – who refused even to be identified – to opine that adjusting rates of return upward by anywhere from 1.5-3 % was appropriate.  See AR11239, 11243.  Astonishingly, in the Supplemental EA the Corps accepted this as clear and convincing evidence that an 8.0% rate of return was required and that CCTC's size, and wetlands impacts, could not be reduced.  See Supp. EA, AR15345-47.

35

It is the applicant's burden to "*prove[]* impracticability" with "detailed, clear and convincing information." Utahns for Better Transp, 305 F.3d at 1186.  It is the Corps's duty to hold the applicant to this standard, and to enforce the very strong presumption that alternatives to wetlands impacts exist, id.; Nw. Bypass, 490 F.Supp.2d at 191, especially for projects such as a shopping mall and town center that are not "water dependent." 40 C.F.R. § 230.10(a)(3).  Here, however, neither the Corps nor the applicant remotely satisfied that stringent standard.

### 3.    The Corps Violated The Clean Water Act By Failing To Enforce The Practicable Alternative Of Reducing The Number Of Parking Spaces

Another practicable alternative that would avoid or minimize wetlands loss, independent of the financial analyses, is simply reducing the amount of parking.  According to the Corps nearly half of the wetlands loss is for parking.  EA, AR6646.  Nonetheless, the Corps failed to require the applicant even to reduce CCTC's sprawling parking.  CCTC will have 14,212 spaces for 2,631,000 square feet ("SF"), if one excludes hotels and residences for ease of comparison to other malls.  AR3973 (based on figures in first row of table).  This comes to a ratio of 5.4 spaces per 1000 SF.  Cf. id. (calculating the ratio for CCTC components individually).

Correspondence from entities the applicant identified as "Regional Mall Developers," AR4044, submitted in support of the permit includes a letter from one developer stating that "[t]he entire center should park 4.5 spaces per 1,000 square feet."  AR4047.  Meanwhile, a second developer provided the "latest thinking in large scale retail development" and explained that "[p]arking [is] typically a ratio of 4.5 to 5 spaces per 1,000 sq ft."  AR4050.  Thus, with 5.4 spaces/1000 SF, CCTC has roughly twenty percent more parking than the applicant's own colleagues stated was necessary.  Compare AR3973 with AR4047, AR4050.  CCTC's parking even exceeds the 5.0/1000 SF ratio requested by potential tenants.  See AR6647.

36

The Corps also asked the applicant to "compare the proposed parking" of CCTC to other malls.  Id.  In response, the applicant surveyed five other malls.  See AR3973.  As the Corps itself explained, "the results revealed that the project proposed more parking than any existing mall in the evaluation." EA, AR6647 (emphasis added).  Yet the Corps dismissed these findings because the "applicant state[d] that regional malls, such as that proposed, have a much higher component of restaurant uses than older malls."  Id.  While this may or may not be true, the other regional mall developers' statements corroborate the fact that CCTC's parking is excessive even by current regional mall standards.  At the very least, the evidence does not constitute clear and convincing information that CCTC cannot reduce parking – it does just the opposite.

*          *          *

The Corps has long been admonished by the courts and others for failing its charge under the CWA to protect wetlands and aquatic resources.  As the General Accounting Office ("GAO") concluded in 2005, "the Corps' priority has been and continues to be processing permit applications" and it has, for example, "consistently neglected to ensure that the mitigation it has required . . . has been completed."  AR10416; see also, id. (as GAO previously reported in 1988 and 1993, the Corps "place[s] little emphasis on its compliance efforts").  Just recently, Judge Robertson rejected a Corp decision concluding that the Corps "resorted to arbitrary and capricious reasoning - manipulating models and changing definitions where necessary - to make this project seem compliant with [CWA] and [NEPA] when it is not."  Envtl Def. v. Army Corps of Eng's, 515 F. Supp. 2d 69, 74 (D.D.C. 2007).  The record here similarly shows an agency at best indifferent to its CWA charge of avoiding adverse impacts to wetlands whenever feasible.

37

**B.     The Corps's Determination That The Project Would Not Cause Or
        Contribute To The Substantial Degradation Of Waters Of The United States
        Or Violate State Water Quality Standards Is Arbitrary and Capricious**

The CWA regulations prohibit permits that will "cause or contribute to significant

degradation" of waters and wetlands, 40 C.F.R § 230.10(c), and the Corps must examine

individual, cumulative, and secondary impacts to fish, wildlife, wetlands, nutrient and pollutant

assimilation, drinking water supplies, and aesthetics.  Id. § 230.11; Subparts B-G.  "Significant"

in this context means anything that is "more than 'trivial.'"  1980 Notice, 45 Fed. Reg. at 85,343

(emphasis added).  Moreover, a permit cannot be issued "if there is insufficient information to

make a reasonable judgment as to . . . significant degradation."  Utahns For Better Transp., 305

F.3d at 1191, or if it violates state water quality standards.  See 40 C.F.R. § 230.10(b)(1).

As discussed at length above, in this case CCTC has already had significant impacts to

Cypress Creek and violated state water quality standards.  Turbidity levels in Cypress Creek and

its wetlands shot up to over fifty times their ambient levels.  See AR10863; see also AR10524.

Testimony from an expert hydrologist explained that given the high turbidity levels and their

duration, there were "significant environmental impact[s]" to Cypress Creek's aquatic ecology,

including effects on feeding, reproduction and growth of aquatic life, see AR10863-64; see also

AR10861, and lead and copper levels exceeding state water quality standards were found in

stormwater ponds and wetlands that received CCTC's runoff.  See AR15361.

Nonetheless, the Corp now asserts that "the effect of the turbid discharges was temporary

in nature" and "does not alter its previous conclusions" that the CCTC permit did not and will

not cause or contribute to the significant degradation of Cypress Creek.  AR15359.  Plainly,

however, simply because pollution in a water body eventually dissipates over time does not mean

that it did not have a significant impact.  Similarly, because a water body might recover from

such pollution given enough time hardly means that the effect of the pollution was not

significant.  The Corps's counter-intuitive conclusion is entirely at odds with its suspension of

the permit for over a year, its imposition of a large fine, and its earlier conclusion that CCTC had

imposed "significant, unacceptable impacts to wetlands and water quality."  See AR10886-87.

The Corps also asserts that the degradation of Cypress Creek was not because "of a fault

in the design of the storm water management system" but rather because of human error during

construction.  AR15340.  Even if that were true it would not negate the fact that the project

seriously degraded Cypress Creek.  But in any case the Corps's effort to attribute this degradation

solely to "human error" ignores the massive change in the natural systems effected by the project.

Thus, the CCTC permit did not just authorize the construction of a storm water management

system.  It authorized the construction of an entire town center, and the resulting destruction of

the natural features that protected the Creek – its wetlands and buffers – which, again, concerned

the Corps precisely because they provide "important aquatic resource functions including:

sediment removal and erosion control, excess nutrient and metal removal [and] moderation of

storm water runoff."  AR6650; see e.g., AR3975.

CCTC's stormwater system has a capacity of only 1.5 inches of runoff, AR6676, with

limited ability to treat typical pollutants like phosphorous and nitrogen, for example.  See

AR4111.  The Corps still has not conducted the necessary analysis to determine what will happen

when the type and nature of the pollutants in CCTC's runoff, and the volume of the runoff,

exceed the system's 1.5" capacity.  Not only, therefore, is there "insufficient information" for the

Corps "to make a reasonable judgment" that CCTC will not significantly degrade Cypress Creek

39

and violate state water quality standards, Utahns For Better Transp., 305 F.3d at 1191 (citing 40

C.F.R. § 230.12(a)(3)(ii), (iv)), but a year of discharges affirmatively demonstrates that the

CCTC permit has in fact and inevitably will continue to do both.

## IV.    The Corps And FWS Violated The Endangered Species Act

Under section 7 of the ESA, the Corps must engage in formal consultation with the

Service if its action "may affect listed species."  50 C.F.R. § 402.14(a).  Section 7 is the "heart of

the [ESA]" as its procedural and substantive requirements are central to the ESA's protections of

listed species.  Fla. Key Deer v. Stickney, 864 F. Supp. 1222, 1226 (S.D. Fla.1994).  Only if an

agency's action "is not likely to adversely affect" a listed species may formal consultation – and

the FWS's preparation of a Biological Opinion – be avoided.  50 C.F.R. § 402.14(b).  In this

case, the Corps' determination that CCTC "may affect" but was "not likely to adversely affect"

the Indigo and the Wood Stork, and the FWS's concurrence therein, failed to address factors that

were central to their analyses, and were in fact contrary to the evidence in the record.  Moreover,

because the Corps failed to obtain authorization of its take of federally listed species, the Corps

has also violated section 9 of the ESA.  16 U.S.C. § 1538.

## A.    The Corps And The Service Failed To Evaluate The Impacts To The Indigo Of Habitat Loss, Fragmentation, And Road Mortality

The Indigo – the longest snake in the United States – is a lustrous black, docile,

non-venomous snake that now exists only in Georgia and Florida.  FWS 2584.  It has suffered

"dramatic population declines" and FWS has determined that "any additional threats to its

survival could cause local extirpations."  FWS2584, FWS2589 (emphasis added).  Habitat "loss

and fragmentation by residential and commercial expansion" are now the most significant threats

40

to the Indigo, <u>see</u> FWS2584, and "human population growth will increase the risk of direct mortality . . . from property owners, domestic animals, and highway mortality."  FWS2589.

The Indigo ranges over large areas and needs a mosaic of habitat types, though it is "closely associated with the gopher tortoise . . . the burrows of which provide shelter." FWS2586; <u>see also</u> FWS2588-89.  The CCTC site – on which the applicant found 66 gopher tortoise burrows and 25 live tortoises, AR10529 – is prime Indigo habitat: even the applicant's own biologists agreed that Indigos "occur on site or have a reasonably high probability of occurring," FWS191, and an Indigo was actually observed on site in May 2007.  AR10522.

Yet remarkably, despite the fact that habitat loss is the <u>greatest</u> threat to the Indigo's survival, <u>neither the Corps nor FWS have ever considered the effect of destroying the Indigo's habitat on the CCTC site.</u>  EA, AR6682; Supp. EA 15364-65, Concurrences, FWS6367, AR21040.  The agencies never evaluated the amount or quality of Indigo habitat lost, CCTC's fragmentation of remaining Indigo habitat, or the increased risk of road mortality once CCTC is operating, much less CCTC's cumulative impact when added to other nearby development.  <u>Id.</u>

To the contrary, <u>the agencies limited their consideration solely to the direct injury or death of an Indigo during the actual construction of the CCTC development.</u>  Specifically, the agencies concluded that there would be no adverse impact because the "applicant has agreed to follow the [Indigo] Protection Measures <u>during project construction</u>, which [FWS] believe[s] should adequately address adverse effects to the snake."  Concurrence, AR6367 (emphasis added); <u>see also</u> AR21040; EA, AR6682; Supp. EA 15364-65.

But the agencies' analysis inexplicably ignores the principal threat to the species' survival and recovery – habitat loss and fragmentation.  FWS2584.  The court in <u>Sierra Club v. Flowers,</u>

423 F. Supp. 2d 1273 (S.D. Fla. 2006) (vacated in part on other grounds, 526 F.3d 1353 (11th Cir. 2008)), expressly rejected the Corps's and FWS's conclusion that destroying a species' habitat would have no impact because the species "can relocate to other areas."  Id. at 1374.  The agencies' conclusion here are even more absurd because the primary threat to the Indigo is the loss of its habitat, and there is no evidence in the record that Indigos using the site will simply relocate elsewhere.  If listed species are adversely impacted and agencies failed to formally consult, courts enjoin the agency's action.  See e.g., Citizens for Better Forestry v. U.S. Dep't Agric., 481 F. Supp. 2d 1059 (N.D. Cal. 2007); Fla. Key Deer, 864 F. Supp. at 1241-42.  Likewise, an agency that fails to obtain authorization for incidental take – as will happen when Indigos are forced off habitat, see 50 C.F.R. § 17.3 – violates section 9 and will be enjoined.  See Defenders of Wildlife v. Adm'r EPA, 882 F.2d 1294 (8th Cir. 1989); Loggerhead Turtle v. Volusia County, 896 F.Supp. 1170 (M.D. Fl. 1995) (rev'd on other grounds, 148 F.3d 1231 (11th Cir. 1998)).[9]

**B.  CCTC Will Adversely Affect Wood Stork Foraging Habitat**

The Wood Stork is a "large, long-legged, white wading bird with an unfeathered gray head and a stout dark bill" that "frequent[s] freshwater and brackish wetlands" to feed: it "usually nests in cypress and mangrove swamps."  Wood Stork Listing Rule, 49 Fed. Reg. 7332, 7332.

---

[9]  The agencies did no better with regard to the Florida Scrub Jay.  Florida Scrub Jays use the same "xeric" (dry) habitat as Indigos and Gopher Tortoises.  FWS2633, FWS2639.  Jays, Gopher Tortoises and Indigos share habitat to such an extent that FWS considers it "critical" that management decisions for one species consider the other species.  FWS2639.  The principal threat to the Jay is "loss, fragmentation, and degradation of scrub habitats."  FWS2630.  But rather than consider the impacts of CCTC on the Jay through habitat loss, the agencies concluded there was no Jay habitat on site, AR6367, AR6683, despite the overlap of the species' terrain and the concrete evidence of such habitat on site, including Dr. Stith's declaration.  AR10555-562.

The Wood Stork's primary cause of decline is the "loss of suitable feeding habitat."  Id. at 7333;

FWS2541.  For the Wood Stork to recover "[a]t a minimum . . . currently occupied . . . foraging

habitat must be protected from further loss or degradation."  Recovery Plan, FWS2549.

When the Corps initially issued the CCTC permit, both the Corps and FWS had

concluded that no Wood Storks had ever been observed on site.  See e.g., EA, AR6681, AR6364.

However Wood Storks have been observed foraging on site, and the site contains quality habitat

for wading birds.  See AR6560; FWS191-92, 196; FWS204-05 ("numerous birds were counted,

[i]ncluding wood storks").  The agencies' inaccurate assessments resulted from the applicant's

false statements that it had never observed Wood Storks on site.  See AR5562 ("[n]o wood storks

have ever been observed"); AR3989; AR5917 ("Wood storks have never been observed").  The

agencies' assessments of impacts to Wood Stork habitat was therefore limited to estimating

wetlands Wood Storks might use and proposing compensatory mitigation, rather than also

reviewing actual reports of Wood Stork observations.

As a result, FWS did not identify all of the Wood Stork habitat that CCTC will in fact

destroy.  For example, CCTC will result in a significant loss of Wood Stork foraging habitat in

the connected wetland system W-A/W-A1/W-A3, in which the applicant's biologists had

identified Wood Storks foraging, but for which FWS did not require compensation.[10]

---

[10]  Compare AR6365 (FWS Concurrence identifying wetlands considered to be foraging
habitat, which does not identify the connected wetland system W-A/W-A1/W-A3, as Wood
Stork habitat, nor does it address the destruction of over 23 acres of the system, although Wood
Storks use it) with AR1923 (map of Wood Storks foraging in wetland system at north of site);
AR1964 (map identifying "regionally significant" wetlands system as wetlands 1, 4, 5, which
correlates to the wetland system at AR1923 in which Wood Storks were observed); AR2019
(explaining wetlands 1, 4, 5 are "lobes of a connected wetland system totaling 53.6 acres");
AR6497 (map of the authorized filling of over 23.2 acres of the system identified as wetlands 1,
4, 5 at AR1964, and as W-A/W-A1/W-A3 at AR6497).

Several courts have now rejected the Corps's and FWS's analyses that have failed to accurately quantify and address impacts to Wood Storks.  See Nat'l Wildlife Fed. v. Souza, 2009 U.S. Dist. Lexis 99674 *38, Civ. No. 08-141115 (S.D. Fla. 2009); Sierra Club v. Flowers, 423 F. Supp. 2d at 1374-75.  The same result should be reached here.

In addition, FWS failed to explain how it calculated the amount of mitigation needed to offset lost wood stork habitat, which the FWS relied upon in determining there would be no adverse impacts to the Wood Stork.  The record contains extensive reports from the GAO and the National Academy of Sciences ("NAS") concluding that the Corps's wetlands mitigation efforts have a long record of failure.  See AR10345-10517.  The Corps' own former permitting officers have described the Corps's mitigation as "a huge scam," a "fraud," and "a make-believe program."  AR3360, 61; see also Envtl Def., 515 F. Supp. 2d at 73.  Already the Corps's mitigation is faltering as, for example ponds A and C, which the Corps and FWS relied on to compensate for lost Wood Stork habitat, see AR6365-66, were too dry to be planted.  See AR18624.  Yet neither the Corps nor FWS explain why CCTC's mitigation will succeed at CCTC when the Corps's related mitigation requirements have failed.[11]

## V.    RELIEF

Plaintiffs seek the standard APA relief of remand and vacatur of the Corps's permits and FWS's concurrence letters.  See 5 U.S.C. § 706.  Plaintiffs also seek injunctive relief a)

---

[11]  See NAS, Compensating for Wetland Losses Under the Clean Water Act at 2 (2001), AR10352 ("[t]he goal of no net loss of wetlands is not being met for wetland functions by the mitigation program."); see also id. AR10383 (in Florida in 1991 only 10% of surveyed mitigation was in compliance with Corps permits); AR10416 (GAO concluding "the Corps' priority has been and continues to be processing permit applications" and it "has consistently neglected to ensure that the mitigation that it has required . . . has been completed"); AR10459 (similar).

precluding any further activity on site until the Corps and Service comply with the ESA, CWA, and NEPA; and b) compelling restoration of the wetlands and habitat for federally listed species. With regard to the ESA, the Supreme Court has explained that "Congress had foreclosed the exercise of the usual discretion possessed by a court of equity," Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982), and that in "the 'balancing of equities and hardships' involving endangered species, "the order of priorities . . . favors endangered species." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 193, 194 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of . . .  endangered species").

Similarly, injunctive relief is also warranted with regard to the CWA and NEPA claims. As the Supreme Court has explained, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987).  Thus, in cases such as this one, "when an action is being undertaken in violation of NEPA, there is a presumption" of irreparable harm justifying a court order precluding "continuation of the action until the agency brings itself into compliance." Realty Income Trust v. Eckerd, 564 F.2d 447, 456 (D.C. Cir. 1977).

## CONCLUSION

For the reasons described above, the CCTC permit should be remanded and vacated, and appropriate injunctive relief should be fashioned pursuant to the procedure outlined in the attached proposed order.

Respectfully submitted,


/s/ Joshua Stebbins
Joshua Stebbins
D.C. Bar No. 468542

/s/ Eric Glitzenstein
Eric R. Glitzenstein
D.C. Bar No. 358287

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
jstebbins@meyerglitz.com
hcrystal@meyerglitz.com

Attorneys for Plaintiffs


Date: January 4, 2010