UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB, CLEAN WATER ACTION, GULF RESTORATION NETWORK, CHRIS LOY, and RICHARD SOMMERVILLE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers, DIRK KEMPTHORNE, in his official capacity as Secretary, U.S. Department of the Interior, and H. DALE HALL, in his official capacity as Director, U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) | Civil Action No.   1:07-cv-01756 (RCL) |
| Defendants, | ) ) | |
| and | ) ) | |
| SIERRA PROPERTIES I, LLC, PASCO 54, LTD., PASCO RANCH, INC., AND JG CYPRESS CREEK LLC, | ) ) ) ) | |
| Intervening Defendants. | ) ) / | |

**INTERVENING DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  FACTUAL BACKGROUND ..............................................................................4

    A.  The Cypress Creek Town Center Project.................................................4

    B.  Initial State and Local Regulatory Approvals of the Project ..................5

    C.  The Corps' Initial Approval of the Project .............................................5

    D.  Developments Since Issuance of the Corps Permit .................................7

        1.  Site Development and Construction Work ...................................7

        2.  Permit Suspension and the Voluntary Remand .........................7

III.  SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF FEDERAL
      DEFENDANTS AND INTERVENING DEFENDANTS ................................11

    A.  Standard of Review................................................................................11

    B.  The Corps Complied with NEPA ..........................................................12

        1.  No Environmental Impact Statement was Required...................13

            a.  Unique Characteristics .................................................14

            b.  Federal, state and local environmental laws .................17

            c.  No Impacts on the Eastern Indigo Snake......................17

            d.  Degree to Which Action May Establish Precedent.......18

            e.  Uncertain Impacts .......................................................18

            f.  Controversial................................................................19

        2.  The Initial and Supplemental Environmental Assessments were
           Legally Sufficient.......................................................................20

            a.  The Corps Took a Hard Look at Cumulative Impacts..................20

                i.  Plaintiffs' dissatisfaction with the cumulative
                impacts analysis does not render it arbitrary and
                capricious. .....................................................20

ii.    The Corps took a hard look at the impact of the project on a wildlife linkage. ...............................21

iii.    The Corps took a hard look at the impact on the Eastern Indigo Snake. .......................................22

iv.    The Corps took a hard look at the impact of the project on Florida Scrub Jay habitat. ................................22

v.    The Corps took a hard look at the impact of the project on groundwater resources. .....................................22

vi.    The Corps was entitled to consider and rely upon materials submitted by the applicant.................................23

C.    The Corps Complied with the Clean Water Act .....................................24

1.    The Corps' Determination that There are No Practicable Alternatives was Not Arbitrary and Capricious........................................25

a.    The Record Evidence Supports the Corps' Determination That There are No Practicable Alternatives...................................25

b.    Downsizing the Project is Not a Practicable Alternative..............27

i.    A smaller project does not meet the project purpose.........27

ii.    Downsizing CCTC is not practicable from a cost perspective. ......................................................27

iii.    The Corps considered a relevant time frame when evaluating market conditions. ...........................................30

iv.    The Corps' independent economic review confirmed that a smaller project was not practicable from a cost perspective. ....................................................32

c.    Reducing the Number of Surface Parking Spaces is Not a Practicable Alternative.................................................32

2.    The Corps' Determination that the Project Will Not Cause or Contribute to the Significant Degradation of the Waters of the United States was not Arbitrary and Capricious........................................34

a.    The Corps Extensively Analyzed the Project's Impacts on Cypress Creek and the Adjoining Wetlands During the Original Permitting Process ...........................................34

|  |  |  | i. | The buffers will protect Cypress Creek and adjoining wetlands. ...........................................35 |
|  |  |  | ii. | The stormwater management system................................35 |
|  |  |  | iii. | The surface water quality monitoring plan. .......................38 |
|  |  | b. | | The Discharges During Initial Construction Did Not Cause Significant Degradation or Lasting Environmental Impacts. ........39 |
|  | 3. | | | The On-Site and Off-Site Mitigation Complies with Applicable Requirements ............................................39 |
| D. | | | | The Corps and the FWS Complied with the Endangered Species Act .................40 |
|  | 1. | | | The Corps' and the FWS's Determinations that CCTC is "Not Likely To Adversely Affect" the Eastern Indigo Snake Were Not Arbitrary and Capricious..............................................40 |
|  | 2. | | | The Corps' and the FWS's Determinations that CCTC is "Not Likely To Adversely Affect" the Wood Stork Were Not Arbitrary and Capricious ...........................................42 |
|  | 3. | | | The Corps' Consultation with the FWS was Sufficient............................44 |
|  | 4. | | | The FWS's Determinations Regarding the Wood Stork and the Eastern Indigo Snake Should be Given Great Deference .........................44 |
| IV. | | | | CONCLUSION...........................................................45 |

I.     **INTRODUCTION**

This case concerns a 500-acre mixed use development located 9 miles north of Tampa,

Florida known as Cypress Creek Town Center ("CCTC").  It has received all necessary federal,

state, and local government permits and authorizations.  Construction on this multi-phase project

began over two and one half years ago, and over 1800 area residents will be employed during the

construction phase of the project alone.  When completed CCTC is expected employ over 4000

men and women and generate over $5.9 million annually in tax revenue for Pasco County.  AR

6666, 6669.

Three environmental groups and two individuals have filed suit in this Court contesting,

on various grounds, the decision of the U.S. Army Corps of Engineers ("Corps") to permit the

filling of wetlands that comprise only about ten percent of the CCTC project site.  Some of the

Plaintiffs also contested the state wetlands permit for the project and the local government's

development order.  Those challenges, raising many of the same arguments made here, were

unsuccessful.  Undaunted, Plaintiffs now attack the federal approvals, hoping that their

repackaged arguments will win favor in this Court.

The Corps issued its permit for this project in May 2007, and construction commenced

shortly thereafter.  Six months later, Plaintiffs filed this lawsuit.  During the initial stages of

construction, muddy water was discharged from the site in violation of the Corps permit.  As a

result of the discharges, on February 1, 2008, the Corps suspended the permit.  Thereafter, the

Corps requested and received this Court's approval to remand the case to re-evaluate the permit

in light of the releases from the site.  D.E. 54; D.E. 55.  After an exhaustive one and a half year

review, the Corps reissued the permit, concluding that the discharges, which caused no lasting

impact on the environment, resulted from human error and unusually high rain events, not a flaw with the design of the permanent stormwater management system.

During the original permitting proceedings and again on remand, Plaintiffs submitted extensive documentation to the Corps in opposition to the permit.  In addition to form letters and newspaper articles, Plaintiffs also filed affidavits from various individuals, including some scientists, criticizing various aspects of the project.  The Corps, as well as the U.S. Fish and Wildlife Service ("FWS"), considered all the material Plaintiffs submitted, and those materials are now part of the massive administrative record in this case.  Ultimately, the Corps and the FWS, *like every other governmental agency that has reviewed this project,* were unpersuaded by Plaintiffs' evidence and arguments.

Now, more than two and half years after the permit was originally issued, Plaintiffs would have the Court order the Corps and the FWS to engage in a pointless bureaucratic exercise.  The Corps has already prepared two lengthy Environmental Assessments (one during the initial permitting process and one during the one and a half year remand) which cover all the issues that would be contained in the Environmental Impact Statement ("EIS") that Plaintiffs would now like the Corps to prepare.  The Corps has consulted with the FWS twice on this project.  The "formal" consultation Plaintiffs demand would accomplish nothing.  The authorized wetland filling took place over two years ago, the permanent stormwater management system has been largely constructed and all of the wetland mitigation, which will result in a net gain of wetland function, has been completed.   Each aspect of this project has been painstakingly scrutinized, not only by the federal agencies sued in this case, but also by all other responsible state and local regulatory agencies.  Ordering the preparation of lengthier versions of documents

already prepared by the agencies would result in little more than further delay (which Plaintiffs obviously seek) and the pointless expenditure of agency resources.

Plaintiffs' lawsuit is simply their latest attempt to have the Court substitute its judgment for that of the agencies. But as this Court well knows, the law does not allow for the type of review Plaintiffs seek.  Under the Administrative Procedure Act ("APA"), the role of the Court is limited to determining whether the agency took a hard look at the issues, and drew a rational connection between the facts found and decisions made.  *See Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Rock Creek Pack Station, Inc. v. Blackwell*, 344 F. Supp. 2d 192, 200 (D.D.C. 2004) (Lamberth, J.) ("[I]t is well settled that NEPA does not require a particular agency to reach a particular result based on the information it collects and analyzes, but only prescribes the necessary process").  Whether the project is good or bad is left up to the agencies.  Even if Plaintiffs disagree with the agencies' conclusions, those conclusions are entitled to substantial deference, especially when they deal with technical subject matters such as water quality, endangered species, and financial analysis. As set forth herein, the Corps and FWS fully complied with the applicable requirements of NEPA, CWA, and ESA.  All of Plaintiffs' claims lack merit, and are based on a fundamental misunderstanding of the Court's role in reviewing the administrative decisions of federal agencies.  The Court should enter summary judgment in favor of the Federal and Intervening Defendants.[1]

---

[1] The Court should also deny Plaintiffs' request for injunctive relief.  An injunction does not issue as a matter of course in environmental cases, even if Plaintiffs were to win on the merits.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982); *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983).  Plaintiffs have not met the heavy burden necessary to support issuance of an injunction, and have not demonstrated that the balance of irreparable harm and the public interest weighs in favor of an injunction.  *St. Croix Chippewa Indians of Wisconsin v. Kempthorne*, 2008 WL 474162, *2 (D.D.C. Feb. 22, 2008).  At a minimum, Defendants are entitled to an evidentiary hearing prior to the Court deciding whether an injunction is appropriate.  *United States v. Microsoft*, 253 F.3d 34, 100 (D.C. Cir. 2001) ("[o]ther than a temporary restraining order, no injunctive relief may be entered without a hearing.").  At such a hearing, the Court may consider other relevant evidence such as the Environmental Protection Agency's letter supporting the Corps' permitting decision in this case.  *See* Exhibit A.

## II.   FACTUAL BACKGROUND

### A.   The Cypress Creek Town Center Project

CCTC is a regional multi-use development located near a small, meandering stream called Cypress Creek.  AR[2] 6636-37, 15343.  Plans for the project include a regional retail business center, retail stores, financial institutions, hotels, restaurants, theaters, offices, and multi-family housing.  AR 6637, 6649.

The project design calls for a large on-site stormwater management system, AR 6672, which is now substantially complete, AR 11049; D.E. 52-2-4, D.E. 57-2.  The system will include a network of stormwater pipes, infiltration swales and other "low impact design" features, stormwater treatment ponds, and on-site wetlands.  AR 6648, 6676-78, 15402, 15428. The system includes five large stormwater treatment ponds around the perimeter of the site.  AR 6523, 11387-89, 15402, 15408.  The project also calls for a minimum buffer between Cypress Creek and any project activity of 50 feet, a minimum distance between Cypress Creek and any paved surface of 600 feet, and 25-foot buffers around on-site preserved wetlands.  AR 6650.  The project also includes a surface water quality monitoring plan, AR 6622-41, 6651, 6675-76, 15426-46, and a groundwater monitoring plan, AR 2324-25, 6675, to ensure water quality.

Most of the site is comprised of uplands outside of the Corps' wetland jurisdiction.  AR 6636, 15342-43.  Approximately 155 acres of wetlands on the property are within Corps regulatory jurisdiction.  *Id.*  The Corps has approved the filling of 53.39 acres of such wetlands and 9.66 acres of man-made Corps-jurisdictional surface waters.  AR 15342.  Almost two thirds of the federal wetlands on-site will be preserved.  AR 6636, 16672, 5342-43, 15358.

---

[2] Citations to the Corps' Administrative Record, filed with the Court on January 2, 2008, D.E. 27, September 15, 2009, D.E. 60, and January 4, 2010, D.E. 69, are in the form of "AR ___."  Citations to the FWS's Administrative Record, filed with the Court on January 2, 2008, D.E. 27, are in the form of "FWS ____."

### B.       Initial State and Local Regulatory Approvals of the Project

CCTC was reviewed and approved by all local governments having jurisdiction over the project.  CCTC is a Development of Regional Impact, requiring a comprehensive review of all aspects of the project by the State of Florida Department of Community Affairs, the Southwest Florida Regional Planning Council, and Pasco County.  Fla. Stat. § 380.06; AR 2317-40. Following a regulatory review process that lasted more than two years, on November 23, 2004, Pasco County issued the Development Order ("DO") approving the project.  AR 2317-40.  In addition, Intervening Defendants were required to obtain an Environmental Resource Permit ("ERP") from the Southwest Florida Water Management District ("SWFWMD") for the project. AR 6522-41, 6638.  The ERP was issued on January 30, 2007, and provides extensive conditions to avoid and minimize the project's environmental impacts.  *Id.*  It also serves as the State Water Quality Certification under the CWA.  33 U.S.C. § 1341; Fla. Stat. § 373.036.  The Florida Department of Environmental Protection ("FDEP") also approved coverage of the project under the state's National Pollutant Discharge Elimination System generic permit.  AR 6737-40. Plaintiffs challenged both the Pasco County and SWFWMD permits for the project on environmental grounds.  AR 3785-86, 5724.  Both challenges were unsuccessful.  *Id.*

### C.       The Corps' Initial Approval of the Project

On September 5, 2005, Sierra Properties submitted a permit application to the Corps for the CCTC project.  AR 2397-2511.  The Corps issued a Public Notice on October 31, 2005, AR 3091-3135, identifying the areas to be permitted, the acreage of the project, and the impacts, AR 3092-93.  On December 5, 2005, after concluding that the project is "not likely to adversely affect" the Wood Stork and the Eastern Indigo Snake (the "Snake"), the Corps initiated informal consultation with the FWS regarding these species.  AR 3410-11.  After this consultation, on March 22, 2007, the FWS concurred with the Corps' "not likely to adversely affect"

determination regarding the two species.  AR 6681-82, 5962-67.

The Corps received comments on the Public Notice from state and local agencies, elected officials, organizations, and individual citizens.  AR 6639-40.  The Corps took into account all of these comments in reviewing the permit application.  AR 6639.  The Corps also made several requests for additional information from the applicant.  AR 3877-84, 4467-73, 5384-88, 5956-60.

On May 15, 2007, the Corps issued a Section 404 permit for CCTC, AR 6476-6635, and a Statement of Findings regarding the permit, AR 6636-88.  The Statement of Findings also functioned as an Environmental Assessment for the project (the "Initial Environmental Assessment").  AR 6636.  The Initial Environmental Assessment identifies and considers the "no-action" alternative, stating that the "no-action alternative would result in the continued use of the parcel for agriculture."  AR 6640.  The Environmental Assessment also contains an analysis of three on-site and eleven off-site alternatives to CCTC, and concludes that none would be practicable.  AR 6640-46.  The Corps concluded that the project will not cause significant degradation of waters of the United States, AR 6664-65, and, after consultation with the FWS, that the project is "not likely to adversely affect" the Wood Stork, the Snake, or any other listed species, AR 6681-82.

The Corps has required both on-site and off-site mitigation for the 53.39 acres of wetland areas authorized for filling on the 502.4-acre CCTC site.  AR 15349-59.  The mitigation consists of: 1) restoration and preservation (through mandatory conservation easements) of 101.65 acres of existing on-site wetlands, 2) creation and preservation (through mandatory conservation easements) of an additional 13.61 acres of on-site wetlands, 3) restoration and preservation (through mandatory conservation easements) of 130.5 acres of wetlands on a 250-acre tract off-site in southeastern Pasco County, 4) creation of stormwater ponds to mitigate for loss of flood

storage, and 5) construction of littoral shelves in the stormwater ponds to mitigate for the loss of wildlife habitat.  *Id.*; AR 15447-513.  Based on a quantitative functional assessment using the Unified Mitigation Assessment Methodology, the Corps determined that the total wetland function loss due to the project was -38.70, and that the total functional gain from the mitigation was +40.73, resulting in a net gain of environmental resources.  AR 15354.

### D.    Developments Since Issuance of the Corps Permit

#### 1.    Site Development and Construction Work

In June 2007, site development and construction work commenced at CCTC.  AR 8849, 11047.  At that time, the target opening date for the main commercial center was October 2008.  *Id*.  As part of initial site preparation and grading, the low areas of the site, including all but .508 acres of wetlands authorized to be filled, were demucked and filled to grade.  AR 8849; D.E. 52 at 2.  Many of these low lying areas, including former wetland areas, were covered with fill and compacted to prepare the site for building foundations, parking lots, roadways, and the extensive landscaping provided for in the approved development plans.  *Id*.  By the end of 2007, the required mitigation had been substantially completed.  *Id*.[3]

#### 2.    Permit Suspension and the Voluntary Remand

In September 2007 and January 2008, while construction was underway, muddy (turbid) water was released from the site to nearby Cypress Creek.  AR 15340-41.  The turbidity was caused by the very fine clay particles in the soils on the CCTC site.  AR 8906.  Both events were the result of human error related to construction sequencing and unusually high rainfall events (including one rainstorm that dropped more than 10% of average annual rainfall in a single

---

[3] Intervening Defendants completed earthwork associated with the off-site mitigation in August 2007, and conducted initial seeding of the mitigation lands in December 2007.  AR 8849-50, 11047.  On-site mitigation area M-3 was completed in September 2007, and on-site mitigation area M-1 was completed in November 2007.  *Id*.  On-site mitigation M-2 was planted in July 2008.  *Id*.

night) that overwhelmed the temporary construction-phase sediment and erosion control measures installed by the contractor.  AR 8853-56, 15340-41.  The visual impact of the discharges was captured in photographs, placed on YouTube by project opponents, and vividly described by the Corps.  *See*, *e.g.*, AR 6886-87, 6892-95, 7197-98.

As a result of the discharges, on February 1, 2008, the Corps suspended the permit.  AR 15340.  The discharges initially violated state water quality standards because state law prohibits discharges that reduce the clarity of the water, even in small areas of the water body.  AR 8853, 8869.  Following the discharges, however, responsible state and local agencies, and qualified biologists, conducted comprehensive environmental assessments of Cypress Creek and the adjoining wetlands, and found no permanent environmental damage as a result of the discharges. AR 8853, 8869-90, 8897, 15367.

Upon suspension of the permit, Intervening Defendants immediately ceased all work on the site other than the implementation of corrective action measures to ensure no further discharges.  D.E.[4] 41-2 at 11; D.E. 52 at 2; AR 6882-85, 15340.  Intervening Defendants implemented various additional corrective erosion and sediment control measures, including: 1) Increasing the capacity of on-site stormwater ponds by building reinforced concrete-block walls on the top of the discharge weirs on each pond; 2) Installing additional turbidity control screens across the small stream that drains one on-site wetland into Cypress Creek; 3) Placing sod on the side of the stormwater berm located between an on-site pond and a Florida Department of Transportation ("FDOT") pond to avoid potential turbid runoff into an on-site wetland; 4) Pumping turbid water from an on-site wetland to an on-site pond so that this turbid water could not discharge into Cypress Creek during future rainfall events; 5) Constructing two large on-site

---

[4] "D.E." citations refer to docket entries in this case.

containment areas to supplement the on-site ponds built during the construction phase; 6)
Constructing and sodding additional perimeter berms to contain construction water within the
site; 7) Constructing masonry bulkheads in twin storm lines to control drainage leading to on-site
ponds; and 8) Planting grass seed on all exposed soils by direct seeding or application of
hydroseed.  D.E. 41-2, D.E. 52-2 - 4.  As a result, ***there have been no discharges of turbid water
from the site since April 2008***.  AR 15341.[5]

The Corps conducted an extensive assessment and analysis during the one and a half year
remand period regarding the causes and impacts of the discharges.  AR 15340-70.  It collected
and reviewed approximately 15,000 additional pages of information from various sources,
including other agencies, as well as Plaintiffs and Intervening Defendants.  D.E. 60, D.E. 69.
There was another extensive public comment period, during which Plaintiffs submitted hundreds
of pages of material, including newspaper articles, advancing the same arguments and positions
contained in their original summary judgment motion and raised herein.  AR 10855-910, 11432-
440, 12213-83, 15294-30, 15340, 15344-45, 15367-68.

In addition, the Corps reinitiated consultation with the FWS with regard to the Wood
Stork, the Snake, and other potentially affected species.  AR 153037-47, 15360.  Both agencies
engaged in extensive consultation, and again concluded that the project is "not likely to
adversely affect" the Wood Stork or the Snake.  AR 15274-76, 15362-65.

More than one and a half years after it suspended the CCTC permit, and based on an
exhaustive review of the substantial supplemental administrative record compiled during the
remand, the Corps reissued the permit, AR 15382-531, and issued a Supplemental

---

[5] In April 2008, after the permit had been suspended, there was an additional release of muddy water from the
project site as a result of pipe inlets being unplugged at the wrong time; this problem was immediately corrected.
AR 8786, 15341.  The Corps concluded that this discharge was also the result of human error, not a flaw with the
design of the permanent stormwater management system.  AR 15341.

Environmental Assessment for the project setting forth its findings on remand, AR 15340-70. The Corps reaffirmed its original findings regarding the impacts of the project, and concluded that the discharges were the result of human error in implementing construction-phase temporary erosion and sediment control measures.  *Id*.  In the instance of the January 2008 discharge that directly resulted in the suspension, the Corps found that it was caused by human error, combined with an unusually high rain event that dropped over 5 inches of rain during an approximately 10-hour period, more than 10% of average annual rainfall in Florida ***in a single day***.  AR 15341.[6] The Corps concluded that the discharges during initial construction were not the result of a flaw with the design of the project's stormwater system.  *Id*.

The Corps and the other responsible regulatory agencies severely fined Intervening Defendants as a result of the discharges.  Intervening Defendants paid approximately $300,000 in penalties to the Corps, AR 15266, and paid approximately $47,000 in penalties to the SWFWMD, AR 16130-39.[7]  No agency, however, revoked its permit for CCTC following the regrettable discharges.

---

[6] In fact, the event caused between 5.2 and 6 inches of rain.  AR 8854-55.

[7]  Intervening Defendants will also be paying a civil penalty to FDEP in excess of $100,000.  AR 10248-49.

## III.   SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF FEDERAL DEFENDANTS AND INTERVENING DEFENDANTS[8]

### A.   Standard of Review

The Court has a limited scope of review in this case because the challenged agency actions are reviewable pursuant to the APA.  *See Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 282-83 (D.C. Cir. 1981) (applying APA standard of review to CWA permit claims); *Oceana, Inc. v. Gutierrez*, 488 F.3d 1020, 1025 (D.C. Cir. 2007) (applying arbitrary and capricious standard of review to ESA and NEPA claims).  Courts may review agency decisions only to determine whether those decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  To pass review under the arbitrary and capricious standard of review, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between facts found and the choice made.'"  *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  As the D.C. Circuit has observed, a party seeking to have a court declare an agency action arbitrary and capricious carries "a heavy burden indeed." *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 714 (D.C. Cir. 2000).

The "scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency.  Rather, the agency action under review is entitled to a presumption of regularity."  *Millennium Pipeline Co., L.P. v. Gutierrez*, 424 F. Supp. 2d 168, 174 (D.D.C. 2006) (Lamberth, J.) (internal citations omitted); *see also Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008) (court "cannot substitute

---

[8] Plaintiffs' NEPA, CWA, and ESA claims are moot because all of the wetlands on the CCTC site authorized to be developed have been cleared and filled.  Because the permitted activity that Plaintiffs' lawsuit challenges has already been completed, there is no effective relief regarding those claims that the Court may grant.  *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006); *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 396-97 (5th Cir. 2000).

[its] judgment for that of the agency. . . .") (internal quotations and citations omitted); *Costle*, 657 F.2d at 283 (arbitrary and capricious is a narrow standard that presumes agency action to be valid, and "forbids a court from substituting its judgment for that of the agency"); *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) ("it is not [the court's role] to conduct its own investigation and substitute its own judgment for the administrative agency's decision.") (internal citations and quotations omitted).

The decisions by the Corps and the FWS in this case easily pass muster under the deferential APA standard of review.  The agencies met their procedural obligations and provided a reasonable explanation why issuing a permit to impact only 53.39 acres of wetlands at CCTC is in the public interest.  Plaintiffs' lawsuit comes down to policy disagreements with the agencies. Since the Court may not substitute its judgment for that of the agencies, all of Plaintiffs' claims should be rejected.

### B.    The Corps Complied with NEPA

NEPA is a procedural statute that does not impose "substantial environmental mandates," *American Bird Conservancy v. FCC*, 516 F.3d 1027, 1032 (D.C. Cir. 2008), or "mandate particular results," *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004); *see also Rock Creek Pack Station, Inc.*, 344 F. Supp. 2d at 200 ("[I]t is well settled that NEPA does not require a particular agency to reach a particular result based on the information it collects and analyzes, but only prescribes the necessary process.").  Instead, it requires agencies to follow procedures for assessing environmental impacts and to consider and disclose such environmental impacts. *Id*.  If an agency follows these procedures, its actions have not violated NEPA.  *Id*.  Because the NEPA process "involves an almost endless series of judgment calls . . . [t]he line drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."  *Coal. on Sensible Transp. Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  "If the adverse environmental

effects of the proposed action are adequately identified and evaluated, the agency is not

constrained by NEPA from deciding that other values outweigh environmental costs."

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

### 1.      **No Environmental Impact Statement was Required**

The Corps issued a Finding of No Significant Impact ("FONSI") in its Initial

Environmental Assessment.  AR 6687.  The FONSI was issued following a lengthy three-year

review of the CCTC permit application, and based on an over 6,000-page administrative record.

*Id*.  During the year and a half remand period, the Corps reconsidered its original decision, and

reviewed thousands of additional pages of materials collected by the Corps from other agencies,

as well as materials submitted by Plaintiffs and Intervening Defendants.  D.E. 60; D.E. 69.  After

its exhaustive analysis of all of the data, the Corps reaffirmed its FONSI.  AR 15368.  The

Corps' FONSIs are entitled to substantial deference.  *Coal. on Sensible Transp. Inc.*, 826 F.2d at

66.  Because both of the FONSIs were based on a review that complied with NEPA, the Corps'

issuance of the FONSIs was not arbitrary and capricious, or an abuse of discretion.  Therefore,

no EIS was required.  *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (reviewing court

will "overturn an agency's decision to issue a FONSI – and therefore not prepare an EIS – only if

the decision was arbitrary, capricious or, an abuse of discretion.") (internal citations and

quotations omitted).

An EIS is only required when the acting agency determines that a proposed action will

have a "significant" impact on the environment.  42 U.S.C.A. § 4332(2)(c).  The Council on

Environmental Quality ("CEQ") has established regulations that identify factors for assessing

whether an impact is "significant" within the meaning of NEPA.  40 C.F.R. § 1508.27.  These

factors are to be weighed by an agency when assessing whether an EIS should be prepared.  *See*

*Town of Cave Creek v. FAA*, 325 F.3d 320, 327-28 (D.C. Cir. 2003).  No single factor is

definitive.  *Id.*; *see also* 40 C.F.R. § 1508.27.  The CEQ factors raised by Plaintiffs actually

support the Corps' conclusion that no EIS was necessary here.

a.    <strong>Unique Characteristics</strong>

One CEQ criteria identified by Plaintiffs is CCTC's "close proximity to" alleged "unique

characteristics," but this criteria does not support preparation of an EIS here.  Even if there were

"unique" characteristics close to the site, that is insufficient to mandate preparation of an EIS.

*See Ind. Forest Alliance v. U.S. Forest Service*, 2001 WL 912751, at *13 (S.D. Ind. July 5, 2001)

("mere presence of unique features does not require . . . preparation of an EIS").  The only

"unique characteristics" that Plaintiffs identify are Cypress Creek and its wetlands, a buffer

between Cypress Creek and the project site (which will be preserved), and a wildlife linkage

(that will also not be disrupted by CCTC).  Mot. at 19-22.  Because the Corps considered the

impacts to these resources, this factor does not support preparation of an EIS.  *See Presidio Golf*

*Club v. Nat'l Park Serv*., 155 F.3d 1153, 1162 (9th Cir. 1998) ("unique characteristics" did not

mandate preparation of EIS when agency considered impacts to those characteristics).

### *Cypress Creek and its Wetlands*

As set forth in Section III, C, the Corps extensively analyzed and discussed the impacts

of CCTC on Cypress Creek and its wetlands during the initial permitting process and on remand.

AR 15340-41, 15360-63, 15367-68.  In fact, the primary purpose of the over one and a half year

long remand period was to re-assess the impacts of the project on Cypress Creek and its

wetlands.  AR 15340, 15369.  To ensure protection of Cypress Creek and its wetlands, the Corps

required an extensive stormwater management system, buffers between the project and Cypress

Creek and its wetlands, and a comprehensive surface water quality monitoring system.  AR

6616-27, 6650-55, 6672, 6676.[9]

Under NEPA, impacts to small areas of wetlands (such as the 53.39 acres of impact here) do not require an EIS, particularly when those impacts will be mitigated. Here, in the Environmental Assessments, the Corps considered the loss of wetlands and wetland functions, and required mitigation for such losses. AR 6637, 6646, 15342-43, 15349-59.[10] This satisfied NEPA. *See Coal. on Sensible Transp. Inc. v. Dole*, 642 F.Supp. 573, 592-94 (D.D.C. 1986), (destruction of wetlands was adequately analyzed in Environmental Assessment), *aff'd*, 827 F.2d at 66; *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 954-55 (Environmental Assessment sufficient to assess impacts of permit authorizing the filling of over 340 acres of wetlands).

### 50 and 25 foot buffers of natural vegetation

In order to protect Cypress Creek from project impacts, buffers were established between CCTC and Cypress Creek. AR 6650. To ensure that these buffers would provide the designed level of protection, the Corps took a hard look at them, and concluded that the buffers serve several functions, including sediment removal and erosion control, removal of excess nutrients and metals, moderation of stormwater runoff, moderation of water temperature, maintenance of habitat diversity, wildlife species distribution and diversity, and reduction of impact. *Id*.

Plaintiffs contend that the buffers are insufficient based on a declaration submitted after permit issuance by one of Plaintiffs' experts, Dr. Rains, as well as reports for the State of Washington and other areas outside of Florida. AR 10668, 10737-834. The areas of the country studied in the reports do not require the same stormwater management, attenuation, and

---

[9] While Plaintiffs are correct that Cypress Creek has been designed as a Florida Outstanding Florida Water ("OFW"), this is a common designation in Florida for streams in their natural state. Rule 62-302.700 (9), Florida Administrative Code.

[10] *See also* 6648, 6651-52, 6654-55, 6667, 6670, 6672, 6684.

treatment as required by the State of Florida.  AR 11380.  Development runoff in the areas covered by the reports Plaintiffs rely upon is routinely routed overland, with no velocity controls or pollution abatement.  *Id.*  For these types of development, buffers would be essential to the protection of wetlands and would provide velocity control, limited attenuation, and nutrient removal.  *Id.*  Florida leads the nation in stormwater management, in both quantity and quality. *Id.*  For example, all development runoff must be conveyed to attenuation/treatment ponds prior to discharge to wetlands.  *Id.*  Thus, larger buffers are not necessary for development projects in Florida, as they are in other states.  *Id.*  The Corps considered both of Dr. Rains' declarations and the reports regarding other states that he relied on.  AR 15344-45.  That the Corps chose not to adopt the analysis or conclusions of Plaintiffs' expert does not implicate NEPA.  *See Mich. Gambling Opposition v. Norton*, 477 F. Supp. 2d 1, 14-15 (D.D.C. 2007), *aff'd*, 525 F.3d at 29; *S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 117 (D.D.C. 2004).

### Wildlife Corridor

As discussed herein, the site will contain a continuous vegetated connection between properties up and downstream of Cypress Creek.  AR 6672.  This will allow uninterrupted wildlife movement along Cypress Creek.  *Id.*  During the initial permitting process, the Corps concluded that the buffers required by the project will sufficiently protect the "critical wildlife linkage."[11]  AR 6650, 6672.  The Initial Environmental Assessment sufficiently analyzed this issue and, thus, satisfied NEPA.  *Id.*

---

[11] The "critical wildlife linkage" has no legal basis in federal law, but instead is a local land use concept of Pasco County, Florida.  Pasco County Comprehensive Plan-2025, 3-7 (Revised 2006) ("Pasco County has identified Critical Linkages . . . which shall serve as connecting corridors for lands that are currently in public ownership to protect and conserve native vegetative communities, endangered and threatened species, and natural functions of wildlife habitats, including wetlands."); AR 3924-25, 5958.  Pasco County determined that the project would not cause unacceptable impacts to this "linkage" in issuing its DO.  AR 2319.  If the governmental entity that created the concept of the linkage believes the project will not threaten it, there is no reason why the Corps should have to reach a different decision.

b.    **Federal, state and local environmental laws**

The second CEQ criteria Plaintiffs rely upon, whether the action "threatens a violation of

Federal, State, or local law or requirements imposed for the protection of the environment," also

does not support preparation of an EIS.  Plaintiffs argue that because the construction-phase

discharges resulted in temporary violations of certain water quality standards, preparation of an

EIS was mandated.  Mot. at 22.  But, as discussed herein, the discharges were not the result of a

design flaw with the permanent stormwater management system, which had not been completed

at the time of the discharges.  AR 15340-41.  The Supplemental Environmental Assessment

extensively analyzed the causes of the discharges and whether those discharges affect the Corps'

initial conclusion that the permanent stormwater system was sufficient.  AR 15340-69.  The

Corps concluded that it did not.  *Id.*  In fact, all of the responsible agencies have concluded that

the project will not violate environmental laws.  AR 11710, 15273, 15340-41.  Plaintiffs are not

in a better position than these agencies to assess this issue.  And, once it is satisfied that the

Corps complied with the procedural requirements of NEPA, it is not the Court's role to second-

guess the ultimate permitting decisions of the Corps.  *Coal. on Sensible Transp. Inc.*, 826 F.2d at

66.

c.    **No Impacts on the Eastern Indigo Snake**

Plaintiffs argue that alleged impacts of the project on the Snake require an EIS.  Mot. at

23-24.  But, as discussed in greater detail below in Section III, D, the Corps (and the FWS)

analyzed the impacts of the project on the Snake and concluded – twice – that the project is "not

likely to adversely affect" the Snake.  AR 6681-82, 15360-65.  Preparation of an EIS is not

required in such circumstances.

d.      **Degree to Which Action May Establish Precedent**

The fourth CEQ criteria that Plaintiffs rely on – the "degree to which the action may

establish a precedent" – is inapposite.  The permit at issue here is a Section 404 dredge and fill

permit that authorizes the filling of approximately 53 wetland acres on a project site of more than

500 acres.  AR 15349-59.  That decision is not of sufficient magnitude to have far reaching

impact on other projects or government decisions.  This is what the CEQ "precedent" criteria

seeks to address.  *See Town of Cave Creek*, 325 F.3d at 355 (finding that this factor was not

implicated when FAA decision regarding air traffic rerouting project "created no binding

precedent which will control the FAA's future use of EISs for" similar projects); *Presidio Golf

Club*, 155 F.3d at 1163 (finding that this factor was not implicated when public golf clubhouse

project was "a unique, independent project" and would not "set[] in motion [ ] a chain of

bureaucratic commitment that [would] become progressively harder to undo the longer it

continues," which was what the "precedent" criteria was intended to address).[12]

e.      **Uncertain Impacts**

Plaintiffs' attempt to characterize the impacts of the project as "highly uncertain" also

must fail.  As set forth herein, this project has undergone far more regulatory scrutiny than most

development projects that involve impacts to wetlands.  The Corps carefully reviewed the

potential impacts of this project twice – during original permitting and during the lengthy

remand.  AR 11710, 15273, 15340-41.  It calculated and assessed the impacts and determined

---

[12] Even the cases Plaintiffs cite make this point.  *See, e.g., Anderson v. Evans*, 371 F.3d 475, 479 (9th 2004)
(applying "precedent" criteria to Department of Commerce's whale hunting quota for Makah Indian Tribe because it
was "not an ordinary, time limited regulatory permit, but rather the way the government has gone about contracting
with the Makah," but ultimately concluding that precedent criteria did not warrant preparation of EIS); *Natural Res.
Def. Council v. Dept. of Energy*, 2007 WL 1302498, at *22 (N.D. Cal. May 2, 2007) (applying "precedent" criteria
to decision by Department of Energy ("DOE") regarding remediation of areas that were radioactively contaminated
by the government's Energy Technology Engineering Center ("ETEC") in part of Simi Valley, California because
"whatever cleanup level [was] chosen at the ETEC could set a precedent for other DOE sites across the nation.")
(internal citations and quotations omitted).

that they would not be "significant."  AR 15359.  Plaintiffs' disagreement with the Corps'

decision not to prepare an EIS is no grounds for finding the Corps' decision arbitrary and

capricious under NEPA.  *See, e.g., Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir.

1993).

f.    <strong>Controversial</strong>

Having objected to the project since it was first conceived, Plaintiffs claim that CCTC is

"controversial" within the meaning of the CEQ criteria.  Mot. at 25.  But a project is only

"controversial" where a "substantial dispute exists [about] the size, nature, or effect of the major

Federal action, ***rather than to the existence of opposition to a use***."  *Town of Cave Creek*, 325

F.3d at 431.[13]  Here, Plaintiffs and their supporters alone oppose CCTC.[14]  The continued

approval of the CCTC by all local, state, and federal agencies with jurisdiction, *see* AR 2340,

6638, 6737-40, 15273, 11710, 15340-41, demonstrates the lack of "controversy."  *See Coal. on*

*Sensible Trans. Inc.*, 642 F. Supp. at 587-88 (citing to the fact that no "local, state or federal

agency charged with environmental responsibility opposed the [ ] project" as "significant" in

reaching its conclusion that project was not "controversial") (internal citations and quotations

omitted).  Despite the vehemence of Plaintiffs' opposition, it is insufficient to establish that the

project is "controversial."  *Id.* ("[T]he fact that some people may be highly agitated" by a project

is not enough to establish that it is "controversial.").  The fact that Plaintiffs hired experts to sign

affidavits opposing the project also does not establish that the project is controversial.  *See, e.g.,*

*Greenpeace Action*, 14 F.3d at 1335.

---

[13] In fact, *Anderson*, the only case Plaintiffs cite in support of their contention that the project is controversial, illustrates the point.  In *Anderson*, the court found that a whale-hunting quota for a Native American tribe was "controversial" within the meaning of the CEQ regulations because of the potential impact of the whale-hunting quota on the local whale population and future whale-hunting quotas for the area.  *Anderson*, 371 F.3d at 489.

[14] In fact, supporters of CCTC also submitted comments on remand.  *See, e.g.*, AR 8781-82, 11710.

2.      **The Initial and Supplemental Environmental Assessments were Legally Sufficient**[15]

The Initial and Supplemental Environmental Assessments prepared by the Corps satisfied the requirements of NEPA.  The Corps carefully considered all of the issues raised by Plaintiffs here.  That is all the Corps was required to do under NEPA.  *See Robertson*, 490 U.S. at 350-51; *Rock Creek Pack Station, Inc.*, 344 F. Supp. 2d at 200.  Since NEPA is a procedural statute only, and the Corps followed the applicable procedures, the agency action was not arbitrary and capricious.  *Id*.  As set forth below, both of the Environmental Assessments sufficiently considered and discussed each required issue.[16]

a.      **The Corps Took a Hard Look at Cumulative Impacts**

i.      **Plaintiffs' dissatisfaction with the cumulative impacts analysis does not render it arbitrary and capricious.**

The Corps is required under NEPA to consider the cumulative impacts of a project.  40 C.F.R. § 1508.8.  Cumulative impacts are those that result from the "incremental impact of the action when added to the past, present, and reasonably foreseeable future actions . . . ."  40 C.F.R. § 1508.7.  The 24-page Cumulative Impacts Analysis, which contains an additional 51 pages of appendices, analyzed the cumulative impacts of CCTC in detail.  AR 4707-82.  The

---

[15] Plaintiffs no longer argue that the Corps' Environmental Assessments were deficient because the Corps did not take a hard look at the direct and secondary impacts of CCTC.  Plaintiffs, thus, apparently concede that summary judgment should be entered in favor of Defendants on these two points.  In any event, the Corps did take a hard look at both the direct and secondary impacts.  AR 6636-88, 15340-70.

[16] Plaintiffs' focus on the amount of detail in the Environmental Assessments, *see, e.g.,* Mot. at 26-27, reflects a fundamental misunderstanding of the nature of an Environmental Assessment.  An Environmental Assessment is a shorter, more concise document than an EIS.  40 C.F.R. § 1508.9(b); *see also* CEQ's "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed. Reg. 18026 ("[T]he Council has generally advised agencies to **keep the length of EAs to not more than approximately 10-15 pages**.") (emphasis added).  Pursuant to the applicable regulations, it contains only "brief discussions" of the need for the proposal, the alternatives, the impacts of the project, and the alternatives, and the agencies and persons consulted.  *Id.  See also S. Utah Wilderness Alliance*, 326 F. Supp. 2d at 117; *Biodiversity Conservation Alliance v. U.S. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 217 (D.D.C. 2005).  The Initial and Supplemental Environmental Assessments were 52 and 30 pages long, respectively, longer than the recommended length of 10-15 pages.  AR 6636-88.

Initial Environmental Assessment incorporates the required Cumulative Impacts Analysis. AR 6686. The Supplemental Environmental Assessment adopts and reaffirms the Corps initial cumulative impacts determination. AR 15366-67. Given the relatively minimal direct impacts of the project, it was entirely reasonable for the Corps to conclude that there would not be significant cumulative impacts associated with the project on a going forward basis.

The "determination of the extent and effect of [cumulative impacts] . . . is a task assigned to the special competency of the appropriate agencies." *Ind. Forest Alliance,* 2001 WL 912751, at *11 (internal citations and quotations omitted). Plaintiffs' criticisms of the cumulative impacts analysis are largely based on Plaintiffs' general dissatisfaction with the extent of the analysis in the Environmental Assessments on various issues. But Plaintiffs' desire for a lengthier analysis does not render the cumulative impacts analysis arbitrary and capricious. *See S. Utah Wilderness Alliance*, 326 F. Supp. 2d at 117 ("[P]laintiffs' contention that 'they would have done more' does not render the cumulative impacts analysis violative of NEPA."). Indeed, the "determination of the extent and effect of [cumulative impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club,* 427 U.S. 390, 414 (1976).

ii.     **The Corps took a hard look at the impact of the project on a wildlife linkage.**

A total of 39.31 acres of wetlands, uplands, and ponds within 600 feet of Cypress Creek have been placed under conservation easements to permanently provide wildlife habitat. AR 6672, 15358. For the entire length of Cypress Creek, the project contains an average buffer of 600 feet from impervious surfaces. AR 6672. A wildlife corridor will run through the entire southern width of the property, providing a continuous vegetated connection between properties up and downstream of Cypress Creek. *Id.* The Corps specifically found, based on the record

evidence, that the project "will not impede wildlife movements along the creek," and that it will

"preserve the integrity of this linkage." *Id*. Thus, the Corps identified the issue of the wildlife

linkage and analyzed the impacts of the project in compliance with NEPA. *See, e.g., Save Our*

*Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339-40 (6th Cir. 2006) (40-page

environmental assessment that identified and discussed the environmental impacts of the

proposed action satisfied NEPA).

iii.   **The Corps took a hard look at the impact on the Eastern Indigo Snake.**

Plaintiffs' NEPA argument with regard to the Snake is also without merit. As discussed

below in Section III, D, regarding Plaintiffs' ESA claim, the Corps took a hard look at the

impacts of the project on the Snake and its habitat and concluded that the project is "not likely to

adversely affect" it. AR 6682, 15364-65. The Corps identified and analyzed the project's

impact on the Snake in compliance with NEPA. *Id.*

iv.   **The Corps took a hard look at the impact of the project on Florida Scrub Jay habitat.**

The Corps identified and considered the impacts of CCTC on the Florida Scrub Jay

during the permitting process, AR 6683, and on remand, AR 15365. Both times, the Corps and

the FWS concluded that the project would have no effect on the Scrub Jay. *Id.* Plaintiffs are

simply wrong in their assertion that Scrub Jay habitat existed on the site. The record evidence

established that there was none. AR 15365, 6683, 15365; FWS 1428. Scrub Jays "have

extremely specific habitat requirements" which do not occur on the CCTC site. *Id.* This is

confirmed by the fact that no Scrub Jays were ever observed on the site. AR 3819; FWS 1454.

v.   **The Corps took a hard look at the impact of the project on groundwater resources.**

Plaintiffs attack the Corps for allegedly failing to consider the impact this project will

have on the use of groundwater.  But Plaintiffs ignore that the consumptive use of water falls within the province of the state, regional, and local regulators, not the Corps.  Fla. Stat. § 373.036; Fla. Stat. § 373.042; Fla. Stat. § 373.0421.  The state, regional, and local agencies considered these issues and did not object to CCTC on these grounds.  AR 6521-41, 6638, 6675-76.  The Corps was entitled to defer to the findings and positions of the responsible regulators regarding local water demand and withdrawal.  *See Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 646 F.2d 215, 221 (5th Cir. 1981).  The Corps, nevertheless, also took a hard look at water demand and withdrawal issues.  AR 6638, 6674-77.

vi.    **The Corps was entitled to consider and rely upon materials submitted by the applicant.**

Plaintiffs criticize the Corps for relying on the cumulative impacts analysis submitted by consultants for the applicant.  There is, however, no prohibition on the Corps relying on materials prepared or supplied by an applicant or its consultants.  *See Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974) ("There is no NEPA prohibition against a state agency, financially interested private contractor or a new community applicant providing the federal agency, which must of necessity work with these parties, data, information, reports, groundwork environmental studies or other assistance in the preparation of an environmental impact statement."); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 165-66 (D.D.C. 2002) (affirming Environmental Assessment that was prepared by and based on materials and studies conducted by applicants).  The applicable regulations allow and, indeed, expect that applicants and their consultants will provide key information necessary to the preparation of the Environmental Assessment.  40 C.F.R. § 1506.5(c); 33 C.F.R. § Pt. 325, App. B, 8(f)(2).

In preparing both Environmental Assessments, the Corps reviewed, examined, and analyzed the materials submitted by third parties, including the applicant and its consultants (and

Plaintiffs).  AR 6639-40, 6687, 15344-45,15365.  The Corps also made various requests for additional information regarding potential cumulative impacts, again reflecting their careful analysis and review of materials submitted by the applicant.  AR 3881-82, 3893-912, 4471-72, 4480, 4500.  This process was fully in compliance with NEPA.

C.      The Corps Complied with the Clean Water Act

Under the CWA, the Corps seeks to avoid wetland impacts, minimize those that cannot be avoided, and mitigate the unavoidable impacts.  40 C.F.R. § 230.10.  In so doing, the Corps is required to consider whether there are "practicable" alternatives to a proposed project, 40 C.F.R. § 230.10(a), and whether the project will result in "significant degradation" of waters of the United States, 40 C.F.R. § 230.10(c), prior to issuing a dredge and fill permit.

Plaintiffs attack the Corps' permitting decision on the grounds that its practicable alternatives analysis was flawed and that the project will significantly degrade waters of the United States.  As set forth herein, the administrative record amply demonstrates that the Corps exhaustively analyzed alternatives during its initial consideration of the CCTC permit application.  And, during remand, at Plaintiffs' request, the Corps once again thoroughly examined the financial analysis the applicants submitted in support of their position that no smaller project would be economically viable.  AR 15345-49.  As discussed below, Plaintiffs' arguments regarding impacts of the project on waters of the United States are based entirely on discharges that occurred during construction – before the stormwater management system was even built – and do not reflect the water quality impacts of the project when construction is completed.  AR 15340-41.

Because the Court is reviewing "the Corps' interpretation of its own regulations, [its] review is cabined to assessing the reasonableness of that interpretation," and "is highly deferential," and the Corps' interpretation of the CWA is "controlling unless plainly erroneous or

inconsistent with the regulation." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177,

193 (4th Cir. 2009) (quoting *Auer v. Robbins,* 519 U.S. 452, 461 (1997)); *see also EPA v. Nat'l*

*Crushed Stone Ass'n,* 449 U.S. 64, 83-84 (1980).  "It is enough [under the CWA] that the Corps

considered all relevant factors and that there is credible evidence in the record to support its

action." *Envtl. Coal. of Broward County, Inc. v. Meyers*, 831 F.2d 984, 986 (11th Cir. 1987).

    1.    **The Corps' Determination that There are No Practicable Alternatives**
            **was Not Arbitrary and Capricious**

        a.    **The Record Evidence Supports the Corps' Determination That**
                  **There are No Practicable Alternatives**

    The record supports the Corps' finding that there are no practicable alternatives for

CCTC.  A "practicable alternative" is an alternative that "is available and capable of being done

after taking into consideration cost, existing technology, and logistics in light of overall project

objectives."  40 C.F.R. § 230.10(a)(2).  In determining overall project objectives, the Corps must

take into account the applicant's objectives.  *La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044,

1048 (5th Cir. 1985) ("[T]he Corps has a duty to take into account the objectives of the

applicant's project.  Indeed, it would be bizarre if the Corps were to ignore the purpose for which

the applicant seeks a permit and to substitute a purpose it deems more suitable."); *see also*

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1270 (10th Cir. 2004).

    In this case, the overall project purpose was "to develop a regional mall and supporting

commercial enterprises to serve a market bounded by U.S. 302 on the east, the Suncoast Parkway

on the west, extreme southern Hernando County to the north, and northern Tampa to the South."

AR 6637.  The record supports the Corps' determination that there are no other practicable

alternative sites that can achieve this overall project objective.  The Initial Environmental

Assessment contains an analysis of three on-site and eleven off-site alternatives, and concluded

that none of these alternatives is practicable.  AR 6644-46.  Of the four on-site alternatives

analyzed in the Initial Environmental Assessment, the approved plan (CCTC), had the least

acreage of wetland impacts.  AR 6645.  Eleven off-site alternatives, in addition to the approved

plan, were evaluated in the Initial Environmental Assessment and the alternatives analysis.  AR

6643-45, 2792-2803.  Four of the off-site alternatives – Alternatives 5, 6, 7, and 8 – were

impracticable because they were not available for sale.  AR 6644, 2798-2800.  Off-site

alternatives 2, 3, 9, 10 and 11 were too small for the development of a regional retail center.  AR

2795, 2800-01.  Site 1 was not practicable because of the lack of population density and

extremely limited populated growth in the northern section of Pasco County where the site is

located.  AR 6644, 2792-93.  Site 4 was impracticable because it was only accessible by a single

arterial road.  AR 6644, 2796-97.  Thus, the approved plan is the only practicable alternative.

AR 6644, 2803.

On remand, the Corps further analyzed: (i) the impacts if the site reverted to its prior use

of agriculture; and (ii) the impacts if the site were developed for residential use.  AR 11258-67.

This analysis concluded that the preferred alternative, the CCTC project, had the least

environmental impacts.  AR 11267.

Plaintiffs cite no record evidence that supports a conclusion that the Corps' analysis fails

to comply with applicable rules.  Instead, Plaintiffs attack the Corps' practicable alternatives

analysis because the Corps relied, in part, on materials submitted by the applicants in reaching its

decision.  Mot. at 28-34.  The CWA, however, does not prohibit the Corps from relying on

technical materials prepared by the applicant in making permit decisions.  *See Hintz*, 800 F.2d at

835-36 (Corps did not violate CWA by relying on information supplied by applicant in

determining that there were no practicable alternatives).  In fact, the CWA expressly allows it.

*Ohio Valley,* 556 F.3d at 193 (the Corps' internal guidelines authorize the Corps to "use

functional assessments by qualified professionals to determine impacts.") (citation omitted).

Moreover, the Corps did not accept at face value any assertions or analysis submitted by the applicant regarding practicable alternatives.  *See, e.g.*, AR 4467-74, 5384-90, 15345-49. Instead, it closely scrutinized the applicant's submissions and sought and obtained independent analysis in making decisions regarding the project.  *Id.*; AR 12285-89.

### b.      Downsizing the Project is Not a Practicable Alternative

During the initial review of the project, the applicant and the Corps considered a variety of site plans to ensure that the project would avoid impacts to wetlands to the maximum practicable extent.  AR 6640-50, 2792-2803.  Plaintiffs continue to assert that further downsizing of CCTC is still practicable.  Mot. at 29-36.  According to Plaintiffs, because some environmental reduction of project size is physically possible, the Corps' permitting decision should be vacated for failure to choose such an alternative.  The record evidence, however, demonstrated that the Corps correctly concluded that further downsizing is impracticable.

### i.      A smaller project does not meet the project purpose.

The overall project purpose is "to develop a regional mall and supporting commercial enterprises . . . ."  AR 6637.  Plaintiffs have not challenged that project purpose.  An alternative is not practicable, however, if it does not meet the overall project purpose.  40 C.F.R. § 230.10(a)(2).  A smaller project would not meet CCTC's overall project purpose.  AR 6646-47. Accordingly, building a smaller project need not be considered in the alternatives analysis.

### ii.      Downsizing CCTC is not practicable from a cost perspective.

The record evidence demonstrated that downsizing CCTC is not practicable from a cost perspective as required by the Section 404 Guidelines.  AR 6649.  An alternative is not practicable if it makes the project cost-prohibitive for the applicant.  *See Bering Strait Citizens*

*for Responsible Res. Dev.,* 524 F.3d at 947 ("After extensive consultation with [the applicant], the Corps determined that all alternatives were impracticable . . . because alternatives were cost prohibitive or undesirable for other reasons.  This rationale is acceptable under the CWA."); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1266-67 (10th Cir. 2004) (affirming determination that a smaller project would not be economically viable); *James City County, Va., v. EPA*, 955 F.2d 254, 259-260 (4th Cir. 1992) (finding alternative to dam project would result in water costing 50% more, thereby rendering alternative impracticable due to cost).  The preamble to the 404 Guidelines confirms that the inquiry into "cost" turns on whether the alternative is "reasonable in terms of the overall scope/cost of the proposed project," and that an alternative is not practicable if it is "unreasonably expensive."  *See* 1980 Notice, 45 Fed. Reg. at 85,339,43.

The record contains detailed, clear and convincing evidence that downsizing CCTC is impracticable because it would make the project unreasonably expensive; a smaller project would not generate an 8% rate of return, the reasonable minimum rate of return for the project. The Corps' determination on this technical point is entitled to substantial deference, especially because the agency conducted its own financial analysis for the project.  *See Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'") (quoting *Kleppe v. Sierra Club*, 427 U.S. 90, 412 (1976)).

The administrative record established that it would be virtually impossible for CCTC to obtain equity investors with a rate of return lower than 8 percent.  AR 12289, 15348, 12172-75, 11236-11245.  An appropriate going-in capitalization rate, also known as a rate of return, for a similar **established** regional mall in Tampa, Florida in the second quarter of 2006 would have

been 7.6%.  AR 12286, 11240.  But this is the average rate of return for an established,

stabilized, regional mall, not a development project, such as CCTC, which requires a higher rate

of return.  AR 12285-86.

The going-in capitalization rate for a development project must be upwardly adjusted to

take into account the risks associated with new projects: construction cost escalations beyond

inflation, construction cost overruns, permanent financing rate risks, increases in capitalization

rates, increases in investor equity return requirements, and lease-up risks.  AR 11241.  For

CCTC, the record established that a 1.5 to 3.0 upward adjustment above 7.6% was appropriate.

AR 12286.  This would result in an applicable going-in capitalization rate of 9.10% to 10.6%,

higher than the minimum 8% going-in capitalization rate Intervening Defendants identified for

the project.  AR 4600, 4619, 11243, 12286.

The record also supports the Corps' finding that it was proper for Intervening Defendants

to use the 2006 market value of the project site property (instead of the original purchase price

from over 20 years ago) in analyzing financial feasibility.  AR 12288-89.  There is no support for

using an unadjusted historic purchase price to determine current market value and current rates

of return.  According to Plaintiffs, however, if Intervening Defendants inherited the project

property instead of purchasing the property for fair market value before seeking a permit, then

the project could be reduced substantially more in size based solely on Intervening Defendants'

cost basis in the property.  But this is of no relevance in determining whether a smaller

alternative project is economically viable.  AR 11244, 12285-86.  The appraised value of the

land (approximately $72,837,500 at the time the permit application was under consideration)

combined with other relevant factors discussed extensively in a report of Ernst & Young

submitted on remand, confirms the Corps' original conclusion that reducing the size of the

project was impracticable because it would make the project cost prohibitive.  *Id.*; AR 11236-47.

As the Corp's Socioeconomic Branch found, "[t]he Corps' acceptance of the present value rather

than actual historic land costs allows more accurate, correct and realistic financial feasibility

studies."  AR 12288.[17]

Plaintiffs argue that the Corps' entire cost analysis was flawed because Intervening

Defendants inadvertently cited to the wrong table (containing pre-tax yield averages) in the

Summer 2006 RERC Report during the permitting process.  Mot. at 34-35.  Both before and after

submission of the pre-tax yield document, Intervening Defendants submitted other

documentation referencing going-in capitalization rates that supported the Corps' finding that an

8% going-in capitalization rate was a reasonable minimum rate for the project.  AR 11240-41,

12285, 12287, 15345-47.  Plaintiffs incorrectly characterize the citation to the wrong table as a

deliberate attempt to mislead the Corps.  Mot. at 34-35.  This is not true.  Furthermore, as the

Corps' own Socioeconomic Branch found, the applicant's single reference to the wrong table,

since corrected, does nothing to change the fact that 8% was a reasonable minimum rate of return

for the project as the expected rate of return could have actually been higher.  AR 12287.

### iii.   The Corps considered a relevant time frame when evaluating market conditions.

During the remand period, Plaintiffs argued that due to changed market conditions, the

Corps should jettison its original financial analysis of whether there were alternatives that were

"practicable" from a "cost" perspective.  According to Plaintiffs, on remand, the Corps should

have started from scratch in light of changed economic conditions two years after the original

---

[17] The Corps itself uses current land values in calculating cost-sharing on civil works projects.  *See* Master Agreement Between Corps and South Florida Water Management District Regarding CERP, dated August 13, 2009, available at: http://cerp.info/pm/pm_docs/master_agreement/081309_master_agreement_cerp.pdf, last visited on January 19, 2010.

permitting decision was made.[18]  Even if the Corps was required to conduct a practicable alternatives analysis when it lifted the suspension, Plaintiffs cite no legal support for the contention that a "cost" or financial feasibility analysis underlying a previously issued permit must be reassessed every time the economic environment changes.  If that were the case, the Corps would be required to reconsider every single "cost" or financial feasibility determination it made prior to the fall of 2007.  This is why new information does not typically result in a new EIS.  *See, e.g.*, *Marsh*, 490 U.S. at 373 ("To require [a new EIS every time new information comes to light] would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.").  This is true even when the agency is aware of the new information or the likelihood of changed conditions in the near future.  *TOMAC*, 433 F.3d at 862-63.

It makes no sense to reanalyze financial feasibility based on post-permit issuance market conditions because this type of analysis is based on economic conditions that can fluctuate greatly between the issuance of the permit and the completion of the project.  *See, e.g.*, *Ass'n of Flight Attendants-CWA, AFL-CIO v. Pension Benefit Guaranty Corp.*, 2006 WL 89829, at *12 (D.D.C. Jan. 13, 2006) (finding that "agency is not required to delay action while awaiting even more current information" and that Pension Benefit Guarantee Corporation was not required to consider current financial ability of United Airlines to sustain its flight attendants' pension plan because the ultimate success of United's reorganization was dependent on future unknown financial conditions).  As the Corps' Socioeconomic Branch found, the real estate market fluctuations tend to be localized, and the Tampa market where CCTC is located "may react very differently from other areas of the state and the country."  AR 12289.  The Corps acted

---

[18] By this argument, Plaintiffs can only be challenging the decision to unsuspend the permit in 2009, not the decision to issue the permit in 2007.  Nothing in the CWA regulations makes the practicable alternatives inquiry applicable to post-permit issuance decisions by the Corps.  40 C.F.R. § 230.10.

reasonably in analyzing its original permitting decision based on 2006 market conditions, and Plaintiffs have cited no authority that the Corps' selection of this time frame was arbitrary and capricious.  During remand, the Corps considered and rejected Plaintiffs' position.  AR 12289.

Even if Plaintiffs were correct, there is no reason to believe that it would be easier to attract investors and financing in 2009 for a project being built during an economic downturn.  If anything, as Ernst & Young found, the 8% minimum rate of return is much lower than what would be expected if post-2007 market conditions were analyzed.  AR 11244.

iv.     **The Corps' independent economic review confirmed that a smaller project was not practicable from a cost perspective.**

As noted herein, it is entirely appropriate for an agency to rely on materials submitted by an applicant.  But, here, the Corps did far more than simply rely on materials submitted by Intervening Defendants.  The Corps' own Socioeconomics Branch conducted an independent analysis and review of the issue, and concluded that: "8% is a reasonable minimum ROR" for the CCTC project, the methodology utilized in the feasibility studies submitted by Intervening Defendants was "appropriate and reasonable," the analysis was "conducted correctly," the "[c]alculations can be clearly seen on provided excel documents," the "data used is reasonable and conservatively within professional industry average range of values," and the analysis and data in the record show that "any further reduction in the scope of the project will cause the [rate of return] to drop below 8%."  AR 12285-89.  There is no record support for the Plaintiffs' suggestion that the Corps did not independently analyze the economic impacts of the project.

c.     **Reducing the Number of Surface Parking Spaces is Not a Practicable Alternative**

Plaintiffs also argue that reducing the number of surface parking spaces, either by constructing a second parking garage or by simply reducing the number of parking spaces

altogether, was a practicable alternative.  Mot. at 36-37.  But Plaintiffs completely ignore that the project already features one parking garage, with 2,098 parking spaces, AR 6646, so the project plan does, in fact, include a parking garage that reduces the amount of surface parking.

Plaintiffs' complaint is apparently that two, not one, parking garages should be utilized. The record clearly established that replacing some of the remaining surface parking with a second parking garage is not financially practicable.  AR 6646.  The Corps concluded that, "Although . . . a parking garage would reduce the project footprint . . . the resulting [lower] Rate of Return . . . deems the alternative impracticable since financing cannot be secured at this profit level."  *Id.*[19]

The record evidence also established, as the Initial Environmental Assessment concluded, that another parking garage is impracticable because proposed tenants for CCTC will not accept structured parking.  AR 6646-47, 3972, 2155; s*ee also D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Eng'rs*, 513 F. Supp. 2d 1261, 1274, 1280-81 (D. Ala. 2007) (finding that parking decks or otherwise terraced parking would be both too expensive and unacceptable to the development's retail tenants).

The record evidence further established that simply reducing the total number of surface parking spaces is not practicable.  CCTC has an average of one parking space per 200 square feet.  AR 6647.  This is consistent with shopping center industry standards.  AR 5412, 5532, 5533, 5530.  Regional multi-use developments, such as CCTC, have a much higher utilization rate than older malls due to high restaurant utilization.  AR 4604-06, 4660-65.  As the Initial Environmental Assessment concluded, restaurant uses require 2-3 times the amount of parking

---

[19] Case law also supports this conclusion.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 450 F. Supp. 2d 503, 530 (D.N.J. 2006) (finding reasonable the Corps' conclusion that stacked parking would be too costly and therefore impracticable).

than retail alone.  AR 6647; *see also* AR 4604-06, 5530.[20]  The Corps properly concluded that the number of parking spaces at CCTC could not be further reduced.

> 2. **The Corps' Determination that the Project Will Not Cause or Contribute to the Significant Degradation of the Waters of the United States was not Arbitrary and Capricious**

Plaintiffs' argument that the project will violate water quality standards is now based primarily on the accidental discharges that occurred during initial construction.  Mot. at 38-40. But the Corps extensively analyzed the project's potential impacts on Cypress Creek and its wetlands both before and after the discharges and concluded, based on the record, that the project would not cause significant degradation of waters of the United States.  AR 15359-60.

> a. **The Corps Extensively Analyzed the Project's Impacts on Cypress Creek and the Adjoining Wetlands During the Original Permitting Process**

The Corps extensively analyzed the impacts to Cypress Creek and its wetlands.  AR 6650, 6652, 6656, 6669-73, 6676, 6679, 6684, 15340, 15369.[21]  The Corps required a stormwater management system to ensure that the completed project will have no adverse impacts to Cypress Creek and its adjacent wetlands.  AR 6672.  It required a minimum buffer distance of 50 feet between Cypress Creek and any type of activity. AR 6650.  It required a minimum buffer distance of 25 feet between the conserved on-site wetlands and any activity.  AR 6650.  To ensure that water quality standards are not violated, the Corps and the other responsible agencies

---

[20] Plaintiffs' argument that the Corps simply accepted the applicant's representations is contrary to the record.  The Corps verified the applicant's information, and even requested that the applicant evaluate the practicability of employing additional parking garages in order to minimize the footprint, AR 6646, 3969-72, and compare the proposed parking at CCTC to parking at other malls in the area, AR 6647, 3972-73.  The Corps also inquired as to why the number of parking spaces in the project exceeded the minimum for Pasco County, which is one parking space per 300 square feet, and the applicant supplied uncontested record evidence that the Pasco County requirement was a minimum, not a maximum, that is inconsistent with industry standards.  AR 6647, 5412.  This record evidence demonstrates that the Corps did not simply accept the statements of the applicant, but engaged in a rigorous analysis of the issue.  Plaintiffs apparently would require the Corps to hire its own experts on regional multi-use development, design, and economics, which is well beyond the requirements of the CWA.

[21] *See also* AR 2108, 2394, 2396, 2566, 3790, 3852, 3880, 3882, 3891-92, 4469, 4472, 5385, 5557, 5958.

required a comprehensive surface water quality monitoring plan, AR 6676, 6616-27, and a groundwater monitoring plan, AR 2324-25, 6675. Finally, the approved permit requires extensive wetlands mitigation, including placing all preserved on-site wetlands under a conservation easement. AR 6651-52, 6654-55, 15358.

i.      **The buffers will protect Cypress Creek and adjoining wetlands.**

The Corps analyzed the impacts of the project and concluded that the required 50 and 25 foot buffers would sufficiently protect Cypress Creek and on-site wetlands upon project completion. AR 6650, 6672. The buffers serve several functions, including sediment removal and erosion control, excess nutrient and metal removal, moderation of stormwater runoff, moderation of water temperature, maintenance of habitat diversity, wildlife species distribution and diversity, and reduction of human impact. AR 6650.

ii.      **The stormwater management system.**

The Corps also extensively analyzed the permanent stormwater management system designed for the project and concluded that it was sufficient to protect the water quality of Cypress Creek. AR 6676-77. The stormwater system south of SR 56, that drains to Cypress Creek, was designed to provide 50% more treatment than Florida law requires. AR 6676. The Initial Environmental Assessment discussed in great detail the stormwater management system that the applicant designed, confirmed that it exceeds State requirements, and concluded that the system will actually enhance water quality when it is completed. AR 6676-77. A detailed analysis of the stormwater management system was also conducted by the SWFWMD before it issued the Water Quality Certification/ERP, which is incorporated and attached to the Corps permit. AR 6520-41.

Plaintiffs argue that the permanent stormwater management system will not have

sufficient capacity and will have a limited ability to treat typical pollutants. Mot. at 39. Neither

of these contentions is supported by the administrative record.[22] Plaintiffs argue that the system

only has the capacity to treat 1.5 inches of "runoff," which Plaintiffs argue is insufficient.[23] To

produce 1.5 inches of runoff, there must be 2.9 inches of rainfall. AR 11379. 2.9 inches is

actually a conservative estimate of the amount of rain that is needed to produce 1.5 inches of

runoff because it does not take into account that 10% of the parking for CCTC will be

constructed of porous pavement that will absorb rain. *Id.* It also fails to take into account the

evapotranspiration that will occur during rainfall events. *Id.*[24]

Plaintiffs also assert that the system has a limited ability to effectively treat the specific

types of contaminants likely to be present in the CCTC stormwater. Mot. at 39. The

administrative record evidence established, however, that the stormwater system has more than

sufficient capacity to treat the types of contaminants that likely will be present at CCTC.[25] More

specifically, the stormwater treatment ponds that are part of the system meet the design criteria

---

[22] In their original motion for summary judgment, and in the comments they submitted to the Corps during remand, Plaintiffs raised various other alleged inadequacies of the stormwater system. Apparently, Plaintiffs concede that those claims lack merit.

[23] Plaintiffs' position on this issue has evolved. Initially, Plaintiffs argued that the system had insufficient capacity because it was designed to treat only 1.5 inches of "rainfall." AR 10293-94. But, as Intervening Defendants pointed out during the remand period, AR 11054, the permanent stormwater system approved by the Corps treats the first 1.5 inches of runoff, not rainfall, AR 6676, 11379.

[24] The volume of runoff that the system is designed to treat is based on the fact that approximately 90% of all storm events in Florida will produce one inch of rainfall or less. AR 11379. Studies by the U.S. Geological Survey ("USGS") have shown that the first inch of runoff carries 90% of the pollution load from a storm event. *Id.* Therefore, the treatment of the first 1.5 inches of runoff will treat well over 90% of all storms and pollution loads. *Id.* Plaintiffs' contention that the CCTC site will decrease infiltration and, thereby, increase the magnitude of stormwater off the site and decrease the quality of water flowing off the site is simply unsupported. Mot. at 20. Plaintiffs ignore the fact that, as part of the design and permitting for the CCTC project, a detailed hydrodynamic model was developed for the entire watershed between Interstate 75 and SR 54, which includes the CCTC site. AR 11379. The model evaluated the 1-inch, 2-inch, 2.33, 10, 25, 50 and 100-year/24-hour storm events, and showed that the completed CCTC stormwater management system will ensure that CCTC will not cause any increase or decrease in flows or durations. *Id.* The model also shows that the surrounding wetland hydroperiods for the entire study area would not be adversely affected by the CCTC project for both peak stages and durations. *Id.* Historical data shows that, on average, only approximately 2 days each year have rainfall that exceeds 2.5 inches. *Id.*

[25] In addition to having the capacity to sufficiently treat contaminants, the stormwater system is expressly designed to monitor the following contaminants identified by Dr. Rains: nitrogen, phosphorous, oil, grease, and heavy metals. AR 4713.

for stormwater treatment ponds established by the State of Florida.  AR 11387.[26]  In fact, the

system exceeds the requirements established by the SWFWMD, which have been proven

effective at ensuring compliance with state water quality standards.  AR 11379, 11389-90.  The

FDEP has reported and concluded that wet detention systems, such as the CCTC ponds, provide

significant treatment of stormwater.  AR 11385.[27]

The Corps extensively analyzed whether the discharges that occurred during initial

construction were due to a flaw in the design of the CCTC permanent stormwater management

system, and whether the discharges required modification of the stormwater system.  AR 15340-

41.  The Corps (and SWFWMD and FDEP, the responsible state and local agencies), concluded

that the answer to both of these questions was no.  *Id.*  The Corps concluded that the discharges

were caused by human error related to the temporary construction-phase erosion and sediment

control measures (and unusually heavy rainfall).  *Id.*  The Corps further concluded that the

permanent system did not need to be modified, and that the supplemental and modified

construction-phase temporary erosion and sediment control measures implemented by

Intervening Defendants after the discharges were sufficient to protect Cypress Creek and its

---

[26] Studies by USGS and others have shown that changes in the quality of groundwater near stormwater ponds are localized.  AR 11388.  They do not pose a threat to the aquifer.  Moreover, the soils on the CCTC site have high clay content, thereby dramatically impede percolation, infiltration, and transport of contaminants in groundwater.  *Id.* Any infiltration or percolation that occurs will result in the adsorption of nutrients, metals, and organics into pond sediments and immediately adjacent soils, thereby preventing such constituents from reaching Cypress Creek.  *Id.* The presence of clay in the soils at CCTC augment this adsorption capacity.  *Id.*  The CCTC project retains buffers along Cypress Creek to maintain this filtering function, and provides a well-designed stormwater system to prevent losses of such function from the areas being developed.  AR 11379, 11385, 11387-88.

[27] The system also includes various low impact development features that are designed to improve water quality, including: bioswales and rain gardens, which collect the stormwater runoff from the parking areas through shallow swales prior to discharge into the stormwater system, FWS 0750; AR 2348, utilization of porous pavement parking areas in strategic locations, comprising at least 10% of the total parking provided, FWS 0750, where possible, roof runoff will be directed into dry wells to capture the first runoff prior to discharging to the stormwater system, FWS 0750; AR 2348, for tire, battery, and gas pump areas, separate catchments will be provided that drain into the sanitary sewer system, instead of the stormwater system, FWS 0751, use of fertilizers and pesticides will be minimized, FWS 0751; AR 11394-402, and streets and parking areas will be vacuumed monthly instead of swept to reduce pollutant in runoff, FWS 0751.

wetlands.  *Id.*[28]  There is no basis for Plaintiffs' argument that the permanent stormwater

management system – that was not completed or operable at the time of the discharges – is

deficient.  In fact, as set forth herein, all responsible agencies have concluded otherwise.

### iii.    The surface water quality monitoring plan.

The water quality of Cypress Creek is within the province of the SWFWMD.  33 U.S.C.

§ 1341; Fla. Stat. § 373.036; Fla. Stat. § 373.042; Fla. Stat. § 373.0421.  While the Initial

Environmental Assessment makes clear that the Corps viewed the surface water quality

monitoring plan as important in ensuring no adverse impacts to Cypress Creek, the SWFWMD's

issuance of the Water Quality Certification/ERP is conclusive with regard to water quality.  *See*

*Hintz*, 800 F.2d at 834 (finding Washington State's issuance of Water Quality Certification for

project was "conclusive with respect to water quality considerations"); *Bering Strait Citizens for*

*Res. Dev.*, 524 F.3d at 938 (Corps was not arbitrary and capricious when it found no significant

degradation under the CWA because a state's Water Quality Certification is "conclusive with

respect to water quality issues.").  Thus, Plaintiffs are "foreclosed from raising water quality

issues" with respect to CCTC.  *See Hintz*, 800 F.2d at 834.[29]

---

[28] In reaching these conclusions, the Corps considered all of the materials submitted by other state and local agencies, Plaintiffs, Intervening Defendants, and other commenters, an additional approximately 15,000 pages since the administrate record was initially compiled.  AR 15344-45; D.E. 60; D.E. 69.  The Corps considered the same arguments that Plaintiffs make in their motion for summary judgment regarding the cause and impacts of the discharges, the capacity of the stormwater system, and whether the project will result in the significant degradation of waters of the United States.  *Id.*

[29] The proper vehicle for Plaintiffs to challenge this state finding was to challenge the SWFWMD's Water Quality Certification/ERP.  Plaintiffs did so, and dismissed their own challenge.  AR 5716-17, 5724-25, 6450.

b.  **The Discharges During Initial Construction Did Not Cause Significant Degradation or Lasting Environmental Impacts.**

Plaintiffs mischaracterize the nature and extent of the discharges, and the environmental impacts of the discharges.  The Corps suspended the CCTC permit due to two discrete discharge events that were months apart – one in August 2007 and one in January 2008.  AR 15340-41.[30] Since April 2008, there have been no turbid discharges from the CCTC site.  AR 15341.

Not only are the construction-phase discharges not reflective of the permanent stormwater system, the administrative record evidence established that the discharges did not result in any lasting environmental impacts.  AR 8853, 8869-90, 8897, 15367.  The evidence collected during the remand period established that turbidity measurements immediately following the discharges were relatively low, the plumes did not extend far downstream, and that turbidity exceedances were short in duration, lasting only 2-5 days, and had no lasting environmental impacts on Cypress Creek or its adjacent wetlands.  AR 8853, 8914.  In other words, the muddy water washed away shortly after it entered the Creek, leaving no sign that it was ever there.  With regard to lead and copper exceedances in on-site stormwater ponds and wetlands, the biological assessments found that such exceedances were linked to turbidity, were not biologically available to organisms, and could be effectively treated prior to the water being released into Cypress Creek or its wetlands.  AR 8915.

3.  **The On-Site and Off-Site Mitigation Complies with Applicable Requirements**

The on-site and off-site mitigation required by the permit is more than sufficient to compensate for the 53.39 acres of wetland losses on the CCTC site.  AR 6651-56.  This mitigation includes preservation of approximately 115 acres of on-site wetlands, preservation of

---

[30] A third discharge in April 2008 referred to in the Supplemental Environmental Assessment occurred two months *after* the permit was suspended and was the result of inlet plugs being improperly unplugged.  AR 15341.

approximately 118.6 acres of off-site wetlands, and construction of littoral shelves in the

stormwater ponds to mitigate for the loss of wildlife habitat.  AR 6651-52,15349-50.  Based on a

quantitative functional assessment using the Unified Mitigation Assessment Methodology, the

Corps determined that the total wetland function loss due to the project was -38.70, and that the

total functional gain from the mitigation was + 40.73.  AR 15354.  This more than adequately

compensates for the wetland impacts of the project.  Thus, the record supports the Corps'

determination that when completed, the project will not cause significant degradation of Cypress

Creek or its wetlands.  *See City of Olmsted Falls v. EPA*, 435 F.3d 632, 638 (6th Cir. 2006) ("It

was neither arbitrary nor capricious for the Corps Defendants to balance the environmental harm

caused by the project against the benefits of the proposed mitigation and find that, on balance,

the project would not contribute to a significant degradation of the waters of the United States").

### D.     The Corps and the FWS Complied with the Endangered Species Act

Under the ESA, an action agency, such as the Corps, is required to consult with the FWS

regarding any endangered or threatened species that may be affected by the project.  16 U.S.C. §

1536(a)(2); 50 C.F.R. § 402.14(a).  This may be accomplished through informal consultation.  50

C.F.R. § 402.13(a).  If informal consultation between the agencies results in a finding that the

proposed action is "not likely to adversely affect" the species at issue, no further consultation is

required.  *Id*; *see also Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997)

(agencies fulfilled ESA consultation requirement by engaging in informal consultation which

resulted in finding that proposed action was "not likely to adversely affect" species at issue).

### 1.     The Corps' and the FWS's Determinations that CCTC is "Not Likely To Adversely Affect" the Eastern Indigo Snake Were Not Arbitrary and Capricious

Here, both the Corps and the FWS determined – twice – that the project is "not likely to

adversely impact" the Snake.  AR 5962-67, 6681-82, 15274-76, 15360-65.  Those

determinations are well supported by the record.  *Id*.  No Snakes were ever observed on the site

by the Corps, or the biologists who conducted the wildlife surveys for the project.  AR 3819-20,

6367, 6682, 15276, 15364.  Although gopher tortoise burrows can be suitable habitat for the

Snake, no Snakes were observed during the gopher tortoise relocation that occurred during site

preparation, AR 15364-65, or during site preparation after the permit was issued, AR 15276.[31]

     The sole alleged and unconfirmed observation of a single Snake was by one of the

proponents of this action (Clay Colson), who claimed he saw a Snake ascending from Cypress

Creek after the permit was issued.[32]  AR 10522.  All of the land immediately adjacent to Cypress

Creek is a protected buffer for the specific purpose of providing wildlife habitat, and protecting

Cypress Creek and its wetlands.  AR 6672.  If Mr. Colson is correct that he saw a Snake ascend

from the Creek, then he saw the Snake go into one of the conserved areas that borders the site,

the purpose of which is to provide habitat.

     In any event, both during the initial consultation and during the remand consultation, both

agencies assumed the presence of Snakes for purposes of their analysis.  AR 5962-67, 6367,

15360-65.  The permit requires compliance with the FWS's 2004 Standard Protection Measures

for the Snake.  AR 6682, 15364-65.  As a result, the Corps and the FWS found that the project

was "not likely to adversely affect" the Snake.  *Id*.  Requiring the applicant to follow standard

protection measures that the FWS has found will protect the species from adverse impacts is

sufficient to satisfy the ESA.  *See Sierra Club v. Bosworth*, 352 F. Supp. 2d 909, 920 (D. Minn.

2005); *Fund for Animals v. Norton*, 365 F. Supp. 2d 394, 425 (S.D.N.Y. 2005).

---

[31] The existence of unoccupied potential habitat on the site does not require formal consultation.  *See Nat'l Wilderness Institute v. U.S. Army Corps of Eng'rs*, 2005 WL 691775, at *3, 17 (D.D.C. March 23, 2005); *Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005).

[32] Mr. Colson is not a biologist.  AR 11063.  The sighting was unconfirmed and does not establish that Snakes utilized as habitat any portion of the site slated for development, including the gopher tortoise burrows.

The Corps and the FWS carefully considered all of the materials submitted by Plaintiffs during the original permitting process, and during the remand consultation, in reaching – and reconfirming – their "not likely to adversely affect" determinations regarding the Snake.  AR 15365.  That conclusion by the two agencies, based on a thorough review of the issue, is entitled to substantial deference.

> 2.  **The Corps' and the FWS's Determinations that CCTC is "Not Likely To Adversely Affect" the Wood Stork Were Not Arbitrary and Capricious**

The Corps' and the FWS's two determinations that the project is "not likely to adversely affect" the Wood Stork are supported by the record.  While the project area is within "core foraging area of 5 wood stork breeding colonies," the site is not within the primary or secondary zones of any of these colonies.  AR 6681.  Moreover, while the site contained 16.22 acres of potential Wood Stork habitat, AR 6681, 15361, the uncontested record evidence is that no Wood Stork colonies or rookeries were actually located on the project site, AR 6559, 6681-82.  Impacts to very small amounts of potential Wood Stork habitat do not require formal consultation, especially when the birds forage within an 18-mile radius.  AR 6682.

The FWS found that the "majority of wetland habitat onsite appears to be of marginal foraging value because of existing land-use patterns."  AR 6365.  This finding is confirmed by the infrequent observation of Wood Storks on the site prior to issuance of the permit.  AR 3813, 5746-48.  Such uncommon observations of the Wood Stork support the agencies' determinations that formal consultation was not required.  *See, e.g., State of New Mexico v. BLM*, 459 F. Supp. 2d 1102, 1130-32 (D. N.M. 2006) (formal consultation not required when Falcon sightings within project area were rare or uncommon).

Even though the Wood Stork habitat value of the project site was marginal, the agencies nonetheless required mitigation for potential Wood Stork habitat loss.  AR 6365-66.  This

mitigation requirement resulted in the creation of 21.35 acres of potential Wood Stork habitat, thus providing more potential foraging habitat for the Wood Stork than the 16.22 acres of potential habitat that existed on the site prior to the project.  AR 15361.  The FWS properly took these mitigation measures into account in evaluating the effects of the project on the Wood Stork.  *See Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 955-56 (9th Cir. 2003) (FWS properly relied on mitigation commitments contained in conservation agreement in arriving at no jeopardy conclusion).[33]  Significantly, the Wood Stork mitigation has already been successful – *the Corps has documented Wood Storks foraging in the mitigation areas created on the site as a condition of the permit.*  AR 15362.

Plaintiffs incorrectly argue that the Corps' and the FWS's initial determinations were based on the belief that no Wood Storks had ever been observed on the site.  Mot. at 43.  But both agencies assumed that Wood Storks utilized the site in reaching the determinations.  AR 6364, 6681-82, 15364.[34]

The cornerstone of Plaintiffs' Wood Stork argument is their allegation that BRA purposely misled the Corps and the FWS regarding the existence of Wood Storks on the site.  Mot. at 43.  This is contradicted by the record.  BRA submitted materials during the permitting

---

[33] Plaintiffs argue that alleged past failures of other wetland mitigation projects that the Corps approved elsewhere somehow suggest that the mitigation here will be unsuccessful.  Mot. at 44.  But the alleged failures of other mitigation projects are irrelevant to whether this mitigation will succeed.  *Sierra Club v. U.S. Army Corps of Eng'rs,* 464 F. Supp. 2d 1171, 1212 (M.D. Fla. 2006) (rejecting plaintiffs' contention that reports criticizing the Corps' alleged past history of unsuccessful mitigation required finding that the Corps acted arbitrarily and capriciously when it approved wetland mitigation in that case).  As in *Sierra Club,* Plaintiffs attempt to use government reports to encourage the Court to reject the Corps' nationwide wetland mitigation program on a wholesale basis.  The Court should follow the decision of the Middle District of Florida and reject this approach.

[34] There were repeated references to observations of Wood Storks in the agencies' original administrative records.  FWS 191-92, 196 (wildlife survey by Biological Research Associates ("BRA"), environmental consultants for the permit applicant, recording Wood Storks foraging on site); FWS 204 (Wood Storks observed by FDEP); AR 6560 (Mitigation Plan attached to Permit stating that Wood Storks, along with other birds, were observed on the site).  It is axiomatic that both the Corps and the FWS considered all of the record evidence in reaching their determinations.  *See, e.g., Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs,* 448 F. Supp. 2d 1, 4 (D.D.C. 2006); *Comm. of Domestic Steel Wire Rope & Specialty Cable Mfrs. v. United States*, 201 F. Supp. 2d 1287, 1291 (Ct. Int'l Trade 2002).

process documenting that Wood Storks had been observed on the site.  *See, e.g.,* FWS 191-92,

196.  One BRA employee mistakenly reported no Wood Storks had been observed on the site,

even though BRA had previously reported them.  AR 11064, 15364.  This mistake was corrected

and was clearly not relied on by the agencies.  AR 6364, 6681-82, 15364.  Indeed, the Corps

expressly addressed whether this mistaken statement altered its original determination, and

concluded that it did not.  AR 15364.

### 3.       The Corps' Consultation with the FWS was Sufficient

The Corps initiated consultation with the FWS during the original permitting process

with regard to the Wood Stork and the Snake.  AR 3410, 6363.  During this consultation, both

agencies determined that the project is "not likely to adversely affect" the Wood Stork or the

Snake.  AR 6363-67, 6681-82.  During the remand, the Corps reinitiated consultation with the

FWS regarding the Wood Stork and the Snake.[35]  AR 15274-76, 15360-65.  Both agencies

reaffirmed their "not likely to adversely affect" determinations.  *Id.*  Once the action agency and

the FWS have determined that the proposed action is "not likely to adversely affect" the listed

species at issue, no formal consultation is required.  50 C.F.R. § 402.13(a); *see also Fund for*

*Animal, Inc.,* 127 F.3d at 84.  Plaintiffs have cited no authority to the contrary.

### 4.       The FWS's Determinations Regarding the Wood Stork and the Eastern Indigo Snake Should be Given Great Deference

The determination of whether the project is "not likely to adversely affect" the Wood

Stork and the Snake is a matter within the technical expertise of the FWS, and should be afforded

great deference.  *See Marsh*, 490 U.S. at 377 ("Because analysis of the relevant documents

'requires a high level of technical expertise,' we must defer to 'the informed discretion of the

responsible federal agencies.'") (quoting *Kleppe*, 427 U.S. at 412); *Nat'l Wilderness Institute*,

---

[35] The Corps also reinitiated consultations with regard to the Florida Scrub Jay and the Florida manatee.  AR 15274.

2005 WL 691775, at *17 (court must "'give an extreme degree of deference to the agency when it is evaluating data within its technical expertise'") (quoting *Hüls Am., Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996)); *Hawai'i Orchid Growers Ass'n v. Johanns*, 2007 WL 1982079, at *2 (D.C. Cir. June 28, 2007) (agency's determination whether action may harm listed species was prediction within agency's special expertise and must be afforded great deference).  Even if the affidavits submitted by Plaintiffs created a conflict in the record regarding the suitability of the site as habitat for, or even the presence of, listed species, it is for the FWS to resolve that conflict.  *See Webr v. FCC.*, 420 F.2d 158, 164 (D.C. Cir. 1969); *Horras v. Leavitt*, 495 F.3d 894, 900 (8th Cir. 2007).

## IV.    CONCLUSION

Based on the foregoing, Intervening Defendants respectfully request that the Court grant Intervening Defendants' Motion for Summary Judgment as to all claims in the Complaint for Declaratory and Injunctive Relief (D.E. 1), and the Supplemental Complaint for Declaratory and Injunctive Relief (D.E. 65), and deny Plaintiffs' Motion for Summary Judgment in its entirety.

Respectfully submitted,

s/ Douglas M. Halsey
Counsel for Intervening Defendants
Douglas M. Halsey (Florida Bar No. 288586)
T. Neal McAliley (Florida Bar No. 172091)
Angela D. Daker (Florida Bar No. 681571)
White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida  33131-2352
(305) 371-2700 (telephone)
(305) 358-5744 (facsimile)

Eric Grannon (D.C. Bar No. 473778)
White & Case LLP
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600 (telephone)
(202) 639-9355 (facsimile)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of January, 2010, the following was

electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing

document is being served this day on all counsel on the below service list via Notice of

Electronic Filing generated by CM/ECF:


Joshua R. Stebbins
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue, NW
Suite 700
Washington, DC  20009-1056
(202) 588-5206
Fax:(202) 588-5049
Email: jstebbins@meyerglitz.com

*Counsel for Plaintiffs Sierra Club, Clean
Water Action, Gulf Restoration Network, Chris
Loy and Richard Sommerville*

Kristofer Swanson
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resource Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
(202) 305-0248
Fax: (202) 305-0274
Email: kristofer.swanson@usdoj.gov

*Counsel for Federal Defendants Robert Van
Antwerp, Dirk Kempthorne and Dale Hall*

Mark Arthur Brown
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resource Division
Wildlife and Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, DC  20044-7369
(202) 305-0204
Fax: (202) 514-0097
Email: mark.brown@usdoj.gov

*Counsel for Federal Defendants Robert Van
Antwerp, Dirk Kempthorne and Dale Hall*

Jessica O'Donnell
U.S. DEPARTMENT OF JUSTICE
Environmental and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 305-0856
Fax: (202) 514-8865
Email:  jessica.odonnell@usdoj.gov

*Counsel for Federal Defendants Robert Van
Antwerp, Dirk Kempthorne and Dale Hall*


s/ Angela D. Daker
Angela D. Daker