**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SIERRA CLUB, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | No. 1:07-cv-1756 (RCL) |
| v. | ) | |
| | ) | |
| SIERRA PROPERTIES, LLC., et al., | ) | |
| | ) | |
| Intervening Defendants. | ) | |
| | ) | |

**PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND REPLY
IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

_____/s_____
Joshua Stebbins
D.C. Bar No. 468542
Eric R. Glitzenstein
D.C. Bar No. 358287

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
jstebbins@meyerglitz.com
eric@meyerglitz.com

Attorneys for Plaintiffs

Date: February 2, 2010

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    The Corps Has Violated NEPA Because It Has Refused To Prepare An
      EIS And Has Not Taken A Hard Look At The Environmental Impacts
      Of CCTC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    CCTC Has And Will Have Significant Environmental Impacts . . . . . . . . . . . . . 4

            1.    CCTC Has Violated Federal, State And Local Regulations
                  Intended For The Protection Of The Environment . . . . . . . . . . . . . . . . . 4

            2.    CCTC Has Had And Will Have Significant Environmental
                  Impacts On Unique Environmental Characteristics . . . . . . . . . . . . . . . . 5

                  a.    Cypress Creek And Its Wetlands Are A Unique Resource . . . . . . 5

                  b.    CCTC's Pollution Was Not "Temporary" With "Low"
                        Turbidity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                  c.    CCTC's Pollution Cannot Be Divorced From The CCTC
                        Permit And NEPA Requires That The Potential For Future
                        Pollution Also Be Examined In An EIS . . . . . . . . . . . . . . . . . . . . 9

                  d.    CCTC Severs A Critical Wildlife Linkage . . . . . . . . . . . . . . . . . 12

            3.    CCTC Will Adversely Impact Federally Listed Species . . . . . . . . . . . . 13

            4.    CCTC Creates Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            5.    CCTC Is Highly Controversial and Its Impacts Uncertain . . . . . . . . . . . 15

      B.    The Corps's EAs Cannot Substitute For An EIS . . . . . . . . . . . . . . . . . . . . . . . 16

II.   The Corps Violated The Clean Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.    The CCTC Permit Is Unlawful Because It Authorizes The Avoidable
            Destruction Of Wetlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.    CCTC's Destruction Of Wetlands Can Be Avoided Or Lessened
                  Simply By Making CCTC Smaller . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

a.     The Evidence In The Record Shows That CCTC Can
Be Reduced In Size And Still Make The 8.0% Profit That
The Applicant Asserts Renders CCTC Practicable . . . . . . . . . . 21

b.     The Applicant Failed To Establish The Requirement Of An
8.0% Profit With Clear And Convincing Evidence . . . . . . . . . 26

2.     CCTC's Parking Can Be Reduced, Saving Wetlands . . . . . . . . . . . . . . . 28

B.     The CCTC Permit Is Unlawful Because It Will Cause The Significant
Degradation Of Cypress Creek And Its Wetlands And Violate State Water
Quality Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III.     The Corps And FWS Have Violated Section 7 Of The ESA . . . . . . . . . . . . . . . . . . . . . . 34

A.     The Corps's And FWS's Determination That CCTC Will Not Adversely
Affect The Indigo Is Contrary To All Of The Evidence In The Record . . . . . . . 34

B.     The Corps's And FWS's Determination That CCTC Will Not Adversely
Affect The Wood Stork Is Arbitrary And Capricious . . . . . . . . . . . . . . . . . . . . . 39

1.     FWS's And The Corps's Reliance On Mitigation To Offset Impacts
To The Wood Stork Is Arbitrary And Capricious Because The
Mitigation Does Not Work And Is Already Failing On The Site . . . . . 40

2.     FWS And The Corps Failed To Fully Account For Impacts To Wood
Stork Foraging Habitat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV.     RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ii

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                      **PAGE**

Anderson v. Evans,
   371 F.3d 475 (9th Cir. 2004)  ............................................................... 15, 16, 17

Bering Strait Citizens for Responsible Resources Development v. Corps,
   524 F.3d 938 (9th Cir. 2008)  ....................................................................... 21

City of Shore acres v. Water Worth,
   332 F. Supp. 2d 992 (S.D.Tex. 2004)  ........................................................... 31

*Department of Transport v. Public Citizen,
   541 U.S. 752 (2004)  ...................................................................... 2, 9, 10, 15

Environmental Defense v. Army Corps of Eng'rs.,
   515 F. Supp. 2d 69 (D.D.C. 2007)  .............................................................. 3, 24

Environmental Prot. Information Ctr. v. Blackwell,
   389 F. Supp. 2d 1174 (N.D. Cal. 2004)  ......................................................... 13

FCC v. Nextwave Personal Commc'ns,
   537 U.S. 293 (2003)  ...................................................................................... 45

Friends of the Earth v. Hall,
   693 F. Supp. 904 (W.D. Wash. 1988)  ............................................................ 31

Fund For Animals v. Norton,
   281 F. Supp. 2d 209 (D.D.C. 2003)  ................................................................. 4

*Grand Canyon Trust v. FAA,
   290 F.3d 339 (D.C. Cir. 2002)  .................................................................... 1, 12

Greater Yellowstone Coal. v. Flowers,
   359 F.3d 1257 (10th Cir. 2004)  ..................................................................... 21

Hill v. Norton,
   275 F.3d 98 (D.C. Cir. 2001)  .................................................................. 14, 43

_____

* The cases upon which plaintiffs' chiefly rely are marked with an asterisk

iii

La. Wildlife Federation, Inc. v. York,
    761 F.2d 1044 (5th Cir. 1985) ...................................................................... 21

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance
    Co.,
    463 U.S. 29 (1983) ............................................................................. 12, 39

National Mining Association v. U.S. Army Corps of Eng'rs.,
    145 F.3d 1399 (D.C Cir. 1998) .................................................................. 45

National Parks & Cons. Association v. Babbitt,
    241 F.3d 723 (9th Cir. 2001) ....................................................................... 4

National Wildlife Federation v. Norton,
    332 F. Supp. 2d 170 (D.D.C. 2004) ...................................................... 36, 37

Natural Resources Defense Council, Inc. v. Department of Energy,
    No. C-04-04448SC, 2007 WL. 1302498 (N.D.Cal. May 2, 2007) ................ 15

Neighbors of Cuddy Mountain v. Alexander,
    303 F.3d 1059 (9th Cir. 2002) .................................................................. 45

Nw. Bypass Group v. U.S. Army Corps of Eng'rs.,
    490 F. Supp. 2d 184 (D.N.H. 2007) .......................................................... 19

Sierra Club v. U. S. Forest Service,
    843 F.2d 1190 (9th Cir. 1988) .................................................................. 15

Sierra v. Flowers,
    423 F. Supp. 2d 1273 (S.D. Fla. 2006) ...................................................... 38

*Sierra v. Marsh,
    769 F.2d 868 (1st Cir. 1985) .................................................... 14, 15, 17, 18

Sierra Club v. Watkins,
    808 F. Supp. 852 (D.D.C. 1991) .............................................................. 17

Sylvester v. U.S. Army Corps of Eng'rs.,
    882 F.2d 407 (9th Cir. 1989) .................................................................. 20

_____

\* The cases upon which plaintiffs' chiefly rely are marked with an asterisk

Town of Cave Creek,
      325 F.3d 320 (D.C. Cir. 2003) ........................................................ 15

*Utahns for Better Transport v. U.S. Department of Transport,
      305 F.3d 1152 (10th Cir. 2002), modified in part 319 F.3d 1207
      (10th Cir. 2003) ........................................................... 19, 30, 31

Wisc. Public Power, Inc. v. FERC,
      493 F.3d 239 (D.C. Cir. 2007) ....................................................... 45

## FEDERAL STATUTES

16 U.S.C. § 1536 ...................................................................... 36

16 U.S.C. § 1538 ...................................................................... 44

33 U.S.C. §§ 1251-1387 ............................................................... 1

42 U.S.C. § 4332 .................................................................... 1, 9

## FEDERAL REGULATIONS

40 C.F.R. § 230.1 ..................................................................... 23

40 C.F.R. § 230.10 ............................................... 1, 3, 18, 20, 21, 22, 23, 30

40 C.F.R. § 1502 ...................................................................... 10

40 C.F.R. § 1508.9 .................................................................... 17

40 C.F.R. § 1508.27 ........................................................... 4, 5, 14, 15

50 C.F.R. §17.21 ...................................................................... 44

50 C.F.R. § 17.31 ..................................................................... 44

50 C.F.R. § 402.14 .................................................................. 3, 39

---

* The cases upon which plaintiffs' chiefly rely are marked with an asterisk

v

**FEDERAL REGISTER NOTICES**

45 Fed. Reg. 85,336, 39, 43 (Dec. 24, 1980) ............................................. 20

46 Fed. Reg. 18026, 18037 (1981) ........................................ 17

**STATE STATUTES**

62-302.200(32), Fla. Stat. § 403.031(13) .................................. 6, 8

Fla. Admin. Code Ann. r. 62-302.700 ................................. 6, 33

Fla. Stat. § 403.031(13) ...................................... 33

# INTRODUCTION

The Army Corps of Engineers ("Corps") defends its issuance of the 2009 Cypress Creek Town Center ("CCTC") permit under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, and its refusal to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., on the ground that there is no reason to believe that CCTC will pollute Cypress Creek.  See e.g., Federal Defendants' Mem. in Opp. at 9-10, 31-32 ("Gov. Br.").  NEPA requires the Corps to prepare an EIS "[i]f any significant environmental impact[] might result" from CCTC.  Grand Canyon Trust v. FAA, 290 F.3d 339, 340 (D.C. Cir. 2002) (italics in original, emphasis added); 42 U.S.C. § 4332(C).  And the Clean Water Act ("CWA") and its regulations strictly prohibit the Corps from issuing permits for filling wetlands where the destruction of wetlands causes violations of "state water quality standard[s]" or "the significant degradation" of waterbodies.  40 C.F.R. § 230.10.

Yet as explained by Plaintiffs in their opening brief, see Pltfs'. Mem. at 1 ("Pltfs' Br."), this is the second time the Corps has issued the CCTC permit, and the project has a clear and proven track record of significant environmental impacts.  The Corps, however, contends that the discharges were merely the result of unspecified "human error," and thus NEPA does not require an EIS to be prepared, nor does the CWA prohibit the permit.  See AR15341, Gov. Br. at 9-10.

The Corps's effort to divorce the permit from the pollution is both belied by the record and irrelevant to whether an EIS must be prepared for a project that has already caused significant impacts.  Record evidence firmly establishes that CCTC repeatedly discharged highly polluted water to Cypress Creek for prolonged periods of time in June 2007, July 2007, August 2007, September 2007, October 2007, January 2008, February 2008 and April 2008.  See infra at 6 n.1; see also id. at 6-11.  The Corps itself has concluded that CCTC violated state water quality

standards and "impos[ed] significant [and] unacceptable impacts to wetlands and water quality."
Supp. EA, AR15340; AR10886-87.

Moreover, there is no "human error" exception to NEPA's duty to consider potential impacts or to the CWA's prohibitions. NEPA requires an EIS be prepared precisely so that foreseeable impacts – from human error or otherwise – may be carefully examined in an EIS and, with the insight gained, an informed decision made on whether and how to proceed, see Dep't of Transp. v. Pub. Citizen, 541 U.S. 752 (2004), which includes how to minimize the risk of environmentally harmful "human error" in the future.

In addition, the pollution of Cypress Creek is just one of several significant impacts of the CCTC permit. Once again, the CCTC permit will sever a critical wildlife linkage on site and destroy the occupied habitat of federally listed species. The Corps cites no evidence in its brief for its assertion that stormwater ponds suffice for a linkage, Gov. Br. at 33. The Corps did not even consider the species that use the linkage or the habitat they require in its Environmental Assessment ("EA") or its Supplemental EA ("Supp. EA").

Likewise, the Corps and the Fish and Wildlife Service ("FWS") have cited no evidence indicating they considered CCTC's adverse impact on the federally threatened Eastern Indigo Snake ("Indigo") resulting from the destruction of its occupied habitat. Instead, the agencies concluded that so long as the Indigo could "leave the [habitat] on its own accord" it would not be adversely impacted. AR6367. Yet FWS has concluded that the primary threat to the Indigo's survival is habitat loss, see FWS2584, and the agencies engaged in no analysis of whether there is even suitable proximate habitat which the species can utilize. For the same reason, the agencies' efforts to defend their failure to formally consult regarding impacts to the Indigo as

required by the Endangered Species Act ("ESA"), 50 C.F.R. § 402.14, is equally meritless.

Perhaps most egregious, however, is the Corps's determination – contrary to record evidence – that CCTC could not be reduced in size and its impacts to wetlands reduced, as required by the CWA regulations. See 40 C.F.R. § 230.10(a). Although the Corps concludes that this project is not "water-dependent" – and hence there is a heavy presumption against any wetlands destruction for a shopping mall – the Corps refused to require the applicant to use its actual "cost[s]" in determining if there were practicable, less damaging alternatives to CCTC, as required by its regulations. 40 C.F.R. § 230.10(a)(2).

The General Accounting Office ("GAO") concluded in 2005 that "the Corps' priority has been and continues to be processing permit applications" rather than carrying out its statutory mission under the CWA to protect the nations' dwindling wetlands. AR10416. Courts have also severely criticized the agency for giving short shrift to environmental considerations. Just recently Judge Robertson rejected a Corp decision to approve a project, concluding that the Corps "resorted to arbitrary and capricious reasoning – manipulating models and changing definitions where necessary – to make this project seem compliant with [CWA] and [NEPA] when it is not." Envtl. Def. v. Army Corps of Eng'rs., 515 F. Supp. 2d 69, 74 (D.D.C. 2007).

The Corps's actions here are no different. This is not a case of policy disagreements or conflicting expert opinion as alleged by Defendants. To the contrary, the evidence in the record demonstrates that the Corps simply failed to consider relevant factors and disregarded or downplayed evidence that CCTC causes avoidable impacts to wetlands, significantly degrades Cypress Creek and adversely affects federally listed species. At minimum, the CCTC permit should be vacated and remanded pending full compliance with federal environmental law.

I.     **The Corps Has Violated NEPA Because It Has Refused To Prepare An EIS And Has Not Taken A Hard Look At The Environmental Impacts Of CCTC**

   A.     **CCTC Has And Will Have Significant Environmental Impacts**

In its brief and Supplemental EA the Corps does not appear to dispute that the impacts from CCTC's pollution have been significant.  Indeed, that assertion would make little sense in view of the Corps's decisions to suspend the permit for more than a year and impose a huge fine for the illegal impairment of Cypress Creek.  But Defendants seek to avoid the need for an EIS by arguing that affected resources were of marginal value, the impacts temporary, and that there is no reason to believe the pollution will recur.  Likewise Defendants assert the impacts were caused by "human error" and NEPA therefore does not require an EIS.

These rationalizations for bypassing preparation of an EIS are legally and factually baseless.  There is no dispute that the Council for Environmental Quality's ("CEQ's") NEPA regulations identify the relevant criteria for assessing if an action may have a significant impact. 40 C.F.R. § 1508.27.  Indeed, courts have explained that just one criterion can warrant an EIS. See Nat'l Parks & Cons. Ass'n v. Babbitt, ("NPCA"), 241 F.3d 723, 732 (9th Cir. 2001); Fund For Animals v. Norton, 281 F.Supp.2d 209 (D.D.C. 2003).  Yet contrary to the assertions of Defendants, the record in this case affirmatively establishes that at least six criteria are implicated and that NEPA requires an EIS be prepared.

   1.     **CCTC Has Violated Federal, State And Local Regulations Intended For The Protection Of The Environment**

For example, Defendants never dispute that CCTC has already violated "Federal, State, or local law or requirements imposed for the protection of the environment," one criterion for preparing an EIS.  40 C.F.R. § 1508.27(b)(10); Int. Br. at 12; Supp. EA, AR15340.  Nor were the

violations minor transgressions, as reflected by the fines that the agencies levied.  Again, the Corps suspended the CCTC permit for over a year and a half and issued what even Interveners have described as an unprecedented fine of approximately $300,000 due to the violations of state water quality standards and the mandatory terms of a federal CWA permit.  AR21295; AR21310. FDEP issued fines for $100,000.  See Int. Br. at 14 n.7.  SWFWMD issued a fine of approximately $41,000.  See AR15841-58.  Pasco County issued 23 notices of violations.  See AR8764, AR10872-81.  Accordingly, if this criterion for preparing an EIS is not satisfied in this case, it is difficult to comprehend when Defendants think it would be met.

### 2. CCTC Has Had And Will Have Significant Environmental Impacts On Unique Environmental Characteristics

As Plaintiffs demonstrated in moving for summary judgment, an EIS should also be prepared because CCTC will be built in "proximity to" "[u]nique characteristics" such as "park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."  40 C.F.R. § 1508.27(b)(3).  Such characteristics include Cypress Creek and the critical wildlife linkage, both of which CCTC has already significantly affected.

Defendants seek to avoid such a conclusion by attacking the value of Cypress Creek as "likely already not meeting state water quality standards."  Gov. Br. at 29.  Interveners also assert Cypress Creek is "common."  Int. Br. at 19 n.9.  Alternately, they argue that CCTC's pollution was merely "muddy water [that] washed away shortly after . . . leaving no sign that it was ever there."  See Int. Br. at 43.  None of these assertions is supported by the record.

### a. Cypress Creek And Its Wetlands Are A Unique Resource

The Florida Department of Environmental protection has explained that Cypress Creek's status as an Outstanding Florida Water ("OFW") is not common – "[m]ost OFWs are . . .  parks,

including wildlife refuges, preserves, marine sanctuaries, estuarine research reserves . . . scenic and wild rivers, or aquatic preserves."  http://www.dep.state.fl.us/water/wqssp/ofw.htm. Florida's Environmental Regulatory Commission engaged in a fact finding hearing and concluded "that the waters [of Cypress Creek] are of exceptional recreational or ecological significance."  62 FL ADC 62-302.700(3) (emphasis added); see also id. at (4), (5).  The Commission had to find that Cypress Creek is "exceptional" because it is either "part of an ecosystem of unusual value" given "species, productivity, diversity, ecological relationships, ambient water quality, [or] scientific or educational interest," or because it offers "unusual value as a resource for outdoor recreation activities."  62-302.200(11), (12) (emphasis added). Moreover, it is not just Cypress Creek itself but also its adjoining wetlands that are the OFW. See Fla. Admin. Code Ann. r. 62-302.700(9)(i)(14)(c) (listing Cypress Creek as an OFW), 62-302.200(32), Fla. Stat. § 403.031(13) ("[w]aters" include wetlands); see also AR8751.

### b.    CCTC's Pollution Was Not "Temporary" With "Low" Turbidity

Defendants' efforts to downplay CCTC's pollution as "temporary in nature" and only occurring on three discrete dates, see e.g., Supp. EA, AR15359, 15340, are also inaccurate. Eyewitness accounts, along with government records, document that CCTC discharged polluted water for extended periods of time almost every month from June 2007 through February 2008, except November-December 2007, and it then resumed polluting in April 2008.[1]

---

[1]  Dates of documented unlawful discharges include but are not limited to: AR10524 (June-September 2007), AR6796 (July 26, 2007), AR6767 (August 3, 2007), AR6797, AR8952, AR10259 (August 2, 3, 2007), AR10871 (August 14, 2007), AR10259 (September 4, 2007) AR10859 (September 5, 2007), AR6781 (September 8, 2007), AR10872 (September 14, 2007), AR10876 (September 26, 2007), AR10261 (October 9, 2007), AR10854 (January 22, 2008), AR10268 (January 23, 2008), AR10879, 80 (January 24, 2008), AR10881 (January 25, 2008),

The Corps's dismissal of the turbidity as "temporary," Supp. EA, AR15359, is simply irreconcilable with the long period over which discharges occurred and the Corps's own record of residual turbidity almost two years after discharges started, on March 4, 2009. AR15362. The Corps's records describe "[h]ighly turbid" water weeks after discharges occurred. AR15361.

Moreover, even after the turbidity cleared, it left in its wake a blanket of sediment as much as an "1 inch" thick in Cypress Creek's wetlands, see e.g., AR6996, AR10854 ("thick veneer" of sediment), along with an "accumulation of eroded sediment" in the creek itself. AR6767; see also e.g., AR10262, 66. An affidavit in the record attests to CCTC's runoff "cover[ing] the Creek, its banks and surrounding wetlands in silt." AR10524. Photos show thick deposits of sediment. See e.g., AR8516-17 (Ex. 1). Unless the sediment is shoveled out or re-suspended to cause more turbidity with the next rain, the sediment remains – one area documented sediments sitting for 81 days before it was shoveled out. See AR10853.

Nor was the resulting turbidity "low." Rather, on August 3, 2007 SWFWMD found turbidity levels of 49 NTUs, twenty five times background levels of 2.28 NTUs.[2] See AR6761. One month later Dr. Rains sampled Cypress Creek and found levels of 100 NTUs, fifty times background level. AR10863; AR10524. In January SWFWMD found levels approximately of 44 NTUs, twenty times background level. AR6994. CCTC's wetlands were also greatly

---

AR10878 (January 27, 2008), AR10262 (January 28, 2008), AR10265-66 (April 7-10, 2008), AR10854 (April 23-25, 2008). These dates inevitably under-represent CCTC's pollution as they only reflect days discharges were witnessed and reported. Moreover, the site hemorrhaged polluted water everywhere. E.g. AR6874 (Violation notice documenting "Turbid waters entering Wetlands A, B, C, D, E, J and L;" "Sediment deposition in Wetlands A, B, C, D, E, J and L;" and "Wetland 'J' discharging turbid water into the creek.").

[2] NTU is the standard unit of turbidity and is an abbreviations of "Nephelometric Turbidity Units." AR10860.

affected.  E.g., AR8737 ("the entire extent of wetland P [was] affected by high turbidity").[3]

Such high turbidity levels and sedimentation, and their extended duration, had other significant environmental impacts.  See e.g., AR10860.  Indeed, contrary to its current position, the Corps itself concluded it was "clear" CCTC was "impos[ing] significant, unacceptable impacts to wetlands and water quality." AR10886-87 (emphasis added).  The Corps itself acknowledges that turbidity "can result in significant environmental damage," "interfere with light penetration to aquatic plants" and "harm fish by clogging their gills or killing their food." AR6887.  An undisputed eyewitness affidavit attests to CCTC having these exact effects, including finding dead "aquatic organisms, such as frogs." AR10524.  Dr. Rains also corroborated these effects.  AR10860.  Moreover, the runoff contained levels of lead and copper that exceeded State standards.  See e.g., AR15361.

In short, CCTC has had significant impacts.  Although the Corps sought a remand for the ostensible purpose of investigating the effects of the discharges, it failed to prepare the legally mandated EIS for addressing precisely these kinds of significant impacts.  Instead, in inexplicable conflict with what it said in suspending the permit, the Corps now seeks to trivialize the impacts without any discussion of why the supposed "temporary" nature of the discharges mitigates the need for an EIS or the severity and long-term nature of the impacts.  AR15359.

_____

[3] Even the Corps disagrees with Intervener's erroneous assertion that "plumes did not extend far downstream."  Id.  According to the Corps, CCTC "sent clouds of turbid, silt-laden water billowing far downstream."  AR21295.  Dr. Rains, a hydrological expert, described a "large plume of turbid water . . . well downstream of the discharge point."  AR10859.

      **c.**     **CCTC's Pollution Cannot Be Divorced From The CCTC Permit And NEPA Requires That The Potential For Future Pollution Also Be Examined In An EIS**

In the alternative, the Corps seeks to avoid its duty to prepare an EIS by implausibly asserting that CCTC's <u>pattern</u> of pollution over almost a year was solely the result of "human error," implying that NEPA therefore does not require that either the ongoing effects of that pollution or the potential for future pollution be studied in an EIS.  For several reasons this syllogism makes no legal, factual or logical sense.

As a preliminary matter, the Corps cites no authority – because there is none – for its apparent view that there is a "human error" exemption to NEPA's requirement to prepare an EIS.  Assuming arguendo that the Corps has properly ascribed CCTC's repeated instances of unlawful pollution to "human error," that does not mean that the project has not had a significant environmental impact that warrants consideration in an EIS.  NEPA flatly mandates an EIS for <u>all</u> federal or federally approved projects "significantly affecting . . . the human environment."  42 U.S.C. § 4332(C).  The statute makes no distinction between impacts caused by "human error," inherent design features, or – as is commonly the case – some combination of the two.

Indeed, the Corps's argument is antithetical to NEPA's fundamental purpose and the means by which it achieves that purpose.  NEPA's requirement that an EIS be prepared if an action <u>may</u> significantly affect the environment is "intended to reduce or eliminate environmental damage" by informing agencies as to the potential foreseeable environmental impacts of its actions.  <u>Public Citizen</u>, 541 U.S. at 756, 768-69.  The EIS injects environmental considerations "in[to] the agency decisionmaking process itself" to "'help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore,

9

and enhance the environment.'" Id. at 768-69 (quoting 40 C.F.R. § 1500.1(c)).  Accordingly, if

"human error" associated with an action results in repeated harm to the environment, as with the

discharges here, that is all the more reason to prepare an EIS addressing those impacts, how to

prevent them, and how to restore the impaired resources.

To put the argument in stark relief, it would be patently absurd, and flatly illegal, for an

agency to disregard in a re-licensing hearing a nuclear power plant's history of repeated releases

of radiation because all of its past releases of radiation were attributable to "human error."

Rather, so long as a project has had, or potentially entails future, significant and foreseeable

impacts, see e.g., 40 C.F.R. § 1502.22; id. at § 1508.7 (defining cumulative impacts), id. at §

1508.8 (defining effects), an EIS is required.

Moreover, the pollution associated with CCTC has not only been foreseeable, but was

integral to the permit.  It was not a single, isolated event.  There is no dispute that the discharges

only ceased sometime after April 2008 – that is, after construction was suspended, see e.g., Int.

Br. at 12-13, and after the site was planted with grass.  AR15756 (Corps memo to file: "only way

to reduce this turbidity . . . is to vegetate the site"), AR10254, AR10201.  Interveners' own

engineer explained there was a likelihood of discharges given CCTC's size – because it

"proposes up to one million (1,000,000) square feet (SF) of vertical construction with just the

first phase . . . Rainfall events of this magnitude can and did cause an undesirable discharge to

the Creek."  AR6773 (emphasis added).  Interveners' contractor stated the same.  AR17850.  The

Corps's effort to write the pollution off as "human error" is just as unsupported as its conclusion

that CCTC only polluted on "3 Aug 07, 24 Jan 08, 9 Apr 08".  See Supp EA, AR15340.

As discussed below, the nature of CCTC's pollution is closely correlated with the specific

10

risks that the CCTC permit posed.  The Corps's permit authorized the destruction of buffers and wetlands – the very features that control stormwater runoff, reduce sedimentation and purify water, AR6670 – and it authorized using Cypress Creek as a drain.  AR6676-77.  Thus, when the rains fell they inevitably eroded the site and carried turbid water into Cypress Creek.

Until construction stopped and the site grew over no one was able to control the discharges, and all assurances that there would be no future discharges proved false.  In the initial EA the Corps erroneously concluded CCTC would not pollute Cypress Creek.  EA, AR6676-77, AR6687.  Four months later in September 2007 Interveners' engineer promised they were "implementing a very aggressive, costly, and well thought out plan to prevent any future discharges regardless of rainfall intensity," AR6773, but that plan also failed.  In February 2008 Interveners again assured that new measures "provide[d] . . . assurance that additional discharges . . . will not occur," AR7053, AR7013, including "increas[ing] the capacity of the [stormwater] system" by "250%."  AR7056.  These measures failed as well and the assurances proved false.

In March 2008 Interveners promised "implementation of the additional berms and elevated control structures . . .  will prohibit further discharges of turbid water."  AR8266.  These too failed and the assurance proved empty.  When CCTC discharged polluted water between April 7 and April 26, 2008, see e.g., AR10265-66, AR10854, even the Corps admitted the obvious – that "contrary to [their] assurances, [Interveners] are still unable to stabilize and contain the site against unauthorized discharges." AR8783 (emphasis added); see also id. ("You have been making that claim since the first offsite discharge in September 2007").

Now, however, with the site dormant and seeded and construction temporarily halted, the Corps yet again assures that CCTC will not pollute Cypress Creek and will comply with the

CWA.  See Supp. EA, AR15359.  The Corps asserts it has no reason to even believe that CCTC

"might" pollute again, Grand Canyon, 290 F.3d at 340, and it refuses to prepare an EIS.  Given

the past discharges, which alone warrant preparation of an EIS, and the prior public assurances

that have proven false, this is the essence of arbitrary and capricious decision making.[4]

### d.    CCTC Severs A Critical Wildlife Linkage

Defendants' argument that stormwater ponds holding polluted runoff will substitute for

the critical wildlife linkage and preserve its "integrity," see AR6672, is equally unsupported by

the record.  Nowhere in its brief does the Corps identify where in the record it considered

relevant factors such as the habitat needs of the species that actually use the linkage.  Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citations

omitted); AR6672.  Yet these were the factors considered in creating the linkage.  See e.g.,

AR10569-70.  Nor does the Corps explain how polluted stormwater ponds and fifty feet of

residual buffer will maintain the corridor's integrity, AR6672 – but as the Corps notes in its

Supplemental EA, at this point the ponds cannot even support vegetation as they have been

modified to make them deeper and they may also contain alum.  AR15363. Yet failure to

adequately consider impacts to wildlife linkages is a basis for rejecting an agency's refusal to

---

[4] The Corps's accusation that Plaintiffs "ignore the actual causes of the water quality violations" and "make a large assumption, without support, that those causes will continue to occur" is belied by CCTC's track record and the Corps's own predictions of future turbidity. Gov. Br. at 32.  Even the Corps anticipates that the "causes" may result in additional turbidity in the future.  As the Corps itself found in the Supplemental EA, **"Alum treatments within [stormwater] ponds may be necessary in the future during resumed construction to reduce turbidity."** Supp. EA at AR15363 (emphasis added).  And these are the very storm water ponds that discharged turbid water to Cypress Creek and its wetlands in the past, and that will discharge in the future when their capacity is reached – even if the alum treatment, which takes weeks to complete, see e.g., AR9956, AR9735, is ongoing.

prepare an EIS.  See Envtl. Prot. Info. Ctr. v. Blackwell, 389 F. Supp. 2d 1174, 1195-97 (N.D. Cal. 2004).[5]

Meanwhile, record evidence concerning the species that use or may use the corridor and the habitat they require demonstrates that CCTC severs the corridor for such species.  For example, with respect to the Indigo, which was seen in the corridor on Cypress Creek's banks, see AR10522, Dr. C. Kenneth Dodd, an undisputed expert on the species, opined that the critical linkage is "far too narrow to allow a corridor for all but the most tolerant wildlife species," will not support Indigos and is "not conducive to the presence and survival of the Indigo snake population."  Id. at 10545-46.  Similarly, Dr. Bradley Stith, a biologist working for the United States Geological Services ("USGS"),  has explained that:

> current development plans . . . to leave a fifty foot "buffer" along the side of Cypress
> Creek, with storm water [ponds] placed in the designated critical wildlife linkage, is
> insufficient to maintain the integrity of the corridor as a wildlife linkage.

AR10561.  Contrary to Defendants' assertions, this does not reduce to expert disagreement – again, the agencies never considered the species using the linkage and their habitat needs.[6]

### 3.   CCTC Will Adversely Impact Federally Listed Species

As discussed in greater detail below, CCTC also results in the destruction of occupied habitat for federally listed species including the Indigo and the Wood Stork, see infra at 34-44,

---

[5]  Ironically, the Corps now asserts that the corridor will be preserved by "maintaining the upland buffer," Gov. Br. at 33, even though according to the Corps's own statements the buffer is actually being reduced to fifty feet, AR3795, and while the Corps minimizes CCTC's stormwater ponds, together with a new arterial roadway they will run the length of the Creek.  E.g. 6497.

[6]  Contrary to the Interveners' assertions, Pasco County did not conclude that CCTC would not in fact "threaten" the corridor, see Int. Br. at 20 n.11: it never even mentioned the linkage and instead simply issued a conclusion of law and a stipulation that CCTC must "be governed by the standards and procedural provisions of the Comprehensive Plan."  AR2319.

another criterion indicating CCTC will have a significant impact.  See 40 C.F.R. § 1508.27(b)(9).

In a series of post hoc rationalizations – the agencies themselves never addressed the issue –

counsel for the agencies argue that the Indigo habitat on site was not high quality and that Indigos

also live in other areas.  Gov. Br. at 37.  However, it is "well understood that '[t]he courts may

not accept . . . counsel's post hoc rationalizations for agency action.'"  Hill v. Norton, 275 F.3d

98, 105 (D.C. Cir. 2001) (quotations omitted).  Moreover, habitat loss is the most significant

threat driving these species towards extinction, see FWS2584, and record evidence demonstrates

that CCTC's destruction of the species' habitat does in fact adversely affect them.  See AR10551.

FWS has concluded elsewhere that "any additional threats to [the Indigos'] survival could cause

local extirpations."  FWS2584, FWS2589.  The extent and manner in which CCTC adversely

affects the Indigo's habitat is precisely what NEPA requires to be studied in an EIS, and yet it is

now essentially ignored by the Corps.

### 4.      CCTC Creates Precedent

Interveners also argue that an EIS is unwarranted as CCTC will not create precedent with

the binding force of law.  Int. Br. at 22.  Yet the inquiry under the NEPA significance criterion,

see 40 C.F.R. § 1508.27(b)(6), is not whether the action creates legally binding mandates but

whether, as then Judge Breyer explained in Sierra Club v. Marsh, the action as a practical matter

might create a "bureaucratic commitment that will become progressively harder to undo."  769

F.2d 868, 879 (1st Cir. 1985).  Thus, in Sierra Club v. Marsh, the First Circuit concluded that a

project required an EIS in part because it might result in "pressure to develop the rest of the

island [which] could well prove irreversible."  Id.  Likewise, although no legally binding

precedent was established by the Department of Energy's selection of certain post-remediation

14

radiation levels in <u>Natural Res. Def. Council, Inc. v. Dep't. of Energy</u>, No. C-04-04448SC, 2007

WL 1302498 *22 (N.D.Cal. May 2, 2007), the Court found NEPA's precedent criterion satisfied.

In this case the Corp's approval of the CCTC permit creates an environmentally

damaging precedent that adverse unintended consequences attributed to "human error" during

project construction are irrelevant to both the Corps's willingness to reissue a permit and the

need to prepare an EIS.  Moreover, the record makes evident that CCTC is not an isolated

development, <u>see</u> <u>e.g.</u>, AR5738-41, AR5757-58, AR5924-25, and yet as Pasco County's wildlife

biologist's email to the Corps demonstrates, CCTC is already establishing serious precedent that

building in the wildlife linkage is acceptable.  AR15944.  Much like in <u>Sierra Club</u>, "pressure to

develop the rest of the [linkage] could well prove irreversible."  769 F.2d at 879.

### 5.     CCTC Is Highly Controversial and Its Impacts Uncertain

Contrary to Interveners' assertions, CCTC is also "highly controversial" within the

meaning of the significance criteria, and the full scope and degree of its impacts are "highly

uncertain."  40 C.F.R. § 1508.27(b)(4), (5).  No one disputes that under NEPA an action is

"highly controversial when there is 'a substantial dispute [about] the size, nature, or effect of the

major Federal action.'" <u>Anderson v. Evans</u>, 371 F.3d 475, 489 (9th Cir. 2004), <u>accord</u> <u>Town of</u>

<u>Cave Creek</u>, 325 F.3d 320, 331 (D.C. Cir. 2003).  Such a dispute exists when experts disagree

about the nature and scope of potential impacts, <u>Anderson</u>, 371 F.3d at 489, because, again,

NEPA requires an EIS to be prepared <u>if</u> there may be a significant impact so that it can be better

understood and factored into the decision making process.  <u>Public Citizen</u>, 541 U.S. at 756, 768-

69.  Thus, in <u>Anderson</u>, when scientists disagreed upon the potential effect of hunting whales, the

need for an EIS was triggered.  371 F.3d at 490.  Likewise in <u>Sierra Club v. U. S. Forest Service</u>,

843 F.2d 1190, 1193 (9th Cir. 1988), "affidavits and testimony of conservationists, biologists, and other experts" established the need for an EIS.  In addition, such a dispute among experts also indicates uncertainty under NEPA.  See Anderson, 371 F.3d at 490 (finding uncertainty when "no one, including the government's retained scientists, has a firm idea what will happen").

Likewise, the record in this case contains affidavits from undisputed experts that indicate CCTC will have significant environmental impacts and that the impacts can and should be reduced.  For example, Dr. Dodd – a retired FWS and USGS biologist who authored the rule listing the Indigo while at FWS, AR10535, and whose credentials no one has challenged – has testified CCTC's destruction of habitat is likely to significantly affect the Indigo.  See e.g., AR10551.  Dr. Stith, an unchallenged Florida Scrub Jay expert has attested to adverse impacts to the Jay.  AR10555-62.  Dr. Rains – again an expert hydrologist with unchallenged credentials that the Corps, EPA and Department of Justice have retained in the past, see AR10684 – has testified as to CCTC's significant water quality impacts.  See AR10664, AR10863-64.  And Mr. Magdziarz, an expert in the real estate industry, has testified as to the practicability of reducing CCTC's impacts.  This is the precise context in which courts have held that controversy and uncertainty exist under NEPA warranting an EIS – particularly given that neither the Corps nor FWS even bothered to address the opinions of the biologists on whom Plaintiffs relied.

**B.  The Corps's EAs Cannot Substitute For An EIS**

Contrary to the Interveners' assertion that an EIS here would be a "pointless bureaucratic exercise," see Int. Br. at 6, the Corps's EA cannot legally serve as a substitute for an EIS, and moreover, the fact that the Corps prepared two EAs totaling 83 pages demonstrates, if anything, that an EIS is in fact required.  Again, the central purpose of an EA is to determine whether a

significant impact may result from an action and, if not, to justify a Finding Of No Significant

Impact.  See 40 C.F.R. § 1508.9; Sierra Club v. Watkins, 808 F.Supp 852, 859, 870 (D.D.C.

1991) (Lamberth, J.).  For this reason, the CEQ instructs that "'[i]n most cases . . . a lengthy EA

indicates that an EIS is needed'" because it reflects that, at minimum, "it is extremely difficult to

determine whether the proposal could have significant environmental effects."  Forty Most

Asked Questions, 46 Fed. Reg. 18026, 18037 (1981) (emphasis added).  As then Judge Breyer

explained in Sierra Club, to "announce that these documents – despite their length and

complexity – demonstrate no need for an EIS is rather like the mathematics teacher who, after

filling three blackboards with equations, announces to the class, 'You see, it is obvious.'"  769

F.2d at 874; see also Anderson, 371 F.3d at 494.

    The EA and EIS serve two "very different purposes" and an EA cannot "substitute for an

EIS" regardless of the "time, effort, and analysis that went into [the EA's] production."  Sierra

Club, 769 F.2d at 875.  Thus, in Sierra Club, an EA "consisting of at least seven documents

containing 350 pages of text, plus numerous pages of diagrams, maps, and technical drawings"

did not render an EIS superfluous.  Id. at 874.  An EA indicates an action will not have

significant consequences and no further actions need be considered or taken to reduce impacts.

In contrast, an EIS is always required when – as here – there are in fact potentially significant

impacts that should be carefully considered.  To treat an EA the same as an EIS is to "confuse

these different roles, to the point where neither the agency nor those outside it could be certain

that the government fully recognized and took proper account of environmental effects in making

a decision with a likely significant impact on the environment." <u>Sierra Club</u>, 769 F.2d at 875.[7]

## II.   The Corps Violated The Clean Water Act

One would have no idea from the Corps's brief, much less from its EA and it Supplemental EA, that the CWA and its implementing regulations are fundamentally designed to protect the nation's ecologically crucial wetlands rather than the interests of developers in maximizing profits.  In particular, the regulations prohibit issuing a permit if 1) it is possible to avoid wetlands destruction; 2) it would cause a violation of state water quality standards; or 3) it would contribute to the significant degradation of waterbodies.  40 C.F.R. §230.10 (a)-(c).  The Corps never even acknowledges in its brief that regulations flatly prohibit permits that violate state standards or cause substantial degradation – it refers to these as factors to "consider."  <u>See</u> Gov. Br. at 4, 22.  And for good reason.  <u>The Corps could not lawfully issue the second CCTC permit and still comply with the regulations.</u>  Moreover the record firmly establishes that CCTC's wetlands impacts can be significantly reduced without rendering CCTC impracticable.

### A.   The CCTC Permit Is Unlawful Because It Authorizes The Avoidable Destruction Of Wetlands

Because CCTC is concededly not water-dependent, before the Corps can lawfully issue

---

[7]   Here, as Plaintiffs have demonstrated, the Corps has failed to take a hard look at the direct, indirect and cumulative impacts of CCTC in its EA.  Indeed, in its brief the Corps admits that it did not even consider cumulative impacts on water demand.  Gov. Br. at 27.  The Corps's assertion in its EA that water demand is "not likely . . . lowering water levels in wetlands on [the CCTC] site," AR6675, simply ignores environmental impacts not specifically on site.  Moreover, the Corps unreasonably relies on Tampa Bay Water's ("TBW's") reduction of pumping to avoid impacts when the record shows a) TBW has increased pumping beyond allowed limits and is facing fines, AR12282-83; b) cumulative water demand is already exceeding water supplies, see AR3496, AR3802, AR6223-26, AR12282-83, AR12267-81; and c) this is resulting in regionally lower water levels that can have significant impacts.  See AR1460-61, AR1466-68 (1998 SWFWMD report finding regional impacts including "moderate to severe impacts" such as "near-complete" wetland dewatering and over 80 acres of treefall).

the CCTC permit the applicant must "prove" with "clear, detailed and convincing information" that it is impossible to build CCTC – a mall, office and residential complex – anywhere but in wetlands.  Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1186 (10th Cir. 2002), modified in part 319 F.3d 1207 (10th Cir. 2003).  Moreover, in so doing, the applicant must overcome a "very strong presumption" that it in fact could build CCTC without destroying many acres of wetlands.  Nw. Bypass Group v. U.S. Army Corps of Eng'rs., 490 F. Supp. 2d 184, 191 (D.N.H. 2007).  And it is the Corps's duty to enforce this prohibition and "independent[ly] verif[y]" information submitted.  Utahns for Better Transp., 305 F.3d at 1186.

If anything, the Corps's brief indicates that it never required the applicant to clearly demonstrate that there is no alternative to filling wetlands.  Instead, it disregarded the plain terms of its own regulations and dismissed strong evidence that affirmatively demonstrates the existence of practicable alternatives.

### 1.  CCTC's Destruction Of Wetlands Can Be Avoided Or Lessened Simply By Making CCTC Smaller

As a preliminary issue, the Corps argues that its analysis of CCTC's ability to make an 8.0% profit was a proper inquiry into the practicability of reducing CCTC's wetlands impacts under the EPA's regulations.  Gov. Br. at 18-19.  However, the Corps's analysis of CCTC's profit margin – its rate of return – was in fact contrary to the plain meaning of the regulations.  Moreover, the Corps dismissed evidence that conclusively showed that, even according to the Corps's analysis, CCTC could be reduced in size.

Under the 404 regulations an "alternative is practicable" and a permit to destroy wetlands must be denied "if [the alternative] is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40

19

C.F.R. § 230.10(a)(2); accord id. § 230.3(q).  The plain meaning of the regulations requires the

Corps to examine whether the "overall project purposes" of the CCTC project could be pursued

with less wetlands loss and taking into account the actual "cost" of the smaller project.  See id.

§§ 230.10(a)(2), 230.3(q); see also American Heritage College Dictionary 232 (4th ed. 2010)

(defining "cost" as the "amount paid or required in payment;" the "expenditure of something").

The preamble to the 404 Guidelines confirms the plain meaning and explains that the inquiry into

"cost" turns on if the alternative is "reasonable in terms of the overall scope/cost of the proposed

project:" an alternative is not practicable if it is "unreasonably expensive."  Guidelines For

Specification Of Disposal Sites, 45 Fed. Reg. 85,336, 39, 43 (Dec. 24, 1980) (emphasis added).[8]

Moreover, the relevant Corps Regulatory Guidance Letter ("RGL") confirms the plain

meaning of the rule and explains that "[t]he determination of what constitutes an unreasonable

expense should generally consider whether the projected cost is substantially greater than the

costs normally associated with the particular type of project."  RGL 93-02, Guidance on

Flexibility of the 404(b)(1) Guidelines at 6, Exhibit 2 (emphasis added).  And in this very case,

Corps superiors specifically directed the line officer to apply just this cost analysis by obtaining

"an estimate [of cost], then . . . review[ing] that estimate based on the total cost of the project and

make a judgment on that being a 'reasonable' cost.'"  AR3787.[9]

---

[8]  The 1980 Notice specifically explained that it substituted the term "cost" for
"economic," which was initially proposed, precisely because "[t]he term economic might be
construed to include consideration of the applicant's financial standing, or investment, or market
share" for examples.  Id. at 85,339.

[9]  Sylvester v. U.S. Army Corps of Eng'rs., 882 F.2d 407, 409 (9th Cir. 1989), which the
Corps quotes out of context, has nothing to do with costs and is completely inapplicable: it
addresses whether the stated purpose of a project to build a golf resort unfairly skewed the
Corps's practicability analysis towards allowing a gold course.  Indeed none of the cases cited by

If the Corps had followed its own regulations and preamble, its Regulatory Guidance Letter, the direction of Corps superiors, and most important, the overarching purpose of the CWA to <u>reduce</u> wetlands loss wherever feasible, <u>see</u> 40 C.F.R. § 230.10(a), the Corps would have been required to conclude that a less damaging alternative is "practicable." This is because reducing CCTC's size reduces its costs. It makes CCTC less expensive, not more. This is evident from the applicant's own data showing that for slightly smaller – but significantly more wetlands protective – versions of CCTC the <u>costs</u> of building CCTC are reduced. <u>Compare</u> e.g., AR4345 ($330,232,820 in costs for the permit as approved), <u>with</u> AR5477-78 ($320,063,420 in costs, 5% reduction). <u>For this reason alone the CCTC permit should be set aside.</u>

However, to evade such an outcome the applicant advanced the argument that it could not reduce CCTC's size because it would not be able to earn enough of a profit – 8% – to attract other investors. EA, AR6648-49. Even assuming arguendo that such an analysis is lawful – which it is not – the analysis shows reducing CCTC's size and wetlands impacts is practicable.

> **a.     The Evidence In The Record Shows That CCTC Can Be Reduced In Size And Still Make The 8.0% Profit That The Applicant Asserts Renders CCTC Practicable**

As Plaintiffs explained in their opening brief, the analysis that the Corps followed in determining whether the applicant could reduce CCTC's wetlands impacts is straightforward. First, the applicant asserted it required an 8.0% rate of return – an 8.0% profit – from CCTC.

---

the Corps support the analysis it used in this case. <u>E.g.</u>, <u>Bering Strait Citizens for Responsible Res. Dev. v. Corps</u>, 524 F.3d 938, 949 (9th Cir. 2008) (discussing whether alternatives were "cost prohibitive"); <u>Greater Yellowstone Coal. v. Flowers</u>, 359 F.3d 1257, 1266-67 (10th Cir. 2004) (discussing the "much higher cost" of alternative locations); <u>La. Wildlife Fed'n, Inc. v. York</u>, 761 F.2d 1044, 1047-48 (5th Cir. 1985) (affirming legitimacy of analyzing overall purpose of project).

AR6649.  Second, it then submitted rate of return calculations – profit calculations – that showed

what the supposed rate of return would be for various CCTC alternatives.  See e.g. AR4344-45.

In the calculations the applicant added up its supposed costs of building CCTC and the supposed

yearly income it would earn from CCTC and calculated the annual profit rate.  Id.  The largest

purported cost is $72,837,500 for the CCTC land, included in "NET LAND COSTS."  AR4345.

But, as Defendants never dispute in their briefs, $72,837,500 is simply not an actual cost

to the applicant of building CCTC.  The applicant never in fact paid out $72,837,500 for the

CCTC land and, indeed, it never will.  The applicant paid only $4,317,488 for the land.  See

AR10707 (handwritten tax stamp).  This is critical because simply by using the applicant's actual

cost for the land, or something nearer to its actual cost, the applicant could significantly reduce

CCTC's size and still obtain an 8.0% profit.  See Pltfs'. Br. at 39-40, AR10702-03.

In its brief the Corps asserts that "Plaintiffs erroneously argue that . . . the applicant . . .

should have relied upon its 'actual purchase price,'" Gov. Br. at 15, that is, upon the applicant's

actual costs.  The Corps arrives at this conclusion by reasoning that because in 2006 "the

[applicant] could sell the land for [$72 million] on the open market" – a number that was never

even substantiated – it was therefore reasonable to use the $72 million dollar value in calculating

whether a smaller project is practicable.  Id. at 16.  But the justification that the applicant could

have sold its land four years ago for $72 million is utterly irrelevant to whether CCTC can be

reduced in size and still earn the 8.0% profit that the applicant asserts renders CCTC practicable.

It also has nothing to do with the actual "cost" of the project or the "overall project purposes."

40 C.F.R. § 230.10(a)(2).

It could hardly be clearer that by allowing this mathematical manipulation as a basis for

avoiding an otherwise practicable alternative, the Corps has not only jettisoned the straightforward meaning of its own regulations, it has abandoned its duty to prohibit avoidable wetlands fill.  Indeed, the entire premise of the Corps's initial practicability analysis was that an 8.0% profit rendered CCTC practicable.  But when the Corps was shown on remand that CCTC could be reduced and still generate an 8.0% profit, it simply changed the analysis to allow the applicant to also make an additional $68 million profit, more than the stated minimum 8% return, in order to justify a finding of impracticability.  It is a 1700% markup in land costs from $4 million to $72 million that the applicant is itself charging the CCTC project: $68 million that the applicant simply does not have to spend to build or operate this project.[10]

Simply put, the Corps is now completely adrift from the fundamental purpose of section 404 review, particularly with regard to a project that need not be built in wetlands.  The CWA section 404 regulatory scheme is intended to safeguard as many of the nation's wetlands as possible, not maximize profit from land speculation.  The regulations emphasize that "filling operations in wetlands[] is considered to be among the most severe environmental impacts" and that a "guiding principle" is that doing so "may represent an irreversible loss of valuable aquatic resources."  40 C.F.R. § 230.1(d).

Yet in an effort to justify the CCTC permit the Corps has entered a land of complete conjecture unrelated to CCTC's actual, objective costs.  Perhaps the most concrete sign of this is

---

[10]  Even if one accepts the Corps's anomalous assertion that the $68 million markup of the applicant's actual cost for the CCTC land is somehow properly one of the costs of building CCTC, it is still, nonetheless, an amount that the applicant itself, which bought the land for $4 million, would be charging, and thus the applicant itself controls the largest single "cost" in the CCTC profit calculations.  See Magdziarz Decl. at AR10702.  There is nothing impracticable about the applicant demanding less for its own land, particularly from the applicant's own project, if it is necessary to make the project work.  Id.

that on remand the applicant submitted an appraisal for the CCTC land as of 2006 of $83,850,000 – $11 million higher than the $72 million figure.  See Gov. Br. at 18 n.10.  If this new $83 million is the fair market value of the land – and indeed it is the only evidence in the remanded record as to the supposed value of the CCTC land in 2006 – and if it is properly considered a "cost" as the Corps asserts, Gov. Br. at 16, then CCTC as approved is impracticable because it would increase CCTC's "costs" by $11 million and thus drop the approved project to below an 8.0% profit.  Yet not even Intervener contends the project is therefore "impracticable" – thus highlighting the arbitrariness of using market value as opposed to actual costs in addressing practicability.

In short, as in Environmental Defense, the Corps has "resorted to arbitrary and capricious reasoning – manipulating models and changing definitions where necessary – to make th[e] project seem compliant with [CWA] and [NEPA] when it is not."  515 F. Supp. 2d at 74.  Indeed, this is also evident from the Corps's refusal to even apply its own approach consistently: as described in Plaintiffs' opening brief, and undisputed by Defendants, when the modified CCTC permit was issued in 2009 the market value of the CCTC land had plummeted.  See Pltfs'. Br. at 41-42.  Remarkably, however, when confronted with this undisputed information, the Corps summarily chose not to consider the supposed present market value of the land after all, asserting it would be "unreasonable . . . to consider the 2009 market value."  Gov. Br. at 17.

Yet, not only has the government failed to explain why it would  not be "reasonable"– in light of the CWA's purposes – to protect more wetlands when reissuing the permit, but with respect to numerous other issues the Corps did review the evidence between 2007 and 2009, and then it issued a new, modified permit on the basis of that updated information.  Even if the Corps

24

need not reconsider evidence with every market fluctuation, see Int. Br. at 35, it surely must consider pertinent evidence at the time it issues a permit, as it did in 2009, and more important, it certainly must act consistently with respect to the information.

For example, the Corps considered evidence of the applicant's intervening sales of parcels of CCTC land between 2007 and 2009.  Supp. EA at 15342.  It then revised the "project boundary" in the 2009 permit accordingly, resulting in a different boundary from the 2007 permit.  Id.  The Corps purported to consider evidence of environmental impacts and environmental observations between 2007 and 2009, and it used this information to determine whether the 2009 permit would comply with the CWA, ESA, and NEPA.  This includes CCTC's pollution between 2007 and 2009, e.g., Supp. EA, 15340-41, and the observation of Indigos and Wood Storks between 2007 and 2009.  AR15360, AR15365.  The Corps also addressed modifications in the design of the stormwater treatment system between 2007 and 2009, such as its "elevation of weir structures in Ponds C, D, and E."  AR15364.  And, based upon these design changes, the Corps expressly changed the terms of the new modified permit.  Id.

In essence, when it served the applicant's interests, the Corps did consider updated information generated between, and reflecting events that transpired between, 2007 and 2009.  And it used that information to undertake, in the Corps's words, "additional environmental reviews under the CWA, ESA and NEPA culminating in a Supplemental Assessment and Statement of Finding" Of No Significant Impact, Gov. Br. at 10, and a new modified permit.

Yet when Plaintiffs asked the Corps to take the same approach with respect to information bearing on one of the most critical issues in a section 404 case – the ability of a non water-dependent project to avoid destroying wetlands – the Corps deemed it "unreasonable" to

consider evidence that the value of the CCTC land plummeted between 2007 and 2009.  This is utterly arbitrary and capricious and inconsistent with the Corps's other actions and with its suggestion to the Court that on remand it would address all pertinent issues.  See D.E. 41 at 9. The Corps explicitly stated in its Public Notice that it was engaging in a "reevaluation of the Permit" and would "evaluate any other facts and issues as necessary to determine whether reinstatement, modification, or revocation complies with applicable laws," including ""[a]ll factors which may be relevant" such as "economics" "property ownership and, and in general, the needs and welfare of the people" under the "application of the [EPA section 404 Guidelines]." AR11674-75 (emphasis added).  Apparently, however, and arbitrarily, the only factor this comprehensive "reevaluation" omitted was the collapse of CCTC's land value.  In any event, the Corps's actions are entirely inconsistent with its regulatory mandate to require that, if the facts objectively show that reducing wetlands loss is  "practicable" – as was true when the decision was made in 2009 to reissue the permit – it must require wetland impacts be reduced.[11]

> **b.      The Applicant Failed To Establish The Requirement Of An 8.0% Profit With Clear And Convincing Evidence**

As Plaintiffs explained in their opening brief, record evidence showed that an 8.0% profit rate was not, in any event, necessary.  See Pltfs. Br. at 43-45.  In this regard, the applicant had misled the Corps by substituting different types of profit equations to argue that an 8.0% profit would be needed but that a smaller CCTC could not achieve it, and had also submitted conflicting evidence as to whether an 8.0% profit rate was even required to obtain financing.

---

[11]  Ironically, while the applicant ardently argues that current land values should not be considered, the applicant is taking full advantage of plummeting land values in the area and in 2009 paid $5 million for land in Pasco County to a developer of the nearby Wiregrass project -- roughly 13.6% of the $36.5 million the developer had bought the land for in 2005.  See Ex. 3.

Stunningly, the Corps's primary response to this, after its apparent acknowledgment that it was indeed mislead and hence "made a mistake" – which alone would have been a sufficient basis for revoking the permit, see AR15395-96 – is that its past reliance on "conflicting and misleading information submitted by the permittee . . . is now moot."  Gov. Br. at 19, 20 ("regardless of whether the Permittee misled the Corps").  Yet the issue is anything but "moot," and it is remarkable that the Corps does not even care that it has been provided false information.

In its brief the Corps claims the issue is now moot because several "pieces of evidence" supposedly validate an 8.0% return.  Gov. Br. at 20 (citing AR12285).  None of them do so.

For example, the first "piece[] of evidence" cited by the Corps is the 2006 Real Estate Research Corporation Real Estate Report ("RERC" report).  Gov. Br. at 20.  Yet if one accepts the RERC report as evidence of a minimum rate of return, the RERC report indicates CCTC, a Regional Mall in Tampa, can be built for a 7.7% return, AR5469, at which point CCTC could be reduced 5%.  See Pltfs'. Br. at 44.  RERC does not support an 8.0% return, it does the opposite.[12]

Another "piece of evidence" is a survey of six individuals who refused to be identified, AR11239, who opined that one must adjust up reported rates of return like RERC's by anything from 1.5% to 3.0%.  AR11243.  But not only were the unattributed statements throughly disputed by Plaintiffs' unchallenged financial real estate expert, see AR10689,[13] but the survey proves too

---

[12]  Although it is a small difference in a few tenths of a percent, it is critical to wetlands destruction under the Corps's analysis.  The Corps rejected a CCTC alternative for a 5% smaller project because it would only generate a 7.73% and 7.8% rate of return for the first and second construction phases – 0.27% less that 8.0%.  See id. (citing AR6649; AR5469).  A 5% smaller CCTC would reduce CCTC by 28 acres, AR6649 – almost half the 50+ acres of wetlands lost.

[13]  Mr Magdziarz's credentials have never been challenged and indeed he teaches and holds high appointments at the Appraisal Research Institute – including sitting on its Board of Directors and its Audit, Education and Publication Committees, AR10686-88 – which is the very

27

much.  If one adjusts up the 7.7% RERC reported return by 1.5-3.0%, then CCTC would have to

earn a return far higher than the 8.0% figure adopted by the Corps, and because CCTC earns an

8.0% profit, EA, AR6649, the <u>current</u> project itself is impracticable, highlighting the arbitrariness

of the agency's entire approach.  The same flaws afflict the other pieces of evidence relied on by

the Corps.  <u>See</u> Gov. Br. at 20 (citing (1) AR4600 (the "Real Estate Capital Markets Scorecard"

with adjusted returns over 8.0% and averaging 8.54%) and (2) AR4619 (which identifies an

average return of 10.06%)).  The record simply does not establish clear and convincing evidence

of an 8.0% minimum return.  If the Corps truly credited the "evidence" it cites for the Court, the

Corps would have to have concluded that CCTC <u>as approved</u> is impracticable.

## 2. CCTC's Parking Can Be Reduced, Saving Wetlands

The Corps's assertion that CCTC's 14,000 parking spaces could not be reduced fares no

better.  In its brief and EA the Corps dismisses a survey of other malls – that demonstrated CCTC

would have "more parking than any existing mall" – because, as the Corps explains, the applicant

asserted that the other malls are old, not regional malls, and thus not comparable.  EA, AR6647.

If the Corps had simply looked at the record evidence concerning the five malls in the

survey, AR3973 (Brandon Town Center, Citrus Park, International Plaza, University Square, and

West shore Plaza), the Corps would have seen that the applicant's dismissal of these other malls

as "older" and not "regional malls," EA, AR6647, was incorrect according to the applicant itself.

Most of the malls had been built within the last 5 -10 years.  <u>See</u> AR4042.  <u>And the applicant, as</u>

<u>well as others, described at least four of the five malls as regional malls comparable to CCTC</u>

---

Institute where the author of the survey who recommends adjusting up RERC's rates of return
received his qualifications and advanced training.  AR11246.

everywhere else – except in the context of the survey.[14]

The Corps also dismissed statements by "Regional Mall Developers" that indicated CCTC only needed a parking ratio of 4.5 to 5 spaces per 1000 SF.  AR4044, AR4047, AR4050.  But according to the Corps's brief,  it "did not give any weight to . . . [these] letters."  See Gov. Br. at 21.  Although the Corps never explains in its decision documents why it dismissed the evidence, the Corps's attorneys assert several rationales for ignoring it, including that the letters were "anecdotal."  Gov. Br. at 21.  Yet the statements were offered by the applicant itself from some of the largest "Regional Mall Developers" in the country and they provide statistics to support their analyses: they are far from anecdotal.  Furthermore, they were corroborated by the Corps's survey of other regional malls.[15]

In sum, this record simply cannot support a finding of the "detailed, clear and convincing evidence" "proving impracticability" that the CWA requires before the Corps can authorize a

_____

[14]  See e.g., AR2994 (applicant states that in the "Tampa area, the regional retail center model described [for CCTC] occurs at all successful regional mall sites including the Westfield Shopping town – Citrus Park, Westfield Shopping town – Brandon, and International Mall."); AR2997 (applicant describes Citrus Park Town Center, University Mall, and Brandon Town Center as "regional shopping centers"); AR4049 (describes Westfield Shopping town – Brandon, also identified as Brandon Town Center, as regional shopping center); AR4041-42 (applicant identifies "Westfield Shopping town - Brandon" and Citrus Park Mall as a "regional mall" and "comparable mall project" to CCTC).

[15]  Moreover, the evidence the Corps asserts it relied on – documents indicating "specific parking requirements per use," Gov. Br. at 21 – specifically allow exceptions to the parking ratios if, for example, there is a conflict with a federal requirement. AR5530.  Presumably the CWA's prohibition of impacts to wetlands would be one such requirement.  And although the Corps cites a "trend" in new "life style" malls for more restaurants, e.g., Gov. Br. at 22 (citing AR4606), the Corps is once again manipulating its analysis to justify wetlands destruction because the stated purpose of CCTC is to create a "regional mall," EA, AR6637, of millions of square feet, and not a "lifestyle mall" which are much smaller and located near affluent areas. AR4660.  In any event, the Corps never explains why it is not practicable to reduce the number of restaurants at CCTC if doing so would reduce resulting wetlands impacts.

permit for the destruction of wetlands.  <u>Utahns for Better Transp.</u>, 305 F.3d at 1186.  The

applicant's <u>own</u> evidence, and the survey it compiled, demonstrate that CCTC's parking can be

reduced and wetlands saved.

    **B.**    **The CCTC Permit Is Unlawful Because It Will Cause The Significant Degradation Of Cypress Creek And Its Wetlands And Violate State Water Quality Standards**

Rather than addressing the governing CWA regulations which expressly prohibit issuing

a permit that "[c]auses or contributes . . .  to violations of any applicable State water quality

standard" or "the significant degradation" of waterbodies, 40 C.F.R. § 230.10 (b), (c), in its brief

the Corps characterizes the prohibitions as merely requiring that the Corps "consider" substantial

degradation and state standards.  Gov. Br. at 22.  Presumably this is because CCTC has <u>already</u>

caused the substantial degradation of Cypress Creek, and it has <u>already</u> violated state water

quality standards.  These critical points are not even disputed.

Instead, the Corps broadly states that under Corps regulations "state water quality

certification is conclusive as to water quality considerations," Gov. Brief at 23, and it asserts that

Plaintiffs assume without support that CCTC's pollution will recur in the future.  Again, the

Corps is simply failing to come to grips with its responsibilities under the law.

EPA Guidelines require the Corps to undertake a specific fact finding inquiry and

determine in writing whether a permit will contribute to the significant degradation of Cypress

Creek.  40 C.F.R. §§ 230.10(c), 230.11-12, <u>id.</u> Subpart C-G; <u>see also</u> <u>Utahns for Better Transp.</u>,

305 F.3d at 1191-92 (Corps must consider "potential short-term or long-term effects of a

proposed discharge on the physical, chemical, and biological components of the aquatic

environment"); <u>City of Shore acres v. Water worth</u>, 332 F.Supp.2d 992, 1016 (S.D.Tex. 2004);

Friends of the Earth v. Hall, 693 F.Supp. 904, 945-46 (W.D. Wash. 1988).  Moreover, the Corps
is even prohibited from issuing a permit "if there is insufficient information to make a reasonable
judgment as to whether the discharge will result in significant degradation."  Utahns for Better
Tranp., 305 F.3d at 1191 (citation omitted).  And under the circumstances of this case the
Corps's reliance on the applicant's assurances of no future degradation –  assurances that have
proven consistently false in the past – cannot be deemed the basis for a "reasonable judgment"
that the project will not degrade Cypress Creek and its wetlands.

To overcome the overwhelming evidence against the Corps permit, the government
advances two overarching but internally contradictory arguments.  As discussed above, the Corps
first seeks to divorce the CCTC permit from the pollution caused by its issuance.  Then the Corps
tries to justify its determination that the CCTC permit will not degrade Cypress Creek by
pointing back to the terms of the permit.

With regard to the Corps's argument that the discharges were all the result of some ill-
defined "human error," see Gov. Br. at 23-24, Plaintiffs have already explained that that
argument makes little sense given the series of unlawful discharges over many months that surely
points to an inherent flaw in the project being permitted, rather than an isolated human mistake,
despite the Corps's inaccurate assertion that the discharges only occurred on August 3, 2007,
January 24, 2008 and April  9, 2008.  See AR15340.

Indeed, the nature of CCTC's pollution is inextricably intertwined with the environmental
risks CCTC poses.  Among the known risks the CCTC permit poses is that it authorizes the
destruction of buffers and wetlands that protect Cypress Creek and the ultimate use of Cypress
Creek as a drain for stormwater runoff.  Even the Corps noted that the destruction of buffers

raises a "paramount concern" because they "provide[ed] a high [protective] function" through "sediment removal and erosion control . . . [and] moderation of storm water runoff." AR3975. And the permit's authorization of the destruction of wetlands raises the same risk: the wetlands provide "valuable storage areas for storm and flood waters"and "water purification" services. AR6670; AR10664-67. Thus, in predictable fashion, destroying buffers and wetlands compound each other's effects and reduce the site's ability to store and slow stormwater, increasing the likelihood that larger and more rapidly moving volumes of stormwater runoff will erode soil and transport sediment and other pollutants. See e.g., AR10666-68. The Corps explained the risk is magnified given CCTC's large "scale" and close "proximity" to the Creek. EA, AR6650.

The predictable, if not inevitable, results are the massive, repeated discharges of polluted water time and again from June 2007 for most of a year through April 2008. See supra at 6-11. No one could control the pollution and CCTC did not stop polluting until all work authorized by the permit halted and the site was seeded and grown over with grass. See e.g., Int. Br. at 12-13.

Accordingly, attributing the discharges to "human error" and not the project itself is simply disingenuous. Indeed, that characterization is belied by Interveners' own laundry list of "additional corrective erosion and sediment control measures" that were adopted belatedly in an attempt to control CCTC's pollution. Int. Br. at 12-13 (emphasis added). Plainly, if the sole problem was "human error" rather than risks inherent in building a massive shopping mall in a sensitive ecosystem, it would make no sense to, e.g., "increas[e] the capacity of on-site stormwater ponds" and construct additional "large on-site containment areas," etc. Id.; see also e.g., AR9956-57, AR9731-33, AR15754-59.

In the alternative the Corps asserts that it rationally determined the CCTC permit would

32

no longer significantly degrade Cypress Creek, pointing to the stormwater treatment system and

to the surface water quality monitoring plan.  Gov. Br. at 22-24.  According to the Corps, the

stormwater treatment system is reliable because it "will <u>exceed</u> state requirements."  Gov. Br. at

23, 24.  But whether the treatment system exceeds state standards does not address whether <u>the</u>

<u>CCTC project as a whole</u> will nonetheless degrade Cypress Creek.

   In any event, the storm water treatment system does not in fact exceed state requirements.

There is no dispute that state law requires that the first 1.5" of runoff be treated for OFWs: the

applicant has simply asserted that because CCTC discharges to Cypress Creek's wetlands before

Cypress Creek, it is not discharging to an OFW.  <u>See e.g.</u>, AR6209; AR5413, AR8535.  But this

is wrong – again, Cypress Creeks wetlands <u>are part of the OFW</u>.  <u>See</u> Fla. Admin. Code Ann. r.

62-302.700(9)(i)(14)(c); 62-302.200(32); Fla. Stat. § 403.031(13) ("[w]aters" include wetlands).

The Corps itself acknowledges that discharges to Cypress Creek's wetlands constitute discharges

to an OFW, <u>see</u> AR8751, and state permitting documents indicate that CCTC must treat the first

1.5" of runoff.  <u>See e.g.</u> FWS226, FWS231, AR9702.[16]

   Second, the Corps cites correspondence from the City of Tampa that supposedly

concluded there would be no impacts on its water supply.  Gov. Br. at 30.  But what the letter

---

   [16]  In this regard, although Interveners assert that the CCTC system has a capacity of 2.9 inches, <u>see</u> Int. Br. at 40, government records establish that the area regularly experiences rain events that exceed 3 inch/24 hour rain events.  AR10719, AR10723, AR10725, AR10727, AR10731.  And, though Defendants repeatedly blame CCTC's discharges on "unusually high" rain events, such as a 5 inch rainfall, for example, <u>e.g.</u>, Int Br. at 10, 7, government data Plaintiffs submitted to the Corps demonstrates such events are not uncommon and that just recently on June 20-21, 2008, there was a rain event with over 5 inches of rain within a 24 hour period.  AR10730-31.  In this light Interveners' argument that buffers are not even required because CCTC has a storm water system – citing only its own engineer's self serving statement, <u>see</u> Int. Br. at 20 – is particularly misguided.

actually does is reiterate the City's "concern for this project," express tentative reliance on mitigation, and commit to "track and monitor this project" to "ensure that the quality and quantity of water is not . . . adversely affected." AR4295. Subsequent correspondence from the City adopts the assertive position that CCTC is "polluting" its "precious water supply" AR6770.

The Corps's reliance on the surface water quality monitoring plan is even more misguided. Gov. Br. at 23, 30. The monitoring plan that the Corps is relying upon <u>has failed to identify any of CCTC's massive discharges to date.</u> Indeed, the 2007 and 2008 Annual Reports for the plan concluded that "[t]urbidity measurements during 2007 did not raise any concern in Cypress Creek," AR7231, that "[f]ield measurements for . . . turbidity were all within normal, expected ranges," AR7237, AR11825, and that water quality was "acceptable" with "normal, expected levels with no adverse effects as a result of development activities." AR11826.[17]

## III.    The Corps And FWS Have Violated Section 7 Of The ESA

### A.    The Corps's And FWS's Determination That CCTC Will Not Adversely Affect The Indigo Is Contrary To All Of The Evidence In The Record

In their brief the agencies never contend that they actually considered the effect of CCTC's destruction of Indigo habitat on the Indigo. Gov. Br. at 37-39. To be sure, neither Federal Defendants nor Interveners seriously dispute that the CCTC site contained suitable Indigo habitat, or that the habitat was occupied by the Indigo. In fact, as discussed in Plaintiffs' opening brief, the evidence of Indigo habitat and of Indigos on site is overwhelming.

---

[17]   Plaintiffs informed the Corps of the inadequacy of the plan and that it would fail to accurately report Cypress Creek's conditions. AR10296. Plaintiffs even provided the Corps with a declaration from Dr. Rains explaining that the monitoring plan had numerous faults – including that it had a "small number of sampling stations" and "limited time frames [for] sampling." AR10671. These statements were confirmed by the failure of the 2007 and 2008 annual reports to detect even CCTC's massive discharges of polluted water.

Interveners' own biologists concluded that Indigos "occur on site or have a reasonably high probability of occurring." FWS191. Dr. Dodd corroborated Interveners' own biologists' conclusions that Indigos were likely to be present on the CCTC site. AR10543. And the common conclusion of the biologists was then confirmed when an Indigo was seen on site in May 2007 – as reflected in the sworn declaration submitted to the Corps and FWS by Plaintiffs. See AR10522. There is therefore no genuine dispute regarding the presence of Indigos and Indigo habitat on the CCTC site.[18]

The only question before the Court, then, is whether the agencies' failure to address the impact on the Indigo from the destruction of habitat that Indigos were using was arbitrary and capricious. And in this regard, Defendants point to absolutely no evidence that justifies ignoring such an impact, rather all of the scientific evidence demonstrates otherwise.

_____

[18] Without disputing Indigo presence on site, Defendants' counsel assert several impermissible post hoc arguments to minimize the value of the Indigo habitat on site. Even if considered by the Court, the arguments are meritless. Contrary to the assertion that there was a "relatively low density of active gopher tortoise burrows on site," Gov. Br. at 37, the report cited by the attorneys estimates a population "density of tortoises" of "1.3 tortoises per acre" in the southern portion of the site. FWS195. According to the Florida Game And Fresh Water Fish Commission ("FGFWFC"), a "moderate to high densities of gopher tortoises" is considered to be "0.4 individuals per acre or greater." AR0375. In other words, the estimated tortoise population was over three times what is considered to be moderate to high density. Moreover, the estimate of 16 tortoises, upon which the 1.3 tortoises per acre estimate was based, significantly underestimated the 25 tortoises ultimately found. AR10529. Second, the lawyers assert that Indigos "were not observed during numerous wildlife surveys." Gov. Br. at 37. However, no Indigo surveys were done, see AR6367, and yet as FGFWFC explains, the Indigo is "extremely difficult to census due to their highly cryptic nature:" an Indigo survey requires that "one-way funnel traps (minimum three foot length) should be placed at the burrow entrance of at least twenty-five percent of the . . . burrows on a site" – 66 in the case of CCTC. See AR375. This was never done on the CCTC site, and hence the failure to observe an Indigo using patently inadequate survey techniques indicates nothing as evidenced by the fact that an Indigo was observed on the site in May 2007. See AR10522. The fact that no Indigos were observed when the burrows were excavated also proves nothing – the burrows were excavated at night in the dark using a backhoe, AR10523, greatly reducing any chance of observing a black snake.

First, neither the agencies nor Interveners dispute in their brief that the greatest threat to the Indigo today is the loss, degradation, and fragmentation of its habitat.  Indeed, FWS's own documents, including its recovery plan for the Indigo, expressly state that this is the case.  <u>See</u> <u>e.g.</u> FWS2584, AR2176; <u>see also</u>, AR10541.[19]

Second, FWS's own draft "Species Conservation Guidelines," which specifically state they are FWS's "tool to determine if a project, i.e., a Federal permit . . . may adversely affect eastern indigo snakes," AR2176, <u>identify protecting gopher tortoises as the first criterion for avoiding impacts to the snake.</u>  AR2178.  More specifically, they state that "1) Gopher tortoise burrows on site are [to be] protected via conservation easements" and "[n]ative vegetation should be maintained on site as refuges for the snake." <u>Id.</u>  Additional criteria include "[c]learing and grading activities . . . outside high activity months (June to November)." <u>Id.</u> "If the project involves substantial land clearing, a determination of likely to adversely affect may be warranted."  <u>Id.</u> at AR2179.

According to FWS's own documents, therefore, the most relevant criterion for

---

[19]  The government's assertion that recovery plans are not always legally binding misses the point.  Plaintiffs are citing the recovery plan to demonstrate what FWS's own scientists have asserted are the primary causes of the Indigo's threatened extinction.  Hence, the Plan reflects the Service's own understanding of the "best available" science on the species, 16 U.S.C. § 1536, and, as Judge Robertson has held, it is arbitrary and capricious for FWS and the Corps to disregard a formal recovery plan in a section 7 consultation.  <u>See</u> <u>National Wildlife Federation v. Norton</u>, 332 F. Supp. 2d 170, 180 (D.D.C. 2004).  In this regard, it is notable that although the Corps states in its Supplemental EA that Indigos are not always associated with gopher tortoises in Central and South Florida, <u>see</u> Supp. EA, AR15364, FWS's official recovery plan for the Indigo in South Florida expressly states that "[w]herever the eastern indigo snake occurs in xeric [dry] habitat" – such as the sandy uplands in the south of the CCTC site – "it is <u>closely associated</u> with the gopher tortoise."  FWS2586 (emphasis added).  Indeed, FWS found that "on the sandy central ridge of South Florida, [Indigos] use gopher tortoise burrows more (62 percent) than any other underground refugia."  FWS2587.

determining whether a project may impact the species is Indigo habitat on site – including in particular, Gopher Tortoise burrows – and whether that habitat would be destroyed.  In this light it is patently arbitrary and capricious for the agencies to fail to consider that a project that has already destroyed 66 Gopher Tortoise burrows, see AR10529, and cleared vast amounts of vegetation will adversely impact the Indigo and thus bypass formal consultation.

Third, the affidavit by Dr. Dodd affirmatively establishes the relevancy of habitat destruction to considering adverse impacts to the Indigo.  As Dr. Dodd explained, the "CCTC development is likely to adversely affect the Eastern Indigo Snake through the loss, degradation and fragmentation of habitat on site."  AR10551, AR10544-46.  In fact, Dr. Dodd identified several adverse impacts to the Indigo from the habitat loss caused by CCTC, including the fragmentation of the Indigo's habitat on the nearby conservation lands from the severance of the corridor.  Id.  At the very least the agencies must address such evidence and discuss the relevant criteria for assessing such an impact, such as the existence, quality, and amount of Indigo habitat, how much would be destroyed, or how much native vegetation cleared, and when, but they did not.  FWS6367, AR6682; AR21040, AR15364-65.[20]

Instead, in their brief the agencies continue to rely upon the Eastern Indigo Snake Protection Measures to demonstrate that they rationally determined the Indigo would not be adversely affected by CCTC.  However, as Plaintiffs explained in their opening brief, the

_____

[20]  FWS's treatment of the Wood Stork indicates that habitat destruction is an adverse impact that must be addressed.  The centerpiece of FWS's analysis of CCTC's Wood Stork impacts is its "compar[ison] of proposed impacts to suitable foraging habitat to the proposed wetlands mitigation to see if the mitigation adequately compensates for those impacts."  AR21038; AR6364-66.  Nowhere in their briefs do the agencies point to evidence that could justify the disparate treatment between the Wood Stork and the Indigo.

measures address <u>only</u> the direct mortality of the Indigo during construction and require that

Interveners allow an Indigo to "leave the construction area on its own accord" if one is

encountered.  AR6367.  As Dr. Dodd explained, reliance on these measure alone "ignore[s] a

basic concept of ecology by assuming that individuals are separate from [their] habitat.  Wild

animals require habitat in order to survive."  AR10549.

Indeed, instead of analyzing the quality and amount of Indigo habitat that will be lost, the

agencies appear to assume that the Indigos using the CCTC site can simply move elsewhere.  <u>See</u>

Gov. Br. at 39.  In <u>Sierra Club v. Flowers</u> the court emphatically rejected the Corps's and FWS's

assumption that destroying a species' habitat would have no impact because the species "can

relocate to other areas."  <u>See</u> 423 F. Supp. 2d 1273, 1374 (S.D. Fla. 2006) (vacated in part on

other grounds, 526 F.3d 1353 (11th Cir. 2008)).  The court reasoned that species uses a particular

habitat in order to satisfy its specialized biological needs, and it is arbitrary to assume that it can

just pack up and move elsewhere.  <u>Id.</u>

Yet Defendants' counsel – in a post hoc rationalization that seeks to justify what the

agencies never actually assert – essentially rely on the same argument in this case.  According to

counsel, there are "large areas of protected public lands in South Florida" in which Indigos can

live.  Gov. Br. at 39.  But that does not mean that the destruction of the Indigo's habitat <u>on the</u>

<u>CCTC site</u> does not adversely affect the species.  Indeed, FWS's own publications specifically

state that because the Indigos' population has declined so dramatically, "<u>any additional threats to</u>

<u>its survival could cause local extirpations.</u>"  FWS2584, FWS2589 (emphasis added).  Moreover,

according to the expert agency's own publications, its is precisely "[b]ecause of its relatively

large home range [that] this snake is especially vulnerable to habitat loss, degradation, and

fragmentation."  FWS2589; see also AR2176.[21]

The agencies repeatedly assert that the Court should defer to their scientific judgment.

See e.g., Gov. Br. at 41.  However, although judicial review under the APA is deferential, it is

not meaningless, and among the specific criteria that warrant overturning an agency's decision is

the agency's failure even to consider the "relevant factors" and draw "a rational connection

between the facts found and the choice made" with "a satisfactory explanation" for its

conclusion.  State Farm, 463 U.S. at 43 (citations and quotations omitted).  The agencies failed

that State Farm test by ignoring the impact to the Indigo that is its greatest threat to its survival

and recovery, i.e., habitat loss and degradation.

**B.      The Corps's And FWS's Determination That CCTC Will Not Adversely Affect The Wood Stork Is Arbitrary And Capricious**

As Plaintiffs explained in their opening brief, there are two flaws in the agencies'

conclusion that CCTC will not adversely impact the Wood Stork.  First, although FWS sought to

account for impacts to the Wood Stork from destruction of wetlands on site, it failed to account

for all of the Wood Stork habitat.  This is critical because the agencies' no adverse effect

determination was based upon determining the total loss and total offsetting gain of Wood Stork

foraging habitat: because they believed there was a net gain, they determined there was no

adverse impact to the species.  AR6364-66.  Second, the agencies relied upon mitigation to offset

---

[21]  If the government is suggesting that formal consultation is not required unless a project
threatens the continued existence of the Indigo everywhere it exists, such an argument turns the
ESA consultation process upside down.  The ESA regulations are clear: any action that "may
affect" a listed species adversely triggers formal consultation.  50 C.F.R. § 402.14(a), (b).  If that
low threshold is satisfied, as it plainly is here, the express purpose of formal consultation is to
then determine whether the effect is significant enough that it is "likely to jeopardize the
continued existence of a listed species," 50 C.F.R. § 402.14(h)(3), and if not, to develop
mandatory "terms and conditions" to minimize the negative effect.  Id. at § 402.14(i)(iv).

habitat loss when not only is there a proven track record of the Corps's mitigation failing at other sites, but it is already failing at CCTC.

1.    **FWS's And The Corps's Reliance On Mitigation To Offset Impacts To The Wood Stork Is Arbitrary And Capricious Because The Mitigation Does Not Work And Is Already Failing On The Site**

As Plaintiffs have explained, see Pltfs'. Br. at 42-44, the mitigation the agencies are relying upon to offset wetlands impacts and impacts to Wood Stork foraging habitat has a track record of failing at other Corps sites and is already suffering the same fate at the CCTC site. Perhaps for this reason the agencies do not even address CCTC's failing mitigation in their brief.

Plaintiffs submitted abundant evidence to the Corps and FWS, including reports from the National Academy of Sciences ("NAS") and the General Accounting Office ("GAO") documenting the Corps's long track record of failure with respect to its attempts at mitigating for actual loss. NAS, citing numerous studies, concluded point blank that the Corps's mitigation was not working and that "[t]he goal of no net loss of wetlands is not being met . . .  by the mitigation program." See AR10352. In fact, one study showed that in Florida as little as 10% of surveyed mitigation complied with Corps permits. AR10383. Four other studies in Florida concluded that even those mitigation sites that did comply with permit conditions were nonetheless found to have very low actual wetlands function when inspected. AR10384.

Neither the Corps nor FWS ever explain why the mitigation they are proposing for CCTC will succeed where their other mitigation attempts have failed. Indeed, in response to comments, and in response to Plaintiffs' summary judgment motion, the agencies never even acknowledge the documents systemic problems with the Corps's mitigation requirements.

Interveners assert in their brief that these are abstract points without relevance to the

40

CCTC site.  See Int. Br. at 47 & n.33.  But again, the record shows that mitigation at the CCTC site is itself already failing in significant ways.  For example, FWS and the Corps rely upon littoral shelves in storm water ponds A, C, D and E to provide Wood Stork habitat as compensatory mitigation for the foraging habitat that CCTC destroys.  See AR6365-66.  Yet ponds A and C, which the Corps and FWS rely upon to provide mitigation for Wood Stork habitat, see e.g., AR6366, are too dry to be planted.  See AR18624.[22]

Nonetheless, the Corps asserts that the delay in planting will be offset by the additional 5 acres of mitigation that FWS asserts are a "net gain" of Wood Stork foraging habitat – even though as discussed below neither agency addressed the true amount of Wood Stork habitat that CCTC will destroy.  To reach this calculation the Corps explains that it applies a "3% discount rate" to its mitigation to account for the "lag" of its mitigation projects – that is, failure of the mitigation to achieve compliance and in a timely manner – without any justification for why only a 3% discount rate would apply when most mitigation, including that at CCTC, fails.  Moreover, as the NAS report explains, such mitigation ratios – a principal tool for accounting for temporal lags, AR10374 – should vary depending upon factors such as the difficulty in mitigating for the particular type of wetlands involved and the presence of listed species.  AR10372 (explaining that "ratios can be as high as 5:1 for impacts to endangered species habitats").

---

[22]  On the other hand, when the ponds are not too dry, they may well become too wet.  As the Corps explains, in an effort to minimize turbidity reaching Cypress Creek, the weirs from which the ponds discharge runoff have been raised higher than initially designed as a "temporary" measure.  See AR15363.  Thus, during construction, which could take until 2019, id., "planting of vegetation [is] impracticable, as the water may reach a depth at which the vegetation may not survive."  Id.  Moreover, the very alum treatments that Defendants assert will protect Cypress Creek from future turbidity renders planting the ponds impracticable because such "alum treatments within the ponds . . . may adversely affect[] any planted vegetation."  Id.

Yet if the agencies are not fully accounting for Wood Stork habitat that will be lost as discussed below, and if they are overestimating the amount that will be gained through mitigation, there is absolutely no rational basis for FWS's and the Corps's conclusion that CCTC will not adversely affect Wood Storks.

> ### 2.     FWS And The Corps Failed To Fully Account For Impacts To Wood Stork Foraging Habitat

As discussed when Plaintiffs moved for summary judgment, in calculating the amount of Wood Stork foraging habitat that CCTC would adversely impact, FWS failed to include a wetland complex referred to as wetlands 1, 4, 5 and wetland system W-A/W-A1/W-A3: it is the only wetland where Wood Storks have been observed foraging.  See Plaintiffs' Br. Brief at 43 n.10 (citing AR1923, AR1964, AR2019, AR6497).  CCTC will destroy over 23 acres of that wetland system.  AR6497.  Plaintiffs explained this oversight to the agencies on remand. AR10299.  In response, however, both FWS and the Corps essentially dismissed the oversight by stating that they had always "assum[ed] [Wood Storks] had and would use the project area for foraging."  2009 Concurrence letter, AR21039; Supp. EA, AR15364.

In their brief the agencies argue that though they had "erred" in concluding that no Wood Storks had ever been observed on site, it was harmless error as the agencies had accounted for 16 acres of habitat.  Gov. Br. at 39.  The agencies' responses, however, are entirely unresponsive to the specific data that Plaintiffs brought to the agencies' attention.  The data demonstrated that the agencies "assumption" of the amount of pre-project Wood Stork was an inaccurate assumption that failed to fully account for the total amount of Wood Stork habitat lost.  The fact that the agencies had assumed some amount of habitat existed, 16 acres, misses the point – the relevant question is not whether some habitat was used for foraging, but whether the agencies'

assumptions as to the amount of habitat, which is the basis of FWS's no adverse impact finding, was accurate. And in this case, the agencies missed over 23 acres of impacted habitat, wrongly concluding, therefore, that because there would supposedly be 21 acres of on site mitigation, there was a net gain of 5 acres of Wood Stork habitat, AR6366, when in fact CCTC would result in a net loss of habitat, even assuming the efficacy of the mitigation.

With no explanation from the agencies as to why this difference is irrelevant, their attorneys offer unsupported post hoc explanations that the W-A/W-A1/W-A3 wetland system does not qualify as foraging habitat because, "accounting for normal plant growth," it may not be suitable "foraging habitat five years later" and that there were only "four observations of a wood stork in a single location over five days in 2002." Gov Br. at 41 n.17.

As a preliminary matter, these are not the agency's explanations, but their lawyers', and they should be disregarded on that ground alone. See Hill v. Norton, 275 F.3d at 105. Moreover, the lawyers' suppositions prove to much. If five years of plant growth renders a wetland useless to the Wood Stork, there presumably may be no reason to create mitigation, for example, because in five years they too would grow over. Furthermore, it is entirely common for Wood Storks to forage singly or in small numbers, see FWS2270, and as FWS explains, Wood Storks may use a site only in certain years and not others. See AR6364.[23]

_____

[23] The governments' attorneys assert that FWS evaluated potential habitat for Wood Storks in the W-A/W-A1/W-A3 wetland system but concluded the system did not contain habitat, citing a table at AR1549. Gov. Br. at 41 n.17. However, the table at FWS1549 does not, in fact, reflect FWS's evaluation of Wood Stork habitat: the table's cover letter shows it is Interveners' biologists characterization of the habitat, AR3926-28 – the very biologists that had denied ever seeing Wood Storks in the wetland – and elsewhere the biologist expressly concluded that the wetlands complex did provide foraging habitat for "listed wading birds." See FWS956. Moreover, although FWS may not premise its impact analysis "on the presence or absence of foraging wood storks," Gov. Br. at 40 (citing FWS1123), the existence of foraging

In sum, the record indicates that the agencies failed to consider evidence directly relevant to their determination of whether Wood Storks were adversely impacted. As a result, the agencies failed to properly assess the extent of Wood Stork impacts and their not likely to adversely affect determination is arbitrary and capricious.

## IV.   RELIEF

Interveners assert in a footnote that Plaintiffs' claims should be denied as moot because Interveners have supposedly already filled wetlands. Int. Br. at 15 n.8. The test for mootness is not whether a challenged project has been completed – and CCTC has not been completed – and not whether all the destruction sought to be avoided has been realized, but whether any remedy may be crafted for legal violations. See Wisc. Pub. Power, Inc. v. FERC, 493 F.3d 239, 263 (D.C. Cir. 2007) ("The mootness doctrine ensures that judicial relief can still redress the asserted injury." (citation and quotations omitted)); Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1065 (9th Cir. 2002) (The "completion of an activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief . . . can be given.").

In this case there is no question that relief can still be granted, both vis-a-vis the Corps, FWS and Interveners. Indeed, the very fact that the Corps's suspension of the permit stopped all work in the wetlands (and the status quo on the site has not changed since then) pending environmental reviews demonstrates that further such relief can surely be provided by the Court.

Wood Storks in habitat would presumably be a consideration relevant to, if not dispositive of, whether the habitat is foraging habitat, and it was presumably for this reason that agencies repeatedly asked for survey data, see e.g., AR3824-25, AR2567, and why FWS and the Corps both incorrectly noted the lack of any observations of Wood Storks foraging on the site in their decision documents. See AR6364, AR6681. In the very least the information should have been considered by the expert agency in evaluating W-A/W-A1/W-A3 as foraging habitat, and an explanation given by the agencies if they dismiss the presence of the species nonetheless.

There is no reason why setting aside the permit pending further analysis of impacts and alternatives that may minimize such impacts would not be meaningful relief.  For example, the result of that remand could be a permit that conditions project construction on restoration of wetlands or other steps to ameliorate impacts on listed species.

Accordingly, Plaintiffs request that the Court grant the "ordinary" APA relief of vacatur. Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs., 145 F.3d 1399, 1409 (D.C Cir. 1998); see also FCC v. Nextwave Personal Commc'ns, 537 U.S. 293, 300 (2003) ("[i]n all cases agency action must be set aside if the action was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law") (citations omitted).  In addition, although Plaintiffs seek compliance with federal laws and restoration of unlawful environmental damage inflicted thus far, in this regard the parties should file short supplemental submissions addressing the exact parameters of such relief in light of the specific legal violations discerned by the Court.[24]

---

[24]  Such relief would be especially appropriate in light of the fact that the record demonstrates that Interveners had full notice before the permit was issued that Plaintiffs would likely challenge the permit if it was issued as initially requested, e.g., AR6450-51, and as a result Interveners expressly sought to cause as much environmental damage as quickly as possible to preempt such challenges.  To this end, Interveners' own contractor has stated in court documents that Interveners "urgently desired the Work [on the CCTC site] to commence as quickly as possible to minimize or avoid further challenges to the environmental impacts resulting from the Project," even requiring that work be commenced before a contract was executed.  AR17847. Likewise, Interveners excavated Gopher Tortoise burrows in the dark of night to preempt a challenge to the relocation permit.  AR10523.

Respectfully submitted,


/s/ Joshua Stebbins
Joshua Stebbins
D.C. Bar No. 468542

/s/ Eric Glitzenstein
Eric R. Glitzenstein
D.C. Bar No. 358287

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049
jstebbins@meyerglitz.com
hcrystal@meyerglitz.com

Attorneys for Plaintiffs

Date: February 2, 2010