# Regulatory Guidance Letter 93-02

## SUBJECT: Guidance on Flexibility of the 404(b)(1) Guidelines and Mitigation Banking

DATE: August 23, 1993    EXPIRES: December 31, 1998

1. Enclosed are two guidance documents signed by the Office of the Assistant Secretary of the Army (Civil Works) and the Environmental Protection Agency. The first document provides guidance on the flexibility that the U.S. Army Corps of Engineers should be utilizing when making determinations of compliance with the Section 404(b)(1) Guidelines, particularly with regard to the alternatives analysis. The second document provides guidance on the use of mitigation banks as a means of providing compensatory mitigation for Corps regulatory decisions.

2. Both enclosed guidance documents should be implemented immediately. These guidance documents constitute an important aspect of the President's plan for protecting the Nation's wetlands, "Protecting America's Wetlands: A Fair, Flexible and Effective Approach" (published on 24 August 1993).

3. This guidance expires 31 December 1998 unless sooner revised or rescinded.

FOR THE DIRECTOR OF CIVIL WORKS:

JOHN P. ELMORE, P.E.
Chief, Operations, Construction and Readiness Division
Directorate of Civil Works

---

United States Environmental Protection Agency
Office of Wetlands, Oceans and Watersheds
Washington, D.C. 20460

United States Department of the Army
U.S. Army Corps of Engineers
Washington, D.C. 20314

MEMORANDUM TO THE FIELD

SUBJECT: APPROPRIATE LEVEL OF ANALYSIS REQUIRED FOR EVALUATING COMPLIANCE WITH THE SECTION 404(b)(1) GUIDELINES ALTERNATIVES REQUIREMENTS

Exhibit 2

1. **PURPOSE:** The purpose of this memorandum is to clarify the appropriate level of analysis required for evaluating compliance with the Clean Water Act Section 404(b)(1) Guidelines requirements for consideration of alternatives. 40 CFR 230.10(a). Specifically, this memorandum describes the flexibility afforded by the Guidelines to make regulatory decisions based on the relative severity of the environmental impact of proposed discharges of dredged or fill material into waters of the United States.

2. **BACKGROUND:** The Guidelines are the substantive environmental standards by which all Section 404 permit applications are evaluated. The Guidelines, which are binding regulations, were published by the Environmental Protection Agency at 40 CFR Part 230 on December 24, 1980. The fundamental precept of the Guidelines is that discharges of dredged or fill material into waters of the United States, including wetlands, should not occur unless it can be demonstrated that such discharges, either individually or cumulatively, will not result in unacceptable adverse effects on the aquatic ecosystem. The Guidelines specifically require that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 CFR 230.10(a). Based on this provision, the applicant is required in every case (irrespective of whether the discharge site is a special aquatic site or whether the activity associated with the discharge is water dependent) to evaluate opportunities for use of non-aquatic areas and other aquatic sites that would result in less adverse impact on the aquatic ecosystem. A permit cannot be issued, therefore, in circumstances where a less environmentally damaging practicable alternative for the proposed discharge exists (except as provided for under Section 404(b)(2)).

3. **DISCUSSION:** The Guidelines are, as noted above, binding regulations. It is important to recognize, however, that this regulatory status does not limit the inherent flexibility provided in the Guidelines for implementing these provisions. The preamble to the Guidelines is very clear in this regard:

*Of course, as the regulation itself makes clear, a certain amount of flexibility is still intended. For example, while the ultimate conditions of compliance are "regulatory", the Guidelines allow some room for judgment in determining what must be done to arrive at a conclusion that those conditions have or have not been met.*

Guidelines Preamble, "Regulations versus Guidelines", 45 Federal Register 85336 (December 24, 1980)

Notwithstanding this flexibility, the record must contain sufficient information to demonstrate that the proposed discharge compiles with the requirements of Section 230.10(a) of the Guidelines. The amount of information needed to make such a determination and the level of scrutiny required by the Guidelines is commensurate with the severity of the environmental impact (as determined by the functions of the aquatic resource and the nature of the proposed activity) and the scope/cost of the project.

   a. **Analysis Associated with Minor Impacts:**

The Guidelines do not contemplate that the same intensity of analysis will be required for all types of projects but instead envision a correlation between the scope of the evaluation and the potential extent of adverse impacts on the aquatic environment. The introduction to Section 230.10(a) recognizes that the level of analysis required may vary with the nature and complexity of each individual case:

*Although all requirements in Section 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.*

40 CFR 230.10

Similarly, Section 230.6 ("Adaptability") makes clear that the Guidelines:

*allow evaluation and documentation for a variety of activities, ranging from those with large, complex impacts on the aquatic environment to those for which the impact is likely to be innocuous. It is unlikely that the Guidelines will apply in their entirely to any one activity, no matter how complex. It is anticipated that substantial numbers of permit applications will be for minor, routine activities that have little, if any, potential for significant degradation of the aquatic environment.* ***It generally is not intended or expected that extensive testing, evaluation or analysis will be needed to make findings of compliance in such routine cases.***

40 CFR 230.6 (9) (emphasis added)

Section 230.6 also emphasizes that when, making determinations of compliance with the Guidelines, users:

*must recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation.* ***The level of documentation should reflect the significance and complexity of the discharge activity.***

40 CFR 230.6 (b) (emphasis added)

Consequently, the Guidelines clearly afforded flexibility to adjust the stringency of the alternatives review for projects that would have only minor impacts. Minor impacts are associated with activities that generally would have little potential to degrade the aquatic environment and include one, and frequently more, of the following characteristics: are located in aquatic resources of limited natural function; are small in size and cause little direct impact; have little potential for secondary or cumulative impacts; or cause only temporary impacts. It is important to recognize, however, that in some circumstances even small or temporary fills result in substantial impacts, and that in such cases a more detailed evaluation is

necessary. The Corps Districts and EPA Regions will, through the standard permit evaluation process, coordinate with the U.S. Fish and Wildlife Service, National Marine Fisheries Service and other appropriate state and Federal agencies in evaluating the likelihood that adverse impacts would result from a particular proposal. It is not appropriate to consider compensatory mitigation in determining whether a proposed discharge will cause only minor impacts for purposes of the alternatives analysis required by Section 230.10(a).

In reviewing projects that have the potential only for minor impacts on the aquatic environment, Corps and EPA field offices are directed to consider, in coordination with state and Federal resource agencies, the following factors:

i. Such projects by their nature should not cause or contribute to significant degradation individually or cumulatively. Therefore, it generally should not be necessary to conduct or require detailed analyses to determine compliance with Section 230.10(c).

ii. Although sufficient information must be developed to determine whether the proposed activity is in the fact the least damaging practicable alternative, the Guidelines do not require an elaborate search for practicable alternatives if it is reasonably anticipated that there are only minor differences between the environmental impacts of the proposed activity and potentially practicable alternatives. This decision will be made after consideration of resource agency comments on the proposed project. It often makes sense to examine first whether potential alternatives would result in no identifiable or discernible difference in impact on the aquatic ecosystem. Those alternatives that do not may be eliminated from the analysis since Section 230.10(a) of the Guidelines only prohibits discharges when a practicable alternative exists when would have *less adverse impact on the aquatic ecosystem.* Because evaluating practicability is generally the more difficult aspect of the alternatives analysis, this approach should save time and effort for both the applicant and the regulatory agencies.* By initially focusing the alternatives analysis on the question of impacts on the aquatic ecosystem, it may be impossible to limit (or in some instances eliminate altogether) the number of alternatives that have to be evaluated for practicability.

* In certain instances, however, it may be easier to examine practicability first. Some projects may be so site-specific (e.g. erosion control, bridge replacement) that no offsite alternative could be practicable. In such cases the alternatives analysis may appropriately be limited to onsite options only.

iii. When it is determined that there is no identifiable or discernible difference in adverse impact on the environment between the applicant's proposed alternative and all other practicable alternatives, then the applicant's

        alternative is considered as satisfying the requirements of Section 230.10(a).
iv. Even where a practicable alternative exists that would have less adverse impact on the aquatic ecosystem, the Guidelines allow it to be rejected if it would have "other significant adverse environment consequences." 40 CFR 230.10(A). As explained in the preamble, this allows for consideration of "evidence of damages to other ecosystems in deciding whether there is a 'better' alternative." Hence, in applying the alternatives analysis required by the Guidelines, it is not appropriate to select an alternative where minor impacts on the aquatic environment are avoided at the cost of substantial impacts to other natural environmental values.
v. In cases of negligible or trivial impacts (e.g., small discharges to construct individual driveways), it may be possible to conclude that no alternative location could result in less adverse impact on the aquatic environment within the meaning of the Guidelines. In such cases, it may not be necessary to conduct an offsite alternatives analysis but instead require only any practicable onsite minimization.

This guidance concerns application of the Section 404(b)(1) Guidelines to projects with minor impacts. Projects which may cause more than minor impacts on the aquatic environment, either individually or cumulatively, should be subjected to a proportionately more detailed level of analysis to determine compliance or noncompliance with the Guidelines. Projects which cause substantial impacts, in particular, must be thoroughly evaluated through the standard permit evaluation process to determine compliance with all provisions of the Guidelines.

b. **Relationship between the Scope of Analysis and the Scope/Cost of the Proposed Project:**

The Guidelines provide the Corps and EPA with discretion for determining the necessary level of analysis to support a conclusion as to whether or not an alternative is practicable. Practicable alternatives are those alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 CFR 230.10(a)(2). The preamble to the Guidelines provides clarification on how cost is to be considered in the determination of practicability:

*Our intent is to consider those alternatives which are **reasonable in terms of the overall scope/cost of the proposed project**. The term economic [for which the term "cost" was substituted in the final rule] might be construed to include consideration of the applicant's financial standing, or investment, or market share, a cumbersome inquiry which is not necessarily material to the objectives of the Guidelines.*

Guidelines Preamble, "Alternatives", Federal Register 85339 (December 24, 1980) (emphasis added).

Therefore, the level of analysis required for determining which alternatives are practicable will vary depending on the type of project proposed. The determination of what constitutes an unreasonable expense should generally consider whether the projected cost is substantially greater that the costs normally associated with the particular type of project. Generally, as the scope/cost of the project increases, the level of analysis should also increase. To the extent the Corps obtains information on the costs associated with the project, such information may be considered when making a determination of what constitutes an unreasonable expense.

The preamble to the Guidelines also states that "[i]f an alleged alternative is unreasonably expensive to the applicant, the alternative is not, 'practicable.'" Guidelines Preamble, "Economic Factors", 45 Federal Register 85343 (December 24, 1980). Therefore, to the extent that the individual homeowners and small businesses may typically be relevant consideration in determining what constitutes a practicable alternative. It is important to emphasize, however, that it is not a particular applicant's financial standing that is the primary consideration for determining practicability, but rather characteristics of the project and what constitutes a reasonable expense for these projects that are most relevant to practicability determinations.

4. The burden of proof to demonstrate compliance with the Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued. 40 CFR 230.12(a)(3)(iv).

5. A reasonable, common sense approach in applying the requirements of the Guidelines' alternatives analysis is fully consistent with sound environmental protection. The Guidelines clearly contemplate that reasonable direction should be applied based on the nature of the aquatic resource and potential impacts of a proposed activity in determining compliance with the alternatives test. Such an approach encourages effective decision making and fosters a better understanding and enhanced confidence in the Section 404 program.

6. This guidance is consistent with the February 6, 1990 "Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning The Determination of Mitigation under the Clean Water Act Section 404(b)(1) Guidelines."

ROBERT H. WAYLAND, III
Director, Office of Wetlands, Oceans, and Watersheds
U.S. Environmental Protection Agency

MICHAEL L. DAVIS
Office of the Assistant Secretary of the Army (Civil Works)
Department of the Army

United States Environmental Protection Agency
Office of Wetlands, Oceans, and Watersheds
Washington, D.C. 20460

United States Department of the Army
U.S. Army Corps of Engineers
Washington, D.C. 20314

MEMORANDUM TO THE FIELD

SUBJECT: ESTABLISHMENT AND USE OF WETLAND MITIGATION BANKS IN THE CLEAN WATER ACT SECTION 404 REGULATORY PROGRAM

1. This memorandum provides guidelines for the establishment and use of wetland mitigation banks in the Clean Water Act Section 404 regulatory program. This memorandum serves as interim guidance pending completion of Phase I by the Corps of Engineers' Institute for Water Resources study on wetland mitigation banking,* at which time this guidance will be reviewed and any appropriate revisions will be incorporated into final guidelines.

\* The Corps of Engineers Institute for Water Resources, under the authority of Section 307(d) of the Water Resources Development Act of 1990, is undertaking a comprehensive two-year review and evaluation of wetland mitigation banking to assist in the development of a national policy on this issue. The interim summary report documenting the results of the first phase of the study is scheduled for completion in the fall of 1993.

2. For purposes of this guidance, wetland mitigation banking refers to the restoration, creation, enhancement, and, in exceptional circumstances, preservation of wetlands or other aquatic habitats expressly for the purpose of providing compensatory mitigation in advance of discharges into wetlands permitted under the Section 404 regulatory program. Wetland mitigation banks can have several advantages over individual mitigation projects, some of which are listed below:

   a. Compensatory mitigation can be implemented and functioning in advance of project impacts, thereby reducing temporal losses of wetland functions and uncertainty over whether the mitigation will be successful in offsetting wetland losses.
   b. It may be more ecologically advantageous for maintaining the integrity of the aquatic ecosystem to consolidate compensatory mitigation for impacts to many smaller, isolated or fragmented habitats into a single large parcel or contiguous parcels.
   c. Development of a wetland mitigation bank can bring together financial resources and planning and scientific expertise not practicable to many individual mitigation

proposals. This consolidation of resources can increase the potential for the establishment and long-term management of successful mitigation.
  d. Wetland mitigation banking proposals may reduce regulatory uncertainty and provide more cost-effective compensatory mitigation opportunities.

3. The Section 404(b)(1) Guidelines (Guidelines), as clarified by the "Memorandum of Agreement Concerning the Determination of Mitigation under the Section 404(b)(1) Guidelines" (Mitigation MOA) signed February 6, 1990, by the Environmental Protection Agency and the Department of the Army, establish a mitigation sequence that is used in the evaluation of individual permit applications. Under this sequence, all appropriate and practicable steps must be undertaken by the applicant to first avoid and then minimize adverse impacts to the aquatic ecosystem. Remaining unavoidable impacts must then be offset through compensatory mitigation to the extent appropriate and practicable. Requirements for compensatory mitigation may be satisfied through the use of wetland mitigation banks, so long as their use is consistent with standard practices for evaluating compensatory mitigation proposals outlined in the Mitigation MOA. It is important to emphasize that, given the mitigation sequence requirements described above, permit applicants should not anticipate that the establishment of, or participation in, a wetland mitigation bank will ultimately lead to a determination of compliance with the Section 404(b)(1) Guidelines without adequate demonstration that impacts associated with the proposed discharge have been avoided and minimized to the extent practicable.

4. The agencies' preference for on-site, in-kind compensatory mitigation does not preclude the use of wetland mitigation banks where it has been determined by the Corps, or other appropriate permitting agency, in coordination with the Federal resource agencies through the standard permit evaluation process, that the use of a particular mitigation bank as compensation for proposed wetland impacts would be appropriate for offsetting impacts to the aquatic ecosystem. In making such a determination, careful consideration must be given to wetland functions, landscape position, and affected species populations at both the impact and mitigation bank sites. In addition, compensation for wetland impacts should occur, where appropriate and practicable, within the same watershed as the impact site. Where a mitigation bank is being developed in conjunction with a wetland resource planning initiative (e.g., Special Area Management Plan, State Wetland Conservation Plan) to satisfy particular wetland restoration objectives, the permitting agency will determine, in coordination with the Federal resource agencies, whether use of the bank should be considered an appropriate form of compensatory mitigation for impacts occurring within the same watershed.

5. Wetland mitigation banks should generally be in place and functional before credits may be used to offset permitted wetland losses. However, it may be appropriate to allow incremental distribution of credits corresponding to the appropriate stage of successful establishment of wetland functions. Moreover, variable mitigation ratios (credit acreage to impacted wetland acreage) may be used in such circumstances to reflect the wetland functions attained at a bank site at a particular point in time. For example, higher ratios would be required when a bank is not yet fully functional at the time credits are to be withdrawn.

6. Establishment of each mitigation bank should be accompanied by the development of a formal written agreement (e.g., memorandum of agreement) among the Corps, EPA, other relevant resource agencies, and those parties who will own, develop, operate or otherwise participate in the bank. The purpose of the agreement is to establish clear guidelines for establishment and use of the mitigation bank. A wetlands mitigation bank may also be established through issuance of a Section 404 permit where establishing the proposed bank involves a discharge of dredged or fill material into waters of the United States. The banking agreement or, where applicable, special conditions of the permit establishing the bank should address the following considerations, where appropriate:

   **a.** location of the mitigation bank;
   **b.** goals and objectives for the mitigation project;
   **c.** identification of bank sponsors and participants;
   **d.** development and maintenance plan;
   **e.** evaluation methodology acceptable to all signatories to establish bank credits and assess bank success in meeting the project goals and objectives;
   **f.** specific accounting procedures for tracking crediting and debiting;
   **g.** geographic area of applicability;
   **h.** monitoring requirements and responsibilities;
   **i.** remedial action responsibilities including funding; and
   **j.** provisions for protecting the mitigation bank in perpetuity.

Agency participation in a wetlands mitigation banking agreement may not, in any way, restrict or limit the authorities and responsibilities of the agencies.

7. An appropriate methodology, acceptable to all signatories, should be identified and used to evaluate the success of wetland restoration and creation efforts within the mitigation bank and to identify the appropriate stage of development for issuing mitigation credits. A full range of wetland functions should be assessed. Functional evaluations of the mitigation bank should generally be conducted by a multi-disciplinary team representing involved resource and regulatory agencies and other appropriate parties. The same methodology should be used to determine the functions and values of both credits and debits. As an alternative, credits and debits can be based on acres of various types of wetlands (e.g., National Wetland Inventory classes). Final determinations regarding debits and credits will be made by the Corps, or other appropriate permitting agency, in consultation with Federal resource agencies.

8. Permit applications may draw upon the available credits of a third party mitigation bank (i.e., a bank developed and operated by an entity other than the permit applicant). The Section 404 permit, however, must state explicitly that the permittee remains responsible for ensuring that the mitigation requirements are satisfied.

9. To ensure legal enforceability of the mitigation conditions, use of mitigation bank credits must be conditioned in the Section 404 permit by referencing the banking agreement or Section 404 permit establishing the bank; however, such a provision should

not limit the responsibility of the Section 404 permittee for satisfying all legal requirements of the permit.

ROBERT H. WAYLAND, III
Office of Wetlands, Oceans, and Watersheds
U.S. Environmental Protection Agency

MICHAEL L. DAVIS
Office of the Assistant Secretary of the Army (Civil Works)
Department of the Army