UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB, CLEAN WATER ACTION, GULF RESTORATION NETWORK, CHRIS LOY, and RICHARD SOMMERVILLE, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers, DIRK KEMPTHORNE, in his official capacity as Secretary, U.S. Department of the Interior, and H. DALE HALL, in his official capacity as Director, U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) | Civil Action No. 1:07-cv-01756 (RCL) |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SIERRA PROPERTIES I, LLC, PASCO 54, LTD., PASCO RANCH, INC., AND JG CYPRESS CREEK LLC, | ) ) ) | |
| | ) | |
| Intervening Defendants. | ) | |
| _____ | / | |

**INTERVENING DEFENDANTS'
MEMORANDUM REGARDING REMEDIES**

Intervening Defendants file this memorandum in accordance with the Court's

Memorandum Opinion ("Mem. Op.") and Order issued June 30, 2010.

**INTRODUCTION**

By May of 2007, following more than five years of extensive review, comment, and

public input, the developers of the Cypress Creek Town Center ("CCTC") project (the

"Developers") had received all necessary local, regional, state, and federal permits for the 500+

acre mixed use development in Pasco County, Florida.  As planned and permitted, the CCTC

project will include a regional retail business center, retail stores, financial institutions, hotels,

restaurants, theaters, offices, and multi-family residential housing.  The final approval for the

project was the permit from the U.S. Army Corps of Engineers ("Corps"), issued in May of

2007, under Section 404 of the Clean Water Act ("CWA") (the "Permit").  The Permit

authorized the filling of approximately 53 acres of wetlands scattered throughout the project site,

and required the creation, enhancement, restoration, and preservation of over 200 onsite and

offsite wetland acres with values and functions the Corps determined exceeded those of the

wetlands that would be filled under the Permit.  The State of Florida has concurrent jurisdiction

over the wetlands at CCTC, and it too authorized the filling of wetlands and required the

Developers to compensate for the loss of the wetlands with onsite and offsite mitigation.  All

authorized filling of wetlands and all required mitigation are now substantially complete, and are

being maintained and monitored by the Developers.

During the initial phases of construction, the contractor responsible for site preparation

failed to fully implement contractually required erosion control measures, resulting in four

discrete discharges of turbid water from the site to Cypress Creek and its adjacent wetlands

following storm events in 2007 and 2008.  Even though testing confirmed that the discharges of

turbid water from the site caused no environmental harm to Cypress Creek or its wetlands, the

regulatory fallout from the discharges had a devastating impact on the project, as the Corps

suspended the Permit for over 18 months, resulting in a complete shutdown of the project.

Immediately prior to the suspension of the Permit, approximately 150 people were

employed at the project site.  During full build out, up to 1,000 people will work at the site.

When completed, CCTC is expected to provide 4,000 jobs, and annual tax revenues of

approximately $6,000,000 for Pasco County and its schools.  Today, only a handful of people are working at the project site to complete construction of County Road 54 on land the Developers conveyed to Pasco County.  The final judgment this Court enters in this case will affect not only the Corps and the Developers, but also Pasco County and its residents.

The Court has remanded the Permit, having concluded that the Corps failed to comply with the National Environmental Policy Act ("NEPA") and the CWA.  The Court has the authority to remand this matter to the Corps without vacating the Permit.  Vacatur is neither required nor automatic.  It is not appropriate here because the deficiencies this Court noted in the Corps' NEPA and CWA analysis are capable of being addressed on remand.  It is also not appropriate because of the disruptive effect vacatur would have.  It would raise serious concerns about the project's viability because the former wetlands are interspersed throughout the site, and would likely render impractical any work on the site during remand.  It would also cause serious disruption to Pasco County and its residents because it would result in the loss of thousands of jobs and millions in annual tax revenues to Pasco County and its schools, and could jeopardize the completion of a county road that is currently being partially constructed on former jurisdictional wetlands.  Because all values and functions of the former wetlands that were filled pursuant to the Permit have already been replaced by the required onsite and offsite mitigation, no purpose would be served by vacating the Permit, regardless of changes in the project that may be determined during remand.

As this Court noted in its Memorandum Opinion of June 11, 2008, Plaintiffs had the ability to move for injunctive relief since they filed suit.  D.E. 54 at 9 n.4.  They never did.  Over two years ago, this Court observed, "Plaintiffs have still filed no motion for preliminary injunction – ensuring that the issue is not properly before this Court – and yet they state the

Court should order such relief." *Id*. Plaintiffs' Motion for Summary Judgment and supporting

memorandum (D.E. 70) ("Plaintiffs' Motion for Summary Judgment"), filed after remand, does

not purport to meet the requirements for an injunction. Yet, like their earlier motion for

summary judgment that was pending in June 2008, it asks the Court to order injunctive relief.

But injunctive relief, like vacatur, is not warranted here.

Plaintiffs have never filed a motion for injunctive relief, and Plaintiffs, not the Federal

Defendants or Intervening Defendants, have the burden of proof. Though Plaintiffs prevailed in

their motion for summary judgment regarding their NEPA and CWA claims, this Court's

findings of statutory violations does not relieve Plaintiffs of their burden of satisfying the four-

part test for obtaining injunctive relief. Among other factors, Plaintiffs have not established in

the record before this Court that they will be irreparably harmed in the future, or that wetlands or

other natural resources will be irreparably harmed if an injunction is not issued. Indeed, this

Court has determined that the Corps lawfully concluded that the project will not cause or

contribute to significant degradation of Cypress Creek or its surrounding wetlands. Mem. Op. at

25.

In their Motion for Summary Judgment, Plaintiffs did not directly contest the sufficiency

of the CCTC mitigation to compensate for the 53.39 acres of wetland impacts authorized by the

Permit. The Corps determined the combination of onsite and offsite wetlands creation,

restoration, enhancement, and preservation more than offset the values and functions of the

wetlands that were filled years ago, and this Court did not find otherwise. Further wetlands

remediation is not required or warranted. Intervening Defendants are aware of no authority that

would require the restoration of wetlands filled pursuant to a permit, where the required wetlands

mitigation has already been completed, the mitigation was not found to be deficient, and the

party who successfully challenged the permit never filed a motion for injunctive relief seeking to enjoin the filling of the wetlands under the permit.

This Court should enter a final judgment remanding this matter to the Corps without vacating the Permit or issuing an injunction halting work on the CCTC site or requiring the restoration of wetlands the filling of which has already been fully mitigated in accordance with applicable law.

## I.   The Permit Should Be Remanded To The Corps Without Being Vacated

### A.   Vacatur Does Not Automatically Follow From This Court's Decision

In its decision, the Court determined it appropriate to remand this matter to the Corps to address the NEPA and CWA issues it identified.  *See* Mem. Op. (D.E. 92) at 29.  But the Court's finding that the Corps violated NEPA and the CWA does not mean, much less require, that the Corps Permit must be vacated.  Indeed, the D.C. Circuit Court has rejected the argument that vacatur is mandatory under such circumstances.  *See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) ("Appellants insist that we have no discretion in the matter; if the Department violated the APA – which it did – its actions must be vacated.  But that is simply not the law.").  The D.C. Circuit Court has often remanded agency decisions without vacating them.  *See Milk Train, Inc. v. Veneman,* 310 F.3d 747, 755-56 (D.C. Cir. 2002); *Radio-Television News Directors Ass'n v. FCC,* 184 F.3d 872, 888 (D.C. Cir. 1999); *United Distrib. Comm'n. v. FERC,* 88 F.3d 1105, 1191 (D.C. Cir. 1996); *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1492 (D.C. Cir. 1995); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150-51 (D.C. Cir. 1993); *Int'l Union, UMW  v. FMSHA,* 920 F.2d 960, 966-67 (D.C. Cir. 1990); *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1171-72 (D.C. Cir. 1987);

*Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 824 (D.C. Cir. 1975).[1]  The decision whether to vacate flawed agency action is within the discretion of the Court reviewing the agency action.

In determining whether vacatur is appropriate, the Court must consider: 1) the seriousness of the deficiencies; and 2) the disruptive consequences of vacating the agency action. *See A.L. Pharma, Inc.*, 62 F.3d at 1492 ("In deciding whether to vacate an agency's decision pending further explanation, we consider the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.") (internal citations and quotations omitted); *see also Allied-Signal, Inc.*, 988 F.2d at 150-51; *Chamber of Commerce of U.S. v. SEC,* 443 F.3d 890, 908 (D.C. Cir. 2006); *Advocates for Highway & Auto Safety v. FMCSA,* 429 F.3d 1136, 1151 (D.C. Cir. 2005); *Sugar Cane Grower Coop. of Fla.,* 289 F.3d at 98.

While either one of these factors would be sufficient alone to justify remand without vacatur, *see, e.g., Sugar Cane Growers Coop. of Fla.*, 289 F.3d at 98 (despite agency's complete failure to engage in required rulemaking, court refused to vacate rule because it would cause significant disruption); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002) (though disruptive consequences of vacatur would likely not be great, court nonetheless declined to vacate because the agency could address court's concerns on remand), ***both*** factors weigh heavily against vacatur in this case.

---

[1] Other courts have also frequently remanded agency decisions without vacating them.  *See, e.g.*, *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1380-81 (Fed. Cir. 2001); *Cent. Me. Power Co. v. FERC,* 252 F.3d 34, 48 (1st Cir. 2001); *Cent. & S.W. Servs., Inc. v. EPA,* 220 F.3d 683, 692 (5th Cir. 2000), *cert. denied,* 532 U.S. 1065 (2001); *Idaho Farm Bureau Fed. v. Babbitt,* 58 F.3d 1392, 1405-06 (9th Cir. 1995); *Natural Resources Defense Council v. U.S. Dep't of Interior,* 275 F.Supp.2d 1136, 1156 (C.D. Cal. 2002).

### B. The Deficiencies In The Permitting Process Identified By The Court Can Be Remedied On Remand

The NEPA and CWA deficiencies this Court identified can be addressed by the Corps on remand. The Court ruled that the Corps violated NEPA because it failed to prepare an Environmental Impact Statement ("EIS"). Mem. Op. at 11-15. But the Court's finding of a NEPA violation does not mean that the CCTC project is unpermittable. Indeed, the Court expressly noted that: "preparation of an EIS does not foreclose the CCTC project; it simply mandates the Corps to follow NEPA's procedures." Mem. Op. at 14. The specific NEPA deficiencies noted by the Court in its opinion can be rectified during the remand process.

The Court also found that the Corps violated the CWA because it "failed to require the applicant to provide detailed, clear and convincing information proving that an alternative with a less adverse impact was impracticable." Mem. Op. at 17. Like the NEPA violation identified by the Court, this deficiency can be addressed on remand. The applicant can submit additional information to the Corps, and the Corps will have another opportunity to consider such additional information. Likewise, the deficiencies this Court identified in the Corps' practicable alternatives analysis can be addressed during remand consistent with the Court's opinion.

Because both the NEPA and CWA deficiencies can be corrected by the Corps during remand, vacatur is not appropriate here. *See County of L.A. v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999) (remanding without vacating because panel did not perceive any "rare circumstances" that would warrant break from "established administrative practice" of remanding to afford the agency opportunity to reconsider its decision); *Md. Native Plant Soc'y v. U.S. Army Corps of Eng'rs*, 332 F. Supp. 2d 845, 862 (D. Md. 2004) ("Where a court determines that remand is appropriate because an agency's explanation is deficient, remand without vacatur allows the agency an opportunity to respond to the deficiency identified by the

court."); *WorldCom, Inc. v. FCC,* 288 F.3d 429, 434 (D.C. Cir. 2002) (when there is a "non-trivial likelihood" that agency can correct deficiencies on remand, remand without vacatur is appropriate); *Fox Television Stations, Inc.*, 280 F.3d at 1049 (court refusing to vacate where it was probable that the agency could address deficiency in its decision on remand).

### C.    Vacatur Would Be Severely Disruptive

Vacatur of the CCTC Permit would mean that Intervening Defendants would no longer be authorized to discharge fill materials in "waters of the United States."  33 U.S.C. §§ 1311(a), 1344.  Here, the onsite wetlands that were authorized for impacts in the CCTC Permit have already been filled pursuant to that Permit.  Vacatur does not mean that other activities that do not include the discharge of dredge or fill material in jurisdictional wetlands are prohibited. Intervening Defendants believe, however, that the Plaintiffs may take the position that an order from the Court vacating the CCTC Permit would mean that Intervening Defendants would be precluded from doing any work in the former onsite wetland areas that were filled pursuant to the Permit.  This would be extremely disruptive to Intervening Defendants and would offer no commensurate environmental benefit.

As discussed in more detail below in Section II.C., Intervening Defendants have expended approximately $37,800,000 (excluding land acquisition costs) in reliance on the CCTC Permit to develop the site, including grading, installation of storm sewers, installation of sanitary sewers, installation of watermains, installation of electric/telephone infrastructure, installation of CATV utilities, pouring foundations, and building a large concrete floor slab, and for onsite and offsite mitigation required by the Permit.  *See* Declaration of Thomas P. Schmitz, attached hereto as Exhibit A, at ¶ 14.  If the CCTC Permit is vacated, Intervening Defendants will be forced to incur additional carrying costs to maintain and preserve the site, in its partially constructed state,

during a potentially lengthy remand period.  *Id*. at ¶ 22.  The economic impact of vacatur would be financially devastating to the owners of the CCTC site.

Vacatur would also cause a severe disruption to Pasco County and its residents because it would preclude completion of the construction of County Road 54, a portion of which is being constructed on former Corps jurisdictional wetlands that were filled pursuant to the CCTC Permit.  Exhibit A at ¶¶ 10-12, 15, 17; Declaration of Bipin B. Parikh, attached hereto as Exhibit B, at ¶¶ 10, 12, 14.  Vacatur would further delay, perhaps indefinitely, the much-needed jobs and tax revenues CCTC will bring to the Pasco County area.  Exhibit B at ¶¶ 2-4, 14.

Courts that have found agency action to have violated applicable statutory requirements have declined to vacate that agency action where the vacatur would be highly disruptive of the interests of affected parties.  *See, e.g., Sugar Cane Growers Coop. of Fla.*, 289 F.3d at 98 (vacatur not appropriate when it would cause significant disruption; regulated parties had already relied on the Department of Agriculture's pay-in-kind program for the 2001 sugar crop); *Md. Native Plant Soc'y*, 332 F. Supp. 2d at 863 (vacatur not appropriate pending remand of Corps permit because "vacatur at this juncture would have a serious economic impact on the developer").  Accordingly, this Court should not vacate the CCTC Permit during remand.

## II.     Plaintiffs Have Not Met The Heavy Burden Necessary To Justify Injunctive Relief

Injunctive relief, like vacatur, is not supported by the evidence of record or applicable case law.  In the over three years since they filed suit, Plaintiffs never filed a motion for an injunction, and the administrative record does not support the extraordinary injunctive relief requested by Plaintiffs: 1) restoration of the onsite wetlands that were filled in reliance upon the CCTC Permit, and 2) a complete halt of all work on the CCTC site, even in upland areas that are not within the Corps' jurisdiction.

Both of these remedies are forms of injunctive relief because both would instruct Intervening Defendants "what to do or not to do" and would "direct the conduct of a party … with the backing of [the Court's] coercive powers."  *Nken v. Holder*, 129 S.Ct. 1749, 1757 (2009).  Even Plaintiffs acknowledge in their Motion for Summary Judgment that both forms of relief they seek are injunctive relief.  *See* Pl. Mot. for S.J. (D.E. 70) at 44-45 ("Plaintiffs also seek injunctive relief a) precluding any further activity on site until the Corps and Service comply with the ESA, CWA, and NEPA; and b) compelling restoration of the wetlands and habitat for federally listed species.").

### A.    Plaintiffs Bear The Burden Of Establishing That They Are Entitled To Injunctive Relief

The Court's finding of NEPA and CWA violations, without more, does not support the entry of an injunction.  *See Monsanto Co. v. Geertson Seed Farms,* __ S.Ct. __, 2010 WL 2471057, at *12 (June 21, 2010) ("[T]he statements quoted above appear to presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances.  No such thumb on the scale is warranted. . . . It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test . . . ."); *Winter v. Natural Resources Defense Council*, 129 S.Ct. 365, 381 (2008) (in reversing granting of preliminary injunction in case involving NEPA claim, noting: "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *Natural Resources Defense Council v. U.S.  Nuclear Regulatory Commission*, 606 F.2d 1261, 1272-73 (D.C. Cir. 1979) (injunction during remand to prepare EIS not warranted even though NEPA violation found); *United States v. Lambert*, 695 F.2d 536, 539-40 (11th Cir. 1983) (applying four-part injunction test in affirming district court's denial of injunction in

action alleging violations of CWA).

Injunctive relief is an "extraordinary remedy" that "should issue only where the intervention of a court of equity is essential in order effectually to protect . . . against injuries otherwise irremediable." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (internal citations and quotations omitted).  It "is not a remedy which issues as a matter of course" and "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff[.]"  *Id.* at 311-12 (internal citations and quotations omitted).  An injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (internal citations and quotations omitted) (emphasis in original).  To obtain permanent injunctive relief, Plaintiffs must demonstrate: (1) that they will suffer an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Monsanto*, 2010 WL 2471057, at *11.

Plaintiffs thus bear the burden of demonstrating that the balance of irreparable harms and the public interests weigh in favor of an injunction.  *CityFed Financial Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995).  In balancing the equities, Plaintiffs must prove that they will suffer irreparable harm in the ***future*** if an injunction is not issued because an injunction cannot be based on "future *effects* from past violations."  *Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp*., 28 F.3d 1268, 1273 (D.C. Cir. 1994) (emphasis in original); *see also Natural Resources Defense Council v. Pena,* 147 F.3d 1012, 1022 (D.C. Cir. 1998).

It is not the Defendants' burden to demonstrate why an injunction should not issue. *Monsanto*, 2010 WL 2471057, at *12.  Plaintiffs never attempted to meet their burden of

demonstrating irreparable harm and the need for injunctive relief, but instead simply asked for injunctive relief in the context of their Motion for Summary Judgment on the merits.  It is Plaintiffs who must make a showing that they are entitled to injunctive relief and who should first be required to specify the injunctive relief they seek and demonstrate that they can meet the four-part test necessary to support such relief.  Because Plaintiffs have not even attempted to make the required showing, Intervening Defendants find themselves in the untenable position of attempting to show why the Court should not enter an injunction without the Plaintiffs ever having demonstrated that they are entitled to receive one.  But it is not Defendants' burden to show why Plaintiffs are not entitled to an injunction, much less to propose relief for Plaintiffs.

Importantly, to the extent the Court is considering granting Plaintiffs injunctive relief, Intervening Defendants are entitled to an evidentiary hearing prior to entry of such relief.  *See United States v. Microsoft*, 253 F.3d 34, 100 (D.C. Cir. 2001) ("[o]ther than a temporary restraining order, no injunctive relief may be entered without a hearing."); *United States v. International Harvester Co.*, 387 F.Supp. 1338, 1341 (D.C. Cir. 1974) ("the Court, sitting as a court of equity, must hear evidence before acting on a prayer for injunctive relief.").  Thus, if the Court is considering entering an injunction either requiring Intervening Defendants to restore filled wetlands, or to halt all activity on the CCTC site, Intervening Defendants request an evidentiary hearing[2] regarding such injunctive relief.[3]  In light of the procedurally unusual

---

[2] Intervening Defendants respectfully request the opportunity to conduct limited discovery on Plaintiffs' request for injunctive relief prior to any evidentiary hearing.  At a minimum, Intervening Defendants request the opportunity to reply to Plaintiffs' remedies submission to the Court.

[3] Intervening Defendants also believe that the Court should have before it all necessary parties who will be impacted by an injunction, prior to issuing an injunction that would impact them.  This would mean, at a minimum, having Pasco County before the Court.  Intervening Defendants are currently constructing a new road on behalf of the County, on former Corps' jurisdictional wetlands that were filled pursuant to the CCTC permit.  Exhibit A at ¶¶ 10-12; Exhibit B at ¶¶ 9, 10, 12.  This road is located on land that is now owned by Pasco County.  *Id.*  To halt construction of the road, and to order excavation and restoration of the parts of the road on top of former Corps jurisdictional wetlands, would preclude completion of construction of this public road.  Exhibit B at ¶ 14.  The Court cannot enjoin a third party in the exercise of its property rights without having the party before it.  *See National*

posture of being ordered to address appropriate relief first, Intervening Defendants address below the Plaintiffs' failure on the current record to demonstrate that they are entitled to injunctive relief of any kind.

**B.      There Will Be No Irreparable Harm To Plaintiffs If The Court Does Not Enter A Permanent Injunction**

As discussed below, Plaintiffs have not established that they will be harmed if the Court denies the injunctive relief Plaintiffs request in their Motion for Summary Judgment.  More specifically, Plaintiffs have failed to establish that absent an injunction there will be any future irreparable harm to any interests they might have in Cypress Creek and its adjacent wetlands, to other wetlands located on site, or listed species habitat.  Moreover, Plaintiffs' failure to move for injunctive relief – from the filing of the initial Complaint in October 2007 through today – weighs against a finding of irreparable harm.

**1.      This Court Found That The Corps Properly Concluded That The Project Will Not Cause Or Contribute To Significant Degradation Of Cypress Creek Or Its Surrounding Wetlands**

The primary environmental harm that Plaintiffs have contended CCTC will cause is significant degradation of Cypress Creek and its adjacent wetlands.  But Plaintiffs have not established that there will be future irreparable harm to Cypress Creek and its adjacent wetlands absent an injunction.  In the Memorandum Opinion, the Court found that the Corps "lawfully concluded that the modified permit would not cause or contribute to significant degradation of Cypress Creek or its surrounding wetlands" or "violate water quality standards."  Mem. Op. at 25.  Thus, there is no basis for Plaintiffs' contention that the project will cause future irreparable harm to Cypress Creek or its wetlands.

---

*Wildlife Federation v. Buford*, 835 F.2d 305, 315-16 (D.C. Cir. 1987) (injunction did not impermissibly enjoin unrepresented third parties because injunction did not "deprive any person or entity who is not before the court of his property rights.").

Plaintiffs have not established that, absent an injunction, there will be future irreparable harm to onsite wetlands.  All onsite Corps jurisdictional wetlands authorized for impacts were filled years ago during initial site preparation (except for .509 acres that were part of a portion of land that was conveyed to the Florida Department of Transportation ("FDOT") for the widening of State Road 54/State Road 56, and subsequently filled.).  AR 8849; D.E. 52 at 2; Exhibit A at ¶ 6; Exhibit B at ¶ 13.  As a result, there will be no additional onsite wetland impacts if the project is allowed to continue during the remand period.

### 2.   All Onsite Wetland Impacts Have Already Been Remediated

Plaintiffs have not established that the former wetlands on the CCTC were in any way irreplaceable.  Indeed, that mitigation in the form of creation, restoration, enhancement, and preservation of onsite and offsite wetlands can compensate for onsite wetland losses is an integral part of the Corps' Section 404 program.  40 C.F.R. § 230.91.  The values and functions provided by the former jurisdictional wetlands at CCTC were fully assessed and quantified in accordance with federal regulations.  Those values and functions have already been offset by the onsite and offsite wetlands mitigation, approved by regulatory officials, and long since completed.  More specifically, the Corps required both onsite and offsite compensatory mitigation for the 53.39 acres of wetland losses on the 502.4-acre CCTC site.  AR 15349-59, 15447-513.  The mitigation includes: 1) enhancement, restoration, and preservation (through mandatory conservation easements) of 101.65 acres of existing onsite wetlands, 2) creation and preservation (through mandatory conservation easements) of an additional 13.61 acres of onsite wetlands, and 3) creation, enhancement, restoration, and preservation (through mandatory conservation easements) of 130.5 acres of wetlands on the 250-acre offsite Alson tract.  AR 15349-59, 15447-513.  The Corps determined that the total wetland functional loss due to the project was -38.70, and that the total wetland functional gain from the onsite and offsite

mitigation was +40.73, resulting in a net positive balance.  AR 15354.

Plaintiffs did not directly challenge the sufficiency of the CCTC mitigation to compensate for the 53.39 acres of wetland impacts in their Motion for Summary Judgment following remand (D.E. 70), and the Court did not find this mitigation to be insufficient.  *See Citizens Alliance to Protect Our Wetlands v. Wynn*, 908 F.Supp. 825, 834 (W.D. Wash. 1995) (court noting how it could consider mitigation for wetland impacts in considering irreparable harm, particularly in light of plaintiffs' failure to challenge sufficiency of mitigation).  In circumstances where the Court did not find the Corps-approved mitigation to be deficient, there is no justification for ordering restoration of wetlands, the loss of which has already been fully compensated for in accordance with applicable law.

All creation, enhancement, restoration, and preservation of onsite and offsite wetlands required as mitigation under the CCTC Permit has been completed.[4]  Onsite mitigation area M-3 was completed in August 2007, onsite mitigation area M-1 was completed in November 2007, and onsite mitigation area M-2 was completed in July 2008.  Declaration of Eva Bailey, attached hereto as Exhibit C, at ¶ 4.  Prior to the CCTC mitigation, these three onsite mitigation areas were pastureland.  *Id.*  Photographs depicting mitigation areas M-1, M-2, and M-3 prior to mitigation are attached to Exhibit C as Ex. A.  Now, these areas consist of 13.61 acres of newly created, high value, wetlands.  Exhibit C at ¶ 4.  Photographs depicting the current state of mitigation areas M-1, M-2, and M-3 are attached to Exhibit C as Ex. C.

Intervening Defendants completed the Alston tract offsite mitigation in December 2007.  Exhibit C at ¶ 5.  Prior to the CCTC mitigation, the Alston tract consisted of a combination of Bahia grass dominated pasture, poor quality wetlands, and a slough system.  *Id.*  Photographs of

---

[4] All mitigation required under the CCTC permit has been completed except for minor plantings in littoral shelves that are being created around onsite ponds, and the Corps has approved the planting of the littoral shelves surrounding the onsite ponds after the project is completed.  Exhibit C at ¶ 3, n.1.

the Alston tract prior to the CCTC mitigation are contained in the most recent monitoring report

for the Alston tract, which is attached to Exhibit C as Ex. D.  Today, the 250-acre Alston tract

contains 130.5 acres of high value, newly created, restored, and enhanced wetlands, and upland

areas that have been preserved and enhanced.  *Id*.  Photographs of the Alston tract in its current

state are also contained in the monitoring report.  Exhibit C at Ex. D.

The onsite and offsite mitigation for the CCTC wetlands more than compensates for the

loss in function of the onsite wetlands that have been filled.  As a result, Plaintiffs have not

established any irreparable injury.  *See Sierra Club v. U.S. Army Corps of Engineers*, 935

F.Supp. 1556, 1584 (S.D. Ala. 1996) (denying request for permanent injunction when plaintiffs

failed to "establish irreparable injury" absent injunction precluding construction of baseball

stadium and parking lot because offsite compensatory mitigation requiring creation of 15 acres

of wetlands would successfully mitigate for the loss of the 7.4 acres of wetlands authorized for

impacts); *Citizens Alliance to Protect Our Wetlands*, 908 F.Supp. at 834 ("Considering the

mitigation required by the § 404 permit at issue, the environment on the whole will not suffer

irreparable injury.  Although 17.4 acres of wetlands will be lost at the proposed site, NRA will

create 56.5 acres of new or restored wetlands in the immediate vicinity."); *Pogliani v. U. S. Army

Corps of Eng'rs*, Case Nos. 01-6199, 01-6201, 2002 WL 31260060, at **2 (Oct. 9, 2002 2d Cir.)

(plaintiffs failed to establish sufficient irreparable injury absent preliminary injunction because

electric generating plant plaintiffs sought to enjoin was already under construction and "the

principal relief available to plaintiffs would be further environmental mitigation, which could

take place just as effectively in the future").[5]  Therefore, no additional remediation is warranted

---

[5] Compensatory mitigation is a form of remediation.  *See United States v. Bedford*, No. 07cv491, 2009 WL
1491224, at *14 (May 22, 2009 E.D. Va.) (while discussing forms of remediation for unlawful filling of wetlands
without Section 404 permit, the court noted: "Other forms of remediation are compensatory mitigation, such as
purchasing credits at a mitigation bank to accomplish off-site creation of wetland [ ], or ensuring the preservation of

or supported in this case.

3.      **There Will Be No Additional Impacts To Species Habitat If Work Continues On The CCTC Site**

There will also be no future impacts to listed species habitat because all such onsite habitat authorized for impacts has already been cleared for future construction.  The remaining development onsite will not alter the undisturbed onsite habitat areas, which are subject to appropriate conservation easements.  AR 15447-513.

Moreover, the project plans and the required compensatory mitigation for the project *create* and *maintain* wildlife habitat.  A total of 39.31 acres of wetlands, uplands, and ponds within 600 feet of Cypress Creek have been placed under conservation easements to permanently provide wildlife habitat.  AR 6672, 15358.  For the entire length of Cypress Creek adjacent to the CCTC site, the project contains an average buffer of 600 feet from impervious surfaces.  AR 6672.  A wildlife corridor will run through the entire southern width of the property, providing a continuous vegetated connection between properties up and downstream of Cypress Creek.  *Id.* The Corps specifically found, based on the record evidence, that the project "will not impede wildlife movements along the creek," and that it will "preserve the integrity of this linkage."  *Id.*

In addition, even though the Wood Stork habitat value of the project site was marginal, the agencies nonetheless required mitigation for potential Wood Stork habitat loss.  AR 6365-66. This mitigation requirement will result in the creation of 21.35 acres of potential Wood Stork habitat, thus providing more potential foraging habitat for the Wood Stork than the 16.22 acres of potential habitat that existed on the site prior to the project.  AR 15361.  Significantly, the Wood Stork mitigation has already been successful – the Corps has documented Wood Storks

existing wetlands [ ]."); *Orange Environment, Inc. v. County of Orange*, 923 F.Supp. 529, 537 n.10, 538 (S.D.N.Y. 1996) (referring to remediation in the form of restoration of offsite wetlands as "mitigation" and upholding Corps and EPA decision that restoration of offsite wetlands was sufficient remediation for the unlawful filling of onsite wetlands).

foraging in the mitigation areas created on the CCTC site as a condition of the Permit.  AR

15362.

> ### 4.     Plaintiffs' Failure To Move For Injunctive Relief For Three Years Weighs Against A Finding Of Irreparable Harm

Plaintiffs' decision to sit on their hands for almost three years, without filing a motion for

injunctive relief in the interim, weighs strongly against a finding of irreparable harm.  As the

Court noted in its June 11, 2008 Memorandum Opinion on the Federal Defendants' Motion for

Voluntary Remand:

> From the time that plaintiffs initiated this lawsuit, they had the
> ability to seek injunctive relief from this Court.  Either because
> they thought that they were not entitled to such relief, or for some
> other strategic reason, plaintiffs did not seek an injunction.
> Plaintiffs have still filed no motion for preliminary injunction –
> ensuring that the issue is not properly before this Court – and yet
> they state that the Court should order such relief.

D.E. 54 at 9 n.4.  The same is true now.  Plaintiffs could have filed a motion for injunction and

pursued injunctive relief from the onset, but they elected not do so.  They simply asked for

injunctive relief in their Motion for Summary Judgment without even attempting to meet the

legal requirements for such relief.  This delay weighs heavily against a finding of irreparable

harm.  *See Pena*, 147 F.3d at 1026 ("If the plaintiff has failed to prosecute its claim for injunctive

relief promptly, and if it has no reasonable explanation for its delay, the district court should be

reluctant to award relief."); *National Propane Gas Ass'n v. U. S. Department of Homeland

Security*, 534 F. Supp. 2d 16, 19-20 (D.D.C. 2008) (finding no future irreparable harm justifying

injunction precluding the implementation and enforcement of rules regulating certain propane

facilities, in part, because "any urgency [is] undermined by [plaintiffs'] choice to wait nearly

sixty days" after learning of the designations proposed by the rule to seek injunctive relief).

###### C. The Equities Weigh Against Granting Injunctive Relief Because There Will Be No Future Irreparable Harm To Plaintiffs If Injunctive Relief Is Not Granted And There Will Be Considerable Economic Harm To Intervening Defendants If Injunctive Relief Is Granted

As discussed above in Section II.B., Plaintiffs have failed to establish that they will suffer future irreparable harm if the CCTC project is allowed to go forward during remand and if there is no restoration of former onsite wetlands.  Intervening Defendants, on the other hand, will suffer significant harm if the Court enters an injunction.  In addition to taking on significant obligations to state and local government entities, excluding land acquisition costs, Intervening Defendants have spent approximately $37,800,000 for:

- project design and engineering services;

- site development (including grading, installation of storm sewers, installation of sanitary sewers, installation of watermains, installation of electric/telephone infrastructure, installation of CATV utilities, pouring foundations, and building a large concrete floor slab);

- the acquisition of offsite wetland mitigation areas, and creation, restoration, and enhancement of a total of more than 115.26 acres onsite and 130.5 acres offsite to compensate for the loss of 53.39 wetland acres on the site; and

- the extension of County Road 54 and the widening of State Road 54/State Road 56.

Exhibit A at ¶ 14.  Intervening Defendants also conveyed approximately 3.622 acres of land to the FDOT for the widening of State Road 54/State Road 56 and conveyed another 10.806 acres of land Pasco County.  *Id*. at ¶ 10; Exhibit B at ¶¶ 10, 11.

If the Court orders either restoration of all onsite former wetlands, the effect of which would result in a complete halt to work on the site, or orders a complete halt to work on the site, there will be considerable economic harm to Intervening Defendants.  First, it would imperil their financial investment in the CCTC project.  Second, they would incur additional carrying costs in order to maintain a partially constructed project during the remand process, Exhibit A at

¶ 22, which will likely be between 18 to 36 months.  Third, excavation and restoration of former

wetlands on the CCTC site is completely impracticable – it would mean altering the complex

stormwater management system for the project and obtaining new approval from the Southwest

Florida Water Management District for a new stormwater system.  Exhibit A at ¶ 18.  It would

also require excavating portions of internal roads and infrastructure components (such as pipes,

sewers, electric conduits, etc.) that have been built on and installed in former wetland areas.  *Id*.

at ¶ 19.  This, in turn, would require that the CCTC project be redesigned to relocate these

aspects of the project.  *Id*.  The project would then have to be replatted and reapproved.  *Id*. at ¶

20.

 Intervening Defendants' extensive investments and financial commitments based on the

Corps' issuance of the CCTC Permit weigh heavily against entry of an injunction.  *Amoco*

*Production Co. v. Village of Gambell, Ala*., 480 U.S. 531, 545 (1987) (finding that oil company

petitioners' expenditures on oil exploration weighed against injunction prohibiting oil

exploration, stating: "And on the other side of the balance of harms was the fact that the oil

company petitioners had committed approximately $70,000,000 to exploration to be conducted

during the summer of 1985 which they would have lost without chance of recovery had

exploration been enjoined."); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1123, 1146-47 (D. Minn.

2010) (weighing intervening defendants' monetary expenditures and obligations on international

oil pipeline in balancing the harms of injunction and, ultimately concluding, based on economic

harm to intervening defendants and other factors, that balance of harms weighed against

injunction).

**D.     An Injunction Preventing Completion Of The Project And/Or Requiring Restoration Of Former Wetlands That Have Already Been Mitigated For Would Be Contrary To The Public Interest**

The actual harm to the public from enjoining work on the CCTC project site vastly outweighs the speculative harm alleged by Plaintiffs, and the public interest would not be served by restoration of former wetlands for which the loss has already been mitigated.

First, the Pasco County Road 54 extension is being constructed, in part, on former Corps jurisdictional wetlands that were filled pursuant to the CCTC Permit.  Exhibit A at  ¶¶ 10, 12; Exhibit B at ¶¶ 10, 12.  Intervening Defendants have conveyed property on which the County Road 54 extension is being constructed to Pasco County, and are currently constructing the road on behalf of the County.  Exhibit A at ¶¶ 10-12; Exhibit B at ¶¶ 10, 12.  The road is more than 50% completed, and is expected to be completed by October 2010.  Exhibit A at ¶ 12. Destroying this partially-constructed public road by requiring its excavation in order to restore the former Corps jurisdictional wetlands upon which it is constructed, or halting completion of the road by halting all work being performed on the site, would result in a waste of public funds. This would be particularly harmful in light of the fact that currently Pasco County is not before this Court.

Second, the CCTC project is expected to create 4,000 jobs for Pasco County residents. AR 6669; Exhibit B at ¶ 2.  An injunction will further delay the opportunity to create these jobs in this part of Pasco County.  *Id*. at ¶ 4.

Third, the CCTC project is expected to result in an annual net tax revenue benefit for Pasco County and its schools of approximately $6,000,000 at build-out.  Exhibit B at ¶ 3.  An injunction will only serve to delay, perhaps indefinitely, this important revenue source for this local government and school district.  *Id*. at ¶ 4.

Because neither form of injunctive relief Plaintiffs have requested would be in the public interest, their request for injunctive relief should be denied. *Romero-Barcello*, 456 U.S. at 312 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."); *Village of Gambell*, 480 U.S. at 545 ("We acknowledged in Romero-Barcelo the important role of the 'public interest' in the exercise of equitable discretion.").

## <u>CONCLUSION</u>

Based on the foregoing, Intervening Defendants respectfully request that the Court enter final judgment and remand this matter to the Corps without vacatur of the CCTC Permit. Further, Plaintiffs having failed to move for injunctive relief and having failed to establish in the record before the Court that they are entitled to such extraordinary relief, no injunction should issue. If the Court believes that injunctive relief may be appropriate, it should schedule an evidentiary hearing and allow discovery regarding the propriety and proper scope of any such injunctive relief. At a minimum, Intervening Defendants request that they be allowed to submit a reply brief and supporting evidence after Plaintiffs file their remedies brief.

Respectfully submitted,

s/ Douglas M. Halsey
Counsel for Intervening Defendants

Douglas M. Halsey (Florida Bar No. 288586)
T. Neal McAliley (Florida Bar No. 172091)
Angela D. Daker (Florida Bar No. 681571)
White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida  33131-2352
(305) 371-2700 (telephone)
(305) 358-5744 (facsimile)

Eric Grannon (D.C. Bar No. 473778)
White & Case LLP
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600 (telephone)
(202) 639-9355 (facsimile)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of July, 2010, the following was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel on the below service list via Notice of Electronic Filing generated by CM/ECF:

Joshua R. Stebbins
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue, NW
Suite 700
Washington, DC  20009-1056
(202) 588-5206
Fax:(202) 588-5049
Email: jstebbins@meyerglitz.com

*Counsel for Plaintiffs Sierra Club, Clean Water Action, Gulf Restoration Network, Chris Loy and Richard Sommerville*

Kristofor Swanson
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resource Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
(202) 305-0248
Fax: (202) 305-0274
Email: kristofor.swanson@usdoj.gov

*Counsel for Federal Defendants Robert Van Antwerp, Dirk Kempthorne and Dale Hall*

Mark Arthur Brown
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, DC  20044-7369
(202) 305-0204
Fax: (202) 514-0097
Email: mark.brown@usdoj.gov

*Counsel for Federal Defendants Robert Van Antwerp, Dirk Kempthorne and Dale Hall*

Jessica O'Donnell
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 305-0856
Fax: (202) 514-8865
Email:  jessica.odonnell@usdoj.gov

*Counsel for Federal Defendants Robert Van Antwerp, Dirk Kempthorne and Dale Hall*

s/ Angela D. Daker
Angela D. Daker