UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB, CLEAN WATER ACTION, GULF RESTORATION NETWORK, CHRIS LOY, and RICHARD SOMMERVILLE, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers, DIRK KEMPTHORNE, in his official capacity as Secretary, U.S. Department of the Interior, and H. DALE HALL, in his official capacity as Director, U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:07-cv-01756 (RCL) |
| Defendants, | ) ) ) | |
| and | ) ) ) | |
| SIERRA PROPERTIES I, LLC, PASCO 54, LTD., PASCO RANCH, INC., AND JG CYPRESS CREEK LLC, | ) ) ) ) | |
| Intervening Defendants. | ) ) / | |

## DECLARATION OF BIPIN B. PARIKH

I, Bipin B. Parikh, P.E. am currently employed as Assistant County Administrator for Development Services of Pasco County, Florida. My responsibilities include oversight of planning, permitting, engineering and construction in Pasco County. Based upon my review of the Cypress Creek Town Center ("CCTC") documentation on file with the County and Florida Department of Transportation, I hereby declare the following:

1.     On November 23, 2004, the Pasco County Board of County Commissioners adopted the Development Order ("DO") for CCTC.

2.     The CCTC project is expected to create approximately 4,000 jobs in Pasco County.

3.     It is also expected to generate approximately $6,000,000 in tax revenue annually for Pasco County and the Pasco County School Board.

4.     If the project is halted or unable to be completed, Pasco County and its residents will be forced to forgo the opportunity to generate much-needed jobs and tax revenue that the project is expected to create.

5.     Under the DO, Sierra Properties I, LLC,JG Cypress Creek LLC, and related entities (collectively, the "Developers") are required to construct certain County infrastructure improvements ("County Improvements") as mitigation for the CCTC project transportation impacts. *See* DO at pp. 19 – 22, attached hereto as Exhibit A.

6.     One of the Improvements required under the DO is the County Road 54 Extension (from State Road 54/56 to the north side of Cypress Creek) in Pasco County. *Id.*

7.     A second Improvement required under the DO is widening a portion of State Road 54/State Road 56 (from State Road 54 to west of I-75) from a 4-lane divided arterial to a 6-lane divided arterial in Pasco County. *Id.* at 19-20.

8.     A map reflecting these two Improvement projects in Pasco County is attached hereto as Exhibit B.

9.     The DO requires Developers to design, permit, construct, and acquire necessary rights-of-way for the extension of County Road 54 Extension (from State Road 54/56 intersection to the north side of Cypress Creek) and the widening of State Road 54/State Road 56 from State Road 54 to west of I-75. *Id.* at 19-22.

10.     In accordance with these obligations, Developers conveyed 10.806 acres of the CCTC site to Pasco County for the County Road 54 Extension, approximately 2.724 acres of which were wetlands subject to the jurisdiction of the U.S. Army Corps of Engineers ("Corps").

11.     Developers also sold another 3.622 acres of the CCTC site to the Florida Department of Transportation ("FDOT") for the widening of State Road 56, 0.509 of which were Corps jurisdictional wetlands.

12.     Construction of the County Road 54 Extension from Sta 177+09.28 to Sta 146+50 is more than 50% completed, and the 2.724 acres of Corps jurisdictional wetlands in the right-of-way have been filled and compacted with limestone rock.  Upon completion, the County Road 54 Extension will provide an important North/South roadway connection between Pasco and Hillsborough Counties.

13.     The State Road 54/State Road 56 widening project is completed, and the 0.509 acres of Corps jurisdictional wetlands in the right-of-way have been filled and are now graded roadside swales.

14.     If the Court requires the restoration of the former Corps jurisdictional wetlands that were located under the County Road 54 Extension and the portion of State Road 54/State Road 56 that was widened, that will cause hardship to Pasco County and will negatively impact the Florida Department of Transportation and the traveling public.  It will prevent completion of County Road 54 Extension as currently designed and permitted and will require redesign and reconstruction.  In addition, it may require the stormwater facilities for a portion of State Road

54/State Road 56 to be redesigned and reconstructed. County Road 54 Extension and State Road 54/State Road 56 are important roadway corridors in Pasco County and alterations could cause a significant impact to the regional transportation network.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: **7/20/10**

Bipin B. Parikh

**Exhibit A**

THE BOARD OF COUNTY COMMISSIONERS                    RESOLUTION NO. _10-100_

**A RESOLUTION AMENDING, RESTATING AND CONSOLIDATING THE DEVELOPMENT ORDER APPROVING THE CYPRESS CREEK TOWN CENTER DEVELOPMENT OF REGIONAL IMPACT (DRI NO. 252).**

**WHEREAS,** on May 1, 2009, in accordance with Section 380.06(19), Florida Statutes, as amended, Pasco 54, Ltd., Pasco Ranch, Inc., and JG Cypress Creek LLC (Developer), filed a Notice of Proposed Change (NOPC) to the previous Application for Development Approval (ADA) for a Development of Regional Impact (DRI) known as Cypress Creek Town Center (DRI No. 252) (Project); and,

**WHEREAS,** the Pasco County Board of County Commissioners is the governing body having jurisdiction over the review and approval of DRIs in Pasco County in accordance with Chapter 380.06, F.S., as amended; and

**WHEREAS,** the culmination of review pursuant to Section 380.06(19), F.S., requires approval, approval with conditions, or denial of an NOPC; and

**WHEREAS,** the original Development Order for the Project was adopted by the Board of County Commissioners on February 24, 2004; and

**WHEREAS,** the original Development Order was amended by the Board of County Commissioners on April 26, 2005 (RES 05-188) and May 13, 2008 (RES 08-217); and

**WHEREAS,** the changes in the NOPC are to 1) extend the Phase 1 build-out date to December 31, 2021 for purposes of transportation concurrency and State/ Regional review; 2) extend the Development Order expiration date by a corresponding ten (10) years, from December 31, 2019 to December 31, 2029; 3) incorporate the updated project entitlements (in Table 1 of the DO) from the prior land use conversion approved by the Board of County Commissioners on May 13, 2008 (RES 08-217) (i.e. conversion of 115,075 square feet of Regional Mall for 2,582 Move-Theatre seats); 4) incorporate the revision to Map H that combined the approved land uses in the northern portion of the development as approved by the Board of County Commissioners on May 13, 2008 pursuant to Section 380.06(19)(e)(2), Florida Statutes (RES 08-217); 5) modify Development Order 5.n.(4) to specify the Developer's specific Phase I transportation mitigation requirements; and 6) replace "Pasco Properties of Tampa Bay, Inc." with "JG Cypress Creek LLC" as one of the Master Developers of Record; (the Proposed Changes); and

**WHEREAS,** on November 25, 2008, the BCC adopted Ordinance No. 08-47, amending the County's Concurrency Management Regulations to extend, without additional concurrency review or analysis, the concurrency expiration date of all projects in Pasco County by one (1) year (the One-Year Extension); and

**WHEREAS,** on June 23, 2009, the BCC adopted Resolution No. 09-269 pursuant to the County's Concurrency Management Regulations to further extend, without additional concurrency review or analysis, the

concurrency expiration date of all projects in Pasco County by two (2) additional years (the Two-Year Extension); and

WHEREAS, the Project is eligible for the One-Year Extension and the Two-Year Extension for transportation concurrency review purposes; and

WHEREAS, on November 5, 2009, the Development Review Committee approved a variance from Section 402.3.C, 402.6.C.(1) and 402.6.D, Pasco County Land Development Code, to extend the build-out date for transportation concurrency by seven (7) years without requiring a new traffic study and without additional traffic study review because the developer completed the S.R. 54/56 pipeline project in advance of utilizing any of the additional transportation capacity created by the S.R. 54/56 pipeline project; and

WHEREAS, for State/regional review purposes, a two (2) year extension was granted pursuant to Senate Bill 360 (2009) (which provided a 2-year extension from December 31, 2011 to December 31, 2013) (the Two-Year State/Regional Extension); and a three (3) year extension was granted pursuant to House Bill 7203 (2007) (which provided a 3-year extension from December 31, 2013 to December 31, 2016) (The Three-Year State/Regional Extension).  The Two-Year State/Regional Extension and the Three-Year State/Regional Extension were claimed respectively in the July 9, 2009 and July 22, 2009 letters from the Developer to the TBRPC. Pursuant to this NOPC a five (5) year extension from December 31, 2016 to December 31, 2021 has been requested pursuant to 380.06(19)(c), Florida Statutes and is not a substantial deviation pursuant to 380.06(19)(c), Florida Statutes; and

WHEREAS, the Board of County Commissioners has approved the NOPC on December 15, 2009, and hereby adopts this Amended, Restated, and Consolidated Development Order for the Project (DO), which shall replace and supersede the original Development Order as amended in its entirety.

NOW, THEREFORE, BE IT RESOLVED by the Board of County Commissioners of Pasco County, Florida, in regular session duly assembled that:

The  DO for the Project is hereby amended, restated and consolidated as set forth below:

AMENDED, RESTATED AND CONSOLIDATED

CYPRESS CREEK TOWN CENTER DEVELOPMENT ORDER

1.    General Findings of Fact

The Pasco County Board of County Commissioners makes the following general Findings of Fact:

a.    The DRI Development Order for the Cypress Creek Town Center was approved by the Pasco County Board of County Commissioners on November 23, 2004, by Resolution No. 05-40. The nature, type, scope, intensity, density, costs, and general impact of the Cypress Creek Town Center DRI are those which are summarized in Composite Exhibit A, the Application for Development  Approval ("ADA"), and in Exhibit B, the Specific Findings of Fact and Regional Impacts contained in Pages 1-91 of the Tampa Bay Regional Planning Council ("TBRPC") Final Report.    Both Exhibits A and B are not attached to this

Development Order, but are on file with the County and incorporated into this Development Order by reference.

b.     The DRI Development Order for the Cypress Creek Town Center was reviewed and appealed by the Department of Community Affairs to the Florida Land and Water Adjudicatory Commission pursuant to Section 380.07, Florida Statutes.  That case went before the Division of Administrative Hearings as DOAH Case No. 05-0865.

c.     The appeal of the DRI Development Order for the Cypress Creek Town Center was resolved by the settlement agreement approved by the Pasco County Board of County Commissioners on April 26, 2005.

d.     The April 26, 2005, public hearing to consider and approve the settlement agreement and its implementing amendments to the DRI Development Order for the Cypress Creek Town Center was noticed to the general public by publication in a newspaper of general circulation in Pasco County at least 15 days before that public hearing.

e.     At the noticed public hearing on April 26, 2005, all parties and members of the general public requesting to do so were afforded the opportunity to present written or oral communications as to the proposed settlement agreement and to the implementing amendments to the DRI Development Order for the Cypress Creek Town Center.

f.     On April 26, 2005, the Pasco County Board of County Commissioners approved those amendments to the DRI Development Order for the Cypress Creek Town Center based on staff reports, documents, evidence and testimony received at the April 26, 2005 public hearing, as well as the staff reports, documents, evidence and testimony received at the November 23, 2004, public hearing for Resolution No. 05-40.

g.     On May 1, 2009, the Developer filed, in accordance with Section 380.06(19), as amended, an NOPC for the Project and associated responses to requests for additional information.  The Proposed Changes are not a substantial deviation  pursuant to Section 380.06(19), F.S.  The NOPC, collectively with the original ADA, are referred to herein as the application and are incorporated into this DO by reference as Exhibit A.

h.      The nature, type, scope, intensity, density, and general impact of the Project, as revised, are summarized in the NOPC and Table 1 below; the specific findings of fact and regional impacts contained in the Tampa Bay Regional Planning Council (TBRPC) DRI Final Report and the NOPC Report, which collectively are incorporated into this DO by reference as Exhibit B.

i.     The real property encompassed by the Project is owned by the individual property owners described in the Biennial Reports.  A description of the real property is attached hereto as Exhibit C (Legal Description) and incorporated herein.

j.     The Pasco County Comprehensive Plan Future Land Use Map classifications for the

3

area subject to this DO are CON (Conservation Lands), RES-3 (Residential - 3 du/ga) and ROR (Retail/Office/Residential). The proposed development is consistent with the provisions of the CON (Conservation Lands), ROR (Retail/Office/Residential) and RES-3 (Residential - 3 du/ga) (as applicable) Land Use Classifications and other Goals, Objectives, and Policies of the Comprehensive Plan.

      k.     Zoning on the property which is subject to the application is MPUD Master Planned Unit Development.

      l.     On August 28, 2009 the TBRPC notified the County that the NOPC review was complete and that the TBRPC had issued a draft DRI NOPC Report for DRI No. 252, Cypress Creek Town Center, recommending approval of the NOPC. On September 14, 2009 the TBRPC adopted the NOPC Report for DRI No. 252, Cypress Creek Town Center recommending approval of the NOPC.

      m.     The Board of County Commissioners scheduled and held a public hearing on the pending NOPC on December 15, 2009.

      n.     Notice of the hearing was published in a newspaper of general circulation at least fifteen (15) days prior to the date set for the Board of County Commissioners.

      o.     At the public hearing, all parties were afforded the opportunity to present evidence and argument on all issues and to submit rebuttal evidence.

      p.     Additionally, at the public hearing, any member of the general public requesting to do so was given the opportunity to present written or oral communications.

      q.     The Board of County Commissioners received and considered the TBRPC NOPC Report on the NOPC application.

      r.     The Board of County Commissioners received and considered various other reports and information including, but not limited to the recommendations of the Pasco County Development Services Branch and the DRC.

2.    <u>Conclusions of Law</u>

The Pasco County Board of County Commissioners hereby finds as follows:

      a.     The Project as amended by the NOPC will not unreasonably interfere with the achievement of the objectives of the State Land Development Plan applicable to the area encompassed by the Application.

      b.     As conditioned, this DO is consistent with the report and recommendation of the TBRPC.

      c.     As conditioned, this DO is consistent with the applicable provisions of the Land Development Code (LDC).

      d.     As conditioned, this DO is consistent with the applicable provisions of the Comprehensive Plan.

      e.     The land that is subject to this DO is not in an area of critical State concern.

      f.     This DO is consistent with the settlement agreement approved on April 26, 2005.

g.      The Proposed Changes in the NOPC application are not a substantial deviation pursuant to Section 380.06(19).

3.      Approval Stipulations

a.      Specific approval of Phase I of the Application is hereby granted with conditions. Phase II of the Application is subject to additional review as provided herein.  Conceptual approval is granted for Phase II; this may be changed to specific approval, subject to an amendment to Sub-area Policy 9.1.2 of the Future Land Use Element of the Comprehensive Plan, additional analyses through the NOPC process performed pursuant to the requirements of Section 380.06, F.S., and in accordance with Specific Conditions No. 5.n.(1) and 5.o. (2) of this DO.

b.      The requirements of and conditions contained in this DO shall regulate the development of the property described in Exhibit C.  Following the adoption of this DO, all plans for development on this property shall be consistent with the conditions and restrictions recited herein.  Such conditions and restrictions shall be binding upon all Applicant's/Developer's successors in interest to the property.

In the event Pasco County believes violation of the provisions hereof has occurred, the Pasco County Administrator or his designee may issue a Notice of Noncompliance to the Applicant/Developer after providing the Applicant/Developer with an opportunity to be heard and, if it is determined by the County Administrator or his designee that a violation has occurred, the County Administrator or his designee may require that all development related to the violation shall cease until the violation has been corrected or the Board of County Commissioners rescinds the Notice of Noncompliance at a hearing to consider the matter. Notwithstanding the foregoing, violations of the Development Agreement shall be addressed in accordance with the provisions of the Development Agreement.

c.      All development specifically authorized by this DO shall be carried out in accordance with the provisions hereof.

(1)      Adverse impacts shall be mitigated in the manner specified in this DO.

(2)      The Applicant's/Developer's commitments set forth in Exhibit D shall be honored by the Applicant/Developer, except as they may be superseded by specific terms of this DO.

d.      Development of the Cypress Creek Town Center DRI shall be governed by the standards and procedural provisions of the Comprehensive Plan.  Land development regulations shall be applied in a manner that is consistent with Section 163.3194(1)(b), Florida Statutes Conflicts between the land development regulations and this DO shall be resolved in accordance with applicable law.

e.      The approved DRI shall not be subject to downzoning, unit density reduction, or intensity reduction until December 31, 2029, unless the County can demonstrate that substantial changes in the conditions underlying the approval of this DO have occurred or that the DO was based on substantially inaccurate information provided by the Applicant/Developer, or that the change is clearly established by local

government to be essential to the public health, safety, or welfare.  Compliance with this DO, the associated Development Agreement, the MPUD Master Planned Unit Development conditions, and the Pasco County Comprehensive Plan and land development regulations, shall not constitute downzoning, unit density reduction, or intensity reduction for purposes of the prohibition contained in this paragraph.

    f.  As provided in Chapter 190, F.S., and subject to the Pasco County Board of County Commissioners separate approval, Community Development District(s) (CDD) are hereby authorized to undertake the funding and construction of any of the projects, whether within or without the boundaries of the CDD, which are identified within this DO.  Further, any obligations of the Applicant/Developer contained in this DO may be assigned to a CDD, homeowners'/property owners' association, or other entity approved by Pasco County.

    g.  The property is currently utilized for agricultural activities.  It is understood that while the use will cease when the DRI is built out, portions of the property may continue to be used for agricultural activities until the property is developed in accordance with this DO, but at no greater intensity than at present.  No silvicultural or agricultural activities shall be initiated on land not currently under such use.

  4. Phasing and Duration

    a.  Phasing Schedule

      (1)  Development of the Cypress Creek Town Center shall proceed in accordance with the phasing schedule indicated in Table 1 below.

      (2)  Excess infrastructure capacity constructed to potentially serve latter phases of the development shall be at the Developer's risk and shall not vest latter phase development rights.

**Table 1**
**Cypress Creek Town Center DRI**
**Land Use and Phasing Schedule**

| Land Use | Phase 1 12/31/2021[1] | Phase 2 TBD[3] | Totals |
|---|---|---|---|
| Regional Mall (SF)[2] | 1,184,925 | 215,000 | 1,399,925 |
| Retail Center (SF)[2] | 600,000 | 0 | 600,000 |
| Office (SF)[2] | 120,000 | 300,000 | 420,000 |
| Hotel (Rooms) | 350 | 350 | 700 |
| Highway Commercial (SF)[2] | 96,000 | 0 | 96,000 |
| Multifamily Residential (D.U.) | 230 | 400 | 630 |
| Movie Theater (Seats) | 2,582 | 0 | 2,582 |

[1]  The build-out date for transportation concurrency, and state/regional review purposes is December 31, 2021, unless otherwise extended pursuant to the County's Concurrency Management Ordinance and/or applicable State law.

[2] Square feet in Gross Leasable Area ("GLA") for the purposes of calculating entitlements only shall mean the actual number of square feet on all levels that is equal to the Gross Building Area ("GBA") minus any enclosed or open air mall, and other interior or exterior areas occupied primarily by mechanical, electrical, telephone or other operating equipment, truck or loading docks, police substations, service and fire corridors, stairwells and freight elevator shafts, and maintenance facilities. Construction plans shall reflect both GBA and GLA.  All construction plans shall provide an updated accounting of total approved, previously permitted and requested GBA and GLA.

[3] To Be Determined consistent with Conditions 5.n. (1) and 5.o. (2).

b.    Effective Date and Duration

(1)    The DO for the Project shall take effect upon transmittal to the FDCA, the TBRPC, and the Developer.  The effectiveness of this DO shall be stayed by the filing of a notice of appeal pursuant to Section 380.06, Florida Statutes.

(2)    The effective period of this DO shall be until December 31, 2029.  The effective period may be extended by the Board of County Commissioners upon a showing of good cause and as provided by statutes.  Application for such extension shall be made at least sixty (60) days prior to the expiration date.  All extensions shall be subject to a substantial deviation determination pursuant to Section 380.06(19), F.S.

(3)    Development of the Project shall proceed in accordance with the phasing schedule indicated in Table 1 above.

c.    Commencement of Development

If physical development of the Cypress Creek Town Center has not commenced within three (3) years of the effective date of this DO, the Board of County Commissioners shall determine, pursuant to Section 380.06(19), F.S., whether the delay represents a substantial deviation from the terms and conditions of this DO.  For the purpose of this DO, "commencement of development" shall mean the commencement of development of infrastructure, roadways, or vertical development, unless otherwise approved by Pasco County.

d.    Build-out of Project

(1)    Unless extended by the Board of County Commissioners pursuant to the Concurrency Management Ordinance, the build-out date of Phase 1 of the Project shall be December 31, 2021.  This build-out date includes the One-Year Extension and the Two-Year Extension.

(2)    Any delay in the build-out date of Phase 1 of the Project beyond December 31, 2021, may require a new transportation analysis, in accordance with applicable law, as the basis for a DO amendment which may include a re-evaluation of required transportation mitigation.  The County Administrator or the Board of County Commissioners may waive any applicable transportation analysis requirement for any entitlements within the Project that satisfy the Limited Exemption criteria of Section 402.7 of the County's Concurrency Management Ordinance; however, build-out date extensions for such

entitlements are still subject to applicable statutory requirements in Section 380.06(19), Florida Statutes, as may be amended from time to time. The applicable build-out date for Phase 2 shall be established when specific approval of Phase 2 is obtained.

5. Specific Conditions

a.    Development Components

Subject to the possible exchange of land uses as described elsewhere herein, the project consists of the land uses by phase as described in Table 1.

b.    Land Use Exchange

(1)    Phase 1 development entitlements within the project may be exchanged pursuant to the Land Use Equivalency Matrix set out in Exhibit E attached hereto. Land use exchange requests shall be provided to and approved by Pasco County, with copies to the Florida Department of Community Affairs and the TBRPC for review and comment a minimum of fourteen (14) days prior to final authorization granted by Pasco County, and the use thereof shall be reported in the next Biennial Report. Exhibit E represents the Land Use Equivalency Matrix which is acceptable. Notwithstanding the foregoing, office entitlements cannot be exchanged for retail, mall, hotel, or residential entitlements. In addition, no approved entitlements may be traded for additional residential entitlements.

(2)    Any amendments to the land use mix or proposed phasing schedule, other than those described herein, shall be approved pursuant to the Notice of Proposed Change (NOPC) process as required by Section 380.06(19), F.S., which approval shall not be withheld for mere acceleration or deceleration of phases if otherwise there is compliance with the terms of this DO.

(3)    Unless the Applicant/Developer demonstrates to Pasco County that projected traffic volumes and patterns would be similar to those initially approved, conversion of land entitlements authorized under provisions of the Land Use Equivalency Matrix shall be limited as follows: Land use entitlements located on the parcel north of S.R. 56 can only be exchanged for authorized entitlements located on the north parcel. The same applies for south parcel entitlements.

c.    Water Quality and Drainage

(1)    Development of Cypress Creek Town Center shall not result in a Level of Service (LOS) for off-site drainage structures below acceptable standards as established in the adopted Comprehensive Plan and Land Development Code.

(2)    The project's stormwater management system shall be designed, constructed, and maintained to meet or exceed Section 40D-4, Florida Administrative Code (FAC), and Pasco County stormwater management requirements. Treatment shall be provided by biological filtration and residence times or a combination thereof. Best Management Practices (BMP) for reducing adverse water quality impacts as required by the regulations of Pasco County and other appropriate regulatory bodies shall be implemented. South of S.R. 56, the stormwater treatment system shall be designed to treat the first 1½

inches of rainfall and shall provide fourteen (14) day residence time, unless otherwise approved by Pasco County and the SWFWMD.   In addition, the Applicant/Developer shall comply with the following design requirements.

(a)    All swales shall be fully vegetated and operational.

(b)    Dry stormwater retention/detention areas, including side slopes and bottoms, shall be fully vegetated as required.

(c)    The Applicant/Developer or other responsible entities shall ensure that the stormwater management system is being properly maintained in keeping with its design and is providing the level of stormwater storage and treatment as established in the Environmental Resource Permit (ERP).   The Applicant/Developer or other responsible entities shall hire a licensed engineer to conduct annual inspections of the stormwater management system on the project site to ensure that the system is being properly maintained in keeping with its design and is capable of accomplishing the level of stormwater storage and treatment for which it was designed and intended.   Inspection results shall be included in each DRI Biennial Report.

(d)    Should the Applicant/Developer or its representative discover that if any portion of the stormwater system is not being adequately maintained or that the system is not functioning properly, the Applicant/Developer shall, within seven (7) days, report such fact to Pasco County and shall promptly undertake any necessary repairs or modifications to the system.   The Biennial Report shall describe any such problems and the necessary repairs or modifications to remedy them as well as what repairs or modifications to the system have been undertaken since the previous Biennial Report.

(e)    The stormwater management system shall be designed to maintain the natural hydroperiod of the on-site wetlands and the floodplain habitats of Cypress Creek and Cabbage Swamp in full conformance with permit requirements by appropriate agencies with jurisdiction.

(f)    Prior to the first construction plan approval, the Applicant/Developer must provide a plan detailing the operation and maintenance of the stormwater management system.   The plan shall, at a minimum, identify the responsible entity, establish a long-term funding mechanism which may include the formation of a Property Owners Association, and provide assurance through written commitments that the entity in charge of the program has the technical expertise necessary to carry out the operation and maintenance functions of the stormwater management system.   The plan must be approved by Pasco County prior to construction plan approval, and implementation of the plan must begin prior to each phase.

(g)    Landscape and irrigation shall be in conformance with the Land Development Code in effect at the time of preliminary site plan approval.

(h)     The Applicant/Developer shall advise future residents and tenants of seasonal variations with created water features and that lakes should not be perceived as having constant water levels.

(3)     Planning and development of the Cypress Creek Town Center shall conform to the rules adopted by the Southwest Florida Water Management District (SWFWMD) for the Northern Tampa Bay Water (TBW) Use Caution Area.   Development of the Cypress Creek Town Center shall be designed to not negatively impact the existing water quality of Cypress Creek, an OFW, as required in Section 40D-4, FAC.  There shall be no direct discharge of stormwater runoff into Cypress Creek.

(a)     In order to protect surface-water quality, stormwater exiting the site shall meet all applicable State water quality standards.  The Applicant/Developer shall develop a surface-water quality monitoring program to be continued for five years following project build-out demonstrating compliance with such standards.  The following parameters shall be included within any required surface water-quality monitoring program:  sampling locations and specific parameters, frequency of monitoring, and reporting subject to approval by Pasco County, SWFWMD, FDEP, TBW and other appropriate regulatory bodies.  Access to the monitoring sites shall be made available to the agencies listed above.

(b)     All water quality analytical methods and procedures shall be thoroughly documented and shall comply with the (EPA/FDEP) Environmental Protection Agency/Florida Department of Environmental Protection quality-control standards and requirements.

(c)     The surface water-quality monitoring results shall be submitted to the FDEP, SWFWMD, TBW, and Pasco County.  Should the monitoring indicate that applicable State water-quality standards are not being met, the violation shall be reported to Pasco County and other appropriate regulatory bodies immediately.  In the event there is a violation of any State water-quality standard, the Developer shall identify the specific construction or other activity identified as causing the violation which shall cease until the violation is corrected.  The design of the stormwater collection system shall facilitate the testing of stormwater runoff from individual parcels to help in detection of the specific source of any such violation.  In the event that the specific construction or other activity causing the violation cannot be identified, all construction shall cease until the violation is corrected.

(d)   Subsurface investigations shall be performed prior to construction of stormwater management and floodplain compensation ponds.  All test boring logs of the site are to be provided during the permitting process and prior to any construction to the FDEP and the Southwest Florida Water Management District (SWFWMD).

(4)     A groundwater-quality monitoring program shall be developed in coordination with the FDEP and the SWFWMD to establish parameters, methodology, and locations of monitoring sites.  Any such program shall be submitted to Pasco County, FDEP, SWFWMD, and TBW for review and approval and shall be included in each Biennial Report.  Any required groundwater-quality

monitoring program shall be instituted before construction begins to provide background data and shall continue for five years following project build-out.  If reclaimed water for irrigation purposes is used in the future, any groundwater-monitoring program shall be amended as required by the permit for use of reclaimed water.  In the event there is a violation of any State water-quality standard, the specific construction or other activity identified as causing the exceedance shall cease until the exceedance is corrected.  Monitoring results shall be included in each Biennial Report.  To prevent adverse effects to groundwater quality during construction, there shall be no excavation into the Floridian aquifer's confining layers or underlying limestone. The ways that the Developer will prevent this from occurring and any remedial action it will implement should it occur, are required to be outlined during the site plan permitting process and submitted by the County to TBW for review and comment.

(5)     An integrated, pest-management program shall be implemented to minimize the use of fertilizers and pesticides.  The Applicant/Developer shall implement BMPs for reducing water-quality impacts as recommended by Pasco County, TBW, and SWFWMD.  This activity shall include, but not be limited to, a street-cleaning program for roadways and parking areas.

(6)     The Applicant/Developer shall encourage the use of water conserving landscapes and the responsible use of water by occupants.  Existing native vegetation shall be incorporated into the landscape design to the greatest extent practicable following examples such as the Florida Yards and Neighborhoods program.  Construction BMP shall be used to prevent construction-related turbidity and erosion problems.

(7)     On-site stormwater wet-detention ponds shall include littoral zones constructed on slopes no steeper than a 4:1 horizontal to vertical ratio and shall be planted with or allowed to be colonized by native emergent and submergent vegetation.  The Applicant/Developer shall ensure, by supplemental replanting if necessary, that at least eighty (80) percent cover by native aquatic vegetation is established within the littoral zone (to include at a minimum the area between ordinary high water and ordinary low-water) for the duration of the permit.

(8)     All drainage system components shall comply with Section 40D-4, FAC, as well as all other applicable local, State, and Federal rules and regulations.

(a)     The amount of development proposed will result in an increased volume of stormwater runoff.  Several methods exist that can help reduce the impact from this increased volume of stormwater.  Low-impact design elements should be incorporated throughout the site to the maximum extent possible to include:  shallow, vegetated swales in all parking areas; small, recessed garden areas throughout parking and building landscape areas; porous pavement and other pervious pavement technologies; stabilized grass areas for overflow parking; and retention of the maximum amount of existing, native vegetation.

(9)     Protect water quality within the Cypress Creek OFW by providing setbacks from the OFW that are a minimum of fifty (50) feet, except as may be required for the bridge crossing Cypress Creek. The bridge design shall include curbing and fencing to ensure that runoff is funneled into the storm water system and to limit the opportunity for trash and debris to enter Cypress Creek.

(10)    The historic average volume discharged from the project should not be decreased post-development. The developers shall, in cooperation with Tampa Bay Water (TBW) and to the extent the permitting agencies (Pasco County and SWFWMD) can allow, propose stormwater-design solutions which achieve this goal (i.e., use of swale systems and reducing treatment-volume requirements).

d.    Wetlands

(1)     Wetlands protection shall be in accordance with all applicable County, State, and Federal laws, permits, rules, and regulations.

(2)     Development plans for each parcel in the project shall include specific limits of wetlands pursuant to wetland delineation surveys conducted in coordination with the SWFWMD and other regulatory agencies as may be applicable.

(3)     Prior to preliminary plan approval for any parcel, the Applicant/Developer shall submit an On-Site Wetland Protection Plan to the Florida Fish and Wildlife Conservation Commission (FFWCC), FDEP, SWFWMD and TBRPC for review and to Pasco County for approval. The plan shall address, but not be limited to, control of exotic species, mitigation of impacted wetlands, restoration of previously-impacted wetlands, control of on-site water quality, and restoration of natural hydroperiods in on-site wetlands.

(4)     Existing annual hydroperiods, normal pool elevation, and seasonal high-water elevations shall be maintained in substantial conformance with permit requirements by appropriate jurisdictional entities.

(5)     Buffering around all post-development wetland areas shall comply with Pasco County policies at the time of this DO approval or the SWFWMD regulations at the time permits are obtained, whichever is more restrictive, to provide an upland transition into the wetland areas and to protect the natural system from development impacts. All mitigation areas and littoral shelves shall be monitored in accordance with the requirements of the appropriate permitting agency.

(6)     This Development Order does not authorize impacts to Category 1 wetlands. At the time of preliminary site plan approval, the County may decide to authorize impacts to Category I wetlands, but only in accordance with the provisions of Conservation Element Policies 2.7.3, 2.7.4, and 2.7.6 and subject to the following:

(a)     No impacts will be permitted for the purpose of increasing the developable portion of the outparcel in the southwest corner of the intersection of SR 56 and CR 54 (delineated on attached Exhibit J). Any such impact will only be permitted when needed to provide access or construct roadways, and only after

12

the Developer has reduced and eliminated impacts to the wetlands in accordance with state permitting requirements.

(b)      In the event the Southwest Florida Water Management District determines (during permitting) that wetlands located adjacent to Interstate 75 at the southeast corner of the property (delineated on attached Exhibit J as Wetland 2) are connected to Cypress Creek, thereby triggering a Category I Wetlands designation, the County will require the Developer to grant a conservation easement over said wetlands to the Department of Environmental Protection, the Southwest Florida Water Management District or a non-profit conservation organization, in perpetuity, so that the wetlands would not be subject to development in the future.

e.    <u>Mitigation Standards</u>

(1)      By adopting this DO, Pasco County has recognized that the location of the project makes those uses which are approved herein reasonable. The Applicant/Developer shall submit a detailed Ecosystem Improvement Plan (Ecosystem Plan) prior to the approval of the first preliminary site plan. The Ecosystem Plan shall emphasize a watershed approach to mitigation and shall be developed in accordance with:

(a)      The "net ecosystem benefit" concept embodied in Section 403.0752, F.S.

(i)      Section 3.2.1.2 of the SWFWMD's basis of review.

(ii)      The Army Corps of Engineers' (ACOE) Regulatory Guidance Letter No. 02-2 (Guidance on Compensatory Mitigation Projects under the ACOE Regulatory Program pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899).

(b)      The Ecosystem Plan must be designed, at a minimum, to meet the following criteria:

(i)      Demonstrate a net ecosystem benefit of natural resources within the affected drainage basin.

(ii)      Provides for greater, long-term, regional, ecological value than would be provided by on-site mitigation.

(iii)      Include one (1) or a combination of preservation, enhance-ment, restoration, and/or recreation of wetland and upland resource.

(iv)      The amount of mitigation will exceed the amount that would be required for mitigation when the wetland losses (on-site) and gains are assessed using the Florida Unified Wetland Assessment Methodology or other methodology as agreed to by the SWFWMD.

(v)      The mitigation for wetland impacts proposed as part of the Ecosystem Plan shall identify proposed mitigation in a maximum of two (2) (one [1] south of S.R. 56 and one [1] north of S.R. 56) master permit applications.

13

(vi)   The Future of the Region Strategic Policy Plan, Regional Goal 4.5, and related policies.

(vii)   References to the Hillsborough River Drainage Basin shall mean the basin shown on Appendix 6 of the SWFWMD's basis of review.

(c) Wetland encroachments included in the Ecosystem Plan must be permitted by appropriate regulatory agencies, including the FDEP, the SWFWMD, and the ACOE.   The Ecosystem Plan shall be approved by Pasco County prior to any wetland impacts.   A change in the Ecosystem Plan as provided herein resulting from requirements imposed by the FDEP, the SWFWMD, or by any appropriate Federal regulatory agency shall be submitted to Pasco County.   The change shall be presumed not to create a substantial deviation subject to further DRI review.   Mitigation is expected to include fee simple purchase and/or purchased conservation easements of land for one or some combination of the following:

(i)   Protection/preservation of lands identified as falling within, extending, or expanding one (1) of the habitat corridors identified by Pasco County.   The exact acreage will vary depending on how conservation rights are acquired, activities that may be allowed upon lands not acquired by fee simple purchase, available mix of uplands and wetlands, quality of uplands and wetlands, and relative quantities of uplands and wetlands.

(ii)   Restoration of degraded wetlands within the Hillsborough River Drainage Basin (as defined by the SWFWMD).

(iii)   Wetland creation within the Hillsborough River Drainage Basin (as defined by the SWFWMD).

(iv)   Wetland enhancement and/or creation on-site.

(d) The Ecosystem Plan shall be approved prior to issuance of the first construction permit associated with Cypress Creek Town Center development.

(e) All wetland mitigation activities shall be completed, in accordance with the approved Ecosystem Improvement Plan, prior to issuance of Certificate(s) of Occupancy beyond 500,000 sq. ft. of development within Cypress Creek Town Center.   The mitigation activities shall be determined successful, using SWFWMD criteria, prior to any Phase 2 approval.

f.   Water Supply Protection

(1)   Planning and development of the Cypress Creek Town Center shall conform to the SWFWMD-adopted rules for the Northern Tampa Bay Water Use Caution Area.

(2)   Pasco County, along with nine (9) other counties within the SWFWMD, is located in a region where water demand is expected to exceed the ability of traditional groundwater sources to provide necessary supplies over the next twenty (20) years.   New development represents additional water

demand in an area where water resources are already stressed in providing for current, reasonable, and beneficial uses. The development must, therefore, implement to the maximum extent possible, all options for developing alternative supplies (reclaimed water, stormwater, water conservation, etc.) to meet their needs.

(3)    Prior to construction, the Applicant/Developer shall determine the opportunities to use nonpotable water for irrigation and other purposes within the development. Nonpotable sources may include, but are not limited to, reclaimed wastewater, stormwater, and water pumped from shallow wells. The determination shall include, at a minimum, the proximity of the nonpotable source to the proposed development, the long-term availability of that source, the appropriateness of the source for the intended use.

(4)    Installation of high-efficiency (low-volume) plumbing fixtures, appliances, and other water-conserving devices is required. Efficient plumbing fixtures are required by the Florida Building Code.

(5)    Other water-conservation measures shall be included, such as landscaping, buffering, rain and soil moisture sensors and shut-offs, low-volume fixtures, mulching, preservation of natural areas and individual meters on multifamily units.

g.    Floodplain/Disaster Preparedness

(1) Elevation for all habitable structures shall be at, or above, a 100-year floodplain elevation. All preliminary plan/preliminary site plan submittals shall show 100-year floodplain elevations. Roadways providing access to residential areas shall be at, or above, floodplain elevations as identified in the Pasco County Land Development Code.

(2)    No fill shall be added within the 100-year floodplain without approval by the appropriate permitting agencies.

h.    Vegetation and Wildlife

(1)    The Applicant/Developer shall comply with the rules and regulations, including the adopted Comprehensive Plan and Rule 9J-2.041, FAC, of all applicable agencies regarding the protection of listed wildlife and plant species found on-site. In the event any additional State or Federally listed species, nesting colonies of wading birds, or nesting Florida sandhill cranes are discovered on-site during project development, the Applicant/Developer shall immediately notify the FFWCC and implement the recommended measures for species protection in accordance with any applicable regulations.

(2)    The entirety of Cypress Creek OFW lands (as shown on Exhibit I) located on the site shall be preserved. The proposed roadway crossing over Cypress Creek shall be designed to minimize impacts to the environmentally sensitive areas. The proposed southern access roadway crossing Cypress Creek will feature a bridge structure which includes a minimum of twenty-five (25) feet of uplands at both banks to facilitate wildlife movement along this riverine corridor and provide continuity to the riverine

corridor and previously constructed wildlife crossings. The bridge shall have a span adequate to accommodate wildlife (e.g. Deer) in accordance with Pasco County standards.

(3)     The applicant shall complete mitigation and permitting for any species of special concern, threatened, endangered floral, or faunal species encountered on the property through the FFWCC and U.S. Fish and Wildlife, in compliance with any applicable regulations.  The applicant shall also continue to monitor for the presence of all protected species through the period up to, and including, various construction phases and provide for the appropriate mitigation or permitting requirements.  The applicant shall submit all correspondence and proposed mitigation or take permits to FFWCC and the County for review and comment prior to commencement of these activities.

(4)     The Applicant/Developer shall make every reasonable effort to relocate all gopher tortoises within the project site.  In the event that on-site relocation is not reasonably possible, all gopher tortoises shall be relocated to an appropriate off-site location subject to approval by the FFWCC.  In no event shall the Applicant/Developer seek to kill or wound any gopher tortoise without first receiving specific approval of the BOCC and the FFWCC.

i.     Wellfield Protection

(1)     The Applicant/Developer shall comply with the current Wellhead Protection Ordinance (Section 612 of the Pasco County Land Development Code as amended).

(2)     Should any noticeable soil slumping or sinkhole formation become evident, the Applicant/Developer shall immediately notify Pasco County, TBW, and the SWFWMD and adopt one (1) or more of the following procedures as determined to be appropriate by Pasco County and the SWFWMD:

(a)     If the slumping or sinkhole formation becomes evident before or during construction activities, stop all work (except for mitigation activities) in the affected area and remain stopped until Pasco County and the SWFWMD approve resuming construction activities.

(b)     Take immediate measures to ensure no surface water drains into the affected areas.

(c)     Visually inspect the affected area.

(d)     Excavate and backfill as required to fill the affected area and prevent further subsidence.

(e)     Use geotextile materials in the backfilling operation, when appropriate.

(f)     If the affected area is in the vicinity of a water-retention area, maintain a minimum distance of five (5) feet from the bottom of the retention pond to the surface of the limerock clay or karst connection.

(g)     If the affected area is in the vicinity of a water-retention area and the above methods do not stabilize the collapse, relocate the retention area.

(3)     Discharge of stormwater into depressions with direct or demonstrated hydrologic connection to the Floridian Aquifer is prohibited.

j.     <u>Historical and Archaeological Sites</u>

Should any historical or archaeological resources be encountered within the project, measures shall be taken in coordination with the Florida Department of State, Division of Historical Resources, and Pasco County to either protect and preserve the site(s) in place or to mitigate any adverse impacts consistent with the requirements in Rule 9J-2.043, FAC.  This DO shall be amended to incorporate any required mitigation consistent with Rule 1A-46, FAC.  If any significant resources are found, a Certificate of Appropriateness must be obtained from Pasco County pursuant to requirements of the Land Development Code.

k.     <u>Land</u>

(1)  BMP to reduce soil erosion and fugitive dust shall be implemented.

(2)  Prior to commencing development, the Applicant/Developer shall provide the Pasco County Engineering Services Department, Survey Division, with two (2) pair of Global Positioning Satellite (GPS) control points with twenty-four-(24) hour access.  The Applicant/Developer and the County Surveyor shall mutually determine the location.  The Applicant's/Developer's existing survey shall be valid for permitting purposes until final plat approval is requested.  All final plats will be referenced from this point in accordance with Rule 61G17-6, FAC.  All the GPS points shall be installed in accordance with standards contained in Rule 61G17-6, FAC.

l.     <u>Utilities</u>

(1)  Water Supply and Wastewater Treatment

(a)     Pasco County has indicated that capacity exists, and water and wastewater services will be provided by Pasco County in accordance with Section 110 of the Pasco County Code of Ordinances as amended.  The Applicant/Developer shall construct all water and wastewater facilities within the development to Pasco County standards in effect when application is made for connection.

(b)     Development of the project shall not result in levels of service for water and wastewater services below the acceptable levels of service established in the Comprehensive Plan.

(c)     The Applicant/Developer agrees to use the lowest quality water reasonably available and suitable for a given purpose in order to reduce the unnecessary use of potable water and groundwater.  Potable water (i.e., water that is treated and provided through a public-distribution system) shall not be used for the irrigation of common areas if lower quality water becomes reasonably available.

(d)     Water-saving fixtures shall be required in the project, as mandated by the Florida Water Conservation Act (Section 553.14, F.S.), and xeriscape-type landscaping shall be encouraged within the project.

(e)     High-efficiency, water-saving devices, irrigation systems, and low-volume, plumbing fixtures will be used throughout the project.

(f)     Prior to construction, the Applicant/Developer shall provide the County with evidence that adequate water-supply capacity and wastewater capacity for that construction is available. The assurance shall include adequate water supply for firefighting purposes.  Pasco County shall have the right to rely on assurances of adequate potable-water supply from TBW.

(g)     Wastewater shall not be treated on-site or by a private utility, unless approved by Pasco County.

(h) No permanent septic tanks shall be installed on the Cypress Creek Town Center site.  "Interim" septic tanks shall be removed from the site following completion of construction.

(2)  Solid/Hazardous/Biohazardous Waste and Recycling

(a)     Pasco County has determined that adequate capacity exists to process the solid waste generated by the project.  The collection, transportation, and disposal of solid waste are controlled by Section 90 of the Pasco County Code of Ordinances and shall take place in accordance with the terms thereof.

(b)     Development of the project shall not result in levels of service for solid-waste collection/disposal below the acceptable levels of service established in the Comprehensive Plan. Documentation of adequate disposal capacity, including assurance of adequate hazardous/biohazardous waste and material disposal to service the project shall be obtained from Pasco County or other appropriate entities.

(c)     As stated in the ADA, it is not anticipated that hazardous or toxic waste will be generated by the project.  The Applicant/Developer or his designee shall advise businesses within the project of applicable statutes and regulations regarding hazardous waste and materials, including those listed in Rule 9J-2.044, FAC.

(d)     Solid-waste recycling shall be given a high priority, and a specific plan shall be submitted to and approved by Pasco County to maximize solid-waste recycling for all phases of and all types of development within the Cypress Creek Town Center.

m.     <u>Energy</u>

(1)  The energy-conservation measures referenced in the Applicant's/Developer's Commitments, attached hereto as Exhibit D, shall be implemented.

(2)  All Cypress Creek Town Center tenants, businesses, and residents in the project shall be encouraged to:

(a)     Use energy alternatives, such as solar energy, waste heat recovery, and cogeneration.

(b)     Use landscaping, building orientation, and building construction and design to reduce heat gain.

(c)     Institute programs to promote energy conservation by employees, buyers, suppliers, and the public.

(d)     Institute recycling programs.

(e)     Reduce levels of operation of all air conditioning, heating, and lighting levels during nonbusiness hours.

n.     <u>Transportation</u>

(1)     Specific approval is hereby granted for Phase 1 of the CYPRESS CREEK TOWN CENTER DRI, as defined herein, subject to the conditions outlined herein.  Specific approval of Phase 2 shall be contingent upon further Section 380.06, Florida Statutes, transportation analysis submitted through the Notice of Proposed Change process.

(2)     Transportation Impact Fees and Credits:  The Developer shall pay transportation impact fees and is eligible to receive transportation impact fee credits in accordance with Pasco County Transportation Impact Fee Ordinance No. 94-03, as amended, and the Development Agreement.

(3)     Access Management:  The Developer shall be responsible for construction of the access improvements to S.R. 56, S.R. 54 and C.R. 54 for the project prior to or concurrent with vertical construction of the portions of the project necessitating such improvements, as determined by the County and FDOT at the time of preliminary site plan approval and/or at the time of issuance of access permits for the project.  All access improvements, number of access points and spacing of access points shown on Map H shall be subject to compliance with the provisions of the Florida Department of Transportation (FDOT) and Pasco County's access management regulations.  The Development Agreement described in subsection n.(5) below, and Exhibit D to the Development Agreement, set forth: (a) the scope of the required and optional access improvements for the project, (b) which intersection improvements are part of the Pipeline Projects, (c) which access improvements are site-related improvements, and (d) which intersection improvements are eligible for impact fee credits.

(4) Mitigation:  The Developer agrees to construct Pipeline Improvements as mitigation for the Cypress Creek Town Center DRI Phase 1 transportation impacts.  Pursuant to Section 163.3180(12), F.S., and Rule 9J-2.045, FAC, the Developer's proportionate share contribution for those improvement projects listed in Exhibit G (Required Phase 1 Improvements) attached hereto, is Twenty-Two Million, Nine Hundred and Ninety-Two Thousand and Ninety-Four and 00/100 Dollars ($22,992,094) (the "Proportionate Share") in 2004 dollars.  The Developer has elected to design, permit, construct, and acquire right-of-way (where necessary) for the S.R. 54/56 Pipeline Project and has elected to provide for the design,

permitting and construction of the C.R. 54 Extension Pipeline Project, to fully mitigate the transportation impacts of Phase 1 of the Project. The first Pipeline Project is the design, permitting, and construction of a new extension of C.R. 54 from the intersection of S.R. 56 and S.R. 54 south to County Line Road, including the construction of a 2-lane bridge over Cypress Creek and additional intersection improvements, all as more fully described in the Development Agreement discussed in subsection n.(5) below (herein referred to as "the C.R. 54 Extension Pipeline Project"). The C.R. 54 Extension Pipeline Project will serve as the last link of a County roadway connecting S.R. 52 to County Line Road through Old Pasco Road and C.R. 54. This roadway will serve as a parallel facility to Interstate 75, thus improving the capacity of Interstate 75 (one of the roadways listed in Exhibit G), as well as improving the capacity of other north-south roadways near the project such as C.R. 581, Collier Parkway, Livingston Road and Cypress Creek Road. The second Pipeline Project is the widening of S.R. 56 and S.R. 54 from a 4 lane divided arterial to a 6 lane divided arterial from the western I-75 ramps west to the existing 6 lane section approximately .6 miles east of U.S. 41, including intersection improvements at the S.R. 54/S.R. 56/C.R. 54 intersection and S.R. 54/Collier Parkway intersection, all as more fully described in the Development Agreement discussed in subsection n.(5) below (hereinafter "the S.R. 54/56 Pipeline Project"). The C.R. 54 Extension Pipeline Project and S.R. 54/56 Pipeline Project are collectively referred to herein as the "Pipeline Projects".

   The estimated cost of the C.R. 54 Extension Pipeline Project is at least six million dollars ($6,000,000.00) in 2004 dollars. The Developer shall design, permit, construct, and donate right-of-way for Segments #1 and #2 of the C.R. 54 Extension Pipeline Project. In addition, the Developer shall (1) design, permit and construct Segment #3 of the C.R. 54 Extension Pipeline Project, or (2)  make a payment to the County in lieu of designing, permitting, and constructing Segment #3 of  the C.R. 54 Extension Pipeline Project, for which the specifications, deadlines, terms, and obligations related to both options are set forth in the Development Agreement.   The estimated cost of the S.R. 54/56 Pipeline Project is twenty-one million one hundred fifty two thousand four hundred ninety eight dollars ($21,152,498.00) in 2004 dollars. The Developer shall design, permit, construct, and acquire right-of-way (where necessary) for the S.R. 54/56 Pipeline Project, regardless of cost, pursuant to the terms of the Development Agreement discussed in subsection n. (5) below; however, the County agrees to reimburse the Developer for (1) all County-approved design, permitting, construction, and right-of-way acquisition expenses on the S.R. 54/56 Pipeline Project between sixteen million nine hundred ninety two thousand ninety four dollars ($16,992,094.00) and twenty one million one hundred fifty two thousand four hundred ninety eight dollars ($21,152,498.00), (2) nineteen and seven tenths percent (19.7%) of all County-approved design, permitting, construction, and right-of-way acquisition expenses on the S.R. 54/56 Pipeline Project between  twenty-one million one hundred fifty two thousand four hundred ninety eight dollars ($21,152,498.00) and twenty-three million five hundred sixty four thousand dollars ($23,564,000.00), and (3) forty-eight and six tenths percent (48.6%) of all County-approved design, permitting, construction, and right-of-way acquisition expenses on the S.R. 54/56 Pipeline Project

above twenty-three million five hundred sixty four thousand dollars ($23,564,000.00).  County reimbursement for such expenses shall be processed in the same manner, and subject to the same limitations, as requests for transportation impact fee credits as set forth in the Development Agreement discussed in subsection n. (5) below.

(5)   Development Agreement:  The County and Developer, following review by the Florida Department of Transportation (FDOT), have entered into a Development Agreement attached hereto as Exhibit H setting forth the terms and conditions governing the design, permitting, construction, and right-of-way acquisition for the Pipeline Projects.   The Development Agreement also contains: (a) the final detailed scope of the Pipeline Projects, (b) phasing requirements for the C.R. 54 Extension Pipeline Project, (c) a schedule for design, permitting, right-of-way acquisition, and construction of the Pipeline Projects, and/or payment in lieu of such requirements, to ensure that the Pipeline Projects are expeditiously constructed, (d) a requirement that if the Developer should fail to adhere to the schedule in the Development Agreement, then no further building permits or development approvals shall be issued until the Pipeline Projects have been recommenced to the satisfaction of the County, (e) provisions for assistance from Pasco County in the acquisition of right-of-way, and Developer right-of-way dedication requirements, for the Pipeline Projects as needed, (f) requirements for financial performance guarantees to be provided by the Developer to ensure that the Pipeline Projects will be completed in accordance with the applicable schedule, (g) provisions addressing the payment of transportation impact fees and transportation impact fee credits, (h) insurance and indemnification requirements, and (i) other provisions as deemed appropriate by the County. Changes to the Development Agreement which materially affect the requirements in subsection n.(4) above or which remove any condition required by Rule 9J-2.045, F.A.C. shall be amended in the Development Order through the NOPC process pursuant to Chapter 380, F.S..  All other amendments to the Development Agreement shall not require a NOPC or Development Order amendment.

(6)   Traffic Monitoring

Eighteen months following construction plan approval, for vertical construction, of fifty (50) percent of the DRI entitlements for Phase 1 (including the already built portion) in terms of the p.m. peak-hour project trip generation, or prior to construction plan approval, for vertical construction, of sixty-five 65 percent of the DRI entitlements for Phase 1 (including the already built portion) in terms of PM peak-hour trip generation, whichever date is earlier, the Developer shall institute an annual monitoring program and provide annual monitoring reports to Pasco County, the Tampa Bay Regional Planning Council, and FDOT to verify that the allowable trips are not exceeded.  The total driveway trips of the development shall not be allowed to exceed 3043 inbound and 3381 outbound p.m. peak-hour trips, for a total of 6424 p.m. peak-hour trips.  The total pass by trips the development shall not be allowed to exceed is 1,472 p.m. peak-hour trips (sum of both directions).   The monitoring program shall be in accordance with the following:

21

(a)     The monitoring program shall obtain traffic field counts at appropriate locations to accurately measure the total and directional gross external trips, net external trips, diverted trips, and passerby trips.  The counts shall be collected in accordance with acceptable engineering standards as approved by Pasco County.

(b)     The counts shall consist of weekday p.m. peak directional counts from 4:00 p.m. to 6:00 p.m., with subtotals at fifteen (15) minute increments at all project entrances. The sum of the project entrance trips will be totaled in fifteen (15) minute increments and the highest four (4) consecutive fifteen (15) minutes totals will be summed to determine the project's total p.m. peak-hour traffic volume.

(c)     The total count shall include net external trips, diverted trips, and pass-by trips for this development.

(d)     If the monitoring reports indicate that the allowable trips are exceeded by more than five (5) percent or if the annual reports are not submitted within thirty (30) days of its due date Pasco County shall conduct a substantial deviation determination pursuant to Subsection 380.06(19), F.S., and amend the DO to change or require additional improvements.   Any required transportation analysis shall be subject to review by all appropriate review entities.

(7)     Transportation System Management (TSM) Program

In the first year following the issuance of a Certificate of Occupancy for the first office development in the project, the Developer or its successor shall initiate a TSM program to divert vehicle trips from the p.m. peak-hour.  The TSM program shall include an annual assessment of the actual achievement of trips diverted from the p.m. peak-hour as a result of the program.  Results of the TSM program shall be included in each Biennial Report.

o.     Air Quality

(1)     BMP, as identified in the ADA, shall be employed during site preparation and construction to minimize air quality impacts.

(2)     Prior to preliminary plan approval in Phase 2 of the project, the Applicant/Developer or its successor shall submit an air-quality analysis regarding applicable Phase 2 transportation improvements consistent with the statutes and rules in effect at that time.  If any unmitigated, adverse, air-quality impacts are identified as being caused by traffic generated by the project, this DO shall be amended to incorporate conditions for curing or mitigating such impacts.

(3)     In the event that the required transportation analysis identifies additional intersection improvements needed to accommodate the impacts of the Cypress Creek Town Center project, DRI-level analysis for potential air-quality impacts shall also be conducted and the results provided to the TRBPC, the FDEP, and Pasco County for review.  Any improvements determined necessary to mitigate air quality impacts shall be required in a DO amendment.

22

p.      Educational Facilities

The Applicant/Developer agrees to pay school impact fees as full mitigation for the impacts of the residential component of the Cypress Creek Town Center on the Pasco County school system in accordance with the terms of the School Impact Fee Ordinance, No. 01-06, adopted February 27, 2001, as amended.

q.      Recreation and Open Space

The Applicant/Developer shall comply with the Pasco County Neighborhood Parks Ordinance, No. 02-03, adopted January 29, 2002, as amended.

r.      Health Care/Police/Fire

(1)     Pasco County shall provide fire and emergency medical services (EMS) service to the development. The Pasco County Sheriff's Office shall provide law enforcement services to the development. The Applicant/Developer shall be required to pay impact fees for all such services.

(2)     The Applicant/Developer shall review the concepts of "fire safe communities" as provided by the Division of Forestry, FDACS, and implement all appropriate measures.

(3)     The Applicant/Developer shall coordinate with the Pasco County Sheriff's Office prior to construction to incorporate reasonable security features throughout the project.

(4)     The Applicant/Developer shall provide the Pasco County Sheriff's Office 600 square feet of finished shell space in the main regional retail complex for use as a Sheriff's Substation to facilitate law enforcement activities. Said space shall be accessible directly from the exterior of the building that said space will be located within. In addition, a tourist center may be an ancillary use within the Sheriff's substation. The space shall be provided at no cost to the Sheriff's Office.

(5)     The Applicant/Developer shall make available for a period of five years from the effective date of this DO, a site, for a Pasco County Sheriff's Office district facility. The said site and availability shall meet the following requirements:

a.      Be a minimum of 3,000 square feet in size.

b.      Be in configuration and location mutually acceptable by the Applicant/Developers and the Pasco County Sheriff's Office and visible to traveling public.

c.      Be provided as a price equal to the price per acre, adjusted pursuant to the minimum site size listed above, and used to establish the Pasco County Law Enforcement Impact Fee.

d.      Parking spaces pursuant to the County's Land Development Code shall be provided for the Sheriff's facility by the applicants/developers adjacent to the site at no cost to the County or Sheriff's Office.

e.      Drainage from the site and adjacent parking spaces shall be incorporated into the applicant's/developer's stormwater management plan at no cost to the County or Sheriff's Office.

If the County has adopted a Law Enforcement Impact Fee at the time the site is

conveyed, the County may, at the County's option and in lieu of a cash payment, provide credit against the land portion of the Law Enforcement Impact Fee in an amount not to exceed the price stated above. The County or Sheriff's Office shall have one year from the effective date of the Cypress Creek Town Center DO to select a site. If the Applicants/Developers do not agree with the site selected by the County, no additional site plans shall be approved by the County until the County and applicants/developers have agreed upon a mutually acceptable site.

Conveyance of the site to the County shall occur within 90 days of the County's request, shall be in a form acceptable to the County, and shall be free and clear of all liens.

s.    Housing

The Applicant/Developer has completed an Affordable Housing Assessment for the nonresidential component of the Cypress Creek Town Center in accordance with the agreements reached at the DRI Preapplication Conference for the development conducted on January 28, 2002, and determined that the existing housing supply is adequate to meet the anticipated demand for very low-, low-, and moderate-income housing units for development of all planned retail commercial, hotel, and office uses.

t.    Hurricane Preparedness

The Applicant/Developer shall coordinate with the Pasco County Office of Emergency Management regarding incorporation of hurricane and wind resistant technology into the design criteria of all development.

u.    General Conditions

(1)    Should the Applicant/Developer divest himself of all interest in the project prior to the expiration of this DO, the Applicant/Developer shall designate the successor entity to be responsible for preparation of the Biennial Report.

(2)    In the event ordinances or resolutions are adopted by the Board of County Commissioners establishing County impact fees for the purpose of funding solid waste, public safety, and/or wildlife mitigation, the Applicant/Developer shall be required to pay the fees, subject to applicable credits, in accordance with the terms of the ordinance(s) or resolution(s).

(3)    Payment for any future activities of the TBRPC with regard to this development including, but not limited to, monitoring or enforcement actions, shall be paid to the TBRPC by the Applicant/Developer in accordance with Rule 9J-2.0252, FAC.

6.  Procedures

a.    Biennial Reports

(1)    Monitoring of the Cypress Creek Town Center DRI by Pasco County shall be the responsibility of the County Administrator or his designee.

(2)    The Applicant/Developer shall provide a Biennial Report on the required form to the Pasco County Growth Management Department, the TBRPC, and the FDCA on April 26, 2005 and

every two (2) years during the term of this DO.   The contents of the Biennial Report shall meet the requirements of Section 380.06(18), F.S., and shall include all additional data and information as required in this DO.

(3)      If the Biennial Report is not submitted within sixty (60) days after the due date, Pasco County shall notify the Applicant/Developer and shall declare the project not to be in compliance with this DO.  Should the report not be submitted within thirty (30) days after such notification, all ongoing development activity, the further issuance of Building Permits, and the extension of services to the project shall cease immediately pursuant to Section 380.06(17), F.S., as amended, until a public hearing has been held, pursuant to Section 380.06(19), F.S., as amended, to determine if a substantial deviation has occurred.

(4)      In addition to the required elements of the Biennial Report, the Applicant/ Developer shall include:

(a)      The cumulative number of units developed through the land use tradeoff mechanism.

(b)      The cumulative number of units (by type and square feet of retail and office/by number of rooms for hotels) with site plan approval (preliminary plan/construction plan/site plan), final plat approval, and Certificates of Occupancy.

(c)      A synopsis of all DRI and zoning amendments.

(d)      A synopsis of ownership (major parcels).

(e)      A list of DRI/DO conditions of approval and whether the Applicant/Developer has met the conditions.

b.   Amendments/Substantial Deviations

Future proposed changes to this DO are subject to review pursuant to the provisions of Section 380.06(19), F.S., as amended, prior to implementation of such changes.  Application to amend any provision of this DO shall be made on the required form (NOPC to a Previously Approved DRI), and shall be provided by the Applicant/Developer to the TBRPC, the FDCA, and Pasco County.

c.   Notice of Adoption

(1)      A Notice of Adoption of this resolution shall be filed and recorded in the Public Records of Pasco County, Florida, in accordance with Section 380.06(15)(f), F.S., as amended.

(2)      The Clerk of the Circuit Court, Secretarial Services, for the Board of County Commissioners shall return six (6) signed and certified copies of this DO and Notice of Adoption to the Pasco County Attorney's Office.  The Pasco County Attorney's Office shall then send copies of each document to the FDCA, the TBRPC, and to the attorneys-of-record of these proceedings.

d.   If any section, subsection, sentence, clause, or provision of this resolution is held invalid, the remainder of the resolution shall be construed as not having contained the section, subsection, clause, or other provision, and shall not be affected by such holding.

**DONE AND RESOLVED** this 15th day of December, 2009.

(SEAL)

ATTEST:

PASCO COUNTY, FLORIDA
1887

BOARD OF COUNTY COMMISSIONERS OF
PASCO COUNTY, FLORIDA

_____
PAULA S. O'NEIL, CLERK & COMPTROLLER

_____
CHAIRMAN

**APPROVED**

DEC 1 5 2009

**BOCC**

26

**EXHIBITS**

A     ADA*; Sufficiency Responses* and NOPC Application*

B     TBRPC DRI Final Report* & NOPC Report

C     Legal Description

D     Developer's Commitments

E     Land Use Equivalency Matrix

F     Revised Map H - Master Plan

G     Transportation Impact Summary & Proportionate Share Calculation

H     Development Agreement*

I     Cypress Creek Outstanding Florida Waters Boundary Map

J     Wetlands Boundary Map

* Incorporated by reference only—on file with the Pasco County Growth Management Department

**EXHIBIT B**

NOPC REPORT



Consent Agenda 9/14/09
Agenda Item #3.E.

# NOPC

**Notice of Proposed Change Report**

4000 Gateway Centre Boulevard, Suite 100, Pinellas Park, FL 33782
Phone (727) 570-5151   /   FAX (727) 570-5118
www.tbrpc.org

## DRI #252 - CYPRESS CREEK TOWN CENTER
## PASCO COUNTY

On May 1, 2009 (dated April 30, 2009), the Applicant submitted a Notice of Proposed Change application requesting modifications to the Development Order. Supplemental information was received on July 31, 2009 (dated July 30, 2009). The following provides a summary of project entitlements and history, a description of the proposal, and the Council recommendation.

## PROJECT DESCRIPTION

On December 10, 2004, Pasco County granted a Development Order (Resolution No. 05-40) to Pasco 54, Ltd., Pasco Ranch, Inc., and Pasco Properties of Tampa Bay, Inc. for a 510-acre mixed-use development in southern Pasco County, generally along S.R. 56 at the intersection of the realigned S.R. 54, adjacent to and west of I-75 and north of the Hillsborough County line. S.R. 56 traverses and nearly bisects the project. A Land Use Equivalency Matrix has been adopted as part of the Development Order which would recognize conversion(s) between office and commercial uses but not residential. While development must commence on or before January 23, 2008, the Development Order expires on December 31, 2019.

The Development Order has been amended only once (Resolution No. 08-217), on May 13, 2008, to combine approved land uses in the northern portion of the development on the Master Development Plan.

The following constitutes the approved phasing schedule:

| LAND USE | | PHASE 1 (2005-2011) | PHASE 2* (TBD) | TOTAL |
|---|---|---|---|---|
| **Commercial** | **(Sq. Ft.)** | **1,880,925** | **215,000** | **2,095,925** |
| | Regional Mall | 1,184,925 | 215,000 | 1,399,925 |
| | Retail Center | 600,000 | 0 | 600,000 |
| | Highway Commercial | 96,000 | 0 | 96,000 |
| **Office** | **(Sq. Ft.)** | **120,000** | **300,000** | **420,000** |
| **Residential/Multi-Family** | **(Units)** | **230** | **400** | **630** |
| **Hotel** | **(Rooms)** | **350** | **350** | **700** |
| **Movie Theatre** | **(Seats)** | **2,582** | **0** | **2,582** |

\* - Specific approval of Phase 2 is contingent upon further transportation and air quality analyses.

## PROPOSED CHANGES UNDER THIS NOPC

The Applicant has requested the following modifications of the Development Order:

- extend the Phase 1 buildout and Development Order expiration date each by a period of ten years, to December 31, 2021 and December 31, 2029, respectively;
- update project entitlements (Table 1) to recognize a prior land use conversion approved by the Pasco County BOCC on May 13, 2008 (i.e. conversion of 115,075 sq. ft. of Regional Mall for 2,582 Movie-Theatre seats). Such conversion was consistent with the existing Land Use Equivalency Matrix;
- modify Development Order Condition 5.n.(4) to specify the Developer's specific Phase 1 transportation mitigation requirements;
- replace "Pasco Properties of Tampa Bay, Inc." with "JG Cypress Creek LLC" as one of the Master Developers of Record; and
- corresponding Master Development Plan and Development Order condition modifications.

## CONSISTENCY WITH SUBSECTION 380.06(19), FLORIDA STATUTES

Subsections 380.06(19)(c) & 380.06(19)(e)2.a., F.S. identifies the provision applicable to this proposal.  This citations reads as follows:

> *"An extension of the date of buildout of a development, or any phase thereof, by more than 7 years shall be presumed to create a substantial deviation subject to further development-of-regional-impact review.  An extension of the date of buildout, or any phase thereof, of more than 5 years but not more than 7 years shall be presumed not to create a substantial deviation... These presumptions may be rebutted by clear and convincing evidence at the public hearing held by the local government. <u>An extension of 5 years or less is not a substantial deviation</u>.  For the purpose of calculating when a buildout or phase date has been exceeded, the time shall be tolled during the pendency of administrative or judicial proceedings relating to development permits.  Any extension of the buildout date of a project or a phase thereof shall automatically extend the commencement date of the project, the termination date of the development order, the expiration date of the development of regional impact, and the phases thereof if applicable by a like period of time. <u>In recognition of the of the 2007 real estate market conditions, all phase, buildout, and expiration dates for projects that are developments of regional impact and under active construction on July 1, 2007, are extended for 3 years regardless of any prior extension</u>.  The 3-year extension is not a substantial deviation, is not subject to further development-of-regional-impact review, and may not be considered when determining whether a subsequent extension is a substantial deviation under this subsection."* [underline has been added to express intended provisions of current application].

> *"changes in the name of the project, developer, owner, or monitoring official"* [is not a Substantial Deviation]

**DISCUSSION**

The following statements serve as representations made by, or on behalf of, the applicant or are statements or recommendations made by Tampa Bay Regional Planning Council staff. These references/recommendations were relied upon by the Tampa Bay Regional Planning Council to determine that no further information would be required in conjunction with the current proposal:

1.    The Applicant has requested a cumulative ten-year extension of the Project buildout and Development Order expiration dates. The basis for this extension request is five-years in conjunction with Subsection 380.06(19)(c), F.S. **plus** three-years in conjunction with a 2007 revision to Subsection 380.06(19)(c), F.S. due to "real estate market conditions" **plus** two additional years associated with the recent passage of SB 360 (i.e. 5 + 3 + 2 = 10).

2.    The Applicant has requested that Condition 4.d.(2) be modified to reflect that no further transportation analyses shall be required prior to 2021, which is consistent with #1 above. However, as acknowledged by the Applicant, Phase 2 will retain its conceptual approval status, subject to further transportation and air quality analyses and incorporation of corresponding mitigation into the Development Order, as may be applicable. (July 30, 2009 Correspondence/Page SR1-5/Response to TBRPC #1)

3.    *The Applicant is formally removing one of the Master Developers of Record (Pasco Properties of Tampa Bay, Inc.) and formally requesting the addition of one Master Developer of Record (JG Cypress Creek LLC). All three Master Developers of Record (Pasco 54, Ltd., Pasco Ranch, Inc. and JG Cypress Creek LLC) will be responsible for the submittal of future of all future Biennial Reports.* (July 30, 2009 Correspondence/Page SR1-5/Response to TBRPC #3). The following constitutes the revised contact information associated with these entities:

| | |
|---|---|
| Pasco 54, Ltd. and Pasco Ranch, Inc. 509 Guisando de Avila, Suite 200 Tampa, FL 33613 | JG Cypress Creek, LLC c/o The Richard E. Jacobs Group LLC 25425 Center Ridge Road Cleveland, OH 44145-4122 |

4.    The Applicant has modified Condition 6.a.(2) to specify that Biennial Reports are due on April 26th of each odd-numbered year. (July 30, 2009 Correspondence/Page SR1-6/Response to TBRPC #6)

5.    The phasing schedule associated with the Master Development Plan shall be updated to recognize the Phase 1 buildout date extension.

**RECOMMENDED ACTION**

Indicate to Pasco County and the Florida Department of Community Affairs that the proposal is presumed not to create a Substantial Deviation, as defined above.



DRI #252
Cypress Creek Town Center
General Location Map

0   0.2   0.4   0.8   1.2 Miles

**EXHIBIT C**

LEGAL DESCRIPTION

PARCEL I-A (Parcel I.D. Number: 27-26-19-0010-00000-0010)

DESCRIPTION: A parcel of land lying in Section 27, Township 26 South, Range 19 East, Pasco County, Florida, being a portion of WORTHINGTON GARDENS, according to the map or plat thereof as recorded in Plat Book 2, Page 57, Public Records of Pasco County, Florida and being more particularly described as follows:

From the Northeast corner of Section 27, Township 26 South, Range 19 East, Pasco County, Florida and run thence S.89°49'19"W., 25.00 feet along the North boundary of said Section 27; thence S.00°39'53"W., 25.00 feet to the Northeast corner of Tract 1 of said WORTHINGTON GARDENS; thence S.89°49'19"W., 2492.57 feet along the North boundary of said Tract 1 and the Northerly boundary of Tract 17 of said WORTHINGTON GARDENS (being a line 25.00 feet South of and parallel with the North boundary of said Section 27) to the POINT OF BEGINNING; thence SOUTH, 1975.00 feet; thence EAST, 807.92 feet to a point on a curve on the Northerly right-of-way line of State Road No. 56; thence along said Northerly right-of-way line the following eleven (11) courses: 1) Southwesterly, 554.25 feet along the arc of a curve to the left having a radius of 2676.48 feet and a central angle of 11°51'54" (chord bearing S.61°49'20"W., 553.26 feet); 2) S.52°02'21"W., 105.12 feet to a non-tangent curve; 3) Southwesterly, 141.23 feet along the arc of a curve to the left having a radius of 2671.48 feet and a central angle of 03°01'46" (chord bearing S.52°07'30"W., 141.25 feet) to a point of tangency; 4) S.50°36'37"W., 365.55 feet; 5) S.59°08'27"W., 101.12 feet; 6) S.50°36'37"W., 800.00 feet; 7) S.73°03'50"W., 106.45 feet; 8) N.31°23'23"W., 334.17 feet to a point of curvature; 9) Northwesterly, 828.05 feet along the arc of a curve to the right having a radius of 2739.79 feet and a central angle of 17°19'00" (chord bearing N.22°43'53"W., 824.90 feet); 10) N.27°39'28"W., 99.27 feet to a non-tangent curve; 11) Northwesterly, 112.30 feet along the arc of a curve to the right having a radius of 2674.79 feet and a central angle of 02°40'20" (chord bearing N.10°54'35"W., 112.29 feet) to a point on the West boundary of said WORTHINGTON GARDENS; thence along said Westerly boundary N.00°42'08"E., 638.52 feet; thence S.89°54'27"W., 92.49 feet to the Easterly right-of-way line of State Road No. 54, as shown on State of Florida, State Road Department Right-of-Way Map, Section 14090-2151; thence N.05°21'08"E., 25.11 feet along said Easterly right-of-way line; thence N.89°56'46"E., 20.87 feet to a point on a curve; thence Northeasterly, 65.82 feet along the arc of a curve to the right having a radius of 2794.79 feet and a central angle of 01°20'58" (chord bearing N.04°31'23"E., 65.82 feet); thence N.05°24'08"E., 201.95 feet; thence S.89°56'39"W., 20.09 feet to the Easterly right-of-way line of said State Road No. 54; thence N.05°21'08"E., 626.82 feet along said Easterly right-of-way line to a point of curvature; thence continue along said Easterly right-of-way line, Northerly, 414.20 feet along the arc of a curve to the right having a radius of 2814.79 feet and a central angle of 08°25'52" (chord bearing N.09°34'04"E., 413.82 feet) to a point on the North boundary of Lot 1, Block 1 of said WORTHINGTON GARDENS, also being a point on a line lying 25.00 feet South and parallel with the North boundary of said Section 27; thence N.89°51'18"E., 1293.87 feet along a line being 25.00 feet South of and parallel with the North boundary of said Section 27; thence N.89°49'19"E., along a line 25.00 feet South of and parallel with the North boundary of said Section 27, 159.99 feet to the POINT OF BEGINNING.

PARCEL I-B (Parcel I.D. Number: 27-26-19-0010-00000-0015)

DESCRIPTION: A parcel of land lying in Section 27, Township 26 South, Range 19 East, Pasco County, Florida, being a portion of WORTHINGTON GARDENS, according to the map or plat thereof as recorded in Plat Book 2, Page 57, Public Records of Pasco County, Florida and being more particularly described as follows:

From the Southwest corner of said WORTHINGTON GARDENS, run thence along the Westerly boundary of said WORTHINGTON GARDENS N.00°42'08"E., 1526.25 feet to the POINT OF BEGINNING; thence continue along said Westerly boundary N.00°42'08"E., 1002.17 feet to a point on the Northerly right-of-way line of State Road No. 56; thence along said Northerly right-of-way line the following six (6) courses: 1) S.86°21'22"E., 17.10 feet to a point on a curve; 2) Southeasterly, 351.74 feet along the arc of a curve to the left having a radius of 2989.79 feet and a central angle of 06°44'26" (chord bearing S.28°01'10"E., 351.73 feet) to a point of tangency; 3) S.31°23'23"E., 334.17 feet; 4) S.08°31'41"E., 105.37 feet; 5) S.50°36'37"W., 400.00 feet; 6) S.57°44'08"W., 88.73 feet to the POINT OF BEGINNING.

PARCEL I-C (Parcel I.D. Number: 27-26-19-0010-00000-0016)

DESCRIPTION: A parcel of land lying in Section 27, Township 26 South, Range 19 East, Pasco County, Florida, being a portion of WORTHINGTON GARDENS, according to the map or plat thereof as recorded in Plat Book 2, Page 57, Public Records of Pasco County, Florida and being more particularly described as follows:

BEGINNING at the Southwest corner of said WORTHINGTON GARDENS, run thence along the Westerly boundary of said WORTHINGTON GARDENS N.00°42'08"E., 391.58 feet to a point on the Southerly right-of-way line of State Road No. 56; thence along said Southerly right-of-way line the following ten (10) courses: 1) N.27°32'36"E., 189.43 feet; 2) N.43°21'42"E., 98.99 feet; 3) N.38°32'45"E., 105.45 feet; 4) N.38°59'06"E., 198.80 feet; 5) N.42°03'23"E., 190.95 feet; 6) N.41°18'02"W., 390.05 feet; 7) N.50°36'37"E., 872.85 feet; 8) N.44°50'16"E., 248.56 feet; 9) N.50°36'37"E., 1018.16 feet to a point of curvature; 10) Northeasterly, 822.87 feet along the arc of a curve to the right having a radius of 2406.48 feet and a central angle of 19°35'30 (chord bearing N.60°24'22"E., 818.86 feet); thence SOUTH, 293.03 feet; thence WEST 200.00 feet; thence S.53°26'52"W., 1705.71 feet; thence S.29°23'55"W., 2037.46 feet to the POINT OF BEGINNING.

PARCEL II-A (Parcel I.D. Number: 27-26-19-0010-00000-0012)

DESCRIPTION: A parcel of land lying in Section 27, Township 26 South, Range 19 East, Pasco County, Florida, being a portion of WORTHINGTON GARDENS, according to the map or plat thereof as recorded in Plat Book 2, Page 57, Public Records of Pasco County, Florida and being more particularly described as follows:

From the Northeast corner of Section 27, Township 26 South, Range 19 East, Pasco County, Florida and run thence S.89°49'19"W., 25.00 feet along the North boundary of said Section 27; thence S.00°39'53"W., 25.00 feet to the Northeast corner of Tract 1 of said WORTHINGTON GARDENS for a POINT OF BEGINNING; thence S.00°39'53"W., along a line 25.00 feet West of and parallel with the East boundary of said Section 27, 1790.13 feet to a point on point on the Northerly right-of-way line of State Road No. 56; thence along said Northerly right-of-way line the following three (3) courses: 1) N.82°53'14"W., 151.44 feet; 2) S.88°37'28"W., 513.03 feet to a non-tangent curve; 3) Southwesterly 1026.63 feet along the arc of a curve to the left having a radius of 2676.48 feet and a central angle of 21°58'38 (chord bearing S.78°44'36"W., 1020.34 feet); thence WEST, 807.92 feet; thence NORTH, 1975.00 feet to a point on the North boundary of Tract 17 of said WORTHINGTON GARDENS, also being a line lying 25.00 feet South and parallel with the North boundary of said Section 27; thence N.89°49'19"E., along a line 25.00 feet South of and parallel with the North boundary of said Section 27, 2492.57 feet to the POINT OF BEGINNING.

PARCEL II-B (Parcel I.D. Number: 27-26-19-0010-00000-0014)

DESCRIPTION: A parcel of land lying in Section 27, Township 26 South, Range 19 East, Pasco County, Florida, being a portion of WORTHINGTON GARDENS, according to the map or plat thereof as recorded in Plat Book 2, Page 57, Public Records of Pasco County, Florida and being more particularly described as follows:

From the Northeast corner of Section 27, Township 26 South, Range 19 East, Pasco County, Florida and run thence S.89°49'19"W., 25.00 feet along the North boundary of said Section 27; thence S.00°39'53"W., 25.00 feet to the Northeast corner of Tract 1 of said WORTHINGTON GARDENS; thence S.00°39'53"W., along a line 25.00 feet West of and parallel with the East boundary of said Section 27, 2129.76 feet to the POINT OF BEGINNING; thence continue S.00°39'53"W., along a line 25.00 feet West of and parallel with the East boundary of said Section 27, 0.53 feet to a point on a line 25.00 feet South of and parallel with the Westerly projection of the South boundary of Borrow Pit No. 4 as shown on State of Florida, State Road Department Right-of-Way Map, Section 14140-2401; thence S.89°20'20"E., along said parallel line, 1.59 feet to a point on a curve on the Southerly right-of-way line of State Road No. 56; thence Southeasterly, along said Southerly right-of-way line, 25.06 feet along the arc of a curve to the right having a radius of 336.00 feet and a central angle of 04°16'22 (chord bearing S.68°28'45"E., 25.05 feet) to the East boundary of said Section 27; thence S.00°39'53"W., 849.51 feet along the East boundary of said Section 27; thence WEST, 1476.81 feet; thence NORTH, 793.02 feet to a point on a curve on the Southerly right-of-way line of State Road No. 56; thence along said Southerly right-of-way line the following seven (7) courses: 1) Northeasterly, 184.38 feet along the arc of a curve to the right having a radius of 2406.48 feet and a central angle of 04°23'24 (chord bearing N.72°23'49"E., 184.35 feet); 2) N.71°08'14"E., 160.68 feet to a non-tangent curve; 3) Northeasterly, 479.35 feet along the arc of a curve to the right having a radius of 2421.48 feet and a central angle of 11°20'32 (chord bearing N.84°03'39"E., 478.57 feet) to a point of compound curvature; 4) Southeasterly, 189.49 feet along the arc of a curve to the right having a radius of 3694.72 feet and a central angle of 02°56'18 (chord bearing S.88°47'56"E., 189.47 feet); 5) S.77°44'52"E., 97.69 feet; 6) S.80°39'05"E., 321.02 feet to a non-tangent curve; 7) Southeasterly, 58.18 feet along the arc of a curve to the right having a radius of 360.00 feet and a central angle of 09°15'36 (chord bearing S.75°51'47"E., 58.12 feet) to the POINT OF BEGINNING.

PARCEL III (Parcel I.D. Numbers:  27-26-19-0010-00000-0013; 34-26-19-0000-00100-0040; and 34-26-19-0000-00700-0000)

DESCRIPTION: A parcel of land lying in Section 27, Township 26 South, Range 19 East, Pasco County, Florida, being a portion of WORTHINGTON GARDENS, according to the map or plat thereof as recorded in Plat Book 2, Page 57, Public Records of Pasco County, Florida AND that part of the East 3/4 of the North 1/4 of Section 34, Township 26 South, Range 19 East, Pasco County, Florida lying North of the Northerly line of Cypress Creek and West of the Westerly boundary of I-75 (State Road 93) and all being more particularly

10/6/2004
ver 2.11

described as follows:

From the Northeast corner of Section 27, Township 26 South, Range 19 East, Pasco County, Florida and run thence S.89°49'19"W., 25.00 feet along the North boundary of said Section 27; thence S.00°39'53"W., 25.00 feet to the Northeast corner of Tract 1 of said WORTHINGTON GARDENS; thence continue S.00°39'53"W., along a line 25.00 feet West of and parallel with the East boundary of said Section 27, 2130.29 feet to a point on a line 25.00 feet South of and parallel with the Westerly projection of the South boundary of Borrow Pit No. 4 as shown on State of Florida, State Road Department Right-of-Way Map, Section 14140-2401; thence S.89°20'20"E., along said parallel line, 25.00 feet to the East boundary of said Section 27; thence S.00°39'53"W., 858.43 feet along the East boundary of said Section 27 to the POINT OF BEGINNING; thence continue S.00°39'53"W., 677.54 feet along said East boundary of Section 27 to a point on a curve; thence Southwesterly, 251.15 feet along the arc of a curve to the right having a radius of 3725.72 feet and a central angle of 03°51'45" (chord bearing S.18°53'17"W., 251.11 feet); thence S.23°33'05"W., 125.92 feet; thence S.20°49'13"W., 1365.40 feet to a point on the South boundary of said Section 27; thence continue S.20°49'13"W., 84.60 feet; thence S.69°10'47"E., 30.00 feet to the Westerly right-of-way line of State Road No. 93 (I-75) as shown on said State of Florida, State Road Department Right-of-Way Map, Section 1414-2401; thence S.20°49'13"W., along said Westerly right-of-way line, 1102.29 feet to the Northerly line of Cypress Creek, lying in the aforesaid Section 34; thence Westerly, along said Northerly line of Cypress Creek as approximated by the following forty one (41) courses: 1) N.89°59'03"W., 28.54; 2) N.89°59'03"W., 315.23 feet; 3) N.82°54'43"W., 155.80 feet; 4) N.52°51'11"W., 52.19 feet; 5) N.44°45'09"W., 322.68 feet; 6) N.70°08'29"W., 89.40 feet; 7) S.07°32'10"W., 59.07 feet; 8) N.75°39'53"W., 118.25 feet; 9) S.28°40'02"W., 201.86 feet; 10) N.71°55'17"E., 78.72 feet; 11) S.07°28'14"W., 98.14 feet; 12) S.64°18'48"W., 199.03 feet; 13) S.11°20'23"W., 155.44 feet; 14) N.75°19'30"W., 114.61 feet; 15) N.82°11'08"W., 186.67 feet; 16) S.75°12'55"W., 318.21 feet; 17) N.86°01'02"W., 218.94 feet; 18) N.71°10'02"W., 108.14 feet; 19) N.00°42'23"W., 165.90 feet; 20) N.37°20'40"W., 87.65 feet; 21) N.58°04'11"W., 72.19 feet; 22) N.13°54'31"W., 96.13 feet; 23) N.34°39'50"W., 136.86 feet; 24) N.06°54'43"W., 191.11 feet; 25) N.44°49'24"W., 150.09 feet; 26) N.27°16'08"W., 64.72 feet; 27) N.73°08'56"W., 41.33 feet; 28) N.30°34'34"W., 34.82 feet; 29) N.05°16'42"W., 40.53 feet; 30) N.35°21'28"W., 38.88 feet; 31) N.33°51'04"W., 45.51 feet; 32) N.65°33'39"W., 61.97 feet; 33) S.89°50'29"W., 32.11 feet; 34) N.23°31'51"W., 66.07 feet; 35) N.32°56'07"W., 47.22 feet; 36) N.58°13'35"W., 106.64 feet; 37) N.69°00'54"W., 39.14 feet; 38) S.85°23'20"W., 77.24 feet; 39) S.17°54'15"W., 35.19 feet; 40) S.61°29'18"W., 33.94 feet; 41) N.56°51'46"W., 22.29 feet to the West boundary of the East 3/4 of said Section 34; thence leaving said Northerly line of Cypress Creek, N.00°51'14"E., 182.80 feet along the West boundary of said East 3/4 of Section 34 to the Southwest corner of said WORTHINGTON GARDENS; thence N.29°23'55"E., 2037.44 feet; thence N.53°26'52"E., 1705.71 feet; thence EAST, 200.00 feet; thence SOUTH, 500.00 feet; thence EAST, 1476.81 feet to the POINT OF BEGINNING.

**EXHIBIT D**

**DEVELOPER'S COMMITMENTS**

**DRI NO. 252 - CYPRESS CREEK TOWN CENTER**

**PASCO COUNTY**

The following commitments have been made by, or on behalf of, the Applicant/Developer in the ADA, the First Sufficiency Response (SR1), the Second Sufficiency Response (SR2), the Third Sufficiency Response (SR3), or the Fourth Sufficiency Response (SR4):

General

1. A new roadway through the south parcel may be created as an extension of C.R. 54 south from its intersection with S.R. 56 (ADA/Page 10.4).

2. The office uses located on the north side of S.R. 56 will be designed in a campus setting nestled between two (2) large wetland areas and accessed via the internal roadway loop (ADA/Page 10.4).

3. Wetlands bordering Cypress Creek on the south of the project will remain largely in their natural state, providing for natural site drainage and overall project aesthetics (ADA/Page 10.11).

4. The multifamily residential land uses within Cypress Creek Town Center will contain both active and passive, private, recreation facilities for use by their residents. It could be expected that swimming, tennis, hiking/nature trails, and similar facilities would be provided (ADA/Page 10.11).

5. Much of the on-site wetland system associated with Cypress Creek, including mixed wetland forest, cypress strands, swamps, and marshes of the Cypress Creek Town Center, will be protected and maintained, thus preserving the functioning of these natural systems (ADA/Page 10.13).

6. The project's stormwater management system will be integrated into the natural wetlands ensuring that surface and groundwater quality during and after development will meet or exceed all State and local water-quality standards (ADA/Page 10.14).

7. The project will utilize approved methodologies for prevention of fugitive dust particles during construction (ADA/Page 10.14).

8. Cypress Creek Town Center will provide access for its residents through the creation of recreational easements developed in conjunction with on-site ponds and wetland areas to maintain accessibility to natural resources (ADA/Page 10.14).

9. Cypress Creek Town Center will comply with their requirements for installation of water-saving fixtures and adherence to water-conserving maintenance practices (ADA/Page 10.14).

10. Access to natural systems on site will be provided for residents of the project through methods, such as boardwalks and/or nature trails (ADA/Page 10.15).

11. Preserved on-site wetlands will be retained in their natural state or enhanced in an effort to address impacts related to prior access and poor quality attributable to recent agricultural and silviculture operations (ADA/Page 10.15).

12. Where impacts are anticipated, permitting and mitigation standards will ensure that postdevelopment, natural and recreated resources are at least equal to and most likely higher quality and of a greater quantity than those existing in predevelopment condition (ADA/Page 10.17).

13. The project will utilize public wastewater collection and treatment services as well as reuse water supply, if available (SR1/Page 10.4).

14. Wetland mitigation is proposed to occur within the Hillsborough River Basin containing the proposed project (SR1/Page 10.6).

Vegetation and Wildlife

15. In the case of gopher tortoises, the Applicant/Developer intends to provide mitigation for take of tortoises through donation to the FFWCC mitigation bank (ADA/Page 12.13).

16.   Loss of existing on-site wetland habitat will be mitigated through enhancement, restoration, and creation of wetlands in the Hillsborough River Basin.  Regionally, no loss of breeding or foraging habitat for cranes is anticipated (ADA/Page 12.13).

17.   The mitigation program will replace wetland functions lost on site with a greater quality and function of restored wetlands on and off site (SR1/Page 12.4).

18.   The Applicant/Developer is preserving the entirety of Cypress Creek OFW lands located on the site.  The proposed roadway crossing over Cypress Creek will be designed to minimize impacts to the environmentally sensitive areas (SR1/Pages 10.10 and 12.5).

19.   The Applicant/Developer will commit to the roadway crossing having an adequate underpass to accommodate wildlife and that the remainder of the Cypress Creek OFW be set aside as preservation area (SR1/Pages 10.11 and 12.6).

20.   Prior to development, appropriate permits will be obtained from the FFWCC to handle incidental "take" of listed species, including the gopher tortoise and its commensals (SR1/Page 12.6).

21.   If cranes are nesting in a wetland, construction in or adjacent to that wetland will be avoided until the cranes have completed nesting (SR1/Page 12.7).

22.   Any roadway crossing over Cypress Creek will allow wildlife movement under the roadway (SR1/Page 12.8).

23.   Wetland impacts due to surface-water management will be mitigated within the overall off-site mitigation solution being developed (SR2/Page 12.3).

24.   Oversized littoral zones will be constructed at the outfalls of each [pond] system (SR3/Page 12.1).

25.   The bottom of wet pond, littoral zones will be covered with partially degraded, vegetative matter and peaty materials that possess natural ion-exchange abilities (SR2/Page 12.2).

26.   It is anticipated that the surface-water monitoring plan will require sampling during and following construction to ensure that water quality on and exiting the site remains the same or is improved by the proposed surface-water management system (SR2/Page 12.3).

27.   Through an approved wetland mitigation plan, the Applicant/Developer will provide at least as much foraging habitat, through an as yet undetermined combination of wetland enhancement, restoration, and creation as is lost onsite.  (SR2/Page 12.5)

28.   The overall mitigation package to be provided will provide more than 1:1 replacement of wetland losses and will provide protection and potential restoration of additional wetland and upland acreage in the basin (SR3/Page 12.5).

Wetlands

29.   The Applicant/Developer will use BMP, such as silt fencing and hay bales to protect wetlands during construction (ADA/Page 13.3).

30.   Several techniques will be used to maintain/restore the preserved wetlands in a natural state (SR1/Pages 13.2 and 13.3):

      a.    During construction, wetlands will be protected from erosion and siltation by placement of silt fences, hay bales, or other appropriate measures.

      b.    An average twenty-five (25) foot buffer will be maintained between wetlands and developed areas.

      c.    Pretreatment areas such, as grease baffles, swales, or other measures to reduce entry of oils, trash, etc., into the wetlands will protect wetlands incorporated into the surface-water management system.

      d.    Key elevations (seasonal-high water and normal pool) will be established for any wetland to be incorporated into the surface-water management system.

31.   All water-control structures will be designed to maintain natural hydroperiods and water levels in the natural wetlands.  During the engineering design phases of the project, appropriate analyses will be conducted to establish appropriate depths for the floodplain-compensation areas and to provide either

adequate distance or engineering solutions that will prevent the dewatering of wetlands (SR1/Page 13.2).

32.	There will be no stormwater discharges directly into any area mapped as part of the Outstanding Florida Water (SR1/Page 13.7).

33.	The Applicant/Developer will place stipulations in any sales or lease agreements that prohibit discharges to groundwater (SR1/Page 13.7).

34.	The Applicant/Developer will place stipulations in the sales or lease agreements that developers of individual parcels must comply with xeriscape principles and principles of the Florida Yards and Neighborhoods (FY&N) Program to the extent the latter apply to retail and office settings (SR1/Page 13.8).

35.	The Applicant/Developer will conduct such testing (geotechnical investigation) as is appropriate to support the surface water management system design and construction engineering processes. (SR1/Page 13.9).

36.	Although wetlands are proposed to be removed from the project site, substantial mitigation for those impacts will be provided that will result in an increased in total quantity of wetlands within the Hillsborough River Basin and/or enhancement/improved quality of other wetlands within the watershed (SR2/Page 10.2).

37.	The overall mitigation package to be provided will provide more than 1:1 replacement of wetland losses and will provide protection and potential restoration of additional wetland and upland acreage in the basin (SR3/Page 12.5).

38.	Mitigation will occur within the Hillsborough River Basin (SR3/Page 13.5).

39.	Conservation easement(s) will be provided for mitigation areas (SR3/Page 13.5).

40.	The developer shall submit a detailed Ecosystem Improvement Plan ("Ecosystem Plan") prior to approval of any preliminary site plan or preliminary plan that would impact any on-site wetlands. The Ecosystem Plan shall include a "net ecosystem benefit," as defined in Section 403.0752, F.S. (SR4/Page 13.2).

41.	The Ecosystem Plan shall be designed to meet the Future of the Region Strategic Regional Policy Plan, Regional Goal 4.5 and related policies (SR4/Page 13.3).

42.	Within proposed DO conditions, the amount of mitigation will exceed the amount that would be required for mitigation when the wetland losses (on site) and the gains are assessed using the Florida Unified Wetland Assessment Methodology or other methodology as agreed to by the SWFWMD(SR4/Page 13.3).

43.	The proposed mitigation will be in some combination of wetland creation, enhancement, and preservation that will provide greater relative values of function than the areas to be affected. The mitigation is proposed to enhance regional, wetland functions in a manner that will be permanent (SR4/Page 13.8).

44.	More detailed, in-depth analysis (of stormwater treatment) will be conducted when the mall layout has been determined. No treatment ponds will outfall into the OFW, so further wetland treatment will occur before water reaches the OFW (SR4/Page 13.9).

45.	The Applicant/Developer is willing to encumber the remaining wetlands (postdevelopment) with a conservation easement (SR4/Page 13.10).

Water Quality

46.	The wetlands that will be retained after the proposed development will be buffered by swales and stormwater ponds that are created for stormwater attenuation and treatment for the project (ADA/Page 14.3).

47.	The surface-water management system proposed for the site will be designed to protect surface-water quality through the use of grass-swale systems, surface-water detention ponds, and stormwater-attenuation ponds. The design will incorporate on-site detention of the first one (1) inch of runoff (ADA/Page 14.4).

48.	Construction BMPs will be used to prevent construction-related, turbidity and erosion problems (ADA/Page 14.5).

49.   The detention ponds, inflow and outflow structures will be owned and maintained by the Applicant/Developer or assignee. A regular maintenance program will be developed for the site in a form similar to the "Operating and Maintenance Instructions" (ADA/Page 19.5).

50.   All ditches and swales shall be periodically mowed and cleaned. During the mowing operation, ditches and swales shall be inspected for bare spots, damage, and erosion. Any bare spots greater than one (1) square foot in area shall be seeded or sodded to replace the grass cover. In case of erosion or damage where underlying soil is missing, the missing soil shall be replaced and the area brought back to grade, then seeded or sodded as required (ADA/Page 19.5).

51.   Inlet grates will be checked monthly for damage or blockage. Any damaged grates will be replaced or repaired. Any debris blocking full flow through the grate will be removed. Pipes and inlets will be checked yearly for damage or blockage. Any damaged pipes or inlets will be replaced or repaired. Any trash, debris, or sand deposits will be removed (ADA/Page 19.6).

52.   Each detention pond will be provided with a littoral zone. Natural vegetation that becomes established will be maintained and encouraged (SR1/Page 19.2).

53.   All vegetation that becomes established in the littoral zone will be maintained. Dredging of the littoral zone, application of herbicides and the introduction of grass carp will be prohibited. In addition, cattails, bulrushes, and other nuisance vegetation will be cut back from inlet or outfall structures to the minimum extent needed to maintain design discharges. All inflow and outflow structures will be maintained by the procedures outlined for pipes, inlets, and grates (ADA/Page 19.6).

54.   Before disturbance occurs in any area of construction, perimeter controls, sediment traps, basins, and diversions will be in place to control runoff and capture sediments. Areas in the vicinity of water bodies, wetlands, slopes, etc., will be prioritized to receive effective stabilization as quickly as possible, preferably prior to the next anticipated precipitation event and always within seven (7) days of disturbance. Graded areas that will not be the focus of ongoing construction will be mulched immediately rather than waiting until all project grading is done. Any construction roads will be stabilized to prevent off-site sedimentation and to keep sediments off of public roads and completed project roads (SR2/Pages 14.2-14.3).

Soils

55.   Spoil derived from soils unsuited for construction will be used to the extent feasible in landscape berms and similar areas (ADA/Page 15.5).

56.   Should any noticeable soil slumping or sinkhole formation become evident, the Applicant/Developer shall immediately notify the County and the SWFWMD and adopt one (1) or more of the following procedures as determined to be appropriate by the County and the SWFWMD (SR3/Page 15.1).

Floodplains

57.   In the postdevelopment situation, the floodplain limits will be contained within the stormwater management system. No proposed development will lie within the revised floodplain (SR2/Page 16.1).

58.   The pond south of the development adjacent to Cypress Creek will provide only floodplain mitigation and will not receive direct runoff from the development (ADA/Page 19.3).

Water Supply

59.   The development will commit to encourage the use of water-conserving, landscape materials and the responsible use of water, pesticides, and fertilizers by the occupants (ADA/Page 17.3).

60.   The Applicant/Developer will use the lowest quality of water available for irrigation purposes. Those sources will include nonpotable quality groundwater, stormwater, and/or reclaimed water (when available). Irrigation systems shall be designed, installed, and operated for water-use efficiency (ADA/Page 17.3).

61.   For the purpose of potable-water conservation, installation of high-efficiency (low volume), plumbing fixtures, appliances, and other water-conservation devices shall be used (ADA/Page 17.3).

62.   The above-referenced water-saving measures will be enforced through such devices as deed restrictions, property owners' associations' rules and regulations and/or building design standards (ADA/Page 17.3).

63.    The developer has no objections to a requirement that excavations for retention/detention facilities will not remove any of the confining clay unit and in no event will contact the limestone aquifer (SR1/Page 17.2).

64.    The Applicant/Developer will request a commitment for service from the public reuse system (since it has been installed adjacent to the subject property) (SR3/Page 17.1).

Wastewater Management

65.    Interim use of septic tanks may be requested although it is not expected that septic tanks will be used on site (ADA/Page 18.2).

66.    At such time as those uses (for sales offices, construction trailers and the like) are no longer needed, the "interim" septic tanks would be removed (SR1/Page 18.1).

67.    The Cypress Creek Town Center DRI project will utilize reuse water if sufficient quantities are available from Pasco County to meet the project's demands and if the water quality provided is such that it does not degrade groundwater quality (SR1/Page 18.2).

Stormwater Management

68.    There will be a floodplain mitigation pond south of the development adjacent to Cypress Creek.  That pond will provide only floodplain mitigation and will not receive direct runoff from the development (ADA/Page 19.3).

69.    The detention ponds, inflow and outflow structures will be owned and maintained by the Applicant/Developer or assignee.  A regular maintenance program will be developed for the site in a form similar to the "Operating and Maintenance Instructions" (ADA/Page 19.5).

70.    All ditches and swales shall be periodically mowed and cleaned.  During the mowing operation, ditches and swales shall be inspected for bare spots, damage, and erosion.  Any bare spots greater than one (1) square foot in area shall be seeded or sodded to replace the grass cover.  In case of erosion or damage where underlying soil is missing, the missing soil shall be replaced and the area brought back to grade then seeded or sodded as required (ADA/Page 19.5).

71.    Inlet grates will be checked monthly for damage or blockage.  Any damaged grates will be replaced or repaired.  Any debris blocking full flow through the grate will be removed (ADA/Page 19.6).

72.    Pipes and inlets will be checked yearly for damage or blockage.  Any damaged pipes or inlets will be replaced or repaired.  Any trash, debris, or sand deposits will be removed (ADA/Page 19.6).

73.    All side slopes and maintenance berms (of detention ponds) will be periodically mowed and cleaned.  During the mowing operation, the ponds will be inspected for bare spots, damage, and erosion.  Any bare spots greater than one (1) square foot in area shall be seeded or sodded to replace the grass cover.  In case of erosion or damage where underlying soil is missing, the missing soil shall be replaced and the area brought back to grade with seeding or sodding as required.  All vegetation that becomes established in the littoral zone will be maintained.  Dredging of the littoral zone, application of herbicides, and the introduction of grass carp will be prohibited.  In addition, cattails, bulrushes, and other nuisance vegetation will be cut back from inlet or outfall structures to the minimum extent needed to maintain design discharges.  All inflow and outflow structures will be maintained by the procedures outlines for pipes, inlets, and grates (ADA/Page 19.6).

74.    Each detention pond will be provided with a littoral zone.  Natural vegetation that becomes established will be maintained and encouraged (SR1/Page 19.2).

75.    The development will be designed with the most efficient method for stormwater treatment, which is the construction of wet detention/bioretention systems (SR4/Page 19.1).

Solid Waste/Hazardous Waste/Medical Waste

76.    No hazardous wastes are anticipated for this project; however, commercial and/or office tenants will be provided with information at the time of purchase or lease which identifies hazardous and/or medical materials and proper procedures for the disposal of such materials (ADA/Page 20.2).

Transportation

77.    Cypress Creek Town Center supports transit use and will work with Pasco County or other appropriate entities to make transit service available to the site at such time as service becomes available.  All

primary access points and major internal-circulation roadways will be designed and constructed to provide sufficient geometry to accommodate transit vehicles (ADA/Page 21.8).

<u>Air Quality</u>

78.    To minimize wind erosion, clearing and grubbing operations will be performed only on individual parcels of land where construction is scheduled to proceed.  Measures to be employed to minimize fugitive dust will include sodding, seeding, mulching, or planting of landscaped material in cleared and disturbed areas.   Watering procedures will be employed as necessary to minimize fugitive dust (ADA/ Page 22.1).

<u>Hurricane Preparedness</u>

79.    The Applicant/Developer will coordinate with the Pasco County Office of Emergency Management regarding incorporation of hurricane- and wind-resistant technology into the design criteria of all commercial, office and hotel facilities (ADA/Pages 23.1 and 23.2).

<u>Recreation and Open Space</u>

80.    Approximately 82.2+ acres, or more than 16 percent of the site, will be available in the form of open space and wetlands (ADA/Page 26.1).

<u>Health Care</u>

81.    At the present time, it is anticipated that the office use will not contain medical offices (SR1/Page 28.1).

<u>Energy</u>

82.    Xeriscape landscaping methods will be recommended wherever possible to reduce irrigation and energy needs by selecting and grouping plants with similar water needs that are most suitable to the climate and conditions of the area (ADA/Page 29.3).

EXHIBIT E (Revised 10/04)
CYPRESS CREEK TOWN CENTER DRI
PHASE 1 - LAND USE EQUIVALENCY MATRIX

| Change To:<br><br>Change From: | Office | Retail (northside) | Hotel (northside) | Multi-Family (northside) | Retail (southside) | Hotel (southside) | Movie Theater |
|---|---|---|---|---|---|---|---|
| Office | N/A | N/A | N/A | N/A | N/A | N/A)[3] | N/A[3] |
| Retail (northside) | 1,111 sf/ksf (1.1113)[3] | N/A | 3.29 rm/ksf (3.2926)[3] | N/A | 991 sf/ksf (0.9905)[3] | 3.12 rm/ksf (3.1193)[3] | 20.23 seat/ksf (20.2250)[3] |
| Hotel (northside) | 338 sf/rm (0.3375)[3] | 304 sf/rm (0.3037)[3] | N/A | N/A | 301 sf/rm (0.3008)[3] | 0.95 rm/rm (0.9474)[3] | 6.75 seat/rm (6.7500)[3] |
| Multi-Family (northside) | 348 sf/du (0.3481)[3] | 313 sf/du (0.3133)[3] | 1.03 rm/du (1.0315)[3] | N/A | 310 sf/du (0.3103)[3] | 0.98 rm/du (0.9772)[3] | 6.96 seat/du (6.9625)[3] |
| Retail (southside) | 1,122 sf/ksf (1.1219)[3] | 1,010 sf/ksf (1.0096)[3] | 3.32 rm/ksf (3.3240)[3] | N/A | N/A | 3.15 du/ksf (3.1491)[3] | 22.44 seat/ksf (22.4375)[3] |
| Hotel (southside) | 356 sf/rm (0.3563)[3] | 321 sf/rm (0.3206)[3] | 1.06 rm/rm (1.0556)[3] | N/A)[3] | 318 sf/rm (0.3176)[3] | N/A | 7.125 seat/rm (7.125)[3] |
| Movie Theater | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

[1]   Land use exchanges are based on net external p.m. peak hour two-way project traffic.  Use of this matrix shall be limited to the following minimums and maximums to ensure that impacts for transportation, water, wastewater, solid water, and affordable housing are not exceeded.

| Land Use | Minimum | Approved | Maximum[4] |
|---|---|---|---|
| Office | 120,000 sf | 120,000 sf | 600,000 sf |
| Retail (northside) | 250,000 sf | 600,000 sf | 1,100,000 sf |
| Hotel (northside) | 0 rooms | 150 rooms | 800 rooms |
| Multi-Family (northside) | 120 dus | 230 dus | 230 dus |
| Retail (southside) | 1,000,000 sf | 1,300,000 sf | 1,800,000 sf |
| Hotel (southside) | 0 rooms | 200 rooms | 800 rooms |
| Movie Theater | - (-) | (-) | 4,000 seats |

[2]   Example exchanges:  Add 100 Hotel rooms (northside) by reducing Retail (northside), 100 rooms $\div$ 3.2926, retail factor =30.371; reduce retail by 30,371 sf

[3]   Actual Equivalency factor for use in calculations

[4]   Maximums are intended to set the outside limit for each individual land use listed in the "Land Use" column.  Any land use mix achieved through the use of this Trade-Off matrix cannot generate impacts which exceed those generated by the land use mix approved in this Development Order.

**EXHIBIT F**

REVISED MAP H - MASTER PLAN



Legend

Wetlands

0 150' 300' 600' 900'

| CYPRESS CREEK TOWN CENTER DRI DEVELOPMENT INFORMATION | | | |
|---|---|---|---|
| DEVELOPMENT CATEGORY * | PHASE 1 2004 -2018 | PHASE 2 To be determined | TOTAL |
| NORTH PARCEL | | | |
| RETAIL CENTER | 600,000 S.F. | 0 S.F. | 600,000 S.F |
| HIGHWAY COMMERCIAL | 56,000 S.F. | 0 S.F. | 56,000 S.F. |
| OFFICE | 120,000 S.F. | 300,000 S.F | 420,000 S.F |
| HOTEL | 150 ROOMS | 150 ROOMS | 300 ROOMS |
| MULTI-FAMILY RESIDENTIAL | 230 UNITS | 400 UNITS | 630 UNITS |
| SOUTH PARCEL | | | |
| REGIONAL MALL | 1,184,925 S.F. | 215,000 S.F. | 1,399,925 S.F. |
| HOTEL | 200 ROOMS. | 200 ROOMS | 400 ROOMS |
| MOVIE THEATER (SEATS) | 2,582 | 0 | 2,582 |
| WEST PARCEL | | | |
| HIGHWAY COMMERCIAL | 40,000 S.F | 0 S.F. | 40,000 S.F. |

* Land uses may be modified in accordance with the proposed Equivalency Matrix

| NOVEMBER 2004<br>Revised<br>APRIL 2009 | **REVISED MAP H MASTER DEVELOPMENT PLAN** | **CYPRESS CREEK TOWN CENTER**<br>*Pasco County, Florida* | **WilsonMiller, Inc.**<br>Project Coordination, Planning and Transportation | **Biological Research Associates, Ltd.**<br>Environmental |
|---|---|---|---|---|

**EXHIBIT G**
TRANSPORTATION IMPACT SUMMARY
AND
PROPORTIONATE SHARE CALCULATION

| INTERSECTION IMPROVEMENT PROPORTIONATE SHARE | | | | |
|---|---|---|---|---|
| Cypress Creek Town Center DRI | | | | |
| Intersection 1 | Required Improvement | Cost 1 | % Project Traffic 2 | Proportionate Share |
| Phase 1 (2021) | | | | |
| S.R. 54/U.S. 41 | NB Right; WB Left 4 | $283,000 | 53.4 | $151,122 |
| S.R. 54/Collier Parkway | EB/WB Thru | n/a | 47.7 | n/a |
| S.R. 54/S.R. 56 | EB/WB Thru; SB 2Thru, R; NB 2L, 2Thru, R 4 | $830,000 | 100.0 | $830,000 |
| S.R. 54/C.R. 581 | EB/WB Thru; NB Thru; NB r; WB L 4 | $283,000 | 21.2 | $59,996 |
| S.R. 54/C.R. 577 | | n/a | 19.2 | n/a |
| | | | | |
| S.R. 56/Project Drive | EB/WB Thru | n/a | n/a | n/a |
| S.R. 56/I-75 | EB Left | $691,200 | 100.0 | $691,200 |
| S.R. 56/C.R. 581 | EB Right; NB Left | $175,000 | 38.6 | $67,550 |
| | | | | |
| County Line Road/Cypress Creek Run | EB Left; WB Right; SB Left | $200,000 | 19.6 | $39,200 |
| | | | | |
| C.R. 581/County Line Rd | NB/SB Thru | n/a | 27.1 | n/a |
| C.R. 581/Cross Creek | NB/SB Thru and Left | $100,000 | 6.4 | $6,400 |
| Freeway Ramps | | | | |
| I-75/S.R. 56 NB On Ramp | NB/SB Freeway Thru | n/a | n/a | n/a |
| I-75/S.R. 56 NB Off Ramp | NB/SB Freeway Thru | n/a | n/a | n/a |
| I-75/S.R. 56 SB On Ramp | NB/SB Freeway Thru; 2-Lane Ramp | $1,760,000 | 32.0 | $563,200 |
| 1-75/S.R. 56 SB Off Ramp | NB/SB Freeway Thru | n/a | n/a | n/a |
| PHASE 1 TOTAL | | $4,322,200 | | $2,408,668 |
| Does not include the previously identified improvements to the intersection of County Line Road/Livingston Road | | | | |

| Road | Segment | Exist Lanes | Length (Miles) | Improved Lanes | Cost Per Mile[2] | Peak Hour Project Traffic | Service Volume Increase[3] | % Project Traffic[4] | Improvement Cost | Proportionate Share Amount |
|------|---------|-------------|----------------|----------------|------------------|---------------------------|----------------------------|----------------------|------------------|----------------------------|
| | ROADWAY IMPROVEMENT PROPORTIONATE SHARE Cypress Creek Town Center DRI | | | | | | | | | |
| S.R. 54 | US 41 to Collier Parkway - EB | 4 LD | 1.536 | 6 LD | 2,201,931[5] | 221 | 930 | 0.2376 | 3,382,166 | 803,603 |
| S.R. 54 | US 41 to Collier Parkway - WB | 4 LD | 1.536 | 6 LD | 2,201,931[5] | 253 | 930 | 0.2720 | 3,382,166 | 919,949 |
| S.R. 54 | Collier Parkway to Livingston - EB | 4 LD | 0.618 | 6 LD | 2,201,931[5] | 411 | 930 | 0.4419 | 1,360,793 | 601,335 |
| S.R. 54 | Collier Parkway to Livingston -WB | 4 LD | 0.618 | 6 LD | 2,201,931[5] | 470 | 930 | 0.5054 | 1,360,793 | 687,745 |
| S.R. 54 | Livingston to Cypress Creek Run -EB | 4 LD | 1.222 | 6 LD | 2,201,931[5] | 559 | 930 | 0.6011 | 2,690,760 | 1,617,416 |
| S.R. 54 | Livingston to Cypress Creek Run -WB | 4 LD | 1.222 | 6 LD | 2,201,931[5] | 488 | 930 | 0.5247 | 2,690,760 | 1,411,842 |
| S.R. 54 | Cypress Creek Road to S.R. 56 - EB | 4 LD | 0.485 | 6 LD | 2,201,931[5] | 559 | 930 | 0.6011 | 1,067,937 | 641,937 |
| S.R. 54 | Cypress Creek Road to S.R. 56 - WB | 4 LD | 0.485 | 6 LD | 2,201,931[5] | 716 | 930 | 0.7699 | 1,067,937 | 822,204 |
| C.R. 54 | S.R. 56 to Site - EB | 2 L | 0.640 | 6 LD | 3,333,096 | 199 | 1,930 | 0.1031 | 2,133,181 | 219,931 |
| C.R. 54 | S.R. 56 to Site - WB | 2 L | 0.640 | 6 LD | 3,333,096 | 174 | 1,930 | 0.0902 | 2,133,181 | 192,413 |
| C.R. 54 | Site to Old Pasco - EB | 2 L | 2.410 | 4 LD | 2,194,062 | 295 | 1,000 | 0.2950 | 5,287,689 | 1,559,868 |
| C.R. 54 | Site to Old Pasco - WB | 2 L | 2.410 | 4 LD | 2,194,062 | 258 | 1,000 | 0.2580 | 5,287,689 | 1,364,224 |
| C.R. 54 | I-75 to C.R. 581 - EB | 4 LD | 0.309 | 6 LD | 2,083,716 | 291 | 870 | 0.3345 | 643,868 | 215,374 |
| C.R. 54 | I-75 to C.R. 581 - WB | 4 LD | 0.309 | 6 LD | 2,083,716 | 254 | 870 | 0.2920 | 643,868 | 188,010 |
| S.R. 56 | S.R. 54 to Site - EB | 4 LD | 0.250 | 6 LD | 1,873,128 | 370 | 930 | 0.3978 | 468,282 | 186,283 |
| S.R. 56 | S.R. 54 to Site - WB | 4 LD | 0.250 | 6 LD | 1,873,128 | 323 | 930 | 0.3473 | 468,282 | 162,634 |
| S.R. 56 | Site to I-75 - EB | 4 LD | 0.636 | 6 LD | 1,873,128 | 1,044 | 930 | 1.0000 | 1,191,309 | 1,191,309 |
| S.R. 56 | Site to I-75 - WB | 4 LD | 0.636 | 6 LD | 1,873,128 | 912 | 930 | 0.9806 | 1,191,309 | 1,168,198 |
| C.R. 581 | County Line Rd to Cross Creek Blvd. - NB | 4 LD | 1.894 | 6 LD | 1,873,128[5] | 186 | 870 | 0.2138 | 3,547,704 | 758,499 |
| C.R. 581 | County Line Rd to Cross Creek Blvd. - SB | 4 LD | 1.894 | 6 LD | 1,873,128[5] | 213 | 870 | 0.2448 | 3,547,704 | 868,478 |
| I-75 | City Limits to I-275 - NB | 4 LX | 1.520 | 6 LX | 2,197,828 | 304 | 1,570 | 0.1936 | 3,340,699 | 646,759 |
| I-75 | City Limits to I-275 - SB | 4 LX | 1.520 | 6 LX | 2,197,828 | 349 | 1,570 | 0.2223 | 3,340,699 | 742,637 |
| I-75 | I-275 to S.R. 56 - NB | 4 LX | 1.700 | 6 LX | 2,378,203 | 373 | 1,570 | 0.2376 | 4,042,945 | 960,604 |
| I-75 | I-275 to S.R. 56 - SB | 4 LX | 1.700 | 6 LX | 2,378,203 | 427 | 1,570 | 0.2720 | 4,042,945 | 1,099,681 |
| I-75 | S.R. 56 to S.R. 54 - NB | 4 LX | 3.410 | 6 LX | 1,446,70 | 264 | 1,570 | 0.1682 | 4,933,250 | 829,773 |
| I-75 | S.R. 56 to S.R. 54 - SB | 4 LX | 3.410 | 6 LX | 1,446,701 | 230 | 1,570 | 0.1465 | 4,933,250 | 722,721 |
| | | | | | | | | | | |
| | **TOTAL PHASE 1** | | | | | | | | 68,181,169 | 20,583,426 |

[2] See Per Mile Roadway Improvement Costs Worksheet Appended
[4] Project Traffic Divided By Service Volume Increase
[3] Future Service Volume Less Existing Service Volume
[5] No Right-of-Way Required

**EXHIBIT I**

**CYPRESS CREEK OFW BOUNDARY MAP**



Cypress Creek OFW Boundary Map

**EXHIBIT J**

**WETLANDS BOUNDARY MAP**



Outparcel

Wetland 1

Wetland 2

Approximate Property Boundary
JD Wetlands

Sec. 27 & 34 Twp. 26S  Rng 19E

0      700
Feet

1 inch = 697 feet



| Preparation Date: | Revision Date: | Project Number: |
| 17 March, 2004 | 8 April 2004 | 7724-003-BPI |
| Project Manager: | GIS Operator: | GIS QA/ QC: |
| JJB | LBS | |
| ArcMap Name: | | Plot File: |
| jd_aerial_11x17.mxd | jd_aerial_11x17.pdf | |

*Cypress Creek Town Center*
*Pasco County, Florida*
*JD Wetlands*

**Biological Research Associates**
3910 US Highway 301N
Suite 180
Tampa, Florida 33619
813-664-4500 FAX: 813-664-0440
www.biologicalresearch.com

**Exhibit B**



*S.R. 56 PIPELINE IMPROVEMENT*

*S.R. 54 PIPELINE IMPROVEMENT*

*C.R. 54*

APPROXIMATELY 1,430 FT *

*S.R. 56*

APPROXIMATELY 1,200 FT

*COLLIER PARKWAY*

*EXISTING 6 LANES END*

*S.R. 54*

*CR 54 EXTENSION SEGMENT #1*

*CR 54 EXTENSION SEGMENT #2*

*S.R. 54 BRIDGE*

APPROXIMATELY 1,200 FT

*BRIDGE*

*I-75*

*BEGINNING OF BRIDGE APPROACH*

*U.S. 41*

*LIVINGSTON ROAD*

*CR 54 EXTENSION SEGMENT #3*

*CR 54 EXTENSION*

*COUNTY LINE ROAD*

THE SR PIPELINE IMPROVEMENTS
THE CR 54 EXTENSION PIPELINE IMPROVEMENT
SITE-RELATED IMPROVEMENTS
* EXISTING FOUR-LANE DIVIDED SECTION WILL BE EXTENDED NORTH FROM SR 56 THROUGHT THIS INTERSECTION AND A NEW TRANSITION WILL BE CONSTRUCTED FROM THE FOUR-LANE DIVIDED SECTION TO THE TWO-UNDIVIDED SECTIONS

**WilsonMiller**
WilsonMiller, Inc.   FL 1-4 # LC-C000038
Registration #6   Contents of Authorization #43
Planners • Engineers • Ecologists • Surveyors • Landscape Architects • Transportation Consultants
WilsonMiller, Inc.
Naples • Fort Myers • Sarasota • Bradenton • Tampa
1101 Channelside Drive Suite 400N  Tampa, Florida 33602 • Phone 813.223.9500  Fax 813.223.0009   Web-Site www.wilsonmiller.com

| CLIENT: | | DATE: | TITLE: | **MAP 3 ROADWAY LINK IMPROVEMENTS** | |
|---|---|---|---|---|---|
| | | HORIZONTAL SCALE: | | | |
| PROJECT: | | VERTICAL SCALE: | | | INDEX NUMBER: |
| | | SEC:   TWP   RGE: | CROSS REFERENCE FILE NO: | PROJECT NUMBER: | SHEET NUMBER:   OF |